**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case Number 1:21-cr-00123-PLF** |
| **VITALI GOSSJANKOWSKI,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' RESPONSE IN OPPOSITION**
**TO DEFENDANT VITALI GOSSJANKOWSKI'S**
**MOTION TO SUPPRESS STATEMENTS**

The United States of America respectfully submits that defendant Vitali GossJankowski's Motion To Suppress Statements, ECF 66, should be denied. Because the motion protests generally and inaccurately that the defendant's pre-arrest and non-custodial statements to law enforcement were involuntary, and also claims with an additional lack of accuracy or explanation that later statements in a custodial setting were involuntary and somehow violated *Miranda*[1] requirements, there is no basis for suppression. As explained below, it was the defendant who initiated contact with police officers because he wanted to speak with them; when the defendant was later in custody, he received proper and sufficient *Miranda* warnings, voluntarily waived his rights and voluntarily spoke with detectives and the FBI. Accordingly, grounds for relief do not exist.

FACTUAL AND PROCEDURAL BACKGOUND

This case arises from the defendant's participation in the January 6, 2021 attack on the United States Capitol. To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 1-1:1-2; *see also Trump v. Thompson*, 20 F.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

4th 10, 17-18 (D.C. Cir. 2021).  That attack included the trespasses of a riotous and violent mob that breached barriers and assaulted police officers in an effort to invade the U.S. Capitol and obstruct the certification of the 2020 presidential election.  GossJankowski was a part of that mob.

*GossJankowski's Role In The Attack On The Capitol*

Once the mob overran police lines defending the Capitol's West Front, officers regrouped on the Capitol's lower west terrace and elsewhere.  A substantial number of officers assembled behind double doors accessed through the inaugural archway.[2]  GossJankowski was among the earliest rioters to enter the archway.  He observed efforts to break the glass in the double doors separating the officers from the mob and bearing signs as shown below restricting entry.[3]

---

[2] The archway is the location typically used on inauguration day for the President's entrance onto the inaugural stage.  The rounded arch is a feature constructed for the inauguration and fixed to a normal set of doors.  To access the archway on January 6, at a minimum, rioters needed to walk, climb, or scale up to the Lower West Terrace landing and climb a set of stairs.  The archway and doorway are narrow and no more than 10 feet across.  The archway leads to a narrow hallway and a set of double doors.

[3] Figure 1A shows a GossJankowski beneath a red arrow in a screenshot from another defendant's cellular phone recording at the 59 second mark.  Figure 1B is a screenshot from the same recording at the 60 second mark showing the signs more clearly with the defendant out of the frame.



*Figure 1A*



*Figure 1B*

GossJankowski arrived inside of the archway at approximately 2:41 p.m.  Between 2:41 p.m. and 3:12 p.m., he repeatedly entered and exited the archway.  While inside of the archway at various times, GossJankowski breached the double doors, spit at officers, grabbed an officer's riot shield, passed stolen riot shields to rioters outside of the archway, obtained a stun gun from another rioter, activated and brandished that weapon towards officers, and joined group pushes in an effort to breach the police line inside of the archway.  Figures 2A and 2B show GossJankowski possessing and brandishing the stun gun.



*Figure 2A*



*Figure 2B*

By approximately 3:18 p.m., police officers had pushed the mob out of the archway.

GossJankowski remained nearby on the lower west terrace with a view of the arch and the line of

5

officers beneath it.  At approximately this time, members of the mob dragged two police officers into the crowd, including an officer identified by the initials M.M.[4]  With the stun gun in hand, GossJankowski made his way through the crowd to officer M.M.  Figure 3A below shows the officer's helmet under a blue arrow as he is assaulted and engulfed by the mob while GossJankowski, above a red arrow, approaches.  Figure 3B shows GossJankowski, under a red arrow, extending the stun gun towards the besieged officer whose helmet is partially visible above a blue arrow.



*Figure 3A*

---

[4] *See* ECF 41:2.



*Figure 3B*

A few members of the crowd were able to assist the officer and remove him from his assailants.  GossJankowski remained in the area of the assault observing the crowd and the line of officers under the archway.  After attacks against police officers involving projectiles and deployment of an unknown gas, a camera recorded GossJankowski applauding conventionally and in American Sign Language (ASL).

*GossJankowski's Outreach To Law Enforcement On January 14*

On or about January 10, 2021, the Federal Bureau of Investigation (FBI) issued "Be On the Lookout" posters for the defendant and others.  On January 14, 2021, after learning of the posters, the defendant contacted police.  As a result of this outreach from GossJankowski, Metropolitan Police Department (MPD) officers responded to an area near GossJankowski's home.  Because GossJankowski is deaf, the responding MPD officers included an officer from the MPD's Deaf and Hard of Hearing Unit (DHHU) whose first language is ASL.  The claim that the defendant was questioned on January 14, 2021 "in the absence of any sign language interpreter",

*see* ECF 66:2, is inaccurate.[5]

The responding officers respected GossJankowski's preference to meet with them outside of and a short distance from his residence.  Upon learning that GossJankowski wanted to contact officers because authorities sought him in connection with the January 6 attack, the MPD requested participation from the FBI.  While MPD and the FBI communicated with GossJankowski on this occasion, he was not detained or handcuffed, he was free to leave, and he was not charged or under arrest.  With the assistance of the DHHU officer, GossJankowski provided routine identification and contact information, advised that he attended Gallaudet University, and made the following statements once the FBI arrived:

> GOSSJANKOWSKI stated that someone had called him to inform him that they had seen him on FBI wanted posters. GOSSJANKOWSKI said he never went inside of the building and that he went to the U.S. Capitol out of curiosity. GOSSJANKOWSKI admitted to possessing a Taser, but said he found it on the ground when he was walking up towards the U.S. Capitol. GOSSJANKOWSKI stated that he left after he could not gain entrance to the U.S. Capitol and that he discarded the Taser in a trashcan outside the U.S. Capitol building. GOSSJANKOWSKI stated that he had gone to the U.S. Capitol with a friend of his from Frederick, Maryland.

ECF 1-1:4.  GossJankowski agreed to have his picture taken, as shown below.

---

[5] In support of his inaccurate claim, the defendant cites ECF 1-1 at 4-5; however, the officer mentioned by name in ECF 1-1 at page 4 is the MPD officer from the DHHU who communicated in ASL.



*Figure 4*

He also agreed to participate in a later and more detailed discussion with the FBI.    His

discussion about January 6, 2021 lasted approximately 15-20 minutes. After January 14,

GossJankowski kept in contact with the FBI through text messages.

*GossJankowski's January 17, 2021 Interview*

On January 17, 2021, GossJankowski participated in an additional non-custodial interview.

The same FBI Special Agent and FBI Task Force Officer (collectively, the FBI) who responded

to GossJankowski on January 14 returned to his residence and questioned him there with assistance

from three ASL interpreters.  In this recorded interview, and through the assistance of the ASL

interpreters, GossJankowski was told that there were no charges against him, that he was not under

arrest, and that he would not be arrested on January 17, 2021. He was told that the interview sought

information about January 6.[6] [Exhibit 30.mp4 at 2:24-3:42] The interview occurred in what

---

[6] Pursuant to an earlier Memorandum Order from this Court, ECF 58, the United States produced
exhibits to this Court and again to the defense that included Exhibit 30.mp4, recording
GossJankowski's January 17, 2021 interview, and Exhibit 31.mp4, recording his custodial post-
arrest interview on January 18, 2021.  References in brackets throughout this response refer to
times in a format for hours:minutes:seconds when particular statements occur.

appears to be GossJankowski's kitchen or dining room.  GossJankowski had his cellular phone throughout the interview.  He was advised that he could decline to answer questions that made him uncomfortable, and he was told that agents preferred for him to choose not to answer any question rather than lie. GossJankowski responded that he understood. [*Id*. at 3:42-4:27]  At various times throughout this interview, GossJankowski signed at length, providing statements without prompting.

GossJankowski explained that he left the Ellipse where there was a speech and marched up the street to the United States Capitol. [*Id*. at 6:14-7:33] He estimated that he arrived at the Capitol around 2:00 or 2:30 p.m.  He stated that he went up steps to a platform before there were a lot of other people around, but then the police started pushing people back and people flooded to get through to the front.  He went with a friend; GossJankowski had previously texted the FBI to provide the friend's name. [*Id*. at 7:36-48] His friend left the Capitol after pepper spray from the police got in his eyes.  [*Id*. at 7:48-8:01]

GossJankowski described how people were trying to break in through double doors at the front of the Capitol and police were trying to create a barricade and block people from getting in. He stated that someone took a police shield which he had touched without really meaning to, and the shield had been passed back through the crowd.  He said that "a black officer" had been carried out by the crowd and that people were punching him; GossJankowski denied touching the officer. [*Id*. at 8:38-9:33]

According to GossJankowski, he saw a Taser on the ground and he wanted to grab hold of it.  Other people were pushing him.  He showed texts to people who tried to take the Taser from him.  People broke through the doors and were pushing and shoving. Officers started shooting pepper spray all through the crowd.   Other protesters were trying to hit the police and

GossJankowski was stuck in the middle and could not move.  GossJankowski eventually got out and walked around.  [*Id*. at 9:40-11:30]

The FBI questioned GossJankowski about differences between his account and video recordings from January 6 and pointed out that on video, someone handed the Taser to the GossJankowski.  [*Id*. at 22:54-23:24].  GossJankowski insisted that he found the weapon "on the floor" and would not change his account. [23:44-27:33], even after the FBI reviewed video with him that showed someone handing him the weapon.  [*Id*. at 27:49-31:58]  In response to GossJankowski's denials, the Task Force officer responded simply, "Okay.  Alright.  I'm not going to harp on that." [*Id*. at 31:58-59]  GossJankowski denied "tasing" anyone.  [*Id*. at 33:20-25]

GossJankowski described what he saw happen to the "officer with the tattoos on his neck." He denied using the stun gun against the officer but stated that he touched the officer's helmet "to help him." [*Id*. 34:15-35:02]  When asked why he approached an officer that the crowd was trying to hurt, GossJankowski replied, "to film it."  [36-:27]  He added that he did film but did not have video [*Id.* at 37:13-15]; his phone died and he lost a lot of the video he recorded. [*Id*. at 37:18-22] The officer with the tattoo on his neck was eventually able to escape. [*Id*. at 40:11; 41:44-45] GossJankowski said he deleted pictures he had taken of the Taser.  [*Id*. at 43:46-44:14]

The defendant explained that in addition to the officer with tattoos on his neck, "a black officer" had been assaulted.  [*Id*. at 44:51-46:00]  GossJankowski claimed that he could not get close to this officer because too many people were beating up on him, and then Trump supporters helped the officer get to safety.  [*Id*. at 46:19-47:00]

The FBI gave GossJankowski an opportunity to ask them questions.  He said he was not sure what his questions were, and suggested he could text the FBI later with any questions.  [*Id*. at 54:48-55:50]  Then GossJankowski asked what would happen after the interview.  He asked what

the difference was between people who were at the Capitol and got arrested and those who did not. GossJankowski said he understood the FBI's answer to his question, and in response to an additional question, denied moving or going through any barriers at the Capitol. [*Id*. at 56:07-58:44]  He volunteered that he did not see any signs telling him he could not walk right up to the United States Capitol.  One final time, he reiterated that he found the Taser on the ground, outside the archway as he was walking up the steps. [1:00:35-1:01:10].   GossJankowski said it was fine with him if the FBI spoke with his roommates [1:06:40], and he texted a roommate in his apartment so the FBI could speak with him.  [1:07:05].  The entire interview, including conversation about GossJankowski's roommates and topics that did not include January 6, lasted for an hour and seven minutes. GossJankowski did not ask at any point to end the interview.

*GossJankowski's Custodial Interview On January 18, 2021*

On January 18, 2021, Magistrate Judge Zia M. Faruqui issued a warrant for GossJankowski's arrest based on a complaint charging him with entering and remaining in restricted grounds without lawful authority violation while using and carrying a dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); engaging in disorderly or disruptive conduct in or within such proximity to any restricted building or grounds, with intent to impede or disrupt the orderly conduct of Government business or official functions, when or so that such conduct in fact impeded or disrupted the orderly conduct of Government business or official functions, and all while using and carrying a dangerous weapon in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); and with engaging in disorderly or disruptive conduct at any place in the grounds or in any of the Capitol Buildings with intent to impede, disrupt or disturb the orderly conduct of a session of Congress or either House of Congress, in violation of 40 U.S.C. §

5104(e)(2)(D). ECF 1. Magistrate Judge G. Michael Harvey also issued a warrant to search GossJankowski's home and devices.

The FBI arrested GossJankowski later that that day and transported him to a holding cell. Before any attempt to question GossJankowski [Exhibit 31.mp4 at 1:03:46-1:05:50], an FBI agent conferred with an ASL interpreter about placement of a desk and seating to ensure optimal ASL interpretation. The FBI agent also explained seating arrangements, camera locations, and arrangements for ASL interpretation to MPD detectives participating in the interview. [*Id.* at 1:06:02-1:07:17].

Before questioning began, an MPD detective identified himself and his colleague and thanked GossJankowski for his willingness to speak with law enforcement. [*Id.* at 1:16:29-36] The detective explained that he had questions about different events GossJankowski may have seen in the archway on January 6. [*Id* at1:16:39-45]. In response to this information, GossJankowski indicated a willingness to speak. [*Id.* at 1:16:52]. The detective invited GossJankowski to stop and ask questions if he had any. [*Id.* at 1:16:59] As part of his preliminary statements to GossJankowski, the detective encouraged him to respond to questions truthfully, and explained he did not expect the defendant to answer about anything he did not know. [*Id.* at 1:16:55 1:17:53] The detective also explained that because GossJankowski was under arrest, the FBI agent was going to advise GossJankowski of warnings concerning his rights before any questioning started. [*Id.* at1:18:02-23] The detective also stated that the FBI agent and interpreters would make sure he understood his rights before any discussion began [*Id.* at 1:18:23-30].

The FBI agent then explained that GossJankowski's rights would be read to him and then reviewed line by line. The agent used a written form containing printed *Miranda* warnings which he placed in front of GossJankowski before those warnings were read. [*Id.* at 1:18:32-50]

GossJankowski read the form on his own and then looked up at one of the three ASL interpreters and asked that since he did not have a lawyer, would he be getting a public attorney [*Id*. at 1:19:03-18].  Through the interpreter, the detective responded that GossJankowski would not be getting appointed counsel for the interview, explaining that the *Miranda* form was so that he could speak at that moment, but he did not have to do so and he could speak with police with a lawyer present at a later time.  [*Id*. at 1:19:19-34]  GossJankowski added that he did not want the ASL interpreter to translate the contents of the form which he preferred to read on his own; however, the FBI agent explained that he was required to read the form with ASL interpretation as part of the FBI's protocol.  [*Id*. at 1:19:55-1:20:07].  GossJankowski consented to that protocol, and the *Miranda* form was then passed to an interpreter who translated its contents into ASL. [*Id*. at 1:20:09-33]  As she did so, another ASL interpreter repeated out loud the rights that were being signed to GossJankowski. [*Id.* at 1:20:13-1:21:35].

Once the contents of the form were translated for GossJankowski, he expressed his agreement to speak with law enforcement.  The MPD detective sought explicit confirmation that GossJankowski agreed to answer questions without an attorney present; through the interpreters, GossJankowski provided that confirmation.  [*Id*. at 1:21:36-44]  The FBI agent then reviewed the form with GossJankowski as the agent completed spaces on the form with information including the date, time, and location of the questioning.[7] [*Id*. at 1:22:20-1:23:05].  GossJankowski initialed each line on the form that listed individual *Miranda* warnings. [*Id*. at1:23:08-56].  The FBI agent again reviewed out loud with ASL interpretation the portion of the form stating that

---

[7] The agent recited the details he wrote on the form and the ASL interpreters signed them to the defendant.  Additionally, before writing this information, the agent showed GossJankowski the date and time appearing on his wristwatch. [*Id*. at 1:22:35]

GossJankowski was willing to speak without an attorney present.  GossJankowski then signed the form followed by those signing as witnesses. [*Id*. at 1:23:02-25] A copy of the signed form is attached.

From the time GossJankowski signed the *Miranda* waiver until the conclusion of questioning, one hour, eleven minutes and twelve seconds elapsed.[8]  During this session, the same FBI agent from the two previous encounters remained in the interview room but did not participate in questioning.  Two MPD detectives conducted this interview with assistance from three ASL interpreters.  Once again, the tone of the interview was cordial and professional.  All participants appeared calm.  Throughout the session, the MPD detective taking the lead in questioning thanked GossJankowski for his time and cooperation. [*Id*., *e.g.*, at 1:33:54; 1:45:30; 2:23:39; 2:29:36; 2:31:20-25; 2:32:16]  About 16 minutes before the interview ended, and without prompting from the defendant, the FBI agent provided GossJankowski with a bottle of water. [*Id*. at 2:16:12]

Questions during this interview focused on the assault of the officer GossJankowski described as having tattoos on his neck, who was not the officer GossJankowski is charged with assaulting.  Once again, GossJankowski provided narrative responses to questions. He cooperated with officers by listing his social media accounts [*id*. at 2:22:49-2:23:39] and by offering to look for information about another person with him on January 6. [*Id*. at 2:29:31-2:30:05]  When questioning turned to GossJankowski's acquisition of the stun gun, once again, GossJankowski refused to change his account about finding the weapon on the ground, even when a detective politely explained that recorded evidence refuted GossJankowski's statements. [*Id*. at 2:01:31-

---

[8] Detectives collected routine biographical information after GossJankowski signed the waiver. If this collection is excluded, questioning by detectives lasted for an hour, six minutes and fifty seconds.

2:02:10] At the end of the interview, the detectives thanked GossJankowski again and as they left, they fist-bumped with GossJankowski. [*Id*. at 2:32:18-52; 2:35:52]

In the aftermath of the interview, which was also recorded, the FBI explained when GossJankowski would appear in court and informed him how he could arrange for the return of his seized phone.  The FBI also made a point of explaining that since GossJankowski would be held overnight, arrangements had been made to house him in a detention facility staffed with ASL interpreters.  [*Id*. at 2:37:49-2:40:34]

GossJankowski is now charged in a Superseding Indictment.  ECF 41. It accuses him of committing Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Obstruction of Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) & (b)(1)(A); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) & (b)(1)(A); and Disorderly Conduct in the Capitol Grounds or Building, in violation of 40 U.S.C. § 5104(e)(2)(D).

GossJankowski now demands suppression of his statements to law enforcement.  ECF 66. As explained below, his motion lacks merit and should be denied.

## LEGAL ANALYSIS

According to the defendant, his statements occurred in violation of *Miranda*, requiring suppression of all of his statements to law enforcement.  He further contends that any of his statements to law enforcement in January, 2021 were involuntary.  Both of these assertions are meritless.

I.  GossJankowski's Pre-Arrest Statements To Law Enforcement Did Not Require *Miranda* Warnings Because GossJankowski Was Not In Custody

The requirement for *Miranda* warnings applies only to custodial interrogations.  *Id*. at 444; *United States v. Cooper*, 949 F.3d 744, 748 (D.C. Cir. 2020)(obligation to advise a suspect of *Miranda* rights attaches only when restrictions on that person's freedom are sufficient to place him in custody); *United States v. Hitelsberger*, 991 F.Supp.2d 130, 137 (D.D.C. 2014)(police interview of those not under restraint would not fall under *Miranda*'s purview); *United States v. Suchit*, 480 F.Supp.2d 39, 53 (D.D.C. 2007); *United States v. Goldberger*, 837 F.Supp. 447, 452 (D.D.C. 1993)(where defendant was not in custody, "*Miranda* does not govern").  Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* at 444. As the Supreme Court expressed the standard more recently, all circumstances surrounding an interrogation must be examined to determine if a person is in custody for *Miranda* purposes, but the ultimate inquiry is whether there was a formal arrest or a restraint on movement to a degree consistent with a formal arrest.  *California v. Beheler*, 463 U.S. 1121, 1123 (1983); *see also Berkemer v. McCarty*, 468 U.S. 420, 440, 442 (1984) (referring to the functional equivalent of formal arrest).

When assessing whether a person is in custody, the relevant inquiry depends on the objective circumstances of the interrogation and not on the subjective views of any law enforcement officer or the person being questioned.  *Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam).  It is the defendant who bears the burden of proving custody by a preponderance of the evidence. *United States v. Petersen*, 506 F.Supp.2d 21, 23 (D.D.C. 2007); *Suchit*, 480 F.Supp.2d at 53; *see also United States v. Woodsen*, 30 F.4th 1295, 1302 (11th Cir. 2022)(burdens of production and persuasion generally rest on movant in suppression hearing so a

defendant must show a confession was obtained during custodial interrogation); *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989); *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir. 1986).  GossJankowski cannot meet this burden.

A.  The Defendant Was Never In Custody On January 14, 2021

"Freedom to depart ends the inquiry—no *Miranda* warnings are required."  *Woodsen*, 30 F.4th at 1303.  In this case, the defendant completely fails to meet his burden of production or persuasion and references no evidence that statements made on January 14 occurred while he was in custody.  Since GossJankowski's motion proffers no evidence to support a claim that he was in custody on January 14, the demand to suppress the January 14 statements merits neither a hearing nor relief.

Moreover, the circumstances of the January 14 encounter are wholly inconsistent with any claim that the defendant was in custody.  First, the defendant initiated contact with officers and the FBI by calling them; law enforcement simply responded to his request.[9]  Second, it was the defendant who chose the location of his January 14 meeting with law enforcement, selecting a public street in his own neighborhood near his home.  GossJankowski approached officers once they arrived.  He was not restrained, placed in handcuffs, or confronted with weapons, and he was not told that he was not free to leave or to end any conversation with the officers he summoned.  No warrant for his arrest had been issued, and law enforcement had no reason to restrain him or take him into custody; no one suggested that they would.

---

[9] The defendant's initiation of any questioning also removes the January 14 encounter with police from the scope of *Miranda* and refutes any claim that suppression is warranted.

GossJankowski was cooperative with law enforcement and provided his contact and identification information.[10] He explained that after learning of the "Be On The Lookout" poster, he wanted "to turn himself in." The MPD assisted GossJankowski's ability to communicate by involving a DHHU officer proficient in ASL in the response to his call. With that assistance, GossJankowski provided a largely mitigating statement about his presence at the Capitol on January 6. He permitted law enforcement to take his photograph.  He then parted company with officers and the FBI.  No reasonable and objective person could conclude from this encounter that its circumstances were custodial, or even that they involved interrogation.  In fact, the defendant was not in custody.  Accordingly, *Miranda* protections were not required on January 14 and none of its requirements were violated.  Thus, no basis for suppression exists.

B.  The Defendant Was Never In Custody On January 17, 2021

GossJankowski agreed to meet again in his home on January 17, 2021 with the same FBI agent and FBI Task Force officer who questioned him on January 14 and then left him free to go about his business.  For this second meeting, the FBI brought three ASL interpreters; no other officers participated.[11]  All law enforcement personnel were dressed casually and did not display,

---

[10] *Miranda* does not apply to routine booking and pedigree information.  *E.g.*, *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990).

[11] To say, as the motion does, ECF 66:2, that five officers "surrounded" and "interrogated" GossJankowski in his home is misleading and inaccurate. Three of the individuals present were ASL interpreters.  The recording of the interview makes clear that the three interpreters, who were acting as no more than "language conduits" for the defendant, positioned themselves to most effectively communicate in ASL without objection or apparent discomfort on GossJankowski's part.  *See also United States v. Alvarez*, 755 F.830, 860 (11th Cir. 1985)(adopting view of interpreter as a "language conduit," and quoting *United States v. Da Silva*, 725 F.2d 828, 832 (2d Cir. 1983)).  The recording of the interview provides no example of any interpreter confronting GossJankowski or generating questions other than to clarify translation.

let alone use, handcuffs or weapons.  The meeting, which occurred around a kitchen or dining room table, was recorded, lasted slightly more than an hour, and had a conversational tone.  The FBI was explicit that the defendant did not have to answer questions, he was free to leave, and he was not going to be taken into custody that day.  His movements were in no way restricted.

Once again, the defense fails to carry its burden of showing that GossJankowski was in custody for this meeting.  "When an interview takes place in a suspect's home, that circumstance usually weighs against finding the kind of custodial situation that merits a *Miranda* warning." *United States v. Cooper*, 949 F.3d 744, 748 (D.C. Cir. 2020) (internal citations omitted). If anything, the circumstances of the January 17 interview were even further from custody than the circumstances in *Cooper*, where agents accompanied Cooper to and from her home while she took her daughter to school before resuming questioning.  As in *Cooper*, however, GossJankowski simply was not in custody in his own home any more than he had been outside of his residence when speaking with officers on January 14.  Once again, the FBI and interpreters left without arresting or detaining GossJankowski. Because the defense fails to show custody, once more *Miranda* warnings were unnecessary and suppression is unwarranted.[12]

---

[12] *Compare United States v. Calloway*, 298 F.Supp.2d 48-49 (D.D.C. 2003), where officers executing a search warrant breached Calloway's front door with force, kicked in his bedroom door, brandished weapons, detained Calloway for approximately 10 minutes, placed him in flex cuffs, deployed officers throughout his home, and left Calloway feeling at the mercy of officers and not free to leave.  Nevertheless, Judge Leon determined that Calloway was not in custody for *Miranda* purposes when questioned during the search. In contrast, GossJankowski's home was not breached or entered with force, he was never detained, the FBI never brandished weapons and never placed him in flex cuffs.  He never came close to experiencing the level of force that confronted Calloway, and never approached the functional equivalent of arrest that would amount to custody under *Miranda*.

The defense's attempt to rely on *Orozco v. Texas*, 394 U.S. 324 (1969), ECF 66:3, is misplaced and fails to compel suppression of evidence.  In *Orozco*, four police officers entered Orozco's room in a boarding house while he slept and questioned him; however, at the time of that questioning, Orozco was under arrest and an officer testified that he was not free to leave.  *Id.* at 326-27.  The Supreme Court found that because Orozco was asked incriminating questions when he was under arrest and not free to leave, the officer's failure to follow *Miranda* warranted suppression.  GossJankowski, however, was not under arrest and was free to leave.  The facts of *Orozco* are irrelevant in his case.   As a matter of fact and law, there are no grounds supporting any finding that GossJankowski was in custody, and his demand for suppression of statements in his home must accordingly fail.

II.  The Defendant's Pre-Arrest Statements Were Voluntary

The Due Process Clause precludes admission of statements that are not voluntary.  *E.g., United States v. Reed*, 522 F.3d 354, 358-59 (D.C. Cir. 2008) (internal citation omitted).  Coercive police activity is a necessary predicate, however, to a finding that a statement is not voluntary within the meaning of the Due Process Clause.  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  The determinative factor for evaluating the voluntariness of a statement is whether the defendant's will was overborne and his capacity for self-determination critically impaired as a result of law enforcement conduct.  *United States v. Hallford*, 816 F.3d 850, 857 (D.C. Cir. 2016) (quoting *Schneckloth v. Bustamente*, 412 U.S. 218, 225-26 (1973)).   A court's voluntariness inquiry concerns the totality of the circumstances that produced the defendant's statements, and includes specifics such as the defendant's age, education, the length of any detention, whether the defendant was advised of his rights, and the nature of the questioning.  *United States v. Avitan*, 349 F.Supp.3d 23, 31 (D.D.C. 2018).  Normally, egregious facts are necessary to establish that statements made

during questioning are involuntary. *United States v. Hallford,* 816 F.3d at 853. No such egregious facts existed in connection with any of GossJankowski's pre-arrest (or for that matter, his post-arrest) statements.

A. The January 14 Statements Were Voluntary

Most of the details refuting any claim of custody on this date also demonstrate that GossJankowski's statements were voluntary. Most notably, GossJankowski initiated contact with law enforcement and requested to speak with police, even stating that he wanted to "turn himself in." Law enforcement simply acceded to his request. *See United States v. Avitan*, 349 F.Supp.3d 23, 32 (D.D.C. 2018) (defendant's role in initiating and continuing communication with agents showed voluntary nature of his statements). Unlike Avitan, GossJankowski was not charged when he initiated contact with agents. He was, however, aware that the FBI was looking for him, and certainly aware that other participants in the breach of the U.S. Capitol had been arrested. When he chose to contact law enforcement, GossJankowski was not without knowledge that law enforcement sought accountability for the Capitol breach.

On January 14, 2021, GossJankowski was 32 years old. He attended Gallaudet University and was completing his fourth year and final semester, studying government after switching from studies in accounting.[13] He was not detained during this encounter with law enforcement; moreover, he set the terms of this meeting by choosing its location at an outdoor site in his neighborhood. He did not receive *Miranda* warnings; however, none were required since GossJankowski was not in custody and through his request for contact with officers he was clearly volunteering to interact and speak with law enforcement. Thus, it was GossJankowski who determined the circumstances of his statements.

---

[13] [Stated in recorded 1/18/21 custodial interview at 1:26:38].

GossJankowski was not only able to speak with law enforcement on his own terms on January 14, but, contrary to what his motion asserts, he was able to do so in his own language with assistance from an officer fluent in ASL.  The substance of his statements also indicates that GossJankowski spoke voluntarily, since, apart from admitting his presence at the Capitol on January 6, his statements were largely mitigating, self-exculpatory, and lacking any admission of misconduct.

When GossJankowski's discussion with the FBI concluded, MPD officers and the FBI departed and GossJankowski was free to return home and do as he pleased.  Nothing in these circumstances shows law enforcement coercion, egregious behavior, or any suggestion that GossJankowski's will was overcome. In fact, he was sufficiently comfortable after January 14 that he continued to communicate with the FBI through text messages. There is simply no hint of any reason for suppression in connection with GossJankowski's affirmative desire to speak with the FBI and MPD on January 14.

B.  The January 17 Statements Were Voluntary

Following his January 14 meeting with law enforcement, GossJankowski continued to communicate with the FBI.  He texted the name of a roommate the FBI requested, and he agreed to meet again with the FBI on January 17, this time at his residence. Thus, the interview did not occur in a police-dominated atmosphere. Throughout the interview, the GossJankowski had his cellular phone and there is no evidence he was deprived of anything he needed during the interview. *See Hallford*, 816 F.3d at 858-59 (absence of police dominated atmosphere supported voluntary nature of statements); *Avitan*, 349 F.Supp.3d at 32 (same with respective to defendant's access to essentials).

23

Although GossJankowski did not receive *Miranda* warnings (and none were required) before questioning began, the FBI provided him with relevant information.  The agent and Task Force officer each identified and re-introduced themselves.  They informed GossJankowski they were speaking with him to gain information about the events of January 6.  They confirmed that GossJankowski had seen himself on a wanted poster and that he wanted to turn himself in to police. They advised him that there was no warrant for his arrest and that he would not be arrested on January 17. They encouraged him to be truthful and advised him that he could chose not to answer questions that made him uncomfortable or that he did not want to answer.  They asked if he understood and received an affirmative answer.

GossJankowski was aware that the FBI agent and Task Force officer were the same law enforcement personnel who had spoken with him only three days earlier without arresting, restraining, or harming him.  During the interview, the FBI remained cordial and professional. Throughout this interview, GossJankowski was cooperative, reviewing photographs and other materials, attempting to look up a video for the FBI, and arranging for a roommate to speak with the FBI as well.  GossJankowski often provided narrative and even lengthy responses to questions. As noted above, the interview lasted just over an hour.  *See Avitan*, 349 F.Supp.3d at 33 (considering tone of interview as factor that supported finding it was voluntary; also finding that interview lasting three to five hours was voluntary).

Although GossJankowski was cooperative in several respects, he was not always truthful during questioning.  Recorded evidence refuted certain statements that he made, such as the claim that he found a stun gun on the ground while at the Capitol.  When calmly confronted with the discrepancy between his statement and evidence, GossJankowski would not change his story, even after reviewing recorded evidence with the FBI.   Whatever else this may show about

24

GossJankowski, his refusal to alter his story establishes that during the interview he was not easily swayed and demonstrates that with respect to the most important factor for the Court to consider, his will was not overborne.  His statements were voluntary.[14]

III.   The Defendant's Post-Arrest Statements Followed A Valid *Miranda* Waiver And Occurred Voluntarily

Following his arrest on January 18, agents placed GossJankowski in custody in both the ordinary sense and for purposes of triggering *Miranda* requirements.  Those requirements were met, however, and GossJankowski waived his rights under *Miranda* and voluntarily spoke again with law enforcement officers.

The FBI administered *Miranda* warnings with scrupulous care, utilizing an advice-of-rights form that GossJankowski was able to read and understand for himself; he did not even want ASL translation of the form.  Despite GossJankowski's explicit desire not to have the form translated for him into ASL, qualified interpreters did so.  The FBI and the ASL interpreters established that GossJankowski understood his rights and chose to waive them.  The FBI and MPD detective each confirmed, again with ASL interpreters translating, that GossJankowski chose to speak without a lawyer present.[15]

---

[14] Once again, the GossJankowski's apparent desire to provide his version of events establishes a reason for choosing to speak with the FBI and is additional evidence that his statements were voluntary.

[15] To obtain GossJankowski's waiver, the FBI was not required to use ASL interpreters to translate *Miranda* warnings.  *See United States v. Venegas*, 594 F. App'x 822, 828 (5th Cir. 2014)(a hearing-impaired suspect may validly waive his or her *Miranda* rights even when the interrogating officer does not employ a sign-language interpreter at all, but instead administers a written warning alone); *United States v. Hamberger*, No. 07-CR-175, 2008 WL 906133at *7 (E.D. Wisc. Mar. 31, 2008) (as a matter of constitutional law, court was aware of no requirement for use of sign language interpreter to convey *Miranda* warnings to a deaf person); *United States v. Hamlett*, No. 4:18-cr-487, 2020 WL 5803307, at *8 (E.D. Ark. Sept. 29, 2020) (finding waiver of *Miranda* rights by deaf suspect voluntary, collecting cases finding effective waiver where deaf person has been subjected to a custodial interrogation without an interpreter); *see also Avitan*, 349 F.Supp.3d at 34,

No defects occurred in the provision of *Miranda* warnings, and the defendant's motion contains no specific allegations that any such defects occurred.  Similarly, the motion identifies no specific facts indicating coercion or the absence of a voluntary waiver of rights.

Instead, the defense maintains that unspecified "circumstances" involved in GossJankowski's January 14 and 17 encounters with law enforcement somehow negated the effectiveness of the carefully administered warnings GossJankowski received.  This argument rests on the faulty premise that the FBI committed some impropriety during earlier questioning of GossJankowski.  But the defense identifies no impropriety and, for the reasons explained above, no impropriety occurred: GossJankowski initiated contact and agreed to speak with law enforcement, was not in custody when he spoke with the FBI before arrest, and experienced no pre-arrest coercion or police misconduct.   Nothing about his pre-arrest contacts with law enforcement was improper or provides any basis to question the effectiveness of his *Miranda* warnings.

The defense's reliance on *Missouri v. Seibert*, 542 U.S. 600 (2004) offers no reason to conclude otherwise.  That decision concerned the practice of questioning a defendant in custody without *Miranda* warnings and issuing warnings only if admissions were made; the police would then have the defendant repeat all statements, including the un-*Mirandized* admissions following a waiver of *Miranda* rights.  *Id*. at 604.  The plurality opinion in *Seibert* determined that compliance with *Miranda* only after receipt of incriminating statements could not be remedied during the same interrogation with a post-waiver repetition of the same previously un-*Mirandized* statements.

---

36 (non-native English speakers can still voluntarily waive *Miranda* rights).

Reliance on *Seibert* fails to support relief in this case because its facts did not occur in this case. GossJankowski's pre-arrest statements of January 14 and 17 were not subject to *Miranda*'s requirements, were not involuntary or the result of law enforcement coercion and were not subject to suppression.    Thus, they would not have undermined the efficacy of the warnings GossJankowski received post-arrest. Moreover, just before GossJankowski received *Miranda* warnings, he was advised that because he was under arrest, the warnings were necessary before the interview could begin.  Thus, it was made clear to GossJankowski that his post-arrest interview differed from earlier encounters and required different protections and decisions on his part.

The recording of this interview contains no indication that GossJankowski's statements were anything other than voluntary.  They occurred after *Miranda* warnings and after a waiver of the rights described in those warnings. Cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.  *E.g., Dickerson*, *v. United States*, 530 U.S. 428, 444 (2000).  Nothing about this case makes it one of such rare exceptions.

The recording shows the entire interview occurred in a relaxed and conversational tone. MPD detectives were courteous and repeatedly thanked GossJankowski for speaking with them. Nothing in the recording shows that GossJankowski's will was overborne or that his self-determination was impaired; indeed, GossJankowski again persisted in his prior claims about finding a stun gun even when detectives politely but firmly confronted him with evidence to the contrary.  This interview was also not unreasonably long, with questioning that lasted for about an hour and seven minutes.  Neither the MPD nor the FBI engaged in any trickery, psychological pressure, or mistreatment. *See, e.g., Hallford*, 816 F. 3d at 863 (listing such conduct as a potential source of coercion). GossJankowski showed no signed of discomfort or distress.  His answers to

questions were responsive and often lengthy.  The interview concluded with fist-bumps between GossJankowski and the MPD.  Thus, the recorded interview demonstrates that there is no basis for suppression of any statement from January 18.

On April 23 and 28, 2021, copies of GossJankowski's January 17 and January 18 interviews were produced to defense counsel.[16]  The United States is prepared to produce, or to re-produce, the recordings of these two interviews to this Court.  These recordings contain no information that would support suppression of any of GossJankowski's statements.  They document the absence of any circumstances that would render his statements involuntary.  The defense has not proffered specific facts that show GossJankowski was in custody for any pre-arrest encounter with police.  The defense has not cited any specific detail or portion of any interview showing GossJankowski's statements were involuntary.  The defense has not cited a single case showing any similar interview that merited suppression.  Unless the defense can supplement its motion with specific facts or cases supporting the requested relief, this Court should summarily deny the motion as baseless, and should decline the defendant's request for an evidentiary hearing. *See United States v. Harris*, No. CR 19-358 (RC), 2021 WL 1167263, at *3 (D.D.C. Mar. 26, 2021)(concluding, based on a recording of the defendant's interrogation, that defendant seeking suppression of statements had not alleged facts sufficient to warrant further review and denying request for evidentiary hearing).

## CONCLUSION

The motion to suppress statements should be denied.

Respectfully submitted,

---

[16] Although the meeting GossJankowski initiated on January 14, 2021 was recorded on MPD officers' body-worn camera, consistent with MPD's retention practices, these recordings were not preserved and are no longer available.

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052


By:      *s/Karen Rochlin*

Karen Rochlin
Assistant United States Attorney Detailee
DC Bar No. 394447
99 N.E. 4th Street
Miami, Florida 33132
(786) 972-9045
Karen.Rochlin@usdoj.gov

*/s/ Barry K. Disney*
BARRY K. DISNEY
Trial Attorney - Detailee
Kansas Bar No. 13284
U.S. Attorney's Office for the District of
Columbia
601 D. Street, N.W.
Washington, D.C. 20530
202-305-4367 (office)
202-924-4861 (cell)
Barry.Disney@usdoj.gov

[insert Adam Dreher]