UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | No. 21-cr-123 (PLF) |
| | ) | |
| **VITALI GOSSJANKOWSKI,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

### REPLY IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS

Mr. Vitali GossJankowski, through counsel, respectfully replies to the United States' Response in Opposition to [His] Motion to Suppress Statements ("Gov't Opp'n"), ECF 78.

As an initial matter, the government asserts in a footnote at the very end of its pleading that "consistent with MPD's retention practices," the body-worn camera video recordings of Mr. GossJankowski's interrogation on January 14, 2021 "were not preserved and are no longer available."  Gov't Opp'n at 28 n.16.  The government cites no MPD policy or procedure under which body-worn camera video recordings of police contact with an individual wanted by the FBI—and four days later federally charged with crimes—may be destroyed instead of preserved.

On April 27, 2021, shortly after Mr. GossJankowski's arrest, the defense specifically requested from the government, pursuant to Federal Rule of Criminal Procedure 16, Local Criminal Rule 5.1, and other applicable authority, "the video footage from all interviews and officer interactions with Mr. Gossjankowski," as well as "a list of all law enforcement officers involved in this case in any way, however minimal," and "a list of all sign language interpreters who assisted law enforcement."  The government did not provide the defense with any discovery from the MPD—not even a police or incident report—concerning the incident on January 14, 2021.  Because the government failed to comply with Rule 16, the Court should prohibit the

1

government from introducing any statements from January 14, 2021, and the fruits of any such statements, *i.e.*, any statements from January 17 and 18, 2021, in its case-in-chief at trial. The government's failure to comply with Rule 16 provides an independent basis to suppress at trial any statements Mr. GossJankowski made to law enforcement. *See* Fed. R. Crim. P. 16(d)(2)(C)–(D) ("If a party fails to comply with [Rule 16], the court may . . . prohibit that party from introducing the undisclosed evidence; or . . . enter any other order that is just under the circumstances.").

> Notably, a month before on March 10, 2021, the Court ordered the government to:
>
> review their disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, as set forth in Local Criminal Rule 5.1, and comply with those provisions. The failure to comply could result in dismissal of the indictment or information, dismissal of individual charges, exclusion of government evidence or witnesses, continuances, Bar discipline, or any other remedy that is just under the circumstances.

Min. Order (Mar. 9, 2021). The government agreed to comply with its obligations. It is unclear how doing so would permit in the destruction of evidence. The Due Process Protection Act's intention is to ensure that the government does not overreach in its power to control evidence, particularly exculpatory evidence, in any case. "Congress was concerned about 'inadequate safeguards in Federal law' to ensure prosecutorial compliance with disclosure obligations." *United States v. Hossain*, No. 19-CR-606 (SHS), 2020 U.S. Dist. LEXIS 219232, at *18 (S.D.N.Y. Nov. 23, 2020) (citing e.g., 166 CONG. REC. H4,582-83 (daily ed. Sept. 21, 2020) (statement of Rep. Jackson Lee)).

The government's destruction of evidence is extremely troubling. The failure of the government to disclose that evidence was destroyed and the decision to disclose it in a footnote to a pleading is extraordinarily troubling. Despite this, the government boldly and baldly asserts that "the defense fails to carry its burden of showing that GossJankowski was in custody for [the

January 14th] meeting", Gov't Opp'n at 20, when the video evidence was in its custody and then destroyed.

In any event, Mr. GossJankowski disputes the government's version of the facts and recitation of the statements made at all of the interviews. Gov't Opp'n at 7–16.[1] An evidentiary hearing is required to resolve the factual disputes material to Mr. GossJankowski's motion.

The MPD officer who allegedly communicated with Mr. GossJankowski in ASL on January 14, 2021 (Gov't Opp'n 7–8) was not a qualified or certified ASL interpreter. Sign language interpretation is complex and specialized. Knowledge of both sign language and English does not qualify a person as an interpreter. *See* Registry of Interpreters for the Deaf, Inc., Standard Practice Paper: Professional Sign Language Interpreting (2007); Registry of Interpreters for the Deaf, Inc., Standard Practice Paper: Interpreting in Legal Settings (2007).[2] The government's suggestion that Mr. GossJankowski was questioned in the presence of a "sign language interpreter" simply because a person "whose first language is ASL" was present is misplaced and unsupportable. Mr. GossJankowski was indisputably questioned in the absence of any qualified sign language interpreter on January 14, 2021. As a result, the accuracy and content of the statements the government alleges Mr. GossJankowski signed to an MPD officer in the absence of any qualified ASL interpreter are inherently unreliable.

---

[1] The defense is in the process of retaining an expert to review the accuracy of the ASL and English interpretation recorded during the interrogations on January 17 and 18, 2021. To that end, the defense has made multiple requests for the video footage of the Certified Deaf Interpreter ("CDI") at the January 17, 2021 interrogation. The government has not yet provided it. The government also has not provided complete video footage of the CDI at the January 18, 2021 interrogation. Specifically and notably absent from the footage the government provided is the start of the interview, including the CDI's interpretation of statements about Mr. GossJankowski's *Miranda* rights.

[2] https://rid.org/about-rid/about-interpreting/setting-standards/standard-practice-papers/ (accessed Sept. 30, 2022).

Citing no authority, the government boldly asserts that since Mr. GossJankowski contacted law enforcement to turn himself in, he "set the terms of this [January 14] meeting" and could not be "in custody." Gov't Opp. at 18 & n.9, 22. Mr. GossJankowski did not, as the government contends, "initiate[] contact with police officers because he wanted to speak with them," nor did he "initiat[e] . . . any questioning." Gov't Opp'n at 1, 18 n.9. Mr. GossJankowski initiated contact with police officers to turn himself in because his face was on two separate FBI "WANTED" posters broadcast all over the internet, television, and social media. He did not contact law enforcement to speak with them, be interrogated, or submit to their questioning. Contacting the police to turn yourself in as a result of an FBI "WANTED" poster is not "initiating contact" with police to speak with them about the subject of the offenses the government alleges you committed. Nor is it "clearly volunteering to interact and speak with law enforcement." Gov't Opp' n at 22.

Rather, the fact that Mr. GossJankowski was responding to FBI "WANTED" posters evidences the inherently coercive circumstances and custodial nature of the encounter on January 14. As the government describes the events of January 6, there was no way that a person who was wanted by the FBI on posters plastered all over the news, internet, and social media was going to go free. Indeed, the government concedes that when Mr. GossJankowski contacted law enforcement to turn himself it, it was clear "that law enforcement sought accountability for the Capitol breach." Gov't Opp'n at 22.

The government's assertion that Mr. GossJankowski was not in custody for the purposes of *Miranda* on January 14, 2021 is thus unsupported. Mr. GossJankowski had dialed 9-1-1 with a telephone relay service to turn himself in to law enforcement in response to the FBI poster. Consequently, four marked MPD police vehicles came to his street and parked on the corner

outside his house. From those four marked MPD police vehicles emerged at least seven uniformed and armed MPD police officers. Mr. GossJankowski was thus met and surrounded by at least seven uniformed and armed police officers. The officers were subsequently joined by at least one FBI agent, who drove up in a separate (fifth) vehicle and also parked on his street. The fact that the encounter took place outside rather than inside did not render it any less custodial or coercive. No reasonable person would have felt, or been, free to leave that situation.

Similarly, on January 17, 2021, at least five FBI officers came into Mr. GossJankowski's house to interrogate him.[3] Contrary to the government's contention, the interpreters were not mere "language conduit[s]." Gov't Opp'n at 19 n.11. It was apparent that the interpreters were themselves FBI officials and worked directly for the FBI. The officers surrounded Mr. GossJankowski around his dining room table such that he physically could not leave unless the officers moved and left the room. The atmosphere was thus entirely "police-dominated." Gov't Opp'n at 23. Contrary to the government's assertion, the FBI did not tell Mr. GossJankowski that he "did not have to answer questions" or that "he was free to leave." Gov't Op'n at 20. No warnings were given or rights mentioned. Coupled with the law enforcement presence and interrogation on January 14, no reasonable person in these circumstances would have felt free "to go about his business" during the January 17 interrogation. Gov't Opp'n at 19.

The January 18, 2021 interview was tainted by the previous two lengthy interrogations without any *Miranda* warnings or mention of Mr. GossJankowski's constitutional rights. The MPD detective began by stating to Mr. GossJankowski, "we know you've been talking to these

---

[3] The government's assertion that Mr. GossJankowski "was sufficiently comfortable after January 14 that he continued to communicate with the FBI through text messages" (Gov't Opp'n at 23) is undermined by the government's failure to notice or produce any such text messages to the defense over the past 20-plus months, despite the government's obligations under Rules 12(b)(4)(B) and 16(a)(1)(B).

5

guys [referring to the FBI agents and FBI official interpreters] over the past day or so" and thanking him for "bringing to light the involvement that you've had so far." Gov't Ex. 31 [1:16:20].[4]  The detective told Mr. GossJankowski that the officers "have some questions about some of the other things you may have seen on the 6th ok?" and "want[ed] to get as much information" from him as possible.  The detective lectured Mr. GossJankowski about "being 100% truthful," stating "the only thing that helps any party out, you in your position and us in ours, is being truthful.  We're going to be nothing but 100% truthful with you, it is only helpful for you in your position to be truthful with us, ok?"  It was not until after that the government, for the first time, notified Mr. GossJankowski of his rights.

Almost immediately upon reading the Miranda waiver form, Mr. GossJankowski stated (as interpreted in the video recording):  "So I don't have a lawyer, so I guess I'll get a public attorney, is that right?"  Gov't Ex. 31 [1:19:11].  By so stating, Mr. GossJankowski effectively invoked his right to an attorney.  *See Michigan v. Jackson*, 475 U.S. 625, 633 (1986) (asserting that a "broad, rather than a narrow interpretation" of one's invocation of his right to counsel must be granted, even considering some arguable ambiguities); *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (holding that invocation of the right to counsel requires "some statement that can be reasonably construed to be an expression of a desire for the assistance of an attorney").  The detective responded:  "You would but not for the purposes of this interview right now and here."  The detective continued:  "This document is to, if you want to speak to us now without an attorney present you can but you also don't have to.  If you want to wait until an attorney is

---

[4] For the purposes of this argument, Mr. GossJankowski relies on the FBI ASL interpreter's oral representations in the video recording of the interview.  He does not concede, however, that what the detective said orally in English on the video recording was signed verbatim or accurately to him in ASL, or that what he signed was interpreted into oral English verbatim or accurately.  *See supra* note 1.

present then you can do that as well."

The detective's statements were wrong, confusing, and not responsive to Mr. GossJankowski's concern that he did not have an attorney. Mr. GossJankowski had the right to have a lawyer present there for that interview. Since he could not afford one, it was the government's duty to get him a lawyer for that interview. He did not have to choose between having an attorney present then or later; he had the right to an attorney then. When Mr. GossJankowski asked for a lawyer, the government had to stop questioning him. *See Miranda*, 384 U.S. at 444–45 (holding that if an individual "indicates *in any manner* and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning") (emphasis added); *Edwards v. Arizona*, 451 U.S. 477, 482, 484–85 (1981) (holding that when a suspect invokes his right to counsel he may not be questioned again unless he himself initiates further communication with the police). Mr. GossJankowski should have been appointed a lawyer or told explicitly that he qualified for appointed counsel for that interview. *See Powell v. Alabama*, 287 U.S. 45, 69 (1932) ("He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence."). Instead, the detective effectively neutralized the effect of the *Miranda* warnings. *See Seibert*, 542 U.S. at 617 (declaring that strategies designed to "drain the substance out of *Miranda*" and circumvent its purpose are unconstitutional).

In *United States v. Allegra*, 187 F. Supp. 3d 918, 924 (N.D. Ill. 2015), the court held that a question concerning counsel, rather than a statement, was sufficient to find that a suspect's Miranda rights had been violated. In *Allegra*, the suspect asked agents, "So can you provide me with an attorney?" *Id*. The court held that the suspect's question was a straightforward request,

noting that it occurred during the early stages of his interrogation. *Id*. at 925 (highlighting that the suspect asked the question *before* making any potentially incriminating statements). The suspect's question in that case is all but identical to Mr. GossJankowski's question, "I'll get a public attorney, is that right?" Moreover, Mr. GossJankowski's reference to an attorney occurred before he began providing any information surrounding the events that were the subject of the interrogation.

Even when *Miranda* warnings are given, if interrogators engage in tactics that tend to undermine those warnings, the accused's rights are essentially void. *See Seibert,* 542 U.S. at 613 (holding that warnings were presented in a way that rendered them "ineffective in preparing the suspect for successive interrogation"). In *Seibert*, the Court concerned itself with whether the suspect believed he had a "genuine right to remain silent" and ultimately held that because of the question-first tactics used by police, the suspect did not. *See id.* Here, as in *Seibert*, the detective's response to Mr. GossJankowski's inquiry about counsel would cause a reasonable person to believe that a genuine right to appointed counsel for that interview did not exist. Thus, even if Mr. GossJankowski's reference to counsel is found to be equivocal, the detective's circumvention of his right to counsel, which worked to obscure and misrepresent its meaning, requires finding that his subsequent statements were unconstitutionally procured.

## CONCLUSION

For the foregoing reasons, and for any other reasons set forth at a hearing on this motion or in supplemental pleadings, and that this Court may deem just and proper, the Court should suppress the use of all statements made by Mr. GossJankowski to law enforcement agents in this case.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong Akpan
Celia Goetzl
Assistant Federal Public Defenders
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
