**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-123-PLF** |
| **v.** | : | |
| | : | |
| **VITALI GOSSJANKOWSKI,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MOTION TO EXCLUDE**
**THE PROPOSED EXPERT TESTIMONY**
**OF MARK KROLL AND JUDY SHEPARD-KEGL**
**OR FOR A *DAUBERT* HEARING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby moves to exclude Defendant Vitali GossJankowski's proposed expert testimony from Mark Kroll and Judy Shepard-Kegl. This Court should bar their testimony for several reasons. First, some or all of each expert's testimony concerns facts that are not in dispute. Otherwise, the proffered testimony does not amount to scientific law and lacks sufficient reliability. The defendant's proposed experts either fail to offer appropriate validation for their methods, misconstrue the issues which a jury must decide, or proffer testimony that will not assist the jury in resolving disputed facts. Accordingly, the proposed experts' opinions do not comply with Federal Rule of Evidence 702 or the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The proposed expert testimony should be excluded or alternatively, this Court should set a hearing

for the defendant, as the proponent of the challenged evidence, to demonstrate its admissibility.

## RELEVANT FACTS AND PROCEDURAL HISTORY

GossJankowski faces charges that arise from the attack on the United States Capitol on January 6, 2021. He joined the mob of rioters outside of the Capitol during Congress's attempt to certify the electoral count for the 2020 Presidential Election. At the inaugural archway[1] on the Capitol's Lower West Terrace, another rioter handed GossJankowski a stun gun. At trial, the Government will present evidence that GossJankowski used this hand-held stun gun during an assault on a fully uniformed officer of the United States Capitol Police.

GossJankowski is now charged in a Superseding Indictment. ECF 41. It charges him with interfering, impeding and obstructing a law enforcement officer, and attempting to do so, in violation of 18 U.S.C. § 231(a)(3); obstructing and attempting to obstruct an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b); entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) & (b)(1)(A); disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) &

---

[1] The archway is the location typically used on inauguration day for the President's entrance onto the inaugural stage. The rounded arch is a feature constructed for the inauguration and fixed to a normal set of doors. The archway and doorway are narrow and no more than 10 feet across and created the appearance of a tunnel on January 6, 2021.

(b)(1)(A); and disorderly conduct in the Capitol grounds or building, in violation of 40 U.S.C. § 5104(e)(2)(D).

On Friday, January 6, 2023, the Government received notice, attached hereto, that GossJankowski may seek to call Dr. Judy Shephard-Kegl ("Shephard-Kegl") as an expert regarding deaf communication, speech, and lipreading; and Dr. Mark Kroll ("Kroll") as an expert regarding "electrical devices and weapons."

## LEGAL STANDARDS

"Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). The United States Court of Appeals for the D.C. Circuit has outlined that "[u]nder *Daubert*, the district court is required to address two questions, first whether the expert's testimony is based on 'scientific knowledge,' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Meister v. Medical Engineering Corp.*, 267 F.3d 1123, 1126 (D.C. Cir. 2001). The party seeking the admission of testimony within the scope of Rule 702 carries the burden of demonstrating satisfaction of *Daubert*'s requirements by a preponderance of the evidence. *Meister*, 267 F.3d at 1127, n. 9; *see also United States v. Hunter*, 554 Fed.Appx. 5, 8 (D.C. Cir. 2014) (the proponent of expert testimony bears the burden of showing its admissibility); *McReynolds v. Sodexho Marriott Services, Inc.*, 349 F.Supp.2d 30, 35 (D.D.C. 2004) ("The party offering the expert's testimony must

establish by a preponderance of the evidence that the expert testimony is admissible and that the expert is qualified").

To meet the  requirement for testimony based on 'scientific knowledge', the United States Supreme Court has "identified four factors for courts to consider in evaluating scientific validity, focusing on whether the theory or technique had been tested, whether it had been subjected to peer review and publication, the method's known or potential error rate, and the method's general acceptance in the scientific community." *Meister*, 267 F.3d at 1127.  To perform this 'gatekeeping' role "the district court must engage in 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Ambrosini v Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996).

The requirement for proposed expert testimony to 'assist the trier of fact' "goes primarily to relevance." *Daubert*, 509 U.S. at 591. The "standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id*. at 592.

## ARGUMENT

GossJankowski seeks to present opinion testimony from one proposed expert that supposedly concerns the weapon he possessed during the attack on the Capitol and from another proposed expert concerning his ability to speak and to read lips. Both proposed experts have proffered testimony on matters that are irrelevant. Proffered testimony relating to the defendant's weapon depends on factual matters

any laymen or juror is capable of assessing without assistance from an expert; otherwise, the proffered testimony lacks sufficient indicia of reliability while the proposed expert lacks sufficient qualifications to offer expertise within the scope of the defendant's notice.  Testimony from both experts should be excluded.

I.     Grounds For Exclusion Of Opinions From Mark Kroll

A.   Uncontested Facts Do Not Provide A Basis For Expert Testimony

The defendant proffers testimony from Mark Kroll that the weapon charged in Counts Three, Four and Five of the superseding indictment was not "a TASER® electrical weapon."  Expert Report of Mark Kroll ("the Kroll Report") (attached hereto) at 4.  No count in the indictment, however, contains the word "TASER" in all capital letters followed by the symbol "®", an apparent reference to a trademark registered with the United States Patent and Trademark Office.[2]  No charge in the indictment depends on the manufacturer or specific brand or model of any weapon. The United States does not intend to prove that the weapon GossJankowski used or carried was a "TASER®", or in other words, the specific branded product with a registered trademark held first by Taser International, Inc. and then by Axon Enterprise, Inc. More generically, the United States anticipates proving that the defendant used and carried a stun gun which is distinct from the trademarked TASER® discussed in the Kroll report.

---

[2]   Taser is often used as a synonym for stun gun.  *See, e.g.,* https://www.dictionary.com/browse/taser;   https://www.businessinsider.com/google-taser-xerox-brand-names-generic-words-2018-5.

Accordingly, there is no dispute over the use of a trademarked "TASER®." Undisputed facts do not require expert analysis, and in the absence of a dispute, expert testimony will not provide assistance to a jury. Accordingly, the proffered conclusion that GossJankowski did not use the TASER® brand of an electrical weapon does not justify the use of expert testimony.

B. This Court Should Exclude Proffered Testimony About The Identity Of The Defendant's Weapon

The defense proffers Kroll's claim that he has identified the weapon GossJankowski used and carried on January 6, 2021 as either a "Vipertek VTS-979 or a POLICE 916." Kroll Report at 7. According to that report, Kroll appears to have visually compared various unspecified devices to images of the defendant holding a weapon on the Capitol grounds and has decided that the two weapons mentioned above appeared similar to the weapon in the photograph. Excluding captions under photographs, the Kroll Report's section on the "identification" of the weapon consists of three sentences.

Kroll's visual comparison of an unexplained selection of weapons is one that any layman could make without scientific, technical or other specialized knowledge. Just like the jury in *United States v. Naegele*, 471 F.Supp.2d 152, 159 (D.D.C. 2007) needed no assistance to decide what it hears, any jury selected for this case will not need assistance to decide what it sees. Indeed, in the section purportedly identifying GossJankowski's weapon, the Kroll report makes no attempt to characterize the process of identification as one requiring specialized knowledge, skill, training, education, or experience. *See* F.R.E. 702. No particular principles or methodology

for the identification of the weapon are identified in the report beyond an ordinary visual examination.  The report provides no information addressing the likelihood of error for the identification.  If any methodology was used to select weapons to compare to images of GossJankowski with a stun gun, the Kroll report does not identify that process.  The absence of such information illustrates the non-scientific, non-technical, non-expert nature of the comparison made for the purported identification of the defendant's weapon.

Since a comparison of how weapons appear is not beyond the capability of ordinary jurors, "expert" testimony for the comparison would be inappropriate. *United States v. Gonzalez-Maldonado*, 115 F.3d 9, 17–18 (1st Cir. 1997) ("Expert testimony on a subject that is well within the bounds of a jury's ordinary experience generally has little probative value. On the other hand, the risk of unfair prejudice is real. By appearing to put the expert's stamp of approval on the government's theory, such testimony might unduly influence the jury's own assessment of the inference that is being urged") (citation omitted); *Sonrisa Holding, LLC v. Circle K Stores, Inc.*, 835 Fed.Appx. 334, 339 (10th Cir. 2020) ("expert testimony is unnecessary if the question does not require specialized or technical knowledge.") (quotations omitted); *United States v. Davis*, 772 F.2d 1339, 1343–44 (7th Cir. 1985) ("Expert testimony is not admissible under Rule 702 if it will not assist the jury in understanding the evidence or determining a fact in issue or it is purely speculative."); *United States v. Montas*, 41 F.3d 775, 783 (1st Cir. 1994) ("There is no more certain test for determining when experts may be used than the common sense inquiry whether the

untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."). The proffered testimony from Kroll poses two potential problems.  First, it seeks to place an expert's stamp of approval on a determination that the jury can make on its own. Second, it opens a backdoor for the defense to admit evidence that would otherwise lack proper foundation.

Accordingly, this Court should exclude the proffered testimony about identification of the defendant's weapon, or at a minimum, require the defendant to demonstrate its admissibility.

C.  Kroll's Proposed Identification Testimony And Resulting Conclusions Are Speculative

An expert's testimony must be "based upon sufficient facts or data" and must also be "the product of reliable principles and methods," applied "reliably to the facts of the case." Fed. R. Evid. 702. Here, however, the Kroll Report's conclusions depend on facts that have not been shown to exist.  Thus, the defense has not established a proper basis for admission of his testimony.

While Kroll's purported identification of the defendant's weapon is the result of simple observation that any juror can make without assistance, his comparison suffers from a critical flaw.  His report is silent on whether other devices may use the same housing or have the same appearance in addition to the devices pictured in his report that appear to match GossJankowski's stun gun.  Because the Kroll Report provides no facts or data giving a basis to believe no other matching devices exist, the

conclusion that the correct devices and their properties have been identified and tested is speculative. The identification is accordingly not based on data that is reliable. Thus, the suggestion that Kroll has tested the correct devices with the right characteristics is equally unreliable. Put differently, Kroll's proffered testimony that is not sufficiently tied to the facts of this case. *See Naegele*, 471 F.Supp.2d at 157. It should not be admitted.

### D.  Kroll Is Not Qualified To Offer Opinion Testimony On Weapons Generally Or On What Qualifies As A Weapon

The defense has proffered that Kroll is "an expert regarding … weapons." His report summarizes his qualifications as follows:

> I am a Biomedical scientist with a primary specialty in bioelectricity or the interaction of electricity and the body. I hold a B.S. degree in Mathematics and a M.S. degree and a Ph.D. degree in Electrical Engineering from the University of Minnesota and a M.B.A. degree from the University of St. Thomas. I have invested most of my career researching and developing electrical devices to diagnose and treat disease. The primary focus is the effect of electrical shocks on the human body.

> This involves researching, lecturing, and publishing on electric shocks and their effects on the human body. It includes lectures throughout Europe, South America, and Asia (in 35 countries) as well as at many of the major universities and medical centers of the United States (U.S.). Usually, the typical audience member is a cardiologist, electrophysiologist, medical examiner, or forensic pathologist. With over 380 issued U. S. patents and numerous pending and international patents, I currently hold the most patents on electrical medical devices of anyone in the world. Over 1 million people have had devices with some of these patented features in their chest, monitoring every heartbeat.

Kroll Report at 4.  The majority of his experience concerns electrical medical devices, although he has also published and testified about the TASER®.  Neither his report nor his resumé provide any basis to conclude that Kroll is an expert in weapons

generally. And even if Kroll can be viewed as an expert on the TASER®, such expertise is irrelevant to this case because the parties agree that on January 6, 2021, the weapon GossJankowski used and carried was not the trademarked TASER® distinguished in the Kroll Report.

Neither his report nor his resumé provide any indication that Kroll is a lawyer or has any legal training. Similarly, the Kroll report and accompanying resumé provide no indication that Kroll has any law enforcement background or training, or military other experience that would qualify him as an expert for what constitutes a weapon generally or a weapon that is deadly or dangerous.

From his resumé, Kroll appears to be very experienced and accomplished in his fields. He appears to have had a successful career, broadly stated, in researching and developing electrical devices to research and treat disease. His areas of expertise, however, have little or no connection to the unique events of January 6, 2021, including what constitutes a weapon during a riot, what may have endangered law enforcement officers confronting a violent mob, or what weapons caused police officers physical pain or impairment, or loss of physical or mental function.[3] Yet with respect to a device that has not been conclusively identified, the defense seeks to offer Kroll as witness who will testify that the weapon charged in Counts Three, Four, and Five was "not a deadly or dangerous weapon." Kroll report at 17.

---

[3] While other courts addressing unrelated cases may have allowed Kroll to testify as an expert, the relevant inquiry is not whether his testimony has been admitted in the past but whether his testimony in the instant case is sufficiently reliable and relevant to warrant admission. *McReynolds*, 349 F.Supp.2d at 45.

Kroll is not a judge or a lawyer. He has no apparent legal training. He has not identified any experience he has with criminal law. He was not present at the Capitol on January 6, 2021, and did not observe the wide variety of items used or repurposed as weapons during the events of that day. He proffers no experience with or knowledge of what has constituted a dangerous weapon during other riots or civil disturbances. He is not qualified to opine under the guise of expertise what was or was not a dangerous weapon in the context of an assault on a federal officer or the restricted area of the Capitol grounds. This Court should accordingly exclude his testimony.

E. Kroll's Proposed Testimony Is Not Relevant

To convict GossJankowski for violating 18 U.S.C. § 111(a) and (b) as charged in Count Three, the United States must show that while using a deadly or dangerous weapon, he forcibly assaulted, resisted, opposed, impeded, intimidated or interfered with an officer and employee of the United States, while such officer or employee was engaged in the performance of his official duties. *Id*. The analysis of when a weapon is deadly or dangerous focuses on the defendant's use or intended use of the object and not solely on its inherently dangerous qualities, if any. Courts have commonly held that "a deadly or dangerous weapon includes 'any object which, as used or attempted to be used, may endanger the life of or inflict great bodily harm on a person.' *United States v. Sanchez*, 914 F.2d 1355, 1358-59 (9th Cir. 1990) (collecting cases). "[T]he object's latent capability . . . coupled with the manner of its use, is determinative." *United States v. Loman*, 551 F.2d 164, 169 (7th Cir. 1977) (citation

omitted); *United States v. Bullock*, 970 F.3d 210, 215 (3d Cir. 2020); *see also United States v. Klein*, 533 F.Supp.3d 1, 10-11 (D.D.C. 2021); *United States v. Chansely*, 525 F.Supp.3d 151, 162 (D.D.C. 2021).

Otherwise innocuous objects not designed or intended to endanger life or cause injury may nevertheless qualify as "dangerous weapons" within the meaning of Section 111(b). *E.g.*, *Loman*, 551 F.2d at 169 (walking stick brought down on victim's head was a dangerous weapon although the stick did not cause serious injury); *United States v. Murphy*, 35 F.3d 143, 147 (4th Cir. 1994) (although stationary, steel bars in jail cell were a dangerous weapon when correctional officer's head was struck against them); *United States v. Gholston*, 932 f.2d 904, 905 (11th Cir. 1991) (desk was a dangerous weapon when overturned on the victim); *Chansely*, 525 F.Supp.3d at 162 (objects that have perfectly peaceful purposes may be turned into dangerous weapons) (internal quotation omitted). To convict under Section 111(b) based on the use of a deadly or dangerous weapon, proof of physical contact with the victim is not required. *United States v. Siler*, 734 F.1290, 1297 (11th Cir. 2013), *cert. denied*, 572 U.S. 1025 (2014).

Sections 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2), as charged in Counts Four and Five, prohibit entering and remaining in any restricted building or grounds without lawful authority to do so, and engaging in disruptive or disorderly conduct in any restricted building or grounds when other specified conditions are met. The penalties for each of these offenses increase from imprisonment for not more than one year to imprisonment for not more than 10 years if the defendant "during and in relation to

the offense, uses or carries a deadly or dangerous weapon or firearm." 18 U.S.C. § 1752(b). Both Counts Four and Five allege that Goss-Jankowski "did use and carry a deadly and dangerous weapon …" ECF 41:3.[4]

Under the provision for carrying a deadly or dangerous weapon, the weapon must be capable of causing serious bodily injury and the defendant must have carried the weapon with the intent to cause such injury; however, the defendant need not have actually used the weapon in that manner. *United States v. Robertson*, No. 21-cr-34 (CRC), --- F.Supp.3d ---, 2022 WL 2438546 at *6 (D.D.C. July 5, 2022). Under the carrying prong of Section 1752(b), the evaluation of dangerousness for a weapon that was not inherently so depended on the defendant's conduct and intent. *Id*. at 7. As the decision in *Robertson* explained,

> Consider a pen, for example. It cannot be criminal to simply carry a pen. But a fact finder's assessment may change if there were evidence that a defendant tightly gripped a pen in his hand, raised to his chest, with its tip facing out toward an approaching officer. Even if the defendant never used the pen to jab at the officer, a jury may find that he carried the pen with the intent to use it in a manner capable of causing serious injury.

*Id*.

What the cases above demonstrate, regardless of whether they address Section 111(b) or 1752(b), is that an item can qualify as a deadly or dangerous weapon without being inherently dangerous and without being designed to be dangerous. An item can qualify as a deadly or dangerous weapon even when its common use or standard

---

[4] The United States may charge in the conjunctive and prove its case disjunctively. *United States v. Brown*, 504 F.3d 99, 104 (D.C. Cir. 2007); *United States v. Joseph*, 169 F.3d 9, 12 (D.C. Cir. 1999).

purpose is utterly harmless.  Whether an item qualifies as a deadly or dangerous weapon may depend on its inherent capabilities or its capability to cause harm in a particular context, like the chest-high pen gripped with its tip pointed towards an approaching officer.

The Kroll report reviews certain characteristics of a device that may or may not, despite visual similarities, have been the same type of device GossJankowski possessed on January 6, 2021.  Even assuming, however, that the Kroll Report correctly identifies GossJankowski's stun gun, the characteristics that the report reviews do not provide an assessment of the device in any relevant context.  The Report could just as easily state that unlike a TASER®, a pen does not expel projectiles or emit an electrical charge capable of causing death or serious bodily injury. Nevertheless, if aimed at or thrust into an eye or other sensitive area, a pen, as in the example from *Robertson*, becomes a deadly or dangerous weapon.  If either end of the stun gun GossJankowski possessed were aimed at or thrust into an officer's eye, for example, a jury could reasonably find that the stun gun was a deadly or dangerous weapon.  It could do so even if the stun gun were used or carried without batteries.

The testimony proffered through the Kroll report will not assist any jury and has no relevance to this case because it is disconnected from any appropriate factual context.  The measurements taken from the stun gun in a sterile laboratory or quiet workspace have no bearing on the harm a pronged electrical device can cause when directed towards the head of an already victimized officer engulfed by a mob and

under attack.  Dr. Kroll can offer no testimony about GossJankowski's intent as he extended the stun gun towards that victim's head.  He cannot say if GossJankowski used the weapon consistently with the purpose it was designed for since Kroll was not present at the Capitol on January 6.  For all he knows, GossJankowski intended to use he stun gun like baton or a club or a rock. Absent context, or any consideration of facts such as GossJankowski's behavior, his interactions with police officers on January 6, 2021, his display and handling of the stun gun, the circumstances surrounding his use and attempted use of the stun gun, and the effect of the stun gun on others, to mention only some of the relevant details a jury can use to determine the stun guns capability to endanger, the information in the Kroll Report cannot meaningfully assist any factfinder.

Unlike Kroll, a jury will receive evidence of the context for GossJankowski's use or carrying of the stun gun he acquired during the attack on the Capitol.  Like the jury in *Robertson*, and like juries that have considered assaults under 111(b), the jury in this case will have the capability of determining whether the defendant's stun gun was used or attempted or intended to be used to inflict the requisite bodily harm. Because the Kroll report addresses no facts or context tied to the circumstances of this case, the defense has failed to demonstrate relevance or that the admission of Kroll's testimony is appropriate.  Accordingly, this Court should exclude Kroll's testimony.

II.      Grounds To Exclude The Testimony Of Dr. Judy Shepard-Kegl

Dr. Shepard-Kegl opines that "Mr. GossJankowski … is neither comfortable nor competent at spoken English", that he is "completely unable to understand

spoken English", and that GossJankowski "at no time during the events of January 6th . . . could he have accessed or shared communication with anyone . . . via lipreading and speech." *See* Linguistic Consulting Service Assessment Report, attached hereto, at p. 15. The United States has not alleged any crime that requires proof of GossJankowski's ability to lipread, understand spoken English, or speak English himself.

The United States does not anticipate offering any evidence in its case-in-chief to dispute the defendant's inability to lipread, understand spoken English, or speak English himself. Insofar as these claims are not disputed, expert analysis is unnecessary.

Moreover, whether or not GossJankowski can read lips is not a fact that requires expertise, technical understanding, or specialized education. If the GossJankowski chooses to present a case and take the witness stand, he could testify to this information. Alternatively, he can call lay witnesses such as friends, family, teachers, or others with knowledge of his abilities.

The conclusions in Shepard-Kegl's report fall easily within the bounds of a juror's ordinary experience. *See Gonzalez-Maldonado*, 115 F.3d at 17–18; *Sonrisa Holding*, 835 Fed.Appx. at 339; *Davis*, 772 F.2d at 1343–44; *Montas*, 41 F.3d at 783. Her report concerns facts which jurors are capable of deciding for themselves. Expert testimony will accordingly not assist a jury but will create prejudice from the inaccurate impression that otherwise ordinary facts have greater significance when

presented with the imprimatur of expertise.  Accordingly, this Court should also exclude Dr. Shepard-Kegl's proposed testimony.

## CONCLUSION

For all of the foregoing reasons, this Court should exclude the testimony of the defendant's proposed experts.  Alternatively, the Court should hold a hearing for the defense to demonstrate the admissibility of testimony from its proposed experts.

Respectfully Submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:

s/Karen Rochlin
Karen Rochlin
Assistant United States Attorney Detailee
DC Bar No. 394447
99 N.E. 4th Street
Miami, Florida 33132
(786) 972-9045
Karen.Rochlin@usdoj.gov