UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 21-0123 (PLF) |
| | ) | |
| VITALI GOSSJANKOWSKI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

OPINION AND ORDER

Defendant Vitali GossJankowski has filed an Amended Motion for Transfer of Venue ("Mot.") [Dkt. No. 79]. Mr. GossJankowski's trial is currently scheduled to begin with jury selection on February 27, 2023. He has requested that the Court move his trial outside of the District of Columbia pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure and on constitutional grounds, citing the risk of potential juror prejudice against defendants charged in connection with the events at the U.S. Capitol on January 6, 2021. The government opposes Mr. GossJankowski's motion, see Government's Opposition to Defendant's Motion to Transfer Venue ("Gov't Opp.") [Dkt. No. 75], and counsel for the parties presented oral argument on January 17, 2023.

The legal challenges that Mr. GossJankowski raises, as well as the jury surveys that he cites in his motion, have been considered and rejected by other judges of this court. In fact, every judge who has ruled on a motion for a transfer of venue in connection with a January 6 case has denied the motion. See United States v. Oliveras, Crim. No. 21-738, 2023 WL 196679 (D.D.C. Jan. 17, 2023) (Howell, C.J.); United States v. Sheppard, Crim. No. 21-203, 2022 WL 17978837 (D.D.C. Dec. 28, 2022) (Bates, J.); Memorandum Opinion and

Order, United States v. Nordean, Crim. No. 21-175 (D.D.C. Nov. 9, 2022) [Dkt. No. 531]

(Kelly, J.); United States v. Ballenger, Crim. No. 21-719, 2022 WL 16533872 (D.D.C.

Oct. 28, 2022) (Boasberg, J.); United States v. Eicher, Crim. No. 22-0038, 2022 WL 11737926

(D.D.C. Oct. 20, 2022) (Kollar-Kotelly, J.); United States v. Nassif, Crim. No. 21-421, 2022

WL 4130841 (D.D.C. Sept. 12, 2022) (Bates, J.); United States v. Brock, Crim.

No. 21-140, 2022 WL 3910549 (D.D.C. Aug. 31, 2022) (Bates, J.); Order, United States v.

Williams, Crim. No. 21-618 (D.D.C. Aug. 12, 2022) [Dkt. No. 63] (Jackson, J.); United States v.

Garcia, Crim. No. 21-0129, 2022 WL 2904352 (D.D.C. July 22, 2022) (Jackson, J.); Minute

Order, United States v. Bledsoe, Crim. No. 21-204 (D.D.C. July 15, 2022) (Howell, C.J.); United

States v. Rhodes, Crim. No. 22-15, 2022 WL 2315554 (D.D.C. June 28, 2022) (Mehta, J.);

Minute Entry, United States v. Williams, Crim. No. 21-377 (D.D.C. June 10, 2022)

(Howell, C.J.); Minute Entry, United States v. McHugh, Crim. No. 21-453 (D.D.C. May 4, 2022)

(Bates, J.); Order, United States v. Alford, Crim. No. 21-263 (D.D.C. Apr. 18, 2022) [Dkt.

No. 46] ("Alford Order") (Chutkan, J.) (denying defendant's request to transfer venue but

granting request for expanded examination of prospective jurors); Order, United States v.

Webster, Crim. No. 21-208 (D.D.C. Apr. 18, 2022) [Dkt. No. 78] (Mehta, J.); Memorandum

Opinion and Order, United States v. Brooks, Crim. No. 21-503 (D.D.C. Jan. 24, 2022) [Dkt.

No. 31] (Lamberth, J.); United States v. Bochene, 579 F. Supp. 3d 177 (D.D.C. 2022) (Moss, J.);

Minute Entry, United States v. Fitzsimons, Crim. No. 21-158 (D.D.C. Dec. 14, 2021)

(Contreras, J.); Minute Order, United States v. Reffitt, Crim. No. 21-32 (D.D.C. Oct. 15, 2021)

(Friedrich, J.); Order, United States v. Caldwell, Crim. No. 21-28 (D.D.C. Sept. 14, 2021) [Dkt.

No. 415] (Mehta, J.).  For the following reasons, the Court concludes that Mr. GossJankowski

has not established a presumption of prejudice and that voir dire is the appropriate means of

assessing potential juror prejudice in this case.  The Court therefore will deny Mr. GossJankowski's motion.

## I.  BACKGROUND

The charges against Mr. GossJankowski relate to the events at the U.S. Capitol on January 6, 2021.  The events of January 6, 2021 are summarized in the Court's opinion in United States v. Puma.  See United States v. Puma, 596 F. Supp. 3d 90, 93-94 (D.D.C. 2022).  The government alleges that Mr. GossJankowski was a member of the crowd that entered the Capitol building on January 6, 2021 and engaged in certain activities while there.  See Superseding Indictment [Dkt. No. 41].  According to the statement of facts accompanying the criminal complaint in this case, a publicly available video depicts Mr. GossJankowski attempting to gain access to the U.S. Capitol building on January 6, 2021.  See Statement of Facts [Dkt. No. 1-1] at 2.  The video depicts Mr. GossJankowski handling and activating a Taser.  See id.  On January 14, 2021, Mr. GossJankowski contacted law enforcement regarding an FBI "Be on the Lookout" poster that included a picture of him, and officers of the Metropolitan Police Department interviewed him that same day.  See id. at 4.  Law enforcement officers interviewed Mr. GossJankowski again on January 17, 2021.  See id. at 5.  During these interviews, Mr. GossJankowski admitted to possessing a Taser on January 6, 2021 but denied using the Taser on a law enforcement officer.  See id. at 4-5.

On January 18, 2021, the United States charged Mr. GossJankowski by criminal complaint for offenses arising out of his conduct in relation to the Capitol riot, see Complaint [Dkt. No. 1], and he was arrested that same day at his residence.  A grand jury returned an indictment on February 17, 2021, and a superseding indictment on November 10, 2021.  The superseding indictment charges Mr. GossJankowski with five felony offenses and one

misdemeanor offense: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Obstruction of an

Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2;

Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation

of 18 U.S.C. §§ 111(a)(1) and (b); Entering and Remaining in a Restricted Building or Grounds

with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A);

Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or

Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); and Disorderly

Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D). See Superseding

Indictment.

        In support of his motion to transfer venue, Mr. GossJankowski submits two jury

surveys. The first is a survey conducted by Select Litigation, LLC ("Select Litigation"), a

consulting firm engaged by the Federal Public Defender for the District of Columbia to "assess

the federal jury pool in the District of Columbia." See Exhibit 1, Amended Motion for Transfer

of Venue ("Select Litigation Survey") [Dkt. No. 79-1] at 2 (page numbering based on ECF

stamp). Select Litigation "conducted two public opinion polls, one among jury-eligible citizens

of the District of Columbia, and one among jury-eligible citizens of the Atlanta Division of the

Northern District in Georgia." Id. Four hundred respondents were polled in each jurisdiction.

Id. Select Litigation also "retained the services of a media research firm, News Exposure, to

analyze aspects of news coverage concerning January 6." Mot. at 4.

        The second survey was conducted by In Lux Research ("ILR"), a firm engaged by

Juli Haller and Fischer & Putzi, P.A., who represent January 6 defendants Connie Meggs and

Thomas Edward Caldwell. See Exhibit 2, Amended Motion for Transfer of Venue ("ILR

Survey") [Dkt. No. 79-2] at 2 (page numbering based on ECF stamp).  ILR was asked "to design

and conduct a study that would meet the following objectives":

> 1.  Identify any specific themes of bias.
>
> 2.  Gauge the intensity of any prejudicial bias detected.
>
> 3.  Determine whether the rates and intensity of any prejudicial bias discovered within the DC [c]ommunity are unique to the DC [c]ommunity.
>
> 4.  Ascertain whether respondents who indicate harboring bias against [January 6] [d]efendants report doubt in their ability to be fair and impartial jurors for [such] [d]efendants.

Id.  ILR "conducted a telephone poll of potential jurors in the District of Columbia and in three

other jurisdictions:  the Ocala Division of the Middle District of Florida, the Eastern District of

North Carolina, and the Eastern District of Virginia."  Gov't Opp. at 4.  The polling yielded

"over 350 responses" from each jurisdiction.  ILR Survey at 2.

## II.  LEGAL STANDARD

In general, criminal trials are held in the state where the offense was committed.

See U.S. Const. art. III, § 2 ("The Trial of all Crimes . . . shall be held in the State where the said

Crimes shall have been committed."); FED. R. CRIM. P. 18 ("[T]he government must prosecute an

offense in a district where the offense was committed.  The court must set the place of trial

within the district with due regard for the convenience of the defendant, any victim, and the

witnesses, and the prompt administration of justice.").  As a "basic requirement of due process,"

a criminal defendant has the right to a "fair trial in a fair tribunal," Irvin v. Dowd, 366

U.S. 717, 722 (1961) (citation omitted), as well as a Sixth Amendment right to a trial "by an

impartial jury of the State and district wherein the crime [was allegedly] committed."  U.S.

Const. amend. VI.  Thus, pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure, a

court "must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." FED. R. CRIM. P. 21(a).

In Skilling v. United States, the Supreme Court recognized that "if extraordinary local prejudice will prevent a fair trial," it may be necessary to transfer a proceeding "to a different district at the defendant's request." Skilling v. United States, 561 U.S. 358, 378 (2010). The Supreme Court set forth a list of three non-exhaustive factors to consider in determining whether prejudice exists: (1) "the size and characteristics of the community in which the crime occurred"; (2) whether media coverage of the crime "contained [a] confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"; and (3) whether the time between the crime and the trial has "diminished" the "level of media attention." Id. at 382-83. The Supreme Court also cautioned that a "presumption of prejudice . . . attends only the extreme case" and that "[p]rominence does not necessarily produce prejudice, and juror impartiality . . . does not require ignorance." Id. at 381.

The D.C. Circuit has stated that it is "well established procedure" for a court to decline to transfer venue except in "extreme circumstances." United States v. Haldeman, 559 F.2d 31, 60, 64 (D.C. Cir. 1976) (en banc) (per curiam). Instead, voir dire is the preferred means of excluding prejudiced jurors. See id. at 62 (counseling against a "pre-voir dire conclusion" that "a fair jury cannot be selected"). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." Id. at 63.

III. DISCUSSION

*A. Jury Surveys*

Mr. GossJankowski cites two jury surveys in his motion – the Select Litigation Survey and the ILR Survey – and argues that these surveys "lead to the inescapable conclusion that prejudice has attached to the D.C. jury pool." Mot. at 4. Other judges of this court, however, have considered the same surveys in the context of motions to transfer venue, and have found that these surveys are "flawed" and fail to "supply persuasive evidence that would support a decision to transfer the case without trying the voir dire process first." United States v. Garcia, 2022 WL 2904352, at *10; see also, e.g., United States v. Nassif, 2022 WL 4130841, at *8-11; United States v. Rhodes, 2022 WL 2315554, at *20-23.

In United States v. Garcia, Judge Amy Berman Jackson examined both the Select Litigation Survey and ILR Survey and found both to be flawed. The first problem with the two surveys, she concluded, is that these surveys are not representative of the D.C. jury pool. See United States v. Garcia, 2022 WL 2904352, at *10. With respect to the Select Litigation Survey, "99% of the D.C. respondents were 'officially registered to vote in Washington, D.C.'" Id. at *11 (quoting Select Litigation Survey at 14). In contrast, the D.C. master jury wheel generates lists of potential jurors from three different sources, consisting of "the Registered Voters Master File of the D.C. Board of Elections"; "D.C. Department of Motor Vehicles records 'of individuals 18 years and older who hold a driver's license, learner's permit, or valid identification card'"; and "the list of all individuals of the District of Columbia whose income tax forms are filed with the D.C. Department of Finance and Revenue." Id. at *10 (citing Jury Selection Plan for the United States District Court for the District of Columbia for the Random Selection of Grand and Petit Jurors, United States District Court: District of Columbia, 1 (2016),

https://www.dcd.uscourts.gov/sites/dcd/files/JurySelectionPlan2016.pdf).  These sources include

swaths of the D.C. population beyond individuals registered to vote in the District of Columbia.

Thus, the Select Litigation Survey "excludes many [potential jurors] who live or work [in the

District of Columbia] but may have no particular political affiliation or interest" and fails to

"target the full range of this district's jury pool."  Id.  Because the Select Litigation Survey's

"method utilized for selecting survey participants is unexplained, there are no grounds to feel

confident that it accurately reflects the views of a cross-section of the D.C. jury pool."  Id.

at *11.  This Court agrees with Judge Jackson.

      The ILR Survey also offers "limited utility as a predictor of juror behavior."

United States v. Garcia, 2022 WL 2904352, at *11.  Although this survey purports to rely on this

Court's Jury Selection Plan in creating its list of potential survey respondents, the survey still

fails to "specify the sources it used" to generate its list, "clarify how [a] 'supplemental list of

consumers' was generated or obtained," or "describe how that [supplemental] list might be

related to the sources utilized by the Jury Office."  Id.

      In addition, both surveys suffer from the problem of flawed questions.  As

Judge Jackson explained, the respondents to the Select Litigation Survey "were informed that [it]

was a public opinion poll, and the questions specifically asked for a prediction based on what

respondents had 'heard or read[]' [about January 6 defendants] or to guess about a theoretical

case."  United States v. Garcia, 2022 WL 2904352, at *12 (quoting question four of the Select

Litigation Survey:  "From what you have heard or read, do you think the people who were

arrested for activities related to those demonstrations are guilty or not guilty of the charges

brought against them?").  The questions that the Select Litigation Survey posed to respondents

do not offer much insight on what potential jurors who are "screened for biases during voir dire

and asked if they can put aside what they have read or heard, and who are specifically instructed

that they may base their verdicts only on the evidence, will do when called upon to render a

verdict with respect to an individual defendant." Id.

        The ILR Survey is similarly flawed in the questions it posed to respondents.  The

survey asked "how respondents feel about current events, or to speculate, rather than how they

would behave during the formality of a jury trial." United States v. Garcia, 2022 WL 2904352,

at *13.  For example, question three of the ILR Survey – which asked whether respondents were

"more likely to find a defendant charged with crimes for activities on January 6th guilty or not

guilty" – "called for the 'likely' result in an abstract case with an unidentified defendant,

and . . . d[id] not do much to show that jurors would ultimately find any particular defendant

guilty, or refuse to view the evidence objectively even if instructed to do so by the presiding

judge." Id. (quoting ILR Survey at 22).

        For the same reasons articulated by Judge Jackson in United States v.

Garcia – and by other judges of this court – the Court is not persuaded that either the Select

Litigation Survey or the ILR Survey demonstrate that the risk of juror prejudice against

Mr. GossJankowski is so great as to warrant transfer of venue.  Based on the imprecise

formulation of their questions, both surveys draw overgeneralized conclusions from their results.

See, e.g., Select Litigation Survey at 4 ("An overwhelming majority of the District of Columbia

jury pool have a prejudgment about the case."); ILR Survey at 5 ("The results . . . show that bias

against individual defendants can be reasonably imputed from bias against the group of all

defendants charged with crimes related to the [e]vents of January 6th.").

        Furthermore, irrespective of the flaws in the surveys, the D.C. Circuit has held

that the results of jury surveys do not necessitate mandatory transfer of venue before voir dire.

In United States v. Haldeman, the defendants – including high-level White House officials and the former Attorney General of the United States, prosecuted in connection with the Watergate scandal – commissioned a poll showing that "93% of the Washington, D.C. population was found to know of the [Watergate] indictments"; "73% of those people were found to have an opinion of guilt or innocence[,] a proportion 15% more than the corresponding national average and 23% more than in one other sampled area, close by Richmond, Virginia"; and "the proportion of the total Washington, D.C. population that thought the [defendants] to be in fact guilty was about 61%[,] [which was] significantly higher than the corresponding national average of about 43%." See United States v. Haldeman, 559 F.2d at 144 (MacKinnon, J., concurring in part and dissenting in part).  Nevertheless, despite these results and the prominence of the defendants on trial, the D.C. Circuit concluded that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel."  Id. at 64 n.43.  As in United States v. Haldeman, the Select Litigation Survey and ILR Survey in this case do not support a finding of prejudice or the need for a change of venue.

In addition to the jury surveys, Mr. GossJankowski argues that each of the three factors that the Supreme Court articulated in United States v. Skilling for assessing potential juror prejudice compels transfer of venue in this case.  Mot. at 3.  The Court disagrees and will address each Skilling factor in turn.

### B.  Size and Makeup of D.C. Juror Pool

The first Skilling factor requires the Court to assess "the size and characteristics of the community in which the crime occurred" to determine whether there is potential prejudice.

10

<u>Skilling v. United States</u>, 561 U.S. at 382.  Mr. GossJankowski asserts that the "size and makeup of the D.C. juror pool ensures that prejudice has attached." Mot. at 10.  He argues that the District of Columbia is a relatively small major U.S. city, with a total population of approximately 690,000 residents, and that "an enormous share of D.C. residents has connections with the federal government and entities that were directly affected by January 6." <u>Id</u>. at 10-12. He points out that a large proportion of D.C. residents work for the federal government, including Congress; many D.C. residents have friends or family in law enforcement who responded to the Capitol on January 6; D.C. residents "report feeling deeply traumatized by the events that took place so close to where they live and work"; and "an overwhelming number" of D.C. residents voted for President Biden, whose electoral college certification was the target of the conduct of January 6 defendants. <u>Id</u>. at 10-13.

Judge Bates considered similar arguments in <u>United States v. Nassif</u>.  As Judge Bates explained, "courts have rejected the presumption of prejudice when confronted with similarly sized – and indeed smaller – populations" as the population of the District of Columbia. <u>United States v. Nassif</u>, 2022 WL 4130841, at *9 (citing <u>Skilling v. United States</u>, 561 U.S. at 382 (noting that there is a "reduced likelihood of prejudice where the venire was drawn from a pool of over 600,000 individuals"); <u>see</u> <u>United States v. Taylor</u>, 942 F.3d 205, 223 (4th Cir. 2019) (affirming denial of venue transfer motion where local population "was approximately 621,000 residents")).  In addition, as Judge Jackson explained, this court's "master list of available jurors is large enough to include individuals who have paid little or no attention to the January 6 cases.  It includes several hundred thousand District residents who may not be involved in policy or politics or the operation of the federal government at all [and] who travel to and from work or school without coming near the Capitol." <u>United States v.</u>

Garcia, 2022 WL 2904352, at *8.  And with respect to the political leanings of potential D.C. jurors, such leanings "are not, by themselves, evidence that those jurors cannot fairly and impartially consider the evidence presented."  Alford Order at 6; see United States v. Haldeman, 559 F.2d at 64 n.43.

During oral argument on January 17, 2023, counsel for Mr. GossJankowski contended that as more January 6 defendants go to trial and as more D.C. residents become jurors in January 6 trials, the more the D.C. jury pool shrinks.  See Transcript of Motions Hearing, January 17, 2023 ("Tr.") at 3:1-3:15.[1]  The Court is unpersuaded by this argument. There have been approximately twenty January 6 jury trials so far.  With a jury of twelve for each trial – and with the generous assumption of four alternate jurors on each jury – sixteen jurors for twenty trials would result in 320 individuals who potentially would have to be excluded from serving on a jury in another January 6 trial.  That is an extremely small number when compared to the District of Columbia's total population of 690,000 residents.  The fact that jurors are being impaneled for other January 6 trials has no meaningful impact on the number of potential jurors for Mr. GossJankowski's trial.  It therefore is not a reason to transfer his trial from this district.

### C.  Media Coverage

The second Skilling factor is whether media coverage of the defendant's conduct at issue "contained [a] confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  Skilling v. United States, 561 U.S. at 382.  Mr. GossJankowski argues that he is prejudiced by media coverage of the events of

---

[1]    No official transcript of these proceedings has yet been prepared.  References are to a rough draft of the transcript generated by the court reporter at the Court's request.

January 6 in the District of Columbia. Mot. at 14. The Court disagrees. "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." United States v. Childress, 58 F.3d 693, 706 (D.C. Cir. 1995). Jurors need not be "totally ignorant of the facts and issues involved" in a case; rather, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. at 722-23. Even if media coverage is "pervasive and concentrated," pretrial publicity "cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial." Neb. Press Ass'n v. Stuart, 427 U.S. 539, 565 (1976). In addition, "[w]hen publicity is about [an] event, rather than directed at the individual defendants, this may lessen any prejudicial impact." Skilling v. United States, 561 U.S. at 384 n.17 (citation omitted).

The second Skilling factor therefore does not support a transfer of venue. As Mr. GossJankowski himself acknowledges, "[m]ost, if not all" of the media coverage of the events of January 6 "has nothing to do with Mr. GossJankowski or this prosecution." Mot. at 16. By contrast, in Rideau v. Louisiana, the pretrial publicity that led the Supreme Court to determine that there was prejudice against the defendant involved a recording of the defendant's interrogation and confession, which was broadcast in a small town prior to trial. See Rideau v. Louisiana, 373 U.S. 723, 724 (1963). Mr. GossJankowski's case is very different. It is likely that "not a single member of the venire will ever have heard of [Mr. GossJankowski], much less have formed an opinion of his guilt." United States v. Nassif, 2022 WL 4130841, at *10. The Court is also unpersuaded by Mr. GossJankowski's attempt to distinguish his case from Skilling, where the Supreme Court concluded that a change of venue was unwarranted in the criminal

prosecution of a former Enron executive despite extensive local media coverage.  See Skilling v.
United States, 561 U.S. at 367-68, 385.

### D.  Time Between January 6 and Trial

The third Skilling factor is whether the time between the date the offense was
committed and the date of trial has "diminished" the "level of media attention."  Skilling v.
United States, 561 U.S. at 383.  Mr. GossJankowski suggests that for the past twenty months,
D.C. residents have been exposed to "extensive and persistent" news coverage of the events of
January 6.  Mot. at 16-17.  Mr. GossJankowski's trial, however, is scheduled to begin on
February 27, 2023 – over two years after the events of January 6, 2021 and his arrest on
January 18, 2021.  While media coverage of January 6 has continued, particularly around the
anniversary of the event, "it no longer dominate[s] the news and ha[s] become less intense than it
was in the immediate aftermath of the riot."  United States v. Garcia, 2022 WL 2904352, at *9
(citing In re Tsarnaev, 780 F.3d 14, 22 (1st Cir. 2015) ("The nearly two years that have passed
since the [Boston] Marathon bombings has allowed the decibel level of publicity about the
crimes themselves to drop and community passions to diminish.")).  There is also no indication
that Mr. GossJankowski's case in particular has been heavily featured in the news.  The Court
therefore concludes that the current media coverage "is not of the type or tenor requiring a
transfer of venue."  United States v. Nassif, 2022 WL 4130841, at *10.[2]

---

[2]     During oral argument, counsel for Mr. GossJankowski highlighted a fourth
Skilling factor:  whether a jury's verdict "undermine[s] in any way the supposition of juror bias."
Skilling v. United States, 561 U.S. at 383; see Tr. at 2:8-2:25.  Counsel argued that this factor
reinforces Mr. GossJankowski's argument that he cannot receive a fair and impartial jury trial in
this district because nearly every jury trial in a January 6 case has resulted in the conviction of
the defendant or defendants on all counts.

*E.   The Sufficiency of Voir Dire*

The Court agrees with the other judges of this court who have concluded that <u>voir dire</u> is the appropriate means of assessing potential juror prejudice.  As Judge Jackson pointed out, "[t]he January 6 cases will not be the first politically or emotionally charged trial in the District of Columbia."  <u>United States v. Garcia</u>, 2022 WL 2904352, at *6.  In those other cases – relating to the assassination of President Garfield in 1881, the Teapot Dome scandal in the 1920s, the shooting of members of Congress from the gallery of the House of Representatives in 1954, the Watergate scandal in the 1970s, John Hinckley's attempted assassination of President Reagan in 1981, and, more recently, the prosecutions of Scooter Libby, Senator Ted Stevens, Paul Manafort, and Roger Stone – "the safeguard against a biased jury has always been the same:  an 'extensive voir dire' with a 'detailed inquiry into the sources and intensity of the [ ] exposure to [pretrial] publicity.'"  <u>Id.</u> (quoting <u>United States v. Haldeman</u>, 559 F.2d at 69).  In fact, several juries have successfully been impaneled in other January 6 cases, including cases involving defendants who have received much more individual news coverage than Mr. GossJankowski has.  <u>See</u> Minute Entry, <u>United States v. Rhodes</u>, Crim. No. 22-15 (D.D.C. Sept. 27, 2022) ("Minute Entry for proceedings [in Oath Keepers trial] held before Judge Amit P. Mehta:  Jury Selection as to ELMER STEWART RHODES, III (1), KELLY MEGGS (2), KENNETH HARRELSON (3), JESSICA WATKINS (4), and THOMAS

---

The Court disagrees that this factor supports Mr. GossJankowski's request to transfer venue.  Whether a jury's verdict "undermine[s] in any way the supposition of juror bias" is not for this Court to consider at this stage of the proceedings, before a jury in Mr. GossJankowski's trial has even been selected, let alone reached a verdict.  <u>See Skilling v. United States</u>, 561 U.S. at 383 ("It would be odd for <u>an appellate court</u> to presume prejudice in a case in which jurors' actions run counter to that presumption." (emphasis added)).  Moreover, the jury verdicts in <u>other</u> January 6 trials, with facts specific to those defendants, do not support juror prejudice against Mr. GossJankowski.

EDWARD CALDWELL (10) began and held on 9/27/2022."); see also United States v. Garcia, 2022 WL 2904352, at *10 (collecting cases and concluding that "[t]o date, courts have had little difficulty qualifying enough jurors to empanel juries, with the requisite number of alternates, in January 6 cases").  Accordingly, there is no reason to transfer this case from the District of Columbia to another jurisdiction without first attempting to voir dire potential jurors.

For the foregoing reasons, it is hereby ORDERED that Mr. GossJankowski's Amended Motion for Transfer of Venue [Dkt. No. 79] is DENIED; and it is

FURTHER ORDERED that Mr. GossJankowski's Motion for Transfer of Venue [Dkt. No. 71] is DENIED as moot.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE:  1 | 25/23

16