UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | No. 21-cr-123 (PLF) |
| ) | |
| VITALI GOSSJANKOWSKI, ) | |
| ) | |
| Defendant ) | |
| ) | |

**OPPOSITION TO GOVERNMENT'S MOTION TO EXCLUDE
DEFENSE EXPERTS AND FOR A *DAUBERT* HEARING**

Mr. Vitali GossJankowski, through counsel, hereby responds to the Government's Motion to Exclude the Proposed Expert Testimony of Mark Kroll and Judy Shepard-Kegl or For a *Daubert* Hearing ("Gov't Mot."), ECF 112. For the reasons discussed below, the Court should deny the government's motion in full on the papers. No *Daubert* hearing is necessary or warranted.

BACKGROUND

Mr. GossJankowski is profoundly Deaf. His first language was not English, but rather American Sign Language ("ASL").[1] He is charged with, *inter alia*, three felony counts alleging the use or carrying of a "deadly or dangerous weapon, that is, a Taser," in violation of 18 U.S.C. §§ 111(b) and 1752(b)(1)(A). Superseding Indictment at 2–3, ECF 41 (Counts Three, Four, and Five). In the wake of January 6, law enforcement questioned Mr. GossJankowski extensively about the alleged "Taser," and internet trolls labeled photographs of Mr. GossJankowski online

---

[1] ASL is a language that is distinct from English in both syntax and grammar. "ASL is not derived from English; ASL has its own syntax and grammar and utilizes signs made by hand motions, facial expressions, eye gazes, and body postures." *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 275 (D.D.C. 2015) (Brown Jackson, J.).

1

with "#taserguy." The government now apparently "anticipates proving that the defendant used and carried a stun gun which is distinct from a" Taser. Gov't Mot. at 5. The object was not recovered. However, it is visible in multiple videos and photographs of the charged conduct provided in discovery. In some of those videos it has been activated; a buzzing sound can be heard and an electric arc can be seen between two electrodes at the end of the device.

Regardless of whether the object at issue here was a Taser or a stun gun, to meet its burden of proof at trial the government must prove beyond a reasonable doubt that (1) the object was capable of causing serious bodily injury or death to another person *and* (2) the defendant used it in that manner. *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002). Thus, whether the object was capable of causing serious bodily injury or death will be a central issue at trial. Tasers and stun guns are non-lethal. *See Caetano v. Massachusetts*, 577 U.S. 411, 415 n.2 (2016) (Alito, J., concurring). Moreover, every handheld device capable of producing some visible and audible electrical charge does not necessarily qualify as a Taser or a stun gun. Standards in the field establish the amount of charge a device must emit to qualify as either a Taser or stun gun. There are countless handheld devices available for purchase by the general public that produce sound and an electrical charge (many of which are marketed as "stun guns") that are far less powerful than would be required to qualify that device as a Taser or a stun gun. And of course, the strength of the charge a handheld device is capable of emitting goes directly to the question at issue in three of the felony charges here: whether the device is capable of causing serious injury or death.

**Dr. Kroll**

Dr. Mark Kroll is a biomedical scientist specializing in bioelectricity, the interaction of electricity and the human body. He has a B.S. in mathematics and an M.S. and Ph.D. in

electrical engineering from the University of Minnesota.  His research focuses on the effect of electrical shocks on the human body.  He has authored over 200 abstracts, papers, and book chapters on "Conducted Electrical Weapons" (CEW), and co-edited the only two scientific treatises on that topic.  His qualifications as an expert in the field of electrical devices and electrical weapons are extensive.  *See* Kroll Report at 4–6, ECF 112-2; Kroll C.V. (attached as Ex. 1).  Accordingly, numerous courts have found him qualified to provide expert testimony and opinion relating to electrical weapons.  *See, e.g., Silva v. Chung*, 2019 WL 2195201, at *4–5 (D. Haw. May 21, 2019).

Dr. Kroll viewed several images and videos of the device Mr. GossJankowski was holding on January 6.  Using his education, training, experience, and expertise with electrical devices and electrical weapons, he was able to identify the device as a Vipertek VTS-979 or POLICE 916.  Kroll Report at 19 (Opinion Methodology).  He obtained seven devices (four units of the Vipertek TVS-979 and three units of the POLICE916) and performed electrical testing on them.  *Id*. at 11–12.  He compared the electrical output of the devices to standard electrical outputs of electrical nerve stimulators (used for medical purposes), stun guns, and Tasers, using specific standards published by the American National Standards Institute ("ANSI"), the American Association for Medical Instrumentation ("AAMI"), and the International Electrotechnical Commission ("IEC").  *Id*. at 13.

Dr. Kroll found, *inter alia*, that the devices he tested were too weak—lacked sufficient electrical power—to even be considered a medical nerve stimulator by the FDA.  They came nowhere close to the maximum charge permissible, which standard is in place specifically to preclude the possibility of causing injury.  *Id*. at 14.  Dr. Kroll concluded that:

1. The device in this incident was a Vipertek VTS-979 or POLICE 916.

2. The device allegedly used in this incident was *not* a stun gun.

3. The device allegedly used in this incident was *not* an electroshock weapon.

4. The device allegedly used in this incident was *not* a TASER® electrical weapon.

5. The device is best described as a "sparkler flashlight" since its effects are primarily auditory and visual and there is no stunning. To use a canine analogy, it was all bark and no bite.

6. It is my opinion to a reasonable degree of scientific certainty that the device could not be used in a manner likely to endanger life.

7. It is also my opinion to a reasonable degree of scientific certainty that the device cannot be used in a manner likely to inflict serious bodily harm because it cannot cause injury that involves a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

Kroll Report at 7.

### Dr. Shepard-Kegl

Dr. Judy Shepard-Kegl is a linguist specialized in theoretical and neurolinguistics, an ASL interpreter with national credentialing, and an interpreter trainer. She is also nationally certified in oral transliteration. She has a B.A. in linguistic anthropology and an M.A. in linguistics from Brown University, and a Ph.D. in theoretical linguistics from M.I.T., with a dissertation on word formulation, syntax, and discourse in ASL. She currently teaches linguistics and interpreting, directs the Signed Language Research Laboratory, and coordinates the ASL/English Interpreting Concentration of the Linguistics major at University of Southern Maine. Her research and teaching experience include theoretical linguistics, bilingualism, neurolinguistics, and cultural research on spoken and signed languages, emergent languages, and cases of language deprivation. Shepard-Kegl Report at 2–3, ECF 112-3; Shepard-Kegl C.V. (attached as exhibit 2).

Dr. Shepard-Kegl met with and assessed Mr. GossJankowski's communication abilities, including his ability to verbalize English via speech and understand spoken English through lipreading. She concluded, based upon her education, training, and experience as a linguist, oral transliterator, and interpreter, and upon her professional assessment of Mr. GossJankowski, that:

> 1. Mr. GossJankowski's "speech is completely unintelligible and practically non-existent," and that "[h]e is unable to rely upon speech for access to communication";
>
> 2. Mr. GossJankowski's "lipreading skills are negligible"; "[h]e can comprehend less than 8% of verbal communication through lipreading" and "is unable to rely upon lipreading for access to communication in even the most basic situations"; and
>
> 3. "at no time during the events of January 6th (including the rally march, and events at the Capitol) could he have accessed or shared communication with anyone (other participants or law enforcement officers) via lipreading and speech."

Shepard-Kegl Report at 15.

Mr. GossJankowski may seek to present the testimony of Dr. Kroll and/or Dr. Shepard-Kegl in his defense case-in-chief at trial.

## LEGAL STANDARD

Under Rule 702 an expert may testify if his or her "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," so long as the witness "is qualified as an expert by knowledge, skill, experience, training, or education"; the witness's "testimony is based on sufficient facts or data [and] . . . is the product of reliable principles and methods"; and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "In general, Rule 702 has been interpreted to favor admissibility." *United States v. Sutton*, 2022 WL 16960338, at *2 (D.D.C. Nov. 16, 2022) (citation omitted). Expert testimony is admissible if it is reliable and

5

relevant. *Id*. As this Court has explained:

> With respect to reliability, the court's focus must be on the methodology or reasoning employed by application of the factors in Rule 702 and the non-exhaustive lists of factors set forth in *Daubert* and *Kumho*. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."); *Ambrosini v. Labarraque*, 101 F.3d at 140 ("[T]he admissibility inquiry focuses not on conclusions, but on approaches."). With respect to relevance, the court must determine whether the proffered testimony is sufficiently tied to the facts of the case and whether it will aid the jury in resolving a factual dispute. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 592-93.

*Id*.

For reliability, the same factors will not be appropriate in every case. "The test of reliability is 'flexible' and 'the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.'" *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 972 (D.C. Cir. 2016) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999)). For relevance, it is a question of "fit." *Daubert*, 509 U.S. at 591. "The district court must determine whether the proffered expert testimony 'is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Ambrosini v. Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996) (quoting *Daubert*, 509 U.S. at 591).

"Under Rule 704(a) of the Federal Rules of Evidence, 'an opinion is not objectionable just because it embraces an ultimate issue.'" *Id*. at *3 (quoting FED. R. EVID. 704(a)). "[A]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was [or was not] satisfied." *Burkhart v. WMATA*, 112 F.3d 1207, 1212 (D.C. Cir. 1997).

A trial court has "latitude . . . to decide whether or when special briefing or other

6

proceedings are needed to investigate reliability." *Kumho Tire*, 526 U.S. at 152. "District courts are not required to hold a *Daubert* hearing before ruling on the admissibility of scientific evidence." *See In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1138–39 (9th Cir.2002) (*citing United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir.2000)).

## ARGUMENT

**I.       Dr. Mark Kroll's Testimony is Relevant, Reliable, and Admissible.**

Dr. Kroll's testimony is directly relevant to and will assist the jury in determining whether the alleged device was a deadly or dangerous weapon, i.e., whether it was capable of causing serious injury or death. Dr. Kroll's testimony is necessary to explain the difference between a Taser, a stun gun, and a sparkler flashlight because the government and others have repeatedly referred to the alleged weapon in this case as a "Taser" and will likely mistakenly refer to this device as either a Taser or a stun gun at trial. In addition, his testimony is necessary to explain the level of power of the alleged weapon. How powerful the alleged weapon was is crucial to the jury's factual determination of whether it was carried or used as a deadly or dangerous weapon.

The government's arguments are meritless. First, it makes no difference that the government now apparently agrees that the alleged weapon was not a Taser. Gov't Mot. at 5–6. In the wake of January 6, law enforcement questioned Mr. GossJankowski extensively about the alleged "Taser," and internet trolls labeled photographs of Mr. GossJankowski online with "#taserguy." Most people, unfamiliar with electrical weapons, including members of a jury, are unaware of crucial distinctions between electrical devices and are likely to assume that any device that produces an electrical charge or visible spark has the same characteristics as a Taser or stun gun and might be capable of injuring or incapacitating a person. It is therefore critical to

Mr. GossJankowski's defense to present evidence that the alleged weapon was not a Taser, regardless of the government's position on that matter. In addition, Dr. Kroll will testify that, contrary to the government's assertion, the alleged weapon was *not* a stun gun either. Because it produces such a minimal charge, it would be more appropriately referred to as a sparkler flashlight, incapable of causing bodily injury when used in its intended manner.

Second, the government challenges Dr. Kroll's identification of the alleged weapon, claiming, nonsensically, that any layperson can identify an electrical device and that identifying the device required no specialized knowledge, skill, training, education or experience. Gov't Mot. at 6–8. This argument is belied by the government's own misidentification of the alleged weapon as a "Taser" that it now "anticipates proving" was a "stun gun." *Id*. at 5. To the extent that the government takes issue with the accuracy of Dr. Kroll's identification, the "likelihood of error for the identification," or the "methodology . . . used to select weapons to compare," *id*. at 7, that goes to the weight of the evidence and not to its admissibility. The government can explore these issues on cross-examination. Identifying an electrical weapon is in no way "layman's work." Importantly, it does not appear that the government has made any independent effort to identify the object Mr. GossJankowski possessed. The government is apparently instead planning to suggest to the jury, absent any evidence about the characteristics or power of the object, that it constituted a "stun gun" that qualifies as a deadly or dangerous weapon. The defense must be entitled to counter the government's baseless arguments using expert testimony about the object and its characteristics.

Third, Dr. Kroll's identification of the alleged weapon was not "speculative." Gov't Mot. at 8. It was based on his education, training, and experience. Kroll Report at 19. Other courts have rejected similar claims, reasoning that the opposing party "can explore on cross-

examination the specific variables utilized by [Dr.] Kroll." *Rowan v. Sunflower Elec. Power Corp.*, 2017 WL 3593223, at *2 (D. Kan. Aug. 21, 2017). *See also Estate of Carlock v. Williamson*, 2012 WL 75765, at *6 (C.D. Ill. Jan. 10, 2012) ("Plaintiff's objections to the reliability of Kroll's opinions go to the weight of the evidence, not its admissibility. Plaintiff may, on cross-examination, challenge Kroll's theories . . . ."). Moreover, as other courts have recognized, the government can present its own expert witness testimony to discredit Dr. Kroll, though the government has noticed no such expert. *Id*. "The soundness of the factual underpinnings and the correctness of [Dr. Kroll's] conclusions are matters for the jury, and do not go to the admissibility of his opinion." *Silva v. Chung*, 2019 WL 2195201, at *5 (D. Haw. May 21, 2019) (citing *Daubert*, 509 U.S. at 596).

Dr. Kroll has the relevant experience, knowledge, and training to form an opinion that the alleged weapon in this case was a sparkler flashlight, not a stun gun or a Taser. He sufficiently explained his identification of the device in this case, and the government is free to challenge his identification and methodology during cross-examination. *See Martin v. City of Reading*, 2015 WL 4714649, at *2 (E.D. Pa. Aug. 7, 2015) ("[A]n expert s free 'to base his opinion on a particular version of disputed facts,' and the burden is on opposing counsel to 'explore the facts and assumptions underlying the testimony of an expert witness . . . during cross examination.'" (quoting *Walker v. Gordon*, 46 F. App'x 691, 696 (3d Cir. 2002)). The government's objections here do not call into question Dr. Kroll's ability to testify as an expert witness under Rule 702 and are, instead, proper subject for cross-examination. *Id*. Moreover, significantly, the government bears the burden of proof in this case and has not presented any facts or data providing any basis to identify the alleged weapon as anything other than the device Dr. Kroll identified.

Fourth, the defense does not seek to present Dr. Kroll's opinion on "weapons generally." Gov't Mot. at 9–10. The defense seeks to present Dr. Kroll's opinions regarding *electrical* weapons and, more specifically, the device possessed by Mr. GossJankowski in this case. He is clearly qualified to opine on what constitutes an electrical weapon—he has, *inter alia*, co-edited two treatises on this topic. He performed testing on several devices he has identified as being the same type of device possessed by Mr. GossJankowski and will testify about the charge produced by those devices and whether those devices could produce serious bodily injury or death. Again, this is a crucial element of three felony charges against Mr. GossJankowski. The government does not explain why a law degree, "law enforcement background or training, or military or other experience," *id*. at 10, would be necessary to qualify a person as an expert on electrical weapons. As this Court has recognized, "[a]n expert may be qualified on the basis of his or her practical experience." *Sutton*, 2022 WL 16960338, at *2 (citation omitted).

The government's challenge to Dr. Kroll's lack of "connection to the unique events of January 6, 2021" or "what may have endangered law enforcement officers confronting a violent mob, or what weapons caused police officers physical pain or impairment, or loss of physical or mental function," Gov't Mot. at 10, makes no sense. The defense will present Dr. Kroll's opinion only with respect to the specific facts of this case—and the specific alleged assault on a specific officer here. No expertise or connection to January 6 as a general matter is necessary, warranted, or appropriate. Dr. Kroll will not provide blanket assertions or generalizations about "the wide variety of items used or repurposed as weapons during the events of that day." Gov't Mot. at 11. As an expert in electrical weapons, he will testify that the "weapon" that Mr. GossJankowski is alleged to have carried and used is not deadly or dangerous when used in its intended manner.

Lastly, the government essentially concedes that an object's "inherently dangerous qualities, if any" are relevant to the determination of whether a weapon is deadly or dangerous. Gov't Mot. at 11. Mr. GossJankowski does not, for the purposes of this motion, dispute the government's recitation of the law or that "an item can qualify as a deadly or dangerous weapon without being inherently dangerous and without being designed to be dangerous." *Id*. at 11–13. But, as the government recognizes, it also "may depend on its inherent capabilities." *Id*. at 14. The government may make its various arguments, including that "GossJankowski intended to use [t]he stun gun like baton or a club or a rock" and not as it was intended, to the jury. That is not a valid legal basis to exclude the defense's extremely probative, valuable expert testimony.

Mr. GossJankowski has the absolute right to dispel any presumption by the jury that the alleged weapon was a powerful electrocution device. Absent this crucial expert testimony, the jury will be left with only video showing this device creating a noise and a visible arcing electrical charge. A layperson lacking any experience with these devices is likely to assume that a device that arcs and creates a buzzing sound would necessarily cause injury if it is applied to another person. Dr. Kroll, relying upon his extensive expertise in the area, must be permitted to dispel this myth, particularly given the fact that it is clear that the device possessed by Mr. GossJankowski did not even have enough power to qualify as a medical muscle stimulator.

The Court should summarily deny the government's motion with respect to Dr. Kroll.

**II.     Dr. Judy Shepard-Kegl's Testimony is Relevant, Reliable, and Admissible.**

The government does not challenge the qualifications or reliability of Dr. Shepard-Kegl's expert testimony, but argues, essentially, that it is irrelevant, undisputed, and not "expert." Gov't Mot. at 15–17. On relevance, the government is wrong. Mr. GossJankowski's knowledge and intent are key elements of the alleged crimes. Also, significantly, Mr. GossJankowski is charged

11

with aiding and abetting the obstruction of an official proceeding (Count Two). His knowledge of what was going on around him and what he was doing on January 6 were directly impacted by his inability to hear, speak, or lipread English—and thus his inability to understand or communicate with those people he is alleged to have aided and abetted. Among other things, jurors are likely to hear evidence of alarms going off, of police yelling commands to rioters to move back or leave, of rioters making threatening statements to members of law enforcement, and of rioters verbalizing plans and directives to one another. Mr. GossJankowski did not absorb any of this and the defense must be permitted to dispel any belief that he may have been able to understand any of these things or to communicate with others in the crowd.

Even though the government does not dispute Mr. GossJankowski's inability to lipread, understand spoken English, or speak English himself, Gov't Mot. at 16, this information is nonetheless relevant and material to his *mens rea*, and Mr. GossJankowski is entitled to present a defense case at trial.

The government's assertion that an assessment of a Deaf individual's lipreading ability does not "require[] expertise, technical understanding, or specialized education" and "fall[s] easily within the bounds of a juror's ordinary experience," Gov't Mot. at 16, is simply incorrect. A layperson has no ability to know if a Deaf individual can read lips and understand spoken English, and many people incorrectly assume that Deaf individuals can lipread, when the majority cannot. The government's misunderstanding shows exactly why Dr. Shepard-Kegl's testimony is critical. Contrary to the government's assertion, Mr. GossJankowski cannot himself testify to his ability to lipread, because he has no way of determining whether what he may think is being spoken is actually being spoken at any given time. Similarly, laypeople, including "friends, family, teachers, or others," are not qualified or capable of opining on his abilities.

### III.     No *Daubert* Hearing Is Necessary or Warranted.

This Court has "latitude . . . to decide whether or when special briefing or other proceedings are needed to investigate reliability." *Little v. Washington Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 409 (D.D.C. 2017) (*quoting Kumho Tire*, 526 U.S. at 152). "District courts are not required to hold a *Daubert* hearing before ruling on the admissibility of scientific evidence." *Id*. (*quoting In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1138-39 (9th Cir. 2002) (*citing United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000)). "Thus, a trial court properly may exercise its discretion to forego a formal pretrial hearing outside the presence of the jury," and "where the dispute is easily resolved, no hearing, in limine or otherwise, should be necessary." *Id*. (*quoting* 29 Wright & Miller, Federal Practice & Procedure: Evidence § 6266 (1st ed. & Supp.)). Still, "the trial court should identify for the record the factors bearing on reliability that it relied upon in reaching a determination." *Id*. (quoting 29 Wright & Miller § 6266).

Here, the government's challenges to the proffered defense expert testimony are easily resolved without a hearing. The issues about which the experts will testify are relevant, their methodologies were reliable, and their expertise is unquestionable. If the Court wishes to hold a hearing, the defense respectfully requests that it occur on the same day the witness testifies at trial, before the testimony, outside the presence of the jury, because both experts are located out-of-state and have significant time constraints. If the Court wishes to hold a *Daubert* hearing at the pretrial conference scheduled on February 23, 2023 or before the start of trial, the defense respectfully requests that the witnesses be permitted to appear remotely by video.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's motion.

              Respectfully submitted,

              A.J. KRAMER
              FEDERAL PUBLIC DEFENDER

              _____/s/_____
              Ubong Akpan
              Celia Goetzl
              Edward Smock
              Assistant Federal Public Defenders
              625 Indiana Ave., N.W., Suite 550
              Washington, D.C.  20004
              (202) 208-7500