```
 1                        UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
 2
      ------------------------------------------------------------
 3                                  )
      United States of America,     )   File No. 21-cr-123
 4                                  )            (PLF)
               Plaintiff,           )
 5                                  )
      vs.                           )   Washington, D.C.
 6                                  )   February 27, 2023
      Vitali Gossjankowski,         )   9:14 a.m.
 7                                  )
               Defendant.           )
 8    ------------------------------------------------------------
 9
                    BEFORE THE HONORABLE PAUL L. FRIEDMAN
10                  UNITED STATES DISTRICT COURT JUDGE
                            (PRETRIAL CONFERENCE)
11
      APPEARANCES:
12    For the Plaintiff:         United States Attorney's Office
                                 Adam Dreher, AUSA
13                               Francesco Valentini, AUSA
                                 Karen Rochlin, AUSA
14                               Capitol Siege
                                 601 D Street NW
15                               Washington, Minnesota 20530

16    For the Defendant:         Federal Public Defender for the
                                 District of Columbia
17                               Celia Goetzl, ESQ.
                                 Edward Smock, ESQ.
18                               625 Indiana Avenue NW
                                 Suite 550
19                               Washington, D.C. 20004

20    Court Reporter:            Lynne M. Krenz, RMR, CRR, CRC
                                 Suite 146
21                               316 North Robert Street
                                 St. Paul, Minnesota 55101
22
      American Sign Language     Sara Blattberg
23    Interpreters:              Carla Mathers

24
                  Proceedings reported by certified stenographer;
25    transcript produced with computer.
```

1                    **P R O C E E D I N G S**

2                        **IN OPEN COURT**

3        (Defendant present)

4            THE CLERK:  This is criminal action 21-123, United

5    States versus Vitali Gossjankowski.

6            For the United States I have Francisco Valentini

7    and Adam Dreher.

8            For the defendant I have Edward Smock and Celia

9    Goetzl.

10           Our American Sign Language interpreters today are

11   Sara Blattberg and Carla Mathers.

12           Our court reporter today is Lynne Krenz.

13           All parties are present.

14           THE COURT:  Okay.  Good morning, everybody.

15           THE CLERK:  Could I have the interpreters.

16           (Interpreters sworn.)

17           THE INTERPRETERS:  I do.

18           THE CLERK:  Thank you.

19           THE COURT:  Good morning.

20           So I think we've got a lot to talk about today and

21   I don't have any particular preference as to the order in

22   which we address the issues that are open, although what I

23   do want to make sure that we do is assuming we're going to

24   be here more than just this morning, before we break for

25   lunch, I want to make sure we've talked about the voir dire

3

1    questions because if I need to revise them or reorganize

2    them or something I would like to get that process going.

3            So other than that suggestion that we have that

4    discussion at some point before the lunch hour, I will leave

5    it to you to decide which motions you want to -- you want to

6    argue in which order, and I know with respect to some of

7    them you want me to see some videos.

8            So who wants to start?  Mr. Smock?

9            MR. SMOCK:  Good morning, Your Honor.

10           You mentioned voir dire.  It might make sense to

11   start with that but I, of course, defer to the Court.

12           THE COURT:  It's all right with me.

13           MR. DREHER:  Yes, that makes sense to me.

14           THE COURT:  So what I would say about that is, I

15   had suggested that the defense -- that you all go back and

16   revisit the submission you earlier had made and that there

17   was some redundancies and that I ask that the defense --

18   yeah, that's a good idea, Mr. Valentini, and that the

19   defense try to simplify, get rid of the redundancies and all

20   that, which they did.

21           And what struck me in what was filed is that the

22   defense filed first on Docket 136 on the 24th and then the

23   government filed on the 25th, Docket 144.

24           And so the government, seemed to me, made an

25   effort to wherever possible use the language that the

1    defendant had proposed.  So it's likely that our areas of

2    dispute are much narrower than they were the other day.

3              So I would, and maybe the way to do it, Mr. Smock,

4    is to look at the government's filing and -- because they've

5    incorporated a lot of what you've proposed, and then go

6    through it and tell me where you disagree or you don't like

7    their language and then go back to yours and see what you

8    want to add.

9              MR. SMOCK:  That sounds alright.

10             You're right.  That, I mean, I was yesterday

11   evening kind of going through and highlighting the points of

12   agreement and there's much more agreement than there are

13   disagreement.  So I think that's a fine way of going about

14   it.

15             I think there are several that we proposed that we

16   would submit should still be read to the jury and we can

17   have argument --

18             THE COURT:  Okay.

19             MR. SMOCK:  -- if that's necessary afterwards.

20             THE COURT:  We'll just go back and forth.

21             Can I ask both of you a question?  The first

22   question from each of you, Do any of you live outside the

23   district?

24             Now, obviously you have to be a resident of D.C.

25   to sit on a D.C. jury.  Did you include that because that's

1        a problem that people have moved or something?

2                MR. VALENTINI:  Your Honor, I think it's intended

3        to capture the possibility that somebody may have a

4        residence or former residence in D.C. while not in fact

5        living in D.C.  That's the extent of the question.

6                THE COURT:  And I don't mind asking it, I just

7        wondered why it was there.

8                MR. SMOCK:  I think it's the government's initial

9        proposal.  We didn't have a strong objection to it --

10               THE COURT:  Okay.

11               MR. SMOCK:  -- so in the interest of being

12       agreeable we put it in there.

13               THE COURT:  All right.  It's fine.

14               MR. SMOCK:  I don't --

15               THE COURT:  All right.  So how do we want to go

16       through this?

17               MR. SMOCK:  So I guess if we're going through it

18       first by looking at the government's proposals, I think to

19       some extent these -- well, first of all, it seems as if

20       there's an agreement as to 1, 2, 4, 5 and 6, I think those

21       are all essentially consistent with ones that both parties

22       had submitted before.

23               Then I think with respect to number 3, it may just

24       be a difference of wording.  And I think our preference

25       would be to substitute, well, our questions 4 and 5 I think

1    essentially capture that, but with a little bit more

2    specificity.

3                And --

4                THE COURT:  So their number 3, your 4 and 5 is --

5    were some you would prefer?

6                MR. SMOCK:  Yes.

7                THE COURT:  Well, I think -- actually, family

8    member or close friend is narrower than someone you know and

9    it may be sufficient, so.

10               MR. VALENTINI:  In that respect, Your Honor, if I

11   may interject, in that respect the question is narrower.

12   However, our concern is was more to the remainder of the

13   question it's, you know, affected by the January 6 events,

14   seems to be an very open-ended question.

15               We think our phrase --

16               THE COURT:  Affected by.  You say -- they say --

17   the government says direct or indirect connection and

18   defense says affected by.

19               MR. VALENTINI:  Yeah.

20               MR. SMOCK:  And I think affected by is the

21   appropriate question because we want to encompass folks who

22   might feel that direct or indirect connection is quite

23   narrow and affected by -- addresses people --

24               THE COURT:  All right.

25               MR. SMOCK:  -- who, for example, feel that they

1      have been somehow psychologically harmed or, you know, in

2      some way impacted.  And I think what we're trying to do is

3      just elicit a response that is accurate.

4                  THE COURT:  Okay.

5                  MR. SMOCK:  And then can create followup

6      questions.

7                  THE COURT:  Okay.  I get the point.

8                  What about personally victims?  What do you mean

9      by that?

10                 MR. SMOCK:  I think it's a more direct way of

11     asking question number 4 and trying to get at the question

12     of whether there is a personal, strong feeling about the

13     impact on the --

14                 THE COURT:  Let me put it --

15                 MR. SMOCK:  -- the citizens of Washington D.C.

16                 THE COURT:  That's a very subjective thing.  And I

17     think that I'm disinclined to give it, particularly if I use

18     your language "affected by."  You know, what do you mean,

19     you feel like you were a victim, do you believe you were a

20     victim?

21                 I'd rather have somebody say, I was or a close

22     friend was affected by and then ask them some followup

23     questions rather than have them characterize themselves as

24     victims.  I mean, a lot of people feel victimized these

25     days.

1          MR. SMOCK:  That's for sure.

2          THE COURT:  So I think what I will do is I will --

3     I'll think about this, but I think I will probably do some

4     version of the defendant's number 4 but not Number 5.

5          MR. SMOCK:  So I think to the extent we're going,

6     again, specifically looking at the government's submissions,

7     I think there's an agreement as to 7 and 8 based on my

8     reading.

9          I think we would object to Number 9.  I appreciate

10    that one possible motivation for the government asking that

11    question is making sure that there's no preconceived

12    notions, et cetera, but I think that 7 and 8 capture that.

13         9, from our perspective might suggest that this

14    alleged conduct was kind of a very significant thing covered

15    on the news and should be taken very seriously.

16         And I don't want to give the jury the impression

17    that this is something that has been a focus of national

18    news coverage or internet coverage.

19         I think 7 and 8 adequately address the question of

20    whether they are aware of our client and the conduct that's

21    alleged.

22         THE COURT:  Is there a question later about seeing

23    videos of the events in general?

24         MR. VALENTINI:  Yes.

25         MR. SMOCK:  I believe there is, yes.

1          MR. VALENTINI:  Yes, Your Honor.

2          To answer your question, the government proposed

3    number 4, which I understand from my colleague on the other

4    side is not one of the ones that is in dispute, would

5    capture that in general.

6          The reason for including question number 9 is to

7    make sure that sometime into the trial it doesn't surface

8    that, in fact, a juror did see a particular video, which

9    didn't include Mr. Gossjankowski.  And so we think it would

10   be safer to include it, so that's why we have it in our

11   proposed voir dire.

12         MR. SMOCK:  And, I mean, I think question 8 would

13   cover that.

14         THE COURT:  Question which?

15         MR. SMOCK:  8, the government's question 8 would

16   cover that.

17         THE COURT:  Well, question 8 asks whether they've

18   heard anything in the news or elsewhere about the defendant,

19   right?

20         MR. SMOCK:  I guess then what I would propose then

21   is saving A and B for followup questions --

22         THE COURT:  Oh, absolutely.

23         MR. SMOCK:  -- to the jurors, that we --

24         THE COURT:  Anything that does not have a yes or

25   no answer is a followup question.

```
 1            MR. SMOCK:  That would be posed to individual
 2   jurors, not to the entire panel in other words?
 3            THE COURT:  Yeah.  So with that suggestion, are
 4   you okay?
 5            MR. SMOCK:  Yes.
 6            THE COURT:  All right.  Moving along.
 7            It seems to me there might be a certain redundancy
 8   between -- where do I have this?  No, never mind, I'm --
 9   it's not Number 6.
10            Oh, is there a redundancy between Number 5 and
11   Number 11 in the government's?  I mean, it seems to me the
12   only thing that's different is we add the phrase, "Or be
13   able to follow my instructions."
14            MR. VALENTINI:  Your Honor, I think the two
15   questions could be merged by transplanting some of the
16   language that you just referenced into the question that
17   doesn't have that language.
18            I think one of the questions is more geared at the
19   events in general.  The other one's about the defendant,
20   about the individuals who participated in the events.
21            However, yes, the two question could be more
22   efficiently merged if the reference to the ability to follow
23   the jury instructions incorporate it where it does not
24   appear present.
25            THE COURT:  Okay.  All right.
```

1             So where are we now, Mr. Smock?

2             MR. SMOCK:  Your Honor, it might make sense to,

3     since we're sort of covering the same topic areas to look at

4     the defense proposed voir dire and --

5             THE COURT:  Do it however you want to do it.

6             MR. SMOCK:  Right.

7             THE COURT:  I just want to do it as efficiently as

8     we can since you've been so good at trying to be as

9     consistent as possible.

10             MR. SMOCK:  So with respect to our proposal, just

11     going to page 1, I think the only remaining question on

12     page 1 that we would request is our number 3, which goes to,

13     you know, whether they have specific experience on Capitol

14     Hill and might call for followup questions about their

15     awareness of the layout, any particular feelings they have

16     one way or the other related to their connection, for

17     example --

18             THE COURT:  Right.  I'm inclined to add defense

19     number 3 and Mr. Valentini doesn't seem to object.

20             MR. VALENTINI:  No, that's fine.

21             MR. SMOCK:  Okay.

22             So just sort of keeping with the -- going at the

23     same time here.  I think -- I don't have any particular

24     objection to the government's number 10.

25             I'm not sure it will elicit particularly helpful

1    answers, but I don't have any objection to it.

2              THE COURT:  Okay.  I mean, I'm not sure what we're

3    going to get.  We may get, yes, I've heard about so and so

4    and it's totally irrelevant to this case, but.

5              MR. SMOCK:  I mean, I can imagine everybody saying

6    they've heard about the Shaman guy, for example.

7              THE COURT:  Well, that's true.  Is there --

8              MR. VALENTINI:  The defense doesn't have an

9    objection to removing this particular question.  That's

10   fine.  It can be removed.  That's fine.

11             THE COURT:  Okay.  So 10 will go.

12             MR. SMOCK:  I don't think we have any objection to

13   number 12.  I think we had a different way of wording that

14   but I don't have any objection to it.

15             So then moving back to the defense proposals on

16   page 2, there are a series of them from number 11 to number

17   15 that we would ask to be read.

18             THE COURT:  11 to 15?

19             MR. SMOCK:  Correct.

20             THE COURT:  Well, just before Mr. Valentini

21   responds, I will tell you my initial reaction, because I've

22   been through this over the weekend, I think I'm fine with

23   adding 11, 12 and 14.  I'm not sure where I am on the other

24   two.

25             How do you feel, Mr. Valentini, about defendant's

1    11, 12 and 14?

2            MR. VALENTINI:  If I may have one moment, Your

3    Honor?

4            THE COURT:  Sure.

5            (Counsel confer)

6            MR. VALENTINI:  The question -- the concern with

7    question 12 is that there's no specificity as to the charges

8    brought against them and I just am not sure how significant

9    the response would be because it's a bit of an empty box

10   unless there's some substance around what charges one is

11   referring to, right?  So I don't know how informative it

12   would be.

13           For the -- it seems like it could -- the response

14   is more likely going to be driven more by sort of perception

15   about the question as opposed to the substance of the

16   question itself.

17           MR. SMOCK:  And, Your Honor, I think our focus,

18   obviously, is trying to ferret out folks who are predisposed

19   to convict regardless of what the charge is, regardless of

20   what the elements of each charge is.

21           THE COURT:  Okay.

22           MR. SMOCK:  And just based on -- and regardless of

23   the evidence in this particular case.  And I think it's

24   important to figure out who among this venire has that

25   predisposition and follow up with questions if they are

1    among those people.

2              THE COURT:  Okay.

3              MR. VALENTINI:  In response to that I think, Your

4    Honor, there's other questions here that ask the members of

5    the venire whether they would not be able to follow the law

6    and instructions.  And that's really the heart of that

7    matter.  It's not whether at some point they think that

8    individuals who participated in the events of January 6th

9    are sort of in an abstract sense of guilty of something out

10   there.

11             THE COURT:  Okay.  All right.  What about --

12   that's number 12 we're talking about.  What about 14?

13             MR. VALENTINI:  I think that too there is other

14   questions in our proposed voir dire that gets at the general

15   point whether a member of the venire is a potential juror

16   would be -- has such strong philosophical or political

17   beliefs that would prevent them from serving on the jury.

18   And I think that this becomes repetitive, but at the same

19   time because it sort of singles political views as opposed

20   to philosophical views, ethical, moral, religious beliefs is

21   inappropriate and may send an unwarranted message to the

22   potential juror.

23             THE COURT:  All right.  So I've got your point on

24   12 and 14.

25             Is there any question in the government's proposal

1      that mentions President Trump by name?

2                  MR. VALENTINI:  I don't believe there is.

3                  THE COURT:  Well, I think number 13 should be

4      added.  And I think it could affect -- it could produce

5      answers that both sides would want to know.

6                  There are strong feelings about President Trump.

7      And I know in various motions that have been made, including

8      in this case to change venue, the argument has been made

9      that because of the nature of the city and high registration

10     of democrats rather than republicans that, you know, so that

11     you can't get a fair trial here.  I've rejected that, other

12     judges have rejected that.  But if somebody feels very

13     strongly in a negative way about President Trump I think

14     that the defendant has a right to know that.

15                 It is also possible that there are people that

16     are, arguably maybe a small number of the District of

17     Columbia, but there are citizens in the District of Columbia

18     who voted for President Trump and support President Trump

19     and maybe think the election was stolen and all that stuff.

20                 So I think that, that the government would want to

21     know that as just as much the defendant would want to know

22     the other.  Now it's also possible that somebody will say,

23     you know, I'm very anti-Donald Trump but I think I can put

24     that aside and be a fair and impartial juror and then we'll

25     have to evaluate that.  So I would exclude number 13.

 1             So that means I've just got to think about 12 and

 2      14.  I'll add 11 and 13.

 3             I think number 15 is very broad, Mr. Smock, Have

 4      you ever attended a protest or rally?  Any kind of a protest

 5      or rally any time in your life?  You know, you ask somebody

 6      my age, a lot of people, including a lot of lawyers I know

 7      would have said they were in anti-Vietnam protests way back

 8      when.  They were in Civil Rights protests.  They were in

 9      protests after the assassination of Martin Luther King.

10      They were in situations in Mayday when protesters tried to

11      shut down the city.

12             So I think if you want to come up with a narrower

13      question I'll think about it, Mr. Valentini can think about

14      it.

15             So we can come back to that if you want to.

16             MR. SMOCK:  So I think that would move us to our

17      questions 18 and 19, which relate to the alleged stun gun in

18      this case.  And I think it's absolutely necessary to ask

19      questions about --

20             THE COURT:  I reject that argument.  I don't think

21      18 should be asked.  We're highlighting something.  And,

22      first of all, it is not a full and complete discussion of

23      what assault means, whether an assault was required, all of

24      which we're going to be talking about later today and will

25      find its way into jury instruction.  You know, they'll find

1    out soon enough that he denied that he possessed a stun gun.

2         The expert, whom I'm inclined to admit, will

3    testify as to what it was and what it was capable of doing.

4    Yes, he's presumed innocent until proven guilty.  We've

5    already got an instruction on that.

6         I just think we are highlighting one piece of a

7    statute and a defense theory.  It's an incomplete statement

8    and there are all sorts of reasons to reject it.

9         MR. SMOCK:  So I understand the Court's position

10   on that.

11        I think first of all we would be open to, for

12   example, to the Court's extent, the concerns is related to

13   the language in the middle of that section about --

14        THE COURT:  You know, you can keep making your

15   arguments.  I can't see any version of this that I would

16   accept.  Your objection's noted for the record.

17        MR. SMOCK:  So I think we should at least include

18   19.

19        My concern is there may be potential jurors who

20   have had some sort of experience with stun gun, taser or

21   other conducted electrical weapon that was traumatic to them

22   or had some significant impact in their life that we would

23   want to be aware of to the extent it would affect their

24   ability to be fair and impartial.

25        THE COURT:  Right.  I understand that point.

1          Mr. Valentini?

2          MR. VALENTINI:  We think question 18 is

3     significantly more concerning than question 19.  We're glad

4     that it will not be part of voir dire.

5          For question 19, we don't think it's necessary but

6     our objection is relatively --

7          THE COURT:  We'll add number 19.

8          And number 20 is, excuse me, similar to a number

9     that's included in the government's proposal.  I can't

10    remember which number.

11         MR. SMOCK:  13.

12         THE COURT:  13.

13         MR. VALENTINI:  Yeah.

14         MR. SMOCK:  I think Your Honor is right.  I think

15    we simply have added information about the fact that there

16    will -- that Mr. Lucas is our interpreter so we can

17    communicate with Mr. Gossjankowski.

18         I think the reason we add that is just in an

19    abundance of caution, for example, you know, there are some

20    folks who feel strongly about expenditure of government

21    funds.  And I don't know whether there would be some

22    objection to three interpreters being present, which is

23    undeniably necessary under the circumstances.

24         THE COURT:  Well, is this an accurate --

25    forgetting for a minute whether it's useful to say

1      something, is this sentence accurate?

2              "This interpreter will interpret communications

3      between Mr. Gossjankowski and his lawyers during the trial."

4      Well, that's true.

5              But the thing that the jurors will see most

6      visibly is the interpreters interpreting questions asked by

7      lawyers on both sides of witnesses and witnesses' responses

8      to questions.

9              I mean, they may notice that the interpreters are

10     talking to -- communicating with Mr. Gossjankowski.  But

11     what they're going to see every day, every hour of every day

12     is a witness on the witness stand, interpreters, several of

13     them, at least two, and capturing what both the lawyers says

14     and what the witness says in making sure that Mr.

15     Gossjankowski understands what they say.

16             So this sentence is not -- it's either too much or

17     not enough.

18             MR. SMOCK:  So respectfully, I'm not sure it's not

19     enough.  I think it describes what Mr. Lucas's role is here.

20     And that's the reason we've included it, is to just make

21     sure they understand the existence of this number of

22     interpreters and whether that in any way causes them

23     concern.

24             THE COURT:  I mean, I don't get your point.  I

25     mean, why is it important that they understand they're going

```
 1    to interpret communications between Mr. Gossjankowski and

 2    his lawyers?  That's a -- that's a minor -- I mean, that's

 3    part of what they're going to do.  But why is it needed at

 4    all?

 5              MR. SMOCK:  This isn't a point that I'm going to,

 6    you know, go crazy about.

 7              The only thing I want to make sure the Court

 8    understands is that Mr. Lucas is retained by the defense.

 9    He's not in any way going to be interpreting witness

10    testimony.

11              So his only role --

12              THE COURT:  Well, somebody is.

13              MR. SMOCK:  That's correct.  And that's --

14              THE COURT:  Oh, I see.  He's going to be

15    interpreting -- he's retained by the defense as opposed to

16    the other two interpreters who are here retained by the

17    Court --

18              MR. SMOCK:  Correct.

19              THE COURT:  -- or paid by the Court.

20              MR. SMOCK:  So we need to communicate with him,

21    whisper back and forth as we would otherwise do with a

22    hearing client.  That's his role is to facilitate our

23    communications with him.

24              THE COURT:  I see.

25              MR. VALENTINI:  Your Honor, if I may interject, we
```

1        have a -- we will have a case agent at counsel table.

2               We also have Mr. Stucklass, who is our consulting

3        expert.  The fact that there are individuals at counsel

4        tables who are not lawyers or the defendant is part of a

5        criminal trial.  I don't think that it's necessary or

6        appropriate to single out one particular person at counsel

7        table for some explanation to the jury that this is

8        particularly needed or needed for a different reason than

9        other nonlawyers and nondefendants at counsel tables.  It

10       seems to me a bit of an arbitrary distinction.

11              THE COURT:  I guess I'm not sure why the defense

12       wants or needs this.

13              In a case involving someone who is not deaf, the

14       jury would see lawyers conferring/whispering to their

15       client.  The jurors would see prosecutors

16       conferring/whispering with their case agent.  And I think

17       that what is sufficient is when you stand up and introduce

18       yourself to the jury to say, I'm Mr. Valentini.  I represent

19       the United States.  My colleague is so and so.  My colleague

20       -- I don't know how many colleagues you're going to have,

21       it's -- one of them signs a lot of pleas, but she's not

22       here, and also at counsel table is so and so.

23              So, you know, I think you can identify rather than

24       my giving a voir dire question to say, also at counsel table

25       is so and so.  And you might also say, unless you want me to

1    say it, that -- I mean, maybe somebody should identify all

2    of the interpreters and make the point that one of them is

3    part of the defense team and the other two are part of the

4    court.

5            I'm not sure how to say it, but I don't think we

6    need a voir dire question.

7            MR. SMOCK:  So, Your Honor, moving on to further

8    questions about the fact --

9            THE COURT:  So at the moment we are -- are we

10   through the first 14 of the government's?

11           MR. SMOCK:  We are, Your Honor.

12           THE COURT:  All right.

13           MR. SMOCK:  And I think I'm happy to say that

14   there's a fair amount of agreement on the next several

15   questions.  I think there's an agreement -- we have no

16   objection --

17           THE COURT:  The other thing, let me before we

18   leave this, I think maybe I'll combine 14 and 15 and say,

19   Are any of you deaf or hard of hearing or do any of you have

20   any immediate family members or close personal friends who

21   are deaf or hard of hearing.

22           Okay.  So we are now at 16 of the government's

23   and.

24           MR. SMOCK:  So, Your Honor, I think there is

25   agreement about --

1             THE COURT:  Is there -- is there -- I'm sorry, I

2    don't want to interrupt you.

3             Comparing 15 of the government's and 22 of the

4    defense, is there a distinction there and one that's

5    important?

6             MR. SMOCK:  I don't believe so.  I think we're

7    fine with 15.

8             THE COURT:  Okay.  Okay.

9             I am now on page -- number 16 of the government's

10   and number 23 of the defense.  They may be the same, I'm not

11   sure.

12            MR. SMOCK:  They are.  16 is fine.  17 is fine.

13            I think we have -- on page 3 of our proposal we

14   have 24 and 25, which simply get at the question of whether

15   there is any reason for concern about bias against folks who

16   are nonhearing.

17            MR. VALENTINI:  Your Honor, I think that the

18   question, I don't want to interrupt my colleague, Mr.

19   Smock --

20            THE COURT:  I think we're ready to talk about 24

21   and 25 of the defense proposal.

22            MR. VALENTINI:  Okay.

23            So with respect to that proposal, we think that

24   the question, the right way to get at those potential issues

25   of bias is in question 13, which says, "The Defendant Vitali

1    Gossjankowski is deaf."  And then asks the jurors whether

2    there is anything about the defendant's condition, the fact

3    that he's deaf or his use of interpreters that would prevent

4    you from being able to follow my instructions on the law and

5    being a fair and impartial juror in this case.

6         THE COURT:  So your argument is that what is in 24

7    and 25 of the defense is captured in 13, which is going to

8    be a followup question one-on-one and it can be explored

9    further if they say yes.

10        MR. VALENTINI:  Yeah.

11        THE COURT:  Or they're going to say -- they've got

12   to answer this question yes or no.  And if they say yes,

13   then there will be followup questions.

14        MR. VALENTINI:  Right.

15        THE COURT:  And I take it your argument is that

16   would be a time for the defense to explore the things that

17   are set out in number 24 and 25 of the defense proposal.

18        MR. VALENTINI:  Yes, Your Honor.

19        MR. SMOCK:  And our view is that while 13 is

20   appropriate, it's fairly broad.  And 24 and 25 specifically

21   get to sort of boiled down to a question of whether there

22   should be concern and force to people to sort of think of

23   whether there might be any bias and articulate it.

24        We would be okay with one or the other if the

25   Court doesn't want to do both.

1          MR. VALENTINI:  Your Honor, just to -- maybe I'm

2     just repeating my point.  I just don't see what kind of

3     answer to question 24 or 25 would lead to "actionable

4     information" that would be relevant during voir dire that is

5     not already captured by the government's proposed question

6     number 13.

7          MR. SMOCK:  Just speaking from experience on this,

8     and I think the Court is better aware of this than I am, but

9     I know from experience that broad questions about whether

10    things will cause any concern about being fair and impartial

11    are less effective and, in fact, more often than not jurors

12    essentially say, sure I can be fair and impartial.

13         But on this question about potential bias against

14    deaf people, it's important to be able to ask at least one,

15    if not two specific questions that might elicit something

16    beyond a general, yes, I can be fair and impartial.  And

17    that's why we're proposing these questions.

18         THE COURT:  All right.  Let me think about it.

19         MR. SMOCK:  Your Honor, before I forget, Ms.

20    Goetzl has handed me up a couple Post-its.

21         I wanted to be sure I didn't miss something here.

22    And our -- I think I mistakenly said that we were totally

23    fine with the government's 15.  I think we are generally

24    fine with government's 15.  I think our only request is that

25    it be slightly broader in terms of people and we're asking

```
 1     you to take --
 2               THE COURT:  Say that again?
 3               MR. SMOCK:  Number 15 sentence.
 4               THE COURT:  I know.  I just couldn't hear your
 5     last few words.
 6               MR. SMOCK:  All right.
 7               THE COURT:  I don't know why.
 8               MR. SMOCK:  I'm asking that you use our
 9     delineation of contacts from number 22.
10               So instead of, "any immediate family members or
11     close personal friends" that you use our proposal from 22,
12     which is "any family member, close friend or coworker."
13               MR. VALENTINI:  And, Your Honor -- oh, I'm sorry.
14               MR. SMOCK:  No, go ahead.
15               MR. VALENTINI:  Just to address that.  Family
16     members can be a fairly broad term.  Like a second cousin
17     who's deaf --
18               THE COURT:  Well, it says immediate family member.
19               MR. VALENTINI:  No, no.  Their version -- our
20     version's fine.  It's number 13.
21               Their version, which I understand my colleague on
22     the other side is advocating for now, is 22 which says, "any
23     family member, close friend or coworker."  I mean, coworker
24     and family member without qualifications can be very, very
25     broad terms that would not efficiently get what the question
```

1    before the Court will be during voir dire.

2              THE COURT:  All right.  Okay.  Moving on.

3              MR. SMOCK:  I think there's an agreement as to

4    government's 17, which I think was drawn from our number 26.

5              I think as far as I can tell, 18 through 23 are

6    basically the same as our 27 through 34.  I haven't done the

7    math here, but I think they match up numbers wise.

8              THE COURT:  Say that again.

9              MR. SMOCK:  I think the easier way to express that

10   to you is I don't think there's any objection to 18

11   through 23.

12             THE COURT:  Okay.  So let me ask you a two

13   questions.

14             One is this assumes that Ms. Akpan will be back?

15             MR. SMOCK:  Right.  I appreciate you raising that

16   and I've just crossed her name off here, she's not going to

17   be back.

18             THE COURT:  She's not going to be back?

19             MR. SMOCK:  Correct.

20             THE COURT:  I'm sorry.

21             MR. SMOCK:  And this is an issue that is more

22   appropriately raised with my --

23             THE COURT:  And Ms. Peterson will not be back?

24             MR. SMOCK:  Correct.

25             THE COURT:  It's just you and Ms. Goetzl?

```
 1              MR. SMOCK:  Yes.  And my name, my parents named me
 2      as Edward but no one has ever known me as Edward, so I think
 3      to the extent there's any concern about somebody knowing me,
 4      which is highly unlikely, I think we should change it to
 5      Ned.
 6              THE COURT:  Ned?
 7              MR. SMOCK:  Yes.
 8              THE COURT:  What do you want, your number 28?
 9              MR. SMOCK:  Oh, right.  Yes, I think I think
10      that's appropriate and we want to make sure we're
11      encompassing everyone who's been involved in this case from
12      the government.  And if the government -- if we have those
13      names wrong in some way, of course, we're open to cutting
14      people or adding people.  But I think it's important given
15      that, I mean, long before my involvement in the case there's
16      been a series of different prosecutors involved.  I think it
17      makes sense in case there's any concern that there were
18      communications with them about this case or --
19              THE COURT:  And so you want number 28 and you want
20      number 29?
21              MR. SMOCK:  Yes.
22              THE COURT:  And what's the government's view of
23      all of that?
24              MR. VALENTINI:  Your Honor, the likelihood that
25      some acquaintance with one of this named prosecutors who
```

1    were involved at various stages in the past, but who are not

2    here at trial that that could lead to some sort of bias is

3    very remote.

4         It also, I think, sends a message inadvertently

5    and one that is not warranted about necessarily the type of

6    -- so the number of people that were involved in the

7    investigation and prosecution, I think it would confuse the

8    jury.

9         I think if the question -- if the Court wanted to

10   add some sort of open-ended catchall after -- is

11   representing this case by -- I'm sorry, some sort of

12   question about any -- anyone else that you know has been

13   involved in the case, on the part of the prosecution or

14   investigation of this case we could do that, but I think the

15   listing a half-dozen individuals would not be helpful.

16        THE COURT:  Let me ask you this question:

17        Were all of these people -- not all of them were

18   Assistant U.S. Attorneys in the District of Columbia, right?

19        MR. VALENTINI:  Yeah, I mean, I know some of them

20   are trial attorneys from the criminal division like myself.

21        THE COURT:  Yeah.

22        MR. VALENTINI:  Yeah.

23        THE COURT:  I don't know.

24        MR. VALENTINI:  I should say, Your Honor, at least

25   one of them.

1          THE COURT:  So sometimes we ask a question, you

2     know, do you know anybody who's been a prosecutor -- who is

3     a prosecutor or criminal defense lawyer and would that

4     affect you.  And I don't know that we've got that question.

5     I'm not inclined to ask 29 and 28.

6          Okay.  What else?

7          MR. SMOCK:  Your Honor, actually maybe just to the

8     extent there's -- I think probably what would be most

9     efficient is for government 19.  I mean, we already sort of

10    talked about --

11         THE COURT:  Government what?

12         MR. SMOCK:  Government 19.

13         THE COURT:  Yeah.

14         MR. SMOCK:  Simply substituting our 30, which also

15    names our paralegal who will be present during trial,

16    instead of trying to dictate that to you.

17         THE COURT:  Okay.

18         MR. SMOCK:  I think substituting those two.

19         I think that gets us to government's 24, assuming

20    we're still working from their document.

21         I think here there's essentially a series of

22    questions with slightly different wording addressing burden

23    of proof, presumption of innocence, et cetera.

24         And our position is that our 35 through 40 should

25    be read as parts of this section instead of the government's

1    24 through 26.

2              THE COURT:  So we've got government's 24

3    through 26, as opposed to the defense 35 through --

4              MR. SMOCK:  40.

5              THE COURT:  35 through what?

6              MR. SMOCK:  40.

7              THE COURT:  Okay.  I'll think about that.  And I'm

8    going to look at instructions I've given in prior cases.

9              MR. SMOCK:  I think there's -- if I'm not

10   mistaken, the government's 27 and 28 are identical to

11   defense 41 and 42.

12             THE COURT:  Okay.  So 27 and 28 are okay?

13             MR. SMOCK:  Yes.  I think the only -- so then

14   there's 29, 30, 31, and 32, which are the same as defense

15   43, 44, 45, and 46.

16             I think the only difference is that the defense

17   suggests naming a handful of other federal law enforcement

18   agencies, the ATF and the CIA, that's, I think, the only

19   difference.

20             THE COURT:  You're -- the government says, "FBI,

21   Secret Service, Departments of Homeland Security, U.S.

22   Capitol Police."  You want to add --

23             MR. SMOCK:  ATF.

24             THE COURT:  -- ATF and CIA?

25             MR. SMOCK:  Yes.

1                    THE COURT:  And the reason is?

2                    MR. SMOCK:  You know, again, I don't feel

3     particularly strongly about this, but I think the point is

4     just making sure we're encompassing every, you know, as many

5     agencies as possible.

6                    MR. VALENTINI:  And, Your Honor, not a

7     particularly strong point of opposition, but the phrasing of

8     our question 29 says, "Agencies like the FBI and the Secret

9     Service."

10                   THE COURT:  True.

11                   MR. VALENTINI:  Department of Homeland Security,

12    yes, Capitol Police is still illustrative, it's not --

13    doesn't purport to be comprehensive, so.

14                   THE COURT:  Well, I don't think it matters a great

15    deal.

16                   MR. VALENTINI:  Yeah.

17                   THE COURT:  But it does seem to me -- I don't know

18    any whether DATF officers were in any way involved on

19    January 6th.  If the CIA was involved, it was in a very

20    different capacity.

21                   Okay.  That gets us through number 20 -- I'm

22    sorry.

23                   MR. SMOCK:  So I think --

24                   THE COURT:  Where are we now?

25                   MR. SMOCK:  I think we're at -- prior to getting

1     to government 46 we'd propose number 48 from out list.

2               THE COURT:  All right.  Excuse me a second.  What

3     have we agreed?

4               MR. SMOCK:  I think --

5               THE COURT:  What number are we on -- what number

6     are we past on the government's and what are we moving on to

7     in the government's?

8               MR. SMOCK:  We've past 35.

9               THE COURT:  Okay.  And now we're at 36.

10              MR. SMOCK:  And I think, to preview it, I don't

11    think there's a disagreement about 36, but our proposal is

12    that prior to that the Court use defense number 48, which is

13    about, "Any unpleasant experiences with the defense attorney

14    or defense investigator that would cause you to disfavor the

15    defense."

16              THE COURT:  Do we have a parallel question with

17    respect to prosecutors?

18              MR. SMOCK:  47.

19              THE COURT:  So the defense would like to add 47

20    and 48 between 35 and 36?

21              MR. VALENTINI:  To be clear, I don't mean to make

22    this more complicated than it needs to be, I think 47 is

23    already in the government's proposed 33, right?

24              MR. SMOCK:  True.

25              THE COURT:  Yes.  So we should -- if I add 48

1    after number 33, right?

2              MR. SMOCK:  Yes.

3              MR. VALENTINI:  Yeah.

4              THE COURT:  Okay.  Now we're at number 36.

5              MR. SMOCK:  Yes.  And I think that is consistent

6    with defense 51.  I think 37 is agreeable to us, that's our

7    52.

8              THE COURT:  I don't know why I'm having such

9    trouble hearing you, Mr. Smock.

10             MR. SMOCK:  I'm sorry.

11             THE COURT:  I think you lean down and then you're

12   not near the microphone.

13             MR. SMOCK:  Yes, sir.  I think 37, 38, and 39 are

14   all agreeable.

15             I think really we're in agreement with respect to

16   the rest because they're, you know, drawn from the earlier

17   versions of the voir dire that have been submitted by us, I

18   believe.

19             THE COURT:  Okay.  So 40 through 42 are okay.

20             The question then is is there anything after 48 on

21   your proposal that should be added?

22             MR. SMOCK:  I'm sorry, did you say 38?

23             THE COURT:  48.

24             MR. SMOCK:  Our 48.

25             THE COURT:  Past 48 on the defense.

1            MR. SMOCK:  Oh.  I'm sorry, I thought we had --

2      perhaps I misunderstood the Court.  I thought that there was

3      an agreement that our 48 would be read after --

4            THE COURT:  Yes.

5            MR. SMOCK:  -- government's 33.

6            THE COURT:  Yes, I said is there anything -- okay.

7      Is there anything beginning with number 49 in your proposal

8      that we should be discussing or is it all captured in the

9      government's?

10           MR. SMOCK:  I believe it is.

11           We had 49 -- I won't -- I think it's okay not to

12     use 49 in this case and I think everything else there's

13     agreement on.

14           MR. VALENTINI:  Again, don't mean to -- just for

15     the sake of the record, I think 49 is government's 34; isn't

16     it?

17           MR. SMOCK:  Oh, again, thank you, sir.

18           MR. VALENTINI:  No, no.  I mean, let's clear up

19     the record.

20           THE COURT:  I'm sorry, 49 is the same as which of

21     the government's?

22           MR. VALENTINI:  34, I believe.

23           MR. SMOCK:  And I think that's why I didn't note

24     it as something I would fuss about because it sounds like

25     there's an agreement.

1              THE COURT:  34 says -- yeah, 34 and 49 seem to be

2      the same.

3              MR. SMOCK:  Yes.  I misspoke.  And we're -- we

4      don't object to 34.  I think it's the same thing.

5              THE COURT:  What about 52 on the defense?

6              MR. SMOCK:  So I think that mirrors 37.

7              THE COURT:  Oh, okay.  Okay.  I see it.

8              Because what I'm going to tell the jurors, and I

9      know some judges don't follow this, but what I'm going to

10     tell the jurors is that I want them to wear masks.  I want

11     them to wear masks throughout the trial.  They're going to

12     be sitting close quarters here.  And the people in the

13     galley will be wearing masks, and the people -- many of the

14     people at counsel table will be wearing masks when they're

15     not speaking, so that's what I plan to tell them.

16             MR. SMOCK:  So I think, Your Honor, I'm just

17     thinking of this as we talk about it, I think this question

18     is appropriate in that it will elicit a response, positive

19     or negative, actually negative is the relevant one, I don't

20     want to -- I think we'll address that when it comes.

21             I don't know that we will be comfortable agreeing

22     to kick for cause, for example, somebody who's not

23     comfortable wearing a mask.  But I don't think we need to

24     address that today.

25             THE COURT:  Yeah, I mean, I think that judges of

1     the court have decided that we don't ask people if they've

2     been vaccinated because we might exclude people from the

3     jury and I don't know which way that cuts.

4              And this question is going to be answered on a 5x8

5     card like all the other questions and so no one will be

6     embarrassed in front of the other members of the jury panel

7     and will be asked followup questions.

8              MR. SMOCK:  That's fine.

9              THE COURT:  All right.  So, okay, I have your

10    views.  What are we going to do next?  And then I'll ask the

11    court reporter -- tell me what I want to do next.

12             MR. SMOCK:  I defer to the Court.  I mean, we can

13    -- I have no real problems, we can do whatever the Court

14    wishes.

15             THE COURT:  Do you want to do experts next?  Do

16    you want to do videos next?  Do you want to do other issues

17    next?

18             MR. SMOCK:  We can do experts next.

19             MR. VALENTINI:  Sounds great.

20             THE COURT:  All right.

21             So we've been here since about quarter after

22    10:00.  Is it all right to keep going?

23             COURT REPORTER:  Yes.

24             THE COURT:  And so we'll keep going.  And if,

25    depending on how long this argument goes, we might decide to

1    take a break in the middle of it or we might decide to see

2    where we are.

3            All right.  So I don't know how you want to do

4    this.  It's the government's motion to exclude the two

5    experts, right?

6            MR. SMOCK:  Correct.

7            MR. DREHER:  Your Honor, we did receive

8    communication from the defense team regarding one of those

9    experts, Ms. Shepard-Kegl, about a possible stipulation and

10   it's my understanding that we would be ready to stipulate to

11   very specific verbiage that at least was addressed in that

12   communication relating to Gossjankowski's ability to speak

13   English, read lips through English, and I believe it was

14   verbally communicate through English, but I would have to

15   refer back to the specific language used in that e-mail.

16           Do you have the language?

17           MR. SMOCK:  Yeah.

18           THE COURT:  And, I mean, I don't know if you've

19   not -- if you haven't reached an agreement, then I probably

20   have to have to hear argument, but if you're close to

21   reaching an agreement, maybe we can --

22           MR. DREHER:  Sir, I believe we would agree to the

23   language that was in the e-mail.  My concern, though, I

24   didn't have the language of the e-mail readily available to

25   produce to the Court today, Your Honor.

```
1                MR. SMOCK:  I have it, if the Court is interested.
2                I think that it may be that the Court doesn't even
3        need to hear it today, but we've resolved this issue.
4                THE COURT:  Well, if you're all in agreement that
5        there will be a stipulation instead of Dr. Shepard-Kegl,
6        then I don't have to hear augment about Dr. Shepard-Kegl.
7        If the discussions are not finalized, then maybe I do.
8                The alternative is to finalize them over the lunch
9        hour and argue something else this morning instead of the
10       experts.
11               MR. SMOCK:  So, Your Honor, assuming that the
12       government is comfortable with the language that we proposed
13       to them in an e-mail on Friday, then I think it's agreed and
14       we don't need to argue it before Your Honor.
15               We can discuss it at the break and make sure and
16       bring it before you.
17               THE COURT:  All right.
18               Why don't we start with the discussion of Mark
19       Kroll's proffered expert testimony and then we'll take a
20       break.  And after the break you'll tell me whether we can --
21       whether we need to talk about Dr. Shepard-Kegl or not, and
22       if not we can move on to some of the other motions.
23               MR. DREHER:  Yes, Your Honor.
24               As it relates to Dr. Mark Kroll, the government
25       believes that his testimony should be excluded based on the
```

1    opinions that were provided in the expert report.

2           Namely, there were -- namely there were seven

3    different opinions.  And just going in order, I believe the

4    first one related to the identification of the device that

5    Mr. Gossjankowski did possess while at the Capitol on

6    January 6.

7           And at least as outlined within the expert report,

8    Dr. Kroll does not provide any additional information that

9    the jurors themselves would not be able to apply as well,

10   which would fall outside of the requirements of 702 that

11   require some sort of specialized knowledge through training,

12   education or experience that would benefit the jury in

13   reaching any sort of conclusions such as that.

14          Now, the underlying experience and training that

15   Mark Kroll at least presented to the government related

16   solely to the parent company of Taser, the trademark Taser

17   brand Axon, which would explain that he is able to identify

18   that this is not one of Axon's products, but then diving

19   deeper into what product it, in fact, is.  His report did

20   not provide sufficient foundation as to why he would be able

21   to identify this device from the means that he did use as

22   outlined within the report.

23          Now I'm not sure if the Court would like a

24   recitation as to of the methodology that he used in order to

25   render his opinion as to what the device was.  But

1    ultimately what he does is he takes a photograph and looks

2    at it and compares it to several devices that are available

3    on Amazon.com.

4            This sort of testimony I don't believe falls under

5    Federal Rules of Evidence 702 and certainly doesn't provide

6    the jury with any more information than what they could have

7    on their own.

8            So based on that, we would ask that his opinion as

9    to what this device is be excluded.

10           THE COURT:  So that's his -- that's his first --

11   the first of the seven opinions?

12           MR. DREHER:  Yes, Your Honor.

13           Now moving on, if the Court would like to take

14   arguments as a whole or --

15           THE COURT:  Just keep going.  Just keep going.

16   Give me all your arguments.  Mr. Smock will respond to all

17   your arguments.

18           MR. DREHER:  Yes, Your Honor.

19           Based on that, it's sort of a -- the premise is --

20   that flawed premise is then used in the remaining of his

21   conclusions in that the device that he does identify this

22   device as, is then somehow tested and produces an electrical

23   charge that he then opines cannot be used in a deadly or

24   dangerous manner.

25           THE COURT:  Well, second and third opinions are,

1    and you make the point that if the premise is flawed he

2    shouldn't be able to say what comes next.

3             I guess his second, third, and fourth opinions are

4    number two, it's not a stun gun.  Number three, it's not an

5    electroshock weapon.  Number four, it's not a Taser

6    electrical weapon, which I gather is a trademark, a specific

7    kind of weapon.

8             And if I disagree with your argument about opinion

9    number 1, you need to give me your other arguments about

10   opinions 2, 3 and 4.

11            MR. DREHER:  Certainly, Your Honor.

12            I think ultimately with 2, 3 and 4 what Kroll is

13   opining is that the device that he believes it to be is not

14   a stun gun or an electroshock weapon, but he doesn't provide

15   any sort of definitions of what a stun gun would be or any

16   sort of methodology to include what sort of charge would be

17   needed to satisfy those terms, whether they be colloquial or

18   scientific or some sort of -- some sort of other way to

19   where they would fit that definition.

20            Now within his report he does talk about the ANSI

21   standards as it relates to some of the medical electroshock

22   devices.  However, those standards were not outlined within

23   the report and are not easily accessible, considering that

24   they are propriety and would require quite a bit of money to

25   be able to access what those standards are.

1          So in terms of being able to, you know, I think

2     it's a little easier to say this is not a Taser with the

3     trademark on it, because it has a very specific definition

4     that everyone can understand and, quite frankly, regardless

5     of whether the trademark Taser version or the colloquial

6     taser version is used, becomes a little simpler than saying

7     this is not a stun gun, because that incorporates a lot more

8     information.

9          And so given that it's unclear as to what exactly

10    he defines as a stun gun of what the capabilities of what a

11    device should be, he doesn't provide a sufficient basis for

12    this Court to make a finding that his methodology is correct

13    and that his conclusions should be offered to a jury to

14    assist in their factual determinations.

15         Now, moving on -- moving on then to 5, which I

16    think is separate from 2, 3, and 4 in that those conclusions

17    he says with this device is not, and then in 5 he describes

18    this particular device as a sparkler flashlight.  But the

19    basis for that is the audio and visual effects and not

20    necessarily the stunning capability of this, which sort of

21    leads into then conclusions 6 and 7.

22         So tabling opinion 5 for a bit and speaking

23    directly to 6 and 7, I think the ultimate conclusion that

24    Kroll is -- or at least the defense is seeking to provide to

25    the jury, is that this device itself is not capable of

1    producing a sufficient shock to be considered deadly or

2    dangerous.

3         THE COURT:  Well, first of all, he says there is

4    no stunning even though, you know, he says it's not a stun

5    gun and that there is no stunning.  And are you disputing

6    that as a factual matter or are you -- are you saying, we

7    don't have a sufficient basis for that conclusion or what?

8         I mean, you just said there's no stunning -- he

9    said it doesn't take effect of its stunning capability.  I

10   mean, is there evidence that it has -- this may be a nuanced

11   double question, but is there evidence somewhere that

12   whatever this thing was has a stunning capability versus he

13   just has no basis to reach his conclusions and hasn't told

14   us what his basis is.

15        MR. DREHER:  So it's my understanding the

16   information that he reviewed in coming to these conclusions

17   is based on photographs of the device, then once his

18   identification of the device is used, all the information is

19   then based on additional devices that he somehow purchased.

20        Based on the expert report, he does obtain seven

21   different devices and tests five of them because two are

22   inoperable.  And it's from that testing that he concludes

23   there was no stunning, but --

24        THE COURT:  He did not have access to the specific

25   -- well, let me -- nobody had access to the specific thing

1    that Mr. Gossjankowski is holding in the videos that we've

2    seen.

3              MR. DREHER:  And this might answer the Court's

4    question.

5              I believe the evidence at trial is going to show

6    that Mr. Gossjankowski did get rid of the device, but also

7    at trial there's going to be videos of this device that Mr.

8    Gossjankowski held on January 6 lighting up, flashing, you

9    can also hear the electricity being shot through this device

10   and the like.

11             But then returning then back to the bases of Mark

12   Kroll's conclusion, his testing of it then relates to

13   standards again, as opposed to relating to the effects that

14   this will have on the human body itself, which I think is a

15   very important distinction when trying to determine whether

16   this individual is able to provide an opinion as to whether

17   or not this device would be a deadly or dangerous weapon.

18             Ultimately, at least as outlined within the

19   briefings, the government did provide this Court with the

20   *Russell* case out in the Ninth Circuit that I think -- I

21   think squarely puts what a stun gun is in the context of a

22   deadly or dangerous weapon in a way that most cases do not.

23             In that case it was -- the defendant was charged

24   with and convicted of carrying a deadly or dangerous weapon

25   onto an airplane.  And the district court in that case found

1    as a matter of law that this stun gun -- the stun gun used

2    in that case was a deadly or dangerous weapon based on its

3    inherent danger of not only the device itself, but also the

4    situation of being on an airplane, in a confined space, and

5    that this device has the capability of causing a lot of pain

6    to multiple different people.

7            In the same way that this case presents in that

8    although the space itself was not confined as an airplane,

9    the space with which this -- the space in which this device

10   was used was confining in that the officer it was used upon

11   was being held and pulled in different directions and being

12   pushed through a crowd in a very confined space, but then

13   also that it's the environment that goes into that -- that

14   assessment as well.

15           So I know the Court sort of alluded to this on

16   Thursday in asking about whether this is a question of law

17   or a question of fact, and ultimately I think in the *Russell*

18   case what the District Court did there was found as a matter

19   of law that this was an inherently deadly or dangerous

20   weapon based on all of those factors.

21           However, I do not believe that without that

22   finding the jury is not able to make that -- make that

23   determination factually in the absence of that legal

24   finding.

25           THE COURT:  I don't understand what you just said.

1          They are -- I thought we were all in agreement

2    that the question of whether something is a dangerous weapon

3    is a fact question.

4          And what as I said the other day, what I had

5    looked at previously, admittedly under a different statute,

6    but all of the case law from the D.C. Court of Appeals with

7    respect to assault of a dangerous weapon under that D.C.

8    code statute, is that the jury has to conclude, it has to

9    make a finding.

10         We also know that there are certain, and we talked

11   about this the other day, too, weapons that are inherently

12   dangerous, like a loaded gun and there are other weapons

13   that can be used in a way that make them dangerous, a ball

14   point pen, a heel of a shoe, a heavy pitcher.

15         So what did *Russell* say they found as a matter of

16   law?

17         MR. DREHER:  That the stun gun in the environment

18   of an airplane is an inherently dangerous weapon.

19         And I can read from the Ninth Circuit's opinion.

20   And this is at, excuse me, I lost the cite.  So this is at

21   800 F.2d 1509, Ninth Circuit from 1986 and ultimately then

22   on page 1513.  The Ninth Circuit in rejecting the

23   defendant's position in that case it reads, "Evidence was

24   introduced at trial indicating that stun guns may cause

25   permanent injury to eyes and that a single stun gun may

1    incapacitate 20 to 40 people at a time.  Moreover, the

2    potential for devastating injury that is present during even

3    a temporary incapacitation of key personnel aboard an

4    aircraft in flight requires courts applying the statutory

5    prohibition against a deadly or dangerous weapon to consider

6    the both the transitory and permanent nature of the weapon's

7    effects."

8            And what ultimately I think the District Court

9    found in the *Russell* case is that when viewing a deadly or

10   dangerous weapon in sort of that two different versions of

11   both the inherently dangerous or the not inherently

12   dangerous but used in a dangerous manner, that the decision

13   between those two was first made as a matter of law, which

14   then allowed for the beginning of, at least in the *Russell*

15   case, that initial legal decision being made to then allow

16   the government to pursue it just as an inherently dangerous

17   weapon.

18           Now I will admit in this case we have not sought

19   that sort of legal decision from the Court which then puts

20   it back onto the jury to decide whether or not this is a

21   deadly or dangerous weapon as a factual matter, but in this

22   context, I believe that the conclusions made by Mark Kroll

23   in 6 and 7 of his expert report go to that inherently

24   dangerous versus not inherently dangerous distinction, which

25   is normally something that the Court would decide as opposed

1    to the jury.

2            Now, certainly I believe Mark Kroll would be able

3    to testify as to what, if -- you know, what a microcolumn of

4    electricity into the human body would do.  He certainly

5    would be able to testify to the electricity that he tested

6    and what effects it would have on the human body.  But the

7    conclusions as presented within his expert report do not

8    dive into that.

9            Instead, it goes into that distinction of

10   inherently dangerous versus not inherently dangerous, that

11   at least according to the *Russell* case, is supported by the

12   Court making that legal determination.

13           And with Kroll's ultimate opinion being at legal

14   conclusion, I believe that this Court should follow its same

15   ruling that it handled in the *Sutton* case, in that no legal

16   conclusion can help the jury make a factual decision.

17           And ultimately that's why we think that Kroll's

18   testimony should be excluded in this trial.

19           THE COURT:  Got it.  You don't have an expert?

20           MR. DREHER:  That's correct, Your Honor.

21           THE COURT:  Well, let's hear what Mr. Smock has to

22   say.

23           MR. SMOCK:  Your Honor, this issue has been

24   thoroughly briefed, so I don't want to repeat things that

25   were written to the extent possible.

1          But I think this is a straightforward question.  I

2     mean, there are three counts in the second superseding

3     indictment that reference a deadly or dangerous weapon.  Law

4     in this circuit is absolutely clear that there is a

5     requirement that the government prove that it's capable of

6     causing serious bodily injury and/or death.

7          Now, the government intends to put forward

8     evidence, show multiple videos of this device being

9     activated.  It does make a loud noise.  It creates an

10     electrical arc and to layperson it may very well look like

11     something that could cause an injury.

12          The government is satisfied to go forward with

13     that evidence because it prejudices our client in a way that

14     is utterly inappropriate because it hides from the jury

15     actual facts that are relevant to the determination of

16     whether it, in fact, qualifies as a deadly or dangerous

17     weapon.

18          The government hasn't put forth any experts.  It

19     hasn't tried to determine what that device was because it's

20     convenient to them in meeting their burden by just showing

21     videos of it and hoping that the jury makes a conclusion

22     that it is, in fact, deadly or dangerous.  And there's an

23     extreme concern on our part that they will do that in light

24     of the fact that the government itself has referred to this

25     thing as a Taser.  They've referred to it as a stun gun.

1          We have an expert who is going to opine, there's

2    no minimizing his expertise in this area.  He is --

3          THE COURT:  And what --

4          MR. SMOCK:  -- what he --

5          THE COURT:  What do you offer him as an expert in?

6    What would I tell the jury?  He is an expert in the

7    following...

8          MR. SMOCK:  Conducted electrical weapons and the

9    effect of electricity on the human body.  Those are things

10   that --

11         THE COURT:  Say that again.

12         MR. SMOCK:  -- he is eminently qualified to

13   testify.

14         THE COURT:  Say that again.

15         MR. SMOCK:  Conducted electrical weapons and the

16   effect of electricity on the human body.

17         So Dr. Kroll can testify about his research to

18   determine what this device was and in doing so then can give

19   detailed testimony that's outlined in his report explaining

20   what the actual power of this device is.

21         These devices are available for sale for $20.  And

22   he will explain that while a device like this makes noise,

23   while it creates a visible electronic current, it has no

24   ability to injure a person, let alone seriously injure a

25   person and no ability to cause death.  That's

1   straightforward.  That's within his expertise.  There really

2   should be no debate about this question.

3           To the extent the government wants to make an

4   argument separate and apart from the question of the power

5   of this device that, for example, it was a deadly or

6   dangerous weapon because of the way it was used to come into

7   contact with the person, we have no quarrel with the idea

8   that if they were making an argument that a pencil is a

9   deadly or dangerous weapon because of the way it was used,

10  that's an argument they can make.

11          THE COURT:  Used our capable of being used.

12          MR. SMOCK:  Correct.

13          But the issue here is they intend to rely upon the

14  jury to make a conclusion that simply touching a person with

15  this thing when it's activated or when the button has been

16  pressed and the electrical arc has occurred, would cause

17  serious body injury or death.  And it will not.  That's

18  indisputable.

19          And so it's absolutely crucial that this evidence

20  comes in.  There's -- I don't know what else to say about it

21  other than the fact that much of what the government is

22  talking about is fruitful ground for cross.

23          All the case law talks about this.  If they want

24  to cross him on any of these things they can, but it's by no

25  means a basis to keep out his testimony.

1          THE COURT:  What about the *Russell* case?

2          MR. SMOCK:  I think they're referring to a case

3     *Wallace* from the Ninth Circuit, I could be confused.

4          THE COURT:  He said *Russell*.

5          MR. SMOCK:  Yeah, they did repeatedly.  I think

6     it's *Wallace*.

7          That's a case, I mean, first of all --

8          THE COURT:  *Wallace*?

9          MR. DREHER:  I apologize, Your Honor, it is

10    *Wallace*.

11         MR. SMOCK:  I'm happy to address it, but I also

12    don't want to waste the Court's time because the government

13    has essentially agreed after a great deal of discussion of

14    this out-of-circuit case, that it is a question of fact for

15    the jury to decide.  That case is not on point.  It's

16    related -- it's a different issue.  And it would be

17    absolutely error for there to be a finding, a legal finding,

18    that this item is a deadly or dangerous weapon, particularly

19    when we have an national expert saying that it's one tenth

20    as powerful as a medical device that it by definition won't

21    cause injury.

22         THE COURT:  Let me go back to the first point that

23    Mr. Dreher made.  That he -- there is not a sufficient

24    foundation for his conclusion number 1 or his opinion number

25    1 because all he basically did was look at a bunch of

1     pictures.  And I guess compared --

2               MR. SMOCK:  That's a --

3               THE COURT:  -- compared to videos of Mr.

4     Gossjankowski on that day with various things on Amazon.com.

5               MR. SMOCK:  That's a basis for cross-examination.

6          I can tell the Court that there's not going to be

7     a basis to suggest a better way to make a determination of

8     what this item was.  Reviewing every video, every photograph

9     of the item from January 6th and then comparing it to

10    anything that's available for sale is the way that this

11    needs to be done.

12         We have to have the ability to present evidence to

13    the jury about what this item was and its power.  They can

14    make an argument to the jury.  They can cross-examine him

15    and say that this is -- he didn't follow -- you know, he

16    wasn't correct, it was some other item.

17         Remember, they haven't presented an alternative.

18    You know, they just want to put on a video of this thing

19    making a lot of noise and arcing and hope that the jury

20    concludes in the absence of fact, relevant facts from an

21    expert what it was.

22         If they want to make an argument on cross, they

23    want to ask him questions on cross and make an argument to

24    the jury that what Dr. Kroll identified is not the item

25    itself, that's their -- of course they can do that.  We have

1    no objection to that.  But it's not, again, a basis to

2    allows us to offer evidence about what it was and what the

3    power of it was.

4             THE COURT:  Okay.  Anything else you want to say?

5             MR. SMOCK:  No, Your Honor.

6             MR. DREHER:  Your Honor, this is somewhat

7    anecdotal, but I would point out that the prosecution team

8    did attempt to purchase one of these devices and it is not

9    able to be shipped to Washington D.C. based on whether it's

10   -- my guess is the D.C. code as opposed to whether or not

11   something like that is legal within Washington D.C. itself.

12            We're attempting to track it down and get -- find

13   a way to at least confirm the test that Mark Kroll did

14   conduct.

15            But ultimately the idea that we are just going to

16   present videos in the hopes that the jury finds that this is

17   a deadly or dangerous weapon I think really defeats the --

18   defeats the idea that it's not just the electrical output of

19   this device that is affecting people in how it's being used.

20            There's also the environment in which it is used,

21   as well as the number of times that this device can be

22   effected, to the point to whether it's inherently dangerous

23   becomes something that -- you know, let me just go back to

24   the example that the Court gave in terms of a gun.

25            If a case involved a gun, I don't believe we would

1     have an expert that would come and testify that, yes, when

2     the trigger is pulled the gun expels bullets and will shoot

3     you.  It's something that the factfinder would determine

4     itself.

5              In the same sense that we have here, that this is

6     something that the jury would be able to see in its

7     operation from January 6th and hear and really understand

8     the dangerousness of this outside of expert testimony.

9              Now, putting that aside, the issue before the

10    Court today is whether this expert should give his opinion

11    to the jury.  And I believe the answer is still no because

12    of the methodology used in determining what this device was,

13    but then also just the conclusions that he's drawing are

14    more equivalent to the legal conclusions as opposed to the

15    factual conclusions that will be made by the jury.

16             And with that, Your Honor, I'll stop.

17             THE COURT:  Anything else you want to say?

18             MR. SMOCK:  No.  I mean, unless the Court has any

19    concerns, I think the motion should be denied.

20             THE COURT:  Well, let me say this.  You know, to

21    the last point that was made that you couldn't get one of

22    these shipped to the District of Columbia and the inference

23    you draw from that fact, you know, if I let this expert

24    testify, if I let Dr. Kroll testify, you know, you're going

25    to have to figure out a way to -- well, obviously you'll

1    figure out a way to cross-examine him, but to counter it.

2    And you still have time to go get one of these devices and

3    have somebody examine it, whether it's an expert at this

4    late date or whether it's somebody from the Bureau of

5    Alcohol, Tobacco & Firearms or not, or just stand on the

6    cross-examination of Kroll and the other witnesses that you

7    have, and admittedly yes, it is context.

8         And that gets us to the other issues of what use

9    means in 111, I mean, Count 3, 111, they have to show that

10   he used a deadly or dangerous weapon.

11        And with respect to Counts 4 and 5, as I

12   understand the statute, you have to show that he either used

13   or carried a deadly or dangerous weapon.

14        And so if the statute requires only that he carry

15   it, you still have to show that it's a deadly or dangerous

16   weapon, the government has the burden of proof of showing

17   that.

18        And so if -- and admittedly both in terms of the

19   witnesses you have and the arguments you will make, context

20   is important in carrying anything in the context of what was

21   happening on January 6th, is different from just walking

22   down the street by yourself with something.

23        But, you know, I'm very much inclined to admit

24   this testimony.  I'm not sure whether opinion number 7 is

25   maybe too broad in the way it's phrased, but I'll think

 1    about that.

 2              I'll think about all of this and I'll go back and

 3    read whatever cases -- I think I've read the case that had

 4    previously been cited.  I'm not sure whether I've read

 5    *Wallace* or not, but I'll certainly do that and think about

 6    that.

 7              All right.  So it's now -- anybody else have

 8    anything else they want to say about this?  It's now 20 to

 9    12, and we can take a 15-minute break and come back and

10    argue some other motions and then go to lunch at 1:00.

11              MR. DREHER:  It sounds great, Judge.

12              MR. SMOCK:  That's fine.

13              THE COURT:  All right.

14              And then either at some point you will finalize

15    the agreement on the stipulation or tell me that it's not

16    going to happen.  So we'll come back in 15 minutes and we'll

17    sit for another hour or so.

18              (Recess taken at 11:43 a.m.)

19                        *    *    *    *    *

20         (12:06 a.m.)

21                        **IN OPEN COURT**

22              THE COURT:  So what should be the next item on

23    your agenda?

24              MR. DREHER:  Your Honor, I would just point out

25    that on the break I was able to meet with the defense team

 1    and we have agreed to the language of the stipulation for

 2    Dr. Shepard-Kegl.

 3              THE COURT:  Wonderful.

 4              So, A, I don't have to decide whether to permit

 5    her as an expert testimony; and, B, we have one fewer

 6    witness for trial.

 7              MR. DREHER:  Yes, Your Honor.

 8              THE COURT:  Thank you, very much.

 9              Ms. Goetzl, you are alive and well.

10              MS. GOETZL:  I am.  Thank you so much and I

11    sincerely apologize to the Court about last week.  I

12    appreciate the small continuance.

13              The defense thinks we should start with the

14    government's exhibits and our objections to those exhibits

15    because those are essentially the bulk also of our motion in

16    limine.  And so that's where we would propose that we would

17    start also because we think that --

18              THE COURT:  Is that microphone on?

19              MS. GOETZL:  Sorry.

20              So we would propose that we start with the

21    government's exhibits and our objections to them because we

22    think that that would take possibly the most time of

23    anything remaining.

24              THE COURT:  So as I understand it, a number of the

25    objections to exhibits also relate to the pending motion

1       number Docket 107 to preclude certain video evidence.

2                    MS. GOETZL:  That's correct, Your Honor.

3                    Our motion in limine, Docket 107, seeks to

4       preclude three things:

5                    One, the government from playing the audio portion

6       of videos at trial in general because we believe the audio

7       is irrelevant.  Our client couldn't decipher spoken English,

8       so the audio is irrelevant and highly prejudicial because it

9       involves all of sorts of communications and yelling and

10      screaming and directives from other individuals that Mr.

11      Gossjankowski could not hear.

12                   And then the second thing our motion in limine

13      seeks to exclude is the government's video montage, which is

14      one of its exhibits, and that is Government Exhibit 102.

15                   And the third thing that it seeks to exclude are

16      specific exhibits which are also --

17                   THE COURT:  The third thing is what?

18                   MS. GOETZL:  Are specific exhibits.

19                   THE COURT:  Yep.

20                   MS. GOETZL:  And those specific exhibits in the

21      motion they are referred to as, I believe -- let me just

22      make sure.

23                   THE COURT:  Yeah, I don't remember, the numbers

24      are listed in the motion.

25                   MS. GOETZL:  Exhibit 1, 6 and 15 are the only

1    remaining exhibits.

2              THE COURT:  So there were a larger list of

3    exhibits in your motion 107, specific exhibit numbers, and

4    you're saying that some of those exhibits are not on the

5    government's final witness list?

6              MS. GOETZL:  There were five exhibits listed in

7    107.  Two of them are not on the government's list.

8              However, we have now made additional objections to

9    government's exhibits, and that would be ECF 146 which we

10   filed yesterday.

11             THE COURT:  Right.  I've got it.

12             MS. GOETZL:  And our primary concern with all of

13   these exhibits, the video exhibits, is that the government

14   is seeking to play what is essentially hours of video

15   footage that doesn't depict Mr. Gossjankowski.

16             And we are also concerned with the government's

17   editing of videos, particularly putting certain parts in

18   slow motion, which -- and certain editing features that

19   haven't been articulated to us or described or written

20   anywhere and that distort the accurate depiction of what's

21   being shown in those videos.

22             And I can go through -- I would just go through

23   Document 146, but we did ask the government if they would

24   agree to any of these on Friday and they have not gotten

25   back to us.  So perhaps --

1          THE COURT:  Well, let me ask Mr. Valentini whether

2     there is anything that they have agreed to so that I don't

3     have to decide everything.

4          MR. VALENTINI:  Yeah.

5          So as to, you know, the things in their letter

6     from this weekend that we may be able to agree to, the

7     concern for instance with the length of the videos.  Now, we

8     are not ready to agree to the fact that we only play video

9     that actually depicts the defendant.  There is some

10    additional video that is relevant for other reasons because

11    it helps us -- it helps the government determine the time of

12    other video, which is not timestamped for instance.  That

13    may not -- that video, it's critical to tell the story, to

14    provide the narrative, but it may not have the defendant

15    represented.

16         We also more fundamentally have to prove the

17    existence of a civil disorder and that does not -- it's not

18    limited to the participation of the defendant, that's an

19    objective fact about January 6th.

20         But just putting that concern to one side for a

21    second, I think that in terms of the general concern about

22    playing every minute of every exhibit that was submitted,

23    no, that is not our intent.

24         The fact that evidence of certain videos are

25    submitted into evidence doesn't mean that we plan to play

1      every second of every exhibit to the jury.

2                THE COURT:  Well, wait, wait, wait.

3                That's a problem.  Because if you don't show it to

4      the jury during trial, how I do decide whether some of its

5      prejudicial or not if you want to admit the whole thing as

6      an exhibit?  They could watch the whole thing.

7                MR. VALENTINI:  Right.

8                So as far as legal matter, we think that admitting

9      the whole thing and if the jury, for instance if they want

10     to, review the entirety of the exhibits in the jury room.

11               THE COURT:  The only thing they will see in the

12     jury room is what you show in the courtroom.

13               MR. VALENTINI:  Okay.

14               THE COURT:  I'm not going to let them have an

15     entire video that I myself haven't seen, that I myself

16     haven't applied Rule 403 and 401 to.

17               So if you want the entire video to go back to the

18     jury, A, think about that again or, B, we're going to spend

19     a day watching everything you want to go to the jury and you

20     are going to prove to me frame, by frame, by frame, just as

21     I required in the *Sutton* case, frame, by frame, by frame

22     what's relevant, what it's relevant to, and why it's not

23     prejudicial.

24               We spent about two days doing that in the *Sutton*

25     case with respect to body-worn cameras of police officers.

1    The burden on the proponent of the evidence to show that

2    each frame, each piece of the video is relevant and not

3    overly prejudicial.

4         The way to avoid that is to edit them now and show

5    me just what you want the jury to see, because they are not

6    going to view on their own anything that they haven't seen

7    at trial.

8         MR. VALENTINI:  Yes, Your Honor.

9         We have edited a number of these videos.  There is

10   some video, as I mentioned, that is necessary to create a

11   triangulate the time of other video that is not timestamped.

12        THE COURT:  I understand.

13        MR. VALENTINI:  More generally, we don't think

14   that the playing -- that any of the video that is even now

15   listed in our exhibit list is overly precedential.  Again,

16   we have to prove the existence of a civil disorder.

17        Now, to the point that if we don't plan to play

18   for the jury then we will need to edit it, and we will edit

19   it, and we will get to it as soon as possible, which is

20   today.

21        But I want to make clear that the video itself is

22   admissible.  It proves the existence of a civil disorder.

23        Now, at that point after that there's a question

24   as to what Your Honor just pointed out if we don't plan to

25   play every minute of the exhibit then it shouldn't be in

```
1    our -- in the video file itself and we will get them that

2    right away.

3            But as a matter of admissibility, it is

4    admissible.  It proves the existence of a civil disorder,

5    that's a heavy lift, that's what we have to prove under 231.

6            THE COURT:  I understand your argument that you

7    have to prove civil disorder.

8            MS. GOETZL:  Your Honor, we have offered to

9    stipulate to that.

10           THE COURT:  What?

11           MS. GOETZL:  We have offered to stipulate that

12   there was a civil disorder.

13           THE COURT:  They don't have to accept your

14   stipulation.

15           MS. GOETZL:  We would argue that the videos are so

16   highly prejudicial that we would ask for some sort of Old

17   Chief stipulation in this case.  It's essentially like

18   saying -- it's the equivalent of the Old Chief.

19           THE COURT:  No, it's not.

20           MS. GOETZL:  That would be our argument.

21           THE COURT:  I don't buy your Old Chief argument.

22           Look, I believe, and I think every other judge in

23   this courthouse who's tried any of these cases believes,

24   that or has concluded that the jury is entitled to see a lot

25   of what went on that day.  The jury is entitled to see the
```

1    context in which things happened.

2            They will be instructed that in order to convict

3    Mr. Gossjankowski of any particular count they must find

4    beyond a reasonable doubt what he did and whether what he

5    did satisfies the elements of the particular count.  There's

6    no doubt about that.  But that doesn't mean that the context

7    of what occurred on January 6th is not important.  It's

8    important for a number of reasons.

9            One, because with respect to civil disorder, the

10   government does have to prove civil disorder beyond a

11   reasonable doubt.  And the way that statute is written it

12   says that a particular individual must do certain acts

13   during the commission of a civil disorder.

14           The defendant by himself have to commit the civil

15   disorder.  He's charged with submitting certain acts during

16   the commission of a civil disorder, and then the statute

17   goes on.  So they have to prove that there was a civil

18   disorder.

19           Secondly, with respect to the other charges.  Then

20   it is important that the jury understand the context of what

21   happened at the Capitol or certainly what happened at those

22   portions of the Capitol, that Mr. Gossjankowski was present

23   at or near to or within his sight lines as he was doing what

24   he is alleged to have done.  And we certainly can't have the

25   jury relying on what they've read on the newspapers or what

1    they saw on television because I'm going to tell them, first

2    of all, you're going to try to exclude some of them based on

3    how much they've seen or heard or read during voir dire.

4            And, secondly, we're going to tell them over and

5    over again that they can only consider the evidence they see

6    and hear in this courtroom, not on anything else they may

7    have heard before.  No independent research now.  No viewing

8    videos now.  And we will exclude those that -- either for

9    cause or because you've entered peremptory challenges that

10   have seen or heard too much and/or been affected by what

11   they've seen or heard in advance.  So the rest of them can

12   be told they're limited to the evidence they hear in the

13   courtroom.

14           That means that the government has to show a civil

15   disorder and I believe is entitled to show the context in

16   which the events, the things that Mr. Gossjankowski is

17   charged with doing, the context in which they occurred.  And

18   that context is, you know, it's not just two guys going in

19   robbing a store.  There are hundreds of people.  And the

20   context is the atmosphere, the mob context, and the -- and

21   what he saw and observed, not what he just did.

22           I've had lots of misdemeanor cases where somebody

23   has gone to listen to President Trump speak because they

24   were supporters of his, because they thought the election

25   was stolen.  And then they went to the Capitol and they

1    walked in and when they saw that what was going on they

2    left.  Some in two minutes, some in 15 minutes.  So the

3    context effected their conduct which meant they were only

4    charged with trespassing.

5         And the context is important for the jury to see

6    in evaluating Gossjankowski's conduct and whether or not he

7    is guilty of these particular charges.  And I just think

8    that's got to be the answer.

9         Now, that having been said, some of these videos

10   were too long.  I get the -- I understand the argument about

11   the montage.  We'll talk about it.  And there may be other

12   issues, as well.  One of them's an hour and five minutes

13   long, an hour and a half long, I'm sorry.

14        And then in addition, as Ms. Goetzl started to say

15   at the beginning, we have other issues that they've raised

16   about the audio portions, about the montage, about whether

17   certain videos have been altered or manipulated in certain

18   ways for illegitimate or prejudicial or misleading purposes

19   or if not purposes of fact, rather than for legitimate

20   nonconfusing, nonmisleading, nonprejudicial reasons.  Those

21   are all legitimate issues we should talk about.

22        But I don't buy your *Old Chief* argument.  I don't

23   buy your argument that only what Mr. Gossjankowski did, only

24   videos where he's seen on the videos, that's much too

25   constrictive in view of what's going to be presented for the

1    jury to decide.

2              MS. GOETZL:  I understand.

3              THE COURT:  And how we parse through all of that,

4    do we do it now?  How much can we do now?  How much can we

5    do as the trial proceeds?  How much can we -- I don't want

6    to waste the jury's time, so how much of it can we do either

7    by agreement of the parties or reluctant agreement by the

8    parties or by my viewing some of the videos?  Those are the

9    questions, so.

10             MS. GOETZL:  We would leave that to the

11   government.

12             We've detailed our objections.  We've thoroughly

13   reviewed the government's exhibits, which took us a very,

14   very long time.  There is a lot of footage.

15             And so we are prepared to address our individual

16   objections to each exhibit if the Court would like at this

17   time or however the Court would like to proceed.

18             MR. VALENTINI:  (Nods head).

19             THE COURT:  Well, I mean, we could do it in -- as

20   I understand what's included in your -- in Docket 107, that

21   motion, there are exhibits to audio portions of videos,

22   number one.

23             Number two, there are exhibits to -- there are

24   objections to five specific exhibits now limited to three,

25   but there may be some additional things too.

1           Number three, there are summary videos that the

2    defense objected to.

3           Number four, there's the video montage.

4           And number five, there's a discussion of

5    inflammatory labels.  And I wasn't 100 percent clear whether

6    that relates to quote/unquote "inflammatory labels" in

7    certain videos or whether it was intended to also cover,

8    which is not a video issue, but the use of certain

9    quote/unquote "inflammatory language" either by witnesses or

10   by the government.

11          And, you know, we could limit ourselves for the

12   moment to talking about videos and these various video

13   arguments.

14          I will say this about -- if the inflammatory

15   labels argument is broader than just the videos, and I think

16   from some of what I've read it is, as I recall, I read this

17   a few days ago I think, the government has said they do not

18   intend to intentionally elicit any inflammatory language

19   from witnesses.  But they can't always control what

20   witnesses say.  But they're not going to prepare them to use

21   buzz words and red flags and all of that.  And, Mr.

22   Valentini, correct me if I'm wrong.

23          As for opening statements and closing arguments,

24   you know, the jury will be told that opening statements and

25   closing arguments are not evidence.  And just as judges in

1    our written opinions have used words like riot,

2    insurrection, mob, attempt to obstruct, delay, interfere

3    with, well those have to be used because they're part of the

4    statutory language, within ethical limits, professional

5    responsibility limits, and to the extent that they are fair

6    inferences from the evidence, I think government -- I don't

7    think I will be precluding the government from using such

8    words in their opening statements and their closing

9    arguments.

10          So how do we want to --

11          MR. VALENTINI:  Thank you.

12          THE COURT:  -- best use our time either now or

13    after lunch?

14          MR. VALENTINI:  Your Honor, I think you identified

15    a number of claims that are raised in Docket Number 107.

16    And I propose that we move through some of those, at least

17    the general ones, and then possibly look at some exhibits

18    and going to the more exhibit specific set of arguments.

19          So the first argument they raise is this idea that

20    the entire -- the entirety of the video that is shown during

21    trial and played for the jury during trial should be played

22    on mute, essentially, without audio because the defendant

23    cannot hear.

24          Except this goes back to the point that I made

25    before, and I hope Your Honor understood, which is we have

1    to prove not just what the defendant understood or heard in

2    this case but we have to prove general facts about the

3    world, including the existence -- the existence of a civil

4    disorder on January 6, 2021.

5            And that civil disorder is informed and proven in

6    part by what went on at the -- well, entirely by what went

7    on at the Capitol which has -- which had sound.  And so the

8    jury should not be asked to decide in the abstract what

9    happened at the Capitol with the -- under the pretense that

10   there was no sound when they're asked to make an objective

11   finding about what happened at the Capitol.

12           Now, to the extent that the defense is asking for

13   some sort of an instruction at some point that the sound may

14   not inform necessarily or may not inform the defendant's

15   understanding or should not be used for that purpose, that's

16   a different set of requests and something that one might

17   consider.

18           But the idea that this trial is conducted under

19   the false impression that the riot at the Capitol was silent

20   makes no sense as a matter of fact and it has no foundation

21   in the law.

22           THE COURT:  Ms. Goetzl.

23           MS. GOETZL:  Our argument about the sound is set

24   forth clearly in our papers and I've mentioned before --

25   I've mentioned earlier also our argument.

1          I mean, the idea is to the extent that the

2    government is relying on what Mr. Gossjankowski observed and

3    personally knew of and witnessed that day, sound was not a

4    part of that.  So to the extent -- and we've -- we will

5    stipulate that a civil disorder occurred.

6          So we just think that the sound in this case is

7    more prejudicial than probative of the key issues, which are

8    his intent, and his knowledge, and his understanding.

9          THE COURT:  All right.

10          First, I don't think the government should be

11    required to accept your stipulation and I think there's law

12    to that effect and they need to prove civil disorder.  They

13    need to show context.  And to that extent -- and the civil

14    disorder is not committed by any one defendant alone, it is

15    a thing, a commission that a civil disorder was being

16    committed or happened, I can't remember the language of the

17    statute, I said it about 15 minutes ago, and it's relevant

18    to that.  It's relevant to put it into context.  The sound

19    will be admitted.

20          You can propose a limiting instruction.  Mr.

21    Valentini and his colleagues are open to a limiting

22    instruction, he's just said so.

23          And, secondly, I was just told a half an hour ago

24    that there's going to be a stipulation that incorporates

25    some of what Dr. Kegl would have testified to.  And so the

1      jury should know that Mr. Gossjankowski doesn't read lips.

2      He has limited ability to articulate sounds, words,

3      understand sounds.  And so it seems to me that the prejudice

4      argument, to the extent there's any merit to it, is dealt by

5      the limiting instruction by the stipulation and by argument

6      and cross-examination, but it's relevant for all the reasons

7      that Mr. Valentini suggested.

8              So I'm going to reject that portion of a defense

9      argument set forth in Docket 107.

10             Next.

11             MR. VALENTINI:  You want --

12             THE COURT:  Let's deal with some of the generic

13     ones first.

14             MR. VALENTINI:  Yeah.

15             THE COURT:  So what else?

16             MR. VALENTINI:  I believe the next one on the list

17     will be the montage, if I'm correct.

18             THE COURT:  Yeah.

19             MR. VALENTINI:  And, Your Honor, I think we've

20     already touched on some of this, the issues raised with

21     respect to the montage.

22             Again, it's about context.  It's about the civil

23     disorder that happened on January 6th, 2021.  It is not

24     inflammatory video.

25             I will say that it seems to me from, as Judge Moss

1    noted in the *Vargas* case, it seems like the most

2    inflammatory -- the most vivid video, portions of the video

3    actually are from the lower west terrace, which is video

4    that is within the four corner of this case and not just

5    this case but the defendant's specific conduct in this case,

6    so we see no reason to exclude any portion of that video.

7          We have also heard an objection to the inclusion

8    of radio runs, which are interspersed in the montage.  And

9    those are, as defense counsel they've represented they have

10   watched the video, they can attest to the fact that there

11   are short snippets or short portions of the radio runs.

12   They've had the radio runs for months.  They said, oh, this

13   is too close to trial.  They've had the radio runs for

14   months.  They've had all of the CCTV footage, all of

15   which -- which is the only source of video in this montage

16   for months.

17         They've had these exhibits since February 17th.

18   They've had time to review it.  We see no reason to exclude

19   any portion of the montage or play without sound.

20         MS. GOETZL:  Yes.  We've had a copy of the

21   government's 22 -- 22-minute montage or video.

22         THE COURT:  It's 22 minutes?

23         MS. GOETZL:  No.  The video that the government is

24   seeking to use in this case is 15 minutes.

25         THE COURT:  15, 1-5?

LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

1           MS. GOETZL:  Yes.  We've had a 22-minute what

2      we've been referring to as the video's 22-minute video

3      montage, which I would imagine has most, if not all,

4      everything in this particular 15-minute video that the

5      government just now has produced to us in this case.

6           If I remember correctly, the 22-minute montage

7      does not have any sound.  I don't think it has any radio run

8      overlay.

9           In terms of radio runs that they are saying we've

10     had for months, we've had radio runs on a database.  That is

11     a huge dump of everything related to Capitol discovery.  And

12     that's the relativity database we have not had radio runs

13     produced in this case for months that are relevant to this

14     defendant here.

15          It is impossible for us to go through the video,

16     the 15-minute video, and check the accuracy of what the

17     government has compiled.  It's essentially a demonstrative

18     and it should -- consisting of other evidence that is not

19     relevant to this case in other parts of the Capitol.

20          So it shows -- one of the first scenes shows

21     people breaking windows and breaking into a door that Mr.

22     Gossjankowski was nowhere near.  I mean, we maintain our

23     objection to showing the video montage exhibit and to the

24     radio run overlay.

25          And I can find out more about what Judge Bates

1    excluded recently, I know that he excluded at least a part

2    of the 22 -- first of all, I just want to --

3          THE COURT:  Well, is the 15-minute montage that is

4    now Exhibit 102 a portion of the 22-minute montage or it's

5    something different?

6          MR. VALENTINI:  It's something not entirely

7    different.  I think the overlap is, if not exhaustive, it's

8    largely an overlap.  I am not in a position right here,

9    unfortunately, to represent it is 100 percent overlap.

10         MS. GOETZL:  The government doesn't even know what

11   its exhibits consists of, so I just want to point that out.

12         I don't know what is the same or the different

13   between the 15-minute montage that they seek to use here and

14   the 22-minute montage that they just sought to use recently

15   in the *Andries* case -- or, I'm sorry, *Sheppard* case that

16   just went to trial in front of Judge Bates, but I do know

17   that Judge Bates did exclude at least a portion of that

18   22-minute video, and I can find out more about his ruling.

19         MR. VALENTINI:  Your Honor, just to be absolutely

20   clear, we know exactly what's in the exhibit that we are

21   proposed to offer in this case.

22         THE COURT:  Well, look, I think we asked you if --

23   I think Ms. Ma asked you for the montage last week and I

24   don't know whether we got.  Well, what did we get the

25   22-minute montage or the 15-minute montage.

1          MR. VALENTINI:  The only trial exhibit that we

2     offered in this case is the 15-minute montage and we know

3     exactly what's in that video.

4          THE COURT:  Do we have it?

5          MS. MA:  We have the 15-minute.

6          THE COURT:  We have the 15-minute?  Okay.  So I've

7     got it.

8          And the radio runs that she's talking about is a

9     part of this montage?  Are they audio or captions across the

10    top or the bottom or something?

11         MR. VALENTINI:  They are not captioned, they're

12    audio.  Right.

13         And they are overlaid based on the time because

14    the montage has timestamps and they're drawn from that

15    timestamps and they tend to describe the video, which is

16    captured in the montage.

17         THE COURT:  They describe --

18         MR. VALENTINI:  Yes.

19         THE COURT:  In other words --

20         MR. VALENTINI:  Well, I mean --

21         THE COURT:  -- the person who's in the radio run

22    is talking to the dispatcher and saying, Here's what's going

23    on?

24         MR. VALENTINI:  Correct.  And I misspoke when I

25    said described because of course that image was not before

1    necessarily whoever was speaking on the radio run.  The

2    radio run of events which are depicted in the video or

3    around the same time.  They give a general narrative of what

4    was happening, what was going through the United States

5    Capitol Police radio channels at the time that these events

6    were happening.

7              MS. GOETZL:  And with that I just want to say

8    there are no timestamps in the radio runs, so.  And I don't

9    know what radio runs have been produced, but there is no

10   possible way for us to check the accuracy of the overlay,

11   the timing of the radio runs, as they narrate the video.

12             MR. VALENTINI:  Your Honor, all I can say they've

13   had the radio run for months.

14             THE COURT:  Well, that's not an answer to her

15   question.  It does not explain -- you have a montage --

16             MR. VALENTINI:  Yes.

17             THE COURT:  -- which shows something that happens

18   at 2:59 p.m.?

19             MR. VALENTINI:  Right.

20             THE COURT:  And a radio run which doesn't tell us

21   what time the radio run was taking place?

22             MR. VALENTINI:  Not within the four corners of the

23   montage, yes.

24             THE COURT:  Pardon me?

25             MR. VALENTINI:  It doesn't say -- the radio

1    runs --

2            THE COURT:  How do we know that the radio runs

3    were occurring at the same time as what's happening on the

4    video?

5            MR. VALENTINI:  Because we have produced the radio

6    run and they can crosscheck them based on the radio runs.

7            THE COURT:  You're going to need an expert to

8    explain all of that or a witness.

9            MR. VALENTINI:  To?

10           THE COURT:  To tell us -- to prove.  To prove that

11   this -- I am talking to you at 20 minutes to 1:00 but if

12   somebody were taking a video of you standing underneath that

13   podium at 20 minutes to 2:00 and they superimpose my radio

14   run, the inference is it was happening simultaneously.  You

15   need a witness to demonstrate it was happening

16   simultaneously.

17           MR. VALENTINI:  Understood.

18           THE COURT:  Or we should just exclude the radio

19   runs.

20           MR. VALENTINI:  Understood.

21           Just to be clear, so those are the two options,

22   would be either exclude the radio runs and play from the

23   montage or have the witness radio run by radio run be able

24   to testify, yeah, this is what went to the radio channel at

25   this particular time.

 1          THE COURT:  Assuming that you can also show me

 2    that the radio runs are, A, relevant; and, B, not hearsay.

 3          MR. VALENTINI:  Okay.  Understand.

 4          THE COURT:  I don't think you can do that.

 5          You got to show that they're relevant, that

 6    they're not hearsay, and that they were happening precisely

 7    at the same time as the video that's being seen by the jury

 8    while the radio runs are going.

 9          Why don't we just forget the radio runs.

10          MR. VALENTINI:  Under those parameters, I was

11    going to say that the government would be inclined to not

12    include the radio runs in the montage.

13          THE COURT:  I had similar problems in the *Sutton*

14    trial, but in that case the radio runs were so crucial to

15    how people responded and when they responded that the

16    government jumped through lots of hoops to prove this

17    precise time of the radio runs and when they tried to tie

18    them to particular body-worn cameras.  They went through

19    lots of hoops to do that properly.

20          MR. VALENTINI:  I don't think they're critical to

21    the extent that you're describing in the *Sutton* case.

22          THE COURT:  So Ms. Ma and I will look at the

23    montage, okay.  And then maybe either -- and make a decision

24    or ask both of you some more questions.

25          But while we're on that subject, there's also a

1    discussion in Docket 107 of summary videos.  And are those

2    something different from the montage or it's -- I wrote down

3    on my list of issues and I don't have, you know, summary

4    videos, which is discussed in 107, is that something

5    different from the montage or is it just another word for

6    the montage?

7                MS. GOETZL:  Your Honor --

8                THE COURT:  I think it --

9                MS. GOETZL:  Sorry.  I can answer the Court's

10   question.

11               There are two summary videos that the government

12   is seeking to offer in this case.  One is the montage that

13   we just discussed.  The other is a similar montage,

14   Exhibit 503.

15               THE COURT:  Exhibit what?

16               MS. GOETZL:  Exhibit 503, which is another video

17   montage of the Congressional Record and footage of the

18   congressional hearing portion of the montage, with parts of

19   the Congressional Record on the video.

20               We've made a separate objection to just.

21               THE COURT:  What is that, Mr. Valentini?

22               MR. VALENTINI:  Yes, it's a montage that goes

23   through the events within -- against the backdrop of the

24   video from C-SPAN from within the chambers and it's

25   essentially a timeline that narrow rates with C-SPAN video

1    and summaries from the Congressional Record.

2             THE COURT:  What do you mean by Congressional

3    Record?

4             MR. VALENTINI:  The Congressional Record of the

5    proceedings on January 6th as they were halted because of

6    the breach.

7             THE COURT:  You don't mean the document called the

8    Congressional Record?

9             MS. GOETZL:  Yes.

10            MR. VALENTINI:  We do.

11            MS. GOETZL:  They are showing the document.

12    That's our one objection to this exhibit.

13            THE COURT:  Well, why would we do that?  Why would

14    you do that?

15            MR. VALENTINI:  Your Honor, they've been unwilling

16    to stipulate in this case to anything including the fact

17    that it was an official proceeding.

18            An official proceeding is necessarily an element

19    of 1512(c)(2).  We have encountered nothing but objection on

20    all of these elements and now they're coming back and

21    complaining that we want to put on evidence of what the

22    official proceeding consisted of.

23            THE COURT:  So it would be evidence of what is an

24    official proceeding?

25            MS. GOETZL:  We are just objecting -- our only

1    objection with respect to this video is that they are

2    showing some sort of corrected, what their record -- the

3    Congressional Record has a yellow stamp on it that says

4    "correction."  That does not appear to be the actual

5    Congressional Record.

6              MR. VALENTINI:  Your Honor --

7              MS. GOETZL:  That is our objection with respect to

8    that exhibit.

9              MR. VALENTINI:  Your Honor, the yellow stamp that

10   Ms. Goetzl just referred to was imposed by the government

11   printing office when it produced the final permanent version

12   of the Congressional Record.  It's because there was a

13   correction between the daily record, which was produced by

14   the government printing office and the permanent record.

15             THE COURT:  Well, why can't you stipulate to that?

16             I mean, if that is, in fact, accurate, you know,

17   it's like when the Court of Appeals issues an amended

18   opinion.  They say, you know, we issued an opinion a week

19   ago and we forgot footnote 4 and when --

20             I can think of other examples.

21             MR. VALENTINI:  Your Honor, we have stipulated in

22   many cases as to the congressional proceeding and the

23   official proceeding and that has satisfied the requirement

24   of 1512(c)(2).

25             When we had a meet and confer with the defense, we

1      floated the possibility of stipulations and what we heard

2      back is we are not stipulating to anything in this case.

3              THE COURT:  Well, I'm not saying they have to

4      stipulate to whether there was an official proceeding.  I'm

5      just saying if this is an officially corrected record by the

6      government printing office, I don't understand why defense

7      won't stipulate to that.

8              MS. GOETZL:  We have not been able to locate that

9      document anywhere publicly available, so we don't have a

10     copy of the document that the government is referring to.

11             MR. VALENTINI:  Your Honor, last night I was able

12     to locate that document on the website of the government

13     printing office.  It's as easy as that, Your Honor.

14             THE COURT:  Well, I think you should talk about

15     that.

16             MR. VALENTINI:  Yeah.

17             THE COURT:  Because, I mean, if that's the only

18     problem with 503, I mean I'm happy to look at 503 also, but

19     if the problem is, is this the official record, I mean, is

20     the official record the uncorrected one or the corrected

21     one, that shouldn't be easy to resolve between you.

22             MR. VALENTINI:  I agree, Your Honor.

23             We have not heard -- we heard this objection to

24     this particular exhibit I think for the first time when it

25     was filed last night at around 4:00 p.m.

1          So it's true we have not reached out to confer

2     about this particular issue.  I am hopeful that some of

3     these matters can be stipulated to.

4          THE COURT:  I'm hopeful, too.

5          MS. GOETZL:  I'm also hopeful.  And that would

6     resolve the remaining of our summary videos.

7          THE COURT:  I'm sorry, I interrupted you.

8          MS. GOETZL:  That would basically be the only

9     remaining objection to the summary videos.

10         THE COURT:  Okay.

11         MS. GOETZL:  As in ECF 107.

12         THE COURT:  All right.  So you will talk about

13    that.

14         That leaves us with the question of what used to

15    be 1, 6 -- I'm sorry, I think that's the only thing that

16    leaves us with is what used to be 1, 6 and 15, but now we

17    have other exhibit numbers on the official exhibit list and

18    in addition there's some other specific videos that defense

19    has raised objection to.

20         Is that the only thing left of -- not that I've

21    resolved it all, but is that the only thing left of motion

22    number 107, which is related to videos?

23         MS. GOETZL:  Yes.

24         THE COURT:  Okay.  So that means what we need to

25    talk about is the analog to 1, 6 and 15 on the government's

1     exhibit list and other exhibits that the defense -- other

2     video exhibits that the defense has raised objections to.

3           And do we want to do that now?  Do we need to do

4     it after lunch?  Do I need to view some of these videos in

5     order to decide them or should we just go through them?

6           MR. VALENTINI:  It's a defense motion.  We're

7     happy to proceed how the Court and the defense prefer.

8           MS. GOETZL:  It's the government's burden to show

9     they're admissible, as the Court said earlier.

10          I can tell the Court that Exhibit 1 is the same as

11    Government Exhibit 136.  Exhibit 6 in our motion in limine

12    is the same as Government Exhibit 138.

13          THE COURT:  What's 136?  The same as what?

14          MS. GOETZL:  Exhibit 1.

15          THE COURT:  All right.

16          MS. GOETZL:  In ECF 107.

17          Exhibit 6 in ECF 107 is the same as Government

18    Exhibit 138.  And Exhibit 15 in ECF 107 is the same as

19    Government Exhibit 140.

20          THE COURT:  1?

21          MS. GOETZL:  140.

22          THE COURT:  4-0.  Let's talk about those a little

23    bit.  Since I've looked at those exhibits or thought about

24    those exhibits.

25          As I understand it, first objection was that Mr.

1    Gossjankowski is not depicted in some of those and we've

2    talked about that but can talk about it further.

3           There's another objection to number -- and I said

4    this earlier and I think this is true of those exhibits is

5    that the government has to prove civil -- this civil -- the

6    commission language, I think is the commission of a civil

7    disorder and also for context.  I think that the fact that

8    it portrays other individuals other than Mr. Gossjankowski

9    is a losing argument and it's irrelevant.

10          The second objection to Exhibit 1, now

11   Exhibit 136, that at least was identified in Docket 107 was

12   that there are two subtitles reading, "Made some friends and

13   took a tour."  And we should talk about that.

14          Exhibit 6.  The additional objection to Exhibit 6

15   is cumulativeness and I don't see how we can

16   decide cumulativeness until we actually get to trial and

17   until we can see whether I think the government's overdoing

18   it.

19          And with respect to Exhibit 15, now Exhibit 140,

20   an Instagram live stream video.  The defense wants to

21   exercise certain comments from Instagram users and Twitter

22   notification as both irrelevant and prejudicial and probably

23   hearsay.

24          So unless I'm mistaken, the primary issue left for

25   discussion is the subtitles in Exhibit 136 and the comments

1    from others over Instagram in Exhibit 140.

2         MS. GOETZL:  Your Honor, we maintain our objection

3    to the portions of the video where there's no evidence that

4    Mr. Gossjankowski was there or seeing what was happening in

5    those videos.

6         And with respect to those particular videos we

7    think that what is depicted in them, in those particular

8    videos, is more prejudicial than probative, so we would ask

9    the Court to view videos before permitting them to be

10   admitted.

11        THE COURT:  Okay.  So for the moment we're talking

12   about 136, 138, and 140.

13        And the objections are the ones I mentioned, the

14   subtitles evidently authored by somebody other than Mr.

15   Gossjankowski and the comments by participants on Instagram,

16   not by Mr. Gossjankowski.

17        And the second is that he's only visible briefly,

18   and maybe even in portions of the Capitol where he was at

19   present, I'm not sure about that.

20        So we have the Instagram question, the subtitles,

21   other inflammatory and prejudicial comments, alleged

22   prejudicial and inflammatory comments by others.

23        MR. VALENTINI:  Your Honor, if I can take those

24   points in reverse.

25        Starting with the fact that Mr. Gossjankowski did

1    not -- was not in the area and may not be visible, we think

2    other evidence, including the surveillance video, will show

3    that he was in the area.  There are things that somebody

4    could have seen.  Nothing preventing him from seeing.

5            And in addition to that I think -- I don't mean to

6    rehash what we said before about the civil disorder but that

7    remains sort of a stage setting point for all of these

8    videos.

9            With respect to the subtitles and the commentary,

10   they are in the exhibits right now because we have

11   encountered objections to any nature of alteration to any of

12   the exhibits.  You have heard some of those today about, you

13   know, an objection about our, you know, using basic trial

14   graphics to highlight for facts the finder of fact.

15           We did not undertake some editing of these

16   comments from other users if they are from other users

17   because we wanted maintain the perceived appearance of the

18   evidence as we found it, whether it's open source or whether

19   it was obtained from other defendants or as part of the

20   investigation.

21           We don't have we don't have a strong -- we don't

22   plan to make anything of the comments that may appear on

23   this Instagram videos and we don't have a strong objection

24   to the extent it's technically feasible within the short

25   time that we have before trial to remove them.

1          So we're now going to point to those comments by

2     third parties or by whoever they are as evidence in this

3     case.  There's a question, a technical question in my mind,

4     as to whether -- what it takes to edit from video.  I think

5     it's feasible.  I don't know what the timing is.  But that's

6     the extent of our point of view on the subtitles.  Certainly

7     nothing nefarious, Your Honor.

8          MS. GOETZL:  Your Honor, if I may just have a

9     moment to confer with counsel.

10          (Counsel confer)

11          MS. GOETZL:  With respect to the comments I just

12     want to make clear that the comments are basically live

13     tweets that are being tweeted while the video is taking

14     place.

15          And so regardless of those -- the government

16     thinks it needs those, I don't know why it would need those

17     to authenticate the video, but we'd ask that those be

18     redacted before they be submitted.

19          THE COURT:  All right.  Well, it seems to me, and

20     we're just at the moment we're just talking about 136, 138

21     and 140, that the government wanted to maintain the

22     appearance and integrity of the exhibit and now the defense

23     requests, and on the defense's objection, I will order that

24     the subtitles and the tweeting and the Instagram comments

25     all be deleted.

1          Whether it's feasible to get that done is another

2     question.  But it's the defense's request and I'll grant the

3     defense's request and to that extent be granting that part

4     of Docket 107 motion.

5          Now, my suggestion is, and we've already talked

6     about how government is -- I've already said the government

7     does not have to limit the videos to things that Mr.

8     Gossjankowski has seen because of the context that the jury

9     to see and because of the need to prove civil disorder.

10          That having been said, some of these videos are

11     very long and the government has agreed -- has said they

12     don't want to show all of them.  And I've said that I'm not

13     going to let the jury -- that nothing will go back to the

14     jury room that hasn't already been shown to the jury in the

15     courtroom and/or that I haven't already ruled on, relevance,

16     prejudice, and hearsay to a certain extent.

17          So having that been said, maybe what we should do

18     after lunch is go through the rest of the government's

19     exhibits -- the government's objection to video exhibits and

20     to other exhibits as well, I suppose, but we also have the

21     following additional motions to discuss:

22          One is Docket 92, which has to do with Secret

23     Service Agency witnesses, and the Vice President, and his

24     family.

25          One is Docket 93, specific locations of U.S.

1      Capitol surveillance.

2              And then the most recent thing is the Bill of

3      Particulars, which I think now has been fully briefed unless

4      the defense plans on filing a reply.

5              MS. GOETZL:  No, Your Honor.  We do not want to

6      file a reply.  Yes, it is fully briefed.

7              THE COURT:  So maybe you could talk to each other

8      about how we can most efficiently do all of this this

9      afternoon and I think our goal still is to have jury

10     selection tomorrow.

11             Is that still everybody's understanding of what

12     we're going to do or is there a reason -- are there reasons

13     that we -- because we have to let the jury office know at

14     some point or are there reasons we think we're going to have

15     to -- there's any reason -- and then we have Section 111

16     that has been further briefed, too.

17             Is there any reason to think that we can't be

18     ready to do this tomorrow?

19             MS. GOETZL:  The defense has no reason to think

20     that we can't be ready to do this tomorrow and expects to go

21     forward with voir dire.

22             MR. VALENTINI:  Yeah, we don't have any reason to

23     believe that we're not going to be able to begin voir dire

24     tomorrow.

25             The question in the government's mind is sort of

1    the technical time that may be needed to implement changes

2    to the exhibits before the evidence is actually received,

3    but that's a separate question.  And, you know, the fact

4    that we have the -- couldn't do this pretrial conference

5    last week, of course, has a significant impact on our

6    response time because it takes away the weekend from making

7    those changes, but I suggest we cross that bridge when we

8    get there.

9            THE COURT:  Well, my plan is to take our

10   discussion from this morning about voir dire and revise the

11   voir dire questions and get those to you sometime today.

12   And if you don't like it, I mean, if there's anything I

13   missed, I don't want to reargue any of it, if you don't like

14   any decisions I've made, you can put your objections on the

15   record, maybe you already have, unless in looking back at my

16   notes and at what we agreed or I said this morning and I've

17   got something wrong, then we'll correct it.

18           And then some of what -- some of what we've done

19   this morning I've already ruled, in fact, or in fact on a

20   number of the things that we've discussed this morning

21   orally and there's no reason to write anything.

22           And I will either rule orally on Dr. Kroll this

23   afternoon or get you something in writing very, very, very

24   soon, but my inclination is to admit his testimony.

25           So should we come back at, what time is it?  1:00?

```
 1    2:15.  And if there's any way you can talk to each other to
 2    streamline what this afternoon's going to look like, that
 3    would be great.
 4         MS. GOETZL:  Thank you.
 5         (Recess taken at 12:03 p.m.)
 6              *    *    *    *    *
 7    (2:39 p.m.)
 8                        IN OPEN COURT
 9         THE COURT:  All right.  So where are we?
10         MR. SMOCK:  Your Honor, I appreciate you giving us
11    a little extra time.
12         I think I can report to the Court that we met and
13    conferred and I think have made some fairly significant
14    progress on trying to work out some of these issues without
15    involving the Court.
16         Not everything has been resolved but I think we've
17    made some progress on editing and agreements about editing
18    down the video footage.  The government over the lunch break
19    in part in reaction to the Court's rulings and statements
20    during the hearing I think have endeavored to shorten some
21    of these videos.
22         I think, and the government can certainly pitch in
23    on this as well, I don't think it makes sense this afternoon
24    to watch hours and hours of video whether --
25         THE COURT:  Good.
```

1          MR. SMOCK:  You're welcome.  In order to, well, I

2   think we're getting close to reaching some agreements about

3   some of these exhibits.

4          And so I think what we will be doing, the

5   government just gave us now just sort of minute markers for

6   a number of the longer exhibits and I think are going to get

7   back to us about one or two others.  And I think we will --

8   the parties will meet and confer later today as well.

9          To the extent we have ongoing objections about the

10  minute markers and the length of time of these videos, I

11  think we can have a significantly shorter discussion about

12  that, you know, at some point tomorrow, I would hope, and

13  figure that out.

14         THE COURT:  It's going to be a busy day if we're

15  picking a jury.

16         MR. SMOCK:  Understood.

17         THE COURT:  All right.

18         MR. SMOCK:  I'm encouraged that we've made some

19  progress here.

20         THE COURT:  Good.

21         MR. SMOCK:  I think that's the point.

22         I think there are some remaining issues that might

23  make sense to discuss now, if the Court is willing.

24         THE COURT:  Anything you want to say about the

25  videos Mr. Valentini?

 1              MR. VALENTINI:  Yes, Your Honor, if I may, yes.

 2    We have made significant progress and I am also pleased to

 3    report from our perspective the real hurdle at this point is

 4    the progress also cost -- comes at a cost for us, which is

 5    we'll have a time cost.  We'll have to implement some

 6    significant editing and that makes it a difficult to plan on

 7    Thursday as a first day to introduce to start with the

 8    evidence.

 9              So that's the nature of our concern.  And I think

10    we have come closer to an agreement with respect to the

11    exhibits, but we do need a little bit more time, I'm afraid.

12              I'm prepared to, I'm reluctant to commit now

13    without speaking to my office in terms of how much time will

14    be needed to revise the exhibit and the revisions are

15    substantial, some of them, in terms of time, which will save

16    a tremendous amount of time at trial.  But I would like to

17    consult with my office --

18              THE COURT:  Sure.

19              MR. VALENTINI:  -- about timing and see what's

20    feasible technologically, which is not one of my strongest

21    suits.

22              THE COURT:  Well, my suggestion is that we go on

23    to discuss some of the other motions.  That we do voir dire

24    in the morning, start voir dire in the morning.

25              MR. VALENTINI:  Okay.

```
 1              THE COURT:  And the plan would be before we leave,
 2    Ms. Johnson and I can explain the procedures more, that we
 3    would have a group of 70 people here, I'll ask the
 4    questions.  And I will e-mail you later the questions as
 5    I've revised them, and you may still have some issues, but I
 6    think essentially unless I've misunderstood what I've said
 7    or you said this morning, the issues will be preserved for
 8    appeal not for -- or we'll just go forward after a few
 9    minutes discussion.
10              And so and then we will do individual voir dire
11    with some of them tomorrow morning, some of them tomorrow
12    afternoon, and the rest of them on Wednesday.  That will
13    give you time to tell us whether we can actually begin with
14    openings on Thursday morning or Thursday afternoon or not at
15    all on Thursday and with your first witnesses.
16              But I think we should just go ahead.  Nothing that
17    you all have agreed or the technical problems that you may
18    face should affect picking a jury, right?
19              MR. VALENTINI:  No.  The only question about that
20    will become whether the Court is comfortable with picking
21    the jury and then maybe not starting the evidence right
22    away.
23              THE COURT:  Yeah, I would -- what I would do is --
24    have we agreed on two alternates by the way?  Does anybody
25    think we need more than two alternates?
```

1           MR. SMOCK:  I think two is okay.

2           THE COURT:  Yeah.

3           MR. VALENTINI:  Yeah.

4           THE COURT:  So I would plan to do is we'd pick the

5    jury and the alternates.  I would not swear the jury.  We

6    would ask them to come back and maybe ask another -- the

7    next four people in line, say, in case somebody gets sick

8    overnight or suddenly they remembered they've got an open

9    heart surgery next week or that they know somebody who's a

10   witness or whatever the case may be, but not swear them

11   until you're ready to go with opening statements and your

12   first witnesses.  And hopefully that will be Thursday

13   morning but if it's not, we will not have jeopardy attached

14   until you're ready to begin.

15          MR. VALENTINI:  Thank you, Your Honor.

16          MR. SMOCK:  Thank you.

17          THE COURT:  Make sense to you, Mr. Smock?

18          MR. SMOCK:  It does.  I think my hope is that

19   ideally by tomorrow morning we'll have a better sense from

20   the government because I think one of the things we'll need

21   to ask the jury is about their availability up until a

22   certain date, etcetera, etcetera.  And I think the beginning

23   of the evidence effects the end of the evidence.  But I

24   think that would be -- my hope is that we'll have a sense by

25   tomorrow morning whether the government thinks they will

1     need additional time.  I may not be clear.

2              THE COURT:  I'll leave that up to you guys.

3              MR. SMOCK:  Okay.

4              THE COURT:  All right.  So we have other issues to

5     decide.  We've got -- or to discuss.

6              We've got Section 111, which you've filed

7     supplemental briefs on some issues I raised and in light of

8     Judge Moss's recent opinion.

9              We've got the Vice President and his family.

10    We've got Secret Service Agents and witnesses.  We've got

11    specific locations of cameras.  We've got Bill of

12    Particulars.  I think that's what there is.

13             MR. SMOCK:  So, Your Honor, I think to the extent

14    Your Honor still has the patience, it may be worth

15    discussing a handful of outstanding exhibit issues, just the

16    ones we do not appear to have come to an agreement about.

17             THE COURT:  There are other issues --

18             MR. SMOCK:  I think it's a smaller universe.

19             THE COURT:  Right.

20             MR. SMOCK:  I think I consider the --

21             THE COURT:  So I'm looking at Document 145, the

22    government's revised exhibit list and Docket 46, which is

23    the defendant's objections.

24             MR. SMOCK:  Yes.  So I'll try to make this as

25    efficient as possible.

1              So I think our first concern is and Mr. Valentini,

2     and Ms. Goetzl, and Mr. Dreher and I discussed this moments

3     ago, and so it may be that the Court doesn't need to

4     intervene on this point.

5              But there are a handful of exhibits, 100A, 141C

6     and 143.3A in which the government has taken an existing

7     video and made alterations to it, for example, getting to a

8     point that they view is a key moment and slowing down the

9     video.  So it's going at normal speed and then suddenly it

10    slows down.

11             Just to be clear, we have no objection if a

12    witness is on the stand, they've played a video through and

13    then they say, you know, sir or ma'am, we're now going to

14    play this and we're going to slow it down at this moment.

15    That's not a problem for us.  We understand that's something

16    that any party can do.

17             I think our position is though that that -- to the

18    extent that video is used, it should be a demonstrative that

19    wouldn't go back to the jury.  The actually normally speeded

20    footage is what should go to the jury.

21             And I take responsibility for this.  I'm not sure

22    we got a final answer from the government about that, but to

23    the extent we need the Court's guidance on that, it might

24    make sense to discuss.

25             THE COURT:  What exhibit numbers are they?

1          MR. SMOCK:  100A, 141C and 143.3A.

2          THE COURT:  Oh.

3          MR. SMOCK:  Which is on page 1 of our motion.

4          And our, you know, one obvious concern is that the

5     alleged assault here occurred in a period of one or two

6     seconds.  And our concern is, you know, certainly when they

7     have a witness on the stand and they say, okay, now we're

8     going to slow this moment down, that's fine.  But having

9     that as an independent exhibit that goes back to the jury

10    gives -- we're concerned that it gives a false impression

11    that this was an extended, slow moment that it wasn't.  And

12    same with other -- I think there are other moments during

13    those videos that have been slowed down as well.

14          THE COURT:  Okay.

15          MR. VALENTINI:  So the exhibit that primarily

16    depicts the attack that is charged, the assault that is

17    charged on Count 3 is not one of the exhibits that you're

18    objecting to, right, the defense is objecting to.

19          For instance, I think some of this alterations,

20    editing, which is somewhat in the nature of trial graphics

21    that my office uses generally in January 6 cases.

22          THE COURT:  In what kind of cases?

23          MR. VALENTINI:  January 6.

24          THE COURT:  Oh.

25          MR. VALENTINI:  The edits to Exhibit 100, which is

1    the surveillance camera from the back of the tunnel that is

2    not where the assault takes place, that's out in the lower

3    west terrace, those mostly have to -- they highlight, as I

4    remember as I stand here, they highlight the defendant as he

5    walks into the tunnel, the handoff of the device.

6              THE COURT:  I mean, here's the question.  I mean,

7    we're spending a lot of time on this stuff.

8              His objection is -- his only objection is, should

9    it be a demonstrative or should it go back to the jury.  We

10   don't have to decide that.  I mean, I want to see it.  I

11   can't -- you're talking about something I've never seen.

12   So, you know, let's wait until trial and I'll decide.

13             MR. VALENTINI:  Okay.

14             THE COURT:  I mean, I don't understand why I have

15   to decide in advance of trial of whether this should be an

16   exhibit that goes back to the jury or not.  He's got no

17   objection to you slowing it down when the witness is on the

18   stand.

19             And in speaking with demonstratives, though, I

20   hope that if there are going to be exhibits or

21   demonstratives used in opening statements, you're going to

22   have to find time to talk to each other and make sure

23   there's no objection because neither side wants an objection

24   in the middle of an opening statement.

25             MR. VALENTINI:  Yes, Your Honor.

1          We do not expect to use any demonstratives during

2     the opening statement.

3          We may have some images or still frames from

4     likely video, but it wouldn't be video that is -- it would

5     be video that we are reasonably certain would be admitted

6     into evidence.

7          THE COURT:  Okay.  So, moving on.

8          MR. SMOCK:  The government has agreed to make

9     edits to body-worn camera footage without having sort of

10    looked at it moment by moment and just getting minute

11    markers.  I don't think it makes sense to raise objections

12    to all of them.

13         There is one, which is Number 123, and it was just

14    based on our knowledge of that video, the government has

15    agreed to edit it down slightly by about eight minutes or

16    so, but our concern is that that video is 21 minutes long,

17    there is -- I can just sort of recite to the Court that it

18    begins with the officer being outside the tunnel in the sort

19    of -- outside and for a moment, I think Mr. Gossjankowski is

20    visible in the first 30 seconds, but then the officers --

21    the officer goes into the tunnel and then there's a long

22    period of time where officers are sort of recovering from

23    being exposed to tear gas, understandably, you know,

24    essentially upset and concerned.  And it's a long period of

25    time where officers are essentially sort of in a hallway,

1   coughing, et cetera, Mr. Gossjankowski is nowhere to be

2   seen.  And our concern is it's, number one, overly

3   prejudicial; number two, not relevant to anything that needs

4   to be determined here.

5            So our view is that really Officer Bogner's

6   body-worn camera is only relevant for those first 30 seconds

7   where you can actually see Mr. Gossjankowski.  I think, and

8   Mr. Valentini can correct me if I'm wrong, I think that I

9   recall that he then goes into the tunnel area and is

10  involved in being with or behind a group of officers who

11  were encountering protesters or rioters, and but if my

12  recollection serves, there's certainly nowhere where Mr.

13  Gossjankowski is viewable.  And I don't even know that the

14  time matches up to times when he was in the hallway.  And

15  it's cumulative.

16           I mean, we're going to have footage of this.  The

17  Court will see, there's footage of this tunnel both from

18  body-worn cameras, from multiple camera angles, we have CCTV

19  footage.  The government already has a number of open source

20  videos of that tunnel.  And so having a third or fourth

21  body-worn camera footage video is cumulative and overly

22  prejudicial.

23           MR. VALENTINI:  Your Honor, the body-worn camera

24  of Officer Bogner goes to -- shows first as to strategic

25  importance of a particular location where the tunnel and the

1    battle over the tunnel occurred.

2            It also shows how the civil disorder unfolded.

3    How the law enforcement officers had to retreat from outside

4    the lower west terrace into the tunnel.  How they regrouped.

5    How they prepared to confront the rioters and how they

6    ultimately confronted the rioters.  It's really the

7    perspective of the officers as they confronted the rioters

8    on January 6th.

9            THE COURT:  Why is it relevant?

10           MR. VALENTINI:  It goes to show the civil

11   disorder.  It goes to show what happened on January 6th.  It

12   goes to show --

13           THE COURT:  A lot of things happened on

14   January 6th.

15           MR. VALENTINI:  How the lower -- how the lower

16   west terrace was defended.

17           THE COURT:  Where was Mr. Gossjankowski with

18   respect to the tunnel?

19           MR. VALENTINI:  Okay.  So in the -- in the

20   agreement that we have proposed to the defense, we will

21   start playing the exhibit at 2:40 p.m.  Mr. Gossjankowski

22   shows -- enters the tunnel at about 2:43 p.m.  Is visible

23   right outside the tunnel right before that.

24           Now is not visible necessarily in the early

25   moments of 2:40 p.m. in the body-worn camera.  And that's

1    because they're at that point behind the glass doors at the

2    end of the tunnel.

3            THE COURT:  Wait.  So there are two primary

4    objections as I heard them.

5            One is that it's a long video and why you need to

6    show all of it from this particular officer.

7            And the other is that it's prejudicial because a

8    lot of it shows the officers reacted to or recovering from

9    being pummeled by tear gas at a time when Mr. Gossjankowski

10   is nowhere around.

11           And, you know, why we need to see that in the

12   tunnel at that moment when we've got other videos,

13   presumably, that are more contextual of things going on with

14   officers being pummeled or being assaulted with tear gas and

15   other things.

16           MR. VALENTINI:  To be clear I want to be sure, the

17   tear gas in this case, the providence [ph] of the tear gas

18   is not necessarily explained, the fact is that they were

19   recovering from being exposed to tear gas.

20           But beyond that, the evidence will show at trial

21   that Mr. Gossjankowski was on the lower west terrace well

22   before the officers retreated into the tunnel.  There will

23   be footage that captures him in the inauguration stage that

24   had been set up, so --

25           THE COURT:  Well, if you can't work this out,

1   we'll have to send the jury back to the jury room and I'll

2   view the video --

3           MR. VALENTINI:  Okay.

4           THE COURT:  -- before the jury sees it.

5           I mean, either you work it out, or you shorten it,

6   or I'll view the video.  I mean, that's what I did in the --

7   that's what I did in the *Sutton* case.  I reviewed body-worn

8   camera for hours on end.  I was not happy to have the jury

9   sitting in the jury room waiting and I was hoping they could

10  work more of it out.  But in that case nobody could agree to

11  anything, maybe in this case you already have and will.

12          MR. SMOCK:  We're doing our best.

13          You know, one point that I just -- I didn't get to

14  say because I wasn't up here that I just want to make one

15  time, you know, I understand that the Court is saying that

16  the government is not forced to agree to our stipulation

17  that there is a civil disorder.  Understood.

18          What I would just say with respect to the evidence

19  that's coming in is I think it's relevant that we're

20  agreeing to stipulate to it and the concern I have is that

21  if the government is permitted to just introduce exhibit

22  after exhibit and video after video about an issue that

23  we're prepared to concede, it goes to the cumulativeness, it

24  goes to prejudice, and I think that's just our overarching

25  concern.  I just want to make a record about.

1              MR. VALENTINI:  And, Your Honor, and just in

2      response to my colleague on the other side.

3              This is video from the lower west terrace.  This

4      is really close to where Mr. Gossjankowski was on

5      January 6th.  This is not some other part of the Capitol.

6      This is not -- it doesn't touch on any -- of some of the

7      objections that I've heard from the defense about what they

8      characterize as unrelated areas.  This is close to the core

9      of this case.

10             MR. SMOCK:  I'm happy to report, Your Honor, that

11     with respect to 130, 131, 133, et cetera, I think we have an

12     agreement that those excerpts are what are going to go back

13     to the jury and so we don't need the Court to get involved

14     in that.

15             I'm trying to keep track of what we discussed.

16             THE COURT:  And we've dealt with 136, 138, and

17     140.

18             What about the video that's an hour and a half

19     long?  You're working on that?

20             MR. VALENTINI:  Yes, Your Honor.

21             MR. SMOCK:  So, yes, I forget how we left that.

22             I think, am I right that the government is going

23     to be creating excerpts of that hour and a half long video?

24             MR. VALENTINI:  So the excerpts are already in the

25     exhibit sets.

 1            MR. SMOCK:  All right.

 2            MR. VALENTINI:  There's two of them that will

 3    be -- there will be no hour and a half video.  So that's the

 4    good news.

 5            There's three excerpts from that video.  Two of

 6    them will that will be unobjected to.  One of them I

 7    understand there is some objection to the use of trial

 8    graphics.  And we'll endeavor to create both versions so

 9    that we'll be ready depending on what the Court's ruling is

10    with respect to trial graphics.

11            MR. SMOCK:  I think we -- with respect to

12    Exhibit 140, I think we will have an ongoing dispute about

13    that unless the government has changed its position about

14    that.

15            That's an example of video that only shows Mr.

16    Gossjankowski very briefly.  Among other things, if memory

17    serves, this is something that's true with much of the open

18    source videos the Court will hear.

19            The person shooting the video is commenting,

20    making statements, many of which are political, many of

21    which are inflammatory and frankly offensive, and our

22    concern is the prejudice to Mr. Gossjankowski.  Again, given

23    that there are already going to be so many of these videos

24    that the prejudice to him outweighs any probative value.

25            And as I speak, I mean one thing that I imagine we

1    could do, Your Honor, is after we've had further discussions

2    with the government, it may be that to facilitate this

3    process and to avoid keeping the jury waiting during trial,

4    identifying a much smaller scope of videos that it might

5    make sense for the Court to take a look at, recognizing the

6    limitations on the Court's time.

7         But that may be something we would want to do.  I

8    understand that the Court probably can't at this point make

9    a ruling on an exhibit that it hasn't seen.  We're nearing

10   the end.

11        THE COURT:  We're nearing the end of the exhibits,

12   we have half a dozen of motions to argue.

13        MR. SMOCK:  I hear you.

14        I think, if I could just check with Ms. Goetzl, I

15   want to make sure I'm --

16        (Counsel confer)

17        MR. SMOCK:  So just to quickly make a record about

18   on page 5, Exhibits 200 through 209.  I don't wish to make

19   further argument about this, but I just wanted to make note

20   that we have an objection based on our previous briefing on

21   the motion to suppress about admission of photographs and

22   any evidence from --

23        THE COURT:  Which exhibit are you talking about?

24        MR. SMOCK:  Exhibits 200 through 209, which are

25   referenced at page 5.

1                    THE COURT:  Aren't those the ones that are subject

2       to a motion to suppress?

3                    MR. SMOCK:  Correct.

4                    THE COURT:  Yeah.  So what else do you want to say

5       about that other than there's a motion pending?

6                    MR. SMOCK:  That's all.

7                    The only remaining issue on exhibits I think is in

8       relation to -- you know what, I don't think it makes sense

9       to discuss anything further, but I think it's a short

10      objection that can be resolved once I've sort of digested

11      the discussions we've had with the government.  Thank you.

12                   THE COURT:  All right.  Thank you.

13                   So there are motions.  And I think, maybe I said

14      this several times, Secret Service witnesses.

15                   Vice President and his family.  That's Docket 92.

16                   Specific location of surveillance cameras.  That's

17      Docket 93.

18                   Section 111 motion, which you've filed

19      supplemental briefs on over the weekend and Judge Moss's

20      opinion is piece of that.

21                   And then the Bill of Particulars questions.

22                   So I would like to try to deal with as many of

23      those things as we can because it's important for you to

24      know what my view of the law is on some of this and my view

25      of what's admissible on some of this.

1          So what do you want to talk about first, second

2     and third?

3          MR. VALENTINI:  Your Honor, if the Court doesn't

4     have a preference, we're happy to start with the motions in

5     limine.  And then we can move on to the question of the 111.

6     And then can move on to the remaining issues, questions.

7          THE COURT:  That's fine.  Motions in limine.

8          MR. VALENTINI:  Yes, Your Honor.  We filed two

9     motions in limine and we think at this point there is very

10    limited daylight in the positions of the parties.

11         With respect to the position of the specific

12    location of the cameras, I understand the defendant, the

13    defense has represented that they do not intend to elicit

14    testimony.  They do not intend to first seek admission to

15    evidence of the maps that reveal the location of particular

16    surveillance cameras.  And I understand that they don't plan

17    to introduce or to elicit testimony about specific location

18    of surveillance cameras.

19         I think the only remaining issue, I think there's

20    a reservation of a potential argument in case, you know, it

21    becomes necessary at trial.  If it's a point of rebuttal, of

22    course, the only case -- the only circumstance in which that

23    will become an issue is if the government would to so to

24    speak open the door to the issue at which point, of course

25    is always, there could be a discussion.

1              But beyond that, unless the defense has a

2      different view, I think that at this point the Court should

3      grant the motion as was filed, of course with the usual

4      reservation that if some issue arises it could revise the

5      judgment.

6              THE COURT:  Yeah, I mean, if I read the response

7      to that properly, it seems to me that I could easily grant

8      the government's motion without prejudice to the defense

9      reopening the question if something develops in the

10     government's case that makes them think it becomes relevant

11     and should overcome all the other objections to -- there's a

12     lot of reason to keep this stuff, despite what the Speaker

13     of the House may think, there's a lot of good reasons to

14     keep this kind of material protected in terms of danger to

15     the Capitol in the future.

16             And there's a protective order by which a lot of

17     this material relevant -- some of the relevant material,

18     wasn't made available to the defense under protective order

19     so they've seen it.  There's no reason to air it, it seems

20     to me, in the public forum in open court unless it becomes

21     relevant.

22             And, Mr. Smock, and, Ms. Goetzl, if I've read

23     everything correctly, isn't the right thing for me to do at

24     this point to grant the government's motion without

25     prejudice to you saying after you've heard the government

1    witnesses, either before you begin cross-examination of a

2    particular witness or before you begin your case, that you

3    want me to revisit that decision?

4              MR. SMOCK:  No objection.

5              THE COURT:  Okay.  So that resolves number --

6    Docket Number 93.

7              MR. VALENTINI:  So next I wanted to raise very

8    briefly our motion in limine at Docket Number 92, which has

9    to do with the cross-examination of a potential U.S. Secret

10   Service witness.

11             As we have done in many January 6th cases, we have

12   moved to limit the scope of the cross-examination.  Not to

13   preclude examination to two distinct areas which have to do

14   with the ongoing protocols to protect the Capitol and other

15   government buildings, the protectees of the Secret Service,

16   as well as details about the nature of Secret Service

17   protective details.

18             As the Court is aware, and we are not moving to

19   preclude cross-examination as to the general area within the

20   Capitol Congress -- within the Capitol complex where the

21   Vice President and his family were taken on January 6th.

22   That was disclosed in another case and we are now seeking to

23   prevent the defendant in this case from eliciting similar

24   testimony in this case -- similar to the testimony that was

25   elicited in the *Griffin* case.

1           So, again, much of the response of the defendant

2      to this motion seems to me to go to issues that are not

3      generally raised by the motion.  Whether they -- I think

4      they raise an issue that there should be some nexus between

5      the area that is supposedly cordoned off or otherwise

6      restricted and the Vice President by the statute is clear.

7      And in that event, the limited relief that is sought in this

8      motion is not implicated by that -- by their legal position

9      on that issue.

10          So I think, again, similar to the Capitol

11     surveillance cameras, we think this -- this motion is ripe

12     to be granted and without prejudice, of course, if some

13     issue were to become relevant in the case.

14          THE COURT:  In this motion, yes, it deals with the

15     Vice President's family and the Secret Service Agency

16     protocols and witnesses?

17          MR. VALENTINI:  Yes.  Correct.

18          I should also mention, they also raise in their

19     opposition some cross motions to preclude evidence and

20     argument about the Vice President's family, but I think as

21     we point out, that's procedurally flawed because a cross

22     motion to a motion in limine is not a workaround -- the

23     proper procedure which is to file a motion in limine in the

24     first place, but more importantly substantively the location

25     of the Vice President's family is relevant because it tends

1    to be probative of where the Vice President himself was on

2    that day.  So it still remains relevance.

3              Having said that, we don't expect to go into any

4    length -- at any length into that issue at trial.

5              THE COURT:  So as I understand it, Count 4 and 5.

6              MR. VALENTINI:  Yeah.

7              THE COURT:  Which are under a different provision

8    of 1752, the allegation is that he knowingly entered and

9    remained in a restricted building and grounds.  That is area

10   restricted and its grounds where the Vice President was and

11   would be temporarily visiting.

12             And the statute itself defines restricted grounds

13   and it includes where the President or Vice President is

14   temporarily visiting, if I'm remembering the statute

15   correctly.

16             And so you don't need to prove it was -- I don't

17   think you need to prove it was a restricted area because

18   that would be part of a jury instruction, but you do need to

19   prove that the Vice President was there.  Correct me if I'm

20   wrong on either of those points.

21             MR. VALENTINI:  Our position is that we need show

22   that there was -- the defendant entered or remained

23   unlawfully within an area that was restricted and that that

24   restricted area was in a building or grounds where the Vice

25   President was or was going to be temporarily present.

1            THE COURT:  Okay.  So the statute says, "A

2      restricted area includes a place where the Vice President

3      might be temporarily."

4            MR. VALENTINI:  Well, so the restricted area is

5      defined as any area that is posted --

6            THE COURT:  I see and now I'm --

7            MR. VALENTINI:  I just want to get the statutory

8      language exactly right.

9            THE COURT:  Me too.

10           MR. VALENTINI:  "Any area that is posted, cordoned

11     off or otherwise restricted."  And so that's the area that

12     we have to show the defendant entered into or remained and

13     without -- knowingly, without lawful authority.

14           And then we have to show that that area is in a

15     building or grounds where the Vice President was going --

16     was or was going to be temporarily visiting.

17           THE COURT:  I understand.

18           MR. VALENTINI:  So that's why we offer testimony

19     from Secret Service Agents in these January 6 cases and

20     that's why we offer testimony and evidence --

21           THE COURT:  I see.

22           So the term under the statute 1752(b) -- 1752(c)

23     says, "The term restricted building or grounds meant any

24     posted, cordoned off or otherwise restricted area."  So you

25     have to prove that.

1            MR. VALENTINI:  Yep.

2            THE COURT:  "Of a building," among other things,

3      "Of a building or grounds where the President or other

4      person protected by the Secret Service is or will be

5      temporarily visiting."

6            So you need to prove that it was cordoned off, et

7      cetera, to make a restricted area.  You need to prove that

8      the Vice President was there.  And you need to prove that he

9      is one of those people protected by the Secret Service.

10           MR. VALENTINI:  The Vice President, yes.

11           THE COURT:  The Vice President.

12           MR. VALENTINI:  Yes.

13           THE COURT:  So here's my expert on 1752.

14           MS. GOETZL:  So our issue is that the indictment

15     charge --

16           THE COURT:  Microphone.

17           MS. GOETZL:  Our issue is that the indictment

18     charges that the reason -- or I guess not getting into the

19     weeds of what the statute requires for the reasoning for the

20     restriction, but a restricted building or grounds is defined

21     by the Secret Service protectee, a Secret Service protectee

22     being present.

23           In this case, the government has indicted in all

24     of the January 6th cases that the area was restricted

25     because the Vice President was there.  Now the government

1      would like to also say his family, who are Secret Service

2      protectees were there and temporarily visiting.

3               They are essentially seeking -- as the Court

4      knows, we have an argument as a factual matter that we would

5      like to make that the Vice President wasn't temporarily

6      visiting the Capitol that day, that the jury could either

7      accept or --

8               THE COURT:  Where was he?

9               MS. GOETZL:  -- reject.  That he has an office at

10     the Capitol.

11              THE COURT:  Hasn't that argument been rejected by

12     many judges already.

13              MS. GOETZL:  But it's a factual issue for the jury

14     to determine.

15              The government shouldn't be able to then say,

16     well, his family was temporarily visiting there so the area

17     was restricted anyway.

18              THE COURT:  Well, I'm not convinced that -- you're

19     not saying the jury has to decide the question of

20     temporarily because he had an office there?  That's a legal

21     question.

22              MS. GOETZL:  Whether the Vice President was

23     temporarily visiting the Capitol on January 6th is an

24     factual issue for the jury to decide.

25              THE COURT:  Whether he was temporarily visiting,

1    yes.  But what's the jury instruction going to say?

2            MS. GOETZL:  That the building or grounds is

3    restricted if the Vice President was temporarily visiting

4    there.

5            THE COURT:  So you're going to put on evidence and

6    arguing saying he had an office there so he couldn't

7    temporarily be visiting?

8            MS. GOETZL:  That is a defense argument theory

9    that we should be allowed to setting forth.

10           THE COURT:  It is a theory.

11           MS. GOETZL:  But the problem in this case is that

12   the government's like, oh, well, they want to inject his

13   family as Secret Service protectees, basically providing an

14   alternate -- an alternate Secret Service protectee that was

15   temporarily visiting the Capitol.

16           THE COURT:  I don't think that's what they're

17   trying to do, but maybe I'm wrong.

18           MS. GOETZL:  Well, they haven't indicted -- they

19   haven't provided any discovery about any of the individuals

20   who were there.

21           THE COURT:  Well, wait.  You're jumping -- you're

22   comparing apples and oranges.

23           The question I want to ask the government is what

24   they think it's relevant to.  You're making a supposition as

25   to what they think it's relevant to.

1          You're saying you think they're trying to inject

2      another Secret Service protected person into the mix, even

3      though they haven't indicted it, and therefore it's an

4      impermissible variance and all these other things.  They're

5      saying, now, that's not what we're trying to do.  So then

6      the question is, what are they trying to do?

7          They're not going to say to the jury, if you

8      decide the Vice President had an office there or that he

9      really wasn't there, we got his wife, we got his whichever

10     children were with him or grandchildren, that's good enough.

11     I don't think that's what they're arguing.

12          MS. GOETZL:  Then we would ask for a limiting

13     instruction that the jury cannot consider the fact that the

14     Vice President's family was there as going to that prong of

15     the factual determination for as a matter of law.

16          MR. VALENTINI:  Your Honor, I think -- Your

17     Honor's jury instructions and, you know, I don't mean to

18     predict how Your Honor's going to instruct the jury, will

19     account for the issue in instructing the jury that it will

20     have to find that who will have to be there as a protective

21     person.

22          If Your Honor thinks that the jury should not be

23     instructed that one of the potential protected persons in

24     this case is the family of the Vice President and then Your

25     Honor will not instruct the jury according to that

1     possibility.

2               THE COURT:  Well, you can't make that argument

3     because that's not what the indictment says.

4               MR. VALENTINI:  Right.

5               So if Your Honor -- right.  If Your Honor -- if

6     Your Honor believes that the indictment precludes us from

7     arguing that, first of all, we don't have any plan to argue

8     that to the jury, but if Your Honor believes that that

9     argument is precluded as a matter of constructive amendment

10    to the concern, you can just instruct the jury accordingly

11    in the jury instructions.

12              I don't think we need a limited instruction if

13    there is reference by one witness to, oh, and the Vice

14    President was there with his family.  That seems to me

15    excessive and seems to create a problem that is not there.

16              If Your Honor believes there's an issue, it can

17    address it in the jury instructions, but.

18              THE COURT:  I don't know why I think this is so

19    simple and the two of you are trying to make it so

20    complicated.

21              The indictment says, "Where the Vice President was

22    and would be temporarily visiting."  It doesn't say his

23    family.  Some of the early indictments said the Vice

24    President-elect and then it was discovered that she wasn't

25    actually there.  But the Vice President has to be the Vice

LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

1    President and, you know, they have to make that finding.

2         And if the evidence develops in a way that

3    suggests that they might be confused, that it might be

4    somebody else, then I will tell them that to begin with but

5    I could also give a limiting instruction if necessary during

6    the trial or embellish the instruction I otherwise would

7    have given if I think that they have been confused by what a

8    witness or two said.

9         The question about whether he would be temporarily

10   visiting I guess is something that does have to be proved.

11   I don't -- I don't know exactly what the defense has in mind

12   in terms of showing that -- I mean he does have an office

13   there, that's true.  But I think, and you may be right

14   because this is now a factual question for the jury, and in

15   some of the other cases came up in maybe a motion to dismiss

16   or something and somebody -- either in this case or maybe it

17   wasn't even in a January 6 case, it could have been an old

18   Vice President Cheney case or something that, you know,

19   that's not his primary office and he's not a member of the

20   legislature.

21        MR. VALENTINI:  Yes, Your Honor.  The issue has

22   been raised in a number January 6th cases, has been rejected

23   as a matter of law as a legal matter.  When raised pretrial

24   has been rejected by every judge of this district that has

25   decided that issue.

1            THE COURT:  But are you saying -- are you saying

2      that the -- you're not saying that I would instruct the jury

3      as a matter of law that he was temporarily visiting; are

4      you?

5            MR. VALENTINI:  No, no.  The jury has to find that

6      the Vice President was there.

7            THE COURT:  The jury has to find.

8            And as to the question about the Vice President's

9      family, I just don't think that they can substitute another

10     protectee in view of the way the indictment is worded.

11           But on the other hand, I believe what the

12     government's primary argument is there is at least some

13     relevance to the fact that they are present there because it

14     would support the inference that he was also present there

15     and they have to prove that he was also present there.

16           Now they may also have people who say they saw him

17     there.  We may also have videos of him being there.  We may

18     also have videos of him presiding.  So how important it is

19     is questionable.

20           But I get their point that since they have to

21     prove that he was there that the fact that his family was

22     there too has some probative value.  And if it -- if anybody

23     think the jury's going to be confused of what it's probative

24     of or that it's an impermissible variance of the indictment,

25     which I frankly don't see but we'll have to see how the

1    testimony evolves.  I mean, if suddenly they're spending

2    hours talking about his wife instead of about him, then we

3    might have a different situation.  I don't think that's

4    going to happen.  So I think that the government wins this

5    motion and the defense loses.

6             Now, there is buried in here somewhere, and I

7    can't remember the context exactly, something about the

8    confrontation clause.  And I don't recall, Ms. Goetzl, what

9    piece of motion in limine Docket 92 raises confrontation

10   clause issues or whether that's by the boards at this point.

11            MS. GOETZL:  I don't remember the precise nuance

12   of that argument, but I will say is that we do believe it's

13   improper for the Court to restrict our cross-examination of

14   the Secret Service at this time.

15            We will not ask irrelevant questions and the

16   government can object at that time if anything we ask is

17   irrelevant.  There's no need for the Court to restrict our

18   confrontation rights of the Secret Service pretrial.

19            THE COURT:  Okay.

20            MR. VALENTINI:  Your Honor, it appears that the

21   confrontation clause doesn't add much analytically to the

22   issue before Court.  If they don't have a right to ask those

23   questions, then the Court can grant that motion.

24            THE COURT:  Right.

25            MR. VALENTINI:  If they do have a right, then the

1    confrontation clause -- it's not because of the

2    confrontation clause, so.

3            THE COURT:  I think I said it a little while ago

4    that I understand, first, that the defense is actually --

5    said that they won't ask certain types of questions of the

6    Secret Service Agent, which goes a long way towards solving

7    the problem.

8            And, secondly, that I understand the need for some

9    protection for their protocols, the number of people on a

10   detail, things like that.  And so I'm going to grant the

11   government's motion, without prejudice, like I am doing with

12   the other one.  And if something arises either on cross or

13   on -- after the government's case is done, we can revisit

14   it, but I think that the government has made its case for

15   granting Docket 92 motion in limine.

16           All right.  We have, and everybody told me not to

17   worry about the public authority defense when we were here

18   last week, that it's not really being raised.

19           So where do we want to go next?

20           MR. SMOCK:  Would Your Honor like to address the

21   motion for Bill of Particulars as to Count --

22           THE COURT:  What?

23           MR. SMOCK:  The motion for Bill of Particulars as

24   to Count 1.

25           THE COURT:  Sure.  We can talk about Bill of

1    Particulars.

2            MR. SMOCK:  So I just want to start by saying I

3    think that really what this comes down to at this point is a

4    request for a unanimity instruction.

5            THE COURT:  Are there any cases that say you're

6    entitled to a unanimity instruction that a particular

7    officer has to be identified and that the jury has to

8    conclude -- conclude unanimously that that officer was the

9    officer victimized under 231?

10           MR. SMOCK:  So I think the answer to that is no,

11   but I'll tell you why.

12           If I recall having done some research on this,

13   number one, one thing is clear that 231 is not a charge

14   probably prior to January 6th that was seen often in federal

15   courts.  So there's not a great deal of case law on this

16   question.

17           I think what is absolutely clear is that a

18   defendant has a Sixth Amendment right to unanimous verdict

19   on crucial elements of offenses.

20           The government, despite a lengthy opposition

21   brief, provided no law that actually says that they are not

22   required to identify for the jury and the jury's not

23   required to make a unanimous finding about who the victim

24   is.  There's cases that talk about indictments and

25   indictments not having to name a victim.  But none of the

1     cases speak to the question of whether or not the jury has

2     to decide on a particular victim.

3              And the obvious concern we have is the government

4     has described several different incidents which they purport

5     to serve as the basis for this charge.

6              Our concern, obviously, is the jury could agree

7     with us about the incident related to Officer Morris [sic],

8     for example, M.M. in the indictment equipment for

9     Count Number 3, and find that that doesn't amount to

10    obstruction or interference for Count 1, but some of them

11    might agree that something that occurred in the tunnel

12    amounted to obstruction.

13             So we might have some jurors agreeing as to one

14    but not as to the other, but they're coming together to make

15    a finding despite a disagreement about who the actual victim

16    is.  That's a concern that's addressed in countless cases

17    about a Sixth Amendment right to a unanimous verdict.

18             The once case that the Court described or the

19    government described that went to trial with this issue, I

20    think the crucial distinction there is that wasn't a jury

21    trial.

22             THE COURT:  Judge Kotelly's case.

23             MR. SMOCK:  Correct.  That's one finder of fact.

24    She's obviously not going make a disagreement with herself

25    about who the victims are.

1          So we're not asking, you know, we're not

2     suggesting that we don't have evidence with respect to what

3     the government is saying, as we might normally do in a Bill

4     of Particulars motion submitted early on.  Perhaps it should

5     have just been labeled a motion for a special verdict.  It

6     doesn't seem --

7          THE COURT:  What about Judge Hogan's opinion in

8     *Sergeant*?

9          MR. SMOCK:  That, if memory serves, that case

10    talks about the indictment and what needs to be alleged in

11    the indictment.  I don't think that case stands for the

12    proposition that the government doesn't have to establish

13    for all twelve jurors who the victim was.

14          I think that goes to the -- if I remember, one of

15    the questions was whether the government has to prove that

16    the defendant knows that the person was a law enforcement

17    officer.  That doesn't go to any of the questions that we're

18    addressing here.  We're simply --

19          THE COURT:  I'm sorry, I don't mean to interrupt

20    you.

21          Judge Hogan's opinion, you're right, was motion to

22    dismiss the indictment.  And he said, you know, "The

23    question is when viewed on its face and accepting the

24    allegation of true does it allege the elements of the charge

25    sufficiently that have proven a jury could find that he

1    committed the charged crimes."  Which is the standard for a

2    motion to dismiss.  You're looking at the four corners of

3    the indictment.

4              In that context he said, "Nor it is the

5    government's failure to identify the specific law

6    enforcement officer fatal to the superseding indictment.

7    And in order to prove his guilt on Count 1 the government

8    need not prove the individual identity of the law

9    enforcement officer, but rather that the person Mr. Sergeant

10   obstructed, impeded or interfered with is a law enforcement

11   officer."  Exactly what the superseding indictment alleges.

12             So that's all he says.  It's just a couple of

13   sentences.

14             MR. SMOCK:  That's correct, Your Honor.

15             And I think given that the focus of this civil

16   disorder charge is an act by the defendant, it's not the

17   ultimate -- you know, whether there was a civil disorder was

18   one of the elements, but the focus of it was that there was

19   an act taken by the defendant towards a law enforcement

20   officer that impeded, obstructed, et cetera.  And there

21   needs to be a finding of an agreement among the jurors about

22   who that person is.

23             And I haven't heard any argument from the

24   government about the prejudice to them or some case focusing

25   on the fact that it's not appropriate to have a unanimity

1    finding in context like this.

2           MR. VALENTINI:  Yes.  Your Honor, that is actually

3    precisely our argument.  That there be unanimity as to a

4    specific officer because like Judge Hogan concluded in the

5    case you just cited, there's no requirement that twelve

6    jurors agree --

7           THE COURT:  Well, he didn't say that.

8           MR. VALENTINI:  Well, he says that the government

9    need not prove that a particular officer was impeded or

10   interfered with, which is exactly our point.

11          THE COURT:  The only case -- his only citations

12   are to the indictment itself and to a Supreme Court case,

13   *United States versus Russell.*  And I haven't looked at

14   *Russell* recently, but I thought that *Russell* was a case

15   involving the sufficiency of an indictment.

16          MR. SMOCK:  I believe that's right.  I don't think

17   we have cases from the government related to this particular

18   question.  Our argument is not with respect to the

19   sufficiency of the indictment.

20          MR. VALENTINI:  Okay.  So, Your Honor, if we can

21   move on to *United States versus Grider,* which was the other

22   case that was just discussed, which is a case that I tried

23   last December and where Judge Kollar-Kotelly before closing

24   arguments specifically instructed the parties to include in

25   their closing argument, which in a bench trial is a little

1    different than in a jury trial, the question whether the

2    proof must establish that a particular officer was, in fact,

3    interfered with.  And we took the position that, no.  Why?

4    Because the statute says any firearm or law enforcement

5    officer and any, as the Supreme Court has said, time and

6    again, is capacious, and it means any, it doesn't mean a

7    specific one, there is no such requirement.

8            That is why the office does not identify

9    typically -- well, in some occasions may have, but at least

10   in this case we have not identified a particular victim of

11   the civil disorder that was targeted by the defendant in

12   this case.

13           And the problem they have is not whether with the

14   posture the -- whether it's at the indictment stage or

15   whether the case is going to jury, or whether it's a bench

16   trial.  The problem is they read the statute wrong.  And the

17   statute doesn't require that a proof that a single law

18   enforcement officer was interfered with as opposed to any

19   law enforcement officer.

20           And in any event, since they filed a motion for a

21   Bill of Particulars, we think that the discovery we have

22   provided, and our exhibit list makes clear we have

23   identified a number of officers that the defendant

24   interfered with that have been on notice --

25           THE COURT:  Well, not by name.

134

1           MR. VALENTINI:  We have identified -- we have

2     identified one in Count 3, which carries over into -- I'm

3     sorry, in Count 3, which also carries over into Count 1.

4           There's other officers for whom we have included

5     body-worn camera in our exhibit list, which also gives them

6     a strong sense of other officers -- the identity of other

7     officers that were victimized for purposes of 231.

8           So as far as a Bill of Particulars in particular

9     is concerned, their request is particularly off base.  To

10    the extent they have unanimity concern, that is different

11    questions --

12          THE COURT:  It's a different question.

13          MR. VALENTINI:  It's a different question.  It's

14    also not a question -- it's a question that the Court would

15    have to confront at the instruction stage of the charging

16    conference.  And on that too --

17          THE COURT:  You know, it seems to me, you're right

18    to divide them into two questions, right.  And Bill of

19    Particulars is not a discovery device.  A Bill of

20    Particulars is a way to make sure that if the notice seems

21    inadequate that it's supplemented in some way to provide

22    more information.

23          And so it seems to me, I'm reading your filings on

24    this Bill of Particulars question and I'm reading my own

25    prior opinion in the *Sutton* case in which I denied a Bill of

1    Particulars and other cases, that you can cure any asserted

2    deficiency or but let's put it this way.

3         If a judge assumes that there might have been a

4    deficiency and is confronted with case law saying a Bill of

5    Particulars is an exception not a rule, and then sees

6    massive discovery that provides a lot of information, that

7    argues against granting a Bill of Particulars.

8         The question of unanimity is a different question.

9    And I don't know whether either side can find any case law

10   under this statute or analogous statutes that help, but we

11   might have to deal with that at pretrial.

12        You know, it was very easy -- I keep coming back

13   to the *Sutton* trial because I spent nine weeks of not happy

14   weeks.  That was easy because it was a conspiracy.  One of

15   the counts was conspiracy to obstruct justice.  And the law

16   on conspiracy is that the jury has to agree on one or

17   more -- has to agree unanimously on one or more overt acts.

18   I mean, that's established law.

19        But not so true in lots of other statutes.  And I

20   guess I would want case law from both sides under this

21   statute or any analogous statutes before we get to the --

22   before we get to jury instructions.

23        MR. VALENTINI:  Understood.

24        THE COURT:  And it's a problem, because there's

25   not a lot of law under this statute.  And, you know, I'm not

1    -- at this point prepared to conclude that one or two

2    sentences from Judge Hogan is a definitive answer to the

3    question that Mr. Smock raises and Judge Kotelly was a bench

4    trial.

5         I mean, did you say that there were briefs or

6    arguments presented to her on the question of whether a

7    particular officer had to be identified?

8         MR. VALENTINI:  Yes.

9         So Judge Kollar-Kotelly's practice in bench trials

10   is to suggest questions of law, occasionally, that the

11   parties should address in closing and they never are to

12   address in closing.  And that was one of the questions.  The

13   question was whether a particular officer must be identified

14   for purposes of 231.

15        THE COURT:  Okay.  But we can look at that, but

16   again, they're two separate questions.

17        MR. VALENTINI:  Yeah.

18        THE COURT:  So in terms of the identification of

19   the officers, it may be that they largely have been, some

20   people, at least more than one, have been identified through

21   discovery.

22        Secondly, if we're going to see going to see

23   body-worn camera and/or hear testimony from witnesses who

24   were victimized, that will mean that the jury will hear who

25   the other victims were other than the individual identified

1        by initials in another count of this indictment.

2               And so we may have and the videos may show, so we

3        may have a video which shows five people, whether we know

4        their names or not, although by now maybe you do know their

5        names because you may have their badge numbers and know who

6        they are.  And we may have people whose names we do know

7        because they're going to be witnesses and/or we will see

8        their body-worn cameras.

9               And all of that to me undercuts the need to grant

10       the motion for a Bill of Particulars, including what you

11       said about discovery, but it doesn't get us to an answer on

12       the unanimity question.

13              So now that I've gone on for a while, Mr. Smock, I

14       will hear whatever else you want to say on this.

15              MR. SMOCK:  It sounds to me as if that's an issue

16       that can be left for the charging conference, to the extent

17       the Court's view is that that's the remaining question.

18              THE COURT:  All right.

19              MR. SMOCK:  I don't think -- yeah, I think that's

20       what we should leave it for.

21              THE COURT:  Okay.

22              MR. SMOCK:  I think that leaves the 111 briefing.

23              THE COURT:  Okay.

24              MR. SMOCK:  Is that the last --

25              THE COURT:  I think you can -- well, let me just

 1    sort of tie -- to make clear that the record is clear so I

 2    don't -- so I don't have to write anything on this.

 3            In view of the discussions that we've had, I'm

 4    going to deny the portion of the Bill of Particulars motion,

 5    requesting a Bill of Particulars and leave open for further

 6    briefing and discussion the question about whether the jury

 7    has to unanimously agree on one or more particular officers.

 8            And terms of the law, you know, my opinion in

 9    *Sutton*, Docket 156, April 21, '22 sets out the law in Bills

10    of Particulars.  They are far from routine.  It's within the

11    discretion of the Judge.  The Judge has to decide whether it

12    is absolutely necessary for adequate preparation and to

13    avoid surprise at trial.  It's not a discovery tool.  It's

14    designed to define the government's case where it's unclear

15    from the indictment what the government's case.

16            And it seems to me applying those principles here,

17    that in my discretion I'm going to deny their request for a

18    Bill of Particulars on the ground that it's not necessary

19    for the reasons we've been discussing and leave open the

20    portion of the motion that talks about the unanimity

21    question.

22            So it sounds like the only thing we got left,

23    which is not insignificant, is 111 for today, is that your?

24            MR. SMOCK:  Yes, Your Honor.  And assuming the

25    Court would like to spend a bit of time on it, the defense

1    would request a five-minute break.

2              THE COURT:  Yeah, let's take ten actually.

3              MR. SMOCK:  Okay.

4              (Recess taken at 3:45 p.m.)

5                        *    *    *    *    *

6         (4:05 p.m.)

7                          **IN OPEN COURT**

8              THE COURT:  Okay.  So the one, I think, remaining

9    issue for today is the Section 111 issue.

10             Sir?

11             MR. VALENTINI:  Yes, Your Honor.

12             You have asked for supplemental briefing with

13   respect to the 111 with respect to the meaning of deadly or

14   dangerous weapon, as well as the implications of Judge

15   Moss's recent decision in *United States versus Cua.*

16             With respect to the meaning of deadly or dangerous

17   weapon, as we explained in our brief, and I don't mean to

18   keep the Court here longer than I have to, we think there is

19   a two -- there's two paths to establishing whether an object

20   is a deadly or dangerous weapon.

21             One is by showing that it's an inherently

22   dangerous weapon is something that the finder of fact can

23   just assess and ascertain based on the inherent

24   characteristics of the weapon.  Fundamentally the fact that

25   it's something that is used as a weapon and there's no other

1    natural use to -- and there's no other natural use to the

2    object.

3          And second, it's the definition that, I mean the

4    parties agree, has been at least cited with approval by the

5    D.C. District Circuit in *Herrington*, which is an object that

6    has the capability of causing deadly or serious bodily

7    injury and is used in that manner.

8          We think the jury should be instructed as to both

9    options to establish that an object, in this case stun gun,

10   is a deadly or dangerous weapon.  And I think that that

11   definition makes sense not only for the 111 charge, 111(b)

12   but also for the 1752 enhanced penalty provision.

13         Unless Your Honor has any specific question about

14   those definitions, I'll be ready to move on to Judge Moss's

15   recent decision in *United States versus Cua*.

16         THE COURT:  Say that again?

17         MR. VALENTINI:  I'll be ready to move on to Judge

18   Moss's recent decision in *United States versus Cua*.

19         THE COURT:  Yes.

20         MR. VALENTINI:  We agree with certainly with the

21   holding of *United States versus Cua*.  111(a) sets forth six

22   verbs that define, describe -- define the contours of the

23   type of conduct which is criminalized.  It's a crime under

24   111.  And that is not limited to the assault.  All six verbs

25   are modified by the adverb forcibly.  That's the position of

1    the office.  And so the qualifier there does carry through

2    to all six verbs.

3           But an assault in some street sense or common law

4    sense is not required for the last five of the six.  In

5    fact, that's why there is five additional verbs after

6    assaults in 111(a).

7           Now, then the question is, does anything else

8    about the provisions, the penalty provisions, embed or work

9    back in an assault requirement, if you will, into the other

10   five verbs?

11          With respect to 111(b) there's nothing that could

12   be construed in the text of the statute or as Judge Moss

13   explained, in the structure, in the context, in the

14   legislative history of the statute that will support that

15   result.

16          And that's because 111(b) refers to the

17   commissions of such acts, meaning any one of the six.

18   There's no reference anywhere in 111(b) to the assault as a

19   -- which would be the theoretical hook for then attributing

20   some common law or street sense to the verbs, it's just not

21   there to the provision to 111(b), and there's just no

22   reference that can carry that weight.

23          So the question is how about the other provisions?

24   The defendant's also charged in second superseding

25   indictment with 111(a)(1) and the felony version, which has

1          two options.

2                    THE COURT:  Wait, wait, wait --

3                    MR. VALENTINI:  One is --

4                    THE COURT:  Wait, wait.  He is charged in Count 3

5          with 111(a) and (b).

6                    MR. VALENTINI:  Mm-hmm.

7                    THE COURT:  But it says that -- let me, are you

8          saying he's charged with two different offenses under 111?

9                    MR. VALENTINI:  No, I mean, it's one offense,

10         there's two penalty provisions, which in an *Alleyne* sense,

11         if you will, that may define two sets of elements --

12                   THE COURT:  Okay.  Well, I was trying to

13         understand what you're about to say.

14                   MR. VALENTINI:  Right.  Well, in an *Alleyne* sense

15         they might define two sets of elements and that's why our

16         proposed jury instructions do precisely that.  They instruct

17         the jury first as to the elements of the 111(b) and they

18         said and then if you do not find the defendant guilty under

19         111(b) then you go and look at the elements of 111(a)(1).

20                   Now 111(a)(1) has a misdemeanor version and a

21         felony version.  We're talking about the felony version.

22         Now the felony version in turn is divided into two options.

23         And one has -- and I'm going to use probably not *Alleyne*

24         compliant terminology but as the aggravator of the intent to

25         commit a specific another offense.

1             With respect to that option of the 111(a)(1)

2       felony there's no reference back to an assault.  There's

3       nothing in the text of the statute that could support it

4       that way.

5             So, again, like the 111(b), in that case, all

6       there is in terms of operative conduct that is prohibited,

7       are the five verbs that are set forth in 111(a).

8             With respect to 111(a)(1), the physical content

9       version, there is some reference, physical content with the

10      victim of that assault.

11            THE COURT:  Right.

12            MR. VALENTINI:  And with respect to that, Judge

13      Moss viewed that reference back as somewhat implicitly

14      incorporating a street version or a common law sense of

15      assault requirement.  With respect to that option only, only

16      one of two options under 111(a)(1).

17            Now, we disagree with that limited --

18            THE COURT:  You disagree?

19            MR. VALENTINI:  Yeah, we think that that reference

20      is just a common sense, it's just a reference back to all

21      six verbs in the original sort of actus reus requirements of

22      111(a).

23            So we don't think that that reference alone

24      incorporates or was intended to carry into -- to bring into

25      until the full range of requirements of common law assault.

1           THE COURT:  Okay.  So your view is that you mostly

2     agree with Judge Moss, except for misdemeanor quote/unquote

3     "assault."  Misdemeanor whatever it is.

4           MR. VALENTINI:  Well, the misdemeanor refers to

5     simple assault and Judge Moss also said, again --

6           THE COURT:  That's what I'm not clear about.

7           MR. VALENTINI:  Okay.

8           THE COURT:  Are you disagreeing with his -- let me

9     go to his opinion.

10          So you're disagreeing with -- you're not

11    disagreeing.  All right.  Under (a)(1) he says that if it's

12    simple assault, misdemeanor -- if it's a misdemeanor,

13    assault is required and none of the other acts.

14          He goes on to say that if it's a violation of

15    (a)(1) where such acts involve physical contact with the

16    victim or the intent to commit another felony, then the

17    penalty is eight years.  And he says that the misdemeanor

18    you must prove an assault.

19          MR. VALENTINI:  Yes, that's on page 10, I believe.

20    The full paragraph on page 10 of the *United States versus*

21    *Cua*.

22          THE COURT:  Right.

23          MR. VALENTINI:  That's correct.

24          THE COURT:  I'm trying to get what you just

25    said --

```
 1                    MR. VALENTINI:  Yes.
 2                    THE COURT:  About where you disagree with him --
 3                    MR. VALENTINI:  Yes.
 4                    THE COURT:  -- and what you think is required
 5       under the two different --
 6                    MR. VALENTINI:  Yes.
 7                    THE COURT:  -- parts of (a)(1).
 8                    MR. VALENTINI:  Yes.  So with respect to the
 9       misdemeanor version of (a)(1), our memorandum does not take
10       a position in part because it's not -- the misdemeanor is
11       not what we have charged.  We have charged (a)(1) felony and
12       (b), which is a felony.
13                    With respect to (a)(1), I believe that the office
14       position is that the reference like for the (a)(1) felony
15       physical contact version, that it's just a reference back to
16       all six acts but, and it's just a way for the statute to
17       draw distinction for that type of only -- of unaggravated,
18       if you will, violation of 111(a) versus the aggravated
19       version of 111(a) or the further aggravated version, if you
20       will of 111, which is 111(b).
21                    So that's with respect to the misdemeanor.
22                    With respect to 111(a), felony, there is two
23       options:
24                    One is if the defendant commits -- in the course
25       of committing the offense, there is physical contact with
```

1        the victim of that assault.

2              THE COURT:  Right.

3              MR. VALENTINI:  So that, Judge Moss indicated,

4        again, it wasn't necessary to his decision, because his

5        decision in terms of holding only denied a motion to

6        dismiss.  But he did take the view in paragraph -- on

7        page 10 of his decision, that the reference to that assault,

8        someone incorporated the common law requirement of assault.

9        In that limited respect we disagree.

10             With respect to 111(a), the second option, which

11       is where the aggravator, if you will, is the intent to

12       commit a separate felony, in that respect Judge Moss found

13       that there is no requirement of a, again, common law street

14       assault with respect to that option of 111(a) and we agree

15       with that.

16             With respect to 111(b), which I think was really

17       the core and the strike zone of to dismiss issue in *Cua*, we

18       also agree with Judge Moss that there is no requirement of a

19       common law or, again, street understanding of assault,

20       because the only operative prohibited conduct is the conduct

21       that described by the six alternative verbs in 111(a).

22             THE COURT:  Okay.  And fundamentally in this case

23       he's charged with (b).

24             MR. VALENTINI:  Yes.

25             THE COURT:  And you and Judge Moss say all six

1    verbs apply.  And you and Judge Moss say that forcibly

2    modifies all six verbs.

3              MR. VALENTINI:  That's correct.

4              THE COURT:  And you can prove any of them.

5              And if the jury is instructed to consider that

6    first and they cannot reach an unanimous verdict on that,

7    you would then ask me to say now you can consider 111(a).

8              And are you asking them to consider both the

9    physical contact part and the intent to commit a separate

10   felony part?  I haven't looked at your instructions so I

11   don't know what you've said.

12             MR. VALENTINI:  So two points to that.

13             The defendant's charged with both prongs, so we

14   would ask the jury to consider both prongs.

15             When we submitted the jury -- our proposed jury

16   instruction on February 17th that was before Judge Moss's

17   decision --

18             THE COURT:  Right.

19             MR. VALENTINI:  -- so we did not predict that.

20             It also happens that with respect to (a)(1),

21   because we don't think there is a common law assault

22   requirement under either prong and as to 1, we agree with

23   and that's where we agree with Judge Moss with whom we think

24   is exactly right, with the other one we quibble.

25             For that reason we don't think that *Cua*, the part

1    of *Cua* that we agree with, we don't think that that requires

2    any change or any amendment to the jury instruction that we

3    proposed.

4                 THE COURT:  Okay.

5                 MR. VALENTINI:  I hope that -- I know there's a

6    lot of moving parts to this.

7                 THE COURT:  That's fine.

8                 MR. VALENTINI:  I hope I have some clarity.

9                 THE COURT:  Okay.  All right.  I understand where

10   you are.

11                And we've discussed earlier, but -- your view of

12   the meaning of deadly or dangerous weapon, and we also had

13   an argument on that this morning when your colleague was

14   talking about the Ninth Circuit case and *Herrington* and

15   other things.

16                And then on the question of -- and you can add

17   anything if you want, but I've read your filing and I think

18   I get it.

19                And the deadly or dangerous weapon would mean the

20   same thing under each of the counts in which he's charged

21   with either using or carrying a deadly or dangerous weapon?

22   I'm not talking about the verb used versus carrying, I'm

23   talking about deadly or dangerous weapon.

24                MR. VALENTINI:  So the only quibble with that is

25   so for 1752 because of the verb "carry" we think -- and I

1    think this is the same view expressed by Judge Cooper in the

2    *Robertson* case.  We think it would be enough to carry an

3    object which is capable of being used as a dangerous weapon,

4    with intent to use it as a dangerous weapon, regardless of

5    whether it's actually used or attempted to be used in that

6    manner.

7           So with respect to the difference between 111 and

8    1752 and the fact that there's an important verb in 1752,

9    the "carries" verb, that only adds, if you will, a third

10   option in defining or in permitting the jury to find that

11   the defendant carried an object that was capable of being

12   used as a weapon with intent to use it.  That way if you

13   didn't use it or attempt to use it that way.

14          THE COURT:  All right.  Let me cut to the chase

15   here.

16          So, and I want to hear from the defense, but I

17   don't think we have to spend a whole lot more time on all of

18   this.

19          Is any of this important until we get to jury

20   instructions?  I mean, there's no motion pending before me.

21   And it seems to me the reason I asked for supplemental

22   briefs originally was because of my misconception, according

23   to you, that an assault was required under 111 every time

24   and if we didn't see an assault or hear -- or testimony

25   about an assault, I kept saying, how can you prove your

1      case?  And you kept saying because it doesn't require an

2      assault.  So that's why I first asked for supplemental

3      briefs, I believe.

4              And then we got Judge Moss's opinion, which led me

5      to also ask both sides to what extent they agree with him

6      and what extent they disagree with him.

7              But other than jury instructions and what you say

8      in opening statement and how I view the Rule 29 motion,

9      there's nothing I need to do right now.

10             MR. VALENTINI:  No, Your Honor.

11             We view this as part and parcel of the three

12     issues -- the three points in the case that you just

13     mentioned.

14             THE COURT:  Yeah.  Okay.  Thank you.

15             So, I mean, even if I agree completely with Judge

16     Moss on *Cua* and disagree with you, it doesn't affect

17     anything that you would do in how you try the case, it would

18     only affect our debate at the charging conference?

19             MR. VALENTINI:  Yes.  And maybe just to state the

20     obvious, we agree with 95 percent of what Judge Moss said in

21     *Cua*, but yes.

22             THE COURT:  Okay.

23             MR. VALENTINI:  Thank you.

24             THE COURT:  Thank you.

25             MS. GOETZL:  Your Honor, the defense agrees that

1      the appropriate time to discuss this would be at the

2      charging conference when we are discussing jury

3      instructions --

4                  THE COURT:  Okay.

5                  MS. GOETZL:  -- as well.

6                  THE COURT:  That's all you want to say?

7                  MS. GOETZL:  No, I mean, I can expound.

8                  THE COURT:  I don't think you need to.

9                  MS. GOETZL:  I mean, the main difference between

10     this case and *Cua* is that here he's charged with 111(b) and

11     that requires use of a deadly or dangerous weapon.

12                 Use of a deadly or dangerous weapon is active

13     employment.  Active employment is what the Supreme Court has

14     said how that defines use.

15                 And so our position is that --

16                 THE COURT:  But you're -- you don't disagree at

17     this point that for 111(b) an assault is not required, that

18     any of the acts listed can be proved so as long as they are

19     done forcibly?

20                 MS. GOETZL:  Your Honor, we don't see how 111(b)

21     how a weapon could be used without an assault occurring.

22                 THE COURT:  But --

23                 MS. GOETZL:  So in that way, we do believe that it

24     requires an assault.

25                 THE COURT:  But is there anything I need to do

1    with respect to that argument?

2          MS. GOETZL:  No.

3          THE COURT:  So they're going to argue -- they're

4    going to tell the jury in their opening statement that they

5    intend to prove that he forcibly either assaulted, or

6    resisted, or opposed, or impede, or intimidated, or

7    interfered with.  And you're going to say, look at the

8    video, listen to the testimony, there's no assault here.  He

9    wasn't even close to the guy.  And besides our expert's

10   going to tell you the following.

11         MS. GOETZL:  That's correct.

12         THE COURT:  Okay.  Anything else?

13         I mean, I think that I fundamentally agree with

14   Judge Moss, he must have been an English major with sentence

15   structure and everything.

16         And, you know, we will have more discussion at the

17   time of closing.

18         The other thing, I guess that -- at the time of

19   the charging conference is I don't know whether the defense

20   agrees with you that this indictment includes both a 111(a)

21   and 111(b) charge or whether you have to meet the standards

22   for a lesser-included offense, which you may be able to do

23   anyway, I'm not sure.  That gets too down in the weeds for

24   the moment, probably.

25         MR. VALENTINI:  Your Honor, I'm happy to try and

1    answer if you like the government to address the point, but,
2    no -- well, so --
3              THE COURT:  Go ahead.
4              MR. VALENTINI:  So 111(a)(1) and 111(b) are both
5    charged in the indictment.
6              If Your Honor's question is is the 111(a) felony
7    version a lesser-included of 111(b), no it is not, because
8    they each have an element that the other one doesn't have.
9    111(b) has the use of dangerous weapon and 111(a) is to
10   incarnations.
11             Now 111(a) the felony and there's also 111(a) the
12   misdemeanor as to whether -- I don't know if the defendant
13   plans to ask for an instruction on that count as a
14   lesser-included.  We don't have that in our proposed jury
15   instructions.
16             THE COURT:  All right.
17             MR. VALENTINI:  Thank you.
18             THE COURT:  Well, we'll see where we are, I guess.
19             Is there anything else that we can fruitfully do
20   today?
21             If not, I'm going to -- we will e-mail you soon
22   what the voir dire is going to look like and unless I've
23   gotten something wrong, I don't want to hear another
24   argument about it, you can just say, we object or you're not
25   doing certain things we wanted you to do.

1          My suggestion is that we meet here at 9:30 in the

2     morning and see if there is anything we need to discuss

3     before we bring the jury panel in and then so I -- Ms.

4     Johnson and I can review with you how we will proceed with

5     jury selection, just to remind you where everybody's going

6     to be seated and how we're going to ask the questions and

7     all of that.

8          And then we'll see what time it is when we get

9     through the written voir dire and then I'll ask a certain

10    number of them to stay and we'll start bringing them in one

11    at a time, and others of them to come back tomorrow

12    afternoon, and the rest of them to come back more or less

13    half -- on Wednesday morning and half on Wednesday afternoon

14    with the hope we can be done on Wednesday.  We'll see.

15         And, you know, if you can try to limit your

16    followup questions as much as possible and not be redundant

17    and just ask things that are really going to get you

18    information that you need.  Obviously, and we'll take --

19    we'll take for cause strikes after we talk to each person so

20    we know where we are.

21         All right.  So anything else?

22         MR. VALENTINI:  Your Honor, not from the

23    government.

24         MR. SMOCK:  No thank you.

25         THE COURT:  All right.  Thank you all.  See you

1    tomorrow at 9:30.

2              (Court adjourned at 4:30 p.m.)

3                    *          *          *

4                   **REPORTER'S CERTIFICATE**

5

6

7         I, Lynne M. Krenz, do certify the foregoing
     pages of typewritten material constitute a full, true and
     correct transcript of the digital recording, as they purport
8    to contain, of the proceedings recorded at the time and
     place hereinbefore mentioned.

9

10            /s/Lynne M. Krenz
              Lynne M. Krenz, RMR, CRR, CRC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25