```
1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2
     ------------------------------------------------------------
3                                )
     United States of America,   )  File No. 21-cr-123
4                                )           (PLF)
            Plaintiff,           )
5                                )  VOLUME I
     vs.                         )  Washington, D.C.
6                                )  February 28, 2023
     Vitali Gossjankowski,       )  9:54 a.m.
7                                )
            Defendant.           )
8                                )
     ------------------------------------------------------------
9
                BEFORE THE HONORABLE PAUL L. FRIEDMAN
10               UNITED STATES DISTRICT COURT JUDGE
                          (JURY SELECTION)
11
     APPEARANCES:
12      For the Plaintiff:        United States Attorney's Office
                                  Adam Dreher, AUSA
13                                Francesco Valentini, AUSA
                                  Karen Rochlin, AUSA
14                                Capitol Siege
                                  601 D Street NW
15                                Washington, Minnesota 20530

16      For the Defendant:        Federal Public Defender for the
                                  District of Columbia
17                                Celia Goetzl, ESQ.
                                  Edward Smock, ESQ.
18                                625 Indiana Avenue NW
                                  Suite 550
19                                Washington, D.C. 20004

20      Court Reporter:           Lynne M. Krenz, RMR, CRR, CRC
                                  Suite 146
21                                316 North Robert Street
                                  St. Paul, Minnesota 55101
22
        American Sign Language    Sara Blattberg
23      Interpreters:             Carla Mathers

24
                Proceedings reported by certified stenographer;
25      transcript produced with computer.
```

1 **I N D E X**

2

PAGE

3

JUROR NUMBER 264
4        Examination by the Court                    53
         Examination by Mr. Dreher                   60
5        Examination by Mr. Smock                    61

6     JUROR NUMBER 2020
         Examination by the Court                    69
7

      JUROR NUMBER 0763
8        Examination by the Court                    76

9     JUROR NUMBER 1878
         Examination by the Court                    81
10       Examination by Mr. Dreher                   88

11    JUROR NUMBER 0504
         Examination by the Court                    92
12                                                   92

13    JUROR NUMBER 1961
         Examination by the Court                    98
14       Examination by Mr. Dreher                  103
         Examination by Mr. Smock                   104
15       Examination by the Court                   106

16    JUROR NUMBER 1197
         Examination by the Court                   112
17       Examination by Mr. Dreher                  116

18    JUROR NUMBER 0417

19       Examination by the Court                   119
         Examination  By Mr. Dreher                 125
20       Examination  By Mr. Smock                  126
         Examination  By Mr. Dreher                 130
21       Examination the Court                      131

22    JUROR NUMBER 0790
         Examination by the Court                   134
23

      JUROR NUMBER 1236
24       Examination by the Court                   138

25

1    **JUROR NUMBER 1474**
          Examination by the Court                     143
2         Examination by Mr. Dreher                    147
          Examination by Mr. Smock                     149
3
     **JUROR NUMBER 2027**
4
          Examination by the Court                     152
5         Examination By Mr. Dreher                    159
          Examination  By Mr. Smock                    161
6
     **JUROR NUMBER 1661**
7         Examination by the Court                     167

8    **JUROR NUMBER 0831**

9         Examination by the Court                     173
          Examination by Mr. Dreher                    178
10        Examination by Mr. Smock                     179
          Examination by the Court                     181
11        Examination by Mr. Smock                     183
          Examination by Mr. Dreher                    183
12
     **JUROR NUMBER 0280**
13        Examination by the Court                     187
          Examination by Mr. Dreher                    192
14        Examination by Mr. Smock                     195

15   **JUROR NUMBER 0065**
          Examination by the Court                     198
16        Examination by Mr. Dreher                    205
          Examination by Mr. Smock                     206
17
     **JUROR NUMBER 1620**
18
          Examination by the Court                     213
19        Examination by Mr. Dreher                    217
          Examination by Mr. Smock                     218
20
     **JUROR NUMBER 0606**
21        Examination by the Court                     225

22   **JUROR NUMBER 1924**
          Examination by the Court                     229
23
     **JUROR NUMBER 0888**
24        Examination by the Court                     241
          Examination by Mr. Dreher                    247
25        Examination by Mr. Smock                     248

```
 1                   P R O C E E D I N G S

 2                      IN OPEN COURT

 3        (Defendant present)

 4        MS. JOHNSON:  This is criminal action 21-123,

 5   United States versus Vitali Gossjankowski.

 6             For the United States I have Francisco Valentini

 7   and Adam Dreher.

 8             For defendant I have Edward Smock and Celia

 9   Goetzl.

10             Our court reporter today is Lynne Krenz.

11             And our interpreters this morning are Sara

12   Blattberg and Carla Mathers.

13             All parties are present.

14        THE COURT:  Okay.

15             Look, it is time that everybody start to act more

16   efficiently.  We got a jury.  We're not going to keep them

17   waiting.  You do not send me changes to voir dire questions

18   20 minutes after we're supposed to start the session.  It's

19   just not done that way.  Okay?

20             Secondly, every morning there's going to be a long

21   security line.  Mr. Gossjankowski either has to get here

22   early or you have to meet him outside the courthouse and

23   tell -- I don't know whether the security guards will do

24   this, but they let members of the bar in by showing their

25   bar card, they ought to be able to let a defendant in too.
```

1    Figure out if it's possible.

2          We can't keep these jurors waiting once we get

3    started, it's not fair.  So please try to be efficient.

4          And the same with objections, and problems, and

5    issues that come up.  Let's try to deal with them.  If we

6    tell the jury to be here at a certain time, then if you

7    think there are going to be issues, we need to be here

8    earlier and deal with it or over the lunch hour or

9    something.

10          And there are some things, I know everybody has to

11   make the record and preserve the record, on the defense side

12   in particular, but there are just some things that aren't

13   going to be perfect, you know, this is a trial.

14          Some things are important and some things aren't

15   that important.  Use your judgment.  You're all good

16   lawyers, you've all tried cases.

17          So that having been said, now that I've gotten

18   that off my chest, I know there are a couple of minor

19   changes and I think it's just with respect to just some

20   additional names of people that are at the counsel table.

21          Are there any other things about, first of all,

22   the voir dire questions that -- just so the record is clear,

23   after our session yesterday, in hearing what both sides said

24   about the voir dire questions at some length, I revised

25   them.  And some of the things we discussed in court and

1    agreed-upon, some of which I changed a little bit later.

2    Some wording changes and combining some questions.

3          So is there anything urgent that anybody still

4    objects to or wants to try to persuade me to change or is

5    there anything you need to put on the record that you

6    haven't already put on the record about what your objections

7    are or other than the changes the government has proposed

8    this morning?

9          Are there any other things that either side wants

10   to say?

11          MR. VALENTINI:  No, Your Honor.  Not from the

12   government.  And we apologize for the timing of the

13   additional names.

14          THE COURT:  Okay.

15          Mr. Smock?

16          MR. SMOCK:  No thank you, Your Honor.

17          THE COURT:  Thank you.

18          There was some additional objections that were

19   filed this morning by the defense to exhibits.

20          Do we need to discuss them now or can we discuss

21   them --

22          MR. SMOCK:  They don't need to be discussed now.

23          Your Honor, just what I wanted to do is just keep

24   the Court abreast of where we're at and I think that we've

25   reached a point where we don't have any more negotiating to

1     do and I wanted the Court to be aware of what the Court

2     might want to watch.  It doesn't have to happen now, but

3     just keeping you up-to-date.

4               THE COURT:  Okay.  And thank you.

5               And what I would like to do is I may want to watch

6     some of the videos.

7               There are also some objections to two or three

8     hardcopy exhibits, right?

9               MR. SMOCK:  That's correct.

10              THE COURT:  And so the easiest thing for me to

11    evaluate those would be if the government would just give my

12    law clerk a copy of those two or three exhibits that are

13    objected to and sometime during a break or later today I'll

14    look at them.

15              So the hardcopy exhibits are easier -- are easy.

16    The videos I may want to look at.  And I'll let you know

17    when we take a closer look.

18              MR. SMOCK:  Thank you.

19              THE COURT:  Okay.  So if there's nothing else that

20    anybody wants to raise, let me tell you what the plan is for

21    jury selection.

22              I tend to yell once in a while, but I try to do it

23    only with lawyers and not when there are jurors in the room

24    and witnesses in the room.  I don't ever want the jury to

25    think that I'm angry at a particular lawyer or a particular

1    side of the case.

2          Mr. Gossjankowski, you may recall, I used to be

3    much more even-keeled when I was five years younger or so

4    when we first met, but, Ms. Goetzl knows that, but I won't

5    yell at anybody when the jury's here.

6          So that having been said, the plan is that there

7    -- you have a list of 70 people and they are listed in

8    random order.  The jury office did that this morning when

9    everybody showed up.  And they will be brought into the

10   courtroom in that order.

11         And essentially the way it will work is the first

12   person on your list will be seated in the first row on my

13   right, your left, against the wall.

14         There will be nine people in that row.  So then

15   the next juror on the list, 1474, will be the first person

16   against the wall on my right, your left, in the second row.

17   We will go back a number of rows to do that.

18         Will that get us all the way to this back row or

19   not?

20         MS. JOHNSON:  Yes.

21         THE COURT:  So we're going to be filling every

22   row?

23         MS. JOHNSON:  Yes.

24         THE COURT:  Then we will start over on my left.

25   And the next person, and we'll identify -- or Ms. Johnson or

1    I will identify the number of that person, will be on my far
2    left against the left wall of the courtroom.
3            And once they're here, I'll make a few preliminary
4    remarks and I'll tell them about the case.  You've submitted
5    an agreed-upon statement of the case that I'll read to them.
6    And then I will ask them the questions that I e-mailed to
7    you last night, the voir dire questions, and each one of
8    them has a number.  And I will ask them to put on their 5x8
9    card their juror number at the top and if they have a yes
10   answer to any question or if there's something they think we
11   should know or they would like to bring to our attention
12   privately, they should write the number of that question.
13   And I may repeat some of the questions to be sure that they
14   get it and I will certainly repeat the number and the
15   question a number of times.
16           When they've completed their cards, we'll see what
17   time it is, but I'll ask a subset of them to remain and to
18   go back in the jury room or to the hallway back here.  To
19   Judge Kotelly's courtroom, I'm sorry, we're going to be
20   using Judge Kotelly's courtroom next door.  They'll be able
21   to spread out more that way.
22           And then we'll bring them one at a time, put them
23   on the witness stand where Ms. Ma's sitting at the moment,
24   and I'll ask them some followup questions.  And then each of
25   you can ask some questions.  I hope we can do it reasonably

1    efficiently.

2          I wrote down the second group to come back this

3    afternoon, the third group to come back tomorrow morning and

4    a fourth group to come back tomorrow afternoon.  And

5    hopefully we can get a jury by the end of the day tomorrow,

6    which would suggest that we have to have everyone who's not

7    excused for cause also come back tomorrow afternoon, unless

8    Mr. Valentini has more information about whether we're going

9    to be able to start on Thursday morning or not with opening

10    statements.

11          MR. VALENTINI:  Your Honor, we are working on it.

12          I continue to believe it will be safer to build in

13    some additional time to implement those changes.

14          I understand there's still some objections that

15    are unresolved and there's not many videos, but those would

16    also require additional work, so...

17          THE COURT:  I suppose one thing we could do in

18    order not to have -- I'm just thinking about logistics of

19    jury selection.

20          If we're going to still have a bunch of jurors to

21    ask individual questions of tomorrow afternoon but we're

22    aiming to pick a jury tomorrow afternoon, that means they're

23    going to be, you know, 20, 30 people we've already asked

24    questions to just sitting around.

25          So the other way to do it, and I'll see what the

1    defense thinks about this, is to everyone who is not excused

2    for cause tell them to come back Thursday morning instead of

3    late tomorrow afternoon and we'll seat a jury Thursday

4    morning and have opening statements on Thursday afternoon,

5    you know, I don't want to lose days.  And I also am not -- I

6    do not think it's a good idea to do opening statements on a

7    Friday.  I would rather have opening statements on Thursday

8    and let them start to hear some testimony.

9         So in view of what you've just said, and I think

10   we have to decide this before we start jury selection, I

11   think I would opt for, depending on what Mr. Smock and Ms.

12   Goetzl think, telling the jurors who remain on the panel

13   after for cause challenges have been exercised to come back

14   Thursday morning, with the goal of having had individual

15   voir dire of everybody by the end of tomorrow.  They come

16   back Thursday morning, you exercise your peremptories

17   Thursday morning, and we have a jury that can be seated.

18        And assuming that all of the logistical problems

19   have been resolved and my rulings on evidentiary questions

20   have been resolved or at least the ones that need to be

21   resolved before openings, we start with opening statements

22   and the first witness Thursday afternoon.  And then we have

23   a full day on Friday.  And at least that way they have part

24   of a trial.  I say that remembering that we were hoping to

25   have started with witnesses on Wednesday.

1          So that's my suggestion that you all try to work

2     out your logistical problems.

3          MR. VALENTINI:  Yes.

4          THE COURT:  I will try to work through the

5     remaining objections and the open motions and if we swear a

6     jury Thursday morning and we have opening statements

7     Thursday afternoon.

8          MR. VALENTINI:  Understood.  Thank you, Your

9     Honor.

10          THE COURT:  Mr. Smock, what's your view?

11          MR. SMOCK:  Your Honor, I think we would obviously

12     like to start on Thursday.

13          The only thing I would say is that I'm not

14     entirely clear the logistical needs here.  I mean, we have a

15     number of objections but really the objections are just

16     about cutting the length of the videos.  And as the Court's

17     well aware --

18          THE COURT:  He said that he was talking to his

19     technical people and it's more complicated than you might

20     think or I might think.

21          MR. SMOCK:  Very well.

22          THE COURT:  I mean, that's all I know is what you

23     know.

24          MR. SMOCK:  Understood.

25          I appreciate the Court's interest in starting

1    things on Thursday.

2              MR. VALENTINI:  Your Honor, with the processes

3    there's also quality assurance that we need to do to make

4    sure there is no technical issues once the exhibits are

5    actually put before -- well, admitted into evidence and put

6    before the jury.  We're working as fast as possible.

7              We are hoping to start opening argument

8    presentation of the evidence on Thursday.  The same time we

9    are here because we could not have a pretrial conference

10   last week, which would have allowed additional time, so we

11   are racing against the clock.  And we are doing everything

12   we can to get it done and we will get it done, Your Honor.

13             THE COURT:  All right.

14             Anything else anybody wants to say about

15   scheduling or anything else before we get the jury in?

16             MR. SMOCK:  No, thank you.

17             THE COURT:  So let me ask this question:

18             There are two gentleman seated in the gallery and

19   we need the entirety of the gallery for the jury.

20             Are any of you part of either side's teams or are

21   they --

22             UNIDENTIFIED SPEAKER:  (Through Interpreter)  No,

23   we're just observers, Your Honor.

24             THE COURT:  Pardon me?

25             UNIDENTIFIED SPEAKER:  (Through Interpreter) Just

1    observers.

2         THE COURT:  Can we have them sit up front in front

3    of the jury?  Are we going to need the whole back of this

4    side?

5         MS. JOHNSON:  Yes.

6         THE COURT:  Well, I don't quite know what to do

7    about it because we need the full gallery for the jury

8    selection at least initially.  And when I -- what I guess we

9    could ask these gentleman to do if they don't mind is to

10   come back in an hour or so and watch the second phase of

11   jury selection but miss the first phase.

12        I say that reluctantly because court proceedings

13   are supposed to be open to the public.  And I think that

14   what we have done in other cases when we have more -- people

15   who are from the public who are interested is to have a

16   second courtroom where you can have audio and video.  If I'm

17   not mistaken, having audio would not work with at least with

18   one of the gentleman in the gallery.

19        So I would suggest, and I don't know how else to

20   do this, that we ask them with great respect if they

21   wouldn't mind leaving us for an hour or so and coming back

22   at 11:00 or 11:15 when the courtroom will be much emptier.

23   So that's my request.

24        UNIDENTIFIED SPEAKER:  (Through Interpreter)

25   Thank you, Your Honor.  That works best.

1              THE COURT:  Thank you so much for your

2      understanding.

3              And if anybody else shows up as a member of the

4      public -- if anybody sees anybody show up once the jury is

5      selected -- well, once they're seated there won't be any

6      room.

7              Okay.  So I think we're ready to bring the jury

8      in.  Will that take a while?  Just I absent myself for a few

9      minutes?

10             MS. JOHNSON:  Yeah, it's going to take a few

11     moments.

12             THE COURT:  All right.  It's going to take a few

13     minutes.

14             And since we're not using the jury box in the way

15     we do jury selection, I will explain to them, so I've got a

16     law clerk and two interns sitting here and I've got my other

17     law clerk sitting here.  And once we start the second phase

18     of this, everybody -- they can all be in the jury box

19     because we'll need the witness box.

20             Okay.  So why don't we take a few minutes.  Ms.

21     Johnson will bring them in and have them seated in the order

22     that you have in front of you.  Thanks everybody.

23             (Recess taken at 10:11 a.m.)

24                     *    *    *    *    *

25          (10:35 a.m.)

1                    **IN OPEN COURT**

2                    **(JURORS PRESENT)**

3               MS. JOHNSON:  This is criminal action 21-123,

4    United States versus Vitali Gossjankowski.

5               For the United States I have Francisco Valentini,

6    Adam Dreher.

7               For the defendant I have Edward Smock, Celia

8    Goetzl.

9               Our court reporter today is Lynne Krenz.

10              And our interpreters this morning are Sara

11   Blattberg and Carla Mathers.

12              All parties are present.

13              THE COURT:  Excuse me.  I'll get a glass of water.

14              Well, good morning, Ladies and Gentlemen.  Welcome

15   to Courtroom 29.  Thanks for your patience so far.  We're

16   going to ask for a lot of patience, I'm afraid, going

17   forward.

18              I'm Judge Paul Friedemann and I'm going to be the

19   presiding judge in this trial.  And you've been called this

20   morning to this courtroom for possible selection as a juror

21   in a criminal case entitled The United States of America

22   versus Vitali Gossjankowski.

23              I'm going to ask you first to stand up so you can

24   be sworn in because I'm going to ask you some questions and

25   your answers will be under oath.

1              MS. JOHNSON:  Ladies and gentlemen, please rise.

2              Please raise your right hand for me, please.

3              (Jury sworn)

4         THE COURT:  Somebody say no?

5         UNIDENTIFIED JUROR:  I don't take religious oaths.

6              THE COURT:  All right.  You don't have to.

7         Do you affirm that you will answer these questions

8    truthfully?

9              UNIDENTIFIED JUROR:  I do.

10             THE COURT:  Thank you.  Please be seated.

11        It's interesting, we've changed the oath for

12   witnesses and I guess we're behind the curve on the oath for

13   jurors, so I apologize.

14        The purpose of jury selection is to select jurors

15   who have no prior knowledge of the case and no bias towards

16   either side in the case.  And it's my aim and the aim of the

17   lawyers in the case to select a jury that will reach a

18   verdict based solely on the evidence presented in this

19   courtroom and the law as I instruct you on the law.

20        So during this process of voir dire you'll be

21   introduced to the participants in the trial and I'm going to

22   ask you a series of questions that the lawyers and I think

23   will be helpful to us in selecting a fair and impartial

24   jury.  And you're bound by the oath you've just taken to

25   answer these questions truthfully.

1          And you should all have an index card and a pen or

2     pencil to write with.

3          So the first thing I'm going to ask you to do is

4     look at your juror badge and please write the last three

5     digitals, the whole number, the last four digits.  The last

6     four digits.

7          MS. JOHNSON:  I instructed them to do that.

8          THE COURT:  Okay.  The last four digitals from

9     your badge in the upper right-hand corner of the index card.

10          And now I'm going to ask you a series of questions

11     and most of them are yes or no questions.  Each question

12     will have a number.  And so if you have a yes answer to a

13     particular question, please write the number of that

14     question on the card.  Don't write yes or why you have a yes

15     answer, just write the number or if it's not a yes but

16     there's something that you're concerned about or that you

17     think you should bring to our attention, also write down the

18     number.  But don't list every number.  Don't write yes,

19     don't write no.

20          If you have a yes to a particular question or

21     there's something you think I should know about or the

22     lawyers should know about, put that number the question down

23     as well.

24          And after we've completed that process I will talk

25     to each of you personally and the lawyers and I will ask you

1    some followup questions.

2            When we do that, nobody else will be -- none of

3    the other jurors will be in the courtroom.  We're going to

4    do that privately one-on-one and there are reasons for

5    that.

6            One is that we may be asking what appear to be

7    some personal kind of questions in an attempt to get your

8    viewpoint or opinions about certain things.

9            It is important that you be entirely candid and

10   straightforward with us in your responses so we may select

11   the fairest, most impartial jury possible.

12           And we will try always also in the course of our

13   followup questions to address you by your juror number

14   rather than your name so that names are not publicly

15   disclosed.  Some of you may be concerned about that.

16           So that's the way we're going to proceed.

17           Does anybody understand that?  Does anybody have

18   any questions so far?  Okay.  Nobody's raising their hand.

19           So, by way of background.  In this case the

20   government has charged the defendant, Mr. Vitali

21   Gossjankowski, with six crimes relating to Congress's Joint

22   Session at the United States Capitol on January 6, 2021, to

23   certify the electoral vote for president.

24           First, he's charged with obstructing, impeding, or

25   interfering with a law enforcement officer during the

1          commission of a civil disorder.  Okay.

2                    Second, he is charged with obstruction of an

3          official proceeding.

4                    Third, he's charged with assaulting, resisting, or

5          impeding an officer of the United States Capitol Police

6          Department with a deadly or dangerous weapon, that is a stun

7          gun.

8                    Fourth, he's charged with entering, or remaining

9          in a restricted building, or grounds with a deadly or

10         dangerous weapon.

11                   Fifth, he's charged with engaging in disorderly

12         and disruptive conduct on restrictive Capitol grounds with a

13         deadly or dangerous weapon.

14                   And, sixth, he's charged with engaging in

15         disorderly conduct within the United States Capitol grounds.

16                   Mr. Gossjankowski has pleaded not guilty to all of

17         these charges.

18                   So my first question, question number 1, is based

19         on this very brief description of this case.

20                   Do any of you think you have any personal

21         knowledge of the facts of this particular case or think you

22         might have heard or read about the case?

23                   So if you think you may have heard anything about

24         this case against Vitali Gossjankowski or that you've read

25         anything about it, write down number 1.

1          Okay.  Question number 2 may seem a little odd,

2     but just in case, Do any of you currently live outside the

3     District of Columbia?  If so, write down number 2.

4          Number 3.  Do any of you live or work at or near

5     the U.S. Capitol building?  So write down number 3.  If you

6     live or work at or near the U.S. Capitol building.

7          Have you or a close friend or family member ever

8     worked on Capitol Hill?  That's number 4.

9          Number 5.  Were you or a close friend or family

10     member affected by the events that occurred at the U.S.

11     Capitol on January 6th, 2021?  If you or a close friend or

12     family member was affected by the events that occurred at

13     the Capitol on January 6th, write down Number 5.

14          Have you followed the news or watched videos about

15     the events that took place at the Capitol on January 6,

16     2021?  If so, write down Number 6.  And if you write down

17     number 6, we have some followup questions for you about the

18     extent of your knowledge, and observations, and so forth.

19     But if you followed the news or watched videos about the

20     events of January 6th at the Capitol write down Number 6.

21          Number 7.  Do you have strong feelings either

22     positive or negative about the events on January 6th at the

23     Capitol or about individuals who participated in them that

24     would make it difficult for you to be a fair and impartial

25     juror in this case or to follow my instructions on the law?

1    That's number 7.  If you have such strong feelings, either

2    positive or negative, that would make it difficult for you

3    to be a fair and impartial juror or follow my instructions

4    on the law, write down number 7.

5         Do you follow -- number 8.  Number 8.  Do you

6    follow any social media platform that regularly reports or

7    comments on the events of January 6th, 2021?  That's

8    question number 8.

9         Number 9.  Do any of you know or think you might

10   know the defendant in this case, Mr. Vitali Gossjankowski?

11        Mr. Gossjankowski, would you stand up for a moment

12   and face the jury panel as they answer question number 9.

13        Do any of you know Mr. Gossjankowski?  That's Ms.

14   Goetzl, one of his lawyers, standing with him.  Do any of

15   you know or think you might know Mr. Gossjankowski?  If so,

16   please write down number 9.

17        Thank you, Mr. Gossjankowski.  You may please be

18   seated.

19        Number 10.  Do any of you think you might have

20   seen or heard anything on the news or elsewhere about Mr.

21   Vitali Gossjankowski?

22        11.  Did you attend, or view, or listen to any

23   portion of the congressional hearings related to the events

24   that occurred at the U.S. Capitol on January 6, 2021?

25   That's number 11.  Whether you attended, or viewed, or

1    listened to any portion of those hearings that Congress held

2    with respect to those events of January 6th.  Write down

3    number 11.

4              Number 12.  From what you have read, what you've

5    heard, what you've seen, do you think from the outset that

6    people who were arrested for involvement in the events on

7    January 6, 2021, at the U.S. Capitol are likely guilty of

8    the charges brought against them?  Do you think that because

9    someone was arrested for involvement in those events that he

10   or she is likely guilty of the charges?  That's question

11   number 12.

12             Number 13.  Would your opinion concerning former

13   President Donald Trump or his supporters, either positive or

14   negative, make it difficult for you to serve as a fair and

15   impartial in this case?  That's number 13.

16             Number 14.  Do any of you have any strong personal

17   opinions or feelings about the outcome of the 2020

18   presidential election that might affect your ability to be a

19   fair and impartial juror in this case?  That's number 14.

20             Any questions so far?  Everybody with me?  Okay.

21             Number 15.  The defendant in this case, Mr. Vitali

22   Gossjankowski, is deaf.  During the trial he will use the

23   services of an American Sign Language interpreter.  Is there

24   anything about the defendant's condition or his use of

25   interpreters that would prevent you from being able to

1    follow my instructions on the law and from being a fair and

2    impartial juror in this case?  That's number 15.

3             Number 16.  Is any of you, yourself, deaf or hard

4    of hearing or do you have any immediate family members, or

5    close personal friends, or coworkers who are deaf or hard of

6    hearing?  If so, write down number 16.

7             Number 17.  Do any of you understand or have the

8    ability to communicate in American Sign Language or any

9    other sign language?  If so, please write down number 17.

10            Do you have any strong -- number 18.  Do you have

11   any strong opinions, positive or negative, about deaf

12   people?

13            Number 19.  Have you, or any family members, or

14   close friends ever worked at, attended, or participated in a

15   program that Gallaudet University?  If so, please write down

16   number 19.

17            Number 20.  Have you, or a close friend, or family

18   member ever had any experience with a stun gun, or a taser,

19   or any other kind of conducted electrical weapon?  That's

20   number 20.  Again, have you, or a close friend, or family

21   member had any experience with a stun gun, taser, or other

22   conducted electrical weapon.

23            So you've met Mr. Gossjankowski.  I'm now going to

24   introduce you to the lawyers and the other people at counsel

25   table.

1          The government in this case is represented by

2    Assistant United States -- I'll ask them to stand, Assistant

3    United States Attorney Karen Rochlin, Adam Dreher, and Trial

4    Attorney Francisco Valentini.

5          So you might want to take off your masks for a

6    minute so that they can see you because the question is

7    whether any of them know any of you, or think they might

8    know any of you, or recognize you from anything.

9          They're also assisted by a paralegal, Noah Weko.

10   I don't know if I'm pronouncing that right, Mr. Weko.

11   Please stand.

12         And also at counsel table with the government are

13   FBI Special Agent James Mulvihill and Interpreter David

14   Stucklass.

15         So, again, you might take off your masks as well

16   for a minute.  Good.  Thank you.

17         So the question number 21 is if any of you know

18   any of the people I just have introduced, or think you might

19   know them, or they look familiar, write down number 21.

20   Whether it's a personal relationship, from the neighborhood,

21   from school, or that you've been involved in another case

22   involving lawyers or others and these people look familiar,

23   write down number 21.

24         And now I'm going to introduce you to the team

25   representing Mr. Gossjankowski.

 1            Mr. Gossjankowski is represented in this case by

 2      two federal public defenders, Celia Goetzl and Ned Smock.

 3      Ms. Goetzl and Mr. Smock are standing.  And also with them

 4      is a paralegal, Adam Moran, and an interpreter, Joe Lucas.

 5            There you go.  So you may be seated.  Thank you so

 6      much.

 7            If any of you recognize any of the people just

 8      introduced at the defense table, again personally, in the

 9      neighborhood, school, church, other cases you might have

10      been acquainted with, please write down number 22.

11            I'm Judge Paul Friedman, as I said.  My law clerks

12      are Erica Ma, who is sitting over here, and Meghan Downey

13      who's sitting over there.  I have two interns today.

14      There's a third one.  They will be in and out of the

15      courtroom.

16            If any of you know me or either of my law clerks

17      or my courtroom deputy clerk, whom you've met, Tanya

18      Johnson, please, please let me know by writing down number

19      23.

20            And our court reporter is Lynne Krenz sitting over

21      here taking down every word I say.

22            So if any of you know any of those people,

23      including myself, please write down number 23.

24            We're also -- there are also other American Sign

25      Language interpreters in the courtroom who are employed by

1    the court system and they will be sitting sometimes at

2    counsel table, sometimes over on the left.

3           So maybe they should -- I don't know if we'll have

4    the two same two people every day, but why don't you both

5    stand up and introduce yourself to the members of the jury

6    panel.

7           INTERPRETER MATHERS:  Carla Mathers.

8           INTERPRETER BLATTBERG:  Sara Blattberg.

9           THE COURT:  If any of you know or think you might

10   know any of our interpreters, please also write down

11   question number 23.

12          Now, I'm going to ask the government to introduce

13   by name their witnesses.  Now the witnesses are not here

14   today so you're just going to hear a name.

15          And I'm going to ask you if you know or think you

16   might know any of them, if so, write down number 24.

17          And later when you see them in person if suddenly

18   the face looks familiar, we'll have an opportunity even

19   during the trial to let us know.  But do any of these names

20   sound familiar to you?

21          And I would like to say, and I hope I'm right,

22   that the list -- well, the list may seem long.  I'm hoping

23   that the government -- the government is including the names

24   of witnesses that they will call as well as names of

25   witnesses they may call.  So it's not 100 percent certain

1    that you'll hear from each and every person.

2              Who's up?  Mr. Valentini or Mr. Dreher?

3              Mr. Dreher.  And I suggest that you take off your

4    mask.  And can you speak loudly?

5              MR. DREHER:  Of course, Your Honor.

6              Good morning, everyone.

7              As the Judge mentioned the United States may call

8    the following witnesses:

9              United States Capitol Police Officer Morris Moore.

10             The United States Capitol Police Captain Ronald

11   Ortega.

12             The United States Secret Service Inspector

13   Lanelle Hawa.

14             Former General Counsel to the Secretary of the

15   Senate, Daniel Schwager.

16             Metropolitan Police Officer Sarah Beaver.

17             Metropolitan Police Officer Bronson Spooner.

18             Metropolitan Police Sergeant William Bogner.

19             Metropolitan Police Sergeant Jason Mastony.

20             Kyle Sexton.

21             Neal Matthews.

22             Safeway District Manager Edgar Tippett.

23             Federal Bureau of Investigations Task Force

24   Officer Scott Brown.

25             Federal Bureau of Investigation Special Agent

1     James Mulvihill.

2          Federal Bureau of Investigation Special Agent

3     Richard Magliara.

4          Federal Bureau of Investigation Card Examiner,

5     Terry Schultz.

6          Thank you, Your Honor.

7          THE COURT:  Ladies and gentlemen, if any of you

8     know, or think you might know, or are acquainted with any of

9     those individuals, please write down number 24.

10         Now I'll ask Ms. Goetzl or Mr. Smock to identify

11    any witnesses they may call.

12         MR. SMOCK:  Good morning.  The defense may call

13    Dr. Mark Kroll.

14         THE COURT:  All right.  If any of you think you

15    might know Dr. Kroll, please write down number 25.

16         Number 26.  There are a lot of people on the jury

17    panel.  And as you assembled this morning or as you look

18    around the room, if you think you recognize anybody else on

19    the jury panel, again, a friend, a relative, someone you've

20    worked with, someone you went to school with, someone you go

21    to religious services with, or whatever, write down number

22    26.

23         Now, as you just heard from the government a

24    number of their witnesses are law enforcement officers in

25    this case.

1          I will instruct you, those of you who are selected

2     for the jury, at the end of the trial that the testimony of

3     a police officer should be treated the same as any other

4     witness and that the jury should not give either greater

5     weight or lesser weight to the testimony of a witness simply

6     because he or she is a police officer or law enforcement

7     officer.

8          So question 27.  There are really two questions.

9     Question 27.  One, do you have such strong feelings or

10    opinions about the police or about law enforcement, either

11    positive or negative, that would make it difficult for you

12    to be a fair and impartial jury -- juror in the case and to

13    follow the instruction that I just gave?

14         Do you have such strong feelings or opinions about

15    police officers, either positive or negative, that would

16    make it difficult for you to follow this instruction or to

17    be a fair and impartial juror?

18         And, secondly, would the fact that the witness is

19    a police officer or a law enforcement agent make you more or

20    less likely to believe that person's testimony?

21         If your answer to either of these questions is

22    yes, or you're not sure, or you want to talk about it, write

23    down number 27.

24         Number 28.  The government has the burden of

25    proving Mr. Gossjankowski guilty beyond a reasonable doubt.

1    He is presumed innocent unless and until the government

2    proves that he is guilty beyond a reasonable doubt.  The

3    burden of proof never shifts to Mr. Gossjankowski, it's

4    always with the government.

5        Would any of you have any difficulty or hesitation

6    with applying this principle of law, this burden of proof?

7    If so, write down number 28.

8        29.  You'll hear reference to when I mentioned

9    there were charges in this case.  Those charges are

10    contained in an indictment.  An indictment is merely a

11    formal way to begin a case in presenting the charges.  An

12    indictment is not evidence or proof of a crime.  The

13    indictment's purpose is to inform Mr. Gossjankowski, the

14    Court, and Members of the Jury of the charges against him.

15        My question number 29 is, Would the fact that

16    there is an indictment charging Mr. Gossjankowski with

17    crimes lead you to believe he is guilty or to make it

18    difficult for you to apply the presumption of innocence?  If

19    so, write down 29, please.

20        Number 30.  Because Mr. Gossjankowski is presumed

21    to be innocent and that the government has the burden of

22    proving guilt beyond a reasonable doubt, he is not required

23    to offer any evidence at trial.  Would you view his decision

24    not to offer evidence as any evidence of his guilt?  If so,

25    write down number 30.

1          Number 31.  All defendants have a constitutional

2     right not to testify.  If Mr. Gossjankowski decides not to

3     testify, I will instruct that you cannot hold that fact

4     against him in any way.  Would any of you have any

5     difficulty following that instruction?  If so, please write

6     down number 31.

7          Number 32.  As you sit here today and based upon

8     what I've said so far or anything else, do you currently

9     have an opinion regarding Mr. Gossjankowski's guilt or

10    innocence in this case?  If so, write down number 32.

11         33.  Jurors are the sole judges of the facts, but

12    they must follow the principles of the law that I instruct

13    you on.  The jury may not follow -- I'm sorry.  The jury may

14    not choose to follow some rules of law and ignore others.

15    And even if you disagree with the rule of law, or dislike

16    the rule of law, or even if you don't understand the reasons

17    for some of the rules, it is the jury's duty, each juror's

18    duty to follow the rules of law as I instruct you.

19         Please write down number 33 if any of you believe

20    that you will have difficulty following my instructions on

21    the law wherever they may be, at the end of the case and

22    maybe during the case as well.  If so, write down 33.

23         Number 34.  If you are selected as a juror in this

24    case I will instruct you to avoid all media coverage

25    relating to the case including radio, television, postcast,

1    social media, other internet sources.  That is you will be

2    forbidden from reading any newspaper articles about this

3    case, if there are any, or listening to any radio or podcast

4    stories about this case, or watching any TV news about the

5    case or about Mr. Gossjankowski.

6          You will also be forbidden from googling this

7    case, blogging, tweeting, reading, posting comments about

8    the case or about Mr. Gossjankowski on social media sites or

9    anywhere else on the internet during the course of this

10   trial and until after a verdict is rendered.

11         Do any of you have any reservations or concerns

12   about your willingness to do this or about your ability to

13   do this and to follow this instruction?  If so, write down

14   34.

15         Do any of you -- this is number 35.  Do any of

16   you, or members of your immediate family, or close personal

17   friends work for any law enforcement agency or worked for a

18   law enforcement agency in the past?  Any of you, or members

19   of your immediate family, or close personal friends work for

20   now, in the past, or worked for any law enforcement agency?

21   If so, write down 35.

22         That includes any local police or sheriff's

23   department inside the District of Columbia, in the

24   Metropolitan area or otherwise.  It includes the D.C.

25   Metropolitan Police Department.  It includes federal law

1    enforcement agencies such as the Federal Bureau of

2    Investigation; the Secret Service; the Department of

3    Homeland Security; the Bureau of Alcohol, Tobacco and

4    Firearms; and the U.S. Capitol Police, among others.

5         I also include broadly prosecutor's offices.  The

6    U.S. Attorney's Office or any U.S. Attorney's Office.  The

7    State Attorney's Office; the Department of Justice; or the

8    District Attorney's Office.  If so, please write down number

9    35.  Again, you, immediate family, close personal friends.

10        Number 36.  Have you, members of your immediate

11   family, or close personal friends ever worked in the

12   criminal justice system, court system or for criminal

13   defense firm/office, public defender, probation office,

14   correctional facility, jail?  If so, write down 36.

15        37.  I hesitate to ask.  Have you, or members of

16   your immediate family, or close personal friends ever

17   attended law school, or worked as a lawyer, or worked in a

18   law office, or performed legal investigative work, or

19   investigative work for lawyers?  That's number 37.

20        38.  Have you, or members of your immediate

21   family, or close personal friends ever been arrested for a

22   crime, charged with a crime, convicted of a crime, not

23   including traffic violations?  So excluding traffic

24   violations.

25        Have any of you, or members of your immediate

1    family, or close personal friends ever been arrested for a

2    crime, charged with a crime, or convicted of a crime?  If

3    so, please write down number 38.  And we'll have some

4    followup questions I'm sure.

5           Have you, or any members of your immediate family,

6    or close personal friends had any experiences with any law

7    enforcement agencies, or the government, federal or local,

8    that might cause you to favor or disfavor the government or

9    law enforcement?

10          Have you, or any family members, or close personal

11   friends had any unpleasant experiences with a defense

12   attorney or a defense investigator that would cause you to

13   disfavor the defendants in this case?  I'll say it again.

14   Number 40.  Have you, or any family, or close personal

15   friends had any unpleasant experiences with a defense lawyer

16   or a defense investigator so that it would cause you to

17   disfavor the defense or the defendant, Mr. Gossjankowski, in

18   this case?

19          41.  Have any of you, or members of your immediate

20   family, or close personal friends ever been the victim of a

21   crime or a witness to a crime?  If so, please write down 41.

22          42.  Have you ever served on a jury before?  If

23   so, write down 42.  Whether it's a trial jury or a grand

24   jury, whether it's in this court, across the street in

25   Superior Court, or elsewhere, if you've been in other

1    jurisdictions.  If you've served on a jury, please write

2    down 42.

3          43.  If after considering all of the evidence and

4    my instructions on the law you find the defendant guilty of

5    one or more of the charges in the indictment, if you sit as

6    a jury and you should find him guilty, it is my job later as

7    the Judge, and my job alone, to decide the punishment and

8    the appropriate sentence, if any.  The law does not permit

9    the jury to consider the issue of punishment.  That is not

10   your concern, it's up to me.

11         Number 43 is, Would any of you have any difficulty

12   or would you be uncomfortable serving as a juror knowing

13   that you will not have any say in any sentence or punishment

14   that I may impose later.  If so, write down 43.

15         Okay.  Let me talk a little bit about COVID

16   protocols and how we will operate.

17         And you can see I'm sitting behind Plexiglass.

18   And the podiums -- the lawyers may not use the podiums all

19   the time.  We also have a handheld mic, if that's more

20   convenient for them, or a lapel mic, if that's more

21   convenient for them, but they may be behind Plexiglass.

22         My procedure has been and will be that everybody

23   in the courtroom should be wearing a mask, including the

24   jurors, except when they're talking.

25         Now, when a lawyer is asking a question or making

1       an argument or an objection, the court reporter can't hear
2       them well with a mask and the jurors can't hear them well if
3       they're wearing a mask, so they will not be wearing masks
4       while they're talking.
5               The witness sitting on the witness stand will not
6       be wearing a mask while talking.
7               Mr. Gossjankowski and the interpreters will not be
8       wearing masks because, as I understand it, the ability to
9       communicate with him is assisted by him seeing the
10      interpreter's faces and them seeing his face.  So other than
11      that, though, I'm going to ask everybody to keep their masks
12      on.
13              When we go to the next phase of jury selection
14      when you'll be called in here one at a time, those who are
15      not here will be in the courtroom next door, Judge Kotelly's
16      courtroom, Judge Kollar-Kotelly's courtroom.  And so you can
17      spread out however way you want to.
18              Once we are down to the jury and two alternates,
19      fourteen people, there's a jury room back here where you
20      will be when you're not in the courtroom and there will also
21      be seats out in the corridor, so you can decide among
22      yourselves or individually whether you want to be in the
23      jury room or while you're waiting for us sometimes, but
24      during deliberations you'll have to be in the jury room, or
25      whether you want to sit in the corridor, and, again, you may

1    or may not -- you make your own decisions based on your own

2    preferences and respect for your fellow jurors about keeping

3    masks on.

4         So that's what we're going to try to do.  If any

5    of you have any concerns or would be uncomfortable serving

6    as a juror with these protocols in place as I've just

7    described them, please write down number 44.

8         Number 45.  Do you have any physical, health or

9    medical problems, including hearing problems, language

10   problems, vision, eyesight problems, or any other health

11   issues that would make it difficult for you to see or hear

12   the evidence in this case, to listen carefully to the

13   evidence, to pay attention to the testimony, or would

14   otherwise make it difficult for you to give your full time

15   and attention to the case or are you taking any medication

16   that might affect your ability to serve as a juror in the

17   case?  If so, please write down number 45 and you can

18   explain more to us privately.

19        Number 46.  Do you have difficulty speaking, or

20   reading, or writing, or understanding the English language?

21   That's number 46.

22        So back to my previous question in terms of

23   hearing and eyesight.  There will be a fair number of videos

24   in this case that you'll be shown.  Each juror will have a

25   screen, well, there's a screen for every two jurors in the

 1    jury box, plus there's a big screen at the end of the jury

 2    box that will be facing the jury also, so you'll be able to

 3    see things up there.  So there will be a lot of visual

 4    evidence in this case, I think.  So that goes back to

 5    question 45.

 6              Question 46.  Do you have any difficulty speaking,

 7    reading, writing, or understanding the English language?

 8              47.  Do you have any personal beliefs, whether

 9    religious, philosophical, moral, political, or otherwise

10    that could affect your ability to serve as a juror in this

11    case?

12              Do you have any reluctance, past judgment on

13    another person based on any of those views?

14              Do any of your beliefs -- would any of your

15    beliefs, do you think, affect your ability after hearing all

16    of the evidence and the law in this case to enter a fair and

17    impartial verdict?

18              Do you have any concerns about that, please write

19    down 47.

20              We expect a presentation of the evidence in this

21    case to begin on Thursday, because I think it will take us

22    two days to pick a jury and to conclude by the end of next

23    week.

24              After the close of the evidence, could be faster,

25    no one knows for sure, but after the close of the evidence,

 1    whenever it ends, the testimony and the closing arguments of

 2    counsel, the jury will deliberate.  It's possible that that

 3    will extend into the following week.

 4         And I will say this many times, I'm sure those of

 5    you have been on jury's before, understand that once you

 6    begin deliberating to consider your verdicts it's really

 7    important that you take the time that is necessary to be

 8    fair to both sides in the case and to your fellow jurors and

 9    respect their views as well as your own, so no one can

10    predict how long deliberations will take.

11         Compared to some other trials I've had, this is

12    not a long trial.  But that's the plan.  That the

13    presentation of evidence should be concluded by the end of

14    next week and then deliberations will begin and

15    deliberations will continue until the jury reaches a

16    verdict.  That may extend until the week after next.

17         So the question 48 is, Would serving on a jury --

18    as a juror in this case be extreme hardship on you?  We know

19    that serving on a jury is a hardship on everyone.  You're

20    interfering with your normal lives, it's often inconvenient,

21    but that's what we do as citizens.

22         So the question is whether it would be extreme

23    hardship for you.  So if so, it would be difficult to do so,

24    please write down 48.

25         The final question, I believe, question 49, is

1     kind of a catchall because I think we've tried to ask

2     everything.  Are there any other reasons, things I've not

3     raised, things that are on your mind, that might make it

4     difficult for you to sit as a juror on this case and to

5     render a fair and impartial verdict based solely on the

6     evidence and the law as I instruct you?  If so, please write

7     down number 49.

8              Now, do any of you have any questions or want me

9     to repeat any?  If so, just raise your had.

10             Okay.  I see one hand.

11             UNIDENTIFIED JUROR:  Can you repeat number 4?

12             THE COURT:  Pardon me?

13             UNIDENTIFIED JUROR:   Number 4, That question.

14             THE COURT:  Question number 4?

15             UNIDENTIFIED JUROR:  Yeah.

16             THE COURT:  Thank you.  You've got a good memory.

17             Number 4 was, Do you have a close friend or family

18     member who's ever worked on Capitol Hill?

19             3 was whether you work on -- in the Capitol

20     building, or live, or work at, or near the building.  That

21     was 3.

22             4 was whether you, or a close friend, or a family

23     member ever worked on Capitol Hill.

24             And 5 was whether you, or a close friend, or

25     family member had been affected by the events that occurred

1      at the Capitol on January 6, 2021.

2                  Is there another hand back there?  Yes.

3                  UNIDENTIFIED JUROR:  Can you repeat 42?

4                  THE COURT:  42.  42 was whether you have ever

5      served on a jury before.  Is that the one that you meant?

6                  Unidentified JUROR:  Yes.

7                  THE COURT:  If you ever served on a jury before

8      write down 42.

9                  It could be a trial jury like this with lawyers on

10     both sides or it could be a grand jury.  It could be any

11     court, any trial court, any grand jury.  And we'll ask you

12     some followup questions about that.

13                 Anybody else?

14                 Do the lawyers think I missed anything or anything

15     you want me to raise?

16                 MR. SMOCK:  No thank you, Your Honor.

17                 MR. VALENTINI:  No, Your Honor.

18                 THE COURT:  Thank you.

19                 All right.  All right.  Here is what I am going to

20     suggest we do:

21                 As I said, I think selecting a jury is going to

22     take us two days.  There are a lot of you here and we have

23     questions.

24                 And so I'm going to ask the first two rows to stay

25     here, unless anybody thinks I'm being too optimistic.

1          The first two rows over here on this side of the

2     courtroom (indicating), then I'm going to ask --

3          (Pause in proceedings)

4          THE COURT:  All right.  Logistics.

5          So if the first two rows on this side of the

6     courtroom, on my right, your left, would stay here.

7          The next two rows on my right, your left, come

8     back at 2:15 and go to Judge Kollar-Kotelly's courtroom next

9     door, and Ms. Johnson can tell you where it is.  And that

10    gets us, just to be clear, so the first two rows gets us

11    through Juror 088, right?

12         JUROR 088:  Yes.

13         THE COURT:  The next two rows gets us through

14    Juror 0029, correct?  Where is 0029?

15         MS. JOHNSON:  0831.

16         THE COURT:  What?

17         MS. JOHNSON:  0831.

18         THE COURT:  Oh, I've got one too many persons

19    here, 0831.  Where is 0831?  Where?  At the end of the last

20    row?

21         MS. JOHNSON:  Yeah.

22         THE COURT:  Okay.  So I got my numbering wrong.

23         So Juror 496 through 831, which is the last two

24    rows here, will go to Judge Kotelly's courtroom at 2:15,

25    please.

1          The next two rows, beginning with 0029 and ending

2     with 1428?  That's one row?

3          MS. JOHNSON:  Yes.

4          THE COURT:  And then the next one would end at

5     327?

6          MS. JOHNSON:  327.

7          THE COURT:  327?

8          MS. JOHNSON:  Yes.

9          THE COURT:  So 0029 is where?  Okay.

10          That whole row, the first row on my left and the

11     next row ending with 327, where is 327?

12          JUROR 327:  (Indicating).

13          THE COURT:  Is that the end of the row?  Is there

14     somebody in the same row next to you?

15          JUROR 327:  There is a person next to me, 0752.

16          THE COURT:  752, so we should include him.

17          All right.  So through 752.  That group of people

18     in the first two rows, on my left, your right, should report

19     to the jury lounge tomorrow morning at 9:30, if you would,

20     please.

21          And then all the rest of you on this side of the

22     room, which is, I guess 1463 through 1138 where -- there's

23     1138.  Where is 1463?  Okay, you know who you are.  If you

24     would report to the jury office on the fourth floor tomorrow

25     afternoon at 1:30?  1:30?  Sound good?

 1              All right.  So this is like musical chairs or

 2      something.

 3              And what I will ask all of you to do and I will

 4      say this many times, until we finally pick the jury, please

 5      don't talk to anybody about the case.

 6              You don't know very much about the case but you

 7      know something about the case now.  Don't talk to anybody

 8      about the case.  Don't let anybody talk to you about the

 9      case.  Don't read about the case.  Don't Google.  Don't go

10      on social media.  Don't do your own independent research.

11      Don't look up Mr. Gossjankowski's name or any of the other

12      witnesses -- or any of the witnesses whose names you've

13      heard.  Just -- and if you haven't watched information about

14      the January 6th events before, don't start now.  So keep

15      yourself pure between now and the time we finish picking a

16      jury.

17              And if something does come to your attention or

18      someone tries to talk to you about the case, tell Ms.

19      Johnson.

20              If you see any of the lawyers or anybody in the

21      hallway, they're not going to talk to you.  They may say hi

22      if you say hi, but they're not going to talk to you.  That's

23      not because they're not nice people but they can't and they

24      shouldn't.  And you shouldn't talk to them.

25              So, anybody have any questions about when and

1      where you're supposed to show up?

2                    Yes, sir -- yes, ma'am?

3                    UNIDENTIFIED JUROR:  I have conflict tomorrow.

4                    THE COURT:  What time?

5                    UNIDENTIFIED JUROR:  I think 11:15 a.m.

6                    THE COURT:  And I want you to be in the morning I

7      said, right?

8                    UNIDENTIFIED JUROR:  Yes, sir.

9                    THE COURT:  Why don't you stay with us now.

10                   UNIDENTIFIED JUROR:  Yes, sir.

11                   THE COURT:  Sir?

12                   UNIDENTIFIED JUROR:  I have surgery tomorrow and I

13     have a doctor's note.

14                   THE COURT:  Okay.

15                   You're probably going to -- why don't you stay and

16     I'll look at your note after everybody else leaves.

17                   All right.  So we've got -- everybody's got

18     their --

19                   (Off-the-record discussion.)

20                   THE COURT:  Oh, those that are coming back in the

21     jury lounge on the fourth floor tomorrow, both the morning

22     contingent and the afternoon contingent, Ms. Johnson will

23     meet you there.  Don't go anywhere.  Don't let them send you

24     to another courtroom.  She will meet you there.  And we will

25     try to -- and she will also tell you where to -- you know,

1        what the procedures are from there.  Okay.  Yes?

2                UNIDENTIFIED JUROR:  Where do we got at 2:15,

3        these two rows?

4                MS. JOHNSON:  I'll show you.

5                THE COURT:  Those on this side, the 2:15 crowd,

6        the jury lounge is not for you.  Ms. Johnson will show you

7        where you should show up at 2:15.

8                All right.  So everybody can leave except the

9        first two rows.  There's somebody else got a problem in the

10       back.  Wait.  Wait, before you go anywhere.

11               MS. JOHNSON:  I'll collect them.

12               THE COURT:  Before you go anywhere -- I'm sorry.

13       Thank you.  Collect the cards.

14               Could I, while Ms. Johnson's collecting the cards,

15       will the gentleman with the note from the doctor come up to

16       the side here, please.

17               UNIDENTIFIED JUROR:  I have the name thing.

18               THE COURT:  Off the record.

19               (Bench conference held off the record.)

20               THE COURT:  Another medical problem?

21               (Pause in proceedings)

22               THE COURT:  If everyone would just be patient.  I

23       don't know why other people are standing, but if everyone

24       would just be patient until Ms. Johnson gets back here.

25               I don't know why we can't just -- why the rest of

1    you just can't leave, the people on the left can't just

2    leave.

3         All right.  Those on the left, except those that

4    still need to talk to us about something, just go until

5    tomorrow.  You know what time you're supposed to be back in

6    the jury lounge.  Those that still need to talk to us about

7    something on the left remain.

8         Those of you on the right, she's going to put you

9    in Judge Kotelly's courtroom after she explains to the other

10   people about Judge Kotelly's courtroom.

11        All right.  I don't think we can do anything else

12   until Ms. Johnson gets back.

13        You can all sit.  Just because I'm standing

14   doesn't mean you all can't sit.

15        (Pause in proceedings)

16        THE COURT:  Okay.  So can we now -- there's one

17   more person with a medical excuse, but can we take everybody

18   else to Judge Kotelly's courtroom?

19        MS. JOHNSON:  Yes.

20        THE COURT:  Everybody that we're going to talk to

21   and then I'll put everything on the record that's happened.

22        (Jurors excused)

23        THE COURT:  Okay.  So there's one more person --

24   let me say this for the record.

25        We're back on the record and, you know -- you're

1    going to be --

2              UNIDENTIFIED JUROR:  I also had a medical.

3              THE COURT:  I thought you just said -- what?

4              UNIDENTIFIED JUROR:  A medical conflict.

5              THE COURT:  I thought you were the gentleman who

6    said you couldn't be here tomorrow but you could be here

7    today?

8              UNIDENTIFIED JUROR:  That's correct.  I have my --

9    yes.

10             THE COURT:  All right.  Well, why don't you go to

11   Judge Kotelly's courtroom and we'll deal with you first.

12             (Juror excused from courtroom.)

13             THE COURT:  So while we are -- while we were off

14   the record because of all of the logistics going on the

15   lawyers and I met at the sidebar separately with two

16   individuals who have medical issues and letters from

17   doctors.  And the lawyers and I for both sides reviewed

18   their letters from doctors and both sides agreed that they

19   should be excused.

20             The first person, Tanya's got his number now.

21   What's his number?  Was Juror 960, who's having knee surgery

22   tomorrow.  And some of us know from friends how long the

23   rehabilitation can be.  So all the lawyers on both sides

24   agree that he should be excused.

25             The other person is Juror 1646.  And she also

1    presented a letter from a doctor.  And I'm looking for her

2    on my list.  Yeah, she's on the last page of the list.  And

3    the lawyers on both sides agreed that she should be excused

4    for medical reasons.

5           Now there's one other gentleman who has a letter

6    from a doctor who's sitting in the courtroom.

7           Why don't you come up, if you would, with your

8    letter.

9           You said you have a medical excuse?

10          MS. ROCHLIN:  Your Honor, Karen Rochlin for the

11   United States.

12          If I may, I don't believe the gentleman in the

13   courtroom is a member of the pool.  I believe he is,

14   perhaps, one of the individuals here at the very beginning

15   who came to --

16          THE COURT:  Oh, I thought somebody said --

17   somebody else said --

18          MS. ROCHLIN:  That individual who had the other

19   medical conflict I believe is now in Judge Kollar-Kotelly's

20   courtroom.

21          THE COURT:  Oh, I was confused.  Good.

22          UNIDENTIFIED SPEAKER:  That's right.  I'm a member

23   of the public, Your Honor.

24          THE COURT:  All right.

25          So, Ms. Johnson is now back.

1          MS. JOHNSON:  Yes.

2          THE COURT:  These two have been excused.

3          MS. JOHNSON:  Okay.  This is 2020.  That is juror

4    number 2020, who's the first juror.

5          THE COURT:  That's been excused?

6          MS. JOHNSON:  No, no, no.

7          THE COURT:  What are you pointing to?

8          MS. JOHNSON:  I'm giving you the cards for the

9    first juror that we have.

10         THE COURT:  Well, I'd like to take the gentleman

11   who's sitting over here --

12         MS. JOHNSON:  Okay.  I apologize.

13         THE COURT:  -- who's got a medical appointment

14   now tells us he's got a medical problem.

15         MS. JOHNSON:  Oh, okay.

16         THE COURT:  And we can deal with him maybe first.

17         MS. JOHNSON:  Who is that gentleman?

18         MR. VALENTINI:  Your Honor, I believe the

19   gentleman who addressed a medical problem is now in Judge

20   Kollar-Kotelly's courtroom.

21         THE COURT:  Yes.

22         MR. VALENTINI:  Oh, okay.

23         THE COURT:  But I just was saying I'd like to take

24   him first because it may only take a minute.

25         MR. VALENTINI:  Understood.

 1                MS. JOHNSON:  And I don't know what juror that is.

 2     I'm sorry, but was that the gentleman with the green-striped

 3     shirt?

 4                MR. VALENTINI:  Green shirt.

 5                MS. JOHNSON:  Green.

 6                THE COURT:  And why don't you vacate the witness

 7     stand.

 8                MR. SMOCK:  And, Your Honor, just to add another

 9     wrinkle, if there ever were a time to have a bathroom break

10     that would be helpful.

11                THE COURT:  I would like to do that, too.

12                And I will tell you off the record a quick story,

13     Mr. Smock.

14                (Off-the-record discussion.)

15                MS. ROCHLIN:  Excuse me, Your Honor, I'm so sorry,

16     I don't want to interrupt, I just want to flag for the Court

17     that we have a member of the jury pool still present in the

18     courtroom.

19                THE COURT:  Are you a member of the jury panel?

20                UNIDENTIFIED JUROR:  Yeah.

21                THE COURT:  Why are you here?

22                UNIDENTIFIED JUROR:  I was told to stay here.

23                THE COURT:  I'm just confused by what's going on.

24                Why don't you go back to Judge Kotelly's

25     courtroom, please.

```
 1                    The story's not important.
 2                    MS. ROCHLIN:  I didn't know what it was going to
 3          be and I thought it might be appropriate to --
 4                    THE COURT:  Yeah, I mean, Tanya told her to stay
 5          because she's the first one on the list.
 6                    MR. VALENTINI:  Exactly.
 7                    THE COURT:  Thank you, Ms. Rochlin.  I like
 8          lawyering and judging better than logistics.
 9                    MS. JOHNSON:  Judge, I have a juror.
10                    THE COURT:  Yes.
11                    MS. JOHNSON:  You ready?
12                    THE COURT:  Yes.  And you have his card?
13                    MS. JOHNSON:  I'm looking for it.  They were not
14          in order.  I thought they were.
15                    You said you were 264?
16                    JUROR:  Yes.
17                    (Juror present)
18                          (Juror number 264)
19                             EXAMINATION
20                    THE COURT:  Over here, please.  Please have a
21          seat.
22                    What's your juror number?
23                    JUROR:  0264.
24                    THE COURT:  Okay.  Take off your mask, please.
25                    JUROR:  Yes, sir.
```

```
 1                    THE COURT:  And tell me again your juror number?

 2                    JUROR:  0264.

 3                    THE COURT:  Okay.  And have a seat.

 4                    MS. JOHNSON:  These are not in order.  I

 5          apologize.

 6                    THE COURT:  Does anybody know what line on the

 7          list he is, 0264?

 8                    MR. VALENTINI:  Were you seated in the first row?

 9                    JUROR:  Yes.  I was the second in on the front row

10          in the third batch or about two-thirds in.

11                    THE COURT:  0264?

12                    JUROR:  That's correct, yes.

13                    THE COURT:  Got it.

14                    So if you wouldn't mind pulling the microphone

15          closer and telling us about your medical problem.

16                    JUROR:  My wife is having surgery tomorrow, so I

17          just need to drive her to and from.

18                    THE COURT:  Oh, okay.  So you can't be here

19          tomorrow?

20                    JUROR:  That's correct.

21                    THE COURT:  But you can be here today?

22                    JUROR:  That's correct.

23                    THE COURT:  Oh, all right.  I thought you had a

24          medical problem like the others that was going to be

25          excused.
```

```
 1              Oh, I didn't realize Mr. Gossjankowski wasn't
 2    here.  Well, now that I've -- do we want to begin now or do
 3    we want to honor --
 4              MR. DREHER:  Your Honor, if I could just ask a
 5    followup question as to whether or not there will be any
 6    recovery time from the wife's surgery that he might be
 7    needed for?
 8              JUROR:  It's a minor surgery but she will be under
 9    anesthesia, so she can't drive herself to and from.
10              THE COURT:  Okay.
11              JUROR:  But --
12              THE COURT:  But you could be here the day after
13    tomorrow?
14              JUROR:  That is correct.
15              THE COURT:  Okay.  Let me ask you some questions.
16    And, if you don't mind, pulling your mic -- getting closer
17    to the microphone.
18              JUROR:  Certainly.
19              THE COURT:  So you answered questions 3 and 4
20    whether you live or work at or near the Capitol and whether
21    you or a close friend or family member ever worked on
22    Capitol Hill.
23              So would you tell us a little more about that.
24              JUROR:  Certainly.  I live in Kingman Park.  So,
25    you know, just straight east of the Capitol building.
```

```
 1                  THE COURT:  I can't hear you.  I don't know if
 2     anybody else is having a problem.
 3                  JUROR:  Can you hear me now?
 4                  THE COURT:  Yes.
 5                  JUROR:  Is this better?
 6                  I live in northeast in Kingman Park, so just east
 7     of the Capitol building.  My mother worked at the Library of
 8     Congress and my father works for the Department of Energy
 9     and has for my entire life.  So plenty of familiarity with
10     the Capitol region.
11                  THE COURT:  Your mother still works at the Library
12     of Congress?
13                  JUROR:  No, she passed away.
14                  THE COURT:  Oh, okay.  And tell us about the
15     extent to which you followed the news or watched videos
16     about the events of January 6th.
17                  JUROR:  Well, I was working from home on
18     January 6th and had the television on all day.  Was
19     receiving a lot of contact from family and friends that do
20     not live in D.C., that live elsewhere across the country,
21     checking in to ensure that my wife and I were safe.  And
22     I've certainly been following since.
23                  THE COURT:  And you've been following it since?
24                  JUROR:  Yes.
25                  THE COURT:  And can you estimate how many times
```

1     you've seen videos or excerpts or things?

2               JUROR:  I haven't watched a lot recently, you

3     know, I think when everything happened the day -- the

4     immediate days following, certainly looked a lot into it.

5     And I'm an avid Twitter scroller so, you know, a lot of

6     accounts I follow post about it and then I also watched the

7     committees.  Some of the days of the committee when I

8     happened to be working from home would have the TV on, the

9     January 6th committee.

10              THE COURT:  Could you identify particular

11    websites, or social media, or news channels that you watch

12    more than others or a lot?

13              JUROR:  I don't -- my wife watches CNN.  I'm not

14    necessarily a big fan of CNN myself.  I don't, you know, I

15    grew up watching NBC4, I guess, if that should give you an

16    idea of the media I follow.

17              THE COURT:  Now all the people you have watched

18    have now retired.

19              JUROR:  Yeah, unfortunately or perished, sadly,

20    yeah.

21              THE COURT:  Do you follow any particular social

22    media platform that regularly reports on events concerning

23    January 6th?

24              JUROR:  There's a couple Twitter accounts I

25    follow.  I think that, you know, their entire purpose is to,

 1     you know, talk to folks of a certain leaning.

 2            The Good Liars I want to say is one of them.  ACYN

 3     is another.  It's predominantly, you know, accounts that

 4     focus on kind of pointing out the hypocrisy of the folks

 5     that were involved an January 6th.

 6            THE COURT:  So do you think that any of the topics

 7     that you and I just have -- well, I'll ask you one more.

 8            Did you watch, or attend, or listen to any portion

 9     of the congressional hearings related to the events that

10     occurred?

11            JUROR:  Yes, yes, I have.

12            THE COURT:  Extensively?

13            JUROR:  Not extensively, no.  But it's certainly

14     the first handful of days.  And my dad as a joke printed off

15     and gave my brother, and sister, and I the transcript of the

16     January 6th hearings as a Christmas gift.

17            THE COURT:  The transcript of the report?

18            JUROR:  Yep, yeah.

19            THE COURT:  Have you read any of it yet?

20            JUROR:  Some of it, not all of it now.  It's quite

21     wieldy.  I'd prefer to read fiction.

22            THE COURT:  So do you think that any of the -- the

23     fact of watching these things, reading these things,

24     following to a certain extent, any of the questions I've

25     just asked you, would it affect your ability to be a fair

1    and impartial juror and to judge the case based solely on

2    the evidence you hear in the courtroom?

3              JUROR:  I could imagine it would be challenging.

4    You know, I choose to come to this, obviously viewing

5    innocent until proven guilty but, I mean, I think if that's

6    the charge then I will approach it as such, but...

7              THE COURT:  Do you have opinions about President

8    Trump, or his supporters, or about the outcome of the

9    election one way or the other that might affect your ability

10   to be a fair and impartial juror in this case?

11             JUROR:  I think the results of the election speak

12   for themselves and have been verified for a reason.  That

13   doesn't affect my viewpoint on this.

14             THE COURT:  And about President Trump?

15             JUROR:  I'm certainly not a fan but it doesn't --

16   I don't think would, you know -- I don't judge, I have

17   plenty of friends who are, so...

18             THE COURT:  This is question 37.

19             Oh, I asked whether you, or a close friend, or

20   family member have ever worked as a lawyer or been to law

21   school, et cetera.

22             JUROR:  My mom.  She had her JD.  She worked at LC

23   as the Law Librarian of Congress.

24             THE COURT:  Oh, very interesting.  And a beautiful

25   place to work.

```
 1                  JUROR:  Yeah.
 2                  THE COURT:  So the last question had to do with
 3       the length of the trial and deliberations.
 4                  Do you have a problem with next week or beyond?
 5                  JUROR:  I put an answer.  I think I responded to
 6       that one specific to my conflict with my wife's surgery
 7       tomorrow.
 8                  THE COURT:  Okay.  Okay.  Followups?
 9                  MR. DREHER:  Yes, Your Honor.
10                            EXAMINATION
11       BY MR. DREHER:
12       Q.  So, good morning, sir.  I do apologize hearing about
13       your mother.  Was she at work on January 6th, 2021?
14       A.  She was not.  Her staff were.  My mom was working from
15       home on that day but I know a lot of her staff had to be
16       evacuated through the underground tunnels underneath the LC.
17       Q.  And at the time were you living in the same household as
18       your mother?
19       A.  No.  I lived -- I moved into my current condominium in
20       Kingman Park, so just 18th and D Street Northeast.  I've
21       lived there since 2020, so.  So before January late 2020.
22       Q.  Now aside from your mother's employment at the time,
23       were there other family members that were affected by what
24       happened on January 6th?
25       A.  No, sir.
```

```
 1                    THE COURT:  And you're an engineer, is that
 2       correct?
 3                    JUROR:  That's correct, yes.
 4       BY MR. DREHER:
 5       Q.  And I just want to get back to one thing that the Judge
 6       had mentioned.
 7                    Are you able to put aside perhaps conversations
 8       that you've had with your wife or the Twitter feed that you
 9       follow and judge this case based solely on the evidence
10       that's presented at trial?
11       A.  Yes, sir.
12       Q.  Okay.
13                    MR. DREHER:  I have no further questions, Your
14       Honor.
15                    JUROR:  Thank you.
16                    THE COURT:  Mr. Smock or Ms. Goetzl?
17                              **EXAMINATION**
18       BY MR. SMOCK:
19       Q.  Hello.  I'm Ned Smock.  I represent Mr. Gossjankowski.
20       A.  Good morning.
21       Q.  You mentioned the Twitter -- I'm so embarrassed I don't
22       even know whether you called it a site or a Twitter --
23       A.  Account.
24       Q.  Account?
25       A.  Yeah.
```

1      Q.  Thanks.  I'm getting a lot older.  That you follow and

2      you mentioned, I think, one called Good Liar and ACYN?

3               Can you tell us a little bit about Good Liar.

4      A.  The Good Liar is just a gentleman who travels around the

5      country going to various Trump rallies and interviewing

6      attendees and, you know, positioning them with questions and

7      asking them their viewpoints on it.

8               For example, you know, is there something that you

9      are very -- a viewpoint that you're very strong about and,

10     you know, say maybe a critical race theory, and then will

11     follow up with, okay, well, can you explain to me what that

12     is, to which many of the attendees can't.

13     Q.  I see.  So, I mean, I'm familiar with that from the

14     Daily Show.  And so it's sort of --

15     A.  It's just, yeah, a similar approach.  That's probably a

16     fair comparison.

17     Q.  Okay.  And to what extent does that provider talk about

18     January 6th?  Is that a significant part of the --

19     A.  No.  It's predominantly more kind of -- a lot of it has

20     been recently critical race theory and stuff like that.  I

21     don't know that there's been much specific to January 6th.

22     Q.  Okay.  And then ACYN, I think, was the other that you

23     described?

24     A.  That's just a Twitter account that follows kind of the

25     happenings within politics pointing out maybe something that

1    a right-leaning or a politician may state that is maybe

2    disingenuous, or hypothetical, and/or follows, you know,

3    something Tucker Carlson and some of the stuff he says and

4    kind of his viewpoint.

5    Q.  Okay.  And, obviously, you know, you're talking about

6    these folks who were interviewing Trump followers.  And

7    certainly there's no denying the fact that the Trump

8    followers were the folks who were at the Capitol on

9    January 6th.

10            You know, to what extent do you think or how do

11   you think you're thinking about followers of Trump and some

12   of the hypocrisy, I think you described, would play into

13   your consideration of evidence in this case?

14   A.  You know, I think that a lot of what has come about

15   recently is people felt like they were swept up into, you

16   know, or into the event or activity and not necessarily

17   fully had thought through all of the decisions that had

18   happened and, you know, weren't necessarily bad people or

19   trying to do bad things like, I guess.

20            So, you know, I think certainly bad things

21   happened on January 6th but not with necessarily everybody

22   was going there with bad intentions.

23   Q.  Thank you for that.

24            And you also mentioned also that you watched the

25   hearings.  Obviously those hearings were quite substantive,

1    went into detail.  There was a lot of video.  You will be

2    seeing video in this case and hearing specific evidence in

3    this case.  How do you think having learned -- I guess let

4    me back up.

5            This case is just different than normal cases that

6    we have in that everybody on the venire has some information

7    about it, normally jurors come in here and really don't have

8    any background information.

9            How do you think, and knowing things from outside

10   of this courtroom will play into your deliberations, and

11   will it play into your deliberations?

12   A.  As I mentioned to Your Honor, you know, I think the

13   charge of a citizen coming in here and sitting in this court

14   is to presume innocence until proven guilty, and I will

15   certainly uphold that.

16   Q.  I think in response to one of the questions that the

17   Judge asked, you said you thought it would be challenging.

18           Can you talk a little bit more about what you

19   meant by that.

20   A.  I guess in my response to that was predominantly

21   connected to, you know, I've seen that some folks who had

22   been in attendance on January 6th that have gone through

23   their trial process and have seen, you know, the

24   deliberations that have come down.  And from my, you know,

25   my viewpoint of not being in the room and seeing the

1    evidence, you know, assumed or imagined that the judgment

2    that had come down seemed -- was fair, right?

3              But I wasn't in the room, so I don't -- you know,

4    I've never seen any of the evidence proposed in those

5    hearings.

6    Q.  And the results of those trials that you were following

7    were --

8    A.  I've just seen a couple.  I want to say like every once

9    in a while it will hit my feet that another trial had come

10   to deliberation, and judgment had been passed down and, you

11   know, somebody else was sentenced to a period of time.

12             THE COURT:  You're talking about trials in this

13   court?

14             JUROR:  Just trials in general of folks that had

15   attended --

16             THE COURT:  Of the January 6th cases?

17             JUROR:  That's correct.

18             THE COURT:  When you say you followed them, where?

19   On NBC?

20             JUROR:  No, I mean, I don't particularly follow

21   them.

22             THE COURT:  What's your source of information?

23             JUROR:  Just scrolled through Twitter, you know,

24   when news -- I follow NBC, any of the major news

25   organizations will say, you know, this person's, you know,

```
 1    court trial has ended and this is what they were sentenced

 2    to.

 3    BY MR. SMOCK:

 4    Q.  And how --

 5              THE COURT:  Are you almost done?

 6              MR. SMOCK:  I am, Your Honor.

 7    BY MR. SMOCK:

 8    Q.  Can you just tell us just briefly, I mean, obviously

 9    when you came in here you were told that this case involved

10    January 6th.

11              Did you have an immediate gut reaction or what was

12    your immediate reaction when you heard that this involved

13    January 6th?

14    A.  I assumed that it was going to be involving January 6th

15    given the timing and the court that I was told --

16              THE COURT:  Why does that matter?  You're here

17    now.

18              JUROR:  Okay.

19              THE COURT:  I think if you wouldn't mind waiting

20    in the jury room for a minute.

21              JUROR:  Yes, sir.

22              (Juror excused from courtroom)

23              THE COURT:  So we've got 18 people to get through

24    in the next hour so we can eat lunch and be back by 2:15.

25    We don't need time for your speeches, Mr. Smock, we just
```

```
 1      don't.

 2              Limited followup questions.  18 people in the next

 3      hour.  This is just too much.

 4              Now does anybody have a motion to move to strike

 5      for cause?

 6              MR. DREHER:  No, Your Honor.

 7              MR. SMOCK:  No, Your Honor.

 8              THE COURT:  Okay.  Let's bring him back.

 9              MS. JOHNSON:  And that was juror number 0264?

10              THE COURT:  Yes.

11              (Juror present)

12              THE COURT:  Thank you, sir.

13              So we would like you to come back Thursday morning

14      at 10:00 in the jury lounge and Ms. Johnson will meet you

15      there.

16              JUROR:  That's where I came in?

17              THE COURT:  On the fourth floor where you started.

18      And good luck to your wife and her surgery tomorrow.

19              JUROR:  Thank you very much.  I'll appreciate it.

20              THE COURT:  And now we can take the bathroom break

21      that Mr. Smock asked for.  All right.  Ten minutes.

22              (Recess taken at 12:20 p.m.)

23                      *   *   *   *   *

24      (12:33 p.m.)

25                          **IN OPEN COURT**
```

```
 1                THE COURT:  Who's next?

 2                MS. JOHNSON:  2020.

 3                THE COURT:  All right.  Is she here?

 4                MS. JOHNSON:  She's outside.

 5                THE COURT:  So we're going to start at the top of

 6     the list now with number 2020, juror number 2020, who's on

 7     line 1 of the form.  And we'll see how far we'll get.

 8                The good news is a lot of these questions in the

 9     first group of 15 or so on the list are sort of related, so

10     I can ask them a bunch of them and then catchall followup

11     questions and then maybe that will help.

12                MR. SMOCK:  Yeah, and I assume you're going to do

13     this, I was just hoping that you could clarify for the

14     parties, when you see the sheets, since we're not seeing it,

15     which ones they answered yes to.

16                THE COURT:  Say that again?

17                MR. SMOCK:  Can you clarify just when you look at

18     the card which answers that the jurors answered yes to.

19                THE COURT:  Sorry.

20                MS. JOHNSON:  I'm bringing in juror number 2020.

21                THE COURT:  Okay.

22                (Juror present)

23

24

25
```

```
 1                    (Juror number 2020)

 2                       EXAMINATION

 3           THE COURT:  Would you mind -- right up here.

 4   Thank you.  Good afternoon.  Good afternoon.

 5           JUROR:  Good afternoon, Your Honor.

 6           THE COURT:  Please have a seat and take off your

 7   mask, if you don't mind, so we can all hear you.

 8           So you're juror number 2020.

 9           JUROR:  Yes.

10           THE COURT:  Tell us about your job.  It sounds

11   interesting.

12           JUROR:  My job?  Sometimes I go up to the Capitol

13   to work.

14           THE COURT:  Move a little closer.

15           JUROR:  I'm sorry.  Can you hear?

16           THE COURT:  Yeah.

17           JUROR:  Sometimes I have to go up to the Capitol

18   to work.  I work on federal migratory bird legislation for a

19   nonprofit bird conservation organization.

20           THE COURT:  So you've testified on the The Hill.

21           JUROR:  No, I have not testified.

22           THE COURT:  Okay.  So I'm going to go back to some

23   of the questions that you've indicated you might have an

24   answer to and the first was number 3, whether you work at or

25   near the Capitol.  Tell us about that.
```

 1                JUROR:  Yeah, I just wanted to clarify that I have

 2       been at the Capitol building for meetings but unrelated to

 3       this.

 4                THE COURT:  Okay.  And, well, the meetings have

 5       taken place there, so you're familiar in the Capitol

 6       building itself or was it --

 7                JUROR:  Yes, in the Capitol building.

 8                THE COURT:  And you also indicated to question

 9       number 6 that you have viewed news or watched videos about

10       the events of January 6th.

11                Could you tell us a little bit about what you've

12       watched, how extensive, and so forth.

13                JUROR:  Yes, Your Honor.

14                So when January 6th happened, I'm living and

15       working in D.C. and, of course, you know trying to make sure

16       that my personal safety is utmost importance, was monitoring

17       the news, you know, via news outlets, and social media, and

18       from other people that I know that were out and about around

19       town and then following it just to make sure that myself and

20       people that I knew were safe.

21                THE COURT:  And what particular social media do

22       you watch?  If any, particular ones.

23                JUROR:  At the time there were a lot of people

24       posting on Facebook.  It's not something that I'm on

25       regularly any longer.  Sometimes on Instagram, but it was

```
 1      mostly regular news outlets.

 2              THE COURT:  Such as?

 3              JUROR:  Whatever we would get on -- I don't even

 4      remember, maybe it was ABC or NBC or whatever the national

 5      news stations were.

 6              THE COURT:  Okay.  Number 7 was, Do you have

 7      strong feelings, either positive or negative, about the

 8      events on January 6th or individuals who participated in it

 9      that would make it hard for you to be fair and impartial?

10              JUROR:  Yes.  I had just wanted to be very honest

11      and transparent that I do have very strong feelings about it

12      and I do believe that every defendant deserves a fair and

13      proper trial.  And I would want to make sure that I disclose

14      my very strong feelings about it in advance to make sure

15      that you could determine whether or not you felt that I

16      would be able to provide a fair opportunity for the

17      defendant.

18              THE COURT:  Well, you said you had strong feelings

19      about it but you also believe that a defendant is entitled

20      to a fair and impartial trial.

21              JUROR:  Yes, Your Honor.

22              THE COURT:  So do you think you could be a fair

23      and impartial juror in a case flowing out of the events of

24      January 6th?

25              JUROR:  Based on my strong negative feelings on
```

1    January 6th, I think it would be difficult, but I know that

2    I would do my best.

3            THE COURT:  Okay.  Are there social media

4    platforms that you regularly follow?  That was question

5    number 8.

6            JUROR:  So that one is that I do follow some news

7    outlets on social media like Washington Post or the New York

8    Times or NPR.

9            THE COURT:  And you say that you have watched some

10    portions of the congressional hearings?

11            JUROR:  Yes, Your Honor.

12            THE COURT:  And how extensive were your viewings

13    of those or excerpts of those.

14            JUROR:  Not terribly extensive because I have to

15    work during the day but, you know, sometimes people would

16    share different excerpts of testimony in a courtroom, yeah.

17            THE COURT:  So number 12 sort of relates to what

18    we were talking about a couple minutes ago.

19            From what you have seen, or heard, or read, do you

20    think that someone who was arrested, charged with

21    involvement in the events of January 6th, is likely guilty

22    of the charges brought against him or her?

23            JUROR:  This was a question that I was slightly

24    unclear about.

25            I don't automatically assume everyone arrested is

1    guilty in every circumstance.  However, often when there are

2    multiple witnesses and an arrest is made often it has, in my

3    understanding, in my knowledge, led to a guilty verdict, so

4    I just wanted to clarify that for you.

5              THE COURT:  So is that answer that you just gave

6    sort of your general view -- I mean, if we were talking

7    about a, you know, burglary or robbery on the street would

8    you have the same view or is it more a view informed by your

9    thinking about the January 6th events?

10             JUROR:  I believe it would be more my view

11   informed by the January 6th events.

12             THE COURT:  Okay.  And then the last question I

13   think you answered was number 13.  Would your opinion

14   concerning former President Trump or his supporters make it

15   difficult for you to be a fair and impartial juror in this

16   case?

17             JUROR:  It is very possible, but I wasn't sure to

18   what extent you would like me to elaborate on that.

19             THE COURT:  Well, I think since we're trying to

20   seat people who think they can be fair and impartial and

21   people who think they can judge the case just on the

22   evidence they hear in the courtroom, I guess I would like

23   you to elaborate.

24             JUROR:  So my elaboration on that full

25   transparency, I mean, the January 6th, it was terrifying for

 1     those of us that lived in D.C.

 2              THE COURT:  Talk a little louder.

 3              JUROR:  Sorry.  January 6th was pretty terrifying

 4     for those of us that were living and impacted by the January

 5     6th insurrection in Washington D.C.  And I hold very strong

 6     and negative feelings and opinions toward Donald Trump and

 7     those that participated in the January 6th insurrection.

 8              THE COURT:  Okay.  Thank you.

 9              Let me ask you, if you would, step out for a few

10     moments with Ms. Johnson.

11              (Juror excused from courtroom)

12              THE COURT:  I'm happy to let counsel proceed with

13     followup questions.

14              Let me just confirm with Ms. Goetzl and Mr. Smock.

15     Even before followup questions, were you planning to move to

16     strike her for cause?

17              MR. SMOCK:  Yes, Your Honor.

18              THE COURT:  There were a number of things which

19     gave me concern, and her last answer particularly, but if

20     the government wants to follow up, you're certainly entitled

21     to.

22              Her last answer wasn't just about Donald Trump but

23     about supporters of Donald Trump.  And I don't have the

24     exact language now, I'm sure we could have it read back, I

25     found that troubling.  And there are certain other things

1      that she said that I understand why Mr. Smock and Ms. Goetzl

2      would want to move to strike her for cause.

3              So the question is whether or not the government

4      thinks that it's worth the time to try to resurrect her.

5              MR. DREHER:  No, Your Honor.

6              THE COURT:  Okay.  She'll be struck for cause.

7      And you can bring her back.

8              I'm just trying to save time where I think we

9      might be able to.  I'm not trying to force anybody to make

10     any decisions they wouldn't otherwise make.

11             (Juror present)

12             THE COURT:  Thank you.

13             So we appreciate your candor very much and we're

14     going to excuse you from service on this jury.  And you

15     should go back to the fourth floor jury lounge and tell them

16     you've been excused and they'll tell you what need to do

17     next, if anything.

18             JUROR:  Thank you.

19             THE COURT:  Thank you very much.

20             (Juror excused)

21             THE COURT:  And then we can talk to number 763.

22             And he doesn't have any answered -- wait a minute,

23     763.  He doesn't have any answers that relate to

24     January 6th.  His answers all relate to the back end of the

25     list of questions, starting with 27, I believe.

```
 1                (Juror present)

 2              **(Juror number 0763)**

 3                  **EXAMINATION**

 4          THE COURT:  Sir, please have a seat.  And, if you

 5    don't mind, taking off your mask so that we can hear you

 6    better, I want to ask you a few questions following up.

 7          You're juror number 763, correct?

 8          JUROR:  Yes.

 9          THE COURT:  763.

10          JUROR:  Yes, sir.

11          THE COURT:  Sir, you answered question 27, you

12    wrote down 27.  And that was the question where it said

13    there would be testimony from law enforcement officers and I

14    asked whether you had strong feelings about the police,

15    either positive or negative, that would make it difficult

16    for you to treat them like other witnesses or make it more

17    or less likely to believe a law officer's testimony.

18          Could you tell us a little more about why you

19    wrote down that number 27.

20          JUROR:  Well, basically my prior experiences with

21    the law, judicial system.

22          As far as friends and family is, just haven't been

23    really pretty much fair to me and people that I know that's

24    dealt with the judicial system.

25          So I'm kind of bias when it come down to that that
```

1    type of -- the judicial system and stuff.  I just don't

2    think it's fair.

3              THE COURT:  Do you have a bias against the police?

4              JUROR:  Yes, sir.

5              THE COURT:  Well, do you feel that that may be a

6    bias about the police generally but if a particular police

7    officer, or FBI agent, or Capitol Police Officer testified

8    that you would be able to evaluate, consider their testimony

9    fairly and decide whether that particular officer was being

10   honest or is that going to be a problem?

11             JUROR:  It probably be a problem because then,

12   like I set out, my belief in the way I feel about everything

13   -- about, just like I said just, sir, is just I'm kind of

14   bias about it, so I really don't -- I really don't look into

15   it as if I can make a good judgment on it based off of

16   whatever the situation is.  I don't -- I just feel bias.

17             THE COURT:  Could you get a little closer to the

18   microphone, please.  Thanks.

19             Say that last thing again?  Could you say again

20   what you just said.

21             JUROR:  Basically I was basically saying that that

22   just being biassed only because it just -- I'm not sold on

23   the judicial system, I just think sometimes it's just unfair

24   how things work as far as the law.

25             THE COURT:  Another question I asked was whether

1    you, or members of your immediate family, or close friends

2    have ever been arrested for a crime, or charged with a

3    crime, or convicted of a crime.

4            Could you tell us what that's all about.

5            JUROR:  Basically I have multiple family members

6    and friends that's has been incarcerated as well as be held.

7            I have my best friend right now who's been held

8    without bond as of Saturday morning on something over here

9    saying --

10           THE COURT:  He's being held without bond right

11   now?

12           JUROR:  Yes, sir.  He's been held at Fairfax

13   County Jail right now based off of hearsay.

14           THE COURT:  Do you know what he's charged with?

15           JUROR:  I'm sorry?

16           THE COURT:  Do you know what he's charged with?

17           JUROR:  Not at the moment.  We're still trying

18   to -- I think he's going today on arraignment today.

19           THE COURT:  For what kind of crime?

20           JUROR:  It's a domestic violence charge.

21           THE COURT:  You're not sure?

22           JUROR:  Yeah, I'm not sure.

23           THE COURT:  And who are the other family members

24   or friends?  How close are these family members or friends

25   that you're mentioning?

1          JUROR:  Well, probably most of my friends are the

2     people I grew up with, family members.  I have uncles that

3     have been incarcerated for years and --

4          THE COURT:  Sir, another question you answered was

5     whether you, or yourself, or any other family members, or

6     friends have had difficulties, or unpleasant experiences

7     with defense lawyers or defense investigators.  Do you

8     remember answering that question?

9          JUROR:  Well, like I said, said one of my closest

10    friends actually got into an altercation with a defense

11    lawyer?

12         THE COURT:  An altercation with a defense lawyer?

13         JUROR:  Yes, sir.

14         THE COURT:  Was it his lawyer?  His own lawyer?

15         JUROR:  Yeah, it was a defense lawyer.  It wasn't

16    his --

17         THE COURT:  Somebody else's lawyer?

18         JUROR:  Yes, sir.

19         THE COURT:  And was that here in D.C. or somewhere

20    else?

21         JUROR:  Somewhere else.

22         THE COURT:  What?

23         JUROR:  Somewhere else.

24         THE COURT:  In the area or outside the area?

25         JUROR:  Outside the state.

1            THE COURT:  Okay.  How long ago was that?

2            JUROR:  Well, about four or five years ago.

3            THE COURT:  So does that -- would that make it

4    difficult for you to be fair to the defendant in this case

5    or his lawyers?

6            JUROR:  Could be.

7            THE COURT:  Pardon me?

8            JUROR:  It could be.  Could be.

9            THE COURT:  Okay.  I also said that if a jury is

10   supposed to consider whether somebody did the crime, the

11   jury is not supposed to consider punishment or sentencing

12   because that's my job if somebody's convicted.

13           And I asked if you find it difficult or

14   uncomfortable to know that you -- that I'm going to sentence

15   somebody maybe and you don't have anything to say about

16   sentencing, and you said that would make you feel

17   uncomfortable.

18           JUROR:  Well, yeah.  Like I said, speaking on my

19   first question that I was asked, I really don't like being

20   in the judicial system at all.  I've never really been in

21   any trouble myself, but just when it comes down to family

22   and friends, it just hasn't been fair.

23           THE COURT:  Okay.  Thank you, sir.

24           Would you mind waiting outside for just a couple

25   minutes?

1              JUROR:  All right.

2              (Juror excused from courtroom)

3              MR. DREHER:  Your Honor, I believe all I should

4    say for the sake of efficiency is perhaps "Goose V. Gander."

5              THE COURT:  So we should strike him?  What does

6    the defense think?

7              MR. DREHER:  Yes, Your Honor.

8              THE COURT:  What does the defense think?

9              MR. SMOCK:  No objection.

10             THE COURT:  All right.  One for three so far.

11             (Juror present)

12             THE COURT:  Sir, thank you very much.  We're going

13   to excuse you from this jury.

14             Would you please go down to the fourth floor jury

15   lounge and tell them you've been excused.

16             JUROR:  Okay.

17             THE COURT:  Thanks, sir.

18             (Juror excused)

19             THE COURT:  And next is number 1878.

20             (Juror present)

21                      **(Juror number 1878)**

22                         **EXAMINATION**

23             THE COURT:  Sir, good afternoon.

24             JUROR:  Good afternoon.

25             THE COURT:  You're number 1878?

1              JUROR:  I am.

2              THE COURT:  Would you mind taking off your mask --

3              JUROR:  I will.

4              THE COURT:  -- and talk into the microphone.

5              I think you answered 44 that you're not

6    comfortable with the COVID protocols that I was discussing.

7              Could you explain yourself.

8              JUROR:  Well, I can certainly tell you that, yes,

9    I mean, I would say I'm certainly willing to do what I need

10   to do.

11             THE COURT:  Could you talk a little louder, yeah.

12   Okay.

13             JUROR:  I'm certainly willing to do what I need to

14   do, but I'm quite firmly opposed to this whole charade of

15   wearing masks.  I came here by bus and subway, no mask.  I

16   visited a crowded place.  It's just absolutely absurd.

17             But so I just wanted to voice that.  I find it

18   very uncomfortable to wear one for an extended period of

19   time and they're utterly useless.

20             THE COURT:  Okay.  Now turning to other questions.

21             I asked whether you, or a close friend, or family

22   member has ever worked on Capitol Hill or -- I'll start with

23   that one.

24             JUROR:  Yeah.  No, it's -- and it's nothing

25   significant, I just -- it was a broad question.  I used to

1     work within a block of -- I used to work right by Union

2     Station.  And I am, somewhat relevant to this, I was

3     actually on the Metro both ways on January 6th, 2021.

4              THE COURT:  When you say you used to, how recently

5     did you work there?

6              JUROR:  I left there in December.

7              THE COURT:  Okay.  And to what extent have you

8     followed the news or watched videos, been on social media,

9     et cetera, about the events of January 6th?

10             JUROR:  Not closely.  I'm certainly familiar with

11    the events, but no, I didn't follow any of the congressional

12    stuff.

13             THE COURT:  Okay.  Are there any particular

14    sources that you get your news on social media or?

15             JUROR:  I don't use social media at all.

16             THE COURT:  Okay.

17             JUROR:  So, no.

18             THE COURT:  Are there particular things you watch,

19    channels or programs, that you watch on television or

20    newspapers that you read or whatever?

21             JUROR:  And I read a lot of publications and

22    different things like that online since there's no other

23    way, but generally speaking I have not sought out this topic

24    in any way.

25             THE COURT:  Okay.  I asked whether you, yourself,

1   or a close family member, or a friend, or coworker is deaf,

2   or having significant hearing problems?

3          JUROR:  Yes.  I guess a couple -- I had worked for

4   a disability organization for a few years, about three

5   years, so very familiar and I have many deaf friends,

6   although I hate to say I cannot speak ASL.

7          THE COURT:  You cannot speak ASL.  What's the

8   organization that you worked for?

9          JUROR:  I'm sorry?

10          THE COURT:  What was the --

11          JUROR:  It was National Disability Rights Network.

12   Well, but I left that position in December and when we get

13   to that, I personally have a hearing loss.  I have hearing

14   aids but I'm totally functional.

15          THE COURT:  I think a lot of people do.

16          JUROR:  Yeah.

17          THE COURT:  And I think maybe I should because I

18   keep saying I'm having trouble hearing people.

19          JUROR:  I'd recommend it.

20          THE COURT:  Are you a lawyer?

21          JUROR:  Yes.

22          THE COURT:  And other than the disability rights

23   group that I'm familiar with, what other kind of legal jobs

24   have you had over the years?

25          JUROR:  A lot of disability related.

1              I guess the most focused area for about a dozen

2      years, I practiced prisoner's rights here in D.C.  So it's

3      mostly prison conditions not --

4              THE COURT:  Prison conditions?

5              JUROR:  Yeah, not criminal defense or anything.

6              THE COURT:  So I asked, it's question 35, whether

7      you, or family, or close personal friends have ever worked

8      for law enforcement, police, sheriffs, Homeland Security,

9      FBI, et cetera.

10              JUROR:  Yeah, I have a good friend who's a former

11      homicide detective in Montgomery County.

12              THE COURT:  Montgomery County.

13              JUROR:  But that's really in terms of that side of

14      things.

15              I'll save you the next one.  Also his wife, a good

16      friend, works for the D.C. Public Defender Services.

17              THE COURT:  Currently?

18              JUROR:  Yes.

19              THE COURT:  Okay.

20              JUROR:  And not in a --

21              THE COURT:  Pardon me?

22              JUROR:  Not in a representational capacity.

23              THE COURT:  So she's not representing people?

24              JUROR:  Like an administrative role.

25              THE COURT:  So she's administrative.  Okay.

1          36 was whether you, or close friends, or family

2     members ever worked in the criminal justice system.

3          JUROR:  And I was really referring to what I told

4     you about, the prisoner stuff.

5          THE COURT:  And obviously I asked you if you had

6     been a lawyer.  That was 37.  I think you've answered that.

7          Have you, or members of your immediate family, or

8     close friends ever been arrested, or charged with, or

9     convicted of a crime?

10          JUROR:  Yes.

11          THE COURT:  Could you tell us.

12          JUROR:  Oh.  My domestic partner was fairly

13     brutally arrested in Washington D.C. on an extremely minor

14     situation involving going through a red light on a bicycle

15     at 10:00 at night and was beaten up by the police and

16     convicted.

17          THE COURT:  When was that roughly?

18          JUROR:  Nine years ago.  And that was my -- I

19     actually did handle that appeal and I won.

20          THE COURT:  And you won?

21          JUROR:  Mm-hmm.

22          THE COURT:  So he was prosecuted?

23          JUROR:  Yeah, full trial and everything.

24          THE COURT:  In Superior Court?

25          JUROR:  Yes.

```
 1                    THE COURT:  Were you a witness?

 2                    JUROR:  No.

 3                    THE COURT:  Maybe you've just answered -- no, I'm

 4      sorry.

 5                    Have you, or members of your immediate family, or

 6      close personal friends ever been a victim of a crime or a

 7      witness to a crime?

 8                    JUROR:  Yes, same person within a few weeks was

 9      beaten up on the street.

10                    THE COURT:  Wow.  You say you've served on a jury

11      before, what kind of juries were you --

12                    JUROR:  D.C. Superior Court, this was an

13      automobile accident.

14                    THE COURT:  Okay.

15                    JUROR:  It was a civil matter.

16                    THE COURT:  Is that the only one?

17                    JUROR:  Yes.  Usually I get knocked off for being

18      a lawyer.

19                    THE COURT:  Well, there's so many lawyers in D.C.

20      that it doesn't happen automatically.

21                    JUROR:  Yeah, what are you going to do?

22                    THE COURT:  I think that's all -- I think I've

23      covered everything that you put on the card, so I'll let the

24      lawyers ask some followup questions.

25
```

```
 1                          EXAMINATION

 2    BY MR. DREHER:

 3    Q.  Good afternoon, sir.

 4    A.  Good afternoon.

 5    Q.  So I'm going to go back to the beginning --

 6    A.  Okay.

 7    Q.  -- of what we discussed and ultimately what the Judge

 8    asked related to your mask usage.

 9            Now it's one thing to follow the instructions from

10    the Court, but how would you handle the situation of your

11    fellow jurors if they expressed interest in you wearing the

12    mask during deliberation?

13    A.  Yeah, I would comply, I suppose.  No, I don't want to

14    make anyone else uncomfortable.  So, no, of course I would

15    comply.

16    Q.  Okay.  Now would you still feel confident in being able

17    to express your opinions about the mask?

18    A.  I think, yes, certainly.

19    Q.  Now, was there ever a time aside from the case you said

20    nine years ago, I believe --

21    A.  Yes, sir.

22    Q.  -- with your partner, has there been another time in

23    your career where you've practiced criminal law?

24    A.  As a law student, you know, misdemeanor stuff, but

25    that's really it.  I went straight civil after law school.
```

1    Q.  Was that an internship or?

2    A.  Yeah.  Formally known as law students in court, so I

3    handled a number of misdemeanor assault cases.

4    Q.  Was that for a prosecutor's office or for --

5    A.  No, I'm sorry, on the defense side.

6    Q.  The defense side?

7    A.  They all pled out.

8    Q.  And then ultimately I guess, you know, perhaps the

9    reason why most attorneys are kicked off the jury, the

10   question ultimately is, are you able to follow the

11   instructions from the Judge if he is to provide those -- or

12   he will be providing those instructions, but are you able to

13   follow those instructions and interact with your fellow

14   jurors in making a decision in the fact of this case?

15   A.  I believe so.

16   Q.  You believe you'll be able to do that fairly and

17   impartially?

18   A.  Yeah, I don't see why not, yes.

19   Q.  To both sides?

20   A.  No, I believe, yes, I would be able to comply with --

21   follow the instructions as told.

22          MR. DREHER:  Thank you.  I have no further

23   questions.

24          THE COURT:  Mr. Smock.

25          MR. SMOCK:  Your Honor, I don't have any followup

 1    questions.

 2              THE COURT:  Okay.  Would you wait outside for just

 3    a minute?

 4              JUROR:  Sure.

 5              (Juror excused from courtroom)

 6              THE COURT:  Anybody have an issue with number

 7    1878?

 8              MR. SMOCK:  No, Your Honor.

 9              MR. DREHER:  Your Honor, I would just ask, were

10    the -- was the venire prior to entering the courtroom

11    instructed that they must wear masks before entering the

12    courtroom or was the first instruction when the Court gave

13    it after the venire had been seated?

14              THE COURT:  They were told to wear masks coming

15    into the courtroom and I've got a sign outside my courtroom,

16    not every judge does, but I have a sign outside my courtroom

17    saying you're supposed to wear masks.

18              MR. DREHER:  Okay.  I don't believe we have an

19    issue for cause, Your Honor.

20              THE COURT:  Okay.  I mean, I think that what he

21    basically told us is he does not believe in all this stuff

22    but that he would respect his fellow jurors and not cause a

23    problem.  So I think he's good to stay for now, at least.

24              (Juror present)

25              THE COURT:  Sir, I think what we're going to do is

1    ask you to come back on Thursday morning, not tomorrow, but

2    Thursday morning at 10:00.  Go to the jury lounge on the

3    fourth floor, Ms. Johnson will find you, and we will

4    continue the process.

5         JUROR:  All right.  Thank you, sir.

6         THE COURT:  You can go this way actually if you

7    got everything.

8         (Juror excused from courtroom)

9         THE COURT:  So I'm thinking maybe we should tell

10   the second row of people to leave and come back at 2:15?

11        MS. JOHNSON:  They can go to lunch, correct?

12        THE COURT:  They can go to lunch, come back at

13   2:15 --

14        MS. JOHNSON:  2:15?

15        THE COURT:  Or tell them 2:30 if you want to give

16   them a little more time, we don't have to do it all exactly

17   in order if they're not all here.  They can take an hour and

18   a half for lunch and then come back to Judge Kotelly's

19   courtroom.  That's the second row of people.  And we will

20   move on to 1197 right now.

21        MS. JOHNSON:  Right now.  So just 1197 and

22   everyone else --

23        THE COURT:  No, not everyone else, the second row,

24   the last nine.

25        MS. JOHNSON:  Give me one second.

```
 1                 THE COURT:  I want to get through nine.  If I
 2      can't get through eighteen, let's try and get through nine.
 3                 MS. JOHNSON:  Second row beginning with 1474,
 4      correct?
 5                 THE COURT:  Correct.
 6                 (Pause in proceedings)
 7                 THE COURT:  Erica, why don't you see what's going
 8      on.  Why don't you see if we can get 1197 in here.
 9                 We may go to 504 because 1997 seems to have
10      disappeared.  She could be in the restroom, I don't know.
11                 MS. JOHNSON:  Judge, I'm not sure where 1197 is so
12      we have 0504.
13                 THE COURT:  Thank you.
14                 (Juror present)
15                           (Juror number 0504)
16                              EXAMINATION
17                 THE COURT:  Sir -- ma'am, sir.  504 is -- are you
18      504.
19                 JUROR:  Yes.
20                 THE COURT:  Okay.  Would you take off your mask,
21      please, so we can hear you a little bit.
22                 JUROR:  Sure.
23                 THE COURT:  Thank you very much.  We have two
24      Davises on my list, I'm sorry.
25                 JUROR:  It's a common name.
```

 1                    THE COURT:  So you've answered a number of these

 2       questions and I want to ask you some followup questions.

 3                    One is, whether you or a close family member ever

 4       worked on Capitol Hill or close friend.

 5                    Could you tell us about that, please.

 6                    JUROR:  Yes, I work for two Members of Congress.

 7                    THE COURT:  And how recently were you working

 8       there?

 9                    JUROR:  That was -- ended in 2012.

10                    THE COURT:  You ended in 2012?

11                    JUROR:  2012.

12                    THE COURT:  And what are you doing now?

13                    JUROR:  I'm interacting with Congress on a

14       government consulting basis.

15                    THE COURT:  And what kind of consulting do you do?

16                    JUROR:  I help people find financial services,

17       information, and documents they need for their companies.

18                    THE COURT:  So do you work with particular

19       committees of Congress or staff people?

20                    JUROR:  The committees on financial resources as

21       well as the Committee of Ways and Means and several other

22       committees.

23                    THE COURT:  In both houses?

24                    JUROR:  No, I stick to the House.

25                    THE COURT:  We asked number 5, Were you or a close

1    family, or family member affected by the events that

2    occurred on January 6th?

3              JUROR:  Yes, I good friend of mine is the Senior

4    Adviser to Nancy Pelosi.

5              THE COURT:  Okay.  Do you feel -- you said this

6    person's a good friend of yours.

7              Do you feel that that fact and the fact that he

8    worked for Speaker Pelosi would affect your ability to be a

9    fair and impartial juror in this case?

10             JUROR:  To be honest, I'm not quite certain.

11             THE COURT:  Okay.  I don't think there's any

12   evidence that this defendant was anywhere near Speaker

13   Pelosi's office on January 6th, the government or the

14   defense can correct me if I'm wrong.

15             But the charges are that he was involved and the

16   question is whether you could give him a fair and impartial

17   trial and decide this case based only on the evidence you

18   hear in the courtroom.

19             JUROR:  You know, when I first arrived here and I

20   heard what the case was, I did become a little agitated just

21   because I have followed all of the hearings, except for the

22   final -- excuse me, the final one.

23             But then I ran into him in the hallway on his way

24   to lunch and it just dawned on me that --

25             THE COURT:  Who did you run into?

```
 1                  JUROR:  The defendant.

 2                  THE COURT:  Pardon me?

 3                  JUROR:  The defendant on his way to lunch.  I just

 4      saw him on the way to lunch.  It just dawned onto me that I

 5      should probably -- or someone who looks like him --

 6                  THE COURT:  Oh.

 7                  JUROR:  -- within the hall or he was on his way to

 8      lunch.

 9                  THE COURT:  Or maybe on his way to the restroom or

10      something?

11                  JUROR:  Restroom or something, but I think it was

12      him.

13                  Anyway, it dawned on me that I had been possibly

14      too bias in the back.  So in order to be -- I can't give you

15      a yes or no answer to that because it just depends on what

16      the information is that's provided.

17                  I mean, I could easily watch the videos you're

18      probably going to show and base it on that as well as on the

19      fact that he's deaf.  And it's very curious that a deaf

20      person would end up having an interpreter with him or

21      possibly in such a situation.

22                  So that's a very roundabout way of saying that

23      after seeing someone who looked at him at least made me

24      think that I could possibly do that.  I'm using possibly in

25      a -- I am still very angry what happened and my friend was
```

```
 1        in the office.

 2                  THE COURT:  Your friend what?

 3                  JUROR:  Was in the office, Nancy Pelosi's office.

 4                  THE COURT:  On the day in question?

 5                  JUROR:  And I still have friends that were also up

 6        there hiding.  We have special -- there are special hallways

 7        we know that no one else knows.  And the Members of Congress

 8        have even more secret exits from there, especially on the

 9        Senate side when the Senate was reconstructed.

10                  THE COURT:  And are you familiar with some of

11        those areas?

12                  JUROR:  I'm familiar with two of them.

13                  THE COURT:  Okay.  And did you also watch much of

14        -- I think you've just answered question number 7, which

15        was --

16                  JUROR:  I watched all of them except the final

17        one.

18                  THE COURT:  Pardon me?

19                  JUROR:  Of the hearings.  I watched all of them

20        except for the final one.

21                  THE COURT:  Watched what?

22                  JUROR:  I'm sorry.  I watched all of them except

23        for the final one.

24                  THE COURT:  Okay.  I'm going to ask you to wait

25        out in the hallway or the jury room for a minute.
```

```
 1                    JUROR:  Sure.
 2                    THE COURT:  Ms. Johnson will take you out there.
 3                    (Juror excused from courtroom)
 4                    THE COURT:  Yes, sir.
 5                    MR. SMOCK:  Your Honor, I think you can guess we'd
 6      move to strike for cause in light of the answers.  I can go
 7      into it but --
 8                    THE COURT:  All right.  And I haven't even gone
 9      through all the questions he answered yet.
10                    MR. DREHER:  No objection, Your Honor.
11                    THE COURT:  Okay.  Thank you.  Okay.
12                    (Juror present)
13                    THE COURT:  Sir, thank you.
14                    We're going to excuse you from this jury, but
15      please go back to the jury lounge on the fourth floor and
16      tell them you've been excused.  All right.
17                    JUROR:  All right.
18                    THE COURT:  Thank you very much.  Appreciate your
19      candor.
20                    JUROR:  So I can go where?
21                    THE COURT:  You can go out that way.
22                    JUROR:  I'm leaving?
23                    MS. JOHNSON:  You can go back to the fourth floor
24      where I met you earlier and let them know that you've been
25      excused.
```

```
 1                JUROR:  Okay.

 2                MS. JOHNSON:  Thank you.

 3                (Juror excused)

 4                THE COURT:  Okay.  So 1197, if you've got her or

 5      1961.

 6                It's probably good thing we asked for a larger

 7      jury panel.

 8                (Juror present)

 9                        (Juror number 1961)

10                           EXAMINATION

11                THE COURT:  Sir.

12                JUROR:  Hi.

13                THE COURT:  You're 1961?

14                JUROR:  Yes.

15                THE COURT:  Would you mind taking your mask off so

16      we can hear you a little bit better?

17                JUROR:  Yeah, sure.

18                THE COURT:  And get close to the microphone.

19                So I'm going to ask you a few followup questions

20      based on your questionnaire.  And the first was, whether you

21      live or work at or near the U.S. Capitol.

22                JUROR:  Yeah, in January 6, 2021, I lived in

23      Capitol Hill.  And so I was --

24                THE COURT:  So the answer is yes?

25                JUROR:  I was living there, yeah.
```

1          THE COURT:  In looking at your list here, Trinidad

2     Avenue?

3          JUROR:  Yeah, that's where I currently live.

4          THE COURT:  But that wasn't where you were on

5     January 6th?

6          JUROR:  No.

7          THE COURT:  Would you mind telling us not the

8     street address, but the general, what streets?

9          JUROR:  Like 5th and E.

10         THE COURT:  5th and E?

11         JUROR:  Yeah.

12         THE COURT:  I used to live at 4th and A.

13         JUROR:  Oh, that's my same road.

14         THE COURT:  And have you followed the events on

15    the news, and videos, and various other places?

16         JUROR:  I have.

17         THE COURT:  You have?

18         JUROR:  Yeah.

19         THE COURT:  And watched any of the hearings?

20         JUROR:  Yeah, I watched some of the hearings

21    either live or like videos on Twitter and stuff like that.

22         THE COURT:  Do you have such strong feelings,

23    either positive or negative, about the events of January 6th

24    or the individuals who participated in them that would make

25    it difficult for you to be a fair and impartial juror in

1    this case?

2               JUROR:  Yeah.  I mean, when it was happening I

3    remember we were driving out of D.C. and trying to like get

4    by all the emergency vehicles and stuff and it was like a --

5    like I felt sick honestly listening to the news.  And just

6    kind of following it just made me, like, I've gotten like

7    more -- more comfortable, obviously, as it's been like less

8    immediate, but it was like a visceral feeling.  It would be

9    hard to be impartial I feel, so.

10              THE COURT:  So you think it would be hard to be

11   impartial?

12              JUROR:  Yeah.  Just given what I have followed so

13   far and what I've seen in terms of the videos.

14              THE COURT:  You don't know anything about this

15   particular defendant, Mr. Gossjankowski?

16              JUROR:  I don't know this individual.

17              THE COURT:  Do you start with the -- this is

18   question number 12.  I asked you, Do you start with the

19   assumption based on what you've read, or seen, or heard that

20   people who were arrested for involvement in the events of

21   January 6th are likely guilty of the charges brought against

22   them?

23              JUROR:  It's my bias, I guess.

24              I mean, I would be open to obviously

25   counterarguments, but it's from what I had seen -- I've seen

```
1     I think a fair amount, so it's hard to overcome that.  Just
2     being honest.
3              THE COURT:  And do you -- would your opinion
4     concerning President Trump or his supporters make it
5     difficult for you to be a fair and impartial juror in this
6     case?
7              JUROR:  Yeah.  It was -- I would say I don't
8     feel -- I have pretty strong negative feelings towards them,
9     so...
10             THE COURT:  Okay.  I'm going to ask you to wait
11    outside for a few minutes, please.
12             JUROR:  Okay.
13             (Juror excused from courtroom)
14             MR. SMOCK:  We'd move to strike for cause.
15             MR. DREHER:  Your Honor, in this particular
16    instance I would ask for some follow up.
17             THE COURT:  Okay.  We'll bring him back and ask
18    followup questions.
19             There are two or three more unrelated questions
20    that I have to ask from the card unrelated to January 6th
21    but we'll bring him back and ask him some more questions,
22    because, yeah.
23             (Juror present)
24             THE COURT:  Actually, I do have a few more
25    questions.
```

1                    JUROR:  Sure.

2                    THE COURT:  And the lawyers may too.

3                    Have you -- as number 42, Have you, or members of

4      your immediate family, or close personal friends ever been a

5      victim of a crime or a witness to a crime?

6                    JUROR:  Yeah, I got my car broken into at Capitol

7      Hill and -- yeah, that's kind of it.

8                    THE COURT:  How long ago was that?

9                    JUROR:  It was in 2020.

10                   THE COURT:  Did the police come or did you call

11     them?

12                   JUROR:  I don't think we even called them.  I

13     don't think we figured it was going to be a high priority.

14                   THE COURT:  Question 37.  I asked whether you, or

15     members of your immediate family, or close personal friends

16     ever attended law school, or worked as a lawyer, worked in a

17     law office, or performed legal investigative work of any

18     kind?

19                   JUROR:  Yeah, my late father was an attorney,

20     civil.  Defended hospitals, and doctors, and medical

21     malpractice.

22                   THE COURT:  Okay.  Followup questions from

23     counsel?  Mr. Dreher?

24                   MR. DREHER:  Yes, Your Honor.  Thank you.

25

1                              **EXAMINATION**

2    BY MR. DREHER:

3    Q.  Earlier you told us that on January 6th you were leaving

4    the city?

5    A.  Yeah, we were supposed to go to Pennsylvania for a, like

6    a cabin weekend, and so we were driving through Capitol Hill

7    at around the time when the insurrection was happening.

8    Q.  So it was completely unrelated to what happened at the

9    Capitol, it was a preplanned trip?

10   A.  Preplanned trip.

11   Q.  And also since that, you also indicated that you had

12   been following what happened at the Capitol on January 6th.

13   Was that a pretty close following that you had been doing?

14   A.  I mean, I wouldn't say the most close, like I don't

15   think I'm obsessed with it but I, you know, I look at

16   Twitter every day.  I follow people who talk about it from

17   time to time.  I follow some people who follow, you know,

18   people pretty closely.  So I get information about it when

19   information arises.

20   Q.  Now, one of the instructions will be during this trial

21   that you would not be allowed to follow that feed.

22   A.  Yeah.

23   Q.  Would that cause you any sort of hardship?

24   A.  No, I can give up social media.

25   Q.  All right.  Do you also believe that you would be able

 1     to judge the facts of this case and this specific defendant

 2     in the context of January 6th in a fair and unbiassed

 3     manner?

 4     A.  Probably.  It would be -- I mean, it's difficult with

 5     sort of unconscious biases, again, someone who is already

 6     indicted for this, but I could -- I could try, yes.

 7     Q.  Do you believe that identifying the fact that you might

 8     have an unconscious bias is a good thing?

 9              In other words, would you be able to consciously

10     put that aside when determining the facts in this case?

11     A.  Yeah.  I could do that.

12              MR. DREHER:  I have no further questions, Your

13     Honor.

14              THE COURT:  Mr. Smock?

15                             **EXAMINATION**

16     BY MR. SMOCK:

17     Q.  Hello.

18     A.  Hi.

19     Q.  I appreciate you talking to us about these issues.

20     A.  Mm-hmm.

21     Q.  I heard you say, I think, and you can correct me if I'm

22     wrong, that you felt sick listening to the news on

23     January 6th?

24     A.  Yeah.

25     Q.  I think you said that things had kind of -- you had

1    gotten a little bit more comfortable as time passed.

2          Obviously this case is going to involve bringing

3    that -- all that evidence back up --

4    A.  Mm-hmm.

5    Q.  -- or that information.

6          Can you talk a little bit about how that might

7    impact you.

8    A.  I mean, I -- it would be not pleasant, I would say, but

9    I think I could suck it up and, you know, be a part of it,

10   if necessary.

11   Q.  I think you had also talked about your bias and that you

12   assume that this defendant was guilty.  You also said that

13   you were open to counterarguments.

14          Would you be, that would be open to

15   counterarguments based on your assumption that this

16   defendant is guilty, is that what I'm understanding?

17   A.  I mean, I would have to see the evidence, obviously.  I

18   could judge the evidence.  But, yeah, I would be open to

19   counterarguments that this defendant in particular was

20   guilty.

21   Q.  But that's based on an assumption coming in that he's

22   probably guilty, you're willing to listen to our arguments

23   convincing you otherwise?

24   A.  Yeah, I would say that my assumption is that anyone who

25   was there and who, you know, is credibly accused of these

                    LYNNE M. KRENZ, RMR, CRR, CRC
                         (651) 848-1226

1     things probably did it but that, you know, if there was --

2     there's also, I don't necessarily put the word of, you know,

3     any particular witness, whether they be law enforcement or

4     otherwise, above -- or point like on a pedestal as far as

5     being more truthful than others.  I could foresee a scenario

6     where someone was wrongly accused of something like this,

7     so.

8     Q.  And can you assure us that with confidence that you

9     would be able to set aside these biases that you described

10    to be -- come in here with a blank slate or is that

11    something you're not certain of?

12    A.  I wouldn't say I'm certain of it.  I can try, but

13    ultimately it's not something I could guarantee.  It's just

14    I feel like it's difficult for me -- like it's not a case

15    where I'm completely unfamiliar with the facts.  Obviously

16    it's hard to find anybody who is, but I'm coming in with a

17    decent amount of, you know, understanding or knowledge about

18    the case -- about January 6th as general things.

19    Q.  And is it fair to say a fair number of strong feelings?

20    A.  Yeah, I would say I have strong feelings about it.

21          MR. SMOCK:  Thank you.

22                           **EXAMINATION**

23          THE COURT:  I heard you say that you thought that

24    a case like this growing out of January 6th that somebody

25    was charged that they were probably guilty or they probably

1      did it, right?

2                  JUROR:  Yeah.  I would say, you know, it would

3      impact, my guess is, yes.

4                  THE COURT:  Do you understand that --

5                  JUROR:  Yeah.

6                  THE COURT:  At the end of the trial I will

7      instruct the jury that they have to find that the government

8      has proved guilt beyond a reasonable doubt?

9                  JUROR:  Yeah.

10                 THE COURT:  Which is you understand it to be more

11     than probably?

12                 JUROR:  Yes.

13                 THE COURT:  And would you be able and willing to

14     follow that instruction despite what you've said here this

15     morning?

16                 JUROR:  I would.

17                 THE COURT:  Would you follow all of my

18     instructions on the law despite whatever biases you've

19     described this morning?

20                 JUROR:  Yeah, I would follow your instructions.

21                 THE COURT:  Okay.  Are there any further questions

22     from anyone?

23                 MR. DREHER:  No further questions, Your Honor.

24                 MR. SMOCK:  No, Your Honor.

25                 THE COURT:  Okay.  I'm going to ask you to wait

1     again for a minute.

2               JUROR:  All right.

3               (Juror excused from courtroom)

4               MR. SMOCK:  Your Honor, I'd move to strike for

5     cause.

6               I think this juror answered -- I couldn't keep

7     track of the number of the answers, yes answers, he gave

8     with respect to bias, but there were many of them with

9     respect to both reactions to January 6th, supporters of

10    Donald Trump.

11              He, when not prompted with sort of a yes or no can

12    you be fair and impartial question said it would be

13    difficult for him to be fair and impartial.  Talked about a

14    visceral reaction he had on January 6th.  Felt sick

15    listening to the news.  He said, again, it would be hard to

16    be impartial given what he has followed.  He said when asked

17    if he could be fair "it would be difficult to me", that he

18    would try.  He has strong feelings.

19              He also indicated that he thought that defendants

20    charged on January 6th were probably guilty but that he

21    would be open to counterarguments.  Obviously the Court is

22    well aware of the burdens in a case like this and my concern

23    is that despite his efforts to be cordial with the Court and

24    answer the Court's questions in a way that he thought that

25    might be preferred, his underlying answers about his

1    feelings, his strong feelings and the like, make clear that

2    he should be struck for cause.

3              MR. DREHER:  Your Honor, the government believes

4    that this juror should not be struck for cause.

5              Ultimately he has answered that he would be able

6    to remain fair and impartial when judging the facts of this

7    defendant's case.  And although he did indicate that it

8    would be challenging, I think jury service in and of itself

9    is challenging.

10             Now his ability to identify that there might be

11   some sort of unconscious bias I think weighs in favor of

12   this being precisely the juror that we would want on a case

13   like this.

14             And I would point out just to an specific point

15   that Mr. Smock brought up in terms of the charging.  If my

16   memory serves, I believe he referenced it as a credible

17   charge.  In other words, I believe this juror still

18   understands that ultimately he is going to determine whether

19   or not this charge has been proved beyond a reasonable doubt

20   and follow this Court's instructions.  Thank you.

21             THE COURT:  Anything else?

22             Okay.  I'm going to deny the motion for cause and

23   the defense can use a peremptory if they like on this juror.

24             (Juror present)

25             THE COURT:  Sir, you don't have to sit.  Thank you

1    very much.

2              JUROR:  Okay.

3              THE COURT:  We are going to ask you to come back

4    Thursday morning, not tomorrow, but Thursday morning, 10:00

5    the fourth floor jury lounge.

6              JUROR:  Okay.  Thank you.

7              THE COURT:  And Ms. Johnson will meet you and

8    other people there and we'll take the next step in this

9    process.

10             JUROR:  All right.

11             THE COURT:  Thanks for your patience and your

12   candor.

13             JUROR:  Sure all right.

14             THE COURT:  Appreciate it.

15             JUROR:  Okay.

16             (Juror excused from courtroom)

17             THE COURT:  Okay.  I think we should take lunch.

18             MS. JOHNSON:  Okay.

19             THE COURT:  I think we should take lunch.

20             It's 1:30, and although I'm reluctant because

21   there's been people that have been waiting for us, the

22   cafeteria does close at 2:00 and that may affect some of the

23   people in the room right now, as well as some of the jurors.

24             So why doesn't everybody try to be back in their

25   seats by 25 after, 20 after, 1:30, -- 20 after 2:00.  And

1    we'll tell this group of jurors that's been waiting that

2    they can come back at 3:00.

3           So we may not take everybody in precisely the

4    right order, because they've been waiting a long time, if

5    they want to go out to lunch it will take them awhile.

6           We will have people in Judge Kotelly's courtroom

7    by 2:15.  We will take them in the most logical order we

8    can, but Ms. Johnson will figure it out.

9           MS. JOHNSON:  Okay.

10          THE COURT:  So I'm going to give you, the next one

11   should be 1197 going back, assuming we will find her.  Maybe

12   she misunderstood her and left us for some reason.

13          MS. JOHNSON:  I don't know what happened.

14          THE COURT:  And if we can, we'll start with 1197

15   and then move on to 417, but if I'm going to tell them not

16   to come back to 3:00 or whatever we're telling them, we may

17   wind up starting with people in the third group rather than

18   the second group.  We'll see.  We'll just see where we are.

19          All right.  I've got them organized by groups.

20   Ms. Johnson has them organized with groups.  Here's the

21   one's we're done with this morning.  Here are the ones we go

22   with next.

23          If we can, we'll go in order.  If we can't, we'll

24   go out of order.

25          MS. JOHNSON:  Okay.

1          THE COURT:  So we will see everybody here

2     hopefully by around 20 after the hour.  We'll get started by

3     2:30.

4          (Recess taken at 1:33 p.m.)

5                    *    *    *    *    *

6          (2:28 p.m.)

7                         **IN OPEN COURT**

8          THE COURT:  So what would make logical sense is

9     that we first see whether 1197 on line 4 is present and if

10    not, go to line 7, but I don't think, which is number 417,

11    but I think we didn't tell them to come back until much

12    later because we let them go to lunch much later.

13         So Ms. Johnson will just bring in whoever she can

14    from as close to the top of page 1 as possible, and she will

15    tell us who the person is, and I will reconfirm that with

16    the person when they sit down.  That way we'll make progress

17    even if not everybody's back yet.

18         MS. JOHNSON:  Ready?

19         THE COURT:  Okay.

20         (Juror present)

21         MS. JOHNSON:  This is juror number 1197.

22                    **(Juror number 1197)**

23                         **EXAMINATION**

24         THE COURT:  Thank you.  Would you have a seat

25    right up here, please.  Thank you.

LYNNE M. KRENZ, RMR, CRR, CRC
(651) 848-1226

1              And, if you don't mind, taking off your mask and

2      speaking into the microphone.

3              JUROR:  Definitely.

4              THE COURT:  You are number 1197, correct?

5              JUROR:  Yes.

6              THE COURT:  So you've written down a number of

7      things on this card.  I'll have some followup questions and

8      the lawyers may as well.

9              I asked whether you follow the news or watch

10     videos about the events on January 6th, that's question 6,

11     and you said yes.

12             Could you tell us, you know, what you followed,

13     how you followed it, how extensively, things like that.

14             JUROR:  I mean, it wasn't too extensive.  It was

15     essentially as it was happening.  I was reading articles

16     like from the Post.  Watching videos that were kind of

17     coming up from the Post or news outlets.

18             THE COURT:  So was this as it was happening?

19             JUROR:  As it was happening.

20             THE COURT:  And how about since then?

21             JUROR:  Not as much.  I kind of have not really

22     followed it as much since.

23             THE COURT:  And what's your source of news, social

24     media, hardcopy, newspapers, whatever?

25             JUROR:  I read the Washington Post, the New York

1   Times often through like their app and then Instagram, kind

2   of the stories that kind of come up that way.

3          THE COURT:  Are you on any particular social media

4   platforms?

5          JUROR:  Not much other than Instagram.

6          THE COURT:  Instagram?

7          JUROR:  Yeah.

8          THE COURT:  Okay.  I think the next question you

9   answered was question 37, which was whether you, or close

10  friends, or members of your immediate family have ever

11  attended law school, worked as a lawyer, worked in a law

12  office, performed investigative work for lawyers.  Tell us

13  about that.

14         JUROR:  Yeah, my sister-in-law works as an

15  attorney for the Federal Trade Commission and my brother

16  went to law school and was an attorney, I think, for an

17  insurance company but hasn't practiced since.

18         THE COURT:  And tell us a little bit about your

19  own job at American University.

20         JUROR:  I work at the library.  I manage the

21  course reserves.

22         THE COURT:  Manage what?

23         JUROR:  The course reserves.  So like the readings

24  that professors ask us to post for their classes and I also

25  manage the Makerspace.

```
1                    THE COURT:  Question 42 is whether you've ever
2      served on a jury before.  Would you tell us about your prior
3      jury experience.
4                    JUROR:  I was a juror on a trial for the Superior
5      Court.
6                    THE COURT:  Yep.
7                    JUROR:  Yep.  This was years ago.  I believe it
8      was two individuals were accused of threatening police
9      officers, so I served on that.
10                   THE COURT:  So it was a criminal case?
11                   JUROR:  Criminal case.
12                   THE COURT:  Was the jury able to reach a verdict?
13                   JUROR:  We did.
14                   THE COURT:  And what was the verdict?
15                   JUROR:  Not guilty.
16                   THE COURT:  Okay.  Were you the foreperson of that
17     jury?
18                   JUROR:  No.
19                   THE COURT:  Is there anything about that
20     experience that would make you uncomfortable being a juror
21     again or think you could not be a fair and impartial juror?
22                   JUROR:  Nothing really.  I mean, I think that
23     experience as it was happening, I had a lot of issues kind
24     of managing my stress about kind of passing a judgment on
25     someone but that was years ago and I feel like I've kind of
```

1   combatted that.

2              THE COURT:  You're older and wiser or something?

3              JUROR:  I'm sorry?

4              THE COURT:  You're older and wiser or something?

5              JUROR:  Somewhat.  We'll say that.

6              THE COURT:  Do you feel today that you would have

7   problems after you've heard all of the evidence and my

8   instruction on the law passing judgment one way or the other

9   based on the evidence and the law?

10             JUROR:  I don't think I would have issues.  I

11  don't think.

12             THE COURT:  Say that again?

13             JUROR:  I don't think I'd have issues.

14             THE COURT:  Okay.  And I'll ask counsel if they'd

15  like to ask some followup questions.

16             MR. DREHER:  Yes, Your Honor.  Thank you.

17                          **EXAMINATION**

18  BY MR. DREHER:

19  Q.  Ma'am, you told us that your sister-in-law and brother

20  were both attorneys?

21  A.  Mm-hmm.

22  Q.  Could you tell us what areas of law they practice in?

23  A.  Yeah, my sister-in-law was -- she works for the Federal

24  Trade Commission.  I think mergers and acquisitions in that

25  area.  And my brother, he no longer practices, but I think

1    an insurance company.

2    Q.  Do these two individuals ever speak to you about their

3    work?

4    A.  Yes.  They -- my sister-in-law specifically because she

5    still practices, so I've heard after cases like finished

6    what they were about and her piece of it.

7    Q.  And does she normally practice in the criminal side of

8    things?

9    A.  I don't think so.  I don't know actually.

10              THE COURT:  You said mergers and acquisitions.

11              JUROR:  Its mergers and acquisitions.  She does go

12   to trial.  She has been a trial attorney, so I'm not sure,

13   unfortunately, so.

14   BY MR. DREHER:

15   Q.  And this experience that you told us about in Superior

16   Court.  How long ago were you a juror?

17   A.  Probably 10-ish years ago.

18   Q.  Was that your only time being a juror, either both grand

19   or petit?

20   A.  I've done this before but never moved past kind of

21   sitting on a trial.

22   Q.  Was that in this courthouse or also --

23   A.  It was in this courthouse, yes.

24   Q.  Would this have been after the Superior Court

25   experience?

```
1     A.  Yes.  Yes it would have been after.

2              MR. DREHER:  Your Honor, I have no further

3     questions.

4              MR. SMOCK:  I don't have any followup questions.

5              THE COURT:  Okay.  All right.

6              Unless anybody has anything they want to say, I

7     think we can move on by asking you to come back not

8     tomorrow, but Thursday, and report to the jury lounge on the

9     fourth floor 10:00.

10             JUROR:  Okay.

11             THE COURT:  And Ms. Johnson will meet you and

12    other potential jurors there and we'll proceed.

13             JUROR:  Okay.

14             THE COURT:  Thank you very much.

15             JUROR:  Thank you.  Can I exit the same way?

16             THE COURT:  No, you can go out that way.

17             JUROR:  Thank you.

18             THE COURT:  If you've got all your belongings with

19    you.

20             JUROR:  I've got them.

21             THE COURT:  Who's next depends?

22             MS. JOHNSON:  0417.

23             THE COURT:  If you've got that person.

24             (Juror excused from courtroom)

25             (Juror present)
```

```
 1                    (Juror number 0417)

 2                         EXAMINATION

 3            THE COURT:  Please have a seat.  0417?

 4            MS. JOHNSON:  Yes, Judge.

 5            THE COURT:  Sir, if you don't mind, would you take

 6       off your mask and speak into the microphone.  Thank you.

 7            Are you juror number 417?

 8            JUROR:  Yes.

 9            THE COURT:  Okay.  I have a few questions for you

10       and the lawyers may have a few questions for you as well.

11            On the card that you filled out, you answered the

12       following questions, some of these questions I'll ask you

13       about.

14            It says that you answered the question number 6

15       that you have followed the news or watched videos about the

16       events of January 6th at the Capitol.

17            Could you tell us how you followed the events, how

18       frequently you followed the events, what you watch, and

19       read, and listen to.

20            JUROR:  On the day of the events I watched it

21       intently probably for five or six hours as it was happening.

22       Followed the news coverage after that.

23            I did a lot of reading about the events, both as a

24       news reporting and as opinion pieces.  And later on I

25       watched most of the hearings.
```

```
1              THE COURT:  Most of the hearings?

2              JUROR:  Yeah.

3              THE COURT:  And on television or on?

4              JUROR:  It was on probably MSNBC or NBC news,

5    yeah.

6              THE COURT:  And do you follow any particular

7    social media platform?

8              JUROR:  I'm on blogs, and Facebook, and Instagram

9    but I don't read, or post news, or anything like that to it.

10             THE COURT:  So you said you watched most of the

11   hearings.

12             Do you think that having watched the hearings and

13   having followed the events on the day and somewhat

14   afterwards would affect your ability to be a fair and

15   impartial juror in this case?

16             JUROR:  Probably to some degree would affect my

17   ability to be impartial, yes.

18             THE COURT:  Do you think you'd have difficulty

19   judging this case and this particular defendant, Mr.

20   Gossjankowski, based only on the evidence you hear in the

21   courtroom or would you be affected by other things you've

22   seen or heard?

23             JUROR:  I may be affected by all the things I've

24   seen and heard.  I can't specifically about this defendant,

25   of course, but just in general about the events of that day
```

1    would probably come into play when reviewing any evidence of

2    this case.

3         THE COURT:  Well, question number 12 is, from

4    based on what you have seen, or heard, or read.

5         Do you think that people who have been arrested

6    and charged for their involvement in the events of

7    January 6th are probably guilty of the charges brought

8    against them?

9         JUROR:  I believe so, yes.

10        THE COURT:  Okay.  I'll ask you one other question

11   and then we may take a break here or maybe a couple more

12   questions.

13        Would your opinion concerning President Trump or

14   his supporters make it difficult for you to be a fair and

15   impartial juror in this case?

16        JUROR:  Well, I have an opinion about it.  I'm not

17   sure you want me to sort of share it, but I just, my view of

18   that day's events, if not for the incitement then it may

19   have wound up just being a protest, but because of the

20   incitement it became a riot.  So in that sense it would

21   affect me.

22        THE COURT:  Okay.  All right.  Why don't we ask

23   you to wait outside for just a few minutes.

24        (Juror excused from courtroom)

25        THE COURT:  So there are some additional questions

1    which he answered, none relating to the events of

2    January 6th question 37, 41, 42.  But before we proceed I

3    wanted to ask whether there was a motion?

4             MR. SMOCK:  There is a motion to strike for cause.

5             THE COURT:  Okay.  And what's the government's

6    view?

7             MR. DREHER:  Your Honor, I would ask for some

8    followup as it relates to sort of putting these aside.

9             THE COURT:  You would like to ask followup?

10            MR. DREHER:  Yes, Your Honor.

11            THE COURT:  Well, then we'll bring him back.

12            (Juror present)

13            THE COURT:  So if you'd have a seat again.  I do

14   want to ask you a few more questions now that I see the

15   other answers on your card.

16            Have you, or members of your immediate family, or

17   close personal friends ever attended law school, worked as a

18   lawyer or worked in a law office or performed legal work,

19   investigative work?  Tell us about that, please.

20            JUROR:  My friends?  My friend from college went

21   to --

22            THE COURT:  Talk a little more into the

23   microphone, please.

24            JUROR:  I'm sorry.  A friend of mine from college

25   went to [indiscernible] and was later a partner in a firm, I

```
 1     forget which now.  But a younger who's recently graduated is

 2     now at, I think at Fried Frank in New York.

 3                  I've worked for law firms myself for about

 4     18 years in marketing.

 5                  THE COURT:  It was --

 6                  JUROR:  Yeah, but not in the legal area but just

 7     in --

 8                  THE COURT:  In marketing?

 9                  JUROR:  Marketing, yeah.

10                  THE COURT:  And what kind of work do you do now?

11                  JUROR:  I work for, can I say the organization?  I

12     work for PWC also in marketing.

13                  THE COURT:  In marketing?

14                  JUROR:  Yeah.

15                  THE COURT:  Okay.  Have you, members of your

16     family or close personal friends ever been the victim or a

17     witness to a crime?

18                  JUROR:  Yes.

19                  THE COURT:  Tell us about that, if you would,

20     please.

21                  JUROR:  Just in general.  I've been a city dweller

22     for about 32 years and most of my friends have been and so

23     just have been their share of muggings or beatings.

24                  THE COURT:  You've been a victim or you've been a

25     witness?
```

```
 1                    JUROR:  They have been, not me.

 2                    THE COURT:  Yeah.  Okay.

 3                    JUROR:  Yeah.

 4                    THE COURT:  And the last question you answered was

 5       about your prior jury service.  Would you tell us about

 6       that.

 7                    JUROR:  I forget when it was, it was many years

 8       ago, but it was in the Superior Court, surrounding basically

 9       I think it was the illegal possession of a firearm crossing

10       state lines.

11                    THE COURT:  So it was a criminal case?

12                    JUROR:  Yes.

13                    THE COURT:  Crossing state lines and illegal

14       possession of a firearm, as you recall?

15                    JUROR:  Specifically, I think a car full of guys

16       had a gun on their car and they crossed from Maryland to

17       D.C., got stopped by a police officer for running a red

18       light.  And that event is what made it a federal case, so,

19       yeah.

20                    THE COURT:  What was the verdict?  Do you

21       remember?

22                    JUROR:  We -- it was about a four-day trial and

23       then at the very end we were about to start deliberation, we

24       were called back in and we were said -- we were told that

25       our service was no longer needed.  They never said why
```

1     exactly.

2               THE COURT:  Okay.

3               JUROR:  So we didn't conclude the case as far as

4     the jury.

5               THE COURT:  Is that the only jury you've served

6     on?

7               JUROR:  Yes.

8               THE COURT:  Anything about that experience that

9     was uncomfortable for you, would make it difficult for you

10    to serve as a juror in this case?

11              JUROR:  Not particularly, no.

12              THE COURT:  Okay.  Questions?

13                              **EXAMINATION**

14    BY MR. DREHER:

15    Q.  Sir, earlier you told us that you would probably be

16    affected by what you had observed on January 6th when being

17    asked about the facts of this case.

18              One of the instructions that you'll receive is to

19    only consider what you hear in the courtroom when deciding

20    this case.

21              Do you believe that you would be able to follow

22    that instruction and put aside your outside experiences when

23    judging the facts of this case?

24    A.  I believe I can put them aside, yes.

25    Q.  Okay.  So just to --

1    A.  If that answers your question, I'm not sure.  Can I make

2    them vanish?  No.  But can I put them aside and look at sort

3    of the of the evidence in this case, objectively?  Yes.

4              MR. DREHER:  I have no further followup.  Thank

5    you.

6              THE COURT:  Questions, Mr. Smock?

7                           **EXAMINATION**

8    BY MR. SMOCK:

9    Q.  Hi.

10   A.  Hello.

11   Q.  So you mentioned that obviously you followed what was

12   happening on January 6th for much of the day, right?  And

13   you're --

14   A.  Largely, yes.  I work from home and I was either

15   watching it directly or I was in the background, but I was

16   certainly paying attention.

17   Q.  And you also mentioned that you followed news about it

18   during that day and days after?

19   A.  Correct.

20   Q.  And then you, I think you said you watched just about

21   the entire hearing, congressional hearings?

22   A.  I can't say for sure how much of it but it seemed like,

23   again, it was always on for days while I was at least

24   working.

25              So I do recall turning to it several times and

1    watching it directly.  Other times turning away from it,

2    just sort of hearing it.  That sort of attention.

3    Q.  What led you to decide to watch those hearings?

4    A.  I just was interested in it.  This is my city.  I live

5    here.  I mean, I live near Logan Circle.  This is almost my

6    backyard.  I can walk there very easily.

7            Although I think one of the questions was were you

8    directly affected by it.  I was not because of where I live,

9    but it just was.  I think more so if you were a D.C.

10   resident it affects you more.

11   Q.  Yeah, and I assume like many D.C. residents you sort of

12   had strong feelings about what happened on January 6th?

13   A.  I did.

14   Q.  And I assume it would be fair to say strong negative

15   feelings about those people who attacked the Capitol?

16   A.  Yes.

17   Q.  And those are feelings that you maintain to this day, I

18   assume?

19   A.  I would say my negative feelings towards them has

20   probably lessened as time has passed, but that's just more a

21   function of that gap of time that's done it.

22   Q.  And so as you sit here today, can you say with

23   confidence that those strong negative feelings you have

24   won't enter your mind as you consider the evidence in this

25   case or decide whether the government has met its burden in

1    this case?

2    A.  At this point I can say I don't have strong negative

3    feelings.  I probably did at the time.  And since then it's

4    -- I don't feel really the same way about it as I did then.

5           So to answer your question, I, yes, can probably

6    put them aside.

7    Q.  So you said probably.  I guess maybe I'm just trying to

8    figure out a way to articulate this.

9           I mean, there was a question, for example, about

10   whether your feelings about January 6th, and I'm

11   paraphrasing, would have an impact on your ability to be

12   fair and impartial and I think you said yes to that.

13          I'm trying to get a sense if we put this on a

14   scale of sort of zero, being completely confident that

15   nothing about your following the hearings and feelings about

16   January 6th would impact you, to five, being -- wait, let me

17   -- zero being you can't be sure that this will impact you at

18   all.

19          So five being you can be sure that you will place

20   it totally out of your mind as if you didn't have any

21   feelings about January 6th.  Where would you be on that

22   scale?

23   A.  Can I give you somewhere around a four and a half?

24   Q.  Oh, okay.

25   A.  4.5.  I would say I'm probably up near the five point

1    but that's to the point where I guess I forget.

2    Q.  And so I guess what I'm trying to get at is your

3    feelings about what happened on January 6th would remain

4    something that's present in your mind as you're considering

5    the facts of this case?

6    A.  You know, I would actually say let's not even use the

7    word feelings because that's not where I am at with it.  I

8    don't have feelings about it.  I have a negative impression

9    about it, but I don't have emotions about it.

10   Q.  Okay.

11   A.  If that makes a difference to you.

12   Q.  Can you tell us a little bit about what you meant when

13   you answered the question about believing that people who

14   were at the Capitol were likely guilty.

15   A.  Was that the actual question?  That if they were at the

16   Capitol they were likely guilty?

17           THE COURT:  The question was --

18           JUROR:  I think the question was, if someone is

19   arrested is it do you feel that they're more or likely

20   guilty.

21   BY MR. SMOCK:

22   Q.  Oh, and then --

23   A.  And then further on on that question I believe it said

24   if somebody's indicted, is it likely that they're also

25   guilty.  And I think I said in those cases, in my view --

1                    THE COURT:  Which question number is that?

2                    MR. SMOCK:  I believe it was number 12, Your

3      Honor.

4                    THE COURT:  Yeah.  The question was, "From what

5      you have heard, seen or read, do you think people who are

6      arrested for involvement in the events of January 6th at the

7      Capitol are likely guilty of the charges brought against

8      them?"

9                    JUROR:  That would be my feeling, yes.

10                    THE COURT:  That they're likely guilty?

11                    JUROR:  Yes.

12                    MR. SMOCK:  No further questions.

13                    THE COURT:  Anything further?

14                              **EXAMINATION**

15      BY MR. DREHER:

16      Q.  Sir, with the idea that there has been or at least

17      you'll be instructed that there has been an indictment but

18      you'll also be instructed to put that to the side, would you

19      be able to still put that aside when deciding the facts of

20      this case in a fair and impartial manner?

21      A.  I suppose I'm a little confused.  I have to hear those

22      or the instructions, is there an indictment or no, if you're

23      saying there is but we can't consider that.

24      Q.  So one of the instructions that I believe you'll

25      receive --

1    A.  Yeah.

2    Q.  -- is you shouldn't consider that as evidence in this

3    case, you should only consider the facts that are presented

4    by the witnesses or the exhibits that you receive.

5           Would you be able to put aside any of these

6    outside thoughts that you have about January 6th or whether

7    or not there was an indictment in this case when deciding

8    the facts of this case?

9    A.  I believe so.

10          MR. DREHER:  Your Honor, I have no further

11   followup.

12                        **EXAMINATION**

13          THE COURT:  Do you think you would be able to

14   follow my instruction that the defendant is presumed

15   innocent unless proven guilty beyond a reasonable doubt?

16          JUROR:  Yes.

17          THE COURT:  Would you hold the government to its

18   burden of proving guilt of this particular defendant beyond

19   a reasonable doubt?

20          JUROR:  Yeah.  According to your instructions on

21   that matter, yes.

22          THE COURT:  Anything else?

23          Okay.  Why don't you step out for a minute with

24   Ms. Johnson.

25          (Juror excused from courtroom)

```
 1              MR. SMOCK:  Your Honor, we'd move to strike for

 2    cause.

 3              I think what we're seeing is folks who sort of are

 4    giving their, what I would say is their accurate views on an

 5    inability to be impartial and that followups are sort of

 6    leading them down the road of trying to assure us that they

 7    will be okay.  I think in the end, though, this juror

 8    acknowledged that he believed that folks who were arrested

 9    were guilty.

10              He had said in response to the Court's questions

11    that, "Probably the experiences he had had following the

12    hearing would affect his ability to be impartial.  May be

13    affected by what he had seen and heard."

14              And ultimately, I confess that my scale question

15    was a bit unclear, but in the end couldn't be sure --

16              THE COURT:  It was like four and a half.

17              MR. SMOCK:  Right.  Couldn't be sure that he'd be

18    able to put his following of the hearing and his feelings

19    about what happened on that day as a resident of D.C. out of

20    his mind and so I think this is an instance in which a cause

21    strike is warranted.

22              I think, I mean, just stepping back, I would just

23    say that what we're seeing is the basis for our venue

24    motion, for our transfer of venue motion.  That we're being

25    forced ultimately essentially look aside at folks that in a
```

1    normal case that we would probably kick for cause anyway.

2    But so many of these jurors, and we're only in the

3    beginning, that are hedging.

4         And this man, I think while he was trying to, you

5    know, work with the Court and work with the government to

6    suggest an ability to be impartial, I don't think we can be

7    confident about that based on his answers.

8         MR. DREHER:  Your Honor, I would just point out

9    that the legal standard for a challenge for cause involves

10   whether or not the potential juror is able to follow this

11   Court's instructions and judge the case in a fair and

12   unbiased manner.

13        When asked those questions, the responses received

14   by this potential juror left me no suggestion otherwise that

15   he would not be able to put this outside information that he

16   has aside in determining the facts of this case.

17        So I would ask the Court not strike this potential

18   juror for cause and instead bring him back on Thursday.

19   Thank you.

20        THE COURT:  I'm going to deny the motion.

21        (Juror present)

22        THE COURT:  All right, sir.  We're going to ask

23   you to come back on Thursday.  We may have more some more

24   questions.  We'll finish the process.

25        So if you would come back Thursday, not tomorrow,

```
 1    but Thursday, 10:00 in the jury lounge on the fourth floor.

 2    Ms. Johnson will meet you down there.

 3                JUROR:  All right.

 4                THE COURT:  You can go out the back.  Thanks.

 5    Thanks very much.

 6                So next, 790, if 790 is available.

 7                MS. JOHNSON:  Yes.

 8                (Juror excused from courtroom)

 9                (Juror present)

10                      (Juror number 0790)

11                         EXAMINATION

12                THE COURT:  Please have a seat.

13                Would you take off your mask and speak into the

14    microphone, please.  Thank you very much.

15                You are juror 790, correct?

16                JUROR:  Yes.

17                THE COURT:  Okay.  So I have a couple of -- I'm

18    going to start at the back instead of the front.

19                The question was:  Do you have any physical,

20    health, medical problems, vision, language, hearing or

21    medication problems that might make it difficult for you to

22    pay attention, listen and serve on this jury?

23                JUROR:  I recently was diagnosed --

24                THE COURT:  You need to talk a little louder, I'm

25    sorry.
```

1          JUROR:  I'm being treated for ADD and anxiety.

2     And the ADD, the anxiety medication, if I take it, it makes

3     me drowsy.

4          I don't take that every day, just when I'm getting

5     really nervous.

6          THE COURT:  When you need it?

7          JUROR:  Yeah.

8          THE COURT:  And do you take it a particular time

9     of day or it just depends?

10         JUROR:  The anxiety medicine?  Just it's if it

11    happens if I'm getting anxious or really, really feeling a

12    panic attack coming.

13         THE COURT:  And does it -- it makes you tired?

14         JUROR:  Yes.  That's one of the side effects.

15         THE COURT:  And unable to focus.

16         JUROR:  It ends up exacerbating the ADD.  It's a

17    sick cycle.

18         THE COURT:  Do you -- there's another question you

19    answered and it had to do with how long the trial might go.

20    And I said that it might go through next week and possibly

21    deliberations would go into the following week and you

22    indicated that might cause you a hardship.

23         JUROR:  Yes.  I'm a divorced, single woman.  And

24    for the next three days I'm available because he's with his

25    father, but after that I'm responsible.  I don't have any

1    family in the area, so I'm responsible for taking him to

2    school, and picking him up, and his primary caretaker.  So

3    next week I wouldn't necessarily be available outside of the

4    school day.

5              THE COURT:  So, and how old is your child?

6              JUROR:  He's eight and a half.

7              THE COURT:  And what time do you normally drop him

8    off at school?

9              JUROR:  He has to be at school by 8:15 and then I

10   pick him up at 3:45.

11             THE COURT:  And there's nobody, if we -- if the

12   jury -- if we were in court until say 5:00 most days, is

13   there any alternative that you have for that period of time

14   from 3:45 to 5:00 or 5:30?

15             JUROR:  Unfortunately this week, yes, but next

16   week, no.

17             THE COURT:  Okay.  I want to ask one followup

18   question about the medication.

19             And I don't know enough about ADD and panic

20   attacks, but do you have the sense -- have you ever served

21   on a jury before?

22             JUROR:  No, I've never gone through this process

23   before.

24             THE COURT:  Do you have the sense from today or

25   what we've been talking about that this experience itself

1    might be anxiety producing?

2              JUROR:  Just being here is a little bit -- I feel

3    a little nervous.

4              THE COURT:  Okay.  Does anybody want to ask -- let

5    me look at one other thing before I ask this question.

6              Does anybody want to ask any followup questions on

7    what we've discussed so far?

8              MR. DREHER:  No thank you, Your Honor.

9              MR. SMOCK:  No.

10             THE COURT:  Okay.  Why don't you go back with Ms.

11   Johnson for a minute to the other room and we'll be back

12   with you in a minute or two.

13             (Juror excused from courtroom)

14             THE COURT:  I don't know what your thoughts are.

15             I mean, I've had experiences in other cases where

16   jurors will say, you know, my child can stay after school

17   with doing something or another, or I've got a relative or a

18   neighbor that can look after the child for an hour or two.

19   That's not what she's saying, although we didn't explore it

20   all that deeply.

21             But in view of the two answers she's given us so

22   far, I wonder what your views are, otherwise we can go

23   through the other questions.

24             MR. DREHER:  Your Honor, the government would have

25   no objection to striking for cause based on her answers, not

```
 1    only to the medication causing drowsiness, as I believe some

 2    of the depictions in this trial will be very, perhaps,

 3    anxiety-inducing, but also the caretaking function of her

 4    young child.

 5              MR. SMOCK:  No objection.

 6              THE COURT:  Okay.  Thank you.

 7              (Juror present)

 8              THE COURT:  Okay.  You don't have to sit down.

 9              So we're going to excuse you from this jury.  She

10    can go back to the fourth floor jury lounge and tell them

11    you've been excused.  And you might also tell them about

12    your scheduling problems for next week and see what they

13    have to say.  But go back and talk to them.

14              JUROR:  Okay.

15              THE COURT:  Tell them you've been excused.

16              JUROR:  Okay.

17              THE COURT:  Thanks so much.

18              All right.  1236 is next if available.

19              (Juror excused)

20              (Juror present)

21                        (Juror number 1236)

22              THE COURT:  Just have a seat.

23              And please take off your mask and speak into the

24    microphone.  We've got a few questions for you.

25              You're juror number 1236, correct?
```

```
 1                    JUROR:  Yes.

 2                    THE COURT:  Could you first tell us a little bit

 3         about your job.  It says you're a consultant, but what

 4         exactly do you do?

 5                    JUROR:  Oh, I do business transformation

 6         consulting for life insurance -- group and life insurance

 7         companies.

 8                    THE COURT:  For what kind of company?

 9                    JUROR:  Group and life insurance companies.

10                    THE COURT:  One of the questions you answered was

11         number 6 and asked you whether you followed the news or

12         watched videos about the events of January 6th at the

13         Capitol.

14                    Could you tell us a little bit, you know, what you

15         watch, what you listen to, how much of this have you looked

16         at and heard about?

17                    JUROR:  Yeah.  I mean, I think everyone has seen

18         some sort of news coverage on it.  I don't recall watching

19         anything in depth or reading anything in depth.

20                    As it was happening live I was living in Chinatown

21         at the time, so I was watching just to see if there was

22         anything that was going to affect me.

23                    But, yeah, I've seen the pictures that I feel like

24         that are kind of plastered everywhere and, you know, heard

25         some things, but I haven't read any particular articles or
```

1      anything that I remember.

2                  THE COURT:  So since that date you have or have

3      not followed it closely?

4                  JUROR:  Not very closely.  I know broad terms that

5      what's happening.

6                  THE COURT:  Did you watch any of the hearings on

7      before Congress.

8                  JUROR:  No.

9                  THE COURT:  Okay.

10                 But from what you've heard, or seen, or read, do

11     you think that people -- this is question 12.

12                 JUROR:  Mm-hmm.

13                 THE COURT:  People who have been arrested or

14     charged for involvement in those events on January 6th are

15     probably guilty of the charges brought against them?

16                 JUROR:  I was a little confused by that question.

17     I think it depends on what charge.

18                 If it was trespassing and you're arrested where

19     you're not supposed to be, I feel like that's proof enough,

20     but I don't think they're automatically guilty of all

21     charges.

22                 THE COURT:  And would you be -- are you willing to

23     listen to the evidence in this case --

24                 JUROR:  Yes.

25                 THE COURT:  -- about this defendant, Mr.

1     Gossjankowski's, activities on January 6th and decide this

2     case based only on the evidence you hear and see in the

3     courtroom?

4              JUROR:  Yes.

5              THE COURT:  And would you follow my instructions

6     on the law if you're picked for the jury?

7              JUROR:  Yes.

8              THE COURT:  I asked whether you or, number 41, you

9     or any members of your immediate family, or close personal

10    friends have ever been a victim of a crime or a witness to a

11    crime.  Would you tell us about that, please.

12             JUROR:  Yeah.  Two close friends of mine were

13    pickpocketed or robbed and a good friend of mine was

14    sexually assaulted in college.

15             THE COURT:  In college?

16             JUROR:  Yes.

17             THE COURT:  And was that around here or someplace

18    else?

19             JUROR:  It was down in the University of Virginia.

20             THE COURT:  Okay.  And the pickpockets around here

21    or someplace else?

22             JUROR:  No, while studying abroad in Madrid.

23             THE COURT:  Okay.  Questions?  Followup questions

24    from anybody?

25             MR. DREHER:  None from the government.

```
 1                MR. SMOCK:  No thank you.

 2                THE COURT:  Okay.  All right.

 3                So here's what we're going to ask of you.  I'd

 4     like you to come back not tomorrow.

 5                JUROR:  Mm-hmm.

 6                THE COURT:  But Thursday morning at 10:00 and go

 7     to the jury lounge at the fourth floor.

 8                JUROR:  Do you mind if I take out my phone to

 9     write this down?

10                (Pause in proceedings)

11                THE COURT:  Thursday morning at 10:00.

12                JUROR:  Yep.

13                THE COURT:  Fourth floor.

14                Ms. Johnson will meet you and other potential

15     jurors there and we'll finish this process and pick a jury.

16                JUROR:  Okay.

17                THE COURT:  Thank you for your patience today.

18                JUROR:  Am I all good for today?

19                THE COURT:  You are done for today.

20                JUROR:  Okay.  Thank you so much.

21                THE COURT:  And you can go out the backdoor --

22     actually the front door.  Thanks so much.

23                (Juror excused)

24                THE COURT:  All righty.  We are going to move on

25     if we can to number 1474.
```

```
 1                    (Juror present)

 2                 (Juror number 1474)

 3                      EXAMINATION

 4          THE COURT:  Have a seat, sir.  Good afternoon.

 5          JUROR:  Good afternoon.

 6          THE COURT:  Yeah, please take it off so we can all

 7    hear you.

 8          So you're a retired lawyer?

 9          JUROR:  Yes.

10          THE COURT:  Aren't you too young to retire?

11          JUROR:  So far it's working for me.

12          THE COURT:  Could you tell us a little bit about

13    your legal career.

14          JUROR:  Private practice, Steptoe & Johnson

15    primarily antitrust law.

16          THE COURT:  What kind of law?

17          JUROR:  Antitrust law.  Sorry, too far from the

18    microphone.  So criminal defense, civil defense, mergers.

19          THE COURT:  Did you ever have a case before me, do

20    you know?

21          JUROR:  Your Honor, not directly.  I was racking

22    my brains.  I've had partners before you.

23          THE COURT:  Yeah.

24          JUROR:  But I don't think I was directly involved

25    in any of them.
```

1          THE COURT:  Okay.  So going back to some of the

2   earlier questions that you answered on the card.

3          JUROR:  Mm-hmm.

4          THE COURT:  Number 6 was:  Have you followed the

5   news or watched videos about the events of January 6th at

6   the Capitol?

7          Could you tell us a little bit about it.  How you

8   followed it, how frequently, what you've watched, listened

9   to, et cetera.

10          JUROR:  Well, overall just watching the news or to

11   be more precise reading it.

12          I saw some of the hearings but not all of them.

13   My news is primarily written news, New York Times,

14   Washington Post, Wall Street Journal.  Don't do social

15   media.  Don't at all.  Don't listen to the radio for news.

16   I do listen to podcasts and the economists.

17          THE COURT:  Okay.

18          JUROR:  There was some coverage on all of those.

19   And so to the extent that I was reading it, as a daily news

20   item I was reading it.

21          THE COURT:  So do you think that the exposure that

22   you have had would make it difficult for you to be a fair

23   and impartial juror and decide the case just based on the

24   evidence you hear in this courtroom, see in this courtroom?

25          JUROR:  No, I do not.  It would be no problem.

1          THE COURT:  But from what you've heard, seen or

2    read, do you think that people who were arrested or charged

3    in the January 6th events are likely guilty of the charges

4    brought against them?

5          JUROR:  Somewhat nuance to answer.

6          I've done some criminal defense work, white

7    collar.  My experience with that has been that by and large

8    but not universally, an arrest has been correlated highly

9    with guilt of some kind.

10          Charging decisions are a different matter.  And

11   whether there's adequate proof and whether the prosecution

12   actually can deliver a case is definitely another matter and

13   I've made a living off of that.

14          So I have a prior statistical expectation that

15   there's probably something there as a general matter once

16   you get to an arrest.

17          With respect to the specific events here, I have

18   absolutely no sense one way or the other.  To the contrary,

19   I have suppose a -- there are a lot of arrests that I've

20   read about.

21          THE COURT:  Mm-hmm.

22          JUROR:  There are a lot of opportunities for

23   error.

24          THE COURT:  And you also understand probably

25   better than most that the government always have the burden

1        of proving guilt beyond a reasonable doubt.

2               JUROR:  Indeed.  And as a lawyer I have taken it

3        very seriously that that has a real meaning.  And I believe

4        that I would have no problem following that rule.

5               THE COURT:  Okay.  Other than yourself, are there

6        members of your immediate family -- the question is:  Are

7        there members of your immediate family or close friends have

8        ever worked in the criminal justice system?

9               And the next question is:  Or ever attended law

10       school, or worked as a lawyer, or worked in a law office.

11              Probably most of your friends have attended law

12       school or worked in a law office.

13              JUROR:  I have quite a few friends.  I also have a

14       brother who's a practicing lawyer and my father was a

15       practicing lawyer.  And as I think about it, he was actually

16       in the Carter administration.  He was a Deputy Assistant

17       Attorney General and he had a trust division with some a

18       criminal responsibility at least at a high level.

19              THE COURT:  Yes.

20              JUROR:  He was the legislative deputy so he didn't

21       -- he was in the main chain.  So, yes is an answer.

22              THE COURT:  Okay.

23              JUROR:  But it's that kind.

24              THE COURT:  Any friends that worked in the

25       criminal justice system, public defender, probation,

```
 1    correctional facility, or are these all lawyers that you're
 2    thinking about?
 3              JUROR:  So some lawyers.  And some who have spent
 4    time in the Public Defender's Office.
 5              THE COURT:  Okay.  Any D.C. public defenders?
 6              JUROR:  Not in D.C., well, I've known people but I
 7    wouldn't say friends, but friends elsewhere in other cities.
 8              THE COURT:  Okay.
 9              JUROR:  And I don't know anybody over there at the
10    moment.
11              THE COURT:  All right.  Questions?
12                            EXAMINATION
13    BY MR. DREHER:
14    Q.  Good afternoon, sir.  Do you maintain your bar license?
15    A.  I'm in essentially retired status.  I'm not an active
16    member but I'm still a member in Maryland and D.C. bars.
17              THE COURT:  Which means that you don't have to pay
18    dues.
19              JUROR:  I don't have to pay dues, indeed.
20    Inactive status is a technical term.
21    BY MR. DREHER:
22    Q.  So do you still take cases?  I'm guessing no.
23    A.  No, I do not.
24    Q.  How long ago was it that you worked for --
25    A.  Steptoe & Johnson?
```

1     Q.  Yeah, Steptoe & Johnson.

2     A.  Formal retirement was effective 1/1/2000 [sic].  I

3     stopped taking cases about a year before so 1/1/19.

4              THE COURT:  Well, so you retired in 2000?

5              JUROR:  I misspoke, 2020.

6              THE COURT:  Okay.

7              JUROR:  Sorry.

8              THE COURT:  I thought you maybe you had misspoke.

9              JUROR:  Thank you for correcting me, Your Honor.

10    Age-wise it would have been tough.  So I apologize, 2020 and

11    2019 were the two dates in question.

12    BY MR. DREHER:

13    Q.  Okay.  When did you start there?

14    A.  I have to think about this.  I think my formal full-time

15    employment was 1992.

16    Q.  Okay.  And was it while there that you accepted criminal

17    cases?

18    A.  Yes.

19    Q.  Yep.

20    A.  Yes.  I've only practiced at Steptoe and then at a

21    German firm slightly before that.

22    Q.  Okay.

23              THE COURT:  So the criminal cases that you did the

24    law firm were white color?

25              JUROR:  White collar.  Defending corporations in

```
 1    price fixing and some other criminal antitrust cases.

 2              MR. DREHER:  I have no further followup.

 3                           EXAMINATION

 4    BY MR. SMOCK:

 5    Q.  Hello.

 6    A.  Greetings.

 7    Q.  I wanted to ask about whether you've sort of thought

 8    about what it means to be a lawyer serving on a jury.  And

 9    obviously you have some specific knowledge that other jurors

10    wouldn't have.

11              Have you thought a little bit about how you would

12    handle that?

13    A.  Yes.

14    Q.  Can you talk about that a bit?

15    A.  At various times in my career I have thought different

16    things about it.

17              Early on, you know, I mean I clerked for a judge

18    and was always curious about what goes on inside a jury room

19    and that continued after I started practicing.

20              Been very curious about, you know, I've run mock

21    trials, you know, participated in mock jury exercises, so I

22    have an interest, it's in a sense academic trying to

23    understand how that works in practice.  I have not done that

24    before, not been in a jury.  So I've thought about those

25    sorts of things.
```

```
 1              I have had friends who have been on juries who are
 2    lawyers who have had a variety of experiences.  Some of them
 3    have been asked to play foreman roles.  Some of them have
 4    talked to me about that experience and so on.  I have no --
 5    I honestly haven't really thought too much about that, I've
 6    just heard stories about that.
 7              So that's the only other context in which sort of
 8    come to mind.
 9    Q.  Okay.  I appreciate you saying that.
10              I think what I'm sort of getting at is do you feel
11    comfortable that you could sort of serve as a coequal jury
12    with other jurors on a case?
13    A.  Yes, I do.
14              THE COURT:  And would you follow my instructions
15    on the law?
16              JUROR:  Yes, I would.
17              MR. SMOCK:  Thank you, I appreciate it.
18              THE COURT:  Okay.  So I think we will ask you to
19    come back on Thursday, not tomorrow, but Thursday at 10:00
20    and report to the jury lounge on the fourth floor.
21              Ms. Johnson will meet everybody there and then
22    we'll finish this process Thursday morning.
23              JUROR:  10:00, all right.
24              THE COURT:  10:00.
25              JUROR:  Thank you, Your Honor.
```

```
 1                    THE COURT:  Thanks everybody.

 2                    JUROR:  May I exit out the front?

 3                    THE COURT:  You can go out that way, yes.  Thank

 4       you.

 5                    JUROR:  You're welcome.

 6                    THE COURT:  So, yes, sir.

 7                    MR. SMOCK:  Your Honor, I think it's okay.

 8                    THE COURT:  Wait until he leaves.

 9                    (Juror excused from courtroom)

10                    MR. SMOCK:  I recognize I'm being a pest about

11       this, but just if I could ask that the Court can identify,

12       maybe before they start or something what --

13                    THE COURT:  I'm trying to do that.

14                    MR. SMOCK:  I know, Your Honor.

15                    THE COURT:  You know, unfortunately some of them

16       are so related that we save time if I group them.  But you

17       know that the questions about January 6th are all within the

18       first 15 questions, so I'll do my best.

19                    MR. SMOCK:  Okay.  It's just so the record is

20       clear about what they're saying yes to is the only reason.

21                    THE COURT:  Okay.  So one quick story and then

22       we'll go back.

23                    My late friend, Judge Silberman, who only recently

24       died, was called to jury duty one time and in Superior

25       Court.
```

1           As you may know, if you are appointed by the

2    President at any job and confirmed by the Senate you do not

3    have to serve on a jury in federal court but you do in

4    Superior Court.  So Justice Ginsburg was over there one

5    time.

6           So Larry Silberman goes over there and the judge

7    calls him to the bench with the lawyers and he says, Now

8    Judge Silberman, we all know who you are.  Are you prepared

9    to say you would follow my instructions of the law no matter

10   what you think?  And he said, "If you're right I will."

11          So Mr. Ewing here did not say that.  So I am

12   comfortable with him.  I think I remember who his father

13   was, a justice many, many years ago.

14          Okay.  Moving right along.  We are ready to for

15   the next person.

16          MS. JOHNSON:  Juror 2027.

17          THE COURT:  2027, if that person is here and

18   available.

19          (Juror present)

20                    **(Juror number 2027)**

21                     **EXAMINATION**

22          THE COURT:  Please have a seat.  Good afternoon.

23          JUROR:  Good afternoon.

24          THE COURT:  If you don't mind, would you take off

25   your mask so we can all hear you a little better.

1              You are number 2027, correct?

2              JUROR:  Yes.

3              THE COURT:  Good.  I have a few questions for you,

4      the lawyers may have a few questions for you.

5              And first was question number 3 on the list.  Do

6      you live or work at or near the U.S. Capitol building?

7              JUROR:  Yes, near enough.  I work for a government

8      publishing office which is near --

9              THE COURT:  Move the microphone a little closer.

10             JUROR:  I work for Government Publishing Office,

11     GPO, which is near the Capitol.  So I didn't know how so to

12     answer that.

13             THE COURT:  Is that still up north Capitol Street?

14             JUROR:  Yeah.

15             THE COURT:  At about what, H or something?

16             JUROR:  H, G and H.

17             THE COURT:  Yeah, okay.  So the Government

18     Printing Office?

19             JUROR:  Yes.

20             THE COURT:  To what extent or how closely have you

21     followed the news or watched videos about the events that

22     took place at the Capitol on January 6th?

23             JUROR:  Initially I followed it enough because I

24     think a day or two after I had to go into the office.  So

25     when I went into the office I couldn't really get to work

1    easily because everything was just like very bare and

2    shutdown.  And I followed it enough.  And I live in D.C., so

3    close.

4              THE COURT:  Were you at home on January 6th?

5              JUROR:  I was.

6              THE COURT:  And did you watch some of it on

7    television that day?

8              JUROR:  Yes, I did.

9              THE COURT:  And since then have you read a lot

10    about it, followed it?

11              JUROR:  Honestly, no.

12              THE COURT:  Okay.  Are you on any particular

13    social media?

14              JUROR:  No.

15              THE COURT:  Okay.  Do you -- okay.

16              I asked in question number 11 whether you had

17    viewed or listened to any parts of the congressional

18    hearings related to the January 6th.

19              JUROR:  Yes.  I just initially when it first came

20    out because I think the one about the Congressman, Stacy

21    Plaskett, she is from where I grew up, which is St. Croix

22    U.S. Virgin Islands, so I just watched a little bit to watch

23    her.

24              THE COURT:  Okay.  So you were watching because

25    she was --

```
 1                    JUROR:  Yeah.

 2                    THE COURT:  -- somebody that you knew of?

 3                    JUROR:  Yes.

 4                    THE COURT:  And how much of those hearings do you

 5       think you saw?

 6                    JUROR:  Not a whole lot because I tune out the

 7       news.  It's becoming overwhelming.

 8                    THE COURT:  Do you think you could be a fair and

 9       impartial juror in a case like this?

10                    JUROR:  Yes.

11                    THE COURT:  Okay.  Turning to some other topics.

12                    On question 16 I asked whether you were deaf or

13       hard of hearing, or had any immediate family members, or

14       close personal friends, or coworkers who are deaf or hard of

15       hearing?

16                    JUROR:  Yes.  One of my friends, her daughter's

17       hearing impaired.  So while I don't know sign language, we

18       grow up with her and so she's the one that I know.

19                    THE COURT:  Do you see her frequently?

20                    JUROR:  She moved away but she -- while she was

21       here at Gallaudet and --

22                    THE COURT:  Say that again?

23                    JUROR:  While she was here and going to school at

24       Gallaudet we frequented enough, Gallaudet University.

25                    THE COURT:  Did she, if you know, use American
```

1    Sign Language?

2                 JUROR:  She did, but I wish I did.

3                 THE COURT:  How did you communicate with her?

4                 JUROR:  She could actually read lips too, so, with

5    my hand gestures too.

6                 THE COURT:  Okay.  And she's somebody you grew up

7    with?

8                 JUROR:  Yeah.  She actually was born in the U.S.

9    Virgin Islands and I grew up there too.

10               THE COURT:  And she came here for school at

11   Gallaudet.

12               JUROR:  Her mom moved here and then since

13   Gallaudet was the only school there, she actually went there

14   and graduated with her master's.

15               THE COURT:  She was there for about how many years

16   then?

17               JUROR:  So the four years plus the two, so six.

18               THE COURT:  Okay.  And then did she leave the area

19   after that?

20               JUROR:  Yeah.

21               THE COURT:  Back to the Virgin Islands?

22               JUROR:  No, she wished.  She moved to Arizona

23   because she got a job there, counseling I think.  There was

24   another hearing impaired school there.

25               THE COURT:  So you, yourself, don't have the

1    ability to communicate with American Sign Language?

2                JUROR:  No.

3                THE COURT:  Do you have the ability to understand

4    any of it or any other sign language?

5                JUROR:  Just by -- like I said, she knew how to

6    read lips so she once -- I don't even know how I understood

7    her but she understood me, but we understood each other.

8                THE COURT:  So you certainly read her lips --

9                JUROR:  Yeah, Mm-hmm.

10               THE COURT:  -- when dealing with her.

11               JUROR:  Mm-hmm.

12               THE COURT:  And then question 19 asked whether you

13   had friends or relatives who participated in programs at

14   Gallaudet, and that's the woman you're referring to?

15               JUROR:  Yes.

16               THE COURT:  You're at the Government Printing

17   Office but -- so you're a Certified Public Accountant there?

18               JUROR:  Yes.

19               THE COURT:  The next question you answered was

20   number 35, which asked whether any -- whether you

21   personally, or members of your immediate family, or close

22   personal friends had worked for a law enforcement agency,

23   including D.C. Police, or FBI Secret Service, Capitol

24   Police, prosecutor's offices.

25               JUROR:  Yeah, so one of my real good friends,

1      she's a prosecutor, but it's a different agency -- it's a

2      state -- in Pinellas County in Florida.

3                  THE COURT:  In Florida?

4                  JUROR:  Yeah, but she worked for children and

5      family division, yeah.

6                  THE COURT:  So she's a lawyer?

7                  JUROR:  She's a lawyer in the district.

8                  THE COURT:  And she prosecutes cases in the

9      juvenile area, a family area?

10                 JUROR:  Yes.

11                 THE COURT:  Is that your understanding?

12                 JUROR:  Yes.

13                 THE COURT:  In Florida?

14                 JUROR:  In Florida, Pinellas County.

15                 THE COURT:  I think the last question you answered

16     was number 41.  Have you, or members of your immediate

17     family, or close personal friends ever been the victim of or

18     a witness to a crime?

19                 JUROR:  Yes.

20                 THE COURT:  Tell us a little bit about that if you

21     would.

22                 JUROR:  My son, he was freshman in college and he

23     had just come back here in the Bowie area and he was held up

24     by gunpoint and they robbed his phone, and sneakers, and

25     stuff like that.

1                  THE COURT:  Was he injured?

2                  JUROR:  Yeah, they hit him over the head with the

3        gun.

4                  THE COURT:  Do you know whether anybody was ever

5        arrested as a result of that?

6                  JUROR:  Not for that particular charge because

7        they just didn't have enough evidence for the person that

8        did it because they -- but just because they used a credit

9        -- they said they used the credit card at McDonald's and

10       McDonald's didn't have any footage and things like that, so

11       that person was not prosecuted for that particular charge.

12                 THE COURT:  But was he prosecuted for something

13       else?

14                 JUROR:  For something else.  Because they found

15       the credit cards and everything on the person.  On the

16       person, yeah.

17                 THE COURT:  Did your son testify?

18                 JUROR:  No.  No, he did not.  He went back to

19       school.

20                 THE COURT:  Okay.  Followup questions?

21                 JUROR:  Yes.

22                              **EXAMINATION**

23       BY MR. DREHER:

24       Q.  Good afternoon, ma'am.

25       A.  Good afternoon.

1    Q.  With your son's experience did you have the impression

2    that he was treated fairly throughout his interactions with

3    the police?

4    A.  Definitely.  Most definitely.  Definitely.

5    Q.  So is it safe to say then there was nothing about that

6    experience that would provide you with any sort of opinion

7    about police officers?

8    A.  No, not with that experience.  They were very fair.

9    Q.  And then you also told us about a friend that you grew

10   up with who attended Gallaudet University?

11   A.  Yes.

12   Q.  Can you tell us approximately when that individual

13   attended Gallaudet University?

14   A.  My brain.  So we're in 2023?

15   Q.  Yes.

16   A.  They must have graduated may 2016, '17, so they went six

17   years prior to that, so, yeah.

18   Q.  Okay.  And when the two of you would, I guess hang out

19   is the best way to put it, would you see this individual

20   interact with other individuals who were deaf?

21   A.  Yes.  Their friends would come over from college to the

22   mom's house.

23   Q.  Okay.

24   A.  Yeah.

25   Q.  Would those interactions ever involve you as well?

1      A.  Yeah.

2      Q.  Okay.

3      A.  Yeah.

4      Q.  At any point during those interactions did you ever feel

5      left out or unable to communicate in any way?

6      A.  No.  Not at all.  Not at all.  I just wished I knew sign

7      language.  That would help them understand me too.

8      Q.  And then, finally, you told us about the difficulty that

9      you had getting into the office after January 6?

10     A.  Mm-hmm.

11     Q.  Was there any other, I guess, direct effects of

12     January 6th that you felt?

13     A.  Not directly, but indirectly.

14     Q.  What are those?

15     A.  Because it was just the atmosphere and the mood of the

16     whole city, of the whole country.

17     Q.  And so you were scheduled to be at home on January 6th?

18     A.  Yes, I was teleworking.

19     Q.  Okay.

20             MR. DREHER:  Your Honor.  I have no further

21     followup.  Thank you.

22                          **EXAMINATION**

23     BY MR. SMOCK:

24     Q.  Hello.

25     A.  Hi.

1    Q.  I just wanted to follow up on the question that was just

2    asked of you and I think you talked about the mood of the

3    city after January 6th.

4            Can you talk a little bit about that and how it

5    impacted you?

6    A.  Because I was working from home and I didn't know -- I

7    actually I didn't know when you were watching television you

8    just didn't know what else was going to happen.  I live

9    close enough or far enough so that I just -- we just didn't

10   know.  And that fear of the unknown, that's what scared me.

11   Q.  So it was -- you've described fear.

12   A.  Mm-hmm.

13   Q.  Did you have any other emotions?  I mean, that --

14   A.  I was -- I was anxious.  And watching what was on

15   television and watching what was going on, that was

16   unexpected and so therefore the fear of the unknown and what

17   else could happen.

18   Q.  And is that a feeling that you continued to have?

19   A.  Not necessarily so.

20   Q.  Okay.  A number of people in this city had feelings of

21   anger after what happened on January 6th.  Is that a feeling

22   that you shared?

23   A.  Yeah.  At the time, yes.

24   Q.  And how about now?

25   A.  That too.

1    Q.  Okay.

2    A.  Too.

3    Q.  And as you sit here, are you certain that you would be

4    able to separate that anger that you continue to feel from

5    what you're considering in this case since it does involve

6    January 6th?

7    A.  Yes.

8    Q.  You're confident of that?

9    A.  Yeah.

10   Q.  Okay.  How can you be confident of that, I guess?

11   A.  Because facts are facts.

12   Q.  Okay.  So you feel confident that you can separate sort

13   of your understandable emotions from the facts?

14   A.  Yeah.

15   Q.  I appreciate that.

16        One quick question, I may have gotten this mixed

17   up.  It was your friend's daughter who --

18   A.  Yeah.

19   Q.  -- was deaf?

20   A.  Yeah.

21   Q.  How could you tell that she could understand you?

22   A.  Well, she could respond to me.

23   Q.  Okay.  And did she understand everything you were saying

24   or was it something --

25   A.  Not word for word.  And I couldn't understand because

```
1    she would mumble sounds.

2    Q.  Okay.

3    A.  And so and then her mom would be there also.  Her mom

4    knew a little bit of sign language so we also communicated.

5    Q.  Okay.

6    A.  And then she fell, you know, and after that two people

7    text, so.

8    Q.  So you're aware that not every deaf person is able to

9    lip read, am I right?

10   A.  Yeah, I do know that.

11   Q.  Okay.  Thank you.

12   A.  You're welcome.

13         THE COURT:  Why don't we get you wait outside just

14   for a minute or two with Ms. Johnson while I talk to the

15   lawyers and then we'll see if we have any more questions for

16   you.

17         JUROR:  Okay.

18         (Juror excused from courtroom)

19         THE COURT:  Anything anybody wants to say about

20   number 2027?

21         MR. DREHER:  No, Your Honor.

22         MR. SMOCK:  No, Your Honor.

23         THE COURT:  Okay.  Thank you.

24         (Juror present)

25         THE COURT:  Thank you.  So we're going to ask you
```

```
 1        if you would come back on Thursday morning, not tomorrow,

 2        Thursday morning at 10:00.  Go to the jury lounge.  You can

 3        make a note, put it on your phone.

 4              Go to the jury lounge Thursday morning at 10:00.

 5        Ms. Johnson will meet you down there.

 6              (Juror excused from courtroom)

 7              THE COURT:  Before you get the next person, I want

 8        to just say something.

 9              So it's 3:35.  We've gotten through 12 people.  We

10        were hoping to get through 35 people.  And so I propose that

11        we let some of these people who have been sitting there go

12        back -- go home until tomorrow.  The question is how many we

13        can fairly let go.

14              If we do six more, we will have finished what we

15        intended to accomplish in the morning.  I don't know whether

16        we think we can do 10 or 12 more, but I haven't looked at

17        the cards to see how extensive they are.  But maybe we

18        should let, I don't know maybe we should keep -- I don't

19        know.  What do you suggest?

20              MR. DREHER:  Your Honor, I would suggest that it

21        makes sense to keep the groupings that we've already

22        identified together.

23              THE COURT:  Okay.  And see what we can accomplish?

24              MR. DREHER:  Yes, Your Honor.

25              THE COURT:  That makes logical sense.  And,
```

1     therefore, we would let group number 4 go, but keep number 3

2     and hope we can get through as many of them as we can.

3     We're in group 2 now and we have about six more to go in

4     group 2.

5              So if we let group 4 go, we would keep through

6     line 27 on the list, number 1478, right?

7              So let's try Mr. Dreher's suggestion.  I hope that

8     we can all be a little more efficient in the next hour and a

9     half.  Let me ask Ms. Johnson to bring in number --

10              MS. JOHNSON:  1661.

11              THE COURT:  1661 and then she can release group 4,

12    which begins with number 1640.

13              MS. JOHNSON:  You said 16 -- okay.  So that's

14    1640, line 28?

15              THE COURT:  I think it runs through 831.

16              MS. JOHNSON:  Yes, okay.

17              THE COURT:  All right.  So let's bring in 1661.

18              MS. JOHNSON:  And they'll be told to return

19    tomorrow at --

20              THE COURT:  What time have we told everybody else,

21    9:30?

22              JUROR:  We haven't told anyone for tomorrow.

23              THE COURT:  Well, people we've released, what did

24    we tell them?

25              MS. JOHNSON:  Oh, yeah.  9:30 and then a 1:30

1    group.

2              THE COURT:  Okay.  We'll have this group come at

3    9:30 also.

4              MS. JOHNSON:  9:30.

5              THE COURT:  So try and keep them in order, even

6    though --

7              MS. JOHNSON:  Okay.

8              THE COURT:  All right.  So next is 1661.

9              (Juror present)

10                     **(Juror number 1661)**

11                        **EXAMINATION**

12             THE COURT:  Right here.  Thank you.

13             JUROR:  Oh, that's terrifying.

14             THE COURT:  Good afternoon.  How are you?

15             JUROR:  Good afternoon.

16             THE COURT:  Would you mind taking off your mask so

17   we can all hear?

18             JUROR:  No problem.

19             THE COURT:  You are number 1661, correct?

20             JUROR:  Yes, sir.

21             THE COURT:  So we want to ask you some followup

22   questions based on what you put down on the card.

23             The first question is whether you live or work at

24   or near the U.S. Capitol.

25             JUROR:  Yeah, I work on 500 C Street.

1          THE COURT:  Work where?

2          JUROR:  500 C Street.

3          THE COURT:  And what do you do?  Where do you do?

4          JUROR:  FEMA.

5          THE COURT:  FEMA.

6          JUROR:  Mm-hmm.

7          THE COURT:  Okay.  Well, FEMA's been busy.

8          JUROR:  A little.

9          THE COURT:  What do you do there?

10          JUROR:  I work in policy.

11          THE COURT:  Okay.  Program analyst it says.

12   What's your educational background?

13          JUROR:  I have a master's in public international

14   affairs.

15          THE COURT:  So the next question was whether you

16   followed the events of January 6th at the Capitol.  And we'd

17   like to know how closely you followed it, how you followed

18   it.

19          JUROR:  As closely as local news because it was

20   local and I live here, so nightly news.

21          Followed it via Twitter.  Mostly just Twitter, not

22   really anything else.  And other news, like national news

23   sources.

24          THE COURT:  So after the day of the events did you

25   continue to follow it on Twitter.

1                    JUROR:  Yeah, on Twitter, yeah, loosely.  But not

2         extensively.  Not like I was only looking at that on

3         Twitter.

4                    THE COURT:  Is Twitter the social media platform

5         that you typically use or are there other social media

6         platforms you use?

7                    JUROR:  I use Instagram.  Okay.  So I have

8         platforms but I use Twitter the most, probably.

9                    THE COURT:  Twitter and Instagram.

10                    Do you watch any news on television or read any

11        newspapers?

12                    JUROR:  Yes.  I watch local news regularly.

13                    THE COURT:  What channels?

14                    JUROR:  7?  They're all different.

15                    THE COURT:  Okay.

16                    JUROR:  But in the lower numbers for sure and --

17        okay.

18                    THE COURT:  Okay.

19                    JUROR:  Yeah.

20                    THE COURT:  And did you follow or watch any of the

21        congressional hearings related to these events?

22                    JUROR:  Loosely, yes.

23                    THE COURT:  What?

24                    JUROR:  Loosely, yes.  Like I'd see them come up

25        on my Twitter feed, I would click on, look at it and then

1    like flick away and move on to something else.

2          THE COURT:  I mean, did you watch it like --

3          JUROR:  No, not form start to finish, no.  Just

4    tuning in every so often.

5          THE COURT:  So given the answers that you've just

6    given us, do you think you could be a fair, impartial juror

7    in this case or do you think that what you've seen, and

8    heard, and read, and where you work and everything would

9    make it difficult for you to be a fair and impartial juror?

10         JUROR:  No, I think I could be a fair and

11   impartial juror.

12         THE COURT:  Would you -- are you prepared to limit

13   yourself only to the evidence you see and hear in the

14   courtroom and judge this defendant, Mr. Gossjankowski, based

15   on what you -- what this trial's about, what's in evidence,

16   not anything else?

17         JUROR:  Yes.

18         THE COURT:  Okay.

19         I asked whether you, or close friends, or family

20   members have worked for law enforcement, including police

21   departments, Metropolitan Police, Capitol Police, Secret

22   Service, FBI, Homeland Security, and any other police

23   offices or law enforcement police officers.

24         JUROR:  I answered yes to that.  My aunt was a

25   D.C. Police Officer.  And I said that was close because she

1    was my dad's twin, so she's a little bit closer than most of

2    my aunts are.

3              THE COURT:  Has she retired?

4              JUROR:  She's retired and since past, but after

5    her retirement.

6              THE COURT:  So about how long ago was she on the

7    MPD?

8              JUROR:  She was probably on there for 25-plus

9    years.

10             THE COURT:  And when did her career end roughly?

11             JUROR:  2014.

12             THE COURT:  Okay.

13             JUROR:  2015.

14             THE COURT:  So maybe 10 years ago or something

15   like that?

16             JUROR:  Yeah.

17             THE COURT:  And do you have any friends or close

18   relatives in prosecutor's offices of any sort?

19             JUROR:  No, Your Honor.

20             THE COURT:  Counsel, any followup questions?

21             MR. DREHER:  None from the government, Your Honor.

22             MR. SMOCK:  No thank you.

23             THE COURT:  All right.  Thank you.

24             So I think what we will do is we'll ask you to

25   come back on Thursday, not tomorrow, but Thursday.  Come

```
1    back at 10:00.  Report to the jury lounge on the fourth

2    floor at 10:00 on Thursday.  Ms. Johnson will meet you

3    there, won't you Ms. Johnson?

4              MS. JOHNSON:  Yes.

5              JUROR:  Okay.

6              THE COURT:  Thanks so much for your patience

7    today.  And you can go out the front door if you've got

8    everything.

9              (Juror excused from courtroom)

10             THE COURT:  And this might be a good time to take

11   a ten minute break before we talk to the next person.

12             (Recess taken at 3:42 p.m.)

13                       *    *    *    *    *

14        (3:55 p.m.)

15                       IN OPEN COURT

16             THE COURT:  So one of the people who we were going

17   to send home and come back tomorrow cannot come tomorrow, so

18   we're going to take this person out of turn now and if he

19   passes muster we'll send him home until Thursday.

20             MS. JOHNSON:  And, counsel, this is jury number

21   0831, line 35.

22             THE COURT:  Line 35, 0831.

23             MS. JOHNSON:  Yes.

24             (Juror present)

25
```

```
 1                    (Juror number 0831)

 2                        EXAMINATION

 3              THE COURT:  Good afternoon, sir.

 4              JUROR:  All right.

 5              THE COURT:  Thanks for your patience.  Would you

 6   mind taking off your mask so we can all hear you a little

 7   better?

 8              JUROR:  Okay.

 9              THE COURT:  Thank you.  You're juror number 0831;

10   correct?

11              JUROR:  Yeah.

12              THE COURT:  All right.  A few followup questions.

13              You said here in your card that in response to

14   question number 6 that you followed the news or watched

15   videos about the events of January 6th at the Capitol.

16              Would you tell us a little bit about how much you

17   watched, what you watched, how you followed it.

18              JUROR:  Well, I didn't watch it, but when it first

19   came on they were at the Capitol breaking in.

20              THE COURT:  So this -- on January 6th itself?

21              JUROR:  Yeah.

22              THE COURT:  Were you at work, or at home, or what?

23              JUROR:  I believe I was at work.

24              THE COURT:  So was it on television at work --

25              JUROR:  Yeah.
```

1           THE COURT:  -- or how did you watch it?

2           Okay.  Did you follow it a lot that day?

3           JUROR:  We watched it real good because once I got

4    home I didn't watch it at all.

5           THE COURT:  Okay.  And what about since

6    January 6th, have you watched much about it since then?

7           JUROR:  I've seen it on and off.

8           THE COURT:  On television or on --

9           JUROR:  On television.

10          THE COURT:  You watch any social media or

11   otherwise?

12          JUROR:  No.

13          THE COURT:  You did indicate in response to

14   question 11 that you did watch some portions of the

15   congressional hearings.

16          How much of that did you watch?

17          JUROR:  That was on at work during my lunch

18   period.

19          THE COURT:  During your lunch period at work and a

20   couple of different days?

21          JUROR:  Just one day I watched it.

22          THE COURT:  Just one day?

23          JUROR:  Yeah.

24          THE COURT:  Do you -- you say you don't watch

25   social media.  You're not on -- how do you get your news

1    mostly, television, radio?

2              JUROR:  Television, yeah.

3              THE COURT:  Newspaper?

4              JUROR:  No.

5              THE COURT:  Okay.  Let's see.  From what you have

6    seen or heard do you think that everyone who is arrested for

7    the events -- their involvement in the events on January 6th

8    at the Capitol are probably guilty of the charges?

9              JUROR:  In the way I grew up here, yes, I would

10   say that's supposed to be a restricted area.

11             THE COURT:  Say that again?

12             JUROR:  Area is a restricted area, you're supposed

13   to behave a certain way.  And what they were doing, that's

14   not the way I was brought up.

15             THE COURT:  Would you -- do you think that you

16   could -- if you were picked for the jury do you think you

17   could agree to consider only the evidence that you hear and

18   see in this courtroom in deciding whether or not you think

19   that this particular defendant, Mr. Gossjankowski, is

20   guilty?  Can you do that?

21             JUROR:  Yeah.  I mean, I would say if I would see

22   you, say, in the library destroying a book and just walk

23   away --

24             THE COURT:  Say that again?

25             JUROR:  I was saying if you were in something like

1          a library and destroy a book, that would be, you know,

2          something not to do.

3                    THE COURT:  Have you ever served on a jury before?

4                    JUROR:  It's been a while.

5                    THE COURT:  What kind of -- do you remember, this

6          is question 42.  Do you remember what kind of a case it was?

7                    JUROR:  Not offhand.

8                    THE COURT:  Do you remember whether it was a

9          criminal case?

10                   JUROR:  Petit.

11                   THE COURT:  Was it a criminal case?

12                   JUROR:  Petit.

13                   THE COURT:  What?

14                   JUROR:  It was in petit court.

15                   THE COURT:  Petit trial.  Jury trial.  Was it

16         jury trial.  Though, across the street?

17                   JUROR:  Yeah.

18                   THE COURT:  Do you remember whether it was a

19         criminal trial?

20                   JUROR:  Yeah.

21                   THE COURT:  Was it criminal?

22                   JUROR:  Yeah.

23                   THE COURT:  Do you remember, do you know -- do you

24         remember what the charge was?

25                   JUROR:  Not offhand.

1              THE COURT:  Do you remember what the verdict was?

2     Was it guilty or not guilty?

3              JUROR:  I think they found him guilty.

4              THE COURT:  And you were on that jury?

5              JUROR:  Yeah.

6              THE COURT:  And did you understand at that time

7     that in order to find him guilty you had to find that the

8     prosecutor had proved him guilty beyond a reasonable doubt?

9              JUROR:  I don't know what that -- I believe from

10    the evidence they had it was --

11             THE COURT:  Do you think it was beyond a

12    reasonable doubt?

13             JUROR:  Yeah.

14             THE COURT:  Do you understand that if someone's

15    convicted of a crime that it's up to the Judge to sentence

16    the person?

17             JUROR:  Yeah.

18             THE COURT:  If you were on this jury and you found

19    the defendant guilty, it would be my job to sentence him --

20             JUROR:  Right.

21             THE COURT:  -- and not the jury's.  Do you

22    understand that?

23             JUROR:  Yeah.

24             THE COURT:  Would you have any difficulty serving

25    as a jury or would you feel uncomfortable knowing that you

```
 1    could -- you have nothing to do with the sentence?
 2                JUROR:  No.
 3                THE COURT:  Okay.  All right.  Well, you wrote
 4    down 43, so I'm not sure.
 5                So let me ask the lawyers if they would like to
 6    ask you some questions.
 7                            EXAMINATION
 8    BY MR. DREHER:
 9    Q.  Good afternoon, sir.
10    A.  How you doing?
11    Q.  I'm doing well.  And yourself?
12    A.  All right.
13    Q.  Now, earlier you told us about how you were raised.
14                Can you elaborate a little more about that.
15    A.  Well, I was raised with my grandmother, my grandparents.
16    It was kind of strict, you know.  You go to grocery store or
17    something, just don't touch this.  Don't even think about
18    it.
19    Q.  Okay.  Now, I do want to bring it back to the case that
20    we'll hear in this courtroom.
21                Would you be able to follow then the instructions
22    that the Judge gives you in that same manner?
23    A.  Yeah.
24    Q.  And would you be able to remain fair and impartial in
25    determining the facts of this case based solely on the
```

1   evidence presented during trial?

2   A.  Yeah.

3   Q.  Okay.  Now, you also told us that it was at work and

4   during lunch is when you would generally observe either the

5   congressional hearings or what was happening on January 6th?

6   A.  Yeah.

7   Q.  Were -- at any time did you ever view what happened or

8   any of the congressional hearings while at home?

9   A.  I usually get home real late.  So by the time I turn the

10  TV on in the next, 15, 20 minutes I'm like, I'm out.

11  Q.  No.  I understand.  So is it are you normally working

12  afternoon shifts then?

13  A.  I work in the mornings, say 6:00 a.m. to like 2:00, but

14  then I take care of a lady the rest of the time.  I usually

15  leave her house around 9:00, 10:00 at night, just every day.

16  Q.  So there's just not much time then for TV?

17  A.  No.

18  Q.  Okay.

19          MR. DREHER:  Your Honor, I have no further

20  followup.

21          THE COURT:  Mr. Smock.

22                      **EXAMINATION**

23  BY MR. SMOCK:

24  Q.  Hello.

25  A.  Hello.

1    Q.  When you were talking about the question about whether

2    people who had been arrested related to January 6th were

3    likely guilty, I think I heard you talk about this being a

4    restricted area.

5            Can you clarify a little bit more about what you

6    meant by that.

7    A.  Well, places like the Capitol, you know, the museum or

8    something, they have it roped off or something, and then my

9    grandparents would like, would go places like that, it was

10   like, don't touch this, don't go beyond that.  They

11   explained that that was a restricted area to me when I was

12   younger.

13   Q.  Okay.

14   A.  Even when I was in school when we went to, like, field

15   trips.

16   Q.  And can you -- you said something about destroying a

17   book in a library.  Can you explain what you meant by that?

18   A.  Well, that's I would say the books -- books, bible,

19   anything like that, that's a symbol, like, or how I can put

20   it?  Educational books.

21           That's something that you would not -- not

22   normally do, like burning the books, like they did back in

23   certain places.  Like they didn't like the books or

24   something.

25   Q.  And am I right that you're saying that that's what folks

1    who were at the Capitol on that day were doing?

2    A.  I would say it was something similar.

3    Q.  Okay.  And is that what leads you to say that you think

4    folks were arrested that day are likely guilty?

5    A.  For their actions, yeah.

6              MR. SMOCK:  Okay.  Thank you.

7              THE COURT:  What was your last question?

8              MR. SMOCK:  Whether his view about people --

9    people's actions on January 6th and this analogy to burning

10   books or breaking things, and you can --

11             JUROR:  That's wrong.

12             MR. SMOCK:  -- and you can correct me if I'm

13   wrong, I'm trying to paraphrase, that that is part of the

14   basis for his view that people are likely guilty who have

15   been arrested on January 6th.

16             THE COURT:  Okay.

17             MR. SMOCK:  Thank you.

18                          **EXAMINATION**

19             THE COURT:  So you think if somebody's been

20   arrested they're likely guilty, they're probably guilty?

21             JUROR:  Not all of the time.

22             THE COURT:  Not always.

23             JUROR:  Mm-hmm.  Just what evidence --

24             THE COURT:  Pardon me?

25             JUROR:  What evidence, you know, if they have to

1    prove that they're not.

2              THE COURT:  Well, I said during -- the questions

3    that I asked the jury before, that the person who's charged

4    with a crime doesn't have to prove anything.  The

5    government, the prosecutors, have to prove that the person

6    who's charged with a crime did the crime.

7              Would you hold the prosecutors to the burden even

8    if the defendant didn't have any --

9              Would you hold the prosecutors to the burden that

10   they, the government, must prove guilt beyond a reasonable

11   doubt or do you think that the defendant has to do something

12   to persuade you?

13             JUROR:  The prosecutors have to prove it.

14             THE COURT:  Okay.

15             JUROR:  That it's been done.

16             THE COURT:  Do you understand that anybody charged

17   with a crime is presumed to be innocent until the government

18   proves them guilty?

19             JUROR:  Yeah.

20             THE COURT:  And would you follow that instruction?

21             JUROR:  Yeah.

22             THE COURT:  And if I tell you that even though

23   this defendant, Mr. Gossjankowski, was arrested and charged,

24   that the government still has to prove through evidence that

25   he was guilty beyond a reasonable doubt, would you do that?

1          JUROR:  If that's your directive.

2          THE COURT:  Well, would you evaluate the evidence

3    with an open mind?

4          JUROR:  Yeah.

5          THE COURT:  Okay.

6          Any other questions, Mr. Smock?

7          MR. SMOCK:  A couple quick ones.

8                        **EXAMINATION**

9    BY MR. SMOCK:

10   Q.  So you heard when everybody was back here the government

11   list a fairly long list of witnesses that they expect to

12   call.

13          It may very well be that the defense, our side,

14   chooses to call no witnesses.  In other words, we would not

15   be putting forward any evidence to prove affirmatively that

16   our client is not guilty.

17          Is that something that would concern you or would

18   lead you to be more likely to side with the government or

19   agree with the government?  The fact that they're calling a

20   lot of witnesses and we may not call any witnesses?

21   A.  Yeah, that would probably show an unequal balance.

22          MR. SMOCK:  Okay.  Thank you.

23                        **EXAMINATION**

24   BY MR. DREHER:

25   Q.  Now, sir, if you were given an instruction to disregard

1    that, would you be able to follow that?

2                THE COURT:  Disregard what?

3                MR. DREHER:  Disregard the uneven balance that he

4    referenced, Your Honor.

5    BY MR. DREHER:

6    Q.  Would you be able to follow that instruction that the

7    Court gives?

8    A.  Yeah.

9                MR. DREHER:  I have no further followup, Your

10   Honor.

11               THE COURT:  Why don't we ask you to wait outside

12   for a few minutes.

13               (Juror excused from courtroom)

14               MR. SMOCK:  Your Honor, we would move -- I keep

15   doing that.

16               We would move to strike this juror for a number of

17   reasons, one of them being there were answers that he gave

18   that suggested a preconceived notion of guilt.

19               The second being in answer to my questions it

20   became clear that despite having earlier answered a question

21   about there being no burden on the defense and suggesting

22   that he was okay with that, that when asked the direct

23   question he said, no, I think that would be something that

24   would weigh against the defense.

25               Of course, again, when these jurors are asked, if

 1     you're told this will you follow it, folks tend to answer

 2     yes, but I think these questions are drawing out the actual

 3     views of folks.

 4            And the last thing I would say is, you know, there

 5     were a number of things that he said that were a little bit

 6     hard to follow and his demeanor was slow in terms of his

 7     answers.  And it was -- I had some concerns about the

 8     answers being responsive to questions in ways that we could

 9     understand, particularly the story about the library and

10     books being burned.

11            MR. DREHER:  Your Honor, I don't -- I would argue

12     that there hadn't been anything to cause us to question the

13     credibility of this potential juror's answers and to whether

14     or not he would follow the instructions and judge the facts

15     of this case in a fair and impartial way.

16            So certainly I would ask that the Court deny the

17     motion.  Thank you.

18            THE COURT:  I'm going to grant the motion.

19            I just don't have any confidence that we know what

20     he really thinks and what he would really do in the jury

21     room.

22            I understand Mr. Smock saying that some of my

23     questions sometimes about reasonable doubt and presumption

24     sort of might lead someone to just agree with me.  I'm

25     afraid that's true with this potential juror, but not with a

1    lot of others.  I mean, there are a lot of people that push

2    back.  No matter what you ask or what I ask, they're not

3    going to let people speak for them or put words in their

4    mouth.

5          I just don't feel confident that we know that we

6    have a fair and impartial jury with this gentleman.  So I'm

7    going to grant the government -- the defense motion.

8          (Juror present)

9          THE COURT:  All right.  Sir, we're going to excuse

10   you from this jury.

11          Is the jury lounge closed?  So tomorrow he calls

12   or tonight?

13          MS. JOHNSON:  Tonight?  I will send an e-mail.

14          THE COURT:  Okay.  So would you call the jury

15   lounge again later tonight and they'll have a recording

16   about whether they need you tomorrow or not.  But we don't

17   need you for this jury, you've been excused from this jury

18   and thank you so much for your patience.

19          JUROR:  All right.

20          THE COURT:  You can go right out that way.

21          JUROR:  Thank you.

22          THE COURT:  Thank you, sir.

23          (Juror excused)

24          THE COURT:  So I think the next person is 280, is

25   that right?

1              MS. JOHNSON:  One second.  We took him out of

2        order.  Yes, 0280.

3              THE COURT:  280.

4              JUROR:  Mm-hmm.

5              THE COURT:  Well.

6              (Juror present)

7                        **(Juror number 0280)**

8                          **EXAMINATION**

9              THE COURT:  Good afternoon.

10             JUROR:  Good afternoon.

11             THE COURT:  Thanks for your patience.

12             JUROR:  Sure, no problem.

13             THE COURT:  Would you take off your mask so we can

14       hear you a little bit better.

15             So you're juror 0280?

16             JUROR:  Right.

17             THE COURT:  So what kind of law do you practice?

18             JUROR:  I'm healthcare law.  So I do FDA, HIPAA,

19       like health privacy laws.  Nothing criminal in nature at

20       all, so.

21             THE COURT:  You don't try cases?

22             JUROR:  No, I don't try cases.

23             THE COURT:  Litigate?

24             JUROR:  No.

25             THE COURT:  And so let me go back to the -- you've

1    never been a prosecutor or a defense lawyer?

2              JUROR:  Never been a prosecutor, never been a

3    defense lawyer.

4              In law school the reason I circled one of the

5    questions was I volunteered for the Eastern District of

6    Virginia to do like a juror -- like a voir dire where we

7    were hoping, like, review the juror files but that's the

8    extent of my involvement with any kind prosecutorial, or

9    defense, or trial work.

10             THE COURT:  So have you -- you or a close friend

11   or family member ever worked or lived on Capitol Hill?

12             JUROR:  I used to work at the Congressional

13   Research Service for about six years, a little less than six

14   years.  And the Congressional Research Service is in the

15   Madison building, which is connected to the Capitol.  And we

16   would do briefings for Members of Congress and Congressional

17   staff, so.

18             THE COURT:  And when did you leave that job?

19             JUROR:  2012.

20             THE COURT:  Oh, it was a while ago.

21             JUROR:  Yeah.

22             THE COURT:  Did you follow the news or watch

23   videos or whatever on January 6th about the events of the

24   Capitol that day?

25             JUROR:  Yes.  I watched CNN and probably some

1    other local news channels as well that day, yeah.

2              THE COURT:  And on January 6th were you at the

3    firm or at home?

4              JUROR:  I was working from home because we were

5    still teleworking.

6              THE COURT:  Yeah.

7              JUROR:  I mean, because of COVID protocols, yeah.

8              THE COURT:  So you watched it that day.  Have you

9    been following and have you followed news about January 6th

10   on video, or newspaper, or social media since January 6th.

11             JUROR:  I have watched some of the hearings, not

12   the entire hearings and not every single hearing, but I did

13   watch some of the news coverage of some of the hearings.

14             THE COURT:  So do you think that to the extent

15   that you've watched some of the hearings and the events of

16   January 6th would affect your ability to be a fair and

17   impartial juror in this case?

18             JUROR:  No, I don't think it would affect my

19   ability.  I think I would be able to be fair and impartial

20   as a juror and listen to all the evidence.

21             THE COURT:  And could you -- could you limit your

22   universe of knowledge to what you hear and see in this

23   courtroom and judge this defendant based solely on what you

24   see and hear in this courtroom?

25             JUROR:  Yes, yeah.  I won't watch any -- I'll stop

1    like looking at news apps.  I'll stop watching, like, news

2    coverage.  I won't watch anything related to trial or

3    January 6th if I'm selected, yeah.

4              THE COURT:  I asked if you, or family members, or

5    close friends have ever worked or attended or participated

6    in programs at Gallaudet.

7              JUROR:  Yeah, my daughter did swim lessons there

8    before COVID, but that's it.  That's the extent.

9              THE COURT:  She did what there?

10             JUROR:  Swimming lessons.

11             THE COURT:  How?

12             JUROR:  Yeah.  Gallaudet has a pool and they had a

13   school program, it's called Old City Swim School.

14             And so we would go there to do swimming lessons

15   for my now six year old but at the time she was three.  So

16   we would go on the campus but the interaction we had with

17   the student population was limited in terms of just whoever

18   was at the pool.  It wasn't like attending programs on a

19   regular basis at the school.  It was just the swim lessons.

20             THE COURT:  Got it.  I understand.

21             I asked whether you, or members of your immediate

22   family, or close friends ever worked in the criminal justice

23   system, the public defender's office, criminal defense

24   lawyer, probation, correctional facility.

25             JUROR:  Yeah.  That was just the -- in law school

```
1    when I had volunteered.  That's the only interaction I've

2    had.  And that was for the defense side that, just that

3    volunteering.

4              THE COURT:  So the question about friends or

5    immediate family who are lawyers, or have attended law

6    school, or performed legal investigative work will be

7    lengthy?

8              JUROR:  Yeah.

9              THE COURT:  Are there any close friends or

10   immediate family who have done work in criminal defense or

11   criminal prosecution that you can recall?

12             JUROR:  No close friends that are in criminal

13   defense or criminal prosecution.

14             I mean, I would have law school classmates who

15   might have done that.

16             THE COURT:  Sure.

17             JUROR:  But none of my close law school friends do

18   that work today.

19             THE COURT:  Okay.  And I think the last question

20   you answered that I want to ask you:

21             Have you, or a member of your immediate family, or

22   close personal friend ever been the victim of or a witness

23   to a crime?

24             JUROR:  Yeah, I have been a victim of a crime

25   myself.
```

1                    In 2015 I was mugged and attacked and beaten.

2        June 9th, 2015.  Filed a police report.  So, yeah, that was

3        my -- that's -- I've been a victim of a crime.

4                    THE COURT:  Was that here in D.C.?

5                    JUROR:  Here in D.C., yes.

6                    THE COURT:  And did you report it?

7                    JUROR:  I did report it, yeah.

8                    THE COURT:  And did the police respond?

9                    JUROR:  The police did respond.

10                    We circled the block a couple times looking for

11        the individual who attacked me.  The police could not locate

12        the person.  They then took me to the hospital for

13        treatment, so.

14                    THE COURT:  So to the best of your knowledge no

15        one was ever arrested or charged?

16                    JUROR:  To the best of my knowledge no one was

17        ever arrested or charged.

18                    THE COURT:  Okay.  Questions?

19                                    **EXAMINATION**

20        BY MR. DREHER:

21        Q.  Now, I'm sorry, ma'am, to hear about in 2015.

22                    Was there anything about that experience that

23        would give you a certain bias towards or against police

24        officers in any way?

25        A.  No, no, definitely not.  I have a cousin who's a police

1    officer.  But, no, nothing about that experience would give

2    me a bias one way or another.

3    Q.  So during that experience, did you believe you were

4    treated fairly by the police?

5    A.  Yes, yeah, absolutely.  I mean, in my experience they

6    wanted to try to find the person who attacked me but we just

7    weren't able to find him.

8    Q.  Now, I do want to jump back then to, you said your

9    daughter was taking swim lessons at the pool?

10   A.  Yes, yes.

11   Q.  Were the lessons themselves taught by students or

12   employees of the Gallaudet?

13   A.  I'm not sure.  I could find the woman's name who ran the

14   swim program, but I don't know if she was an employee or a

15   student at Gallaudet.

16         I mean, to my knowledge she -- I mean, she was

17   able to communicate by speaking.  She wasn't -- she might

18   have also had the ability to communicate through sign

19   language, but I think it was just the program was run at the

20   pool.  I don't know if she was an employee or a student.

21   Q.  And was it her that always taught the lessons every

22   time?

23   A.  The woman who ran the swim program, she employed other

24   individuals to teach lessons depending on the level of the

25   child's capability, but I don't know if those individuals

1    were students or employees of Gallaudet, as well.

2    Q.  Were there males that taught the swim lessons as well?

3    A.  I think so.  I think it was males and females, yeah.

4    Q.  And do you think you would recognize anybody who may

5    have been at the pool during that period if you were to see

6    them?

7    A.  No.  I mean, maybe I would recognize the woman who was

8    kind of running the swim program.  I can't recall her name

9    at the moment, but she had blond hair and she's also in like

10   some videos that were about the swim program.

11          But other than her, it's been over three years

12   since my daughter was in those lessons, so I don't

13   recognize -- I don't think I'd recognize anyone else who was

14   there.

15   Q.  And so you don't have a continuing connection to

16   Gallaudet or any of the instructors of the swim program?

17   A.  No.  That program shut down during COVID and then we

18   never went back there for swim lessons after that.

19   Q.  Now, when you worked at Congressional Research, do you

20   have individuals that you still know who work at in the

21   Madison building?

22   A.  Yes, I do.

23   Q.  And do you know if they were at work on January 6th and

24   have you discussed their experience of that day?

25   A.  I have -- I know there's one person, one of my former

1    colleagues who was supposedly in the building, Charlie

2    Doyle.  He was, I think, in the Madison building.  He was a

3    senior colleague to me, so he had been at the Congressional

4    Research Service for a long time.  And he -- I just heard

5    thirdhand that, you know, he was in the building that day.

6    But I've never seen him since then and I haven't talked to

7    him about his experience on that day.

8    Q.  Okay.  So that connection itself won't affect your

9    ability to only receive evidence taken in this trial?

10   A.  Right.  Yeah.  Exactly, yeah.  I don't know anyone who

11   was on the Capitol who had like any kind of experience, you

12   know, that I -- and it wouldn't affect my ability to receive

13   evidence.

14          MR. DREHER:  Thank you.  I have no further

15   followup, Your Honor.

16          THE COURT:  Mr. Smock.  Your turn.

17                        **EXAMINATION**

18   BY MR. SMOCK:

19   Q.  Hello.

20   A.  Hi.

21   Q.  I won't be long.

22          Ms. Burrows, the question I have is just that

23   within D.C. and throughout the country, but I think in D.C.

24   in particular, there are a lot of people who have very

25   strong feelings about January 6th and particularly folks who

1      were there on January 6th.

2              And I was wondering if you could tell us if you

3      share those feelings or if you have any particularly strong

4      feelings one way or the other.

5      A.  I mean, I think, you know, probably most of the people

6      in the jury pool will have had some kind of experience

7      related to January 6th, you know, for example, the fencing

8      that went up around the Capitol obviously affected traffic

9      in the area.

10             But I don't think it would affect my ability to

11     receive evidence, learn about the facts and circumstances of

12     what actually happened with the defendant at the Capitol

13     that day.

14             I think I could be fair and impartial about the

15     specific facts of this case and the specific evidence of

16     this case and, you know, as the Judge said, applying the law

17     to, you know, what actually happened in looking at the

18     charges and the way that they should be read and focusing on

19     that specifically.

20             MR. SMOCK:  Thank you.  I appreciate it.

21             THE COURT:  Okay.  Unless anybody has anything

22     further I think we will ask you to come back on Thursday.

23             JUROR:  Thursday, okay.

24             THE COURT:  10:00 in the jury lounge.

25             JUROR:  Okay.

1          THE COURT:  Ms. Johnson will meet you and others

2     there.

3          JUROR:  Okay.

4          THE COURT:  And that's on the fourth floor where

5     you started today.

6          JUROR:  Fourth floor.  Okay.

7          THE COURT:  And we'll finish the process of

8     picking a jury on Thursday.

9          JUROR:  Okay.  Thank you.

10          THE COURT:  Thank you very much for your patience

11     today.

12          JUROR:  Thank you.

13          THE COURT:  Appreciate it.

14          And you can just go out the front of the

15     courtroom.

16          JUROR:  Okay.

17          THE COURT:  Thanks very much.  65.

18          (Juror excused from courtroom)

19          THE COURT:  So the next gentleman, number 65, has

20     only answered two questions, so I'll try to explore some

21     other things with him, too.

22          (Juror present)

23

24

25

1                    **(Juror number 0065)**

2                         **EXAMINATION**

3            THE COURT:  Have a seat, sir.  How are you?

4            JUROR:  I'm well.  How are you?

5            THE COURT:  Could you take off your mask and speak

6     up so we can all hear you.

7            JUROR:  Okay.

8            THE COURT:  Talk into the microphone.

9            JUROR:  Oh.

10           THE COURT:  So you're number 65, 065; right?

11           JUROR:  Yes.  Correct.

12           THE COURT:  So are you a student?

13           JUROR:  Yes.

14           THE COURT:  And where are you a student?

15           JUROR:  Online at Florida International

16    University.

17           THE COURT:  Say that again.

18           JUROR:  Online at Florida National University.

19           THE COURT:  Oh, okay.  And so you're a student

20    online?

21           JUROR:  Yes.

22           THE COURT:  And you're also working at Whole

23    Foods; right?

24           JUROR:  Correct.

25           THE COURT:  Which Whole Foods do you work at?

1          JUROR:  The one on Florida Avenue.

2          THE COURT:  Ah, okay.

3          JUROR:  It's new.

4          THE COURT:  It's new?

5          JUROR:  It's right by Howard.  Yeah, it opened

6     like two years ago.

7          THE COURT:  Yeah.  How long have you been there?

8          JUROR:  I started working in October.  I've been

9     with the company since 2018.

10         THE COURT:  Were you at other stores around here?

11         JUROR:  I was at the Tenleytown store for two

12    years since 2020.  And then I was actually in-person at

13    school before the pandemic, so I worked at the South Beach

14    store in Miami and then the pandemic happened and I moved

15    up --

16         THE COURT:  Now you're back?

17         JUROR:  Yeah.  And I should be going back in,

18    like, June so.  Fingers crossed.

19         THE COURT:  Going back to where?

20         JUROR:  Miami.

21         THE COURT:  Oh, Miami?

22         JUROR:  Yeah.  I have a job lined up.

23         THE COURT:  When is that?

24         JUROR:  I haven't gotten my start date but it's

25    either going to be the middle of June or middle of July.

```
1                    THE COURT:  With Whole Foods?

2                    JUROR:  No.  With Encore Global.  They're an AV

3       company that works in hotels.

4                    THE COURT:  Oh, good.

5                    JUROR:  Yeah.

6                    THE COURT:  So you only answered a couple of

7       questions here.  So let me ask you, one of them was question

8       19, which asked whether you, or a family member, or close

9       friend's ever worked at, or attended, or participated in any

10      programs at Gallaudet.

11                   JUROR:  Yeah.  In high school we -- I was in

12      honors choir, so we had a lot of rehearsals there.  We sang

13      at an event there one time.  And then shortly after

14      graduation there was a practice there at the All-Star game

15      at the NATs, so I've been --

16                   THE COURT:  The All-Star teams in what?

17                   JUROR:  I'm sorry?

18                   THE COURT:  The All-Star team?

19                   JUROR:  The All-Stars game that they had at the

20      National Stadium back in --

21                   THE COURT:  Okay.  So you were playing with a band

22      or orchestra?

23                   JUROR:  I was a singer.

24                   THE COURT:  You're a singer?

25                   JUROR:  Yeah, I was in honors choir.
```

1          THE COURT:  Did you go to Ellington?

2          JUROR:  No, I went to Washington Latin --

3          THE COURT:  Okay.

4          JUROR:  -- Public Charter School.

5          THE COURT:  Got it.  Got it.  So you performed at

6    Gallaudet?

7          JUROR:  Yeah.

8          THE COURT:  And you performed at National Stadium?

9          JUROR:  Yeah, but they were affiliated with NOMA

10   so I just put that there just to be honest.

11         THE COURT:  Got it.

12         JUROR:  Yeah.

13         THE COURT:  Interesting.

14         So question number 6.  Did you follow the news, or

15   events, or videos, or whatever on January 6 about what was

16   going on or after January 6?

17         JUROR:  So I saw some videos online on Twitter,

18   and Instagram, and Snapchat so it was all over my social

19   media feed.  So it wasn't like -- it wasn't unavoidable.

20         And then my parents and grandparents are way more

21   into the news than I am.  So any time I would come around or

22   come around them it would be a topic of conversation.

23         They have very, very strong opinions, so they

24   would always voice them.

25         THE COURT:  Your parents and grandparents?

1          JUROR:  Yes.  Everybody in my household.

2          THE COURT:  Do you live with your parents?

3          JUROR:  Yes.

4          THE COURT:  And, generally, what are their

5   opinions?

6          JUROR:  They're -- they're not --

7          THE COURT:  I can ask the question differently.

8          JUROR:  Yeah.  They don't -- they're not a fan of

9   what happened.  They are -- if I'm being completely honest,

10  my parents are not huge Trump supporters.  They have a great

11  disdain for them.

12         As a matter of fact, my grandfather especially

13  does not care for that movement, that political party, the

14  people that follow President Trump, and specifically about

15  January 6th.

16         Because we've had no immediate family in police

17  but we've had my cousin, who's up in Maine, who I'm not

18  close with at all, that I don't really talk to that --

19         THE COURT:  Cousin's who what?

20         JUROR:  Cousin's up in Maine.  They were in law

21  enforcement up there.  So when they saw that, it was very

22  triggering for them, because they're closer to them than I

23  am.  I'm from a divorced family so I don't see that side of

24  the family.  But I do hear and get their opinions quite

25  often, quite regularly.

```
 1              I had a conversation about their disdain with
 2   Donald Trump and my own views recently on Sunday.
 3              THE COURT:  With your parents or your cousins?
 4              JUROR:  My grandparents.
 5              THE COURT:  Your grandparents.
 6              JUROR:  I went out there.
 7              THE COURT:  Okay.
 8              JUROR:  Because they live over there in College
 9   Park, so I see them often.
10              THE COURT:  Okay.  So do you yourself -- I mean,
11   you've been obviously listening --
12              JUROR:  Yes.
13              THE COURT:  -- hearing what your grandparents have
14   to say and what your parents have to say.
15              JUROR:  Yes.
16              THE COURT:  And you live with your parents.
17              So do you, yourself, have such strong opinions
18   regarding President Trump and his supporters that would make
19   it difficult for you to be a fair and impartial juror in
20   this case?
21              JUROR:  I would like to believe no.  And I thought
22   about this in the jury room very intensely.  I want to say
23   yes that -- I mean, no that I wouldn't, but I don't trust
24   myself to.  And everybody is entitled to a -- to a fair and
25   impartial jury.
```

1          So I want to put that on the record that although

2     I do not necessarily share the same disdain that my family

3     has, because I am part of the family and part of those

4     conversations, it may skew my view.

5          THE COURT:  And if you were on this jury, you

6     would go home each night to a home that you share with your

7     parents?

8          JUROR:  Yes.

9          THE COURT:  Are you confident -- I mean, one of my

10    instructions would be to all the jurors, you know, don't

11    read anything, don't go on social media.

12         JUROR:  Yeah.

13         THE COURT:  Don't, you know, talk to anybody about

14    this case.

15         Is that something that you -- if you were on the

16    jury you could avoid or would it be difficult to avoid

17    conversations with your parents or hearing your parents talk

18    about stuff?

19         JUROR:  I think for the purpose of a trial -- like

20    if I'm being honest, we have a very big house.  So there are

21    days where I don't see them because I stay in my room and

22    they're in the library and then they go to the kitchen and

23    go to their room.

24         So we have -- it could be avoidable.  And, you

25    know, of course I would just say, like, let's not

1    discuss that.

2              THE COURT:  Do you have meals together?

3              JUROR:  No.  No.  They're vegan and I am not.  So

4    I provide my own food.

5              THE COURT:  Okay.  Counsel?

6                        **EXAMINATION**

7    BY MR. DREHER:

8    Q.  Good afternoon, sir.

9    A.  Hi.

10   Q.  So I want to dive back into unfortunately your home

11   life.

12   A.  Mm-hmm.

13   Q.  Would you feel any sort of pressure one way or another

14   based on the opinions that your parents and grandparents

15   have expressed to you that you should decide this particular

16   case one way or the another?

17   A.  No.  They promote my own thinking.  I don't think that

18   would be an issue.  But I would have to like tell them to

19   not speak about it with me.

20   Q.  Certainly.  And is your status of living with them, is

21   it something you still pay rent for or is this any sort of

22   financial assistance that your parent provide to you?

23   A.  I don't pay rent.  My dad has a college fund for me.

24   I'm in college.  So I stay there for free and he pays my

25   tuition so, yeah.

1    Q.  Has there been any other situations to where, perhaps,

2    uncomfortable conversations have, perhaps, led to any sort

3    of coercion to decisions that you might have made?

4    A.  In terms of legally or just in life?

5    Q.  No, no.  I'm sorry.  I might have put too many words in

6    my own mouth there.

7           More, have you had any experiences with your

8    parents while living in their house, under their roof, to

9    where there has been attempts by them to change the way that

10   you think about things?

11   A.  Yes.

12   Q.  Okay.

13          MR. DREHER:  I have no further followup, Your

14   Honor.

15          THE COURT:  Okay.  Mr. Smock.

16                          **EXAMINATION**

17   BY MR. SMOCK:

18   Q.  Hello.

19   A.  Hi.

20   Q.  I appreciate you sort of -- I think you had said that

21   back in the jury room you thought a lot about some of these

22   questions and I think we all appreciate that.

23          I was hoping you could talk a little bit more

24   about what you were thinking back in the jury room when you

25   were thinking that you don't trust yourself to be fair and

1        impartial.

2        A.   Okay.  So based on just that period of the presidency

3        and the January 6th, I wasn't in D.C. at the time, I was in

4        Miami while that was happening.  However, my -- I was born

5        and raised in D.C., I have family here.  So I was getting

6        phone calls.  My friends were telling me about it.

7               And I've had my own, like, run-ins with some

8        not-so-friendly Trump supporters that have got in my face

9        and not so nice just because of the color of my skin.  And

10       I -- although I, you know, I have friends that are Trump

11       supporters.  Like my aunt is a Trump supporter.  It's not

12       foreign to me to be, you know, cordial or anything like that

13       with somebody who is.  And I'm not like the biggest

14       politician in the world and I don't -- I'm 22, I'm not into

15       politics like that.

16              But, you know, just based on some negative

17       experiences that I have in my life, I don't know what the

18       evidence is, and I didn't Google anything about the case or

19       anything, but it could, you know, bring back a memory or

20       something or anything like that that would maybe drive my

21       opinion one way.

22              And like I stated earlier, I don't want to -- if

23       I'm sitting on it I would want to be fair and impartial.

24       And I regrettably cannot promise that.

25       Q.   Thank you.  I appreciate you telling that.


                    LYNNE M. KRENZ, RMR, CRR, CRC
                         (651) 848-1226

1    A.  Yes.

2    Q.  I know it's a personal thing to discuss in front of

3    folks.

4    A.  Yeah.

5    Q.  Another question I had was just about your parents and

6    your grandparents.  And I appreciate it and I think everyone

7    here appreciates that you would not talk to them about the

8    case when the case is happening.  But I imagine that at the

9    end of the case when you're allowed to talk about it,

10   certainly your family would want to know.

11          And one question I had is whether you've thought

12   about how you would feel, for example, if you were part of

13   the jury that found a person who was there on January 6th

14   not guilty and if you would have any concern about

15   explaining that to your grandfather, or your parents, or any

16   reaction that they might feel if you were involved in that?

17   A.  I don't think I would necessarily be afraid to tell

18   them, but the response I would get, especially from my

19   grandfather would not be the nicest.  And he was just

20   unfortunately diagnosed with really bad cancer so, and we're

21   really, really close, so I wouldn't want to, like, upset him

22   in any way.

23          So although I would tell him, it would just be

24   what -- it is what it is.  I would feel bad for upsetting

25   him in a certain way, not that I would -- I wouldn't feel

1    bad that I followed the law but, you know, that I

2    disappointed my grandfather.

3    Q.  Understand.  Thank you very much.  I appreciate that.

4          THE COURT:  Okay.  Thank you.  We're going to ask

5    you to wait for a few minutes while we talk and see if we

6    have any more questions.

7          JUROR:  Okay.  Where?

8          MS. JOHNSON:  I'll just open it up for you.

9          (Juror excused from courtroom)

10         MR. SMOCK:  Your Honor, I think I would say I like

11   Mr. Logan a great deal.  I think we probably all have

12   reasons to like him.  I think, though, that we would need to

13   move for cause.

14         I think he was very honest, very forthcoming and

15   there were a numbers of reasons for concern.

16         The one that we addressed last is his concern

17   about essentially disappointing his grandfather, who with

18   whom he's very close, who's been diagnosed with cancer.  Who

19   he would, if he found Mr. Gossjankowski not guilty, he would

20   have to tell that and he knows his grandfather would have

21   that reaction.  And I think my sense is that was part of his

22   reason for saying that he was concerned about his ability to

23   be fair and impartial.

24         The other thing that he talked about was negative,

25   in fact, physical or threatening interactions he's had with

1    Trump supporters and his concern about how that would impact

2    his deliberations.  And I think that's actually probably

3    further than we've heard any of the jurors go in terms of

4    talking about personal experiences they've had.

5            And now having seen this case is going to involve

6    watching a significant amount of video of Trump supporters

7    being violent and so I think, especially given his clear

8    statement that he cannot be impartial and fair, he needs to

9    be struck.

10           MR. DREHER:  There's not much argument I can give,

11   Your Honor.

12           THE COURT:  No.  I'm going to grant the motion and

13   we'll excuse him for cause.

14           I do think -- I think Mr. Smock's comments

15   reflected this too, this is a very impressive young man.

16   Very, very impressive young man who was quite candid with us

17   about a lot of sort of personal stuff.  And he's kind of a

18   guy you'd like to know and he's going to be a success.

19   Okay.

20           (Juror present)

21           THE COURT:  Well, sir.

22           JUROR:  Hi.

23           THE COURT:  We all want to thank you --

24           JUROR:  Yes.

25           THE COURT:  -- for your candor with us.

1          I know it was kind of a difficult conversation,

2     but you were very upfront with us all and candid.  And I

3     think given all the circumstances we should excuse you from

4     this jury.  You can call the jury office today or tomorrow.

5          MS. JOHNSON:  Tomorrow.

6          THE COURT:  And see if they need you for another

7     jury.

8          But since none of us will see you again, probably,

9     we want to wish you good luck with the rest of your

10     education and your career.  And I think you got great

11     potential to do really great things, so.  Nice to meet you.

12          JUROR:  Nice to meet you.

13          THE COURT:  And I wish we could have you on the

14     jury but I don't think it's the right thing to do, so thank

15     you.

16          JUROR:  Yes.

17          (Juror excused)

18          THE COURT:  So given the time of day, we have four

19     people left in group 2.  And despite Mr. Dreher's suggestion

20     that it would be nice to keep the group together, I'm

21     suggesting that we tell group 3 go home until tomorrow and

22     thank them for their patience and they'll have to be patient

23     tomorrow, and that we finish group 2 and that we see

24     everybody in group 3 tomorrow, unless there's anybody there

25     that tells Ms. Johnson that they can't be here tomorrow and

1      that we have to see them today.

2                So I believe we will see 1620 and --

3                MS. JOHNSON:  I have four jurors sitting in the

4      jury room right now, so 1620.

5                THE COURT:  We're going to see the next four in

6      group 2.

7                MS. JOHNSON:  Okay.

8                THE COURT:  1620, 606.

9                MS. JOHNSON:  Okay.

10               THE COURT:  1924, 888.

11               MS. JOHNSON:  Everybody else can go home until 930

12     tomorrow?

13               THE COURT:  Yes.

14               MS. JOHNSON:  Okay.

15               THE COURT:  Everybody else can go home until 9:30

16     tomorrow unless somebody says I really, really need to talk

17     to the Judge today.

18               MR. VALENTINI:  And, Your Honor, with my

19     apologies, I notified Ms. Johnson before, I will leave you

20     the capable hands of my cocounsel.

21               THE COURT:  Yep.

22               MR. VALENTINI:  Okay.  Thank you.

23               THE COURT:  See you tomorrow.

24               MR. VALENTINI:  See you tomorrow.

25               THE COURT:  So moving on to 1620.

1          MS. JOHNSON:  This is juror number 1620.

2          THE COURT:  Thank you.

3          (Juror present)

4                    **(Juror number 1620)**

5                         **EXAMINATION**

6          THE COURT:  If you could have a seat.  Thank you.

7          And if you could take off your mask so we can hear

8     you.  You're number 1620, correct?

9          JUROR:  I am.

10         THE COURT:  So thanks for your patience.

11         JUROR:  You're welcome.

12         THE COURT:  I'm going to ask you a few followup

13    questions.

14         The first thing that you noted was that you have

15    lived, or worked at, or near the U.S. Capitol building.

16    Would you tell us about that.

17         JUROR:  I currently live in NOMA.

18         THE COURT:  Say that again.

19         JUROR:  I currently live in NOMA, so it's a Metro

20    stop away and I lived there previously as well.

21         THE COURT:  Yeah.  And where were you on

22    January 6?

23         JUROR:  I was in Chicago.

24         THE COURT:  Okay.  Did you follow the events that

25    day?

1          JUROR:  I was watching the certification of the

2     electoral college votes and saw what unfolded for the

3     remainder of the day.

4          THE COURT:  And were you watching it on social

5     media or television?

6          JUROR:  Yes.

7          THE COURT:  Which one?

8          JUROR:  Both.

9          THE COURT:  Okay.  Have you -- have you followed

10    it subsequently?

11         JUROR:  Yes.

12         THE COURT:  Extensively or not extensively?

13         JUROR:  I would say pretty extensively.

14         THE COURT:  On television, social media,

15    newspaper?

16         JUROR:  Social media and television.

17         THE COURT:  Okay.  What social media in particular

18    to you tend to follow.

19         JUROR:  Instagram, Twitter.  The various news

20    outlets, particularly on Twitter.

21         THE COURT:  What was the last one?

22         JUROR:  The news outlets on Twitter.

23         THE COURT:  Okay.  Do you -- one more question.

24         Do you think that -- and those are the only

25    questions that you wrote down here, 3, 6, and 8 actually.

1            So do you think that the exposure that you've had

2     or any feelings -- exposures you've had would make it

3     difficult for you to be a fair and impartial juror in this

4     case?

5            JUROR:  I think that I followed the events

6     broadly.  I do have pretty strong opinions about the event

7     as a whole that occurred that day.  However, I would be

8     objective to the facts of the case.

9            THE COURT:  So you believe that you could judge

10    this particular defendant and the evidence that is presented

11    with respect to his contact fairly and impartially without

12    being biased by what you've seen or heard before about

13    events generally?

14           JUROR:  Yeah.  I would base my opinion based off

15    of the facts of the case.  I would be a little bit

16    concerned, however, that kind of my political views would

17    probably sway in some capacity.

18           THE COURT:  Well, tell us, what do you mean by

19    your political views?

20           JUROR:  So I'm very liberal, I would say.  So I --

21    I think that kind of the January 6 event as a whole was --

22           THE COURT:  Well, I mean, everybody's got

23    political views.  And the question is whether those views

24    would lead you to, and you haven't said anything about

25    President Trump, but your liberal political views, your

1    views about those generally who participated in the events

2    of January 6, would interfere with your ability to judge

3    this case and the evidence against Mr. Gossjankowski or

4    whether you believe you could give him a fair and impartial

5    consideration of the evidence?

6         JUROR:  Yeah.  I would base my opinion based off

7    of whatever facts are presented.  I don't know anything

8    about his particular instance.

9         I don't think that just because someone was

10   present on January 6 that they have committed a crime or

11   have done something bad.  I think it's varied on an

12   individual basis.

13        THE COURT:  And so you would be willing to limit

14   yourself to the evidence you see and hear in the courtroom?

15        JUROR:  Correct.

16        THE COURT:  And would you follow my instructions

17   on the law?

18        JUROR:  Yes.

19        THE COURT:  And do you believe that somebody

20   charged with a crime is innocent until proven guilty?

21        JUROR:  Yes.

22        THE COURT:  Before I turn over to the lawyers,

23   could you tell us a little bit about your work, what you do?

24        JUROR:  I'm a consultant.

25        THE COURT:  That much I know, but I never know

1    what that means.

2              JUROR:  Yeah, I don't think anyone knows what it

3    means.

4              But I'm a consultant for the government.  So I've

5    worked with the Department of Homeland Security, IRS.

6              THE COURT:  And what kind of work, to the extent

7    you can tell us, that you do with Homeland Security?

8              JUROR:  It was finance.  Finance.

9              THE COURT:  Finance, okay.

10             All right.  Questions?

11                         **EXAMINATION**

12   BY MR. DREHER:

13   Q.  Good afternoon, ma'am.

14             So at least on the questionnaire it says Deloitte

15   is who you are a consultant for?

16   A.  Yes.

17   Q.  Yes.  Are you involved with the Capitol investigation

18   portion of Deloitte at all?

19   A.  No.

20   Q.  No.  And earlier you told us that you were actually in

21   Chicago on January 6th but watching the certification?

22   A.  Correct.

23   Q.  Was that for a hobby or as part of your work?

24   A.  It was hobby.

25   Q.  Hobby?

1    A.  I was interested in it.

2             THE COURT:  And were you watching it before

3    anything unusual happened or did you only start watching it

4    when you started to hear that things were happening?

5             JUROR:  Yeah, I was watching C-SPAN, watching the

6    actual certification of the votes and then things happened

7    and then I watched for the remainder of the day on kind of

8    things that unfolded.

9    BY MR. DREHER:

10   Q.  And the Chicago trip itself was preplanned and not

11   related to January 6 at all?

12   A.  No, I was in business school.

13            MR. DREHER:  Okay.  I have no further followup,

14   Your Honor.

15            THE COURT:  Okay.

16                          **EXAMINATION**

17   BY MR. SMOCK:

18   Q.  Hello.  I want to talk to you about the -- you said that

19   you follow news or followed news about January 6 on Twitter.

20            Are there any particular folks that you or

21   providers that you follow on Twitter?

22   A.  CNN and New York Times.

23   Q.  Okay.  So you're essentially getting news from --

24   through Twitter?

25   A.  Correct.

1    Q.  And no individuals who are posting about January 6 or

2    anything?

3    A.  No.

4    Q.  So you're -- would you say that you followed what

5    happened in the news after January 6 based on -- I don't

6    want to assume anything.  Why do you think that you followed

7    it so closely as you did?

8    A.  I followed it because I'm generally, like, pretty

9    politically in tune.

10        I would say that kind of the recent political

11   atmosphere has been pretty eventful and so to remain

12   educated I stay informed through news sources.

13   Q.  And in terms of the -- you talked a little bit about a

14   concern that you had about your political views maybe

15   seeping into your consideration of the evidence in the case.

16   Can you talk a little bit more about that.

17   A.  Yeah.  So I think given my general political leaning, I

18   think kind of the events as a whole on the day that

19   occurred, I generally think that those were wrong, but

20   because an individual was present that day it doesn't

21   necessarily mean that something illegal was done.

22        So I think I would be able to look at an

23   individual case based off the facts, but in general I think

24   that kind of the activities that went on that day were

25   generally wrong.

1      Q.  And do you -- I appreciate that.

2             Do you have any concerns about the -- well, let me

3      ask it this way.  Many people feel anger about what happened

4      on January 6, particularly people in D.C. and anger at

5      participants.  Is that a feeling that you've ever had?

6      A.  Yes.

7      Q.  Is it one that you continue to have?

8      A.  Yes.

9      Q.  And can you say with complete confidence that that anger

10     wouldn't seep into your viewing of the evidence in

11     consideration of the evidence in this case?

12     A.  I'm pretty confident in that, yes.

13     Q.  And how can you be confident?

14     A.  That's a good question.  I mean, I do ultimately believe

15     that everyone is innocent until proven guilty.  And just

16     because he was present that day doesn't mean that something

17     illegal happened.

18            However, there are kind of thoughts in the back of

19     my mind that could potentially creep in.

20     Q.  Okay.  And another thing to think about is the fact that

21     in this case there's going to be a fair amount of video

22     evidence that shows violence occurring.

23            And do you have any concern about that somehow

24     sort of maybe reinvigorating some of this anger or causing

25     you to separate out the particular elements that are being

```
 1    decided in this case?

 2    A.  I don't think I have a concern about seeing the video

 3    evidence.  I don't know, like, what it's going to be, so

 4    there's always the potential that it could stir something

 5    up.  But as of right now I would assume not.

 6    Q.  Okay.  This is a question I've asked other people, but

 7    just to get a sense of your thinking about this.

 8            If we were to talk about your confidence that none

 9    of these, this anger that you feel, that many people feel,

10    would enter your deliberations, if zero were that you cannot

11    be confident, that you're concerned it would enter your

12    consideration.  Five was, I'm sure it will not enter my

13    mind, where would you be on that spectrum?

14    A.  So five is confident that it will not?

15    Q.  Correct.

16    A.  Okay.  Probably like a 15 to 20.

17    Q.  That's --

18    A.  Sorry.

19    Q.  That's triple the scale?

20    A.  I'm sorry.

21    Q.  That's my fault.

22            THE COURT:  His hypothetical is zero, is I got

23    zero confidence that I can be fair and impartial.

24            JUROR:  Okay.  And then 100 was?

25            THE COURT:  Five, is that I have complete
```

1      confidence I can be fair and impartial.

2                  JUROR:  Okay, so I did triple his scale, I

3      apologize.

4      BY MR. SMOCK:

5      Q.  It's my fault.

6      A.  So with zero being very confident?

7                  THE COURT:  Zero being not confident.

8                  MR. SMOCK:  This is my fault.

9                  JUROR:  So zero is not confident, five is

10     extremely confident?

11                 THE COURT:  That's his question.

12                 JUROR:  Okay.

13                 MR. SMOCK:  I apologize.

14                 THE COURT:  I'm just trying to qualify.

15                 Zero being not confident and five being very

16     confident or completely confident or something.

17                 JUROR:  3.5 to 4.

18                 THE COURT:  What's your number?

19                 JUROR:  3.5 to 4.

20                 THE COURT:  3.5 to 4.

21                 MR. SMOCK:  Okay.

22                 THE COURT:  You can tell she's a consultant.

23                 JUROR:  Always provide a range.

24                 THE COURT:  Okay.  We're going to ask you to wait

25     outside for a few minutes with Ms. Johnson.

1          (Juror excused from courtroom)

2          MR. SMOCK:  Your Honor, I think in light of a

3    number of Ms. Glatt's answers we would move to strike for

4    cause.

5          She during the initial questioning indicated that,

6    number one, she followed the events of January 6 both before

7    and afterwards extensively, she had strong opinions as to

8    it, and that she had concerns that her strongly liberal

9    political rules would swing her opinion in this case.

10         She then, you know, indicated again, she affirmed

11   that when I was asking her the question and then gave a very

12   precise number of 3.5 to 4 in terms of her confidence that

13   she can be -- separate her views about January 6 from her

14   deliberations and I think that's not adequate.

15         She needs to be confident without any hesitation

16   that she would not let her strong political views, and her

17   anger about what happened on January 6, and people on

18   January 6 that it wouldn't enter her consideration and we

19   didn't get that from her.

20         MR. DREHER:  And, Your Honor, the government would

21   oppose a strike for cause.

22         I believe the potential juror has described, I

23   think, that the key difference of January 6 as a whole

24   versus weighing the evidence presented against Mr.

25   Gossjankowski fairly and impartially, and that she would be

1    able to not only do that but also follow the instructions of

2    this Court.

3              So certainly we would ask the Court not strike her

4    for cause and instead bring her back on Thursday.   Thank

5    you.

6              THE COURT:   Okay.   I'm going to deny the motion.

7              I think she can be fair and follow my

8    instructions.

9              (Juror present)

10             THE COURT:   So we're going to ask you come back

11   Thursday morning at 10:00.

12             JUROR:   Thursday.

13             THE COURT:   Report to the jury lounge on the

14   fourth floor where you started this morning.

15             Ms. Johnson will meet you there and we'll finish

16   this process.

17             JUROR:   Thank you.

18             THE COURT:   Thank you.

19             (Juror excused from courtroom)

20             THE COURT:   I'm going to take literally a

21   two-minute break.   I think we have three more people.   Two

22   minutes.   In case anybody else needs to.

23             (Recess taken at 5:02 p.m.)

24                           *    *    *    *    *

25        (5:06 p.m.)


LYNNE M. KRENZ, RMR, CRR, CRC
(651) 848-1226

```
 1                        IN OPEN COURT
 2            THE COURT:  Okay.  606 is next.
 3            (Juror present)
 4                    (Juror number 0606)
 5                        EXAMINATION
 6            THE COURT:  Sir, thank you for your patience.
 7   Please, if you wouldn't mind removing your mask so we can
 8   hear you better.
 9            You are number 606; correct?
10            JUROR:  0606, yes.
11            THE COURT:  So I want to follow up on some of the
12   things that you wrote down here.  And let me start at the
13   back actually.
14            I said we expect the presentation of evidence in
15   this case to conclude by the end of next week and after the
16   close of the evidence the jury will have to deliberate and
17   continue talking until it reaches a decision, which could
18   extend into the following week.
19            And I asked whether that might cause a hardship
20   for anybody.  What exactly is your concern about the timing?
21            JUROR:  Well, the concern about timing, I'm --
22   it's a -- it's a combination of things.
23            I'm an executive director of a youth soccer club
24   and we're heading into a very busy season and we have
25   several things going on right now.  And I have a couple of
```

1     coaches traveling that I cover for.

2                    I'm also a single parent and my daughter is with

3     me this week and so there's just a lot colliding at the same

4     time.

5                    I know this is a privilege to be and to serve but

6     it -- I don't know if I would be in the right frame of mind

7     to just be honest and, you know, to give my best if I am

8     selected to be on the jury.

9                    THE COURT:  Are you are you traveling in

10    connection with the soccer thing?

11                   JUROR:  We are, yes.  It's a travel --

12                   THE COURT:  In the next couple of weeks?

13                   JUROR:  Yes.  We're supposed to -- I mean, we have

14    tournaments and we have games.  It could be up to two hours,

15    it could be --

16                   THE COURT:  So what exactly is your position?

17                   JUROR:  I'm the director of soccer operation.

18                   THE COURT:  Director what?

19                   JUROR:  Soccer operation.

20                   THE COURT:  For?

21                   JUROR:  For Washington Capitol United.

22                   THE COURT:  Got it.  And you're a single parent as

23    well?

24                   JUROR:  I am.  My daughter is with me a week at a

25    time.

```
 1                THE COURT:  And how old is your daughter?

 2                JUROR:  My daughter is 17.

 3                THE COURT:  Say again?

 4                JUROR:  17.

 5                THE COURT:  17.

 6                JUROR:  Yep.

 7                THE COURT:  All right.

 8           Do you think that your work obligations would --

 9      if you were selected for this jury, do you think that your

10      focus -- that you would be unable to be fair and concentrate

11      on this case because of your concern about being away from

12      your work and not traveling?

13                JUROR:  That was my concern.  And in the back of

14      my mind is, you know, already from here I'm going to go

15      straight to the fields just making sure that I cover for the

16      coach.  So that is exactly what my mind frame is currently.

17                THE COURT:  All right.  Why don't we ask you to

18      step out for a minute.

19                (Juror excused from courtroom)

20                THE COURT:  Wait until the door closes.

21           I'm always reluctant to release someone based on

22      complaints about their job unless they're, you know,

23      self-employed, don't get a paycheck, if they're not working

24      and all of that.

25                On the other hand, there's something about what he
```

LYNNE M. KRENZ, RMR, CRR, CRC
(651) 848-1226

1    said that makes me think we're not going to get the best out

2    of him.

3              MR. DREHER:  That's correct, Your Honor.  I would

4    have no objection to striking him for cause.

5              MR. SMOCK:  No objection.

6              THE COURT:  Okay.

7              (Juror present)

8              THE COURT:  All right, sir.

9              We're going to excuse you from this jury.  And

10   what you need to do is call the jury office tomorrow night

11   after 5:00 and they'll tell you if they need you further.

12             I'm sure if you're called back they're going to

13   have the same -- any time in this next period you're going

14   to have the same concerns that you'll express to another

15   judge, but I understand it will be difficult for you to

16   concentrate on what's important to the people in this room

17   while you're focused on other things.

18             JUROR:  Thank you.

19             THE COURT:  So thank you.

20             JUROR:  Thank you.

21             (Juror excused)

22             THE COURT:  The next person is number 1924, who

23   has an -- who's got a lot of numbers he's written down.  A

24   lot.  And he doesn't list an occupation.

25             (Juror present)

```
 1                    (Juror number 1924)

 2                         EXAMINATION

 3             THE COURT:  Please have a seat.

 4             You're number 1924; is that right?

 5             JUROR:  Yep, that's correct.

 6             THE COURT:  Do you mind taking off your mask so we

 7    can hear you better.

 8             JUROR:  Yes.

 9             THE COURT:  So this list doesn't list any

10    employment for you.  Are you employed currently?

11             JUROR:  Yes, I am.

12             THE COURT:  What do you do?

13             JUROR:  I'm in cyber security and financial

14    services.

15             THE COURT:  In what.

16             JUROR:  I do cyber security.

17             THE COURT:  For whom do you work?

18             JUROR:  J.P. Morgan.

19             THE COURT:  Okay.  I don't know why I didn't have

20    anything down here.

21             So I want to follow up on some of the questions

22    that you have auto answered here.

23             JUROR:  Mm-hmm.

24             THE COURT:  Let's start at the beginning.

25             Have you or -- you personally, or have any close
```

```
1    friends, or family members who have ever worked on Capitol

2    Hill?

3              JUROR:  Yes, that's correct.

4              THE COURT:  So who?

5              JUROR:  My wife used to do some deliveries there

6    at the Capitol.

7              THE COURT:  At where?

8              JUROR:  At the Capitol.

9              THE COURT:  And what did she do there?

10             JUROR:  She made deliveries.

11             THE COURT:  Okay.  Did you follow on January 6th

12   the events that were going on at the Capitol?

13             JUROR:  Yes.

14             THE COURT:  Was your wife at the Capitol?

15             JUROR:  No, that was a job many years ago.

16             THE COURT:  Oh, okay.

17             JUROR:  Yeah, this was recent.

18             THE COURT:  And how did you follow, television or

19   social media, or what?

20             JUROR:  Television.

21             THE COURT:  And did you watch most of it that day?

22             JUROR:  Yes, I did watch it live.

23             THE COURT:  Yeah, and what about January 6 have

24   you continued to follow it?

25             JUROR:  As it's come up in the news in the top
```

1    stories.  Did watch the hearings as well.  I know that's a

2    later question.

3                THE COURT:  Would you say that you watched it

4    extensively or not extensively or?

5                JUROR:  I didn't go out of my way to find it, if

6    that makes sense.

7                THE COURT:  Yeah.

8                JUROR:  It was top of the news, so I watched when

9    I was on.

10               THE COURT:  Do you follow any particular social

11   media platforms or use any?

12               JUROR:  Yes, like just name them and stuff?

13               THE COURT:  Yeah.

14               JUROR:  So, I mean, yeah, I do follow on Facebook

15   or Instagram.  I've seem things go by on TikTok recently

16   too.  But, yeah, just that's really the only ones.

17               THE COURT:  And you indicate in question number 11

18   that you viewed or listened to at least some of the

19   congressional hearings.

20               Did you watch a lot of it, or some of it, or what?

21               JUROR:  I think there was, like, three or four of

22   the hearings.  I think I watched, like, three of them.  I

23   didn't watch all of them.

24               THE COURT:  You watched them from beginning to end

25   or just portions of each of them?

1          JUROR:  Just portions, like when it was on, once

2     again.

3          THE COURT:  Do you think that your exposure of the

4     January 6th stuff that you've seen on social media, and

5     television, and so forth would affect your ability to be a

6     fair and impartial juror in this case?

7          MR. SMOCK:  So I guess can you expand kind of what

8     you mean by that?

9          THE COURT:  Well, what I'm going to tell the

10    jury --

11         JUROR:  Mm-hmm.

12         THE COURT:  -- is that they can only consider the

13    evidence that they see and hear in this courtroom.  There

14    will be witnesses who testify and there will be videos and

15    other pieces of evidence.

16         Do you think that you can limit your consideration

17    only to the evidence that you hear in the courtroom or do

18    you think you would be affected by the stuff you've already

19    seen or heard?

20         JUROR:  So it's -- to me it's hard to answer the

21    question just because I don't know what that might be, what

22    I might have seen before that would be related to that.

23         I mean, I will try to do it to the best of my

24    ability.  I will say that I don't think anyone should have

25    gone into the building, but I'll just kind of --

1          THE COURT:  Well, let's start with the assumption

2     that this defendant, Mr. Gossjankowski, went into the

3     building and he's charged with doing certain things in the

4     building.

5          JUROR:  Mm-hmm.

6          THE COURT:  Would you hold that against him from

7     the outset based on what you've seen and heard or would you

8     wait to see what evidence the government has about the

9     charges against him and his conduct?

10          JUROR:  Yeah, I would want to understand more of

11     what those charges were that specifically happened going in

12     -- going into the building.  So, yes, I believe I could

13     impartially judge that.

14          THE COURT:  Okay.  Do you think in general that

15     everyone who was arrested or involved in the events of

16     January 6 is probably guilty of what they're charged with

17     doing?

18          JUROR:  I believe there is a lot -- if there's a

19     lot of video evidence, there's a lot of things that show

20     that they were there and in a place that they weren't

21     supposed to be, that would put me in that ballpark, yes.

22          THE COURT:  Do you understand that in any criminal

23     case the government has to prove somebody's guilty beyond a

24     reasonable doubt in order for a jury to find them guilty?

25          JUROR:  Yes.  I understand that.

1            THE COURT:  And would you be willing and able to

2    apply that law even though you think that somebody's

3    probably guilty?

4            JUROR:  Yes.  Because I do believe that if there's

5    not enough evidence to show that then, like to probably show

6    that someone was in that place at the wrong time then, yes,

7    I do believe in the fact that we are a -- yeah, that our

8    justice system works in the way that you're innocent until

9    proven guilty.

10           THE COURT:  So you also answered question 13.

11           Would your opinion concerning President Trump or

12    his supporters make it difficult for you to serve as a fair

13    and impartial juror in this case?

14           JUROR:  Yes.  I do not agree with his views and do

15    think there are illegalities that he did perform.

16           THE COURT:  So I understand you don't agree with

17    his views.

18           JUROR:  Mm-hmm.

19           THE COURT:  But would you still be able to fairly

20    judge the conduct of this particular defendant in this case

21    even -- and I don't know what his -- what Mr.

22    Gossjankowski's views are.

23           JUROR:  Right.

24           THE COURT:  But even if he shared those views or

25    some of those views, would you still be able to fairly judge

1      him and the conduct that he is charged with on that day?

2                  JUROR:  Yeah, he is not former President Trump, so

3      he is a different individual, so yes.

4                  THE COURT:  This is a different set of questions.

5                  I asked whether you, or an immediate family

6      member, or a close personal friend, or coworker is deaf or

7      hard of hearing.

8                  JUROR:  Yes.  My grandmother has got a hearing aid

9      or refuses, I should say, to use her hearing aid.

10                 THE COURT:  Okay.

11                 JUROR:  So very hard of hearing, just, yeah.

12                 THE COURT:  But she was a hearing individual

13     before that --

14                 JUROR:  Yes, yes, yes.

15                 THE COURT:  She wasn't deaf?

16                 JUROR:  Right.  That's correct.  She is deaf now,

17     but not previously.

18                 THE COURT:  Yeah.

19                 JUROR:  Yeah.

20                 THE COURT:  Yeah, I'm having hearing problems

21     myself at this point.

22                 Have you, or a close friend, or family member had

23     any experience -- this is Question 20, have had any

24     experience with a stun gun, or a taser, or other conducted

25     electrical weapon?

1          JUROR:  Yes.  I've got friends that are law

2     enforcement officer both in D.C. and Fairfax County.

3          THE COURT:  And so what -- what are you familiar

4     with, tasers, stun guns?

5          JUROR:  Yeah, that they have used and would know

6     how to use a taser, yes.

7          THE COURT:  Have you talked to them about that?

8          JUROR:  No.  I just know that in their profession

9     they have used them, yes.

10          THE COURT:  I mean, have you had any discussions

11     with them about the use of a taser, a stun gun or anything

12     else?

13          JUROR:  Just in general or in this specific case?

14          THE COURT:  Well, I just want to know whether

15     you've talked to any of your friends in law enforcement

16     about the use of a taser, for example, or a stun gun?

17          What it does, what it's used for, what effect it

18     has, things like that.

19          JUROR:  Yeah, the only case I can think of, and

20     this is just -- this is my old, very old high school friend,

21     just how they had went through the Police Academy training.

22     They had to know what it felt like, so they had to be tased

23     and go through that experience.

24          THE COURT:  Had to be tased?

25          JUROR:  Yes.

1          THE COURT:  And was that in the Police Academy

2     here in D.C.?

3          JUROR:  No, in Virginia.

4          THE COURT:  In Virginia.

5          JUROR:  Yeah.

6          THE COURT:  Okay.  So speaking of that individual,

7     and you mentioned others as well, do you have such strong

8     feelings or opinions about police, either positive or

9     negative, that it would be difficult for you to treat

10    testimony of law enforcement officers the same as other

11    witnesses?

12          Would it be difficult for you not to give greater

13    weight or lesser weight to the testimony of a police officer

14    witness?

15          JUROR:  So I do believe, once again, it comes back

16    to the context of that testimony.  If they were serving in a

17    defense capability, I would be believing that they are --

18    they know what they're doing, they know what they are

19    performing there, so I may feel slightly more inclined.

20          But on the other side of that too, I do also

21    believe that there is a lot going on in policing right now

22    that there could be room for improvement.

23          Does that answer your question on both kind of

24    positive and negative sides, so I think that kind of --

25          THE COURT:  Would you evaluate their testimony

1    just the way you would other witnesses?

2              JUROR:  Yes.

3              THE COURT:  Have you or family members ever worked

4    in the criminal justice system, public defender, probation,

5    correctional facility?

6              JUROR:  Yes.  I've got a friend that is a public

7    defender in Virginia and then I've also had got a friend

8    that works as a counsellor within the prison system in

9    Pittsburgh.

10             THE COURT:  Okay.  And what about -- you mentioned

11   law enforcement?

12             JUROR:  Mm-hmm.

13             THE COURT:  So you mentioned police in Virginia.

14   What about D.C. Police, Capitol Police, Secret Service,

15   Homeland Security?

16             JUROR:  Yes.  D.C. Metropolitan Police.

17             THE COURT:  You have currently --

18             JUROR:  Yes.

19             THE COURT:  Metropolitan Police?

20             JUROR:  Yes.  And I should also add that she was

21   on call that day but not at the Capitol.

22             THE COURT:  She was on call that day but not at

23   the Capitol?

24             JUROR:  Yeah.

25             THE COURT:  Have you talked to her about the

1     events on that day?

2            JUROR:  I have in the general sense, but once

3     again, it's more of she was not one of the ones that were

4     directly there.  It's surrounding areas outside of the

5     grounds.

6            THE COURT:  Have you, or members of your immediate

7     family, or close personal friends ever been the victim or a

8     witness to a crime?

9            JUROR:  Yes.  But once -- these are, like, minor

10    things.  So having our car broken into.  Having -- a friend

11    of mine got mowed down the streets of D.C. and law

12    enforcement responded very quickly to that.  So, yes.

13           THE COURT:  Okay.  Why don't we ask you to wait

14    for a couple minutes outside.

15           JUROR:  Sure.

16           (Juror excused from courtroom)

17           THE COURT:  Well, both sides have the right to ask

18    whatever questions you want to ask but I have real concerns

19    about this guy.

20           MR. DREHER:  I'm sorry, Judge.  You said you did

21    have concerns?

22           THE COURT:  I do.

23           MR. DREHER:  Okay.

24           THE COURT:  I have real concerns about this guy.

25           So if you want us -- it's 20 after 5:00, if you

```
1    wanted to spend time to try to save him we can do that, but
2    it's going to take awhile.
3                   MR. DREHER:  No, Judge, no.
4                   THE COURT:  Okay.
5                   MR. SMOCK:  No objection.
6                   THE COURT:  All right.  The government's only
7    magnanimous after 5:00.
8                   (Juror present)
9                   THE COURT:  All right, sir.  We're going to excuse
10   you from this jury, so you're free to go.
11                  And if you would call the jury office tomorrow
12   after 5:00 and see if they need you further for another
13   jury.
14                  JUROR:  Okay.
15                  THE COURT:  That would be great.
16                  JUROR:  Okay.
17                  THE COURT:  Thank you very much.
18                  You call them after 5:00, that number you're
19   supposed to call, but not tonight, tomorrow tonight.
20                  JUROR:  Okay.  Tomorrow.
21                  THE COURT:  Okay.  Thanks.  Thank you for your
22   patience.
23                  (Juror excused)
24                  THE COURT:  All right.  We are now at 888, which
25   should be the last person for today.  Works at Arlington
```

 1     Public Schools, a social worker.

 2              (Juror present)

 3              JUROR:  Hi there.

 4                  **(Juror number 0888)**

 5                      **EXAMINATION**

 6              THE COURT:  You are the most patient one here

 7     since you're the last one for the day.

 8              JUROR:  Yes, all right.  Let's do this.

 9              THE COURT:  Would you mind taking off your mask so

10     we can hear you?

11              JUROR:  Yeah.

12              THE COURT:  So you're number 888; correct?

13              JUROR:  Yes.

14              THE COURT:  So just a few followups to the

15     questions you put down here.

16              And you said that you followed the news, videos,

17     whatever about the January 6th event on January 6th?

18              JUROR:  A little bit.  I'll be honest, you can't

19     miss it in the news unless your head's in the sand.  But I

20     do it moderately.  I'm not obsessed.  And, yes, I live in

21     the district, so everybody I knew was texting me on that

22     day.

23              THE COURT:  And where were you on January 6th?

24              JUROR:  I was at home working from home.

25              THE COURT:  Okay.  So you work for Arlington

```
 1     Public Schools?

 2               JUROR:  Yes.

 3               THE COURT:  But that day you were working from

 4     home?

 5               JUROR:  Yes, I forget why.  Yeah, I can't remember

 6     if that day we were still in COVID.

 7               THE COURT:  Yeah.  And home is in upper northwest?

 8               JUROR:  Yes.

 9               THE COURT:  Up Reno Road.

10               JUROR:  Yep.  Off of Connecticut.

11               THE COURT:  Off of Connecticut?

12               JUROR:  Near Politics and Prose -- Nebraska and

13     Connecticut.

14               THE COURT:  Yeah, I know exactly.

15               JUROR:  Yeah.

16               THE COURT:  You still live on Ingomar?

17               JUROR:  Yes.  Yep, next one over.

18               THE COURT:  You were not near the Capitol

19     yourself?

20               JUROR:  Nope.

21               THE COURT:  And have you followed intermittently

22     since then?

23               JUROR:  No, I mean, peripherally.

24               THE COURT:  Where do you normally get your news?

25               JUROR:  Probably the Post, Washington.
```

1          THE COURT:  Do you watch any television news?

2          JUROR:  Not too much, no.

3          THE COURT:  Social media?

4          JUROR:  Not really.  You know, every one off --

5    somebody texts me something, but I'll not seeking it out.

6          THE COURT:  I asked whether you, or anybody close

7    to you, a close friend, or immediate family member, or

8    coworker are deaf or hard of hearing.

9          JUROR:  My father was, passed away last year.

10          I have a close friend who's partial and then some

11    of the students I work with.

12          THE COURT:  So your father wasn't deaf from birth

13    though?

14          JUROR:  No.  Thirties, so when I was a kid.  But

15    not -- he didn't do sign language.

16          THE COURT:  Yeah, I mean, people get older and

17    they have hearing problems --

18          JUROR:  Yeah.

19          THE COURT:  -- and hearing aids.

20          JUROR:  Yes.

21          THE COURT:  That's the sort of thing.

22          JUROR:  He was in his thirties when he lost his

23    hearing.

24          THE COURT:  From when?

25          JUROR:  In his thirties.

```
 1              THE COURT:  Oh, so he lost his hearing young?

 2              JUROR:  Yeah, yeah.

 3              THE COURT:  Yeah.  And how did he communicate

 4    after that?

 5              JUROR:  He was still young.  He could speak.  But

 6    you just had to speak to him.

 7              THE COURT:  Did he use American Sign Language?

 8              JUROR:  No.

 9              THE COURT:  Did he ever learn it?

10              JUROR:  No.

11              THE COURT:  I did ask though, and I don't know if

12    this was related or not, whether you, or a family member, or

13    close friend ever worked at, or attended, or participated at

14    programs at Gallaudet.

15              JUROR:  My husband.  They're a client of his, the

16    University is.

17              THE COURT:  He's what?

18              JUROR:  The University is a client of my

19    husband's.

20              THE COURT:  Oh, okay.

21              JUROR:  And he does work with them.

22              THE COURT:  And what kind of work does he do?

23              JUROR:  Financial services.

24              THE COURT:  Okay.  So he's on the campus

25    occasionally?
```

```
1                   JUROR:  Yeah.

2                   THE COURT:  And works with administrators there?

3                   JUROR:  Yeah, exactly.

4                   THE COURT:  Have you, or members of your immediate

5         family, or close personal friends ever been a victim of a

6         crime or witness to a crime?

7                   JUROR:  Me and my husband.  We were held up on

8         Capitol Hill.  It's been a while, but...

9                   THE COURT:  How long ago?

10                   JUROR:  25 years, huh.

11                   THE COURT:  Did the -- did you just report it?

12                   JUROR:  Yeah, we were held up at gunpoint.  Yeah.

13                   THE COURT:  Did the police respond?

14                   JUROR:  Mm-hmm.  The police responded.

15                   THE COURT:  Took a report?

16                   JUROR:  They were kids.

17                   THE COURT:  Did they ever arrest anybody?

18                   JUROR:  They arrested them but they went into

19         juvenile court and we don't know what happened, so...

20                   THE COURT:  You don't know what happened?

21                   JUROR:  Yeah.

22                   THE COURT:  And your last question you answered

23         was your prior jury service.  Could you tell us about that.

24                   JUROR:  I have sat on probably five or six juries.

25                   THE COURT:  Civil or criminal?
```

1          JUROR:  I guess both.

2          THE COURT:  Both.  Across the street?

3          JUROR:  Yeah, across the street.

4          THE COURT:  All right.

5          JUROR:  Yeah, it's been a while.

6          THE COURT:  I mean, and when was the last time

7    roughly?

8          JUROR:  It was probably ten years at least.

9          THE COURT:  Okay.  With respect to criminal

10   trials, do you remember what the charges were on any of

11   them?

12         JUROR:  I want to say it was like a robbery, a CVS

13   with a gun.

14         THE COURT:  Okay.

15         JUROR:  That's all I can remember.

16         THE COURT:  Was the jury able to reach a verdict?

17         JUROR:  Yeah.

18         THE COURT:  Do you remember what it was?

19         JUROR:  I don't.

20         THE COURT:  You don't remember what it was?

21         JUROR:  I'm sorry, I don't.

22         THE COURT:  Okay.  But the jury was able to agree?

23         JUROR:  Yeah, Mm-hmm.

24         THE COURT:  Okay.  Followup questions from either

25   side or both sides?

1                          **EXAMINATION**

2      BY MR. DREHER:

3      Q.  Good afternoon -- or good evening, ma'am.

4              Ultimately you told us that your father didn't

5      speak American Sign Language but then you've had other

6      interactions with hard of hearing.  Do you speak American

7      Sign Language?

8      A.  No.

9              THE COURT:  No.  Her comment was her husband has

10     got Gallaudet as a client and has worked with at

11     administrators there, but...

12             JUROR:  And my father.  He's referring to the

13     question about --

14             THE COURT:  Oh, I'm sorry.

15             JUROR:  No, I do not speak American Sign Language

16     or I don't sign.

17     BY MR. DREHER:

18     Q.  Now does your husband speak American Sign Language much

19     at work?

20     A.  No.

21     Q.  And then I guess are you familiar with Gallaudet's

22     campus or sort of the --

23     A.  Not really.  I mean, I went to Catholic University, so

24     I've been in the area for a long time, but no.  I mean, I've

25     been on campus for track meets for my kids, whatever, but

LYNNE M. KRENZ, RMR, CRR, CRC
(651) 848-1226

1      I'm not -- if you ask me where to go on campus I would have

2      to look it up on a map.

3                  MR. DREHER:  Okay.  I have no further followup,

4      Your Honor.

5                  THE COURT:  Mr. Smock.

6                              **EXAMINATION**

7      BY MR. SMOCK:

8      Q.  Hello.

9      A.  Hi.

10     Q.  Just briefly.  You know a lot of people in D.C. have

11     strong feelings about what happened on January 6th and

12     people who were involved that day.

13                  Is that something that -- do you have fairly

14     strong feelings about what happened on January 6th?

15     A.  I mean, yes, I could say I have strong feelings, yeah.

16     I would, yeah.

17     Q.  Can you talk about that just briefly.

18     A.  Well, I mean, I, you know, I guess -- I don't think it

19     was right what happened and I think it's maybe both sides

20     have painted a picture that isn't quite accurate, so, but

21     I'm not, I don't feel so -- I don't, like, get in arguments

22     with people over it, so.

23                  But, yeah, I mean, you have feelings about it, you

24     see stuff in the news.  You're going to, you know, have

25     feelings about it.

 1     Q.  Thanks.  I think just what we're hoping is that you can

 2     assure us that whatever those feelings are, you feel

 3     comfortable that you'll be able to look at the specific

 4     evidence in this case and the elements of the offenses and

 5     decide just based on what's happening in this courtroom?

 6     A.  Yeah.

 7     Q.  You feel confident about that?

 8     A.  Yeah.

 9               MR. SMOCK:  Okay.  Thank you.

10               THE COURT:  Okay.  So unless anybody has anything

11     further they want to raise, I think we'll ask you to come

12     back Thursday morning at 10:00, not tomorrow, Thursday.

13               Go back to the jury lounge on the fourth floor.

14     Ms. Johnson will be there to meet and greet you and others.

15     And then we will finish this process on Thursday.

16               JUROR:  Okay.  All right.

17               THE COURT:  Thank you very much for your patience.

18               JUROR:  Thank you.

19               THE COURT:  We do appreciate it.

20               JUROR:  Sure.  Good night.

21               THE COURT:  You can go straight out that way,

22     thank you.

23               (Juror excused from courtroom)

24               THE COURT:  All right.  So we've got, I guess,

25     both group 3 and 4 are coming in at 9:30 in the morning; is

1     that right?

2               MS. JOHNSON:  (Nods head).

3               THE COURT:  So we are one group behind.

4               But we will start with group 3 since they waited

5     much of this afternoon and then move on.  And hopefully we

6     can be reasonably efficient.

7               And the jury selection this morning, the first

8     part of it, took a while, just the logistics and everything,

9     so hopefully we'll get a lot more done tomorrow morning and

10    hopefully we won't have to go through all 70 of them to get

11    the critical number, but we'll see.

12              All right everybody.  Have a good evening.  We'll

13    all see each other tomorrow.

14              (Court adjourned at 5:34 p.m.)

15                  *           *           *

16                    **REPORTER'S CERTIFICATE**

17

18              I certify the foregoing pages of typewritten
      material constitute a full, true and correct transcript of
19    my original stenograph notes, as they purport to contain, of
      the proceedings reported by me at the time and place
20    hereinbefore mentioned.

                        /s/Lynne M. Krenz
21                      Lynne M. Krenz, RMR, CRR, CRC

22

23

24

25