```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
       ------------------------------------------------------------
 3                                    )
       United States of America,      )   File No. 21-cr-123
 4                                    )            (PLF)
                Plaintiff,            )
 5                                    )   VOLUME II
       vs.                            )   Washington, D.C.
 6                                    )   March 1, 2023
       Vitali Gossjankowski,          )   10:09 a.m.
 7                                    )
                Defendant.            )
 8     ------------------------------------------------------------

 9
                 BEFORE THE HONORABLE PAUL L. FRIEDMAN
10               UNITED STATES DISTRICT COURT JUDGE
                         (JURY SELECTION)
11
       APPEARANCES:
12       For the Plaintiff:         United States Attorney's Office
                                    Adam Dreher, AUSA
13                                  Francesco Valentini, AUSA
                                    Karen Rochlin, AUSA
14                                  Capitol Siege
                                    601 D Street NW
15                                  Washington, Minnesota 20530

16       For the Defendant:         Federal Public Defender for the
                                    District of Columbia
17                                  Celia Goetzl, ESQ.
                                    Edward Smock, ESQ.
18                                  625 Indiana Avenue NW
                                    Suite 550
19                                  Washington, D.C. 20004

20       Court Reporter:            Lynne M. Krenz, RMR, CRR, CRC
                                    Suite 146
21                                  316 North Robert Street
                                    St. Paul, Minnesota 55101
22
         American Sign Language     Sara Blattberg
23       Interpreters:              Carla Mathers

24
                  Proceedings reported by certified stenographer;
25     transcript produced with computer.
```

1                                **I N D E X**

2
                                                                 <u>PAGE</u>
3
        **JUROR NUMBER 0496**
4           Examination by the Court                             256
            Examination by Mr. Dreher                            262
5
        **JUROR NUMBER 1167**
6           Examination by the Court                             265
            Examination by Mr. Dreher                            272
7           Examination by Mr. Smock                             273

8       **JUROR NUMBER 0716**

9           Examination by the Court                             279
            Examination by Mr. Smock                             288
10          Examination by the Court                             292

11      **JUROR NUMBER 1492**
            Examination by the Court                             297
12          Examination by Mr. Dreher                            305
            Examination by Mr. Smock                             306
13
        **JUROR NUMBER 1116**
14          Examination by the Court                             310
            Examination by Mr. Dreher                            320
15          Examination by Mr. Smock                             323
            Examination by Mr. Dreher                            326
16          Examination by the Court                             328

17      **JUROR NUMBER 1627**

18          Examination by the Court                             334
            Examination by Mr. Dreher                            344
19          Examination by Mr. Smock                             346

20      **JUROR NUMBER 1376**
            Examination by the Court                             348
21
        **JUROR NUMBER 0737**
22          Examination by the Court                             350
            Examination by Mr. Dreher                            358
23          Examination by Mr. Smock                             360

24      **JUROR NUMBER 1478**
            Examination by the Court                             364
25          Examination by Mr. Dreher                            370
            Examination by Mr. Smock                             373

**JUROR NUMBER 0795**
    Examination by the Court    381
    Examination by Mr. Smock    385

**JUROR NUMBER 1640**
    Examination by the Court    387
    Examination by Mr. Dreher    397
    Examination by Mr. Smock    398

**JUROR NUMBER 0059**
    Examination by the Court    405

**JUROR NUMBER 1918**

    Examination by the Court    411
    Examination By Mr. Dreher    415
    Examination By Mr. Smock    416

**JUROR NUMBER 1606**
    Examination by the Court    418
    Examination by Mr. Dreher    429
    Examination by Mr. Smock    431

**JUROR NUMBER 1427**
    Examination by the Court    438

**JUROR NUMBER 1540**
    Examination by the Court    443
    Examination by Mr. Dreher    448

**JUROR NUMBER 0029**

    Examination by the Court    450
    Examination by Mr. Dreher    458

**JUROR NUMBER 1570**
    Examination by the Court    461
    Examination by Mr. Dreher    472
    Examination by Mr. Smock    474

**JUROR NUMBER 0331**
    Examination by the Court    479

**JUROR NUMBER 1675**
    Examination by the Court    483
    Examination by Mr. Smock    489

1    **JUROR NUMBER 0498**
           Examination by the Court                             491
2          Examination by Mr. Dreher                            496
           Examination by Mr. Smock                             498
3          Examination by the Court                             502

4    **JUROR NUMBER 1715**
           Examination by the Court                             508
5          Examination by Mr. Dreher                            514
           Examination by Mr. Smock                             515
6
     **JUROR NUMBER 1428**
7          Examination by the Court                             521
           Examination by Mr. Dreher                            525

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2                        **IN OPEN COURT**

3        (Defendant present)

4            MS. JOHNSON:  This is criminal action 21-123,

5    United States versus Vitali Gossjankowski.

6            For the United States I have Francesco Valentini,

7    Adam Dreher, and Karen Rochlin.

8            For defendant I have Edward Smock, Celia Goetzl.

9            Our interpreters today are Sara Blattberg and

10   Carla Mathers.

11           Our court reporter is Lynne Krenz.

12           All parties are present.

13           THE COURT:  Okay.  Good morning, everybody.

14           So is there anything anybody needs to raise before

15   we get the first of our jurors in?

16           MR. SMOCK:  Just very briefly, and I know I've

17   mentioned this before, I was thinking overnight just about

18   how we might do this very easily, again, because we don't

19   have access to that card, I wonder whether before the juror

20   comes in or even as they're sitting there you can simply say

21   6, 12, 14.

22           THE COURT:  No.

23           MR. SMOCK:  Okay.

24           THE COURT:  You'll follow along.  It's not that

25   hard.  Who's coming up?

```
 1              MS. JOHNSON:  We have juror number 0496.

 2              THE COURT:  Who's answered a lot of questions,

 3     written a lot of numbers down.

 4              (Juror present)

 5                        (Juror Number 0496)

 6                           EXAMINATION

 7              THE COURT:  Good morning.

 8              JUROR:  Good morning.

 9              THE COURT:  Please have a seat, please.

10              Take off your mask, if you don't mind, so you can

11     talk into the microphone, so we can hear you.

12              So you're a legal assistant at a law firm?

13              JUROR:  I'm actually the manager of the legal

14     assistants at a law firm.

15              THE COURT:  Manager of legal assistants?

16              JUROR:  Correct.

17              THE COURT:  What's the law firm?

18              JUROR:  Redgrave LLP.

19              THE COURT:  Where are your offices?

20              JUROR:  Chantilly, Virginia.

21              THE COURT:  Okay.

22              JUROR:  Prior to that I managed the docket

23     department at Steptoe in DuPont.

24              THE COURT:  You do or you did?

25              JUROR:  I did.
```

```
1              THE COURT:  Okay.

2              JUROR:  Previously.

3              THE COURT:  So, because the first question you

4    answered was number 3, I think it was number --

5              JUROR:  That's correct.

6              THE COURT:  Did you write down Number 1 and cross

7    it out?

8              JUROR:  I did, yes.

9              THE COURT:  Okay.  Number 3, whether you live or

10   work at or near the Capitol.

11             JUROR:  Correct.  I'm a 15-year resident of

12   Capitol Hill.

13             THE COURT:  Okay.

14             JUROR:  And I actually was working at home on

15   January 6th.

16             THE COURT:  You were at home on that day?

17             JUROR:  I was, yes.

18             THE COURT:  And without giving me the street

19   address, could you just tell me where on The Hill you are?

20             JUROR:  I live about four blocks west of Lincoln

21   Park.

22             THE COURT:  Four blocks west of Lincoln Park.

23   Okay.

24             JUROR:  So, yes.

25             THE COURT:  So, yeah, so you're 9th, or 12th, or
```

```
 1        something like that?
 2               JUROR:  Yeah, on Independence.
 3               THE COURT:  Closer to the Capitol?
 4               JUROR:  Correct.
 5               THE COURT:  Rather than closer to RFK Stadium?
 6               JUROR:  Exactly.
 7               THE COURT:  Yeah.  Okay.  So have you, or a close
 8        friend, or family member ever worked on Capitol Hill?
 9               JUROR:  Correct.  My best friend was a legislative
10        assistant, I believe, for Senator Frank Lautenberg of New
11        Jersey.  And my current roommate was a former aide, I
12        believe, for -- I forgot his exact position, for a
13        Congressperson in Georgia.
14               THE COURT:  For whom?
15               JUROR:  I forget the person now.
16               THE COURT:  Okay.
17               JUROR:  He or she no longer is in Congress.
18               THE COURT:  Got it.
19               JUROR:  But was, I believe, at that point.
20               THE COURT:  So you were at home on The Hill that
21        day?
22               JUROR:  Correct.
23               THE COURT:  And was your roommate there as well?
24               JUROR:  Honestly, I don't remember.
25               THE COURT:  Okay.  And did you follow the events
```

```
 1            that day?  That's question Number 6.

 2                       JUROR:  I did.

 3                       THE COURT:  Closely?

 4                       JUROR:  Yes.  Via social media.  We had news

 5            reports.  I was -- because I lived so close and I

 6            experienced it, I did keep close tabs on the

 7            repercussions --

 8                       THE COURT:  Yes.

 9                       JUROR:  -- of that day.

10                       THE COURT:  So, and you've been following it

11            since?

12                       JUROR:  I have.

13                       THE COURT:  And how do you follow?  What

14            particular social media that you use to follow?

15                       JUROR:  Twitter, Facebook, message boards like

16            Reddit.

17                       THE COURT:  And do you read particular newspapers

18            or television channels?

19                       JUROR:  Yes.  I subscribe to both the Washington

20            Post, and the New York Times, and I follow their coverage

21            there as well.

22                       THE COURT:  So the next question is question

23            number 8 -- 7, I'm sorry.  And that's whether you have such

24            strong feelings, either positive or negative, about the

25            events on January 6th that would make it difficult for you
```

1      to be a fair and impartial juror in this case or to follow

2      my instructions on the law to apply?

3                  JUROR:  Yes.

4                  THE COURT:  Please explain, because that's

5      important.

6                  JUROR:  Understood.  I don't believe I can being

7      impartial mainly because I have been following this case so

8      closely.

9                  I know number 5, which I added later, was how your

10     life was, I guess, affected by the events of January 6th,

11     because like I mentioned before, I'm a Hill resident.  I

12     spent the next six months or eight months having my

13     neighborhood fenced in.

14                 THE COURT:  Having what?

15                 JUROR:  My neighborhood fenced in, not being able

16     to travel, you know, from travelling, west, you know, west

17     of the Capitol to my house.  I had to take more expensive

18     Uber rides.  I couldn't just directly walk just across the

19     Capitol grounds, I had to, you know, go way out of my way.

20                 And one of my favorite things to do was to walk

21     from my house past the Capitol building to the Washington

22     Monument, come back.  And because of the fencing I wasn't

23     able to do things like that.  And I know in the grand scheme

24     of things was incredibly minor, but those inconveniences add

25     up.

```
 1                  To answer your question more directly, I was very
 2       perturbed by some of the images I saw on September -- on
 3       January 6th on social media, on newspaper articles, and it's
 4       very difficult for me to put all that aside and be impartial
 5       in this case.
 6                  THE COURT:  And I noticed you added number 5 later
 7       on.
 8                  JUROR:  Yes.
 9                  THE COURT:  And number 11 you wrote down too,
10       which is whether you watched any portion of the hearings.
11                  JUROR:  Yes.
12                  THE COURT:  A lot?
13                  JUROR:  A fair amount.  As much as I could.
14       Because, again, I do work from home, so I did have the TV on
15       while working.
16                  THE COURT:  So you were at home so you could watch
17       it?
18                  JUROR:  Exactly.
19                  THE COURT:  But you also were supposed to be
20       working.
21                  From what you've -- all of this background you've
22       just given us, do you think that people who were arrested
23       for involvement in events of that day are likely guilty of
24       the charges brought against them?
25                  JUROR:  Correct.  I do.
```

```
1              If they were on the grounds during that day, I

2    believe they were likely guilty of charges the government

3    put forward.

4              THE COURT:  Okay.  Well, this juror has answered a

5    number of additional questions but not related to the topic

6    we've been discussing.

7              Would anybody like to ask any followup questions

8    of this potential juror or not?

9              MR. DREHER:  Just briefly, Your Honor.

10                           EXAMINATION

11   BY MR. DREHER:

12   Q.  Now, you mentioned that certainly the events of

13   January 6th did affect sort of your neighborhood and your

14   ability to move around.

15             Do you have any reason to think that you've ever

16   met the -- Vitali Gossjankowski before or seen him from that

17   day?

18   A.  No.  He has not stood out to me as someone who I

19   possibly met on that day, or before, or after.

20   Q.  Okay.  So then, I guess, would you still be able to keep

21   an open mind then to determine whether or not he was, in

22   fact, at the Capitol on January 6th before this -- having

23   any sort of preconceived notions about what he may or may

24   not have done while at the Capitol?

25   A.  Honestly, it's going to be hard to answer that honestly.
```

```
 1      I hope I could, but I do have a lot of just background
 2      information -- not background, but just experience with
 3      seeing all these photos of not the defendant but other
 4      people on that day, and it's difficult for me to kind of
 5      separate him from those other people.
 6      Q.  Do you believe you would still have that difficulty if
 7      instructed by the Judge to put those aside?
 8      A.  I mean, I would try -- I would try my best.
 9           If, you know, if the Judge orders me to act a
10      certain way, I will absolutely try my best, but it's
11      difficult for me, you know, to make, you know, when given
12      that pressure, you know, it's going to be difficult for me
13      to give you a definite answer, but I certainly hope I could.
14           MR. DREHER:  I have no further followup, Your
15      Honor.
16           MR. SMOCK:  I have no questions.
17           THE COURT:  Okay.  We're going to ask you to wait
18      outside a few minutes with Ms. Johnson.
19           (Juror excused from courtroom)
20           THE COURT:  She has to -- the problem is then when
21      she comes back the door's opened, but the reason she goes
22      with him, because if the back door is open and somebody goes
23      out the back door without the card key, the alarms go off
24      and then -- I won't say what I was going to say, I was going
25      say in theory the Marshals come running, but the Marshals
```

1     come running.

2              Yes, sir, Mr. Smock?

3              MR. SMOCK:  Your Honor, I don't know how much time

4     needs to be devoted to this, but we move to strike for

5     cause.  If you need to hear argument, I'm happy to make it.

6              THE COURT:  Okay.

7              MR. DREHER:  I don't believe the Court will hear

8     argument from me, Judge.

9              THE COURT:  Okay.  I'll strike him for cause.

10             (Juror present)

11             THE COURT:  Sir, we're going to excuse you from

12    this jury.

13             We appreciate your patience yesterday and your

14    candor with us this morning, so thank you.

15             And if you would go back to the jury lounge on the

16    fourth floor and tell them you've been excused.

17             JUROR:  Thank you, Your Honor.

18             THE COURT:  Thank you.  And just go out the front

19    of the courtroom.  Thanks so much.

20             (Juror excused)

21             MS. JOHNSON:  So next?

22             THE COURT:  Next, is it 1627?  It's not 1627.

23             MS. JOHNSON:  That person is not here.

24             THE COURT:  All right.  We're going to -- as you

25    know, we're going to go a little out of order because some

```
 1    of them are late maybe this morning.

 2              MS. JOHNSON:  So we are going to 1167.

 3              THE COURT:  1167?

 4              MS. JOHNSON:  Yes.

 5              (Juror present)

 6                      (Juror Number 1167)

 7                         EXAMINATION

 8              THE COURT:  Have a seat, sir.  Thank you.

 9              And if you don't mind, if you'd take off your mask

10    and speak into the microphone so we can all hear you.

11              JUROR:  All right.

12              THE COURT:  All right.  Thank you for your

13    patience yesterday.

14              So you teach at Catholic University.  What's your

15    field?

16              JUROR:  Musicology.

17              THE COURT:  Interesting.  And your instruments?

18              JUROR:  I play the viola and also the piano a

19    little bit.

20              THE COURT:  And how long have you been teaching

21    there?

22              JUROR:  Since 2005.

23              THE COURT:  So we want to followup on some of the

24    things you wrote down on this 3x5 card.

25              The first was Number 6, whether you had followed
```

1    the news or watched video about the events that took place

2    on January 6th at the Capitol.

3              JUROR:  Yes.  So while I was -- I watched the news

4    that day as it was happening and I read -- so I get most of

5    my news from the New Yorker, so I've heard a lot of

6    commentary from the New Yorker, especially Susan Glasser.

7              THE COURT:  The New Yorker?

8              JUROR:  Yeah.

9              THE COURT:  Especially who?

10             JUROR:  Susan Glasser.  That's required reading

11   for me is her weekly reports from Washington.

12             THE COURT:  And have you read her book too?

13             JUROR:  I have not.  I know of it but I have never

14   read it.

15             THE COURT:  The -- were you at home or?

16             JUROR:  I was at home, yes.

17             THE COURT:  Yeah.  And following January 6th, did

18   you continue to read about, watch, blog, go to social media

19   about the events?

20             JUROR:  Usually I was just reading.  Like, I try

21   to limit my media exposure, so I just really find the New

22   Yorker, is what I trusted, so I was --

23             THE COURT:  What newspapers do you read?

24             JUROR:  I don't, I mean, I don't really --

25             THE COURT:  Okay.

1          JUROR:  If something pops up on social media I

2     might look at an article, but I don't --

3          THE COURT:  Do you have any particular social

4     media platforms that you follow?

5          JUROR:  Just Facebook.

6          THE COURT:  Just Facebook.

7          JUROR:  Yeah.

8          THE COURT:  So do you have such strong feelings,

9     either positive or negative, about the events of January

10    6th, this is question 7, or the individuals who participated

11    in those events that would make it difficult for you to be a

12    fair and impartial juror in this case?

13         JUROR:  I feel very strongly that the

14    insurrectionists were wrong, basically.  And it's hard for

15    me, especially if there's video evidence --

16         THE COURT:  Especially what?

17         JUROR:  If there's video evidence, you know, I

18    can't imagine any argument that would mollify my belief that

19    what they did was wrong.

20         THE COURT:  So there will be video evidence, I

21    believe, in this case.

22         JUROR:  You had mentioned that yesterday.

23         THE COURT:  Yeah.  But the question is whether or

24    not with respect to this particular defendant, Mr.

25    Gossjankowski, you think you would you be prepared to put

1    out of your mind the things you've seen or read previously

2    and focus only on the evidence that's presented here in the

3    courtroom during the trial.

4              JUROR:  I certainly think -- I can certainly pay

5    attention to the evidence, you know, and I can look at the

6    evidence with an open mind.  It will be hard for me to put

7    out of my mind everything that I know about January 6th.

8              THE COURT:  Okay.  Do you think that just because

9    someone's been charged or arrested for events growing out of

10   that day that they are probably guilty of the charges

11   brought against them?

12             JUROR:  My gut says yes, you know.  I would

13   imagine that if they were charged there's -- I don't know.

14   I would -- again, I would look at the evidence but, you

15   know, I find it hard to believe that somebody would be

16   arrested or charged for this without solid proof already,

17   so.

18             THE COURT:  I know you're not a lawyer but do you

19   understand that it's a much higher burden at trial than it

20   is to arrest somebody or charge somebody with a crime.

21             JUROR:  Yes, I do understand that.

22             THE COURT:  And would you be prepared to follow my

23   instruction that in order to convict Mr. Gossjankowski that

24   you and your fellow jurors would have to find that the

25   government has proved him guilty beyond a reasonable doubt?

1          JUROR:  It would be difficult but, yes, I could do

2     that.

3          THE COURT:  Question 13 was whether your opinion

4     concerning former President Trump or his supporters would

5     make it difficult for you to be a fair and impartial juror

6     in this case.

7          JUROR:  Yes.  I mean, I don't have a high opinion

8     of Trump or his supporters.

9          THE COURT:  Say that again?

10         JUROR:  I just don't feel -- I don't have a high

11    opinion of former President Trump and his supporters, so,

12    you know, that is -- I recognize it's a bias that would be

13    bringing to the courtroom.

14         THE COURT:  Well, I mean, you also recognize

15    that -- I mean, a lot of people support Donald Trump and a

16    lot of people have views about why they thought he was a

17    good president or better than others, and I assume you're

18    not convicting somebody for having their political views?

19         JUROR:  No, no, no, no.  I mean, it's not -- I

20    don't even think it's whether or not -- it's not whether

21    he's a good president I think it's what happened on

22    January 6th.

23         THE COURT:  Okay.  As we go forward, this is

24    question number 32, as we go forward in this trial, and

25    based upon all that you just said, and what you bring to

1   this courtroom and what you've heard, the little you've

2   heard about the case so far, you answered question number

3   32, which was, Do you currently have an opinion regarding

4   Mr. Gossjankowski's guilt or innocence in this case?

5           JUROR:  Yes.  I mean, that's -- I mean, that was a

6   very honest answer.

7           Like I said earlier, I think, you know, especially

8   if there's video evidence and he was charged, you know,

9   just, that's the opinion that I would bring.  I'm not saying

10   I wouldn't be willing to change that, but that is certainly

11   where my head is right now.

12           THE COURT:  Question 42 is whether you've served

13   on a jury before.

14           JUROR:  Yes.

15           THE COURT:  More than once?

16           JUROR:  Yes.

17           THE COURT:  Criminal or civil?

18           JUROR:  Criminal.

19           THE COURT:  Here or across the street?

20           JUROR:  Across the street, Superior Court.

21           THE COURT:  And do you recall what kind of a case

22   it was?

23           JUROR:  One was a murder and then one was a

24   robbery, a purse snatching.

25           THE COURT:  And was the jury able to reach a

```
 1    verdict in each of those cases?

 2               JUROR:  Yes.

 3               THE COURT:  And do you remember what the verdict

 4    was?

 5               JUROR:  Yeah, it was guilt.  Well, the murder one

 6    I ended up being an alternate but I know that the jury

 7    eventually found the defendant guilty.  And then the other

 8    one was we found him innocent.

 9               THE COURT:  Not guilty?

10               JUROR:  Not guilty, yeah.

11               THE COURT:  So you didn't vote on the first trial

12    because you were an alternate.

13               JUROR:  I did not vote on the first one, right.

14               THE COURT:  I asked in question 41 whether you, or

15    members of your immediate family, or close personal friends

16    have ever been a victim or a witness to a crime.

17               Can you tell us about that.

18               JUROR:  Yeah.  When I was in my mid-20s I was a

19    victim of a hate crime.  I was assaulted while leaving a gay

20    bar.

21               THE COURT:  Okay.  Was it here in D.C.?

22               JUROR:  No, this was in New Haven, Connecticut.

23               THE COURT:  Where?

24               JUROR:  New Haven, Connecticut.

25               THE COURT:  Such a civil place.
```

1                    JUROR:  I'm sorry?

2                    THE COURT:  Supposed to be such a civil place.

3                    And the other question, maybe there are two, maybe

4          there is one.  Just a second.

5                    Number 35 was whether you, or any personal

6          friends, or immediate family have worked for a law

7          enforcement agency.

8                    JUROR:  I have a very close friend from high

9          school who was a police officer in Bethlehem, Pennsylvania.

10                   THE COURT:  All right.  Questions from counsel, if

11         any?

12                              **EXAMINATION**

13         BY MR. DREHER:

14         Q.  Good morning, sir.

15         A.  Hello.

16         Q.  Earlier you told us that during the trial you would

17         bring a strong opinion to the facts of this case.  But what

18         I want to ask is, before seeing any of the videos, before

19         being presented with any of the evidence, do you have any

20         current opinion as to the facts of this case?

21         A.  I think -- I mean, you're right, I haven't seen any

22         evidence but just knowing that the evidence is there, I

23         mean, it gives me -- I mean, opinion, yeah.  I mean, so

24         opinion, yes.  My opinion is that he's probably guilty, but

25         like I said, I mean, I haven't seen anything.  This is just

1      based -- knowing that there is, you know, that evidence.

2      Does that make sense?

3      Q.  Sort of.  Let me just ask it another way.

4      A.  Sure.

5      Q.  Would you be able to keep an open mind until you're

6      presented with evidence or the facts of this case --

7      A.  I think so.

8      Q.  -- before --

9      A.  I think so I could.

10     Q.  -- before making a decision?

11     A.  Yeah.

12     Q.  Now, ultimately you also have to wait until all the

13     evidence has been presented before you make an opinion.  Are

14     you able to do that?

15     A.  I think so.  I mean, I could certainly -- I can't say

16     I'm not going to have an opinion halfway through the case,

17     but I would be sort of be willing to accept that I was wrong

18     and change my opinion.

19     Q.  Okay.

20              MR. DREHER:  I have no further followup.

21              THE COURT:  Mr. Smock.

22                              **EXAMINATION**

23     BY MR. SMOCK:

24     Q.  Hi, Mr. Weaver.

25     A.  Hello.

1    Q.  I'm Ned Smock.  I appreciate and I think everyone here

2    appreciates your honesty in thinking through this, because

3    that's the purpose of this proceeding.

4              You talked a fair amount about the way you

5    followed the January 6th events.  And I get a sense that

6    it's an issue that you feel pretty strongly about; is that

7    right?

8    A.  Yes, that is true.

9    Q.  And something you think about a fair amount?

10   A.  I wouldn't say I think about it a lot, but when I do

11   think about it I have strong feelings about it.

12   Q.  And that I think -- am I right that that's what prompted

13   you to answer yes to the questions you answered?

14   A.  Yes.

15   Q.  And is anything that you have said or heard today in

16   questioning caused you to change your concern about your

17   ability to be fair and impartial that you raised in answer

18   to the Court's questions?

19   A.  No.  I mean, I answered yes because I know I just --

20   they said if you even think that this is an issue, that's

21   why I answered yes.

22             I do feel I can be fair and impartial but I do

23   also -- I recognize that I have these strong feelings about

24   what happened on January 6th.

25   Q.  And I think that's -- that's what we're asking about.

 1            I think you had said that you -- it would be
 2    difficult to hold the government to its burden?
 3    A.   Right.
 4    Q.   Is that -- I guess what I'm asking is, can you tell us
 5    with confidence that you would be able to come into this
 6    case and separate these strong feelings that you have to
 7    think only about the evidence in this case and treat my
 8    client completely fairly and impartially given what you've
 9    said about your strong feelings?
10    A.   I think I can certainly try.  I mean, I with complete
11    confidence, I mean, I would just say I would -- I could do
12    my best, you know, I think with some confidence.  How is
13    that?
14    Q.   Okay.  Okay.  Thank you.
15            THE COURT:  All right, sir, we're going to ask you
16    to wait outside a few minutes with Ms. Johnson.
17            JUROR:  Okay.
18            (Juror excused from courtroom)
19            THE COURT:  This level of confidence high enough
20    for you?
21            MR. SMOCK:  No, Your Honor.
22            THE COURT:  You didn't ask him for a number.
23            MR. SMOCK:  You know, I was trying to revise that
24    question overnight.  I'll do better in the future.
25            THE COURT:  I'm not so sure --

1              MR. SMOCK:  I'd be happy to do that.

2              I think there's really no question that this is a

3      cause strike in light of the fact that Mr. Weaver answered

4      yes to probably much every one of the relevant questions

5      about an ability to be fair and impartial.

6              He said that he believes that my client is

7      probably guilty.  He said he's open to being convinced

8      otherwise, but that's obviously not the standard that we're

9      working with here.

10              He says he feels very strongly about the

11      insurrectionists, that was his word, being wrong.

12              He said that he can't imagine any argument that

13      would mollify his belief that what they did was wrong.

14              He said, "I can certainly pay attention to

15      evidence, but it would be hard to put everything I know out

16      of my mind.  It would be difficult to hold the government to

17      its burden."

18              He said he doesn't like President Trump or his

19      supporters.

20              And, I mean, I that's one thing that I think we

21      have to accept in this city from potential jurors, but he

22      said that's a bias that he would bring and it's a concern

23      that he had and that was why he raised it as well.

24              You know, in the end he was trying to sort of

25      indicate that he would try to be fair, but really what it

```
 1    came down to is that he would try.  He had some confidence

 2    about it, but that's certainly not enough to warrant

 3    rejecting our cause -- our motion for cause strike.

 4         MR. DREHER:  Your Honor, certainly I think that

 5    there was complete honesty with this potential juror and

 6    there still has to be a distinction between a potential

 7    prejudice for the crime versus the potential prejudice for

 8    the defendant.

 9         And here the potential juror has not outlined any

10    reason to -- for this Court to conclude that this potential

11    juror would be prejudiced so much so against this defendant

12    until after the evidence is presented, which is precisely

13    what this Court will instruct.  And this juror, this

14    potential juror did indicate that he would keep an open mind

15    until all the evidence was presented before rendering a

16    decision.

17         And so I would ask the Court to deny the motion to

18    strike.

19         MR. SMOCK:  Just very briefly, I would just say

20    my concern is this possibility of sort of lowering the bar

21    on cause strikes here.  I mean, this is a person who under

22    normal circumstances in a different case said these things,

23    there would really be no doubt.

24         I think my concern is that we might be lowering

25    the bar where we just stop -- not strike this juror for
```

1      cause given that he checked off every box about an inability

2      to be impartial and his answers didn't resolve that issue.

3              THE COURT:  Look, I don't think we -- I don't

4      think it's a basis to strike everyone for cause just because

5      they've watched the events on January 6th, or after

6      January 6th, or have watched some of the hearings.

7              I do find it troubling that his answers to

8      questions 12 and 13, and the most he could tell us was he

9      would try to be fair and he would follow my instructions,

10     although the first time he was asked that question he was

11     less committed to it.

12             I think all of those things in combination with

13     what I heard him say, which is if you put his answers

14     together, it was, I would try to be fair.  I would keep an

15     open mind.  But if there were a lot of videos, and I see the

16     same sorts of things that I saw before, that's it for me.

17     The visual evidence is going to push me towards conviction.

18             That's what I heard him say and that it would

19     bring up memories of the other videos he saw.  And he said

20     if someone was there, they probably did it.  And if I see

21     videos, he didn't use these words, but if I see videos then

22     I'm pretty sure he did it and I'd likely convict.

23             So I'm going to strike him for cause, Number 1167.

24             (Juror present)

25             THE COURT:  Sir, thank you for your patience

```
 1    yesterday and thank you for your candor today.

 2              We're going to excuse you from this jury.

 3              JUROR:  Okay.

 4              THE COURT:  And I'd ask you to go back to the

 5    fourth floor to the jury lounge and tell them that you've

 6    been excused.

 7              JUROR:  Okay.

 8              THE COURT:  And they'll tell you if they might

 9    need you again or whether to call again.

10              You can go out the front of the courtroom.

11              JUROR:  Go out here?

12              THE COURT:  Yeah.  You can go out there.

13              JUROR:  Okay.

14              THE COURT:  Thank you very much, sir.

15              (Juror excused)

16              THE COURT:  Who's next?

17              MS. JOHNSON:  The next person after 1167?

18              THE COURT:  716?

19              MS. JOHNSON:  716.

20              (Juror present)

21                        (Juror Number 0716)

22                             EXAMINATION

23              THE COURT:  Good morning.

24              JUROR:  Good morning.

25              THE COURT:  How are you?
```

1          JUROR:  I'm doing fine.  How you doing?

2          THE COURT:  I'm doing good so far.

3          JUROR:  That's good.

4          THE COURT:  I've had two cups of coffee, so I'm

5    okay.

6          JUROR:  Well, I don't -- I don't drink coffee,

7    so...

8          THE COURT:  Would you mind taking off your mask

9    and talk in the microphone so we can hear you better?

10          JUROR:  Yeah, I can do that.

11          THE COURT:  Yeah, well, some of us do.

12          So what's not included on this list is it doesn't

13    say anything about what you do, your employment, what you do

14    for a living.

15          JUROR:  What I do for a living?  Work

16    maintenance.

17          THE COURT:  Where?

18          JUROR:  Right on 17th Street down there by the

19    White House.

20          THE COURT:  In an office building?

21          JUROR:  Yes.

22          THE COURT:  Okay.  A government office building?

23          JUROR:  Yeah, federal government.

24          THE COURT:  Which office -- which agency.

25          JUROR:  It's EEOB.

```
 1                  THE COURT:  The old executive office building?

 2                  JUROR:  Yeah.

 3                  THE COURT:  The big, old building or the new one?

 4                  JUROR:  Yeah, EEOB.

 5                  THE COURT:  So EEOB?

 6                  JUROR:  Yeah.

 7                  THE COURT:  So that's the old, beautiful building.

 8                  JUROR:  Yeah.

 9                  THE COURT:  Although it's hard to find your way

10      around inside, right?

11                  JUROR:  Yeah, I work for a contract.

12                  THE COURT:  I see.  And how long have you been

13      there?

14                  JUROR:  Eleven years.

15                  THE COURT:  In that building?

16                  JUROR:  Yes.

17                  THE COURT:  Okay.  So you're very familiar with

18      it?

19                  JUROR:  Yes.

20                  THE COURT:  You can tell me how to get around.

21                  JUROR:  A little bit.

22                  THE COURT:  You answered some questions, and I'd

23      like to do some followup with you and the lawyers will have

24      some questions too, I'm sure.

25                  JUROR:  That's fine.
```

```
 1                    THE COURT:  The first one was question number 4,
 2        and it asked whether you, or a close friend, or family
 3        member have ever worked on Capitol Hill.
 4                    JUROR:  Yeah, my sister.
 5                    THE COURT:  And what does she do or did she do
 6        there?
 7                    JUROR:  I think she do maintenance.
 8                    THE COURT:  On The Hill?
 9                    JUROR:  Yeah.
10                    THE COURT:  In one of the office buildings?
11                    JUROR:  I guess so.  I know she worked down there.
12                    THE COURT:  Like the House office building or the
13        Senate office building?
14                    JUROR:  I guess so.  I know she worked down there.
15                    THE COURT:  And is she still working there?
16                    JUROR:  Yeah, she's still working down there.
17                    THE COURT:  Do you know where she was on
18        January 6, 2021?
19                    JUROR:  I guess she was working in there.
20                    THE COURT:  And was she in a dayshift or a
21        nightshift do you think?
22                    JUROR:  She was dayshift.
23                    THE COURT:  Okay.  Have you and she talked about
24        those events?
25                    JUROR:  No, I think she said they were locked
```

1      down.

2                      THE COURT:  That they were what?

3                      JUROR:  They were locked down.

4                      THE COURT:  They were locked down.  She was part

5      of -- she was locked down?

6                      JUROR:  Yeah, they were locked down, yeah.

7                      THE COURT:  Yeah.

8              And question Number 6, have you followed the

9      events?  Did you watch news or videos?

10                     JUROR:  Yeah, I watched the news and when I seen

11     that I was kind of shocked.  I said, Wow!  I didn't know it

12     was going to happen like that because, you know, since I was

13     working down there and, you know what I mean, working in

14     there and whatever, I didn't know to -- until I saw the news

15     saying, you know, I was shocked, I said, Wow!

16                     THE COURT:  So were you watching it while it was

17     going on on television or something?

18                     JUROR:  Yeah, I watched it on TV when I got off of

19     work.

20                     THE COURT:  When you got off of work?

21                     JUROR:  When I got off work about 5, when I went

22     home by 6 or something, I saw it on the news, I said, Wow!

23                     THE COURT:  And did you watch it that evening

24     more?

25                     JUROR:  Yeah.  I just watched it and I said, Wow!

1        Because I was shocked since I worked down there.  And I

2        worked -- you know, and you know I work -- you know, random

3        person, they come in there without working and had meeting

4        and stuff, I said, Wow!

5               And, you know, since I've worked there, we don't

6        hide nothing, you know, they don't talk about nothing or

7        nothing like that until we hear it on the news.

8               THE COURT:  So when -- after January 6th, did you

9        watch, follow any -- follow those events further or did you

10       watch news, or social media, or read more about it after

11       January 6th?

12              JUROR:  No, I didn't read any more about it

13       because I just worry about it.

14              THE COURT:  Do you follow any particular social

15       media platforms?

16              JUROR:  What do you mean with that?

17              THE COURT:  You know, internet, I mean, TikTok --

18              JUROR:  No.

19              THE COURT:  -- Twitter, any of those things?

20              JUROR:  No.

21              THE COURT:  Do you read any newspapers in

22       particular?

23              JUROR:  No.

24              THE COURT:  And do you ever watch news on

25       television?

```
1                    JUROR:  Watch the news?

2                    THE COURT:  You know, news shows on television?

3                    JUROR:  No.

4                    THE COURT:  So you don't usually watch the news?

5                    JUROR:  No.

6                    THE COURT:  So you don't follow the news that

7       closely?

8                    JUROR:  No.  Mm-hmm.  They show bad things and

9       stuff.  I don't want to hear no bad, I only want to hear

10      some good.

11                   THE COURT:  You want only the good stuff, huh?

12                   JUROR:  Yeah.

13                   THE COURT:  Well, so do we all, but it's sometimes

14      hard.

15                   Let me ask a couple of other questions that you

16      put down answers to later on in this list of questions,

17      number 38.

18                   I asked whether you, or any members of your

19      immediate family, or close personal friends have ever been

20      arrested for a crime, or charged for a crime, or convicted

21      of a crime.

22                   JUROR:  Yes.  My cousin.

23                   THE COURT:  What?

24                   JUROR:  I said my cousin.

25                   THE COURT:  Your cousin?
```

```
1              JUROR:  Yeah.

2              THE COURT:  Here in D.C.?

3              JUROR:  Yeah.

4              THE COURT:  And what was he charged with?

5              JUROR:  I don't really know if I know what he was

6    charged with.  They say he was charged with murder, so I

7    don't really know.

8              THE COURT:  He may have been charged with murder?

9              JUROR:  Yeah, that's what they say.

10             THE COURT:  Yeah.

11             JUROR:  So I don't really know.

12             THE COURT:  Was he sent to prison?

13             JUROR:  Yes.

14             THE COURT:  And is he still there?

15             JUROR:  No, he got out.

16             THE COURT:  Okay.  Anybody else that you can think

17   of, close friends or relatives?

18             JUROR:  That's all I can think of.

19             THE COURT:  Okay.  And I also asked whether you've

20   ever been on a jury before.  Have you been on a jury?

21             JUROR:  Yes.

22             THE COURT:  In this court or across the street?

23             JUROR:  In the big courthouse, at -- what's that,

24   500 Indiana?

25             THE COURT:  Yeah.
```

1                   JUROR:  Yes.  A jury trial.

2                   THE COURT:  And how many times have you been on a

3       jury?

4                   JUROR:  I've been there for a month.

5                   THE COURT:  For a month?

6                   JUROR:  Yeah, a month.

7                   THE COURT:  Was it a trial jury like this or a

8       grand jury?

9                   JUROR:  I can't even remember because it's been

10      about sixteen years.

11                  THE COURT:  Oh, it's been a while?

12                  JUROR:  Yeah.

13                  THE COURT:  Do you remember whether it was

14      criminal or civil?

15                  JUROR:  It might be -- I can't remember.  I can't

16      remember.

17                  THE COURT:  You don't remember what the person was

18      charged with?

19                  JUROR:  Yeah, I can't remember.  It's been sixteen

20      years.

21                  THE COURT:  Was there anything about that

22      experience that would make you not want to serve again?  Are

23      you willing to serve again?  I won't ask you if you --

24                  JUROR:  Yeah, I would serve again, yeah.

25                  THE COURT:  Okay.

```
1                    JUROR:  I would.  Except I know what's going on,
2      you know, for everybody.  I would serve again.
3                    THE COURT:  You're okay?  You're okay?
4                    JUROR:  Yeah, I'm fine.
5                    THE COURT:  All right.  Questions?
6                    MR. DREHER:  No followup from me, Your Honor.
7                              EXAMINATION
8      BY MR. SMOCK:
9      Q.  Hi, Ms. Davis.
10     A.  Hi.
11     Q.  I'm Ned Smock.
12     A.  How you doing?
13     Q.  Good.  I think when you were talking about the events of
14     January 6th, you said you had worked down there.  And I may
15     not have understood what you had said before, and this is my
16     fault.  Did you at some point work on Capitol Hill itself?
17     A.  I ain't work on Capitol Hill.
18     Q.  Okay.
19                   THE COURT:  I mean, you worked in the White House?
20     Near the White House?
21                   THE WITNESS:  Yeah.
22     BY MR. SMOCK:
23     Q.  Okay.
24     A.  Over by the White House.
25     Q.  Got it.  Got it.  And so how did you feel when you saw
```

1    what was going on January 6th, some people say they were

2    scared, angry?

3    A.  No, I wasn't scared or angry, I just was kind of

4    shocked, you know, pray about it and ask God, you know,

5    forgive them for what they're doing.  Because a lot of time

6    people don't think what they're doing and all that.

7    Q.  Okay.

8    A.  So I ask him to forgive them, what they, you know.

9    Q.  Okay.  And one of the things that you -- oh, you were

10   talking about a time you were on a jury and I just wanted to

11   see if I can jog your memory a little bit.  If I can't, it's

12   my fault.

13   A.  Mm-hmm.

14   Q.  Do you remember whether you were in a courtroom and

15   people got on the stand and where questions were asked of

16   them by lawyers?

17   A.  Yeah, I -- they talking to them and the guy -- all that

18   I know is the guy say that the person was coming to him,

19   whoever he killed, the person would come to him, he had to

20   give himself up.  That's all I remember.

21   Q.  Okay.  Do you remember whether you went back into a room

22   and met with other jurors to decide whether --

23   A.  No, we all -- we all -- we all was -- we all got a gavel

24   and said that is that person guilty or not guilty.  And so

25   we all had to be around so everybody, you know --

1          THE COURT:  You sat around and talked about the

2     case?

3          THE WITNESS:  Yeah, we all sit around.  You know,

4     we all sit around.  We didn't go one-by-one.  We all sit

5     around and --

6          THE COURT:  Were you sitting around a table or

7     were you --

8          JUROR:  Yeah, we were all sitting around the table

9     and -- then we were all sitting around the table and then --

10    we all were sitting around the table, then we had to get to

11    the judge, you know, the people, so the -- you know, one of

12    them give it to the judge, so the judge said [indiscernible]

13    whatever.

14         THE COURT:  So after you all sat around and

15    decided, somebody handed a piece of paper to the judge?

16         JUROR:  Yeah, they handed the piece of paper.

17         THE COURT:  To the judge?

18         JUROR:  Yeah, to the judge.

19         THE COURT:  There was a judge there wearing a robe

20    like this?

21         JUROR:  Yeah.

22         THE COURT:  Okay.  Okay.  So it was a trial, not a

23    grand jury.

24         MR. SMOCK:  Got it.

25    BY MR. SMOCK:

1    Q.  You also mentioned when you were talking about

2    January 6th and also talking about being on a jury here that

3    you would pray about it.  I think I got that.

4    A.  Yeah.

5    Q.  And I don't want to delve into your religious beliefs or

6    anything that you feel is private, but I wonder if you could

7    talk to us about how what you meant about praying about it

8    when you were talking about participating in a jury --

9            THE COURT:  I don't think she said that.

10           MR. SMOCK:  I could be wrong.

11           THE COURT:  I think she was praying about

12   January 6th.

13           JUROR:  Yeah, I was praying about January 6th.

14           MR. SMOCK:  Okay.

15           JUROR:  When I was seeing what happened I prayed

16   about it and asked God to forgive them, because a lot of

17   time people don't think what they're doing, you know.  A lot

18   of time, like us, you never know what's going to

19   [indiscernible] their mind, you know.  And saying, if you're

20   a child of God, we have to do the right thing.  Sometime

21   evil thing come to your way and sometimes people don't

22   think, they go ahead and do, because you think further

23   before you do anything.

24   Q.  Got it.

25   A.  I'm a child of God.

LYNNE M. KRENZ, RMR, CRR, CRC
(651) 848-1226

1    Q.  So if you were on the jury in this case and making a

2    decision --

3    A.  Mm-hmm.

4    Q.  -- about whether the government had proven my client

5    guilty, would you -- would prayer play a role in it?

6    A.  I pray about it and ask God to show me a way to speak to

7    a person.  Show me a way how the person, you know, how the

8    person is and all that.  Because God will show you into

9    people.

10   Q.  I'm sorry, could you say that again?  I didn't hear you.

11   A.  I said God will show you into people.  If this person is

12   a bad person to be around or this person a good person to be

13   around.

14   Q.  Got it.  And would that play a role in your decision?

15   A.  Yeah.

16           MR. SMOCK:  Okay.  Thank you.

17           JUROR:  You're welcome.

18                        **EXAMINATION**

19           THE COURT:  Would you follow my instructions on

20   the law?

21           JUROR:  Yes.

22           THE COURT:  And would you consider only the

23   evidence that you hear and see in the courtroom before you

24   make a decision?

25           JUROR:  What do you mean by that?

```
 1                    THE COURT:  Well, they're going to be, like the
 2      other trial you had, there are going to be witnesses who get
 3      up here and they're going to testify --
 4                    JUROR:  Mm-hmm.
 5                    THE COURT:  -- and under oath.
 6                    JUROR:  Mm-hmm.
 7                    THE COURT:  And there will be some videos that the
 8      jury will watch.  And that's the evidence in this case.
 9      Nothing outside this courtroom is the evidence in the case.
10                    So could you agree that you would consider only
11      the evidence that you hear and see while the trial's going
12      on?
13                    JUROR:  Yeah, yeah.
14                    THE COURT:  Yes?
15                    JUROR:  Yes.
16                    THE COURT:  Okay.  And would you listen carefully
17      to what I say the law is and try to follow it?
18                    JUROR:  Yes.
19                    THE COURT:  Okay.  Are there any other questions
20      anybody would like to ask?
21                    MR. DREHER:  Not from the government, Your Honor.
22                    MR. SMOCK:  Nothing, Your Honor.
23                    THE COURT:  Okay.  Is there anything be need to
24      discuss?
25                    MR. SMOCK:  Yes, Your Honor.
```

```
 1                    THE COURT:  All right.  We'll ask the juror to go

 2       out with Ms. Johnson for a few minutes.

 3                    JUROR:  Thank you.

 4                    THE COURT:  Thank you.

 5                    JUROR:  You're welcome.

 6                    THE COURT:  We'll see you again in a few minutes,

 7       so.

 8                    JUROR:  Okay.  Thank you.

 9                    (Juror excused from courtroom)

10                    MR. SMOCK:  Your Honor, we would move to strike

11       Ms. Davis for cause for a couple of reasons.

12                    One being that she referenced praying and its

13       significance to her a number of times.

14                    She talked about how she would pray in relation to

15       this case and that her consideration of what God was telling

16       her would play into it.

17                    In response to the Court's question, she indicated

18       that she would focus on the evidence, but my concern was

19       that that was something that came up a number of times.

20                    I also, you know, am not entirely confident that

21       she understood all of the questions in reference to -- that

22       the Court was asking.  She didn't remember details about

23       jury service and it's true it was a while ago --

24                    THE COURT:  Sixteen years ago.

25                    MR. SMOCK:  It's true it was a while ago.  But we
```

LYNNE M. KRENZ, RMR, CRR, CRC
(651) 848-1226

1      just have some concerns about the nature of her answers

2      about that service.

3                She certainly was very nice and answered all the

4      Court's questions, but we have concerns based on her

5      answers.

6                MR. DREHER:  Your Honor, I believe it would be

7      best for us to just leave it in the Court's discretion.

8                I don't think I have a strenuous argument based on

9      -- the Court was able to view her answers and weigh the

10     answers.  I don't believe the prayer comments should hold

11     any weight.  Certainly that's very common that people will

12     pray about certain decisions before making them or take --

13               THE COURT:  You don't have to go on.

14               MR. DREHER:  Yes, Your Honor.

15               THE COURT:  I'll deny the motion.  The defense can

16     use a peremptory if they want.

17               (Juror present)

18               THE COURT:  All right.  So we would like you to

19     come back tomorrow morning.

20               JUROR:  Oh.

21               THE COURT:  10:00.  And we're going to finish this

22     process tomorrow morning.  We may have some more questions,

23     okay?

24               JUROR:  Oh, okay.  So I have to let my job know.

25     I have to call and let my job know I have to come back

```
 1    tomorrow.
 2              COURT REPORTER:  I couldn't hear what she said.
 3              THE COURT:  I didn't hear what you said.
 4              JUROR:  No, I said I got to let my job know about
 5    it I got to come back tomorrow, though.
 6              THE COURT:  Yeah, so tell everybody you need to
 7    come back tomorrow at 10:00.
 8              And we'll pick a jury tomorrow, so you'll find out
 9    tomorrow whether you're going to be on the jury or not, but
10    we can't decide today.
11              So come back tomorrow at 10:00, go to the jury
12    lounge, back on the fourth floor of the jury lounge where
13    you were this morning.
14              JUROR:  Mm-hmm.
15              THE COURT:  Ms. Johnson will meet you there at
16    10:00.
17              MS. JOHNSON:  You don't have to do anything today.
18    Come back tomorrow.
19              JUROR:  At 10:00?
20              MS. JOHNSON:  10:00.
21              JUROR:  And so you want me to go out this way?
22              MS. JOHNSON:  Yes.
23              THE COURT:  Okay.  Thank you very much.
24              (Juror excused from courtroom)
25              THE COURT:  Do we have somebody?
```

```
 1                    MS. JOHNSON:  Yes, 1492.

 2                    THE COURT:  1492.

 3                    (Juror present)

 4                    (Juror Number 1492)

 5                         EXAMINATION

 6                    THE COURT:  Good morning.  Good morning.  How are

 7      you?

 8                    JUROR:  Good morning, Your Honor.

 9                    THE COURT:  Would you mind taking off your mask

10      and speak into the microphone?

11                    JUROR:  Good morning.

12                    THE COURT:  How are you?  So you teach school?

13                    JUROR:  Yes.

14                    THE COURT:  What do you teach?

15                    JUROR:  I teach Elementary PE.

16                    THE COURT:  PE?

17                    JUROR:  Yes.

18                    THE COURT:  Good.  So what was your sport?

19                    JUROR:  I played a lot of tennis.  I played

20      Lacrosse in college, but, I still play tennis now so I would

21      say that's my main sport.

22                    THE COURT:  So I'm going to ask some followup

23      questions.

24                    JUROR:  Okay.

25                    THE COURT:  The first one was whether you, or a
```

```
 1    close friend, or family member have ever worked on Capitol
 2    Hill?
 3                THE JUROR:  Yes.  I have a couple of friends who are
 4    lobbyists.
 5                THE COURT:  They're what?
 6                JUROR:  Like a lobbyist-type person?
 7                THE COURT:  No.
 8                JUROR:  Is that -- is that what you mean or do you
 9    mean like an actual Senator or Congressmen?
10                THE COURT:  Well, they're not there every day.  In
11    other words, if they're lobbyists?
12                JUROR:  Now, I don't know.  One person was an
13    intern at one point, but...
14                THE COURT:  Were any of them, to your knowledge,
15    present at or near the Capitol on January 6th?
16                JUROR:  No, sir.
17                THE COURT:  Okay.  Where were you on January 6th?
18                JUROR:  At home.
19                THE COURT:  Teaching?
20                JUROR:  Well, no.  I was at home.  We had the day
21    off --
22                THE COURT:  Okay.
23                JUROR:  -- due to the inauguration.
24                THE COURT:  And on that day -- well, it wasn't the
25    inauguration --
```

```
 1                      JUROR:  I'm sorry, no.  We had January 6th off --

 2                      THE COURT:  Okay.

 3                      JUROR:  -- I think either due to potential issues

 4          or --

 5                      THE COURT:  Or whatever?

 6                      JUROR:  Yes.

 7                      THE COURT:  Did you follow the events of

 8          January 6th?  You wrote down question 6.  Did you follow the

 9          events of January 6th on January 6th?

10                      JUROR:  Yes.

11                      THE COURT:  And by television, or social media, or

12          what?

13                      JUROR:  Mostly by television.

14                      THE COURT:  Okay.  And did you watch it much of

15          the day?

16                      JUROR:  Yes.

17                      THE COURT:  Okay.  Did you continue to follow the

18          events after January 6th?

19                      JUROR:  Yes, sir.

20                      THE COURT:  And did you watch a lot of videos or

21          social media about the events?

22                      JUROR:  So, I don't really do -- I'm not on social

23          media very much.  So not very much on social media, but I

24          did watch videos that were on the news.

25                      THE COURT:  On television news?
```

```
 1                    JUROR:  On television, yes.

 2                    THE COURT:  And do you watch particular channels

 3      when you watch the news or particular --

 4                    JUROR:  NBC maybe?  I can't remember.

 5                    THE COURT:  NBC is 4?

 6                    JUROR:  Yes.  I don't -- yeah, I use it on

 7      different apps --

 8                    THE COURT:  Yeah.

 9                    JUROR:  -- but I'm pretty sure it's Channel 4.

10                    THE COURT:  And you said that you watched some of

11      the congressional hearings.  How much of that did you watch?

12                    JUROR:  I watched like, oh, I watched like maybe

13      one or two full hearings, but I watched just kind of

14      snippets of other ones.

15                    THE COURT:  Do you think based on your answers to

16      these questions that you could be a fair and impartial juror

17      in this case against Mr. Gossjankowski?

18                    JUROR:  So I think I answered yes to one of the

19      other -- the last question, because I would like to think

20      so, but I do know that if -- when I hear of someone involved

21      in the insurrection or possibly involved in the

22      insurrection, I feel a certain way.  I feel, you know,

23      disfavorable toward that person, but I would like to think

24      that given facts and information I would be able to go based

25      on that.
```

 1                  THE COURT:  Well, that's a question whether you

 2       think you could limit yourself to the evidence that you see

 3       and hear in this courtroom and just focus on the witnesses

 4       that testify and what they say, and any videos that are

 5       shown, what is said about those videos, and whether you

 6       could say to -- ask yourself the question that I will ask

 7       you and the other jurors, which is based on only -- based on

 8       the evidence you see and hear and only that evidence,

 9       whether you think the government has proved this particular

10       defendant, Mr. Gossjankowski, guilty beyond a reasonable

11       doubt.

12                  The question is whether you think you could do

13       that or whether you'd be too affected by the other stuff to

14       do that.

15                  JUROR:  I would think that I am a, you know,

16       logical person and I could look at just the facts.

17                  THE COURT:  Okay.

18                  Now, you alluded to this a minute ago, but is the

19       discussion you and I are now having the reason you wrote

20       down 49, the last question, the catchall question?

21                  JUROR:  So, yes, that is part of it.

22                  Mostly I think that when I was filling out the

23       form, I think I was giving myself a lot of credit as far as

24       not having some sort of feelings towards the person based on

25       what you had said.

1          So, for example, when you said that he was being

2     indicted maybe, I'm not sure what it was.

3          THE COURT:  Yeah, I asked the question:

4          Do you think that just because someone has been

5     indicted, or charged, or arrested that they're probably

6     guilty or whether you -- I didn't say this, but essentially

7     waiting to see what the evidence shows.

8          JUROR:  Right.  And so I didn't answer to that.

9          But in my mind when I heard that he was being

10    indicted, I was like, oh, my gosh, this person was involved

11    in the January 6th insurrection, you know, that was my first

12    instinct.

13         THE COURT:  Well, and you're not a lawyer, but it

14    takes less evidence to arrest someone, or to charge someone,

15    or to indict someone than it does to convict them.

16         So, one of the things that I may have said, and I

17    can't remember now but will likely say again, is that an

18    indictment is not evidence and it's just a way of bringing

19    somebody before the court and giving them notice of what

20    they're charged with.

21         But at the end of the day, at the end of trial,

22    the jury has to decide, has the government, has the

23    prosecution proved guilt beyond a reasonable doubt, which is

24    a much higher standard.

25         And the question is whether you believe you could

1    follow that and hold the government to its burden?

2              JUROR:  I do believe that I can.

3              THE COURT:  And the other question was that if

4    you're on the jury -- number 43.  If you're on the jury and

5    you find the defendant guilty, it's my job as the Judge to,

6    decide what the appropriate punishment is, what the

7    appropriate sentence, if any.

8              And I said in question number 43, that the law

9    does not permit the jury to consider the issue of

10   punishment.  And I asked whether you would have any

11   difficulty or be uncomfortable serving as a juror knowing

12   that you don't have anything to say about whatever sentence

13   what I might impose.

14             JUROR:  Yes, Your Honor.  So is this -- is this

15   federal?

16             THE COURT:  Yes.

17             JUROR:  I would have difficulty if I knew death

18   penalty was --

19             THE COURT:  If you knew what?

20             JUROR:  If the death penalty was a possibility.

21             That's the only thing that if death penalty were a

22   possibility then I would have -- I think that would weigh in

23   my decisionmaking.

24             THE COURT:  Sure.  And this is not that kind of

25   case.

```
 1                    JUROR:  I figured --
 2                    THE COURT:  Okay.
 3                    JUROR:  -- but I just wanted to --
 4                    THE COURT:  Not that kind of case.
 5                    JUROR:  Yes.
 6                    THE COURT:  And, you know, I mean, we could go
 7     into a long discussion about our jurors -- what happens with
 8     juries in death penalty cases, but don't worry about that --
 9                    JUROR:  Okay.
10                    THE COURT:  -- if that was your only concern.
11                    I think I've covered everything.
12                    JUROR:  So well, for the last one as well, I just
13     wanted to say, I also wanted to mention because I think when
14     I thought about it I was like, I didn't put yes to any of
15     these but maybe I should have, was feelings towards people
16     who followed Trump maybe, and people who were -- I think we
17     already mentioned in the insurrection, but people who follow
18     Trump or people who might have been involved in the
19     insurrection.  I think my feelings are a little bit stronger
20     than -- I think I should have put yes because I do --
21                    THE COURT:  Well, fair enough, but, you know, I
22     think -- let me put it this way.
23                    Let's assume that most of the people who went to
24     the Capitol that day supported Donald Trump but, you know,
25     so did 49 percent of the people who voted, right?
```

 1              JUROR:  Yes, Your Honor.

 2              THE COURT:  Some such number.

 3              And this is not about people's political or

 4     personal views.

 5              JUROR:  Correct.

 6              THE COURT:  It's about conduct and actions.

 7              So are you comfortable -- are you satisfied you

 8     could give a fair trial to Mr. Gossjankowski, even assuming

 9     he supports some of Donald Trump's views and even assuming,

10     which I think the evidence will show, that he was there that

11     day?  Could you give him a fair trial?

12              JUROR:  I do believe that I would be able to look

13     at the facts given to me in order to give him a fair trial.

14              THE COURT:  Okay.  Counsel, questions?

15                              **EXAMINATION**

16     BY MR. DREHER:

17     Q.  Good morning, madam.

18     A.  Good morning.

19     Q.  I just want to get back to on January 6th you indicated

20     -- at that point you were still a teacher?

21     A.  Yes.

22     Q.  And you said prior to January 6th you had the day off?

23     Was that already scheduled?

24     A.  That was scheduled.  I think it was scheduled as maybe

25     not in the beginning of the year, but I think leading up to

```
 1    the date it was scheduled.
 2    Q.  Okay.  Do you recall if days following were also
 3    canceled or --
 4    A.  The days following were not canceled.
 5    Q.  Okay.  And I may -- I may have misheard you.  You had
 6    that you're not really on social media, but then you use
 7    different devices to watch TV; is that correct?
 8    A.  Different apps.
 9    Q.  Different apps?
10    A.  Yes.  So, for example, on Roku I might use Hulu.
11    Q.  Okay.  Okay.
12    A.  Or Peacock.
13              THE COURT:  I assume people have, like, Channel 4,
14    or Channel 7, or FOX as an app on their phone?
15              JUROR:  Yes.  I do not use my phone as --
16              THE COURT:  Or on your device?
17              JUROR:  In general I don't watch TV and things
18    like that on my phone.
19              MR. DREHER:  Okay.  I have no further followup,
20    Your Honor.
21                           EXAMINATION
22    BY MR. SMOCK:
23    Q.  Hello.
24    A.  Hello.
25    Q.  I appreciate you answering these questions and it's
```

1    absolutely clear that you've thought a lot about it and

2    that's something that everybody appreciates.

3              I just wanted to ask you, you had talked a little

4    bit about when you heard people who were involved on

5    January 6th, you have a disfavorable opinion, that's

6    something that we hear a lot.

7              Can you talk about a little bit about what led you

8    to answer yes to the questions you answered and how it

9    relates to that disfavorable opinion you expressed.

10   A.  Can you refer to the questions that you are --

11   Q.  That's a fair question.

12   A.  -- asking about?

13   Q.  I think that's my fault for not being clear.  I think

14   maybe if I just rephrase the question.

15             I think what everyone here is hoping for is that

16   jurors can set aside views they had before and be fair.  I

17   think that's true from every side here.

18             And you talked about a disfavorable opinion you

19   have and you also talked about wanting to be sure you

20   mention everything that you were thinking.

21             As you sit here, do you feel confident that you

22   can assure all of us, both the defense and the government,

23   that as you're listening to the evidence, as you're

24   considering whether the government has proven a case against

25   Mr. Gossjankowski, that you can set aside entirely those

```
 1    disfavorable views that you have?

 2    A.  So I feel -- at this point I do feel confident that I

 3    can just look at what is presented to me.

 4         I think I can't say 100 percent like if someone

 5    was in that position.  How can you say that if you're not in

 6    it in the moment?

 7         But I feel that, yes, I can look at facts and what

 8    is presented and use that to make my decision.

 9    Q.  I appreciate that.

10         And in this case there are elements, parts, things

11    that the government has to prove with respect to every

12    offense.  And can you assure us that if -- that you'd be

13    able to set aside these views that you have and determine

14    whether the government has proven each and every element?

15    A.  So, and there's criteria for each element?

16    Q.  Yes.

17    A.  Then, yes.

18    Q.  So you would be okay doing that?

19    A.  Yes.

20    Q.  And if you found that even if you believed that Mr.

21    Gossjankowski was a Trump supporter or that he was there

22    that day, if they failed to meet one of those elements would

23    you be comfortable returning a not guilty verdict?

24    A.  Yes.  As long as, like you said, there is specific

25    criteria for what would constitute guilty or not guilty.
```

1    Q.  And you'll get that from the Judge.  Thank you very

2    much.

3               THE COURT:  Are there any matters we might have to

4    discuss?

5               All right.  We're going to ask you to come back

6    tomorrow morning at 10:00.

7               JUROR:  Okay.

8               THE COURT:  We're going to finish this process

9    tomorrow.

10              We still have a lot of people to talk to today,

11   but we're going to narrow the group down tomorrow to roughly

12   twice as many as we need and then finally pick the jury

13   tomorrow.

14              So if you could come back tomorrow at 10:00 to the

15   jury lounge on the fourth floor, where you showed up I think

16   today, Ms. Johnson will be there to meet you tomorrow

17   morning.

18              JUROR:  Okay.  Thank you.

19              THE COURT:  All right.  Thanks so much for your

20   patience and your candid answers and you're excused.  You

21   can go out the front door of the courtroom if you like --

22              JUROR:  All right.  Thank you.

23              THE COURT:  -- if you've got all of your

24   belongings.

25              So who's next?  1116?  1116 is next.  Thank you.


LYNNE M. KRENZ, RMR, CRR, CRC
(651) 848-1226

```
 1                    (Juror excused from courtroom)

 2                    (Juror present)

 3                        (Juror Number 1116)

 4                          EXAMINATION

 5            THE COURT:  Good morning.

 6            JUROR:  Good morning.

 7            THE COURT:  Would you mind taking off your mask

 8    and speaking into the microphone?

 9            JUROR:  No problem.

10            THE COURT:  So you are a lawyer, correct?

11            JUROR:  Yes.

12            THE COURT:  Are you practicing?

13            JUROR:  Not for the moment, but I was inhouse for

14    eight years until about a year and a half ago.

15            THE COURT:  Okay.  And what kind of law did you

16    practice?

17            JUROR:  Most recently I did mergers and

18    acquisitions, property law.  Before that I did antitrust law

19    and internal investigations for a security source.

20            THE COURT:  And was this with a private practice?

21            JUROR:  My last job -- I'm sort of a --

22    stay-at-home dad now.  So before the company that I worked

23    for was acquired, it was a corporate position.  And then

24    before that I was at Cleary Gottlieb Steen & Hamilton for

25    five years doing various international --
```

```
 1                    THE COURT:  Have you ever been with a government

 2       agency?

 3                    JUROR:  I have not been with a government agency.

 4                    THE COURT:  Okay.  Sometimes the antitrust lawyers

 5       have been at the FDC or Justice.

 6                    JUROR:  Yeah, I know a lot of people there.

 7                    THE COURT:  So you're a stay-at-home dad at the

 8       moment?

 9                    JUROR:  Yes.

10                    THE COURT:  Is the -- you answered question 48

11       about whether serving as a juror if it goes beyond next week

12       would be an extreme hardship.

13                    What are the issues for you?

14                    JUROR:  The main -- the two main issues are that

15       my wife, who is also an attorney, has a case in Alabama that

16       she's trying on Monday.

17                    THE COURT:  Next Monday?

18                    JUROR:  Yeah, this coming Monday.

19                    So she'd be out of town.  And while the kids have

20       school, I'm pretty much on for taking them to school and

21       picking them up.  So they're out at 3:15 most days.  And

22       then there's no school in D.C. Thursday and Friday

23       unfortunately.

24                    THE COURT:  Next week?

25                    JUROR:  Yeah.
```

```
1                    THE COURT:  I'm told that's true in Virginia and

2       Arlington too.

3                    JUROR:  Yeah.

4                    THE COURT:  So how old are the kids?

5                    JUROR:  My daughter is 9, she's turning 10 on

6       Tuesday.  My son is 5.

7                    THE COURT:  And what time -- if you dropped them

8       off at school, what time could you be at the courthouse?

9                    JUROR:  Let's see.  So they're supposed to be

10      there by 8:40.  So today I dropped them off at 8:40.  I was

11      here about 9:30, I guess.

12                   THE COURT:  Okay.  And are there alternatives for

13      the after school times?

14                   JUROR:  So, yes and no.

15                   My son is in aftercare, which does take him later,

16      but my daughter is out at 3:15, so it would be really being

17      finding people to, I guess --

18                   THE COURT:  Cover.

19                   JUROR:  -- cover.

20                   THE COURT:  And then you've got the problem next

21      Thursday and Friday --

22                   JUROR:  Yes.

23                   THE COURT:  -- because your wife will be out of

24      town?

25                   JUROR:  I'm not sure.  She might be back but I
```

```
 1        don't know at this point.

 2                   THE COURT:  Okay.

 3                   JUROR:  Hoping she's will be back, but even if

 4        she's back I know she's also probably --

 5                   THE COURT:  What kind of law does she practice?

 6                   JUROR:  So she is a partner at Crowell & Moring

 7        and she does defense.  She actually has a case here in front

 8        of Judge McFadden.

 9                   THE COURT:  Criminal defense?

10                   JUROR:  She does, well, environmental law and so

11        not usually criminal.

12                   THE COURT:  Most of it's not criminal?

13                   JUROR:  Yeah.

14                   THE COURT:  So I asked whether you -- at question

15        35, whether you, or any family members, or close friends

16        worked for law enforcement, FBI, D.C. Police, Capitol

17        Police, Secret Service, other agencies.  Who are you

18        referring to?

19                   JUROR:  So my wife was with the DOJ for ten years

20        before she moved over to Crowell & Moring.  That was the

21        main person in my family who's worked for law enforcement.

22                   THE COURT:  Was she environment and natural

23        resources?

24                   JUROR:  Yes.

25                   THE COURT:  Okay.
```

1                    JUROR:  Natural resources and environmental

2      defense.

3                    THE COURT:  And then one question.

4                    JUROR:  Sorry.  That encompass friends or just

5      family?

6                    THE COURT:  Close personal friends or immediate

7      family.

8                    JUROR:  Okay.  Yes.

9                    And then I'm good friends with the former HR head

10     at the FBI, but he is no longer there.  He was there until

11     about six months ago.

12                   THE COURT:  Okay.  Question 36 was whether you, or

13     members of your immediate family, or close personal friends

14     ever worked in the criminal justice system, probation

15     officer, correctional, or public defender's office, state

16     defender's office.

17                   JUROR:  So, again, sort of referencing my wife who

18     was ten years with the DOJ.

19                   THE COURT:  Got it.  All right.

20                   And have you or members of your immediate family

21     ever attended law school or worked as a lawyer, I guess the

22     answer to that one is lots of friends.

23                   JUROR:  Lots of friends and lots of family.

24                   THE COURT:  Question 41.  Have you, or members of

25     your immediate family, or close personal friends ever been a

```
 1              victim of a crime or a witness of a crime?

 2                        JUROR:  Yes.  That's my parents.  They had their

 3              house broken into a couple years ago where a lot of stuff

 4              stolen, so they were victims of a crime.

 5                        THE COURT:  Was that around here?

 6                        JUROR:  Potomac, Maryland.  Yeah.  And other

 7              little bits of crimes.

 8                        I mean, I know, like, my mom was assaulted in

 9              Mexico at one point and had stuff stolen there.  So that's

10              -- I would say no violent crimes.

11                        THE COURT:  No violent crimes.

12                        And tell us about your prior jury service, if you

13              would.

14                        JUROR:  Sure.  Oh, God.  I want to say it was ten

15              years ago, eight years ago.

16                        I served on a jury for D.C. Courts where someone

17              was a -- basically a college student was pulled over for no

18              reason and then searched, I thought inappropriately, but was

19              brought up on charges of position of narcotics, for a small

20              amount of marijuana.  And then also intent to distribute

21              because in his car they found 27 pills of ectasy.

22                        So it was a two-day trial with about a one-day

23              deliberation and ultimately we found him guilty of

24              possession and not guilty of intent to distribute.

25                        THE COURT:  Okay.  And is there anything about
```

1    that experience that would make you reluctant or

2    uncomfortable serving on a jury again?

3             JUROR:  No.  I mean, I found it an interesting

4    experience, you know.  I think it was -- as an attorney it

5    was fun to sort of be on the other side and see --

6             THE COURT:  Yeah.

7             JUROR:  -- how things go in a jury room.

8             THE COURT:  And even though you're a lawyer, are

9    you prepared to commit yourself to following my instructions

10   on the law no matter what you might think?

11            JUROR:  Yeah.

12            THE COURT:  Okay.

13            So now I'm going to go back to some of the earlier

14   questions on the questionnaire, beginning with question

15   number 4.

16            It asked whether you or a close friend or family

17   member has ever worked on Capitol Hill.

18            JUROR:  I worked on Capitol Hill as an aide to a

19   former Congressperson Connie Morella, who was a

20   Congresswoman out of Maryland, yeah, for just roughly a year

21   after college back in --

22            THE COURT:  Okay.  She's been long retired?

23            JUROR:  Long retired, yeah.  This would have been

24   back in 1996, I think.

25            THE COURT:  She's still around, right?

1              JUROR:  I think so.

2              THE COURT:  I can't remember.  I read something

3     about her or about her husband recently.

4              JUROR:  She might have passed.  I'm not sure,

5     honestly.

6              THE COURT:  Yeah.  Question 6 was whether on or

7     around January 6th you followed the news or watched videos

8     about the events that took place on the Capitol that day.

9              JUROR:  Yes.

10             THE COURT:  Okay.  Were you on the 6th itself?

11             JUROR:  I was watching on the 6th.

12             THE COURT:  Yeah.  Were you at home or at the

13    office?

14             JUROR:  I believe that I was at home.  I certainly

15    wasn't in the office on the 6th because I believe I would

16    have been working from home at the time.

17             THE COURT:  Yeah.  So have you followed it since

18    the 6th, pretty much?

19             JUROR:  Yeah.

20             THE COURT:  And you say you watched the hearings.

21    How much of the hearings did you watch?

22             JUROR:  I watched bits and pieces of the hearings,

23    but I read a lot in the Washington Post.  Mostly online,

24    sort of.

25             THE COURT:  Yeah.

LYNNE M. KRENZ, RMR, CRR, CRC
(651) 848-1226

1          JUROR:  The following day's coverage of what were

2     done in the hearings the previous day.

3          And then I'm fairly active on Twitter in terms of

4     following people.  So you would see, you know, clips and

5     stuff from what was presented.

6          THE COURT:  And other than Twitter, are there

7     other social media platforms that you regularly --

8          JUROR:  Mostly Facebook.  I would say Twitter and

9     Facebook.  That's about it for social media.

10         THE COURT:  Next question related to this is, from

11    what you've seen and heard, watched, read about

12    January 6th --

13         JUROR:  Mm-hmm.

14         THE COURT:  -- do you think that people -- this is

15    question 12, that people who were arrested or charged for

16    involvement in the events of January 6th are likely guilty

17    of the charges brought against them?

18         JUROR:  Yes.  I mean, I know that sounds --

19         THE COURT:  But how do you approach it as a juror?

20         You understand that the amount of evidence you

21    need to arrest someone or to indict someone is a lot less

22    than convicting someone?

23         JUROR:  Yes, I do.

24         THE COURT:  And are you prepared, despite your

25    answer you just gave me, to hold the government to its

1    burden of proving guilt beyond a reasonable doubt before you

2    could convict this defendant of any of the charges against

3    him?

4              JUROR:  I know that that is my duty and I would

5    endeavor to do that.  But I also know that my gut feeling is

6    that people who were there on the 6th were there intending

7    to engage in an insurrection.  So that's sort of -- that's

8    my leaning, you know.  I'm prepared to follow the law as

9    need be, but that's --

10             THE COURT:  But you also know that each particular

11   charge is its own elements.

12             JUROR:  Correct.

13             THE COURT:  And, you know, in order to convict of

14   charge A, the government has to prove X, Y, and Z.  In order

15   to convict on count B, they have to prove different

16   elements.

17             Would you commit to making sure that the

18   government establishes each of the necessary elements for

19   each charge beyond a reasonable doubt?

20             JUROR:  I mean, that's -- if that's what we're

21   charged to do, so yes.

22             THE COURT:  Yeah.  Okay.  Let's see.  I think the

23   last question I want to ask you is number 13.

24             Would your opinion concerning former President

25   Trump or his supporters make it difficult for you to serve

1    as a fair and impartial juror in this case?

2             JUROR:  So I put like a little squiggle next to

3    that one --

4             THE COURT:  Yes, you did.

5             JUROR:  -- because I was unsure.

6             I think it depends on the circumstances of the

7    case.  I don't have a very high opinion of former President

8    Trump and of people who are continuing to support him

9    despite his involvement in the time.

10            THE COURT:  Okay.

11            JUROR:  So I felt I should disclose that.

12            THE COURT:  I'll ask counsel if they'd like to ask

13   some followup questions.

14            MR. DREHER:  Thank you, Your Honor.

15                          **EXAMINATION**

16   BY MR. DREHER:

17   Q.  Good morning, sir.

18   A.  Hi.  Good morning.

19   Q.  Earlier you told us that your wife at one point worked

20   for DOJ?

21   A.  Yes.

22   Q.  Can you explain about how long ago that was?

23   A.  Sure.  She was at the Department of Justice through --

24   all right, she's been at Crowell & Moring I think four years

25   now, so she would have been at the Department of Justice

1    through, oh, God -- I know she was there for two years under

2    President Trump and about that point she left.

3    Q.  Okay.  Did she leave under good circumstances?

4    A.  Yes.

5    Q.  Was there, I guess, animosity on either side during her

6    employment there at DOJ that may affect a potential bias for

7    or against DOJ?

8    A.  No, I would not say so.

9    Q.  And you also told her, she was trying a case in Alabama

10   but you're not sure how long it's scheduled to go?

11   A.  Yeah.  She's -- she's heading to Alabama on Sunday for a

12   case that is beginning Monday.  She think it's only going to

13   be today and she'll be back on Tuesday, hopefully, but --

14            THE COURT:  I mean, if she were back she might be

15   able to cover some of the concerns you have about --

16            JUROR:  Hopefully, yeah.  But, yes, she's due to

17   fly out for that and then she'll be back.

18   BY MR. DREHER:

19   Q.  Is it a federal case as well?

20   A.  I actually am not sure what that case is.

21   Q.  Okay.

22            MR. DREHER:  And I think, Your Honor, you hit the

23   nail right on the head where I was going next.

24   BY MR. DREHER:

25   Q.  In terms of conflicts with your children's school

1    schedule are you able to, I guess, make those arrangements

2    if you were asked to?

3    A.  I can try.  I'm assuming that may wife would be back for

4    Thursday and Friday.  I know that she probably has stuff on

5    Thursday.  Normally I would be covering that.  You know, if

6    worse comes to worse we ask friends to sort of watch after

7    the kids on those days.

8         Can I ask, would we be, like, sequestered if we

9    were on the jury or would we be -- at the end of the day

10   would we would be going home?  We wouldn't be sort of tucked

11   away?

12        THE COURT:  I mean, the normal day is we'd

13   probably start around 9:30.

14        JUROR:  Yeah.

15        THE COURT:  Maybe slightly later.  We'd break for

16   lunch for an hour, hour and a quarter.

17        JUROR:  Yeah.

18        THE COURT:  And we would sit again and end by

19   5:00.

20        Now, I do know next Friday I have to end my day

21   earlier like 3:00 or 4:00.  I'm not sure yet.

22        JUROR:  Okay.  Yeah, you know, I mean, obviously

23   I'll do what I can to make -- have somebody watch the kids

24   during those times.  It's not ideal.

25   BY MR. DREHER:

1    Q.  Right.  Well, that brings me to my question.  Assuming

2    you're able to make those arrangements --

3    A.  Yeah.

4    Q.  -- would the arrangements that you have made weigh in

5    the back of your mind at all or cause you to be distracted

6    to be able to hear the evidence in this case?

7    A.  I don't think so.  You know, particularly assuming we're

8    getting out at, like, 5:00 most days, I'm -- you know,

9    certainly for my son, I'm able to pick him up by 6:00.  It's

10   more figuring stuff out for my daughter since she's out at

11   3:15.

12   Q.  I understand.

13          MR. DREHER:  I have no further followup, Your

14   Honor.

15          THE COURT:  Mr. Smock.

16                        **EXAMINATION**

17   BY MR. SMOCK:

18   Q.  Hi, Mr. Berman, I'm Ned Smock.

19   A.  Hi.

20   Q.  You answered questions about believing that folks who

21   were there on January 6th are likely guilty and I just

22   wanted to ask you a quickly about that.

23   A.  Okay.

24   Q.  I think as an attorney you appreciate that there are

25   elements to every offense and you don't, as you're sitting

1    here, know the offenses that are charged.

2              Would you be able to separate that view that you

3    think that folks who were there were guilty from this

4    question, that you'd be required to, as a juror, which is

5    figuring out whether the government and the government alone

6    has met its burden establishing every charge?

7    A.  I mean, I'd like to think I could.  I don't -- you know,

8    I certainly would try to.  I know that I'm coming from a

9    position that -- I don't have a very high opinion of people

10   who were there on January 6th.  So, you know, I don't want

11   to tell you that I can tell you I can do something that I

12   don't know if I can do.  I would certainly endeavor to.

13   That is -- that would be my goal.

14             I do know that I, you know, I don't think very

15   highly of people who were there for that, so that's where I

16   start from.

17   Q.  I appreciate that.  And it sounds like that's something

18   that you've thought about a fair amount after January 6th?

19   A.  Yes.

20   Q.  And a feeling that you hold fairly strongly?

21   A.  Yes.

22   Q.  And, I mean, I guess what I'd ask is, let's say

23   100 percent being I'm totally confident that I can put all

24   that out of my mind and be fair and set aside these strongly

25   held views, and zero percent being I can't, I know that I

```
 1     can't.
 2              How confident are you on that scale that you can
 3     put aside those views and being totally fair to my client?
 4     A.  I honestly don't know.  That's a hard scale to do.  I
 5     don't know.
 6     Q.  I guess maybe the way of asking that is -- it sounds
 7     like, and I don't want to put words in your mouth, you can't
 8     say with confidence that you will be able to set aside those
 9     views?
10     A.  I think that's fair.  I can't say with confidence.
11              I would like to think that I could, but I also
12     know that I have fairly strong feelings about what happened
13     on January 6th.  And I honestly, it would be hard to give
14     somebody the benefit of the doubt, which is kind of what
15     we're being asked.
16              THE COURT:  The benefit of the doubt did you say?
17              JUROR:  Yes.
18     BY MR. SMOCK:
19     Q.  And, right.  I mean, you as a lawyer understand legal
20     standards.
21     A.  Yes.
22     Q.  So it sounds like what you're saying is you can't be
23     sure you'd be able to be utterly fair and impartial in this
24     case?
25     A.  Yes.
```

 1    Q.  Okay.

 2    A.  I feel like I would have a hard time being impartial.

 3            THE COURT:  Say that again?

 4            JUROR:  I feel like I would have a very hard time

 5    being completely impartial, which is I -- you know, I wish I

 6    could say that I support my own better interest there, but I

 7    feel it's difficult, yeah.

 8    Q.  Okay.  Thank you.

 9    A.  Sure.

10                        **EXAMINATION**

11    BY MR. DREHER:

12    Q.  Sir, do you understand that one thing must be proved is

13    that Mr. Gossjankowski was, in fact, at the Capitol?

14    A.  Yes.

15    Q.  So with your -- I'm not going to ask you a percentage of

16    your confidence --

17    A.  Mm-hmm.

18    Q.  -- but when you're viewing the case right now, is it

19    safe to assume you know nothing about whether Mr.

20    Gossjankowski was at the Capitol at this moment?

21    A.  I don't.  You know, obviously I know no information

22    about his specific case except that he's been charged with

23    six counts, I think, of --

24    Q.  Okay.  So then ultimately then, at this moment, would

25    you have any preconceived notions as to whether or not Mr.

 1      Gossjankowski would be guilty or not guilty of the offenses
 2      that you're aware of?
 3      A.  No.  Aside from the fact that he's being charged with
 4      them.  So that's, you know, the fact that he's -- I know
 5      that simply being charged with a crime does not mean that
 6      you committed the crime.  And my -- obviously my instinct is
 7      that people are generally innocent until they are proven
 8      guilty and that lots of people are charged with crimes for
 9      bad reasons.
10          With respect to this, my gut instinct is when
11      someone has been charged with a crime related to January 6th
12      that they were probably at least present.  That it would be
13      very hard to falsely identify someone for that.  That's a
14      preconceived notion that I have.
15      Q.  Okay.  Let me ask it this way.
16      A.  Mm-hmm.
17      Q.  More as a when.
18          Are you able to wait until all the evidence is
19      presented in this case before you make a decision as to
20      whether or not Mr. Gossjankowski is either guilty or not
21      guilty of the offenses that are charged?
22      A.  I would guess.  I would certainly try to.
23      Q.  Okay.
24          MR. DREHER:  I have no further followup, Your
25      Honor.

1                               **EXAMINATION**

2              THE COURT:  Was your last answer that you would

3       certainly try to wait until you heard all the evidence --

4              JUROR:  Some confusing words there.

5              THE COURT:  -- before you would say whether he was

6       guilty?

7              JUROR:  I would certainly -- yes, I would

8       certainly try to not prejudge.

9              THE COURT:  And if he -- let's assume it's

10      established that he was at the Capitol.  Let's assume that

11      it's established that he was inside the Capitol.

12              With an understanding that each of the different

13      counts of the indictment charge a different crime.

14              JUROR:  Mm-hmm.

15              THE COURT:  Is that enough for you or would you

16      still have to see if the government had proved each of those

17      crimes based on the evidence beyond a reasonable doubt?

18              JUROR:  If it was established that he was at the

19      Capitol and it was established that he was in the Capitol, I

20      mean, any other charges would have to be proven beyond a

21      reasonable doubt.  But I feel like I would have a fairly

22      negative opinion of him from that.

23              THE COURT:  All right.  Anybody else have any

24      other questions?

25              Okay.  Why don't you step out for a few minutes

```
 1     with Ms. Johnson.

 2               (Juror excused)

 3               THE COURT:  All right.

 4               MR. SMOCK:  Your Honor, I would move to strike Mr.

 5     Berman.  I think there are a number of things that are

 6     relevant.

 7               I mean, I think as a starting point I think it's

 8     relevant that he's an attorney.  And so --

 9               THE COURT:  Well, that's --

10               MR. SMOCK:  But I'm getting to the reason that I

11     think that's relevant.

12               I think it's relevant in that he understands that

13     there are elements of an offense.  He understands that

14     there's a burden, et cetera, yet he also honestly and I

15     think to his credit, talked about the fact that, number one,

16     he feels very strongly about January 6th and people who

17     participated.

18               He was doing his best as any lawyer would in

19     response to questions from a judge and lawyers to be -- to

20     try his best, but repeatedly he said he would have a very

21     hard time being impartial.  He wished he said he could, but

22     he can't.  He can't be certain that he would be impartial.

23               One thing that I thought was interesting, he said

24     that his instinct as a lawyer is that generally people are

25     not guilty unless and until it's proven, but that he had a
```

1    different impression in a case like this.

2         Again, he said he would endeavor to do it.  He was

3    earnestly indicating he would make an effort, but that's not

4    enough when he repeatedly said that he would not be able to

5    do it.  And he said that without any qualification.

6         So I think this is a clear basis to strike him.

7         MR. DREHER:  Your Honor, I don't believe this

8    potential juror at any point indicated any sort of prejudice

9    towards Mr. Gossjankowski personally.  Instead it was more

10   of what would -- what his, I guess, potential prejudice

11   would be after certain facts were established.

12        Now it's true that at each moment that Mr. Smock

13   does raise, there was questions as to when that would have

14   occurred.

15        I do believe that the potential juror was able to

16   answer that he would wait until the end of the evidence.

17   And it wasn't until this Court's poignant question at the

18   end where I think his ability to be able to follow

19   directions shined the most.

20        And ultimately what he informed this Court was if

21   'X' was established or if 'Y' was established, that it

22   wasn't until that point that any sort of potential prejudice

23   would come out.

24        And, ultimately, that's what we ask of all jurors,

25   is to consider the evidence, make determinations, and wait

1    until the end or conclusion of the evidence before making

2    those decisions.

3              And here, I believe, that's precisely what this

4    potential juror has informed the Court that he would do,

5    which I think as an attorney, himself, only makes it more

6    credible.

7              So I would ask the Court to deny the motion to

8    strike this potential juror and ask him to return on

9    Thursday.  Thank you.

10             THE COURT:  All right.  Mr. Smock has a response.

11             Before you sit down, though, any comments about

12   his scheduling problems?

13             MR. DREHER:  Your Honor, I was worried that it

14   might affect sort of his concentration on the case, but

15   having friends that his daughters [sic] would be able to

16   stay with, I didn't have any concerns with his scheduling

17   for that sense, especially with it sounds like his wife will

18   be back sooner rather than later.

19             MR. SMOCK:  Just very briefly.

20             I think it's absolutely clear that there -- almost

21   every juror is going to have answers about negative feelings

22   about that.  And I think that --

23             THE COURT:  I can't hear you very well.

24             MR. SMOCK:  Just about every juror is going to

25   have answers about negative feelings they have and that's

1     clear in the District of Columbia.

2              My concern is that what differentiates him from

3     some of the jurors we've heard, who said they had negative

4     opinions but then can assure us that they will be impartial

5     and fair, is that repeatedly he came back to the fact that

6     he cannot be.  That differentiates him from folks who have

7     said, I have concerns about Trump, I have concerns about

8     January 6th, but I can be fair and impartial.

9              Several times, and he repeated that he can't be

10    going to the very end and couldn't even, I think, couldn't

11    give any sense on a scale about whether he could be

12    impartial.

13             THE COURT:  Well, I've had trouble with your scale

14    question from the beginning, because different people

15    measure things differently.  Averages, mediums, medians, X

16    percentage, Y percentage.  High level of confidence is one

17    thing, but trying to put a number to it I find problematic.

18             MR. SMOCK:  I think then the answer that he gave

19    that he would have a very hard time, and that's a direct

20    quote, being fair and impartial is certainly enough.

21             THE COURT:  Anything else?

22             MR. DREHER:  No, Your Honor.  Thank you.

23             THE COURT:  All right.  I'm going to grant the

24    motion.

25             I was very close to denying the motion but the

```
 1    last series of answers only underscored the problem.
 2              (Juror present)
 3              THE COURT:  Well, we're going to excuse you --
 4              JUROR:  Okay.
 5              THE COURT:  -- from this jury.
 6              Appreciate your candor.  And ask you to go back
 7    down to the fourth floor and report back and they'll tell
 8    you if they might need you later.
 9              JUROR:  Okay.
10              THE COURT:  Thank you so much.
11              JUROR:  All right.
12              THE COURT:  You can go out that way, thanks.
13              JUROR:  Okay.
14              (Juror excused)
15              THE COURT:  And this would be a good time to take
16    a break I think.  A little midmorning break so-called.
17              (Recess taken at 11:44 a.m.)
18                        *    *    *    *    *
19        (12:01 p.m.)
20                           IN OPEN COURT
21              THE COURT:  All right.  We're going to start with
22    number 1627, who is on line 20 of the sheet.
23              (Juror present)
24
25
```

```
 1                      (Juror Number 1627)

 2                           EXAMINATION

 3              THE COURT:  Hello.

 4              JUROR:  Hello.

 5              THE COURT:  I guess it's still morning.

 6              Would you mind taking off your mask and talking

 7     into the microphone so we can hear you?  Thank you.

 8              So you're Juror 1627, correct?

 9              JUROR:  Yes.

10              THE COURT:  And you work across the street --

11              JUROR:  Yes.

12              THE COURT:  -- in Superior Court?

13              JUROR:  Yes.

14              THE COURT:  Would you tell us all exactly what you

15     do for the Superior Court.

16              JUROR:  I assign attorneys to child abuse neglect

17     cases.

18              THE COURT:  Say that again?

19              JUROR:  I work in the Counsel for Child of Abuse

20     and Neglect.  So I assign attorneys to child abuse and

21     neglect cases for parties involved in neglect cases.

22              THE COURT:  I see.  So you work in the family

23     division in court?

24              JUROR:  Family, yes.

25              THE COURT:  And you're responsible for assigning
```

1      attorneys to represent people in neglect cases?  In neglect

2      cases?

3                 JUROR:  In neglect cases, yes.  Where children are

4      removed from Child and Family Services.

5                 THE COURT:  Yes, so.

6                 JUROR:  So I appoint attorneys to all parties,

7      including the children and the parents or guardians,

8      whoever, is named in the neglect petition.

9                 THE COURT:  How long have you been working in

10     Superior Court?

11                JUROR:  Superior Court, 28 years.

12                THE COURT:  28 years?

13                JUROR:  Yes, sir.

14                THE COURT:  Good for you.

15                So have you been in other divisions of the court

16     besides the family division?

17                JUROR:  Our family division but like different

18     sections, like, I was a child support caseworker for ten

19     years.

20                THE COURT:  What kind of casework?

21                JUROR:  Child support.

22                THE COURT:  Child support.  Okay.

23                JUROR:  Where I monitored my own caseload over

24     5,000 cases, yes.

25                THE COURT:  Wow.  Well, good for you.  I have a

```
 1        lot of friends across the street.

 2                  JUROR:  Okay.

 3                  THE COURT:  So let me ask you some questions about

 4        the numbers you wrote down on the card.

 5                  JUROR:  Okay.

 6                  THE COURT:  First question, number 6.

 7                  Have you followed the news or watched videos about

 8        the events that took place at the Capitol on January 6th?

 9                  JUROR:  Just on the news.

10                  THE COURT:  Okay.  Were you watching it as things

11        were happening on January 6th?

12                  JUROR:  No.

13                  THE COURT:  Were you at the courthouse on

14        January 6th; do you remember?

15                  JUROR:  Not -- I'm not sure.  I believe so.  I'm

16        not sure.

17                  THE COURT:  Okay.  Well, did your getting back and

18        forth to work that day, do you remember whether there was

19        any impact from what was going on up on The Hill as you were

20        coming to work and going home?

21                  JUROR:  Okay.  January 6th was when this event

22        took place?

23                  THE COURT:  When the group of people went into the

24        Capitol.

25                  JUROR:  Okay.  No, I remember.  I was at the
```

LYNNE M. KRENZ, RMR, CRR, CRC
(651) 848-1226

```
 1      dentist office.

 2                  THE COURT:  You were at work?

 3                  JUROR:  At the dentist.  The dentist office.

 4                  THE COURT:  Oh, you at the dentist.  Okay.  So you

 5      weren't down in this part of the city?

 6                  JUROR:  No.

 7                  THE COURT:  All right.  Okay.  So but you watched

 8      some of it at home on television, or social media, or what?

 9                  JUROR:  I just saw it it seems like on the news

10      channel.

11                  THE COURT:  Mm-hmm.

12                  JUROR:  That's it.  I didn't watch it.

13                  THE COURT:  I see.  Have you followed it much

14      since January 6th, what's going on?

15                  JUROR:  No, just -- just by watching the evening

16      news, if it comes up or something like that, other than

17      that, no.

18                  THE COURT:  And what evening news shows do you

19      watch or what channel?

20                  JUROR:  I watch Channel 4, NBC and Channel 5, FOX.

21                  THE COURT:  Okay.  Both NBC and FOX?

22                  JUROR:  Yes.

23                  THE COURT:  Do you follow any particular social

24      media platforms?  No?

25                  JUROR:  No.  Just Facebook.  I just get on and
```

1      off.  I don't really.

2                THE COURT:  Right.  So I want to move on to

3      question 12.

4                You answered question 12.  It said:  From what

5      you've seen or heard, do you think that people who have been

6      arrested for the events of January 6th are probably guilty?

7      And you wrote down number 16.

8                Do you think just because someone's been arrested

9      or charged --

10               JUROR:  No.

11               THE COURT:  Okay.

12               JUROR:  That was a mistake, no.

13               THE COURT:  That was a mistake?

14               JUROR:  Yes.

15               THE COURT:  Okay.  I mean, you work in the court

16     system?

17               JUROR:  Yes.  That's why I said that was a

18     mistake.

19               No, I don't think someone is guilty just because

20     they're arrested.

21               THE COURT:  Okay.  You wrote down the word on the

22     card, I think I'm reading it right, that says "hearing."

23               JUROR:  Yeah, I wear hearing aids in both ears

24     that's why I look at you.

25               THE COURT:  Oh.

1              JUROR:  I meant to tell you that.  I can hear you,

2    but when it's in a low voice, I have to ask you to repeat

3    it, but I do wear left and the right ear.

4              THE COURT:  Okay.  And have you always worn a

5    hearing aid?  You always had a hearing problem?

6              JUROR:  When I got older, not always.  I mean, I

7    started having hearing loss in my, I believe, mid-30s.

8              THE COURT:  Wow, okay.

9              So when you -- if you were not looking at me would

10   you be able to hear?

11             JUROR:  I can hear you.

12             THE COURT:  Yeah.

13             JUROR:  Because it's loud.

14             THE COURT:  Okay.

15             JUROR:  But when you're whispering, I would

16   still -- when you're whispering, I may ask you to repeat or

17   I always look at you when talking, reading lips, because --

18             THE COURT:  Yeah.  Have you ever sat on a jury?

19             JUROR:  Yes.

20             THE COURT:  In this court or your own court?

21             JUROR:  Superior Court, not this court.

22             THE COURT:  Superior Court?

23             JUROR:  Yes.

24             THE COURT:  Were you able to hear the witnesses

25   and the lawyers?

```
 1                    JUROR:  Yes.

 2                    THE COURT:  You're okay?

 3                    JUROR:  Yes.

 4                    THE COURT:  And so if you were on a jury in this

 5      case and were sitting over there where my law clerks and

 6      interns are sitting, and the witnesses were sitting where

 7      you're sitting, would you be okay hearing people?

 8                    JUROR:  Yes, I can hear.

 9                    THE COURT:  Okay.  Would it be helpful to you if

10      you were in a front row seat, for example?

11                    JUROR:  I can sit either or.

12                    THE COURT:  Doesn't matter?

13                    JUROR:  As long as they're speaking into a

14      microphone.

15                    THE COURT:  As long as they're speaking up?

16                    JUROR:  Yeah, I can -- if you're whispering in low

17      tone --

18                    THE COURT:  Yeah.

19                    JUROR:  -- then I have to try to read their lips.

20                    THE COURT:  So that was question 16, yeah.

21                    I also asked whether you, or any family members,

22      or close friends have ever worked at, or attended, or

23      participated in any programs at Gallaudet University.

24                    JUROR:  I never worked.  I went there for referral

25      in reference to trying to purchase hearing aids, that's it.
```

```
 1                    THE COURT:  Okay.  So you saw a doctor there?
 2                    Did you see a doctor there, a hearing specialist
 3        of some kind?
 4                    JUROR:  Not a doctor but an audiologist to try to
 5        get pricing of hearing aids.  That's it.
 6                    THE COURT:  Got it.
 7                    JUROR:  Other than that --
 8                    THE COURT:  I understand.
 9                    So when you did sit on a jury or maybe more than
10        once, what kind of cases were they when you were a juror?
11                    JUROR:  In the Superior Court?
12                    THE COURT:  Yeah.
13                    JUROR:  It was -- oh, it was years ago.
14                    It was someone that hit a child or a pedestrian
15        that rode on a bike and they asked the child questions then
16        they left the scene, they didn't stay, so that was the case.
17                    THE COURT:  So they left the scene?
18                    JUROR:  Yes.
19                    THE COURT:  Okay.  Was the jury able to reach a
20        verdict?
21                    JUROR:  Yeah, there were different -- yes, we did.
22        Yes.
23                    THE COURT:  Was it a criminal case or traffic case
24        of some sort?
25                    JUROR:  I'm thinking -- it was dealing with
```

```
 1    traffic, so, it's been over ten years, so I can't --
 2              THE COURT:  Okay.
 3              JUROR:  It was pertaining to traffic because he
 4    did hit an individual, a child on a bike.
 5              THE COURT:  That's all right.
 6              Question 36 was whether you, or a close friend, or
 7    family members ever worked in the criminal justice system
 8    including defense, office of criminal defense lawyer,
 9    probation, correctional, other than yourself, any other jobs
10    that you're referring to about yourself or you're referring
11    to other friends or relatives of yours --
12              JUROR:  What was the question?
13              THE COURT:  Who have worked in the criminal
14    justice system?
15              JUROR:  Just me working over there at
16    the courthouse.
17              THE COURT:  Just you working over there?
18              JUROR:  Mm-hmm.
19              THE COURT:  Yeah, okay.
20              And so I asked whether you, or a close friend, or
21    family member have ever gone to law school, worked as a law
22    school, performed legal investigative work.  I assume some
23    of the people -- obviously, some of the people you come in
24    contact with are lawyers.
25              JUROR:  Yeah.  Attorneys and so forth, but I never
```

1    went to law school but I received -- I have a certificate in

2    paralegal.

3                THE COURT:  You were a paralegal?

4                JUROR:  No, I have a certificate in paralegal

5    services.

6                THE COURT:  Okay.

7                JUROR:  So, yeah.

8                THE COURT:  So you went to school to get that or

9    took credits?

10               JUROR:  Yes, I did.  I went -- yes.

11               THE COURT:  Have you, or members of your immediate

12   family, or close friends ever been a victim of a crime or a

13   witness to a crime?

14               JUROR:  Yes.

15               THE COURT:  Could you tell us about it.

16               JUROR:  Myself.

17               I was at a gas station and with my young son and I

18   left my belongings in the car, meaning my purse.  So my son,

19   I was teaching him, you know, to help me out, and he went to

20   inside the gas station to pay for the gas.  And while I was

21   -- I was watching him and I wasn't too far from my car, but

22   a car pulled up.  As I was watching my son, they went in my

23   car, stole my purse, took my purse out and drove off.

24               THE COURT:  How long ago was this?

25               JUROR:  Maybe ten years ago.

```
 1                  THE COURT:  Okay.  Anybody ever arrested?

 2                  JUROR:  No.

 3                  THE COURT:  We talked about your jury service.

 4     So, okay, you wrote down 45 with a question mark, and maybe

 5     we've already talked about it.

 6                  45 was whether you had any health problems,

 7     medical problems, hearing problems?

 8                  JUROR:  Yeah.

 9                  THE COURT:  Medication problems?

10                  JUROR:  That would be it.

11                  THE COURT:  Okay.  Questions?

12                              EXAMINATION

13     BY MR. DREHER:

14     Q.  Good morning, ma'am.

15     A.  Good morning.

16     Q.  Now, when you're assigning attorneys for abuse and

17     neglect cases do you interact with them or is your role, you

18     don't touch them, you don't talk to them?

19     A.  Before the pandemic, yes.  Now everything is maybe call

20     in or e-mail them.

21     Q.  Okay.  Have you ever had any bad experiences with

22     assigning attorneys that would cause you any sort of,

23     perhaps, make you uncomfortable having to deal with

24     attorneys in this case?

25     A.  Not at all.
```

1    Q.  Okay.  How about the other way?  Are there a lot of good

2    attorneys that give you good feelings about what attorneys

3    say?

4    A.  Yes.

5    Q.  Okay.  Now, you also told us earlier that you began to

6    experience hearing loss in your 30s, right?

7    A.  Yes.

8    Q.  Do you know American Sign Language or are you able to

9    use sign language?

10   A.  No.

11   Q.  No?

12   A.  Not at all.

13   Q.  Okay.  Now you said at some point you also read lips.

14   Was that a skill that you learned prior to hearing loss or

15   something that you've learned since?

16   A.  As I was losing hearing.

17   Q.  Yeah.  And also you told us earlier that it was mainly

18   local news that provided you information about what happened

19   on January 6th?

20   A.  Yes.  Just -- yes, local.  Yes.

21   Q.  Were there any national news programs that you would

22   watch?

23   A.  No.  Just like I stated, just the evening news or

24   morning when I was getting ready for work.  Other than that,

25   just morning and evening news.  That's it.

```
1    Q.  All right.  Thank you very much.
2              MR. DREHER:  I have no further followup questions,
3    Your Honor.
4                        EXAMINATION
5    BY MR. SMOCK:
6    Q.  Hello.
7    A.  Hello.
8    Q.  Just a couple of very quick questions.
9    A.  Okay.
10   Q.  Do you have any strong feelings about what happened on
11   January 6th that would enter into your consideration of this
12   case do you think?
13   A.  No.
14   Q.  And you also mentioned that -- we talked a little bit
15   about your ability to lip read and you've heard that my
16   client, Mr. Gossjankowski, is deaf.
17              And are you aware that many people who have been
18   deaf since birth do not have the ability to lip read?
19   A.  No, I wouldn't know that.
20   Q.  But do you hold a belief that every deaf person has the
21   ability to read lips?
22   A.  I don't know.
23   Q.  Okay.
24   A.  I don't know.
25   Q.  Okay.
```

1     A.  I can't answer that.

2     Q.  Okay.  Thanks.

3               THE COURT:  Anything we need to talk about?

4               All right.  Thank you.

5               I think we're going to ask you to come back

6     tomorrow morning at 10:00, because we're going to have a

7     bunch of people, we're still not done yet.  You know how

8     juries are selected.  We're going to wind up with probably

9     twice as many people as we need.

10              JUROR:  Okay.

11              THE COURT:  And then we'll make a final decision

12    tomorrow.

13              JUROR:  Okay.  10:00.  Okay.

14              THE COURT:  10:00.

15              And we'd like you to go back to the jury lounge on

16    the fourth floor in this building.  And Ms. Johnson will

17    meet you down there.

18              JUROR:  Okay.  All right.

19              MS. JOHNSON:  Tomorrow at 10:00.

20              THE COURT:  Tomorrow at 10.

21              JUROR:  Okay.

22              THE COURT:  Thank you very much.

23              JUROR:  You're welcome.

24              THE COURT:  Go out the front door of the

25    courtroom.  Go out that way.

```
 1                   JUROR:  Thank you.

 2                   MS. JOHNSON:  1376.

 3                   (Juror excused from courtroom)

 4                   THE COURT:  1376.  He's got a lot of things he's

 5       written down.

 6                   I'm going to start with question number 48.  And

 7       if there's enough troubling in what he's telling us we're

 8       going to stop there.  I don't know what he's going to tell

 9       us.

10                   (Juror present)

11                       (Juror number 1376)

12                            EXAMINATION

13                   THE COURT:  Good afternoon, sir.

14                   JUROR:  Good afternoon.

15                   THE COURT:  Why don't you take your mask off and

16       speak into the microphone.

17                   Let me start with question number 48, which was --

18       has to do with the scheduling of this trial.  And I said

19       that we expected the presentation of the evidence to go

20       through probably through next week and then that after that

21       the jury would begin deliberating, which means that we might

22       well be into the week after next.  And you indicated you had

23       an issue with that that would make it difficult for you.

24                   Could you tell us about that.

25                   JUROR:  Yes.  I currently have travel plans to
```

```
 1    Idaho starting Saturday morning and continuing --
 2              THE COURT:  Which Saturday?
 3              JUROR:  This coming Saturday.  And continuing to
 4    Thursday of next week.
 5              THE COURT:  And may I ask where you're going?
 6              JUROR:  Sun Valley.  It is a personal trip, yes.
 7              THE COURT:  And you've already purchased tickets?
 8              JUROR:  I did, yes.
 9              THE COURT:  I assume.  Did you tell the jury
10    office that?
11              JUROR:  I did.  It was in my questionnaire.
12              THE COURT:  Okay.  So from this Saturday to next
13    Thursday?
14              JUROR:  Correct.
15              THE COURT:  Okay.
16              Questions?  Okay.
17              Well, I'm sorry that you had to wait two days to
18    tell us this.
19              I think that, you know, if you've already
20    purchased tickets there's no way I'm going to ask you to do
21    anything different.
22              So we're going to excuse you from this jury.  Go
23    back to the jury lounge and tell them again, but they may
24    still ask you to call tomorrow night.  And beyond that, you
25    know, you're not going to even be physically in the area,
```

1      so.

2                   JUROR:  Right.

3                   THE COURT:  Thank you very much.  Thanks for your

4      patience.

5                   JUROR:  No problem.

6                   THE COURT:  Okay.

7                   JUROR:  Thank you.

8                   THE COURT:  Thank you.

9                   MS. JOHNSON:  Sir, you can exit through the front

10     of the courtroom.

11                  JUROR:  All right.

12                  (Juror excused)

13                  THE COURT:  737.  737.

14                  (Juror present)

15                       **(Juror number 0737)**

16                          **EXAMINATION**

17                  THE COURT:  Good afternoon.

18                  JUROR:  Hi.

19                  THE COURT:  Would you mind taking off your mask

20     and speaking into the microphone for us?  Thank you.

21                  Let me go through.  So let me just ask you, is

22     this last one crossed off or erased?

23                  JUROR:  It was erased, yeah.

24                  THE COURT:  Okay.  Let me go through and ask you

25     some questions.  I think I'll start back.

1            Question 35 asked whether you, or any close

2    friends, or family members worked for law enforcement of any

3    sort, including police departments.

4            Could you tell us about that.

5            JUROR:  Yes.  My grandfather is a retired police

6    officer and uncle's a retired police officer.

7            THE COURT:  In this area or elsewhere?

8            JUROR:  No, in Florida.

9            THE COURT:  Okay.  Have you, or members of your

10   immediate family, or close personal friends ever been the

11   victim of or a witness to a crime?

12           JUROR:  My home on Capitol Hill was robbed once.

13           THE COURT:  Okay.  How long ago was that?

14           JUROR:  Probably 18 years ago.

15           THE COURT:  All right.  Do you still live on

16   Capitol Hill?

17           JUROR:  No.

18           THE COURT:  All right.  How long have you been

19   away from The Hill?

20           JUROR:  Two years.  I moved in -- well, a year and

21   a half.

22           THE COURT:  Okay.  So you left there before

23   January 6, 2021?

24           JUROR:  No, I was still on The Hill.

25           THE COURT:  You were still there.  Okay.  So, I

1     guess that's an earlier one.

2                 Where, without giving us the street address, if

3     you don't want to --

4                 JUROR:  Near Eastern Market.

5                 THE COURT:  What?

6                 JUROR:  Near Eastern Market.

7                 THE COURT:  Eastern Market.  So what would -- were

8     you -- so that's question number 3.

9                 How long had you lived in that area?

10                JUROR:  About 18 years.

11                THE COURT:  Okay.  And on January 6th were you at

12    home?

13                JUROR:  I was.

14                THE COURT:  And could you tell us about how the

15    events of that day, if at all, affected you?

16                JUROR:  This crosses a couple different questions.

17    Does that matter?

18                THE COURT:  Yeah.

19                JUROR:  Okay.  I was watching the coverage on the

20    TV.  I worked on Capitol Hill for a committee, so I was

21    watching the coverage of particular interests since I was an

22    employee of the House.

23                THE COURT:  You were then an employee of the

24    House?

25                JUROR:  Correct.

1          THE COURT:  And what committee was that?

2          JUROR:  The House Financial Services Committee.

3          THE COURT:  All right.  You were not at the

4     Capitol that day, you were at home?

5          JUROR:  Correct, I was at home.

6          THE COURT:  And did it affect you in any way in

7     terms of your movements around the area or in the days

8     following?

9          JUROR:  I mean, it changed -- it affected the

10    whole city, the traffic patterns.

11         THE COURT:  Yeah.

12         JUROR:  Not me personally in any specific way.

13         THE COURT:  So you followed it that day on the

14    news and how did you follow it, TV news, social media?

15         JUROR:  TV and talking to friends that were

16    evacuated from the Capitol.

17         THE COURT:  So there were people you were talking

18    to who -- were you speaking to them when they were still

19    physically present or after they left?

20         JUROR:  Yes, both.

21         THE COURT:  Okay.  And did you -- had you followed

22    the events subsequent to that?

23         JUROR:  Yes.

24         THE COURT:  And in what ways, social media?

25         JUROR:  Social media.  I've watched the hearings.

1      I consumed most of the information around the events.

2              THE COURT:  And where do you get most of your news

3      from?

4              JUROR:  I watch the evening news almost every

5      night, both ABC and NBC.  But then also reading all The Hill

6      daily rags and the D.C. publications.

7              THE COURT:  And you watched a lot of the hearings?

8              JUROR:  I watched a good chunk of the hearings.

9              THE COURT:  Yeah.  Do you think -- oh, there's

10     something else I was going to ask you.

11             So did people that you talked to who were in the

12     Capitol that day as the events were going on, or

13     subsequently, discussed with you, described to you what they

14     experienced?

15             JUROR:  Yes.

16             THE COURT:  Okay.  And do you think that that --

17     what they've told you in your own following of these events

18     would affect your ability to be a fair and impartial juror

19     in a case involving events at the Capitol that day?

20             JUROR:  No, but -- can you repeat the question?  I

21     want to make sure --

22             THE COURT:  You know a lot because you --

23             JUROR:  Correct.

24             THE COURT:  -- you've been in the buildings and

25     watched the events as they were going on, and you followed

1        it subsequently, and you've watched a lot of the hearings,

2        and you had friends that were in the buildings --

3                THE COURT:  Yep.

4                THE COURT:  -- at the time whom you've spoken to.

5                So the question is:  Do you think with all of that

6        you are capable of providing a fair and impartial jury or

7        being a fair and impartial juror with respect to the

8        particular defendant charged in this case, Mr.

9        Gossjankowski?

10               JUROR:  I guess I would say I know nothing of this

11       defendant or what he is accused of.  So in that regard I

12       think I would be impartial.

13               I do have views generally of the people that

14       entered the Capitol that day and the activities that they

15       participated in, but for -- I have no -- just because

16       somebody is accused of having participated in the events

17       does not mean they participated in the events is I think the

18       best way I can say it.

19               THE COURT:  Okay.  And do you think you -- if I

20       ask you to do this and ask the jury to do this, you could

21       limit your consideration to the evidence that's presented in

22       court or the live witnesses and through the videos, there

23       will be videos, of events involving this defendant and areas

24       in and around the areas where this defendant was and just

25       try to limit yourself to that evidence and your -- and those

1    videos, as opposed to other things you've seen?

2          JUROR:  I definitely do not believe because DOJ

3    says somebody committed a crime that day they did.  So I

4    would absolutely listen to what is presented here.  I mean,

5    I do, you know, if a video is presented of someone who

6    entered the Capitol and there's no evidence of them being,

7    had officially entered the Capitol, I probably have

8    predetermined judgments about what physical presence on the

9    Capitol complex that day meant or in the Capitol itself.

10          But I would not prejudge whether or not somebody

11   had committed a crime before being shown such evidence, I

12   think is the only way I can say that.

13          THE COURT:  Okay.  So I asked whether you, or

14   close friends, or relatives have worked for police

15   departments, law enforcement, Homeland Security, FBI, Secret

16   Service, Capitol Police, et cetera.  Tell us.

17          JUROR:  Yeah, my grandfather and my uncle.

18          THE COURT:  Oh, you said that earlier.

19          Any people from Capitol Police or anybody that you

20   are close friends or?

21          JUROR:  Not close friends.  I know some of the

22   Capitol Police that are detail for certain members of

23   leadership but are not close personal friends.

24          THE COURT:  Have you, or any close personal

25   friends, or family members been victims of a crime or

```
 1      witnesses to a crime?

 2                  JUROR:  Other than the one that I mentioned of

 3      myself, I don't -- nothing jumps to mind.

 4                  THE COURT:  Okay.  And could you tell us about

 5      your prior jury experience.

 6                  JUROR:  It was probably, it was definitely more

 7      than 15 years ago.  It was a drug case in the D.C. Superior

 8      Court.

 9                  THE COURT:  Do you remember if the jury was able

10      to reach a verdict?

11                  JUROR:  It was a hung jury.

12                  THE COURT:  Okay.  And then you answered question

13      44 about COVID protocols.  Tell us what your views are, why

14      you answered that.

15                  JUROR:  In the rest of society we're not wearing

16      masks anymore and so I don't know why the federal courts are

17      still requiring masks of jurors.

18                  THE COURT:  Okay.  Would you be willing to do so

19      if you were selected as a juror?

20                  JUROR:  Yep.  I would.  I don't understand it, but

21      I would do it.

22                  THE COURT:  Yeah.  Okay.

23                  Questions from counsel?

24

25
```

1                              **EXAMINATION**

2      BY MR. DREHER:

3      Q.  Good morning, sir.

4      A.  Good morning.

5      Q.  So you stated that your grandfather as well as your

6      uncle were retired police officers?

7      A.  Correct.

8      Q.  Were these federal agencies, local police department or?

9      A.  City of Miami Police Department.

10     Q.  City of Miami?

11             And so then the friends that you outlined that

12     were Capitol Police Officers, are these individuals --

13     A.  Acquaintances, I wouldn't say friends.

14     Q.  Okay.  Did you have an opportunity to hear the names

15     that were listed off when the entire venire was in the

16     courtroom?

17     A.  I did and I did not recognize any of those names.

18     Q.  Okay.  Now with your experience of working on Capitol

19     Hill, are you familiar with some of, excuse me, some of the

20     operating procedures of the Capitol Police or the like?

21     A.  Many of them, yes.

22     Q.  Okay.  And now would any of your experiences with the

23     Capitol Police lead you to either credit their testimony

24     more or less than a normal witness?

25     A.  No.

1    Q.  No.  Now the experience that you went through 18 years

2    ago with your house on Capitol Hill, do you believe during

3    that either investigation or during that incident that you

4    were treated fairly by the police?

5    A.  Yes.

6    Q.  Okay.  And was there anything about that experience that

7    would lead you to either weigh the evidence differently if

8    other police officers were to testify during this trial?

9    A.  No.

10   Q.  Now, do you have any other familiarity with DOJ?

11            You told us at least that just because DOJ says

12   something doesn't make it true.  Who do you mean by DOJ?

13   A.  The Department of Justice, attorneys representing the

14   Department of Justice, the FBI, whomever is involved in the

15   process.

16   Q.  Okay.  So it was both law enforcement as well as the

17   attorneys that you were referencing?

18   A.  Sure, yeah.

19   Q.  Okay.  Now ultimately would you be able to hold any --

20   hold any conclusions that you might have about this case

21   until after the presentment of all of the evidence in this

22   courtroom?

23   A.  I don't understand the question.

24   Q.  In other words, would you have any preconceived notions

25   prior to the conclusion of the evidence that's been received

1    about whether or not Mr. Gossjankowski would be either
2    guilty or not guilty?
3    A.  I mean, I would -- I would think that some evidence is
4    more compelling than other evidence and if you present
5    something very compelling on the front end, that might sway
6    me, but I would certainly listen to the rest of it to see if
7    that sways me the other way.
8    Q.  Okay.  Now, you're going to also hear from DOJ law
9    enforcement witnesses as well.
10            Would you consider their testimony equally amongst
11   all the other witnesses as well?
12   A.  Definitely.  I have respect for law enforcement.
13   Q.  Okay.  Does the fact that this case was brought by the
14   DOJ affect whether or not you would be able to hear the
15   evidence fairly or impartially?
16   A.  No, I also don't know who else could bring it, but, so
17   no.
18   Q.  Okay.
19            MR. DREHER:  Then I have no further followup.
20   Thank you.
21                        **EXAMINATION**
22   BY MR. SMOCK:
23   Q.  Hi, Mr. Cote, I'm Ned Smock.
24   A.  Hi.
25   Q.  Just briefly, it sounds like you actually have a fairly

1    significant connection to the Capitol building because you

2    work there, right?

3    A.  Yes.

4    Q.  So I knew a number of people who worked in the Capitol

5    and many of them have sort of stronger feelings about

6    January 6th than other residents of D.C. because of their

7    connection to the Capitol.  And many of them have said

8    things to me that make clear that their connection to that

9    building is so strong that they would not be able to be

10   fair.

11        Is that a feeling that you share or do you feel

12   comfortable that you could that you could be fair despite

13   that connection?

14   A.  I think I could be fair, but I don't -- I'll defer -- I

15   don't know how all the different lawyers and the Judge are

16   defining fair.  I think I can be fair.

17        If evidence is presented that someone did

18   something, I will weigh that.  Again, just because -- just

19   because someone was standing on the Capitol lawn the day

20   something happened I don't think they were necessarily an

21   insurrectionist.

22        If there's evidence presented that they entered

23   the building through a broken window, that's a different

24   scenario.  So I don't -- to the best of my ability I think I

25   could be fair.

```
 1    Q.  Okay.  That's all -- I'm not asking you to pre-decide
 2    the case.  Just making sure that you're confident that you
 3    don't feel so strongly about that building somehow that you
 4    would feel personally affronted?
 5    A.  I will say I have strong feelings about the building.  I
 6    was there 911.  I was there for the insurrection.  So I have
 7    strong feelings about the building, but I would not prejudge
 8    somebody who's accused of something until presented
 9    evidence.
10    Q.  Thank you.  I appreciate that.
11            THE COURT:  Okay.  Are there any issues that
12    anybody wants to discuss?
13            All right.  We're going to ask you come back
14    tomorrow morning at 10:00.  We're going to try to get, by
15    the end of today we hope, to approximately twice as many
16    people as we actually need and then we'll make the final
17    cut.
18            JUROR:  Can I offer one additional thing I wasn't
19    asked about?
20            THE COURT:  Sure.
21            JUROR:  I did spend a good amount of time working
22    on the House floor for about eight years.
23            So to the extent that there is, again, I have no
24    idea what this is about, but to the extent that it has
25    something to do with -- I'm not suggesting I couldn't be
```

```
 1    fair but I think it's important to know, like, you know, I
 2    worked in that building for a very long time.
 3              THE COURT:  Yeah, and so you know the layout of
 4    the House, and the corridors, and some of the offices?
 5              JUROR:  I know how you're to allowed to get into
 6    the building, how you're not allowed to get in the building,
 7    so.  But, again, I don't think that will make me impartial
 8    [sic], but I wanted to be clear about that.
 9              THE COURT:  You don't think that would make you
10    partial?
11              JUROR:  Correct, sir.
12              THE COURT:  I'm not trying to put words in your
13    mouth, I just think you might have misstated.
14              JUROR:  That was the correct word.  That was the
15    correct word.
16              THE COURT:  Anything else?  Okay.
17              So tomorrow morning, 10:00 in the jury lounge on
18    the fourth floor.  Ms. Johnson will see you there and
19    hopefully we'll get done tomorrow.
20              JUROR:  Okay.
21              THE COURT:  And thank you very much.  And you can
22    go out the front door, actually, if you like.
23              (Juror excused from courtroom)
24              MS. JOHNSON:  1478.
25              THE COURT:  1478.
```

```
 1              So let me just remind both sides, again, you know,
 2    try to keep your speeches to a minimum.  Try to keep your --
 3    try to keep predicate comments to a minimum.  We have a lot
 4    of people we need to still talk to and it would be nice if
 5    we could actually pick a jury tomorrow morning.
 6              Now this woman works on The Hill, I believe.
 7              (Juror present)
 8                         (Juror number 1478)
 9                             EXAMINATION
10              THE COURT:  Good afternoon.
11              JUROR:  Good afternoon.
12              THE COURT:  Please have a seat.
13              And if you would take off your mask so we can hear
14    you better.
15              So, you're Juror 1478, correct?
16              JUROR:  Correct.
17              THE COURT:  And you work on Capitol Hill?
18              JUROR:  I do.
19              THE COURT:  And did you work -- were you
20    working -- did you work on Capitol Hill on January 6th?
21    Were you employed by the House of Representatives on
22    January 6th?
23              JUROR:  I was.
24              THE COURT:  And so what committee do you work for?
25              JUROR:  I'm on the republican side of the House
```

```
 1          committee on science, space and technology.

 2                   THE COURT:  Interesting work.

 3                   JUROR:  Yes.

 4                   THE COURT:  Very good.  And how long have you been

 5          there?

 6                   JUROR:  Four-and-a-half years.

 7                   THE COURT:  Always for the same committee?

 8                   JUROR:  Mm-hmm, yes.

 9                   THE COURT:  And do not live on The Hill, though?

10                   JUROR:  I do.  I live about a half a mile away

11          from The Hill.

12                   THE COURT:  And do you usually get to work by --

13          how do you get to work?

14                   JUROR:  I walk.

15                   THE COURT:  So were you at the Capitol on

16          January 6th.

17                   JUROR:  I was not.  We were instructed earlier in

18          the week that there was a potential for some sort of

19          demonstration activity.  So we were advised given that we

20          weren't involved in anything with the activities taking

21          place on the 6th that we should just stay home and stay

22          away.

23                   THE COURT:  And when you normally go to work is

24          your office in the Capitol building itself or in one of the

25          House office buildings?
```

```
1                 JUROR:  It's in one of the House office buildings.

2     And at the time we were in the Ford building in federal

3     center southwest, so --

4                 THE COURT:  Oh.

5                 JUROR:  -- farther away.

6                 THE COURT:  Oh, that's odd.

7                 JUROR:  Yeah.

8                 THE COURT:  So, the next -- so you work at the --

9     on The Hill and you have friends that work on The Hill.

10                Were you -- you answered question number 5.  Would

11    you or close friends -- were you, or a close friend, or

12    family member affected by the events that occurred that day,

13    and, if so, how?

14                JUROR:  Well, I was trying to get in touch with

15    people I knew that were in the buildings throughout the day

16    and it was becoming increasingly difficult.  Messages

17    weren't going through, calls weren't getting through.  I

18    think the cell towers must have been jammed with everyone on

19    their phones and social media.  And so that was a little

20    troubling.

21                And my boss, it was actually his birthday, so he

22    was in the building because he had to go vote and

23    participate with what was going on that day, so knowing that

24    I had some friends, and colleagues, and the person I work

25    for in the building that day was a little troubling.
```

```
 1                THE COURT:  And did you -- the answer is probably

 2     yes.  Did you follow the events of the day during the day as

 3     things were going on?

 4                JUROR:  I was.  I was in my home watching C-SPAN

 5     probably until about 4:00 p.m. and then I decided to leave

 6     the area and I went up to northwest to stay with a friend

 7     for the night.

 8                THE COURT:  Okay.  And why did you make that

 9     decision?

10                JUROR:  So I had heard about potential pipe bombs

11     in the area and the one at the democratic committee,

12     whatever that building is.

13                THE COURT:  Yeah.

14                JUROR:  They're equivalent of RNC is about two and

15     a half, three blocks away from my apartment.  So that was my

16     immediate concern.  So I just decided to leave the area in

17     case something happened with that.

18                THE COURT:  Have you followed events subsequently

19     about January 6th?

20                JUROR:  Yeah, but I didn't go out of my way to.

21                I followed, like, major news outlets, the Wall

22     Street Journal, New York Times, Washington Post.  And it was

23     pretty constant, that's all they were reporting on for a

24     while.  But I tried to avoid it, but it was kind of

25     impossible to.
```

```
1              THE COURT:  Yeah.  How much of the January 11th

2    [sic] committee hearings -- January 6th committee hearings

3    did you watch?

4              JUROR:  I never watched any in their entirety, but

5    like if CNN would switch to their coverage, they would have,

6    you know, little bits of the hearings.

7              So whenever there was like a big, major event

8    happening with one of their hearings, I was watching

9    whenever a news station was reporting on it but I never,

10   like, put on their committee channel or went out of my way.

11             THE COURT:  So let me ask you this.  In light of

12   the fact that you did follow it to a certain -- followed it

13   on the day in question, you had friends there --

14             JUROR:  Mm-hmm.

15             THE COURT:  -- you've worked there, you know the

16   building, do you think you could be a fair and impartial

17   juror in this case?

18             JUROR:  I think since two years have past, I

19   believe I could.

20             If you were to ask me that question immediately

21   after, I probably would have said no.  But I would certainly

22   try my best.

23             THE COURT:  Well, put it a different way.

24             So, you don't know this particular defendant,

25   Vitali Gossjankowski, I assume?
```

1           JUROR:  No.

2           THE COURT:  Do you think you could listen to all

3    the evidence, watch the evidence, there will be witnesses

4    who testify, be examined by one side, cross-examined by the

5    other side, and there will be videos that will be shown.

6           Do you think you could consider the evidence

7    that's presented in this courtroom during the course of the

8    trial and not other things in deciding whether you think

9    this defendant is guilty of the particular charges in this

10   case?

11          JUROR:  I think watching the video would be

12   difficult, but I think that I would be able to try to step

13   aside from the fact that these are hallways I walk in pretty

14   frequently.  I would do my best.

15          THE COURT:  Okay.  You answered question 35,

16   whether you, or any close friends, or immediate family have

17   worked for law enforcement, including D.C. Police, other

18   police, FBI, Secret Service, Capitol Police, et cetera,

19   Homeland Security.

20          JUROR:  I have an uncle that was a police officer

21   in Wisconsin but he's been retired for a while.

22          THE COURT:  Okay.  Anybody else?

23          JUROR:  No.

24          THE COURT:  Do you have any close friends among

25   the Capitol Police?

```
 1                    JUROR:  Not close.  There was someone that I was
 2       on a high school rowing team with that's an officer, but
 3       we're not, like, best friends.
 4                    THE COURT:  Have you, or members of your immediate
 5       family, or close personal friends ever been arrested for a
 6       crime, or charged with a crime, or convicted of a crime?
 7                    JUROR:  Yes.  My father's been arrested a couple
 8       of times.  He was arrested two weeks ago, so...
 9                    THE COURT:  Where does he live?
10                    JUROR:  In Milwaukee, Wisconsin.
11                    THE COURT:  And was he ever convicted of anything?
12                    JUROR:  His hearing is Friday, but he's never been
13       charged officially or convicted.
14                    THE COURT:  Would you mind telling us what he was
15       arrested for?
16                    JUROR:  Domestic violence.
17                    THE COURT:  Okay.  Questions.
18                                 EXAMINATION
19       BY MR. DREHER:
20       Q.  Good morning, ma'am.  I believe.
21                    THE COURT:  Afternoon.
22       BY MR. DREHER:
23       Q.  Now, earlier you told us that you do have a boss, and
24       certainly we all do.
25                    Is there any, I guess, discomfort that you would
```

371

1    feel sitting on a jury about a January 6th participant that

2    would lead you discomfort with, perhaps, future

3    conversations with your boss?

4    A.  Like, do you mean that this would, like, jeopardize my

5    work?

6    Q.  Let me ask it another way.  Are you an at-will employee?

7    A.  I am.

8    Q.  Okay.  And certainly I would imagine that your boss

9    knows where you're at today?

10   A.  They do.

11   Q.  Okay.  And do you think that you would have that in the

12   back of your mind while considering the evidence or exhibits

13   presented in this case?

14   A.  I would do my best not to.

15   Q.  Okay.

16            THE COURT:  Well, let's to put it another way.

17            The trial is over.  The trial is -- you were on

18   the jury and the trial is over, you know, you're going to

19   consider the evidence.

20            If you went back to your office and you said we

21   were -- we were -- had one of the January 6th cases and we

22   found the defendant guilty or if you went back to your

23   office and said, I was on a jury, January 6th, we found the

24   defendant not guilty, do you think either of those decisions

25   would have any implications in your office or any

1    ramifications in your office?

2              JUROR:  I wouldn't know for certain.  I would hope

3    not, but I would have hoped if there was concern that I

4    would have been told that earlier on to then express that to

5    you all.

6              THE COURT:  I mean, I don't know anything about

7    your boss or your office, but this is a very partisan

8    environment that everybody's in.

9              And do you think that that you personally sitting

10   on a jury, would be thinking about how your friends or

11   colleagues would react to a decision of this jury, and the

12   jury has to decide unanimously, would be concerned about how

13   it might impact your relationship with people that you work

14   with?

15             JUROR:  I think it would be difficult not to think

16   about what other people would think.

17             THE COURT:  It's a hard question.

18             JUROR:  Yeah.  I mean, I'm human, so I feel like

19   it would be hard to not keep that a little bit, have a

20   little bit of worry in the back of my mind.

21   BY MR. DREHER:

22   Q.  Just to move on to another point that you brought up

23   before.  You did have friends that were in the building

24   during January 6th?

25   A.  They were.

1    Q.  Have any of them described events that they experienced

2    in a way that would lead you -- in other words, have they

3    described their experiences to you in a way that you would

4    also have that in the back of your mind while hearing the

5    evidence and seeing the exhibits in this case?

6    A.  I mean, I know that they were very fearful and scared.

7    I know if I was in their shoes I would also probably be

8    scared.

9          I think I would do my best if called upon to try

10   to keep that compartmentalized somewhere else.  But it would

11   be -- I wouldn't want to say without 100 percent certainty

12   that there's not -- if I see a certain video, or certain

13   hallway, or if it was the same corner one of my friends said

14   she was going to the restroom and saw people that it could

15   maybe distract me.

16          MR. DREHER:  Your Honor, I have no further

17   followup.

18          THE COURT:  Mr. Smock?

19                        **EXAMINATION**

20   BY MR. SMOCK:

21   Q.  Hello.  I'm Ned Smock.

22   A.  Hi.

23   Q.  You mentioned that what happened to you on January 6th

24   and going away from the area.  And I imagine that was a

25   result of understandably being afraid.

1          Did you have any other sort of reactions to that

2     day and that you can describe to us?

3     A.  I mean, there's like a lot happened.

4          So what -- so initially I was really nervous about

5     the pipe bomb, which was what initially decided -- I decided

6     that I should probably leave.

7          And then kept seeing people from the windows of my

8     building walking around in, like, camouflage outfits and it

9     was, like, almost kind like they were dressed like the

10    military, but they clearly weren't, so that kind of scared

11    me a bit.  I mean --

12    Q.  How about -- I don't want to cut you off.

13    A.  Yeah.  I, you know, I feel like there was just a lot

14    going through my head that day that I really haven't had to

15    think about in a while.

16    Q.  Yeah.  I understand.

17         And you talked about the fact that since you

18    hadn't thought about it for a while, some of those feelings

19    had passed to some extent.

20         Recognizing that this trial will involve watching

21    a lot of video of that day, which you experienced

22    personally, do you have any concerns about those feelings

23    coming back and influencing you?

24    A.  I think there's a little bit of concern.

25         I will admit it's become a little bit

```
1    desensitized, but I would be naive if I said that I'm

2    completely desensitized because I haven't had to look at the

3    photos and footage in a really long time.

4    Q.  And I'm assuming that watching the footage and videos at

5    the time was upsetting to you?

6    A.  Extremely.

7    Q.  Because of your connection to the building?

8    A.  Yes.

9              MR. SMOCK:  Thank you.

10             THE COURT:  Okay.  We're going to ask you to step

11   out with Ms. Johnson for just a minute.

12             JUROR:  Okay.  Should I take my things?

13             THE COURT:  You can your stuff here if you'd like.

14             JUROR:  Leave it?  Okay.

15             THE COURT:  Either way.

16             JUROR:  Okay.

17             THE COURT:  We'll protect it.

18             JUROR:  I'll just leave it.

19             (Juror excused from courtroom)

20             THE COURT:  I don't know which side is going to --

21             MR. SMOCK:  I was just waiting for Ms. Johnson to

22   come out, but I don't -- government, we're moving to strike

23   Ms. Ferrara.

24             This is a young woman who had direct experience.

25   I mean, she was literally working on The Hill and continues
```

1    to work on the Hill.  She was honest, she was likeable.  She

2    was -- there's nothing against her.  I think that the

3    problem we have is that she's honestly saying that she was

4    significantly traumatized by those events and that that

5    could enter her consideration of this case.

6         And I think that a significant issue is that she

7    continues to work and is employed by a boss who was on The

8    Hill at the time and she was concerned about coming back

9    with a verdict that she would have to answer to her boss

10   about who was directly affected by those events.

11        She said she had hoped that she would have been

12   told about any concerns by her boss but, of course, she

13   wouldn't have been able to tell her boss about the facts of

14   this case.

15        So our concern is that all of those things in

16   combination mean that it would not be possible for her to be

17   fair and impartial.

18        MR. DREHER:  The government would take no position

19   and leave it in the discretion of the Court.

20        THE COURT:  I'll grant the motion.

21        I think she works in that building.  She knows the

22   layout of the building.  She's, I don't know, there's a

23   whole lot of things going on here, so...

24        (Juror present)

25        THE COURT:  All right.  We are going to excuse you

```
 1       from service on this jury.

 2                JUROR:  Okay.

 3                THE COURT:  You can go back to the jury lounge on

 4       the fourth floor and tell them you've been excused.

 5                JUROR:  Okay.

 6                THE COURT:  Sounds to me like you would be a

 7       wonderful juror on a case that didn't involve January 6th

 8       events, so, we don't want to create -- there's a lot of

 9       stuff going on that you're thinking about, so, we understand

10       and so we'll excuse you.

11                Go down to the fourth floor.  Tell them you've

12       been excused in jury lounge.

13                JUROR:  Okay.

14                THE COURT:  Thank you very much for your candor

15       and your patience.

16                And then I want to talk about logistics before we

17       move on to the next.

18                JUROR:  Thank you, Your Honor.

19                THE COURT:  Thank you.  Is that your -- and you

20       can just go out the front door that way.

21                JUROR:  That way?

22                THE COURT:  Yep.

23                JUROR:  Okay.  Thank you.

24                (Juror excused)

25                THE COURT:  Okay.  So we have seven people who
```

1    were here all yesterday afternoon and who are still waiting

2    for us.  We have 18 people who have been here since 9:30

3    this morning.  We've got 18 or so, maybe a fewer or slightly

4    fewer, coming at 1:30.

5           So what do you think we should do?  Probably too

6    late to call off the 1:30 people, which is a shame, but this

7    is just -- it's just a marathon.  And it's nobody's fault, I

8    do think some of the questions could be shorter, some of the

9    speeches could be shorter, the predicates to the question,

10   but, a lot of this stuff just needs to be explored.

11          So we can try to cover a few more people and then

12   take lunch.  We can take lunch now.  I don't know what we do

13   with the --

14          JUROR:  We have four jurors.

15          THE COURT:  We have four jurors here.  And these

16   poor people that came at 9:30, we're not going to get to

17   them until 2:30.  And then we're going to have the 1:30

18   crowd, so.

19          What does everybody want to do?  Talk to two more

20   people, four more people, no more people before we take

21   lunch?

22          MR. SMOCK:  Your Honor, I think, we'd be fine, so

23   as long as the Court is willing, speaking to the next four

24   since they've been here for so long.

25          Ms. Johnson is probably better at the logistics

1    than I am.  I don't know if it would make sense to let some

2    of group of them go to have lunch, maybe the ones who have

3    been here 9:30.

4         MS. JOHNSON:  Probably the others on the other

5    side.

6         MR. SMOCK:  Yeah.

7         MS. JOHNSON:  And then the four if you want to do

8    the four.

9         THE COURT:  I mean, we can do the four.  I have a

10   feeling that, I don't know whether they'll take time or not.

11        MR. SMOCK:  I have a few, sort of like scale

12   questions that I'd like to go into in detail.

13        THE COURT:  What?

14        MR. SMOCK:  It was a joke.

15        THE COURT:  What do you want to do?

16        MR. DREHER:  Your Honor, throughout my career I've

17   always been hard-pressed to argue against taking lunch, but

18   in terms of the groupings, I'm not sure if it makes sense,

19   and obviously it's up to the Court, to excuse --

20        THE COURT:  We're about to begin what I'm calling

21   group 4.

22        MR. DREHER:  Yes, Your Honor.

23        And it's my understanding that there has been a

24   group that has been waiting all day since 9:30 and then more

25   coming in at 1:30.

```
 1              THE COURT:  Yeah, the group 4 was from yesterday
 2    afternoon.  Group 5 is the 9:30 group.  So we've got seven
 3    people in group 4 from yesterday afternoon.
 4              MR. DREHER:  Mm-hmm.
 5              THE COURT:  Four of them happen to be in the jury
 6    room right now.
 7              MR. DREHER:  Yes, Your Honor, with more coming at
 8    1:30, I understand.  But what I was going to suggest, I
 9    didn't know if it make sense --
10              THE COURT:  The group 4 people have been here,
11    they're not coming at 1:30, they are here in the building,
12    they're just not in the jury room right now.
13              They are seven people in group 4 who were here all
14    yesterday afternoon, who have been here all morning.
15              Group 5, 18 people, have been here since 9:30 this
16    morning.
17              The 1:30 people is a whole new group that we're
18    never going to get to today unless people are a lot quicker.
19              MR. DREHER:  Yes, Your Honor.
20              THE COURT:  So why don't we take lunch and
21    everybody will be back at 2:00 and see what you can do about
22    streamlining.  I know I've said that before.  And see what
23    you can do about -- I don't know what we do, what we tell
24    these people.  Send them home immediately as soon as they
25    get here?
```

```
 1              And then tomorrow morning we're going to have
 2    people that we told we are going to pick the jury tomorrow
 3    morning.  So I don't know whether you all can figure this
 4    out.  Think about it, so.
 5              Tanya, I'm counting on you to figure out an
 6    answer.
 7              (Recess taken at 1:00 p.m.)
 8                      *    *    *    *    *
 9         (2:17 p.m.)
10                          IN OPEN COURT
11              THE COURT:  So, we're going to take this one juror
12    out of order.  I think Ms. Johnson mentioned that already.
13              What's the number we're taking?  Yes, sir.  Remind
14    me again what number?
15              MS. JOHNSON:  0795.
16              THE COURT:  795?
17              MS. JOHNSON:  Yes.
18              (Juror present)
19                        (Juror number 0795)
20                            EXAMINATION
21              THE COURT:  Good afternoon, sir.
22              JUROR:  Good afternoon, Your Honor.
23              THE COURT:  Would you mind taking off your mask so
24    we can hear you?
25              JUROR:  Sure.
```

1              THE COURT:  I'm going to ask you, as soon as I can

2    find the card -- group 4?

3              MS. JOHNSON:  Yes.

4              THE COURT:  I'm sorry.  All right.  Thank you.

5              All right.  You're juror number 795, correct?

6              JUROR:  Yes.

7              THE COURT:  Sorry for the confusion.

8              Let me just ask, you've written down numbers here

9    to follow up with you from your 3x5 card.

10             First, questions 3 and 4 on the list asked first

11   whether you live, or work at, or near the Capitol and

12   whether you have some close friends, family members, or

13   yourself that have ever worked on Capitol Hill.

14             So could you tell us about that?

15             JUROR:  Sure.  I, starting with work, I work at

16   the National Gallery of Art, which is next -- next address

17   down.

18             And from August 2013 to November 2014 I worked in

19   the Capitol as an AC mechanic.

20             THE COURT:  Okay.  So that's sometime ago?

21             JUROR:  Yeah.

22             THE COURT:  Did you follow the -- where were you

23   on January 6th?

24             JUROR:  Home, with most of the rest of us.

25             THE COURT:  Yeah.

 1                    JUROR:  Hiding from the zombies.

 2                    THE COURT:  Say that again?

 3                    JUROR:  I was home hiding from the zombies, along

 4      with most of us.

 5                    THE COURT:  Okay.  So did you watch what was going

 6      on on television or otherwise during the course of day?

 7                    JUROR:  No, no.  I had heard about it later in the

 8      evening, but.

 9                    THE COURT:  All right.  Did you watch anything

10      that day on television, video, social media about the

11      January 6th events at the Capitol?

12                    JUROR:  I think I caught a news, a brief news

13      broadcast.  I wasn't following it.

14                    THE COURT:  Have you followed it much since then

15      or gone back and watched things?

16                    JUROR:  I read the paper from time to time, I'm

17      not religious.

18                    THE COURT:  Not a big follower of stuff.  What

19      papers do you read?  What paper do you read?

20                    JUROR:  I describe to the New York Times, mostly

21      for the puzzles, and the Washington Post.

22                    THE COURT:  You can get them online.

23                    JUROR:  I do them online.

24                    THE COURT:  Yes.  So the Washington Post and the

25      New York Times.

1                 Do you follow any particular social media

2      platforms?

3                 JUROR:  Not these days.  Once upon a time I had a

4      Twitter account, but it was more trouble than it was worth.

5                 THE COURT:  Have you, or members of your family

6      immediate family, or close personal friends ever attended

7      law school or work as a lawyer in law office?

8                 JUROR:  My wife is an attorney.  She has worked

9      the entire time I've known her in family law.

10                THE COURT:  Okay.  And is she with a private law

11     firm or?

12                JUROR:  Right now she's affiliated with Georgetown

13     University working on the concept of medical legal

14     partnerships and the community college.

15                THE COURT:  Is she a faculty member or is she a --

16                JUROR:  Her status is affiliate.  No, she's not

17     professor, not a teacher.

18                THE COURT:  And I think the last question you

19     answered here was about your prior jury service.

20                Could you tell us about that.

21                JUROR:  In 1990, plus or minus, I served on two

22     juries in Collier County, Florida, one civil and one

23     criminal.

24                THE COURT:  You never served on a jury in the

25     District of Columbia?

```
 1                  JUROR:  Never.

 2                  THE COURT:  How long have you lived here?

 3                  JUROR:  About ten years.

 4                  THE COURT:  Hmm?

 5                  JUROR:  About ten years.

 6                  THE COURT:  Have you been called for jury duty

 7      before?

 8                  JUROR:  This is the first time.

 9                  THE COURT:  That's surprising.  Because most

10      people say that, you know, they sit across the street in

11      Superior Court there's so many cases because they're the

12      local court and they've got just a huge number of civil and

13      criminal cases, that a lot of -- most people say you sort of

14      get called every couple of years, but you haven't.

15                  JUROR:  Well --

16                  THE COURT:  All right.

17                  JUROR:  Except here I am.

18                  THE COURT:  Well, here you are.

19                  So I'll ask the lawyers if they have any other

20      questions for you.

21                  MR. DREHER:  No followup, Your Honor.

22                              EXAMINATION

23      BY MR. SMOCK:

24      Q.  Mr. Manville, I'm Ned Smock.

25                  You said one thing and I just wanted to make sure
```

```
1      I understood.  You said that on January 6th you were hiding
2      from the zombies?
3      A.  It's a joke.  That was -- we were still in COVID and I
4      was infrequently at work, so I was mostly calm.
5      Q.  Got it.  So it was a COVID reference?
6      A.  Yes, exactly.
7      Q.  So just to make sure.  I mean, you observed these
8      questions about January 6th, you know this is a case about
9      January 6th.
10     A.  Sure.
11     Q.  Do you have any concern about your ability to be fair on
12     a case of involving January 6th based on your feelings?
13     A.  No, I don't.
14     Q.  Thank you.
15                THE COURT:  All right.
16                So I think, sir, I know you have to leave now.  We
17     would like you to come back tomorrow morning at 10:00.
18                JUROR:  Sure.
19                THE COURT:  And we're going to try to select -- it
20     may take some time tomorrow, but we're going to try to
21     select a jury by the end of the day tomorrow.
22                JUROR:  Okay.
23                THE COURT:  And if you go back to the jury lounge
24     on the fourth floor where you were, Ms. Johnson will meet
25     you and others there at 10:00 tomorrow morning.  Thank you
```

```
 1      very much.
 2                  JUROR:  I appreciate it.
 3                  THE COURT:  Sure.  We'll see you tomorrow.
 4                  JUROR:  Thank you.
 5                  MS. JOHNSON:  So you can exit out the front.
 6                  JUROR:  Thank you very much.
 7                  MS. JOHNSON:  You're welcome.
 8                  (Juror excused from courtroom)
 9                  THE COURT:  So now we're going to go back to an
10      order?
11                  MS. JOHNSON:  1640.
12                  THE COURT:  1640, got it.  The bottom of page 1.
13      1640.
14                  (Juror present)
15                      (Juror number 1640)
16                          EXAMINATION
17                  THE COURT:  Good afternoon.
18                  JUROR:  Good afternoon.  How are you?
19                  THE COURT:  I am good.  How are you?
20                  JUROR:  I'm fine, sure.
21                  THE COURT:  Thank you.
22                  Would you mind taking off why are mask so you can
23      speak into the microphone so we can hear you a little
24      better?
25                  JUROR:  Yes, sir.
```

```
 1                    THE COURT:  So I'm looking at your card that you
 2      filled out the other day and the first thing I see here
 3      is --
 4                    JUROR:  What did I do wrong?
 5                    THE COURT:  Hmm?
 6                    JUROR:  What did I do wrong?
 7                    THE COURT:  On page -- on question number 12, the
 8      question was:
 9                    From what you have seen, or heard, or read, do you
10      think people who have been arrested or charged for the
11      events of January 6th are probably guilty?  And next to
12      number 12 you wrote "no" and then you wrote "I don't know."
13                    JUROR:  I mean, maybe -- I mean, you said, do I
14      think people who will be arrested.
15                    THE COURT:  No.  Could you put the microphone a
16      little closer?  Could you sit a little closer?
17                    JUROR:  I mean, maybe I need to move up.
18                    THE COURT:  No, the question was --
19                    JUROR:  Maybe I misunderstood the question.
20                    THE COURT:  Okay.
21                    JUROR:  Maybe that was.
22                    THE COURT:  Okay.
23                    JUROR:  Because I'm thinking if the people got
24      arrested and then I thought, well, maybe they didn't or
25      something went wrong.  That's why I said maybe I don't know.
```

1        Maybe I misunderstood the question.

2               THE COURT:  So you think maybe something went

3    wrong?

4               JUROR:  Yes, that's what I'm thinking.  That's why

5    I said I didn't know.

6               THE COURT:  Okay.  But if somebody got arrested

7    and charged, do you understand that it doesn't necessarily

8    mean they're guilty?

9               JUROR:  That's right.  They have to come to --

10   whether or not -- it has to come to trial -- to trial.

11              THE COURT:  Right.  And that's what we're here to

12   do is to have a trial.

13              JUROR:  Yeah.  To see -- you have to have all the

14   facts to see whether or not they're guilty or not.

15              THE COURT:  Okay.  So you would --

16              JUROR:  I would want to hear everything before I

17   could say whether or not they were guilty or not.

18              THE COURT:  Okay.

19              And I'm looking further here.  And question

20   number -- a lot of these you wrote down a lot of numbers

21   with the word "no" after it, so I'm just looking for yeses

22   or other things here.

23              So, on question 27 had to do with law officers and

24   law enforcement officers.

25              JUROR:  Well, actually I had a nephew, he just

1       retired last year.

2                   THE COURT:  From the police?

3                   JUROR:  Yes.  And then I had an inlaw.  She was a

4       police too, but she's no longer a police officer, but I did

5       have a nephew that was a police officer.

6                   THE COURT:  Was he a -- your nephew a police

7       officer here in D.C.?

8                   JUROR:  Yes, he was a police officer in the

9       District of Columbia.

10                  THE COURT:  Metropolitan Police Department?

11                  JUROR:  Yes, his name was Michael Dean.

12                  THE COURT:  What?

13                  JUROR:  His name was Michael Dean.

14                  THE COURT:  Do you know what kind of work he did

15      or what district he was in?

16                  JUROR:  I'm not -- he did drive the police car and

17      all.  He did regular work.

18                  THE COURT:  A regular police officer?

19                  JUROR:  Yeah.  He did.  He did arrests, he got

20      shot.  I mean, he did work police work, yes, he did.

21                  THE COURT:  Okay.  So do you think that if you

22      heard testimony from police officers or law enforcement

23      officers that you would be able to treat that witness the

24      same as any other witness?

25                  So that you would not believe somebody more or

1    less just because they're police officers?

2              JUROR:  Well, let me make sure I understand you

3    clearly.

4              You're asking me I do think I would -- in other

5    words, I would use my own judgment.  I wouldn't go by nobody

6    else, I still go about what I believe.  I'm not going to go

7    about what nobody else said.

8              THE COURT:  Right.

9              JUROR:  Yes.  That's my opinion.

10             THE COURT:  So witnesses are going to come into

11   court, they're going to sit where you're sitting and they're

12   going to swear to tell the truth.

13             JUROR:  Right.

14             THE COURT:  And would you believe somebody wearing

15   a uniform more than any other witness or would you treat all

16   witnesses the same?

17             THE JURY:  I would treat everybody equally the

18   same and I would go about what I see and what I believe.

19             THE COURT:  What you heard them say?

20             JUROR:  Yes.

21             THE COURT:  And whether you believe them?

22             JUROR:  What I see what you present to me.  That's

23   what I'm going to go by, what you present to me.

24             THE COURT:  Okay.  Just wanted to be clear.

25             JUROR:  I'm sorry I didn't make it clearer.

```
 1                    THE COURT:  No, no, no, no.  That's why I'm
 2      asking --
 3                    JUROR:  I'm going to go by what I see, yeah.  I'm
 4      going to go by what I see and what I hear and what --
 5                    THE COURT:  What you see and what you hear?
 6                    JUROR:  Yes.
 7                    THE COURT:  In the courtroom?
 8                    JUROR:  Yes.
 9                    THE COURT:  Not outside the courtroom?
10                    JUROR:  No, not out on the outside.
11                    Whatever he present to me, the evidence, and
12      whatever I hear, and whatever I write, because I know I
13      serve in the petit court other there and I served here
14      before.
15                    THE COURT:  So tell -- me.
16                    JUROR:  Jury, on both juries.
17                    THE COURT:  So tell me about your prior service
18      here.  Do you remember what kind of case it was?
19                    JUROR:  It was a big case.  I forget.  It was some
20      dude with -- I think it was with the government.
21                    THE COURT:  Was it a criminal case or a civil
22      case?
23                    JUROR:  Civil case.  It was with the government.
24                    THE COURT:  With the government was involved?
25                    JUROR:  Yeah.
```

1              THE COURT:  And was the case across the street,

2      the criminal case?

3              JUROR:  I had with here and across the street, I

4      have worked both.

5              THE COURT:  Was the one across the street a

6      criminal case?

7              JUROR:  Yes, it was.  It was with cocaine or

8      crack.  The dude -- I went there twice.  One was on

9      Minnesota Avenue where a dude had robbed, a guy had robbed

10     Payless.  Even though I lived in that area, I didn't want to

11     do it but I went on and did it anyway.

12             THE COURT:  And did you find that person guilty?

13             JUROR:  He was guilty, yes.  I didn't want to do

14     it but I --

15             THE COURT:  And then the other guy was a crack

16     case?

17             JUROR:  He had robbed the store and he didn't take

18     more than $60, but he had robbed the store but we did find

19     him guilty, yes.

20             THE COURT:  Okay.  Do you understand that the

21     government has the burden in a criminal case of proving the

22     defendant guilty beyond a reasonable doubt?

23             JUROR:  If I understand what?

24             THE COURT:  Do you understand that in a criminal

25     case the defendant, person charged --

```
1                    JUROR:  Yes.

2                    THE COURT:  -- Mr. Gossjankowski --

3                    JUROR:  Yeah.

4                    THE COURT:  Do you understand that he is presumed

5        to be innocent until the trial is done?

6                    JUROR:  Right.

7                    THE COURT:  Do you understand that the government,

8        the prosecutors, have to prove him guilty beyond a

9        reasonable doubt before you could find him guilty?

10                   JUROR:  Yes.

11                   THE COURT:  So if I tell the jury that the

12       burden's on the government, they have to prove guilt beyond

13       a reasonable doubt, would you follow that instruction?

14                   JUROR:  Yes.  I would do -- yes, I have to.  Yes.

15                   THE COURT:  And in response to number 30, you

16       wrote down number 30.

17                   Do you understand that since the burden is on the

18       government that the person charged does not even have to

19       produce any evidence, it's up to the government to prove

20       them guilty.  Do you understand that?

21                   JUROR:  Yes.

22                   THE COURT:  You okay with that?

23                   JUROR:  Yes.  I mean, the only thing I can go by

24       is what I see that's in here and what I hear.

25                   THE COURT:  I understand.
```

```
 1              JUROR:  That's the only thing I can go by.

 2              THE COURT:  Would you agree that if you were a

 3    jury that you -- juror in the case you wouldn't go and read

 4    anything about the case, or Google, or go on the internet

 5    and all that, you're okay with that?

 6              JUROR:  To be honest, I don't know how to work

 7    that computer anyway.

 8              So you wouldn't have to worry about that.

 9              THE COURT:  We don't have to worry about that?

10              JUROR:  Yeah, so, that's all good and dandy with

11    me.

12              THE COURT:  And question 35, I asked whether you,

13    or a close friend, or family member had ever worked for a

14    law enforcement, or police, or prosecutor.

15              JUROR:  I'm close to my nephew.

16              THE COURT:  Oh, your nephews, right.

17              JUROR:  Yeah.

18              THE COURT:  You mentioned that already.

19              JUROR:  It's all right.  It's good.

20              THE COURT:  You mentioned that.

21              JUROR:  Yes.

22              THE COURT:  I'm going to go back to 27.

23              JUROR:  But I still wouldn't have no problem.

24              THE COURT:  Go back to 27.  We talked about 27.

25    No?  Did we talk about 27?  I think we did.  Tell me if I
```

1      didn't, yeah.

2                Well, you can ask about it, if I didn't.

3                JUROR:  I'm sorry I got it mixed -- the way I

4      written it down, you know, I'm so sorry.

5                THE COURT:  That's fine.  You wrote down all the

6      numbers.

7                JUROR:  I get excited.  I'm sorry.  I'm sorry.

8                THE COURT:  And we talked about your jury service,

9      about COVID, and protocols, and wearing masks, and things.

10     It said, Would you be uncomfortable serving as a juror with

11     those protocols in place?  You wrote, "No, I don't."  Right?

12               JUROR:  Right.

13               THE COURT:  And then the next thing.

14               JUROR:  I have all my shots if you want to see

15     that.

16               THE COURT:  Oh, I asked about medical conditions

17     or health problems.  You wrote about your knee replacement.

18               JUROR:  Yes.  Right.  I had a right knee

19     replacement in 2007, I did.

20               THE COURT:  So you're okay now?

21               JUROR:  Yeah, I'm okay.  I mean, I walk a little

22     slow, but I'll get there.

23               THE COURT:  Okay.

24               JUROR:  Yeah.  And I take pain medicine, but I'm

25     all right, I mean.

```
1                    THE COURT:  Okay.
2                    JUROR:  I'll get there.  As long as you all deal
3       with me walking.
4                    THE COURT:  All right.  And you can sit for --
5                    JUROR:  Yeah, I'm here.
6                    THE COURT:  You're here?
7                    JUROR:  I'm here.  Thank the Lord, I'm here.
8                    THE COURT:  Okay.  I'll ask the lawyers if they
9       have any questions for you.
10                   JUROR:  Yeah.
11                             EXAMINATION
12      BY MR. DREHER:
13      Q.  Good afternoon, ma'am.
14      A.  Oh, oh.
15      Q.  So --
16      A.  Good afternoon.
17      Q.  You did mention that you walked a little slow.
18                   Have you had any trouble getting in and out of the
19      courthouse?
20      A.  No, no.  I mean, I'm okay.
21      Q.  And you've been able to get through security alright?
22      A.  Yes.
23      Q.  Okay.  And certainly, I guess some of the directions
24      that you've been provided by the Marshals or individuals at
25      the security office, you've been able to follow those?
```

```
 1     A.  Yes.

 2     Q.  Okay.  And that sort of brings me to really what we're

 3     asking in terms of, are you able to follow the instructions

 4     that the Judge gives in the areas of the law?

 5     A.  Yes, I am.

 6     Q.  Okay.  So you understand that when you're judging the

 7     credibility of witnesses is what you believe, but then

 8     ultimately for the law you must follow the instructions of

 9     the Judge?

10     A.  Yes.

11            MR. DREHER:  Okay.  No further followup.

12                         EXAMINATION

13     BY MR. SMOCK:

14     Q.  Good morning.

15     A.  Hi, how are you?

16     Q.  Good, thanks.  So I represent the defendant in this

17     case, my name is Ned Smock.

18     A.  Okay.

19     Q.  I think when there was a large group of people here the

20     government named a whole list of witnesses that they were

21     going to call.  Do you remember that?

22     A.  Yeah.

23     Q.  And did you remember that when I was asked as the

24     defense attorney if I was going to call any witnesses, I

25     said that we may call one witness.  Do you remember that?
```

1   A.  Yeah, I heard you, but they wasn't here I think you

2   said.  Somebody wasn't here.

3           THE COURT:  The witnesses were not in the

4   courtroom.

5           JUROR:  In the courtroom, I heard somebody wasn't

6   here.

7           THE COURT:  Yeah, a lot of them weren't here.

8           JUROR:  Yeah, they wasn't here.  Okay.

9   BY MR. SMOCK:

10  Q.  So my question is, if the government calls a long list

11  of witnesses, 14 or so, 15 witnesses, and I as the defense

12  don't call any witnesses, don't put on any evidence in this

13  case, is that something that you would consider as something

14  that would make you think that my client was more likely

15  guilty?

16  A.  No.  I mean, like I said before, I'm going to go by what

17  I see what I -- what I see what he has out there and what I

18  hear, because you can't say -- I just have, I have to go by

19  what I see and hear, I really do.  I mean, that's what I

20  have to go by, what I see and what I hear.  I definitely got

21  to go by that.

22  Q.  And what if my client, Mr. Gossjankowski, does not get

23  on the stand to try to explain to you if you're on the jury,

24  would you have a concern about that if he chose not to

25  testify?

```
 1    A.  He still might not be guilty.  I still have to go by

 2    what I see and hear.  He still might be not guilty.  I don't

 3    know, I just have to go by what I see and hear.

 4    Q.  Okay.

 5    A.  I can't say that man is guilty until I see what's going

 6    on.

 7    Q.  Okay.  Thank you.

 8    A.  I mean, I guess, I don't know.  Okay?  I'll stop.

 9    Q.  No, you're answering my questions.  I appreciate it.

10    A.  I mean, that's my opinion, I'm sorry.

11            THE COURT:  Don't be sorry.

12            JUROR:  I mean, I have to see what's going on.

13            THE COURT:  I mean, what you're saying --

14            JUROR:  I have to see what's going on.  I have to

15    see what's going on first.  I can't -- you're not guilty

16    until you're proven and, I mean, right?

17            THE COURT:  Right.  He's not guilty unless they

18    prove him guilty.

19            JUROR:  Right.  He might be guilty and then he

20    might not be guilty.  I don't know until I see what's going

21    on.  I got to see -- that's the same thing I do with my kid,

22    let me see what's going on first.  I got to see what's going

23    on.

24            THE COURT:  That's what the trial's for, right?

25            JUROR:  Yeah, I want to see what's going on.  I
```

```
 1      want to know everything first.
 2              THE COURT:  Any other questions?
 3              Anybody have any --
 4              All right.  Thank you very much.  And we would
 5      like, I know you've been very patient, but we'd like you to
 6      come back tomorrow morning at 10:00.  We may have some more
 7      questions and we're going to pick a jury tomorrow.
 8              JUROR:  Okay.
 9              THE COURT:  So we're going to have maybe -- we're
10      talking to 70 people first, we're going to narrow it down to
11      about 30 and then we're going to narrow it down more.
12              So tomorrow we're going to pick 14 people.
13              JUROR:  Okay.
14              THE COURT:  So we need you to come back, along
15      with about 30 others, for the final decision.
16              JUROR:  Okay.  I got a question for you.  Do I
17      come here or -- here?
18              THE COURT:  No.  We would like you to go -- I
19      would like you to go back to the jury lounge on the fourth
20      floor --
21              JUROR:  Oh, okay.
22              THE COURT:  -- where you were this morning, I
23      think.
24              JUROR:  Yes, sir.
25              THE COURT:  Jury lounge on the fourth floor.
```

```
 1                    Ms. Johnson will be there and she will meet you

 2       there.

 3                    JUROR:  Okay.

 4                    THE COURT:  And then she'll bring you up here.

 5                    JUROR:  Okay.

 6                    THE COURT:  Along with everyone else.

 7                    JUROR:  So I can go home now?

 8                    THE COURT:  You can go home now.

 9                    JUROR:  Oh, okay.

10                    THE COURT:  How do you travel, bus, subway?

11                    JUROR:  Bus.  Bus.  So I have be here at 10:00

12       tomorrow?

13                    THE COURT:  10:00 tomorrow, yes.

14                    JUROR:  Thank you.  And I hope you have a blessed

15       day.  I hope I did okay.

16                    THE COURT:  You answered all our questions.

17                    JUROR:  Okay.

18                    MS. JOHNSON:  Yes, if you can exit the front.

19                    JUROR:  I can go to the front?

20                    MS. JOHNSON:  Yes, ma'am.  You need help?  You

21       okay?

22                    JUROR:  No, I'm okay.  I live by myself.  I got to

23       do this by myself.

24                    MS. JOHNSON:  Okay.

25                    JUROR:  I'm all right.
```

1          THE COURT:  You're doing fine.  I've got a lot of

2    people that have had knee surgery that don't do that well.

3          JUROR:  If I fall and hurt myself, you call an

4    ambulance.

5          MS. JOHNSON:  Okay.

6          THE COURT:  Thank you.

7          JUROR:  Thank you.

8          (Juror excused from courtroom)

9          THE COURT:  All right.

10         MS. JOHNSON:  Number 059.

11         THE COURT:  Number 59, 059.

12         MR. SMOCK:  Your Honor, just one scheduling that I

13   wonder -- I was talking to the government about.  I'd defer

14   to the Court about when we're asking these people to come

15   back.

16         I guess the only thing I was wondering is given

17   that we're going to still have a fair number of people to go

18   through tomorrow morning, does it make sense to tell these

19   people to come at 1:00 so fewer people are waiting?

20         I defer to the Court.  And obviously some people

21   are going to be coming at 10:00.

22         THE COURT:  Well, whenever we tell them to come

23   back for the final jury selection, they're going to have to

24   wait around for quite a while.

25         So, Tanya, what do you think?  Should we stop

1    telling them 10:00 and tell them 1:00?

2              MS. JOHNSON:  We already have people coming at

3    10:00 and those are the people that have been qualified

4    already.

5              THE COURT:  I know.  So the question is whether we

6    should -- we have half the qualified people come at 10 and

7    the rest come later, since we're not going to get to them

8    until 1:00.

9              MS. JOHNSON:  Right.  I would say starting with

10   this next juror --

11             THE COURT:  Okay.  Tell them 2:00 or something?

12             MS. JOHNSON:  Yes.

13             THE COURT:  All right.  So half of the qualified

14   people will be waiting half a day but the other half won't

15   be.

16             MR. SMOCK:  I just raise that because maybe

17   fewer --

18             THE COURT:  No, that's a good point.

19             MR. SMOCK:  Ms. Goetzl also adds that, I suppose,

20   that Ms. Johnson or whomever can tell the people that were

21   out at 10 that they can come back at 2 and they could at

22   least --

23             MS. JOHNSON:  I do not have telephone numbers --

24             MR. SMOCK:  I know.

25             MS. JOHNSON:  -- and I'd have to get that

```
1     information and what we're doing now, it's going to be kind
2     of --
3               MR. SMOCK:  No, I completely --
4               THE COURT:  What we can do is once they get
5     here --
6               MR. SMOCK:  Right.
7               THE COURT:  -- and after a while we can tell them
8     to go have a long lunch or something.
9               MS. JOHNSON:  Okay.
10              THE COURT:  It's a nice day, they can go for a
11    nice walk.
12              MR. SMOCK:  And I would just add from everybody
13    I'm sure, thank you to Ms. Johnson.  I think she's doing
14    very well.
15              THE COURT:  All right.
16              MS. JOHNSON:  Ready for the next?
17              THE COURT:  We're ready for 059.
18              And 059 is has only answered one question.
19              (Juror present)
20                        (Juror number 0059)
21                           EXAMINATION
22              THE COURT:  Good afternoon.
23              JUROR:  Good afternoon.
24              THE COURT:  How are you?
25              JUROR:  I'm doing well, thank you.
```

```
1              THE COURT:  Good.  So would you mind taking off

2    your mask and speaking into the microphone?

3              JUROR:  Sure.

4              THE COURT:  So you're juror number 059, right?

5              JUROR:  Yes.

6              THE COURT:  And you work at Kaiser Permanente?

7              JUROR:  Yes.

8              THE COURT:  And what do you do?

9              JUROR:  I'm a case manager.

10             THE COURT:  What does that involve?

11             JUROR:  So I work with members who have medical

12   concerns, it could be disabled, need assistance with

13   housing, food, transportation, things of that nature.

14             THE COURT:  And so do you -- do you provide those

15   services yourself or arrange for other people to do it?

16             JUROR:  Through the community, community services.

17   I put them in contact with community services.

18             THE COURT:  I see.  So social workers, and

19   therapists, and things like that?

20             JUROR:  Yes.

21             THE COURT:  So your job is to connect a patient

22   with a problem to someone that can help?

23             JUROR:  Correct.

24             THE COURT:  And so before the pandemic did you see

25   a lot of people in person or was it mostly telephone?
```

```
 1                    JUROR:  In person.

 2                    THE COURT:  Okay.  Probably virtual largely for a

 3       while?

 4                    JUROR:  Yes.

 5                    THE COURT:  So you indicated that you served on a

 6       jury before.

 7                    Could you tell us a little bit about your prior

 8       jury experience.

 9                    JUROR:  So I served grand jury as well as petit

10       jury.

11                    THE COURT:  Was this court or across the street?

12                    JUROR:  Across the street.

13                    THE COURT:  All right.  So with a grand jury, you

14       -- a lot of cases were presented to you?

15                    JUROR:  Correct.

16                    THE COURT:  And what kind of a petit jury trial

17       did you have?

18                    JUROR:  It was criminal case.  I believe it was

19       narcotics.

20                    THE COURT:  Do you remember if the jury was able

21       to reach a verdict?

22                    JUROR:  Yes.

23                    THE COURT:  And what was the verdict?

24                    JUROR:  The verdict was not guilty.

25                    THE COURT:  Okay.  Is there anything -- and have
```

```
1      you had any other petit jury experiences?

2                  JUROR:  No.  That was --

3                  THE COURT:  Is there anything about that

4      experience that would make it difficult for you or

5      uncomfortable for you to serve on a juror, as a juror again?

6                  JUROR:  No.

7                  THE COURT:  So you understand the difference

8      between what the grand jury does and what the --

9                  JUROR:  Yes, that is correct.

10                 THE COURT:  So once we're at trial, do you

11     agree -- do you understand that the defendant's presumed

12     innocent and that the government has to prove him guilty

13     beyond a reasonable doubt for the jury to decide guilt?

14                 JUROR:  Yes, I understand.

15                 THE COURT:  Okay.  And you would follow that

16     instruction?

17                 JUROR:  Yes, of course.

18                 THE COURT:  So I had a number of questions about

19     the events of January 6th and you didn't answer any of them.

20                 So I'm just wondering, did you follow those events

21     at all?

22                 JUROR:  So, no.  I mean, of course I'm not living

23     under a rock.

24                 (Laughter)

25                 JUROR:  But as far as following it, or googling
```

```
 1      it, or diving into more information, I was -- no, I did not.
 2                THE COURT:  Do you remember where you were on
 3      January 6th?
 4                JUROR:  If I'm being honest, I can't even tell you
 5      where I was last week.  No, I do not recall where I was on
 6      January 6th.
 7                THE COURT:  Do you remember whether or not you
 8      watched any of it on television or anywhere else while it
 9      was happening on January 6th?
10                JUROR:  Was I stationary watching?  No.  But, of
11      course I've seen it.  You know, you're watching the TV shows
12      on the news and things of that nature, yes.
13                THE COURT:  So do you -- do you follow any
14      particular social media platforms?
15                JUROR:  Facebook, Instagram, the norms, yeah.
16                THE COURT:  Yeah, and do you read -- do you read
17      the newspaper?
18                JUROR:  I do not.  Does anyone?
19                THE COURT:  Most people do I guess do online.
20                When you go online do you look at any particular
21      news?
22                JUROR:  No, no specific.
23                THE COURT:  Like Washington Post or --
24                JUROR:  Yeah, no.
25                THE COURT:  -- or certain TV channel or anything
```

```
 1     like that?  Whatever's there?

 2               JUROR:  Yeah, whatever's there, yeah.

 3               THE COURT:  Okay.  Okay.

 4               I'll leave it to the lawyers to follow up as they

 5     wish.

 6               MR. DREHER:  I don't have any followup, Your

 7     Honor.

 8               MR. SMOCK:  Nor do I.  Thank you.

 9               THE COURT:  Okay.  So I know you've already waited

10     a long time and we appreciate your patience, but we're going

11     to ask you come back one more time.

12               JUROR:  Oh.

13               THE COURT:  We're going to be done -- we hope

14     we're going to be done soon in the next few hours to narrow

15     the group of 70 down to about 30-some, and then tomorrow

16     we're going to pick a final jury and alternates.

17               So we'd like you to come back tomorrow at 2:00 and

18     report to the jury lounge on the fourth floor 2:00 tomorrow.

19     Ms. Johnson will meet you down there.

20               JUROR:  Okay.

21               THE COURT:  And hopefully we'll finish this

22     process then.  Okay?

23               JUROR:  Sounds fair.

24               THE COURT:  Thank you very much.  I know you have

25     been very patient.
```

```
 1                    JUROR:  All right.  Thank you.

 2                    THE COURT:  We appreciate it.

 3                    MS. JOHNSON:  If you could exit out the front.

 4         Thank you.

 5                    (Juror excused from courtroom)

 6                    THE COURT:  1918?

 7                    MS. JOHNSON:  Mm-hmm.

 8                    THE COURT:  1918.

 9                    (Juror present)

10                    (Off-the-record discussion.)

11                            (Juror number 1918)

12                                 EXAMINATION

13                    THE COURT:  Have a seat.  Thank you.

14                    JUROR:  Hi.

15                    THE COURT:  Good afternoon.  Thanks for your

16         patience.

17                    JUROR:  Of course.

18                    THE COURT:  We appreciate it.  So you are

19         Juror 1918?

20                    JUROR:  Mm-hmm.

21                    THE COURT:  Could you tell us a little bit about

22         your work, what do you do.

23                    JUROR:  Yeah, I work in healthcare.  I'm an

24         executive behavioral healthcare, so...

25                    THE COURT:  With whom?
```

1          JUROR:  Adolescents, with children.  For mental

2     health and substance abuse treatment and I do their

3     compliance and safety.

4          THE COURT:  Okay.  What's your educational

5     background?

6          JUROR:  I studied forensic psychology and

7     communications studies.  And I have a certification in

8     healthcare compliance.

9          THE COURT:  Certification in what?

10         JUROR:  Healthcare compliance.

11         THE COURT:  Good all right.

12         You answered a number of questions about

13    January 6th.  So the first is number 4, whether you have --

14    you, yourself, or a close friend, or family member have ever

15    worked on Capitol Hill.

16         JUROR:  My childhood friend's wife, actually

17    ex-wife, they just got divorced, is a correspondent for one

18    of the news networks.

19         THE COURT:  Okay.

20         JUROR:  But she started after.  She started in

21    May.

22         THE COURT:  So this was after January 6th?

23         JUROR:  Yeah.

24         THE COURT:  Did you follow what was going on on

25    that day on January 6th itself?

```
 1                  JUROR:  Not on January 6th.  I was working, and in
 2      meetings, and I didn't know about anything until --
 3                  THE COURT:  Okay.
 4                  JUROR:  -- the evening.
 5                  THE COURT:   And after that did you follow it that
 6      evening and beyond that evening?
 7                  JUROR:  So I watched the news.  It was kind of
 8      unavoidable, it was being covered.  So, yeah, I saw it on
 9      the news, what was happening.
10                  THE COURT:  Yeah.  And in subsequent days, weeks,
11      months have you followed it much?
12                  JUROR:  No.
13                  THE COURT:  But you did say you watched some of
14      the congressional hearings?
15                  JUROR:  I answered yes to that.  I actually didn't
16      watch the hearings, but when watching the news they would
17      show clips of the hearings, so I would see it that way.
18                  THE COURT:  Got it.  And how do you normally get
19      your news?
20                  JUROR:  Either the television, I have cable, or
21      newspaper.
22                  THE COURT:  Which papers?
23                  JUROR:  New York Times, Washington Post, Wall
24      Street Journal.
25                  THE COURT:  And which television networks or
```

1     stations do you typically watch?

2               JUROR:  CNN, NewsNation, and MSNBC.

3               THE COURT:  And what social media platforms do you

4     regularly?

5               JUROR:  Just Instagram.

6               THE COURT:  Just Instagram.  Okay.

7               Another unrelated topic, you answered question 35,

8     whether you, or members of your immediate family, or close

9     personal friends have worked for law enforcement,

10    Metropolitan Police Department, FBI, Secret Service, Capitol

11    Police, or any law enforcement.

12              JUROR:  My first cousin's husband in Florida is a

13    police officer.

14              THE COURT:  Nobody around here that is?

15              JUROR:  No.

16              THE COURT:  Have you or -- number 36, you, or

17    close friends, or immediate family, ever worked in the

18    criminal justice system, was another question.

19              JUROR:  When I was in graduate school 20 years ago

20    I had an internship in the drug court at the Denver DA's

21    office.

22              THE COURT:  In Denver?

23              JUROR:  Mm-hmm.

24              THE COURT:  Okay.

25              JUROR:  Which was a program, like a diversion

1    program, so that people could get help instead of sitting in

2    jail.

3                THE COURT:  Okay.  And so it was sort of related

4    to the graduate work that you were doing that happened to be

5    in that kind of an agency?

6                JUROR:  Exactly, yep.

7                THE COURT:  Yeah.

8                JUROR:  We had choices and that was one that I

9    picked.

10               THE COURT:  And the other question, although you

11   have a question mark next to it, it's number 37.  Have you,

12   or family members, or close personal friends ever attended

13   law school, or worked at a law firm, or anything law

14   related?

15               JUROR:  The other internship I had during that

16   program was in a law firm in Denver?  A civil -- like they

17   did basically civil defense work.

18               THE COURT:  Okay.  Questions?

19                             **EXAMINATION**

20   BY MR. DREHER:

21   Q.  Good afternoon, ma'am.

22   A.  Hi.

23   Q.  Earlier when you first sat down you were speaking

24   something about communications in the health field.

25               Do you have any experience with members of the

```
 1    public that use American Sign Language for communication?
 2    A.  No.
 3    Q.  Okay.  Do you personally speak American Sign Language?
 4    A.  No.  And by communication I meant, like, argumentation
 5    and theory, and stuff about communication, not actual --
 6    Q.  Okay.  So not -- so I guess not the form, but more of
 7    the substance of --
 8    A.  Yeah.
 9    Q.  Okay.
10              MR. DREHER:  That's all I had, Your Honor.
11              THE COURT:  Mr. Smock.
12                          EXAMINATION
13    BY MR. SMOCK:
14    Q.  Hello.  I'm Ned Smock.
15              You mentioned your study of forensic psychology
16    and that work never delved into this sort of criminal
17    justice arena or was it just during that time in drug court?
18    A.  Just the only experience I had was during that six
19    months in the drug court.
20    Q.  Okay.  And January 6th, it sounds as if that's -- I
21    mean, obviously it's important and significant to everyone,
22    but is that something that has occupied your thoughts a
23    great deal or is something that is not a focus for you?
24    A.  It wasn't a focus for me.  I had so much going on at the
25    time and it just seemed like it was just on the news.
```

1        So actually during that time and also when the war

2    started I stopped watching the news, largely because it was

3    just overwhelming.

4    Q.  Okay.  Do you have any concern that if you were on this

5    jury and saw video and heard evidence about what happened on

6    January 6th that you would be overwhelmed or somehow unable

7    to decide?

8    A.  No.

9        MR. SMOCK:  Thank you.

10       THE COURT:  Anything else, anybody?

11       If there's nothing else, we're not quite done,

12   we're going to ask you come back tomorrow.

13       JUROR:  Okay.

14       THE COURT:  We're narrowing this large group to

15   half the size and then narrowing that to half the size.

16       So if you could come back tomorrow afternoon

17   around 2:00.

18       JUROR:  Okay.

19       THE COURT:  And report to the jury lounge on the

20   fourth floor again, Ms. Johnson will meet you down there

21   with other people.

22       JUROR:  Okay.

23       THE COURT:  And then hopefully we'll finish this

24   process tomorrow afternoon.

25       JUROR:  All right.  Thank you.

LYNNE M. KRENZ, RMR, CRR, CRC
(651) 848-1226

```
1                    THE COURT:  Thank you so much and thanks for your
2       patience.
3                    JUROR:  Of course, you said 2:00?
4                    THE COURT:  2:00.
5                    MS. JOHNSON:  You can just exit out the front.
6                    THE COURT:  You can just go out the front.
7                    MS. JOHNSON:  1606.
8                    THE COURT:  1606.
9                    (Juror excused from courtroom)
10                   THE COURT:  So I'm going to start with question 48
11      and if anybody thinks we shouldn't go any further.  Let me
12      know.
13                   (Juror present)
14                        (Juror number 1606)
15                          EXAMINATION
16                   THE COURT:  Good afternoon.  How are you?
17                   JUROR:  I'm good.  How are you?
18                   THE COURT:  I'm good.  Would you mind taking off
19      your mask and speak into the microphone so we can hear you?
20                   So you're a teacher?
21                   JUROR:  I am.
22                   THE COURT:  And what do you teach?
23                   JUROR:  I'm a special education teacher.
24                   THE COURT:  Special ed?
25                   JUROR:  Yep.  And the special education
```

```
1    coordinator.

2                THE COURT:  For?

3                JUROR:  Oyster Adams.

4                THE COURT:  Okay.

5                JUROR:  Bilingual.

6                THE COURT:  Where is Oyster Adams?

7                JUROR:  Adams Morgan.

8                THE COURT:  Sure.

9                JUROR:  We have two campuses.  So one is in Adams

10   Morgan and one's like Woodley Park.

11               THE COURT:  Is that off Columbia?

12               JUROR:  Yeah.  It's off Columbia and Adams Mill.

13               So we have one that's Woodley Park area and then

14   the Adams Morgan campus on 18th -- well, 19th Street.

15               THE COURT:  Got it.  Okay.  How long have you been

16   doing that?

17               JUROR:  How long have I been a teacher?  Ten

18   years.

19               THE COURT:  Always in special education?

20               JUROR:  Yep.

21               THE COURT:  Yeah.  Good for you.

22               One question I wanted to start with was question

23   48, which has to do with our schedule and this trial.  And I

24   asked if we went beyond next week that it would cause you a

25   hardship of some sort.
```

```
 1                    JUROR:  Yeah.
 2                    THE COURT:  What's going on in your life?
 3                    JUROR:  Well, I have a one year old --
 4                    THE COURT:  What?
 5                    JUROR:  I have a one year old, and a three year
 6      old, and I'm a teacher, so a lot.  That's as far as that
 7      goes.
 8                    THE COURT:  So what, in terms of your children,
 9      how are they cared for while you're at school?
10                    JUROR:  So my son is in pre-K3, so he's in school
11      when I'm in school, so I pick him up.  And then my daughter
12      is in daycare, so I do drop-off.
13                    THE COURT:  And what time do you drop her off?
14                    JUROR:  Well, she has to be there at 7:30.
15                    THE COURT:  Okay.
16                    JUROR:  So and then I drop my son off and then I
17      go to work.
18                    THE COURT:  If you were on this jury it sounds
19      like mornings wouldn't be a problem after you drop her off.
20      I mean, you wouldn't be able to work.
21                    JUROR:  Yeah.
22                    THE COURT:  But if we ended court every day no
23      later than 5:00, would you be able to make any arrangements
24      with respect to --
25                    JUROR:  Yeah, my husband would pick them up.
```

421

1             THE COURT:  Okay.  All right.  So it's not easy

2     but it's possibly manageable.

3             Let me go back to some of the other questions that

4     you responded to.

5             The first few, question number 6:  Where were you

6     on January 6th, 2021?  Were you at school?  Were you at home

7     when the events happened at the Capitol?

8             JUROR:  Well, it depends on the day.  So I

9     probably likely would have been home.  I don't remember.

10            THE COURT:  Okay.  Well, do you remember whether

11    you watched any of this?

12            JUROR:  Oh, I did, yeah.

13            THE COURT:  Was it on television, on social media?

14            JUROR:  It was, yes.  Television.

15            THE COURT:  And have subsequently followed those

16    events, watched videos, watched things about it?

17            JUROR:  Like whatever's on the nightly news, yeah,

18    or like in the newspaper.

19            THE COURT:  And you indicated that you watched

20    some of the congressional hearings.

21            Did you watch the hearings themselves, or just was

22    on the news, or whatever?

23            JUROR:  Yeah, or whatever my husband sent me to.

24            THE COURT:  Whatever your husband what?

25            JUROR:  Whatever he sent me or whatever's on the

1     news.

2              THE COURT:  Okay.  So it's mostly through the news

3     situation?

4              JUROR:  Yeah.

5              THE COURT:  And do you watch the news on

6     television or social media?

7              JUROR:  Television.

8              THE COURT:  Particular channels or?

9              JUROR:  NBC.

10             THE COURT:  Okay.  Do you have such strong

11    feelings about the events of January 6th at the Capitol or

12    about individuals who may have participated in those events

13    that would make it difficult for you to be a fair and

14    impartial juror in this case?

15             JUROR:  Probably not.  But I guess it's hard to

16    say until you're in this situation, but just like right now,

17    probably not.

18             THE COURT:  Okay.  Well, are you -- let me ask

19    another question, which you also wrote down, number 12.

20             From what you have seen, or heard, or think, do

21    you believe that people who are arrested or charged for

22    involvement in the events of January 6th are probably guilty

23    of the charges against them?

24             JUROR:  Yes.

25             THE COURT:  Okay.  Would you -- do you understand

1    that in a criminal trial the question is not really whether

2    somebody may have done it or probably did it, but whether

3    the government can prove guilt of that individual beyond a

4    reasonable doubt?

5              JUROR:  Yeah.

6              THE COURT:  And you understand that that's a

7    higher burden than probably or likely?

8              JUROR:  Absolutely, yeah.

9              THE COURT:  Yeah.  Would you be willing to hold

10   the government to its burden and not make any decisions --

11   first of all, would you be willing to base your decision as

12   a juror based only on the evidence that you see and hear in

13   the courtroom during trial?

14             JUROR:  I would try.

15             THE COURT:  And would you follow the instruction

16   that the only way you can find the defendant guilty is if

17   the government proves him guilty beyond a reasonable doubt?

18             JUROR:  I would try.

19             THE COURT:  Okay.  Would your opinion concerning

20   President Trump or his supporters make it difficult for you

21   to be a fair and impartial juror?

22             JUROR:  No.

23             THE COURT:  You did write down number 13.

24             JUROR:  Some reflection.

25             THE COURT:  Some reflection?

1          JUROR:  I'm just being honest, and being human,

2     and just, you know, trying to be as reflective as I can and

3     take out biases.

4          THE COURT:  Okay.  Well, we appreciate that.  We

5     do.

6          And, I mean, you know, we all know that a lot of

7     people supported President Trump, he got, you know, he got

8     48 or 49 percent --

9          JUROR:  Mm-hmm.

10         THE COURT -- of people voting for him.

11         But would you, even if somebody were a supporter

12    of his, would you keep an open mind until you heard all the

13    evidence at trial and saw all the evidence at trial?

14         JUROR:  Supporter as in, like, their political

15    views or supporter is as in what happened at the Capitol?

16         THE COURT:  Well, that's a very good question.

17         Supporter, there are a lot of people who are

18    supporter of his because they share his political views.

19         JUROR:  Mm-hmm.

20         THE COURT:  There are other people that went to

21    the rally that day and then went to the Capitol.

22         JUROR:  Mm-hmm.

23         THE COURT:  So in this case, of course, the

24    defendant, Mr. Gossjankowski is accused of having gone to

25    the Capitol.

```
 1                  JUROR:  Mm-hmm.

 2                  THE COURT:  And engaged in certain conduct there,

 3       which the government and the grand jury have said is in

 4       violation of certain statutes.

 5                  JUROR:  Mm-hmm.

 6                  THE COURT:  So in this case, the question is

 7       whether you could provide a fair and impartial trial to Mr.

 8       Gossjankowski, who is charged with having gone to the

 9       Capitol, gone into the Capitol and done certain things

10       there.  So could you be fair and impartial?

11                  JUROR:  I don't know.

12                  THE COURT:  Try to think.

13                  JUROR:  I'm just being -- I don't know.  I would

14       try, but I don't know.  Like, political views I don't care

15       about, but...

16                  THE COURT:  Right.

17                  JUROR:  But that's a little harder.  So I don't

18       know.

19                  THE COURT:  Okay.  Now we also mentioned that Mr.

20       Gossjankowski is deaf.

21                  And so one of the questions, question 16, was

22       whether you, or someone close to you, friend or immediate

23       family member, or coworker is deaf or hard of hearing.

24                  JUROR:  My dad's deaf.  My dad is deaf.

25                  THE COURT:  Is that throughout his life or more
```

```
 1        recent?

 2                    JUROR:  He's been deaf about 32 years, so when I

 3        was about 6.

 4                    THE COURT:  And does he wear hearing aids?

 5                    JUROR:  Yep.  Well, he mostly just read lips.

 6        Like lips, he's completely deaf.  So he has a Cochlear

 7        implant but he doesn't really use because it's kind of,

 8        like, mechanic-ish sounding he says, but he reads lips.

 9                    THE COURT:  So he's got a Cochlear implant and he

10        reads lips?

11                    JUROR:  Mm-hmm.

12                    THE COURT:  And does he use or understand American

13        Sign Language?

14                    JUROR:  No.

15                    THE COURT:  Okay.  So it's mostly through reading

16        lips and looking at you closely?

17                    JUROR:  Uh-uh, yes.

18                    THE COURT:  Another question, you wrote down

19        number 18:  Do you have a strong opinion, positive or

20        negative, about deaf people?

21                    JUROR:  Yeah, because my dad's deaf.

22                    THE COURT:  So it's positive?

23                    JUROR:  Yeah.  Well, you know, I'm also from a

24        country where anybody with a disability is kind of like

25        frowned upon.  So deaf people and seeing my dad, it's
```

1      just -- and I work with special ed, so...

2                  THE COURT:  Right.  So where are you from?  What

3      country?

4                  JUROR:  Guyana, South America.

5                  THE COURT:  Yeah, interesting.

6                  This is a question that kind of relates to an

7      earlier question, question 29.

8                  I said there's been an indictment in this case.

9      An indictment is not evidence of a crime.  It's the way a

10     case has begun.  It's the formal way of presenting the

11     charges.

12                 The indictment is to inform Mr. Gossjankowski, and

13     me, and ultimately Members of the Jury of the charges

14     against him.

15                 Would the fact that an indictment has been

16     returned and there is an indictment charging him with crimes

17     lead you to believe that he is guilty?

18                 JUROR:  I think I said yes.

19                 THE COURT:  Yeah.  Would the fact that there's an

20     indictment make it difficult for you to apply the

21     presumption of innocence?

22                 JUROR:  Yes.  Because I'm assuming, again, from my

23     knowledge of that day, that there must be some sort of

24     strong evidence that, videos or whatever, that he was where

25     he might not have supposed to have been.

```
 1                    Again, again, I don't know.  It's just like, you
 2        know.
 3                    THE COURT:  Okay.
 4                    I asked about whether you have any friends, close
 5        friends or relatives that have worked for law enforcement
 6        agencies.
 7                    JUROR:  Yes.
 8                    THE COURT:  Who is that?
 9                    JUROR:  My son's Godmother's husband is CIA.
10                    THE COURT:  It's CIA?
11                    JUROR:  Yeah.
12                    THE COURT:  Okay.  Any other law enforcement
13        agencies, or other friends, or relatives that you can think
14        of?
15                    JUROR:  No.
16                    THE COURT:  Have you, or members of your immediate
17        family, or close personal friends attended law school or
18        worked as a lawyer in a law office?
19                    JUROR:  My husband's an attorney.
20                    THE COURT:  He's an attorney?
21                    JUROR:  Yep, he's not practicing law.
22                    THE COURT:  Did he ever practice?
23                    JUROR:  No, he just went to law school and
24        retired.
25                    THE COURT:  He went to law school and did what?
```

```
1                    JUROR:  He went to law school, passed the bar, and
2       retired in New York.
3                    THE COURT:  Does he work?
4                    JUROR:  Mm-hmm, yeah.
5                    THE COURT:  But not as a lawyer?
6                    JUROR:  No.
7                    THE COURT:  What does he do?
8                    JUROR:  He works for Federal Student Aid.
9                    THE COURT:  For what?
10                   JUROR:  Federal Student Aid.
11                   THE COURT:  I think these are all the questions
12      that you've given answers to.  So I'll ask the lawyers to
13      ask whatever questions they would like.
14                               EXAMINATION
15      BY MR. DREHER:
16      Q.  Good afternoon, ma'am.
17      A.  Hi.
18      Q.  So I'm going to go back to just a few questions that
19      Judge Friedman asked in terms of the indictment.
20      A.  Okay.
21      Q.  As it relates to the indictment, do you understand that
22      during trial the evidence will be presented to you if you
23      are selected on the jury?
24      A.  Mm-hmm, yes.
25      Q.  Yes?
```

```
 1     A.  Yeah.

 2     Q.  And then ultimately you'll be charged with viewing that

 3     evidence and conferring with your fellow jurors to determine

 4     whether or not there was sufficient evidence to prove guilt

 5     beyond a reasonable doubt.  Does that make sense?

 6     A.  Yes.

 7     Q.  So in terms of as of right now, certainly you haven't

 8     been presented with any evidence, but just knowing that the

 9     case was started with an indictment, does that lead you to

10     conclude that Mr. Gossjankowski is guilty?

11     A.  This kind of goes back to my answer from earlier.

12             Just, if I were to take out, like, the biases,

13     he's probably not guilty because I don't know, but I'm just

14     going by if he's here and there's an indictment, there's

15     probably evidence.  So, honestly I don't know how I would

16     answer.

17     Q.  Because you haven't been presented with anything yet?

18     A.  Yeah.

19     Q.  That makes sense.  So for you then, is it more about

20     timing then?

21             In other words, would you be able to follow the

22     instruction to wait until all the evidence is presented

23     before you make that decision?

24     A.  Yes.

25     Q.  Okay.  And you would be willing to follow any
```

1    instructions given to you as what the law is by the Judge?

2    A.  Yeah, I would.

3         MR. DREHER:  Your Honor, I have no further

4    questions.

5                         **EXAMINATION**

6    BY MR. SMOCK:

7    Q.  Hi.  Ned Smock.

8    A.  Hi, how are you?

9    Q.  So you answered yes to question number 7, and I'm not

10   going to ask you to remember them, I'm going ask you about

11   it.  I'm going to sort of ask you about it in two parts.

12        The first was -- the first part of the question

13   was:  Do you have such strong feelings, either positive or

14   negative, about the events on January 6th?

15        Can you talk to us a little bit about the feelings

16   that you have about January 6th?

17   A.  I just think it was sad, you know.  That's the extent of

18   it.  I just think it was awful what happened.  People died.

19   Q.  Understood.

20   A.  Mm-hmm.

21   Q.  And is that something that you have talked about with

22   family members, and your husband, and --

23   A.  Yes.

24   Q.  -- and other folks.  I think you mentioned that your

25   husband sends you stories?

```
1    A.  Yeah.  So like if there's like a news clip, he will send
2    it to me, like, but we send each other different articles
3    and stuff to read, so it's not necessarily just about this.
4    Q.  Okay.  And how strongly do you feel about what happened
5    on January 6th?  Is it something that you've thought about a
6    lot or something that you haven't been thinking about all
7    that much recently?
8    A.  Like, if it's in the news --
9    Q.  Okay.
10   A.  -- like, you know, there's, like, a reflection, that I
11   don't go to bed, like, [makes noise].
12   Q.  Right.  You have a lot going on in your life.
13   A.  Yeah.
14   Q.  I can tell.  So the second part of that question was
15   whether those views or strong feelings would make it
16   difficult for you to be fair and impartial.
17         And I just wanted to ask you in a little more
18   detail about the reasons that you answered yes.  Can you
19   tell us a little bit more about that.
20   A.  Yeah, just kind of going back to what my answer with
21   Judge Friedman.
22         It's kind of, you know, I'm human.  I have biases.
23   And you see the news and you see the celebration around like
24   what happened.  So, it's kind of hard, again I'm just being
25   honest, to just step back and think of the other side when
```

1    you saw the disaster that was left behind.

2    Q.  And thinking of the other side, in other words, the

3    people who were involved that day?

4    A.  Yeah.

5    Q.  Okay.  You know, if you heard the evidence in this case

6    and ultimately felt that the government had not met its

7    burden or you felt, along with other jurors that, in fact,

8    there was not enough evidence to meet the government's

9    burden of proving guilt beyond a reasonable doubt, would you

10   feel comfortable finding someone not guilty who was

11   associated with the events that you feel strongly about?

12   A.  Yeah.  Yes, I would.

13   Q.  Okay.  And so I guess what it comes down to is whether

14   we, everyone in this courtroom, would be able to depend on

15   you to focus only on the evidence in this case and not, you

16   know, understandable views you have about what happened that

17   day.  Could we depend on you for that?

18   A.  I would try.  And I'm just giving you an honest answer.

19          Again, I don't know until I'm in the situation,

20   but, you know, I would try to be fair.

21   Q.  Okay.  I appreciate that.  Am I right that what we're

22   coming back to is the reasons you've said you may not be

23   able to be fair and impartial, that you can't be totally

24   confident about your ability to separate those feelings; is

25   that right?

1     A.  Yes.

2     Q.  Okay.  Thank you.

3              THE COURT:  Anything else?  Any other questions?

4              Okay.  Why don't -- I'm going to ask you to step

5     out for a couple minutes with Ms. Johnson.

6              (Juror excused from courtroom)

7              THE COURT:  Anybody?

8              MR. SMOCK:  Yes, Your Honor.

9              Your Honor, we would move to strike Ms. Fullington

10    for cause.

11             My impression from the Court's questioning is that

12    she answered yes to several of the relevant questions

13    related to January 6th.

14             She said some things that might lead one to

15    believe that she could deal with the issues that she raised

16    in her questioning, but when we had addressed it and delved

17    into it further she said a number of times "I don't know if

18    I can be fair and impartial."  She said she thought that

19    folks were probably guilty.  And she repeatedly talked about

20    a view that if a person's been indicted they're likely

21    guilty.

22             And it's true that when asked by the government if

23    she would focus on the evidence she said that she would, but

24    again, getting back to the issues she has about January 6th

25    ultimately said that she's not confident that she can be

1    fair and impartial.

2              MR. DREHER:  Your Honor, I believe there's a bit

3    of false equivalency that occurs when you ask somebody a

4    complete -- a question about the future of which they know

5    nothing about and then determine that because they're not

6    confident in an answer that they're giving about that future

7    event to then conclude that they're somehow going to be

8    biased in some manner.

9              From the testimony that the potential juror

10   provided, she did indicate that she would follow this

11   Court's instructions and that she would not make a decision

12   until all the evidence had been presented and that she could

13   then consider it.

14             So certainly I would oppose the motion to strike

15   for cause and I would ask this Court to deny the motion.

16             THE COURT:  Can you remind me or somebody remind

17   me, she responded to one of Mr. Smock's questions whether

18   she would be confident if something, something, something in

19   finding him not guilty and she said yes.

20             Now, I don't have the question, I could ask the

21   court reporter to see if she can find it, unless somebody

22   can give me an accurate recollection of that.

23             MR. DREHER:  I remember that exchange, perhaps,

24   certainly not as well as the court reporter would be able to

25   pull up, but in that case, I think that future event had

1      been --

2                   THE COURT:  My point was, that's why I wanted to

3      be reminded of it.  That depending on, if I heard her

4      correctly, it kind of undercut the motion to strike for

5      cause.

6                   MR. DREHER:  Certainly.

7                   And with that answer she was forceful and direct

8      with how she answered that question, Your Honor.

9                   In other words, that she would be comfortable

10     finding someone not guilty.

11                  THE COURT:  Anybody?  Anything else on this?

12                  MR. SMOCK:  Your Honor, I think it's a fair point

13     that no one can tell the future, but I think there's a real

14     distinction between some of these jurors who say without

15     hesitation that they can be fair and those who repeatedly

16     answer questions saying that they don't think they can be

17     fair and impartial, and ultimately coming back to that in

18     the end of a series of questions.

19                  THE COURT:  Lynne, can you find the question I'm

20     thinking of Mr. Smock asked her near the end whether she

21     felt she could be comfortable about something finding him

22     not guilty?

23                  (Off-the-record discussion.)

24                  (Court reporter read back requested question.)

25                  THE COURT:  Thank you.  Anything further?

```
1              Okay.  I'm going to deny the motion and the

2    defense can decide if they want to use a peremptory.  I

3    think that answer was important in my thinking.

4              (Juror present)

5              THE COURT:  So thank you for your patience and for

6    your candor.  We're going to ask you come back one more

7    time --

8              JUROR:  Oh.

9              THE COURT:  -- tomorrow afternoon.  We're going to

10   make a final decision.

11             We're going to narrow the group of 70 down to

12   30-some, have those 30 come back tomorrow, and tomorrow

13   afternoon pick the final jury of two and two alternates, so.

14   Sorry about that, but one more time.

15             So if you would come back tomorrow afternoon at

16   2:00.

17             JUROR:  2:00.

18             THE COURT:  2:00.

19             JUROR:  Okay.

20             THE COURT:  The jury lounge on the fourth floor

21   again.

22             JUROR:  Okay.

23             THE COURT:  And Ms. Johnson will meet you there.

24             JUROR:  Okay.  Thank you.

25             THE COURT:  Thank you so much.
```

```
1              JUROR:  Thank you.

2              (Juror excused from courtroom)

3              THE COURT:  1427, I think.

4              (Juror present)

5                   (Juror number 1427)

6                       EXAMINATION

7              THE COURT:  Good afternoon.

8              JUROR:  Good afternoon.

9              THE COURT:  If you don't mind taking off your mask

10     so we can hear you better.  Thank you.

11             JUROR:  Thank you.

12             THE COURT:  So you're number 1427, correct?

13             JUROR:  Correct.

14             THE COURT:  Could you tell us a little bit about

15     your work.

16             JUROR:  I spent -- I'm retired.  I spent 20 years

17     at the World Bank in human resources.  I was head of global

18     recruitment and I was responsible for the executive team at

19     the World Bank, executive coaching.

20             And since I left the World Bank in 2007, I have

21     been an executive coach and a leadership development

22     professional working with an organization called The

23     Leader's Edge.

24             THE COURT:  What's it called?

25             JUROR:  The Leader's Edge doing executive
```

```
1    development programs for women leaders and emerging women

2    managers.

3              THE COURT:  Is that within this country or

4    internationally?

5              JUROR:  It's within this country, yes.

6              THE COURT:  Okay.  So you -- a couple of the

7    questions near the end of the long list of questions I

8    asked --

9              JUROR:  Yes.

10             THE COURT:  -- one had to do with scheduling.  And

11   I asked -- I said that the case might well go beyond the end

12   of next week, at least as the jury gets into deliberations,

13   and I asked whether that would cause a hardship for anybody.

14   Could you explain why you answered that question.

15             JUROR:  Yeah.  There are a couple of things.

16             One is I am a two-time breast cancer survivor and

17   I have an oncology appointment next Tuesday, which has come

18   up since I was summoned for this court.  And I could

19   reschedule it, but hopefully it's nothing ominous, but I

20   would prefer not to reschedule that.

21             On another health matter, I have a brother who

22   lives in Thailand and he is currently in the ICU with liver

23   failure, kidney failure, and heart disease.

24             THE COURT:  In Thailand?

25             JUROR:  In Thailand and Bangkok.  He's lived in
```

1      Bangkok for a very long time.

2              I get, you know, calls around the clock and it's

3      very hard for me to sit here and not look at my phone and

4      see what's happening.  And my sister-in-law doesn't speak

5      English very well, so it's my nephew in Texas who has to do

6      translating.  Yesterday he was hemorrhaging very badly.  So

7      that's my difficulty.

8              THE COURT:  So two questions, one is which already

9      alluded to, that you would find it difficult to concentrate

10     on other things because of all that going on; is that right?

11             JUROR:  That's correct.

12             THE COURT:  And you understand that from our

13     perspective, having a juror pay attention is important

14     because to be fair to both sides, when somebody's charged

15     with a crime, he wants the undivided attention of people.

16             JUROR:  Absolutely.

17             THE COURT:  Do you think that would be difficult?

18             JUROR:  I think it would be very difficult at this

19     moment.

20             I went to Thailand last year to say goodbye to my

21     brother.  He's hung in there since July.  Yesterday the

22     report was really horrible, so I don't know how much longer

23     he'll --

24             THE COURT:  And if it came to the worst, would you

25     be planning to travel?

1          JUROR:  That's another question that I have not

2     answered yet.

3          My brother, my other brother who lives in

4     Switzerland, is going to Thailand this weekend, so...

5          THE COURT:  In context a less significant

6     question, what time on Tuesday is your doctor's appointment?

7          JUROR:  It's at 1:15.

8          THE COURT:  Okay.  I want to ask you one other

9     thing and then we may take a break for a minute.

10         I asked also whether you had any personal beliefs,

11    whether religious, philosophical, political, or otherwise

12    that could affect your service as a juror.  And specifically

13    could it affect your ability after hearing all of the

14    evidence and the law to enter a fair and impartial  verdict?

15         JUROR:  I'm a resident of D.C.

16         I used to be a Canadian citizen I became a U.S.

17    citizen in 2015.  And I, obviously, saw what happened on the

18    6th of January.  I grew up in Switzerland and I was

19    horrified about what happened.  It was just shocking to me.

20         And I am a registered democrat.  I have certain

21    beliefs that I do believe would interfere with my ability to

22    be impartial or remain open to hearing evidence.

23         In HR terms, I'm an ESTJ.  I tend to be

24    judgmental, for better, for worse, but it's hard for me to

25    suspend judgment in this instance.

```
1            THE COURT:  And just so counsel knows before we
2    take the next step here, she has written down on her card,
3    in addition to the ones we've just talked about, questions
4    6, 7, 11, 12, 13, 29, which relates to indictments.
5            And so while we've only talked about 47 and 48 so
6    far, those other numbers are written down there too.
7            I suggest we ask you to go back and wait for a few
8    minutes with Ms. Johnson.  We'll see where we are.
9            JUROR:  Thank you, Your Honor.
10           (Juror excused from courtroom)
11           THE COURT:  So I'll see what everybody wants to
12   say or we can ask her some followup questions, but let's
13   start by with the answers we have so far.
14           MR. DREHER:  I don't believe any followup
15   questions will be needed, Your Honor.  I wouldn't have any
16   objection to a cause challenge.
17           MR. SMOCK:  Agreed.
18           THE COURT:  Okay.  Interesting career.
19           (Juror present)
20           THE COURT:  Well, in light of what you've told us,
21   we're going to excuse you from this jury.
22           You can go down to the fourth floor and tell the
23   jury lounge that you've been excused, although they may call
24   you again.  But given what's going on in your life, your
25   brother's life, I don't know that you'll need to serve.
```

1          Good luck with everything.

2          JUROR:  Thank you so much.

3          THE COURT:  Thank you.

4          Number 1540, I believe, 1-5-4-0.

5          (Juror excused)

6          (Juror present)

7                    **(Juror number 1540)**

8                      **EXAMINATION**

9          THE COURT:  Have a seat.  Good afternoon.

10         JUROR:  Good afternoon.

11         THE COURT:  How are you?

12         JUROR:  I'm fine.

13         THE COURT:  Would you mind taking off your mask

14    and speaking into the microphone?

15         JUROR:  Yes.

16         THE COURT:  So you are a security guard?

17         JUROR:  Yes.

18         THE COURT:  Where do you work?

19         JUROR:  At NIH.

20         THE COURT:  At NIH.  Is that your permanent

21    assignment then?  You always at NIH?

22         JUROR:  Yes.

23         THE COURT:  Are you dayshift or nightshift?

24         JUROR:  Dayshift.

25         THE COURT:  Okay.  Do you carry a weapon?

1          JUROR:  No.

2          THE COURT:  Have you had training in weapons?

3          JUROR:  I've had.

4          THE COURT:  You have had some?

5          JUROR:  Yes.

6          THE COURT:  Okay.  One of our questions was,

7     whether you have friends or relatives in law enforcement.

8     And I assume you do?

9          JUROR:  Yes.

10          THE COURT:  Anybody with the Capitol Police or

11     Metropolitan Police?

12          JUROR:  Metropolitan.

13          THE COURT:  And who is that person?

14          JUROR:  Father-in-law.

15          THE COURT:  Your father-in-law.  And do you know

16     what his assignment is at Metropolitan Police?

17          JUROR:  He was a sergeant, he retired, then went

18     back.

19          THE COURT:  He's back now?

20          JUROR:  Mm-hmm.

21          THE COURT:  Do you know whether he was involved or

22     on duty or involved in any of the events of January 6th?

23          JUROR:  I don't believe so, no.

24          THE COURT:  Okay.  So, going back to the beginning

25     of the questionnaire, question 6, you were asked whether you

1    followed, or watched news, or videos, or anything about the

2    events of January 6, 2021; did you?

3                 JUROR:  I did watch.  It was on the news.  It was

4    on every channel just about.

5                 THE COURT:  Yeah.  But on January 6th itself, do

6    you remember where you were?

7                 JUROR:  Work.

8                 THE COURT:  And so when things were happening did

9    you work watch things or only when you get home?

10                JUROR:  Yeah, we don't watch TV at work, but when

11   I came home at my leisure, turned on the TV, it's on the

12   news.

13                THE COURT:  Okay.  So you saw it on the news then?

14                JUROR:  Yes.

15                THE COURT:  And did you follow it much after that

16   day?

17                JUROR:  I mean, it stayed on the news, so --

18                THE COURT:  Right.

19                JUROR:  I'll watch clips here and there.

20                THE COURT:  And do you get your news mostly from

21   television or from --

22                JUROR:  Television.

23                THE COURT:  What about are you on any particular

24   social media platforms?

25                JUROR:  I am, but I'm rarely on there.

```
 1                    THE COURT:  Okay.  Did you watch -- this is
 2     question 11.  Did you watch the congressional hearings or
 3     just --
 4                    JUROR:  I watched bits and pieces of it, like, if
 5     I happened to be home and maybe it was on I'll get a piece
 6     of it, but I didn't sit and watch --
 7                    THE COURT:  Okay.
 8                    JUROR:  -- the duration of it, no.
 9                    THE COURT:  And things that popped on television
10     news?
11                    JUROR:  Yes.
12                    THE COURT:  I asked here question 19, whether you,
13     or a family member, or close friend ever worked at Gallaudet
14     University or attended that school or participated in any
15     programs there.
16                    JUROR:  I have a child who played for Gonzaga and
17     we sometimes went there to use their field.  So we have been
18     on the property several times.
19                    THE COURT:  What sport?
20                    JUROR:  Football and rugby.  But football for --
21                    THE COURT:  Your son?
22                    JUROR:  Mm-hmm.
23                    THE COURT:  Plays football and rugby?
24                    JUROR:  Yeah, well, now he's doing neither.  He's
25     about to graduate.
```

```
1                    THE COURT:  Where is he?

2                    JUROR:  He's at Penn State now.

3                    THE COURT:  Is he playing football or rugby?

4                    JUROR:  No, he's eating.

5                    THE COURT:  Because Gonzaga's had a pretty good

6      team over the years, right?

7                    JUROR:  Yeah.

8                    THE COURT:  We talked about question 35.  Oh, tell

9      us, if you would, about your prior jury service.

10                    JUROR:  I had a gun case, a drug case, and a civil

11     case.

12                    THE COURT:  So the first was what?

13                    JUROR:  A gun case.

14                    THE COURT:  Gun?

15                    JUROR:  Mm-hmm.

16                    THE COURT:  Second was drug?

17                    JUROR:  Drug.

18                    THE COURT:  And the other one?

19                    JUROR:  And then the last one was a civil case.

20                    THE COURT:  Civil?

21                    JUROR:  Yes.

22                    THE COURT:  So let's talk about the two criminal

23     cases.  Were they in this court or across the street?

24                    JUROR:  Across the street.  They weren't here.

25                    THE COURT:  Do you remember what the verdicts were
```

1       in either of those cases?

2                   JUROR:  I know with the drug one it was guilty,

3       but not on all counts.

4                   THE COURT:  And the gun?

5                   JUROR:  The gun, I don't remember.

6                   THE COURT:  Okay.  Is there anything about that

7       experience that would make it uncomfortable for you or you

8       wouldn't want to serve on a jury again or?

9                   JUROR:  No.

10                  THE COURT:  Okay.  Good.  Questions?

11                                  **EXAMINATION**

12      BY MR. DREHER:

13      Q.  Good afternoon, ma'am.

14      A.  Good afternoon.

15      Q.  When your son was playing football and rugby, was the

16      practice field at Gallaudet, would there be students from

17      Gallaudet using the field as well?

18      A.  No, just us using field.

19      Q.  Okay.  Was there any interaction that you had with

20      either faculty members of Gallaudet --

21      A.  No.

22      Q.  -- or students?

23      A.  No.

24      Q.  I'm sorry, no?

25      A.  No.

```
1                    MR. DREHER:  Your Honor, I have no further

2        followup?

3                    MR. SMOCK:  I don't have any questions.  Thank

4        you.

5                    THE COURT:  Okay.  Well, thank you.

6                    First, thanks for your patience.  Thanks for being

7        here.  Thanks for your answers, but we're not done with you

8        yet, I don't think.

9                    We're trying to narrow the large group down to

10       about 30 or so people and then down to the final jury.  So

11       we're going to ask you, along with a lot of other people, to

12       come back tomorrow, tomorrow afternoon at 2:00.

13                   JUROR:  Okay.

14                   THE COURT:  And report to the jury lounge on the

15       fourth floor and we'll try to get the jury selected by the

16       end of the day if we can.

17                   JUROR:  Okay.

18                   THE COURT:  Thank you for everything.  And we'll

19       see you tomorrow on the fourth floor.  Ms. Johnson will be

20       down there to meet you --

21                   JUROR:  Okay.

22                   THE COURT:  -- and the others.

23                   JUROR:  Thank you.

24                   THE COURT:  Thank you.

25                   (Juror excused from courtroom)
```

```
 1                THE COURT:  So the next person -- this is group 4
 2       we've been dealing with.  The next person we've already
 3       talked to, number 831.  So why don't we take a little break
 4       before we start Group 5.
 5                (Recess taken at 3:40 p.m.)
 6                          *    *    *    *    *
 7           (3:57 p.m.)
 8                        IN OPEN COURT
 9                THE COURT:  So I think our next person is number
10       0029.
11                MS. JOHNSON:  Yes.  0029.
12                (Juror present)
13                     (Juror number 0029)
14                        EXAMINATION
15                THE COURT:  Good afternoon.  How are you?
16                JUROR:  Well.  Thank you.  Good day.
17                THE COURT:  Thanks for all your patience.
18                JUROR:  Of course.
19                THE COURT:  Would you mind taking off your mask
20       and speaking into the microphone so we can all hear you?
21                You're juror number 0029; correct?
22                JUROR:  That's right.
23                THE COURT:  So could you tell us a little bit
24       about your work, what do you do?
25                JUROR:  Currently I am a communications
```

1    consultants.  So I work for a firm that works with

2    corporations, nonprofits, and trade associations.

3                THE COURT:  So, there are a number of questions

4    that you wrote down on number 2, but I'd like to start with

5    the question number 1, which was, based on the facts and

6    based on the brief description of the case I gave the other

7    day, do any of you think you have personal knowledge of this

8    facts or you might have heard or read about it.

9                JUROR:  You know, if I did mark -- oh, you know

10   what, I did mark that because I might have seen an article

11   about it locally.  I remembered potentially having read

12   something in, you know, Washingtonian, but I don't remember

13   any --

14               THE COURT:  In the Washingtonian magazine?

15               JUROR:  Online.  So I'm not confident --

16               THE COURT:  Do you think it was about this

17   particular defendant, Mr. Vitali Gossjankowski?

18               JUROR:  The name rang a bell, which is why I

19   thought potentially.

20               THE COURT:  Okay.

21               JUROR:  But I'm not sure.

22               THE COURT:  Is there anything, I know it's very

23   vague in your mind, but is there anything about the fact

24   that you may have read something that would affect your

25   ability to be fair to him in this trial?

```
1                      JUROR:  I don't think it would affect my ability
2        to be fair.
3                      THE COURT:  It sounds like you're having trouble
4        remembering what it was.
5                      JUROR:  Yes.  It was just January 6th related, so
6        I don't think it would affect my impartiality.
7                      THE COURT:  All right.  Let me move on to some of
8        the other questions then.
9                      JUROR:  Yes.
10                     THE COURT:  I asked whether in question 4, whether
11       you, or a close friend, or family member ever worked on
12       Capitol Hill.
13                     JUROR:  Yes.  So a couple of answers to that
14       question.
15                     At the beginning of my career, I'm a former
16       journalist.  My first full-time job in D.C.  I was the
17       reporter on Capitol Hill working for BuzzFeed.  I was in
18       that job for eight months.
19                     My husband worked on Capitol Hill previously, for
20       House republicans.  And, you know, having both of us having
21       worked on The Hill, we know a lot of people who have also.
22                     THE COURT:  So you worked as a journalist on The
23       Hill --
24                     JUROR:  Yes.
25                     THE COURT:  -- covering for Congress?
```

```
 1                    JUROR:  Yes.

 2                    THE COURT:  Certain committees or generally?

 3                    JUROR:  No, just Congress generally.

 4                    THE COURT:  So I assume you've been in and out of

 5      the Capitol?

 6                    JUROR:  Many times, yes.

 7                    THE COURT:  And various office buildings as well?

 8                    JUROR:  Yes.

 9                    THE COURT:  And your husband works now or in the

10      past?

11                    JUROR:  In the past.

12                    THE COURT:  For a particular committee?

13                    JUROR:  No.  His most recent, he was not working

14      there on January 6th, he had moved on to the private sector

15      by then.  His most recent position was with Speaker Ryan.

16      Before that he was with Speaker Boehner and a number of

17      other --

18                    THE COURT:  So Speaker Boehner and then who you

19      said he was with?

20                    JUROR:  Most recently it was Speaker Paul Ryan.

21                    THE COURT:  Okay.  So the next question, which was

22      related, is whether you, or a close friend, or family member

23      were affected by the events of January 6th.

24                    JUROR:  Yes.  I think I put an asterisk by that.

25                    THE COURT:  Yes.
```

1          JUROR:  I knew many reporters and a number of

2     staff members as well that were on The Hill that day.  You

3     know, none of them are immediate family or, you know,

4     extremely close friends, but they are people I mean, you

5     know, close enough with that I see them from time to time.

6          THE COURT:  Have you talked to people who were on

7     The Hill that day about it.

8          JUROR:  As a matter of fact, I don't think I have

9     talked to them about it.

10          I have, you know, seen them Tweet about their

11     experiences or talk about it on the news.  But personally,

12     no, I have not talked about it with them.

13          THE COURT:  So do you know where you were on

14     January 6th?  At home, at work?

15          JUROR:  I was at home.  I was sort of writing out

16     the end of my contract, I was at CNN at the time, and I was

17     at the very end of my contract.  I was leaving journalism

18     and about to have my first job -- my baby.  So I was -- I

19     had a dentist appointment that day, I was at home.

20          THE COURT:  Were you -- did you wind up watching

21     what was going on that day?

22          JUROR:  I did wind up watching it, yes.

23          THE COURT:  And during the course of the day and

24     evening?

25          JUROR:  Yes.

```
 1                   THE COURT:  And social media, local television,
 2      national television?
 3                   JUROR:  Twitter and national television.  I'm not
 4      sure if it was a particular network.  I probably switched
 5      around.
 6                   THE COURT:  Okay.  Do you follow a particular
 7      social media platforms?
 8                   JUROR:  Primarily Twitter and Instagram.
 9                   THE COURT:  Twitter and Instagram?
10                   JUROR:  Yes.
11                   THE COURT:  So question number 10, I guess relates
12      to question number 1, because it asks:
13                   Have you seen or heard anything on the news or
14      elsewhere about Mr. Gossjankowski?  And it's the same answer
15      as before.
16                   JUROR:  Only potentially that local article.  I'm
17      not even 100 percent sure.
18                   THE COURT:  Sure.
19                   JUROR:  And I don't remember the details.
20                   THE COURT:  And your recollection is it might have
21      been in Washingtonian magazine?
22                   JUROR:  I think so.
23                   THE COURT:  Okay.
24                   JUROR:  That's my best recollection.
25                   THE COURT:  And to what extent did you watch the
```

1    hearings on the January 6th?

2              JUROR:  I did watch some.  Certainly not all of

3    them.  I was no longer a journalist at that point, so I was,

4    you know, at home with a baby.  So I watched some of it, but

5    I didn't follow it as closely as I would have.

6              THE COURT:  Do you -- do you think any of your

7    experiences both affect what you have seen, and read, and

8    heard about January 6th and your familiarity, and your

9    husband's familiarity with the Capitol and the facilities

10   would affect your ability to be a fair juror and impartial

11   juror in this case?

12             JUROR:  I don't think it would affect my ability

13   to be fair, no.

14             I mean, obviously I have a greater level of

15   understanding about the Capitol grounds than, you know, your

16   average person off the street, but I think I could still

17   approach this in an impartial way.

18             THE COURT:  And do you think you could judge this

19   case just based on the evidence that you see and hear in the

20   courtroom?

21             JUROR:  Yes.

22             THE COURT:  And would you follow my instructions

23   on the law?

24             JUROR:  Yes, of course.

25             THE COURT:  All right.  There was a question,

1    number 35, about whether you, or close friends, or family

2    members have ever worked for law enforcement, police

3    departments, FBI, Capitol Police, Metropolitan Police

4    police, anything?

5            JUROR:  My first cousin and her husband both work

6    for the FBI based out of Los Angeles currently.

7            THE COURT:  Los Angeles?

8            JUROR:  Yes.

9            THE COURT:  Okay.  Number 37 was whether you, or

10   any close friend, or member of your immediate family ever

11   worked in a law office, graduated from law school, attended

12   law school or worked as a lawyer.

13           JUROR:  I do have friends that are lawyers.

14           THE COURT:  Who are lawyers.  Oh, well.  We won't

15   hold that against you.

16           JUROR:  Okay.

17           THE COURT:  And I think the last question you

18   responded to was number 41, whether you, or members of your

19   immediate family, or close personal friends have ever been a

20   victim of a crime or witness to a crime.

21           JUROR:  When I was a journalist I had stalking

22   incident.

23           THE COURT:  A stalking incident?

24           JUROR:  On two occasions, yes.  Nothing related to

25   this case.

458

```
1                    THE COURT:  Was it anything you reported to the
2       police?
3                    JUROR:  Yes.
4                    THE COURT:  Did they find whoever it was?
5                    JUROR:  They did identify him.  I pursued a
6       restraining order, but it was never delivered to him.  It
7       was a jurisdictional issue, but I didn't have another issue
8       with it, so.
9                    THE COURT:  How long ago was that?
10                   JUROR:  A few years now.
11                   THE COURT:  Questions?
12                              EXAMINATION
13      BY MR. DREHER:
14      Q.  Good afternoon, ma'am.
15      A.  Hi, how are you?
16      Q.  Certainly, as you just mentioned, it wasn't pursued
17      further.
18                   Did you feel that you were treated fairly by the
19      police with that incident?
20      A.  Yes, I did.  They were very helpful.
21      Q.  Was there anything about that incident that would lead
22      you to either believe the testimony of a police officer
23      either more or less than someone off the street?
24      A.  No.
25      Q.  And the same being for -- you said your cousin and her
```

1    husband work for the FBI?

2    A.  They do.

3    Q.  So specifically for agents, like, with the FBI, would

4    you consider their testimony with the same weight as you

5    would anyone else?

6    A.  Yes, I would.

7    Q.  Now, as -- you said you were a former journalist for

8    BuzzFeed.  At some point, though, you then started working

9    for CNN?

10   A.  Yes.  BuzzFeed was just the only role where I was a

11   congressional reporter.  After that I was a political

12   campaign reporter for, you know, close to a decade.  I

13   worked for a number of news outlets.  The most recent was

14   CNN.

15   Q.  Was that still here in D.C.?

16   A.  Yes.

17            MR. DREHER:  I have no further followup.

18            JUROR:  Thank you.

19            MR. SMOCK:  I don't have any questions.

20            JUROR: Okay.  Thank you.

21            THE COURT:  All right.  Anything anybody?  Okay.

22            Well, we would like you to come back tomorrow.

23            JUROR:  Okay.

24            THE COURT:  We've got -- we started with 70

25   people, we're going to get down to about 35.

```
 1                    JUROR:  Okay.

 2                    THE COURT:  And then tomorrow we're going to

 3        select a jury and two alternates.

 4                    So if you would come back tomorrow at 2:00.

 5                    JUROR:  Okay.

 6                    THE COURT:  And report to the jury lounge on the

 7        fourth floor.  We should be able to get a jury selected

 8        tomorrow afternoon.

 9                    JUROR:  Perfect.  Okay.  Thank you.

10                    THE COURT:  Thanks very much for your patience and

11        for your answers.

12                    JUROR:  No, of course.  Have a great evening.

13                    THE COURT:  You too.

14                    MS. JOHNSON:  Ma'am, can you exit --

15                    THE COURT:  You can go out the front door.

16                    MS. JOHNSON:  Thank you.

17                    (Juror excused from courtroom)

18                    THE COURT:  So I think we next have number 1570.

19                    So the next person on the list we've already

20        talked to and he's been qualified, number 264, so the next

21        is 1570.

22                    (Juror present)

23

24

25
```

```
 1                    (Juror number 1570)

 2                       EXAMINATION

 3            THE COURT:  Good afternoon.

 4            JUROR:  Good afternoon.

 5            THE COURT:  How are you?

 6            JUROR:  How are you, Judge?

 7            THE COURT:  Would you mind taking off your mask

 8       and speaking into the microphone so we can all hear you a

 9       little better?

10            JUROR:  Yes.

11            THE COURT:  Good thank you.  So you're juror 1570,

12       correct?

13            JUROR:  Yes.

14            THE COURT:  All right.  I want to ask a few

15       questions of you based on what you put down on the card.

16            JUROR:  Right.

17            THE COURT:  Let me start with question 45.

18            I asked whether you had any physical, or health,

19       or medical problems, hearing or eyesight problems, that

20       would make it difficult for you to sit and give your

21       attention full-time to the trial.

22            JUROR:  Well, I suffer from bipolar disorder and

23       that's the reason why sometimes I, you know --

24            THE COURT:  Are you on medication for that?

25            JUROR:  Yes, Ambien, yes.
```

```
 1                THE COURT:  And what is the effect of the

 2    medication?

 3                JUROR:  Well, it's does good.

 4                THE COURT:  What?

 5                JUROR:  It does good.

 6                THE COURT:  It does -- does it make you drowsy?

 7                JUROR:  No.  Because I take it in the morning, but

 8    no, it doesn't.

 9                THE COURT:  So do you think that you could sit on

10    the jury and be -- pay attention to what's going on?

11                JUROR:  Yes, I could.

12                THE COURT:  I mean, do you think your condition

13    would affect your ability to do that?

14                JUROR:  No.  Because my medicine is to keep me

15    level.

16                THE COURT:  Keeps you level?

17                JUROR:  Yeah.

18                THE COURT:  All right.  You only take it one time

19    a day?

20                JUROR:  Yes, sir.

21                THE COURT:  It keeps you going most of the day?

22                JUROR:  Yes.

23                THE COURT:  Because normally we would start at

24    9:30 or 10 and take a couple breaks, take a lunch break.

25                JUROR:  Yeah.
```

463

```
 1                    THE COURT:  And then end at 5:00.
 2                    JUROR:  Yes, I understand.
 3                    THE COURT:  Is that all right?
 4                    JUROR:  Yes.
 5                    THE COURT:  Okay.  I'm going to ask you some other
 6      questions based on what you put down on the card.
 7                    JUROR:  Mm-hmm.
 8                    THE COURT:  I asked you if you lived or worked
 9      near the Capitol.
10                    JUROR:  Mm-hmm.
11                    THE COURT:  Where -- do you live or work near the
12      Capitol?
13                    JUROR:  425 Second Street, right there.  I walk
14      here.
15                    THE COURT:  Oh, okay.  Let me see.
16                    So were you affected by what happened on
17      January 6th?
18                    JUROR:  Of course.  I think most people were.
19                    THE COURT:  Well tell us about how you were.
20                    JUROR:  Oh, devastated is really not the word,
21      just having something like that just, you know, go on like
22      that.  Just why, you know, for something that was so minor
23      as a vote, you know --
24                    THE COURT:  Could you get a little closer to the
25      microphone.
```

1              JUROR:  Something as minor as a vote and then it

2       had fatalities and all of that.  It was just an uncalled for

3       situation.

4              THE COURT:  Do you feel pretty strongly about

5       that?

6              JUROR:  Yes.

7              THE COURT:  Did it affect you and your neighbors

8       in your neighborhood in terms of getting around the city?

9              JUROR:  Yeah.  Things were, like I said, things

10      were detoured and, you know, we had just a mess.

11             THE COURT:  So are you employed at this time?

12             JUROR:  No, I'm on disability.  As I said, I'm

13      bipolar.

14             THE COURT:  Yeah.

15             JUROR:  Okay.

16             THE COURT:  So you didn't have -- on January 6th

17      were you at home?

18             JUROR:  I was out.

19             THE COURT:  You were out?

20             JUROR:  Mm-hmm.

21             THE COURT:  Where were you?

22             JUROR:  At the Walmart down the street.

23             THE COURT:  So did you watch any of this on video,

24      or on television, or anything what was going on?

25             JUROR:  Well, it was all on the news.

```
 1                THE COURT:  Yeah.

 2                JUROR:  All on the news.  Just the devastation.

 3    Just to see people just -- you know, it was just it was an

 4    unbelievable circumstance for something as little as a vote,

 5    you know, because of what happened.  You know, because of a

 6    vote -- people had the right to vote and vote the way they

 7    want, and if you win, you just concede and carry on.  It

 8    should have been like that.

 9                THE COURT:  Do you have such strong feelings about

10    what happened on January 6th and people who participated in

11    it that would make it hard for you to be a fair juror in

12    this case?

13                JUROR:  No.  I don't believe so.

14                THE COURT:  Do you think you could be fair?

15                JUROR:  Yes, I think I could be fair.  Once I

16    know, you know, the second that -- I don't know, there

17    really was no circumstances, it's like I said, but, yes, I

18    could once after I hear everything, I guess I would.

19                THE COURT:  Would you be able to sit here and

20    listen to the testimony of witnesses and watch videos?

21                JUROR:  Oh, yes, of course.  That's the only way I

22    would actually know what, you know.

23                THE COURT:  And would you judge this particular

24    defendant, Mr. Gossjankowski, based just only on what you

25    see and hear in the courtroom?
```

```
 1                   JUROR:  No, what was his participation.

 2                   THE COURT:  Well, that's what this case is about.

 3                   JUROR:  Yeah.  His participation, yes.

 4                   THE COURT:  So are you -- so you're not -- you're

 5       not assuming that he's guilty when we start up?

 6                   JUROR:  No.  No, you can't.

 7                   THE COURT:  You would listen to the evidence?

 8                   JUROR:  You have to and see what -- you know, look

 9       at that.  See whatever you see and hear what he has to say.

10                   THE COURT:  Well, he may not testify.  I don't

11       know.  He's got a constitutional right that says you don't

12       have to testify.

13                   Is that a problem for you if he doesn't testify?

14                   JUROR:  If he wants to take the fifth he can.

15                   THE COURT:  Say that --

16                   JUROR:  If he wants to take the fifth he can.

17                   THE COURT:  Well, he's not taking the fifth, he

18       just doesn't have to take the witness stand.

19                   JUROR:  Well, that's his right.

20                   THE COURT:  I mean, let's assume that you hear

21       from it would be law enforcement officers and other people

22       who were witnesses and you don't hear anything from him.

23       His lawyers will ask all the other witnesses questions --

24                   JUROR:  Mm-hmm.

25                   THE COURT:  -- but if he doesn't testify, is that
```

```
1          a problem for you?

2                    JUROR:  No.

3                    THE COURT:  Now, would your opinion about

4          President Trump or his supporters make it difficult for you

5          to be fair and impartial in this case?

6                    JUROR:  No.

7                    THE COURT:  You wrote down number 13, but you're

8          saying no?

9                    JUROR:  Yeah, but I had a -- I thought, I wanted

10         to say that as soon as I left here.

11                   THE COURT:  You thought about it?

12                   JUROR:  Okay.

13                   THE COURT:  Do you follow any particular social

14         media platforms?

15                   JUROR:  Yeah.  I look at TikTok.

16                   THE COURT:  TikTok.

17                   So number 16 asked whether you, or a close friend,

18         or immediate family member was either deaf or hard of

19         hearing.

20                   JUROR:  Yes.  My 32-year-old niece, we didn't find

21         out until she was, like, eight months old that she couldn't

22         hear.

23                   THE COURT:  She's had hearing problems since she

24         was?

25                   JUROR:  Eight months old is when we found out.
```

```
 1                THE COURT:  She can't hear at all?
 2                JUROR:  No.  She went to Kendall, a part of
 3     Gallaudet.
 4                THE COURT:  How old is she now?
 5                JUROR:  32.
 6                THE COURT:  And does she -- is she considered
 7     totally deaf?
 8                JUROR:  Yeah, well, I only heard her say "daddy"
 9     one time to my brother, and that was just then.
10                THE COURT:  So how does she communicate?
11                JUROR:  Well, we communicate on the phone because
12     she lives in Florida now.  She left when she was younger,
13     but when we talk, we talk on the phone.
14                THE COURT:  Does she -- do you know whether she
15     uses American Sign Language?
16                JUROR:  Yeah, she was -- I'm quite sure she did.
17                THE COURT:  She uses American Sign Language?
18                JUROR:  Yeah, because she had to go to Kendall
19     school as part of Gallaudet, you know, so she could learn
20     sign language.
21                THE COURT:  I see.  So did she go to programs at
22     Gallaudet University here?
23                JUROR:  Yeah.
24                THE COURT:  Okay.  Did she graduate from
25     Gallaudet?
```

1              JUROR:  Oh, no, no, no.  Oh, when you say -- no,

2    she went to elementary school, the elementary school and

3    then her mother moved to Florida.

4              THE COURT:  In Florida?

5              JUROR:  Yeah.

6              THE COURT:  So not here in Washington D.C.?

7              JUROR:  The first years she went to the elementary

8    school that's called Kendall.  It's on the grounds of

9    Gallaudet campus.

10             THE COURT:  Oh, I see.  It's called Kendall?

11             JUROR:  Mm-hmm.

12             THE COURT:  And it's on the grounds of Gallaudet?

13             JUROR:  Mm-hmm.

14             THE COURT:  So she was here for a while and then

15   she and her mother moved to Florida?

16             JUROR:  Yeah, was she here for what?

17             THE COURT:  Did she grow up here or did she grow

18   up in Florida?

19             JUROR:  Partially, but most of it in Florida.

20   Most of it.

21             THE COURT:  Do you -- are you able to communicate

22   with her in American Sign Language?

23             JUROR:  No.

24             THE COURT:  Do you have strong opinions about

25   people who are deaf?

```
1                    JUROR:  One of God's people.  We love them all, no

2         matter what.

3                    THE COURT:  When the trial is over I'm going to

4         tell the jury what the law is, and you wrote down number 33.

5         Will you have any problems following my instructions on the

6         law?

7                    JUROR:  No.

8                    THE COURT:  You will follow them?

9                    JUROR:  Yes, of course.

10                    THE COURT:  I asked whether you, or any members of

11        your immediate family, or close personal friends ever been

12        arrested, or charged with a crime, or convicted of a crime?

13                    JUROR:  Yes.  My brother.

14                    THE COURT:  Your brother?

15                    JUROR:  The niece that I was talking about, the

16        deaf niece, her father, my brother.

17                    THE COURT:  And what was he convicted on?

18                    JUROR:  Well, he got on drugs and so he was

19        shoplifting and this and that.  That's why the mother moved

20        and --

21                    THE COURT:  Oh, his [sic] mother moved away?

22                    JUROR:  Yeah.

23                    THE COURT:  Was he -- did he spend time in prison?

24                    JUROR:  Yes.

25                    THE COURT:  Do you keep in touch with him now?
```

```
 1                    JUROR:  Yes.

 2                    THE COURT:  Is he out?

 3                    JUROR:  Yes.  He just recently got out again.  He

 4       just called me the other night.  His girlfriend called me

 5       and told me he was home.

 6                    THE COURT:  Is he around here somewhere?

 7                    JUROR:  He's in D.C.

 8                    THE COURT:  Okay.  He was convicted here?

 9                    JUROR:  Yes.

10                    THE COURT:  In the district?

11                    Was it across the street in Superior Court; do you

12       know?

13                    JUROR:  Yes.

14                    THE COURT:  Okay.  So I asked if any members of

15       your family or you personally have had any experience in law

16       enforcement or the government that might cause you to favor

17       or not favor the government or law enforcement.

18                    Is that what you think about your brother's

19       situation?

20                    JUROR:  No.  When you're wrong, you're wrong.

21                    THE COURT:  Okay.  Have you, or members of your

22       immediate family, or close personal friends ever been the

23       victim of a crime or a witness to a crime?

24                    JUROR:  Yes, I was.  October 24th of last year I

25       was stabbed.
```

```
1                THE COURT:  You were stabbed?

2                JUROR:  Mm-hmm.

3                THE COURT:  Where did this happen?

4                JUROR:  At Ccnv shelter where I stay across the

5      street.

6                THE COURT:  Where?

7                JUROR:  425 Second Street.

8                THE COURT:  Oh.  Somebody just came up and stabbed

9      you or did you know the person?

10               JUROR:  No, random.

11               THE COURT:  They try to steal something?

12               JUROR:  No, just random.  I guess she was crazy.

13     I don't know, you know, people just come and do things.  So

14     I was stabbed here in the back.

15               THE COURT:  Did you go to the hospital?

16               JUROR:  Yes, I did.

17               THE COURT:  Everything okay now?

18               JUROR:  Yes.

19               THE COURT:  That's too bad.

20               Okay.  Questions?

21                            EXAMINATION

22     BY MR. DREHER:

23     Q.  Good afternoon, ma'am.

24     A.  Good afternoon.

25     Q.  Did you follow your brother's case closely?
```

1    A.  No, I did not.

2    Q.  No?  Do you know approximately how long he was

3    incarcerated?

4    A.  I don't know.  He goes back and forth ever since he was

5    about 18 years old, so I don't --

6    Q.  Okay.  And ultimately you also indicated he was the

7    father of your niece?

8    A.  Yes, I did.

9    Q.  Okay.  And she attended classes at elementary school

10   attached to Gallaudet?

11   A.  Yes, she did.

12   Q.  Okay.  While she was attending classes there, did you

13   ever interact with any faculty members or students at

14   Gallaudet University?

15   A.  We went to things that they would have there.  Like I

16   say, she had just started there.

17   Q.  Okay.  But ultimately you outlined that you do not speak

18   American Sign Language?

19   A.  Exactly.  We talk on the phone, but I can talk to her,

20   she reads my lips.

21   Q.  She reads your lips?

22   A.  Yes.

23   Q.  Okay.

24            MR. DREHER:  I have no further followups, Your

25   Honor.

```
 1                  THE COURT:  All right.  Mr. Smock.
 2                          EXAMINATION
 3    BY MR. SMOCK:
 4    Q.  Hello, Ms. Moore.  I'm Ned Smock.
 5    A.  Hello.
 6    Q.  You mentioned that you were on disability.  When was the
 7    last time that you worked?
 8    A.  Huh?
 9    Q.  When was the last time that you worked?
10    A.  About 12 years.
11    Q.  Okay.  What did you do for a living?
12    A.  Obvious -- I mean, various jobs.
13    Q.  Okay.  Is there one that you did longer than another
14    just so we have a sense of your profession?
15    A.  Oh, I was a caregiver.
16    Q.  Okay.  So for an individual patient or for --
17    A.  For an individual patient.
18    Q.  Okay.  And you stopped working as a result of the
19    diagnosis you told us about?
20    A.  Yeah, because I had a brother that was also that was --
21    that was shot and was killed and that took a toll on me and
22    then I started getting, you know, and so I knew I had to
23    talk to somebody because I was keeping everything in.
24    Q.  Yeah.
25    A.  But all my life I've been kind of up and down and we
```

1    found out what it was.

2    Q.  Okay.  And have you found that with the medication all

3    of your symptoms are gone or do you still feel any of those

4    symptoms?

5    A.  My symptoms will never be gone.  Remember I suffer from

6    bipolar depression.

7    Q.  Yeah.

8    A.  So it's controllable.

9    Q.  Okay.  And I think you -- you said you're comfortable

10   being able to serve on a jury given that?

11   A.  Yeah.

12   Q.  Okay.  And when we talked about January 6th you said

13   that you were devastated by it, which is an experience that

14   many people have felt?

15   A.  Yeah, because I know I'm not the only one in America.

16   Q.  That's true.  Can you talk a little bit more about that.

17   Is that -- why do you see that?

18   A.  Because it was just -- it was a tragedy, like anything

19   else.  You talk about tragedy.

20   Q.  Okay.

21   A.  You know.

22   Q.  And is that something that you -- a feeling you continue

23   to have today?

24   A.  Well, we'll always have tragedy and stuff, and they've

25   discussed it, you know, about people still today and it will

1    be discussed for years to come.  And people will still feel

2    the same, you know.  They'll think about it and they'll know

3    how they felt that day when they were somewhere when it

4    happened so, you know.

5    Q.  Okay.  And how do you feel about the folks who went to

6    the Capitol that day and did what they did?

7    A.  I don't know them.

8    Q.  Okay.  So you don't -- you don't have one feeling one

9    way or another about folks who --

10   A.  No, because I don't know -- I don't -- you know, I don't

11   know how to explain the circumstances why they did it or,

12   you know, whatever, no.

13   Q.  Okay.  You mentioned -- I think it was your niece who

14   went to Kendall Elementary School; is that right?

15   A.  Yes.

16   Q.  Were you involved in her education at Kendall to the

17   extent that you would have known her classmates?

18   A.  Her -- I said my brother got on drugs.  Okay.  Her

19   mother moved to Florida.  She was very young.  And I said he

20   was 17 when she was born and he started using drugs when he

21   was 18 and he started going to jail, so evidently not.  I

22   didn't -- you know, I went to a couple of shows she had

23   there or whatever, you know, and then her mother moved to

24   Florida.

25   Q.  Okay.  So you didn't know her classmates or kids that

1    she was in school with?

2    A.  No.

3    Q.  Okay.  You mentioned that she, when you communicated

4    with her, she reads lips; is that right?

5    A.  Yes.  When she comes to town, yes, I see her.

6    Q.  Okay.  And do you -- do you understand that not

7    everybody who's deaf is able to read lips?

8    A.  Yes, I do.

9    Q.  Is there anything else that you think that I should know

10    about you or your service here today?

11    A.  No.  You asked all the questions, I gave you all the

12    answers.

13    Q.  Perfect.  Thanks very much.

14    A.  Mm-hmm.

15         THE COURT:  All right.  We're going to ask you to

16    wait outside just for a couple of minutes with Ms. Johnson.

17         JUROR:  Okay.

18         THE COURT:  Thank you.

19         JUROR:  All right.

20         (Juror excused from courtroom)

21         THE COURT:  So I didn't know whether anybody had

22    anything they wanted to raise at all?

23         I'm not inviting it, I'm just asking.

24         MR. DREHER:  Nothing from the government, Your

25    Honor.

```
 1                MR. SMOCK:  No, Your Honor.

 2                THE COURT:  Okay.  I think this question that came

 3      up with someone of the other potential jurors too, about

 4      knowing whether some people who are deaf cannot read lips.

 5      It shouldn't be a problem in view of the stipulation you've

 6      reached with respect to Dr. Kegl anyways, so, and nobody's

 7      raising a problem with her.  So we'll have her come back

 8      tomorrow.  Okay.

 9                (Juror present)

10                THE COURT:  All right, ma'am.

11                We're going to ask you to come back tomorrow.

12      We're not quite done.  We've got a bunch of other people to

13      talk to.  We're going to try to narrow the group down.

14                So we're going to have you and other people come

15      back tomorrow.  We may have a few more questions.

16                JUROR:  Okay.

17                THE COURT:  So we'd like you to come back tomorrow

18      afternoon, 2:00.

19                JUROR:  Okay.

20                THE COURT:  And go to the jury lounge on the

21      fourth floor where you were.

22                JUROR:  Mm-hmm.

23                THE COURT:  Ms. Johnson will meet you there and

24      bring you up here.

25                JUROR:  Okay.
```

```
1                THE COURT:  Good.

2                JUROR:  All right.

3                THE COURT:  Right at the front door will be fine.

4    Thank you.

5                JUROR:  Thank you.

6                THE COURT:  Next is number 331.

7                (Juror excused from courtroom)

8                (Juror present)

9                       (Juror number 0331)

10                         EXAMINATION

11               THE COURT:  Good afternoon.  How are you?

12               JUROR:  Good.  Thank you, sir.

13               THE COURT:  Would you mind taking off your mask so

14   we can hear you?

15               JUROR:  Not at all.

16               THE COURT:  So what is your occupation?

17               JUROR:  I'm an architect.

18               THE COURT:  That's what --

19               JUROR:  Project manager.

20               THE COURT:  All right.

21               JUROR:  Logistics is my game.

22               THE COURT:  Good.

23               Well, as you've been able to see over the last

24   couple of days, we're not so good at logistics around here.

25   We're not managing people in the time as well as we should.
```

1           JUROR:  Give me a call, I'm cheap.

2           THE COURT:  Okay.  See, we've been trained as

3     lawyers.

4           JUROR:  I know.

5           THE COURT:  It's just not -- but I do want to ask

6     you this:  In terms of the last number on your card, is that

7     43 or is that a 48?

8           JUROR:  It's a 48.

9           THE COURT:  All right.  So we'll start there.

10          And 48 was the question about our expectations

11    about how long this trial may last into the end of next week

12    and possibly the following week with jury deliberations.

13          So what is the -- what is the difficulty or

14    urgency that would make it difficult for you to serve?

15          JUROR:  I'm running six projects right now,

16    different phases, from design through construction and

17    delivering one a month.

18          I'm also taking care of a 91-year-old aunt, so

19    there's a lot on my plate and this is a pretty tough time

20    constraint for me.

21          THE COURT:  Yeah.  And is most of your work done

22    at your office, from home, at other people's offices on

23    project sites or what?

24          JUROR:  It's a combination.  Mostly at home during

25    the design part but then during construction I'm on the

```
 1      jobsites.
 2                THE COURT:  And are the jobsites mostly in this
 3      area?
 4                MR. SMOCK:  They're all local.
 5                THE COURT:  Okay.
 6                JUROR:  Right now Maryland and D.C.
 7                THE COURT:  Yeah.  So do you think that if you
 8      were here -- so this 91-year-old gentleman, are you talking
 9      about your father?
10                JUROR:  It's my aunt.
11                THE COURT:  Or your aunt.
12                JUROR:  My mother's youngest sister.
13                THE COURT:  And she live with you?
14                JUROR:  No, she lives by herself.
15                THE COURT:  Oh.
16                JUROR:  Fiercely independent.  That's the problem.
17                THE COURT:  Yes.  Do you think that if you were on
18      this jury you would find it difficult to focus on the events
19      of the trial and the evidence and be concerned, overly
20      concerned, with what's going on and all the other things you
21      got going on?
22                JUROR:  Yes, as a matter of fact I have a -- 5:00
23      is -- I put everything on hold until after 5:00 figuring I'd
24      be free.
25                THE COURT:  Yeah, well.  So would you -- do you
```

1      think you'd be so distracted that it would be difficult for

2      you to be fair to both the government side of this case and

3      the gentleman charged with crimes in this case?

4                JUROR:  I do.

5                THE COURT:  Okay.  Thank you.

6                I'm going to ask you to wait outside a minute with

7      Ms. Johnson.

8                JUROR:  Thank you.

9                (Juror excused from courtroom)

10               MR. DREHER:  There's no objection, Your Honor.

11               MR. SMOCK:  No objection.

12               THE COURT:  She also did have answers to 4, 6, 7,

13      11, 13, 17, for what's that worth, but, okay.

14               (Juror present)

15               THE COURT:  Okay.  I'm going to excuse you from

16      this jury.  You need to call the jury tomorrow after 5:00

17      and see if they still want you to come back.

18               JUROR:  Tomorrow after 5?

19               THE COURT:  Tomorrow after 5.  See if they need

20      you to come back.  You may have to tell the same tale to

21      other judges, but I think we all appreciate your situation

22      and you're excused from this jury.

23               JUROR:  Well, thank you very much.

24               THE COURT:  Okay.  Thank you.

25               JUROR:  Good luck everybody.

1          THE COURT:  Thank you.

2          (Juror excused)

3          THE COURT:  We'll move on to 1675.

4          (Juror present)

5                    **(Juror number 1675)**

6                         **EXAMINATION**

7          THE COURT:  All right.  So you're in regulatory

8     compliance with the Fannie Mae?

9          JUROR:  Correct.

10          THE COURT:  And if you're in compliance do you or

11     do you not have a law degree?

12          JUROR:  I am not an attorney.

13          THE COURT:  Okay.  What is your background?

14          JUROR:  History degree.

15          THE COURT:  Well, that serve you well.  It's like

16     people with political science degrees, they're qualified to

17     be president, or a senator, or something.

18          JUROR:  Right.

19          THE COURT:  Okay.  I want to follow up with some

20     of the things you put down on your card.

21          First of all, where were you on January 6th, 2021?

22          JUROR:  I was traveling home from visiting my

23     parents, who lived in new Mexico, and so I was flying all

24     day and got home on evening of January 6th, the national

25     airport, so.

1          THE COURT:  So you were not watching events during

2    the course of the day?

3          JUROR:  No, I was on a plane, you know, caught

4    some things in the airport briefly but was not watching.

5          THE COURT:  So did you watch things when you got

6    home that night?

7          JUROR:  I flipped on the news, just, you know, my

8    parents had called me and said, hey, do you know what's

9    going on but, you know, flipped on CNN or something like

10   that, and just took a look at what was going on.

11         THE COURT:  Have you followed events about

12   January 6th subsequent to that day?

13         JUROR:  Just as a general.  Just following the

14   news, you know, and what happened and trying to grasp what

15   had gone on that day, or what had or hadn't happened and

16   then, you know, the confirmation of the election and the

17   certification and all of that.

18         THE COURT:  Do you -- do you watch news on

19   particular networks, or channels, or whatever?

20         JUROR:  Usually watching news only for live

21   events.  Maybe follow a lot more online and social media,

22   Twitter.  A number of different general news accounts but I

23   don't tweet myself or engaged in anything.

24         THE COURT:  Anything -- are there any other social

25   media platforms besides Twitter?

```
 1              JUROR:  Don't have Facebook, Instagram or any of
 2      those, no.
 3              THE COURT:  Okay.  And you put down number 11
 4      which has to do with the congressional hearings on
 5      January 6th.  Did you watch a lot of that?
 6              JUROR:  Not a lot of that.  Kind of kept up with
 7      that on news but did not actually watch a lot of that live,
 8      no.
 9              THE COURT:  The next question you answered was 19,
10      which asks whether you, or a family member, or close friend
11      had ever worked at Gallaudet University, or attended it, or
12      participated in programs there.
13              JUROR:  My mom taught at Gallaudet maybe 45 years
14      ago.
15              THE COURT:  Really?
16              JUROR:  So she knew sign language and taught there
17      at the beginning of her career before moving on to work at
18      George Washington University, so.
19              THE COURT:  So she stopped teaching there 45 years
20      ago?
21              JUROR:  Yeah, before I was born.
22              THE COURT:  Before you were born?
23              JUROR:  Before I was born.
24              THE COURT:  Is she deaf herself?
25              JUROR:  No, she is not.
```

1          THE COURT:  Do you know whether she knows American

2     Sign Language?

3          JUROR:  She does or she did, at least.  I don't

4     know what her current understanding is.

5          THE COURT:  Did you ever learn any of that?

6          JUROR:  I did not, no.

7          THE COURT:  And then she later taught at GW?

8          JUROR:  She's in administration there.

9          THE COURT:  In administration at GW?

10         JUROR:  Yeah.

11         THE COURT:  The next question you wrote down was

12    36, which is, whether you, or an immediate family member, or

13    close personal friend have ever worked in the criminal

14    justice system, public defender, criminal defense,

15    probation, correctional facilities, et cetera.

16         JUROR:  I just said yes there because I used to

17    work for the administrative office of the U.S. Courts, 2010

18    through 2013.  I worked for the Committee on Financial

19    Disclosure.

20         So I worked for a number of judges who go through

21    federal judges and other court employees, their financial

22    disclosures that they're required to file on an annual

23    basis.

24         THE COURT:  That's why you wouldn't redact all

25    those things that I wanted to redact from my --

1          JUROR:  Yeah, so there's a lot of conversations

2     there.

3          THE COURT:  So you're only there for a couple

4     years --

5          JUROR:  Yeah.

6          THE COURT:  -- at the administrative office?

7          JUROR:  Yes.

8          THE COURT:  What took you there and what took you

9     elsewhere?

10          JUROR:  There, started temping there.  So I got my

11    foot in the door and then applied for a full-time position

12    and, you know, ended up going through a few cycles of doing

13    the whole rush of employees, judges, you know, everyone's

14    financial disclosures.  And I thought that was really kind

15    of a neat job.  And then got an opportunity in the nonprofit

16    space --

17          THE COURT:  Mm-hmm.

18          JUROR:  -- that I took.  And then I've been at

19    Fannie Mae for close to eight years now.

20          THE COURT:  Did you have a lot of interaction with

21    the judicial members of the Committee on Financial

22    Disclosures or other judges?

23          JUROR:  Talked to a lot of judges on the phone --

24          THE COURT:  Yeah.

25          JUROR:  -- to help them file these reports, and

1    clerks, and public defenders, other folks.  No one that I

2    recognize in here.  It's possible that I could have looked

3    at your disclosure at some point, but no recollection of

4    that, so.

5              THE COURT:  And the next question was whether you,

6    or a member of your immediate family, or a close personal

7    friend ever attended law school, or worked as a lawyer, or

8    worked in a law office, did legal investigative work.

9              JUROR:  I have, you know, friends that have

10   attended law school.  My parents are not an attorney, I'm

11   not an attorney, so nothing family-wise.  But living in

12   D.C., a lot of people end up going to law school, so.

13             THE COURT:  And then I asked whether you, or a

14   family member, or close friend had ever been a victim of a

15   crime or a witness to a crime.

16             JUROR:  Yeah, I just said yes because when I was

17   growing up we had our car stolen.  We had a couple other

18   things stolen and vandalized when I was a child, so I

19   answered yes to that question.

20             THE COURT:  Anything here in the D.C. area?

21             JUROR:  This was in D.C.

22             THE COURT:  Oh.

23             JUROR:  Yes.  I was born and raised in D.C.

24             THE COURT:  Okay.  All right.

25             Questions, from either side?

```
 1                    MR. DREHER:  We have no followup, Your Honor.
 2                              EXAMINATION
 3       BY MR. SMOCK:
 4       Q.  Hello.
 5       A.  Hello.
 6       Q.  As a federal public defender I have some questions about
 7       financial disclosure requirements.
 8                    I was wondering, we didn't talk a great deal about
 9       January 6th, and I think that's because you probably didn't
10       answer questions indicating that you had concerns and I just
11       wanted to make sure we covered that.
12                    Obviously as a person who was born and raised in
13       D.C., it might have had some impact on you.  Can you talk
14       about that at all?
15       A.  I think, you know, obviously large events in D.C.,
16       they're, kind of getting used to certain things that happen
17       in the city or obviously very, you know, protests, or
18       demonstrations, or other things that happen.
19                    So I think on January 6th you're just kind of
20       grasping, like, what actually happened or, you know, was the
21       election certified?
22                    So was just kind of, you know, just kind of trying
23       to grasp, you know, what happened that day or didn't happen
24       that day.  I think the news was kind of no one truly knew
25       and I was getting off the plane, I was -- I just didn't know
```

1    everything that was going on.  But obviously, you know,

2    being a resident of D.C., I don't live on Capitol Hill, I

3    worked, you know, at the administrative office that was

4    close by there, but that was many, many years ago.  So I was

5    not directly affected by being in the neighborhood or

6    anything like that.  So I was a little more removed from

7    that when I got home that night, so.

8    Q.  So when you heard this case involved January 6th it

9    didn't give you any concerns that you might prejudge the

10   case or anything along those lines?

11   A.  No.  I think it's important to, you know, as Judge

12   Friedman said before, you know, presume innocence and, you

13   know, see where evidence leads to certain things and the

14   case has to be proven.

15        And, you know, I try to take that approach when I

16   work on my current job with what we have to do with the

17   regulatory compliance, and so I try to pride myself on being

18   open to everything and try and take the facts there, so.

19        MR. SMOCK:  Okay.  Thank you.

20        THE COURT:  Okay.  Anything anybody wants to

21   raise?

22        All right, sir.  Thank you for your patience and

23   your answers and we'd like you to come back tomorrow.

24        JUROR:  Okay.

25        THE COURT:  We are narrowing the group.

```
 1                    JUROR:  Okay.

 2                    THE COURT:  And we're going to get it down to

 3     about 35 and then pick the jury tomorrow afternoon.  So if

 4     you'd come back tomorrow at 2:00.

 5                    JUROR:  Yeah.

 6                    THE COURT:  Go to the jury lounge on the fourth

 7     floor --

 8                    JUROR:  Okay.

 9                    THE COURT:  -- where you started.

10                    Ms. Johnson will meet you and others down there at

11     2:00.

12                    JUROR:  2:00.  All right.  Thank you so much.

13                    THE COURT:  Get this done.  Thank you so much.

14     Thanks for everything.

15                    (Juror excused from courtroom)

16                    THE COURT:  Okay.  498, I believe is next.

17                         (Juror number 0498)

18                             EXAMINATION

19                    THE COURT:  Hello.

20                    JUROR:  Hi.

21                    THE COURT:  How are you?

22                    JUROR:  Good.  How are you doing?

23                    THE COURT:  I'm okay.  Would you take off your

24     mask so we can hear you, please.

25                    JUROR:  Yes.
```

492

```
 1                    THE COURT:  Thanks for your patience.  You are
 2       number 498, correct?
 3                    JUROR:  Yes.
 4                    THE COURT:  So I want to start at the last
 5       question on the question -- or the second to the last
 6       question, I guess.  I had said that -- so first of all, tell
 7       us what you do for work.  What's your --
 8                    JUROR:  I am a program associate.  I work for a
 9       nonprofit.  I work -- we're in a program in Virginia where
10       we employ -- and CSWs, community health workers, that do
11       COVID outreach and things like that.
12                    So I assist with the running the program and
13       housing support, if I'm explaining it right.  I'm sorry.
14                    THE COURT:  So it's community health program?
15                    JUROR:  Yeah.  I work for a nonprofit.
16                    THE COURT:  Got it.  So you live in southeast but
17       you work in Virginia.
18                    JUROR:  Well, I work remotely.  The program that I
19       work for is based out of Virginia.
20                    THE COURT:  I see.  I see.
21                    So you said with respect to question 48, I said
22       that we would probably be still in trial at the end of next
23       week and then it might extend to the following week with
24       jury deliberations and you say that might cause a hardship
25       for you?
```

```
 1                JUROR:  Yes.  Because I'm in charge of a lot of --
 2                THE COURT:  Can you talk a little louder.
 3                JUROR:  Yes.  I'm in charge of some of the
 4       projects that falls underneath the project.  I run a lot of
 5       the meetings, facilitating and working with a lot of
 6       stakeholders and people that help fund the program through
 7       the CDC.
 8                So no one else can really do my position.  So if
 9       I'm not there, it will probably cause hardship on the job.
10                THE COURT:  It will do what?
11                JUROR:  It will interfere with the running of the
12       program if I'm gone for an extended period of time.
13                THE COURT:  So how many people in your
14       organization -- how many people are employed by your
15       organization?
16                JUROR:  In the organization a lot, but on this
17       specific project that I work for, probably a handful, maybe
18       about seven or eight people altogether.
19                THE COURT:  Okay.  I see, okay.  So let me ask a
20       few additional questions.
21                Question 35, do you, or members of your family --
22       have you, or any members of your family, or close personal
23       friends worked for law enforcement agencies, police
24       department, sheriffs, FBI?  Who is that?
25                JUROR:  Yes.  My uncle.  He had worked for the
```

 1    D.C. Police Department probably since before I was born.  He

 2    just retired a few years ago.

 3              THE COURT:  And do you know what he -- what

 4    district he was in, what kind of work he did?

 5              JUROR:  I'm not sure of the district.  I know that

 6    later on in his career that he did do helicopters.  He used

 7    to fly the helicopters.

 8              THE COURT:  Got it.  Thank you.

 9              And then I asked whether any members of your

10    immediate family, or you, or close personal friends have

11    been arrested, or charged with a crime, or convicted of a

12    crime.

13              JUROR:  Yes.  My older brother.  He recently just

14    got released from jail.  This would be his second time going

15    to jail.  He just got released on, I think it was either

16    probation or parole, I'm not sure which one.

17              THE COURT:  Do you know -- what was he convicted

18    of?

19              JUROR:  I know that one of the charges had

20    something to do with a gun.  I mean, I don't know the

21    specifics of what went down or what happened, but I do know

22    that he went to court, and he was charged, and he went to

23    jail.  He was in there for almost a year and got out.

24              And if he gets in trouble while he's reporting to

25    the parole, then he goes back for eight or nine years that

```
 1          he has to finish.

 2                    THE COURT:  Was it in D.C.?

 3                    JUROR:  No, it was actually in Maryland.

 4                    THE COURT:  In Maryland?

 5                    JUROR:  Yes.

 6                    THE COURT:  I also asked whether you, or members

 7          of your immediate family, or close personal friends have

 8          ever been a victim of a crime or a witness to a crime.

 9                    JUROR:  Yes.  One of my closest friends was just

10          robbed at gunpoint in front of his house and we had to work

11          with the police department.  They ended up catching the

12          people that robbed him.

13                    THE COURT:  Okay.  And so going back to the

14          beginning of the questions at question number 6.

15                    Do you remember where you were when the events of

16          January 6th at the Capitol took place?  Where you at work,

17          where you at home?

18                    JUROR:  Yeah.  I was work, yes.

19                    THE COURT:  Remotely or in your office?

20                    JUROR:  I was working remotely.

21                    THE COURT:  So you were at home?

22                    JUROR:  Yes.

23                    THE COURT:  And how close is your residence -- is

24          your residence that close to the Capitol?

25                    JUROR:  Not that close.  I live in southeast D.C.
```

1          THE COURT:  Right.  Did you follow the events that

2     were happening at the Capitol on January 6th?

3          JUROR:  As they were on the news regularly --

4          THE COURT:  Yes.

5          JUROR:  -- yes.  Not me going out, looking for it.

6          THE COURT:  No, no, no.

7          JUROR:  As it showed up on the news, yes, that's

8     how the events were followed.

9          THE COURT:  Have you followed it much since then?

10          JUROR:  No, not much since then.

11          THE COURT:  Are you on any particular social media

12     platforms?

13          JUROR:  I'm only on Facebook and Instagram, but I

14     don't -- I only follow like FOX 5, like, the basic news

15     channels.  But I haven't went searching or following any

16     sites or that people talked about the issue.

17          THE COURT:  Okay.  Followup questions, gentlemen?

18          MR. DREHER:  Yes, Your Honor.  Thank you.

19                         **EXAMINATION**

20     BY MR. DREHER:

21     Q.  Good afternoon, ma'am.

22     A.  Hi, how are you doing?

23     Q.  I'm doing well.  That was going to be my next question

24     for you.  How are you?

25     A.  I'm doing good.  I'm just a little nervous.  I'm sorry.

1    Q.  No, no that's quite all right.  Certainly we're asking

2    some somewhat personal questions.

3    A.  Yes.

4    Q.  And I'm going to have some more, I suppose.

5            Did you follow your brother's case closely?

6    A.  I went online just to check the status of where he was.

7    When he was -- when was his court date, if he was going to

8    be released, and things like that.

9    Q.  Now throughout, I guess, the proceedings, did you get

10   the impression that he was treated fairly by the criminal

11   justice system?

12   A.  I assume so.  He came home but didn't say anything about

13   being mistreated.

14   Q.  So the two of you don't really discuss it, it sounds

15   like?

16   A.  As much as he discusses, I don't even want to pry -- I

17   mean, I don't want to ask him any questions.  I mean, he

18   literally just came home a couple of weeks ago.

19   Q.  And then you told us one of your closest friends?

20   A.  Yes.

21   Q.  Were the police involved in that?

22   A.  Yes.  We did call the police.  We filed a police report.

23   They did an investigation and they ended up finding the

24   people that robbed him at gunpoint.

25   Q.  Now, during that process did you get the impression that

LYNNE M. KRENZ, RMR, CRR, CRC
(651) 848-1226

1     your friend was also treated fairly by the police?

2     A.  Yes, I would assume so.  The followup from the police,

3     it wasn't as what he wanted it to be, but they ended up

4     checking with him at the end and letting him know what the

5     situation was and that they caught called the people.

6     Q.  So now, if chosen as a jury you'll hear testimony from

7     Metropolitan Police Officers.  Will their testimony by you

8     be given any greater or lesser weight just because they're a

9     police officer?

10    A.  No.

11    Q.  Now, you told us earlier that you personally only use

12    Facebook and Instagram.

13    A.  Yes.

14    Q.  But the news sources that come through those platforms,

15    was it just FOX 5 that you mentioned?

16    A.  Well, that's the only one that I actually follow.

17         Now if other people post stuff and forward stuff

18    that shows up on the feed, I have no control over that, but

19    I wasn't looking for it intentionally.

20    Q.  Right.

21         MR. DREHER:  I have no further followup.  Thank

22    you, Judge.

23                          **EXAMINATION**

24    BY MR. SMOCK:

25    Q.  Hello, Ned Smock.

1    A.  Hi, how are you doing?

2    Q.  Good.  I just want to make sure we're understanding

3    completely your concerns about the interruption in your work

4    if you were on a jury.

5    A.  Yes.

6    Q.  That you mentioned that you work at a program and that

7    you sort of supervise people; is that right?

8    A.  Somewhat.  We run the associate of a program manager.

9    So we have -- we build in -- CDC gave us money to build a

10   program in Virginia.  So I oversee 18 community health

11   workers that work throughout Virginia.  They reach out to me

12   on daily basis for TA requests, questions, things like that.

13          And I work with a lot of the sites, the financial

14   consultants, the state coders, the funders, things like

15   that.

16   Q.  And how many -- do you have a sense of sort of how big

17   the number of people that the organization helps, how many

18   does the organization --

19   A.  Well, it's -- the organization is spread through D.C.,

20   Virginia, and Maryland.

21   Q.  I guess, just the Virginia portion that you're working

22   on.

23   A.  And they have various projects, so I'm only assigned to

24   this one project.  I don't know the insight of every other

25   project that they have, had just the one that I'm currently

LYNNE M. KRENZ, RMR, CRR, CRC
(651) 848-1226

```
 1    working on.
 2    Q.  And I wasn't clear, I'm talking about just the program
 3    that you're working on, the project that you're working on.
 4    A.  Could you repeat the question?  I'm sorry.
 5    Q.  No, no problem at all.  That's my fault.
 6              How many people does your project assist?  In
 7    other words, you said that there are 18 workers --
 8    A.  How many people that I work with or how many people that
 9    I assist with the program?
10    Q.  Correct.  Yeah.
11    A.  I can't even say how many people.  We have so many
12    meetings and I work remotely, and so it's meeting after
13    meeting and we have -- I can't give you a specific number --
14    Q.  Okay.
15    A.  -- of how many people.  I'm sorry.
16    Q.  No problem at all.  This wasn't sort of a test.  I'm
17    just trying to get a sense of sort of the impact on your
18    organization were you to be away from the job for a week or
19    a week and a half.
20              Can you talk about specifically the impact on the
21    organization and your concerns about that or on your group.
22    A.  I would say the reason why I said that is because you
23    guys said it would be for two weeks.  And because I'm
24    filling in for other people that they're out and I have my
25    own roles that I have to fill.  And like I said, a lot of my
```

1    work is hands-on and being there when they need me, and

2    answering e-mails, and calls, and things like that.  And we

3    have -- I have to travel out to Virginia in the middle of

4    maybe about the middle of March to do site visits with some

5    of the sites that we are working with the grant.

6            So that's why I said, the whole two weeks, if it

7    keeps going, I don't know if I would be able to stay on that

8    long.

9    Q.  Is that, your concerns about the workers you're reaching

10   out to on a daily basis, is that going to be a distraction

11   to you if you're not able to do that and you're sitting in

12   jury service?

13   A.  Well, it's not a distraction per se but, you know, just

14   not being able to know what's going on and when I get back I

15   will have to play catchup.  Like it will have to somehow

16   keep going without me, but then when I get back, it would be

17   the catchup and figuring out where we are in the program

18   because it's a three-year grant, so we have so much we have

19   to do.  And we're in our second year so we're like getting

20   data, and evaluations, and things like that, so.

21   Q.  Okay.  So I guess, do you still believe that you would

22   not be able to serve or are you rethinking the question now?

23   A.  It's the -- it's the length.  I didn't know it was going

24   to -- and this is my first time going through this process

25   and going through this selection, so I'm learning

1    everything, so I didn't know when you guys said that, asked

2    the question, that's why I said I wasn't sure how it will

3    balance out with my job.

4    Q.  Okay.  Do you think that the providers in the community,

5    those 18 people you work with, would be able to continue

6    doing the work while you're here?

7    A.  They would most likely have to.  I don't think the whole

8    program will come to a halt.

9    Q.  Okay.

10   A.  I just know that they will probably have to figure

11   something out if I don't show.

12   Q.  Okay.  And are you confident that you'd be able to focus

13   if you're on the jury?

14   A.  Yes, I believe so.  I would just have to work something

15   out with my job if they allow me.  I'm assuming they will

16   allow me to serve.

17   Q.  Okay.

18   A.  If chosen.

19   Q.  Okay.  Thank you.

20   A.  Thank you.

21                        **EXAMINATION**

22              THE COURT:  Your employment, I mean, you're a

23   regular employee, right?  Your pay does not depend on your

24   doing everything you're supposed to do, right?

25              You're getting a salary?

```
 1                  JUROR:  Yes.  Yes.

 2                  THE COURT:  And if you're not there, you'll still

 3     get the salary.

 4                  JUROR:  I hope so.  I will have to talk to my job.

 5                  Like I said, this is my first time.  I don't know

 6     the procedure of going through my time sheets and things

 7     like that.

 8                  THE COURT:  Yeah.

 9                  JUROR:  I'll have to follow up with my supervisor.

10                  THE COURT:  That's what I'm trying to get at.

11                  Because most employers understand that if

12     somebody's on jury duty you have to pay them, unless you're

13     an hourly worker, or contract worker, or something like

14     that.

15                  JUROR:  Mm-hmm.

16                  THE COURT:  But that's not your situation?

17                  JUROR:  No, I'm salary.

18                  THE COURT:  That's what I thought.  Okay.

19                  Why don't we ask you to step outside for a minute

20     or two with Ms. Johnson and we'll see where we are.

21                  JUROR:  Okay.  Thank you.

22                  (Juror excused from courtroom)

23                  MR. DREHER:  Nothing related to the potential

24     juror from the government, Your Honor.

25                  MR. SMOCK:  We don't have a motion to strike the
```

```
1     juror.

2                Just for the record, our interpreter, Mr. Lucas,

3     had a hard stop at 5:00.  We've spoken to Mr. Gossjankowski,

4     and also, by the way, the other interpreter had to leave at

5     5:00 as well.

6                THE COURT:  So, I mean, are you suggesting that we

7     should stop?

8                MR. SMOCK:  I've spoken with my client and

9     we're -- I think we only have two more people?

10               THE COURT:  Three.

11               MR. SMOCK:  Maybe three that we are okay with

12    going forward with these last three.

13               THE COURT:  All right.

14               MR. SMOCK:  And I'm making a record.

15               THE COURT:  I want to ask two questions, but one

16    is, there seems to be a skeptical look on the prosecution's

17    side in response to what you just said.  Am I misreading

18    you?

19               MR. VALENTINI:  Your Honor, as long as that is the

20    defense preference and they waive any concern they may have

21    with that arrangement, that's fine for us to go forward.

22               MR. SMOCK:  It's waived.

23               We've also spoken to the court interpreter who has

24    kindly agreed that if the unlikely event that we do have

25    something that we need to say with our client we could seek
```

1      her assistance but, again --

2                  THE COURT:  We can do it that way or we can just,

3      with apologies to the remaining three, have to come back in

4      the morning.  But I'm happy to keep moving forward.

5                  Here's the thing about this last juror.

6                  First of all, I was having trouble hearing her.

7      And I couldn't really tell whether it was just her manner of

8      speech or her nervousness she had said at one point about

9      the process or whether she was really feeling anxious about

10     the implications for her job.

11                 I was having trouble getting a sense of, you know,

12     her kind of speaking style versus I'm just nervous being

13     here, I've never done that before.

14                 MS. JOHNSON:  She expressed that, yeah.

15                 THE COURT:  And she expressed that to Ms. Johnson

16     versus I'm really concerned about my job obligations.

17                 So if you all, if neither side wants to move to

18     strike, I'm not going to strike her on my own certainly.

19                 I mean, I suppose the other thing -- well, it

20     depends how you feel about having this woman on the jury at

21     the end of the day, right?

22                 And one thing I've done in some other cases is

23     I've, if counsel agree, kept a person and see where we are

24     in effect, figuratively, if not literally, moved her to the

25     end of the list, and if we don't need her, we don't need

```
 1        her.

 2               On the other hand, if she's somebody that one or

 3        the other side thinks you really want on this jury, then

 4        moving her to the end of the list doesn't accomplish

 5        anything because, you know, the jurors will be seated in the

 6        order in which they are be seated in the gallery when we're

 7        all done with for cause and peremptories.

 8               So I'm happy to keep her if nobody's challenging.

 9               MR. SMOCK:  Your Honor, we would be fine with

10        moving her to the end, as you suggested, to assure that she

11        have less like likelihood of being picked.

12               MR. VALENTINI:  We would be fine with that

13        arrangement as well.

14               THE COURT:  So if we wind up with 36, or 37, or 38

15        when we are done with this process, then we can let her go

16        because we'll never get to her if she's at the end?

17               MR. VALENTINI:  That's correct, yes.

18               MR. SMOCK:  That's correct.

19               THE COURT:  Does everybody understand what I'm

20        asking?

21               MR. SMOCK:  Yes.

22               MR. VALENTINI:  Yes.

23               THE COURT:  So we'll ask her to come back and

24        we'll see where we are.

25               MR. VALENTINI:  Thank you.
```

```
1                    THE COURT:  And we will proceed with the next
2        person.
3                    This is 498.
4                    (Juror present)
5                    THE COURT:  Okay.  We're going to ask you, do you
6        have something you want to say?
7                    JUROR:  No, no.
8                    THE COURT:  We're going to ask you to come back
9        tomorrow.  We're going to have some more questions, perhaps.
10       At 2:00 back in the jury lounge and we'll get done with the
11       whole process tomorrow I'm sure.
12                   JUROR:  Okay.
13                   THE COURT:  So thank you very much for your
14       patience and everything and we'll see you tomorrow
15       afternoon.
16                   JUROR:  Thank you.
17                   (Juror excused from courtroom)
18                   MS. JOHNSON:  I was advised that juror number
19       1644, which is line 43, was not available when we had the
20       jurors come over last.
21                   THE COURT:  I'm sorry, were not available what?
22                   MS. JOHNSON:  Juror 1644, she just disappeared.
23                   THE COURT:  Okay.
24                   MS. JOHNSON:  She was not there when we --
25                   THE COURT:  Okay.  So then we can't talk to that
```

1    person?

2              MS. JOHNSON:  No.

3              THE COURT:  And we can see if we can find her.

4              MS. JOHNSON:  We've done two checks and she has

5    just disappeared.  She went to supposedly find snacks.

6              THE COURT:  All right.  Well, perhaps between you

7    and the jury office we can see where she is tomorrow.

8              So we have two people left.

9              MS. JOHNSON:  1715 and 1428.

10             THE COURT:  Right.

11             (Juror present)

12             JUROR:  Hi.

13                    **(Juror number 1715)**

14                      **EXAMINATION**

15             THE COURT:  Hello.  Good afternoon or evening.  If

16   you don't mind taking off your mask --

17             JUROR:  Happily.

18             THE COURT:  -- and speaking into the microphone.

19   You are number 1715, correct?

20             JUROR:  Yes.

21             THE COURT:  All right.  We're going to ask you a

22   few questions and then let you leave.

23             So on the card you answered question 6, which had

24   to do with January 6th.  Where were you on January 6th,

25   2021?

```
 1                JUROR:  I work at home.

 2                THE COURT:  You work at home.  So did you then

 3     follow events that were going on at the Capitol that day on

 4     the news?

 5                JUROR:  I did.

 6                THE COURT:  And was it on television or social

 7     media, or what did you --

 8                JUROR:  Television.

 9                THE COURT:  Okay.  And have you followed it much

10     since that day?

11                JUROR:  Yes, I have.

12                THE COURT:  Okay.  Again, and in what ways?  TV,

13     news shows, or other?

14                JUROR:  TV news shows.  I've watched some of the

15     hearings.

16                THE COURT:  Watched some of the hearings?

17                JUROR:  Yeah, I read the newspapers.

18                THE COURT:  How much of the hearing did you watch?

19                JUROR:  What?

20                THE COURT:  How much of the hearing would you say

21     you watched?

22                JUROR:  A good bit of it.

23                THE COURT:  Okay.

24                JUROR:  As I said, I work at home and the TV's on

25     constantly.
```

```
1                    THE COURT:  Yeah.

2                    JUROR:  And I considered it an important thing to

3    know.

4                    THE COURT:  And did -- do you think that your

5    viewing of the events, videos, the news shows, the

6    congressional hearings, would affect your ability to be a

7    fair and impartial juror in this case?

8                    JUROR:  I don't know.  I have pretty strong

9    feelings about what happened on January 6th, and that it

10   wasn't an accident for people who were there, and that's not

11   the way we behave in a democracy.

12                   THE COURT:  Do you think that you -- assuming that

13   the evidence shows that the defendant, Mr. Gossjankowski,

14   was there and that he was, in fact, inside the Capitol,

15   would you still, in your view, despite your feelings, be

16   able to give him the presumption of innocence and require

17   the government to prove his guilt beyond a reasonable doubt?

18   Would you have a problem?

19                   JUROR:  As I said, I don't think that people were

20   there accidentally.

21                   THE COURT:  So do you think you'd have a

22   difficult --

23                   JUROR:  I mean, I would be try to be impartial,

24   yes.

25                   THE COURT:  Yeah.
```

```
 1                JUROR:  I understand that's the standard.

 2                THE COURT:  You understand it's the standard?

 3                JUROR:  Yeah, I've served before.

 4                THE COURT:  What kind of jury cases have you

 5     served on before?

 6                JUROR:  My most recent one was a garden charge in

 7     Superior Court and I was an alternate juror on a murder

 8     trial in federal court.

 9                THE COURT:  Okay.

10                JUROR:  Twenty-five years ago.

11                THE COURT:  Okay.  In the gun case was the jury

12     able to reach a verdict?

13                JUROR:  No, we were deadlocked because one of the

14     jurors had made up her mind before not to convict.

15                THE COURT:  Okay.  Do you follow any particular

16     social media platforms?

17                JUROR:  I'm not big on social media, no.

18                THE COURT:  Okay.  And how do you get your news

19     generally.

20                JUROR:  The old-fashioned way, TV and newspapers.

21     I worked for the Washington Post for a number of years.

22                THE COURT:  Oh, you did.  What did you do for the

23     Post?

24                JUROR:  I worked in finance and I was a controller

25     at the startup website.
```

```
1                    THE COURT:  So you still read the Post.

2                    JUROR:  I do.

3                    THE COURT:  And any other newspapers?

4                    JUROR:  The Wall Street Journal.

5                    THE COURT:  And what television networks, or

6        radio, or whatever, the old-fashioned way?

7                    JUROR:  Generally, I guess NBC.

8                    THE COURT:  NBC?  MSNBC?

9                    JUROR:  Yeah.

10                   THE COURT:  Okay.  All right.

11                   Have you -- I asked whether you or members of your

12       family ever attended law school, worked as a lawyer, worked

13       in a law office, performed legal work.

14                   JUROR:  My brother takes court-appointed cases.

15       He's on the panel in Superior Court.

16                   THE COURT:  He's on the what?

17                   JUROR:  He's on the panel in Superior Court to

18       take --

19                   THE COURT:  That takes criminal case?

20                   JUROR:  Mm-hmm.

21                   THE COURT:  So he does criminal defense work?

22                   JUROR:  Yes, he does.

23                   THE COURT:  And so do you talk to him about his

24       cases.

25                   JUROR:  Occasionally.
```

1          THE COURT:  And what about people who -- well, the

2    previous question was whether you have friends or family

3    members who work in the criminal justice system.  So that's

4    your brother.  Anybody else?

5          JUROR:  My sister-in-law worked there for a while.

6    She doesn't any longer she's also an attorney.

7          THE COURT:  Is this your brother's wife?

8          JUROR:  Yes.

9          THE COURT:  So they're both --

10         JUROR:  That's where they met.

11         THE COURT:  -- criminal defense lawyers.

12         JUROR:  She is in corporate law now.

13         THE COURT:  Okay.  But they met where?

14         JUROR:  Superior Court.  They were both on the

15   panel.

16         THE COURT:  Were they public defender service or

17   just taking cases?

18         JUROR:  Just taking cases.

19         THE COURT:  Okay.  Well, that's quite a place for

20   romance to begin.

21         All right.  Any, yes, I'm sure there will be

22   followup questions, so go ahead.

23         MR. DREHER:  Thank you, Your Honor.

24

25

```
 1                          EXAMINATION

 2    BY MR. DREHER:

 3    Q.   Good evening, ma'am.

 4    A.   Hi.

 5    Q.   So you mentioned that your brother takes cases from the

 6    panel in Superior Court.

 7              Does that mean you understand the presumption of

 8    innocence and not judging the facts of this case until

 9    everything's presented?

10    A.   Yes.

11    Q.   So is it safe then to ask, as of right now, you haven't

12    been presented with anything yet, right?

13    A.   No.

14    Q.   So would you be able to conclude, either guilty or not

15    guilty for Mr. Gossjankowski?

16    A.   Once I saw the facts.

17    Q.   After you see all the facts?

18    A.   Yeah.

19    Q.   Yeah.  Okay.

20              Ultimately, certainly January 6th and Mr.

21    Gossjankowski's specific role within January 6th, do you

22    consider that to be different concepts?

23              THE COURT:  Different what?

24              JUROR:  I'm sorry?

25    BY MR. DREHER:
```

1    Q.  Do you consider that to be, certainly you observed

2    events of January 6th on the news, but at any point was any

3    of that related specifically related to Mr. Gossjankowski?

4    A.  I don't -- I can't say I recognize him or know anything

5    that he did specifically, no.

6    Q.  Okay.

7    A.  Or didn't do.

8    Q.  And so ultimately, would you be able to be fair and

9    impartial to Mr. Gossjankowski?

10   A.  I would try.

11   Q.  Would you be fair and impartial to the government?

12   A.  Yes.

13   Q.  Okay.

14          MR. DREHER:  Your Honor, I have no further

15   followup.

16                            **EXAMINATION**

17   BY MR. SMOCK:

18   Q.  Good evening.

19   A.  Hello.

20   Q.  Ned Smock.  Thanks for staying late.

21          You talked a little bit about your feelings about

22   January 6th and said that it was not a way to behave in a

23   democracy.  That's a feeling experienced by a fair number of

24   people in D.C. and the country.

25          Can you talk about how strong your feelings are

```
 1    about January 6th and what happened there.
 2    A.  At the time it brought back memories of 911 and I
 3    remember the bombings in Oklahoma City.  And, yes, I
 4    considered it terrorists.
 5    Q.  Okay.  And would it be fair to say that you felt angry
 6    at people who were there that day?
 7    A.  Yes.
 8    Q.  And is that a feeling that you still feel to this day?
 9    A.  Probably, yes.
10    Q.  You talked about previous juries you've been on and
11    you've talked about the charges there.
12            Can you talk a little bit about how service on a
13    jury in a case like this about January 6th might differ from
14    your previous service.  Is that something you've thought
15    about?
16    A.  How it would be different?
17    Q.  Right.  Given your experience related to January 6th
18    versus a case like that where you had no prior knowledge of
19    it?
20    A.  It would probably be a little bit harder --
21    Q.  Mm-hmm.
22    A.  -- to deliberate, but I would think for most people it
23    would be.
24    Q.  And when you sit here today, I think we all appreciate
25    your thinking about this, can you say with confidence that
```

```
1    the strong feelings you have about January 6th would not

2    enter your consideration at all as you were deliberating?

3    A.  I don't know how to answer that.  I mean --

4    Q.  Okay.

5    A.  I would try, but I can't say that it wouldn't affect.

6    Q.  Okay.  Thank you.

7              THE COURT:  Okay.  We're going to ask you to step

8    out for a couple minutes with Ms. Johnson.

9              JUROR:  Okay.

10             (Juror excused from courtroom)

11             MS. JOHNSON:  Did I miss something?

12             MR. SMOCK:  We were just waiting for you and the

13   door.

14             MS. JOHNSON:  Okay.

15             MR. SMOCK:  I don't know if the Court needs to

16   hear argument on this, but we certainly would move to

17   strike.  I'm happy to provide argument if you need it.

18             THE COURT:  If the government's going to oppose.

19             MR. DREHER:  The government does oppose, Your

20   Honor.

21             MR. SMOCK:  Very well.

22             I think this is an obvious case for a strike for a

23   number of reasons.

24             Ms. Baron talked about the very strong feelings

25   and anger she has about January 6th.  She answered the
```

518

1    questions on the form and did not back off on her concerns

2    about an inability to be fair and impartial.

3         A number the things struck me.  One of them was a

4    question asked by the government.  She was asked in an

5    effort to cure her concerns about whether she could be fair

6    and impartial to the defense.  She said, after hesitation,

7    "I will try."  He then asked if she would be fair and

8    impartial to the government and without hesitation she said,

9    "Yes", period.

10         That, I think, is an obvious concern and alone

11    would be a basis to strike.  It's not a comment on her as a

12    person, it's simply her being honest about her experiences.

13         She talked about how January 6th brought up in her

14    mind 911, Oklahoma City, that it was a terrorist act and

15    that's still something she feels strongly about.  She could

16    never affirm to us that she could be fair and impartial and

17    I think it's a clear case for a strike.

18         MR. DREHER:  Your Honor, again, I don't mean to

19    beat a dead horse, but ultimately there's a distinction here

20    between being prejudice against a crime and being prejudice

21    against a defendant.

22         At each instance in which the potential juror was

23    asked about her either knowledge or perhaps any prejudice to

24    Mr. Gossjankowski, she was, in fact, able to indicate that

25    she would do her best to be fair and impartial, as she will

1    be instructed by the Court.

2         So certainly I would argue that this is not an

3    instance of a challenge for cause and I would ask the Court

4    instruct her to return Thursday.  Thank you.

5         THE COURT:  I'll grant the motion.

6         I think that her answer that she would be fair to

7    the government as opposed to would try to be fair to the

8    defendant was significant.

9         I think her body language, the way she shook her

10   head, she believes that what happened on January 6th was so

11   awful, I don't know whether she was analogizing it to the

12   terrorism of 911, I think maybe she was.

13        I don't think that she could put aside her strong

14   feelings, particularly when we know already that many of the

15   videos, which over the objection of the defense I've said I

16   will admit, are going to show exactly the kinds of things

17   that she found so offensive.

18        Now, some of it won't have Mr. Gossjankowski in

19   the frames, and the jury will be instructed that it's

20   relevant to the commission, not whatever the language is of

21   the civil disorder statute.

22        So there's a certain -- certain breath or

23   broadness to what I said I would admit based on the

24   government's argument about what they needed to prove, but

25   there may have to be limiting instructions of some sort

1    about what it's relevant to.

2              I don't think she can put aside her strong -- I

3    don't know if she used the word repulsion, but something

4    analogous to it.

5              So I'm going to grant the motion over the

6    government's objection.

7              We still made a lot of progress this afternoon,

8    that having been said, we've got one more.

9              (Juror present)

10             THE COURT:  So we are going to excuse you from

11   this jury.

12             You should call the jury office tomorrow afternoon

13   after 5:00 they may you need to come for some other kind of

14   a case or something, we'll see.

15             JUROR:  Okay.

16             THE COURT:  But you don't have to go back there

17   now because they're closed now and call tomorrow.

18             JUROR:  Okay.

19             THE COURT:  But I do want to say one other thing.

20             My comment about your brother and sister-in-law

21   finding romance as defense lawyers in Supreme Court, I met

22   my wife in an office -- my office as a prosecutor in

23   Superior Court, 47 years, still doing all right, so I think

24   that's great.

25             JUROR:  Thank you.  They're still together.

1          THE COURT:  Great.

2          JUROR:  Thank you.

3          (Juror excused)

4          MS. JOHNSON:  We have one more juror.

5          THE COURT:  We have one more before my single malt

6    Scotch.  I don't drink every night, but I did last night and

7    I will tonight.

8          MS. JOHNSON:  So 1644 is not present and then we

9    have --

10         THE COURT:  1428.

11         (Juror present)

12                    **(Juror number 1428)**

13                      **EXAMINATION**

14         THE COURT:  First, we thank you for your patience.

15   You're number 1428?

16         JUROR:  Yes.

17         THE COURT:  So would you tell us a little bit

18   about your work in international relationships, although I

19   see that -- and take off your mask, if you don't mind --

20         JUROR:  Okay.

21         THE COURT:  -- so I can hear you.

22         JUROR:  Yes.

23         THE COURT:  I see that you said that you're

24   semiretired.

25         JUROR:  Yes.

```
 1                    THE COURT:  But what kind of work did you do and
 2       for whom?
 3                    JUROR:  Conflict mitigation, peace building,
 4       stabilization, post-conflict, economic and social recovery.
 5       I've worked for NGO, Save the Children, for example.  I've
 6       worked for private sector companies, including the last five
 7       years.
 8                    The majority of my career I've worked for the
 9       State Department, the Agency for International Development.
10                    THE COURT:  So a lot of it overseas?
11                    JUROR:  Yes, until five years ago, I spent almost
12       all of the last of am 25 years overseas.
13                    THE COURT:  Where?
14                    JUROR:  Iraq, Afghanistan, Somali, Libya, Central
15       America, West Africa more recently.  Lots of garden spots,
16       sir.
17                    THE COURT:  And is your background in economics or
18       what?
19                    JUROR:  No, I joined the Peace Corps out of
20       college and --
21                    THE COURT:  And that was it.
22                    JUROR:  -- and decided to work internationally.
23                    THE COURT:  So where were you on January 6th?
24                    JUROR:  I was home in Tenleytown.
25                    THE COURT:  Okay.  And so did you watch the events
```

1     of January 6th on that date?

2                 JUROR:  No, no.

3                 THE COURT:  No?

4                 JUROR:  I didn't see -- actually really hear what

5     had happened until the -- towards the end of that, two or

6     three days later.

7                 THE COURT:  Really?

8                 JUROR:  Yeah, when I started picking it up.

9                 I was busy at the time.  I just didn't notice what

10    happened during the day.

11                THE COURT:  You didn't turn on the television?

12                JUROR:  I don't like watch TV news, actually.

13                THE COURT:  Okay.  How do you get most of your

14    news?

15                JUROR:  The Economist.

16                THE COURT:  Say?

17                JUROR:  The Economist magazine, foreign affairs.

18                In terms of television news, Al Jazerra English

19    sometimes, but I mostly watch clips from, like, the

20    Jahiliyyah [ph], the German News Organization, CBC.

21    Essentially clips on YouTube for what's going on in a

22    specific country or on specific issue is how I get most of

23    my news.

24                THE COURT:  Have you -- do you follow any

25    particular social media platforms?

```
 1              JUROR:  I don't do social media at all, sir.
 2              THE COURT:  Okay.  Do you read the Washington
 3    Post, New York Times, Wall Street Journal, anything?
 4              JUROR:  No. They require a subscription and the
 5    Economist is too expensive as it is, so I don't read any
 6    other major news --
 7              THE COURT:  So you get most of your news from the
 8    foreign press?
 9              JUROR:  I wouldn't characterize the Economist as
10    foreign, to be honest with you.
11              I don't know, you know, the editorial staff --
12    I've never noticed that much of a pro-anti or any other bias
13    in the Economist.  And it's consistently rated every year as
14    the most objective and one of the better written sources of
15    news magazines.
16              THE COURT:  So have you ever served on a jury
17    before?
18              JUROR:  No.
19              THE COURT:  And how long have you lived in the
20    District of Columbia?
21              JUROR:  Five years now.
22              THE COURT:  And before that overseas?
23              JUROR:  I spent a few years in New York City and I
24    was once called for jury duty, I wasn't selected.
25              THE COURT:  Okay.  Well, you're semiretired.  Does
```

```
1      that mean you're more frequently in the country?

2                  JUROR:  Yes.

3                  THE COURT:  Okay.  All right.  Questions?

4                              EXAMINATION

5      BY MR. DREHER:

6      Q.  Good evening, sir.

7      A.  Good evening.

8      Q.  Is it safe to say you speak foreign languages?

9      A.  I speak Italian pretty well, Spanish.  Enough words in

10     Arabic, Russian, and a few other languages for greetings and

11     salutations protocol-wise, but that's about it.

12     Q.  Do you speak American Sign Language?

13     A.  No.

14     Q.  No.  Do you have any experience communicating with

15     languages outside of spoken languages and written languages?

16     A.  Well, I'm Italian American so, you know.  No, really.  I

17     mean, I say that only half-jokingly.  Hand gestures and

18     nonverbal cues when you work internationally, especially in

19     conflict zones, are extremely important to be able to read

20     and be sensitive to.

21     Q.  Do you believe that you have a certain sensitivity to

22     those hand gestures and potential other forms of

23     communication?

24     A.  (Nods head).

25     Q.  How much time did you spend in the Peace Corps?
```

 1    A.  Two, three years.  It was in the 80s.

 2    Q.  And after the few days when you first learned of what

 3    occurred on January 6th, did you follow it closely at all?

 4         Did you seek out information about perhaps the

 5    congressional hearings, not about any of the other criminal

 6    cases?

 7    A.  No.

 8    Q.  No?

 9    A.  I mean, what I've picked up in tidbits, you know,

10    reading the news, bits, you know, updates, highlights from

11    the congressional hearings that were held not too long ago,

12    I can't remember exactly when, I've seen a few clips, and

13    bits and pieces of videos, highlights of that.  That's about

14    it really.

15              MR. DREHER:  Okay.  I have no further followup.

16              MR. SMOCK:  I don't have any questions.  Thank

17    you.

18              THE COURT:  All right.  So, we're not done with

19    you yet, I'm afraid.

20              What we've obviously not been as efficient as we

21    would have like to have been, we made a lot of people wait a

22    long time, but we started with 70 people.  We're trying --

23    we will continue tomorrow morning, we're going to try to get

24    it down to about 35 or so.  And then tomorrow afternoon if

25    we have achieved that goal, we're going to have those 35

1    come back and try to pick a jury.

2                JUROR:  Yeah.

3                THE COURT:  So we would like you to come back at

4    2:00 tomorrow afternoon.  You can report to the jury office

5    on the fourth floor.  Ms. Johnson will meet you and others

6    there at around 2:00 and then we'll get started again.

7                JUROR:  Okay.

8                THE COURT:  Thank you very much for your patience

9    and for your answers.

10               JUROR:  Thank you.

11               THE COURT:  And for your service.  I mean, I think

12   it's a fascinating career that you've had, and it's good,

13   and it's so interesting when you've talked to people who

14   have been on the Peace Corps, it changes their whole life

15   sometimes.

16               JUROR:  Thanks.

17               MS. JOHNSON:  Sir, could you please exit off the

18   front.

19               JUROR:  Sure.

20               MS. JOHNSON:  Thank you, sir.

21               (Juror excused from courtroom)

22               THE COURT:  We made a lot of progress this

23   afternoon.  You know, I think if my count is right, and

24   Tanya's counting, that we may have started the afternoon

25   with 16 and wound up with something like 28.

1           MS. JOHNSON:  27.

2           THE COURT:  27.

3           MR. VALENTINI:  Your Honor, may I ask a brief

4    question of scheduling with respect to tomorrow?

5           I understand that probably most of the day will be

6    still spent on jury selection.  I understand there's a

7    possibility of opening argument, being on the optimistic

8    side, I see Your Honor is shaking --

9           THE COURT:  I don't think so.

10          MR. VALENTINI:  Okay.  My question was whether we

11   should be ready to have witnesses, but it sounds like

12   that --

13          THE COURT:  Well, I believe that we have been

14   very -- we haven't been very good about predicting, but then

15   again, a lot of it has to do with human nature, and I hope

16   we can all be more efficient once the trial gets going.

17          I think that we should plan on picking a jury

18   tomorrow and maybe discussing some of the open issues that

19   may still exist about exhibits and other things.

20          You do have to get an exhibit list to Ms. Johnson

21   so that she can follow along as you offer exhibits.  I need

22   to view some videos and some other things.

23          MR. VALENTINI:  Yes.

24          THE COURT:  And we can use, if we have leftover

25   time in the morning before our 2:00, because we can't really

1    finish -- begin the final phase of jury selection until 2:00

2    or after 2:00, that we deal with some of these open

3    questions.

4              MR. VALENTINI:  Yes.

5              THE COURT:  And, again, if we are done early

6    enough tomorrow afternoon, we do the same.

7              And I'm afraid that we -- that we're going to have

8    to do openings and your first witness on Friday, not

9    Thursday.  I said I know I didn't want to start on a Friday,

10   but --

11             MR. VALENTINI:  I understand.

12             THE COURT:  -- I think that's where we are and we

13   certainly do not want to give up a single day so we should

14   use the Friday, unless anybody has any better suggestion.

15             MR. VALENTINI:  Starting Friday would work for the

16   government.

17             THE COURT:  Mr. Smock, I don't know if you or Ms.

18   Goetzl have any better suggestions at this point of where we

19   stand.

20             MR. SMOCK:  That sounds fine.

21             THE COURT:  Now, I will say this -- I think I said

22   this but -- I think I may have said this before the last go

23   around of arguments that, but I have thought further about

24   this after the last go around, including looking closely at

25   the *Wallace* case and some other cases.

1          I am going to admit the expert testimony of Dr.

2    Kroll and I may tinker with conclusion number 7, but I'm

3    going to admit the testimony of Dr. Kroll and I will give

4    you my reasonings so it's on the record.  I mean, we sort of

5    had a back and forth and I said what I thought, and then we

6    had another argument the other day that was more, perhaps,

7    a little more nuanced on the side of both the government and

8    the defense than the earlier discussion and even in some of

9    the briefs, but I've reached a conclusion, even though I

10   haven't articulated to you all of my reasons, but I thought

11   it would be helpful to both sides to know that fact as soon

12   as possible.

13          MR. SMOCK:  Thank you, Your Honor.

14          And I think we confirmed this, but my impression

15   given that his schedule requires him to be done by Wednesday

16   morning, is that I would have him fly in and tell him he's

17   going to testify on Wednesday morning.

18          We spoke before about him testifying out of order

19   if necessary.  I think --

20          THE COURT:  As long as you and the government have

21   an agreement.  And I'll simply tell the jury that for

22   scheduling reasons that's the way it's going to be and I

23   suppose we could do that with other witnesses too, but...

24          It's arisen in other trials, but in this case

25   since you're probably only going to have one witness, that's

```
 1    probably not necessary for you to take a government witness
 2    out of turn.
 3              MR. SMOCK:  Thank you.
 4              THE COURT:  Okay.  So we've asked, as I understand
 5    it, Tanya, everybody from the morning session is supposed to
 6    be in the jury lounge by 9:30, which means that once she
 7    gets them organized maybe we can start by 9:45 but certainly
 8    by 10:00.
 9              And if we have to take some of them a little bit
10    out of order because some of them are late, we'll do that.
11    But if she can get, you know, a half a dozen or so people
12    teed up and ready to go, I think we should just start when
13    we can.  You want these?  The ones that are done?
14              MS. JOHNSON:  Oh, yes.
15              THE COURT:  I'm keeping the ones that are not
16    done.
17              MS. JOHNSON:  Okay.
18              THE COURT:  All right.  So thanks for raising
19    that, Mr. -- why am I blanking on your last name?
20              MR. VALENTINI:  It's Valentini.
21              THE COURT:  I know.
22              MR. VALENTINI:  Okay.
23              THE COURT:  Off the record.
24              (Court adjourned at 5:35 p.m.)
25                       *         *         *
```

1                    **REPORTER'S CERTIFICATE**

2           I certify the foregoing pages of typewritten
      material constitute a full, true and correct transcript of
3     my original stenograph notes, as they purport to contain, of
      the proceedings reported by me at the time and place
4     hereinbefore mentioned.

5                         /s/Lynne M. Krenz
                          Lynne M. Krenz, RMR, CRR, CRC
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25