```
 1                      UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2
        ------------------------------------------------------------
 3                                    )
        United States of America,     )   File No. 21-cr-123
 4                                    )           (PLF)
                 Plaintiff,           )
 5                                    )   Volume III
        vs.                           )   Washington, D.C.
 6                                    )   March 2, 2023
        Vitali Gossjankowski,         )   10:19 a.m.
 7                                    )
                 Defendant.           )
 8      ------------------------------------------------------------

 9
                    BEFORE THE HONORABLE PAUL L. FRIEDMAN
10                  UNITED STATES DISTRICT COURT JUDGE
                              (JURY SELECTION)
11
        APPEARANCES:
12      For the Plaintiff:        United States Attorney's Office
                                  Adam Dreher, AUSA
13                                Francesco Valentini, AUSA
                                  Karen Rochlin, AUSA
14                                Capitol Siege
                                  601 D Street NW
15                                Washington, Minnesota 20530

16      For the Defendant:        Federal Public Defender for the
                                  District of Columbia
17                                Celia Goetzl, ESQ.
                                  Edward Smock, ESQ.
18                                625 Indiana Avenue NW
                                  Suite 550
19                                Washington, D.C. 20004

20      Court Reporter:           Lynne M. Krenz, RMR, CRR, CRC
                                  Suite 146
21                                316 North Robert Street
                                  St. Paul, Minnesota 55101
22
        American Sign Language    Sara Blattberg
23      Interpreters:             Carla Mathers

24
                    Proceedings reported by certified stenographer;
25      transcript produced with computer.
```

1                        **I N D E X**

2
                                                          PAGE
3
     **JUROR NUMBER 1644**
4       Examination by the Court                          537
        Examination by Mr. Smock                          542
5
     **JUROR NUMBER 0927**
6       Examination by the Court                          544
        Examination by Mr. Dreher                         550
7
     **JUROR NUMBER 0907**
8       Examination by the Court                          557
        Examination by Mr. Smock                          565
9
     **JUROR NUMBER 0755**
10      Examination by the Court                          568
        Examination by Mr. Dreher                         572
11      Examination by Mr. Smock                          573

12   **JUROR NUMBER 0659**

13      Examination by the Court                          575
        Examination by Mr. Dreher                         581
14
     **JUROR NUMBER 0672**
15      Examination by the Court                          585
        Examination by Mr. Dreher                         594
16      Examination by Mr. Smock                          595

17   **JUROR NUMBER 2131**
        Examination by the Court                          603
18
     **JUROR NUMBER 1193**
19      Examination by the Court                          609
        Examination by Mr. Dreher                         613
20      Examination by Mr. Smock                          614

21   **JUROR NUMBER 0327**
        Examination by the Court                          617
22      Examination by Mr. Dreher                         623

23   **JUROR NUMBER 0752**
        Examination by the Court                          626
24      Examination by Mr. Dreher                         630

25

1    **JUROR NUMBER 1463**
           Examination by the Court                        632
2          Examination by Mr. Smock                        636

3    **JUROR NUMBER 0822**
           Examination by the Court                        637
4
     **JUROR NUMBER 0871**
5          Examination by the Court                        641

6    **JUROR NUMBER 0488**
           Examination by the Court                        650
7          Examination by Mr. Dreher                       651
           Examination by Mr. Smock                        654

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2                      **IN OPEN COURT**

3          (Defendant present)

4              MS. JOHNSON:  This is criminal action 21-123,

5    United States versus Vitali Gossjankowski.

6                  For the United States I have Francesco Valentini,

7    Adam Dreher and Karen Rochlin.

8                  For defendant I have Edward Smock, Celia Goetzl.

9                  Our ASL interpreters today are Sara Blattberg and

10   Carla Mathers.

11                 Our court reporter is Lynne Krenz.

12                 All parties are present.

13             THE COURT:  Good morning, everybody.

14             MR. DREHER:  Good morning.

15             THE COURT:  Here we are again.  Another day of

16   jury selection.  It will get done, right?

17                 So I think we're going to start with the woman who

18   disappeared yesterday.  What's the number?

19             MS. JOHNSON:  1644, line 43.

20             THE COURT:  I think I have it.  I have her card.

21             MS. JOHNSON:  You do?

22             THE COURT:  I do.

23             MS. JOHNSON:  Ready?

24          (Juror present)

25

1                         **(Juror Number 1644)**

2                              **EXAMINATION**

3              THE COURT:  So good morning.

4              JUROR:  Good morning.

5              THE COURT:  Would you mind taking off your mask

6      and speaking into the microphone so we can hear you?

7              How are you?

8              JUROR:  I'm good.  How are you?

9              THE COURT:  Good.  So I'd like to ask you few

10     questions.

11             You filled out the 3x5 card the other day and

12     first thing, give me a second here to get organized.

13             So you work for the TSA, the Transportation

14     Security Administration; is that right?

15             JUROR:  Yes.

16             THE COURT:  Could you tell us a little bit about

17     what you do.

18             JUROR:  So I basically just do operation and

19     screening.  I work in baggage most days.

20             THE COURT:  Bring the microphone a little closer.

21             JUROR:  I work in baggage most days, so I'm just

22     like screening luggage.  Also I screen passengers, so x-ray,

23     check travel documents.

24             THE COURT:  And which airport are you located at?

25             JUROR:  I'm at DCA.

1          THE COURT:  Okay.  So I might have seen you on my

2    last trip.

3          JUROR:  I don't know.

4          THE COURT:  Possible.

5          JUROR:  Maybe.

6          THE COURT:  How long have you been doing this?

7          JUROR:  This is year three.

8          THE COURT:  Year what?

9          JUROR:  Three.

10          THE COURT:  Okay.  And before that what were you

11    doing?

12          JUROR:  I worked at the zoo.

13          THE COURT:  So you only answered a few questions

14    here, so let me turn to them.

15          One of the questions was number 35.  Do you, or

16    any members of your immediate family, or close personal

17    friends work in law enforcement?  Well, you do.

18          JUROR:  Right.

19          THE COURT:  Are there other friends of yours that

20    work for other agencies, such as the Metropolitan Police

21    Department, or the Capitol Police, or Secret Service, or

22    other police agencies?

23          JUROR:  You said friends?

24          THE COURT:  Friends, or close personal friends, or

25    family members.

```
 1                    JUROR:  I can't recall any friends but I do have
 2       family members.
 3                    THE COURT:  Family members?
 4                    JUROR:  Yes.
 5                    THE COURT:  And who do they work for or did they?
 6                    JUROR:  MPD.
 7                    THE COURT:  D.C.?
 8                    JUROR:  Yes.
 9                    THE COURT:  And what's the relationship?
10                    JUROR:  Cousin.  Close cousin.
11                    THE COURT:  One cousin?
12                    JUROR:  One right now and then one she's retired.
13                    THE COURT:  So the cousin that's currently working
14       for the Metropolitan Police Department, do you know what
15       district or what their responsibilities are?
16                    JUROR:  I actually don't because she just started
17       back working there.  She just started back working --
18                    THE COURT:  Okay.
19                    JUROR:  -- with MPD, so I really don't know.
20                    THE COURT:  Do you know whether she was on duty on
21       January 6th?
22                    JUROR:  No.
23                    THE COURT:  Okay.  So as far as you know she
24       wasn't at or near the Capitol on January 6, 2021?
25                    JUROR:  Correct, no.
```

1                    THE COURT:  Okay.  I asked also whether you, or

2       members of your immediate family, or close personal friends

3       have ever been the victim of or a witness to a crime.

4                    Could you tell us about that please.

5                    JUROR:  It was about 2013, someone broke into my

6       house.

7                    THE COURT:  Somebody broke in?

8                    JUROR:  Yes.

9                    THE COURT:  Yeah.  Did you call the police?

10                   JUROR:  Yes.

11                   THE COURT:  And did they ever find anybody?

12                   JUROR:  No.

13                   THE COURT:  Okay.  So this case, as I said the

14      other day, arises out of the events of January 6th, 2021, in

15      the Capitol, around the Capitol and do you remember where

16      you were on January 6th, 2021?

17                   JUROR:  Work.

18                   THE COURT:  At work?

19                   JUROR:  Yes.

20                   THE COURT:  At the airport?

21                   JUROR:  At Dulles at the time.

22                   THE COURT:  At Dulles?

23                   JUROR:  Yes.

24                   THE COURT:  Did you watch any of the events

25      surrounding what was going on at the Capitol on January 6,

1      2021?

2                  JUROR:  I don't recall.

3                  THE COURT:  You don't remember?  Did you watch any

4      news reports about it?

5                  JUROR:  I try to stay away from the news.

6                  THE COURT:  Try to stay away from the news?

7                  JUROR:  Yeah.

8                  THE COURT:  Do you have any -- do you follow any

9      particular social media platforms?

10                 JUROR:  I'm on social media but I try to keep the

11     news away from the social media.

12                 THE COURT:  Okay.

13                 JUROR:  I don't like to --

14                 THE COURT:  Which ones are you on?

15                 JUROR:  Like Tumblr, Snapchat.

16                 THE COURT:  Okay.

17                 JUROR:  The regulars.

18                 THE COURT:  Okay.  You say you try to stay away

19     from the news.  Did you follow after January 6th, or did you

20     see any videos, or any television reports, or anything on

21     your devices about what happened on January 6th at the

22     Capitol?

23                 JUROR:  It's been a while.

24                 THE COURT:  Yeah.

25                 JUROR:  So potentially, yes, maybe.

```
 1                    THE COURT:  Maybe.

 2                    JUROR:  But as far as being into it, no.

 3                    THE COURT:  All right.  Counsel?

 4                    MR. DREHER:  I have no followup, Your Honor.

 5                    MR. SMOCK:  I just have --

 6                              EXAMINATION

 7       BY MR. SMOCK:

 8       Q.  I'm Ned Smock.

 9       A.  Hello.

10       Q.  Just a quick couple questions.  You mentioned, I mean,

11       we know that you work for TSA and that you have some family

12       members who are members of the MPD.

13              In this case we will likely hear testimony from

14       officers from the MPD who will talk about what happened on

15       January 6th and things that happened to them that were very

16       unpleasant.

17              Do you have any concern that hearing that, given

18       the fact that you're in law enforcement and have family

19       members who are members of the MPD, that that might cause

20       you to have trouble being fair and impartial in this case?

21       A.  No.

22       Q.  No concern at all?

23       A.  (Nods head).

24       Q.  Okay.  Thank you.  I appreciate it.

25                    THE COURT:  All right.  Well, thank you for your
```

```
 1    answers this morning.

 2              We're going to ask you to come back this

 3    afternoon.

 4              JUROR:  Okay.

 5              THE COURT:  Because we're still talking to some

 6    more people but by this afternoon we should have the number

 7    of people we need to finally pick a jury.

 8              So we need a jury of 14.  We'll have twice as many

 9    as that.  And then we'll have some final questions this

10    afternoon and make some decisions.  So would you come back

11    to the jury lounge at 2:00 --

12              JUROR:  2:00.

13              THE COURT:  -- back on the fourth floor, 2:00, and

14    Ms. Johnson will meet you down there at 2:00 this afternoon.

15              JUROR:  Okay.

16              THE COURT:  Along with some other people.

17              JUROR:  Okay.

18              THE COURT:  Thank you very much.

19              JUROR:  Okay.

20              THE COURT:  And you can -- actually you can go out

21    the front door if you've got all your belongings.

22              MS. JOHNSON:  She doesn't have her belongings.

23              THE COURT:  She's got to get them.  Sorry.

24              (Juror excused from courtroom)

25              MS. JOHNSON:  Ready for the next?  0927.
```

1          THE COURT:  I believe it's 0927.

2          (Juror present)

3                    **(Juror Number 0927)**

4                         **EXAMINATION**

5          THE COURT:  Have a seat.  Thank you.

6          If you don't mind -- yeah, so we can hear you

7     better.  Good morning.  How are you?

8          JUROR:  Good.

9          THE COURT:  Thanks for all of your patience.  This

10    is a longer process than we had hoped but, that's

11    unfortunate, but here we are.

12         So, we have some followup questions, excuse me,

13    based on what you wrote down on your 3x5 card.

14         So the first question is whether you followed the

15    events or watched videos about what happened on January 6th.

16    And first question is, did you follow it that day?

17         JUROR:  Yes.  I mean, somewhat.  I was working but

18    I was following the news online.

19         THE COURT:  Were you --

20         JUROR:  Not by television but I was looking at the

21    Washington Post and the New York Times.

22         THE COURT:  Were you at home or at the office?

23         JUROR:  I was working out of my brother's house,

24    so not really either.

25         THE COURT:  Okay.  So you didn't watch it that

1    extensively while you were at work or you did?

2             JUROR:  I mean, I heard the news and I can't

3    remember exactly how, but like a lot of people I

4    intermittently on downtime checked the news.

5             I subscribe to the New York Times and the

6    Washington Post, so I just probably just went quickly and

7    saw the, you know, the headlines, and like a lot of people

8    was very surprised by it.

9             Probably that night, I don't remember

10   specifically, but I would have imagined that I would have

11   watched the news that night.

12            THE COURT:  So did you follow what was reported by

13   the New York Times and the Washington Post online that

14   day --

15            JUROR:  Online that day.

16            THE COURT:  -- or sometime after that day?

17            JUROR:  Well, both.  I mean, I'm a subscriber, so

18   I read them, like, I don't read them cover to cover, or

19   whatever the online version of that is.

20            THE COURT:  Right.

21            JUROR:  But I do.

22            THE COURT:  And there are as fair amount of

23   coverage in those papers?

24            JUROR:  Yeah, what I remember about that day, you

25   know, I was working out of my brother's office and, but I

1    live here, my brother lives in Massachusetts, so I was in

2    Massachusetts at the time.  And then I remember, like,

3    should I come back to D.C. as I planned or should I delay my

4    trip back because it was so unconcern what the consequences

5    of that day were going to be.  So I contacted my neighbor

6    that evening and asked what it was like in our neighborhood

7    and she said basically things seem calm here.

8             THE COURT:  So did you come back as planned or did

9    you wait a bit?

10            JUROR:  I waited, like, an extra few days but, I

11   mean, obviously I came back.

12            THE COURT:  Now, you don't live anywhere near the

13   Capitol, though, correct?

14            JUROR:  I don't.

15            THE COURT:  So you also indicated in response to

16   question 11 that you did follow, or watch, or listen to the

17   congressional hearings.

18            JUROR:  I watched the prime time one, like, I

19   think the earlier one that was a couple hours long and then

20   the ones that were happening during the day, I was working

21   so I didn't generally watch.  I think a few snippets here

22   and there.

23            But, again, I mean, the general gist of what was

24   brought up, I would have read a summary most often and/or

25   heard it on the news.

1           I also -- I joke that I've become my parents, but

2    I tend to look at the PBS news hour in the evening.

3           THE COURT:  The next question you answered was

4    whether your opinion concerning former President Trump or

5    his supporters would make it difficult for you to serve as a

6    fair and impartial in this case.

7           Could you tell us a little bit about your

8    thinking, you said "maybe" on your card.

9           JUROR:  Yeah, I wasn't sure exactly how to answer

10   that.  I mean, if I'm honest, I was not a fan of President

11   Trump.  That doesn't mean I don't think people have the

12   right to protest, you know.

13          Can you read the original question again?

14          THE COURT:  Well, the original question was

15   whether your opinion concerning the former president or your

16   opinion concerning his supporters make it difficult for you

17   to be a fair and impartial juror?

18          JUROR:  Yeah.  I guess I, yeah, I don't know how

19   to answer that exactly.

20          So I, on the one hand I feel that people have the

21   right to have their own opinion.  And obviously there are

22   many people who are big supporters of President Trump, I'm

23   not one of them.  And so I can't say for -- yeah, I just --

24   I don't know.  Like I'm not -- are you tainted by

25   association?  Sort of -- I guess I'd say you have, again,

1   you have the right -- people have the right to protest.  You

2   certainly have the right to march to the Capitol.  I think

3   from what I've observed people who -- I mean, I don't know

4   what to say exactly.

5           And the devil's in the details, right?  So an

6   individual who went to protest, what are the actions at the

7   protest?  Protesting itself isn't against the law in my

8   opinion, but the how that was enacted, you know, what the --

9   how the individual carried out their protest in terms of

10  violence or damaging property, that kind of thing, you know,

11  that does raise eyebrows.

12          THE COURT:  Well, let me ask you sort of a

13  followup and I know the lawyers will have questions too.

14          JUROR:  Sure.

15          THE COURT:  So you don't know anything about this

16  particular defendant --

17          JUROR:  No.

18          THE COURT:  -- Mr. Gossjankowski?

19          JUROR:  No.

20          THE COURT:  And you at this point don't know

21  anything about what he did that day, right?

22          JUROR:  I don't.

23          THE COURT:  So let's assume that the evidence

24  shows that he was at the Capitol and that he entered the

25  Capitol.

1              Do you think, in view of what you just said, that

2       you could give him a fair trial and judge him based on the

3       evidence that you see and hear in this courtroom and not

4       anything else?

5              JUROR:  I do think so.  I mean, I guess I'd need

6       to understand again, and I'm sure you would instruct us on

7       this exactly what the law is but, yeah, I mean, I assume

8       that the way this -- I mean, I assume the way this case

9       would unfold is part of it you would establish whether or

10      not the defendant was at the -- what his level of

11      involvement was or was not at the Capitol.  And then, you

12      know, explain whether it crossed the threshold of breaking

13      the law or not.  And so that would be up for --

14             THE COURT:  And do you understand also that in a

15      criminal case the burden is always on the government --

16             JUROR:  Absolutely --

17             THE COURT:  -- to prove somebody guilty beyond a

18      reasonable doubt?

19             JUROR:  Absolutely, yeah.  I do.

20             THE COURT:  The only other question that you

21      wrote, number that you wrote down on the card was number 42

22      and it's about your prior jury experience.

23             Would you tell us about your prior jury

24      experience.

25             JUROR:  Sure.  I have a juror twice.  Once in New

1    York City, I think that was in 2001, and that was a

2    drug-related case that went to verdict and the defendant was

3    found guilty.

4            And then a second time, I don't remember exactly

5    the year, but it was in D.C., the D.C. courts.  Another drug

6    case.  And that one did not go to verdict, you know, they

7    don't exactly explain why, but I think that the prosecutors

8    had trouble introducing evidence, and so we were released

9    after a day.

10           THE COURT:  So the jury never had to make a

11   decision?

12           JUROR:  No, never had to make a decision.

13           THE COURT:  Is there anything about your prior

14   jury experience that would make it difficult or

15   uncomfortable for you to serve again?

16           JUROR:  No.

17           THE COURT:  Okay.  Questions?

18                           **EXAMINATION**

19   BY MR. DREHER:

20   Q.  Good morning, ma'am.

21   A.  Hi.

22   Q.  Now, you told us earlier that at one point you watched

23   PBS news hour.  Was there specific specials that you watched

24   or is it more just a daily program?

25   A.  So if you're not familiar with PBS news hour, it's an

LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

1     evening, Monday through Friday, new show and they tend to be

2     a little more -- like longer stories than let's say NBC,

3     ABC, or CBS.  So, you know, it's not a 30-second snippet,

4     it's more of a, I don't know, five, ten-minute story on

5     that.  So I guess what I meant by that is, yeah, it was a

6     little more than a sound byte on the topic.

7              So I'm a pretty regular watcher, meaning like I

8     don't watch every night, but since the pandemic I've been

9     home, been able to watch it.  So I've developed that habit,

10    you know, I'd say three out of five nights maybe.

11    Q.  So it's that nightly show?

12    A.  The nightly show, yes.

13    Q.  Okay.

14             THE COURT:  Is that the Judy Woodruff show?

15             JUROR:  No longer.  She's retired.

16             THE COURT:  That's right, she retired but it was?

17             JUROR:  Yeah.

18    BY MR. DREHER:

19    Q.  And then you also told us that the devil's in the

20    details in relation to sort of the crime that are charged

21    and being able to judge those crimes independently of any

22    sort of preconceived notions about what you might have had

23    on January 6th.

24             So do you feel confident that you would be able to

25    be fair and impartial and judge the facts that are

1     introduced in this trial before making a decision about the

2     defendant?

3     A.  I do.

4     Q.  Okay.  The defendant is not charged with protesting.

5     There's specific actions and each of those charged defenses

6     do require certain things that must be proved beyond a

7     reasonable doubt.

8             So would you be comfortable holding the government

9     to its burden of beyond a reasonable doubt?

10    A.  I would.

11            MR. DREHER:  Your Honor, I have no further

12    followup.

13            THE COURT:  Mr. Smock?

14    BY MR. SMOCK:

15    Q.  Hello, I'm Ned Smock.

16    A.  Hi.

17    Q.  I appreciate you taking the time to think through this

18    with us as we ask these questions.

19            You talked a little bit about your feelings about

20    President Trump and his supporters.  And you'll learn that

21    my client, Mr. Gossjankowski, was a supporter of President

22    Trump.

23            Can you talk a little bit about your feelings

24    about folks who supported President Trump, and particularly

25    folks who were there on January 6th.

```
1    A.  I mean, okay, so particularly about January 6th, because
2        the first question said it more broadly, I mean, like,
3        probably everybody in this room, I -- well, let me rephrase
4        that.
5            Everybody I know has, who is not a Trump supporter
6        themselves, have Trump supporters in their extended family
7        or friend network so, like, I'm in that group.
8            With regard to the protest, so, I mean, of the
9        footage that was shown, and the -- and, of course, there's
10       some individuals who have been found guilty of crimes, some
11       of it seems pretty damning based on the footage.  I know
12       that, you know, different angles can serve different things,
13       but the decision to go into Congress and, you know, sit in
14       Nancy Pelosi's office or, I mean, shows a complete lack of
15       respect, frankly, never mind depending on the statute being
16       criminal.
17           So, you know, "The People's House" on the one
18       hand, but on the other hand there are rules about things
19       and, you know, you're meant to follow them.  And just
20       breaking property, and putting people's lives and police
21       officers' lives in danger, yeah, I have a problem with that.
22   Q.  Understood.  And it sounds like that's something you
23       feel very strongly about; am I right?
24   A.  I hope everyone would.
25   Q.  Yeah.  So during this trial, you're going to see videos
```

1    of folks, you know, not Mr. Gossjankowski necessarily, but

2    people engaging in violence, people yelling things about,

3    "This is Our House!"  This is things probably thing you saw

4    on footage?

5    A.  Right.

6    Q.  And people saying negative things about police officers,

7    people saying negative things about Nancy Pelosi and others.

8            Do you have any concern that hearing those things

9    might make -- sort of bring back those feelings and make it

10   difficult for you to be fair to our side?

11   A.  I mean, I hope I can separate the general chaos, and bad

12   behavior, and law breaking observed on film from the actions

13   of your client.

14           Like, yeah, I would hope that since at this point

15   we haven't -- I don't know any of that information, it's

16   hard for me to say.  Can you rephrase your question?

17   Q.  No, I think you've given a good answer to my question.

18   A.  Yeah.

19   Q.  I appreciate that.  And you will hear that there are

20   elements to each crime that's been charged in this case.

21   And are you confident that you would be able to focus on the

22   elements alone and not think about your feelings that you

23   had otherwise about Trump supporters generally?

24   A.  I mean, it seems clear that this is why you charge

25   individuals, right?  You have to prove that they, themselves

```
 1     were --
 2               THE COURT:  You understand the point he's making?
 3               JUROR:  Yes.
 4               THE COURT:  That there's several different crimes.
 5               JUROR:  Right.  There were six of them I think you
 6     said?
 7               THE COURT:  And each crime has its own --
 8               JUROR:  Criteria right.
 9               THE COURT:  -- things that have to be proved,
10     which we call elements.
11               JUROR:  Yeah.
12               THE COURT:  Do you find that he did acts, do you
13     find that he did acts with certain intent, do you find that,
14     et cetera, et cetera.
15               I mean, if it were a burglary case, to make it
16     simple, a judge would say, you know, do you find that
17     someone entered somebody's else's house, do you find that
18     element.
19               JUROR:  Yeah.
20               THE COURT:  Secondly, do you find that they did it
21     with the intent to steal something.  Thirdly, do you find
22     that it was this particular defendant.  Fourthly, you know,
23     that sort of thing.
24               And each -- my instructions will tell you with
25     respect to each charge what the, we call them elements, the
```

1    lawyers call them elements but, basically, you know, item 1,

2    2, 3, and 4, has the government proved those things.

3             I hope I've clarified and not confused.

4             JUROR:  Yeah.  I follow that.  I think I can do

5    that, yes.

6    BY MR. SMOCK:

7    Q.  Okay.  And so hearing what we've talked about and

8    thinking about your prior experiences and feelings, are you

9    confident that you can be fair to our side in this case?

10   A.  I would hope so, yes.

11   Q.  And are you confident that you can be fair to the

12   government in this case?

13   A.  I think so, yes.

14   Q.  Are you sort more confident about one than the other?

15   A.  I mean, no.  At this point I'm equally confident on both

16   sides.

17   Q.  Thank you.  I appreciate you answering the questions.

18             THE COURT:  Anything else?

19             Okay.  Why don't we ask you to step out for a few

20   minutes with Ms. Johnson.

21             (Juror excused from courtroom)

22             THE COURT:  Is there a motion or not?

23             MR. SMOCK:  No, Your Honor.

24             THE COURT:  Okay.  You can bring her back.  I

25   should have -- I should have asked my usual question, my

```
 1    question anybody have anything they want to raise, but I
 2    thought you might have a motion.
 3              (Juror present)
 4              THE COURT:  I'm sorry.  We were quicker than we
 5    thought we would be.  You don't have to sit down again.
 6              So, we would like you to come back this afternoon
 7    at 2:00.  We are narrowing the group down.  By the end of
 8    this morning we hope we will have about 35 or so people, and
 9    then this afternoon we'll narrow it to 14, which is what we
10    need for the jury.
11              So if you come back to the jury lounge on the
12    fourth floor at 2:00 Ms. Johnson will there to meet you and
13    others and we'll see you then.
14              JUROR:  Thank you.
15              THE COURT:  Thanks again.  Thanks for your
16    patience and your candor.
17              (Juror excused from courtroom)
18              THE COURT:  So the next one I believe is Number
19    907.
20              (Juror present)
21                       (Juror Number 0907)
22                            EXAMINATION
23              THE COURT:  Right here.  Thank you.
24              Please have a seat and take off your mask, if you
25    don't mind, so we can hear you better and sit close to the
```

1    microphone.

2              So you -- where did I just put your card?  Excuse

3    me.  I dropped it on the floor.

4              Do you work for the World Bank or you're a

5    consultant with the World Bank?

6              JUROR:  I'm a consultant.  I work about halftime,

7    40 percent of the time for them.

8              THE COURT:  And before you were a consultant for

9    the World Bank, what was your career before that?

10             JUROR:  Well, I do water and sanitation.  I worked

11   mostly overseas for nonprofits.  The Red Cross, Oxfam,

12   things like that.

13             THE COURT:  And so was most of your career in

14   overseas work?

15             JUROR:  Yep, until 2009.

16             THE COURT:  Were you employed by the World Bank at

17   any point?

18             JUROR:  I worked -- in 1994 I worked on a World

19   Bank project in Angola.

20             THE COURT:  Okay.  So I'm going to turn now to

21   what you wrote down on the card.  And the first number you

22   wrote down was number 4.

23             I asked whether you, or a close friend, or family

24   member ever worked on Capitol Hill, and I think you wrote

25   down niece or nieces.

```
 1                    JUROR:  Niece.  I had a niece who was an intern
 2       one summer quite a while ago.
 3                    THE COURT:  Quite a while ago?
 4                    JUROR:  Yeah, probably 15 or 18 years.
 5                    THE COURT:  Okay.  So she wasn't anywhere -- she
 6       wasn't at the Capitol on January 6th, 2021?
 7                    JUROR:  No, no.
 8                    THE COURT:  The next question was whether you
 9       followed the events of January 6th, 2021, at the Capitol.
10                    Do you remember where you were on January 6th.
11                    JUROR:  I would have been at home.
12                    THE COURT:  Sure.  Did you watch any of the --
13                    JUROR:  I watched the hearings.
14                    THE COURT:  Okay.  You watched the hearings, that
15       was later?
16                    JUROR:  Yeah.
17                    THE COURT:  On the day that it was all happening
18       were you on television, or social media, or anything?
19                    JUROR:  Probably was listening to NPR.
20                    THE COURT:  Okay.
21                    JUROR:  I'm not absolutely sure.  I might have
22       been at my mother's house.  In fact, I would have been at my
23       mother's house.
24                    THE COURT:  Do you follow any particular social
25       media blogs or anything?
```

```
 1                    JUROR:  Not really.

 2                    THE COURT:  Do you read particular newspapers?

 3                    JUROR:  I have the Washington Post and the New

 4       York Times.

 5                    THE COURT:  Okay.  And do you watch the news on

 6       television?

 7                    JUROR:  Not very much.

 8                    THE COURT:  Okay.

 9                    JUROR:  I listen to NPR.

10                    THE COURT:  When you say you saw the hearings, how

11       much of the hearings did you see/watch?

12                    JUROR:  Probably about three quarters of about.

13                    THE COURT:  I mean, did you watch like --

14                    JUROR:  Yeah.

15                    THE COURT:  -- from the beginning to the end of

16       day one, or day five, or whatever it was?

17                    JUROR:  Yeah.

18                    THE COURT:  Okay.  So you watched more than one

19       day of it?

20                    JUROR:  Yeah.

21                    THE COURT:  And so the next question you were

22       asked was -- you wrote down was Number 12.

23                    And the question was, from you -- now you've told

24       us what you've seen, including the hearings at some length:

25       From what you've heard, and seen, and read about the events
```

561

1     of January 6th, 2021, do you think people who were arrested

2     or charged with crimes growing out of those events are

3     probably guilty of the crimes?

4              JUROR:  Well, because they used photographs and

5     social media posts from people who said they were there, I

6     think in many cases, yes, they would have that correct.

7              I do realize that photographs aren't always

8     correct or the identification from a photograph is not

9     always correct.

10             THE COURT:  Well, let me ask you a couple of other

11    questions.

12             You don't know anything about -- I assume you

13    don't know anything about this particular defendant, Mr.

14    Gossjankowski?

15             JUROR:  No.

16             THE COURT:  And you don't know what he did or

17    didn't do --

18             JUROR:  Not at all.

19             THE COURT:  -- at this point?

20             JUROR:  No.

21             THE COURT:  So let's assume that he was at the

22    Capitol that day, and that he entered the Capitol that day,

23    and that he's charged with certain crimes based on what the

24    government says he did that day.

25             Would you be able to wait until you hear all the

1    evidence in this case before you decide whether he's guilty

2    or do you think you would be too influenced by what you've

3    seen at the hearings and otherwise?

4            JUROR:  I think I could wait to decide.

5            THE COURT:  Okay.  So you'll hear witnesses on the

6    stand and you'll also see probably a lot of videos involving

7    Mr. Gossjankowski, but also involving other things that were

8    going on at the time.

9            And what I think both sides want to know is

10   whether you think that you would be able to put out of your

11   mind what you saw before the trial began and limit yourself

12   to what the witnesses say in this courtroom and what videos

13   you see in this courtroom and decide on that basis only?

14           JUROR:  Yeah, I think I would be able to do that.

15           THE COURT:  Okay.  Do you also understand that in

16   a criminal case just because someone is charged -- when

17   someone's arrested or charged with a crime, obviously

18   there's some basis for doing that, but at a trial the

19   government has a much higher burden.  Do you understand

20   that?

21           JUROR:  Yes.

22           THE COURT:  Do you understand the prosecutors have

23   to prove guilt beyond a reasonable doubt?

24           JUROR:  Yes.

25           THE COURT:  I asked a question about lawyers and

1    you said you had two nieces who are lawyers.

2              Do you know where they work?  What kind of work

3    they do?

4              JUROR:  One of them is a corporate lawyer and she

5    works for Grauman or somebody like that.

6              The other one does public interest law.  She works

7    with poor people around Boston.

8              THE COURT:  In Boston?

9              JUROR:  Yeah.

10             THE COURT:  Okay.  I also asked whether you have

11   any, you, yourself, or family members, or close personal

12   friends have ever worked for law enforcement agencies.

13             JUROR:  My grandfather was a chief of police in

14   Gardner, Massachusetts.  My father, when he was young, was a

15   part-time policemen.

16             I think my grandfather retired about 1953 or 1955.

17   And my dad certainly didn't work as a policemen after that.

18             THE COURT:  And did you grow up in the Boston

19   area?

20             JUROR:  Not really.  I grew up in Connecticut,

21   went to high school south of Albany.

22             THE COURT:  I also asked the question whether

23   you -- yeah, you said on your card your father and

24   grandfather were both police before I was born.

25             JUROR:  I think so.

```
 1                    THE COURT:  Have you or members of your immediate
 2          family ever been the victim of a crime or a witness to a
 3          crime?
 4                    JUROR:  I was mugged in Swaziland?
 5                    THE COURT:  You were mugged twice?
 6                    JUROR:  No, I was mugged in Swaziland.
 7                    THE COURT:  Oh, not here?
 8                    JUROR:  No.
 9                    THE COURT:  Okay.  So the last question you
10          answered was number 45, whether you have any medical issues,
11          health issues, hearing problems, medication issues.
12                    JUROR:  Well, my urinary track, my interior
13          plumbing is not very reliable and so I need the ladies' room
14          maybe once an hour.
15                    THE COURT:  Okay.  Do you think that would
16          interfere with your right to sit on this jury or would
17          you --
18                    JUROR:  I have not much idea what the --
19                    THE COURT:  Well, let me tell you what our day
20          will look like.
21                    I'm hoping we can start around 9:30 every morning,
22          but I'm very doubtful that will happen.  But we'd probably
23          go from 10:00 to 12:30 or so and take a break in the middle
24          of the morning.  And then we would go from after lunch until
25          5:00.  We're going to try very hard, I think I've said this
```

1      to the lawyers, to break no later than 5:00 every day,

2      because I think some of our American Sign Language

3      interpreters have to be done by 5:00, so, and then we take

4      an afternoon break as well.

5             Do you think you'd be okay with that?

6             JUROR:  Sounds like it, yeah.

7             THE COURT:  Now, last question, I can empathize

8      with your issue.

9             Would you be comfortable that if we were -- if

10     we're not yet ready for our break, would you be comfortable

11     sitting here with 12 or 13 other people and if you felt you

12     really needed a break just raise your hand or say something?

13            JUROR:  Yes.

14            THE COURT:  I mean, that would be okay with you?

15            JUROR:  Yes.

16            THE COURT:  And I will keep an eye on it and if I

17     see that happening I'll take a break, because that actually

18     happened in the last trial that I had with one of the jurors

19     and it was fine.

20            All right.  Thank you.

21            MR. DREHER:  The government has no followup, Your

22     Honor.

23                         **EXAMINATION**

24     BY MR. SMOCK:

25     Q.  Hello, Ms. LeBlanc, I'm Ned Smock.

```
 1            You talked a little bit about your views on these

 2     cases from photographs and of the coverage you've seen.

 3            Can you talk a little bit about reactions you had

 4     when you saw videos of what happened on January 6th.

 5     A.   It looked pretty awful to me.

 6     Q.   And can you say anything more about that?  Is that a

 7     strong feeling you had, something that --

 8     A.   Well, people were pretty violent and you can say that

 9     there was a group mentality going.  Not everybody was

10     violent.  It just, I don't really understand it, that kind

11     of impulse, so you just sort of watched it in disbelief.

12     Q.   And thank you for that.

13            Do you have any concern that given that during

14     this trial you will see a fair amount of video similar to

15     that in which people are engaging in violence and yelling

16     offensive things, that that would cause you to have trouble

17     being fair and consider the specific issues in this trial?

18     A.   Not really.  Don't know what the defendant did or what

19     his intentions were so.  I think I could keep an open mind.

20     Q.   Okay.  And it sounds like that's something you've put a

21     fair amount of thought into particularly since you've had to

22     wait for quite a long time and I appreciate that.

23            Can you tell us that you will do your absolute

24     best to focus solely on the issues in this case and not on

25     your thoughts about other people and --
```

1    A.  Yeah, I certainly would, yes.

2    Q.  Did you -- have you followed the trials that have

3    happened thus far involving people charged with offenses on

4    January 6th?

5    A.  Not really.

6    Q.  Okay.  Thank you.

7    A.  Okay.

8                THE COURT:  Anything else?  Any issue?

9                All right.  So, thank you.

10               We're going to ask you to come back this afternoon

11   at 2:00.  We're narrowing the list over the last couple of

12   days down to about 35 people and then from that group we're

13   going to pick twelve jurors and two alternates.  So we'll do

14   that this afternoon, but we're not quite done with everybody

15   else.  So, 2:00, the jury lounge back on the fourth floor.

16               JUROR:  All right.

17               THE COURT:  And Ms. Johnson will come down and

18   meet everybody and bring you back up here.

19               JUROR:  All right.

20               THE COURT:  Okay.  Thank you.

21               JUROR:  Thank you.

22               THE COURT:  Thanks for your patience and your

23   answers.

24               JUROR:  Thank you.

25               THE COURT:  Thank you.

 1           MS. JOHNSON:  Ma'am, you have all of your

 2    belongings, right?

 3           JUROR:  Yes.

 4           (Juror excused from courtroom)

 5           THE COURT:  So the next person we have is 755, who

 6    only has a few answers on his card.

 7           (Juror present)

 8                      **(Juror Number 0755)**

 9                         **EXAMINATION**

10           THE COURT:  Sir, good morning.

11           JUROR:  Good morning.

12           THE COURT:  How are you?

13           JUROR:  Great.

14           THE COURT:  So would you mind taking off your mask

15    and speaking into the microphone for us?

16           JUROR:  Sure.

17           THE COURT:  Thanks.  So you're Number 755,

18    correct?

19           JUROR:  Yes.

20           THE COURT:  Thank you for your patience over the

21    last few days, I know it's within a long process.

22           Could you tell us a little bit about your work,

23    what you do.

24           JUROR:  Sure.  Steam engineer, 43 years.  Valley

25    Vista Condominium.  Heating and plumbing, air conditioning.

1                    THE COURT:  And what's your background education

2       for that?

3                    JUROR:  Some college.  A lot of trade school.

4                    THE COURT:  So I asked whether you, this is number

5       35, I asked whether you, or any members of your family, or

6       close personal friends have ever worked for a law

7       enforcement agency, here or elsewhere, Metropolitan Police,

8       Capitol police, Secret Service, FBI, anybody like that.

9                    JUROR:  Yes.

10                   THE COURT:  Who?

11                   JUROR:  I have a son, Seassala.

12                   THE COURT:  Your son?

13                   JUROR:  Yes.

14                   THE COURT:  Okay.

15                   JUROR:  And I have a nephew, homicide in Virginia.

16                   THE COURT:  Your son works for whom?

17                   JUROR:  Seassala, in D.C.

18                   THE COURT:  D.C.?

19                   JUROR:  Yes.

20                   THE COURT:  Do you know what district he's in?

21                   JUROR:  I'm not sure.

22                   THE COURT:  A patrol officer?

23                   JUROR:  No, parole, corrections.

24                   THE COURT:  Oh, a correctional officer?

25                   JUROR:  Yes.

```
 1                    THE COURT:  Okay.  And who was the other person
 2      you mentioned?
 3                    JUROR:  Nephew.
 4                    THE COURT:  In Virginia?
 5                    JUROR:  Yes.
 6                    THE COURT:  Okay.  And who does he work for?
 7                    JUROR:  I'm not sure, I know it's Richmond.
 8                    THE COURT:  And I also asked other than those
 9      people, do you have any immediate family or close friends
10      who have ever worked in the criminal justice system.  You
11      already mentioned your son.  Anybody else?
12                    JUROR:  Ex-girlfriend, MPD.
13                    THE COURT:  MPD?
14                    JUROR:  Yes.
15                    THE COURT:  She still MPD?
16                    JUROR:  Yes.  Civilian.  Civilian.
17                    THE COURT:  Civilian?
18                    JUROR:  Mm-hmm.
19                    THE COURT:  Okay.  So she's not a police officer
20      but she's an employee of --
21                    JUROR:  Yes.
22                    THE COURT:  -- the Metropolitan Police Department.
23                    JUROR:  Yes.
24                    THE COURT:  Got it.
25                    Would you tell us, please, about your prior jury
```

1      service.

2                   JUROR:  I can't even remember most of them.  I

3      just remember the longest one, which was a murder case,

4      that's been about 20 years or so ago.

5                   THE COURT:  That's a long time ago.

6                   JUROR:  Yes.

7                   THE COURT:  Do you remember whether the jury was

8      able to reach a verdict?

9                   JUROR:  Yes, they did.

10                  THE COURT:  Did find the person guilty or not

11     guilty?

12                  JUROR:  Guilty.

13                  THE COURT:  Okay.  Do you remember any more recent

14     ones?

15                  JUROR:  I know it was small.  I don't remember.

16                  THE COURT:  So do you remember -- as you know this

17     case is about the events at the Capitol on January 6th,

18     2021.  Do you remember where you were on that day?

19                  JUROR:  Working.

20                  THE COURT:  Your work?

21                  JUROR:  Yes.

22                  THE COURT:  And where is your office?

23                  JUROR:  Connecticut and Belmont Road.

24                  THE COURT:  Did you watch any of the events on

25     television, or social media, or anything?

1          JUROR:  No.

2          THE COURT:  Have you watched much of it since

3    then?

4          JUROR:  I haven't seen any of it, I just heard

5    about it from work.

6          THE COURT:  Okay.  Do you follow any particular

7    social media platforms?

8          JUROR:  None.

9          THE COURT:  Do you read any particular newspapers

10   or watch any news programs?

11         JUROR:  I read the headlines, but I never get into

12   it.

13         THE COURT:  You read what?

14         JUROR:  The headlines.

15         THE COURT:  Okay.  All righty.

16         Questions?

17                         **EXAMINATION**

18   BY MR. DREHER:

19   Q.  Good morning, sir.

20   A.  Good morning.

21   Q.  You mentioned that your ex-girlfriend was a civilian

22   employee of the Metropolitan Police Department?

23   A.  Is.

24   Q.  She currently is?

25   A.  Yes.

 1    Q.  Okay.  Would that relationship cause you to either, you

 2    know, find police officers more or less credible in any way?

 3    A.  No, I have family members.  No.

 4    Q.  Okay.

 5    A.  Yeah.

 6    Q.  So, but specifically you'll hear testimony in this

 7    trial, if selected as a juror, from officers with the

 8    Metropolitan Police Department.

 9          Did you have any familiarity with any of the

10    officer's names that were read at the beginning of this?

11    A.  No.

12    Q.  No?  And so you would be able to come to this trial with

13    a clean slate and not make a decision until after the

14    conclusion of all the evidence has been presented?

15    A.  Yes.

16    Q.  Yes.

17          MR. DREHER:  I have no further followup.

18                         **EXAMINATION**

19    BY MR. SMOCK:

20    Q.  Hello, I'm Ned Smock.

21    A.  Hello.

22    Q.  You mentioned hearing stuff from January 6th some work.

23    Is that from coworkers or from --

24    A.  Coworkers, just day-to-day talk.

25    Q.  Just chat?

1    A.   Yes.

2    Q.   The prosecutor asked you a couple questions about your

3    family members, who were an ex-girlfriend associated with

4    law enforcement.

5         In this case, there is -- if you're on the jury

6    you would see a significant amount of video of members of

7    the MPD and the Capitol Police essentially being under

8    attack and many of them being hurt, and it's alarming

9    footage, I'll just put it out there.

10        And so I guess just one question I have for you is

11   whether the fact that you have family and friends who are in

12   law enforcement would enter your mind or if you would have

13   particular concerns of seeing footage like that in which

14   people are in distress in law enforcement, if that would

15   cause you concern about your ability to be fair to the

16   defense side in this case?

17   A.   Not at all.

18   Q.   Okay.   Thank you.

19        THE COURT:   All right.   Sir, I think we're going

20   to ask you, I know you've been very patient, we're going to

21   ask you to come back this afternoon at 2:00.

22        We're narrowing the group down and we're going to

23   have a lot of -- 30 people come back this afternoon.   Before

24   we pick the jury, we'll pick from that group.

25        So would you please come back at 2:00, go to the

```
1    fourth floor jury lounge.  Ms. Johnson will meet you down

2    there.

3              JUROR:  Okay.

4              THE COURT:  Thank you.

5              JUROR:  Thank you.

6              (Juror excused from courtroom)

7              THE COURT:  So 659?  659.

8              (Juror present)

9                     (Juror Number 0659)

10                        EXAMINATION

11             THE COURT:  Sir, good morning.

12             JUROR:  Good morning.

13             THE COURT:  Thanks for your patience.

14             JUROR:  Sure.

15             THE COURT:  Please, if you don't mind, take off

16   your very colorful mask and speak into the microphone.

17             JUROR:  Okay.

18             THE COURT:  I want to ask you some questions based

19   on what you've written on this card.  You're number 659,

20   correct?

21             JUROR:  Yeah.

22             THE COURT:  All right.  Well, I'm going to start

23   with question 48.  And you responded to that question, which

24   was that we expect that the trial will go into the end of

25   next week and possibly beyond with jury deliberations and we
```

1      asked whether that would cause an extreme hardship for

2      people, and you did write down number 48.

3                 So could you tell us about that.

4                 JUROR:  The only hardship I have, I was scheduled

5      to be out of the country starting on the 18th, I fly out.

6                 THE COURT:  The 18th?

7                 JUROR:  The 18th.  I just wanted to be upfront.

8                 THE COURT:  Okay.  I take it you have tickets and

9      plans?

10                JUROR:  Tickets, booked a vacation and everything.

11                THE COURT:  Pardon me?

12                JUROR:  Booked a vacation and everything.

13                THE COURT:  All right.

14                JUROR:  Are prepaid, so.

15                THE COURT:  The 18th is?

16                JUROR:  Saturday.  In two weeks.

17                THE COURT:  Yeah.  So let's see, we are today at

18     the 2nd.

19                Let me go on and ask you the other questions on

20     the list on the card.

21                JUROR:  Okay.

22                THE COURT:  And while I'm back at the back of the

23     list, I'll start there.

24                I asked whether you, or any family members,

25     immediate family members, or close personal friends have

LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

1    been arrested, or charged with a crime, or convicted of a

2    crime?

3              JUROR:  When I was 27 I got pulled over for

4    speeding, DUI.  I'm not sure if you would call it arrested,

5    but I was basically held for a few hours, paid a fine, and

6    let go.

7              THE COURT:  And you're not 27 anymore?

8              JUROR:  No, no.  I'm 53.  It's been a while.  That

9    was '97.

10             THE COURT:  Okay.  Number 41, whether you or

11   friends, or family have been the victim of a crime, or

12   witness to a crime.

13             JUROR:  The only one that I was, somebody

14   ransacked my car and stole outside my house here in

15   northeast, and stole a few items.  Nothing major, but I

16   guess that's --

17             THE COURT:  How long ago was that?

18             JUROR:  Six months.

19             THE COURT:  And did you call the police?

20             JUROR:  No.  It was change and my CD cases, like

21   50 CDs, and that was it.

22             THE COURT:  Could you tell us about your prior

23   jury experience.

24             JUROR:  It was D.C. court.  I forget the year.  It

25   had to have been '10, '11, or '12, or something like that,

```
 1      and I got sat for a jury and the gentleman was getting his
 2      car towed.  The truck driver, it was on P Street Northwest.
 3      The truck driver lost control of the car, went down the
 4      hill, smacked into a tree and the driver still wanted to be
 5      paid for the tow.  And he said, I'm not going to pay you.
 6      Came out with a -- I think, I'm not sure if it unlicensed,
 7      but it was a gun in a box.  And I'm not sure if it was
 8      unlicensed or not, but he put it down because "I'm not going
 9      to pay you" and he got arrested for it.
10                THE COURT:  Okay.  There may be some followups on
11      that.
12                Could you tell us about your prior jury
13      experience.
14                JUROR:  That was basically it, that case.
15                THE COURT:  That case.
16                JUROR:  That case he was found guilty.  But other
17      than that I've been called in but always never got through
18      voir dire, just one time.
19                THE COURT:  All right.  And I meant to ask you
20      this at the beginning, could you tell us a little bit about
21      your career, your job, your employment.
22                JUROR:  I'm a meeting planner, now a director of
23      housing -- a housing manager at the National Association of
24      Home Builders here in Washington D.C.  I've been there just
25      over only 15 years now.
```

1            I've been working in the meeting/planning industry

2       since mid-90s, so a good -- coming up on 30 years soon.

3                THE COURT:  Where are your offices roughly?

4                JUROR:  15th and M Street Northwest.

5                THE COURT:  So have you, or a close friend, or

6       family member ever worked on Capitol Hill?  You wrote down

7       number 4.

8                JUROR:  My cousin is a chief of staff for a

9       republican congressmen out of Chicago.  I've met him once,

10      but to be honest I can't remember his name.  But he's been

11      working on Capitol Hill with elections for years.  He's ten

12      years younger than me but he's been doing it for a long

13      while.

14               THE COURT:  And he currently does this?

15               JUROR:  Yes, he is.  I talk to him once, twice a

16      year.

17               THE COURT:  Did you talk to him at all after the

18      events of January 6th, 2021?

19               JUROR:  Not about the events, but I talked to --

20      went to -- mostly baseball fans.  I take him to the Orioles

21      baseball games when they're in town.

22               THE COURT:  Did he tell you at all about his

23      experience on January 6th?

24               JUROR:  No.

25               THE COURT:  Do you remember where you were on

1    January 6th, 2021?

2              JUROR:  I was working from home in northeast D.C.

3    up by the arboretum by my house.

4              THE COURT:  And on that day did you watch any of

5    the events going on on The Hill?

6              JUROR:  Yes, I did.  Pretty much all of it.

7              THE COURT:  Okay.  During that day?

8              JUROR:  Yeah.  I forgot where I saw on the news or

9    something, I turned on the TV on and saw it occurred.

10             THE COURT:  And you also answered question 11.

11   How much of the hearings did you watch?

12             JUROR:  I remember watching the first day and

13   maybe a little bit of the next day, but after that, not

14   really.  Maybe little bits and pieces here and there on the

15   news or things, but watching the thing itself, no, except

16   for the first day.

17             THE COURT:  Do you follow any particular social

18   media platforms?

19             JUROR:  Facebook for the most part.

20             THE COURT:  Okay.  And how do you normally get

21   your news, newspaper, television?

22             JUROR:  The internet for the most part or

23   television is really the most.

24             THE COURT:  Yeah.

25             JUROR:  I like watching Channel 5.

```
 1              THE COURT:  Okay.  Is there anything about what
 2    you've seen on the news, or what you saw on January 6th, or
 3    the hearings that you think would make it difficult for you
 4    to be a fair and impartial juror in this case?
 5              JUROR:  No.
 6              THE COURT:  All right.  Do you think you could
 7    judge this defendant, Mr. Gossjankowski, based only on the
 8    evidence you see and hear in this courtroom?
 9              JUROR:  Yes.
10              THE COURT:  Okay.  Good questions?
11                          EXAMINATION
12    BY MR. DREHER:
13    Q.  Good morning, sir.
14    A.  Good morning.
15    Q.  So, unfortunately I'm going to take you back to when you
16    were 27 --
17    A.  Okay.
18    Q.  -- and I'm going to ask about that process just a little
19    bit.
20              Throughout that period of time do you believe that
21    you were treated fairly by both the police and the criminal
22    justice system?
23    A.  Yeah.
24    Q.  Was there anything about that experience that could lead
25    you to think that you will either not believe police
```

1     officers or put more emphasis on their testimony simply

2     because they're police officers?

3     A.   No.

4              MR. DREHER:  Your Honor, I have no further

5     followup.

6              MR. SMOCK:  I don't have any questions.  Thank

7     you, sir.

8              THE COURT:  Okay.  I am, though, going to ask you

9     to step out for just a moment --

10             JUROR:  Okay.

11             THE COURT:  -- with Ms. Johnson.

12             (Juror excused from courtroom)

13             THE COURT:  And my only question relates to the

14    length of the trial.

15             So we told everybody it may go into the week after

16    next.  The week after next begins on Monday the 13th.  Is

17    everybody confident that the jury will be done deliberating

18    and will have rendered a verdict by the 17th, which is the

19    Friday.

20             MR. DREHER:  You know, certainly, Your Honor,

21    without being in the jury room it's hard to know, but I

22    believe that being done by the 17th would still provide them

23    at least four business days, if we go very long.

24             In other words, I would think --

25             THE COURT:  You think deliberations will be done

LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

1    by Friday the 17th?

2              MR. DREHER:  Yes, Your Honor.

3              THE COURT:  Because otherwise if he's on this jury

4    and they're still deliberating then one of the alternates --

5    if he's a regular juror, one of the alternates would have to

6    step up to the plate.  I certainly hope it will be done.

7              You know, we've got Monday the 13th, although I

8    have to leave early that day, Tuesday the 14th, Wednesday

9    the 15th, Thursday the 16th, and then Friday the 17th,

10   although I also have to leave early that day.

11             So, you know, if the jury were deliberating on a

12   Friday and wanted the 17th and deliver its verdict in the

13   afternoon I would not be available.  But I'm certainly

14   hoping that we will be at the jury and they will be done

15   with their deliberations that week.

16             And so far as we know the defense only has one

17   witness and I said I'm going to permit Dr. Kroll to testify.

18   Obviously when we get to that point I will address Mr.

19   Gossjankowski personally to talk to him about his right to

20   testify if he wants to.  Although I'm sure that Mr. Smock

21   and Ms. Goetzl have had those conversations and will

22   continue to have those conversations.

23             Okay.  In that case, I think we can ask him to

24   come back this afternoon.

25             MR. SMOCK:  Your Honor, after this might be a good

584

```
1    time for a short bathroom break.

2              THE COURT:  Sure.

3              (Juror present)

4              THE COURT:  Sir, we're going to ask you to come

5    back this afternoon.  What we've been trying to do these

6    last couple days is get the group down to about 30, 35 and

7    then afternoon we're going to pick 12 jurors and two

8    alternates.

9              So if you would come back at 2:00 --

10             JUROR:  Okay.

11             THE COURT:  -- to the jury lounge on the fourth

12   floor --

13             JUROR:  Okay.

14             THE COURT:  -- where you were this morning, Ms.

15   Johnson will meet you down there.

16             JUROR:  Okay.

17             THE COURT:  Okay.  Thank you.  Yeah, you can you

18   can go that way.

19             JUROR:  Okay.

20             THE COURT:  And there's been a request that we

21   take a short recess now, and we will do that for 12 minutes.

22             (Recess taken at 11:31 a.m.)

23                      *    *    *    *    *

24   (11:31 a.m.)

25
```

|    |    |
|----|----|
| 1  | **IN OPEN COURT** |
| 2  | **(Juror Number 0672)** |
| 3  | **EXAMINATION** |
| 4  | THE COURT:  So I believe the next person is number |
| 5  | 672. |
| 6  | JUROR:  Hello. |
| 7  | THE COURT:  Hello.  How are you? |
| 8  | JUROR:  I'm doing well.  How are you? |
| 9  | THE COURT:  Good.  Good morning. |
| 10 | JUROR:  Good morning. |
| 11 | THE COURT:  Please get comfortable.  And, if you |
| 12 | don't mind, take off your mask so we can hear you better. |
| 13 | JUROR:  Okay. |
| 14 | THE COURT:  You're number 672? |
| 15 | JUROR:  Yes. |
| 16 | THE COURT:  Thank you for your patience the last |
| 17 | couple of days.  We're sorry it's taken so long. |
| 18 | The first question was whether you work or live |
| 19 | near the U.S. Capitol, and you wrote down number 3 with a |
| 20 | question mark. |
| 21 | JUROR:  I work within a mile and a half, so I |
| 22 | didn't know what was considered. |
| 23 | THE COURT:  A mile of the Capitol? |
| 24 | JUROR:  Mile and a half. |
| 25 | THE COURT:  Okay. |

```
 1                    JUROR:  So I didn't know what was considered

 2       close.

 3                    THE COURT:  Well, I guess the question that we're

 4       interested in is whether -- you work within a mile and or

 5       you life?

 6                    JUROR:  I work within a mile and a half.

 7                    THE COURT:  So on January 6th, 2021, were you at

 8       your office?

 9                    JUROR:  I was still teleworking.

10                    THE COURT:  Pardon me?

11                    JUROR:  We were still teleworking.

12                    THE COURT:  You were teleworking?

13                    JUROR:  Yeah.

14                    THE COURT:  So you weren't -- and your home is not

15       near the Capitol?

16                    JUROR:  No.

17                    THE COURT:  So you weren't actually near the

18       Capitol that day?

19                    JUROR:  No.

20                    THE COURT:  And in the days following were you

21       still teleworking?

22                    JUROR:  Yes.

23                    THE COURT:  Okay.  Did you follow the events of

24       January 6th at the Capitol on January 6th?

25                    JUROR:  Yes.
```

```
 1                    THE COURT:  And how did you watch it, on social

 2      media, television?

 3                    JUROR:  Both.

 4                    THE COURT:  And what -- do you follow a particular

 5      social media --

 6                    JUROR:  No.

 7                    THE COURT:  -- platforms?  And do you -- what

 8      television stations do you watch or were you watching, if

 9      you remember?

10                    JUROR:  Broadcast, whatever was free.

11                    THE COURT:  What?

12                    JUROR:  Whatever was free, so like the 4, 5, 7,

13      9s.

14                    THE COURT:  Those are the four?

15                    JUROR:  Yeah, yeah.

16                    THE COURT:  So did you watch a lot of it on that

17      day?

18                    JUROR:  No.

19                    THE COURT:  What about later that evening or the

20      following day?

21                    JUROR:  Still not a lot.  It was a lot, so.

22                    THE COURT:  Yeah.  Do you normally read the

23      Washington Post or any other newspapers?

24                    JUROR:  No.

25                    THE COURT:  Okay.  How do you normally get your
```

1     news?

2              JUROR:  If it's a headline it's through

3     conversations.  I find the news a bit depressing, so.

4              (Laughter)

5              JUROR:  So normally in conversation.  If something

6     is big enough to be discussed then I'll find out.

7              THE COURT:  If it's something important you'll

8     find out?

9              JUROR:  Yeah, yeah.

10             THE COURT:  Question Number 7 asked:  Do you have

11    such strong feelings about the events of January 6th at the

12    Capitol or about the people who participated in those events

13    that it would make it difficult for you to be a fair juror

14    in this case?

15             JUROR:  From what I know about what occurred that

16    day, the leaders of it were a hate group and so I have

17    strong feelings about that.

18             THE COURT:  Okay.  Now, you said the leaders.

19             JUROR:  Yeah.

20             THE COURT:  As you've heard about it, read about

21    it?

22             JUROR:  Yes.

23             THE COURT:  There were lots of people there that

24    day?

25             JUROR:  Mm-hmm.

1          THE COURT:  And you don't know anything about this

2     defendant, Mr. Gossjankowski, do you?

3          JUROR:  No.

4          THE COURT:  Do you think that even though you have

5     strong feelings about some of those who participated in

6     those events that you would be able to judge this case and

7     this defendant based only on the evidence that you hear from

8     witnesses and that you see in the courtroom during the

9     trial?

10          JUROR:  Yes, I would.

11          THE COURT:  Okay.  So in that respect, do you

12     think you could be fair and impartial to him?

13          JUROR:  I could.

14          THE COURT:  Now, the related question that you

15     answered was number 13, whether your opinion concerning

16     Donald Trump or his supporters would make it difficult for

17     you to be a fair and impartial juror.

18          Could you tell us more about your thinking on

19     that.

20          JUROR:  Kind of going hand in hand knowing that

21     what I know about the case and that, like, with the Proud

22     Boys and not denouncing that and all of that, it's a sour

23     taste related to --

24          THE COURT:  Talk a little louder.

25          JUROR:  The hate groups that support Donald Trump,

```
 1    so I'm a little -- I have feelings about that but it's
 2    related to, like I said, about the Number 7, I think.
 3              THE COURT:  Okay.  So you've mentioned the leaders
 4    of the groups, and the Proud Boys, and that some of those
 5    leaders are part of hate groups or are hate groups.  But
 6    like I said, there were lots of people that were there that
 7    day.
 8              JUROR:  Mm-hmm.
 9              THE COURT:  And do you accept the fact that not
10    all of them were part of the Proud Boys?
11              JUROR:  Mm-hmm.
12              THE COURT:  Yeah, or the Oath Keepers?
13              JUROR:  Mm-hmm.
14              THE COURT:  Say yes or no.
15              JUROR:  Yes.  I'm sorry, yes.
16              THE COURT:  And do you also understand that, you
17    know, like it or not, there were, you know, 48 or 49 percent
18    of voters who actually voted for Donald Trump?
19              JUROR:  Mm-hmm.
20              THE COURT:  And that a lot of people -- let me put
21    it this way.  You do not -- do you believe that everybody
22    who supported Donald Trump was part of a hate group?
23              JUROR:  Oh, no.
24              THE COURT:  Okay.
25              JUROR:  No.
```

1              THE COURT:  Okay.  Do you believe that everybody

2      that was at the Capitol that day was part of a hate group?

3              JUROR:  A part of -- no, no.

4              THE COURT:  Okay.  All right.  I'm going to move

5      on to some other questions.

6              JUROR:  Okay.

7              THE COURT:  You have three more answers, although

8      you have question marks next to a couple of them.

9              Question 35 asked:  Do you or any of your close

10     friends or immediate family work for law enforcement or ever

11     worked for law enforcement?  And that includes in D.C. or

12     elsewhere.  It includes Metropolitan Police Department here,

13     Capitol Police, FBI, Secret Service, Homeland Security,

14     other things, prosecutors' offices.

15             JUROR:  So my mother wasn't a law enforcement --

16             THE COURT:  Your mother?

17             JUROR:  She wasn't a police officer but she did

18     work for MPD.

19             THE COURT:  Oh, okay.

20             JUROR:  And then I do have an uncle who is active

21     police.

22             THE COURT:  Active police?

23             JUROR:  Yes.

24             THE COURT:  Here in D.C.?

25             JUROR:  Yes.

1          THE COURT:  At the Metropolitan Police Department?

2          JUROR:  No, but at one of the government

3    buildings.

4          THE COURT:  Oh, okay.  A special police officer,

5    you think?

6          JUROR:  I think.

7          THE COURT:  Okay.  Some sort of law enforcement?

8          JUROR:  Yes.

9          THE COURT:  And your mother was with MPD for a

10    long time?

11          JUROR:  Mm-hmm.

12          THE COURT:  But as a civilian employee but not as

13    an officer?

14          JUROR:  Yes.

15          THE COURT:  I asked whether you, or any members of

16    your family, or close personal friends have ever been

17    arrested for a crime, or charged with a crime, or convicted

18    of a crime.  Would you tell us about that.

19          JUROR:  Immediate family.

20          THE COURT:  Yeah.

21          JUROR:  Siblings arrested but not convicted.

22          THE COURT:  Did they go to trial?

23          JUROR:  They did.

24          THE COURT:  And found not guilty?

25          JUROR:  One went and was found not guilty and the

```
 1     other one had cases dismissed.
 2                 THE COURT:  Had what?
 3                 JUROR:  Had the case dismissed.
 4                 THE COURT:  Okay.  And from the same?
 5                 JUROR:  Two separate.
 6                 THE COURT:  Two separate things?
 7                 JUROR:  Mm-hmm.
 8                 THE COURT:  And what were their relations to you?
 9                 JUROR:  Siblings, my brothers.
10                 THE COURT:  Okay.  Both of them?
11                 JUROR:  Mm-hmm.
12                 THE COURT:  So one of them had his case dismissed
13     and one of the actually went to trial.
14                 Your brother who went to trial, what was the
15     charge, if you remember?
16                 JUROR:  That one might have been firearms.
17                 THE COURT:  Okay.
18                 JUROR:  I think.
19                 THE COURT:  Okay.  But he was found not guilty?
20                 JUROR:  Mm-hmm.
21                 THE COURT:  And then the last question I asked had
22     to do with the timing of the trial, question 48.  And I
23     said, you know, we would probably go through the end of next
24     week but with jury deliberation we might go into the
25     following week.
```

1              So what is your specific concern about the timing?

2              JUROR:  We just had some -- I work in HR, we just

3     had some meetings and things like that, but...

4              THE COURT:  It is what it is.

5              JUROR:  It is what it is.

6              THE COURT:  And what kind of work do you do?

7     Remind me again.

8              JUROR:  Benefits.  I'm a benefits specialist.

9              THE COURT:  Got it.

10             JUROR:  Yeah.

11             THE COURT:  Okay.  Questions?

12                            **EXAMINATION**

13    BY MR. DREHER:

14    Q.  Good morning, ma'am.

15    A.  Good morning.

16    Q.  So your brother who went to trial but was found not

17    guilty.  Was there anything about that experience that led

18    you to believe that he was not treated fairly by the

19    criminal justice system?

20    A.  No.

21    Q.  Was there anything that would affect your opinion of

22    either the testimony of police officers or the conduct of

23    the attorneys in this case?

24    A.  No.

25    Q.  And then earlier we were -- you were discussing with

```
 1     Judge Friedman about the hate groups that may have been
 2     present on January 6th.  And ultimately it was your
 3     conclusion that not everybody there was a member of a hate
 4     group, correct?
 5     A.  Yes.
 6     Q.  So would you be able to judge the actions of this
 7     defendant, Mr. Gossjankowski, separately from your thoughts
 8     about these specific hate groups?
 9     A.  Yes, separate the act from a person's potential belief,
10     yeah.
11     Q.  Certainly.  So you understand there's particular crimes
12     that have been charged and it's really just those crimes
13     that you would be considering?
14     A.  Yes.
15     Q.  And you're comfortable doing that?
16     A.  Yes.
17              MR. DREHER:  Okay.  I have no further followup.
18              THE COURT:  Mr. Smock.
19                           EXAMINATION
20     BY MR. SMOCK:
21     Q.  Good morning, Ms. Morris.
22     A.  Good morning.
23     Q.  I'm Ned Smock.  I'm from the Public Defender's Office.
24              You talked a little bit about your -- I think you
25     answered one of the questions about concerns about your
```

1    feelings about Donald Trump and people who participated in

2    the January 6th, and you -- the government just asked you

3    about what you said about hate groups.

4           And what you said is a feeling that's not unusual

5    and so I just wanted to ask you a little bit about that.

6    A.   Mm-hmm.

7    Q.   Can you just tell us a little bit about what you meant

8    about the leaders on January 6th being members of the hate

9    group.

10   A.   From what I know, and, again, I didn't follow it closely

11   or probably as closely as I should have, but I don't know,

12   that's just what I heard about it, is that it was, like I

13   said, the Proud Boys are the hate-related groups that were

14   leading the charge on that day.

15   Q.   I see.  And obviously you have objections to views that

16   you've seen associated with groups like that?

17   A.   Mm-hmm.

18   Q.   And in terms of your understanding of folks who were

19   there, I think Judge Friedman asked you about whether you

20   thought that participants or all participants were

21   associated with those groups, and I just wanted to make sure

22   we understood your answer about that.

23           Is it your view that everyone on January 6th who

24   was there and engaged in what happened was associated with

25   something you would consider a hate group?

```
 1    A.  No.  I have not understood.  That's not true.

 2    Q.  And, I mean, another question, and I think sort of

 3    broader, is your views about whether a person who was there,

 4    chose to be there on January 6th, might have had views or

 5    hateful views, whether or not they're associated with a

 6    group, that you view as hateful and you would have serious

 7    problems with.  Does that make sense?

 8    A.  I'm sorry, can you repeat?

 9    Q.  I'm sorry.  I'm just sort of trying to get at the

10    question of whether you have specific concerns about hateful

11    views about anyone who would have been there on January 6th

12    or whether it was specific to some people?

13    A.  I'm still not getting it.  I'm sorry.

14    Q.  No, no.  Don't apologize.

15    A.  Okay.

16    Q.  It's my fault.

17    A.  All right.  One more time.

18    Q.  I'm the lawyer, I'm supposed to be able to ask

19    reasonable, understandable questions.  Let me see how I can

20    do this.

21    A.  Okay.

22    Q.  It's my fault.

23    A.  Okay.

24    Q.  Are you concerned about your ability to be fair in this

25    case because of a view that anyone who would have gone on
```

```
1     January 6th is a hateful person?

2     A.  No.  I believe that I can separate an act or what the

3     charges are from a person and what their beliefs may be.

4     Q.  Okay.  And you as you sit here, don't have any

5     information about what my client believed or anything like

6     that?

7     A.  No.

8     Q.  And also no reason to believe that he was a member of

9     any particular group?

10    A.  No.

11    Q.  Okay.  You have family members -- you said that your

12    mother was in MPD?

13    A.  Yes.

14    Q.  Not on the street but associated --

15    A.  A civilian employee, yes.

16    Q.  And another family member, you mentioned your uncle?

17    A.  Yes.

18    Q.  There's going to be footage of good people from MPD who

19    were heros, who did everything they possibly could on that

20    day to protect the Capitol, and you're going to see footage

21    of them under attack, and suffering, and in pain.

22         And I wonder if you could talk to us about whether

23    given your family connections or given any experience you've

24    had, that's something that causes you concern about being

25    able to be fair and consider the specific issues in this
```

1    case.

2    A.  As a human being with empathy I have that problem, but

3    it's not related to them being police officers.  Seeing

4    anybody attacked or hurt is hard.

5    Q.  Understood.  That's a good sign that you feel that way.

6         But do you think that you have any particular

7    sensitivity to seeing images or footage like that that would

8    cause you concern about having feelings about that that then

9    would make it difficult for you to focus on these legal

10   issues that we're talking about in this case?

11   A.  Possibly.

12   Q.  Can you talk about that a little bit?

13   A.  I don't know if I'm allowed to ask, but is the video

14   going to show him hurting somebody?

15        THE COURT:  Is the video going to show what?

16        JUROR:  Is the video going to show --

17        THE COURT:  You're going to have to wait to see

18   what the evidence is.

19        JUROR:  Okay.

20        THE COURT:  I think --

21        JUROR:  In a case if I were to see something like

22   that I would be swayed, if the defendant was possibly on

23   video doing something, but if it's not related to him, I

24   think I can separate the two.

25        THE COURT:  Well, I think, though, that Mr.

```
1    Smock's question, if I can understood correctly, is still

2    related to your mother.

3            And is the fact that your mother worked for the

4    Metropolitan Police Department going to affect your sympathy

5    towards police if you saw on the videos that some of them

6    were assaulted?

7            JUROR:  Not because they're police, but because

8    they're humans.

9            THE COURT:  Because they're humans?

10           JUROR:  Yeah, because they're people, not because

11   they're police.

12           THE COURT:  All right.

13           JUROR:  The police aspect of it doesn't weigh

14   heavily, but I'm just an empathetic person so I'm going to

15   be affected by it.

16   BY MR. SMOCK:

17   Q.  That's understood.  And I guess, this will be my last

18   question.

19           I guess what I was trying to get at is there are

20   some people who come here for potential jury service who

21   say, I am particularly sensitive to images of violence and

22   that because I'm a human being, that whether it's because of

23   a family member or any other reason, I have concerns about

24   an ability to sort of separate my reaction to violence and

25   footage of it from evaluating specific facts, that I'm so
```

1    impacted by images of violence that that causes me to be

2    concerned about being fair and I'm just wondering if you

3    might fit in that category?

4    A.  I can't 100 percent say yes, but that is a possibility.

5    Q.  Okay.  And, this is again me asking a question

6    unartfully.

7           Obviously if there are images of violence that

8    show a crime being committed by my client, that's something

9    that you would need to consider.

10   A.  Mm-hmm.

11   Q.  But I guess my question is more whether general footage

12   of violence is something that you would be especially

13   sensitive to and we should be concerned about?

14   A.  No.  Seeing someone in a fight in the morning isn't

15   going to make me come in here and be bias towards your

16   client.

17           THE COURT:  Say that, and talk a little louder.

18           JUROR:  I was saying, if I were to see a separate

19   act of violence that wouldn't make me biased towards the

20   defendant.  I don't know.

21   BY MR. SMOCK:

22   Q.  I think I understand what you're saying.

23   A.  Yeah.

24   Q.  Thank you, I appreciate it.

25   A.  Gosh.

```
 1                 THE COURT:  Any further questions?

 2                 MR. DREHER:  No, Your Honor.  Thank you.

 3                 THE COURT:  Okay.  We're going to ask you to come

 4     back this afternoon at 2:00.

 5                 JUROR:  Okay.

 6                 THE COURT:  By then we'll have the group narrowed

 7     to about 30, 35 people and we will then pick the jury from

 8     that group.

 9                 So if you report back to the jury lounge at 2:00

10     on the fourth floor where you were.

11                 JUROR:  Yes, sir.

12                 THE COURT:  Ms. Johnson will meet you down there.

13                 JUROR:  Okay.

14                 THE COURT:  Okay.  Thank you very much.

15                 JUROR:  Thank you.

16                 THE COURT:  Thank you for your candid answers too.

17                 Don't forget to get all your belongings.

18                 (Juror excused from courtroom)

19                 THE COURT:  2131.  The next person I have is

20     number 2131.

21                 So I think I'm going to ask him -- well, maybe

22     I'll go in order.

23                 MS. JOHNSON:  I'm sorry, the juror is in the

24     restroom, he'll be with us momentarily.

25                 (Juror present)
```

1                    **(Juror Number 2131)**

2                         **EXAMINATION**

3              THE COURT:  Sir, good afternoon.  Be careful.

4              Would you mind taking off your mask and talking

5       into the microphone so we can hear you?

6              JUROR:  No, not at all.

7              THE COURT:  I take it you're retired?

8              JUROR:  Pardon me?

9              THE COURT:  I understand you're retired?

10             JUROR:  Yes.

11             THE COURT:  And what kind of work did you do

12      before you retired?

13             JUROR:  Human resources.

14             THE COURT:  Say that again?

15             JUROR:  Human resources.

16             THE COURT:  For the government, or private sector,

17      or what?

18             JUROR:  Government, private sector, hospitality,

19      hotels.

20             THE COURT:  Okay.  What kind of -- which

21      government agencies did you work for?

22             JUROR:  I've worked for the Government of

23      Virginia, the State of Virginia, the Government of District

24      of Columbia.

25             THE COURT:  Okay.  And how long have you been

 1    retired?

 2                 JUROR:  Pardon me?

 3                 THE COURT:  How long have you been retired?

 4                 JUROR:  On and off three years.

 5                 THE COURT:  Okay.  So turning to some of the

 6    questions near the end of the questionnaire, the questions I

 7    asked you, rather.

 8                 Do you have any health issues that are concerning?

 9                 JUROR:  No.

10                 THE COURT:  Do you have any hearing problems?

11                 JUROR:  No.

12                 THE COURT:  Okay.  You did answer this last

13    question where I said, are there other reasons that I

14    haven't otherwise asked about --

15                 JUROR:  Yes.

16                 THE COURT:  -- that would make you think it would

17    be difficult for you to be fair and impartial?

18                 JUROR:  Well, you said other reasons.

19                 THE COURT:  Well --

20                 JUROR:  And you didn't mention fair, whatever, so.

21    There were two parts to that.

22                 The first was on the original item that I was sent

23    that I answered it said that people of a certain age could

24    be excused.  I said no, it's two weeks.  Don't worry about

25    it.

1          However, you insinuated that it would be much

2     longer --

3          THE COURT:  Well, it will be a little bit longer.

4          JUROR:  I am dealing with a friend's estate that

5     it's interrupting.  So that's part one of that.

6          And then part two is the actual case itself and

7     what I believe should happen to all the people who were

8     involved.

9          THE COURT:  And to that extent, now I'm going to

10    go back to the very beginning of the questions I asked.

11         JUROR:  Okay.

12         THE COURT:  And I said the very first question,

13    number 1, based on the brief description that I gave two

14    days ago or three days, whenever it was of the case, do you

15    already -- I first asked, do you have any personal knowledge

16    of the facts of this case?

17         JUROR:  Yeah, yes.  I have no personal knowledge

18    of this case whatsoever.

19         THE COURT:  But I take it that you have strong

20    feelings about the events of January 6th?

21         JUROR:  Yes.

22         THE COURT:  And do you feel that anybody who's

23    charged with a crime should -- or arrested for a crime is

24    probably guilty?

25         JUROR:  Okay.  If I could put it my way?

1          THE COURT:  Yeah.

2          JUROR:  Anyone that crossed any of those barriers

3     on that day should be prosecuted to the fullest extent of

4     the law.

5          THE COURT:  And would you have any -- would you --

6     are you -- does that view mean that you would find it

7     difficult or impossible to judge this defendant only on the

8     evidence you hear in the courtroom.

9          JUROR:  Yes, that's -- that is for sure, yes.

10         THE COURT:  I mean, so if I were to tell you, or

11    if you were -- if I ask you to assume that this defendant,

12    Mr. Gossjankowski, was on the Capitol grounds, and did enter

13    the Capitol, and is charged with doing certain things, are

14    those facts enough for you to say, I can't give him a fair

15    trial?

16         He's on the Capitol grounds --

17         JUROR:  You said he did.

18         THE COURT:  Well, I said, assume he was on the

19    grounds on January 6th of the Capitol.  That he entered the

20    Capitol.

21         JUROR:  Yes.

22         THE COURT:  As lots of people did on that day.

23         JUROR:  No, got it.

24         THE COURT:  He did.  Let's assume.  And that the

25    government can prove that both with testimony and with

1    videos.

2                    And then the government has charged him with --

3                    JUROR:  Yeah, you mentioned.

4                    THE COURT:  -- with six separate crimes.

5                    JUROR:  Mm-hmm.

6                    THE COURT:  And the rule of law is they've got to

7    prove it.

8                    JUROR:  Oh, yes.

9                    THE COURT:  But are you saying that because he

10   crossed the line --

11                   JUROR:  No, I admit that's one of, I presume, the

12   six, which might be -- and I don't know what the legal

13   termination is, criminal trespass or something like that.

14   That would be number one.

15                   But the others -- and I cannot remember what

16   you've said they were at the time, so --

17                   THE COURT:  Obstruction.

18                   JUROR:  They have to prove each one.

19                   THE COURT:  Okay.  I have a whole bunch of other

20   questions I want to ask you about, unless you want to invoke

21   your statutory right to be excused.

22                   Because like me, you're over a certain age and you

23   don't have to serve on a jury if you don't want to.

24                   JUROR:  I think in this case I would like to, as

25   your point said, invoke that right.

```
 1                   THE COURT:  Okay.  In that case we'll excuse you
 2       from the jury and you should go down to the jury lounge on
 3       the fourth floor and tell them you've been excused.
 4                   But I think you should probably also tell them
 5       that you meant to check that box that you're over 70 and you
 6       don't want to serve.
 7                   JUROR:  I'll --
 8                   THE COURT:  You decide what you're going to tell
 9       them.
10                   JUROR:  Yes, thank you.
11                   THE COURT:  But you're excused from this jury.
12                   JUROR:  Okay.
13                   THE COURT:  Thank you very much for your patience
14       and your candor with us.
15                   MS. JOHNSON:  Sir, you can exit out of the front.
16                   JUROR:  Okay.
17                   (Juror excused)
18                   MS. JOHNSON:  1193.
19                   THE COURT:  1193.
20                   I thought that would take less time than it would
21       otherwise take if we had gone through all of his answers and
22       followups, so.
23                   This is 1193 coming in next.
24                   (Juror present)
25
```

1                    **(Juror Number 1193)**

2                         **EXAMINATION**

3               THE COURT:  Good afternoon.

4               JUROR:  Hello.

5               THE COURT:  Thanks for your patience.

6               If you don't mind taking off your mask and speak

7    into the microphone so we can hear you.

8               Would you tell us where you work?

9               JUROR:  I work at the U.S. Digital Service.

10              THE COURT:  U.S.?

11              JUROR:  Digital service.

12              THE COURT:  Is that a part of a governmental

13   agency?

14              JUROR:  Yeah, it's a part of OMB, Office of

15   Management and Budget.

16              THE COURT:  Okay.  So where is your office?

17              JUROR:  I'm remote, but occasionally work out of

18   the White House complex.

19              THE COURT:  The old executive office building?

20              JUROR:  Yes.

21              THE COURT:  Were you there on January 6th?

22              JUROR:  No, I was at home.

23              THE COURT:  Okay.  And the question was whether --

24   question number 3 was whether you work or live near the U.S.

25   Capitol.

1           JUROR:  Yeah, I'm in southwest D.C.  It's about a

2      mile from the Capitol.

3           THE COURT:  So was -- so you're within walking

4      distance on a good day?

5           JUROR:  Yes.

6           THE COURT:  Was there anything as a result of the

7      events at the Capitol that on that day that affected your

8      commute, or your neighborhood, or --

9           JUROR:  I was working remotely, so I was at home.

10     But there was a curfew for the city and, you know, I was --

11     I was locked at home as a result.

12          THE COURT:  Yeah, I guess that's true.

13          On January 6th did you follow the events as they

14     were happening?

15          JUROR:  Yes.

16          THE COURT:  Most of the day or?

17          JUROR:  Yes.

18          THE COURT:  And in the evening?

19          JUROR:  Yes.

20          THE COURT:  And social media, or on television, or

21     what?

22          JUROR:  TV and, you know, yeah, you know, New York

23     Times, Washington Post, you know, major outlets like that.

24          THE COURT:  So do you follow the New York Times,

25     Washington Post, on your devices?

```
 1              JUROR:  Yes.

 2              THE COURT:  Okay.  And did you continue to follow

 3     the events of January 6th and subsequent days and week?

 4              JUROR:  Yes.

 5              THE COURT:  And you did indicate in response 11

 6     that you watched some of the hearings.  About how much, what

 7     would you say, extensively?

 8              JUROR:  I watched all of them.

 9              THE COURT:  Watched all of the hearings?

10              JUROR:  Yes.

11              THE COURT:  So in view of the fact that you

12     followed the events of January 6th and, closely apparently,

13     and watched so much of the congressional hearings, do you

14     think you could be a fair and impartial juror in this case?

15              JUROR:  Yes.

16              THE COURT:  Do you think if I told you to consider

17     only the evidence that you hear in this courtroom from

18     witnesses and the videos that you see that you could limit

19     yourself to that?

20              JUROR:  Yes.  Definitely.

21              THE COURT:  All right.  And you don't know

22     anything about Mr. Gossjankowski, the defendant in this

23     case, correct?

24              JUROR:  No.

25              THE COURT:  And as we start the trial, do you have
```

1      a view about whether he's probably guilty or not?

2                  JUROR:  No.

3                  THE COURT:  Moving on.

4                  You also answered question 37 about whether you,

5      or immediate family members, or close friends, or lawyers

6      attended law schools or worked in law offices.

7                  JUROR:  Yes.  Yeah, I have friends that did go to

8      law school.

9                  THE COURT:  Are they practicing law here?

10                 JUROR:  Some, yes.

11                 THE COURT:  And do you know whether any of these

12     close friends, if they're close friends, if they are

13     prosecutors or criminal defense lawyers?

14                 JUROR:  No.

15                 THE COURT:  They are not?

16                 JUROR:  No.  One works in like employment law, so

17     maybe they do go to court sometimes.  I'm not sure about --

18                 THE COURT:  Employment lawyers?

19                 JUROR:  Yeah.

20                 THE COURT:  Yeah.  Okay.

21                 And I think the last question you answered was

22     about your prior jury service.

23                 Could you tell us about that, please.

24                 JUROR:  It was a D.C. case, it was about ten years

25     ago.  It was a drug bust.

1              THE COURT:  And was the jury able to reach a

2     verdict?

3              JUROR:  Yes?

4              THE COURT:  Guilty or not guilty?

5              JUROR:  Not guilty.

6              THE COURT:  Okay.  Is there anything about that

7     experience that would make you reluctant to serve again?

8              JUROR:  No.

9              THE COURT:  Okay.  Questions?

10                          **EXAMINATION**

11    BY MR. DREHER:

12    Q.  Good afternoon, sir.

13              While working with the U.S. Digital Service, is

14    that an at-will job?  In other words, are you -- is your

15    hire or firing controlled by any of the political -- a

16    political appointee?

17    A.  There is an administrator that is a political appointee

18    but we are part of OBM.  So it's is a term limited position.

19              THE COURT:  It is a term limited position?

20              JUROR:  Yes.

21              THE COURT:  Your's is?

22              JUROR:  But it's not politically appointed.  It's

23    like a fellowship.

24    BY MR. DREHER:

25    Q.  So you wouldn't have any concerns about any possible

```
 1    political views of this case as it relates to your

 2    employment?

 3    A.  No.

 4              MR. DREHER:  I have no further followup.

 5                          EXAMINATION

 6    BY MR. SMOCK:

 7    Q.  Hello, my name is Ned Smock.

 8    A.  Hi.

 9    Q.  You said that you followed the hearings after

10    January 6th.

11              Can you tell us a little bit about what motivated

12    you to set aside time to watch the hearings.

13    A.  It's, you know, pertained to my city, my home where I

14    live.  And, again, I live very closely to the Capitol and

15    work in federal government so, you know, I follow news like

16    that.

17    Q.  And after, you know, after seeing the events of

18    January 6th, can you talk about kind of your reaction at the

19    time and then the days afterwards?

20    A.  Can you be more specific?

21    Q.  Some people say they were angry, afraid, perturbed.  Do

22    any of those fit your state of mind at the time?

23    A.  I mean, it was a confusing but difficult situation for

24    everybody in the city.  I mean, I mentioned before we were

25    under curfew as a result of this action, so, you know, I was
```

 1    definitely concerned about safety of my neighborhood.
 2    Q.  What about of any feelings you had towards people who
 3    were there that day, who participated that day?
 4    A.  Can you be more specific?
 5    Q.  Do you have any feelings one way or another about people
 6    who were there that day and participated?
 7    A.  I was, you know, questioning the motivations for the
 8    actions, I guess.
 9    Q.  Never felt anger or anything like that towards them?
10    A.  Not anger, but, you know, again was definitely concerned
11    about the safety of my neighborhood and the people in the
12    building and, you know, surrounding area.
13    Q.  And I guess one thing that some people may feel when
14    asked to serve on a jury in a case like this, which is sort
15    of a moment in our city's history, is an interest in
16    participating in the jury because of that, because of
17    interest in January 6th.  Is that something that you feel?
18    A.  I mean, I'm a federal employee and, you know, jury duty
19    is part of that, you know, my job is sort of service
20    related, so I definitely see this as part of that duty, that
21    service.
22    Q.  So you're thinking about this case wouldn't differ from
23    the previous case that you had been involved in?
24    A.  No.
25    Q.  Can you say with confidence that you could be totally

1    fair to our side, recognizing that there are allegations

2    that is our client was involved on January 6th and may have

3    participated in events that caused you to be concerned about

4    the safety of the city?

5    A.  Yeah, I could be fair, yes.

6    Q.  Okay.  Thank you.

7              THE COURT:  Anything anybody wants to raise?

8              All right.  We're going to ask you to come back

9    this afternoon at 2:00 to the jury lounge on the fourth

10   floor.  We will have about 35 people or so and then we will

11   pick a jury of twelve and two alternates from that group

12   this afternoon.

13             JUROR:  Okay.

14             THE COURT:  So Ms. Johnson will meet you down

15   there at 2:00.

16             JUROR:  Great.

17             THE COURT:  Thank you for your patience and we'll

18   see you again later.

19             JUROR:  Thank you.

20             THE COURT:  Thank you.  And you can actually, if

21   you have all your belongings, you can go out the front way

22   there.

23             JUROR:  Okay.  Thanks.

24             (Juror excused from courtroom)

25             THE COURT:  327, I believe.

```
 1                MS. JOHNSON:  Yes.
 2                THE COURT:  And I'm going to start at question 48.
 3                (Juror present)
 4                        (Juror Number 0327)
 5                            EXAMINATION
 6                THE COURT:  Sir.
 7                JUROR:  Yes, sir.
 8                THE COURT:  Please have a seat.  And, if you don't
 9     mind, take off your mask so we can hear you.  Good
10     afternoon.
11                JUROR:  Of course.
12                THE COURT:  Sir, you're number 327; is that
13     correct?
14                JUROR:  Yes, sir.
15                THE COURT:  Are you retired?
16                JUROR:  No, sir, not that I know of.
17                THE COURT:  That's good.  I was looking at the
18     list and it didn't tell us what you do or you did.
19                JUROR:  I'm an attorney.  I'm practicing the law
20     in the District of Columbia, Maryland, Virginia.
21                THE COURT:  Could you get a little closer to the
22     microphone.
23                So you're a practicing attorney in D.C.?
24                JUROR:  Yes, sir.
25                THE COURT:  And what kind of work do you do?
```

```
 1                JUROR:  I'm a principle in a small law firm.

 2                THE COURT:  Okay.  What kind of work do you do?

 3                JUROR:  I do litigation, trials, appeals, criminal

 4     and civil.  I also do --

 5                THE COURT:  So criminal defense work is part of

 6     what you do?

 7                JUROR:  Yes, sir.

 8                THE COURT:  Do you have prior experiences as a

 9     prosecutor or defense lawyer?  I mean, like public defender

10     or U.S. Attorney's Office?

11                JUROR:  Well, I began my career as a member of the

12     panel of court-appointed attorneys in the Superior Court and

13     also in the federal court in the Eastern District of

14     Virginia and I've tried approximately 100 cases to verdict.

15                And later on as my career proceeded I began to do

16     more civil lawsuits and still I take the occasional criminal

17     case if it's appropriate.

18                THE COURT:  You may have said this already.  Is

19     your office in the District, or Maryland, or Virginia?

20                JUROR:  It's in the District of Columbia.

21                THE COURT:  Okay.

22                JUROR:  My firm also has an office in Richmond,

23     Virginia.

24                THE COURT:  So I'll start near one of the last

25     questions I asked, is you put down 48, which has to do with
```

1        whether serving as a juror in this case in light of what we

2        said about the schedule would impose a hardship on you.

3        Could you tell us about that, please.

4                 JUROR:  Well, I do have a -- my own clients and my

5        own cases going on, and so I don't know if I could be put,

6        perhaps, towards the end.

7                 I understand my civic obligations but I have

8        things scheduled that I'm not able to address for my own

9        cases.  And there's only two lawyers in the firm at this

10       time, so we don't have a large bench to fill in.

11                THE COURT:  Only two lawyers in the firm?

12                JUROR:  There's only two lawyers in the firm at

13       this time, correct.

14                THE COURT:  Okay.  So, all right.

15                And do you have trials, or appeals, or court

16       appearances scheduled in the next couple weeks?

17                JUROR:  I have -- I have no -- I have I think one

18       hearing scheduled and I have a number of briefs and other

19       oppositions to motions that I'm trying to --

20                THE COURT:  And do you think, I know this may be a

21       hard question to answer, but do you think if you were

22       selected for this jury that you would either be resentful or

23       be distracted and not able to focus on this trial?

24                JUROR:  No.

25                THE COURT:  Okay.  I'm going to go back to the

1    earlier part of the questionnaire.

2              You answered question number 1, which said:

3              Based on the brief description of the case that I

4    outlined, do you think you have personal knowledge of the

5    facts of this case, or think you might have heard about it,

6    or read about it?

7              JUROR:  I don't recall that I answered that.  I

8    heard about what happened at the Capitol.

9              THE COURT:  Of course.

10             JUROR:  And I read about it.  I don't know this

11   defendant.  I've never heard about this case.  And I know

12   nothing about the facts of this case.

13             THE COURT:  So you don't know anything about Mr.

14   Gossjankowski?

15             JUROR:  Never heard of him, never seen him.

16             THE COURT:  Okay.  But where were you on

17   January 6th?  In your office?  At home?  Whatever?

18             JUROR:  Is that a trick question?  I don't know

19   where I was on January.  I don't recall, I was somewhere in

20   D.C., but I don't know.

21             THE COURT:  Did you watch a lot of it during the

22   course of the day?

23             JUROR:  I've seen clips, whether it was on

24   January 6th or the 7th or, I wasn't, you know, glued to the

25   television or anything like that.  I was probably -- I don't

 1    know, was it a working day?  If it was a working day, I was

 2    probably working, so.

 3              THE COURT:  Sure.  You did say you watched some of

 4    the hearings.  How much of the congressional hearings did

 5    you watch?

 6              JUROR:  I've only seen clips, you know, little

 7    tiny clips of the hearings.

 8              THE COURT:  How do you normally get your news?

 9              JUROR:  I subscribe to Washington Post, New York

10    Times and Wall Street Journal.

11              I am on Twitter, Facebook.  I listen to NPR if I'm

12    in my car.  And I think I'm generally pretty well-informed,

13    but I don't have a go-to source.

14              THE COURT:  Okay.  So you may have answered this

15    question in part but you can give us more information to 36

16    and 37, whether you, we know the answer, members of your

17    immediate family, close personal friends are lawyers, have

18    gone to law school, or ever worked in the criminal justice

19    system.

20              So other than yourself, family members, close

21    personal friends, I mean.  If you're a lawyer, probably all

22    of your -- a lot of your friends are lawyers.

23              JUROR:  I do have a lot of friends who are lawyers

24    on both sides.  I have friends who are -- I don't know if

25    anybody's currently a prosecutor, but previously have been

1          prosecutors who have gone into private practice.

2                    But none of that would affect my ability to be

3          fair and impartial.

4                    THE COURT:  Okay.  Have you, or any close friends,

5          or members of your family been arrested or charged with a

6          crime or convicted of a crime?

7                    JUROR:  I was arrested many, many years ago for

8          possession of marijuana.  It was subsequently subsequently a

9          C-11, I really don't have to mention because it was

10         expunged.  It was 40 years ago.

11                   THE COURT:  Yeah.

12                   Question 41:  Have you, or members of your

13         immediate family, or close personal friends ever been a

14         victim of a crime or a witness to a crime?

15                   JUROR:  Our house was robbed a couple times.  Our

16         car was stolen a bunch of times.  But nothing, like,

17         extremely --

18                   THE COURT:  Yeah.

19                   JUROR:  -- totally normal.  Nothing traumatic or

20         nothing that would affect my ability to be fair and

21         impartial.

22                   THE COURT:  And would you tell us about your prior

23         jury experience, please.

24                   JUROR:  I sat on one jury in Superior Court 20

25         years ago, I'm guesstimating.  And everybody went fine.  I

1    mean, we were able to reach a unanimous verdict.

2              THE COURT:  Was it criminal or civil?

3              JUROR:  Criminal.

4              THE COURT:  Do you remember what kind of case it

5    was?

6              JUROR:  No.

7              THE COURT:  Okay.  Questions?

8                          **EXAMINATION**

9    BY MR. DREHER:

10   Q.  Good afternoon, sir.

11   A.  Yes, sir.

12   Q.  Now, earlier you told us you don't have any information

13   about this specific case, but have any of your clients been

14   January 6th-related charges or have you represented anyone

15   related to January 6th?

16   A.  No.

17   Q.  And also you mentioned your prior experience.  You said

18   you've tried approximately 100 cases to verdict?

19   A.  Yes, sir.

20   Q.  Have there been additional trials that you've had that

21   have not gone all the way to verdict?

22   A.  Sure.  There have been mistrials.  There have been nolle

23   prosses, there have been -- I can't think of any other

24   reasons why they don't go to verdict.

25              I had one client who just didn't come back to

1    court one day and we haven't -- that was about 30 years ago,

2    so I guess it's still going on, but that, you know, most of

3    them, you know, once you start you get a verdict, but

4    sometimes you don't.  Mistrials, I would say primarily.

5    Q.  And then 20 years ago when you did serve on a jury, was

6    there any, I guess, difficulty while you were in the jury

7    room deliberating with other jurors?

8    A.  No.

9    Q.  Do you recall if those other jurors, perhaps, looked up

10   to you and respected your status as a juris doctorate?

11   A.  I have no idea.

12   Q.  Okay.

13            MR. DREHER:  I have no further followup, Your

14   Honor.

15            THE COURT:  Mr. Smock.

16            MR. SMOCK:  I don't have any questions.  Thank

17   you.

18            THE COURT:  Okay.  I think we'll ask you to come

19   back this afternoon.  We're going to get -- you want to talk

20   first?

21            MR. DREHER:  If I may, Your Honor, if the Court

22   will indulge.

23   BY MR. DREHER:

24   Q.  Are any of your clients currently facing criminal

25   charges that have been filed by the United States Attorney's

LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

```
 1    Office for the District of Columbia?

 2    A.  Current clients, let me think.  Current clients, yes.

 3    Q.  Could you tell us exactly how many.

 4    A.  I thought of one, that's why I said yes.

 5              THE COURT:  Who are currently being prosecuted or

 6    investigated?

 7              JUROR:  It's --

 8              THE COURT:  We don't want you to divulge client

 9    confidentiality.

10              JUROR:  It's an ongoing case in which the other

11    side is the U.S. Attorney's Office in the District -- in the

12    Superior Court branch of the U.S. Attorney's Office.

13              THE COURT:  All right.

14              JUROR:  It's been going on for some time, it's

15    ongoing.  I don't do that many criminal cases anymore.  I'm

16    just racking my brain to think if I have anything else

17    that's going on right now.

18              I've had many former clients, but I think there's

19    only one right now that's still ongoing.

20    BY MR. DREHER:

21    Q.  Would you have any discomfort with a current client who

22    on the other side of the 'v' is the United States Attorney's

23    Office as it relates to this case?

24    A.  No, absolutely not.

25              THE COURT:  Anything further?
```

1           Okay.  Well, we're going to ask you to come back

2     this afternoon at 2:00.

3           JUROR:  Okay.

4           THE COURT:  And pick the jury out of the remaining

5     35 or so people.  And if you'd show up on at the jury lounge

6     at the fourth floor again at 2:00, Ms. Johnson will be there

7     and meet everybody.

8           JUROR:  Thank you, sir.

9           THE COURT:  Thank you very much.

10          MS. JOHNSON:  Please exit out the front, please.

11    Thank you.

12          THE COURT:  One second.

13          (Juror excused from courtroom)

14          THE COURT:  Well, you all can decide what you want

15    to do with your peremptory challenges.

16          I came away thinking he's not going to be a happy

17    camper if he's a juror and he's going to be less of a happy

18    camper if he's an alternate, but he may not be either.

19          The next person is 752.

20          (Juror present)

21                      **(Juror Number 0752)**

22                          **EXAMINATION**

23          THE COURT:  Good afternoon.  How are you?

24          JUROR:  Good.  How are you?

25          THE COURT:  Good.  Thank you for your patience.

```
 1            You're Juror 752, correct?

 2                 JUROR:  0752.

 3                 THE COURT:  And if you wouldn't mind taking off

 4       your mask so we can hear you a little better.

 5                 We have just a few followup questions based on

 6       your questionnaire.

 7                 One is related to question number 6.

 8                 So where were you on January 6th, 2021?  At home?

 9       At work?

10                 JUROR:  I was at home.

11                 THE COURT:  And did you watch the events on

12       television or social media?

13                 JUROR:  I did, yes.

14                 THE COURT:  As they were ongoing?

15                 JUROR:  Somewhat.  I was working from home, so I

16       was, like, in between work and also, like, trying to keep up

17       with the news.

18                 THE COURT:  And have you followed it since then?

19                 JUROR:  Somewhat.  I think of what I've primarily

20       followed has been more like the government involvement in

21       the situation.

22                 THE COURT:  What do you mean?

23                 JUROR:  So, like, Trump's involvement versus,

24       like, the involvement of the citizens involved.

25                 THE COURT:  So less focused on the people in the
```

1     Capitol than --

2                  JUROR:  That's right.

3                  THE COURT:  -- than President Trump himself?

4                  MR. SMOCK:  Yeah.

5                  THE COURT:  So you put down question 11.  How much

6     of the congressional hearings did you watch?

7                  JUROR:  Very little.

8                  THE COURT:  And are you on any particular social

9     media platforms?

10                 JUROR:  Yeah, I'm on Facebook and Instagram.

11                 THE COURT:  Facebook and?

12                 JUROR:  Instagram.

13                 THE COURT:  Okay.  Number 36, have you, or a close

14    friend, or a member of your family ever worked in the

15    criminal justice system?

16                 JUROR:  Yeah.  I have a sister who is a detention

17    officer from Maricopa County in Arizona.  She is actually

18    going to leaving that role for a bailiff role in another

19    county.

20                 THE COURT:  All right.  And then I asked whether

21    you, or a member of your family, or close personal friend

22    has ever been a victim of a crime or a witness to a crime

23    or?

24                 JUROR:  Yes.  One of my close friends actually

25    just recently was carjacked in D.C., and this happened maybe

```
 1   about a week and a half ago.
 2              THE COURT:  And where did it happen?
 3              JUROR:  It happened over by Gallaudet.
 4              THE COURT:  By Gallaudet?
 5              JUROR:  Yeah.  Another vehicle sideswiped him and
 6   when he got out of the vehicle they jumped in and took his
 7   car and took off.
 8              THE COURT:  Was he injured?
 9              JUROR:  He was not injured luckily.
10              THE COURT:  Did they find the car?
11              JUROR:  They did find the car.
12              THE COURT:  What kind of shape was it in?
13              JUROR:  It was in okay shape.  I think the
14   interior was more damaged as they decided to have cigarettes
15   and whatnot and burned some of the fabric within.
16              THE COURT:  I assume no one was ever arrested?
17              JUROR:  There were no arrests.
18              THE COURT:  So you said it was near Gallaudet.
19              Does your friend have a connection with Gallaudet
20   University?
21              JUROR:  No, he was actually on his way to go get
22   lunch.
23              THE COURT:  All right.  Questions?  Followup
24   questions?
25
```

 1                            **EXAMINATION**

 2    BY MR. DREHER:

 3    Q.  Good afternoon, sir.

 4    A.  Hi, how's it going?

 5    Q.  With your friend's case just a week ago, were you

 6    involved in that in any way?

 7    A.  No, I wasn't.

 8    Q.  Did you, I guess, only hear about it through your

 9    friend?

10    A.  Yeah.  He had called us to get a ride back --

11    Q.  Oh.

12    A.  -- after he didn't have his vehicle.

13    Q.  All right.  Do you have any indication whether or not he

14    was treated fairly by the police or the system in itself?

15    A.  Yeah, I think so.  His vehicle was found later that day

16    too, so it was pretty swift.

17    Q.  So is there anything about that that would have you

18    either judge the credibility of a police officer either more

19    or less than a normal person?

20    A.  No, I would not.

21    Q.  Now, do you have any connection to Gallaudet University?

22    A.  I don't, no.

23    Q.  Have you ever been on the campus?

24    A.  I have not.

25    Q.  So was your friend around that area just because -- just

1    lunch?

2    A.   Yeah, I hear he was headed to Chick-fil-A.

3             MR. DREHER:  I have no further followup.

4             MR. SMOCK:  I don't have any questions.

5             THE COURT:  Okay.

6             Sir, we're going to ask you to come back at 2:00.

7    Report to the jury lounge on the fourth floor.  Ms. Johnson

8    will meet you there with other people.

9             We're going to have by that time about twice as

10   many people as we need for the jury, so we'll bring

11   everybody back up here and then we will pick our jury from

12   that group today.

13            JUROR:  Sounds good.

14            THE COURT:  So thank you very much and thanks for

15   your patience so far.

16            JUROR:  Thank you.

17            MS. JOHNSON:  So I think we should go through a

18   few more 1463.

19            (Juror excused from courtroom)

20            (Juror present)

21            THE COURT:  1463.

22            MS. JOHNSON:  Sir, you need a mask.

23

24

25

```
 1                    (Juror Number 1463)

 2                        EXAMINATION

 3            THE COURT:  Sir, please have a seat.

 4            JUROR:  All right.

 5            THE COURT:  How are you?

 6            JUROR:  Good.  How are you?

 7            THE COURT:  Good.  Thank you for your patience.

 8            JUROR:  Yes.

 9            THE COURT:  If you don't mind, would you take off

10    your mask and talk into the microphone.

11            JUROR:  Okay.

12            THE COURT:  And then first, could you tell us a

13    little bit about your work.  What you do?

14            JUROR:  I work with the Federal Reserve Board of

15    Governors and I'm financial institution and policy analyst.

16            THE COURT:  You answered a few questions on the

17    3x5 card.  The first was question 6.

18            Do you remember where you were on January 6th,

19    2021?

20            JUROR:  Yes, I do.

21            THE COURT:  Were you at home, or work, or

22    whatever?

23            JUROR:  I was working from home that day.

24            THE COURT:  And did you follow the events of that

25    day on television?
```

1              JUROR:  I did, yes.

2              THE COURT:  A lot of it?

3              JUROR:  Yes, pretty much.  You know, I was working

4    from home but there was a lot of chatter among the coworkers

5    online about it.  So, yes, I was following it pretty

6    closely.

7              THE COURT:  And did you watch it on television or

8    social media?

9              JUROR:  Television.

10             THE COURT:  Okay.  And did you follow it closely

11   after that day, after January 6th?

12             JUROR:  After that day, not as closely.  But I, of

13   course, heard bits and pieces on the different news sites.

14             THE COURT:  Do you typically watch television

15   news?

16             JUROR:  Yes, I do.

17             THE COURT:  And what stations or channel or?

18             JUROR:  CNN, the ABC affiliate here in Washington

19   D.C.

20             THE COURT:  And what about what newspapers?  What

21   papers do you read?

22             JUROR:  So I usually read newspapers online.  The

23   Washington Post usually, the Washington Business Journal,

24   The Charlotte Observer.

25             THE COURT:  Okay.

```
 1              JUROR:  And various other news.

 2              THE COURT:  And are you on any particular social

 3     media platforms?

 4              JUROR:  Yes.

 5              THE COURT:  Which ones?

 6              JUROR:  I'm on Twitter, Facebook, TikTok and I

 7     believe that's it.

 8              THE COURT:  Question number 13 asked whether your

 9     opinion concerning former President Trump or his supporters

10     would make it difficult for you to serve as a fair and

11     impartial juror in this case.

12              Could you talk a little bit about that.

13              JUROR:  Okay.  I wasn't sure about the end of that

14     question, but, yes, I do have very strong feelings about

15     former President Trump and, you know, his politics and his

16     style of politics.

17              THE COURT:  Well, the second part of the question

18     had to do with supporters.  And, of course, President

19     Trump's not on trial.

20              JUROR:  Yes.

21              THE COURT:  I take it you don't know anything

22     about Mr. Gossjankowski?

23              JUROR:  I do not, no.

24              THE COURT:  All right.  So do you think if he were

25     a supporter of President Trump's and if he were in the
```

1   Capitol on that day would you be able to give him a fair

2   trial?

3              JUROR:  Yes, I would.

4              THE COURT:  Would you consider only the evidence

5   you see and hear in the courtroom?

6              JUROR:  Yes.

7              THE COURT:  Could you tell us about your prior

8   jury experience.

9              JUROR:  Yes.  It's about 30 years ago.  I was in

10  my early 20s.  I was on a jury where a trial in Atlanta --

11  in the Atlanta metro area in Clayton County, Georgia.

12             THE COURT:  Okay.  Criminal or civil?

13             JUROR:  It was a criminal case where an Atlanta

14  police officer off-duty went around to certain known drug

15  dealer's homes and basically robbed them of money that they

16  kept in their residence.

17             THE COURT:  Did the jury reach a verdict?

18             JUROR:  We did reach a verdict.

19             THE COURT:  And what was the verdict?

20             JUROR:  The verdict was not guilty.

21             THE COURT:  And you also answered number 37:

22             Have you, or close friends, or family members

23  attended law school, are a lawyer, or worked in a law

24  office?

25             JUROR:  Yes.  I have a close friend who's an

1    attorney for a financial institution.

2              THE COURT:  Okay.  Questions?  Gentlemen,

3    questions?

4              MR. DREHER:  I have no follow up, Your Honor.

5                        **EXAMINATION**

6    BY MR. SMOCK:

7    Q.  Hello, I'm Ned Smock.

8    A.  Hello.

9    Q.  I appreciate you talking a little about your feelings

10   about President Trump, which are not unusual.

11   A.  Okay.

12   Q.  Can you just assure us that assuming that my client, Mr.

13   Gossjankowski, was a supporter of President Trump that

14   that's not something you would hold against him as you

15   consider the facts of this case?

16   A.  I would not hold that against him in the facts of this

17   case.  I don't think that just because he's a supporter of

18   Trump that he would be guilty of something.

19   Q.  Okay.  Thank you.

20   A.  You're welcome.

21             THE COURT:  All right.  Sir, you've already been

22   very patient, but we're going to ask you come back this

23   afternoon.

24             JUROR:  Okay.

25             THE COURT:  What we've done is we've over the last

LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

```
 1    couple of days we've asked everybody a lot of questions and
 2    we now have a group 35 or so.  We're going to have them come
 3    back at 2:00 and then try to pick our jury of twelve or
 4    fourteen at that point.
 5              JUROR:  Okay.
 6              THE COURT:  So if you come, report to the jury
 7    office on the fourth floor at 2:00, Ms. Johnson will be down
 8    there.
 9              JUROR:  Okay.
10              THE COURT:  Good.  Thank you.  Thanks for your
11    patience and your answers.
12              JUROR:  All right.
13              (Juror excused from courtroom)
14              THE COURT:  So the next we have number 822, 822.
15              He's written down a lot of numbers, this next
16    gentleman.  I'm going to start at number 48 and if you think
17    he's given us a good enough reason we can stop there, but if
18    not I'll keep going.  Interesting.
19              (Juror present)
20                        (Juror Number 0822)
21                           EXAMINATION
22              THE COURT:  Sir, have a seat.  How are you?
23    Are you all right?
24              JUROR:  I'm fine.
25              THE COURT:  Would you mind taking off your mask
```

1    and speaking into the microphone so we can hear you?

2              Sorry for all the delays and thank you for your

3    patience.  So you're number 822, correct?

4              JUROR:  Yes.

5              THE COURT:  Are you retired, or are you working

6    or?

7              JUROR:  I'm self -- no, I'm working on a business.

8              THE COURT:  So what kind of business do you own?

9              JUROR:  Well, this past January I partnered with a

10   company called Vendasta.  They're in Saskatchewan, Canada.

11   They're a digital marketing agency and this is my ninth week

12   in startup.

13             So I'm very busy with learning software, and

14   product knowledge, and most importantly filling out my sales

15   pipeline.  But it's taken me every second of my living

16   moment to get it up and running, sir.  I don't even have

17   time to clean my bathrooms.

18             THE COURT:  And you said this is marketing?

19             JUROR:  Digital marketing.

20             THE COURT:  And that's your background before

21   this?

22             JUROR:  Oh, no, no, no.  I worked -- I retired

23   from Fulton County government.

24             THE COURT:  What agency did you work for?

25             JUROR:  Public works.

```
 1                THE COURT:  Public works.  D.C. Public Works?
 2                JUROR:  No, this was in Atlanta.
 3                THE COURT:  Oh, so how long have you been in the
 4      district?
 5                JUROR:  I moved back in 2012.  My mother and
 6      father, they were elderly.  My mother just passed, she was
 7      like 101.
 8                THE COURT:  Okay.
 9                JUROR:  In September of 2021, she just passed.
10                THE COURT:  Were you -- after you moved back here
11      and before you started this new venture, what were you
12      doing?
13                JUROR:  Pretty much -- what was I doing?  I was --
14      I was kind of involved in real estate as an agent.
15                THE COURT:  Okay.
16                JUROR:  But it just wasn't my passion.  I just
17      didn't --
18                THE COURT:  So, you say you're self-employed, that
19      you connected with this company in Saskatchewan.
20                JUROR:  Mm-hmm.
21                THE COURT:  Are you being paid, getting a paycheck
22      or it's all up to you?
23                JUROR:  No, it's all on me what I generate.
24                THE COURT:  So would serving on a jury for a
25      couple of weeks affect you financially?
```

```
 1                  JUROR:  No.

 2                  THE COURT:  It would not affect you financially?

 3                  JUROR:  No, no.  But it just takes up my time

 4    where I can't work on my business to build it up.

 5                  THE COURT:  I see.  And you've just been at this

 6    for nine weeks, right?

 7                  JUROR:  Yes.

 8                  THE COURT:  All righty.

 9                  We're going to -- I'll ask you to step out for a

10    minute with Ms. Johnson and we may have some additional

11    questions for you.

12                  (Juror excused from courtroom)

13                  THE COURT:  So I thought he was going to say it

14    was going to be a financial hardship, but he didn't.

15                  He, just so you know, he answered the following

16    questions:  4, 6, 7, 12, 13, 27, 30, 37, 38, and 44.

17                  So do you want to move forward and ask him other

18    questions or not?

19                  MR. DREHER:  The government would have no

20    objection for a cause challenge, Your Honor, just

21    considering I understand he may have misconstrued the

22    question of a direct financial hardship as opposed to the

23    indirect of building the business and what not, is what the

24    government's concern would be.

25                  MR. SMOCK:  Agreed.
```

```
 1                   THE COURT:  Okay.

 2                   (Juror present)

 3                   THE COURT:  Sir, we're going to excuse you from

 4      this jury and wish you good luck on your new venture.

 5                   And if you could go back to the jury lounge and

 6      tell them you've been excused, I'd appreciate that.

 7                   JUROR:  Thank you very much.

 8                   THE COURT:  Thanks so much.

 9                   Let's talk to number 820 -- wait a minute, wait a

10      minute, wait a minute.  I just talked to 822.  871.

11                   (Juror present)

12                        (Juror Number 0871)

13                           EXAMINATION

14                   THE COURT:  Have a seat.  Good afternoon.

15                   JUROR:  Good afternoon.

16                   THE COURT:  Would you mind taking off your mask so

17      we can hear you?  Thank you for your patience.

18                   So, what do you -- it doesn't say on my list here,

19      what do you do as a living?

20                   JUROR:  I'm unemployed at the moment, but...

21                   THE COURT:  You're unemployed?

22                   JUROR:  Yes.

23                   THE COURT:  What has been your past career path?

24                   JUROR:  Yeah, I was a researcher at a nonprofit?

25                   THE COURT:  A researcher in what?
```

1            JUROR:  At a nonprofit for energy efficiency and I

2    did a lot of work, like, conducting online surveys, and

3    googling things, and talking with people, and basically

4    writing reports and sending them out to, you know, different

5    companies that might be interested in the research.

6            THE COURT:  So are you looking for employment at

7    the moment right now?

8            JUROR:  Yes.  I haven't found anything yet, so.

9            THE COURT:  Well, I want to ask you a few things

10   about what you put down on the card.

11           The first question is whether you work or live at

12   or near the Capitol building.

13           JUROR:  I live about a ten-minute walk away from

14   the Capitol building.

15           THE COURT:  And is that on -- let's see what I've

16   got down here.  Oh, yes.  Okay.

17           So you're sort of near -- I know exactly where you

18   are, 6th and Independence.

19           JUROR:  Mm-hmm.

20           THE COURT:  So how did the events of January 6th

21   affect you and your neighborhood, if at all?

22           JUROR:  So I was actually about 15 minutes further

23   away at the time, but I since moved closer, obviously.

24           When it was happening, obviously we were still

25   pretty close, but we just kind of followed the news to make

1    sure that, you know, no one kind of spilled over into our

2    neighborhood because we knew that it was a potential to

3    happen.  And then when people, I think, finally

4    disbanding --

5              THE COURT:  Could you move a little closer to the

6    microphone.

7              JUROR:  Yeah, when people were finally disbanding

8    I think -- and they were saying just watch out, like,

9    because I guess people were hiding in houses or, you know,

10   just wandering the neighborhoods nearby and so we were just

11   very aware of, I think.

12             THE COURT:  And did it affect your neighborhood or

13   your area within the days following January 6th?

14             JUROR:  No.

15             MR. SMOCK:  Your Honor, for just a one second, I

16   apologize.  Is there a way we could just have a two-minute

17   bathroom break.  I wouldn't -- wanted to do this, but I

18   think it's --

19             THE COURT:  Yes.

20             MR. SMOCK:  I'm sorry.

21             (Recess taken at 12:56 p.m.)

22                       *    *    *    *    *

23        (12:59 p.m.)

24                         **IN OPEN COURT**

25             THE COURT:  So the next question was whether you

1    have a close friend or family member who's ever worked on

2    Capitol Hill.

3              JUROR:  Yes.  My friend works as the Architect of

4    the Capitol.

5              THE COURT:  Was that person at the Capitol that

6    day?

7              JUROR:  No, she -- so we used to be engaged.

8    We're friends now, obviously, so we broke up, but we were

9    living together at the time so we were --

10             THE COURT:  You were together at the time?

11             JUROR:  Yeah.  So the house we lived in is the

12   placed I mentioned and so we were both together following

13   the news, and obviously since she works there, so she was

14   telling me about everything that kind of happened in the

15   next successive days.

16             THE COURT:  Afterwards she was telling you?

17             JUROR:  Yeah, yeah, yeah.

18             THE COURT:  So was she in touch with people in her

19   office while this was going on?

20             JUROR:  I don't think anyone in her office, like

21   who she worked with at the time was in the building.

22             THE COURT:  But did she -- but then she would tell

23   you because she's such a close friend about what people were

24   telling her about what they experienced, and what they saw,

25   and everything?

```
 1                    JUROR:  Mm-hmm, yeah.  And then what her office
 2       had to do after in the next days too, just cleaning up
 3       things.  And then she would get e-mails from people being
 4       like, thank you for your job, you know, cleaning up whatever
 5       mess had been left behind for the Capitol.  And so just all
 6       of that sort of information.
 7                    THE COURT:  So that probably gets to question 5,
 8       but maybe you have more to say.
 9                    Were you, or any close friend, or family members
10       affected by the events?
11                    JUROR:  Yeah, that's kind of what I was thinking
12       with that, yeah.
13                    THE COURT:  So you've also told us you followed
14       the events and you followed it after January 6th as well?
15                    JUROR:  Yeah.  Again, that was mostly just from my
16       friend.  I wasn't -- there wasn't really more than that, but
17       I figured I would just put it to be safe.
18                    THE COURT:  Do you -- question 7:  Do you have
19       such strong feelings about those events that would make it
20       difficult for you to be a fair juror?
21                    JUROR:  Yeah.  You mentioned the other day how the
22       burden of proof is on the government to make -- to the
23       person guilty -- to find them guilty.
24                    I, in my head, automatically see the person,
25       anyone involved as I assume they're guilty, which is not how
```

```
 1      it's supposed to be.  And I worry that I would not be able
 2      to divorce myself of that mindset to be able to accurately
 3      and objectively basically, you know, look at the evidence
 4      with a clear head, I guess.
 5                 THE COURT:  Is that because of what you saw, and
 6      heard, and read?
 7                 JUROR:  Yeah, yeah.
 8                 THE COURT:  And also because of what your friend
 9      told you?
10                 JUROR:  Mm-hmm.
11                 THE COURT:  About what she or friends experienced?
12                 JUROR:  Yeah.
13                 THE COURT:  And do you think that because someone
14      is charged or arrested that that person is probably -- for
15      these events that that person is probably guilty?
16                 JUROR:  Yeah.  I think the way in my head -- I
17      think they're probably guilty but, like, I guess not -- I
18      don't want to say that, I guess that it's more that they're
19      starting from a position of guilty and have to prove they're
20      innocent as opposed to starting from a position of innocence
21      and having to be proven that they're guilty.
22                 THE COURT:  Starting from a position of innocence
23      and having what?
24                 JUROR:  To be proven that they're guilty.
25                 THE COURT:  So you agree with that?
```

```
1                      JUROR:  No, I think in my head it's the opposite
2        for me.
3                      THE COURT:  Oh, I see.
4                      JUROR:  Starting from a position of guilty.
5                      THE COURT:  So you would have difficulty presuming
6        the person innocent?
7                      JUROR:  Correct.
8                      THE COURT:  And you would have difficulty
9        requiring the government to prove otherwise?  That's a
10       complicated question.
11                     JUROR:  Yeah.
12                     THE COURT:  I just want to ask a couple more.
13                     Would your opinion about President Trump or his
14       supporters make it difficult for you to be fair in this
15       case?
16                     JUROR:  Yes.
17                     THE COURT:  You're nodding yes.
18                     JUROR:  I guess.  Well, I'm not a fan of President
19       Trump.
20                     THE COURT:  What?
21                     JUROR:  I'm not a fan of President Trump.
22                     THE COURT:  Well, let's put him aside for a
23       moment.  He's not on trial.
24                     JUROR:  No.
25                     THE COURT:  Would your opinion and certainly of
```

1    the supporters of President Trump make it difficult for you

2    to serve?

3              JUROR:  You mean, like, the people who were

4    rioting on the Capitol or just in general?

5              THE COURT:  Well, there are supporters.  I mean,

6    48 percent or such number voted for him.

7              JUROR:  Yeah.

8              THE COURT:  And I take it you don't hold it

9    against somebody because they have different views from

10   yours?

11             JUROR:  No, no.

12             THE COURT:  Would your views about -- well, let's

13   assume -- let's assume that the evidence shows that Mr.

14   Gossjankowski, the defendant here, was on the Capitol

15   grounds, and that he entered the Capitol, and was there with

16   lots of other people.

17             Knowing that much and even before you heard the

18   evidence, would you find it difficult to presume him

19   innocent?

20             JUROR:  I think I would lean towards assuming that

21   he's guilty, but I would want to see the evidence to

22   confirm.

23             THE COURT:  You lean towards assuming?

24             JUROR:  He's guilty, but I would want to see the

25   evidence to confirm.

```
 1                    THE COURT:  Okay.  Okay.

 2                    I'm going to ask you to wait outside with Ms.

 3      Johnson for a couple minutes.

 4                    JUROR:  Oh, okay.

 5                    (Juror excused from courtroom)

 6                    THE COURT:  Okay.  So you can ask followup

 7      questions of her if you'd like, it would take a while.  And

 8      we have one more person in the jury room I'd like to talk to

 9      and then see how many we've got.  I think we're okay.

10                    MR. DREHER:  I don't think that would be

11      necessary, Your Honor.

12                    THE COURT:  Okay.

13                    MR. SMOCK:  Agreed.

14                    THE COURT:  Okay.

15                    (Juror present)

16                    THE COURT:  We're going to excuse you from this

17      jury.  Thank you for being so candid with us.  We appreciate

18      it, we all do.  And you can go back to the jury lounge and

19      tell them you've been excused.  Okay?

20                    JUROR:  Okay.  Thank you.

21                    THE COURT:  And thank you for your patience.

22                    JUROR:  Yeah.

23                    So we'll talk with number 488 and then I think we

24      will stop.

25                    MS. JOHNSON:  488, right?
```

```
 1                    THE COURT:  488.
 2                    (Juror excused)
 3                    (Juror present)
 4                  (Juror Number 0488)
 5                      EXAMINATION
 6                    THE COURT:  Please have a seat.  Thank you.
 7       Please talk into the microphone so we can hear you.  Yeah,
 8       keep your mask down.
 9                    JUROR:  Oh.
10                    THE COURT:  Keep it off, off, so we can hear you
11       better.
12                    JUROR:  Okay.
13                    THE COURT:  So thank you for your patience.
14                    JUROR:  Mm-hmm.
15                    THE COURT:  It's been a long time here.  You're
16       number 488, correct?
17                    JUROR:  Yes.
18                    THE COURT:  And I guess let me ask you.
19                    Question 47 was:  Do you have any personal
20       beliefs, whether religious, philosophical, political, or
21       otherwise, moral, that could affect your service as a juror
22       in this case?
23                    Why did you write down 47?
24                    JUROR:  I have no religious beliefs or
25       philosophical beliefs.
```

1          THE COURT:  Say that again.

2          JUROR:  I have no religious beliefs.  I am

3   Baptist, so, you know, I have no type of religion or

4   religious belief.  I am very open-minded about everything so

5   anything that comes through my path or is in question, I'm

6   always honest about it.

7          THE COURT:  Well, do you think that because of any

8   beliefs that you have that you would not be able to reach a

9   verdict and provide the defendant with a fair trial?

10         JUROR:  Yes.

11         THE COURT:  You do not think you could do that?

12         JUROR:  To be honest, no.  It's -- no.

13         THE COURT:  You don't know?

14         JUROR:  I don't know.

15         THE COURT:  Well, let me suggest the following.

16   First of all, get a little closer to the microphone.

17         I'm not sure what to ask so I'll ask counsel if

18   they want to try to pursue this so we can get a better sense

19   of things.

20         MR. DREHER:  Yes.

21                        **EXAMINATION**

22   BY MR. DREHER:

23   Q.  Good afternoon, sir.

24   A.  Good afternoon.

25   Q.  Is there anything from your background that causes you

1    to come into this case with a certain idea of what the

2    results should be?

3    A.  Well, this is my first time, so excuse me.  I am a

4    little nervous.  This is my first time ever doing jury duty,

5    so.

6              I can say that I do have family members, if that's

7    the question you're asking.

8              THE COURT:  Well, just tell us what's on your

9    mind, that's fine.

10             JUROR:  Well, to be honest, I do have family

11   members who are law enforcement.  One is retired and one is

12   currently in the law enforcement as a special police

13   officer.  And I do kind of like have some feeling about

14   attending jury duty, or being around in or around the courts

15   just per se, because I feel -- it's kind of nervous to me

16   because I don't want to be in an environment, you know,

17   where there's a case going on.  And not to say that I know

18   anyone, or that that person may know me, or I may know them,

19   it's just that, you know, this is, like I say, this is my

20   first time, so it's just now that I'm experimenting this and

21   getting the feel of it.  So excuse me if I sound kind of

22   nervous about it, so I do apologize.

23   BY MR. DREHER:

24   Q.  No, no.  And ultimately I guess what I'm asking you is

25   do you already have an idea what your vote would be if you

1    were selected as a jury, whether guilty or not guilty?

2    A.  Well, to be honest I will say guilty.

3    Q.  And that's based on what?

4    A.  Based on the events that took place on January 6th.

5         If that individual was there partaking in any of

6    the events that was going on and I would say that if anyone

7    was down there partaking of any of their, you know, the

8    activities, I would convict them guilty because they had no

9    business down there.

10        It was something that, you know, in my

11   perspective, it's just it was not right at all.

12   Q.  Now I'm just going to ask one more question.

13   A.  Mm-hmm.

14   Q.  And that is, even if the Judge were to instruct

15   different things that you would have to find aside from just

16   being there, would you still think that your vote would be

17   guilty not knowing anything about the case of those other

18   things?

19   A.  Not knowing anything about the case, it would probably

20   be not guilty because I really don't follow the news.  I

21   really don't follow any of the political, you know, anything

22   that's on television.  I used to, but not anymore.

23        Because I felt like to me issues that if --

24   anything that goes on I try not to watch it.  I try not to

25   pay attention to it.  Because to me I feel like people who

```
 1    are grown, to follow directions, to follow protocols, and
 2    should not take anything that any other grown person told
 3    them to do.
 4    Q.  So those other things that you're instructed on then,
 5    you would be able to give the defendant and the government a
 6    fair trial?
 7    A.  Yes, sir.
 8              MR. DREHER:  I have no further followup, Your
 9    Honor.
10              THE COURT:  All right.  I'm going to ask Mr. Smock
11    to ask what he wants.
12              I will tell you that Juror 488 has written down on
13    his card number 6, number 12, and number 13, as well as some
14    -- and number 32, and a couple of others that are not
15    related to topics in those questions.  6, 12, 13, 32 might
16    be to pursue, along with his responses relating to number
17    47.  I'm leaving it to you two at this point.
18                            EXAMINATION
19    BY MR. SMOCK:
20    Q.  Hi, Mr. Braxton?
21    A.  How are you doing?
22    Q.  I work at the Public Defender's Office and I just have
23    some questions to ask --
24    A.  Sure.
25    Q.  -- that we've been asking of everyone.
```

1     A.   Mm-hmm.

2     Q.   So one of the things that you talked about initially is

3     feeling nervous, which is normal.

4     A.   Yeah.

5     Q.   You're like on the witness stand now?

6     A.   Yeah, that's what it feels like.

7     Q.   I'm not going to attack you or anything.

8          Can you talk to us a little bit more about that

9     though, about the feelings that you're having about being in

10    court.

11         And the only reason I ask that is just if you do

12    feel anxious, which is understandable, and that that might

13    be a distraction to you, it may very well be that being

14    involved in this case is not the best thing for you or for

15    the people in the courtroom.  And there's no judgment based

16    on that at all.

17    A.   Sure.

18    Q.   So I wonder whether you could just tell us anything

19    about that at all.

20    A.   Well, I can say that this is my first time

21    experimenting, so this is my first time experiencing this to

22    be up here on the jury stand and to get a feel of what it

23    would be like to serve on a jury stand.

24         I've always watched TV shows and I always, you

25    know, would wonder what it would be like to do that.

1          So if I am chosen, it would be, you know, it would

2     be such a joy to the -- just experience it on my own to say

3     for myself to say, hey, you know, well, it's not that bad.

4     It's not nothing that it's to be frightened of, to be scared

5     of.

6          But I don't think that anything will prevent me

7     from doing it, but if it does, I can say sitting here in

8     front of the jury and in front of the Judge himself, and to

9     say that just, you know, I'm thankful to be up here to do

10    this because it's my first time.

11         And I'm trying to answer the questions as best,

12    you know, to my knowledge to give everyone a truthful answer

13    as to the questions that are being asked.

14    Q.  And I appreciate that.  Thank you very much.

15    A.  Yeah.

16    Q.  So, you know, being here in the witness stand would not

17    be something that would be involved if you're on the jury,

18    but being on a jury can be stressful.  I mean, it involves

19    making very serious judgments that have consequences and --

20    A.  Yes.

21    Q.  -- it can be complicated, and there can be discussions

22    in the jury room that can get contentious.

23         Is that something that you feel confident that

24    you'd be able to do without being distracted or having

25    concerns that would interfere?

1      A.  I think that could be something I could do without being

2      distracted.

3             I think the time from sitting up here, and I think

4      the nervousness and all that would probably -- and anxiety

5      would probably already be gone.  And to give a verdict of

6      the case, it wouldn't be no problem.

7             It's all about agreeing and listening to the

8      information as being given, not only from the Judge himself

9      and from the attorneys who sit here in front of me.  It's

10     all about providing the correct -- you know, just providing

11     the correct information.  Just providing what's best for

12     the -- you know, the Judge and the attorneys themselves.

13     Q.  Okay.  Thank you.

14             MR. SMOCK:  Can I just have one moment?

15             (Pause in proceeding)

16             MR. SMOCK:  Your Honor, this might be a good time

17     to talk outside the --

18             THE COURT:  Okay.  We're going to ask you, if you

19     would, just for a minute, sir, to step outside with Ms.

20     Johnson.

21             JUROR:  Mm-hmm.

22             (Juror excused from courtroom)

23             THE COURT:  She may be chatting with him.

24             MR. DREHER:  Oh, I would make a motion --

25             THE COURT:  Okay.

```
 1              MR. DREHER:  Your Honor, I would make a motion to

 2    strike.

 3              I do have concerns about his answers related to

 4    the presumption of innocence.  And although it could be

 5    attributed to nerves, there was enough, at least confusion

 6    to me, to cause concern, so I would move to strike for

 7    cause.

 8              MR. SMOCK:  I appreciate the government's concern

 9    about his answers about presumption of innocence and I would

10    agree.

11              THE COURT:  Okay.  We will excuse him.  I was

12    confused.

13              (Juror present)

14              THE COURT:  Sir, thank you very much, but we're

15    going to excuse you from this jury, but I would like you to

16    go back to the jury lounge on the fourth floor and tell them

17    you've been excused.  Okay?

18              JUROR:  I'm sorry, I do apologize.

19              THE COURT:  No, no, there's no reason to apologize

20    at all.  Thank you.

21              JUROR:  Thank you, everyone for allowing to ask

22    the questions and I do appreciate it.  I'm just sorry.  I'm

23    a little nervous and I'm a little anxious about it, so

24    please to give me.

25              THE COURT:  Don't worry about a thing.
```

1          JUROR:  I'm just a little nervous, I'm sorry.  And

2     I do apologize, again.

3          (Juror excused)

4          THE COURT:  So let me tell you where I think we

5     are.

6          I think we have 37 qualified people you can double

7     check your lists.  But I think there are 16 on page 1, and

8     21 on page 2, and Ms. Johnson is double checking and Ms. Ma

9     is double checking too.

10         MS. JOHNSON:  37.

11         THE COURT:  37, right?  I think everybody agrees

12    on 37.  I believe we need 32.  12 jurors, plus two

13    alternates equals 14.  Ten defense strikes, six government

14    strikes gets us up to 30.  And then one additional strike

15    each for the alternates.  That's 32 and we've got 37.

16         We may wind up excusing 498 because we agreed to

17    put her at the end of the list or we can just keep her in

18    the mix, but everybody knows she's effectively excused

19    without exercising a challenge on her.

20         So if you all agree, beginning with the last name

21    on page 2, number 1085 through, it was line 59, through

22    line 70 on page 3, Ms. Johnson, I don't think we need to see

23    them.  Ms. Johnson can tell them they're excused, and they

24    can tell the jury lounge they're excused, and thank them for

25    their patience, and hope that nobody yells at her for all

1    the time they waited for no good reason.

2              So that's step one.  All right with everybody?

3              MR. DREHER:  Yes, Your Honor.

4              THE COURT:  Should we also let Ms. Johnson excuse

5    number 498, line 41 when she returns at 2:00 or do we want

6    her to come back to the courtroom?

7              MR. SMOCK:  I think we can excuse her now.

8              MR. DREHER:  The government would agree.

9              THE COURT:  All right.  So that way you won't be

10   confused by having her in the mix when we know she's -- so

11   she will be excused and not return to the courtroom either.

12             Now, what's going to happen when they come to the

13   courtroom, and Ms. Johnson can correct me if I'm wrong,

14   she'll try to seat them in their original seats more or less

15   or not, or not?

16             MS. JOHNSON:  I will, but there have been a lot of

17   jurors that have been excused, so that may change the

18   numbering.

19             THE COURT:  Yeah.  I mean, we can either have them

20   try to sit in their original seats or if they're not in

21   their original seats at least they will definitely be in the

22   order they appear on the list.

23             MS. JOHNSON:  Would you like for me when they

24   enter the courtroom to announce the juror number, which

25   would --

1              THE COURT:  After they have been seated?

2              JUROR:  Yeah.  As they come in, I'll just say

3    juror number such and such, juror number such and such.

4              THE COURT:  We can do that.  If everybody's going

5    to be seated before she comes in, would it be helpful if as

6    she brings them in she announces their number?

7              And you can see them one at a -- because they're

8    going to be seated in the gallery during this process,

9    they're not going to be seated in the jury.  So if she

10   announces their number as she brings them in and you're all

11   at counsel table, and you can stand if you want to get a

12   better look at them that's fine with me, then you'll see a

13   face and a number at the same time and you've got your

14   lists.  Okay?  Then they'll be seated more or less in their

15   position.

16             And then what I'd normally do is ask, in a

17   criminal case, ask the lawyers to simultaneously give their

18   list of strikes to Ms. Johnson, so that the government will

19   have a list of 10 and the defense will have a list of -- the

20   government will have a list of six, and the defense will

21   have a list of ten.

22             But before we call it a day, if there's overlap, I

23   can tell you if there's overlap or not, I don't know what

24   makes the most sense.  I could give you another -- then it's

25   hard to tell whose strike it counts as, so maybe I don't

1        tell you if there's overlap.  What do I normally do?

2                   MS. JOHNSON:  We haven't had that experience, so.

3                   THE COURT:  We haven't had that experience?

4                   MR. DREHER:  Your Honor, I'm not sure if it's

5        possible, but I foresee the possibility that some of the

6        government's strikes may be folks that are later on in the

7        list and not knowing whether each one would be used at the

8        initial strikes.

9                   If it would be possible to at least provide a list

10       to the Court, and knowing that while we only get six, allow

11       for the Court to go one -- one side, then the other side,

12       then the next side, then the other side.

13                  THE COURT:  I mean, we can do it that way and

14       everybody gives me one at a time or we could, for example,

15       have the government provide a list of three and the defense

16       provide a list of five and then we can -- then you could be

17       advised.

18                  MR. DREHER:  That would work as well.  The

19       government would be amenable to that, Judge.

20                  THE COURT:  Yeah, I get your point.

21                  I mean, you know, if you all -- why don't you all

22       talk to each other and then when we -- before she brings the

23       jurors in you can tell me what you think.

24                  I mean, I'm concerned that sort of requires bench

25       conferences to -- or else we just give you each a list.

          1              In civil cases what I've done because there are

          2      fewer strikes is, I said plaintiff, equate that with

          3      prosecution, writes down one number, shows it to the other

          4      side, then gives it to Ms. Johnson.  Then the defense would

          5      write down one number, show it to the other side.

          6              Maybe we should do that.  That would avoid bench

          7      conferences.  It will take a little longer, but that way

          8      each side knows what the other side has done before you make

          9      your next move.  Let's do that.

         10              MR. DREHER:  Yes, Your Honor.

         11              THE COURT:  And thank you for raising it.

         12              So you'll write down a number, you'll show it to

         13      Ms. Goetzl and Mr. Smock.  They'll see it.  They can't argue

         14      about it, they just see it, notify them.

         15              You give your piece of paper or whatever, card,

         16      Ms. Johnson tells you to use to her.  She writes it down.

         17      Then the defense does the same.  It will go back and forth.

         18              Now the only problem with that, and if you feel

         19      that you're being treated unfairly on the prosecution side,

         20      is you're all done when they have four left.

         21              So if you -- if you're fine with that, I'm fine

         22      with that.  If you want to propose a modification of that,

         23      that's fine.

         24              I mean, for example, you could, you know, halfway

         25      through the process they could do two instead of one or

```
 1        something like that.  Why don't you talk to each other.

 2                MR. DREHER:  We will, Your Honor.

 3                THE COURT:  And figure out what seems fair to

 4        everybody and puts everybody on notice.

 5                And once we have the first twelve, we can go ahead

 6        and seat them.  And then you'll see who's left.

 7                But as you exercise your last -- no, we're not

 8        going to seat them?  They're not anonymous.

 9                MS. JOHNSON:  But I'm saying if you're going to

10        seat the twelve and then you've got two alternates, they're

11        going to know the alternates.

12                THE COURT:  They're what?

13                MS. JOHNSON:  Once I seat everyone together, once

14        we've done --

15                THE COURT:  Why does it matter?  The alternates

16        are not anonymous.

17                MS. JOHNSON:  Okay.

18                THE COURT:  I'm confused now.

19                MS. JOHNSON:  Okay.  I didn't mean to interrupt, I

20        apologize.

21                MR. SMOCK:  Your Honor, I think what Ms. Johnson

22        may be trying to say, and I don't want to put words in her

23        mouth, is to the extent the Court sees some value in not --

24        in the additional jurors not knowing --

25                THE COURT:  We've already decided they are going
```

1       to know.

2                    MR. SMOCK:  Okay.

3                    THE COURT:  We discussed that a week or two ago.

4                    MR. SMOCK:  Okay.  Okay.

5                    THE COURT:  I mean, if we're going to do

6       alternates it creates -- if we do anonymous jurors, we have

7       a whole different seating plan.

8                    MR. SMOCK:  Okay.

9                    THE COURT:  I'd rather not discuss it at this

10      point.

11                   And for a short trial, I don't think it matters

12      that much.

13                   All right.  I don't care about how they're seated.

14      But all I wanted to say was, and you talk to each other,

15      talk to Ms. Johnson.

16                   All I wanted to say was, as you're exercising your

17      last couple of strikes on regular jurors, you have to keep

18      in mind that whoever -- the next four people that are left

19      is what you got.  And two are of them are the alternates --

20      two of them are going to be alternates and two of them are

21      going to be struck.  And in that case you might have overlap

22      because neither of you might not want particular person or

23      you might choose not to exercise a strike for an alternate

24      if you like the first guy and you're hopeful the other side

25      doesn't do it.  I don't know.

```
 1              But there are four people who in the universe of
 2    people are left.  And you might want to think about that as
 3    you exercise your last couple of strikes on the regular
 4    jurors.  You've all done this before.  And I don't mean to
 5    confuse things.  And I'm sure Ms. Johnson doesn't either.
 6              MS. JOHNSON:  No.
 7              THE COURT:  I think that by the time she gets
 8    everybody organized, it's going to take a while.
 9              So can we -- they're going to supposedly show up
10    at 2:00.  I guarantee they're not going to all be on time.
11    She needs to get them organized.  So should we -- Tanya,
12    what do you think?  Should we start -- and these are the
13    people you're going to let go.  You want me to hold them or
14    do you want them?
15              MS. JOHNSON:  No.
16              THE COURT:  All right.  Not to confuse things.
17              Do we all want to meet here in an hour and you can
18    tell me with the process you've got and maybe between Tanya,
19    and my interns, and the jury office, Tanya can be in two
20    places at once, she can be here for at least a little bit
21    while we talk about the process and then she can go back and
22    bring everybody up.
23              MS. JOHNSON:  That's fine.
24              THE COURT:  And maybe she greets them or asks
25    somebody in the jury office to greet them at 2:00, but as I
```

1    say some will be late, and/or I've got interns that can help

2    her in the jury office and up here as well.

3              Okay.  Are we sort of on the same page?

4              MS. JOHNSON:  I'll see you in an hour?

5              THE COURT:  2:30.  We'll be here.

6              (Recess taken at 1:31 p.m.)

7                        *    *    *    *    *

8         (2:40 p.m.)

9                          **IN OPEN COURT**

10             THE COURT:  Okay.  So if I understand what we're

11   doing, I can tell you what Ms. Johnson told me and see if it

12   comports with what you've agreed.

13             That essentially the idea that I suggested earlier

14   has been modified so that the government will write down the

15   number of its first peremptory strike, show it to the

16   defense, give that piece of paper to Ms. Johnson, then the

17   defense does the same.  That's round one.

18             In round two, the government does one, the defense

19   does two.

20             In round three, each side does one.

21             In round four, the government does one, the

22   defense does two.

23             In round five, the government does one, the

24   defense does one.

25             And in round six, the government does one, the

1    defense does two.

2              And then, I don't know what round seven means,

3    but, oh, and then the defense has one more.

4              MR. DREHER:  The only clarification that I would

5    add, Your Honor, is believe that the parties have agreed

6    that the defense in each round -- in each round the defense

7    would go first.

8              THE COURT:  Okay.

9              MR. DREHER:  That way they start and finish.

10             THE COURT:  Oh, sure.  That makes sense because

11   that's why they have a seventh round.  It only works if they

12   go first.

13             MR. DREHER:  Correct, Your Honor.

14             THE COURT:  And have we discussed what we do if

15   there's any overlap?

16             MR. SMOCK:  I don't think that will be any.

17             THE COURT:  Oh, this way there won't be, correct.

18             And then the remaining four people are the

19   universe of people for alternates and the jury will know who

20   the alternates are.  Okay.

21             So I think the plan was that Ms. Johnson would

22   bring them in and as they come into the courtroom she would

23   announce their jury number.

24             They will be in the order they were originally on

25   the list, but obviously there are many fewer of them.  There

1    are 36, I believe, because we agreed to strike that one

2    woman at the end, and that's what we'll do.  And they'll be

3    seated in the gallery in that order.

4          Will they all be on the right or will some of them

5    be on the left?

6          MS. JOHNSON:  It just makes sense to keep

7    everybody together on the right -- I'm sorry, on the left or

8    whatever you'd prefer.  Left or right, it doesn't matter.

9          THE COURT:  No, I mean, is everybody going to be

10   on this side (indicating)?

11         MS. JOHNSON:  Yeah, yeah.

12         THE COURT:  So we won't be using the left side at

13   all, probably?

14         MS. JOHNSON:  No.

15         THE COURT:  Okay.  Which means that anybody who's

16   not a juror shouldn't be seated on the right.

17         Okay.  So now what?

18         MS. JOHNSON:  I'm just going to call them, let

19   them know I'm coming down, get them in order and come back

20   up.  We're good.

21         MR. VALENTINI:  Your Honor, maybe stating the

22   obvious, there's one individual who is now sitting on that

23   side of the gallery.

24         THE COURT:  They'll have to move.

25         MR. VALENTINI:  Yeah.

```
1                    (Recess taken at 2:44 p.m.)

2                         *   *   *   *   *

3          (2:47 p.m.)

4                          IN OPEN COURT

5              THE COURT:  Does anybody know whether she has to

6      go to the fourth floor or are they on this floor?

7              MR. VALENTINI:  I don't know.

8              THE COURT:  Because if they're not here, I'm

9      leaving.

10             So they would either be in Judge Kotelly's

11     courtroom or in the hallway.

12             (Off-the-record discussion.)

13             THE COURT:  Somebody else let me know when she's

14     about -- before she brings everybody in.

15             (Recess taken at 2:48 p.m.)

16                        *   *   *   *   *

17         (3:05 p.m.)

18                          IN OPEN COURT

19                          (JURORS PRESENT)

20             THE COURT:  Okay.  Good afternoon, everyone.

21     Welcome back.  You've been very nice and very patient and we

22     all appreciate it.

23             And so what we're going to do now, and this is

24     going to take a while, but first I want to just, I hesitate

25     to do this, but I will anyway, is we've talked to each of
```

1    you individually and personally one-on-one here in the

2    courtroom.  I've asked you questions, the lawyers have asked

3    you questions.  I assume that you've told us everything that

4    you think is relevant and responsive to questions, but it's

5    been a couple of days.

6            Is there anybody who has any new information or

7    anything that they failed to tell us that they think they

8    need to tell us now?

9            I see one hand.  Is there anybody else?

10           Okay.  Why don't we ask this juror to come over to

11   the side here and we will arrange for the court reporter to

12   hear this as well, whatever way we do that and...

13           (At sidebar.)

14           (Juror present at bench)

15           THE COURT:  So remind us again of your juror

16   number.

17           JUROR:  1492.

18           MR. SMOCK:  Hello?  Testing, testing.

19           THE COURT:  1492.

20           MS. ROCHLIN:  Could I bring something up with the

21   Court maybe before we get started with the juror?

22           THE COURT:  Can't we deal with this juror while

23   she's here?

24           (Indiscernible)

25           THE COURT:  All right.  Go back to your seat.

1                    (Juror excused from bench)

2            MS. ROCHLIN:  Apologies, Your Honor.

3            I just want to make the Court aware this will not

4     be private inquiry because the people in the back of the

5     room who are not hearing will be able to understand the

6     interpreter's sign language from counsel table.  If that's

7     not a concern, then fine.

8            THE COURT:  I don't know what she's going to tell

9     us.  Thank you for letting me know.

10           THE INTERPRETER:  My colleague has turned her body

11    in an attempt not to be visible.  I don't know if that's

12    enough.

13           THE COURT:  Thank you all.

14           Sorry not to be as sensitive to these things as

15    you guys are.

16           MS. ROCHLIN:  New for all of us.

17           THE COURT:  Yeah, all right.  Where did she go?

18           MS. JOHNSON:  Ma'am.  Thank you.

19           (Juror present at bench)

20           THE COURT:  Sorry.  So tell us what you wanted to

21    say.

22           JUROR:  Okay.  So I was asked that where I was on

23    Monday the 6th, 2021, and I had just remembered why I was

24    home.

25           I had said that I was home because our school had

```
1    given us the day off due to the January 6th -- possibly the
2    January 6th events, but it happened to be that at that time
3    we were doing a learning.
4             So I was at home not just actively teaching
5    online.  So I was home but it was not because our school had
6    given us the day off.
7             THE COURT:  Okay.
8             JUROR:  The inauguration we did have off, so.
9             THE COURT:  You don't mean the inauguration day,
10   you mean the day of the certification, right?  January 6th?
11            JUROR:  Correct.
12            THE COURT:  All right.
13            JUROR:  But for the inauguration, I had confused
14   the two.
15            THE COURT:  Oh, I see.
16            JUROR:  I had misremembered.  We did have
17   inauguration day off.
18            THE COURT:  Correct.
19            JUROR:  But not that Monday but I was home.
20            THE COURT:  Okay.  Got it.  Anything else?
21            JUROR:  That's all.
22            THE COURT:  Thank you.
23            JUROR:  Thank you.
24            THE COURT:  Thank you very much for telling us
25   that.
```

1          Okay.  I assume that changes nobody's view about

2   it?

3          MR. DREHER:  That does not.

4          (In open court.)

5          THE COURT:  All right.

6          Is there anybody else before we proceed?

7          If not, this process may take a little while, but

8   by now you're used to waiting.  Once we pick a jury we hope

9   we will be more efficient and that's certainly our goal.

10          By the time that we finish in the next hour or so

11  we will excuse roughly half of you and we will have our jury

12  selected, so just be patient.

13          And counsel, you may proceed.

14          (Pause in proceedings)

15          THE COURT:  That is the government -- I mean.

16          MS. JOHNSON:  Defendant.

17          THE COURT:  Wait a minute.  Who's is this, defense

18  or government?

19          MS. JOHNSON:  Defense.

20          THE COURT:  Oh, I see, okay.  I'll be okay.

21          MS. JOHNSON:  Okay.

22          (Pause in proceedings)

23          THE COURT:  So would counsel like to come to the

24  bench for a minute?

25          (At sidebar.)

```
 1                    THE COURT:  So is everybody clear on who we got,
 2      who we don't got?
 3                    MR. VALENTINI:  I think so, yes.
 4                    MR. SMOCK:  I'm unclear based on the numbers, but
 5      I assume we have it right.
 6                    THE COURT:  So does somebody have a list you want
 7      me to read or not?
 8                    The way I see it, and Tanya can correct me, I
 9      think the two alternates are 907 and 755?
10                    MS. JOHNSON:  One second, Judge.
11                    MR. VALENTINI:  I don't think so.
12                    MS. GOETZL:  Yeah, the two alternates.
13                    THE COURT:  Somebody's got it.
14                    [Simultaneous indiscernible crosstalk]
15                    MS. GOETZL:  927.
16                    MR. VALENTINI:  What?
17                    MS. GOETZL:  927?
18                    MR. VALENTINI:  927?
19                    MS. GOETZL:  Yes.
20                    MR. VALENTINI:  Sorry.
21                    THE COURT:  Okay.
22                    (Off-the-record discussion.)
23                    THE COURT:  Why don't we do this, this is a waste
24      of time.  Somebody should read the list and make sure
25      everybody's on the same page.  Her list is the most
```

1        important list.

2                  MR. VALENTINI:  Yeah.

3                  THE COURT:  Tanya, why don't you check with

4        counsel to see if you're all in agreement, maybe I'm wrong.

5                  (Pause in proceedings)

6                  THE COURT:  Can I ask a question before you all

7        leave?

8                  First, I would like counsel from both sides to

9        confirm that you are all in agreement with each other and

10       you have Ms. Johnson's list as to who the jurors are 1

11       through 12 and who the alternates are 1 and 2.

12                  If there's no any longer dispute, would you please

13       tell me that on the record if that is, in fact, the case?

14                  MS. ROCHLIN:  Yes.

15                  MR. DREHER:  Yes.  There is no dispute, Your

16       Honor.

17                  THE COURT:  There is no dispute?

18                  Just for my own curiosity, let's see whether my

19       original copy has the two alternates now.  Too often it's

20       wrong, Lowell and LeBlanc?

21                  MR. VALENTINI:  I didn't hear you, Your Honor.

22                  THE COURT:  I have two alternates, line 46 and

23       line 47.

24                  MS. ROCHLIN:  They're line 46 and line 48?

25                  MR. VALENTINI:  Yes.

```
 1                THE COURT:  Line 37 was never struck?

 2                MS. GOETZL:  He was struck as an alternate.

 3                THE COURT:  What?

 4                MS. GOETZL:  The defense struck 37 as an

 5     alternate.

 6                THE COURT:  Let me see the list again.  That's not

 7     what I had down.  Let's see.  I had something else.

 8     Well --

 9                MR. SMOCK:  Your Honor, I can't remember her

10     page -- her line number wrong, it's my fault, but she's 907.

11                THE COURT:  Oh, I see.

12                MR. SMOCK:  That was my fault.

13                THE COURT:  I may have just looked at that.

14                And so page 2, Line 29 has not been struck?

15                MR. SMOCK:  Yeah, and I'm falling on my sword,

16     it's 907.  For some reason wrote 29 --

17                THE COURT:  There's reference line 29, juror

18     number 059?

19                MR. SMOCK:  That's juror number 6.

20                MR. VALENTINI:  She's seated.

21                THE COURT:  That's what I'm off on, so you really

22     confused me.

23                MR. SMOCK:  I'm sorry.

24                THE COURT:  Because I put juror 29 and I didn't

25     look --
```

```
 1                    [Simultaneous indiscernible crosstalk]

 2                    MR. SMOCK:  Right.

 3                    THE COURT:  And then when I wrote that down, I

 4       thought to myself, is he allowed to go back and strike

 5       somebody up --

 6                    [Simultaneous indiscernible crosstalk]

 7                    MR. SMOCK:  Well, I had so many numbers, Your

 8       Honor.

 9                    [Indiscernible]

10                    MR. SMOCK:  Sorry about that.

11                    THE COURT:  That's okay.  That's the least of our

12       problems, as long as everybody's on the same page.

13                    I'm glad to see so many of you brought reading

14       materials.

15                    (In open court.)

16                    THE COURT:  So we're done, so you guys have to

17       leave.

18                    You don't have to leave courtroom, you just have

19       to leave the jury box.  I mean, you can go over there, you

20       can go back there.

21                    MS. JOHNSON:  Okay.

22                    THE COURT:  Go.

23                    MS. JOHNSON:  Okay.

24                    Will the following jurors -- can you hear me?

25       Would the following jurors please step forward when you hear
```

 1      your juror number.

 2                  Juror number 1236.  And, ma'am, you can take this

 3      first seat.

 4                  Juror number 1661 -- ma'am first seat in here.

 5      You can go around.

 6                  Juror number 1661, ma'am, you're number two.

 7      Please have the second seat in the first row.

 8                  Juror number 0280, and you're juror number three.

 9      So you can have the third seat for me, please.

10                  Juror number 0888.  Ma'am, you're juror number

11      four.  Please take this fourth seat.

12                  Juror number 1627.  Ma'am, you're juror number

13      five.  Take that seat, please.

14                  Juror number 0059.  Ma'am, you're now juror number

15      six, if you would have a seat here, please.

16                  Juror number 0795.  Sir, can you please take this

17      last seat for me, please.

18                  Juror number eight, I have 1540.  If you want to

19      have a seat in the second row, first seat in the corner,

20      please.

21                  Juror number 0029, you're number nine.

22                  Juror number 1675.  Sir, you're juror number ten,

23      okay?

24                  Juror number 1644.  You're juror number eleven,

25      okay?

1          Juror number 1428.  Sir, you're juror number

2     twelve.

3          Juror number 0927.

4          And juror number 0755.  Thank you.

5          THE COURT:  Let me ask counsel to come to the

6     bench for a moment.

7          (At sidebar.)

8          THE COURT:  All right.  So does anybody have any

9     *Batson* challenges or any other challenges?  I don't think

10    that *Batson* covers striking lawyers.

11         Should we keep an extra two or three people until

12    tomorrow morning just in case we have a problem with one of

13    these people here --

14         MR. SMOCK:  No.

15         THE COURT:  -- or are we comfortable that

16    overnight we'll get all 14 back tomorrow?

17         MR. VALENTINI:  You know, we think it would be a

18    good idea, just out of an abundance of caution.

19         THE COURT:  And if we kept the next two, that

20    would be 559 and 672; is that correct?

21         MR. VALENTINI:  659 and --

22         THE COURT:  I'm sorry, did I skip somebody?

23         MR. VALENTINI:  I think the next one would be --

24         MS. JOHNSON:  You said 559.

25         THE COURT:  What?

```
 1                   MS. JOHNSON:  You said 559?

 2                   THE COURT:  659 and 672.

 3                   MR. VALENTINI:  Yes.

 4                   THE COURT:  Okay. So should we let everybody else

 5       go?

 6                   MR. VALENTINI:  Yes.

 7                   (In open court.)

 8                   THE COURT:  So where's Number 659 and 672?  All

 9       right.  The two of you hang on a second.

10                   What I want to say to everybody else sitting in

11       the gallery is that you've all been excused from this jury

12       at this point or you have not -- better phrased, you have

13       not been selected in this jury at this point and you're free

14       to go.  Ms. Johnson will tell you a little bit more.

15                   Continue to call the jury office to see whether

16       during the remainder of whatever your period is, two-week

17       period, to call in to see if they're going to need you for

18       any other potential jury.

19                   I think you've all done Yeoman service over the

20       last few days, however, and all of us, the lawyers and I,

21       and Mr. Gossjankowski, and all of the court staff appreciate

22       your patience and we appreciate your candor.  And I think

23       that's all I have to say, but it's been a long process and

24       I'm sorry for that, but...

25                   So you're all free to go.  You can go home, but
```

1    please call that number at the jury office again after 5:00

2    today.

3           Now, with respect to I said 659 and 672, we

4    probably will not need you.  However, if anything untoward

5    happens between now and tomorrow to any of these 14 people

6    over here, we may need you.

7           So if you would leave your phone numbers with Ms.

8    Johnson, 659 and 672.  She'll be in touch with you tomorrow

9    to tell you you're -- probably tell you you're off the hook

10   and thank you again for your service, and your time, and

11   patience as well.

12          So I'll let Ms. Johnson deal with those in the

13   gallery for the moment and then I'll talk to the remaining

14   individuals.  Thank you all.

15          (Extra jurors excused)

16          THE COURT:  So after this long process you are all

17   jurors.  Twelve of you are jurors and two of you are

18   alternates.  The last two in the last row closest to me are

19   the alternates.

20          Let me say that the job of the alternates is very

21   important.  You need to pay attention.  You need to act as

22   though you will be involved in the final decision because

23   while this is a relatively short trial, one never knows.

24   People have unfortunately crisis in their lives, or their

25   family's lives, or something happens.  So until I tell you

1    that you're -- that we're done with the trial and the jury

2    can start deliberating, you're just as important as

3    everybody else.

4            The law does say, however, that at the end of the

5    process only twelve people can deliberate and decide.

6            It's interesting, because in civil cases the law

7    was changed some years ago so that we can choose a jury of

8    between six and twelve with no alternates and for a longer

9    jury we choose a larger jury -- a longer trial we choose a

10   larger jury, and any number who's left who's there at the

11   end of the trial gets to deliberate and decide.

12           But the criminal law, I'm not a legal historian,

13   but the idea of twelve jurors has really come down from the

14   common law and it's almost -- it's always been so.

15           There's an interesting book about the history of

16   the English jury and so forth, but I had special juries and

17   all sorts of things, but at the end of the day the number

18   has always been twelve in the federal system.  I think there

19   are some states where it's different.  And in the federal

20   system the law says the jury at the end of the day must be

21   unanimous in its decision.

22           So tomorrow morning we will swear you in as

23   jurors.  I will give you some preliminary instructions about

24   what my role is, what you're role is, how you can evaluate

25   evidence, taking notes if you want to take notes, and all of

1     that.  And then the lawyers will give their opening

2     statements and then we'll hear from -- begin to hear

3     testimony from witnesses.

4          Once you're -- I think not tomorrow, they have to

5     be sworn first before they get breakfast?

6          MS. JOHNSON:  Correct.

7          THE COURT:  Okay.  So tomorrow I'd like you here

8     at 9:30.  We'll try to get started as close to 10:00,

9     quarter to 10:00 as we can.  I might have a few things to

10    talk to the lawyers about first at 9:30 before we bring you

11    into the courtroom.

12         And once you've been sworn in and you actually are

13    the sitting jury and alternates, every morning in the jury

14    room there will be water, coffee, I think some little

15    muffins and fruit, things like that just to get you going in

16    the morning.

17         Typically we'll start 9:45, 10:00.  We will break

18    for lunch 12:30 or so, take an hour, maybe an hour or a

19    quarter it depends.  I know the cafeteria can be very busy.

20    We'll take a midmorning break.  We'll take a mid-afternoon

21    break.  We will try to end no later than 5:00 every day.

22         And you should keep in mind that the security

23    lines are very long.  We've got several trials going and

24    other things happening in the courthouse.

25         Will their jury badge get them in once they're

1      sworn in or something?

2           You'll have a badge that says you're a juror so

3      the Court Security Officer will let you in.

4           MS. JOHNSON:  If there's problems I'll just give

5      them my business card.

6           THE COURT:  Oh, she'll take care of you.

7           And there was one other thing I was going to say.

8      Oh, we'll talk about that later.

9           All right.  I don't think I have anything else to

10     say unless counsel does?

11          Okay.  If you want to go out with Ms. Johnson,

12     she'll show you the jury -- anything before we let the jury

13     go?

14          MR. DREHER:  Yes, Your Honor.  Would you rather us

15     approach or?

16          THE COURT:  It depends what it is.

17          MR. DREHER:  I would ask that the Court just

18     reiterate its prior instructions about looking up the

19     case --

20          THE COURT:  Yes.

21          MR. DREHER:  -- or outside information?

22          THE COURT:  Thank you.  I will give you -- thanks

23     very much for raising that again.  I will say this again at

24     great length tomorrow and again, and again, and again.

25          Now that you've been picked for the jury it's

1    really important that you don't read anything about this

2    case, about January 6th events, generally.  That you don't

3    Google it, that you go on social media, that you don't do

4    independent research.

5            If you begin to see anything or hear anything,

6    walk away, turn it off, tell Ms. Johnson.  Don't tell your

7    fellow jurors.  If anybody were to try to talk to you about

8    this case or about your sitting on this jury, don't talk to

9    them, tell Ms. Johnson.  Don't tell your fellow jurors.  And

10   thank you for raising that.  You know why it's important

11   because I've already told you it's important.

12           Keep in mind that one of the reasons that you were

13   selected for this jury as opposed to some of the other

14   people is because of how you responded to questions without

15   your prior knowledge, the extent of it, and your willingness

16   to abide by my instructions and then not to go back and do

17   any research.

18           So you're going to be sworn tomorrow to follow my

19   instructions and you have -- I don't want to -- I don't want

20   to be dramatic, but you basically made a promise to me and

21   most importantly to Mr. Gossjankowski to give him a fair

22   trial, and the government to give their side a fair trial as

23   well.

24           So we're going to hold you to that.  And as the

25   trial goes on, please just insulate yourself from all this

1    stuff and not let your friends or family talk to you about

2    it either.  Just say look, I'm in jury duty in federal

3    court, I can't talk about it.

4           So that's my informal word.  There's more formal

5    jury instructions about it, but I do appreciate Mr. Dreher

6    raising that before you go tonight.

7           Any questions?  Anything you need to know?

8           If not, if you'd go back with Ms. Johnson, she'll

9    show you where you're going to be.  You're very familiar

10   with this room.  You'll decide among yourselves if you all

11   want to wear your masks at all times.

12          We'll also have some chairs out in the hallway, so

13   if you prefer when you're not in the courtroom not sitting

14   in a room with twelve other people, there will be some other

15   places to sit.

16          Thanks again.  And we'll look forward to seeing

17   you tomorrow.

18          (Jurors excused)

19          THE COURT:  So I have a couple things I wanted to

20   raise and you may have some as well.

21          One is, as you know, you just got an e-mail from

22   Erica Ma, my clerk, that because we anticipated the trial

23   would be over by the end of next week, I guess, that the

24   American Sign Language interpreters contracting with the

25   court have done their best to make themselves available when

1   we need them beyond that, but it is -- I believe it's

2   Tuesday the 14th that they're unavailable.

3           Now, I was about to say that to the jury because

4   it's always nice for them to be able to make plans and

5   that's not to say that we couldn't do some other stuff among

6   ourselves depending on where the trial is at, like jury

7   instructions or so forth, but if there's any possibility

8   that you think they might be deliberating on Tuesday

9   the 14th, then I won't tell them not to be here.  I don't

10  know if that's realistic or not.  I mean, we don't have to

11  say that right now, but if you think about how the trial is

12  going to play out, if you think it's possible that we will

13  be charging the jury, instructing the jury, giving closing

14  arguments before the 14th, then we can tell them -- we don't

15  have to tell them now that the 14th is off or we can just

16  wait until the middle next week sometime and see how it's

17  going.

18          I know that when we get to closing arguments, no

19  one will want to have one side give their argument and then

20  take a day off and then give the other side.

21          So it may be that we just tell them that we're not

22  sitting the 14th, but it's nothing we have to decide right

23  now, but I'd like to give them a little warning if that's

24  the case.

25          The only other thing on my mind at the moment is

 1     tomorrow morning if you'd be here at 9:30, we'll see where

 2     we are, any questions we need to talk about.  You may need

 3     to talk about demonstratives, and exhibits, and things like

 4     that to make sure you're not going to have objections that

 5     can be resolved if possible before openings start.

 6              And then I just I guess I would like a prognosis

 7     as to how long you think the openings will be.  I guess my

 8     preliminary instructions will be about 30 minutes.

 9              So those are my -- things on my mind and you can

10     tell me what else is on your mind that we should talk about.

11              MR. VALENTINI:  Thank you, Your Honor.

12              THE COURT:  Mr. Valentini.

13              MR. VALENTINI:  Thank you.  Thank you, Your Honor.

14              I believe that there's just a few unresolved

15     objections with respect to exhibits.

16              Some of them we would expect to introduce into

17     evidence or offer into evidence tomorrow morning or with our

18     first witness, so perhaps it might make sense to address

19     those --

20              THE COURT:  Sure.

21              MR. VALENTINI:  -- if the Court is willing.

22              THE COURT:  Let me just take a look here.

23              I don't know if I've got my -- I have the

24     government's exhibit list as of March 2 and then the most

25     recent relevant document I think is Docket 148, objections;

 1      is that right?

 2                  MR. SMOCK:  That's correct.

 3                  THE COURT:  So where do you want to start?  What

 4      do you want to talk about?

 5                  MR. SMOCK:  Well, I'm happy to sort of go over

 6      them.

 7                  With respect to Exhibit 123, the government has,

 8      as far as I can tell, anticipates playing body-worn camera

 9      footage from four officers.

10                  We have resolved objections with respect to three

11      of them, but what remains is the body-worn camera footage of

12      Officer Bogner.  That's a 14-minute video that the

13      government anticipates offering into evidence.

14                  What one sees in that video is officers walking

15      into the tunnel and then essentially recovering in a side

16      hallway for an extended --

17                  THE COURT:  Say that again.

18                  MR. SMOCK:  Recovering in a side hallway,

19      coughing, they've -- almost all of them have been exposed to

20      tear gas, as far as I can tell.

21                  Mr. Gossjankowski's not in that video.  And, in

22      fact, is not visible as far as I know.  And the government

23      can correct me if I'm wrong, but I don't believe you can see

24      Mr. Gossjankowski in this 14-minute video at all, but, and,

25      again, we already are going to see body-worn camera footage

1        from three other officers.

2            Towards the end of this body-worn camera footage

3        it depicts the sort of pushing between officers and rioters,

4        quote/unquote "in the tunnel."

5            We would have already seen three other body-worn

6        camera footage videos of that.  We have images from CCTV

7        from at least two angles in that tunnel.  We have multiple

8        open source videos taken by participants on the other side

9        of the police line looking towards that scrum.

10           So in our view, this is both prejudicial, it's

11       cumulative, and any sort of value of it is outweighed by the

12       prejudicial effect on our client.

13           Officer Bogner is going to testify.  There's no

14       need to have additional video, much of which -- oh, and I

15       would also add, I'm remembering a fair amount of this video

16       shows bloodied officers.  It shows an officer whose finger's

17       broken, and his broken finger is sort of central and --

18           THE COURT:  Yeah, I've got your document 148 in

19       front of me.  And so you've made that point and the fact

20       that bloodied hand is visible, mucus coming from somebody's

21       nose, and some hearsay from other people, bloodied people.

22           MR. SMOCK:  Correct.

23           MR. VALENTINI:  Thank you, Your Honor.

24           So first of all --

25           COURT REPORTER:  Can you turn on your microphone?

1    Thank you.

2              MR. VALENTINI:  I apologize.  Thank you, Your

3    Honor.

4              So if I can backtrack a little bit before we get

5    to the content of this exhibit.  We have gone with the

6    defense back and forth about limiting and clipping down some

7    of this video, including body-worn cameras from other

8    officers.  And we have been accommodating with many of these

9    exhibits, Your Honor can see that by comparing exhibit lists

10   and we can get into that.

11             As to this one, we think it's particularly

12   important to tell the narrative and show the jury what

13   happened to the officers as they had to retreat, they had to

14   regroup, they had to form a plan in the lower west terrace

15   tunnel and then they responded to what was going to come

16   their way.

17             And for that reason we think it would be important

18   to telling the -- informing the jury about the behavior and

19   the conduct that resulted in the impediment of their

20   official duties, which is, of course, an element of 231.

21             THE COURT:  So first were you planning to use it

22   in opening statement?

23             MR. VALENTINI:  No, not this particular -- we do

24   plan to use some body-worn camera but not this one, no.

25             THE COURT:  And when do you anticipate Bogner

 1          testifying?

 2                    MR. VALENTINI:  Early next week.

 3                    THE COURT:  Okay.

 4                    MR. VALENTINI:  It wouldn't be tomorrow.

 5                    THE COURT:  So I guess what I should do is look at

 6          the 14-minute video myself before I decide.

 7                    MR. VALENTINI:  Yes.

 8                    THE COURT:  Any reason why that doesn't work?

 9                    MR. SMOCK:  No, I think that makes complete sense.

10                    THE COURT:  I mean, as Mr. -- I get the point,

11          because we've had argument about needing to prove that a

12          civil disorder was being committed, not necessarily by the

13          defendant because of the way the statute's worded.  So I get

14          the point that there are a lot of videos broader than Mr.

15          Gossjankowski that are going to be relevant.

16                    The question is whether the questions he raises

17          are whether this particular one or portions of it are too

18          prejudicial and cumulative with things that aren't as

19          prejudicial.

20                    MR. VALENTINI:  Yes.  And the last point I would

21          like to highlight, sort of in response to the thought that

22          you just articulated, while it is true that there is a

23          broader argument that that 231 is a civil disorder and so a

24          lot of things are relevant, with respect to this particular

25          video I think that argument works at a higher level of

1    specificity, because it really explains -- allows the jury

2    to understand how the battle in the lower west terrace came

3    to happen.  It's not just another piece of a body-worn

4    camera, it's not just another video, it's really -- it

5    captures an important juncture shortly after 2:30 p.m. when

6    police officers had to retreat from the inaugural stage

7    through the tunnel and prepare for the next stage of the

8    confrontation.

9         So for that that reason we think it holds greater

10    probative value.  It's more important to understanding what

11    happened at that point on January 6.

12         MR. SMOCK:  Your Honor, all I'd add is we're going

13    to hear from all of these officers who are going to explain

14    it in great deal, I'm sure.  And so the tremendous amount of

15    prejudicial footage in here, which doesn't relate

16    specifically to conduct by Mr. Gossjankowski is --

17         THE COURT:  Okay.  Well, why don't we move on to

18    other things on your list.

19         MR. SMOCK:  So I'm not sure whether the government

20    has considered or rejected, this is a fairly simple one that

21    the exhibit -- if the exhibit list is not going back to the

22    jury, I guess we don't have any objection.

23         THE COURT:  No, the exhibit list is not going back

24    to the jury.

25         MR. SMOCK:  Okay.  Withdrawn.

1          THE COURT:  The exhibit list is not going back to

2     the jury.

3          MR. SMOCK:  This is withdrawn then.

4          Exhibit 136, I'm not sure whether the government

5     has made redactions after minute marker 2:15.

6          THE COURT:  So is 136, that's part of -- 136 was

7     the subject in part of a motion which was Docket 107?

8          MR. VALENTINI:  Yes.

9          THE COURT:  Right?  And I thought I had said at

10    some prior hearing that the comments, captions, live tweets,

11    have to be excised.

12         MR. VALENTINI:  The written comments and tweets,

13    yes.  We've done that.  The version --

14         THE COURT:  Okay.  So that issue is now over?

15         MR. VALENTINI:  Yes, yeah, yeah.

16         THE COURT:  So what is the question about 136

17    then, Mr. Smock?

18         MR. SMOCK:  Simply that our view is that the

19    beginning and the end need to be clipped because they don't

20    involve Mr. Gossjankowski, particularly the ending is shot

21    in a different place and isn't the same sort of chain of

22    events.

23         THE COURT:  Well, how long is it?  Five minutes?

24         MR. VALENTINI:  No, no.  It's less than that.

25    It's two minutes and 16 seconds.  To be clear, we have

1        already edited the end at 2:16 --

2                 THE COURT:  Oh, very well.  You've already what?

3                 MR. VALENTINI:  We have edited at the end.  So the

4        ending is no longer a problem.  I think you still raise an

5        objection in your papers about the beginning.  And I'm

6        sorry, I shouldn't address him.  An objection is raised

7        about the beginning, but the beginning we think is relevant

8        because it shows what Mr. Gossjankowski did see or had a

9        direct line of sight to.

10                So we have edited out the ending.  The beginning,

11       however, we think, it's probative and it should stay in and

12       it's only 40 seconds.

13                MR. SMOCK:  Your Honor, we'll withdraw our

14       objection to 136.

15                THE COURT:  Okay.

16                MR. SMOCK:  138 is one that has been raised in

17       previous pleadings.  The last five minutes --

18                THE COURT:  So I have a question for you looking

19       at Docket 148.

20                When you discussed Exhibit 138, the caption of

21       Exhibit 138 is in bold and the paragraph that follows,

22       there's a reference to Exhibit 137.  Is that a typo?

23                MR. SMOCK:  That is, Your Honor.  I apologize.

24                THE COURT:  Okay.  So we are talking about 138,

25       which was Exhibit 6 from the motion, which was 107, the

1      seven-minute video.  And the argument is the last five

2      minutes show individuals other than Mr. Gossjankowski and

3      that he's not shown there.

4              MR. SMOCK:  And, Your Honor, it might make sense

5      for you to watch this with the fact in mind that this is one

6      of many videos that the government proposes to show of this,

7      again, sort of scrum in the tunnel.

8              And a lot of this footage at the end is

9      essentially just bodies pushing up against each other over

10     to over to one side, people yelling and screaming.  Mr.

11     Gossjankowski is not visible at all.

12             Again, they will be playing CCTV footage of this

13     scrum and they will be playing other footage of it.  It's

14     overly prejudicial and it's cumulative, and it's also not

15     relevant to Mr. Gossjankowski's conduct.

16             THE COURT:  How long is this one?

17             MR. VALENTINI:  I think it's seven minutes total.

18             And with respect to the videos from the tunnel

19     itself, that is really where Mr. Gossjankowski was.

20             So even if it's not directly, in the frame it's

21     not just about the 231 -- the 231 charge, it's not about the

22     fact that the Capitol was under attack and there was a civil

23     disorder, it's really about the fact that this is where Mr.

24     Gossjankowski saw the attack happen and continued to

25     participate in advancing.

1          THE COURT:  Okay.  The next one is Exhibit 140 and

2     that was Exhibit 15.  Okay.

3          MR. SMOCK:  And --

4          THE COURT:  And, again, in both -- in this one I

5     have a note that the government's agreed to excise comments,

6     and captions, and live tweets, and that sort of stuff; is

7     that right?

8          MR. VALENTINI:  So, yes.  To be clear, I just want

9     to make a record, we have excised any visual captions.  To

10    the extent there is audio, that they refer to commentary in

11    their objection, to the extent it's audio, we have not

12    removed the audio.  What we have done is we have excised,

13    there were comments on the exhibit.

14          I just want to make sure that there is no surprise

15    when and if the exhibit is introduced.

16          THE COURT:  And how long is this one?

17          MR. SMOCK:  Seven minutes.

18          THE COURT:  Also seven minutes?

19          MR. SMOCK:  Yes.

20          THE COURT:  So your reference to inflammatory and

21    prejudicial commentary, that's been removed?

22          MR. SMOCK:  No, Your Honor.  That is essentially

23    the person who is filming from, I believe, their cell phone

24    and people surrounding that person saying, you know,

25    offensive things about the police and things of that nature.

1          And our point is were this -- were it true that
2     this video showed relevant footage of our client
3     particularly after the second minute, one might have an
4     argument for its admissibility.  But absent any view of him
5     after the second minute, it -- we would object to playing
6     more than that.
7          MR. VALENTINI:  Your Honor, in the interest of
8     streamlining things as to Exhibit 140, we will agree to
9     excise after -- once Mr. Gossjankowski's no longer visible
10    in the exhibit.
11         THE COURT:  So, and that also reduces the length?
12         MR. VALENTINI:  It does reduce the length.
13         To the extent that, however, the defense is
14    worried about comments are made before that time mark, the
15    audio will still be in the exhibit.
16         THE COURT:  The audio what?
17         MR. VALENTINI:  The audio, the sound, will still
18    be part of the exhibit.
19         THE COURT:  Yeah.
20         So to the extent you're short -- excising the
21    parts where Mr. Gossjankowski is not present or in the area,
22    the audio and the video would both go?
23         MR. VALENTINI:  Yes, yes.  But to the extent --
24         THE COURT:  But there's still some audio in there?
25         MR. VALENTINI:  They have not specified which part

1   of the commentary or the sound they're objecting to, but

2   it's to the extent they are.

3            THE COURT:  All right.  So I think that the answer

4   is that, Mr. Smock, you and Ms. Goetzl, he's made an offer

5   to eliminate some minutes of it and I think maybe the two of

6   you need to look at the revised version before I'm asked to

7   resolve anything.

8            MR. SMOCK:  That's fine.  That makes sense.

9            MR. VALENTINI:  And just to make a clear record,

10  is it the last five minutes of the exhibit the defense is

11  objecting to?

12           MR. SMOCK:  Yes.

13           MR. VALENTINI:  Five minutes?

14           THE COURT:  So, essentially, if I'm hearing

15  correctly, the first two minutes are okay and you will, Mr.

16  Smock, see which portions of the last five minutes remain

17  after the excision that Mr. Valentini is offering?

18           MR. SMOCK:  That sounds right.

19           And we'll discuss it, but it sounded to me as if

20  Mr. Valentini was saying the government would excise the

21  last five minutes, but we'll work that out.

22           THE COURT:  Okay.  Let's see now.  What else?

23           MR. SMOCK:  141 is a half hour long video that as

24  far as we can tell only depicts Mr. Gossjankowski in the

25  first five minutes.

```
1              THE COURT:  Let me ask, is this what you all have

2       been referring to as the montage video or not?

3              MR. SMOCK:  It's not.

4              MR. VALENTINI:  No.

5              THE COURT:  Okay.

6              MR. SMOCK:  It's an open source video shot by, I

7       believe, someone who's present.

8              MR. VALENTINI:  Your Honor, I'm sorry.

9              MR. SMOCK:  Your Honor, I don't think we need to

10      address 141.

11             Mr. Valentini reminds me that that was one of the

12      things we negotiated about and I think we resolved it.

13      There was fisticuffs involved in the discussion, but it got

14      resolved.

15             THE COURT:  So that's 141 and is 141C a subpart of

16      that?

17             MR. VALENTINI:  That actually raises a good point.

18             There is some videos as to which we offered as

19      exhibits, both the original, and what we would like to show

20      to the jury is a version that has some highlighting or that

21      facilitates the -- or facilitated the -- or facilitates the

22      prior facts focused on certain aspects of the video.

23             We would prefer that this type of graphics have

24      been offered and admitted into evidence in a number of

25      January 6 cases.  We would like the Court -- we will
```

1    recommend that the Court proceed in this fashion in this

2    case as well.

3                THE COURT:  I'm not sure what we're talking about.

4                MR. VALENTINI:  Well, we're talking about --

5                THE COURT:  We're talking about 141C --

6                MR. VALENTINI:  Yes.

7                THE COURT:  -- at the moment?

8                MR. VALENTINI:  141C will have some graphics that

9    will help the trier of fact focus its attention on

10   particular aspects of the video, but --

11               THE COURT:  What I'm trying to figure out is

12   whether both 141 and 141C has been resolved or just 141?

13               MR. VALENTINI:  141 has been resolved.  141C, is a

14   -- it's a subset of 141 because it has this graphics that

15   has not been resolved.

16               (Counsel confer)

17               MR. SMOCK:  Your Honor, I think this goes to one

18   of the issues that I think you wanted to table until you see

19   it.

20               I think there are a number of videos that in which

21   the government has slowed things down at different points or

22   put arrows on the video and things of that nature.  We have

23   no objection to them playing for the jury.  Our only

24   objection is that it should be a demonstrative played for

25   the jury during trial but not admitted as an exhibit.

1            THE COURT:  Well, that may be an important point.

2     And I had similar things in the *Sutton* trial.  They slowed

3     down a lot of stuff.  They did, for a lack of a better word,

4     a montage of bringing together different exhibits and

5     showing how they interacted because they wanted to show the

6     same, say, what happened at 1:42 from six different angles.

7     And they took a street camera, plus three body-worn cameras,

8     plus this, plus that, plus a map that the agent had created,

9     and they put it all together in one exhibit.  And it was a

10    demonstrative because they created it for that purpose, but

11    they also had things that they slowed down and was admitted,

12    and they had things where they had still shots from

13    body-worn cameras and those were admitted as evidence.

14            So, you know, it may be that something like this,

15    we have to wait until it's offered and then say you can say

16    we don't object if it's a demonstrative but we do object --

17    you know, there are only certain things that we can only

18    resolve during trial and it may be that I will be better

19    able to -- I mean, I don't want to waste the jury's time.

20    But on the other hand, it may be easier to resolve in

21    context.

22            MR. SMOCK:  I think that makes sense.  I think we

23    will withdraw our objection to 143.2A and 143.3A.

24            The only hesitation I have, Your Honor, is just

25    that we've been getting new versions of these exhibits,

 1    including up until 1:30 in the morning last night.

 2              THE COURT:  Yeah.

 3              MR. SMOCK:  So I do just want to preserve the

 4    possibility that as I'm looking at new versions that

 5    something may come up, but I don't think we need to address

 6    that this evening.

 7              THE COURT:  May I raise something that was raised

 8    the other day, and that's there was this thing about the

 9    Congressional Record and the Amended Congressional Record.

10              And as I recall, you were going to talk to each

11    other about whether you were satisfied now of the

12    authenticity of what it was that they were going to propose.

13    And there may have even been two such documents.  I'm maybe

14    misremembering, but.

15              MR. VALENTINI:  So as I understand it, that

16    objection is no longer in the defense's lists of objections.

17    So I understand that objection has been resolved.

18              But if they still want to assert it, we're

19    prepared -- we will offer from former general counsel -- we

20    will call the former General Counsel of the Secretary of the

21    Senate as a witness.

22              If they have any questions about the correction

23    process of the Government Printing Office, I'm sure they

24    will answer their questions.

25              MR. SMOCK:  That's fine.

```
 1                THE COURT:  Okay.

 2                MR. SMOCK:  So I think that leaves only two

 3      remaining items and these are actually documents from

 4      Facebook.

 5                I know that I have one copy of -- and they don't

 6      have exhibit numbers on them, the ones that the government

 7      produced yesterday, but I think that 304 is --

 8                MR. VALENTINI:  The files are all numbered.

 9                MR. SMOCK:  Okay.  So 304, this is another one

10      that there have been a number of versions of.

11                THE COURT:  304 is what?  Facebook --

12                MR. SMOCK:  304 is a Facebook exchange between Mr.

13      Gossjankowski and another person.

14                THE COURT:  Well, why isn't it --

15                MR. SMOCK:  And it contains communications that

16      are neither relevant to the charges here and also involve

17      prejudicial language that has no relevance to the charges

18      here.  I'm trying to find it, I'm sorry.

19                THE COURT:  And is this the same as Exhibit 305?

20                MR. SMOCK:  Yes, that's our position --

21                THE COURT:  It says, "Several exchanges with posts

22      that have been made by members of a Facebook group.  Only

23      postings by Mr. Gossjankowski should be admitted."

24                So I would think in a general sense is the

25      following:
```

1          Anything that Mr. Gossjankowski said is, if it's

2     relevant to the issues in the case, should come in because

3     he's here and because statements that he's made by a

4     party-opponent -- statements made by a party-opponent are

5     admissible under the Federal Rules of Evidence.

6          If the other things are responses to him or back

7     and forths between him and other people, they are either

8     admitted -- they're probably admissible, maybe not for the

9     truth of the matter asserted, but to put it all in context

10     and to explain the nature of the conversation, unless that

11     person is a witness.

12          As for Facebook exchanges between Smith and Jones,

13     in which Mr. Gossjankowski is not involved, I think that's

14     more attenuated and perhaps more problematic.

15          So my gut reaction is, anything he said, if it's

16     relevant to the issues in the case, party admissions.  And

17     anything somebody said to him or in conversation with him,

18     maybe not for the truth of the matter asserted, but to put

19     it in context and put the whole conversation in context and

20     we can have a limiting instruction.

21          Stuff between other people that he may have seen

22     but didn't react to or respond to, I would need to hear more

23     argument about why they're admissible.

24          MR. SMOCK:  And --

25          MR. VALENTINI:  Do you want to go?

 1                MR. SMOCK:  So with respect to 305, what it is --

 2      and I think it was among the things that were sent to the

 3      Court, I can hand up the copy that Mr. Valentini just gave

 4      me, but what it is is a -- it is a number of postings by

 5      people who are apparently a member of some sort of group on

 6      Facebook and contains several, essentially, sort of

 7      postcard-looking promotions about January 6th, many of which

 8      are inflammatory in nature and prejudicial.

 9                And absent any evidence that Mr. Gossjankowski saw

10      them, there's certainly no evidence that he posted them,

11      they certainly shouldn't be shown to the jury.

12                MR. VALENTINI:  Your Honor, I would just like to

13      offer a bit of explanation about this.

14                We have not heard a hearsay exception from the

15      defense as to this exhibit.  And I understand your comments

16      before were going to hearsay, and that's because these

17      postings are not offered for the truth of the matter

18      asserted.

19                THE COURT:  And what are they offered for?

20                MR. VALENTINI:  They're offered to show that Mr.

21      Gossjankowski had knowledge about January 6th, and the

22      nature of the events of what was going to happen on

23      January 6th at the Capitol, and what was the goal of the

24      individuals that went to the Capitol.

25                And this is directly relevant to the 1512(c)(2)

1    charge where we have to show the intent of Mr. Gossjankowski

2    in obstructing the official proceeding on January 6, 2021.

3              THE COURT:  Well, how do we know that he saw

4    these?

5              MR. VALENTINI:  Because he was a member of this

6    group that was trafficking -- that was exchanging these

7    messages.  Just as we routinely admit into evidence, not

8    necessarily for the truth of the matter asserted, but

9    e-mails that a person receives, because the receipt itself

10   shows that he has -- he likely had knowledge of what -- of

11   the matter asserted, even whether the matter asserted is

12   true or not.

13             MR. SMOCK:  And, Your Honor, Facebook is different

14   than e-mail.

15             One would have to actually look at this.  And

16   there's no evidence that he looked at this, that he received

17   it, certainly no evidence that he posted any of those

18   inflammatory sort of promotions.  And it would -- the

19   question is less hearsay and more relevance.

20             It's extremely prejudicial in that it, just as Mr.

21   Valentini is suggesting, he would be arguing to the jury,

22   look at these inflammatory advertisements suggesting that

23   something bad is going to happen on January 6th.

24             Absent evidence that Mr. Gossjankowski reviewed

25   them, it's not relevant, and certainly overly prejudicial,

1    and the prejudice outweighs any limited relevance under 403.

2    It's actually extremely prejudicial evidence.

3            And, again, if it were something where there was

4    some response from Mr. Gossjankowski to one of the

5    advertisements, saying, Yes.  Sounds good.  I'm on board.

6    That would be one thing.  But there is no such thing in

7    these postings.

8            And so we have real concerns about admission of

9    this evidence.

10           MR. VALENTINI:  Your Honor, this kind of argument

11   is an argument that the defense should make to the jury.

12   This does not go to admissibility.

13           THE COURT:  No.  No, it's not.

14           What evidence do you have that he saw these, was

15   aware of them?

16           MR. VALENTINI:  He's a member of this Facebook

17   group --

18           THE COURT:  How many members are members of the

19   group?  Thousands?

20           MR. VALENTINI:  No, it's not thousands.  They're

21   listed.  I don't have a precise number at my fingertips, but

22   there's certainly not thousands.

23           I'm happy to offer more evidence --

24           THE COURT:  No.  I want -- give me some law that

25   says this sort of stuff is admissible just because you're a

LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

1    member of a Facebook group.  It seem counterintuitive.

2              MR. VALENTINI:  And just as part of this group,

3    for instance, on January 4th Mr. Gossjankowski -- he was not

4    just a passive participant of this group.

5              For example, on January 4th, 2021, he posted to

6    this Facebook group, "We need to set up an arrangement to

7    meet to make a big gathering before we start marching.  I

8    know the excessive usage of phones in heavily crowded areas

9    are going to slow us to communicate."  He's not a passive

10   participant, he's an active participant.

11             THE COURT:  What evidence is there that he saw

12   this stuff?

13             MR. VALENTINI:  This is the group he's --

14             THE COURT:  I don't care.  It's excluded.

15             MR. VALENTINI:  I'm sorry?

16             THE COURT:  Exhibit 305 is excluded.

17             MR. SMOCK:  The only remaining thing, Your Honor,

18   is --

19             THE COURT:  It's out.  Prejudicial, maybe not

20   relevant.

21             MR. SMOCK:  Agreed.  So the last remaining exhibit

22   is 304, which contains an exchange between Mr.

23   Gossjankowski --

24             THE COURT:  I thought you just told me a little

25   while ago that you were probably okay with 304, like five

1     minutes ago, ten minutes ago?

2               MR. SMOCK:  If I said that --

3               THE COURT:  Those were the words that came out of

4     your mouth.

5               MR. SMOCK:  I don't, well, if that's --

6               THE COURT:  We just passed over 304 because you

7     told me it was probably okay.

8               MR. SMOCK:  Your Honor, that I'm not sure why we

9     passed over it, but this is actually very important and we

10    don't withdraw our objection to this.

11              This is simply a one-page exchange that I can hand

12    up.  We have no objection to the --

13              THE COURT:  All right.  Just give it to Ms. Ma and

14    I'll look at it some other time, not now.

15              If you want to move to reconsider on 305 give me

16    some case law that says just because you're a member of a

17    Facebook group, no matter how large or how small, everything

18    in that group chat that you did not participant in is not

19    admissible.  I would find that hard to believe.  And I don't

20    want anything from the Fifth Circuit, or Florida, or Texas.

21              MR. VALENTINI:  Understood, Your Honor.

22              THE COURT:  Or the Supreme Court.  I have to

23    follow the Supreme Court, forget that last remark.

24              (Judge and law clerk confer)

25              THE COURT:  So I'm going to look at 305, because

1    there may be some things that are clear that do include

2    exchanges with Mr. Gossjankowski and other people.  And it

3    may be that on reflection and in looking at it more

4    closely -- so there are two options on 305, two open things

5    on 305 despite what I said ten minutes ago.

6            One is that I will consider whether some parts of

7    it are relative and probative, even under my more limited

8    view of how Facebook postings should be considered, more

9    limited view than in the government's.

10           And the second is, if the government can show me

11   some case law that is helpful with respect to these kinds of

12   postings on Facebook, large groups, small groups,

13   medium-sized groups, that courts have said should come in,

14   even if the individual didn't respond or they can't prove

15   directly that he saw it, I'll consider that case law.

16           Assuming that you can show me that is so and

17   there's some relevance to it, I still think there's the

18   issue of prejudice and whether some -- I mean, we always

19   have to balance prejudice and see whether the prejudice

20   substantially outweighs probative value.

21           So I will -- I have not given you a final ruling

22   on 305.  You will find that I do that occasionally.  Just

23   give you my first reaction and then can be persuaded to

24   reconsider.

25           I don't want, you know, I want to be fair to both

LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

1    sides and I think that -- okay.

2              MR. VALENTINI:  Thank you, Your Honor.

3              I believe my cocounsel wanted to address briefly a

4    question with respect to the opening.  Let me consult with

5    cocounsel.

6              (Counsel confer)

7              MR. VALENTINI:  Nothing further from the

8    government.  Thank you.

9              THE COURT:  Is there anything else anybody wants

10   to raise?

11             MR. VALENTINI:  No, Your Honor.

12             MR. SMOCK:  No, Your Honor.

13             THE COURT:  Do you -- and you'll talk to each

14   other about any other demonstratives, or exhibits, or

15   whatever that are going to be used in openings to see if

16   there are going to be problems that I need to resolve?

17             MR. DREHER:  Your Honor, just for the record, I do

18   intend to e-mail as soon as I get back to the office a copy

19   of my presentation of the opening statement to opposing

20   counsel.  And we'll hopefully receive either feedback or any

21   objections and be able to forward that to the Court, but

22   hopefully at an hour that's decent.

23             THE COURT:  Do you have any estimates as to how

24   long you'll be?

25             MR. DREHER:  The only thing from stopping me from

1    doing it here, Your Honor, is I'm unable to connect --

2              THE COURT:  No, how long your opening is going to

3    be?

4              MR. DREHER:  Oh, I apologize.  I always try to hit

5    20 minutes, Your Honor, but --

6              THE COURT:  No promises.  Would you --

7              (Judge and law clerk confer)

8              MS. JOHNSON:  Sorry.

9              THE COURT:  Would the defense, after you've

10   reviewed what Mr. Dreher sends you later, if you have

11   objections, because this is all about his opening, would you

12   put them in writing?  It doesn't have to be fancy writing,

13   but just so, and either file it, if you think it's something

14   appropriate to be on the docket or send an e-mail and

15   include Erica in the e-mail.

16             So if she gets an e-mail tonight with defense

17   objections, she'll forward it to me tonight.  If there's a

18   filing tonight with defense objections on the docket, we'll

19   both see that tonight and come to court more prepared to

20   have a discussion with you so we can, you know, try to not

21   take too much of the jury's time.

22             Anything else right now?

23             Okay.  Okay.  Well, we'll get started tomorrow.

24   Thank you.

25             (Court adjourned at 4:49 p.m.)


                    LYNNE M. KRENZ, RMR, CRR, CRC
                          (651)848-1226

1                    *          *          *

2                **REPORTER'S CERTIFICATE**

3

4

5            I certify the foregoing pages of typewritten
   material constitute a full, true and correct transcript of
6  my original stenograph notes, as they purport to contain, of
   the proceedings reported by me at the time and place
   hereinbefore mentioned.
7

8                    /s/Lynne M. Krenz
                   Lynne M. Krenz, RMR, CRR, CRC
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25