```
 1                        UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
 2
         ------------------------------------------------------------
 3                                    )
         United States of America,    )   File No. 21-cr-123
 4                                    )             (PLF)
                  Plaintiff,          )
 5                                    )   VOLUME IV
         vs.                          )   Washington, D.C.
 6                                    )   March 3, 2023
         Vitali Gossjankowski,        )   9:39 a.m.
 7                                    )
                  Defendant.          )
 8       ------------------------------------------------------------

 9
                   BEFORE THE HONORABLE PAUL L. FRIEDMAN
10                  UNITED STATES DISTRICT COURT JUDGE
                                 (TRIAL)
11
         APPEARANCES:
12       For the Plaintiff:        United States Attorney's Office
                                   Adam Dreher, AUSA
13                                 Francesco Valentini, AUSA
                                   Karen Rochlin, AUSA
14                                 Capitol Siege
                                   601 D Street NW
15                                 Washington, Minnesota 20530

16       For the Defendant:        Federal Public Defender for the
                                   District of Columbia
17                                 Celia Goetzl, ESQ.
                                   Edward Smock, ESQ.
18                                 625 Indiana Avenue NW
                                   Suite 550
19                                 Washington, D.C. 20004

20       Court Reporter:           Lynne M. Krenz, RMR, CRR, CRC
                                   Suite 146
21                                 316 North Robert Street
                                   St. Paul, Minnesota 55101
22
         American Sign Language    Carla Mathers
23       Interpreters:             Jeremy Brunson

24
                    Proceedings reported by certified stenographer;
25       transcript produced with computer.
```

1                        **I N D E X**

2
                                                              PAGE
3
      **JURY INSTRUCTIONS BY THE COURT**                        729
4         Opening Remarks by Mr. Dreher                        743
          Opening Remarks by Ms. Goetzl                        754
5
      **CAPTAIN RONALD ORTEGA**
6         Direct Examination By Mr. Valentini                  766

7
          GOVERNMENT'S EXHIBITS                                REC'D
8         100.1                                                820
          100.2                                                820
9         100.3                                                820
          100B                                                 823
10        101.1                                                820
          101.2                                                820
11        101A                                                 823
          102                                                  820
12        103                                                  820
          130                                                  857
13        131                                                  861
          132                                                  864
14        133                                                  874
          134                                                  879
15        135.1                                                883
          136                                                  887
16        137                                                  897
          600                                                  772
17        601                                                  782
          602                                                  785
18        603                                                  788
          604                                                  789
19        605                                                  770
          606                                                  793
20        607                                                  795
          608                                                  797
21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                       IN OPEN COURT

 3        (Defendant present)

 4             MS. JOHNSON:  This is criminal action 21-123,

 5   United States versus Vitali Gossjankowski.

 6                  For the United States I have Francesco Valentini,

 7   Adam Dreher, and Karen Rochlin.

 8                  For Defendant I have Edward Smock and Celia

 9   Goetzl.

10                  Our court reporter is Lynne Krenz.

11                  Our ASL interpreters today are Jeremy Brunson and

12   Carla Mathers.

13                  All parties are present.

14                  (Interpreters sworn.)

15             INTERPRETERS:  I do.

16             THE COURT:  So I noticed every morning when Ms.

17   Johnson calls the case she doesn't mention Ms. Rochlin.

18                  Have you formally entered an appearance in the

19   case?

20             MS. ROCHLIN:  Good morning, Your Honor.  Yes,

21   sometime ago.  The Court may not remember me from some of

22   the zoom conferences with Mr. Disney and earlier --

23             THE COURT:  Yes.

24             MS. ROCHLIN:  -- but I have remained in the case

25   although my role has been evolving.
```

 1                THE COURT:  So your name should appear on the

 2       calendar with the other two?

 3                MS. JOHNSON:  They were included, but I did call

 4       her name when I called it this morning.

 5                THE COURT:  Yeah, so, anyway, good.  Yes, I do

 6       recall.

 7                MS. ROCHLIN:  Thank you, Your Honor.

 8                THE COURT:  So first thing I think we have to do

 9       this morning, and I do apologize for the lateness of getting

10       that order out to you, I intended to get it out earlier in

11       the -- I was out-of-pocket for a while my clerks were still

12       working, but the point of the order that was issued last

13       night at Docket 151 has to do with the motion to suppress

14       physical evidence in property Docket 108.

15                And sometime ago I issued an opinion on the return

16       of property portion of the argument, but I hadn't issued

17       anything on the suppression of physical evidence.  And

18       obviously over the last few days we've talked about

19       exhibits, it appears it's clear that some of those exhibits

20       are still offered by the government.

21                And so I've looked hard at the question over the

22       last few days and this order set forth my preliminary views

23       on three subsets of the evidence from the digital devices

24       that were seized.

25                I asked in that order that counsel brief the

1    questions and address certain opinions.  I hadn't realized

2    and probably should have anticipated that at least some

3    evidence from some -- one or more of those exhibits was

4    going to be used in opening statements.

5            So at the last minute there was an e-mail -- I'm

6    saying all of this for the record, obviously a lot of you

7    know, but a lot of it was by e-mail.  There was an e-mail

8    exchanged between counsel, and as I understand it, there was

9    one particular item of evidence in Mr. Dreher's proposed

10   PowerPoint that he had shared with the defense that was

11   objectionable and it's based on the arguments in that

12   motion.

13           And so where I am and I said in my briefs on these

14   cases, and we can talk about whether I need briefs on the

15   cases because I've now spent a lot of time and I've read one

16   of those cases and many more, and I have a pretty clear view

17   of how I'm going to decide that motion.  And even the order

18   suggested how that my thinking at the time, which was that

19   with respect to the iPad, Apple iPad Pro exhibits, I was

20   concerned about the government's position.

21           With respect to the iPhone exhibits, both the

22   Apple iPhone 7 and the Apple iPhone 11 exhibits, I was

23   inclined to agree with the government and that's still my

24   view having read cases last night and this morning.  So I

25   don't know whether I need briefs or not.

1          The question -- the immediate question, and I

2     think and the only question we have to resolve this morning

3     has to do with -- has to do with those portions of the

4     PowerPoint that Mr. Dreher sent to defense counsel that

5     relate to one or more of these exhibits.  And I can decide

6     that without deciding the larger question so we can get

7     going.

8               MR. VALENTINI:  Your Honor?

9               THE COURT:  Mr. Valentini, yes, sir.

10              MR. VALENTINI:  May I be heard very briefly?

11              THE COURT:  Yes, sir.

12              MR. VALENTINI:  Thank you.

13              With respect to the exhibit that will be

14    incorporated in Mr. Dreher's opening statement, that exhibit

15    would be from one of the iPhones, not the iPad.

16              So, you know, if the Court's indicating -- Your

17    Honor's indication from yesterday remains true, that will

18    now raise concerns in terms of incorporating that exhibit in

19    the opening statement.

20              THE COURT:  Okay.  Can you tell me, is it -- is it

21    like one still shot or is it a whole video?

22              MR. VALENTINI:  Yeah, it's a still image that is

23    grabbed.  It's a snapshot from one of the videos from one of

24    the cell phones.

25              THE COURT:  Okay.

```
 1            MR. VALENTINI:  I do, however, want to address not

 2     the substance of course of the motion to suppress but a

 3     point of procedure with respect to these issues.

 4            With respect to the iPad exhibits, in light of the

 5     Court's indication or indicative ruling, if that's the

 6     appropriate term from last night the government no longer

 7     needs to or plans to offer Exhibits 200, 201, 202, 203 and

 8     204 into evidence.  Those will be the only exhibits that

 9     come from the Apple IPad.

10            At the same time --

11            THE COURT:  I do want to say, Mr. Valentini, that

12     you would have saved one of my law clerks a lot of time if

13     you told me that two days ago.

14            MR. VALENTINI:  I understand and I apologize.  Of

15     course our decisionmaking is largely a reflection of our

16     desire to proceed with empaneling the jury as well and it

17     was certainly prompted by Your Honor's indicative ruling

18     from yesterday.

19            I did, however, want to point out that with

20     respect to the other exhibits, in order to preserve our

21     appellate rights under U.S.C. 3231, of course there's an

22     imbalance here.  Once the jury's impaneled jeopardy

23     attaches.  And those rights and the ability to seek a review

24     of an adverse ruling, as Your Honor knows, is a pierce for

25     the government.  And that also means that we will still have
```

1    to report the decision and the decision could -- we don't

2    know what -- the base of the decision, if that decision were

3    to be adverse could be, but we want to make sure that the

4    government preserves its appellate rights.

5            And for that reason we would maintain that with

6    respect to the iPhones that you have indicated that you are

7    inclined to admit into evidence, we would ask that the Court

8    to make a ruling, a determination, as to those before the

9    jury's impanelled if possible.

10           And we understand the time constraints and we

11   regret those, but we think it would be important for the

12   government to be able to preserve its appellate rights.

13           THE COURT:  Okay.  What I can do, I think -- but I

14   want to hear from the defense, both with respect to the

15   opening statement exhibit and what you've just said now.

16           Ms. Goetzl.

17           MS. GOETZL:  Good morning, Your Honor.

18           We maintain our motion to suppress the exhibits

19   from the two iPhones.

20           There was no warrant at all to search the iPhone

21   11.  It was on his person.  They never got a warrant to

22   search it.  The iPhone 7 was in his house and the warrant

23   was overbroad.

24           For all of the reasons that we have already

25   articulated on the papers, I do not believe that we need

1    further briefing on this issue, although I am happy to

2    provide further briefing if the Court would like.

3            So we simply maintain our position that we think

4    that all of the evidence should be suppressed.

5            In terms of what the government just raised about

6    an interlocutory appeal, I have a very difficult time seeing

7    the government filing an interlocutory appeal on this

8    evidentiary ruling.

9            This is not a gun case where the Court would be

10   granting a motion to suppress the gun.  These are images

11   that the government took from Mr. Gossjankowski's phone when

12   it has thousands and thousands of images from that day.  So

13   I understand -- I'd have to look at the rule more closely to

14   make sure that the government would have an interlocutory

15   appeal of the Court's order, but I would hope that the

16   government would not delay trial with an interlocutory

17   appeal on that issue in this case.  And so that is that we

18   just maintain our objection.

19           THE COURT:  I'm not sure that's what Mr. Valentini

20   was suggesting that they would appeal this morning and we

21   delay the jury, but that he wants a ruling before jeopardy

22   attaches.

23           MR. VALENTINI:  That's exactly right.

24           THE COURT:  Okay.  Okay.

25           So Exhibits 200 through 204 are withdrawn, which

1    to me was the hardest of the questions with respect to the

2    electronic devices under the Fourth Amendment.  So those we

3    can put aside.

4          And the request is that I rule with respect to the

5    iPhone 7 and the iPhone 11, and I can do that because -- and

6    then I will issue a written opinion later.  And I think, I

7    want to take a minute with my clerk, but I do think that you

8    should know that if I announce my oral ruling in the next

9    five minutes on those items, it is not gut reaction or just

10   desire to get the trial moving.

11         Over the last -- earlier on in preparation for the

12   oral argument on 41 I looked at some of the key cases, you

13   know I looked at some of the key cases because we talked

14   about *Griffith* and we talked about Judge Allison Nathan's

15   opinion in *Wey*, W-E-Y.

16         And subsequently, the cases that were mentioned in

17   the order issued last night, some of which I had not looked

18   at earlier, *Manafort,* and actually what I want to say is I

19   have spent a lot of time on this issue in the last 24 hours.

20         So Judge Facciola's opinion, *In the Matter of the*

21   *Search of Apple iPhone*, 31 F. Supp. 3d, 159.  Another

22   opinion by Judge Facciola, which I didn't find as helpful,

23   *In Re The Matter of Search of Information*, *et cetera*, 25 F.

24   Supp. 3d 1.  Judge Howell's opinion in *United States versus*

25   *Joseph Smith*, criminal 19-324, Docket 128, decided on

1    July 15, 2021, I found particularly helpful.  Judge -- one

2    of Judge Jackson's opinion in *Manafort*, she issued two on

3    this, unrelated issues, but the one at 314 F. Supp. 3d, 258,

4    I already mentioned Judge Allison Nathan's opinion in *Wey*,

5    W-E-Y, 256 F. Supp. 3d, 335, those to me, there's an opinion

6    by Judge Moss which I didn't think was helpful, those to me

7    are the key opinions in here in evaluating the questions,

8    and I have looked carefully at those.  So give me one

9    minute.

10            (Pause in proceedings)

11            THE COURT:  Okay.  So the iPhone 7 and the iPhone

12   11, I find for reasons which I'll explain further in an

13   opinion, that there was probable cause to seize those two

14   iPhones.

15            With respect to the 11, it was seized incident to

16   arrest on his person, but even if it were part of the

17   search, part of -- if the basis were in the warrant, as Ms.

18   Goetzl argued during the oral argument, there's probable

19   cause within the warrant.

20            And I find that with respect to both of those

21   iPhones that there's a particularized statement of the

22   reasons for seizure and, in both cases, that the warrant was

23   not overbroad in that respect.

24            And alternatively, if there were some issues with

25   breadth, there was no bad faith and therefore the *Leon*

1    decision of the Supreme Court, the good faith exception

2    applies in this case, if necessary, in the alternative.

3              The contents, based on the case law that I have

4    read, I find that there was probable cause to review the

5    contents and the warrant or affidavit was particularized

6    enough and to search the contents.

7              I have more problems with the overbreadth in some

8    of the language in the warrant and I will explain that in a

9    written opinion.  That having been said, there was certainly

10   a good faith basis to search the contents.

11             So the one open question this morning in my mind,

12   but I will articulate it, is the overbreadth argument.  But

13   if I conclude that there is a problem, it's saved by the

14   good faith exception and therefore the motion to suppress

15   the contents of the iPhone 7 and the contents of the iPhone

16   11 is denied.

17             And I think that's enough to get it done before

18   jeopardy attaches even though my precise reasoning will

19   follow.  Okay?

20             MR. VALENTINI:  Thank you, Your Honor.

21             Is the Court prepared to deny the motion to

22   suppress the contents of the iPad as moot?

23             THE COURT:  Yes.

24             MR. VALENTINI:  Thank you.

25             THE COURT:  The iPad, denied as moot because the

1    exhibits it relates to have been have been withdrawn and

2    will not be offered in this trial.

3          I just do want to say just parenthetically, you

4    know we're all interested in a fair trial and what happens

5    in the courtroom.  I think we're all also interested in

6    making sure the record is clear on a variety things, so I

7    appreciate it that counsel reminds me, as Mr. Dreher did

8    yesterday, it's very important to admonish the jury as to

9    their obligations as Mr. Valentini did -- I am so sorry, I'm

10   just now, and as Ms. Goetzl and Mr. Smock often do.

11         You know, we want the record to be clear if there

12   is a conviction so the Court of Appeals knows what we're

13   talking about.  And that would go to things to make sure

14   every time we talk about an exhibit, we mention the number

15   and things like that so that we -- and I always try to do

16   that but sometimes in the -- with everything going on in a

17   trial, if counsel can be helpful in making sure we have a

18   clear record.

19         Okay.  Is there any -- what I was going to suggest

20   is is there anything else we want to talk about before we

21   get the jury in?

22         Because what I -- what might make sense, tell me

23   if you disagree, get the jury in, just make sure Ms. Johnson

24   tells me they're all here.  Make sure nobody has any issues,

25   problems, whatever.  We swear them.  I will give preliminary

1    instructions and then we can take a break so you have five

2    or ten minutes to get your thoughts together before opening.

3    And if after Mr. Dreher's opening if the defense would like

4    another break that's okay, that's fine.

5              Anything else anybody wants to raise?

6              And as soon as we swear the jury, Ms. Johnson will

7    call those other two jurors and tell them they're no longer

8    needed and thank them again.  We good?

9              MR. VALENTINI:  Yes.  Nothing from the government.

10             THE COURT:  All right.  Very good.  Thank you.

11             (Pause in proceedings)

12             THE COURT:  I said yesterday, you can stand at the

13   podium for openings if you want, if you are the kind of

14   lawyer that likes to move around, we can give you a

15   lavaliere mic or a handheld mic.

16             (Juror present)

17             THE COURT:  You all remember your seats?

18             MS. JOHNSON:  We're still waiting for one juror,

19   Judge.  She had to go to the restroom.

20             THE COURT:  Okay.  You can all be seated.  When

21   she here we'll get her and help her find her seat.  There

22   she is.  Great.

23             Well, good morning, everybody.

24             JURORS:  Good morning.

25             THE COURT:  Welcome back.  So everybody ready to

1   go?  You know you're in the right seats, these are your

2   seats for the next couple of weeks.

3           And anybody got any issues or problems?  If not,

4   we're going to swear you in and then get started.

5           MS. JOHNSON:  Could everyone please rise and raise

6   your right hands, please.

7           (Jurors sworn)

8           JURORS:  I do.

9           MS. JOHNSON:  Thank you so much.

10                      JURY INSTRUCTIONS

11          THE COURT:  Thank you.  You all may be seated.

12          So first thing I want to do before we begin with

13   the opening statements is to explain some of the legal rules

14   that will be important in this trial.

15          These remarks this morning are not meant to be a

16   substitute for the more detailed instructions that I'll give

17   you at the end of the trial just before you start your

18   deliberations, but they're intended to give you a sense of

19   what will be going on in the courtroom and what your

20   responsibilities are.

21          First of all, Ms. Johnson has given you or will

22   give you a folder.  I think that has in it a notepad, pen,

23   pencil, et cetera.  And that's because if you want to take

24   notes, you can take notes.  In the old days jurors were

25   never allowed to take notes, it didn't make any sense,

1    you're expected to remember everything.  And different

2    people remember things in different ways, so do what's best

3    for you.

4           Some people remember things by just listening and

5    watching.  Other people take occasional notes, notes of the

6    things they think are important.  And other people like to

7    take more extensive notes.  I'm not telling you what to do,

8    you know how you live your lives, do whatever's most

9    comfortable for you.

10          So if you think it will help you remember

11   testimony better, write it down.  If it will distract your

12   attention, you don't have to take notes.  But I do want to

13   tell you that you will not have transcripts of the trial

14   back in the jury room.  You will -- you will have physical

15   evidence that is admitted.  You will have videos that are

16   admitted into evidence.  But you will not have transcripts

17   of what each witness says.  So notes are for your own use.

18   If they'll help you remember things, great.

19          Remember your notes and the notes of your fellow

20   jurors are not evidence in the case.  So if somebody else

21   has written something down and you have a different

22   recollection of what you heard or what you saw when you get

23   back to deliberate, it's your memory that should control,

24   not somebody else's notes.

25          Each of you has to reach your own conclusion at

1    the end of the trial, obviously then you talk to each other,

2    then you deliberate, but you should rely on your own memory

3    and not somebody else's notes.

4         When there's a recess in the trial, leave the file

5    folder in your seats.  At the end of the day Ms. Johnson

6    will collect them.  None of us -- I will never look at

7    anything in that file folder, I'll never look at any of your

8    notes, none of the lawyers will ever see them.  Okay.

9         Here's a brief description of some of the

10   procedures that we'll follow and some of the rules of law.

11        This is a criminal case.  I've told you that,

12   you've heard that, you understand that.  It began when a

13   grand jury returned an indictment and the government will

14   present evidence in support of the charges of the

15   indictment.

16        I told you before and I'll tell you again,

17   indictment is not evidence.  Indictment is just a formal way

18   of charging a person with a crime in order to bring him to

19   trial.  You must not think of the indictment as evidence of

20   the guilt of a defendant or draw any conclusion or inference

21   about guilt just because he's been indicted or charged or

22   arrested.

23        Now I'm not going to read the indictment to you

24   but I'm going to remind you what I told you at the beginning

25   of jury selection.

1          Mr. Gossjankowski in this case is charged with

2     crime -- six specific crimes relating to what happened on

3     January 6th, Congress's Joint Session at the Capitol.

4          First he's charges with obstructing, impeding or

5     interfering with the law.  And I'm going to give you

6     detailed instructions later about each of these, but first

7     he's charged with obstruction, impeding or interfering with

8     a law enforcement officer during the commission of a civil

9     disorder.

10          Second, he's charged with obstruction of an

11     official proceeding.

12          Third, he's charged with assaulting, resisting or

13     impeding an officer of the United States Capitol Police

14     Department with a deadly or dangerous weapon, specifically a

15     stun gun.

16          Fourth, he is charged with entering or remaining

17     in a restricted building or grounds with a deadly or

18     dangerous weapon.

19          Fifth, he is charged with engaging in disorderly

20     and disruptive conduct on restricted Capitol Grounds with a

21     deadly or dangerous weapon.

22          And sixth, he's charged with engaging in

23     disorderly contact within the Capitol Grounds.

24          Mr. Gossjankowski has pleaded not guilty to all of

25     these charges.

1          At the end of the trial you'll have to decide

2     whether the evidence presented has convinced you beyond a

3     reasonable doubt that the defendant committed the offenses

4     with which he's been charged.

5          I've told you before, every defendant in a

6     criminal case is presumed to be innocent.  This presumption

7     of innocence remains with the defendant throughout the trial

8     unless and until he has been proven guilty beyond a

9     reasonable doubt.

10         The burden's on the government to prove the

11    defendant guilty beyond a reasonable doubt.  And that burden

12    never shifts throughout the trial.  The law does not require

13    a defendant to prove his innocence or to produce any

14    evidence.

15         If you find that the government has proven beyond

16    a reasonable doubt every element of the offense with which

17    he has -- the defendant's been charged, it is your duty to

18    find him guilty.

19         If you find on the other hand that the government

20    has failed to prove any element of any offense beyond a

21    reasonable doubt you must find the defendant not guilty of

22    that charge.

23         As I explain how the trial will proceed I will

24    refer to the government or the prosecution and to the

25    defendant.  When I mention the government I'm referring to

1      the government of the United States who has brought this

2      case or to the specific lawyers all of whom you've met and

3      you will hear from during the trial.  Assistant U.S.

4      Attorney Karen Rochlin, Assistant U.S. Attorney Adam Dreher,

5      Justice Department Trial Attorney Francisco Valentini.

6              And when I mention the defendants I'm referring

7      either to the defendant himself, Mr. Vitali Gossjankowski,

8      or to his two lawyers, Assistant Federal Public Defenders

9      Celia Goetzl and Ned Smock.

10             As the first step in the trial the government will

11     make an opening statement.  Both the government and the

12     defense have an opportunity to make opening statements.  The

13     government must make its opening statement at the beginning

14     of the case.

15             The defendant's lawyer may make an opening

16     statement immediately after the government's opening

17     statement or may wait until the beginning of the defense

18     case or the defendant doesn't have to make an opening

19     statement at all.

20             The opening statements are not evidence.  They're

21     only intended to help you understand the evidence that the

22     lawyers expect will be introduced in this case.

23             And that's what's going to happen this morning.

24             After that, the government will call its first

25     witness and we will begin to introduce evidence to support

1      the charges in the indictment.

2            After the government presents its evidence, the

3      defendant may present evidence, but he's not required to do

4      so.  The law does not require a defendant to prove his

5      innocence or produce any evidence.

6            At the end of all the evidence each side will have

7      an opportunity to make closing argument in support of its

8      case.

9            Again, the closing arguments just like the opening

10     statements are not evidence in the case.  They are only

11     intended to help you understand what each side thinks the

12     evidence has shown or not shown.

13           At the end of the case I will instruct you on the

14     rules of law and the elements of each charge and you must

15     apply those rules of law when you retire to consider the

16     evidence.  Your verdicts must be unanimous.

17           So then we get to what do I do during this trial

18     and what do you do.  You're much more important.

19           My responsibility is to conduct the trial in

20     hopefully an orderly, fair, and efficient manner.  And we

21     certainly hope to be more efficient than we were during jury

22     selection.

23           It's also my job to rule on questions of law which

24     come up during trial, to instruct you on the law, and you

25     must accept my statements of the law.

1          Your job is to determine the facts, to determine

2     what the evidence has shown.  You and only you are the

3     judges of the fact.  You alone determine the weight, the

4     effect, the value of the evidence, as well as the

5     believability, what we call the credibility of witnesses.

6          You must consider and weigh the testimony of all

7     the witnesses who appear before you in this case and you

8     should pay very close attention to the testimony because, as

9     I said, you will not have transcripts during your

10    deliberations.  You'll have to rely on your memory and your

11    notes.

12         You alone are to decide whether to believe any

13    witness and the extent to which that witness is to be

14    believed.  It is your job to resolve any conflicts in the

15    testimony which may occur during the trial and to determine

16    where the truth lies.  So pay careful attention.

17         My job, I may rule on motions during the trial.  I

18    may rule on objections by the lawyers.  I may comment to the

19    lawyers.  I may ask some questions of the witnesses.  I try

20    to limit myself to questions that may clarify things because

21    I think generally the lawyers should be allowed to try their

22    own cases.  You should not take any of my statements or

23    actions or questions as any indication about my opinion of

24    the case or about what I think you should decide.

25         If you think that I have somehow expressed or even

1    hinted an opinion as to the facts of the case or the

2    evidence you should disregard it.  The verdict in the case

3    is your responsibility.  Your sole and exclusive

4    responsibility.

5          And you may consider only evidence, we talked

6    about this during jury selection, you may consider only the

7    evidence that comes into evidence in this case, evidence

8    that is properly admitted in this case.  Nothing outside.

9          The evidence will include the sworn testimony of

10   exhibit.  It will include sworn testimony of witnesses.  It

11   will include exhibits.

12         And I think in one case at least it includes what

13   we call a stipulation, an agreement of the parties, that can

14   consider instead of evidence.  And sometimes the sides agree

15   to stipulate to certain things and it avoids calling a

16   witness and saves some time.

17         During the trial if I ask or if I make a statement

18   or the lawyer makes a statement that in the course of

19   question refers to evidence that you remember differently,

20   you should rely on your memory of the evidence.  It's your

21   recollection that controls.

22         Now the lawyers may object to questions that the

23   other side asks or evidence that the other side argues or

24   makes an argument.  You should not be prejudiced against a

25   lawyer or his or her client just because they make

1    objections.  That's their job.  That's their responsibility

2    to object to evidence they don't think should come in under

3    the Rules of Evidence.  I have to decide.  They have to

4    stand up and say, Your Honor, I object.

5            If I sustain an objection to a question asked by a

6    lawyer you should forget about the question because a

7    question is never evidence.  You must not guess or speculate

8    as to what the answer might have been.

9            If a question is asked and answered and then I

10   rule that the answer -- the question was inappropriate and

11   the answer should be stricken from the record, you should

12   forget -- you must forget the question and the answer and

13   the same is true with exhibits.

14           Your job is to decide this case based on the

15   evidence without prejudice, without fear, without sympathy,

16   without bias, without favor and based only on consideration

17   of the evidence presented in this courtroom.

18           You should disregard any statements made about the

19   case by anyone outside the courtroom.  Don't listen to

20   anybody.  Don't talk to anybody.  Don't talk to the lawyers.

21   Don't talk to the parties.  Don't talk to the witnesses.

22   Don't talk to anybody connected with the case.

23           If you see someone involved in the case other than

24   a fellow juror outside the courtroom, you should not speak

25   with that person and the lawyers know they shouldn't speak

1      with you.  It's not because they're not friendly people but

2      they know they can't speak with you during the trial.

3              If at any time during the trial someone tries to

4      discuss the case with you or if you overhear anybody talk

5      about the case in an elevator, in the cafeteria, in the

6      hallways, step away.  Don't participate.  Don't listen.

7      Tell Ms. Johnson.

8              If there are reports in the newspaper, radio,

9      internet, television concerning this case, if there's any

10     such media coverage, don't read it.  Don't listen to it.

11     Don't watch it.  You must not read, listen to or watch such

12     reports because you have decide the case solely on the

13     evidence presented in the courtroom.  If any information

14     about the case inadvertently comes to your attention, don't

15     tell your fellow jurors, just tell Ms. Johnson.

16             You must -- you know, in this age of the internet

17     and social media I also have to emphasize you must not

18     conduct any independent research about the case, the parties

19     of the case, what the case is about.  Don't go to

20     dictionaries or reference materials.  Don't search the

21     internet.  Don't Google.  Don't go to websites, blogs or any

22     other electronic means.  It's important that you decide this

23     case based solely on the evidence in the courtroom.

24             I know everybody uses cell phones.  Most everybody

25     uses cell phones, iPhones, the internet, other social

1    medias, platforms, blogs, Twitter, text messaging, various

2    websites, internet chat rooms, LinkedIn, YouTube, Facebook,

3    don't do it and if something pops up that you think might be

4    related to this case or January 6th, look away.

5           And don't talk to your family or friends about

6    what the case is about or what's going on in the courtroom

7    and don't let them talk to you about it.

8           Don't talk to your friends or relatives, your

9    spouses or partners until the case is over and you're done

10   with your jury service.

11          After I submit the case to you you may discuss it

12   with your fellow jurors after I instruct you on the law.

13   Discuss it in the jury room when you begin your

14   deliberations in the presence of all your fellow jurors.

15   And the whole point of this is that you keep an open mind

16   until you've heard all of the evidence, not just some of it,

17   but all of the evidence, until you've heard my instructions

18   on the law.

19          When we started the government listed witnesses

20   that they may call.  The defense listed one witness they may

21   call.  I don't think any of them were here in the courtroom.

22   So if suddenly somebody appears on the witness stand and you

23   recognize them even though you didn't recognize the name,

24   don't tell any other member of the jury but let Ms. Johnson

25   know.

```
 1              You will spend most of this trial in the courtroom
 2     and not waiting for us to decide legal questions in the jury
 3     room.  We've had some problems over the years, very few,
 4     don't leave your valuables in the jury room.  Bring your
 5     purses and your wallet with you and stuff.
 6              I think that's all I have to say.
 7              Let me ask counsel, is there anything you want to
 8     raise with me, anything that I've forgotten at the bench
 9     before we proceed?
10              MR. VALENTINI:  Not for the government, Your
11     Honor.
12              MR. SMOCK:  Nothing, Your Honor.
13              MS. JOHNSON:  Judge, I locked the jury -- I locked
14     the door for the jurors.
15              (Off-the-record discussion.)
16              THE COURT:  All right.  Ms. Johnson tells me she
17     locks the door every time you leave the jury room, so maybe
18     I was overly cautious.  Ms. Johnson will take good care of
19     you.
20              So do you want a short break before we begin
21     openings?
22              MR. DREHER:  Yes, Your Honor.
23              THE COURT:  So why don't we take ten minutes and
24     then we'll have opening statements and probably the first
25     witness.
```

```
 1              MS. JOHNSON:  You can leave your notebooks in your
 2     chair.
 3          (Recess taken at 10:19 a.m.)
 4                         *    *    *    *    *
 5          (10:36 a.m.)
 6                          IN OPEN COURT
 7                        (JURY NOT PRESENT)
 8              THE COURT:  All right, everyone.  Are we ready to
 9     begin?
10              We're ready for the jury?  Very good.
11              MR. VALENTINI:  Yes, Your Honor.
12              THE COURT:  Okay.
13              (Recess taken at 10:36 a.m.)
14                         *    *    *    *    *
15          (10:37 a.m.)
16                          IN OPEN COURT
17                         (JURY PRESENT)
18              THE COURT:  All right.  Everybody may be seated.
19              You all ready, Ladies and Gentlemen?
20              JURORS:  (Nods head).
21              THE COURT:  Okay.  Mr. Dreher.
22                         OPENING REMARKS
23              MR. DREHER:  Thank you, Your Honor.
24              Ms. Johnson, will I be able to --
25              MS. JOHNSON:  Yes, sir.
```

```
 1                    MR. DREHER:  Thank you, Ma'am.

 2                    So, good morning everyone.

 3                    JURORS:  Good morning.

 4                    MR. DREHER:  So not only is the United States

 5     Capitol the --

 6                    THE COURT:  Mr. Dreher, I want to just double

 7     check.

 8                    Everybody's monitor working in front of you?

 9                    So you've got a big monitor to your right and each

10     of you have one in front of you as well.  Sorry to interrupt

11     you.

12                    MR. DREHER:  That's all right.

13                    THE COURT:  Go ahead, sir.

14                    MR. DREHER:  But the United States Capitol

15     building also serves as the home of our nation's Congress.

16                    Now through this trial you'll learn that the

17     Constitution and various statutes places different

18     responsibilities on our Congress following each presidential

19     election.

20                    Now the presidential election of 2020 was no

21     different.  And what you'll come to learn is that on

22     January 6 following that election, Congress's role was to

23     meet and certify the election and announce the next

24     president on January 20th, 2021.

25                    Ladies and gentlemen, this case is about the
```

1    defendant's knowledge of that proceeding and his role to do

2    what he could to prevent it from occurring.

3         Now, because your protocol will be to review the

4    evidence presented during only this trial, you're going to

5    be presented with evidence of a protest turned to rally that

6    occurred more than a mile away from the U.S. Capitol.

7         This rally/protest turned violent and members from

8    that rally approached the United States Capitol on

9    January 6th, 2021, removing the signs and fencing that was

10   in place to protect our democracy and ensure that that

11   normally uneventful proceeding would stay uneventful.

12        But you will also be presented with footage from

13   these rioters breaking windows, and breaking doors, entering

14   the Capitol itself to stop that certification.

15        Now, ladies and gentlemen, the first charged

16   offense that the defendant is charged with, it relates to

17   interfering, or impeding, or obstructing a law enforcement

18   officer performing lawful duties on -- at the United States

19   Capitol.

20        Now because of that charge, you are going to hear

21   from those officers how their duties, in fact, changed on

22   January 6th.  But more importantly than that, you are going

23   to also hear about that proceeding that was occurring from

24   someone who was working inside the United States Senate.

25        He's going to explain to you the requirements that

1    this proceeding occur by the Constitution, and the

2    requirements of the various statutes that require it to

3    occur on this specific date through those various statutes,

4    and what it was like inside the room when that certification

5    had to stop.

6           Members of the Jury, you're going to hear that

7    members of the United States Senate and the House of

8    Representatives were evacuated from the United States

9    Capitol for their safety.

10          Now in the second charged defense the defendant is

11   charged with interfering or, excuse me, corruptly

12   obstructing that official proceeding.  And so ultimately

13   you're going to hear what that proceeding was and how the

14   defendant interfered with that occurring.

15          So while some of this trial is going to focus on

16   some of these big picture items, in other words, whether or

17   not the duties of the officers had changed or this official

18   proceeding that was happening, the majority of this trial is

19   going to focus on one person.  That person is Vitali

20   Gossjankowski and his actions on January 6th.

21          But also the evidence in this case while also

22   relating to the entire Capitol is going to focus on one

23   specific area, at least the majority of this case, and that

24   area, that area is both the inside and the outside of an

25   entrance called the lower west terrace entranceway.

1            Now, this entranceway is important for two

2      different reasons.  The first is its historical reasons.

3      The second is its strategic reasons.

4            You're going to hear from witnesses that each

5      recent president from past inaugurations has used this

6      entranceway as the backdrop for their first speech

7      addressing the nation.

8            As I mentioned earlier, January 20th is when the

9      new president takes office.  And on January 6th of 2021,

10     that was no different.

11           With only two weeks between that date and

12     January 20th you're going to see in the exhibits admitted

13     that there was a partially completed stage being built on

14     this location.

15           Now this becomes important because not only was

16     that the scheduled backdrop of the new President's speech

17     two weeks later, but it's also going to serve as the

18     backdrop for our case as well.

19           Now that second reason why this entranceway is

20     important, and perhaps more importantly for our case, is a

21     strategic importance.  You're going to hear testimony that

22     this entranceway, not only being under the Capitol Dome,

23     this entranceway provides access to every other part of the

24     building.  It's the strategic importance that caused rows

25     upon rows of fully uniformed police officers in riot gear,

 1    with riot shields and riot batons to stack up and prevent

 2    that violent mob from entering at this entrance.  Because as

 3    I mentioned, if the rioters were allowed into this

 4    entranceway they would have access to every other part of

 5    the building.

 6            As I mentioned before, the majority of our case is

 7    going to focus on one member of that violent mob.  You're

 8    going to be presented with videos and photos of the

 9    defendant as a participant in this mob.  In fact, one of

10    those videos that you will observe will come from his own

11    cell phone that depicts this selfie-style photograph at the

12    back of that violent mob.

13            Now why that's important is because even though

14    he's at the back, he makes his way to the front through all

15    the people to become one of the first rioters to enter this

16    entranceway at 2:42 p.m.

17            From the back to the front you will see him enter

18    this entranceway and begin to push his way to the front,

19    shove against these officers.  You'll see the officers

20    giving commands, flashing lights, pushing the rioters back

21    and through that you'll see he's undeterred.

22            But you'll also see him coordinate with other

23    rioters.  You'll see him give signs saying, we need more

24    strong people in the tunnel.  You'll see him wave other

25    rioters into this tunnel.  You'll see him approach the

```
 1      police, wrestle with them, spit at these officers.  He'll
 2      make his way to the front and interfere and wrestle with
 3      these officers and take away shields that they're using to
 4      protect themselves to prevent rioters from entering.
 5                   (Video recording playing)
 6                   MR. DREHER:  In short, ladies and gentlemen, you're
 7      going to be presented with evidence that this defendant was
 8      an active participant in this violent mob.  But his fight
 9      doesn't end at this time.  You'll see him continue in the
10      tunnel, pushing against officers, working with others to
11      interfere with these officers until at 2:53 he's handed a
12      weapon.
13            Now the weapon that he's handed is a handheld
14      electrical device commonly known as a stun gun.  And while
15      the surveillance videos from the Capitol will be presented
16      at this trial, there will also be other angles of videos
17      that are presented as well.
18            We're not only provide you with timeline when he
19      receives this weapon, but you will also see the smile on his
20      face when he sees what it is.  You'll see him film and toy
21      with its activation.  He'll use it to then start flashing
22      the officers and continue his fight in the tunnel.
23            After receiving this weapon he will go back,
24      again, wrestle with officers, interfere about what they're
25      trying to do before at one point he's able to take a break
```

1      to go outside.

2              Now you're going to hear from members of the

3      Metropolitan Police Department as well as the Capitol Police

4      Officers who were inside that tunnel during this struggle

5      and they will explain to you the physical toll that the

6      constant fighting took on them but they're also going to

7      explain the mental toll.  The sheer exhaustion that they

8      faced at this moment.  The fear of not knowing what was in

9      that mob.

10             But what you're going to hear is that even through

11     the physical and mental tolls that they experienced, they

12     were able to push all the rioters out of the Capitol through

13     this entranceway.

14             Now as that relates to this trial, you'll be

15     provided with the surveillance footage that will show this

16     push and you will see the momentum of this push caused two

17     separate officers to go into the crowd as well.  One officer

18     was a member of the Metropolitan Police Department.  The

19     other officer was a member of the United States Capitol

20     named Morris Moore.

21             Now, Officer Moore is going to take this witness

22     stand and he's going to explain to you that January 6th,

23     2021, was certainly not uneventful for him.

24             He'll explain that his normal duties placed him

25     where the Capitol receives deliveries, so he had a neon USCP

1    vest on for his safety.

2          But you're also going to hear that the speed with

3    which the violent mob approached the Capitol did not provide

4    him enough time to really prepare.

5          He's going to explain to you that from his

6    position he moved towards the Capitol, and even knowing what

7    he was about to get into with what he was wearing, went to

8    where he was needed most.

9          Now luckily on his way to the Capitol, he sees a

10   Metropolitan Police helmet on the floor and he's going to

11   describe to you that he believed that helmet, even though it

12   was a Metropolitan Police helmet, would do more good on his

13   head than it would on the floor.

14         So in the surveillance videos that you're

15   presented, you'll see him as an individual wearing a helmet

16   with the Metropolitan Police but the vest of a United States

17   U.S. Capitol Police.  And what we'll explain to you is that

18   he was wearing this helmet when he was battling the rioters

19   in the tunnel.  This helmet was his protection.  He was

20   wearing this helmet as he pushed the rioters out of the

21   tunnel.  But ultimately, it was this helmet that would

22   provide the defendant his opportunity to strike.

23         So ladies and gentlemen, in the third count of the

24   charged offenses, the defendant is charged with using a

25   dangerous or deadly weapon, that stun gun, in the use of an

1    assault on a U.S. Capitol Police Officer.

2         So as I mentioned, you're being presented with

3    surveillance footage, as well as footage from outside the

4    tunnel.  And what you will see is that moment as Officer

5    Morris [sic] is pulled into the crowd, the defendant in that

6    crowd as well, but you'll have an opportunity to see the

7    defendant push his way through rioters again.

8         You'll see what's happening.  You'll see the

9    officer come towards him and he will push his way towards

10   Officer Morris [sic].  The camera will give you an

11   opportunity to see the weapon in his left hand.  Again,

12   he'll film and make sure it's on, toying with its

13   activation.  And then when Officer Morris [sic] is close

14   enough, you'll see the defendant reach with his right hand

15   and grab Officer Morris [sic] -- grab Officer Morris [sic]

16   with his right hand, and grab him by that helmet, and pull

17   him close.  So that his left hand was just holding that

18   device to get to Officer Morris's [sic] neck.

19        Now luckily that helmet did protect Officer Morris

20   [sic], but Officer Morris's [sic] day was not over at that

21   point.  This same video will show that Officer Morris [sic]

22   was then led through the mob away from the Capitol to get

23   back to Constitution Ave.  And he's going to describe to

24   you, much like every officer who takes the stand in this

25   trial, that his day started early and ended late.

```
1              There was a lot going to happen on January 6th

2    and you will be presented with a lot of information in order

3    for you to make the decision that we ask that you make

4    during this trial.

5              The remaining three counts -- the remaining three

6    counts of the charged offenses relate to the defendant

7    entering or remaining in a restricted area while carrying a

8    deadly or dangerous weapon.  Again, that stun gun.

9              Count 5 relates to disorderly or disruptive

10   conduct in a restricted building or grounds with a deadly or

11   dangerous weapon.  Again, that stun gun.

12             And, finally, that the defendant was disorderly in

13   inside a Capitol building.

14             Now, as the Judge will instruct, your roll is to

15   decide each of these charged conducts independently based on

16   all the evidence that is presented to you at trial.

17             So Judge Friedman will give instructions, we'll

18   present the evidence, but then at the conclusion of trial

19   the attorneys will have another opportunity to come before

20   you and argue their case.

21             Ultimately the decision will be whether or not my

22   cocounsel and I have proved each of the sixth charged

23   conduct beyond a reasonable doubt.  But I'm confident that

24   when given the opportunity, my cocounsel, Mr. Valentini,

25   will stand before you and ask that you find the only verdict
```

1     that is consistent with the evidence that will be presented

2     during this trial and that is to find the defendant guilty

3     of each of the six counts.  Thank you.

4               THE COURT:  Thank you, Mr. Dreher.

5               Would you like --

6               MS. GOETZL:  Where's the mic?

7               THE COURT:  Are you ready to go or do you want a

8     break?

9               MS. GOETZL:  Yes, I'm ready, Your Honor.  I would

10    just like to get the microphone.

11              THE COURT:  All right.

12              MS. GOETZL:  Testing?  Is it working?

13              (Off-the-record discussion.)

14              MS. GOETZL:  How about now?

15              COURT REPORTER:  Yes.

16                          **OPENING REMARKS**

17              MS. GOETZL:  We can all agree that what happened

18    on January 6th was a terrible event in the history of our

19    city and our nation.  We are not going to disagree with much

20    of what the government said about that day.

21              We are not going to try to convince you that what

22    happened on January 6th was somehow justified or

23    appropriate.

24              Where we part ways with the government is their

25    argument that our client committed the laundry list of

1    crimes that he's charged with.  He did not.

2              You are not being asked to pass judgment on a mob

3    or make a statement that you or residents of D.C. stand

4    against people coming into the city from all over the

5    country and attacking the Capitol.  That is not what this

6    case is about.

7              This case is about particular elements of the six

8    particular crimes and the particular facts related to those

9    and related to this individual and what he and only he did

10   on that day.

11             We are here because Mr. Gossjankowski is not

12   guilty of obstructing or impeding an officer.  He is not

13   guilty of assaulting an officer with a deadly weapon.  He is

14   not guilty -- he is not guilty of obstructing or impeding

15   Congress.

16             (Microphone not working.)

17             THE COURT:  Somebody -- do you have a battery?

18             MS. GOETZL:  I think it might just be low on

19   battery.  I can stand right here.

20             (Off-the-record discussion.)

21             MS. GOETZL:  We are here because Mr. Gossjankowski

22   is not guilty of obstructing or impeding Congress.  He's not

23   guilty of assaulting an officer.  He is not guilty of crimes

24   charging him with carrying a deadly or dangerous weapon.

25             My name is Celia Goetzl and I, along with my

1    colleague, Ned Smock, and our paralegal Adam Moran represent

2    Vitali Gossjankowski.

3              And as you can see from the sign language

4    interpreting and you heard at the voir dire, Mr.

5    Gossjankowski is deaf.  He cannot hear.

6              Joe Lucas, sitting next to Mr. Gossjankowski, is

7    our American Sign Language interpreter so that we can

8    communicate with our client during proceedings and the Court

9    also has American Sign Language interpreters who will be

10   interpreting the proceedings and what is said in court for

11   Mr. Gossjankowski.

12             As a deaf person, Mr. Gossjankowski does not

13   communicate like a hearing person.  He communicates with

14   hearing people only through signing language or writing

15   notes in English.

16             You will hear that he cannot read lips to

17   understand what people are saying.  You will see that there

18   was no sign language interpreter or any other person using

19   sign language with him at the Capitol during the time these

20   charges relate to.

21             You will learn that at the time of the events in

22   this case he was a student at Gallaudet, a university here

23   in the district attended mainly by deaf students, and that

24   morning he had no plan to go to the Capitol.

25             He planned to go to the rally, promoted by then

1    President Trump and got up really early.  He got to the

2    Ellipse at 3:00 in the morning and stood in a long line to

3    get into the Ellipse at 7:00.

4             And at the Ellipse he watched President Trump's

5    speech.  He watched speeches by Rudy Guiliani and a lawyer

6    named John Eastman.  And when the rally was over, he

7    followed thousands of other people who marched from the

8    Ellipse to the Capitol building at the urging of President

9    Trump.

10            At the Capitol no one around him used sign

11   language to communicate.  You will not see him use sign

12   language with any other person around him.  Remember that

13   the sounds and the screaming you will hear on the videos

14   were huge part of what was happening that day.  You will

15   hear people yelling, and screaming, and chanting, and

16   directing other people.  You will hear people say extremely

17   offensive things to officers, yelling about their support

18   for President Trump, saying all sorts of things that may be

19   very upsetting to you.  And as you listen to the audio

20   evidence of what the government plays for you, remember that

21   Mr. Gossjankowski could not hear or understand it.

22            I want to talk a little bit more about the

23   evidence that you will see.

24            During this trial you will see video footage of

25   people who clearly traveled to the Capitol with plans to

1    engage in violence against law enforcement and to stop the

2    electoral vote certification.

3              These people are wearing camouflage, military

4    uniforms, tactical gear.  They have helmets, they have

5    goggles.  They have full gas masks.  They're carrying

6    backpacks of supplies.  They're holding and spraying mace

7    and pepper spray.

8              You will not see Mr. Gossjankowski with any of

9    that.  You will see him wearing a normal outfit that he wore

10   in his daily life, shorts and a bright blue jacket.  You

11   will see no evidence that Mr. Gossjankowski planned to

12   engage in violence or illegal conduct that day.

13             The evidence will show that he planned to go to

14   the speech by Donald Trump and had no plans to do anything

15   more than that.

16             You will not see any posts on social media that he

17   made or communications with others before or on January 6th

18   about any illegal plans to commit violence at the Capitol.

19             You will not see Mr. Gossjankowski jump any fence

20   or scale any wall of Capitol building.  You will not see Mr.

21   Gossjankowski ever enter into the building.  You will not

22   see him break any window.  You will not see him break any

23   door.  You will not see him attack any police officer.

24             You will see Mr. Gossjankowski there in the crowd.

25   You will see videos of him acting carelessly and

1    defensively.  You will see videos of him spitting in the

2    direction of officers and gesturing to others, approaching a

3    line of officers at the door to the tunnel and going in and

4    out of that tunnel repeatedly.

5          And while he came to the Capitol with no gear or

6    weapon of any sort, you are going to see someone randomly

7    hand Mr. Gossjankowski an electronic device and he looks

8    really excited to get it, like it's a new toy.  And he

9    presses the button to activate it and it shows an arc of

10   electricity sparking.  And in the videos you're going to

11   hear that it also makes a very loud noise which, of course,

12   Mr. Gossjankowski could not hear.

13         You are going to see Mr. Gossjankowski doing

14   things that he should not have done, but you are not here to

15   decide whether he behaved inappropriately.  You are here to

16   decide whether his conduct that day spit -- fits the

17   specific laundry list of crimes that he's been charged with

18   and you'll see that it simply does not.

19         I will talk for a moment about the charge of

20   assault with a deadly or dangerous weapon and I want to be

21   very clear about this.  Mr. Gossjankowski did not assault

22   Officer Moore with a weapon or otherwise.

23         This most serious charge in this case relates to a

24   moment that lasted maybe two to three seconds, if that, in a

25   huge crowd of jostling people.  Mr. Gossjankowski was trying

1    to help Officer Moore, he was not trying to harm him.  Like

2    some other people in that area, he was concerned that people

3    had pulled Officer Moore into the crowd and were trying to

4    hurt him and it looked to him like Officer Moore looked

5    helpless.  It was a hectic moment in a closely packed crowd.

6    And you'll see that that moment, that millisecond of a

7    moment when the government says that Mr. Gossjankowski

8    assaulted Officer Moore, you'll see that Mr. Gossjankowski

9    probably couldn't even see where he was reaching.  He

10   absolutely did not reach forward with an intent to assault

11   Officer Moore or use the electrical device on him.  And he

12   did not press a button to activate it when he reached

13   forward.  And Officer Moore is going to come here and tell

14   you that he did not get tased, or shocked, or assaulted and

15   he doesn't even remember that incident at all.

16          The fact that Mr. Gossjankowski did not intend to

17   assault Officer Moore alone makes him not guilty of that

18   charge.  But even if the government somehow convinced you

19   otherwise, which it will not be able to do here, they also

20   have to prove that Mr. Gossjankowski, that the device that

21   Mr. Gossjankowski was holding was deadly or dangerous, which

22   means it would be capable of causing serious injury or death

23   and it was not.

24          You are going to hear from Dr. Mark Kroll, a

25   preeminent expert in the field of conductive electrical

1    weapons, such as tasers and stun guns, that the device that

2    Mr. Gossjankowski was holding was harmless.

3         The device was not recovered, but Dr. Kroll was

4    able to identify it, and you are going to hear from him that

5    it had very little actual power.  It was not a taser.  It

6    was not a stun gun.  It was not even close to as powerful as

7    an electric medical device.

8         You will see video of it being activated and it

9    makes a lot of noise and it creates an electrical arc but

10   that is all that it really does.

11        The government can call it a stun gun, but it was

12   nowhere near meeting the minimum requirements to qualify as

13   a stun gun.  You will hear that it had only 2 percent of the

14   minimum power required to qualify as a stun gun.  Dr. Kroll

15   will tell you that it could not cause injury or death.

16        The noise that it make and the spark that it

17   emitted were irrelevant because it had no actual power to

18   harm anyone.

19        In this case, three of the six crimes charged

20   require the government to prove beyond a reasonable doubt

21   that this was a deadly or dangerous weapon and you will see

22   that it was neither.

23        You're going to see videos also of Mr.

24   Gossjankowski's interview with law enforcement.  He turned

25   himself in immediately to the FBI as soon as he knew that

```
 1    they were looking for him.  And you'll hear that he met with
 2    law enforcement on three separate occasions and each time
 3    was fully cooperative and truthful with them.
 4            You're going to see that each time Mr.
 5    Gossjankowski told the police what really happened.  Each
 6    time he acknowledged he was in the crowd, in the tunnel,
 7    close to police officers.  Each time he denied assaulting
 8    any police officer.  Each time he told them he touched a
 9    police officer momentarily because he was trying to help the
10    police officer.
11            Throughout the questioning, Mr. Gossjankowski said
12    "I did not see anyone get tased and I did not tase anyone."
13    He did not see the electronic device he was holding arc.  He
14    did not smell any burning smell, which would indicate to him
15    that it was activated.  And he said repeatedly that he did
16    not intentionally hurt any officer or use the device against
17    any officer.  And he never varied from his truthful account
18    that he did not attempt to harm Officer Moore.
19            Mr. Gossjankowski is not guilty of assaulting
20    Officer Moore.
21            The government has given you an overview of the
22    witnesses that they will call and the videos they will show
23    during trial as they try to meet their heavy burden on all
24    six charges in this case.
25            I just will to say a few things about that.
```

1          First, we acknowledge that January 6th was a civil

2     disorder.  We acknowledge that people entered the Capitol

3     when they shouldn't have and people broke laws that day.

4     Much of the evidence that the government will present to you

5     is related to these issues that we do not contest.

6          Second, the officers that you will hear from were

7     heros.  You'll never hear us suggest otherwise.  They were

8     outnumbered and overwhelmed and they did everything that

9     they could to protect the building.

10          You will not hear us challenge or attack them.

11          We may not even question some of them.  Some of

12     the witnesses you will hear from because much of their

13     testimony will not relate to the issues that we contest or

14     think matter most in this case, which is what Mr.

15     Gossjankowski intended and what he, himself, did.

16          Third, our focus in this case will be on the

17     assault and on Mr. Gossjankowski's intent that day.

18          He went to the Capitol.  He was in the crowd and

19     went into the tunnel, but that does not make him guilty of

20     all the criminal charges that have been brought.

21          The Judge will instruct you on what the elements

22     of the offenses are, but keep in mind that the government

23     must not only prove the facts of what happened, the actions,

24     but they also must prove beyond a reasonable doubt that Mr.

25     Gossjankowski acted with the criminal intent required for

 1      each offense.

 2             The government has charged serious crimes,

 3      including obstruction of an official proceeding.  And in

 4      order to prove Mr. Gossjankowski guilty of that, they must

 5      show not only that he acted with the intent to obstruct but

 6      also that he acted with corrupt intent.

 7             There will be no evidence showing that Mr.

 8      Gossjankowski intended to interfere with or obstruct a

 9      federal function and certainly not the Joint Session of

10      Congress.

11             Finally, a verdict in this case cannot be an

12      expression of outrage generally about what happened on

13      January 6th.  Mr. Gossjankowski was charged with specific

14      crimes and your task is much more specific and

15      consequential.

16             Can the government prove all of the specific

17      crimes it has charged here?  We only ask that you follow the

18      law and acquit Mr. Gossjankowski on the charges that the

19      government cannot prove.

20             And you will see here that the government cannot

21      meet its burden of proof.  Mr. Gossjankowski did not

22      obstruct a law enforcement officer.  He did not obstruct

23      Congress or act with corrupt intent to obstruct Congress

24      from certifying the electoral vote.  He did not assault

25      Officer Moore.  And he did not have or use a deadly or

1    dangerous weapon.

2              He is not guilty of the long list of crimes with

3    which the government has charged him.  Thank you.

4              THE COURT:  Thank you, Ms. Goetzl.

5              MS. JOHNSON:  Ms. Goetzl, may I have the --

6              THE COURT:  So why don't -- we'll be ready with

7    the first witness in 10 or 15 minutes?

8              MR. VALENTINI:  Yes, Your Honor.

9              THE COURT:  Okay.  Why don't we take a break and

10   when we come back at 11:30 then we'll here from the first

11   witness.

12             (Jurors excused)

13             THE COURT:  Anything anybody has on their mind

14   before we take our break?

15             MR. SMOCK:  No, Your Honor.  Thank you.

16             MR. VALENTINI:  Not at this point.  Thank you.

17             THE COURT:  Okay.  Thank you.

18             (Recess taken at 12:18 p.m.)

19                     *    *    *    *    *

20        (12:18 p.m.)

21                        **IN OPEN COURT**

22                      **(JURY NOT PRESENT)**

23             THE COURT:  We ready for the jury?

24             MR. VALENTINI:  Yes, Your Honor.

25             THE COURT:  Okay.

1              (12:34 p.m.)

2                         **IN OPEN COURT**

3                         **(JURY PRESENT)**

4              THE COURT:  Okay.  Be seated.  Have a seat.

5              Okay.  Everybody ready?  Good.

6              Mr. Valentini, would you call your first witness,

7      please.

8              MR. VALENTINI:  The government calls Captain

9      Ronald Ortega.

10             MS. JOHNSON:  Good morning, sir.

11             THE WITNESS:  Good morning.

12             MS. JOHNSON:  Would you step into the box and

13     raise your right hand.

14             (Witness sworn)

15             THE WITNESS:  I do.

16             MS. JOHNSON:  Thank you, sir.

17             THE COURT:  Good morning.

18                    **(Captain Ronald Ortega)**

19                    **DIRECT EXAMINATION**

20     BY MR. VALENTINI:

21     Q.  Good morning.

22     A.  Good afternoon.

23     Q.  In a loud, clear voice would you please state and spell

24     your name for the record.

25     A.  Ronald Ortega, R-O-N-A-L-D.  Ortega is O-R-T-E-G-A.

LYNNE M. KRENZ, RMR, CRR, CRC
(651) 848-1226

1    Q.  Are you currently employed?

2    A.  I am.

3    Q.  Where are you employed?

4    A.  I'm employed by the United States Capitol Police.

5    Q.  How long have you been working for the United States

6    Capitol Police?

7    A.  Approximately, 15 years.

8    Q.  What is your current title with the Capitol Police?

9    A.  I'm a captain with the U.S. Capitol Police.

10   Q.  Can you explain the rank of captain within the Capitol

11   Police hierarchy?

12   A.  I'm part of upper management.  Below me you have police

13   officers, you have sergeants, and you have lieutenants.

14   Q.  Is captain a supervisory role?

15   A.  It is.

16   Q.  How many Capitol Police officers do you supervisor?

17   A.  I supervisor about 400 employees.

18   Q.  And had you been a captain with the Capitol Police?

19   A.  I'm running on almost three years now.

20   Q.  Were you a captain as of January 6th, 2021?

21   A.  I was.

22   Q.  Could you please explain for the jury what is the

23   mission of the Capitol Police?

24   A.  The mission of Capitol Police is to protect the

25   Congress, its family members, its staff, visitors, and

1    Capitol Grounds.

2    Q.  And how is the Capitol Police different than other

3    Police Departments?

4    A.  We are a federal law enforcement agency.  We have

5    Metropolitan Police Department that is the primary --

6              THE COURT:  Hold on a second.

7              You can't have your screen facing the jury because

8    they can't see exhibits until they're admitted.  Okay?

9              Does everybody understand that on both sides?  Go

10   ahead.

11             THE WITNESS:  Yes, sir.

12             The Metropolitan Police Department would be the

13   primary law enforcement agency in the District of Columbia.

14   Capitol Police specifically is a federal law agency and our

15   primary jurisdiction is going to be Capitol grounds.

16   BY MR. VALENTINI:

17   Q.  Are there different divisions within the United States

18   Capitol Police?

19   A.  There are.

20   Q.  And are you assigned to a specific division?

21   A.  I am.  I'm currently assigned to the Capitol division.

22             THE COURT:  Say that again?

23             THE WITNESS:  I'm currently assigned to the

24   Capitol division, sir.

25   BY MR. VALENTINI:

1    Q.  And what does the Capitol division do?

2    A.  We are in charge specifically of the Capitol building

3    and the grounds immediately surrounding the Capitol and the

4    and the Capitol Visitor Center.

5    Q.  And what are the other divisions within the Capitol

6    Police?

7    A.  We have the House division, which is specifically the

8    House office buildings.  We have the Senate division, which

9    is the Senate office buildings.  And we have the Library

10   division as well.  And that would be part of our Uniformed

11   Services Bureau.

12   Q.  And which division were you assigned to as of

13   January 6th?

14   A.  I was at the time I was assigned to the Senate division.

15   Q.  And what does the Senate division do?

16   A.  So we were in charge of the Senate office buildings, the

17   Russell, Dirksen, and the Hart building, and then the

18   surrounding grounds in that area.

19   Q.  And, Captain Ortega, you said you have worked with the

20   Capitol Police for approximately 15 years?

21   A.  That is correct, sir.

22   Q.  So are you familiar with the Capitol grounds?

23   A.  I am very familiar with the Capitol Grounds.

24   Q.  Both interior and exterior?

25   A.  That is correct.

1    Q.  And the Capitol building itself?

2    A.  That is correct.

3    Q.  Let me show you what's been marked as Government

4    Exhibit 605.

5            Captain Ortega, do you recognize what you see in

6    Exhibit 605?

7    A.  I do.

8    Q.  And what is it?

9    A.  It is an overhead view of the United States Capitol.

10   Q.  And is this a photograph or a diagram?

11   A.  It is a diagram.

12   Q.  And is Exhibit 605 an accurate representation of the

13   Capitol as it existed on January 6th, 2021?

14   A.  It is.

15           MR. VALENTINI:  The government moves to admit

16   Exhibit 605 into evidence.

17           MR. SMOCK:  No objection.

18           THE COURT:  It will be admitted.

19           MR. VALENTINI:  And if we may please publish the

20   exhibit to the jury.

21           (Off-the-record discussion)

22           THE COURT:  I think the witness is trying to speak

23   into the microphone and look at the jury, so we need the

24   court reporter to hear as well.

25           Thank you, Captain.

```
 1                THE WITNESS:  Thanks.
 2   BY MR. VALENTINI:
 3   Q.  So if we start from the left, what is the area on the
 4   left-hand side of this diagram?
 5   A.  On the left-hand side you'd be looking at the Senate
 6   side of the United States Capitol.
 7   Q.  And which geographically, is it north, east, west,
 8   south?
 9   A.  That would be the north side of the U.S. Capitol.
10   Q.  And where is the House of Representatives?
11   A.  The House would be on the south side, so the right of
12   the photo.
13   Q.  And what is the area in the middle of the diagram?
14   A.  In the middle would be the Dome of the Capitol and in
15   the center would be the Capitol Rotunda.
16   Q.  And which floor -- does the Capitol have multiple
17   floors?
18   A.  It does.
19   Q.  And which floors does the Rotunda occupy?
20   A.  The Rotunda would be on the second floor.
21   Q.  And what is below the Rotunda?
22   A.  That would be an area known as the Crypt.
23                MR. VALENTINI:  We can stop publishing.
24   BY MR. VALENTINI:
25   Q.  Captain Ortega, let me also show what has been marked as
```

1    Government Exhibit 600.

2               Captain Ortega, do you see Exhibit 600 on your

3    screen?

4    A.  I do.

5    Q.  And do you recognize it?

6    A.  I do.

7    Q.  What is it?

8    A.  That's an overhead view of the United States Capitol.

9    Q.  Is it an accurate representation of the Capitol as it

10   existed on January 6th, 2021?

11   A.  It is.

12              MR. VALENTINI:  Your Honor, the government moves

13   to admit Government Exhibit 600 into evidence.

14              MR. SMOCK:  No objection.

15              THE COURT:  It will be admitted.

16              MR. VALENTINI:  If we can please publish it for

17   the jury.

18              THE COURT:  Yes.

19   BY MR. VALENTINI:

20   Q.  Captain Ortega, what is the area, the rectangular area

21   on the top side of the picture?

22   A.  If you're referring to the north, that would be the --

23   that would be the Senate side of the U.S. Capitol.

24   Q.  So that is the same area that was depicted on the

25   left-hand side of Exhibit 605?

1    A.  It is.

2    Q.  And where is the House of Representatives?

3    A.  That would be the south side, bottom of the photo.

4    Q.  And could you please identify as before where the

5    Rotunda, the Capitol is?

6    A.  That would be the center of the photo.  If you look at

7    this photo where it actually says U.S. Capitol, the red dot

8    would be the center of the U.S. Capitol.

9    Q.  And if the Rotunda is in the center of the Capitol, what

10   is the area to the left of the Rotunda?

11   A.  To the left of the Rotunda would be the west front.

12   Q.  And further, could you please use -- you have a

13   touchscreen on your screen.  Could you please use the

14   touchscreen to mark the west front for the jury.

15   A.  That would be the west front.

16   Q.  And, Captain Ortega, if you could, if you know how to

17   do, could you please erase the mark from the screen.

18            And, Captain Ortega, between the Rotunda and the

19   mark that you just made on the screen marking the west

20   front, there appears to be a construction which is white in

21   color.

22   A.  That is correct.

23   Q.  Could you please explain to the jury what that structure

24   is.

25   A.  That would be the inaugural stage.

1    Q.  Was the inaugural stage a permanent feature of the

2    Capitol?

3    A.  It is not.

4    Q.  But it was there on January 6, 2021?

5    A.  That is correct.

6    Q.  Could you explain why this structure was in place on

7    January 6, 2021?

8    A.  Yes.  For the inauguration, the inaugural stage is built

9    out specifically for the event.

10   Q.  And was construction on the inaugural stage completed as

11   of January 6, 2021?

12   A.  It was not.  It was still an active construction zone.

13   Q.  And was there scaffolding in the areas around the

14   inaugural stage as of January 6th, 2021?

15   A.  There was.

16   Q.  Captain Ortega, does the Capitol also have a visitor

17   center?

18   A.  It does.

19   Q.  Where is the Capitol's visitor center located on

20   Exhibit 600?

21   A.  If you look to the right of the screen, it actually cuts

22   off, but it would be under the area I just marked 'X.'

23   Q.  So the visitor center is actually an underground

24   structure; is that right?

25   A.  That is correct.

1          THE COURT:  So is the area you've just marked the

2     area where a visitor would enter the visitor center?

3          THE WITNESS:  If the map extended a little bit

4     further you would see a walkway and then underneath the

5     walkway is the entrance to the Capitol Visitor Center, sir.

6     BY MR. VALENTINI:

7     Q.  Captain Ortega, is it possible to travel from the

8     Capitol Visitor Center to the Rotunda without exiting the

9     building?

10    A.  That is correct, yes.

11    Q.  And how does one do that?

12    A.  So when you enter the Capitol Visitor Center, there is

13    an area where it connects from a set escalators or elevators

14    to the U.S. Capitol and it will take you into the Crypt and

15    then one floor up from that would be the Rotunda.

16         MR. VALENTINI:  And, Ms. Johnson, if we could stop

17    publishing Exhibit 600, please.

18    BY MR. VALENTINI:

19    Q.  Let's talk a little bit about security procedures for

20    visitors at the Capitol.

21         As a captain of the Capitol Police, are you

22    familiar with the screening procedures and security

23    procedures at the Capitol?

24    A.  I am.

25    Q.  And are you familiar with those procedures as they

```
 1    existed on January 6th?

 2    A.  I am.

 3    Q.  And if you think back of a normal day before COVID,

 4    before March 2020, could you describe the security -- what

 5    procedures a member of the public would undergo to gain

 6    access to the Capitol building?

 7    A.  Yes, sir.

 8         When you enter the Capitol building you have to go

 9    through different types of security screening.  You enter.

10    You have to put your bags on an x-ray machine.  Your bags

11    are x-rayed.  And then you as an individual you walk through

12    a walkthrough magnetometer.  And then some of the

13    individuals will get actually screened by a hand wand as

14    well.

15    Q.  And, Captain Ortega, you just described the security

16    procedures as they existed before COVID and before

17    March 2020?

18    A.  Yes, sir.

19    Q.  And what is the purpose of the Capitol Police screening

20    procedures more generally?

21    A.  It's to prevent unauthorized items to get inside the

22    building.

23    Q.  So there are some items that are not -- that are

24    prohibited -- that are not permitted inside the Capitol

25    building?
```

1    A.  That's correct.

2    Q.  And what types of items are not permitted in the Capitol

3    building?

4    A.  You would not be allowed to have long knives.  You would

5    not be allowed to have stun guns.  You would not be allowed

6    to have pepper sprays, firearms, explosives.  Those would be

7    the type of items.

8    Q.  And why are those items not permitted inside the Capitol

9    building?

10   A.  It's a safety concern.  These items can be used as

11   weapons against the public, members of Congress, staff.

12   Q.  As a captain with the Capitol Police, if you saw a

13   member of the public inside the Capitol building with a

14   firearm, what would you do?

15   A.  It would be a very serious safety violation.

16          If you see someone with a firearm, I'm going to be

17   taking appropriate police action to take control of that

18   subject and put them into custody and take control of the

19   firearm.

20   Q.  What if you saw a member of the public inside the

21   Capitol building with an electronic stun gun?

22   A.  It would be the same thing.  I'm going to take

23   appropriate police action, well, put the subject -- you

24   know, I'm going to detain the subject.  Find out how the

25   weapon got in there.  Take control of the stun gun and

1    because it's not prohibited -- it's not allowed inside the

2    building.

3    Q.  And why is it not allowed inside the building?

4    A.  Because it is a safety concern.  It can be utilized as a

5    weapon against members of Congress, by police officers,

6    congressional staff and visitors.

7    Q.  And it could injure a member of Congress?

8    A.  That is correct.

9    Q.  It could also injury a Capitol Police Officer?

10   A.  That is correct.

11   Q.  Thinking back before March of 2020, were visitors able

12   to enter the Capitol building through any and all doors?

13   A.  That is incorrect.  They would not be able to.  There

14   were certain doors that individuals were allowed to utilize

15   to enter the Capitol.

16   Q.  Okay.  Now if we fast-forward to, say, April of 2020,

17   after COVID began and before January 6th, 2021.  Were

18   uninvited members of the public allowed into the Capitol

19   building generally?

20   A.  They are not.  To actually enter into the Capitol

21   Proper, you have to be invited to come into the Capitol

22   Police.

23              THE COURT:  As opposed to the Capitol Proper?

24              THE WITNESS:  Correct.

25              THE COURT:  What you do you mean by that?

```
1                THE WITNESS:  You have guests that come in to the
2    CVC that are allowed for tours.  But to actually enter the
3    United States Capitol, you have to be an invited guest to
4    come through the north door or the south door.
5    BY MR. VALENTINI:
6    Q.  And just to unpack your answer a little bit.  When you
7    say "CVC" you refer to the Capitol Visitor Center?
8    A.  That's correct.  The Capitol Visitor Center.
9    Q.  And when you refer to the Capitol Proper you're
10   referring to the --
11   A.  The United States Capitol Building.
12   Q.  Okay.  On January 6th, 2021, was the Capitol building
13   open to the public?
14   A.  It was not.
15   Q.  And why was it not open to the public?
16   A.  Again, the Capitol grounds, you know, the buildings were
17   closed due to COVID.  But as normal with the U.S. Capitol
18   building, it is only open to visitors -- or it's only open
19   to invited guests.  The general public is not allowed into
20   the Capitol building without being a visitor.
21   Q.  Was there another reason why the Capitol building was
22   not open to the public on January 6th, 2021?
23   A.  We did have the certification of the election.
24   Q.  And were additional restrictions put in place because of
25   the certification of the Electoral College on January 6,
```

 1    2021?

 2    A.  They were.

 3    Q.  Excuse me.  Was a restricted area put in place around

 4    the Capitol building on January 6th, 2021?

 5    A.  It was.

 6    Q.  And were portions of the Capitol Grounds beyond the

 7    Capitol building placed under restricted area on January 6,

 8    2021?

 9    A.  That is correct, they were.

10    Q.  Let me show what has been marked as Government

11    Exhibit 601.

12         Do you recognize the image as depicted in

13    Government's Exhibit 601?

14    A.  I do.

15    Q.  And what is it?

16    A.  That would be the outer parameter that was utilized on

17    January 6th, 2021?

18    Q.  And do does this exhibit actually display that

19    parameter?

20    A.  It does.

21         MR. VALENTINI:  Your Honor, the government moves

22    to admit Exhibit 601 into evidence.

23         MR. SMOCK:  Objection, Your Honor.

24         THE COURT:  Pardon me?

25         MR. SMOCK:  Objection, Your Honor, foundation.

1      I'd like to voir dire the witness if I may.

2            THE COURT:  Well, why don't we see if Mr.

3      Valentini can lay more of a foundation.

4      BY MR. VALENTINI:

5      Q.  Captain Ortega, are you familiar with the concourse of

6      the outer parameter of the restricted area that was put in

7      place on January 6th, 2021?

8      A.  I am.

9      Q.  Did you -- did you personally observe the -- how the

10     parameter was put in place for January 6, 2021?

11     A.  I did.

12     Q.  And you're also familiar with the Capitol Police

13     procedures to set up a restricted area around at the

14     Capitol?

15     A.  I am.

16     Q.  And you're specifically familiar with the procedures of

17     the Capitol Police in setting up such a restricted area in

18     connection with events such as the certification of the

19     Electoral College?

20     A.  I am.

21            MR. VALENTINI:  Your Honor, we would move to admit

22     Exhibit 601 into evidence.

23            MR. SMOCK:  Your Honor, I'd just like to ask a

24     couple quick voir dire questions just to clarify --

25            THE COURT:  No.  Overruled.  Will be admitted.

1    You can cross-examine.  The jury may see it.

2              MR. VALENTINI:  Thank you, Ms. Johnson.

3    BY MR. VALENTINI:

4    Q.  So is Exhibit 601 a map?

5    A.  Can you repeat the question?

6    Q.  I'm sorry, is Exhibit 601 a map?

7    A.  It is.

8              THE COURT:  Is it a map or an aerial photograph?

9              THE WITNESS:  You can categorize it as an aerial

10   photograph/map.  I would characterize it as like a Google

11   map, an aerial photo.

12   BY MR. VALENTINI:

13   Q.  And is the parameter that you just described denoted in

14   red in Exhibit 601?

15   A.  It is.

16   Q.  What are the -- what were the borders of the secured

17   parameter on the north side of the Capitol -- of the Capitol

18   Grounds?

19             THE COURT:  Show us where the north side is, just

20   so everybody knows.

21             THE WITNESS:  It would be right here, sir.

22             It would start at First and Constitution in the

23   northwest.  It would travel eastbound until you get around

24   New Jersey.  It would then connect going south on the

25   Capitol -- East Plaza, all the way down to Independence.

LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

1          It would travel from Independence back to --

2     westbound down Independence and then go north up First

3     Street again and then connecting back to Constitution.

4     BY MR. VALENTINI:

5     Q.  And let's talk about the west side specifically.  Could

6     you please mark on Exhibit 601 --

7          THE COURT:  Is the 'X' -- I have an 'X' on my

8     screen, maybe it's not on your screen.  There's an 'X.'

9          THE WITNESS:  I think the 'X' here was a holdover

10    from the last screen.

11    BY MR. VALENTINI:

12    Q.  Okay.  Could you please clear the screen.

13          With specific reference to the west side, could

14    you please describe for the jury what denoted the boundary

15    of the parameter on the west side?

16    A.  On the west side we utilized a mix of bike rack and snow

17    fencing as the outer parameter, and it went up First Street

18    to, you know, from Independence to Constitution.

19    Q.  When you say bike racks, are these bike racks, how are

20    they used?

21    A.  They're steel bike racks, they're connected together to

22    prevent individuals from being able to pull them apart.

23    Q.  Earlier you referred to the red mark on Exhibit 601 as

24    the outer parameter.

25          Were there parameters that were set up on

1    January 6th that were parameters other than outer

2    parameters?

3    A.  There were.

4    Q.  And could you describe those parameters?

5    A.  We had a middle parameter, which consisted of snow

6    fencing again.  There was also signs on both the outer and

7    middle parameter.  Again even further inside the parameter

8    you had more bike rack as well with signs saying "Do Not

9    Enter" and in between the bike rack and snow fencing you had

10   police officers as well that were also serving as part of

11   parameter.

12   Q.  If I may ask you, you have referred a couple of times to

13   snow fencing.  Could you explain to the jury what snow

14   fencing is.

15   A.  Snow fencing is this green type of webbed fencing that

16   the department utilizes as a deterrent as a fence.

17   Typically it's going to be utilized for events like this.

18   Q.  And, Captain Ortega, what was the purpose of having

19   inner parameters?

20   A.  Just another layer of security.

21   Q.  Were signs also used to inform the public that the area

22   was restricted on January 6, 2021?

23   A.  They were.

24   Q.  What do the signs generally say in sum and substance?

25   A.  Something to the effect of "Area Closed By Order of the

 1    United States Capitol Police Board."

 2             MR. VALENTINI:  Ms. Johnson, could we please stop

 3    publishing 601, please.

 4    BY MR. VALENTINI:

 5    Q.  Let me show you what has been marked as Exhibit 602.

 6             Captain Ortega, do you recognize the image that's

 7    depicted in Exhibit 602?

 8    A.  I do.

 9    Q.  And is it an accurate depiction of a portion of the

10    Capitol as of January 6, 2021?

11    A.  It is.

12             THE COURT:  Can you tell us, is this south, north,

13    east, west of the Capitol?  Can you tell from this photo?

14             THE WITNESS:  So from where they're looking, they

15    facing they're looking at the west front toward the

16    inaugural stage.

17             MR. VALENTINI:  Your Honor, the government moves

18    to admit Exhibit 602 into evidence.

19             MR. SMOCK:  No objection.

20             THE COURT:  Thank you.  It will be admitted.

21    BY MR. VALENTINI:

22    Q.  Captain Ortega, do you see a sign on in Exhibit 602?

23    A.  I do.

24    Q.  And do you see any writing on that sign?

25    A.  I do.

1    Q.  And could you please read the lettering on that sign?

2    A.  "Area Closed By Order of the United States Capitol

3    Police Board."

4              THE COURT:  What's the Capitol Police Board?

5              THE WITNESS:  The Capitol Police Board consists of

6    the Chief of Police, the House Sergeant at Arms, the Senate

7    Sergeant at Arms, and the Architect of the Capitol.

8    BY MR. VALENTINI:

9    Q.  And, Captain Ortega, let me zoom into the middle section

10   of Exhibit 602.

11             Captain Ortega, do you see a row in the middle

12   section of Exhibit 602?

13   A.  I do.

14   Q.  And could you explain to the jury what this row is?

15   A.  Well, inside of there I see approximately three police

16   officers standing on the grassy area.

17   Q.  So just first to reorient the jury.  This row runs from

18   east to west, north to south?

19   A.  That way it would be, well, the way they're standing

20   would be north to south.

21   Q.  And do you see any white objects that seem to be hanging

22   in the middle section of the zoomed-in area of Exhibit 602?

23   A.  I do.

24   Q.  And what are those signs?

25   A.  That would be the "Area Closed By the Order of the

1      United States Capitol Police Board" signs.

2      Q.  Now, if we zoom out, this picture appears to be taken

3      from outside the outer parameter of the Capitol on

4      January 6th, 2021, correct?

5      A.  That is correct.

6      Q.  And so how about that row of signs that we just zoomed

7      in on, what is that?

8      A.  The row of signs we just zoomed in on, that would be

9      more that middle parameter.

10             MR. VALENTINI:  Ms. Johnson, if we could stop

11     publishing Exhibit 602.  Thank you.

12     BY MR. VALENTINI:

13     Q.  Let me show you what has been marked as Exhibit 603.

14             Captain Ortega, do you recognize the image that is

15     depicted in Government Exhibit 603?

16     A.  I do.

17     Q.  And what is it?

18     A.  This is looking up the Penn Ave Walkway.  You have the

19     rioters have picked up a bike rack and are utilizing it as a

20     weapon against my officers.

21     Q.  And is the exhibit -- is the image depicted in

22     Exhibit 603 a fair and accurate representation of events of

23     January 6, 2021?

24     A.  It is.

25             THE COURT:  So you said it's the walkway from

LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

1    where to where?

2              THE WITNESS:  It's called the Penn Avenue Walkway.

3    So you're looking at -- if you went from this walkway to the

4    road you'd be passing Peace Circle and then Pennsylvania

5    Avenue so this is called Penn Avenue Walkway.

6              MR. VALENTINI:  Your Honor, the government moves

7    to admit Exhibit 603 into evidence.

8              MR. SMOCK:  Your Honor, I would object as to

9    foundation.

10             THE COURT:  Overruled.

11             MR. VALENTINI:  Ms. Johnson, if you could publish

12   the exhibit to the jury.  Thank you.

13   BY MR. VALENTINI:

14   Q.  And I know you touched on this a little bit before, but

15   based on your knowledge of the Capitol Grounds could you

16   explain to the jury where this picture -- where this picture

17   was taken?

18   A.  So this would be the Penn Avenue Walkway.  So if you're

19   looking where the Peace Circle is, this would be looking

20   towards the Capitol and walking up the Penn Avenue Walkway

21   is going to take you to the west front into the west side of

22   the Capitol.

23   Q.  Captain Ortega, do you see a sign in the foreground of

24   Exhibit 603?

25   A.  I do.

1    Q.  And what does the sign -- does the sign have some

2    writing on it?

3    A.  It does.

4    Q.  And do you see some writing in large, red letters?

5    A.  I do.

6    Q.  What does it say?

7    A.  "Area Closed."

8              MR. VALENTINI:  Ms. Johnson, I think we can stop

9    publishing this exhibit to the jury.

10             Let me pull up what has been marked as

11   Exhibit 604.

12   BY MR. VALENTINI:

13   Q.  Captain Ortega, do you recognize the image in

14   Exhibit 604?

15   A.  I do.

16   Q.  What is it?

17   A.  It is an "Area Closed Sign By the Order of the United

18   States Capitol Police Board" sign.

19   Q.  And I understand that you're familiar with this type of

20   sign?

21   A.  I am.

22             MR. VALENTINI:  Your Honor, the government moves

23   to admit Exhibit 604 into evidence.

24             MR. SMOCK:  No objection.

25             THE COURT:  Okay.  Will be admitted.

1          MR. VALENTINI:  Ms. Johnson, if we could publish

2      it to the jury, please.

3      BY MR. VALENTINI:

4      Q.  Captain Ortega, was this the standard sign that the

5      Capitol Police posted on January 6th to mark the circle or

6      parameter around the Capitol?

7      A.  It is.

8          MR. VALENTINI:  Thank you.  And we can stop

9      publishing the exhibit, please.

10         MS. JOHNSON:  Stop publishing?

11         MR. VALENTINI:  Stop publishing the exhibit,

12     please.

13     BY MR. VALENTINI:

14     Q.  Captain Ortega, let's move back closer to the Capitol

15     building itself and let me show you what has been marked as

16     Exhibit 605.

17         THE COURT:  605 is the one that's already been

18     admitted into evidence?

19         MS. JOHNSON:  Yes.

20         MR. VALENTINI:  Thank you.

21     BY MR. VALENTINI:

22     Q.  And, Captain Ortega, could you please identify, if

23     you're familiar with it, with an area that is referred --

24     well, do you know if there's an area of the Capitol that's

25     referred to as the upper west terrace?

1    A.  There is.  I am familiar.

2    Q.  And could you please mark that area of the Capitol on

3    the screen using the touchscreen, please.

4    A.  (Indicating).  This whole area would be considered the

5    upper west terrace.

6    Q.  Thank you.  And if you could just please take off the

7    marking now.

8            And going back to, you also referred to before to

9    an area called the inaugural stage.

10   A.  Yes.

11   Q.  Could you please mark that area as well.

12   A.  (Indicating).  That would be the inaugural stage where I

13   wrote an 'X.'

14   Q.  And, Captain Ortega, if you could please remove the

15   marking at this point.

16           Is the inaugural stage surrounded by seating?

17   A.  It is.

18   Q.  And do you know what the purpose of that seating is?

19   A.  Yes, the seating is utilized for the guests of the

20   inauguration.

21   Q.  Captain Ortega, how is the inaugural stage used in

22   connection with inauguration?

23   A.  It's the main venue for the actual inaugural ceremony

24   where the President comes out and speaks on the inaugural

25   stage.

1     Q.  Captain Ortega, I'm going to zoom into the inaugural

2     stage.

3              If you could, could you please mark on Exhibit 605

4     where the inaugurated -- the President-to-be inaugurated,

5     the President-elect walks -- how he walks onto the inaugural

6     stage.

7              THE COURT:  And how he gets there from where he

8     was to where he's going?  You said how he walks.  I'm not

9     sure.

10    BY MR. VALENTINI:

11    Q.  How he gets to the inaugural stage.

12    A.  The president would exit out the lower west terrace door

13    through that lower west terrace tunnel.

14              MR. VALENTINI:  So then if you could then please

15    remove the marking.

16    BY MR. VALENTINI:

17    Q.  Could you -- are you familiar with that door that you

18    just marked?

19    A.  I am.

20    Q.  Could you please describe its appearance to the jury.

21    A.  So the -- when you enter that area, that would be a

22    tunnel and inside of there is one set of double doors and

23    behind that there's another set of double towards and that

24    is called the lower west terrace door.

25              MR. VALENTINI:  And we can stop publishing this

1    exhibit, please.

2    BY MR. VALENTINI:

3    Q.  Captain Ortega, let me show you what has been marked as

4    Exhibit 606.

5              Captain Ortega, do you recognize the image

6    depicted in Exhibit 606?

7    A.  I do.

8    Q.  And what is it?

9    A.  It would be schematics of the basement level of the U.S.

10   Capitol.

11   Q.  And is it an accurate -- a fair and accurate

12   representation of the layout of the basement of the Capitol?

13   A.  It is.

14             MR. VALENTINI:  Your Honor, the government moves

15   to admit Exhibit 606 into evidence.

16             MR. SMOCK:  No objection.

17             THE COURT:  Thank you, it will be admitted.

18             MR. VALENTINI:  Ms. Johnson, if you could please

19   publish it for the jury.

20   BY MR. VALENTINI:

21   Q.  You testified a few -- just a minute ago that a door

22   leads from the lower west terrace to the basement of the

23   Capitol.  Is that door reflected on Exhibit 606?

24   A.  It sort of it -- it would be at the top of the photo.

25   Q.  Could you mark on the touchscreen the general area where

1    this door would be.

2    A.  It would be in this area, from the west front into the

3    Capitol.

4    Q.  Thank you.  And if you could please clear that marking

5    from the screen.

6              Is that door an important access point into the

7    Capitol building?

8    A.  It is.

9    Q.  Could you explain why.

10   A.  If someone if gained entry into the west terrace door,

11   there are one set of stairs and they are now up to the

12   Crypt, then next to the stairs, they're up to the Rotunda,

13   and they have access to the Rotunda and the Speaker's

14   office.

15   Q.  Okay.

16             MR. VALENTINI:  If we could stop publishing

17   Exhibit 606, please.

18   BY MR. VALENTINI:

19   Q.  And let me show you what's been marked as Exhibit 607.

20             Do you recognize the images depicted in

21   Exhibit 607?

22   A.  I do.

23   Q.  And what is it?

24   A.  This would be the first floor of the U.S. Capitol, the

25   schematics of it.

1              MR. VALENTINI:  The government moves to admit

2     Exhibit 607 into evidence.

3              MR. SMOCK:  No objection.

4              THE COURT:  It will be admitted.

5              MR. VALENTINI:  Publish to the jury.

6     BY MR. VALENTINI:

7     Q.  Just a minute ago you testified that from the lower west

8     terrace door one could access an area called -- named the

9     Crypt?

10    A.  That is correct.

11    Q.  Could you please mark on Exhibit 607 how one would

12    travel from the lower west terrace door to the Crypt of the

13    Capitol.

14    A.  So there's a stairwell over here (indicating), that they

15    would go up one floor, and then they would enter into the

16    Crypt.

17    Q.  And you testified before that the Crypt is in the center

18    of the Capitol building?

19    A.  That is correct.

20    Q.  And from -- is it possible to -- well, let's strike

21    that.

22              How does one travel from the Crypt of the Capitol

23    building to, say, the chamber, the House Chamber?

24    A.  They would need to take that same stairwell that got to

25    the Crypt, one floor up, and that would get them to the

1    second floor, which would be to the -- which would get you

2    to the Rotunda.  And they could either go towards the House

3    side or the Senate side, and they would get either access to

4    the House floor or the Senate floor.

5    Q.  And how could one travel from the Crypt to the Senate

6    Chamber?

7    A.  To the Senate Chamber they just need to go one floor up

8    and then they're going to go to the north side of the

9    building.  That will get them right to the Senate Chamber.

10            MR. VALENTINI:  Ms. Johnson, if we could stop

11   publishing Exhibit 607 at this point.  Thank you.

12   BY MR. VALENTINI:

13   Q.  Captain Ortega, let me show you what has been marked as

14   Exhibit 608.  Do you recognize what has been marked as

15   Exhibit 608?

16   A.  I do.

17   Q.  And what is it?

18   A.  This would be schematics of the second floor of the U.S.

19   Capitol.

20   Q.  And a few minutes ago you talked about the location of

21   the House Chamber?

22   A.  That is correct.

23   Q.  And could you please mark the House -- I'm sorry.

24            MR. VALENTINI:  At this point the government moves

25   to exhibit -- to admit Exhibit 608 into evidence.

```
 1                MR. SMOCK:  No objection.

 2                THE COURT:  It will be admitted.

 3                MR. VALENTINI:  If we could publish to the jury.

 4   BY MR. VALENTINI:

 5   Q.  And, Captain Ortega, a minute ago you testified about a

 6   staircase near the lower west terrace door.  And does that

 7   staircase go all the way up to the second floor of the

 8   Capitol?

 9   A.  It does.

10   Q.  And how would one travel from that staircase to the

11   House Chamber?

12   A.  They would go up that staircase, they would enter the

13   Rotunda, and then they would go to the south side of the

14   building which would be a direct line right to the House

15   Chamber.

16   Q.  And how long would it take to walk on the lower west

17   terrace door to the House Chamber?

18   A.  Maybe a minute and a half.

19   Q.  Okay.  Let's talk about the Senate Chamber.  How would

20   one travel from the lower west terrace door to the Senate

21   Chamber?

22   A.  It would be the same path up the stairwell to the second

23   floor, instead go north and you would make it to the Senate

24   Chamber, direct access to it.

25   Q.  And how long would it take to walk that path?
```

1    A.  Again, about a minute and a half.

2    Q.  As a Capitol Police Officer are you charged with

3    protecting the safety of the Capitol building?

4    A.  I am.

5    Q.  And is the lower west terrace door a -- does it carry a

6    critical strategic importance to your mission?

7    A.  It does.

8         THE COURT:  What's the question again?

9         MR. VALENTINI:  Does the lower west terrace door

10   carry critical strategic importance to their mission.

11        THE WITNESS:  It does.

12        MR. VALENTINI:  And we can stop publishing

13   Exhibit 608 at this point.

14   BY MR. VALENTINI:

15   Q.  We can switch gears a little bit and talk about your day

16   on January 6, 2021.

17        Were you on duty on January 6th?

18   A.  I was.

19   Q.  And what time did you arrive to work that day?

20   A.  Approximately 0530 hours.

21   Q.  And if you were to use nonmilitary time, which time --

22   what time would that be?

23   A.  That would be 5:30 a.m.

24   Q.  And where -- where is your office?

25   A.  So at the time I was assigned to the Senate division, so

1      I worked outside of the U.S. Capitol Police headquarters,

2      which is located on 119 D Street Northeast.

3      Q.  And did you know what was scheduled to occur at the

4      Capitol on that day?

5      A.  I did.

6      Q.  And what did you do when you arrived at work that day?

7      A.  So when I arrived at work I went through my normal

8      e-mails, briefed up my personnel on what the expectation of

9      the mission was that day.  I eventually went out in a

10     vehicle with Inspector Hawa and patrolled the Capitol

11     Grounds.

12     Q.  And even before you arrived at work that day did you

13     notice anything out of the ordinary as you were arriving to

14     work?

15     A.  I did.

16     Q.  And what was it?

17     A.  When I got off the highway, I noticed a large amount of

18     individuals wearing Trump paraphernalia wearing MAGA --

19     having MAGA flags up and down on D Street.

20            Usually at 5:00, 5:30 in the morning it's pretty

21     empty but there was a large number of individuals out there.

22     Q.  Did there come a time on January 6th where you went to

23     the Capitol building itself?

24     A.  There was.

25     Q.  Why did you do that?

1      A.  At approximately 12:53 p.m. or so, there was a call for

2      breach on the Penn Avenue Walkway.  There was a call for all

3      available officers to respond.  At that point I left

4      headquarters because I had been at my office at that point

5      and responded to the U.S. Capitol.

6      Q.  Where within the Capitol building did you go to?

7      A.  So I entered the --

8              THE COURT:  There should be a picture and water

9      and cups there, if you need some.

10             THE WITNESS:  Thank you, Your Honor.

11             I left headquarters.  I went to the Dirksen

12     building and took the Senate subway to the U.S. Capitol, and

13     then I exited out of the law library door, which put me on

14     the east front of the U.S. Capitol.

15     BY MR. VALENTINI:

16     Q.  What did you see when you got there?

17     A.  When I exited the east front I noticed that there was a

18     large crowd on the east front.  At this point they were

19     behind the bike rack and I had police officers that were

20     lined up on the bike rack.

21             I noticed at the time they were really close to

22     each other, so I started on the south side of the parameter

23     and I walked down and I spread the officers out telling them

24     that there was a large crowd, that we needed to make sure we

25     got the whole fence covered.  And I did that until I got to

1      the north side of the parameter on the East Plaza.

2      Q.  And what was the mood -- you said -- I'm sorry, strike

3      that.  You said you saw a large crowd on the east side when

4      you arrived there?

5      A.  I did.

6      Q.  How would you describe the mood of that crowd at that

7      point?

8      A.  The crowd was very loud, there was a lot of chanting,

9      there was a lot of screaming going on.  There's a lot of

10     bullhorns with the different sounds going on.

11     Q.  And how large was this crowd compared to the number of

12     officers who were on the east side at that point?

13     A.  We were severely outnumbered by the crowd.

14              THE COURT:  How were you dressed that day, by the

15     way?

16              THE WITNESS:  Excuse me, sir?

17              THE COURT:  Were you in uniform?

18              THE WITNESS:  I was in uniform, sir.

19     BY MR. VALENTINI:

20     Q.  Were you wearing anything that could be -- well, does

21     the Capitol Police have different kind of uniforms?

22     A.  We do.

23     Q.  Does the Capitol Police also use gear that is

24     specifically used for civil disturbances?

25     A.  We do.  We have a hard gear that we utilize for civil

1   disturbance events.

2   Q.  And could you describe what the hard gear consists of?

3   A.  Yeah, it would have -- there would be a big helmet that

4   you wear with a face shield on it.  You have protective

5   armor that would be called that protects your arms, your

6   legs, chest protector.

7   Q.  And when you arrived on the east side of the Capitol,

8   you were not wearing what you just describing as hard gear,

9   correct?

10  A.  That is correct.  I was in normal uniform, the blue

11  pants, the white shirt, and a -- my cruiser jacket.

12  Q.  And I believe you just described your officers as

13  severely outnumbered on the east front.

14          Could you estimate the ratio of members of the

15  crowd to police officers?

16          THE COURT:  In a particular area?

17          MR. VALENTINI:  On the east side.

18  BY MR. VALENTINI:

19  Q.  When you arrived on the east side.

20  A.  I would say on the east side it was closer to one, one

21  to thirty.  We were -- the crowd was enormous.

22  Q.  Did there come a time when you went from the east side

23  of the Capitol to a different area of the Capitol on

24  January 6th?

25  A.  There was.

```
1    Q.  And where did you go?

2    A.  When I got to -- after I finished spreading out the

3    officers, I was told by one of the officers, Captain, we

4    don't need you here.  We need you -- we need officers on the

5    west front.  So at that point I proceeded to walk to the

6    west front.

7    Q.  Do you recall approximately at what time that was?

8    A.  It would be closer to probably 1:15 or so.

9    Q.  And the first breach of the Capitol, was it on the east

10   side?

11   A.  No, the first breach was on the west side.

12   Q.  Okay.

13        MR. VALENTINI:  Let me pull up what has been

14   marked what as been what has been admitted into evidence as

15   Exhibit 605.

16        If we could publish it.  Thank you.

17   BY MR. VALENTINI:

18   Q.  Using the touchscreen, could you please explain where

19   you went.  Where you went from the east side to the west

20   side of the Capitol.

21   A.  Yes, sir.

22        So I started on this side from East Plaza.  I

23   walked down to the upper west terrace.  As I was on the

24   upper west terrace, I stopped here (indicating).  I'm on the

25   top of the upper west terrace on the Senate side and I look
```

```
 1    over and just take a look at the crowd.  From that area I

 2    can see the west front and I can see all of Pennsylvania

 3    Avenue and I just see a large number of individuals coming

 4    from Pennsylvania Avenue.  It's nonstop, the crowd that's

 5    coming, and they're starting to fill in the west front at

 6    this point.

 7              From there, I go down the stairwell that's over

 8    here (indicating) and walk past the scaffolding.  And now I

 9    go to the inaugural stage.

10    Q.  If I may interrupt you for a second.

11              You said you arrived to an area that is -- did you

12    identify it as the upper west terrace of the Capitol?

13    A.  That's right.

14    Q.  And if you could mark it on Exhibit 605 for the jury.

15    A.  Where I'm marking the 'X' would be the Senate side of

16    the upper west terrace.

17    Q.  Thank you.  And if you could erase the markings for a

18    second now.

19              When you arrived to the upper west terrace of the

20    Capitol, you say you observed a large crowd?

21    A.  I did.

22    Q.  A large crowd up on the west side of the Capitol?

23    A.  They were both inside of our parameter and on the

24    outside, still coming.

25    Q.  So by that time, by the time you arrived at the upper
```

1    west terrace, the parameter that you described before had

2    already been breached?

3    A.  That's correct.

4    Q.  And you could already see a large crowd within that

5    parameter?

6    A.  That is correct.

7    Q.  Were there any Capitol Police Officers on the west side

8    when you arrived at the west side?

9    A.  There were.

10   Q.  How many police officers were there on the west side

11   when you arrived compared to the number of the members of

12   the crowd?

13   A.  I don't have an exact count, but we were severely

14   overwhelmed at that point.  If we were one to thirty in the

15   front, we were probably close to one to fifty in the back --

16   or I'm sorry on the west side.

17   Q.  And at this point, we're talking about when you were --

18   when you arrived at the upper west terrace, right?

19   A.  That is correct.

20   Q.  And so what went through your mind when you saw the

21   crowd outside the Capitol on the west side?

22   A.  I had a lot of concerns.  I've worked some very big

23   events where we've had a big crowd, where we've been

24   outnumbered.

25             The way that the west front was filling up almost

1    looked like an inauguration level event where we had that

2    many people in the crowd.  And with what I ended up seeing

3    was my officers were starting to get attacked and at that

4    point I had a lot of concerns about how we were going to

5    hold -- to stop the crowd.

6    Q.  Were the officers of Capitol Police responding to the

7    crowd at that point?

8    A.  We had responded to the crowd, correct.

9    Q.  Now, does the Capitol Police have officers who are

10   specifically trained in what's called less than lethal

11   weapons?

12   A.  We do.

13   Q.  Could you describe what less than lethal are?

14   A.  Our less than lethal weapons would be like the FM303.

15   We utilize pepper balls.  We utilize bigger, pepper spray

16   guns.  It's to gain compliance from the ground.  These are

17   less lethal options, so it's less than using, you know,

18   deadly force like a handgun.

19   Q.  You used two terms that I wanted to ask you about.  One

20   is pepper balls.  What are they?

21   A.  So the pepper balls would be -- they're smaller balls

22   that contain, like the same type of stuff that would on

23   inside of a pepper spray, utilize it.  When it's deployed,

24   it both strikes the individual hits, but it also releases a

25   pepper spray that comes out when you utilize them.

1    Q.  And for the first item you used an acronym.

2    A.  Okay.

3    Q.  What is the acronym?

4    A.  The FM303.  That is just the name of the -- I don't know

5    what the FM stands for, but that's just the name of the

6    deployment device.  It launches the pepper bullets and such.

7    Q.  And what is the general purpose of this less than lethal

8    weapons?

9    A.  To gain compliance.  To take control of the situation.

10   Q.  And when you first arrived to the west side of the

11   Capitol on January 6th, were officers deploying these less

12   than lethal weapons?

13   A.  They were.

14   Q.  And what -- what effect were these weapons having on the

15   crowd?

16   A.  Not much.  As much as we were utilizing these weapons,

17   the crowd was deploying their own weapons back on us.

18           Due to the size of the crowd, it wasn't having

19   that much -- it wasn't having the intended effect that we

20   had hoped for.

21   Q.  Could you tell the jury what you did after you left the

22   upper west terrace.

23   A.  When I left the upper west terrace, I went down these

24   stairs and then I went into the inaugural stage.

25           At that point I observed my Senate division

LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

1    officers, they were on the lower west terrace, and they were

2    already engaged in combat with protesters at the time.  From

3    there I was looking for a way to join them to get down to

4    them so I could figure out how to get down, so at that point

5    I went towards the scaffolding and entered the scaffolding.

6    Q.  Okay.  If I may interrupt you for a second.

7         You just mentioned scaffolding.  Could you please

8    mark on Exhibit 605 where the scaffolding was on

9    January 6th, 2021.

10   A.  It would be where I marked the 'X.'

11        THE COURT:  And where is the stage?  Is that right

12   there?

13        THE WITNESS:  Stage is where I marked the circle.

14        THE COURT:  Okay.  So you went to the stage.  And

15   where did you see officers engaged in the combat, below you?

16   At the level below you or?

17        THE WITNESS:  That is correct, Your Honor.

18        This would be referred to as the lower west

19   terrace.  So I'm at the top of the stage and I can see them

20   below me.

21   BY MR. VALENTINI:

22   Q.  And what prompted you to go over to the scaffolding from

23   the inaugural stage area where you were?

24   A.  I was looking for a way to join my officers to lead

25   them.

1   Q.  Did you find any of your officers who were in crisis at

2   that point?

3   A.  I did.  I had an officer that ran into me, a female

4   officer who had just been pepper sprayed.

5           This officer was in tears.  She ran into me, so I

6   grabbed her, and then I grabbed a bottle of water to

7   decontaminate her eyes and to try to clear the peppery spray

8   out.

9           At that point I tried to coach her get her to come

10  back out on the line.  She says, Nope.  I can't go out.  I

11  can't go out.  I said, Why?  You're fine.  You're okay.  And

12  she's like, No.  I can't.  I haven't told anyone I'm

13  pregnant.  So at this point I tell her, All right.  Don't --

14  you don't have to tell anyone.  Just go to the division

15  office, lock yourself in there.  Just tell them Captain

16  Ortega, sent you and if anyone has any questions they can

17  talk to me, but you don't have to tell anyone.  And I pulled

18  her off the line and I sent her inside the building.

19  Q.  And when you were in the area next to the scaffolding,

20  were you able to see what was happening inside the

21  scaffolding?

22  A.  I was.

23  Q.  And what was happening?

24  A.  Initially it had been clear.  Slowly the protesters

25  found a way to come up under the scaffolding and they

1    started to enter the scaffolding.

2    Q.  And were you there when the rioters first started to

3    enter the scaffolding?

4    A.  I was.

5    Q.  And what did you do?

6    A.  As the rioters started to come in, I did try to speak

7    with some of them.  They proceeded to shoot some sort of

8    orange liquid at my face.  More kept coming through.  We had

9    to engage in hand-to-hand combat with them.  We were able to

10   cuff a few and get them out of there.

11         We had one come after me with a hammer, come after

12   my officers with hammers.  There was just a lot of combat

13   inside of there between my officers and the rioters as they

14   were in the scaffolding.

15   Q.  Why was it important to keep the rioters away from the

16   scaffolding?

17   A.  We were doing our best to prevent the rioters from

18   breaching the scaffolding and having access to the lower

19   west terrace door and to the upper west terrace.

20   Q.  Let me detour for a moment.  Are you familiar with a

21   term "situational awareness"?

22   A.  I am.

23   Q.  And what does that mean?

24   A.  A situational awareness is just knowing what is going on

25   around you, having the bigger picture.

1    Q.  And how important is that in conducting police work?

2    A.  It's very, very important.  You have to see the bigger

3    picture.  You have to see everything going on around you

4    when you're conducting police operations.

5    Q.  And what did your -- did you receive training in

6    situational awareness?

7    A.  I have.

8    Q.  What did that training cause you to focus on at that

9    time?

10   A.  At the time I was more -- I was focused on the safety of

11   myself and the officers.  So situational awareness, I was

12   looking for the hazards around us.

13           Unfortunately in the scaffolding the AUSC had

14   failed to remove their tools.  So as we were in combat with

15   the protesters or rioters, hammers, and different weapons

16   were falling from the sky and were being utilized against

17   us.

18   Q.  What kind of weapons did the members of the -- members

19   of the rioters use while engaging with you and your officers

20   at this point?

21   A.  They utilized several different things.  There was some

22   sort of orange spray they were deploying on us.  Flags,

23   flagpoles.  Pieces of wood.  I had frozen cans of food,

24   frozen water thrown at me.  Fists were being utilized.

25   Feet.  Anything that could be found was being utilized

1    against me and my officers.

2    Q.  As a Capitol Police Officer do you carry a firearm?

3    A.  I do.

4    Q.  Did you have a firearm on you on January 6th?

5    A.  I did.

6    Q.  Did you have it when you got to the west side of the

7    Capitol?

8    A.  Can you repeat that again?

9    Q.  I said, was that firearm on you when you got to the west

10   side of the Capitol?

11   A.  It was.

12   Q.  Did you consider using the firearm?

13   A.  I did.

14   Q.  Did you use that firearm?

15   A.  I did not.

16   Q.  Why did you not?

17   A.  At the time when I had the individual run after me with

18   the hammer, I would not have had been able to get a safe

19   shot off with the individuals that were still in the crowd

20   and where my police officers were.

21        And beyond that, we were aware that some of the

22   individuals in the crowd did have firearms on them.  It just

23   wasn't the right move at the time and I think it was the

24   safest option.

25   Q.  So that was your situational awareness calculus, if you

```
 1     will.

 2     A.  It was.

 3     Q.  Did the rioters eventually take over the scaffolding?

 4     A.  They did.

 5     Q.  And did you -- did there come a time when you, yourself,

 6     had to withdraw from the scaffolding area?

 7     A.  I did.  There was some sort of liquid that went into my

 8     eyes.  I remember being blinded and I had my eyes closed and

 9     I remember, you know, people being around me and I had to

10     slowly go up the stairs until I was grabbed by Inspector

11     Hawa, who gave me to Sergeant Sanchez who decontaminated my

12     eyes with water.

13     Q.  Where did you go when you withdraw from the scaffolding

14     area?

15     A.  I went up the stairs and I ended up back on the upper

16     west terrace.

17              MR. VALENTINI:  And if we could clear the markings

18     on Exhibit 605, please.  Thank you.

19     BY MR. VALENTINI:

20     Q.  Now at this point had the rioters -- were there any

21     rioters in the inaugural stage area?

22     A.  At that point, once they breached the scaffolding they

23     did have access and they started slowly going into that

24     inaugural stage area.

25     Q.  Could you explain to the jury what you did when you
```

 1    returned to the upper west terrace area?

 2    A.  Yes.  When I got to the upper west terrace area, there

 3    was a call on the radio that our police SWAT had arrived.

 4         At that point I saw an individual at the top of

 5    the upper west terrace wearing a green uniform.  I ran

 6    towards him and it was a Park Police Officer.  I asked him

 7    where the rest of his team was.  He told me it was just him.

 8    And I said, Then get out of here.  I was like, They're

 9    breaching us right now.  You got to go.  Because he had a

10    long -- he had an M4, a long gun, and my concern was that

11    once the rioters got up there that they would try to remove

12    that weapon from him so I told him to leave the area.

13         At the same time, I looked to the right and I

14    found two officers that were face down on the House side of

15    the upper west terrace.  I ran over to provide them

16    assistance.  I didn't know what happened to them and I shook

17    both of them.  They both had been pepper sprayed or had some

18    sort of chemical on their face.

19         I proceeded to get both of them up, clean both of

20    their eyes out with water real quick, and I told them to get

21    out.  I was like, We're being breached.  You got to get out

22    of here.  You got to get out of here.  And I sent them up on

23    their way.

24         At that point I returned back to the Senate side

25    of the upper west terrace and the rioters at that point were

1     at the top of the stairs.  And we still had a bike rack that

2     we were trying to utilize to prevent them from coming up to

3     the upper west terrace.

4     Q.  Were you successful?

5     A.  We were not.

6     Q.  Did there come a time when you left the upper west

7     terrace to go elsewhere in the Capitol?

8     A.  I did.

9     Q.  Where did you go?

10    A.  Once they breached the upper west terrace, I ordered the

11    officers that were up there to lead the group to the east

12    side, back to the East Plaza.  At the time I was unaware

13    that the East Plaza had collapsed.

14    Q.  Did there come a time when you were on the east side of

15    the Capitol that you received a communication over the radio

16    channel?

17    A.  There was.

18    Q.  And what was that communication?

19    A.  An officer put on Capitol Police dispatch that there was

20    a breach in the Senate subway.  So that would mean -- the

21    Senate subway is at the bottom at the Capitol, it leads to

22    the Senate office buildings.  So I was assigned as the

23    captain to the Senate division, knowing that there was a

24    possible breach from the Capitol into the Senate side.  At

25    that point I did return to the Senate buildings.

1              THE COURT:  The Senate subway is where,

2    underground?

3              THE WITNESS:  It is underground, sir.  So it's at

4    the bottom at the basement level of the Capitol.

5              THE COURT:  And does it go between the Senate

6    office buildings or only within the Capitol?

7              THE WITNESS:  So it goes from the Capitol, Your

8    Honor, to the Senate office.  All three of these Senate

9    office buildings.

10             THE COURT:  Okay.  And so if you're a Senator or a

11   staff member and you're in the Capitol building for some

12   reason, you can get back to your office underground by

13   taking the subway?

14             THE WITNESS:  That is correct, Your Honor.

15             THE COURT:  And those offices are up on, what

16   street is it, north of the Capitol itself?

17             THE WITNESS:  That's correct, sir.

18             THE COURT:  Thanks.

19   BY MR. VALENTINI:

20   Q.  Approximately what time did you arrive to the Senate

21   subway area?

22   A.  I do not recall the exact time, sir.

23   Q.  And very briefly, could you describe for the jury the

24   rest of your day on January 6?

25   A.  So at that point we heard that there was a breach in the

LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

1    Senate subway.  Myself and my inspector were out there, so I
2    told her we needed to return to the Senate building to take
3    command of our buildings since there's a possible breach.

4              We had to get back over to the -- to those
5    buildings.  Unfortunately because the building was -- the
6    Capitol itself was starting to be breached we had to walk
7    through the crowd to get back to the Senate buildings.

8              So I told her to grab onto my gun belt, dig her
9    head in my back, and I lead her through the crowd as they're
10   spitting, pushing, yelling at us.  And then we make back for
11   the Russell building.  And when we're in the Russell
12   building, at that point I assist in the relocation of
13   Senators.  And that is the rest of my mission.  I help
14   assist returning the members back to the Senate floor later
15   that evening.
16   Q.  When you later that evening, at what time did your shift
17   end on January 6, 2021?
18   A.  It did not end on the 6th, it actually ended on the 7th
19   at around 4:30 in the morning.
20   Q.  And what time were you supposed to leave work that day?
21   A.  On a normal workday I would have left work by 5:00 p.m.
22   on January 6th.
23   Q.  Let's take a step back.  In your time at the -- as
24   Capitol Police Officers, did you also become familiar with
25   the security cameras that the Capitol Police uses?

1     A.  I have.

2     Q.  Are these cameras sometimes referred to as CCTV cameras?

3     A.  They are.

4     Q.  And do you know what that stands for?

5     A.  Closed Circuit Television.

6     Q.  And why does the Capitol Police use CCTV cameras?

7     A.  It is a force multiplier.  It gives us the opportunity

8     to see more without having police officers necessarily out

9     there.  It helps us secure the Capitol better by having that

10    ability to view different parts of the Capitol.

11    Q.  Are the Capitol Police CCTV cameras, are there CCTV

12    cameras in the interior of the Capitol?

13    A.  There are.

14    Q.  When I say Capitol, I mean Capitol building.

15    A.  That is correct, there are.

16    Q.  And are there CCTV cameras on the exterior on the

17    Capitol building?

18    A.  There are.

19    Q.  And are there CCTV cameras all over the Capitol grounds?

20    A.  That is correct, there are.

21    Q.  And does the Capitol Police CCTV cameras system keep

22    track of the date and time when footage is recorded?

23    A.  It does.

24    Q.  And have you found these timestamps to be accurate?

25    A.  I have.

1    Q.  And do you rely on them in conducting investigations?

2    A.  I have.

3    Q.  Do the CCTV cameras of the Capitol Police include sound?

4    A.  They do not.

5    Q.  Before coming to Court today did you review CCTV footage

6    from January 6th?

7    A.  I did.

8    Q.  And in particular, did you review the footage that has

9    been marked as exhibits -- Government Exhibit 100.1, 100.2,

10   100.3, 101.1, 101.2, 102 and 103?

11   A.  I have.

12   Q.  Do you know these exhibits to contain fair and accurate

13   -- well, are these accurate copies of the CCTV footage in

14   the possession of the Capitol Police?

15   A.  They are.

16   Q.  And are they fair and accurate representations of the

17   events that are depicted in the footage?

18   A.  They are.

19           MR. VALENTINI:  The government moves to admit

20   Government Exhibits 101 -- excuse me, let's start over.

21   100.1.

22           THE COURT:  Start again, slowly.

23           MR. VALENTINI:  100.1, 100.2, 100.3, 101.1, 101.2,

24   102 --

25           THE COURT:  Wait a minute.  101, you already --

```
 1      oh, I see, I'm -- all right.  100.1, 100.2, 100.3, okay.
 2      Now we're at 101.1, 101.2.
 3                  MR. VALENTINI:  102 and 103 into evidence.
 4                  THE COURT:  I can't recall where he stand on all
 5      of these particular exhibits, but.
 6                  MR. SMOCK:  Can I just have a moment with counsel?
 7                  THE COURT:  Yes.
 8                  (Counsel confer)
 9                  MR. SMOCK:  No objection.
10                  THE COURT:  Did he say no objection?
11                  MR. SMOCK:  I did.
12                  THE COURT:  Good.
13                  So let me ask how much longer you think you're
14      going to be with this witness on direct?
15                  MR. VALENTINI:  We have a few videos to go
16      through --
17                  THE COURT:  Pardon me?
18                  MR. VALENTINI:  We have quite a few videos to go
19      through with this witness, Your Honor.
20                  THE COURT:  Well, here's the question:
21                  Is this a logical place to break if you're going
22      to start this whole line of questioning or do you want to go
23      for, say, until 1:00?  Because I want to break by 1:00.
24                  MR. VALENTINI:  This is very much a natural
25      breaking point, Your Honor.
```

1            THE COURT:  Okay.  So it is 12:45.  Why don't we

2       come back at 2:00.

3            So, ladies and gentlemen, you are excused until

4       2:00 and so are you, Captain Ortega, and you may step down,

5       sir.

6            MS. JOHNSON:  Are those admitted?

7            THE COURT:  Yes, those exhibits are admitted

8       without objection.

9            And, ladies and gentlemen.  You know the normal

10      instructions, don't talk to anybody, don't read anything,

11      don't do anything, just eat lunch.  Good.

12            All right.  So I said 2:00.

13            (Recess taken at 12:41 p.m.)

14                    *    *    *    *    *

15       (2:08 p.m.)

16                      **IN OPEN COURT**

17                    **(JURY NOT PRESENT)**

18            THE COURT:  Are we ready for the jury?

19            MR. VALENTINI:  Yes, we are.

20            THE COURT:  Good.

21                    *    *    *    *    *

22       (2:10 p.m.)

23                      **IN OPEN COURT**

24                      **(JURY PRESENT)**

25            THE COURT:  All right.  Everybody have a seat.

```
 1                    Everybody on the jury ready to proceed?

 2                    JURORS:  Nod.

 3                    THE COURT:  Okay.  And, Captain Ortega, you're

 4      still under oath from this morning.

 5                    THE WITNESS:  Yes, Your Honor.

 6      BY MR. VALENTINI:

 7      Q.  Good afternoon, Captain Ortega?

 8      A.  Good afternoon, sir.

 9                    MR. VALENTINI:  Let me pull up what has been

10      marked as Exhibit 100B.

11                    MS. JOHNSON:  101.

12                    MR. VALENTINI:  100B.  It's not yet in evidence.

13                    MS. JOHNSON:  Okay.

14      BY MR. VALENTINI:

15      Q.  Let me scroll quickly through the pages of this exhibit.

16                    Captain Ortega, do you recognize this exhibit?

17      A.  I do.

18      Q.  What is it?

19      A.  It's screen captures of or stills from CCTV footage in

20      the lower west terrace tunnel.

21      Q.  And some of these images in Exhibit 100B are zoomed-in

22      screen shots, right?

23      A.  That is correct.

24      Q.  And at least two of those images contain graphics that

25      were not part of the original footage, right?
```

1     A.  That is correct.

2     Q.  But they're all from the footage captured by the Capitol

3     Police CCTV television footage?

4     A.  That is correct.

5               MR. VALENTINI:  Your Honor, the government moves

6     to admit Exhibit 100B into evidence.

7               MR. SMOCK:  No objection.

8               THE COURT:  It will be admitted.  Thank you.  This

9     is 100B?

10              MR. VALENTINI:  Yes, Your Honor.

11    BY MR. VALENTINI:

12    Q.  And let me also pull up what has been marked as

13    Exhibit 101A.  Which is a single photograph.

14              And, Captain Ortega, do you recognize what this

15    image is?

16    A.  I do.

17    Q.  What is it?

18    A.  That is actually the interior of the lower west terrace

19    door.

20    Q.  And do you recognize this image as being a screen shot

21    from Capitol Police CCTV footage?

22    A.  I did.

23              MR. VALENTINI:  Your Honor, I move -- the

24    government moves to admit Exhibit 101A into evidence.

25              THE COURT:  Okay.  It will be admitted.

```
1              MR. VALENTINI:  Let me pull up the first frame of
2    Exhibit 102, which is in evidence.
3              THE COURT:  What exhibit again?
4              MR. VALENTINI:  102.
5              MS. JOHNSON:  100.2?
6              MR. VALENTINI:  No, 102.
7              THE COURT:  102.
8              MR. VALENTINI:  Yeah.
9              MS. JOHNSON:  I don't have it.
10             THE COURT:  On the second page of his exhibit
11   list, but -- there it is.
12             MS. JOHNSON:  And this is in evidence, you said?
13             THE COURT:  It was admitted this morning, correct,
14   Mr. Smock?  102?  Exhibit 102?
15             MR. SMOCK:  I may have missed it, but if the Court
16   has it --
17             THE COURT:  Well, everything I admitted with one
18   exception this morning was without objection, you stood up
19   and said without objection.
20             My notes say 102 was admitted.
21             MR. VALENTINI:  Yes, it is one of the ones that I
22   read on my list that I read of the Court.
23             MR. SMOCK:  We have no objection, so that's fine.
24             THE COURT:  Okay.  So it's in evidence.
25   BY MR. VALENTINI:
```

```
 1    Q.  Having seen the first frame of this video, Captain

 2    Ortega, are you familiar with it?

 3    A.  I am.

 4    Q.  And what is it?

 5    A.  It is a video almost like a timeline that shows various

 6    things that occurred on January 6th, 2021.

 7    Q.  And are you able to see approximately how long this

 8    video is?

 9    A.  Approximately 15 minutes and 30 seconds.

10    Q.  So let me start and play this video, and as we play this

11    video we'll ask you questions about what is displaying in

12    the video.

13              THE COURT:  And every juror has a screen in front

14    of them that's working?

15              JURORS:  (Nods heads).

16              THE COURT:  Okay.

17              (Video recording playing)

18    BY MR. VALENTINI:

19    Q.  Let me stop the video at time tracker 15 seconds into

20    the exhibit.

21              Captain Ortega, do you recognize what is displayed

22    at this point in the video?

23    A.  I do.

24    Q.  And what is it?

25    A.  We're facing Peace Circle -- we're at Peace Circle and
```

1    we're facing the Penn Avenue Walkway towards the U.S.

2    Capitol west front.

3    Q.  And is this what the Peace Circle looks like on an

4    average day?

5    A.  It does not.  Typically there is no bike rack in that

6    area.

7    Q.  In addition to bike rack, there appears to be some white

8    signs?

9    A.  Yeah, typically we do not have signs that close that

10   area off on a normal day to day.

11   Q.  Let me ask you about the crowd that is depicted in this

12   video.

13          At this point, where is this crowd vis-a-vis the

14   outer parameter that we talked about this morning?

15   A.  They are on the exterior of the outer parameter.  They

16   have not broken through it.

17   Q.  And what is the timestamp on this video?

18   A.  That's going to be 12:51:03 p.m.

19   Q.  So at this, 12:51, the crowd was still outside of the

20   parameter of the restricted area?

21   A.  That is correct.

22   Q.  Let me continue playing this video until about

23   50 seconds into the exhibit.

24          (Video recording playing)

25          THE COURT:  So where -- where is this camera?

1    This is looking, what, from some portion of the Capitol

2    eastward on -- I'm trying to see.  That's our courthouse in

3    the upper right, but tell us what its view looking from and

4    towards.

5              THE WITNESS:  Absolutely, Your Honor.

6              So this camera would be somewhere on the west

7    front and it's facing towards the Penn Ave Walkway to Peace

8    Circle, to Pennsylvania Avenue, so that would be traveling

9    westbound.

10             THE COURT:  Got it.

11   BY MR. VALENTINI:

12   Q.  And I was going to ask you, do you recognize the

13   building in the back of the exhibit on the right side?

14   A.  I do.

15   Q.  What is it?

16   A.  It is this courthouse.

17   Q.  Okay.  And what do you know, and could you identify the

18   timestamp at this point of about 51 seconds into the

19   exhibit?

20   A.  It would be 12:57:26 p.m.

21   Q.  And what do you notice about the position of the crowd

22   at this point compared to the last place where we stopped at

23   about 12:51 p.m.?

24   A.  At this point the crowd has breached my parameter.  They

25   knocked my officers down and now they have entered a

1    restricted area.

2    Q.  Let me continue to play the exhibit about until one

3    minute and six seconds into the exhibit.

4          Captain Ortega, do you recognize the area that is

5    depicted at time tracker at about one minute and six seconds

6    into the exhibit?

7    A.  I do.

8    Q.  What area is it?

9    A.  So we're looking at the west front, so below is the

10   inaugural stage, below that is the lower west terrace, and

11   then the grassy area is the west front.

12   Q.  And the area depicted at about one minute and six

13   seconds into the exhibit within or outside of the restricted

14   parameter that you discussed this morning?

15   A.  They are now within the restricted parameter.

16   Q.  And what, if anything, do you see sort of running across

17   the screen from left to right towards the top of this

18   screen?

19   A.  So at the top of the screen you're going to see what I

20   would refer to with the snow fencing with the signs that

21   say, "Area Closed Ordered by Order of the United States

22   Capitol Police Board."

23   Q.  And would that snow fencing be the outer parameter that

24   you discussed this morning?

25   A.  That would be middle parameter.

1    Q.  And could you please identify the timestamp at this

2    point in the exhibit?

3    A.  That would be 12:58:33 p.m.

4    Q.  So about 12:58:33 seconds, the crowd had made it past

5    the outer parameter and also what you described as the

6    middle parameter?

7    A.  That is correct.

8    Q.  And where is the majority of the crowd standing at this

9    point in the exhibit?

10   A.  So now they are at the bottom of the lower west terrace

11   and they are behind a line of bike rack.

12   Q.  Am I correct that would be the third line of parameter

13   or fencing?

14   A.  That is correct.

15   Q.  Let me pull up Exhibit 605 already in evidence.

16           Could you please identify the area that was

17   depicted in the exhibit we were just looking in Exhibit 605.

18   A.  So the area I'm circling, you have the inaugural stage,

19   lower west terrace.

20   Q.  And could you identify where the crowd was lined up

21   against?

22   A.  There at this line here (indicating).

23           MR. VALENTINI:  Let me switch back to Exhibit 102,

24   which is already in evidence.

25   BY MR. VALENTINI:

1    Q.  And I will continue playing this exhibit until

2    approximately one minute and 35 seconds into the exhibit.

3              MR. VALENTINI:  It appears I'm experiencing --

4    okay.  Let me stop this exhibit.

5              THE COURT:  Are we still looking at Exhibit 102?

6              MR. VALENTINI:  Yes, Your Honor.  And I'm trying

7    to relaunch the exhibit.

8    BY MR. VALENTINI:

9    Q.  Okay.  Let me stop the exhibit at about one minute and

10   22 seconds into the exhibit.

11             What is -- could you identify for the jury the

12   area that is depicted at this point in the exhibit.

13   A.  This would be the east center steps of the U.S. Capitol.

14   Q.  And is the area depicted at this point in the exhibit

15   within or outside of the restricted parameter that we

16   discussed this morning?

17   A.  They are within the restricted parameter at this point.

18   Q.  And so could you please identify the timestamp at this

19   point in the exhibit.

20   A.  Yes, this is 2:06:05 seconds p.m.

21   Q.  So by 2:06:05 p.m. it's fair to say that both sides of

22   the Capitol's or circa parameter has been breached?

23   A.  That is correct.

24             MR. VALENTINI:  Let me continue to play the

25   exhibit until we'll need to take it down again.

```
 1                    (Video playing)

 2               MR. VALENTINI:  Ms. Johnson, would it be possible

 3     to stop publishing to the jury, please.

 4               MS. JOHNSON:  I stopped it and then you started it

 5     again, so.

 6               MR. VALENTINI:  Absolutely.  Thank you very much.

 7     Brief indulgence, Your Honor.

 8     BY MR. VALENTINI:

 9     Q.  Captain Ortega, I will continue playing this exhibit

10     until about a one minute and 52 seconds into the exhibit.

11               MS. JOHNSON:  Do you want it published?

12               MR. VALENTINI:  Yes.  Ms. Johnson, could you

13     please publish to the jury.  Thank you.

14                    (Video recording playing)

15     BY MR. VALENTINI:

16     Q.  We have stopped at about one minute and 52 seconds into

17     the exhibit.

18               Could you please tell the jury what timestamp you

19     see on this exhibit at this point.

20     A.  2:09:56 p.m.

21     Q.  What area of the Capitol has this captured at this point

22     in the exhibit?

23     A.  So this would be considered the northwest steps.

24               THE COURT:  Which left steps?

25               THE WITNESS:  They call it the northwest steps.
```

1     BY MR. VALENTINI:

2     Q.  And so this would be in the front of the Capitol -- the

3     west side?

4     A.  This would be on the west side of the Capitol, right

5     underneath the upper west terrace.

6     Q.  And this area, is it within or outside of the restricted

7     area parameter?

8     A.  It is within the restricted parameter.

9     Q.  And do you see there is a crowd that is walking along

10    the staircase that you identified?

11    A.  I do see them.

12    Q.  And which direction is the crowd watch walking?  Is it

13    walking towards the Capitol or away from the Capitol?

14    A.  They're walking towards the Capitol.

15    Q.  Earlier this morning you talked about confrontation that

16    you had with rioters in the vicinity of the scaffolding on

17    the west front.

18          Would that be in the general area that's depicted

19    in this exhibit?

20    A.  It is.

21    Q.  And would that confrontation have occurred before and

22    after the image that is captured at this point in the

23    exhibit?

24    A.  It would happen before.

25    Q.  Why is that?  How can you tell?

1    A.  At this point when I was down there they hadn't breached

2    the northwest steps yet.

3              MR. VALENTINI:  I'm going to continue playing this

4    exhibit until about two minutes and ten seconds into the

5    exhibit.

6              (Video playing)

7    BY MR. VALENTINI:

8    Q.  Captain Ortega, what is the timestamp at this point?

9    A.  2:11:51 p.m.

10   Q.  And could you describe or locate the area that is

11   depicted in the exhibit?

12   A.  Yes, this is the upper west terrace Senate side of it.

13   Q.  So this is the actual Capitol building that we're

14   seeing?

15   A.  That is correct.

16   Q.  And did you -- did you see a crowd that was walking

17   across the area outside the Capitol in this exhibit?

18   A.  I do.

19   Q.  And which direction is that crowd walking in?

20   A.  They're talking towards the Capitol.

21   Q.  And just to be clear, at this point this entirely is

22   within the restricted area?

23   A.  That is correct.

24   Q.  And based on your experience working on the Capitol, is

25   the crowd that is depicted at this point in the exhibit are

1    they individuals who are allowed to be in that area?

2    A.  They are not allowed to be in that area.

3    Q.  On January 6th, 2021, that area was closed to the

4    public, right?

5    A.  That's correct.

6            MR. VALENTINI:  Let me continue playing this

7    exhibit until about three minutes and 45 seconds.

8            (Video playing)

9            MR. VALENTINI:  I have stopped playing the exhibit

10   about three minutes and 45 seconds.

11   BY MR. VALENTINI:

12   Q.  So first of all let me ask you, are we now inside or

13   outside of the Capitol?

14   A.  We are in the interior of the Capitol.

15   Q.  And what area within the interior of the Capitol do you

16   see at this point in the exhibit?

17   A.  So this area is called the Senate wing doors.

18   Q.  Could you tell the jury where within the Capitol this

19   area is located?

20   A.  First floor.  First floor of the Capitol.

21   Q.  And we see a set of windows.  Are those windows on the

22   west side or the east side of the Capitol?

23   A.  So those windows would be the west side of the Capitol.

24   Q.  And in the seconds leading up to this moment, this time

25   in the exhibits, did you see a window be being shattered?

1    A.  I did.

2    Q.  Did you see an individual jump through that window?

3    A.  I did.

4    Q.  And based on your memory of the events of January 6th,

5    2021, would this -- was this the first breach of the Capitol

6    building?

7    A.  It was.

8    Q.  And at what timestamps -- well, what is the timestamp on

9    this exhibit at this point?

10   A.  2:13:04 p.m.

11   Q.  As a the Capitol Police officers charged with protecting

12   the Capitol, is this moment an important critical -- an

13   important moment in the events of January 6th, 2021?

14   A.  It was.  It's very critical because we now have

15   individuals breaching our building while we actually have

16   Members of Congress in session at this point.

17   Q.  Do you know if those Members of Congress remained in

18   session after the Capitol building was breached?

19   A.  Temporarily.  And then the session for both the House

20   and Senate had concluded.

21   Q.  And was the session concluded -- stopped because of the

22   breach of the Capitol building?

23   A.  It was.

24            THE COURT:  This is irrelevant to this video, but

25   I have a question.

1          You said that proceedings were stopped.  The

2   proceedings that day?  At this time, were the Senate and the

3   House in their own separate chambers or were they all

4   together in the House Chambers?

5          THE WITNESS:  They were separate, sir.

6          THE COURT:  At 2:13 p.m.?

7          THE WITNESS:  Correct.

8          MR. VALENTINI:  And I will now continue playing

9   this exhibit for about two and a half more minutes until

10   time -- I'm sorry, five and a half more minutes until about

11   nine minutes and nine seconds into the exhibit.

12          (Video recording playing)

13   BY MR. VALENTINI:

14   Q.  Captain Ortega, let me stop right here about

15   five minutes and six seconds into the exhibit.

16          Could you locate the area we're looking at right

17   now?

18   A.  Yes, we are on the second floor of the Capitol right

19   outside the Senate Chamber.

20   Q.  Do you see officers, a line of officers at this point in

21   the exhibit?

22   A.  I do.

23   Q.  Are those Capitol Police Officers or other type of law

24   enforcement officers?

25   A.  It's Capitol Police Officers.

1    Q.  Do you have an understanding why those officers formed a

2    line at that location?

3    A.  They were trying to prevent the rioters from making it

4    even closer to the Senate Chamber.

5    Q.  How long would it take to walk from the area captured in

6    this -- at this point in the exhibit and to get from there

7    to the Senate Chamber itself?

8    A.  Five seconds.

9    Q.  We'll continue playing the exhibit.

10                (Video recording playing)

11   BY MR. VALENTINI:

12   Q.  Let me stop the exhibit about six minutes and

13   43 seconds.

14                Captain Ortega, could you tell us where we're at

15   this point in the exhibit.

16   A.  So this is the second floor, it's called the east foyer

17   area, outside of that would be the east center steps of the

18   Capitol.

19   Q.  And did you see a crowd of rioters approaching a door?

20   A.  I do.

21   Q.  What's the name of that door?

22   A.  That would be the Rotunda door.

23   Q.  And is the fact the rioters would approach the door from

24   the inside of concern?

25   A.  It is.

1    Q.  Why is that?

2    A.  Because we already have a breach inside the building and

3    now the rioters are going towards the door and it is an

4    emergency fire door, so they can push on the emergency --

5    press of the door and open it up to the outside.

6    Q.  Is it possible there were rioters on the outside of that

7    door as well?

8    A.  It is and there were.

9    Q.  So opening that door would allow rioter to come in from

10   a door that would previously have prevented them from

11   entering?

12   A.  That is correct.

13              (Video recording playing)

14   BY MR. VALENTINI:

15   Q.  I have stopped the playing of the video at seven minutes

16   and 13 seconds into the exhibit.

17              Where are we at this point in the exhibit?

18   A.  So they referred to this as the mini-House Rotunda.

19   It's on the first floor of the Capitol, just outside of the

20   Crypt.

21   Q.  And is the Crypt positioned in a central location?

22   A.  That is correct.

23   Q.  Do you see any officers in this image?

24   A.  I do.

25   Q.  Do you have an understanding of what they were

1    attempting to do?

2    A.  They're trying their best to stop the crowd from gaining

3    further access.

4         If you see the way they're positioned, the hallway

5    that they're trying to hold, that archway, if the crowd was

6    able to access that area, that gives them a stairwell up to

7    the Rotunda and access towards the Speaker's office.

8    Q.  When you say Speaker's office, are you referring to the

9    Speaker of the House?

10   A.  Yes.  At that time, Speaker Of the House Nancy Pelosi.

11        (Video recording playing)

12   BY MR. VALENTINI:

13   Q.  I've now stopped at seven minutes and 45 seconds into

14   the exhibit.

15        Where within the Capitol are we now?

16   A.  We are on the first floor and this is outside of an area

17   called the House Wing door.

18        THE COURT:  Which floor did you say?

19        THE WITNESS:  The House Wing floor.

20        THE COURT:  Which floor?

21        THE WITNESS:  Oh, first floor.

22   BY MR. VALENTINI:

23   Q.  Again, do you see a line of officers at this point in

24   the exhibit?

25   A.  I do.

1    Q.  And how do they seem to be positioned compared to the --

2    well, do you also see a crowd of individuals that do not

3    appear to be allowed to be there?

4    A.  The crowd is forcing the officers to fallback.

5             (Video recording playing)

6    BY MR. VALENTINI:

7    Q.  I've now stopped the exhibit eight minutes and

8    20 seconds into the exhibit.

9             Could you tell us where this image was taken.

10   A.  So this is the area in between the CVC and the Capitol.

11            If you look where the officers are positioned at

12   the top of the photo or the video, that's inside the Crypt.

13   And the officers at the bottom, that area technically is

14   what begins the CVC, the Capitol Visitor Center.

15   Q.  Did you notice as we were playing this exhibit there

16   appeared to be what appeared to be some cloud/cloudiness in

17   the air?

18   A.  Yes.

19            THE COURT:  Appeared to be what?

20            MR. VALENTINI:  Cloudiness in the air.

21            THE WITNESS:  I do.

22   BY MR. VALENTINI:

23   Q.  Based on your experience on January 6th, 2021, and your

24   understanding of the Capitol Police procedures, are you able

25   to tell the jury what that was?

```
1     A.  It appears to be some sort of like a tear gas or

2     something to that effect.

3     Q.  Was tear gas deployed within the Capitol building on

4     January 6, 2021?

5     A.  I believe it was.

6     Q.  Does this area that's captured at eight minutes and

7     21 seconds into the exhibit hold particular strategic

8     importance?

9     A.  It does.  So as the video continues or what the officers

10    are doing when they are blocking the Crypt from having the

11    rioters enter the CVC, once the rioters enter the CVC that

12    gives them direct access to the subway.

13          So you would be able to get to the Senate subway

14    or the House subway.  That would give you direct access to

15    the Senate office buildings and the House office buildings.

16    Q.  When you reference the Senate office buildings and the

17    House office buildings, those buildings are buildings other

18    than the main Capitol building that we have been talking

19    today?

20    A.  Correct.  The Senate side would be the Russell building,

21    the Dirksen, the Hart building.

22          The House buildings would be the Rayburn building,

23    the Longworth building and the Cannon building.

24    Q.  And how far away, for example, is the Russell building

25    from the main Capitol building?
```

1    A.  So you would be able to get in the subway and within

2    five minutes of walking be able to access to those

3    buildings.

4              (Video recording playing)

5    BY MR. VALENTINI:

6    Q.  I have stopped the exhibit at about nine minutes and

7    10 seconds into the exhibit.

8              Could you tell us where we are at this point in

9    the exhibit.

10   A.  So we are looking at the inaugural stage and below the

11   inaugural stage would be the lower west terrace.

12   Q.  And could you tell the jury what is the timestamp at

13   this point in this exhibit.

14   A.  This is 2:33:09 p.m.

15   Q.  Where were you -- do you recall where you were at this

16   point on January 6th?

17   A.  At this point I was either on the east front or on my

18   way.  I would say -- actually I take that back.  I was on

19   the east front around this point.

20   Q.  Let me continue playing the exhibit until about

21   11 minutes and 48 seconds into the exhibit.

22              (Video recording playing)

23   BY MR. VALENTINI:

24   Q.  I have stopped the exhibit at about 11 minutes and

25   10 seconds into it.

 1              Now, Captain Ortega, did we see this area captured

 2     at a previous time in this exhibit?

 3     A.  We did.

 4     Q.  Could you please identify the timestamp at this point.

 5     A.  It is 2:48:22 p.m.

 6     Q.  And could you explain how it is that this area

 7     previously when we looked at this area there's -- there

 8     seemed to be the first breach of the Capitol you told us at

 9     this particular point.

10     A.  That's correct.

11     Q.  And you said it was about 2:13 p.m.

12     A.  That's correct.

13     Q.  And can you explain why at this point there appears to

14     be confrontation between the police and the rioters at this

15     door.

16     A.  Because of the breach we had to call about civil

17     disturbance units who did respond at this point and now they

18     are attempting to prevent more rioters from entering the

19     building.

20     Q.  Do you know if they were successful?

21     A.  They were able to stop some of them but we weren't able

22     to stop all of them.

23     Q.  And, in fact, eventually the police line collapses?

24     A.  That is correct.

25              (Video recording playing)

1     BY MR. VALENTINI:

2     Q.  Let me stop the exhibit at about 11 minutes and

3     53 seconds.

4             Where within the Capitol are we at this point?

5     A.  So we are in the tunnel for the lower west terrace door.

6     Q.  And what is the timestamp at this point?

7     A.  3:04:00 p.m.

8             THE COURT:  This is the tunnel from what?

9             THE WITNESS:  The lower west terrace tunnel.

10            MR. VALENTINI:  And if you could momentarily stop

11    publishing for the jury.

12            Let me -- if you could please resume publishing.

13    Thank you, Ms. Johnson.

14            THE COURT:  So we're now back to Exhibit 605.

15            MR. VALENTINI:  Yeah, we switched back to

16    Exhibit 605.

17    BY MR. VALENTINI:

18    Q.  And on Exhibit 605, could you qualify a mark on the

19    touch screen what area was depicted in Exhibit 102.

20    A.  (Indicating).  I'm circling around the lower west

21    terrace tunnel.

22    Q.  Is this the same lower west terrace tunnel that you

23    discussed earlier this morning?

24    A.  It is.

25            MR. VALENTINI:  And if we could stop publishing

1     for the jury momentarily.  Thank you.

2     BY MR. VALENTINI:

3     Q.  So if on January 6th one were to stand about where this

4     camera is, looking out, out west from the Capitol, one would

5     face a tunnel, correct?

6     A.  Can you repeat that?

7     Q.  If someone were to stand in the position of this camera,

8     one would face an archway, correct?

9     A.  That's correct.  They'd be -- where the cameras they

10    would be facing the stage and then the west front.

11    Q.  Let me ask you, are you able to see about on the

12    threshold of that archway an individual who appears to be

13    wearing a bright blue jacket?

14    A.  I do.

15              MR. VALENTINI:  And can we publish exhibit -- we

16    are back on Exhibit 102, if we could publish for the jury.

17    BY MR. VALENTINI:

18    Q.  So are you able to see at this time about 3:00 p.m. on

19    Exhibit 102 an gentleman who appears to be wearing a bright

20    blue jacket?

21    A.  I do.  I see him.

22    Q.  And which direction does he appear to be facing?

23    A.  So he is facing towards the lower west terrace door.

24    He's looking into the tunnel.

25              MR. VALENTINI:  I will now continue playing the

1    exhibit.

2              (Video recording playing)

3    BY MR. VALENTINI:

4    Q.  I have stopped playing the exhibit at about 30 minutes

5    five seconds into the exhibits.

6              Captain Ortega, are we back to the same tunnel

7    that we were looking at about a few minutes ago?

8    A.  We are.

9    Q.  Is this the lower west terrace tunnel?

10   A.  It is.

11   Q.  And are rioters still occupying that tunnel?

12   A.  They are.

13   Q.  And are you able to see what appears to be some items

14   that are being passed back by the rioters at this point in

15   the exhibit?

16   A.  I do, I see them.

17   Q.  What are they?

18   A.  They are U.S. Capitol Police riot shields.

19   Q.  What does the U.S. Capitol Police use those shields for?

20   A.  They are utilized to protect our officers.  It's a

21   defense tool and they are used to push -- during civil

22   disturbance events they're used to push the crowd back.

23   Q.  And at this point the exhibit is about, the time is

24   about 13 -- I'm sorry, 3:13 p.m., correct?

25   A.  That's is correct.

```
 1                    (Video recording playing)

 2      BY MR. VALENTINI:

 3      Q.  And I have now stopped the exhibit about 13 minutes and

 4      33 seconds into it.

 5                    Fair to say we're still looking at the same

 6      location, correct?

 7      A.  That is correct.

 8      Q.  So that's lower west terrace tunnel?

 9      A.  That is correct.

10      Q.  Are the rioters still occupying the tunnel at this

11      particular point?

12      A.  So there's only a few still left in but the police now

13      are starting to push the rioters out of the tunnel.

14      Q.  And could you tell the jury what time this image was

15      taken.

16      A.  That's going to be 3:19:14 seconds p.m.

17                    (Video recording playing)

18      BY MR. VALENTINI:

19      Q.  I have now stopped playing the exhibit about 14 minutes

20      and 30 seconds into it.

21                    And here, again, we are looking at the same

22      location, right?

23      A.  That is correct.

24      Q.  And what time is it now?

25      A.  This is going to be 4:12:09 p.m.
```

1    Q.  And could you describe what you see at this point in the

2    exhibit?

3    A.  At this point police have been able to push the rioters

4    to the edge of the tunnel but the police are still engaging

5    with the rioters at this point and it appears to be some

6    sort of white liquid that is now on the camera.

7    Q.  How about police shields?  Before you talked -- you

8    mentioned some objects that seemed to be passed around that

9    were police shields.

10           Do you see any of those at this point in the

11   exhibit?

12   A.  There appears to be one at the top of the frame.

13           (Video recording playing)

14           THE WITNESS:  It appears to be two that the crowd

15   has taken at this point.

16           (Video recording playing)

17   BY MR. VALENTINI:

18   Q.  I have stopped the exhibit at about 50 minutes and 29

19   seconds into the exhibit.

20           Did there come a time when police officers were

21   able to clear the Capitol building on January 6th?

22   A.  There was.

23   Q.  And can you describe what you are seeing at time tracker

24   50:29 into Exhibit 101?

25   A.  So at this point MPD had brought additional resources

1    and we were able to utilize them to clear these individuals

2    off the upper west terrace of the U.S. Capitol.

3    Q.  And at about what time were police officers able to

4    clear the west terrace?

5    A.  This appears to be 4:30:18 on the p.m.

6         MR. VALENTINI:  We can take this down.  Thank you.

7         Let me pull up the first frame of what has been

8    admitted into evidence as Exhibit 103.

9         THE COURT:  Exhibit what?

10        MR. VALENTINI:  103.

11        MS. JOHNSON:  This has been admitted.  Shall I

12   publish it?

13        MR. VALENTINI:  Yes, it was admitted this morning.

14        THE COURT:  Yes.

15   BY MR. VALENTINI:

16   Q.  Captain Ortega, did you review Exhibit 103 before

17   testifying today?

18   A.  I did.

19   Q.  And what is it?

20   A.  It's a time lapse video of the lower west -- with the

21   inaugural stage, lower west terrace and portion of the east

22   front -- I'm sorry, the west front.

23   Q.  And what is the start time of this video?

24   A.  So it's 12:55:14.

25   Q.  And as of 12:55, are you able to see any barricades in

1      this image?

2      A.  You do, you see barricades.

3      Q.  And do you see any rioters at this point?

4      A.  Not at this point.

5      Q.  And you also see some signs that appear to be affixed to

6      those barricades.  Are those the "Closed Area" signs?

7      A.  That is correct.

8                  (Video recording playing)

9      BY MR. VALENTINI:

10     Q.  I have played this video for about three seconds.  And

11     what time do you see on the time tracker at the bottom right

12     of this exhibit?

13     A.  12:57:34:04.

14     Q.  And what has changed since the last time we stopped this

15     exhibit?

16     A.  Now rioters have entered the restricted parameter.

17     Q.  While the crowd has entered the restricted parameter,

18     you mean the outer parameter, correct?

19     A.  Correct.  They had breached the outer parameter and now

20     you'll see once they're passed that snow fencing they've

21     breached the middle parameter before.

22     Q.  But today you spoke of a third parameter?

23     A.  Correct.

24     Q.  Has the crowd at this point breached that third

25     parameter?

1    A.  They have not.

2              (Video recording playing)

3    BY MR. VALENTINI:

4    Q.  Okay.  I've stopped playing this exhibit about nine

5    seconds into the time lapse.  At nine seconds into the time

6    lapse what is now the time?

7    A.  It is now 1:01:27:14 p.m.

8    Q.  And what has just talked about that third parameter that

9    we were talking about?

10   A.  The rioters have breached that third parameter.

11   Q.  At this point the rioters have breached that last

12   parameter, that third parameter we talked about, but do you

13   see any rioters on the inaugural stage?

14   A.  They have not made their way to the inaugural stage yet,

15   no.

16   Q.  Do you know if ultimately they did?

17   A.  They did.

18             (Video recording playing)

19   BY MR. VALENTINI:

20   Q.  I've now stopped playing this exhibit at about

21   52 seconds into the exhibit.

22             Captain Ortega, it appears what -- can you explain

23   to the jury what the police officers appear to be doing at

24   this point.

25   A.  So at this point they're trying to push the rioters back

1    behind the fence again.  So they're engaging them, and

2    pushing them back, and then putting up fence to put them

3    behind that fence.

4              (Video recording playing)

5    BY MR. VALENTINI:

6    Q.  I have stopped the exhibit about one minute and eight

7    seconds into the exhibit.

8              Does it appear to you that at this point the

9    police officers were successful in creating a police line?

10   A.  We were.

11             (Video recording playing)

12   BY MR. VALENTINI:

13   Q.  And I've now stopped about one minute and 19 seconds

14   into the exhibit.

15             And what is the timestamp at this point?

16   A.  It would be 1:48:32 p.m.

17   Q.  And at this point does the police line appear to be

18   holding?

19   A.  We are still maintaining a police line at this point.

20             (Video recording playing)

21   BY MR. VALENTINI:

22   Q.  And I've now stopped the exhibit at about one minute and

23   37 seconds into the exhibit and I'm going to ask you the

24   same question.

25   A.  At this point we are still maintaining a police line.

1                    (Video recording playing)

2     BY MR. VALENTINI:

3     Q.  And I've now stopped the exhibit at about one minute

4     48 seconds into the exhibit.  And what is the time now?

5     A.  It is now 2:07:31 p.m.

6     Q.  Is the area behind the police line entirely occupied by

7     rioters at this point?

8     A.  Yeah, they are starting to make -- break through our

9     parameter.

10                    (Video recording playing)

11    BY MR. VALENTINI:

12    Q.  I've stopped this exhibit about two minutes and 19

13    seconds into the exhibit.

14                    At this time -- well, first, what time do you see

15    at this point in the exhibit?

16    A.  2:28:16 p.m.

17    Q.  And what did you see happen on the left-hand side of the

18    exhibit?

19    A.  On the left-hand side you'll see the rioters were able

20    to breach the parameter and now they're starting to push the

21    officers back.

22                    (Video recording playing)

23    BY MR. VALENTINI:

24    Q.  I have stopped the exhibit at about two minutes and

25    23 seconds into the exhibit and what time do you see?

1    A.  2:30:47 p.m.

2    Q.  And what has happened right now to the police line that

3    had formed on the west front?

4    A.  The entire police line has collapsed.

5    Q.  But at this point do you see any rioters on the

6    inaugural stage?

7    A.  They have not made their way to the inaugural stage.

8    They are filling up the lower west terrace at this point.

9              (Video recording playing)

10   BY MR. VALENTINI:

11   Q.  I have stopped this exhibit at about two minutes and

12   45 seconds into the exhibit.

13              What has changed since the last time we stopped

14   this exhibit?

15   A.  At this point all the officers have had to fall back and

16   the rioters have now taken over the lower west terrace and

17   now they are starting to take over the inaugural stage.

18   Q.  And what time do you see on the time tracker?

19   A.  It would be 2:45:23 p.m.

20              (Video recording playing)

21   BY MR. VALENTINI:

22   Q.  I have now stopped the exhibit about three minutes into

23   it.  What time tracker do you see?  I'm sorry, what time do

24   you see at this point in the exhibit?

25   A.  2:55:20 p.m.

1     Q.  Is it fair to say that by this point the rioters have

2     completely taken over the inaugural stage as well?

3     A.  It is.

4     Q.  Based on your knowledge of the Capitol grounds and the

5     area, is there anything separating the rioters as they stand

6     on the inaugural stage and the lower west terrace tunnel

7     that we talked about before?

8     A.  There is nothing.  There's nothing separating them.

9              (Video recording playing)

10    BY MR. VALENTINI:

11    Q.  I have stopped the exhibit close to the end of the

12    exhibit, five minutes and five seconds into it.

13             Could you tell us what time you see at this point

14    in the exhibit.

15    A.  Yeah, it says 6 -- I'm sorry, 4:19:22 p.m.

16    Q.  And the last time we stopped the exhibit was about, if I

17    recall correctly, was it about 2:50 p.m.?

18    A.  That sounds about correct.

19    Q.  And by that point the inaugural stage was completely

20    occupied by rioters?

21    A.  That is correct.

22    Q.  And at this point in the exhibit, about 4:20/4:19 p.m.,

23    is the inaugural stage cleared of rioters?

24    A.  It was not.

25    Q.  So rioters were occupying the inaugural stage for at

```
 1    least 90 minutes in the afternoon on January 6, 2021?

 2    A.  That is correct.

 3              MR. VALENTINI:  Could you please take it down at

 4    this point.  Thank you.

 5    BY MR. VALENTINI:

 6    Q.  Sergeant Ortega, let me pull up what has been marked as

 7    Exhibit 130.

 8              Do you see it on your screen?

 9    A.  I do.

10    Q.  Did you review this exhibit before testifying today?

11    A.  I did.

12    Q.  Now you don't know who took this.  Is this exhibit a

13    video, a photograph?  What is it?

14    A.  It's a video.

15    Q.  Do you know who took this video?

16    A.  I do not.

17    Q.  But are you familiar with the Capitol grounds?

18    A.  I am.

19    Q.  And are you familiar with the Capitol grounds as they

20    appeared on January 6th, 2021?

21    A.  I am.

22    Q.  And based on your familiarity with those grounds, are

23    you able to tell whether this video captured the Capitol on

24    -- the Capitol grounds on January 6th, 2021?

25    A.  I can and it did -- it does.
```

1    Q.  And are the events depicted in this video consistent

2    with your memory and understanding of those events on

3    January 6th, 2021?

4    A.  They are.

5         MR. VALENTINI:  Your Honor, the government moves

6    to admit Exhibit 130 into evidence.

7         MR. SMOCK:  No objection.

8         THE COURT:  It will be admitted.

9         MR. VALENTINI:  Permission to publish.  Thank you.

10   BY MR. VALENTINI:

11   Q.  You testified that this video captures events from

12   January 6th?

13   A.  That is correct.

14   Q.  And how can you tell?

15   A.  Specifically what I see in the crowd, in the

16   scaffolding.  What I recollected of that day.

17        MR. VALENTINI:  Let me switch to Exhibit 605,

18   which is already in evidence.

19        THE COURT:  Exhibit what?

20        MR. VALENTINI:  605.

21        THE COURT:  Oh, back to 605.

22   BY MR. VALENTINI:

23   Q.  Using the touchscreen, could you please locate for the

24   jury the area that was depicted in Exhibit 130 on

25   Exhibit 605.

1    A.  Yes, sir.

2             So you're looking at the scaffolding area, so they

3    must have been filming somewhere in this area where the 'X'

4    is.

5    Q.  And this area is already within the restricted parameter

6    that we discussed this morning?

7    A.  That is correct.

8    Q.  All right.

9             MR. VALENTINI:  Let's switch back to Exhibit 130,

10   which is already in evidence.

11            (Video recording playing)

12   BY MR. VALENTINI:

13   Q.  I have stopped playing this exhibit at about 22 seconds

14   into the exhibit.

15            At this point in the exhibit do you see a

16   gentleman wearing a bright blue jacket and sunglasses?

17   A.  I do.

18   Q.  Captain Ortega, do you know this gentleman?

19   A.  I do not know that individual.

20   Q.  You've never met him?

21   A.  I've never met that individual.

22   Q.  Based on your knowledge of the Capitol grounds and the

23   restricted parameter, is the gentleman depicted in the

24   bright blue jacket at 22 seconds into this exhibit already

25   within the restricted parameter that was set up on

```
 1    January 6th, 2021?

 2    A.  That individual is within the restricted parameter.

 3              (Video recording playing)

 4              MR. VALENTINI:  We can take it down, please.

 5    BY MR. VALENTINI:

 6    Q.  Let me show you what has been marked as Exhibit 130.

 7              THE COURT:  Exhibit what?

 8              MR. VALENTINI:  131.

 9    BY MR. VALENTINI:

10    Q.  Are you able to tell us where -- which area this video

11    captures?

12    A.  I can.

13    Q.  Which area is it?

14    A.  So this was the area that was referred to earlier as the

15    northwest stairs and behind that is going to be scaffolding.

16    Q.  And just very broadly, more generally, this is within

17    the Capitol grounds?

18    A.  It is within the Capitol grounds.

19    Q.  And are you able to say when this -- what day this video

20    was recorded?

21    A.  Yeah, January 6th, 2021.

22              MR. VALENTINI:  Okay.  The government moves to

23    admit Exhibit 131 into evidence.

24              MR. SMOCK:  Your Honor, I object.  Without any

25    information about the time of this video and foundation for
```

1        this witness to shoot video.

2               THE COURT:  Objects to the lack of time and date?

3        Is that what Mr. Smock said?

4               MR. SMOCK:  He established the date based on

5        his --

6               THE COURT:  Okay.  But time.

7        BY MR. VALENTINI:

8        Q.  Based on -- do you see -- are you able to tell

9        approximately what time this video was recorded?

10       A.  I cannot tell the time.

11       Q.  Okay.  Are you able to tell whether it was recorded

12       before or after the rioters breached the parameter, the

13       outer parameter surrounding the Capitol on January 6th,

14       2021?

15       A.  So this is after they breached the parameter.

16       Q.  And what area does this video capture?

17       A.  So now they are -- they breached the outer -- they've

18       breached the middle parameter.  This is the northwest steps.

19       They're right near the upper west terrace.

20              So in our previous exhibit where you see them --

21       where you see the rioters breaching the northwest steps,

22       this would be around that time or after it.

23       Q.  Okay.

24              MR. VALENTINI:  Your Honor, we will move to admit

25       Exhibit 131 into evidence.  We believe the witness has

1    sufficiently established the timing of the recording.

2              MR. SMOCK:  Same objection with respect to the

3    time.

4              THE COURT:  Okay.  The objection is overruled.

5    The exhibit will be admitted.

6              The jury can consider this exhibit for what weight

7    it's worth and can decide for itself approximately what time

8    or times and how relevant it is.  That's up to them.

9              MR. VALENTINI:  And we'll play the exhibit until

10   about eight seconds into it.

11             (Video recording playing)

12   BY MR. VALENTINI:

13   Q.  And now that the exhibit has been published to the jury,

14   I will ask you the question I asked you before.

15             Are you able to tell us where within the Capitol

16   does -- what area within the Capitol this video captures?

17   A.  Yes.  This is the area I referred to earlier as the

18   northwest steps.

19   Q.  Okay.  Let me pull up what has been admitted into

20   evidence as Exhibit 605.

21             And I am going to ask you to use the touchscreen

22   to identify the area that is captured in Exhibit 131.

23   A.  It would be this area (indicating) and they would be

24   filming somewhere in the -- in the grassy area.  So where I

25   circled is where you're looking at and where I wrote the 'X'

1    is where it's being filmed from.

2    Q.  And if you could erase the markings at this point.

3    Thank you.

4           And is the areas that you identified closer or

5    farther from the Capitol building --

6    A.  I'm sorry.

7    Q.  -- than the area that we saw a few moments ago in

8    Exhibit 130?

9    A.  We are now closer to the Capitol building.

10   Q.  Okay.  So let's switch back to Exhibit 131.

11          And in Exhibit 130 before, you testified that you

12   saw an individual wearing a bright blue jacket and

13   sunglasses, correct?

14   A.  I did.

15   Q.  Let me play Exhibit 131 until about 30 seconds into the

16   exhibit.

17          (Video recording playing)

18   BY MR. VALENTINI:

19   Q.  I have stopped playing the exhibit about 30 seconds into

20   the exhibit.  And let me ask you a question.

21          Are you able at this point in the exhibit to see a

22   gentleman wearing a bright blue jacket and sunglasses?

23   A.  I do observe that individual, yes.

24   Q.  And could you please -- using the touchscreen, could you

25   please circle that individual.

1     A.   (Witness indicated.)

2     Q.   And you testified a minute ago that the area is captured

3     in Exhibit 131 is closer to the Capitol than the area that

4     was captured in Exhibit 130?

5     A.   That is correct.

6     Q.   Thank you very much.  One more question.

7          Did you see which direction the individual wearing

8     the bright blue jacket and sunglasses was traveling in?

9     A.   Towards the Capitol.

10    Q.   Thank you.

11         (Video recording playing)

12         MR. VALENTINI:  Ms. Johnson, I think we can take

13    the exhibit down.  Thank you.

14    BY MR. VALENTINI:

15    Q.   Let me show you what has been marked as Government

16    Exhibit 132, which is not yet in evidence.

17         Captain Ortega, did you review Exhibit 132 before

18    coming to court today?

19    A.   I did.

20    Q.   Again, you don't know who recorded this particular

21    video?

22    A.   I do not.

23    Q.   But based on your knowledge and memory of the events of

24    January 6th, are you able to tell when this video was

25    recorded?

1    A.  I do know it's from January 6th, 2021.  I do not know a

2    time.

3    Q.  Okay.  Are you able to determine where this video was

4    recorded?

5    A.  I am.

6    Q.  And could you tell us where this video was recorded?

7    A.  So we're looking at the inaugural stage, so it's in that

8    area.

9    Q.  Okay.

10   A.  On the west front of the Capitol.

11          MR. VALENTINI:  The government moves to admit

12   Exhibit 132 into evidence.

13          MR. SMOCK:  Your Honor, same objection with

14   respect to this witness's lack of presence in the area at

15   that time.

16          THE COURT:  I will overrule the objection subject

17   to developing evidence in relation to other evidence at

18   approximately what time this occurred and subject to the

19   jury's right to consider the weight to give it after

20   examination and cross-examination in reviewing the video

21   itself.  So it will be admitted.

22          MR. VALENTINI:  You may publish the exhibit.

23   Thank you.

24   BY MR. VALENTINI:

25   Q.  So before, Captain Ortega, you testified that the crowd,

```
 1    the rioters were initially not on the inaugural stage?

 2    A.  That is correct.

 3    Q.  Do you see -- and they were not in the stadium seating

 4    area surrounding the inaugural stage?

 5    A.  That is correct.

 6    Q.  Do you see any rioters that are in that area at this

 7    point?

 8    A.  I do.

 9    Q.  Do you remember approximately what time you determined

10    that rioters started entering the inaugural stage?

11    A.  I do not recall the time offhand on the video.

12    Q.  But this exhibit, this image will be sometime after

13    those rioters?

14    A.  That's correct.

15              THE COURT:  Sometime after what?

16              MR. VALENTINI:  After the rioters entered the

17    inaugural stage.

18              THE WITNESS:  That would be correct.

19    BY MR. VALENTINI:

20    Q.  I'm going to play the exhibit until about ten seconds

21    into --

22              (Video recording playing)

23              THE COURT:  Stop one second here.  There's a large

24    group depicted here and also some sort of podiums.

25              Where is this relation to the inaugural stage?
```

```
 1                    THE WITNESS:  So we're looking at, Your Honor,

 2       this would be the lower west terrace and then the west front

 3       as well.

 4                    THE COURT:  Okay.  You're looking towards the

 5       inaugural stage?

 6                    THE WITNESS:  So we're facing away from the

 7       inaugural stage.  We're facing towards the west front in

 8       this photo that you see right here.

 9                    THE COURT:  Oh, I see.  No, but the people

10       depicted there, are they -- well, let me put it this way.

11       Is that podium with some people on it facing towards the

12       inaugural stage?

13                    THE WITNESS:  That is correct.

14                    You are referring to this in the center, Your

15       Honor?

16                    THE COURT:  Yes.

17                    THE WITNESS:  Correct.  That's facing the

18       inaugural stage.

19                    THE COURT:  And based on your experience and

20       knowledge, what is that thing?

21                    THE WITNESS:  That is typically used for the

22       media.  During the inauguration they set up cameras there to

23       film the President.

24                    THE COURT:  Okay.  Thank you.

25       BY MR. VALENTINI:
```

1    Q.  And, Captain Ortega, is that structure commonly referred

2    to as the media tower?

3    A.  That is correct.

4    Q.  And does it face the inaugural stage directly?

5    A.  It does.

6         MR. VALENTINI:  Let me go back to the beginning of

7    this exhibit.

8    BY MR. VALENTINI:

9    Q.  Do you see a time tracker zero at the beginning, at the

10   first frame of the exhibit.  Do you see a gentleman wearing

11   a bright blue jacket and sunglasses?

12   A.  I do.

13   Q.  Where is this gentleman positioned and what is he doing?

14   A.  So that he is -- the individual's that's on the seating

15   area of the inaugural stage.  And he's looking over -- or

16   appears to be facing the direction of the bottom, looking at

17   the inaugural stage.

18        MR. VALENTINI:  Let me pull up Exhibit 605, which

19   is already in evidence.

20   BY MR. VALENTINI:

21   Q.  And ask you to please -- let me zoom in first.

22        Captain Ortega, is this the general area where the

23   individual wearing the bright blue jacket was sitting?

24   A.  It is.

25   Q.  And from this area -- let me pull down the zooming.

1                    From this area, would someone have a direct line
2        of sight onto the front, the west front?
3        A.  They would.
4        Q.  So if a crowd of rioters was immediately below someone
5        looking in that area on the west front, that person would be
6        able -- someone standing at that location will have a direct
7        line of sight to those rioters?
8        A.  They would.
9        Q.  See what they were doing?
10       A.  Correct.  They would be able to observe what the rioters
11       were doing.
12                   (Video playing)
13                   MR. VALENTINI:  I'll now stop Exhibit 132 about
14       six seconds into the exhibit.
15       BY MR. VALENTINI:
16       Q.  So this entire scene that is captured now, someone who
17       was standing in the location where the gentleman with the
18       bright blue jacket was sitting would be able to see this
19       area?
20       A.  That is correct.  They would have a very good view of
21       it.
22                   (Video recording playing)
23       BY MR. VALENTINI:
24       Q.  And let's talk about the inaugural stage.
25                   At this point in the exhibit who is on the

```
 1   inaugural stage?

 2   A.  You have police officers there on the top of the

 3   inaugural stage.

 4   Q.  Okay.  But no rioters at this point?

 5   A.  That is correct.

 6   Q.  Okay.

 7            THE COURT:  So if you're about to move to another

 8   video, maybe this would be a good time to take our afternoon

 9   break.

10            MR. VALENTINI:  Certainly.

11            (Recess taken at 3:32 p.m.)

12                    *    *    *    *    *

13       (3:48 p.m.)

14                      IN OPEN COURT

15                    (JURY NOT PRESENT)

16            THE COURT:  All right, everyone.  We'll get the

17   jury.

18                    *    *    *    *    *

19       (3:55 p.m.)

20                      IN OPEN COURT

21                    (JURY PRESENT)

22            THE COURT:  Everybody here?  Okay.  Everybody may

23   be seated.  And you may continue.

24   BY MR. VALENTINI:

25   Q.  Captain Ortega --
```

```
 1                   COURT REPORTER:  Could you turn on your

 2    microphone, please.

 3                   MR. VALENTINI:  Of course.

 4    BY MR. VALENTINI:

 5    Q.  Captain Ortega, let me return to Exhibit 133.

 6                   (Video recording playing)

 7                   MR. VALENTINI:  And specifically the first frame

 8    in that exhibit.

 9    BY MR. VALENTINI:

10    Q.  All right.  Let's return to Exhibit 132 we were just

11    looking at a minute ago, the first frame in particular.

12                   By the time of this first frame in Exhibit 132,

13    there were already rioters on the inaugural stage?

14    A.  That's correct.

15    Q.  Or at least in the standings surrounding the inaugural

16    stage itself?

17    A.  That's correct.

18    Q.  Now let me return to Exhibit 103.

19                   THE COURT:  Exhibit what?

20                   MR. VALENTINI:  103.  The time lapse exhibit that

21    we looked at before.  Ms. Johnson, oh, thank you.

22    BY MR. VALENTINI:

23    Q.  And let's look in particular at minute 2:34 in the time

24    track.  In fact, let's look at minute 2:22 on the time

25    tracker.
```

1          What timestamp do you see at that point?

2    A.  It's 2:30:18 seconds p.m.

3    Q.  At this time there's not rioters on the inaugural stage?

4    A.  That's correct.

5    Q.  You don't see any rioters on the seating around?

6    A.  Can you repeat that last part.

7    Q.  Do you see any rioters on the seating?

8    A.  I do the no see any rioters on the seating.

9    Q.  Let me play the exhibit.

10          (Video recording playing)

11   BY MR. VALENTINI:

12   Q.  Until about 2:38.

13          At this point, 2:36.  At 2:36 p.m. according to

14   the exhibit, also there were no rioters on the stadium

15   seating surrounding the inaugural stage?

16   A.  That is correct.

17   Q.  The gentleman in the blue jacket was on the stadium

18   seating surrounding the inaugural stage as we saw in

19   Exhibit 132?

20   A.  That's correct.

21   Q.  So that exhibit was necessarily after the image captured

22   here at 2:30 on Exhibit 103?

23   A.  That is correct.

24          MR. VALENTINI:  And I am going to pull up

25   Exhibit 100.1, which is already in evidence.

1    BY MR. VALENTINI:

2    Q.  Let me show you.

3              (Video playing)

4    BY MR. VALENTINI:

5    Q.  I have stopped the exhibit at 2:42:30 p.m. in

6    Exhibit 100.1.

7              Captain Ortega, do you see a gentleman wearing a

8    bright blue jacket in this exhibit?

9    A.  I do.

10   Q.  And where -- what area does this exhibit capture?

11   A.  So he is just underneath the lower west terrace tunnel.

12   Q.  And this area is closer to the Capitol building than the

13   stadium seating that we were looking at before in

14   Exhibit 132?

15   A.  That is correct.

16   Q.  So by 2:42:30 this gentleman wearing the bright blue

17   jacket was at the Capitol building, but we saw in

18   Exhibit 132 that at that point he was still on the stadium

19   area?

20   A.  That is correct.

21   Q.  And we know that that image was after 2:36 p.m.?

22             MR. SMOCK:  Objection.

23             THE COURT:  Sustained.  It's leading.

24   BY MR. VALENTINI:

25   Q.  Based on the exhibits that you have looked at, are you

```
 1    able to determine the approximate time frame -- timeline of

 2    when the gentleman in the bright blue jacket was in the

 3    stadium seating area?

 4    A.  I would say it would be between those two times.

 5              MR. VALENTINI:  We can pull down this exhibit.

 6    BY MR. VALENTINI:

 7    Q.  Captain Ortega, I am going to show you what has been

 8    marked as Exhibit 133.

 9              THE COURT:  Exhibit what?

10              MR. VALENTINI:  133.

11    BY MR. VALENTINI:

12    Q.  Captain Ortega, did you review this exhibit before

13    coming to court today?

14    A.  I did.

15    Q.  Again, you don't know who took this video?

16    A.  I do not.

17    Q.  But are you able to determine which day this video was

18    recorded on?

19    A.  I am.  January 6th, 2021.

20    Q.  And are you able to determine which area this video

21    captures?

22    A.  I am.

23    Q.  What area is that?

24    A.  The west front, lower west -- specifically the lower

25    west terrace.
```

```
1    Q.  Let me play a few seconds of this exhibit.

2              (Video recording playing)

3    BY MR. VALENTINI:

4    Q.  Based on the location of the officers on this exhibit,

5    are you able to determine approximately at what time this

6    video was recorded?

7    A.  It was prior to the rioters taking over the inaugural

8    stage.

9              MR. VALENTINI:  Your Honor, the government moves

10   to admit Exhibit 133 into evidence.

11             MR. SMOCK:  Same objection as to authentication.

12   This witness was NOT PRESENT in the area --

13             THE COURT:  Say that again in a microphone.

14             MR. SMOCK:  It's an objection as to authentication

15   because the witness was NOT PRESENT in the area at the time.

16             THE COURT:  Okay.  Because your earlier objections

17   had to do with the -- some of them had to do with the

18   question of whether the time of the video could be

19   established, but this is an objection based on the fact that

20   he was not area at the time.

21             I will overrule that objection.  The jury will see

22   whether any of the portion of this video shows defendant or

23   not.

24             MR. VALENTINI:  May we proceed?

25             THE COURT:  All right.  It's admitted over
```

1      objection.

2                  MR. VALENTINI:  Thank you.

3                  I will play this exhibit until about nine seconds

4      into the exhibit.

5                  (Video recording playing)

6      BY MR. VALENTINI:

7      Q.  Captain Ortega, are you able to see a gentleman wearing

8      a bright blue jacket at this point in this exhibit?

9      A.  I am.

10     Q.  And where is that person located?

11     A.  They are still on the seating area.  They are now --

12     would you like me to circle the screen?

13     Q.  That would be helpful.  Thank you.

14     A.  They are behind the -- looking now into that pillar

15     area, like, there's an opening.  He's looking over and

16     looking under it.

17     Q.  Let me pull up Exhibit 605, which is already in

18     evidence.  Let me zoom in.

19                  Captain Ortega, are you able to identify for the

20     jury more precisely where the gentleman wearing the bright

21     blue jacket was at that time about nine seconds into

22     Exhibit 133?

23     A.  It's around this area.

24     Q.  If you could erase the marking, please.

25                  Are you personally familiar with that area?

1    A.  I am.

2    Q.  Were you in that area on January 6th?

3    A.  I was.

4    Q.  At what point were you in that area?

5    A.  I was there until the group had breached the upper west

6    terrace area.

7    Q.  If we can return to Exhibit 133, which is now in

8    evidence.

9         And I'm going to play the exhibit until about one

10   minute and 40 seconds into the exhibit.

11        (Video recording playing)

12   BY MR. VALENTINI:

13   Q.  Okay.  Let me stop 17 seconds into the exhibit.

14        You still see a gentleman wearing a bright blue

15   jacket and sunglasses at this point in the exhibit?

16   A.  I've seen him.  Yes, sir.

17   Q.  And from that location would someone have a direct line

18   of sight to the inaugural stage?

19   A.  They would.

20   Q.  And would someone have a direct line of sight to the

21   west front?

22   A.  They would.

23   Q.  And would someone have a direct line of sight to the

24   media tower?

25   A.  They would.

```
 1                   (Video recording playing)

 2    BY MR. VALENTINI:

 3    Q.  I've stopped the exhibit about one minute and 40 seconds

 4    into it.

 5              This frame in the exhibit, do you see the

 6    gentleman wearing the bright blue jacket in the frame?

 7    A.  I do.

 8    Q.  Where is he located?

 9    A.  In the same area as before.  He's now leaning over

10    looking down at the inaugural stage.

11    Q.  So by then -- by now the gentleman in the bright blue

12    jacket has a direct line of sight and is actually looking

13    down on the inaugural stage?

14    A.  That is correct.

15                   (Video recording playing)

16    BY MR. VALENTINI:

17    Q.  And I've stopped the exhibit about one minute and eight

18    seconds into it.

19              What appears to be happening down on the west

20    front?

21    A.  The rioters have -- now are taking over the lower west

22    terrace and the officers are now retreating up to the

23    inaugural stage.

24    Q.  And someone standing on the structure that we just

25    talked about where the gentlemen with the bright blue jacket
```

1    was standing, that person would have a direct site on the --

2    line of sight on the officer's retreating?

3    A.  That is correct.  They would.

4              (Video recording playing)

5              MR. VALENTINI:  Let me take the exhibit down, Ms.

6    Johnson.  Thank you.

7              Let me pull up what has been marked as

8    Exhibit 134.

9    BY MR. VALENTINI:

10   Q.  Captain Ortega, did you review this photograph that has

11   been marked as Government Exhibit 134 before coming to court

12   today?

13   A.  I did.

14   Q.  And you don't know who specifically took this

15   photograph?

16   A.  I do not.

17   Q.  But does this photograph appear to capture the events --

18   well, are you able to tell which day this photograph was

19   taken?

20   A.  I am.

21   Q.  Are you able to tell where it was taken?

22   A.  I am.

23   Q.  Which area was it?  Where was it taken?

24   A.  This is lower west terrace looking up at the inaugural

25   stage, specifically the seating area.

1    Q.  And when was it taken?

2    A.  January 6th, 2021.

3              MR. VALENTINI:  The government moves to admit

4    Exhibit 134 into evidence.

5              MR. SMOCK:  Same objection?

6              THE COURT:  Same objection.  Overruled.

7    BY MR. VALENTINI:

8    Q.  Captain Ortega, let me zoom into the portion of the

9    exhibit.

10             Are you able to see a gentleman wearing a bright

11   blue jacket in the exhibit?

12   A.  I am.

13   Q.  Is he also wearing any sunglasses?

14   A.  He is.

15   Q.  And where does he appear to be located?

16   A.  So he's on the inaugural stage closer -- there's stairs

17   on there and he's on the stairs.

18   Q.  And which direction is this gentleman facing?

19   A.  He's facing towards the bottom of the inaugural stage,

20   so towards the bottom of the inaugural stage.

21   Q.  And is this photograph consistent with the gentleman

22   wearing the bright blue jacket walking down the stairs

23   towards the inaugural stage?

24   A.  It is.

25   Q.  And approximately how far is the gentleman wearing the

1    bright blue jacket from the location where the gentleman

2    wearing the bright blue jacket was located in the previous

3    exhibit we reviewed?

4    A.  I'd say about 20 feet or so.

5              MR. VALENTINI:  We may take the exhibit down.

6    BY MR. VALENTINI:

7    Q.  So is it fair to say that between Exhibit 133 and 134

8    the gentleman in the bright blue jacket has moved closer to

9    the Capitol building?

10   A.  That is correct.  He --

11   Q.  Close -- please finish.

12   A.  That is correct.  He is moving closer to the Capitol.

13             MR. VALENTINI:  Let me pull up what's been marked

14   as Exhibit 135.1.

15             (Video recording playing)

16   BY MR. VALENTINI:

17   Q.  Captain Ortega, did you review Exhibit 135.1 before

18   coming to court today?

19   A.  I did.

20   Q.  And, again, is it a video or a photograph?

21   A.  This would be video.

22   Q.  Okay.

23             THE COURT:  It's a what?

24             THE WITNESS:  Video, sir.

25             THE COURT:  Video not a photograph, 135.1, is

1    that --

2                MR. VALENTINI:  135.1, correct, Your Honor.

3    BY MR. VALENTINI:

4    Q.  And do you know who took this video?

5    A.  I do not.

6    Q.  Are you able to determine where this video was recorded?

7    A.  I am.

8    Q.  And where was it recorded?

9    A.  This was recorded on the inaugural stage right outside

10   of the lower west terrace tunnel.

11   Q.  And are you able to determine when the video was

12   recorded?

13   A.  I am.  January 6th, 2021.

14   Q.  Was this video -- are you able to determine whether this

15   video was recorded before 2:38 p.m. or after 2:38 p.m.?

16   A.  After.

17   Q.  Are you able to determine whether this video was

18   recorded before 2:43 p.m. or after 2:43 p.m.?

19   A.  This would be after.

20   Q.  How do you know it was after?

21   A.  At this point the officers are no longer on the

22   inaugural stage and you have the crowd right outside the

23   lower west terrace tunnel.

24   Q.  Okay.

25               MR. VALENTINI:  Your Honor, the government moves

1          to admit Exhibit 135.1 into evidence.

2                    MR. SMOCK:  Same objection, Your Honor.

3                    THE COURT:  So let me -- I have a question I want

4          to ask counsel.

5                    (At sidebar.)

6                    THE COURT:  So actually I have two questions.

7                    One is it's described on the exhibit list as Will

8          Allen-Du-Praw footage.

9                    What does that mean and is that something that's

10         going to be conveyed to the jury in some way?

11                   MR. DREHER:  I believe there's -- just the name,

12         the particular name.  I think it's like a watermark in the

13         back of the exhibit but it doesn't have any significant

14         meaning to it other than maybe the person who shot it or the

15         person who published.

16                   THE COURT:  And the next question is, am I right

17         that this is almost an hour long?

18                   MR. VALENTINI:  No, no, no, no.

19                   THE COURT:  It goes from 10:35 to 11:35.

20                   MR. VALENTINI:  No.

21                   THE COURT:  This is just an excerpt?

22                   MR. VALENTINI:  Yes, it's about 40 seconds.

23                   MR. SMOCK:  A minute and a half.

24                   THE COURT:  Oh, it's about a minute and a half.

25         Okay.

1          MR. VALENTINI:  Yeah.

2          THE COURT:  The reason I've raised that having see

3    that as I had the point made earlier that with respect to

4    videos that you're going to have to show relevance.

5          MR. VALENTINI:  Okay.

6          THE COURT:  And if it was -- if it was almost an

7    hour long I'm going to give Mr. Smock an opportunity.  But

8    it's only a minute and a half and he's viewed it.  If he's

9    got an objection similar to his earlier objections, I'll

10   overrule that objection now I understand that it's only a

11   minute and a half and I think this witness has laid the

12   foundation with respect to the objection.

13         MR. SMOCK:  Thank you.

14         THE COURT:  Objection's are preserved.

15         MR. SMOCK:  Thank you.

16         MR. VALENTINI:  Thank you.

17         (In open court.)

18         THE COURT:  Thank you to both counsel for

19   clarifying and I will overrule the objection and admit

20   Exhibit 135.1.

21         MR. VALENTINI:  I'm going to play this

22   Exhibit 135.1 until about one minute and four seconds into

23   the exhibit.  I'm sorry, strike that.  I'm just going to

24   play the entirety of the 49 seconds of the exhibit.

25         (Video recording playing)

```
 1                    MR. VALENTINI:  Let me just --

 2                    THE COURT:  What were -- are you going back to the

 3       same thing?  What is -- is that a doorway in the center in

 4       the picture in the back?

 5                    THE WITNESS:  Excuse me, Your Honor?

 6                    THE COURT:  In the center of the picture of the

 7       back as you stopped the video now, there's sort of a doorway

 8       or an archway or something, and I wonder if you could tell

 9       us where we are and what that is.

10                    THE WITNESS:  So that would be the lower west

11       terrace tunnel, Your Honor.

12                    If you go in there you would be -- you would enter

13       into the lower west terrace door.

14                    MR. VALENTINI:  And I'm going to pull up

15       Exhibit 605, which is already in evidence.

16                    Could we discontinue publishing for a second?

17       Thank you.

18                    And, Ms. Johnson, can we resume publishing,

19       please.

20       BY MR. VALENTINI:

21       Q.  And, Captain Ortega, just a second ago you answered the

22       Judge's question about where the frame in Exhibit 135.1

23       which frame it was capturing.

24       A.  Mm-hmm.

25       Q.  Which location it was capturing.  Could you please
```

```
1     identify that location on Exhibit 605 for the jury.

2     A.  Yes, sir.  It's where I'm circling, it would be the

3     tunnel to the entrance of the lower west terrace door.

4     Q.  So this general area?

5     A.  That is correct.

6               THE COURT:  And where does it lead to?

7               THE WITNESS:  The lower west terrace door, Your

8     Honor.

9     BY MR. VALENTINI:

10    Q.  And if you were to walk from the inaugural stage into

11    the lower west terrace door, where would you end up within

12    the Capitol?

13    A.  You'd be on the basement level of the U.S. Capitol.

14              MR. VALENTINI:  Let me switch back to

15    Exhibit 135.1.

16    BY MR. VALENTINI:

17    Q.  So in the first frame of this exhibit do you see a

18    gentleman wearing a bright blue jacket?

19    A.  I do.

20    Q.  And wearing sunglasses?

21    A.  I do.

22    Q.  And earlier in Exhibit 134 we saw a gentleman wearing a

23    bright blue jacket and sunglasses.  Do you remember that?

24    A.  That's correct.

25    Q.  And at what point where was he?
```

1    A.  That individual was initially on the inaugural stage and

2    in the seating area.  And now it appears the individual's

3    made their way to the lower west terrace tunnel.

4    Q.  So has this individual moved closer to the Capitol

5    building?

6    A.  The individual has come closer to the Capitol building,

7    yes.

8            MR. VALENTINI:  You may take the exhibit down, Ms.

9    Johnson.  Thank you.

10           Let me pull up what has been marked as

11   Exhibit 136, which is not yet in evidence.  Let me apply a

12   view second of the exhibit.

13           (Video recording playing)

14           MR. VALENTINI:  In fact, let me play a few seconds

15   of the exhibit starting after time mark 40 seconds into the

16   exhibit, only starting after time mark 40 seconds into the

17   exhibit.

18           (Video recording playing)

19   BY MR. VALENTINI:

20   Q.  Captain Ortega, did you review Exhibit 136 before coming

21   to court today?

22   A.  I did.

23   Q.  And, again, do you know -- are you able to determine

24   which -- what area it captures?

25   A.  I am, it's -- it's on the inaugural stage facing into

1    the lower west terrace tunnel.

2    Q.  Okay.  So is that the same lower west terrace tunnel

3    that we've talked about in the previous exhibit?

4    A.  It is.

5    Q.  And are you able to determine on what day this video was

6    recorded?

7    A.  January 6th, 2021.

8    Q.  Are you able to determine at approximately what time the

9    video was recorded?

10   A.  Not the exact time but approximately -- I don't have the

11   approximate time but it is in between the exhibits we looked

12   at, which I can't recall the exact time right now.

13            MR. VALENTINI:  Okay.  The government moves to

14   admit Exhibit 136 into evidence.

15            MR. SMOCK:  Same objection, Your Honor.

16            THE COURT:  Overruled.  Thanks.

17            It will be admitted over objection.

18            MS. JOHNSON:  You said 136?

19            MR. VALENTINI:  136, yes.

20   BY MR. VALENTINI:

21   Q.  And I'm going to start playing this exhibit at

22   timestamp, approximately, 40 seconds into the exhibit.

23            (Video recording playing)

24   BY MR. VALENTINI:

25   Q.  And I've stopped the exhibit about 57 seconds into it.

```
1                    Captain Ortega, were you able to determine what is
2        happening in the lower west terrace tunnel area at this
3        point?
4        A.  Yeah.  Now you see the rioters are now entering the
5        lower west terrace tunnel.
6        Q.  And at the beginning of the portion of this exhibit that
7        we just played, the rioters were not yet in that area?
8        A.  Correct.
9        Q.  And at this point are there any officers in the general
10       area surrounding the lower west terrace tunnel?
11       A.  You do not see them in this frame.
12                    (Video recording playing)
13       BY MR. VALENTINI:
14       Q.  Now I'll stop the exhibit at about one minute and
15       16 seconds into the exhibit.
16                    Are there -- do you see any officers at this point
17       within the lower west terrace?
18       A.  I do not.
19       Q.  There were officers before in the prior exhibits that we
20       saw?
21       A.  That is correct.
22       Q.  -- in that area.  So would this exhibit capture a moment
23       after the officers have retreated into the lower west
24       terrace?
25       A.  It would.
```

```
 1                      (Video recording playing)
 2      BY MR. VALENTINI:
 3      Q.  I've stopped the video about one minute and 30 seconds
 4      into the exhibit.
 5                  Captain Ortega, do you see a set of doors at this
 6      point?
 7      A.  I do.
 8      Q.  Could you please describe where those doors are in this
 9      area.
10      A.  So inside the lower west tunnel you have one set of
11      outer doors, two different -- and they're double doors.
12      Rioters were able to break through those and then they get
13      to the second set of doors and it's another set of double
14      doors and they open those up as well.
15                  THE COURT:  Can you tell, did this excerpt show
16      them entering the first set, the second set or both?
17                  THE WITNESS:  They entered both set of doors in
18      this video.
19      BY MR. VALENTINI:
20      Q.  And at this particular point in time of one minute and
21      36 seconds into the exhibit, are you able to see both sets
22      of doors within the frame or only one set?
23      A.  You can see both sets of doors in the frame.
24      Q.  And, Captain Ortega, I realize this might -- looks a
25      little bit small, but if you look past the second set of
```

```
 1    doors at this point in the exhibit, what do you see?

 2    A.  Police officers holding riot shields.

 3              (Video recording playing)

 4    BY MR. VALENTINI:

 5    Q.  Let me ask you this:  Do you know if these doors have

 6    glass insets?  Do you know if they have glass?

 7    A.  They have glass, they do.  The first set of doors they

 8    were able to break through the glass and that's how they

 9    were able to open the doors.

10              (Video recording playing)

11    BY MR. VALENTINI:

12    Q.  And I have stopped the exhibit about one minute and

13    55 seconds into the exhibit.

14              Are you able to see a gentleman on the left-hand

15    side of the exhibit?

16    A.  I am.

17    Q.  Does this gentleman appear to be wearing a bright blue

18    jacket and sunglasses?

19    A.  He is.

20    Q.  And do you see any fighting happening in that general

21    area?

22    A.  I do.  There is an individual is utilizing flagpoles to

23    hit officers.

24    Q.  And how far do you estimate based on your knowledge of

25    the Capitol area and the Capitol ground, is the gentleman
```

1      from the bright blue jacket from the fighting?

2      A.  He is within arms reach, else right there.

3                  THE COURT:  Within arm's reach of what?

4                  THE WITNESS:  The individual using the flagpole to

5      smash the officers.

6      BY MR. VALENTINI:

7      Q.  And does the gentleman in the bright blue jacket and

8      sunglasses have a direct line of sight to the fighting?

9      A.  He does.

10                 MR. SMOCK:  Objection, Your Honor.

11                 THE COURT:  Yes, that calls for a conclusion.

12     Calls for a conclusion.

13                 But let me ask you for clarification purposes.  Is

14     this -- you've described two sets of doors, an outer set of

15     doors and an inner set of doors.

16                 Can you place for us where this particular frame

17     that's currently on the screen is that shows a gentleman in

18     a bright blue jacket on the left?

19                 THE WITNESS:  Yes, Your Honor.  The individual

20     with the sunglasses and jacket is now in the second set of

21     doors.

22     BY MR. VALENTINI:

23     Q.  And this frame that we just referenced is at time

24     tracker one minute and 54 seconds into the exhibit.

25                 (Video recording playing).

```
 1                    MR. VALENTINI:  We may take it down.  Ms. Johnson,
 2      will you stop publishing.  Thank you.
 3      BY MR. VALENTINI:
 4      Q.  Let me pull up what has been admitted into evidence as
 5      Exhibit 100.1.
 6                    We talked about this before, but what is the
 7      general area that is captured by this -- in this video?
 8      A.  This camera is capturing the inside of the lower west
 9      terrace tunnel.
10      Q.  This is one of the Capitol Police surveillance cameras?
11      A.  It is.
12      Q.  And what is the timestamp in the first frame of this
13      exhibit?
14      A.  2:40:02 p.m.
15      Q.  And do you see any rioters in the lower west terrace
16      tunnel at this point?
17      A.  I do not.
18      Q.  What do you see?
19      A.  I see police officers standing in the lower west terrace
20      tunnel.
21                    (Video recording playing)
22      BY MR. VALENTINI:
23      Q.  I've played about 55 seconds into the exhibit.
24                    Over this 55 seconds, are officers traveling away
25      from the Capitol or back into the Capitol?
```

1    A.  The officers are now traveling into the Capitol.

2    Q.  Do you have an understanding of why that is?

3    A.  They have lost ground and the rioters have now taken

4    over the inaugural stage.

5    Q.  Do you see any rioters within this particular camera's

6    field of view?

7    A.  I do.

8    Q.  And have any rioters crossed into the archway on the

9    outside of lower west terrace tunnel?

10   A.  Not in this frame.

11   Q.  And what time is it now?

12   A.  This is 2:40:56 seconds p.m.

13   Q.  I'm going to ask you to please raise your hand or tell

14   me to stop when you see a riot first cross that archway?

15   A.  Okay.  (Indicating).  Right there.

16   Q.  I see you have raised your hand, Captain Ortega.

17         Do you see a rioter crossing into the archway at

18   this point?

19   A.  I do.

20   Q.  And what is the timestamp?

21   A.  2:41:02 seconds p.m.

22         (Video recording playing)

23   BY MR. VALENTINI:

24   Q.  Let me stop for a second.  Do you see anything on the

25   ledge inside the tunnel?

1    A.  Just -- are you referring to the right side?

2    Q.  Yes, the right side.

3    A.  I see water bottles, I see paper, yeah.

4    Q.  Based on your understanding of the events of

5    January 6th, do you have an understanding of what purpose

6    those water bottles served?

7    A.  Yes.  The water bottles were used to decontaminate the

8    eyes of our officers that had different chemicals sprayed

9    into them.

10                   (Video recording playing)

11   BY MR. VALENTINI:

12   Q.  Let me stop the exhibit at this point.  What timestamp

13   do you see at this point?

14   A.  2:41:52 seconds p.m.

15   Q.  And do you recall before what was the timestamp when you

16   said the first rioter crossed through the archway of the

17   lower west terrace tunnel?

18   A.  Yeah, it was 2:41.  I don't recall the exact seconds.

19   Q.  But it was 2:41?

20   A.  Yes.

21   Q.  At this point do you see a gentleman wearing a bright

22   blue jacket in this frame?

23   A.  I do.

24   Q.  Could you use the touchscreen to circle this gentleman

25   for the jury.

1    A.  (Indicating).

2    Q.  So this would be within one minute of the first rioter

3    crossing the archway into the lower west terrace tunnel?

4    A.  That is correct.

5    Q.  If you could please erase the marking.

6              (Video recording playing)

7    BY MR. VALENTINI:

8    Q.  I have stopped the exhibit at -- well, what time stamp

9    do you see Captain Ortega?

10   A.  2:42:13 seconds p.m.

11   Q.  Is the gentleman wearing the bright blue jacket still

12   within the frame of this exhibit?

13   A.  He is.

14   Q.  And which direction has the gentleman moved compared to

15   the last time we stopped the exhibit?

16   A.  He is now getting closer to the doors in the lower west

17   terrace tunnel.

18              (Video recording playing)

19   BY MR. VALENTINI:

20   Q.  I've stopped the exhibit at about 2:42:30 p.m.

21              Is the gentleman in the bright blue jacket still

22   within the frame of this exhibit?

23   A.  He is.

24              MR. VALENTINI:  And if we can take down the

25   exhibit for a second.

```
 1                   I'm going to switch to what has been marked as
 2      Exhibit 136.
 3                   MR. VALENTINI:  Brief indulgence.
 4                   (Counsel confer)
 5                   MR. VALENTINI:  I'm sorry.
 6                   We're going to switch to Exhibit 137, which is
 7      also not in evidence.
 8                   MS. JOHNSON:  Is not in evidence?
 9                   THE COURT:  137 is not yet in evidence, right.
10                   MS. JOHNSON:  Okay.
11                   (Video recording playing)
12      BY MR. VALENTINI:
13      Q.  Captain Ortega, prior to coming to court today, did you
14      review Exhibit 137?
15      A.  I did.
16      Q.  And are you able to determine when -- or well, is it a
17      video or a photograph?
18      A.  It is a video.
19      Q.  And are you able to determine when it was recorded?
20      A.  January 6th, 2021.
21      Q.  And are you able to determine what general area it
22      depicts?
23      A.  Yes.  That would be inside the tunnel, the lower west
24      terrace.
25                   THE COURT:  Inside what?
```

1                    THE WITNESS:  The tunnel of the lower west

2        terrace.

3        BY MR. VALENTINI:

4        Q.  And are you able to determine whether it was before or

5        after the rioters took over the lower west terrace tunnel?

6        A.  This would be after.

7                    MR. VALENTINI:  Okay.  The government moves to

8        admit Exhibit 137 into evidence.

9                    MR. SMOCK:  Same objection, Your Honor.

10                   THE COURT:  I'll overrule the objection and admit

11       the evidence.  Exhibit 137 is admitted.

12                   And you don't know who took this video I take it,

13       is that correct?

14                   THE WITNESS:  Could you repeat, Your Honor?

15                   THE COURT:  You do not know who took this video?

16                   THE WITNESS:  I do not know who took this video,

17       Your Honor.

18                   THE COURT:  All right.

19                   (Video recording playing)

20       BY MR. VALENTINI:

21       Q.  The prior exhibit -- in a prior exhibit, 136, you -- we

22       saw the double doors both being opened at the same time?

23       A.  That is correct.

24       Q.  Are the double doors opened at the same time in this

25       exhibit at this point?

1     A.  At this point, no.  Only the first set of doors is --

2     the door on the left is being opened right now.

3     Q.  And does the glass in the left-hand pane of the window

4     look intact at this point?

5     A.  It is not.  It has been broken through.

6                 (Video recording playing)

7     BY MR. VALENTINI:

8     Q.  And I've stopped the exhibit at about 18 seconds into

9     this exhibit.

10                Are you able to see a gentleman wearing a bright

11    blue jacket at this point in the exhibit?

12    A.  I am.

13    Q.  Which direction is it looking?

14    A.  He is going -- he is looking towards the doors going

15    towards the Capitol.

16    Q.  Would someone standing in that position have a direct

17    sight to the double doors?

18                MR. SMOCK:  Objection --

19                THE COURT:  Sustained.  The jury can view the

20    video and make its own conclusions.

21                (Video recording playing)

22    BY MR. VALENTINI:

23    Q.  And I've stopped the exhibit at about 24 seconds into

24    it.

25                Which direction, well, do you see -- do you see a

1    gentleman wearing a bright blue jacket at this point in the

2    exhibit?

3    A.  I do.

4    Q.  Which direction is he facing?

5    A.  Facing in towards the doors of the lower west terrace.

6           (Video recording playing)

7    BY MR. VALENTINI:

8    Q.  And I've stopped the exhibit about 49 seconds into the

9    exhibit.

10          Has the gentleman with the bright blue jacket and

11   sunglasses moved closer to the Capitol building or away from

12   the Capitol building?

13          MR. SMOCK:  Your Honor, I'm going to object to

14   this line of questioning.

15          This witness is not present, the data speaks for

16   itself.  I have no objection to it being played but the

17   narrative from a witness who wasn't present --

18          THE COURT:  I'll permit it.

19          The question I think -- let me rephrase his

20   question.

21          At this point, the group of people pictured here,

22   are they between the outer doors and the inner doors?

23          THE WITNESS:  That's correct, Your Honor.

24          THE COURT:  So, all right.  Go ahead.

25   BY MR. VALENTINI:

1    Q.  And based on your knowledge of the layout of the Capitol

2    building in this area in particular, how much space is there

3    between the outer doors and the inner doors?

4    A.  There is not much.  It would be less than four feet.

5    It's very close.

6              (Video recording playing)

7    BY MR. VALENTINI:

8    Q.  And right now could you tell -- could you tell the jury

9    what the timestamp is at this point?

10   A.  52 seconds into the video.

11             (Video recording playing)

12             MR. VALENTINI:  Let me take down the exhibit.  Ms.

13   Johnson, can we please stop publishing?  Thank you.

14   BY MR. VALENTINI:

15   Q.  Let me pull up what's been marked as Exhibit 138.

16             MR. VALENTINI:  Actually, Your Honor, could we

17   have a brief sidebar?

18             THE COURT:  Pardon me?

19             MR. VALENTINI:  A brief sidebar?

20             THE COURT:  Yeah.

21             (At sidebar.)

22             MR. VALENTINI:  Maybe this doesn't require a

23   sidebar but this exhibit is about seven minutes long and I

24   was wondering because of I know you indicated you want to

25   let the jury go by 5:00, I just didn't want to say this

1    before the jury, it's completely up to you, Your Honor, I

2    just wanted to flag that.

3            THE COURT:  I think the concern, we can double

4    check this, is that the Court's American Sign Language

5    interpreters have a hard stop at 5:00.  So it's not so much

6    the jury as the -- as the interpreters.

7            So the question is, you've got about 18 minutes if

8    you wanted to discuss this exhibit in about 18 minutes or we

9    can just leave a little early and come back Monday morning.

10           MR. DREHER:  I understand at this point, is there

11   an objection to this exhibit?

12           MR. SMOCK:  This is the same continuing objection.

13           MR. VALENTINI:  But nothing beyond that?

14           MS. GOETZL:  What exhibit is this?

15           THE COURT:  138.

16           MS. GOETZL:  This is one of the exhibits that we

17   had objected to and asked you to watch.

18           THE COURT:  Oh, yes.  That's what I thought.

19           MR. VALENTINI:  That's why I was asking.

20           THE COURT:  When I heard the number I thought that

21   was one of the ones that -- thanks, Celia, I think that's

22   one of the ones that I need to watch.

23           So maybe we should break and we should -- if you

24   all would be here at 9:30 I would tell them come around 9:30

25   too.  And if they have to wait a little bit because some of

1    them may be a little late with transportation issues and

2    getting in.  Jurors get into the building faster than most

3    people but it's been tough.

4          So, okay.  Why don't we do that.  I'll give them

5    my cautionary instruction.

6          MR. VALENTINI:  Thank you.

7          (In open court.)

8          THE COURT:  So I think, Captain Ortega, we're

9    going to let you go for the weekend and let everyone else go

10   for the weekend too, and resume Monday morning.

11         So if you want to step down, I just have a few

12   things to say to the jury.

13         THE WITNESS:  Thank you, Your Honor.

14         THE COURT:  We'll see you Monday.

15         I had told you we were going to try to stop by

16   5:00 every day and it could be a few minutes after some

17   days, but we'll be a few minutes earlier other days.

18         So there are more videos, I think, and then there

19   will be cross-examination of this witness by the defense

20   side.  But we're underway and you've heard part of this

21   first witness and we're going to take our break over the

22   weekend but, I know I sound like a broken record, but I'm

23   going to remind you not to discuss the case with anyone over

24   the weekend.  You may see -- you will see friends, perhaps,

25   you may see family, don't discuss it with friends, spouses,

1    partners, people you come into contact with over the weekend

2    or socialize over the weekend.

3            And don't let anybody talk to you about the case

4    or try to draw you into conversation about what's going on

5    in the trial.

6            So if everyone talks to you or tries to talk to

7    you, tell them you can't discuss it.  If anyone attempts to

8    discuss the case with you or, again, if you overhear

9    anything coming into the courthouse, in the cafeteria, in

10   the corridors, walk away.

11           If anything like that happens tell Ms. Johnson on

12   Monday morning, but don't tell your fellow jurors.

13           And don't go on any social media.  Don't watch

14   anything, listen to anything, do any independent research,

15   Google, use Twitter, iPhone, text messaging, Instagram,

16   YouTube, Facebook, et cetera, et cetera, et cetera.

17           And other than that, have a good weekend.  And try

18   to get here around 9:30.  I'm going to meet with the lawyers

19   at 9:30.  We might be able to start with you at quarter to

20   10:00 if everyone's here or certainly at 10:00 at the

21   latest, but we can't start until everyone's here so aim for

22   9:30 or 9:35.

23           And we will have, right, we will have a little bit

24   of snacks there on Monday morning?

25           MS. JOHNSON:  Yes.  There's going to be a lot

1     trials here on Monday.

2             THE COURT:  Yeah, so I think you should try to get

3     here by 9:30.  There are a lot of trials going on and you've

4     got your jury information so you should get in --

5             MS. JOHNSON:  Badge.

6             THE COURT:  -- but you never know with witnesses,

7     spectators, whomever's interested.  It's complicated.

8             I had a meeting the other morning with somebody

9     scheduled for 8:45, who was not a juror and not a lawyer and

10    she took a long, long time to be able to get into the

11    courthouse.

12            So, have a nice weekend and thank you so much for

13    your attention so far.

14            (Jurors excused)

15            THE COURT:  Okay.  Anything else -- after the jury

16    leaves, is there anything else that we need to talk about or

17    not until Monday morning?

18            (Counsel confer)

19            MS. JOHNSON:  Counsel, can we take this water?

20            THE COURT:  All right.  We're not done yet.  Go

21    ahead.

22            MR. SMOCK:  So, Your Honor, I guess the only thing

23    I wanted to -- I think the Court is certainly aware of

24    this --

25            THE COURT:  Say that again?

1              MR. SMOCK:  The Court is I'm sure aware of this,

2       just out of an abundance of caution I think we talked about

3       148, ECF 148, and that I think is this sort of operative

4       document.

5              I could go over with the Court what I view is the

6       remaining unresolved issues if it would help if the Court --

7              THE COURT:  Well, let me ask you, if you've got

8       your list in front of you, I am going to tell you what I

9       think and tell me if I'm got it wrong.

10             I think my list actually may be overinclusive at

11      this point because you have agreed on some things, so rather

12      than have you go through it.

13             So I understand I need to review 148.

14             140 I have a note that I'm supposed to review it,

15      but I have another note that says the government has agreed

16      to admit the last five minutes.  And the question then is

17      whether you all have resolved it or whether I need to review

18      it, Exhibit 140?

19             MR. VALENTINI:  We have removed the last --

20             THE COURT:  I have a note that the government

21      agreed to omit the last five minutes of Exhibit 140, which

22      used to be Exhibit 15?

23             MR. VALENTINI:  Yes.  To the extent that that

24      resolves their objection, that's done.  We've already

25      implemented that change to the exhibit, yes.

1          THE COURT:  Okay.  So the question is whether I

2     still have to review the last two minutes or whether the

3     defense is now satisfied?

4          MR. VALENTINI:  Okay.

5          MR. SMOCK:  The defense is satisfied.  And I

6     believe it's the first two minutes, but I think the answer

7     is you don't need to look at it.

8          THE COURT:  Okay.

9          MR. VALENTINI:  Okay.

10          THE COURT:  Exhibit 141C.  The question is whether

11     it should be a demonstrative or an exhibit, I believe,

12     unless you've had further discussions.

13          MR. SMOCK:  That's the only remaining issue with

14     respect to 141C.

15          The government did create excerpts and the only

16     remaining issue is whether demonstratives would go back to

17     the jury.

18          THE COURT:  Exhibit 304 is and 305 are Facebook

19     documents.  And there was an objection to both 304 and 305

20     insofar as it does not involve Mr. Gossjankowski.

21          And I said that, originally overreacted, but on

22     reconsideration it does seem to me that some parts of them

23     do involve Mr. Gossjankowski and some other parts may also

24     be relevant.

25          And I think with respect to 304 and 305 I asked

1    Mr. Valentini if there were any cases involving Facebook

2    itself that might help me think about this question.  And I

3    think that those comments related to both 304 and 305, but

4    correct me if I'm wrong.

5              MR. SMOCK:  304 is different.  304 is about

6    prejudicial and irrelevant communications.

7              THE COURT:  Oh.

8              MR. SMOCK:  And I think the Court can look at it

9    whenever you're ready, but I think among other things on the

10    first page there's a comment about Congresswoman Maxine

11    Waters that is totally irrelevant and certainly prejudicial

12    and distracting to the jury.

13             THE COURT:  Okay.  I'll look at it.

14             Would somebody give me a hardcopy of it at some

15    point?  You gave me a hardcopy of 305 the other day.

16             MR. VALENTINI:  Yes, yep.  Absolutely.  If I could

17    just respond very briefly.

18             With respect to the case law, yes, we absolutely

19    expect to address the issue and provide the case law.  I've

20    not had an opportunity to do it yesterday or today.  It

21    would come in late in our case so we will have a little bit

22    of time.

23             THE COURT:  Okay.

24             MR. VALENTINI:  With respect to 304, I strongly

25    disagree with the idea that the comment that the defense

1     objects to is irrelevant.

2             This string of text messages deals -- pertains to

3     back and forth the conversation about who incited the events

4     of January 6th between the defendant and some other Facebook

5     friend of his.

6             This is not irrelevant but any stretch.  It is

7     charged language to be sure, but the exchange is directly

8     relevant to the issue that is implicated in the 1512(c)(2)

9     count as well as possibly other counts.

10            THE COURT:  Okay.  I'll look at it.

11            The next -- I have a group of exhibit that which

12    were in Docket 146.  And some of them may have already been

13    resolved.

14            I think 143.3A the objection was withdrawn.  100A,

15    I think we've dealt with but is there still an open issue

16    with respect to 141C?

17            MR. SMOCK:  So the only remaining issue with

18    respect to that is the demonstrative question.

19            I do with apologies want to raise one thing about

20    143.3A.  I think this was perhaps the stage of the

21    proceedings yesterday where I said I thought I was

22    withdrawing but I had to go back and look at it.

23            I don't think that the Court will need to resolve

24    this issue.  I've spoken to Mr. Valentini about it, but

25    there is a portion in the middle of 143.3A which is simply

1    mainly an elderly woman crushed against a wall basically.

2    And I think there's an agreement that that portion would be

3    taken out.

4            I'll speak to Mr. Valentini and make sure that

5    that's resolved and if there's some problem with it we can

6    bring it up at 9:30 in the morning on Monday morning.

7            THE COURT:  Okay.

8            So Government Exhibits 121 about the Mastony

9    body-worn camera and 122 about the Spooner body-worn camera

10   were in Docket 146 but not in 148.  Should I assume it's

11   been resolved?

12           MR. SMOCK:  It has been.

13           THE COURT:  Okay.  123, the Bogner body-worn

14   camera, I need to look at.

15           MR. SMOCK:  Correct.

16           MR. VALENTINI:  Yeah.

17           THE COURT:  I think 138.  Is that what we were

18   just about to get to?

19           MR. VALENTINI:  Yes.

20           THE COURT:  Okay.  So 138 I need to look at before

21   Monday -- before we start up with the witness again.

22           What about Exhibit 140 which used to be -- which

23   used to be Exhibit 15?

24           That is back -- that is included in your Docket

25   148, so I assume that there's still issues and I should look

1      at it?

2                     MR. SMOCK:  I think, Your Honor --

3                     THE COURT:  Was this the one that we were talking

4      about, the five minutes are out so two minutes are okay?

5                     MR. SMOCK:  Correct.  I think that's the one we

6      talked about earlier.

7                     THE COURT:  Okay.  I think I may have some of

8      these things on my list twice, so excuse me.

9                     So 141 and 141C, the objection was withdrawn as to

10     141 after the government agreed to shorten a video but is

11     that right?

12                     MR. SMOCK:  Correct.  This is also one where the

13     only remaining issue is the demonstrative.

14                     THE COURT:  And what about 141C?

15                     MR. SMOCK:  I believe that 141C is the

16     demonstrative and 141 is the original.

17                     MR. VALENTINI:  That's correct.

18                     THE COURT:  Is what?

19                     MR. SMOCK:  The original, without the alterations.

20                     THE COURT:  So it's okay or it's not okay?

21                     MR. SMOCK:  It's okay for the original to go to

22     the jury, yes.

23                     MR. VALENTINI:  141 is -- I'm sorry.

24                     THE COURT:  So what's the -- bottom line, what's

25     the story on 141C?

1           MR. VALENTINI:  There's still a question as to

2     whether the version that has trial graphics, alteration of

3     the sort, you know, that we'll be discussing, some slow

4     motion, some zooming, I believe.

5           THE COURT:  All right.  You guys are going to keep

6     talking about 141C?

7           MR. VALENTINI:  We'll keep talking.

8           THE COURT:  I don't have to do anything yet.  Is

9     that fair or is that where we are?

10          MR. SMOCK:  If we're forced to.

11          THE COURT:  What?

12          MR. SMOCK:  If we're forced to, we'll talk.

13          THE COURT:  Okay.  142 -- Exhibit 142 and 143 have

14    been resolved?

15          MR. SMOCK:  I believe so.

16          THE COURT:  143.2 and 143.2A, 143.3A are mentioned

17    in Docket 148, but I have a note that you've withdrawn

18    those.  That the defense --

19          MR. SMOCK:  I think the Court is now going over

20    ones that we had talked about.

21          In other words, I think you're looking at the same

22    list again.

23          143.3A is one that we're going to talk about, I

24    believe that we have a negotiated solution to that.

25          THE COURT:  143.3A?

```
 1              MR. SMOCK:  Correct.  That's the one that I think
 2    I mentioned has the elderly woman in it.
 3              THE COURT:  And what about 143.2A?
 4              MR. SMOCK:  I have withdrawn my objection as to
 5    that one.
 6              THE COURT:  So 143.2A is withdrawn and 143.3A is
 7    still being discussed and hopefully will be resolved?
 8              MR. SMOCK:  That's correct, yep.
 9              THE COURT:  Okay.  With respect to the government
10    exhibits relating to the iPad and the iPhones, I resolved
11    those this morning and told you I'd give you a written
12    opinion.  I resolved them.
13              MR. VALENTINI:  Yes.
14              THE COURT:  But I was going to explain my
15    reasoning in a written opinion.  I resolved them.
16              MR. VALENTINI:  Yes.  With respect to the iPhones,
17    with respect to the iPad my understanding is the issue is
18    now moot.
19              THE COURT:  The iPad you've withdrawn.
20              MR. VALENTINI:  Correct.
21              THE COURT:  And so that you asked me to say is
22    that part of it's denied as moot.
23              MR. VALENTINI:  Yes.
24              THE COURT:  And the other parts will be denied for
25    substantive reasons, have been denied for substantive
```

1      reasons.

2                    MR. VALENTINI:  Correct.

3                    THE COURT:  And I've explained myself sufficiently

4      for you to have preserved your appellate rights?

5                    MR. VALENTINI:  Absolutely.

6                    THE COURT:  A trained appellate lawyer never

7      forgets his training, right?

8                    Aren't you a trained appellate --

9                    MR. VALENTINI:  I'm guilty, yes.

10                   THE COURT:  So that takes care of that.

11                   Government Exhibit 301, resolved or not?

12                   MR. SMOCK:  I'm going to say it is, Your Honor,

13     because I don't have it on my most recent list of

14     objections.

15                   THE COURT:  And that's 301.  303 resolved?

16                   MR. SMOCK:  Yes.

17                   THE COURT:  304 and 305 we just talked about and

18     304 and 305, right?

19                   And 503, 506, and 507 resolved or not?

20                   Those are the congressional record things?  Are

21     still being discussed?

22                   MR. VALENTINI:  I'm sorry, I couldn't hear.  May

23     we confer?

24                   THE COURT:  Yeah, yeah, yeah.

25                   (Counsel confer)

```
 1                    THE COURT:  And you can tell me on Monday if you
 2       want because I don't need to look at anything.
 3                    MR. SMOCK:  Yes, Your Honor.  And I think just
 4       to --
 5                    THE COURT:  All right.  You'll talk about that.
 6                    So is there anything else on your list that I
 7       haven't covered?
 8                    MR. SMOCK:  No, I think you've covered it.  Thank
 9       you.
10                    THE COURT:  I thought this would be more efficient
11       because you've probably would have gone through everything
12       in your order whereas I only had questions about some
13       things.
14                    MR. SMOCK:  Makes sense.
15                    THE COURT:  You never know.  Anything else?
16                    MR. SMOCK:  No thank you, Your Honor.
17                    THE COURT:  Okay.  So we'll see everybody Monday
18       morning.
19                    We will not see Ms. Krenz Monday morning.  She is
20       on loan to us.  She volunteered to be on loan from Minnesota
21       for a week.  And she actually got to see a part of a witness
22       and not just jury selection, finally.  But I want to thank
23       you, Lynne, for being with us and appreciate all of your
24       work and I know the lawyers do as well.  So have a good trip
25       back and come back anytime.
```

915

1               COURT REPORTER:  Thank you.

2               THE COURT:  Okay.  I'll see everybody at 9:30 on

3       Monday.

4               MR. VALENTINI:  Thank you.

5               (Court adjourned at 5:04 p.m.)

6               *                 *                 *

7

8                      **REPORTER'S CERTIFICATE**

9

10

11              I certify the foregoing pages of typewritten
        material constitute a full, true and correct transcript of
        my original stenograph notes, as they purport to contain, of
12      the proceedings reported by me at the time and place
        hereinbefore mentioned.

13

14                       /s/Lynne M. Krenz
                         Lynne M. Krenz, RMR, CRR, CRC
15

16

17

18

19

20

21

22

23

24

25