1    BEFORE THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES OF AMERICA,    )    Case Number 1:21CR123
                                  )
4            Plaintiff,           )
                                  )
5    vs.                          )
                                  )    Washington, D.C.
6    VITALI GOSSJANKOWSKI,        )    March 6, 2023
                                  )      9:37 a.m.
7            Defendant.           )

8

9                        VOLUME V
               TRANSCRIPT OF JURY TRIAL
10        BEFORE THE HONORABLE PAUL L. FRIEDMAN
            UNITED STATES SENIOR DISTRICT JUDGE
11

12

13

14

15

16

17

18

19

20   COURT REPORTER:              Ms. Lisa Grimminger, RDR, CRR, CRC
                                  100 Centennial Mall North
21                                Room 587
                                  Lincoln, NE 68508
22                                (402) 437-1908

23

24

     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.

```
 1                        A-P-P-E-A-R-A-N-C-E-S

 2     FOR THE PLAINTIFF:          MR. FRANCESCO VALENTINI
                                   DOJ-CRM
 3                                 950 Pennsylvania Avenue NW
                                   Washington, D.C. 20530
 4
                                   MR. ADAM MICHAEL DREHER
 5                                 DOJ-USAO
                                   601 D Street NW
 6                                 Washington, D.C. 20001

 7                                 MS. KAREN E. ROCHLIN
                                   DOJ-USAO
 8                                 99 Northeast 4th Street
                                   Miami, FL 33132
 9
       FOR THE DEFENDANT:          MR. EDWARD SMOCK
10                                 MS. CELIA GOETZL
                                   FEDERAL PUBLIC DEFENDER FOR D.C.
11                                 625 Indiana Avenue NW
                                   Suite 550
12                                 Washington, D.C. 20004

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (At 9:37 a.m. on March 6, 2023; with counsel for the

2     parties and the defendant present; WITHOUT the jury:)

3          COURTROOM DEPUTY:  This is Criminal Action 21-123,

4     United States versus Vitali GossJankowski.  For the United

5     States I have Francesco Valentini, Adam Dreher, and Karen

6     Rochlin.  For Defendant I have Edward Smock and Celia Goetzl.

7     Our American Sign Language interpreters are Jeremy Brunson and

8     Carla Mathers, and the court reporter this morning is Lisa

9     Grimminger.

10         All parties are present.

11         THE COURT:  Good morning, everyone.  So everybody had

12    a good weekend?  I know there's at least one issue that we have

13    to discuss this morning before the jury comes in.  So who wants

14    to speak first?

15         MR. SMOCK:  Your Honor, am I right that you're

16    referencing the dispute over exhibits?

17         THE COURT:  Yeah.  I think that -- I think that the

18    one thing that was most urgent was there was a video that was

19    going to be shown to Captain Ortega soon, and so that's a

20    matter I should resolve, and it's Exhibit 138, and I've looked

21    at it over the weekend.

22         MR. SMOCK:  And so our objection to that exhibit is

23    that after the first couple minutes and, in fact, the last five

24    minutes of the seven-minute video do not depict

25    Mr. GossJankowski at all and essentially just show a scrum and

1    people pushing up against the officers.

2        Our view is that it's irrelevant for that reason.  It's

3    cumulative in light of the fact that the government has and

4    will continue to show several videos of that situation, and so

5    it's inadmissible under 403 and also just generally not

6    relevant.  I would also add with respect to authentication that

7    this witness wasn't present in the tunnel and --

8            THE COURT:  Say that again.

9            MR. SMOCK:  This witness wasn't present.

10           THE COURT:  Oh, you can make a point, but he's

11   already testified as to some things that he wasn't present for,

12   but you can make your record.

13           MR. SMOCK:  That is our objection that with respect

14   to authentication he's -- he wasn't present and is not an

15   appropriate witness to authenticate these videos.

16           THE COURT:  And we don't know whose phone this was

17   from.

18           MR. SMOCK:  The defense is not aware.

19           THE COURT:  Okay.

20           MR. VALENTINI:  Your Honor, just to take care of

21   questions in reverse order, we do know whom this video is from.

22   It was obtained from the cell phone of another person who was

23   present.  We do know the name of the person, but we're not

24   offering through that person, so we are relying on the unique

25   circumstances like for other videos from third parties for

1    authentication purposes.  Authentication, I take it, is not the

2    heart of the objection that's presently before the Court.  I

3    understand that the main objection at this point is to

4    relevance and how much of this exhibit is played because the

5    defendant is not present for the entire span of the exhibit.

6        I think there is agreement, if I understood my colleague

7    on the other side correctly, that for the first couple of

8    minutes, perhaps, there's no dispute the defendant is in the

9    frame, and so I don't understand the defense to be challenging

10   the admissibility with respect to that portion of the exhibit.

11       With respect to the second portion of the exhibit or the

12   later part, the defendant, at least for the next several

13   minutes, was still in the tunnel and still -- and I know

14   there's some question as to how we ask the questions.  He still

15   had the opportunity to observe what was going on at the time,

16   so what was going on for the following several minutes goes to

17   his knowledge of what he saw and what was going -- what was

18   happening in that tunnel, and for that reason it's probative,

19   especially with respect to mental state.

20            THE COURT:  Probative of what?

21            MR. VALENTINI:  You know, his knowledge, mental

22   state, and the intent, and for that reason we think the exhibit

23   should be admitted.

24       Having said that, I think we can probably limit the length

25   of how much we play for the jury to the first four and a half

1    minutes, I believe I have in my notes here.  So, you know,

2    happy to make an effort, but the fact that the defendant is not

3    in the exhibit is no reason to leave it out.

4              THE COURT:  Thank you.  Mr. Smock, anything else?

5              MR. SMOCK:  No, Your Honor.

6              THE COURT:  Okay.  I've looked at the video.  After

7    about two, two and a half minutes, there's another gentleman in

8    a light blue coat.  I'm going to exclude everything after his

9    arrival on the scene, including the first time he is depicted.

10   I think the fact that there's another gentleman from the back

11   in a light blue jacket, the same shade of blue, could confuse

12   the jury and could be very prejudicial.  Yes, that gentleman's

13   wearing a hat.  Mr. GossJankowski was not.  Who's to say he

14   didn't have a hat with him?  Who's to say he didn't put it on

15   and take it off?  I think the jury would be confused by seeing

16   another person in a light blue jacket.

17       We've already had testimony from Captain Ortega about

18   other -- not in the tunnel but -- maybe in the tunnel, but

19   certainly near the inaugural stand about a gentleman in a light

20   blue jacket.  In fact, the government is asking the jury to

21   infer it was Mr. GossJankowski even though he's only seen from

22   the back.  They might decide -- draw the same inferences with

23   respect to this other different gentleman with the same color

24   light blue jacket and red hat, so the first two and a half

25   minutes or so.

1          Another reason from my view that it should be excluded

2     after the first minute, couple of minutes or so, is that I

3     think that arguably the last portion of it is not relevant at

4     all.  It's a very narrow area of the tunnel.  We don't know --

5     earlier on in this video we -- and in other videos we see

6     Mr. GossJankowski go into the tunnel and turning around and

7     going back out of the tunnel.  I don't think it's fair to ask

8     the jury to infer that he was in the tunnel when all this other

9     activity was going on, showing the last part of the video of a

10    small portion of the tunnel.

11         I think other than the part where he's in the video, this

12    is cumulative.  This particular exhibit is cumulative to other

13    videos we've already seen, and we may see more of him in the

14    tunnel and of other activity in the tunnel which goes to civil

15    disturbances, including things that he could have observed,

16    some violent things we've already seen.

17         We've already heard words of some people in the tunnel,

18    although there will be an instruction and expert about the fact

19    Mr. GossJankowski could not have seen that -- heard that and

20    which I think makes the audio of the last part of this video

21    even more prejudicial than it would -- might be to someone who

22    could hear people yelling "push, push, push," people yelling

23    "this is our house," and other things.  People yelling "this is

24    their house" will probably come in, people yelling "people are

25    going to die."

1          There's a lot of violent language and violent -- which he

2     could not hear and violent activity which the jury might infer

3     that he was able to observe, but I don't think it's a fair

4     inference after the first two or two and a half minutes, so I'm

5     not going to let you show four and a half minutes.  I'm going

6     to let you show up to the point where the other gentleman in

7     the light blue jacket first appears but not including that

8     other gentleman.

9          MR. VALENTINI:  Thank you, Your Honor.  And just to

10    make sure we comply with the order, we would just ask for a few

11    minutes before the jury comes in so we can make sure that we

12    get the time marked exactly right.

13         THE COURT:  Sure.  I understand.  Thank you.

14         Are there other issues we can fruitfully discuss this

15    morning before the jury comes in?

16         MR. SMOCK:  I don't think that this needs to be

17    resolved prior to the testimony of Captain Ortega, so if that's

18    your only goal, then I don't think we have anything more.

19         We do still have the Bogner body-worn camera.  It sounds

20    like the government may be calling him today towards the end of

21    the day, so whenever the Court wants to address that footage,

22    we can.

23         THE COURT:  Well, let me ask two questions about

24    Officer Bogner.  One, when does the government expect he will

25    be called; and two, how much of that video of his body-worn

1    camera are you planning to show?

2          MR. DREHER:  Your Honor, the government does have

3    Sergeant Bogner appearing this afternoon in hopes that he will

4    be able to present his testimony.  Now, the portion of the

5    body-worn camera that was provided to the Court includes, I

6    believe, 14 minutes of --

7          THE COURT:  I thought it was longer, but would you

8    say 14?

9          MR. DREHER:  Somewhere in there.  But it starts with

10   him outside of the tunnel, then moving into the tunnel, and the

11   government believes it's important to play the entire portion

12   because, as a sergeant within the tunnel, the jury will have an

13   opportunity to see not only Sergeant Bogner's personal actions,

14   but also he's providing orders and guidance to other officers

15   and really outlines the duties that they face while within the

16   tunnel, which becomes relevant as an element of the 231.

17       Now, more specifically, it also provides at least the

18   time -- the timing from start to finish of what was happening

19   in the tunnel to really outline sort of the already shortened

20   clips of the other officers and place them as to when things

21   were happening; so certainly that's why the government proposed

22   the entirety of Sergeant Bogner's body-worn camera in the hopes

23   of him being sort of the calm presence, I guess, in the tunnel,

24   if one can say that, Your Honor.

25          THE COURT:  So in that case I'll view that video when

 1    we take our lunch break.

 2              MR. DREHER:  Yes, Your Honor.

 3              THE COURT:  So we can talk about it this afternoon

 4    before Officer Bogner's called.

 5              MR. SMOCK:  Sounds good.  And I don't think we need

 6    to discuss this today because I don't think a witness is

 7    planning to testify, but it seems to be -- seems to me that the

 8    only remaining dispute is about those Facebook posts, but we

 9    can talk about that.

10              THE COURT:  Is what?

11              MR. SMOCK:  The Facebook posts.

12              THE COURT:  Yeah.  I had asked Mr. Valentini to give

13    me some law on Facebook.  I will say that as I understand it,

14    the entirety of Exhibit 304 is a Facebook interaction between

15    Mr. GossJankowski and Hillary Rose, whereas 305 it is clear

16    that certain of the conversations, interchanges are between

17    Mr. GossJankowski and other people and others are not; so it

18    seems to me that unless you persuade me that any of 304 is

19    irrelevant that it should -- my preliminary feeling about it is

20    that it should all come in with one line excised, which is at

21    17:51:03 with the reference to a particular Congresswoman,

22    because I think that language would prejudice Mr. GossJankowski

23    in the views of the jury and his views about race are not at

24    issue in this trial, assuming that that's what that implies.

25              MR. VALENTINI:  Your Honor, we understand the ruling.

1    We would just ask the Court to consider not including

2    necessarily the slur that is included in that line but some

3    reference to just Congresswoman, 'cause otherwise the jury may

4    be confused about the fact that I think Mr. GossJankowski is

5    pointing to some other one -- someone other than Former

6    President Trump as having incited the riot so I think --

7              THE COURT:  Is there a reference earlier in this

8    exchange to a particular Congresswoman?

9              MR. VALENTINI:  There is not.

10             THE COURT:  Oh, I see.

11             MR. VALENTINI:  So, right, one could --

12             THE COURT:  So earlier on it mentions -- has her name

13   wrong, but he mentions Congresswoman Maxine Waters.

14             MR. VALENTINI:  Right.

15             THE COURT:  Okay.  And we're going to have further

16   discussion about this.  I'm not ruling at this point, but based

17   on Mr. Valentini's point, we can probably just -- assuming that

18   I agree with the government on everything else, and I may not

19   because I haven't heard from you, Mr. Smock -- my immediate

20   concern could probably be dealt with by redacting two words.

21             MR. VALENTINI:  I understand.  Thank you.

22             THE COURT:  Okay.  But we'll have that discussion and

23   the one about Exhibit 305 more fully later.

24        So why don't we take a break, and you can make sure that

25   Exhibit 138 is consistent with what I just said, and then as

1    soon as you're ready to go and the fellow jurors are here, we

2    can begin with Captain Ortega.  We'll resume.

3          (Recess taken at 9:52 a.m.)

4          (At 10:13 a.m. on March 6, 2023; with counsel for the

5    parties and the defendant present; WITH the jury:)

6          RONALD ORTEGA, PREVIOUSLY SWORN, RESUMED THE STAND

7             THE COURT:  Everyone may be seated.  Good morning,

8    everybody.  Welcome back.  I hope everybody had a nice weekend.

9    Everybody got everything they need, or do you need anything

10   else from Ms. Johnson before we get going?  You look like

11   you're ready.

12         So Captain Ortega, welcome back to you as well.

13            THE WITNESS:  Good morning, sir.

14            THE COURT:  Good morning.  You're still under oath

15   from the other day, and Mr. Valentini can continue with direct

16   examination of Captain Ortega.

17                  DIRECT EXAMINATION RESUMED

18   BY MR. VALENTINI:

19   Q.   Good morning, Captain Ortega.

20   A.   Good morning.

21   Q.   Welcome back.

22   A.   Thank you.

23            MR. VALENTINI:  I would like to go back to

24   Exhibit 100.1, which is already in evidence.  If we may please

25   publish it.  Specifically I would like to start playing this

1    exhibit starting at 2:42 p.m.

2           THE COURT:  Let's get it up on everybody's screen.

3    It's in evidence.

4    BY MR. VALENTINI:

5    Q.   And Captain Ortega, I would ask you to pay attention, if

6    you may, to a tall gentleman wearing a bright blue jacket.

7    A.   Yes, sir.

8        (A portion of Exhibit 101.1 was played.)

9           MR. VALENTINI:  I've now stopped playing the

10   exhibit at 2:42:26 p.m., approximately 26 seconds later.

11   BY MR. VALENTINI:

12   Q.   Captain Ortega, what did you see the tall man in the

13   bright blue jacket do in this 26 seconds?

14   A.   You see the individual.  They enter the tunnel, and

15   they're walking towards the doors.  Individual goes to from my

16   side, the right side of the screen, and grabs a bottle of

17   water, takes a drink of the bottle of water, and then something

18   occurs, and the individual starts walking back towards the

19   inaugural platform.

20          MR. VALENTINI:  Let me continue playing this exhibit

21   until approximately 2:43:05 p.m.

22       (A portion of Exhibit 100.1 was played.)

23   BY MR. VALENTINI:

24   Q.   Where is the tall male in the bright blue jacket by now?

25   A.   So at this point the individual is out of the camera

 1   frame, and they're past the camera and now closer to the first

 2   set of double doors at the West Terrace Door.

 3            MR. VALENTINI:  Let me switch to Exhibit 137, which

 4   is already in evidence.

 5        (A portion of Exhibit 137 was played.)

 6            MR. VALENTINI:  Let me stop the exhibit approximately

 7   about five seconds into the exhibit.

 8        Let me zoom into the right-hand side of the exhibit.

 9   BY MR. VALENTINI:

10   Q.    Captain Ortega, do you see a sign hanging on the double

11   glass door at this point in the exhibit?

12   A.    I do.

13   Q.    What does that sign say?

14   A.    It says something to the effect of members only.  Members,

15   I think.  I believe it's going to say members of Congress only.

16            MR. VALENTINI:  Let me proceed frame by frame.

17        (A portion of Exhibit 137 was played.)

18            THE WITNESS:  My apologies.  "Members entrance only."

19            MR. VALENTINI:  And let me zoom out.

20   BY MR. VALENTINI:

21   Q.    And as I continue playing the exhibit, will you please

22   raise your hand when you see a tall male wearing a bright blue

23   jacket appear, enter the frame.

24   A.    Okay.

25   Q.    Captain Ortega, I see you've raised your hand by about

1    20 seconds into the exhibit.  Where did you see the tall male

2    with the bright blue jacket at this point?

3    A.   About a second ago you could see them flash into the frame

4    real quick, and he appears to be going towards the first set of

5    double doors of the Lower West Terrace Door.

6    Q.   And based on your knowledge of the layout of the Capitol,

7    how far was the tall male in the bright blue jacket from the

8    double doors with the Members Entrance Only sign?

9    A.   Less than 5 feet.

10          MR. VALENTINI:  We may pull down this exhibit, and we

11   could stop publishing, please.

12   BY MR. VALENTINI:

13   Q.   Captain Ortega, I am going to pull up Exhibit 138, which

14   is not in evidence.  Now let me play the first about minute for

15   you.

16          THE COURT:  Before you do that, I have previously

17   ruled that portion of that exhibit is admissible, and so it is

18   in evidence, and Ms. Johnson can show it to the jury.

19          MR. VALENTINI:  Thank you.

20          COURTROOM DEPUTY:  Are you ready to do that?

21          MR. VALENTINI:  Yes.  Please go ahead.

22       Thank you.

23       Okay.  Let me play the first 15 seconds of this exhibit.

24       (A portion of Exhibit 138 was played.)

25          MR. VALENTINI:  I have stopped about 13 seconds into

1    the exhibit, time tracker 13 seconds.

2    BY MR. VALENTINI:

3    Q.   Can you tell if the glass on the double doors is still

4    intact or whether it is shattered at this point?

5    A.   It appears to be still intact in this footage.

6              MR. VALENTINI:  Let's play this exhibit until --

7              THE COURT:  Do we know what time -- this doesn't tell

8    us what time it is, I take it?

9              MR. VALENTINI:  No.

10             THE COURT:  Okay.

11             MR. VALENTINI:  Let's play until approximately

12   41 seconds into the exhibit.

13         (A portion of Exhibit 138 was played.)

14             MR. VALENTINI:  Let me see if I can turn the volume a

15   little louder.

16         (A portion of Exhibit 138 was played.)

17   BY MR. VALENTINI:

18   Q.   And Captain Ortega, did you see someone with a bright blue

19   jacket flash into the frame at about 41 or 42 seconds into the

20   exhibit?

21   A.   I did.

22   Q.   And at this point we have no indication that the glass on

23   the double doors has been shattered?

24   A.   That is correct.

25             MR. VALENTINI:  Let me play another five seconds into

1      the exhibit.

2            (A portion of Exhibit 138 was played.)

3               MR. VALENTINI:  In fact, let me continue until about

4      58 seconds into the exhibit.

5            (A portion of Exhibit 138 was played.)

6      BY MR. VALENTINI:

7      Q.   First, did you hear a noise consistent with glass being

8      shattered?

9      A.   I did.

10     Q.   And did you also hear some noise consistent with rioters

11     celebrating at that time?

12     A.   I did.

13     Q.   And do you see a gentleman in a bright blue jacket in the

14     frame at this point?

15     A.   I do.

16     Q.   And which direction is the gentleman in the bright blue

17     jacket facing?

18     A.   So he's on the left-hand side.  He is facing directly

19     towards the Lower West Terrace outer door.

20               MR. VALENTINI:  And let me proceed frame by frame for

21     a second.

22            (A portion of Exhibit 138 was played.)

23               MR. VALENTINI:  And let me zoom in on the double

24     doors.

25     BY MR. VALENTINI:

1    Q.   Without zooming in, are you able to tell what the state of

2    the glass door is at this point, at about 59 seconds into this

3    exhibit?

4    A.   I am.  The top pane on the left, you can see that there's

5    an opening that's been broken through.

6    Q.   And just a few minutes ago you testified just a few

7    seconds earlier that glass appeared to be intact?

8    A.   That is correct.

9         (A portion of Exhibit 138 was played.)

10   BY MR. VALENTINI:

11   Q.   And did you see a gentleman in a bright blue jacket rush

12   back to the entry point of the tunnel?

13   A.   I did.

14   Q.   And that's consistent with what we saw before in the

15   Exhibit 101?

16   A.   It is.

17   Q.   I'm going to ask you to try and listen to any commentary

18   that you might hear in the back.

19        (A portion of Exhibit 138 was played.)

20   BY MR. VALENTINI:

21   Q.   Were you able to hear the commentary?

22   A.   No.  I'm having a hard time hearing it from here.

23             MR. VALENTINI:  Okay.  Let me continue playing this

24   exhibit until 1 minute and 24 seconds.

25        (A portion of Exhibit 138 was played.)

Ortega - Direct (Valentini)                                    934

1    BY MR. VALENTINI:

2    Q.   By now which direction is the gentleman -- the tall man in

3    the bright blue jacket facing?

4    A.   That individual was facing towards the outer door of the

5    Lower West Terrace.

6    Q.   And is that consistent with what we saw in Exhibit 100.1

7    when a tall man wearing a bright blue jacket disappear -- went

8    back towards the entry point of the archway and then went back

9    forward?

10   A.   It is.

11        MR. VALENTINI:  We can take the exhibit down, and

12   I'll stop publishing, please.

13        Thank you.

14        And let's switch back to Exhibit 100.1 at about 2:43.

15        (A portion of Exhibit 138 was played.)

16        MR. VALENTINI:  I'll stop the exhibit at 2:43:08.

17   BY MR. VALENTINI:

18   Q.   And Captain Ortega, I believe that before you testified

19   you saw the gentleman in the bright blue jacket disappear into

20   the foreground of the frame?

21   A.   That is correct.

22        MR. VALENTINI:  So let's switch to a different

23   exhibit.  Switch to 101.1, which is already in evidence.

24        THE COURT:  101.1?

25        MR. VALENTINI:  That's correct, Your Honor.

 1    BY MR. VALENTINI:

 2    Q.   Is this Capitol Police on CCTV footage?

 3    A.   It is.

 4    Q.   Without providing the camera's specific location, could

 5    you please tell the jury which area is depicted at this point

 6    in the footage.

 7    A.   So from the previous exhibit we're looking at the other

 8    side from inside the doorway.

 9              THE COURT:  Is it the same double doorway you were

10    discussing a little while ago?

11              THE WITNESS:  That is correct, the Lower West Terrace

12    Door.  We are now observing from the inside.

13              MR. VALENTINI:  Let me play this exhibit until

14    2:42:28 p.m.

15    BY MR. VALENTINI:

16    Q.   If I may ask you to pay attention to the glass doors in

17    the back.

18         (A portion of Exhibit 101.1 was played.)

19    BY MR. VALENTINI:

20    Q.   Captain Ortega, were you able to see what happened to the

21    farther set of double doors in the frame?

22    A.   I was.

23    Q.   What happened?

24    A.   The rioters were able to smash through the glass and break

25    it.

Ortega - Direct (Valentini)                                        936

1    Q.   And when we're looking at Exhibit 100.1 at approximately

2    this point, 2:32:28, where was the tall man with the bright

3    blue jacket?

4    A.   At that point the individual was again going closer

5    towards the outer doors of the Lower West Terrace Doors.

6    Q.   And do you remember which direction it was looking?

7    A.   At the doors at -- specifically at the Lower West Terrace

8    Doors.

9    Q.   So that would be at the door that is now being shattered?

10   A.   That is correct.

11        MR. VALENTINI:   I'm going to continue playing this

12   exhibit for approximately 30 seconds.

13   BY MR. VALENTINI:

14   Q.   I'm going to ask you to pay attention to what the officers

15   in the front of this group of officers appear to be doing.

16        (A portion of Exhibit 100.1 was played.)

17   BY MR. VALENTINI:

18   Q.   What were the officers doing in the last segment -- at the

19   beginning of the last segment that we just played?

20        MR. SMOCK:   Objection, Your Honor.   I'm objecting to

21   the form of this testimony, essentially narrating the video

22   about which he has no knowledge.

23        THE COURT:   Well, the jury is capable of seeing for

24   itself and reaching some conclusions about what they're seeing

25   in the video, and Captain Ortega was not there, so I tend to

1    agree with Mr. Smock.

2         You should phrase the questions differently.

3    BY MR. VALENTINI:

4    Q.   Based on your understanding of the Capitol layout, would

5    the police officers have had direct access to the rioters on

6    the other side of the glass doors?

7    A.   They would.

8    Q.   Now, how could they, based on your understanding of the

9    layout of the Capitol, protect from the rioters advancing?

10   A.   So --

11             MR. SMOCK:  Objection, calls for an opinion.

12             THE COURT:  Well, not just based on your

13   understanding of the layout of the Capitol, Captain Ortega.

14   Based on your 15 years of experience and now as a supervisor.

15   I think that's a fair question.

16             THE WITNESS:  Yes, Your Honor.  The officers had to

17   utilize their civil disturbance shields as a barrier to prevent

18   the rioters from entering into the Lower West Terrace Door.

19             THE COURT:  And as you look at the front of this

20   group of officers, are we seeing what you just described as the

21   civil disturbance shields being held up by some of them?

22             THE WITNESS:  That is correct, Your Honor.

23             THE COURT:  And just for my edification, a lot of

24   these, if not all of them, appear to be DC Metropolitan Police

25   Department officers and not Capitol Police; is that right?

1            THE WITNESS:  That is correct.  In this frame you see

2    Metropolitan Police Department.

3            THE COURT:  So at that point, whatever time this was,

4    there were MPD officers inside the Capitol as well as Capitol

5    Police?

6            THE WITNESS:  That is correct, Your Honor.

7            MR. VALENTINI:  I'm going to continue playing this

8    exhibit until time record 2:43:05.

9        (A portion of Exhibit 100.1 was played.)

10   BY MR. VALENTINI:

11   Q.   Captain Ortega, did you see a tall man wearing a bright

12   blue jacket appear in the background?

13   A.   I did.

14   Q.   And was 2:43:05 approximately the time when a tall man

15   wearing a bright blue jacket disappeared into the foreground of

16   Exhibit 100.1?

17   A.   It was.

18           MR. VALENTINI:  Let's keep playing until 2:43:11.

19       (A portion of Exhibit 100.1 was played.)

20   BY MR. VALENTINI:

21   Q.   What's happening at this for- -- in the background of this

22   exhibit?

23   A.   At this point the rioters are engaging with the

24   Metropolitan Police Department officers.  The Metropolitan

25   Police Department is trying their best to defend the area with

1    their shields and with batons.

2              MR. VALENTINI:  If we could please take down this

3    exhibit.

4         And I'm going to bring up Exhibit 139, which is not yet in

5    evidence.

6              THE COURT:  Wait a second, wait a second.

7    Exhibit 139 is not in evidence yet.

8    BY MR. VALENTINI:

9    Q.   And I will present to you on mute.  Captain Ortega, did

10   you review this video before coming in to court?

11   A.   I did.

12   Q.   Do you know who took this video?

13   A.   I do not.

14   Q.   But were you able to determine where the events depicted

15   in this video took place?

16   A.   I was.

17   Q.   And are these -- are these roughly the same events as we

18   were just looking at in Exhibit 101.1?

19   A.   They are.

20             MR. VALENTINI:  The government moves to admit

21   Exhibit 139 into evidence, Your Honor.

22             MR. SMOCK:  Same objection regarding foundation and

23   authentication, Your Honor.

24             THE COURT:  Same objection regarding foundation and

25   authentication.  I'm not sure what the -- well, we don't know

1   who took it; right?

2           MR. VALENTINI:  I'm sorry, Your Honor?

3           THE COURT:  We don't know who took it.  Who took

4   these -- where this came -- we don't know whose video this came

5   from; right?

6           MR. VALENTINI:  Your Honor, we do know.  Could we

7   have a sidebar?

8           THE COURT:  No.  Okay.  So maybe you can make a

9   representation.  Is this a video from a civilian person who was

10  in the Capitol that day as opposed to a law enforcement

11  officer?

12          MR. VALENTINI:  Yes, Your Honor, it is.

13          THE COURT:  And were -- Captain Ortega, were a lot of

14  people's cell phones either on that -- seized on that day or

15  some subsequent time and were a lot of people's cell phones

16  voluntarily turned over to law enforcement sometime after that

17  day?

18          THE WITNESS:  To my personal knowledge I don't

19  believe many cell phones were actually seized that day, but

20  from what I am aware from after January 6, a lot of this stuff

21  was posted on social media or different websites and then

22  subsequently taken during other investigations.

23  BY MR. VALENTINI:

24  Q.  And Captain Ortega, are you also aware that cell phones

25  were also seized as part of the investigation?

1    A.    For this investigation?

2    Q.    Or investigation into January 6 events.

3    A.    I am aware that they have been seized for investigations.

4              THE COURT:  So Mr. Smock, the testimony now is that

5    many cell phones were seized during the course of the

6    investigation and a lot of people who were there posted things

7    on YouTube and other social media.  Do you maintain your

8    objection to foundation and authenticity?

9              MR. SMOCK:  Yes.

10             THE COURT:  Okay.  Exhibit 139 will be admitted over

11   objection.

12             MR. VALENTINI:  I am now going to play this 46-second

13   exhibit.

14        (A portion of Exhibit 139 was played.)

15             MR. VALENTINI:  Excuse me, Ms. Johnson.  If you could

16   please publish the exhibit to the jury.

17             THE COURT:  Why don't you go back and show...

18        (A portion of Exhibit 139 was played.)

19   BY MR. VALENTINI:

20   Q.    Captain Ortega, at about 30 seconds into the exhibit, does

21   a tall male wearing a bright blue jacket enter the frame?

22   A.    He does.

23   Q.    Is he moving towards the glass door or away from the glass

24   door?

25   A.    He's moving towards the glass door.

Ortega - Direct (Valentini)                                    942

1   Q.   What appears to be happening next to him?

2   A.   Next to him now the rioters are engaging with the police.

3           MR. SMOCK:  Objection.

4           THE COURT:  Mr. Smock's objection is the same as

5   before.  The video speaks for itself, and the jury can reach

6   its own conclusions.  Fair enough.

7   BY MR. VALENTINI:

8   Q.   Would you be able, Captain Ortega, to estimate how far the

9   gentleman from -- with the bright blue jacket is from the

10  flagpole that is being thrust against the police officers?

11  A.   I would say he --

12          MR. SMOCK:  Objection, Your Honor.

13          THE COURT:  Overruled.

14  A.   I would say he's within arm's reach.

15      (A portion of Exhibit 139 was played.)

16          THE COURT:  From that frame at the end, he appears to

17  be moving away; correct?

18          THE WITNESS:  That is correct.

19          THE COURT:  So let me just say to the jury:  You're

20  going to hear testimony or you're hearing testimony, and some

21  of it does include Captain Ortega's observations of what he's

22  seeing in the video.  Some of it's based on his experience and

23  knowledge.  Some of it's based on seemingly narrating.  You're

24  the best judges of what you see in that video.  He, on the

25  other hand, is -- can help us by describing what part of the

1    Capitol things are in and layout of things.

2         But in terms of what you're seeing and what you're seeing

3    various people doing, if your observations as you watch these

4    videos or back in the jury room during deliberations are

5    different from his observations or different from

6    Mr. Valentini's comments, I told you before that a lawyer's

7    question is not evidence but that sometimes in framing the

8    question and putting it in context the lawyer will state

9    certain facts that he or she thinks are a fair statement of the

10   evidence, but they're not evidence themselves.  They're part of

11   the question.

12        And don't assume that because he uses certain words or

13   seemingly describes -- he, meaning Mr. Valentini, describes

14   certain things that appear on the video to him and uses that as

15   a predicate to his ultimate question to the witness, don't

16   accept what he says.  He's not a witness.  He's not under oath.

17   Captain Ortega is under oath.  But in both cases it's your

18   evaluation of the evidence later that controls both Captain

19   Ortega's credibility as a witness, but in terms of visual

20   evidence, the video evidence, it's what you see in the varied

21   and many videos that you're going to see during this trial that

22   controls.

23             MR. VALENTINI:  I'm going to bring up Exhibit 101.1.

24             THE COURT:  Say it again.

25             MR. VALENTINI:  101.1, starting at 2:43:05.

1              THE COURT:  That's in evidence.

2              MR. VALENTINI:  Yes, Your Honor.

3         (A portion of Exhibit 101.1 was played.)

4              MR. VALENTINI:  And I'm going to zoom into the

5    back -- back in on the exhibit.

6         (A portion of Exhibit 101.1 was played.)

7              MR. VALENTINI:  I have now stopped playing this

8    exhibit about 2:45:18 p.m.

9    BY MR. VALENTINI:

10   Q.   Captain Ortega, do you see -- well, first of all, do you

11   see a tall gentleman wearing a bright blue jacket in the frame

12   at this point?

13   A.   I do.

14   Q.   How far would you estimate him to be from the front of the

15   rioter line?

16   A.   He appears to be at the front of the rioter line.

17   Q.   Did you see this gentleman wag his fingers in the

18   direction of the police line?

19   A.   I did.

20   Q.   What else did you see him do?

21   A.   Just continually walk in and out of the frame and then

22   again wag his fingers.

23             THE COURT:  Did we see -- hold on a second.  Did we

24   see -- is what -- these clear things, are those the police --

25   what did -- are those the shields you were referring to before?

Ortega - Direct (Valentini)                                    945

1                THE WITNESS:  They are, Your Honor.  Those are our

2     CDU shields.

3                THE COURT:  CDU meaning...

4                THE WITNESS:  Civil Disturbance Unit shields.

5                MR. VALENTINI:  I'm going to continue playing the

6     exhibit.

7     BY MR. VALENTINI:

8     Q.   And please tell me if you see the tall gentleman in the

9     bright blue jacket do anything else at this point.

10         (A portion of Exhibit 101.1 was played.)

11    BY MR. VALENTINI:

12    Q.   Did you see him do anything else?

13    A.   I did.

14    Q.   What did he do?

15    A.   He appeared to spit in the direction of the police

16    officers.

17                MR. VALENTINI:  Let me continue playing the exhibit

18    for another five seconds.

19         (A portion of Exhibit 101.1 was played.)

20    BY MR. VALENTINI:

21    Q.   Did something similar happen again?

22    A.   It did.

23                MR. VALENTINI:  I will now play the exhibit for

24    another six or seven seconds.

25         (A portion of Exhibit 101.1 was played.)

Ortega - Direct (Valentini)                                    946

1   BY MR. VALENTINI:

2   Q.   Did the tall gentleman in the bright blue jacket appear to

3   receive an object?

4   A.   He did.

5   Q.   What did it look like?

6   A.   I couldn't tell what it was, but it was some sort of --

7   looked like white -- white object.

8   Q.   Did it appear -- what shape did the object appear to have?

9   A.   It appeared to be like some sort of cylinder or circular

10  object.

11       (A portion of Exhibit 101.1 was played.)

12  BY MR. VALENTINI:

13  Q.   What do you see the gentleman in the bright blue jacket do

14  at this point in the exhibit?

15  A.   At this point it appears that the individual is grabbing

16  one of the shields.

17       MR. SMOCK:  Objection, Your Honor.  I have to -- he's

18  essentially providing an interpretation of the video.

19       MR. VALENTINI:  Could we have a sidebar?

20       THE COURT:  Yes.

21       (At sidebar)

22       MR. VALENTINI:  Your Honor, before we get to the

23  point of the subject matter of the objection, speaking

24  objections before the jury are highly unfair and disfavored,

25  and this has been going on quite a bit.

Ortega - Direct (Valentini)                                947

1          THE COURT:  Well, he's got no choice sometimes.  He

2     just has no choice.  Objections should be made as cryptically

3     as possible -- lack of foundation, hearsay, authentication --

4     and maybe I've been too reluctant to have a bench conference,

5     but I don't want to interrupt.

6          So I understand Mr. Valentini's point, but I also

7     understand Mr. Smock's situation.  He's not in my line of sight

8     because of the way he has to sit and communicate, and, you

9     know, he's got to jump up faster, I guess, and we'll just have

10    to have more bench conferences, if necessary.

11         MR. SMOCK:  Your Honor, if I could just make a record

12    about this objection.  I obviously have no objection to the

13    jury seeing this video, but my concern is we have a captain

14    from the Capitol Police who wasn't there and is essentially

15    giving his interpretation, his opinion about what my client is

16    doing in these videos.

17         And again, they can be played, but my concern is it's not

18    just him saying, you know, here he's to the left, he's to -- it

19    appears that he's reaching over, it appears he's trying to grab

20    something.  If the officer -- I mean, they're going to have

21    officers come and testify who was present, but having someone

22    who wasn't there offering an opinion about what he thinks my

23    client is doing is entirely inappropriate.

24         MR. VALENTINI:  Your Honor, I think some degree of

25    explanation of what is going on from someone who may not have

1    been at the scene but has reviewed the video --

2              THE COURT:  No.  I disagree with you.  I'm going to

3    strike that answer, and any similar questions are off limits.

4    We've got witnesses who were actually there and saw it.  This

5    is the ultimate question and the most important count in the

6    indictment.  He cannot give his opinion or his conclusion.  He

7    didn't see it.  The jury's watching the videos.  They know just

8    as much as Captain Ortega about this, not about the Capitol and

9    how it's laid out.  He can't do this anymore.

10             MR. VALENTINI:  Would it be acceptable to ask

11   questions that relate to the layout of the Capitol, how far

12   something -- an individual is vis-à-vis certain events?

13             THE COURT:  You've asked those and I haven't --

14             MR. VALENTINI:  No.  I understand.

15             THE COURT:  And I've permitted that, but this is

16   different.

17             MR. VALENTINI:  Your Honor, with respect, I believe

18   that some degree of commentary helps the trier of fact --

19             THE COURT:  No.

20             MR. VALENTINI:  -- and directing, but I understand --

21             THE COURT:  No.

22             MR. VALENTINI:  -- your ruling.

23             THE COURT:  No, no.  I agree with the defense.

24        (In open court)

25             THE COURT:  Disregard the last question.  Disregard

1      the last answer.  You will decide what you saw this defendant

2      do.  Captain Ortega was not there.  He knows the layout of the

3      Capitol and he's got 15 years of experience, but in terms of

4      what the video shows, you are the deciders, and so that last

5      question and the last answer are struck.  Do not consider it.

6           You go back and look if the video becomes important in

7      your deliberations, and if it's important, the important parts

8      of the videos will be emphasized, I am sure, in closing

9      argument by both sides, but you draw your own conclusions.  You

10     make your own observations, ladies and gentlemen, but forget

11     about that answer.

12          MR. VALENTINI:  I'm going to continue playing the

13     exhibit.

14     BY MR. VALENTINI:

15     Q.   And before that, Captain Ortega, would you please state

16     the time at this point in the exhibit.

17     A.   2:45:59 seconds p.m.

18          (A portion of Exhibit 101.1 was played.)

19          MR. VALENTINI:  You may take down this exhibit at

20     this point.  I would like to go back to Exhibit 100.1.  This is

21     already in evidence, and I will start playing this exhibit at

22     about 2 minutes and 45 seconds into the exhibit.

23          (A portion of Exhibit 100.1 was played.)

24     BY MR. VALENTINI:

25     Q.   And I'm going to -- would you please identify the time at

Ortega - Direct (Valentini)                                    950

1     this point in the exhibit.

2     A.   It's 2:46:15 p.m.

3     Q.   I'm going to ask you to pay attention -- continue paying

4     attention to the gentleman in the bright blue jacket.

5          (A portion of Exhibit 100.1 was played.)

6     BY MR. VALENTINI:

7     Q.   Captain Ortega, could you identify, please, in your

8     experience as a Capitol Police officer, the object that appears

9     to be close to the ground next to the gentleman in the bright

10    blue jacket.

11    A.   That is one of the Civil Disturbance Unit shields.

12    Q.   Is that a tool of protection for the Capitol Police?

13    A.   It is.  It is used -- it's a protective object for us.

14    Q.   It is essential in carrying out the function?

15    A.   It is.

16         THE COURT:  Can I hold on one -- I have a question.

17    When we -- in the last frame where we saw a CDU shield, were --

18    the individuals in the darker clothes in that frame, if you can

19    tell, were they officers of the Metropolitan Police Department

20    or the Capitol Police, or do they appear to be civilians?

21         THE WITNESS:  You're talking in the previous exhibit

22    or this exhibit?

23         THE COURT:  Yeah.  No.  In this exhibit.

24         Could you just go back a few seconds where we see the

25    shield.

Ortega - Direct (Valentini)                                    951

 1              (A portion of Exhibit 100.1 was played.)

 2                   THE COURT:  So I'm talking about the individuals to

 3      the right of the frame in the dark clothes.

 4                   THE WITNESS:  Your Honor, those are not police

 5      officers.

 6                   THE COURT:  Okay.

 7      BY MR. VALENTINI:

 8      Q.   Captain Ortega, are there any individuals in this frame

 9      that you identify as officers at this point?

10      A.   There are not.

11      Q.   Are civilians allowed to pass Capitol Police shields back?

12      A.   They are not.  That is Capitol Police property.

13                   MR. VALENTINI:  Let me zoom into the portion of the

14      frame that depicts the gentleman in the bright blue jacket.

15      BY MR. VALENTINI:

16      Q.   Before I continue playing the exhibit, is it fair to say

17      at this point in the exhibit to the back of the cameras is a

18      police line?

19      A.   That is correct.

20      Q.   And looking out from this camera do you see any police

21      officers?

22      A.   I do not see any police officers.

23      Q.   So based on your understanding of the uniforms of Capitol

24      Police officers, everyone in this frame right now is not

25      allowed to be there?

1    A.   That is correct.

2    Q.   And everybody in this frame is not allowed to move forward

3    and deeper into the tunnel?

4    A.   That is correct.

5    Q.   Now, rioters are not allowed to incite those other rioters

6    to move deeper into the tunnel?

7    A.   That is correct.

8         (A portion of Exhibit 100.1 was played.)

9         MR. VALENTINI:  At this point in the exhibit, I will

10   zoom out.

11        (A portion of Exhibit 100.1 was played.)

12        MR. VALENTINI:  And I've stopped the exhibit at

13   2:47:26.

14   BY MR. VALENTINI:

15   Q.   And if you could please orient the jury geographically,

16   which direction is the gentleman in the bright blue jacket

17   facing now?

18   A.   So now he's facing back towards the inaugural stage.

19   Q.   And what direction is the left-hand side of the frame?

20   A.   So the left-hand side of the frame would be going south

21   back towards the House side of the complex.

22        (A portion of Exhibit 100.1 was played.)

23        MR. VALENTINI:  I've stopped the exhibit at

24   2:48:21 p.m.

25   BY MR. VALENTINI:

1    Q.   If you could orient the jury again, which direction was

2    the gentleman in the bright blue jacket gesturing in?

3    A.   So now he's gesturing where he's at, and again, he's

4    facing the south side towards the House side of the Capitol

5    complex.

6         (A portion of Exhibit 100.1 was played.)

7              MR. VALENTINI:  And I've stopped the exhibit at

8    2:48:29.

9    BY MR. VALENTINI:

10   Q.   Do you see a gentleman wearing a bright blue jacket in the

11   frame at this point?

12   A.   I do not.

13             MR. VALENTINI:  I will skip forward to 2:49:50.

14   BY MR. VALENTINI:

15   Q.   I'm going to start playing the exhibit, and could you

16   please let me know if -- by raising your hand if you see a

17   gentleman wearing a bright blue jacket appear in the frame

18   again.

19        (A portion of Exhibit 100.1 was played.)

20   A.   (The witness complied.)

21   BY MR. VALENTINI:

22   Q.   Could you please -- for the record, I see, Captain Ortega,

23   you have raised your hand.  Could you please state for the

24   record the time stamp at this point.

25   A.   Yes.  It's going to be 2:49:57 p.m.

1          (A portion of Exhibit 100.1 was played.)

2              MR. VALENTINI:  I have stopped the exhibit at this

3    point.

4    BY MR. VALENTINI:

5    Q.   Could you please state the -- identify the time stamp at

6    this point in the exhibit.

7    A.   And again, that's 2:49:58 p.m.

8          (A portion of Exhibit 100.1 was played.)

9              MR. VALENTINI:  At this point I'm going to skip

10   forward to 2:53:20 in the exhibit.

11         (A portion of Exhibit 100.1 was played.)

12   BY MR. VALENTINI:

13   Q.   Captain Ortega, I have stopped the exhibit at 2:53:30.

14   Did you see an object being passed back through the tunnel?

15   A.   I did.

16   Q.   Do you recognize that, as a Capitol Police officer?

17   A.   Yes.  That is a Capitol Police Civil Disturbance Unit

18   shield.

19         (A portion of Exhibit 100.1 was played.)

20              MR. VALENTINI:  Let me zoom in a second.  I've

21   stopped the exhibit.

22   BY MR. VALENTINI:

23   Q.   Could you please identify the time stamp at this point in

24   the exhibit.

25   A.   Yes.  That's 2:53:40 p.m.

1              MR. VALENTINI:  And let me zoom in for clarity.

2    BY MR. VALENTINI:

3    Q.   Do the fact that Capitol Police shields were being passed

4    back by rioters an element of what -- is that an element of

5    concern for the police officers?

6    A.   Absolutely.  If we're losing shields, we're losing our

7    ability to actually defend the Capitol; and furthermore, they

8    had been utilized as a weapon against myself and my officers.

9              MR. VALENTINI:  I'm going to resume playing the

10   exhibit.

11         (A portion of Exhibit 100.1 was played.)

12             MR. VALENTINI:  And I've stopped the exhibit at this

13   point.  It's minute marker 14 minutes and 53 seconds into the

14   exhibit.

15   BY MR. VALENTINI:

16   Q.   Captain Ortega, could you please identify the time stamp

17   at this point in the exhibit.

18   A.   2:53:53 p.m.

19             MR. VALENTINI:  Let me zoom in for clarity.

20   BY MR. VALENTINI:

21   Q.   What appears to be passed back by the crowd at this point?

22   A.   It is a Capitol Police Civil Disturbance Unit shield.

23   Q.   And are some of the rioters actually stretching their arms

24   up?

25             MR. SMOCK:  Objection.

 1             THE COURT:  I'll permit it.  You may answer.

 2    A.    They are.

 3             MR. VALENTINI:  I'm going to play this video slowly

 4    until -- for the next three or four seconds.

 5         (A portion of Exhibit 100.1 was played.)

 6             MR. VALENTINI:  And let me zoom into the midsection

 7    of the exhibit for clarity.

 8         (A portion of Exhibit 100.1 was played.)

 9    BY MR. VALENTINI:

10    Q.    Captain Ortega, do you see a device with a red -- red

11    light?

12    A.    I do.

13    Q.    Would you please identify the time stamp at this point in

14    the exhibit.

15    A.    2:53:57 p.m.

16    Q.    Approximately how far from the front line of the Capitol

17    Police officers is that device?

18    A.    At this point about 10 feet or so.

19             THE COURT:  I'm sorry.  What was the question?

20    BY MR. VALENTINI:

21    Q.    How far is that device that the witness has identified

22    from the front line of the Capitol Police officers in the

23    tunnel?

24             THE COURT:  Do we -- do we see any officers in this

25    particular frame?

1          THE WITNESS:  Not in this frame, sir.

2          MR. VALENTINI:  Let me zoom in a little further.

3     BY MR. VALENTINI:

4     Q.   And could you please identify the time stamp at this point

5     in the exhibit.

6     A.   2:53:57 p.m.

7     Q.   Is the presence of unknown devices among rioters a reason

8     for concern for the Capitol Police dealing with a riot?

9     A.   Absolutely.

10    Q.   And why is that, Captain Ortega?

11    A.   There's a general concern about devices being utilized as

12    weapons against the officers.

13          MR. VALENTINI:  Let me zoom out momentarily.

14    Let me play the exhibit for a few more seconds.

15    (A portion of Exhibit 100.1 was played.)

16          MR. VALENTINI:  Let me go back for two or three

17    seconds.

18    And let me zoom back in and proceed frame by frame.

19    (A portion of Exhibit 100.1 was played.)

20    BY MR. VALENTINI:

21    Q.   Captain Ortega, are you aware of the existence of devices

22    that can use an electricity arc?

23    A.   I am.

24    Q.   You're not yourself an expert in specific weapons; is that

25    right?

Ortega - Direct (Valentini)                                        958

 1    A.    I'm not an expert in it.

 2    Q.    Based on the appearance of this device, do you have a

 3    view, based on your experience as a Capitol Police officer,

 4    what this device is?

 5                THE COURT:  Before you answer that question --

 6                MR. SMOCK:  Objection.

 7                THE COURT:  Okay.  Why don't we come to the bench.

 8          (At sidebar)

 9                THE COURT:  Is there something doing this on the

10    video at this moment as you close up on it, or are you

11    highlighting it?

12                MR. VALENTINI:  No, no.  It just lit up.  He's

13    triggering it.

14                MR. SMOCK:  My objection is that this officer's

15    giving opinion testimony about what this item is.  There's

16    going to be plenty of video of it, and he wasn't present,

17    again, and I think it's improper for him to offer an opinion

18    about what he thinks it is based on a video that he wasn't

19    present for.

20                THE COURT:  Go ahead.

21                MR. VALENTINI:  Your Honor, I think we've made clear

22    that he's not testifying as an expert.  He can have an

23    impression based on --

24                THE COURT:  Impression is not good enough.

25                MR. VALENTINI:  He has a understanding based on his

1    handling of situations at the Capitol.  If we think that his

2    limited view which is --

3              THE COURT:  What's his answer going to be?

4              MR. VALENTINI:  I assume that he's going to say it is

5    a stun gun but --

6              THE COURT:  What's he going to say?

7              MR. VALENTINI:  That it's a stun gun.

8              MR. SMOCK:  And what a stun gun is and what something

9    qualifies as a stun gun depends on something beyond that it

10   creates an electrical --

11             THE COURT:  I'll sustain the objection.  He cannot

12   answer it.

13        (In open court)

14             THE COURT:  I'm sustaining the objection.  The jury

15   should disregard the question, and do not speculate on what the

16   answer might have been.

17   BY MR. VALENTINI:

18   Q.   Captain Ortega, does the presence of a device like the one

19   depicted at this point in the exhibit raise concern to you, as

20   a Capitol Police officer trying to defend the Capitol?

21             MR. SMOCK:  Objection.

22             THE COURT:  Objection sustained.

23        (A portion of Exhibit 100.1 was played.)

24   BY MR. VALENTINI:

25   Q.   Captain Ortega, I have paused the exhibit at 2:53:14 p.m.,

Ortega - Direct (Valentini)                                960

1   and I'm now going to zoom in and play the exhibit frame by

2   frame.

3           (A portion of Exhibit 100.1 was played.)

4   BY MR. VALENTINI:

5   Q.   Captain Ortega, do you see the gentleman with the bright

6   blue jacket at this point in the exhibit?

7   A.   I do.

8   Q.   Which way is he facing?

9   A.   He is facing towards the Lower West Terrace outer doors.

10  Q.   And who stands at those doors based on the exhibits that

11  you have previously seen?

12  A.   Police officers.

13  Q.   Based on your understanding of the layout of the Capitol,

14  would -- the police officer staying on -- standing on the other

15  side of the police doors, would their view be obstructed if

16  someone is raising their -- their arm?

17  A.   It would be if someone's -- if they're trying to look out

18  into the crowd, they're looking at something, then if the

19  individual has their arms up, it will obstruct the view.

20  Q.   And if one of the rioters has his arm stretched upwards,

21  would the police officers be able to see the arm stretched

22  upwards?

23  A.   They would.

24           MR. SMOCK:  Objection.

25           THE COURT:  Nothing?

1           MR. VALENTINI:  I'm not sure what the nature of the
2     objection is.
3           MR. SMOCK:  Objection, basis of knowledge,
4     non-presence.
5           THE COURT:  I'll permit that.
6        And there were a number of people earlier in this video
7     with arms stretched up?
8           THE WITNESS:  That's correct, sir.
9           THE COURT:  So I guess I'm wondering whether -- how
10    much longer are you going to be on direct, do you think?
11    Because if it's going to be a while, we should take a break at
12    a convenient time at some point.
13          MR. VALENTINI:  Yes, Your Honor.  I think we have
14    quite a few more videos to go to review with this witness.
15          THE COURT:  Okay.  So if you're done -- are you done
16    with this exhibit, or do you want to keep -- I would suggest
17    maybe finish your questioning on this exhibit and then maybe we
18    take a break, or not.
19          MR. VALENTINI:  This is a good -- this is a logical
20    place for a break.
21          THE COURT:  Okay.  If it's a logical time to break,
22    then we will.  See everybody in 10 or 15 minutes.
23          MR. VALENTINI:  Thank you.
24        (Jury out and recess taken at 11:21 a.m.)
25        (At 11:42 a.m. on March 6, 2023; with counsel for the

Ortega - Direct (Valentini)                                962

1   parties and the defendant present; WITH the jury:)

2          THE COURT:  Mr. Valentini, you may proceed with

3   direct.

4          MR. VALENTINI:  I'd like to go back to Exhibit 100.1,

5   which is in evidence.

6          THE COURT:  Which is in evidence?

7          MR. VALENTINI:  It is, Your Honor.  And specifically

8   I would like to start playing this exhibit starting at about

9   2:54:20.

10      (A portion of Exhibit 100.1 was played.)

11         MR. VALENTINI:  And for clarity I will zoom in on the

12  midsection of the exhibit.

13  BY MR. VALENTINI:

14  Q.   Captain Ortega, if you could orient the jury, is the

15  gentleman in the bright blue jacket moving closer to the police

16  officers based on your understanding of the Capitol layout?

17  A.   He is moving closer to the police officers, that is

18  correct.

19         MR. VALENTINI:  May I just mark on the touch screen

20  the face of the gentleman in the bright blue jacket?

21  BY MR. VALENTINI:

22  Q.   Captain Ortega, did you see spit emanate from the

23  gentleman in the bright blue jacket?

24         MR. SMOCK:  Objection.

25         THE COURT:  Do you see what?

1           MR. VALENTINI:  Spit.

2           THE COURT:  Well, I don't know what to do with this

3    objection because the objection is -- it is such a dark image

4    that I don't think anybody can see anything, but of course it's

5    up to the jury what they can see.  I can't see anything because

6    the image is so dark, but I leave it to the jury to see what

7    they see, but I won't let the officer answer -- the captain

8    answer that question on the basis of this video.  There may be

9    better videos.

10          MR. VALENTINI:  Let me just rewind for a second.  Let

11   me proceed frame by frame.

12       (A portion of Exhibit 100.1 was played.)

13   BY MR. VALENTINI:

14   Q.   Captain Ortega, let me ask you:  What is the time stamp at

15   this point in the exhibit?

16   A.   2:54:31 p.m.

17          MR. VALENTINI:  I'm going to resume playing the

18   exhibit, but I'm going to zoom out for a second.

19       (A portion of Exhibit 100.1 was played.)

20          MR. VALENTINI:  Let me just rewind that a couple of

21   seconds.

22       At this point, at time stamp 2:54:57, I'm going to start

23   zooming in to the image, and as we did before, we'll advance

24   the image frame by frame.

25       (A portion of Exhibit 100.1 was played.)

1    BY MR. VALENTINI:

2    Q.   Captain Ortega, which direction is the gentleman in the

3    bright blue jacket facing at this point?

4    A.   He's facing the officers, towards the officers.

5    Q.   Captain Ortega, could you please identify the time stamp

6    at this point.

7    A.   2:54:50 p.m.

8    Q.   That is a different time stamp than last time I played the

9    exhibit frame by frame?

10   A.   That is correct.

11            MR. VALENTINI:  I'm going to play -- continue playing

12   this exhibit for the next approximately 30 seconds.

13            THE COURT:  We're still on Exhibit --

14            MR. VALENTINI:  100.1.

15            THE COURT:  -- 100.1.

16        (A portion of Exhibit 100.1 was played.)

17            MR. VALENTINI:  I've now stopped the exhibit.

18   BY MR. VALENTINI:

19   Q.   Captain Ortega, could you please identify the time stamp

20   at this point in the exhibit.

21   A.   2:55:20 p.m.

22   Q.   And has the gentleman in the bright blue jacket moved

23   deeper into the tunnel or further back into the tunnel?

24   A.   Deeper into the tunnel closer to the Lower West Terrace

25   outer doors.

Ortega - Direct (Valentini)                                965

1   Q.   And at this point are you able to see the gentleman in

2   the -- the gentleman in the bright blue jacket in the frame?

3   A.   He is not in the frame anymore at this point.

4           MR. VALENTINI:  Let me -- let me pull up

5   Exhibit 101.2, which is already in evidence.

6           THE COURT:  101.2 is in evidence, correct.

7           MR. VALENTINI:  Yes.

8       And let me zoom in to the back of the exhibit closer to

9   the double doors for clarity.

10      (A portion of Exhibit 101.2 was played.)

11  BY MR. VALENTINI:

12  Q.   Captain Ortega, are you able to see a gentleman wearing a

13  bright blue jacket in this frame?

14  A.   I am.

15  Q.   In which direction has the gentleman wearing the bright

16  blue jacket moved in this exhibit?

17  A.   He's now moving closer to the doors closer to the

18  officers.

19  Q.   Would you please identify the time stamp at this point in

20  the incident.

21  A.   2:55:49 p.m.

22      (A portion of Exhibit 101.2 was played.)

23          MR. VALENTINI:  We may now take down the exhibit,

24  Ms. Johnson.  If we could please stop publishing.

25      Thank you.

Ortega - Direct (Valentini)                                    966

1          Let me pull up what has been marked as Exhibit 141.1.

2     BY MR. VALENTINI:

3     Q.   Did you review this video before coming to court?

4     A.   I did.

5     Q.   Do you know who took this video?

6     A.   I do not.

7     Q.   Were you able to determine where this video -- where the

8     events depicted in this video took place?

9     A.   I was.

10    Q.   And does Exhibit 141.1 reflect a portion of the same

11    events as the CCTV footage that you reviewed in Exhibit 100.1

12    and 101.1?

13    A.   They do.

14    Q.   Does it capture the same events from a different angle,

15    however?

16    A.   They do.

17               MR. VALENTINI:  The government moves to admit

18    Exhibit 141.1 into evidence, Your Honor.

19               MR. SMOCK:  Same objection, Your Honor.

20               THE COURT:  Okay.  Well, if I understand the

21    objection to being lack of foundation and authenticity, I'll

22    overrule that objection and permit -- and admit the exhibit.

23               MR. VALENTINI:  Let me skip to minute mark- -- to the

24    minute marker 2:25 and play the exhibit from there.

25               THE COURT:  You said 2:25; correct?

```
 1              MR. VALENTINI:  2:25, correct.
 2   BY MR. VALENTINI:
 3   Q.   Captain Ortega, do you see a gentleman wearing a bright
 4   blue jacket at this point in the exhibit?
 5   A.   I do.
 6              MR. VALENTINI:  Let me play this exhibit for about
 7   20 seconds.
 8        (A portion of Exhibit 141.1 was played.)
 9   BY MR. VALENTINI:
10   Q.   Captain Ortega, is the object being held by the gentleman
11   in the bright blue jacket a Capitol Police shield?
12   A.   It is.
13   Q.   Is it one of the shields that you described before?
14   A.   It is.
15   Q.   And again, the purpose of those shields?
16   A.   It is a defense tool for police officers to use in civil
17   disturbance events.
18   Q.   And I think you mentioned this before, but these are the
19   same events that were covered in the CCTV footage before, just
20   from a different angle; correct?
21   A.   That is correct.
22              MR. VALENTINI:  Let me stop the exhibit at 2:43.
23   BY MR. VALENTINI:
24   Q.   Captain Ortega, do you see the gentleman in the bright
25   blue jacket holding up his hands?
```

1    A.    I do.

2    Q.    And did you see an object being passed back through the

3    crowd?

4    A.    I do observe an object.

5    Q.    And were you able to determine what that object is based

6    on your understanding of the Capitol Police gear?

7    A.    I was able to determine it is a Capitol Police Civil

8    Disturbance Unit shield.

9            MR. VALENTINI:  I'm now going to play this exhibit.

10    I'm going to zoom in for clarity, and I'm going to

11    continue playing this exhibit, but I will do so frame by frame.

12        (A portion of Exhibit 141.1 was played.)

13    BY MR. VALENTINI:

14    Q.    Captain Ortega, are you able to see an object in the

15    circle in the touch screen?

16    A.    I am.

17    Q.    And what time stamp is that?

18    A.    2:46.

19    Q.    Does the object appear to have a light -- light portion at

20    the top of the device?

21    A.    It does.

22            MR. SMOCK:  Your Honor, this is -- can I just talk

23    to --

24            COURTROOM DEPUTY:  There's a microphone on the table,

25    Counsel.

1          THE COURT:  Anytime you say anything, it has to be on

2     the record even if you're asking me permission to talk to

3     somebody, and she can't hear you unless you talk into a

4     microphone.

5          MR. SMOCK:  My apologies, Your Honor.  I just want to

6     clarify something that I think Mr. Valentini can clarify with

7     the witness, and it's just a minor issue.

8          THE COURT:  So you two may confer.

9       (An off-the-record discussion was had between counsel.)

10    BY MR. VALENTINI:

11    Q.   And Captain Ortega, when I just referred to the time

12    stamp, I was really referring to the minute marker at the

13    bottom left of the exhibit.  So when you said 2:46, were you

14    referring to an a.m. or p.m. time or just the minute marker of

15    this particular video?

16    A.   I was referring to the minute marker at the bottom of the

17    video.

18         THE COURT:  And earlier when you referred to 2:25,

19    was that 2:25 p.m. or a minute marker?

20         THE WITNESS:  Was it this exhibit or a previous

21    exhibit?

22         THE COURT:  This exhibit.

23         THE WITNESS:  This exhibit?  It's going to be the

24    minute marker on this exhibit.

25         THE COURT:  Thanks for the clarification, because I

1    had noted it incorrectly as well.

2    BY MR. VALENTINI:

3    Q.   And so, Captain Ortega, is it fair to say that for the

4    entirety of Exhibit 141.1, because there is no time stamp,

5    anytime we're referring to a time mark or any sort of time

6    reference is a reference to the minute marker?

7    A.   That is correct.

8         MR. VALENTINI:  Let me continue playing this exhibit

9    frame by frame.

10        (A portion of Exhibit 141.1 was played.)

11   BY MR. VALENTINI:

12   Q.   Captain Ortega, I have stopped at minute marker 2:47.  At

13   this point in the exhibit, which direction is the gentleman in

14   the blue bright jacket looking?

15   A.   He is not looking towards the door.  He is looking towards

16   the right frame of the photo.

17   Q.   Does it appear that his arms and hands are look- -- are

18   positioned on that side of the frame?

19   A.   That is correct.

20        (A portion of Exhibit 141.1 was played.)

21        MR. VALENTINI:  Let me make sure that the volume

22   is...

23        We're now at time marker 2:48.

24   BY MR. VALENTINI:

25   Q.   Does the gentleman in a bright blue jacket still appear to

1    be holding an object?

2    A.   He does.

3    Q.   Same object that you saw before?

4    A.   Correct.

5          MR. VALENTINI:  Now I'm going to play the exhibit at

6    normal speed.

7          (A portion of Exhibit 141.1 was played.)

8          MR. VALENTINI:  I've now stopped the exhibit at time

9    marker 2 minutes and 50 seconds into the exhibit.

10   BY MR. VALENTINI:

11   Q.   Did you hear what appeared to be a crackling sound?

12   A.   I did.

13   Q.   Does that sound consistent with an electric arc being

14   activated?

15   A.   It does.

16          THE COURT:  With what being activated?

17          MR. VALENTINI:  Electricity arc.

18          (A portion of Exhibit 141.1 was played.)

19          MR. VALENTINI:  I've now stopped the exhibit.

20   BY MR. VALENTINI:

21   Q.   Since the last time we stopped the exhibit, has the

22   gentleman in the bright blue jacket moved towards the doors or

23   away from the doors?

24   A.   The gentleman is now moving towards the doors.

25   Q.   Who was standing at those doors again?

 1   A.   Police officers on the other side of the doors, so he's

 2   moving towards the police officers.

 3         (A portion of Exhibit 141.1 was played.)

 4         MR. VALENTINI:  Your Honor, I've now stopped the

 5   exhibit at time marker 3 minutes and 35 seconds into the

 6   exhibit.

 7   BY MR. VALENTINI:

 8   Q.   Are you still able to see the same device in this

 9   gentleman's hands?

10   A.   That is correct.

11         (A portion of Exhibit 141.1 was played.)

12         MR. VALENTINI:  Let me go back a couple of seconds.

13   Let me zoom in for clarity.

14         (A portion of Exhibit 141.1 was played.)

15         MR. VALENTINI:  We're now ready to zoom out.

16         (A portion of Exhibit 141.1 was played.)

17         MR. VALENTINI:  Why don't we take down the exhibit.

18   If we may stop publishing, please.

19         I will bring up what has been marked as Exhibit 141D.

20         THE COURT:  141 what?

21         MR. VALENTINI:  D.

22   BY MR. VALENTINI:

23   Q.   Captain Ortega, do you recognize what has been marked as

24   Exhibit 141D?

25   A.   I do recognize it.

1   Q.   And what is it?

2   A.   It is a still photo of the footage we had just witnessed.

3   Q.   In fact, now that I'm scrolling down, is it fair to say

4   it's a collection of photographs?

5   A.   It is a still photo collection.

6   Q.   They're all still images from the video that was just

7   reviewed?

8   A.   That is correct.

9           MR. VALENTINI:  Your Honor, the government moves to

10  admit Exhibit 141D into evidence.

11          THE COURT:  141D, as in David.

12          MR. SMOCK:  No objection.

13          THE COURT:  It will be admitted.

14          MR. VALENTINI:  And let's now switch back to

15  Exhibit 100.1.

16          THE COURT:  Say that again.  Which one are we

17  switching back to?

18          MR. VALENTINI:  100.1.

19          THE COURT:  100.1?

20          MR. VALENTINI:  Yes.

21      And I'm going to start playing this exhibit now at about

22  time stamp 2:56:23 p.m.

23  BY MR. VALENTINI:

24  Q.   I'm going to start playing the exhibit, but will you

25  please say now when you see -- if you see a tall man wearing a

1    bright blue jacket appear in this frame.

2    A.   Okay.

3         MR. VALENTINI:  Let me start over.

4         (A portion of Exhibit 100.1 was played.)

5    A.   Now.

6    BY MR. VALENTINI:

7    Q.   What portion of the exhibit do you see the gentleman

8    wearing the bright blue jacket appear in this frame?

9    A.   He's at the bottom left corner at this point.

10   Q.   Using the touch screen, will you please circle this

11   individual.

12   A.   (The witness complied.)

13   Q.   Thank you.  If you could please clear the markings now.

14   A.   (The witness complied.)

15   Q.   And you said before that the presence of more rioters in

16   this tunnel, would that make the officers' job more or less

17   difficult?

18   A.   It would make it much more difficult.  The more rioters

19   there, the more we have to contend with.

20        (A portion of Exhibit 100.1 was played.)

21   BY MR. VALENTINI:

22   Q.   So if one of the rioters incites other rioters to join the

23   riot in the tunnel, that would make the officers' job more

24   difficult?

25        MR. SMOCK:  Objection, leading.

1            THE COURT:  Sustained.

2   BY MR. VALENTINI:

3   Q.   How would the incitement of additional rioters to join the

4   tunnel affect --

5            THE COURT:  What's the verb?  How would...

6            MR. VALENTINI:  Incitement of the -- the incitement

7   of additional rioters into the tunnel affect the officers'

8   task.

9            THE COURT:  Okay.

10  A.   It would make the job much more difficult.  It becomes a

11  big safety issue.  We are already contending with larger

12  numbers of rioters, but more that come makes it a harder job

13  for the police officers.

14       (A portion of Exhibit 100.1 was played.)

15           MR. VALENTINI:  I've stopped the exhibit at

16  approximately 2:56:35 p.m., and I've marked a circle on the

17  touch screen.

18       (A portion of Exhibit 100.1 was played.)

19           MR. VALENTINI:  I've stopped playing the exhibit at

20  2:57:22.

21  BY MR. VALENTINI:

22  Q.   Does the gentleman in the bright blue jacket still appear

23  to be holding a device in his hand?

24  A.   He does.

25       (A portion of Exhibit 100.1 was played.)

1    BY MR. VALENTINI:

2    Q.   Captain Ortega, can you tell if the device appears to be

3    lighter at the top at this moment in the exhibit at time stamp

4    2:58?

5              MR. SMOCK:  Objection.

6              THE COURT:  Again, same instruction to the jury.

7    They'll view the videos and decide for themselves what they're

8    seeing.  So the objection's sustained.

9         (A portion of Exhibit 100.1 was played.)

10   BY MR. VALENTINI:

11   Q.   Captain Ortega, I have stopped the exhibit at about

12   2:59:27 p.m., and where is the -- how has the gentleman in the

13   bright blue jacket moved at this point since earlier in the

14   exhibit?

15   A.   So now he went from the side of the wall, and now he's

16   out, almost exiting back towards the inaugural stage.

17        (A portion of Exhibit 100.1 was played.)

18             MR. VALENTINI:  And I've now stopped the exhibit at

19   3 p.m. and 17 seconds.

20   BY MR. VALENTINI:

21   Q.   Are you still able to see the gentleman in the bright blue

22   jacket at this point in the exhibit?

23   A.    No.  He has exited the frame.

24             MR. VALENTINI:  We can pull down this exhibit, and

25   I'm going to bring up Exhibit 142, which is not yet in

1    evidence.

2              THE COURT:  142.

3         (A portion of Exhibit 142 was played.)

4              THE COURT:  Let's take down the sound until it's in.

5              MR. VALENTINI:  Yeah, absolutely.

6    BY MR. VALENTINI:

7    Q.   Did you review the exhibit that's been marked as

8    Exhibit 142 before coming in to court today?

9    A.   I did.

10   Q.   And again, do you know who took this video?

11   A.   I do not.

12   Q.   But are you able to determine where the events that are

13   depicted in the video took place?

14   A.   I was.

15   Q.   And does Exhibit 142 capture a portion of the same events

16   that are depicted in Exhibit 100.1 but from a different angle?

17   A.   It does.

18             MR. VALENTINI:  Your Honor, the government moves to

19   admit Exhibit 142 into evidence.

20             MR. SMOCK:  Continuing objection, Judge.

21             THE COURT:  I will admit it over the objection of the

22   defense.

23        (A portion of Exhibit 142 was played.)

24   BY MR. VALENTINI:

25   Q.   Captain Ortega, are the events that were depicted in

1    Exhibit 142 consistent with the events that were depicted in

2    Exhibit 100.1 just a minute ago?

3    A.   They are.

4         MR. VALENTINI:  Let's bring up Exhibit 100.2, which

5    is already in evidence, and I will start playing this exhibit

6    at time stamp about 3:11:45 seconds.

7    BY MR. VALENTINI:

8    Q.   And Captain Ortega, will you please say now when you -- if

9    you -- if and when you see a gentleman wearing a bright blue

10   jacket appear in this frame.

11   A.   Okay.

12        (A portion of Exhibit 100.2 was played.)

13   A.   Now.

14   BY MR. VALENTINI:

15   Q.   And for the record, the time stamp at this point, Captain

16   Ortega, is...

17   A.   3:11:48 p.m.

18        MR. VALENTINI:  I will now play the exhibit for

19   approximately one minute.

20        (A portion of Exhibit 100.2 was played.)

21        MR. VALENTINI:  In fact, let me stop at 3:12:10 p.m.

22   BY MR. VALENTINI:

23   Q.   Captain Ortega, if the rioters in the tunnel begin to push

24   and shove towards the police officers in a coordinated fashion,

25   is that a particular concern?

1    A.    It is.

2    Q.    Why is that?

3    A.    Now they're able to start pushing the officers back if

4    they're doing a coordinated effort.  At that point they can

5    start pushing the officers over and at -- and if they get able

6    to push the officers over, it helps them gain entry into the

7    United States Capitol.

8    Q.    And if you're able to estimate, how many people are

9    participating in this concerted effort at this point, at

10   3:12:10 p.m.?

11   A.    I'm counting at least 15 that are in the frame right now.

12        MR. VALENTINI:  I've marked on the touch screen one

13   participant in that concerted effort.

14        (A portion of Exhibit 100.2 was played.)

15        MR. VALENTINI:  I've now stopped the exhibit at

16   3:12:21.

17   BY MR. VALENTINI:

18   Q.    Since the last time we stopped the exhibit, does it appear

19   that more -- more or fewer rioters are participating in this

20   activity?

21   A.    More have joined in at this point.

22        (A portion of Exhibit 100.2 was played.)

23        MR. VALENTINI:  And again, I stopped the exhibit at

24   3:12:36.

25   BY MR. VALENTINI:

1    Q.   Do you see a Capitol Police shield being passed back at

2    this point in the exhibit?

3    A.   I do.

4         (A portion of Exhibit 100.2 was played.)

5              MR. VALENTINI:  If we may stop publishing, I will

6    bring up Exhibit Number 141.2.

7              THE COURT:  Point --

8              MR. VALENTINI:  Two.

9              THE COURT:  -- two, 141.2.

10             MR. VALENTINI:  Which is not yet in evidence.

11             THE COURT:  Not yet in evidence.

12   BY MR. VALENTINI:

13   Q.   Captain Ortega, did you review this video before coming to

14   court?

15   A.   I did.

16   Q.   And again, do you personally know who took this video?

17   A.   I do not.

18   Q.   But were you able to determine where and when the events

19   in this video took place?

20   A.   I was.

21   Q.   And how do the events in Exhibit 141.2 relate to the

22   events captured on CCTV footage that we just reviewed?

23   A.   It's seeing the footage from another angle.

24             MR. VALENTINI:  The government moves to admit

25   Exhibit 141.2 into evidence, Your Honor.

Ortega - Direct (Valentini)                                    981

```
 1              MR. SMOCK:  Same continuing objection.
 2              THE COURT:  I will admit it over objection.
 3         (A portion of Exhibit 141.2 was played.)
 4              MR. VALENTINI:  I'm going to now play the exhibit.
 5         (A portion of Exhibit 141.2 was played.)
 6              MR. VALENTINI:  And for the record, I've momentarily
 7     stopped playing the exhibit about five seconds into the
 8     exhibit.
 9         (A portion of Exhibit 141.2 was played.)
10              MR. VALENTINI:  If we may please take down the
11     exhibit.
12         And I would like to bring up Exhibit 143.2A, not in
13     evidence.
14     BY MR. VALENTINI:
15     Q.   And Captain Ortega, did you review this video before
16     coming to court?
17     A.   I did.
18     Q.   And again, do you know who took this video?
19     A.   I do not.
20     Q.   But were you able to determine where and when the events
21     in this video took place?
22     A.   I was.
23     Q.   And when did you determine that this video was taken?
24     A.   On January 6, 2021.
25     Q.   And where?
```

 1    A.    This is outside the -- this is on the inaugural stage

 2    facing the Lower West Terrace Tunnel.

 3    Q.    And this particular portion of the video, does it depict

 4    events that occurred approximately at 3:12 or 3:13 in the

 5    afternoon?

 6    A.    It does.

 7              MR. VALENTINI:  Your Honor, the government moves to

 8    admit Exhibit 143.2A into evidence.

 9              MR. SMOCK:  Objection as to foundation,

10    authentication.

11              COURTROOM DEPUTY:  Mr. Smock, can you use the

12    microphone.

13              MR. SMOCK:  Objection as to foundation,

14    authentication.  Knowledge regarding time of the video as well.

15              THE COURT:  Where -- you mentioned a time in your

16    question.  Where does it say anything about a time?

17              MR. VALENTINI:  Your Honor, I would be happy to link

18    it up on the exhibit, and we can do it before it's admitted if

19    Your Honor approves.

20              THE COURT:  Objection as to authenticity.  I have

21    previously admitted a number of exhibits from YouTube without

22    requiring -- YouTube videos or cell phones without requiring

23    you to identify the individual who may have taken it or having

24    that person here, but I have required you to lay an adequate

25    foundation as to time, place, date, and relevance, so I think

1    you need to lay more foundation.

2    BY MR. VALENTINI:

3    Q.   Captain Ortega, in the prior exhibit did you see a group

4    of rioters engage in a -- so to speak, a heave-ho?

5    A.   I did.

6    Q.   And did you see the defendant approximately around the

7    same time after participating in that heave-ho leave the

8    tunnel?

9    A.   That is correct, I did.

10            THE COURT:  What do you mean at about the same time?

11   BY MR. VALENTINI:

12   Q.   Shortly -- shortly after participating in the heave-ho,

13   did you observe him leave the tunnel area?

14            THE COURT:  In Exhibit 141.2, is that what you're

15   referring back to?

16            MR. VALENTINI:  No, Your Honor.  I'm referring back

17   to 100.2.

18            THE COURT:  100.2.

19            MR. VALENTINI:  Yes.  Let me pull up Exhibit 100.2.

20        (A portion of Exhibit 100.2 was played.)

21            COURTROOM DEPUTY:  Which is in evidence; correct?

22            MR. VALENTINI:  Yes.

23            THE COURT:  This is 100.2?

24            MR. VALENTINI:  Yes, Your Honor.

25        (A portion of Exhibit 100.2 was played.)

1          MR. VALENTINI:  Brief indulgence, Your Honor.

2   BY MR. VALENTINI:

3   Q.   Captain Ortega, do you see a gentleman in a bright blue

4   jacket join a heave-ho at approximately 3:12:01 in the Lower

5   West Terrace Tunnel?

6   A.   I do observe him, yes.

7          (A portion of Exhibit 100.2 was played.)

8   BY MR. VALENTINI:

9   Q.   And do you also observe a gentleman with a dark sweater at

10  the -- right outside the threshold of the archway sort of

11  standing up on the side of the archway?

12         Let me just circle it for you as a reference.

13  A.   I do observe him, yes.

14  Q.   And the time stamp is approximately at this point

15  3:12 p.m.?

16  A.   3:12:07 p.m.

17  Q.   And I would ask you to please let me know when you see the

18  gentleman in the bright blue jacket leave the tunnel.

19         (A portion of Exhibit 100.2 was played.)

20  A.   At this point he has exited the tunnel.

21  BY MR. VALENTINI:

22  Q.   And the time stamp here is about 3:12:45?

23  A.   That is correct.

24  Q.   And you still see a gentleman standing by the side of the

25  archway?

Ortega - Direct (Valentini)                                    985

1    A.    I do.

2              MR. VALENTINI:  Let's go back to Exhibit 141.2 *[sic]*,

3    which is not in evidence.

4              THE COURT:  143.2A, is that what we're talking about?

5              MR. VALENTINI:  Yes, Your Honor, 143.2A.

6              THE COURT:  .2A.

7              MR. VALENTINI:  And let me jump forward to minute

8    marker about 3 minutes and 20 seconds into the exhibit.  Excuse

9    me.  Three minutes and 30 seconds into the exhibit.

10        (A portion of Exhibit 143.2A was played.)

11   BY MR. VALENTINI:

12   Q.    And at this point are you able to see a gentleman with a

13   dark jacket standing at the threshold of the archway?

14   A.    I do observe him, yes.  I do see him.

15   Q.    And are you able to observe a gentleman, a tall gentleman,

16   wearing a bright blue jacket exiting the tunnel and moving in

17   the direction of the inaugural stage?

18   A.    I do see him, yes.

19             MR. VALENTINI:  Your Honor, the government moves to

20   admit Exhibit 143.2A into evidence.

21             THE COURT:  Okay.  I understand the defense

22   objections.  I think that by comparing this scene to the prior

23   scene in the prior video, you've laid an adequate foundation,

24   and I'll admit it and you can inquire.

25             And the jury may see 143.2A, which is now admitted.

1          MR. VALENTINI:  If we may publish.

2     Thank you, Ms. Johnson.

3     I'm going to start publishing this exhibit starting at

4     time marker -- minute marker 3:30.

5          (A portion of Exhibit 143.2A was played.)

6     BY MR. VALENTINI:

7     Q.   And Captain Ortega, just for clarity, is that circle --

8     was that circle part of the original video, or was it added in

9     preparation for trial?

10    A.   That is added for preparation for trial.

11         MR. VALENTINI:  Let me rewind just a couple of

12    seconds and proceed frame by frame at this point.

13         (A portion of Exhibit 143.2A was played.)

14         MR. VALENTINI:  Let me stop at time marker 3 minutes

15    and 51 seconds into the exhibit.

16    BY MR. VALENTINI:

17    Q.   Do you see a gentleman wearing a bright blue jacket at

18    this point in the exhibit?

19    A.   I do.

20    Q.   And which direction is he moving?

21    A.   So now he is moving away from the Lower West Terrace

22    Tunnel.

23    Q.   What does he appear to be holding in his left hand?

24    A.   It appears to be some sort of black object.  To my

25    knowledge it looks to be a stun gun.

 1              MR. SMOCK:  Objection, Your Honor.

 2              THE COURT:  I'll strike that answer.  The jury should

 3     disregard it, same as last time.

 4              MR. VALENTINI:  If I may continue playing the

 5     exhibit.

 6          (A portion of Exhibit 143.2A was played.)

 7              MR. VALENTINI:  I have now stopped the exhibit at

 8     time -- at minute marker 3 minutes and 59 seconds into the

 9     exhibit.

10          (A portion of Exhibit 143.2A was played.)

11              MR. VALENTINI:  I now stopped the exhibit 4 minutes

12     and 4 seconds into the exhibit.

13     BY MR. VALENTINI:

14     Q.   Captain Ortega, did you hear a crackling sound just a few

15     seconds ago in the exhibit?

16     A.   I did.

17          (A portion of Exhibit 143.2A was played.)

18              MR. VALENTINI:  At this point we may take down the

19     exhibit, and I would like to bring up what has been marked as

20     Exhibit 143.2B.

21              THE COURT:  This is Exhibit 141D, as in David?

22              MR. VALENTINI:  No.  I'm sorry.  143.2B, as in boy.

23              THE COURT:  Exhibit 143.2.

24     BY MR. VALENTINI:

25     Q.   And Captain Ortega, do you recognize what has been marked

1    as Exhibit 143.2B?

2    A.    I do.

3    Q.    And what is it?

4    A.    It is a set of still photos from the footage we just

5    watched.

6    Q.    And the footage that you reference is Exhibit 143.2A;

7    correct?

8    A.    That is correct.

9              MR. VALENTINI:  Your Honor, the government moves to

10   admit Exhibit 143.2B into evidence.

11             MR. SMOCK:  No objection.

12             THE COURT:  It will be admitted.

13             MR. VALENTINI:  At this time I would like to switch

14   to Exhibit 100.3, which has been admitted into evidence.

15             THE COURT:  Yes.

16             MR. VALENTINI:  And let me play approximately the

17   first 34 seconds of the exhibit.

18        (A portion of Exhibit 100.3 was played.)

19   BY MR. VALENTINI:

20   Q.    Captain Ortega, do you see towards the bottom of the

21   exhibit a line of police officers who are pushing forward into

22   the tunnel and back out towards the inaugural stage?

23   A.    I do.

24             MR. VALENTINI:  And I will zoom in for clarity on an

25   officer on -- on the -- on a portion of the exhibit on the

1    right-hand side of the exhibit.

2    BY MR. VALENTINI:

3    Q.   Do you see an officer wearing a helmet?

4    A.   I do.

5            MR. VALENTINI:  And this is at 3:18:34.

6            THE COURT:  What's that?  Is it a time, or is it a

7    number of minutes into the video?

8            MR. VALENTINI:  This is a time.  It's 3:18:34 p.m.

9    BY MR. VALENTINI:

10   Q.   Does it appear that one of the rioters has their arms

11   around this particular officer?

12   A.   They do.

13           THE COURT:  I didn't hear what you said, Mr. Smock.

14           MR. SMOCK:  Objection.

15           THE COURT:  I didn't hear what you said, Mr. Smock.

16           MR. SMOCK:  My apologies, Your Honor.  The video

17   speaks for itself.

18           THE COURT:  Okay.  On that basis I'll overrule the

19   objection.

20   BY MR. VALENTINI:

21   Q.   And to be clear, the rioter that we just identified is not

22   the same rioter that was wearing the -- that was wearing the

23   bright blue jacket?

24   A.   That is correct.  Two different individuals.

25           (A portion of Exhibit 100.3 was played.)

1    BY MR. VALENTINI:

2    Q.   Which direction is the rioter and the police officer next

3    to him, which directions are they moving?

4    A.   They're going closer to the inaugural stage.

5    Q.   Will you please let me know if there comes a time when you

6    no longer see the helmet of the police officer.

7    A.   Okay.

8         (A portion of Exhibit 100.3 was played.)

9    A.   At this point I no longer see the police officer's helmet.

10   BY MR. VALENTINI:

11   Q.   And what is the time stamp at this point?

12   A.   It would be 3:19:09 p.m.

13   Q.   So at this point that particular police officer has been

14   pulled into the crowd?

15   A.   That is correct.

16   Q.   Now I want to rewind and go back a bit and ask you about a

17   different part of the exhibit, so I'm going to go back to

18   3:18:42, and I want to ask you about the middle section of the

19   exhibit this time.

20        Captain Ortega, do you see I've circled a portion of the

21   exhibit in the middle section of the exhibit?

22   A.   I do.

23   Q.   And do you see an officer in that portion of the exhibit?

24   A.   I do.

25   Q.   And I'm going to play a few seconds, and after that I'm

Ortega - Direct (Valentini)                                991

1    going to ask you to identify what gear this particular officer

2    is wearing.

3           (A portion of Exhibit 100.3 was played.)

4    BY MR. VALENTINI:

5    Q.   Were you able to see which gear this particular officer is

6    wearing?

7    A.   I was.

8    Q.   Is this officer wearing a helmet?

9    A.   He is.

10   Q.   What does -- does the helmet have any writing on it?

11   A.   It does.

12   Q.   And what does it say?

13   A.   MPDC, standing for Metropolitan Police Department.

14   Q.   And is this police officer, however, wearing a MPD

15   uniform?

16   A.   He is not.

17   Q.   What is he wearing?

18   A.   He is wearing a yellow United States Capitol Police

19   reflective vest.

20   Q.   Okay.  So Capitol Police reflective vest but MPD helmet?

21   A.   That is correct.

22           MR. VALENTINI:  Okay.  Let me continue playing this

23   exhibit.

24   BY MR. VALENTINI:

25   Q.   And before we go there, is it common for Capitol Police

Ortega - Direct (Valentini)                                   992

1   officers to wear MPD helmets?

2   A.   It is not.

3   Q.   And based on the particular gear that this officer is

4   wearing, are you able to identify who this officer is?

5   A.   I cannot at this time.

6         THE COURT:  So can you tell he's wear- -- can you

7   tell whether he's an MPD officer or Capitol Police officer?

8         THE WITNESS:  I can tell he's a United States Capitol

9   Police officer because he's wearing a Capitol Police reflective

10  vest.

11  BY MR. VALENTINI:

12  Q.   And I'm going to ask you to sort of pay attention and try

13  to track this particular individual through the next few

14  seconds of the exhibit, and I'm going to zoom in for clarity.

15        (A portion of Exhibit 100.3 was played.)

16  BY MR. VALENTINI:

17  Q.   Is the officer we're talking about at the very front of

18  the police line?

19  A.   They were.

20  Q.   Can you please tell me if there is a point where you're no

21  longer able to see the officer that we previously identified.

22  A.   There's several points where he disappears from the frame.

23        (A portion of Exhibit 100.3 was played.)

24  BY MR. VALENTINI:

25  Q.   Can you please let me know if there's a point where it

1   looks like he's been pulled into the crowd.

2        (A portion of Exhibit 100.3 was played.)

3   A.   I can no longer see the officer at this point.

4   BY MR. VALENTINI:

5   Q.   Well, are you able to see a helmet at the very front of

6   the line?

7   A.   I can see the back of the helmet.

8   Q.   And is that helmet past someone who appears not to be a

9   police officer?

10  A.   He is.  He is past the police line by himself at this

11  point.

12  Q.   So by this point in the exhibit, that particular officer

13  has been separated from the police force?

14  A.   That is correct.  He is now inside the crowd.

15       (A portion of Exhibit 100.3 was played.)

16            MR. VALENTINI:  Let me switch gears a little bit, and

17  let me zoom in on a member of the crowd.

18  BY MR. VALENTINI:

19  Q.   Are you able to see a gentleman who's wearing a suit?

20  A.   I do.  I do see a gentleman in a suit.

21  Q.   By "suit," I mean a business suit.

22  A.   He is in a business suit with a red hat.

23  Q.   A red hat.  Does he also appear to be wearing a tie?

24  A.   I do observe him wearing a tie.

25  Q.   Does he appear to be holding something in his hand that is

Ortega - Direct (Valentini)                                              994

```
 1    consistent with recording equipment?
 2              THE COURT:  Consistent with what?
 3              MR. VALENTINI:  Recording equipment, like a camera.
 4    A.   He is holding something that appears to be a camera.
 5              MR. VALENTINI:  So let me pull down this exhibit, and
 6    let me bring up Exhibit 144.2, which is not in evidence.
 7              THE COURT:  144.2?
 8              MR. VALENTINI:  Correct.
 9              THE COURT:  Not yet in evidence.
10              MR. VALENTINI:  Not yet.
11    BY MR. VALENTINI:
12    Q.   Captain Ortega, did you review this video before coming to
13    court?
14    A.   I did.
15    Q.   And what kind of video is this, if you recall?
16    A.   It is a -- appears to be from a GoPro.
17    Q.   And is that sort of technically a different type of video
18    than the two-dimensional video that we have been seeing so far?
19    A.   It is different, yes.
20    Q.   And how is it different?
21    A.   It gives you the ability to see almost a 360 view from the
22    GoPro.
23    Q.   You don't know the name of the person who took this
24    particular video?
25    A.   I do not.
```

Ortega - Direct (Valentini)                                          995

1    Q.   But because it's a 360 video, were you able to determine

2    who took this particular video?

3    A.   I was.

4    Q.   Okay.  And how did you determine that?

5    A.   If you manipulate the video, you can turn it around and

6    see the individual who was recording the video.

7    Q.   Is the individual --

8              MR. VALENTINI:  I have now manipulated the video.

9    BY MR. VALENTINI:

10   Q.   Do you see the individual who appears to be holding the

11   camera from this angle?

12   A.   I do.

13   Q.   And what does the individual appear to be wearing?

14   A.   A red hat, glasses, suit, red tie, white shirt.

15   Q.   Same outfit as the individual that we saw before in

16   Exhibit 100.3; right?

17   A.   That is correct.

18   Q.   And so based on the comparison with the CCTV video, does

19   this video fairly and accurately capture the events as they

20   occurred on the Lower West Terrace on January 6, 2021?

21   A.   It does.

22             MR. VALENTINI:  Your Honor, the government moves to

23   admit Exhibit 144.2 into evidence.

24             MR. SMOCK:  Same continuing objection, Your Honor.

25             THE COURT:  It will be admitted over objection.  This

1    is 144.2 now in evidence.

2    BY MR. VALENTINI:

3    Q.   Now that the exhibit is published, let me go over what we

4    just talked about.  Were you able to determine who recorded

5    this video?

6    A.   I was.

7    Q.   And how were you able to determine that?

8    A.   Once you manipulate the photo, you can turn it around 360,

9    and we're able to view the person who was recording the

10   footage.

11   Q.   So let me try and turn the video around to see if we can

12   determine who recorded the video.

13        Do you see an individual in this frame?

14   A.   I do.

15   Q.   What is this individual wearing?

16   A.   He's wearing a red hat, black glasses, a suit, white

17   shirt, red tie.

18   Q.   And does this appear to be the same individual that we saw

19   before in Exhibit 100.3?

20   A.   It does.

21            MR. VALENTINI:  Let me turn the view back to the

22   Capitol.

23        I will now start playing the video, and I will stop about

24   five seconds into the video.

25        (A portion of Exhibit 144.2 was played.)

Ortega - Direct (Valentini)                                    997

1    BY MR. VALENTINI:

2    Q.   Well, first of all, are you able to see -- were you able

3    to see in this five seconds a tall gentleman wearing a bright

4    blue jacket in this video?

5    A.   I don't see him in this frame at this point.

6    Q.   Okay.  Do you see a gentleman wearing a bright yellow

7    jacket?

8    A.   I see the individual on the left wearing the bright yellow

9    jacket.

10   Q.   Yeah.  Do you see an individual standing sort of behind

11   that gentleman but immediately next to him?

12   A.   Now -- now I observe him.

13   Q.   Does that appear to be the same gentleman that we -- that

14   you have identified in other exhibits?

15   A.   It does.

16   Q.   And where is -- based on your knowledge of the Capitol

17   grounds and the inaugural stage, how far is this area in your

18   estimate from the Lower West Terrace Tunnel?

19   A.   At this point I'd say he was about 30 feet or so from the

20   Lower West Terrace Tunnel.

21          MR. VALENTINI:  Let me skip forward to minute tracker

22   4:30.

23   BY MR. VALENTINI:

24   Q.   And before I play it, do you recall from the CCTV camera

25   that two officers were pulled into the crowd?

Ortega - Direct (Valentini)                                998

1    A.    I do recall observing that.

2    Q.    And I will ask you to focus, if you may, on the first

3    officer that we discussed, if you're able to see him in this

4    video.

5          (A portion of Exhibit 144.2 was played.)

6    A.    I see him on the left-hand side.

7    BY MR. VALENTINI:

8    Q.    Could you please circle that individual for the --

9    A.    He's in between those two.  You can see his helmet.

10         MR. VALENTINI:  So I will proceed frame by frame.

11         (A portion of Exhibit 144.2 was played.)

12   BY MR. VALENTINI:

13   Q.    If you could clear the marking.

14   A.    (The witness complied.)

15   Q.    And follow along that individual, if you may.  Are you

16   able to see the helmet at this point?

17   A.    I am.

18         MR. VALENTINI:  I have now stopped at 5 minutes and 4

19   seconds into the exhibit.

20   BY MR. VALENTINI:

21   Q.    Are you still able to see the helmet of the officer?

22   A.    I am.

23   Q.    Does he appear to be surrounded?

24   A.    He is.

25   Q.    And are you able to see a gentleman wearing a bright blue

1    jacket at this point in the exhibit?

2    A.   I believe he's underneath the individual with the

3    yellow -- the yellow jacket.

4    Q.   To be clear, he's not near the officer that you were just

5    describing and talking about now; right?

6    A.   That is correct.

7    Q.   What happened to that first officer in this video since

8    last time you saw him?

9    A.   He's still at this point surrounded by the crowd.

10   Q.   Somewhat to the right-hand side of the picture?

11   A.   That is correct, he's on the right-hand side.

12   Q.   Would you please circle it for the jury.  Circle him for

13   the jury.

14   A.   (The witness complied.)

15   Q.   If you could please remove the markings.

16   A.   (The witness complied.)

17   Q.   Thank you.

18        MR. VALENTINI:  And I would like to go back now and

19   start playing the same video starting at 4:50 and this time

20   hoping to focus on the other officer.

21   BY MR. VALENTINI:

22   Q.   I'm going to ask you to please let me know if you see

23   the -- another officer during this video.

24        (A portion of Exhibit 144.2 was played.)

25   A.   I do.

1    BY MR. VALENTINI:

2    Q.   Could you please circle this officer for the jury.

3    A.   (The witness complied.)

4    Q.   It's next to an individual wearing an eagle costume, for

5    lack of a better term.

6              THE COURT:  Wearing what?

7              MR. VALENTINI:  A bird costume, an eagle costume, it

8    appears.  The individual next to the officer.

9              THE COURT:  Oh, next to the officer?

10             MR. VALENTINI:  Yeah.

11             THE COURT:  What is the officer wearing?  I can't

12   tell from here.

13             THE WITNESS:  The officer is wearing the MPD helmet,

14   and he's wearing the yellow Capitol Police reflective vest, and

15   then to the right-hand side of him, you'll see what appears to

16   be an eagle's head.

17             THE COURT:  Okay.

18   BY MR. VALENTINI:

19   Q.   And could you please remove the markings.

20   A.   (The witness complied.)

21   Q.   Thank you.  Are you able to see an MPD helmet on and off

22   at this point?

23   A.   On the second officer; correct?

24   Q.   On the second officer, yes.

25   A.   I couldn't see the MPD helmet, but I could see the

1    reflective vest.

2         Now I can see the Metropolitan Police Department helmet.

3    Q.   And could you please circle it for the jury.

4    A.   (The witness complied.)

5    Q.   And based on where the writing is on the helmet, is the

6    helmet facing forward, left, right, or downwards?

7    A.   He's facing down.

8    Q.   If you could please remove the markings.

9    A.   (The witness complied.)

10        (A portion of Exhibit 144.2 was played.)

11   BY MR. VALENTINI:

12   Q.   Could you please circle the helmet if you're still able to

13   see it.

14   A.   (The witness complied.)

15            MR. VALENTINI:  And this is at time -- minute marker

16   5:14.

17   BY MR. VALENTINI:

18   Q.   And could you please remove the markings at this point.

19   A.   (The witness complied.)

20        (A portion of Exhibit 144.2 was played.)

21            MR. VALENTINI:  I've now stopped the video at 5:18.

22   BY MR. VALENTINI:

23   Q.   Do you see a gentleman in a bright blue jacket in the

24   vicinity of the officer with the reflective vest?

25   A.   I do see the individual with the bright blue jacket.

Ortega - Direct (Valentini)                                    1002

```
1    Q.   Could you please highlight him for the jury or circle him

2    for the jury.

3    A.   (The witness complied.)

4    Q.   Thank you.  And could you please remove the markings.

5    A.   (The witness complied.)

6         (A portion of Exhibit 144.2 was played.)

7    BY MR. VALENTINI:

8    Q.   Does the office -- does the gentleman with the bright blue

9    jacket seem to -- could you please describe his movement.

10        MR. SMOCK:  Objection.  I didn't hear the question

11   exactly, but can you repeat the question?

12        THE COURT:  What's the question again, and then we'll

13   come to the bench.

14   BY MR. VALENTINI:

15   Q.   Do you see --

16        THE COURT:  You can rephrase it if you'd rather.

17   BY MR. VALENTINI:

18   Q.   Is the gentleman in the bright blue jacket moving towards

19   the officer with the reflective vest at this point?

20        MR. SMOCK:  Objection, Your Honor.  Can we approach

21   for one moment?

22        THE COURT:  We can approach, yes.

23      (At sidebar)

24        MR. SMOCK:  Your Honor, this obviously is crucial --

25        THE COURT:  Say it again.
```

```
 1          MR. SMOCK:  This obviously is crucial footage during

 2    the trial which is the alleged assault.  The video should be

 3    played.  It can be played.  My concern, again, is this is an

 4    incredibly important moment that the jury will need to

 5    interpret, and having a captain from the Capitol Police who

 6    wasn't present essentially narrate what he thinks he's seeing

 7    is incredibly prejudicial, and the video should be shown, and

 8    the jury can decide for itself what they're seeing.

 9          MR. VALENTINI:  Your Honor, my plan is to ask very

10    broad sort of directional questions which do turn in part on

11    the layout of the Capitol and like which direction the

12    gentleman in the blue jacket is moving in and that sort of

13    question.  I obviously don't mean to get into details, so I

14    think that some leeway will be in order.

15          MR. SMOCK:  This is literally a two- to three-second

16    incident.  Which direction he was moving, what is happening is

17    for the jury --

18          THE COURT:  Yeah.  Let's just watch it.  Let's just

19    watch.  How long are you going to be with this video, with this

20    particular video?

21          MR. VALENTINI:  After this there is some -- with this

22    particular video?  Not very much longer.

23          THE COURT:  Okay.  Then we should take a lunch break.

24          MR. VALENTINI:  Yes.  This is critical so I'd prefer

25    to --
```

Ortega - Direct (Valentini)                                    1004

1            THE COURT:  Well, it is critical.

2            MR. VALENTINI:  Yes.

3            THE COURT:  Therefore, you're not going to ask him to

4    describe any piece of it.  We're just going to watch it.

5            MR. VALENTINI:  Understood.  I will continue to use

6    zooming and other visual features, if that's okay.

7            THE COURT:  Well, you can -- why don't you just show

8    it all the way through, and then if you want to go back and

9    zoom without asking him to describe what the jury can observe

10   for itself.

11           MR. VALENTINI:  I will.

12       (In open court)

13           MR. VALENTINI:  I will now play this exhibit --

14   continue playing this exhibit.

15       (A portion of Exhibit 144.2 was played.)

16           MR. VALENTINI:  Let me go back a few seconds, and

17   we'll continue playing the exhibit.

18       (A portion of Exhibit 144.2 was played.)

19           MR. VALENTINI:  I've stopped the video at time -- at

20   minute marker tracker 6 minutes and 27 seconds into the video.

21   BY MR. VALENTINI:

22   Q.   Captain Ortega, will you please read, if you can, for the

23   record -- well, do you see a number printed on the helmet of

24   the officer we were just following?

25   A.   I do.

1    Q.   What is that number, if you're able to read it?

2    A.   Appears to be 2272.

3              THE COURT:  Say it again, please.

4              THE WITNESS:  2272.

5              MR. VALENTINI:  At this point we can pull down this

6    exhibit.  Well, I will play a few more seconds of the exhibit,

7    and then we can pull it down.

8         (A portion of Exhibit 144.2 was played.)

9              MR. VALENTINI:  I have stopped the exhibit at minute

10   marker 6 minutes and 34 seconds into the exhibit.

11   BY MR. VALENTINI:

12   Q.   Are you still able to see the officer at this point in the

13   exhibit?

14   A.   He is -- the officer has now left the frame.

15   Q.   Okay.  Are you still able to see the gentleman in the

16   bright blue jacket?

17   A.   I was able to a second ago.  He had been in the center.

18        Yeah, I see him now.

19             MR. VALENTINI:  We can take down this exhibit at this

20   point.

21             THE COURT:  Okay.

22             MR. VALENTINI:  Thank you.

23             THE COURT:  So I think this would be a good time to

24   take our lunch break.

25        Once again, ladies and gentlemen, you know your

1    instructions.  Don't discuss the case with anybody.  Don't let

2    anybody discuss it with you.  Don't do your own independent

3    research.  Don't blog.  Don't look at anything.  And it's ten

4    after one, so why don't we come back at 2:30?  Let's say 2:30.

5         You may step down, Captain.

6         (Jury out at 1:13 p.m.)

7              THE COURT:  Just to get a sense of what the afternoon

8    is going to look like, how much longer do you think you're

9    going to be?

10             MR. VALENTINI:  Less than 20 minutes, probably

11   15 minutes.

12             THE COURT:  All right.  And does the defense have any

13   idea how long you're going to be?

14             MR. SMOCK:  I would say about a half an hour to an

15   hour, Your Honor.

16             THE COURT:  Okay, all right.  So who is your next

17   witness?  If we start, let's say, if you're -- if we start at

18   2:30 and you get 20 minutes or so and he's got 30 to

19   60 minutes, that gets us to perhaps between 3:30 and 4 o'clock,

20   and we'll take a midafternoon break at some point.  So do you

21   know who your next witness will be --

22             MR. VALENTINI:  Yes.

23             THE COURT:  -- or do you still got to think about it?

24             MR. VALENTINI:  No.  It will be United States Secret

25   Service Inspector Lani Hawa.

```
 1                THE COURT:  Okay.  So we probably won't get to
 2     Officer Bogner today.
 3                MR. VALENTINI:  No, I do not expect that we will.
 4                THE COURT:  All right.  Thank you, all.  See you
 5     after lunch.
 6           (Recess taken at 1:14 p.m.)
 7           (At 2:39 p.m. on March 6, 2023; with counsel for the
 8     parties and the defendant present; WITH the jury:)
 9             RONALD ORTEGA, PREVIOUSLY SWORN, RESUMED THE STAND
10                THE COURT:  Good afternoon, everybody.  And Captain
11     Ortega, you're still under oath.
12                THE WITNESS:  Yes, sir.
13                MR. VALENTINI:  May I proceed?
14                THE COURT:  Yes, sir.
15                      DIRECT EXAMINATION RESUMED
16     BY MR. VALENTINI:
17     Q.   Good afternoon, Captain Ortega.
18     A.   Good afternoon.
19     Q.   Before the break I asked you a few questions about
20     Exhibit 144.2.  I'm going to pull up that exhibit again and ask
21     you a few additional questions.
22                MR. VALENTINI:  And let's jump directly to time mark
23     4:50 into the exhibit.
24     BY MR. VALENTINI:
25     Q.   And as we did before, could you please let me know when
```

1    you see the MPD helmet of the second officer appear in this

2    video.

3           (A portion of Exhibit 144.2 was played.)

4    A.   Okay.  I can see it now.

5              MR. VALENTINI:  Let me stop the exhibit one second.

6    BY MR. VALENTINI:

7    Q.   And would you be able -- did I stop too late?  Can you

8    still see it?

9    A.   You've got -- the flag is in the way at this point.

10   Q.   All right.  Next time you see -- I will resume playing the

11   exhibit.  Next time you see, will you please alert me so we can

12   circle it.

13   A.   Yeah.

14          (A portion of Exhibit 144.2 was played.)

15   A.   You can see it now.

16   BY MR. VALENTINI:

17   Q.   Okay.  Would you please circle it.

18   A.   (The witness complied.)

19   Q.   And is that the helmet of the first officer that we were

20   talking about or the second officer?

21   A.   I believe that's the second officer.

22             THE COURT:  And he's in this -- the area where we

23   stop -- he's stopped it and you circled it, he's sort of a

24   little bit -- just so the record is clear, right -- a little

25   bit to the left of the screen under sort of the middle of the

1    flag; is that right?

2             THE WITNESS:  That is correct, Your Honor.

3    BY MR. VALENTINI:

4    Q.   All right.  And could you please erase the marking,

5    please.

6    A.   (The witness complied.)

7             MR. VALENTINI:  I will continue playing the exhibit.

8    BY MR. VALENTINI:

9    Q.   And if you'd please let me know if you see an MPD helmet

10   of an officer who's also wearing a yellow Capitol Police vest.

11            (A portion of Exhibit 144.2 was played.)

12   A.   My apologies.  The one I marked, that's actually the first

13   officer.  My apologies.  That's not the one with the Capitol

14   Police vest.

15   BY MR. VALENTINI:

16   Q.   Understood.  So will you please let me know when you see a

17   helmet -- an MPD helmet worn by a Capitol Police officer.

18            (A portion of Exhibit 144.2 was played.)

19   A.   Okay.  Now.  Now you can see it.  It is actually behind

20   the flag next to the eagle head.

21   BY MR. VALENTINI:

22   Q.   Could you please circle that area.

23   A.   (The witness complied.)

24   Q.   Thank you.

25            MR. VALENTINI:  Now we'll clear the marking, and I

 1    will zoom in to the view, and we'll continue playing the

 2    exhibit.

 3         (A portion of Exhibit 144.2 was played.)

 4    BY MR. VALENTINI:

 5    Q.   And are you able to tell which direction this helmet is

 6    facing, whether it's, like, forward, backwards, left, right?

 7    A.   Not in this image, but I know when -- as you proceed with

 8    the photo and we -- when we reviewed it before, the helmet is

 9    facing down.

10         (A portion of Exhibit 144.2 was played.)

11    BY MR. VALENTINI:

12    Q.   Are you able to see the helmet of the police officer at

13    this point?

14    A.   You can.  You can see that the helmet is facing down.

15              MR. VALENTINI:  Let's continue.

16         (A portion of Exhibit 144.2 was played.)

17              MR. VALENTINI:  Let me slow down the playing of this

18    exhibit at this point.

19    BY MR. VALENTINI:

20    Q.   Is the helmet still visible?

21    A.   It is still facing down.

22         (A portion of Exhibit 144.2 was played.)

23              THE COURT:  Stop a second.  So could you go back a

24    second.

25              MR. VALENTINI:  Further?

Ortega - Direct (Valentini)                                    1011

```
1              THE COURT:  I want to -- I asked you to go back a
2    second.
3              MR. VALENTINI:  Yeah.
4              THE COURT:  I would like the officer to tell us
5    again -- show us again where the second officer is and maybe
6    circle it.
7              THE WITNESS:  Your Honor, I could not hear what you
8    said.
9              THE COURT:  I want -- first of all, does this video
10   show us the time of day or just the number of seconds into the
11   video?
12             MR. VALENTINI:  This is just a time mark into the
13   video.  There is no time stamp.
14             THE COURT:  This is further along in the video.
15     Would you show us again where the second officer you've
16   referred to is.
17             THE WITNESS:  Yes, sir (indicating).
18             THE COURT:  Now, earlier I think you told us that if
19   somebody's wearing a MPD, Metropolitan Police Department, hat
20   but a yellow vest --
21             THE WITNESS:  Yes, a yellow Capitol Police reflective
22   vest, sir.
23             THE COURT:  -- you know that that means that the
24   person is a Capitol Police officer as opposed to an MPD
25   officer?
```

```
 1            THE WITNESS:  That is correct, sir, and later in the
 2   footage you can actually see the Capitol Police patch on his
 3   arm.
 4            THE COURT:  Okay.  Thank you.
 5   BY MR. VALENTINI:
 6   Q.   And could you please clear the marking.
 7   A.   (The witness complied.)
 8        (A portion of Exhibit 144.2 was played.)
 9            MR. VALENTINI:  At this point I've stopped at time
10   mark 5 minutes and 24 seconds into the exhibit.
11   BY MR. VALENTINI:
12   Q.   Are you able to see a gentleman wearing a bright blue
13   jacket?
14   A.   I am.
15   Q.   Could you please circle him.
16   A.   (The witness complied.)
17   Q.   Thank you.  And could you please erase the mark.
18   A.   (The witness complied.)
19   Q.   And are you able to identify where the Capitol Police
20   officer is?
21   A.   Yes.
22   Q.   Could you please circle that.
23   A.   He's underneath right here.
24   Q.   Thank you.  Could you --
25            MR. SMOCK:  Your Honor, I have the same objection to
```

1    this officer testifying in --

2              THE COURT:  Sorry.  I can't hear you.

3              MR. SMOCK:  I have the same objection to this officer

4    testifying as a narrative to the video that he wasn't present

5    for.

6              THE COURT:  Overruled.

7    BY MR. VALENTINI:

8    Q.   Could you please clear the mark.

9    A.   (The witness complied.)

10   Q.   And is the helmet I have just circled on the touch screen,

11   is that an MPD helmet?

12   A.   It is.

13   Q.   Thank you.

14        (A portion of Exhibit 144.2 was played.)

15   BY MR. VALENTINI:

16   Q.   Directing your attention to the gentleman in the bright

17   blue jacket, can you see the gentleman right immediately under

18   or behind the gentleman wearing a neon sweater?

19   A.   I do.  I can see him.

20        (A portion of Exhibit 144.2 was played.)

21   BY MR. VALENTINI:

22   Q.   And are you able to see any flickering in the object in

23   his hand?

24   A.   I do.

25              MR. SMOCK:  Objection, Your Honor.

1            THE COURT:  At this time I will sustain the

2    objection.  The jury can view the video.  I have permitted some

3    leeway so that -- based on his knowledge of what Capitol Police

4    officers are wearing and following Officer 2 through the crowd

5    and earlier Officer 1 through the crowd.  I've allowed him to

6    do that, but in terms of what the video shows, it is up to the

7    jury to draw their own conclusions as to what they're seeing.

8        You're the finders of fact, and you can watch any of these

9    videos as often as you want to during your deliberations.  So

10   we're not going to let Captain Ortega tell us what we can all

11   see for ourselves.

12       (A portion of Exhibit 144.2 was played.)

13   BY MR. VALENTINI:

14   Q.   Is the MPD helmet still positioned -- well, based on your

15   understanding of the lettering on the MPD helmet, is that

16   helmet at this point in the exhibit positioned looking down or

17   up, left, right?

18   A.   It appears to be kind of twisted to the right facing kind

19   of away from the camera angle like -- almost like diagonal,

20   looking down to the right.

21       (A portion of Exhibit 144.2 was played.)

22   BY MR. VALENTINI:

23   Q.   Are you able to see the MPD helmet at this point in the

24   exhibit?

25   A.   No.  It's just kind of blending in now at this point.  I

 1    can't really see it.

 2         (A portion of Exhibit 144.2 was played.)

 3              THE COURT:  Did you say that at some point in this

 4    video or in another video that you're able to identify the

 5    badge number?

 6              THE WITNESS:  So at the end of this video, you're

 7    going to see what would be the officer's number on the top of

 8    the helmet, but as the officer is walking out, you're going to

 9    see -- you'll have better clarity to see the helmet, the

10    Capitol Police vest, and then the Capitol Police emblem on his

11    shoulder.

12              THE COURT:  Okay.

13         (A portion of Exhibit 144.2 was played.)

14              THE WITNESS:  And Your Honor, the badge as well.

15    You'll see a copy of the Capitol Police sew-on badge on the

16    chest, if I recall correctly.

17         (A portion of Exhibit 144.2 was played.)

18              THE WITNESS:  Right there, Your Honor.  If you pause

19    it a second back, you'll see the Capitol Police emblem on his

20    shoulder.

21    BY MR. VALENTINI:

22    Q.   I'm sorry, Captain Ortega.  Should I rewind the --

23    A.   If you could rewind it, like, a second or so, you'll be

24    able to see the Capitol Police emblem on his shoulder.

25         Right there.

1    Q.   Could you please circle it.

2    A.   (The witness complied.)

3    Q.   Thank you.  And could you please clear the mark.

4    A.   (The witness complied.)

5    Q.   Thank you.

6         (A portion of Exhibit 144.2 was played.)

7    A.   If you could rewind it one second, the yellow mark right

8    there is the sewn-on Capitol Police badge on his chest.  Would

9    you like me to circle it?

10   BY MR. VALENTINI:

11   Q.   Yes.  If you could, please.

12   A.   (The witness complied.)

13   Q.   Thank you.

14   A.   That is the sewn-on Capitol Police badge on his chest.

15   Q.   Thank you, Captain Ortega.

16        (A portion of Exhibit 144.2 was played.)

17        MR. VALENTINI:  We can pull down this exhibit.

18        Thank you.

19        Let me pull up what has been marked as Exhibit 144.2A, not

20   yet in evidence.

21        COURTROOM DEPUTY:  I'm sorry.  Mr. Valentini, can you

22   repeat the number to that exhibit.

23        MR. VALENTINI:  Yeah.  The exhibit number is 144.2A.

24        Thank you.

25   BY MR. VALENTINI:

1    Q.    Captain Ortega, do you recognize Exhibit 144.2A?

2    A.    I do.

3    Q.    And what is it?

4    A.    These are a set of still photos from the footage we just

5    previously viewed.

6            MR. VALENTINI:  The government moves to admit

7    Exhibit 144.2A into evidence.

8            MR. SMOCK:  No objection.

9            THE COURT:  144.2A will be admitted.

10           MR. VALENTINI:  May they be published for the jury,

11   please?

12   BY MR. VALENTINI:

13   Q.    On the first page of this exhibit, Captain Ortega, do you

14   see a MPD helmet with a reflective vest?

15   A.    I do.

16   Q.    Could you please circle it.

17   A.    (The witness complied.)

18   Q.    And if you could please clear the mark.

19   A.    (The witness complied.)

20   Q.    Thank you.

21           MR. VALENTINI:  And I'm now looking at page 6 of this

22   exhibit.

23   BY MR. VALENTINI:

24   Q.    And Captain Ortega, are you able to see the writing of an

25   MPD helmet in this exhibit?

1    A.   Just barely.  You want me to circle it?

2    Q.   Yes, please do.

3    A.   (The witness complied.)

4    Q.   Thank you.  If you could please remove the mark.

5    A.   (The witness complied.)

6    Q.   And in the last page of this exhibit, Captain Ortega, are

7    you able to see a reflective Capitol Police vest?

8    A.   I am.

9    Q.   Could you please circle it.

10   A.   (The witness complied.)

11   Q.   And are you also able to see a helmet next to it?

12   A.   I am.

13   Q.   And could you please read the number on that helmet for

14   the jury.

15   A.   Yeah.  It is 2272.

16        MR. VALENTINI:  We can take down this exhibit,

17   please.

18        Thank you.

19        I'm going to pull up what has been marked as

20   Exhibit 143.4A.

21             THE COURT:  143.4A?

22             MR. VALENTINI:  Yes, Your Honor.

23             THE COURT:  I don't see that on your exhibit list.

24             MR. VALENTINI:  May we have a brief bench conference,

25   Your Honor?

1          THE COURT:  No.

2          MR. VALENTINI:  I believe the numbering of this

3    exhibit was changed in response -- in response to a ruling from

4    Friday.

5          THE COURT:  All right.  Can you just tell me what the

6    old number was, or should you -- do you want a bench

7    conference?

8          MR. VALENTINI:  No.  The number is correct, and it

9    will be reflected in the exhibit list that will be completed.

10         THE COURT:  Whatever.  Okay.  143.4A?

11         MR. VALENTINI:  Correct.

12   BY MR. VALENTINI:

13   Q.   Captain Ortega, did you review the video that's been

14   marked as Exhibit 143.4A before coming to court?

15   A.   I have.

16   Q.   And do you know who took this video?

17   A.   I do not.

18   Q.   But were you able to determine where and when the events

19   depicted in this video took place?

20   A.   I was.

21   Q.   And specifically, were you able to compare this video to

22   the CCTV video and other footage?

23   A.   I was.

24   Q.   And based on that comparison were you able to determine

25   whether this video was recorded around the time of an officer

1    surge in the Lower West Tower's Tunnel?

2    A.    It was.

3            MR. VALENTINI:  Your Honor, the government moves for

4    the admission of Exhibit 143.4A into evidence.

5            MR. SMOCK:  Same continuing objection, Your Honor.

6            THE COURT:  It will be admitted.

7            MR. VALENTINI:  I'm going to start playing the

8    exhibit with one minute into the exhibit.

9        (A portion of Exhibit 143.4A was played.)

10   BY MR. VALENTINI:

11   Q.    Captain Ortega, do you see a gentleman wearing a neon

12   sweater in this exhibit?

13   A.    I do see him.

14   Q.    Does he appear to be the same gentleman that you saw in

15   Exhibit 144.2?

16   A.    He does.

17   Q.    Do you see a gentleman wearing a bright blue jacket next

18   to him?

19   A.    I do.

20   Q.    Does the gentleman wearing the bright blue jacket appear

21   to have his arm raised?

22   A.    He does.

23       (A portion of Exhibit 143.4A was played.)

24   BY MR. VALENTINI:

25   Q.    Did you hear what the gentleman said?

 1    A.   You'd have to replay it.  It's coming in really low over

 2    here.

 3         (A portion of Exhibit 143.4A was played.)

 4    BY MR. VALENTINI:

 5    Q.   Are you able to see an MPD helmet at this point in the

 6    exhibit?

 7              MR. VALENTINI:  And I have stopped at minute mark 1

 8    minute and 41 seconds into the exhibit.

 9    A.   Yes.  I can see the MPD helmet on the right-hand side.

10    BY MR. VALENTINI:

11    Q.   Could you please circle it for the jury.

12    A.   (The witness complied.)

13    Q.   And the officer who was wearing the MPD helmet, does he

14    appear to be wearing a reflective vest as well?

15    A.   He does.

16    Q.   Thank you.

17         (A portion of Exhibit 143.4A was played.)

18    BY MR. VALENTINI:

19    Q.   Captain Ortega, do you see an officer moving back towards

20    the Lower West Tunnel?

21    A.   I do.

22    Q.   And to be clear, that officer is not wearing a Capitol

23    Police uniform?

24    A.   That's correct.  That's an MPD officer.

25    Q.   So not the officer who's wearing the reflective vest?

1    A.    That is correct.

2    Q.    Okay.

3          (A portion of Exhibit 143.4A was played.)

4             MR. VALENTINI:  We can take down this exhibit.

5          Thank you.

6          Let me pull up what has been marked as Exhibit 143.4B.

7    BY MR. VALENTINI:

8    Q.    Captain Ortega, do you recognize Exhibit 143.4B?

9    A.    I do.

10   Q.    And it's a similar photograph.  Do you recognize what it's

11   a photograph of?

12   A.    Yes.  It's a photograph of the last -- a still photo of

13   the last footage we observed.

14             MR. VALENTINI:  The government moves to admit

15   Exhibit 144 -- 143.4B into evidence.

16             MR. SMOCK:  No objection.

17             THE COURT:  It will be admitted.

18         Is there an arrow in the still?  I mean, is that part of

19   the exhibit?

20   BY MR. VALENTINI:

21   Q.    Captain Ortega, is the arrow part of the video that was

22   admitted into evidence, or was it added in preparation for

23   trial?

24   A.    This was added in preparation for the trial.

25             MR. VALENTINI:  Thank you.  And we can take down the

1    exhibit.

2    BY MR. VALENTINI:

3    Q.   Captain Ortega, I'm going to show you what has been marked

4    as Exhibit 140, which is not in evidence.

5         Captain Ortega, do you recognize the video that has been

6    marked as Exhibit 140?

7    A.   I do.

8    Q.   And again, do you know who took this video?

9    A.   I do not.

10   Q.   But are you able -- were you able to determine where and

11   when this video was taken based on its appearance?

12   A.   I was.

13   Q.   When was this -- when and where was it taken?

14   A.   January 6, 2021, out on -- it's from the inaugural stage

15   viewing towards the Lower West Terrace Tunnel.

16             MR. VALENTINI:  The government moves for the

17   admission of Exhibit 140 into evidence.

18             MR. SMOCK:  Same continuing objection, Your Honor.

19             THE COURT:  Overruled.  It will be admitted.

20        (A portion of Exhibit 140 was played.)

21   BY MR. VALENTINI:

22   Q.   And Captain Ortega, do you see a gentleman wearing a neon

23   sweater in this frame at approximately 13 seconds into the

24   exhibit?

25   A.   Yes, to the left of the frame.

1    Q.   Do you also see a gentleman wearing a bright blue jacket

2    and sunglasses?

3    A.   I do.

4    Q.   Will you please circle that gentleman for the jury.

5    A.   (The witness complied.)

6    Q.   And will you now please clear the mark that you just made.

7    A.   (The witness complied.)

8    Q.   Thank you.

9         (A portion of Exhibit 140 was played.)

10            MR. VALENTINI:  And we may take down the exhibit.

11   Thank you.

12   BY MR. VALENTINI:

13   Q.   I'm going to show you what has been marked as

14   Exhibit 143.3A, not yet -- not in evidence.

15        Captain Ortega, do you recognize this exhibit?

16   A.   I do.

17   Q.   Did you review it before coming to court?

18   A.   I did.

19   Q.   Again, you don't know who recorded this particular video?

20   A.   I do not.

21   Q.   But you're able to determine when and where the events

22   depicted in this video occurred?

23   A.   I was.

24   Q.   When did they occur?

25   A.   January 6, 2021.

1    Q.   And where did they occur?

2    A.   Inaugural stage viewing into the Lower West Terrace

3    Tunnel.

4    Q.   Let me play a segment of at least a little bit of the

5    exhibit before I ask you a few more questions.

6         (A portion of Exhibit 143.3A was played.)

7    BY MR. VALENTINI:

8    Q.   I have stopped the exhibit approximately 27 seconds into

9    the exhibit.  Do the events depicted in Exhibit 143.3A match

10   the events depicted in Exhibit 100.2 and 144.2 inside the

11   tunnel?

12   A.   They do.

13           MR. VALENTINI:  Your Honor, the government moves to

14   admit Exhibit 143.4B into evidence -- 4A into evidence.

15           THE COURT:  143.3A?

16           MR. VALENTINI:  Excuse me.  Let's start over.  The

17   government moves to admit Exhibit 143.3A into evidence.

18           MR. SMOCK:  Same continuing objection.  And also with

19   respect to the timing, so long as the government can establish

20   when this is in relation to the other events we've been

21   watching.

22           MR. VALENTINI:  Yes.

23           THE COURT:  I think he's laid a sufficient

24   foundation.  Overruled.

25           MR. VALENTINI:  And if we may publish.

1          THE COURT:  It's admitted.  I'm sorry.  I said

2    overruled; therefore, admitted.

3          (A portion of Exhibit 143.3A was played.)

4          MR. VALENTINI:  I've stopped the -- I've paused the

5    exhibit 26 seconds into the exhibit, and I will play it slowly.

6          (A portion of Exhibit 143.3A was played.)

7          MR. VALENTINI:  Okay.  Now continue playing the

8    exhibit at normal speed.

9          (A portion of Exhibit 143.3A was played.)

10          MR. VALENTINI:  And we may take the exhibit down.

11          Brief indulgence.

12    BY MR. VALENTINI:

13    Q.    Captain Ortega, were you physically assaulted on

14    January 6, 2021?

15    A.    I was.

16    Q.    Were your officers physically assaulted on January 6,

17    2021?

18    A.    They were.

19    Q.    Were you afraid for their lives on January 6, 2021?

20    A.    I was.

21    Q.    Were you afraid at times for your own life on that day?

22    A.    I was.

23          MR. VALENTINI:  No further questions.

24          THE COURT:  Are you ready to proceed, Mr. Smock?

25          MR. SMOCK:  Yes, I am.  Thank you.

Ortega - Cross (Smock)                                              1027

1          THE COURT:  Thank you.

2                     CROSS-EXAMINATION

3     BY MR. SMOCK:

4     Q.   Captain Ortega, hello.  I'm Ned Smock.

5     A.   Nice to meet you, sir.

6     Q.   A number of things that I wanted to clarify as an initial

7     matter.  One of them I wanted to clarify about the last video

8     that was shown, 143.3A, which showed Mr. GossJankowski in the

9     tunnel.  That occurred prior to the footage that you were just

10    going over on the terrace; correct?

11    A.   That is correct, sir.

12    Q.   So that wasn't made clear on direct.  There's no

13    allegation that he went back into the tunnel after that point;

14    correct?

15    A.   That appears to be the heave-ho incident.

16    Q.   Which occurred prior to the incident that you were just

17    going over in slow motion; correct?

18    A.   Correct.

19    Q.   Now I want to get into that actual exhibit which you went

20    over in slow motion a number of times.

21         MR. SMOCK:  And I'd like to start by putting that

22    exhibit up, and I'm going to ask Adam to put up Exhibit 144.2.

23         And this is already in evidence?

24              THE COURT:  Yes.

25    BY MR. SMOCK:

1    Q.   So just for background, you're aware that what happens in

2    this video that we've just been going over is the -- what the

3    government is relying upon for its charge against

4    Mr. GossJankowski of assault on Officer Moore; correct?

5              MR. VALENTINI:  Objection, Your Honor.  Can we go to

6    sidebar?

7              THE COURT:  You can come to the bench or...

8         (At sidebar)

9              MR. VALENTINI:  Your Honor, there is no place for the

10   defense to tell the jury what we are relying on for different

11   charges.  That is our opening argument, that is our closing

12   argument.  That is not their job in cross-examination to decide

13   what our case is and direct the jury to some understanding of

14   our case.

15             MR. SMOCK:  Is this not the basis for the charge?

16             THE COURT:  Were you going to say something further?

17             MR. VALENTINI:  Yeah.  I mean, the officer who is now

18   at bar is not -- who's on the witness stand does not know or

19   may not know -- may or may not know what we're relying on, but

20   I don't understand how it's relevant to the jury.  The

21   knowledge of this particular witness as to what we are relying

22   on or not relying on doesn't seem to me relevant to the jury.

23             MR. SMOCK:  It's entirely relevant, and, in fact, in

24   their opening the government stated that this was the basis for

25   the assault charge.  If it's not, then you need to tell us.

Ortega - Cross (Smock)                                                1029

1          MR. VALENTINI:  No, no.  This is absolutely the basis

2     for the charge, but this particular witness's knowledge of the

3     basis for the charge was completely irrelevant.

4          MR. SMOCK:  He just said yes.

5          MR. VALENTINI:  Yeah.  That's because the answer was

6     before I objected.

7          THE COURT:  Well, look.  I'm going to permit the

8     question, and, you know, you can say this is a basis rather

9     than the basis perhaps, because I don't know if there's going

10     to be additional testimony, and neither does this officer.

11          MR. SMOCK:  Well, I mean, let me be clear.  If the

12     government has some other basis, we need to be aware of it.

13          MR. VALENTINI:  No, no.  Our concern is not about

14     what our basis is or whether the testimony is accurate or not.

15     The fact that this particular witness knows or does not know

16     what the basis of our charge is is irrelevant, so that is for

17     the jury --

18          THE COURT:  Who cares is my bottom line.  He can ask

19     the question and the officer will say yes or no.  It doesn't

20     bind you in any way to what additional evidence you can put on

21     or what arguments you can make in closing.

22          (In open court)

23          THE COURT:  Objection is overruled.

24     You may proceed, Mr. Smock.

25     BY MR. SMOCK:

1    Q.   Captain Ortega, just so we're clear -- I want to make sure

2    I'm getting my question out -- you're aware that what happens

3    in this video is what the government is relying on when it says

4    that my client, Mr. GossJankowski, assaulted Officer Moore.  Am

5    I right?

6    A.   Sir, there's plenty of exhibits, but if that's what you're

7    telling me, that's what you're telling me, sir.

8    Q.   Well, this incident is the basis for the assault charge;

9    correct?

10   A.   I am not sure what the government plan is.  I'm just

11   relying on what the video is, sir.

12   Q.   Okay, very well.  Well, I guess we'll hear from the

13   government about that, but I want to talk about this in more

14   detail.

15        MR. SMOCK:  First of all, I'm going to have Adam play

16   to minute marker 5:17, if you would.

17        THE COURT:  And again, this is not time, p.m. time.

18   It is in this particular video how far into the video it is;

19   correct?

20        MR. SMOCK:  Point taken and I apologize.

21        THE COURT:  No.  You don't have to apologize.  I'm

22   just trying to clarify.

23        (A portion of Exhibit 144.2 was played.)

24        MR. SMOCK:  So we've stopped at minute marker 5:17 on

25   this video, and I want to identify the people we're talking

Ortega - Cross (Smock)                                          1031

1    about here.

2    BY MR. SMOCK:

3    Q.   First of all, are you -- well, actually, I want to back up

4    a little bit.  You've talked in your direct about two officers,

5    and you referred to a first officer from MPD; correct?

6    A.   That is correct, sir.

7    Q.   And am I right that that officer's name is Officer Michael

8    Fanone?

9    A.   That is correct, sir.

10   Q.   And in fact, on this day during this incident, someone did

11   tase or stun gun Officer Fanone; correct?

12   A.   As far as I'm aware.

13   Q.   And that wasn't Mr. GossJankowski; right?

14   A.   I don't believe that to be true, sir.

15   Q.   In other words, it wasn't?

16   A.   It was not.

17   Q.   Okay.  Now, do you see Officer Fanone where we are in this

18   video?

19   A.   I don't see him in this footage.  I believe he's somewhere

20   on the right-hand side.

21   Q.   Okay.  And he has been -- he's off to the side by this

22   time; right?

23   A.   I think he might be on the ground somewhere over here

24   where these individuals are looking down underneath the thin

25   blue line flag.

1    Q.   Got it.  And can you identify where Mr. GossJankowski is.

2    A.   He would be on the right-hand side right next to the

3    individual with the yellow sweater.

4    Q.   I'm going to circle him here.  Is that him?

5    A.   That is.

6    Q.   And can you see -- the second officer you've referred to

7    is Officer Moore; right?  He's the officer from Capitol Police?

8    A.   That is correct, sir.

9    Q.   And can you see him in this image?

10   A.   I believe he's somewhere right next to the megaphone that

11   they're grabbing.  This isn't the best frame to see.  If you

12   want to...

13           MR. SMOCK:  Can you back up a tiny bit, Adam?  There

14   we go.

15           THE WITNESS:  There you go.

16   BY MR. SMOCK:

17   Q.   So I'm circling the MPD helmet there.  Is that Officer

18   Moore?

19   A.   That is him.

20   Q.   Okay.  So during direct you went over with the government

21   this incident in slow motion a number of times and backing up

22   and going forward.

23           MR. SMOCK:  I want to just play this in real time

24   right now.  So Adam, can you play until minute marker 5:37.

25           (A portion of Exhibit 144.2 was played.)

```
1    BY MR. SMOCK:
2    Q.   That's in real time what you were showing in slow motion
3    during your direct examination.  Am I right?
4    A.   That is correct.
5    Q.   Now, Captain Ortega, you have been in law enforcement
6    since 2007.  Am I right?
7    A.   That is correct, sir.
8    Q.   So you've come to understand that when you're determining
9    whether someone actually broke the law or committed a
10   particular crime, figuring out what their intent was is
11   important; right?
12   A.   It depends on what the crime is.
13   Q.   Many crimes, including assault, include an element of
14   intent?
15   A.   I would -- that is fair.  That is a fair thing to say,
16   yes, sir.
17   Q.   In other words, what -- what was -- why was someone doing
18   what they did is sort of a layperson's way of describing it;
19   right?
20   A.   It would be.
21   Q.   Did they mean to harm someone, or did they mean to help
22   someone; right?
23   A.   Well, it does all depend what the situation is, what the
24   facts are with the case.
25   Q.   Got it.
```

Ortega - Cross (Smock)                                            1034

1    A.    It's not a black-and-white thing.  It really depends on a

2    case-by-case basis what the crime is.

3    Q.    But knowing why someone did something is important to law

4    enforcement in determining --

5              MR. VALENTINI:  Objection, Your Honor.

6    BY MR. SMOCK:

7    Q.    -- whether to charge --

8              THE COURT:  Objection sustained.

9    BY MR. SMOCK:

10   Q.    I want to show you what happened before this incident that

11   you've gone over right now.  I'm going to show you --

12             MR. SMOCK:  Can we take down the display for a

13   moment.

14   BY MR. SMOCK:

15   Q.    I want to show this incident to you from a different

16   angle.

17             MR. SMOCK:  Adam, can you put up Exhibit 147, please.

18             THE COURT:  This is Government's Exhibit 147?

19             MR. SMOCK:  Yes.

20             THE COURT:  And it is not in evidence at this point.

21             MR. SMOCK:  It was not admitted by the government.

22        I'm going to ask, Adam, that you play this video for

23   Captain Ortega briefly, and then I'll tell you when to stop.

24        Oh, can -- okay.

25   BY MR. SMOCK:

Ortega - Cross (Smock)                                          1035

1    Q.    So Captain Ortega, I'm going to ask you some questions

2    similar to the ones that were asked of you on direct in

3    identifying this video.  Do you -- can you identify this as

4    being the inaugural stage?

5    A.    I can, sir.  It is the inaugural stage.

6    Q.    And you see the man who is up to the left of the tunnel

7    there standing up with a flag?

8    A.    With the red hat?

9    Q.    Correct.

10   A.    Yes, I can see him.

11   Q.    And can you also on the right of the screen see the person

12   in the fluorescent green or yellow jacket that we've been

13   referring to?

14   A.    Yes, I can.  I can see his elbow.

15   Q.    So this is the same area taken from a different angle.  Am

16   I right?

17   A.    That is correct.

18            MR. SMOCK:  I'd move to admit Exhibit 147, please.

19            MR. VALENTINI:  No objection.

20            THE COURT:  It will be admitted.

21            MR. SMOCK:  Now, can I ask, Adam, that you start

22   playing this video at minute marker 20.

23            THE COURT:  Again, this is not a time of day but the

24   minute markers on the video; correct?

25            MR. SMOCK:  That's correct.

1       And Adam, I'm going to ask you to start with minute marker

2   20 and stop at minute marker 36.

3       (A portion of Exhibit 147 was played.)

4   BY MR. SMOCK:

5   Q.   I've stopped -- or Adam has nicely stopped at minute

6   marker 36.  At the bottom right of the screen, you can see

7   Mr. GossJankowski; correct?

8   A.   I can.

9   Q.   He's the person who has been referred to as the man in the

10  bright blue jacket?

11          THE COURT:  It came down for some minute -- a minute

12  ago.  There you go.

13          MR. SMOCK:  Now, Adam --

14          THE COURT:  You said on the bottom right of the

15  screen?

16          MR. SMOCK:  Bottom right, yes.

17          THE COURT:  Is that where you see him, Captain?

18          THE WITNESS:  Yes, sir.  He's holding a pair of

19  gloves or something.  He has something black in his hand.

20  BY MR. SMOCK:

21  Q.   So there's something black in his hand?

22  A.   Yeah.

23          MR. SMOCK:  Adam, can you play to minute marker 42,

24  please.

25      (A portion of Exhibit 147 was played.)

1          MR. SMOCK:  And maybe, Adam, if you could back up

2    just a tiny bit to make sure we're seeing Officer Fanone.  I

3    just want to get to a point where Captain Ortega will be able

4    to see Officer Fanone.

5          (A portion of Exhibit 147 was played.)

6          MR. SMOCK:  If you'd stop there.

7    BY MR. SMOCK:

8    Q.   Did you see Officer Fanone in the area that I'm circling

9    here?

10   A.   I do.

11   Q.   And he was at this point, we know from the other video,

12   being dragged down the stairs by protesters far from

13   Mr. GossJankowski.  Am I right?

14   A.   That is correct.

15   Q.   And we also know from the other video that at near this

16   time Officer Moore had also been pulled down the stairs; right?

17   A.   That is correct.

18   Q.   Now what I want to do first is have you focus on

19   Mr. GossJankowski, who's at the bottom right of the screen

20   here, and I'm going to play this footage, or I'm going to ask

21   Adam to play this footage through until minute marker 1:46.

22        (A portion of Exhibit 147 was played.)

23        MR. SMOCK:  I'm sorry.  1:46.

24        (A portion of Exhibit 147 was played.)

25        MR. SMOCK:  Thank you.

1    BY MR. SMOCK:

2    Q.   So Captain Ortega, is it fair to say that what we've just

3    seen is the entirety of the incident that was shown in

4    Government's Exhibit 144.2 but showing Mr. GossJankowski's

5    actions?

6             THE COURT:  Is that a question?

7             MR. SMOCK:  I'm sorry?

8             THE COURT:  Is that a question or a statement on your

9    part?

10   BY MR. SMOCK:

11   Q.   Captain Ortega, am I right that that is the same incident

12   we saw in 144.2?

13   A.   It is.

14            MR. SMOCK:  I'd like to go back and look at this

15   again, starting at minute marker 20.

16        Now, Adam, can you zoom in just a little bit on the right

17   bottom corner.

18        (A portion of Exhibit 147 was played.)

19            MR. SMOCK:  Can you stop for a moment.

20   BY MR. SMOCK:

21   Q.   Captain Ortega, do you see Mr. GossJankowski wagging his

22   finger no to members of the crowd?

23   A.   I see him wagging his finger.

24   Q.   And he's wagging it in different directions within the

25   crowd; correct?

Ortega - Cross (Smock)                                           1039

 1   A.   I do see him wagging his finger in different directions,
 2   correct.
 3            MR. SMOCK:  You can keep playing it.
 4        (A portion of Exhibit 147 was played.)
 5            MR. SMOCK:  Do you have a way of pulling back out now
 6   just so we see everything?  You can start maybe back at minute
 7   marker 1 where we were when we left off.
 8        (A portion of Exhibit 147 was played.)
 9            MR. SMOCK:  Can you stop there a moment?
10   BY MR. SMOCK:
11   Q.   Do you hear members of the crowd saying, "Don't hurt the
12   cop"?
13   A.   I do hear a few, or I do hear a female voice yelling that.
14            MR. SMOCK:  You can go forward.
15        (A portion of Exhibit 147 was played.)
16   BY MR. SMOCK:
17   Q.   Captain Ortega, you now see Mr. GossJankowski moving back.
18   Am I right?
19   A.   I do see him moving back.
20   Q.   Do you see him raising his hands to members of the crowd?
21   A.   I do see him raising his hands.
22   Q.   So Captain Ortega, is it fair to say based on watching
23   this video that just moments before the incident that you have
24   shown on direct with the government, Mr. GossJankowski is
25   waving his finger and yelling no to members of the crowd?

1            MR. VALENTINI:  Objection, Your Honor.

2            THE COURT:  The objection is -- let's come to the

3    bench.

4        (At sidebar)

5            MR. VALENTINI:  Your Honor, the defense has not laid

6    the foundation for the inference they're asking the witness to

7    draw.  The witness does not know how Mr. GossJankowski

8    communicates or the meaning of particular gestures.  He's

9    trying to impute, you know, some particular meaning that serves

10   their narrative, but there is no foundation that the witness

11   who, as we've been reminded time and again throughout this

12   trial, was not there at the time of the events to know how to

13   interpret those gestures.  It's highly confusing to the jury.

14   If they want to have some expert witness come in and interpret

15   this particular gesture that their defendant -- that their

16   client makes --

17           THE COURT:  You don't have to be an expert to talk

18   about gestures.

19           MR. SMOCK:  I haven't even asked him to interpret it.

20   I'm just asking him to clarify the timing of wagging his finger

21   and yelling no.

22           THE COURT:  Well, there are two different things

23   here.  One is wagging his finger, and you can ask him about

24   that.  I think that the question of whether he was mouthing the

25   word "no" is a question for your argument, not to ask him to

1   assume that's what he was doing.  That's what it appeared to

2   me, but I'm not the fact finder.  Neither are you.

3        (In open court)

4           THE COURT:  So based on our discussion at the bench,

5   I think, if you would, Mr. Smock, you can proceed, but I would

6   rephrase the question consistent with what we discussed.

7   BY MR. SMOCK:

8   Q.   Captain Ortega, is it fair to say that only moments passed

9   between the time Mr. GossJankowski was wagging his finger to

10  members of the crowd and the time of the incident that you went

11  over on direct in 144.2?

12  A.   Can you repeat the whole question again, sir.  I

13  apologize.

14  Q.   Is it fair to say that only moments passed between the

15  time Mr. GossJankowski is wagging his finger and the time of

16  the incident that you went over the interaction with Officer

17  Moore?

18  A.   Yes.  I observed him wave his finger but then proceed

19  towards the officer.

20  Q.   And it was really a matter of seconds; correct?

21  A.   Correct.

22  Q.   So Captain Ortega, on direct examination we all watched as

23  you went through many, many videos of Mr. GossJankowski and his

24  actions on that day; is that right?

25  A.   That is correct.

Ortega - Cross (Smock)                                                    1042

1   Q.   Any idea why the government didn't show the jury

2   Exhibit 147?

3              MR. VALENTINI:  Objection.

4              THE COURT:  Objection is sustained.  It's not a

5   question for the witness.

6              MR. SMOCK:  Can I have one moment?

7              THE COURT:  Pardon me?

8              MR. SMOCK:  Can I just have one moment?

9              THE COURT:  Yes.  Sure.

10  BY MR. SMOCK:

11  Q.   Actually, one other thing I wanted to cover about the

12  incident in 144.2.  144.2A8 is a still photograph from the

13  video that you went over before, and I'm going to ask --

14             MR. SMOCK:  That's in evidence so I'm going to ask,

15  Adam, that you put that --

16             THE COURT:  So 140 -- just so I'm clear and the

17  jury's clear, 144.2A is a series of still photographs that came

18  from that video, and each of them had a number.  I don't

19  remember how many total there were, but you're looking at one

20  of those several still photographs that was part of 144.2A;

21  correct?

22             MR. SMOCK:  That's correct, Your Honor, and I'm

23  pointing specifically to 142.2 -- I'm sorry, 144.2A8.

24             THE COURT:  Okay.  So 144.2A should be up on the

25  screen.

1              MR. SMOCK:  There it is.

2    BY MR. SMOCK:

3    Q.   I'm going to circle the device that has been discussed by

4    you on your direct examination.

5              MR. SMOCK:  Now I want to ask, Adam, that you pull up

6    another exhibit that's already in evidence, 143.2B2.

7              THE COURT:  143.2B2, which is another still from

8    another video; correct?

9              MR. SMOCK:  Correct.

10   BY MR. SMOCK:

11   Q.   Is it fair to say that the device depicted in this image

12   has what appears to be a flashlight on the front of it?

13   A.   I don't believe -- to me, I don't see a flashlight, sir.

14   Q.   Okay.  Is it your belief that this item is, quote/unquote,

15   activated at this point?

16   A.   It does not appear to be arcing and activated at this

17   point.

18   Q.   Thank you.

19             MR. SMOCK:  Adam, would you please put these two

20   exhibits next to each other, 144.2A8 and 143.2B2?

21        Thank you.  You can unpublish.

22        Or Ms. Johnson, you can unpublish the exhibit.

23   BY MR. SMOCK:

24   Q.   So Captain Ortega, now I want to take a step back to sort

25   of where we began with you on Friday.  You went over from the

1    beginning of your testimony on Friday a video that showed the

2    events at the Capitol on January 6th, covering different areas

3    of the Capitol over the entire afternoon.  Do you recall that?

4    A.   I do.

5    Q.   I want to make sure we cover everything that happened

6    before that.  You're aware that on the morning of January 6,

7    tens of thousands of people gathered at The Ellipse near the

8    White House to hear a speech by President Trump?

9    A.   I am aware, sir.

10   Q.   And you're also aware that President Trump had urged

11   people to come to that rally?

12   A.   I am aware, sir.

13   Q.   You're also aware that he had tweeted, quote, will be

14   wild, beforehand; correct?

15   A.   I'm aware, sir, yes.

16   Q.   You're also aware that during his speech that morning,

17   President Trump urged people in attendance to go to the

18   Capitol; correct?

19   A.   Something to that effect, yes, sir.

20   Q.   And tens of thousands of people did just that; right?

21   A.   That is correct.

22   Q.   Now, another thing I wanted to clarify from Friday, to the

23   extent we remember it, is you also talked about your own

24   experience that day, and I think it's obvious to all of us that

25   your experience that day will be seared in your memory forever.

1    Is that fair?

2    A.    That is fair.

3    Q.    And after that day you have been interviewed by members of

4    the U.S. Attorney's Office many times in relation to

5    prosecution of people involved that day?

6    A.    That is correct.

7    Q.    You've testified in several trials as well?

8    A.    That is correct.

9    Q.    And as part of that preparation, you've been asked to

10   identify people with whom you interacted on that day?

11   A.    That is correct.

12   Q.    And I think you said you were, in fact, assaulted by

13   people that day?

14   A.    That is correct.

15   Q.    You, in fact, were able to identify many people with whom

16   you interacted on that day?

17   A.    That is correct.

18   Q.    But you have no recollection of seeing Mr. GossJankowski

19   on January 6th?

20   A.    That is correct.

21   Q.    And that also means that you don't have any personal

22   knowledge of what Mr. GossJankowski did that day?

23   A.    That is correct.

24   Q.    Now, another thing you went over during your testimony on

25   Friday was a video that showed -- well, I just referenced this

1   video that showed things happening all over the Capitol that

2   day.  Do you recall that?

3   A.   I do recall that, sir.

4   Q.   And that video showed people smashing windows and breaking

5   down doors to get into the Capitol; correct?

6   A.   That is correct.

7   Q.   Mr. GossJankowski never smashed windows; right?

8   A.   I did not observe him smash windows.

9   Q.   And you're not aware that he ever broke down any doors;

10  correct?

11  A.   Not that I'm aware of.

12  Q.   That video also showed people running up the northwest

13  steps and onto the Upper West Terrace; correct?

14  A.   That is correct.

15  Q.   And Mr. GossJankowski did not do that?

16  A.   I did not observe him run up the northwest steps.

17  Q.   And you're not aware of any allegation that he did so;

18  correct?

19  A.   No, I am not.

20  Q.   That video also showed people parading through the Capitol

21  building itself; correct?

22  A.   That is correct.

23  Q.   Showed people confronting Officer Goodman and other

24  officers within the Capitol; right?

25  A.   That is correct.

1    Q.   Mr. GossJankowski never walked through the Capitol

2    building; correct?

3    A.   Not that I'm aware of.

4    Q.   And you're not aware of any allegation to that effect?

5    A.   I am not aware of him walking inside the Capitol.

6    Q.   Now, you also talked on Friday about the security measures

7    that are taken for screening visitors before they're allowed --

8    A.   My apologies.

9    Q.   That's all right.  I have water here if you want water.

10   A.   I have some water.

11   Q.   Got it.  You talked about security measures that are taken

12   for screening visitors before they're allowed to go into the

13   Capitol.  Do you recall that?

14   A.   I do.

15   Q.   You talked about how before entering the Capitol people

16   have to be screened through security; right?

17   A.   That is correct.

18   Q.   There are what you referred to as magnetometers and x-ray

19   machines that people's belongings go through?

20   A.   That is correct.

21   Q.   And that, by policy, is what has to happen before a

22   visitor goes into the building; right?

23   A.   That is correct.

24   Q.   Now, during much of your testimony, we have been focused

25   on the Lower West Terrace Tunnel; right?

1    A.    That is correct.

2    Q.    Now, there was a magnetometer and an x-ray machine inside

3    the doors of the Lower West Terrace Tunnel that we've been

4    talking about; right?

5    A.    There is.

6    Q.    And I'm going to just show Exhibit 101, the first second

7    of it.

8          MR. SMOCK:  Exhibit 101 is already in evidence, but

9    Adam, if you could show that.

10   BY MR. SMOCK:

11   Q.    So what we're seeing that I'm sort of putting an arrow to

12   is the mag- --

13         COURTROOM DEPUTY:  Mr. Smock, I'm sorry to interrupt.

14         MR. SMOCK:  Oh.

15         COURTROOM DEPUTY:  What exhibit is this again?

16         MR. SMOCK:   101, and this is already in evidence.

17   BY MR. SMOCK:

18   Q.    The gray thing that I've sort of put an arrow to is the

19   magnetometer?

20   A.    Correct.  That's a walk-through magnetometer.

21   Q.    And then the item here is the x-ray machine; right?

22   A.    Correct.  That's an x-ray machine.

23   Q.    And just so we're clear about where we're at, what we have

24   here are the two sets of doors that have been spoken about and

25   we've seen a great deal of footage about; correct?

1    A.    Correct.  Those are the outer doors of the Lower West

2    Terrace.

3    Q.    And past those doors is the inaugural platform?

4    A.    Correct, the Lower West Terrace Tunnel that takes you to

5    the inaugural platform.

6    Q.    So Mr. GossJankowski never got past this second set of

7    doors on January 6th.  Am I right?

8    A.    That is correct.

9    Q.    So he never passed the magnetometers; correct?

10   A.    He did not.  Now, I will make a note that clearly at this

11   point the magnetometer is not in the correct location.

12   Q.    Well, they never were in front of this second door.  Am I

13   right?

14   A.    No, it would not have been in front of the second door,

15   but just so we're aware, it's not in the correct place right

16   now due to the circumstances.

17   Q.    Got it.  But again, that -- those machines were never in

18   front of the door that he did not get through; correct?

19   A.    Correct.  However, I would like to make a note, once he's

20   past that first set of doors, at that point on a regular day of

21   business, he'd have to be ready to submit to screening.  He is

22   actually in the building at that point.

23   Q.    Right, but never did he -- never did he get past the point

24   where a normal visitor would have been screened; correct?

25   A.    A normal visitor wouldn't enter through that door at all.

1    That door is not open to the public.

2              THE COURT:  That door is for members?

3              THE WITNESS:  That is a member of Congress entrance

4    only and not made for the general public.

5              THE COURT:  Is it for staff?

6              THE WITNESS:  No.  Staff cannot enter through there.

7    BY MR. SMOCK:

8    Q.   Members of Congress have to be screened through

9    magnetometers?

10   A.   They do not.

11   Q.   So the magnetometers were put there in preparation for the

12   inaugural events.  Am I right?

13   A.   Correct.  We keep them there.  This door will only be open

14   for special events such as the inauguration, such as -- we may

15   open it for the Fourth of July, but the general public does not

16   go through that door.

17   Q.   So I want to talk again about the device that you talked

18   about for a moment.

19             MR. SMOCK:  And you can unpublish this exhibit,

20   Ms. Johnson, if you would.

21             COURTROOM DEPUTY:  I didn't hear what you said.

22             MR. SMOCK:  You beat me to the punch.  I don't need

23   the exhibit up.

24             COURTROOM DEPUTY:  Oh, okay.

25   BY MR. SMOCK:

1    Q.   You said in reference to the device that you believe that

2    it was a stun gun; is that right?

3    A.   That is correct.

4    Q.   But you don't know the power of that device; correct?

5    A.   I do not.

6    Q.   You also are not familiar with standards of power required

7    to make a device qualify as a stun gun; correct?

8    A.   Correct.

9    Q.   So you really have no basis to conclude, based on looking

10   at a photograph of that item, that it is, in fact, a stun gun?

11   A.   Just my observations to what I've seen, what I've been

12   trained in, but I'm not an expert on stun guns.

13   Q.   And you're aware that devices have different power;

14   correct?

15   A.   Yes.

16   Q.   One other thing I wanted to point out.  You isolated on a

17   photograph of Mr. GossJankowski holding that device up.  Do you

18   recall that?

19   A.   Correct.

20   Q.   You're not telling this jury that that device somehow had

21   the ability to project a probe like a Taser would; correct?

22   A.   No.  A Taser would be a different device.

23   Q.   So holding the device up and even activating it doesn't

24   have the ability to cause harm to someone; correct?

25   A.   Unless someone touches the arc.  That's how the device

1    harms somebody.

2    Q.   Got it.  I want to shift back now to talking about the

3    perimeter that you talked about on Friday around the Capitol

4    Building on the morning of January 6th.  Just as an initial

5    matter, you said that you drove the perimeter of the Capitol on

6    the morning of January 6.  Did you drive the entire perimeter

7    and see the entire perimeter of the Capitol that morning?

8    A.   Correct.

9    Q.   So I want to ask you about that.  A lot of us are familiar

10   with the fencing that was placed up around the Capitol after

11   January 6th.  You're aware of that?

12   A.   I am.

13   Q.   That was pieces of fencing that were firmly affixed to one

14   another; correct?

15   A.   You're talking about the global fencing after January 6?

16   Q.   Correct.

17   A.   Correct.

18   Q.   That fencing was several feet tall?

19   A.   Correct.

20   Q.   Correct?  Couldn't be climbed over?

21   A.   It's referred to as antiscalable, yes.

22   Q.   And those were the fences that were put up around the

23   Capitol after January 6th.  Am I right?

24   A.   That is correct.

25   Q.   So I want to talk now about the measures that were taken

1   around the perimeter on January 6th, itself.  You referred to

2   Government's Exhibit 601 which actually I'll ask Adam to put

3   up.  It's in evidence.

4        Now, you testified that that red line essentially reflects

5   the perimeter that had been set up around the Capitol on

6   January 6th.  Am I right?

7   A.   Correct, sir.

8   Q.   And just to be clear, this was a document that was created

9   in preparation for trial; right?

10  A.   Correct.

11  Q.   This is not a document that was created by Capitol Police

12  in advance of January 6th; correct?

13  A.   I'm actually not sure if Capitol Police initially created

14  this, so I can't answer that.

15  Q.   But you -- you, yourself, are in a supervisory position in

16  Capitol Police; correct?

17  A.   I am.

18  Q.   And you're not aware of ever having seen this map in

19  advance of January 6th; correct?

20  A.   I'm not part of the Security Services Bureau, but I do

21  know there was a perimeter made and that would have been sent

22  out to everybody, but I'm not sure if it's specifically this

23  map or not.

24  Q.   You have no basis for knowing whether or not it is;

25  correct?

1    A.   I do not know if this was a Capitol Police versus created

2    for this.

3    Q.   Now, you also are aware that this map was not posted

4    publicly on the grounds of the Capitol or outside the grounds

5    of the Capitol on January 6th; correct?

6    A.   I'm not aware that it was.

7    Q.   You have no basis for believing that it was?

8    A.   I do not believe it was.

9    Q.   You also know that it wasn't handed out to people in the

10   area or shown to people in the area; correct?

11   A.   That is correct.

12   Q.   So for people who were on the ground on January 6th, that

13   thick line -- that red line that's in this map was actually

14   bike racks and snow fencing; correct?

15   A.   Correct.  Bike racks, snow fencing, and signs that say --

16   I believe it said area closed by order of the Capitol Police

17   force.

18   Q.   And that's what you saw on the morning of January 6th;

19   right?

20   A.   That is correct.

21   Q.   So I want to talk a little bit about each of those things,

22   snow fencing and bike racks.  Snow fencing --

23           MR. SMOCK:  Actually, maybe it would make sense,

24   Adam, for you to put up Exhibit 602, which is in evidence.

25   BY MR. SMOCK:

1    Q.   Is this an image of what you've referred to as snow

2    fencing?

3    A.   It is, sir.

4    Q.   So I looked this up.  Snow fencing is designed to cause

5    blowing snow to be deposited as drifts where it's stored.  Is

6    that why it's called a snow fence?

7    A.   I'm not sure where the name comes from, but I know we've

8    used it as a barrier before.

9    Q.   Essentially it's plastic netting that's held up by posts

10   that are several feet apart; right?

11   A.   That is correct.

12   Q.   It's fair to say that snow fencing is not designed to

13   effectively prevent people from going over it, cutting it down,

14   knocking it over, et cetera?

15   A.   We've used it for several events, including concerts, and

16   it's worked well.

17   Q.   But if people want to get past it, they can?

18   A.   People can get past things if they want to, sir.

19   Q.   So that, in fact, is one of the first things that happened

20   on January 6th; right?

21   A.   That is correct.

22   Q.   I'm going to show you Exhibit 103, which is a time lapse

23   video that's already in evidence, and I want to ask Adam to

24   stop at the very beginning of this video.

25        So this is -- this is the Capitol Building just prior to

1    the time that protesters started coming towards it, and I want

2    to point -- direct your attention to this line here.  That is

3    snow fencing; correct?

4    A.   Yes, sir.

5    Q.   That's what I think you referred to as a middle perimeter;

6    correct?

7    A.   That is correct, sir.

8    Q.   And we can see there that there are signs on the snow

9    fencing; right?

10   A.   That is correct, sir.

11           MR. SMOCK:  I'm going to ask, Adam, that you play

12   until about 12:59 on this.

13       (A portion of Exhibit 103 was played.)

14   BY MR. SMOCK:

15   Q.   So is it fair to say that within about four minutes that

16   snow fencing had been knocked down or cut down and that people

17   were essentially walking past that middle perimeter?

18   A.   They were.

19   Q.   And that to the extent there was signage, it was either

20   gone or looks as if it was maybe on the ground?

21   A.   There's some on the ground, but there's some still --

22   still more snow fencing on the left of the photo.

23   Q.   So if we keep playing, we'll see what happened to that

24   perimeter as time passed.

25       (A portion of Exhibit 103 was played.)

1    BY MR. SMOCK:

2    Q.   Fair to say that there's nothing impeding the crowd at

3    that middle perimeter at this point?

4         And that's about seven minutes after the video started.

5    A.   Just far left.  It looks like no one has knocked down the

6    snow fencing on the far left.

7    Q.   Now, we also talked about bike racks.  Bike racks were

8    also put up around the perimeter, and now I think all of us are

9    familiar with bike racks.  They're about 3 feet tall, 3 or

10   4 feet; is that right?

11   A.   Yeah.  They're somewhere at stomach level.

12   Q.   Those bike racks can be connected together essentially by

13   sort of hooking them together; right?

14   A.   That is correct.

15   Q.   But it's also true that simply by lifting one off of the

16   other, they can easily be separated?

17   A.   That is correct.

18   Q.   And, in fact, you, yourself, wrote a report, what was

19   referred to as an after action report, after the events of

20   January 6.  Do you recall that?

21   A.   I do.

22   Q.   And what that was was sort of your assessment of what went

23   wrong on that day or how there could be improvements made?

24   A.   That is correct.

25   Q.   One of the things you wrote about was that fencing.  The

1    bike racks weren't secured by locks or zip ties.  Am I right?

2    A.   That is correct.

3    Q.   And, in fact, you wrote that, quote, I found this highly

4    unusual considering we knew protest was coming.  The fencing

5    ended up being pushed right over and used as a weapon.

6         Is that right?

7    A.   That is correct.

8    Q.   And just to be clear, Mr. GossJankowski never used a bike

9    rack as a weapon; right?

10   A.   I did not observe him using a bike rack as a weapon.

11   Q.   And not only did you not observe it, you're not aware of

12   any allegation that he ever did anything like that?

13   A.   That is correct.

14   Q.   So not long after the first people approached the Capitol

15   from the west side -- which is the side closest to where the

16   speech was occurring; right?

17   A.   That is correct, sir.

18   Q.   There were areas where those bike racks had been pushed

19   aside and the snow fencing was knocked down.  Am I right?

20   A.   There were.

21   Q.   And we've established from looking at that video that

22   people first went past that west perimeter at around 12:58;

23   right?

24   A.   That is correct.

25   Q.   And not long after that most officers who had been in that

1    front -- or actually, let me back up.  What was the term that

2    you used for the perimeter closest to the Peace Circle, in

3    other words?

4    A.    That would be the outer perimeter.

5    Q.    Got it.  So not long after that time, 12:58, most of the

6    officers who had been at that outer perimeter had retreated to

7    the Capitol; correct?

8    A.    That is correct.

9    Q.    And at that point thousands of people were just walking as

10   a group up to the Capitol Building?

11   A.    They were.

12   Q.    Now, there is a walkway that leads from that Peace -- I'm

13   sorry.  Is it Peace Circle or Peace Fountain?

14   A.    Peace Circle, and the walkway you're referring to is Penn

15   Avenue Walkway.

16   Q.    Right, the Penn Avenue Walkway.  So there were thousands

17   of people going up that Penn Avenue Walkway to the Capitol

18   steps; right?

19   A.    That is correct.

20   Q.    And there were also thousands of people walking along the

21   grass up towards the Capitol; correct?

22   A.    That is correct.

23   Q.    Now, on a typical day that area, in other words, you know,

24   the Penn Avenue Walkway, the grassy area in front of the

25   Capitol, is open to the public; right?

1    A.   It depends on the time of year.  Right now it's open to

2    the public, but specifically for that it was closed because it

3    was a construction site.

4    Q.   Okay.  But that -- the way that anyone would have figured

5    that out was because of the bike racks and the snow fencing

6    that had been knocked down; correct?

7    A.   Correct.

8              MR. SMOCK:  I'm going to ask that Adam put up

9    Exhibit 601, which is already in evidence.

10   BY MR. SMOCK:

11   Q.   So we're talking now about this area in front of the

12   Capitol which, if I'm not mistaken, on normal days is open to

13   the public; correct?

14   A.   Correct.  But again, during that time frame it would not

15   have been.  That -- it had been closed, I think, since -- for a

16   few months at that point because of the construction of the

17   inaugural stage.

18   Q.   Got it.  And again, the way a person would have known that

19   was because of the bike racks and snow fencing; correct?

20   A.   Correct.

21   Q.   Now, we've already talked about the fact that by 1:28 in

22   the afternoon or so, the walkway in front of the Capitol

23   essentially was filled with people.  In other words, this area

24   was essentially a huge crowd of people; correct?

25   A.   That is correct.

Ortega - Cross (Smock)                                          1061

1   Q.   No officers were at that point able to hold the crowd out

2   of that area.  Am I right?

3   A.   That is correct.

4   Q.   And we also know that Mr. GossJankowski approached the

5   Capitol well after the point that this crowd had developed;

6   correct?

7   A.   I actually do not know what time he approached the

8   Capitol.  If you could advise.

9   Q.   So you don't have any basis to believe that he had entered

10  before that; correct?

11  A.   I -- the first time I could see him was he was -- I did

12  not see -- let me rephrase it.  I did not see him enter, but if

13  you could tell me when, that would help.

14  Q.   So the first footage that I think you talked about on

15  direct, if I recall correctly, was 2:36 p.m.  Do you remember

16  that from last week?

17  A.   I do.

18  Q.   And we've established that an hour prior to that this area

19  in front of the Capitol was filled with people; correct?

20  A.   Correct.

21          THE COURT:  About how much longer are you going to be

22  on cross, do you think?

23          MR. SMOCK:  I'd say about 20 minutes.

24          THE COURT:  Why don't we take a break for about ten.

25      (Jury out and recess taken at 4:03 p.m.)

1          (At 4:21 p.m. on March 6, 2023; with counsel for the

2    parties and the defendant present; WITH the jury:)

3          RONALD ORTEGA, PREVIOUSLY SWORN, RESUMED THE STAND

4              THE COURT:  Okay.  Everyone may be seated.  Jury's

5    all here.

6          Mr. Smock, you may continue.

7              MR. SMOCK:  Thank you, Your Honor.

8                     CROSS-EXAMINATION RESUMED

9    BY MR. SMOCK:

10   Q.   Captain Ortega, the last few things I just want to go over

11   with you, first I wanted to talk to you a little bit about

12   timing.  You're aware from your presence at the Capitol that

13   day and your involvement in cases afterwards that on that day

14   the House of Representatives recessed at 2:15 p.m.  Am I right?

15   A.   That sounds about correct, sir.

16   Q.   And that -- I'm sorry.  I reversed it.  The Senate

17   recessed at 2:13 -- that wasn't a trick question -- and the

18   House recessed at about 2:18.  Does that sound right?

19   A.   Sounds about right.  I don't know the exact times offhand,

20   though.

21   Q.   But it's no reason to think that I have that off, other

22   than the fact that I just messed up the question?

23   A.   Correct, sir.

24   Q.   Now, we've already talked about the fact that the first

25   footage that we've seen of Mr. GossJankowski during your direct

1   was about 2:36 p.m.; correct?

2   A.   That sounds correct, sir.

3   Q.   And that he was first seen at the tunnel at 2:41 p.m.; is

4   that right?

5   A.   That sounds about correct, sir.

6   Q.   And so that he would have been seen at the entrance to the

7   tunnel about 23 minutes after the House recessed.  Does that

8   sound right?

9   A.   That sounds about correct, sir.

10  Q.   Now, we talked about the fact that -- actually, have you

11  done an assessment?  Do you know how many people actually did

12  enter the Capitol that day?

13  A.   I do not.

14  Q.   But fair to say it was hundreds?

15  A.   I think it was beyond hundreds, sir.

16  Q.   So thousands of people?

17  A.   That sounds about correct.

18  Q.   And, in fact, several entryways into the Capitol were

19  breached that day; right?

20  A.   That is correct.

21  Q.   People went into the Senate Chamber that day?

22  A.   That's correct, sir.

23  Q.   People went into the Office of the Speaker of the House,

24  Nancy Pelosi?

25  A.   That is correct.

1    Q.   And they went into other offices; correct?

2    A.   That is correct, sir.

3    Q.   Now, Mr. GossJankowski did not go into the building;

4    right?

5    A.   As far as I'm aware, he did not go inside the building.

6    Q.   And we've talked about these breaches, and I want to talk

7    about one in particular.  That's the Senate Wing Doors that

8    you've talked about.  And I may have this wrong, but am I right

9    that there are doors that were breached on the lower -- on the

10   Upper West Terrace?

11   A.   That is correct, sir.

12   Q.   And those doors were -- actually, maybe it makes sense to

13   put up Exhibit 605, which is already in evidence, so that I'm

14   not -- so that I'm being accurate.

15        Can you mark on this diagram where those doors are that

16   we've referred to.

17   A.   Which one do you want to start with, the Upper West

18   Terrace?

19   Q.   Yeah, the Upper West Terrace.

20   A.   (The witness complied.)

21   Q.   Now, was there a door on the Upper West Terrace within

22   that circle that was breached, if you recall?

23   A.   There was.

24   Q.   And was there also a door on the -- I'm horrible with

25   directions.  On the left side of the screen, is that north?

1    A.    Are you looking for the Senate Wing Door?

2    Q.    Yes.

3    A.    The Senate Wing Doors would be here, sir.

4    Q.    And those were also breached?

5    A.    That is correct, sir.

6    Q.    And, in fact, the breach of the Senate Wing Alcove Doors,

7    which you've just circled second here, was the first breach

8    into the Capitol building; correct?

9    A.    That is correct, sir.

10   Q.    And that occurred at about 2:13 in the afternoon?

11   A.    Yeah.  I cannot recall the exact time, but that sounds

12   correct.

13   Q.    Now, just so we're understanding the layout here, this

14   area here that I'm circling in green is a -- was the

15   scaffolding that we've referred to; correct?

16   A.    Correct, sir.

17   Q.    And that scaffolding was built on top of what is actually

18   normally a pretty wide stairway; correct?

19   A.    That is correct, sir.

20   Q.    And I think it's your testimony -- and correct me if I'm

21   wrong -- that a large number of protesters or rioters actually

22   got up this stairway and climbed up onto the Upper West

23   Terrace?

24   A.    That is correct.  They came up both on the landing side

25   and through the scaffolding.

1    Q.   And so when you refer to the landing side, am I right in

2    understanding that there was a portion of stairway that was not

3    covered by the scaffolding, or are you talking --

4    A.   It's a small portion of stairway, but they were climbing

5    up on -- there's like a hand railing, a wide hand railing, that

6    they were climbing on and going up.

7    Q.   Got it.  And I think maybe we can show that in the video.

8         MR. SMOCK:  That's Exhibit 102, which is already in

9    evidence.  And Adam, if you could play from 1:43 to --

10   beginning at 1:43, minute marker 1:43.

11        (A portion of Exhibit 102 was played.)

12   BY MR. SMOCK:

13   Q.   And is that the north stairway that we were just pointing

14   out?

15   A.   The northwest stairs, sir.

16   Q.   Northwest stairs.  I apologize.

17        MR. SMOCK:  You can go forward, Adam.

18   BY MR. SMOCK:

19   Q.   So these are people who are going up that stairway from

20   the level that was -- the Lower West Terrace level up onto the

21   Upper West Terrace here; correct?

22   A.   So if you want to pause it.  So where they're coming up

23   from is called, like, the middle landing.  It's in between the

24   Lower West Terrace and the Upper West Terrace.

25   Q.   So is that about right here?

1   A.   Correct.

2   Q.   Got it.  And from this stairway that I'm now marking, is

3   it fair to say that these people were then able to area -- to

4   enter the area and go to the Senate Alcove Door which was

5   breached?

6   A.   Correct, sir.

7   Q.   Now, there is footage that you showed on direct yes- -- on

8   Friday, I believe, showing Mr. GossJankowski on that northwest

9   stairway.  Do you remember that?

10  A.   I -- you're going to have to play it again.

11       MR. SMOCK:  That's Exhibit 131A, which is in evidence

12  already, and I'm going to ask Adam to play it from minute

13  marker 29.

14  A.   Yes, I recall this footage.

15  BY MR. SMOCK:

16  Q.   So that's Mr. GossJankowski on that northwest stairway;

17  correct?

18  A.   Correct, sir.

19  Q.   Now, you have no basis to believe that Mr. GossJankowski

20  ever actually went up that stairway to the Upper West Terrace

21  and tried to go into the door which had already been breached

22  at that time.  Am I right?

23  A.   I did not see him go up and try to enter that door, sir.

24  Q.   And he would have been able to do that at this point;

25  right?  People had already gone up that stairway and had

 1    breached that doorway; correct?

 2                    MR. VALENTINI:  Objection, calls for speculation.

 3                    THE COURT:  Sustained.

 4    BY MR. SMOCK:

 5    Q.   Well, let's talk about the timing, then.  You already

 6    established that the first footage you've seen of

 7    Mr. GossJankowski in the area of the scaffolding was at 2:36;

 8    correct?

 9    A.   You'd have to pull the video for me, but I believe that

10    sounds correct.

11    Q.   And this footage of him going in the direction upward on

12    that stairway would have necessarily been after that; correct?

13    A.   Sounds about right.

14    Q.   And we talked about the fact that the Senate Alcove Door

15    had been breached at 2:13; correct?

16    A.   That's correct.

17    Q.   So that's prior to the time that we see footage of him on

18    the stairway?

19    A.   That is correct.

20                    MR. SMOCK:  Now, going back to Exhibit 605, if we

21    could, Adam.

22    BY MR. SMOCK:

23    Q.   We went over two of the doorways to the Capitol that were

24    breached.  Do you have a recollection of how many other

25    doorways to the Capitol were breached on that day?

1    A.    I do not.

2    Q.    Fair to say we know the one on the east side was breached;

3    correct?

4    A.    That is correct.

5    Q.    Do you know of doorways on the -- is the right side the

6    House side?

7    A.    It is, sir.

8    Q.    -- doorways on the House side being breached?

9    A.    I am aware the Upper House Door was breached.

10   Q.    Okay.  Can you mark that on this map.

11   A.    (The witness complied.)

12   Q.    How many doors in total were breached at the Capitol?

13   A.    I don't have a full --

14   Q.    More than ten?

15   A.    I honestly don't have a full number.

16   Q.    You also know that on that day people were wandering

17   around or able to walk around the perimeter of the Capitol;

18   correct?

19   A.    That is correct.

20   Q.    Which would have given them access to different doors

21   around the building that had been breached; correct?

22   A.    That is correct.

23   Q.    And you know that Mr. GossJankowski never went into any of

24   those breached entrances; correct?

25   A.    Not that I'm aware of.

Ortega - Redirect (Valentini)                                    1070

1           MR. SMOCK:  Nothing further.

2           THE COURT:  Yes, sir, Mr. Valentini.

3           MR. VALENTINI:  Very briefly.

4                   REDIRECT EXAMINATION

5    BY MR. VALENTINI:

6    Q.   On cross-examination, Captain Ortega, you were asked some

7    question whether the defendant did or did not enter the Capitol

8    Building.  Do you remember those?

9    A.   I do remember that.

10   Q.   Was there a sign posted on the glass doors in the Lower

11   West Terrace Tunnel?

12   A.   There was.

13   Q.   What did that sign say?

14   A.   Members entrance only.

15   Q.   Did the defendant cross those doors?

16   A.   He did.

17   Q.   You were also asked on cross-examination some questions as

18   to whether the device that the defendant obtained on January 6

19   was or was not a stun gun.  Do you remember those questions?

20   A.   I do.

21   Q.   If you saw a member of the public inside the Capitol

22   Building with a device like the one you saw in the videos in

23   the defendant's hands, what would you do?

24   A.   I would stop that individual, detain them, and then remove

25   them from that item.

Ortega - Redirect (Valentini)                                    1071

1    Q.   You also were asked some questions about barricades and

2    fencing.  My question for you is this:  Was the area

3    restricted?

4    A.   It was restricted.

5    Q.   How was it restricted?

6    A.   We had multiple perimeters utilizing bike rack, utilizing

7    snow fencing, utilizing signs, and utilizing police officers.

8    Q.   And were those signs up until the rioters knocked them

9    down?

10   A.   They were.

11   Q.   Was the fencing up until the rioters knocked it down?

12   A.   They were.

13   Q.   And when those signs were knocked down and the fences were

14   knocked down, were they still scattered on the ground?

15   A.   They were.

16   Q.   You were also asked about the timing of the defendant's

17   arrival compared to the timing of the Joint Session of

18   Congress.  Do you remember those questions?

19   A.   I do.

20   Q.   Did the fact that the rioters were present in the Lower

21   West Terrace Tunnel prevent the Joint Session of Congress from

22   reconvening and continuing its proceeding?

23   A.   They did.

24   Q.   At the beginning of your -- of the cross-examination, you

25   also were asked some questions about Exhibit 147.  Do you

1    remember those questions?

2    A.   I do.

3    Q.   Those questions had to do with the defendant -- I believe

4    it was characterized as wagging his finger.  Do you remember

5    those questions?

6    A.   I do.

7    Q.   Now, during your -- this -- that instance was not the only

8    time the defendant wagged his finger on January 6, 2021?

9    A.   That is correct.

10   Q.   Let me show you Exhibit 101.1, which is already in

11   evidence, at 2:45:13, and it's zoomed in in this version.

12   Please tell me when you see the defendant --

13              THE COURT:  Wait.  It's not up yet.  101.1?

14              MR. VALENTINI:  Yes, Your Honor, 101.1.  Thank you,

15   Your Honor.  Could we publish?

16       Thank you.

17   BY MR. VALENTINI:

18   Q.   Captain Ortega, please tell me when you see the defendant

19   wag his finger in this exhibit.

20       (A portion of Exhibit 101.1 was played.)

21   A.   I see him wagging his finger.

22   BY MR. VALENTINI:

23   Q.   Captain Ortega, do you remember what the defendant does

24   immediately after wagging his finger in Exhibit 101.1 at this

25   point?

1    A.   I don't.  You'd have to play it for me, sir.

2    Q.   Let me see if this refreshes your recollection.

3         (A portion of Exhibit 101.1 was played.)

4    BY MR. VALENTINI:

5    Q.   What did you see -- what did you see the defendant do?

6    A.   Spit at the police officers.

7    Q.   Do you remember if that was the only time the defendant

8    spat at the officers after wagging his finger at the officers?

9    A.   There was multiple times he spit.

10        MR. VALENTINI:  Let me continue playing it.

11        (A portion of Exhibit 101.1 was played.)

12   BY MR. VALENTINI:

13   Q.   What did you just see in the exhibit?

14   A.   I saw him spit again at the officers.

15   Q.   Was that -- was that within six or seven seconds of

16   wagging his finger at the officers?

17   A.   Maybe less.

18        MR. VALENTINI:  No further questions.

19        MR. SMOCK:  No questions, Your Honor.

20        THE COURT:  All right.  Captain Ortega, I think

21   you're done with us.

22        THE WITNESS:  Thank you, Your Honor.

23        THE COURT:  Thank you very much.  You're excused, and

24   we appreciate your being here for so long.

25        Okay.  So I think that's about all we can accomplish

1    today, so I'm going to let the jury go for the evening.  Now,

2    tomorrow, again, I'm going to ask the lawyers to be here at

3    9:30.  We'll talk about various things if we need to.  We'll

4    start with the jury no later than 10 o'clock, I hope, so, you

5    know, get here when you get here, between 9:30, quarter to 10,

6    and if we can start before 10, we will.  If not, we'll start as

7    close to 10 as we can.  I think today we started about 10 after

8    10.

9         Now, tomorrow I do have to end no later than 4:30, if

10   possible a few minutes earlier but -- so you'll be done by 4:30

11   tomorrow.  Again, you just came back from a weekend, so I'll

12   remind you every time you leave here you cannot discuss the

13   case with anyone, not with the parties, not the witnesses, not

14   the lawyers, not anybody connected with the case, not your

15   fellow jurors, your friends, your family members.  You need to

16   keep an open mind to be fair to both sides in this case until

17   you have heard all of the evidence.

18        If anybody tries to talk to you about the case or you

19   overhear anything in the courthouse, in the cafeteria, in the

20   elevators, don't tell your fellow jurors.  Tell Ms. Johnson.

21   And don't do any independent research.  Don't Google, don't

22   blog, don't go on the internet, don't go to Twitter, don't text

23   anybody, don't go to YouTube or any of the other sources that

24   you have.  You need to be open-minded and not infected by

25   anything outside the evidence you see in here in the jury -- in

1    the trial.

2         So that's all I have to say.  We'll see you tomorrow

3    morning, and we will be done by 4:30 tomorrow.  Thank you.

4         (Jury out at 4:39 p.m.)

5              THE COURT:  So is there anything on anybody's mind?

6    Anything we need to talk about?

7              MR. VALENTINI:  Not from the government.

8              MR. SMOCK:  No, Your Honor.  Thank you.

9              THE COURT:  Who's your first witness tomorrow, do you

10   think, or are you sure yet?

11             MR. VALENTINI:  There's two possibilities.  It either

12   is going to be Secret Service Inspector Hawa or Dan Schwager.

13   Just need to figure it out.

14             THE COURT:  Okay.  And we're going to take the

15   government's expert out of turn, is that correct, on Wednesday?

16             MR. SMOCK:  The defense expert, yes.  Yes, and we

17   would need to start the beginning of the day with Dr. Kroll on

18   Wednesday.

19             THE COURT:  Okay.  So you'll keep that in mind as we

20   pace the witnesses tomorrow and see where we are tomorrow, and

21   then we'll explain to the jury that for scheduling reasons we

22   have to do that.

23         Yes, Mr. Dreher.

24             MR. DREHER:  Your Honor, I did have a question as to

25   whether or not the Court intended to issue a written order as

1    to the conclusions that Dr. Kroll will have prior to Wednesday,

2    or is there --

3              THE COURT:  I'm going to give you an oral ruling.

4              MR. DREHER:  Yes, Your Honor.

5              THE COURT:  Maybe what we should do is -- I mean,

6    whatever issues you want to raise at 9:30 we can do, but I'll

7    give you an oral ruling on that tomorrow morning, so that'll

8    give you 24 hours.

9              MR. DREHER:  I understand, Your Honor.  And then

10   before I let you go, Judge, this Sergeant Bogner video as well,

11   should we cover that tomorrow at 9:30?

12             THE COURT:  Yes.

13             MR. DREHER:  That's all I have, Your Honor.

14             THE COURT:  So tomorrow morning, 9:30, talk about the

15   defense expert, and we'll talk about Sergeant Bogner's

16   body-worn camera.

17        (Recessed at 4:41 p.m.)

18

19                        *  *  *  *  *  *  *  *

20

21        I certify that the foregoing is a correct transcript from

22   the record of proceedings in the above-entitled matter.

23

24

25        _/s/Lisa G. Grimminger_          April 19, 2023
          Lisa G. Grimminger, RDR, CRR, CRC   Date

```
 1                          I-N-D-E-X

 2                              Direct   Cross   Redirect

 3   WITNESS:

 4   FOR THE PLAINTIFF:

 5   Ronald Ortega                 927     1027     1070

 6

 7                                                 Ruled
                                                    On
     EXHIBITS:                          Offered
 8
     139. Cantwell
 9      [Unified Message 396786214945046]    939       941

10   140. Haskins [IMG_4721]              1023      1023

11   141.1. Excerpt of video:  UNBELIEVABLE
            Footage: Trump Supporters Battle Cops
12          Inside the Capitol [0:00 to 6:00]   966     966

13   141.2. Excerpt of Video:  UNBELIEVABLE
            Footage: Trump Supporters Battle Cops
14          Inside the Capitol [20:45 to 21:00]  980    981

15   141D. Still images from Exhibits 141 and 141C  973   973

16   142. YouTube Video:  Political Trance Tribune
          (PoliticalTrance) Capitol Eviction
17        Notice                         977       977

18   143.2A. Excerpt of BANNED VIDEO - Just
             Another Channel [1:00:05 to 1:05:00]
19           [TRIAL GRAPHICS VERSION]     982,985   983,985

20   143.2B. Still images from Exhibit 143.2A   988    988

21   143.3A. Excerpt of BANNED VIDEO - Just
             Another Channel [1:15:00 to 1:16:15]  1025   1025
22
     143.4A. Excerpt of BANNED VIDEO - Just
23           Another Channel [1:22:00 to 1:24:45]  1020   1020

24   143.4B. Still images from Exhibit 143.4A   1022   1022

25   144.2. Go-Pro Video (Lower West Terrace):
            Raw360clip.mp4                 995       995
```

1078

```
 1    EXHIBITS: (cont'd.)                    Offered    Ruled
                                                         On
 2
      144.2A. Still images from Exhibit 144.2   1017      1017
 3
      147. Open-source video
 4         [Sf4kaTrpe9SSQ4Yap.mpeg4]            1035      1035

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```