1    BEFORE THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLUMBIA

2

3    UNITED STATES OF AMERICA,     )    Case Number 1:21CR123
                                    )
4              Plaintiff,           )
                                    )
5    vs.                            )
                                    )    Washington, D.C.
6    VITALI GOSSJANKOWSKI,          )    March 7, 2023
                                    )    10 a.m.
7              Defendant.           )

8

9                        VOLUME VI
                  TRANSCRIPT OF JURY TRIAL
10         BEFORE THE HONORABLE PAUL L. FRIEDMAN
             UNITED STATES SENIOR DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20   COURT REPORTER:            Ms. Lisa Grimminger, RDR, CRR, CRC
                                100 Centennial Mall North
21                              Room 587
                                Lincoln, NE 68508
22                              (402) 437-1908

23

24

     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.

```
 1                         A-P-P-E-A-R-A-N-C-E-S

 2     FOR THE PLAINTIFF:           MR. FRANCESCO VALENTINI
                                    DOJ-CRM
 3                                  950 Pennsylvania Avenue NW
                                    Washington, D.C. 20530
 4
                                    MR. ADAM MICHAEL DREHER
 5                                  DOJ-USAO
                                    601 D Street NW
 6                                  Washington, D.C. 20001

 7                                  MS. KAREN E. ROCHLIN
                                    DOJ-USAO
 8                                  99 Northeast 4th Street
                                    Miami, FL 33132
 9
       FOR THE DEFENDANT:           MR. EDWARD SMOCK
10                                  MS. CELIA GOETZL
                                    FEDERAL PUBLIC DEFENDER FOR D.C.
11                                  625 Indiana Avenue NW
                                    Suite 550
12                                  Washington, D.C. 20004

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (At 10 a.m. on March 7, 2023; with counsel for the parties
 2      and the defendant present; WITHOUT the jury:)
 3              COURTROOM DEPUTY:  This is Criminal Action 21-123,
 4      United States versus Vitali GossJankowski.  For the United
 5      States I have Francesco Valentini, Karen Rochlin, and Adam
 6      Dreher, who's soon to arrive to court.  For Defendant I have
 7      Edward Smock and Celia Goetzl.  Our ASL interpreters this
 8      morning, Jeremy Brunson and Carla Mathers.  Our court reporter
 9      is Lisa Grimminger.
10          All parties are present.
11              THE COURT:  Good morning, everybody.  So who's your
12      next -- your first witness going to be this morning?
13              MR. VALENTINI:  It will be Inspector Hawa from the
14      Secret Service.
15              THE COURT:  Talk into the microphone, please.  A
16      microphone, any microphone.
17              MR. VALENTINI:  Good morning, Your Honor.
18              THE COURT:  Good morning.
19              MR. VALENTINI:  Our next witness will be Inspector
20      Hawa from the United States Secret Service.  I am told she's on
21      her way right now.  She's not right outside, but she should be
22      here momentarily.
23              THE COURT:  The question is:  What makes sense while
24      we're waiting?  Is this your witness or his witness?
25              MR. VALENTINI:  I will be directing the witness.
```

1       THE COURT:  So we're waiting for him and we're

2  waiting for the witness.  I said I was going to do two things

3  this morning.  One is to give you my views on the video of the

4  body-worn camera of Officer Bogner, and the other one was to

5  give you my views on the expert that the defense is going to

6  call tomorrow.  I gather that that witness is Mr. Dreher's

7  witness, the expert?

8       MR. VALENTINI:  That is correct, but if Your Honor

9  wants to proceed providing your views, we'll of course keep

10  track of it.

11       THE COURT:  I can do either or both of those things

12  while we're waiting, or I can start with one of them, and if

13  the witness arrives, we could postpone the other one and get

14  the jury in and do it during lunch or something like that.  My

15  discussion of the expert may take 15 minutes or so.  My

16  discussion of the body-worn camera will take less time.

17       So any thoughts that either side has while we're waiting?

18       MR. VALENTINI:  If the Court is willing to proceed

19  with the issue relating to Officer -- Sergeant Bogner first,

20  that would be ideal.  That would be ideal from the government's

21  perspective, but of course we understand that the Court may

22  proceed as it wishes.

23       THE COURT:  Anything from the defense side?  Do you

24  care which I do first?

25       MR. SMOCK:  We defer to the Court.  I mean, there are

```
 1    two -- one minor issue that we could probably address quickly
 2    about a stipulation that we've discussed, and then the other is
 3    I have a question.  I guess I'm seeking an offer of proof from
 4    the government about a witness who they told us they intend to
 5    call today named Neal Matthews.  I could address that as well.
 6    I don't know that we need to -- I don't know when they intend
 7    to call him today.  My assumption is after lunch.
 8            THE COURT:  Okay.  What order do you want to proceed
 9    in?  And the government will let us know when the witness
10    arrives, and my goal is -- the goal is not to keep the jury
11    waiting any longer than necessary.  I've been delayed this
12    morning, and I apologize for that.
13            MR. SMOCK:  We're prepared to have the Court rule on
14    the exhibit for Sergeant Bogner because it sounds like he's
15    likely to testify at some point today.
16            THE COURT:  Okay.  Well, here are my views.
17        (Mr. Dreher entered the courtroom.)
18            THE COURT:  I thought if you were a member of the
19    bar, you get in more quickly.  Not so?
20            MR. DREHER:  That was my thought as well, Your Honor.
21    I unfortunately learned the hard way that that's not always the
22    case.
23            THE COURT:  All right.  We're going to try to get a
24    letter for Mr. GossJankowski so he can get in quickly too.
25        So the body-worn camera from Officer Bogner, and as I
```

1    understand the government's proffer, they want to show not all

2    of it.  They want to show about 14 minutes of it, from 2:40 --

3    is it 2:40 p.m. to 2:54 p.m.?

4         MR. VALENTINI:  (Nods head.)

5         THE COURT:  And the defense objects for a number of

6    reasons.  One is that this was already shown or will be shown

7    through other officers extensive CCTV footage that will depict

8    what happened in the tunnel from several different angles, but

9    they've already shown a lot of stuff depicted within the

10   tunnel.  They therefore say this is cumulative, and they also

11   say it's irrelevant, and finally they say it's overly

12   prejudicial.

13        As to the prejudice part of it, the government argues that

14   obviously with the body-worn camera you get only the audio --

15   for the first two minutes, which is after the officer activates

16   his body-worn camera, it goes back.  For two minutes we don't

17   have audio.  Then the audio kicks in.  So once the audio kicks

18   in, there is an officer who tells Bogner, according to the

19   defense, that this is a federal crime, and that's part of the

20   audio according to the defense, and the government can correct

21   me if that's wrong, at about 2:42.

22        The rest of the tape shows a standoff in the tunnel, to

23   use the defense words in Docket 148, and at 2:51 it shows an

24   officer's bloody finger which is the focus of the footage, and

25   the officer says his finger is broken.  And then later at about

1    2:52 there's a bloodied hand that comes into view which I think

2    is a different officer.  And then at 2:54 an officer's face is

3    visible with mucous coming from his nose, apparently caused by

4    tear gas, and that's all prejudicial.  That's the defense

5    position.

6        I've watched the body-worn camera from Officer Bogner, and

7    it does show -- it does show rioters in the hallway.  It does

8    show the breaking of the glass which is -- was also testified

9    to by Captain Ortega, which is important to the government's

10   case for a lot of reasons, and there are people saying it's --

11   officers saying "it's terrifying, he's got a weapon."  There

12   are rioters saying "hold the line" and yelling USA; officers

13   saying "stop, we will not let you in"; more people from the

14   rioters saying "this is our house", which we heard on prior

15   videos; and then we have a lot of conversation among the

16   officers talking -- what I would characterize as talking their

17   strategy as to what to do amidst the chaos that is beginning to

18   appear in front of them and around them and a lot of discussion

19   about establishing a second line.  There's some rioters using

20   fire extinguishers and officers saying "back up."

21       So that gets us to the bloody finger.  There clearly was

22   tear -- at 2:52 an officer is heard to say, "Go out the door,

23   please," and at 2:51 or 2:52 we see the bloody finger and

24   somebody saying "my finger is broken" and people coughing,

25   probably tear gas.

1    So here's my view.  I think the whole thing is relevant,

2    and I disagree with the defense argument that it's not

3    relevant, and it is -- as to whether it's cumulative, I don't

4    think so.  It shows -- yes, it shows a lot of the same things

5    that Officer Ortega showed us, but it comes from an officer who

6    was actually there.  And again, as in my prior trial involving

7    a police officer who was charged with second degree murder, the

8    body-worn cameras are very helpful to see what's happening and

9    to corroborate what the officer's telling us.  I mean, in terms

10   of the officer's credibility, he's telling us these things

11   happened, and we're seeing them happen in front of his face.

12       It still has to be relevant, and I think the whole thing

13   is relevant to proving the charges.  Obviously

14   Mr. GossJankowski is not there every minute, and that will come

15   out on probably direct and certainly on cross, but it may be in

16   connection with other videos that we've seen or will see

17   showing where these officers are in relation to the double

18   doors, what they're doing, and then by connecting up this with

19   earlier videos where Mr. GossJankowski was at the time.  In

20   some cases he was quite close and arguably could see what was

21   going on.  In other cases he wasn't very close.  He'd walked

22   away from what was going on.  All of that will come out, so I

23   don't buy the argument of cumulativeness or lack of relevance.

24       And in terms of what the officers are saying to each

25   other, it's not for the truth of the matter asserted, but it is

1    helpful to understand the context and what they were doing and

2    why were they doing it.  I would -- I do think that the

3    government should delete or mute the part where somebody says

4    "this is a federal crime."  The jury's going to decide whether

5    there were federal crimes here and what they were, and I don't

6    think we need an unidentified officer's opinion, so I think

7    that is prejudicial and not fair.

8        I am not troubled by the bloody finger.  I am troubled by

9    the bloody hand.  It's right in the face of the camera, and

10   it's quite bloody.  And I'm not troubled by the mucous.  I

11   mean, there's going to be a lot of testimony -- there's already

12   been some -- about tear gas.  There's been testimony already

13   about, you know, how -- what you do when you get tear-gassed.

14   You take bottles of water, you pour them in people's eyes.

15   Some people were taken off the lines, and I do think that it is

16   helpful and relevant for the jury to understand that that was

17   going on to prove context, to prove civil disorder and some of

18   the other things as well.

19       Obviously there is -- has been and will be testimony that

20   Mr. GossJankowski -- there's no evidence that he broke doors.

21   He entered already open areas, and the only evidence I think of

22   an assault or is -- is -- has to do with Officer Moore.  Maybe

23   I'm wrong.  The government can correct me.  But in terms of

24   what Officer Bogner saw, my guess is he's going to say he

25   didn't see Mr. GossJankowski or he saw him at a distance, and

```
 1    so I think his testimony is relevant and not cumulative and,

 2    except in those two areas I mentioned, not overly prejudicial

 3    under 403.  So that's my ruling.

 4            MR. DREHER:  Your Honor, does the -- certainly I

 5    understand the Court's ruling, and we'll be able to mute the

 6    beginning portion of the officer outlining the federal nature

 7    of what's being recorded.  As it relates to the bloody hand, I

 8    will also be able to clip it but not until lunch.  Does the

 9    Court wish to review it prior?

10            THE COURT:  I don't have to review it as long as

11    you've represented as an officer of the Court that you will

12    modify it accordingly, and it'll be fine.

13            MR. DREHER:  Yes, Your Honor.  I'll also consult with

14    defense to ensure that it's done correctly.

15            THE COURT:  Okay.  So is that the witness?

16            MR. VALENTINI:  No.  No, Your Honor.

17            THE COURT:  Should I go on to discuss *Daubert*, or

18    should I go on to deal with the other things Mr. Smock wanted

19    to raise?  Because I would like to go ahead with the jury as

20    soon as we can.

21            MR. VALENTINI:  Your Honor, we defer to the Court.

22    Our full team is here, so we defer to the sequence the Court

23    wishes to address.

24            THE COURT:  If you think the witness is going to be

25    here in 10 or 15 minutes, I'll postpone my *Daubert* ruling until
```

```
 1    later.
 2              MR. VALENTINI:  That's what I hope, but she's not
 3    here right now.  It's my hope that she will be here within the
 4    next 10 or 15 minutes.
 5         I stand corrected.  The witness is outside right now.
 6              THE COURT:  The witness is here?
 7              MR. VALENTINI:  Yeah.
 8              THE COURT:  Okay.  You want to -- Mr. Smock, should
 9    I -- you want me to do anything else first?  If so, we'll ask
10    the witness to step out for a few minutes, and then we'll see
11    if all the jurors are here.
12              MR. SMOCK:  The only quick thing is we have the
13    stipulation that we worked out between the parties.
14              THE COURT:  The what?
15              MR. SMOCK:  The stipulation we worked out between the
16    parties about the fact that Mr. GossJankowski can't read lips,
17    understand spoken English, or speak English himself.  Our
18    proposal would be to read it this morning.  I believe the
19    government objects to that.  Our view is that it's an
20    undisputed fact, and we would ask that it be put before the
21    jury now.
22              MR. VALENTINI:  Your Honor, it is a stipulation.  It
23    is not a disputed fact.  However, there is a question of order
24    of proof and when we put on our case and when the defense puts
25    on their case.  The stipulation is in lieu of -- it replaces
```

1    expert testimony that the defense had proposed to offer and the

2    obvious need for that, but that is part of the defense case.  I

3    don't think we are really probably -- well, we already agreed

4    to accommodate the need of another expert the defense intends

5    to offer, but I think there should be -- there should remain

6    some order to the proof and the sequence in which the cases are

7    presented.

8            THE COURT:  Anything else, Mr. Smock?

9            MR. SMOCK:  No, Your Honor.

10           THE COURT:  Okay.  I agree with the government.  I

11   think that this is a defense witness, and the government has

12   agreed to stipulate to the important things that the witness

13   would have testified about; so I understand that the language

14   of the stipulation is agreed and the only issue is the timing,

15   and it should be done in the defense case.  I'm going to

16   instruct the jury or tell the jury that the reason we're taking

17   Dr. Kroll out of turn is for scheduling reasons, but he is a

18   defense witness, but I don't think we should take other defense

19   witnesses out of turn if there's no urgent need to do so, and

20   this stipulation is in lieu of a defense witness, so I agree

21   with the government.

22           MR. SMOCK:  So long as the government is not going to

23   call Neal Matthews before lunch, I think we're ready to go

24   forward.  But if they do, I'd like to raise something before

25   the jury comes in.

```
 1              THE COURT:  Okay.

 2              MR. VALENTINI:  So Your Honor, Mr. Matthews will be

 3     the next witness after Inspector Hawa.  I am not entirely sure

 4     whether Inspector Hawa's testimony is going to take the

 5     remainder of the morning until lunchtime.

 6              THE COURT:  We'll find out.

 7              MR. VALENTINI:  I propose that we start.

 8              THE COURT:  As soon as Ms. Johnson tells us that all

 9     the jurors are here, we can start with the government's next

10     witness.  When we're finished with that witness, we will then

11     discuss the matter Mr. Smock wants to raise, and at some point

12     during a break or during the lunch break, I will tell you my

13     views on Daubert.

14          I was going to do it this morning earlier, but our new --

15     our soon-to-be new chief judge came by and wanted to chat, so I

16     couldn't say no.  We have a new chief judge beginning next

17     week.  Judge Howell's term is up.  She had some good clerks

18     during her term, though, I think.

19          Don't you agree, Ms. Goetzl?

20              MS. GOETZL:  I do, very much so.

21          (Jury in at 10:18 a.m.)

22              THE COURT:  Would you call the next witness,

23     Mr. Valentini.

24              MR. VALENTINI:  The government calls Inspector

25     Lanelle Hawa.
```

 1          LANELLE HAWA, PLAINTIFF'S WITNESS, SWORN

 2              THE COURT:  Yes.  Please take off your mask.  Speak

 3      into the microphone.  There's water there if you need it.

 4                          DIRECT EXAMINATION

 5      BY MR. VALENTINI:

 6      Q.   Good morning.

 7      A.   Good morning.

 8      Q.   In a loud, clear voice, will you please state your name

 9      for the record.

10      A.   Yes.  Lanelle Hawa.

11      Q.   Where do you work?

12              THE COURT:  Could you spell your first name.

13              THE WITNESS:  Yes, sir.  L-A-N-E-L-L-E, last name,

14      Hawa, H-A-W-A.

15      BY MR. VALENTINI:

16      Q.   Where do you work?

17      A.   The United States Secret Service.

18      Q.   And what is your title at the United States Secret

19      Service?

20      A.   Inspector.

21      Q.   And what are the responsibilities of an inspector at the

22      Secret Service?

23      A.   We handle compliance investigations throughout the offices

24      in the country as well as international, and we also handle

25      integrity investigations, internal affairs matters.

1   Q.   Inspector Hawa, how long have you been working in that

2   role?

3   A.   I've been with the inspection division for about a year

4   and a half now.

5   Q.   And stepping back, what is the mission of the United

6   States Secret Service more generally?

7   A.   We basically protect some of our nation's highest leaders:

8   The President, Vice President, their families, any other

9   appointed individuals who we would protect, and we also

10  safeguard the financial infrastructure of the United States.

11  Q.   Is the Secret Service part of the executive branch?

12  A.   Yes.

13  Q.   Which department is it a part of?

14  A.   Department of Homeland Security.

15  Q.   Does the Secret Service protect the Vice President of the

16  United States?

17  A.   Yes.

18  Q.   How about the Vice President's immediate family?

19  A.   Yes.

20  Q.   How long have you been with the Secret Service?

21  A.   Twenty-four years.

22  Q.   And does the Secret Service have different divisions or

23  units within its organization?

24  A.   Yes.

25  Q.   Could you please describe those divisions.

1    A.    There's multiple divisions, investigative, protective

2    divisions.  We have training division, intergovernmental

3    affairs division.  There's multiple divisions.

4    Q.    Which divisions have you been a member of during your

5    career at the Secret Service?

6    A.    Sure.  I've been a member of the investigative divisions.

7    I've been involved with the criminal divisions, a training

8    division.  More specifically, or is that what you're asking?

9    Q.    No.  That's sufficient for now.  Thank you.  And which --

10   and so you were with the Secret Service as of January 6, 2021?

11   A.    Yes.

12   Q.    And which division were you with as of that day?

13   A.    I was with the Liaison Division.

14   Q.    So could you --

15            THE COURT:  What does the Liaison Division do?

16        Maybe I stepped on your question.

17            THE WITNESS:  Yes.  So the Liaison Division is in

18   charge of working with our partners throughout the government.

19   Specifically, we might be with different departments.  I was

20   assigned to the Capitol in particular, so we coordinate and

21   liaison, if you will, with those entities, and we handle any

22   matters in which our protectees would come to those facilities

23   in which we're working with our government partners.

24        So in this instance any protectees who came to the

25   Capitol, I would handle coordinating access control, their

1    movements throughout the Capitol, getting them, you know, to

2    the right meeting places and getting their motorcade situated

3    and basically just serving as the point of contact and

4    interacting with the other entities at the Capitol.

5    BY MR. VALENTINI:

6    Q.   So Inspector Hawa, were you working at the Capitol on

7    January 6, 2021?

8    A.   Yes.

9    Q.   And on January 6, did any individuals protected by the

10   United States Secret Service visit the Capitol?

11   A.   Yes.

12   Q.   Was one of those protectees the Vice President?

13   A.   Yes.

14   Q.   Who was the Vice President at that time?

15   A.   Michael Pence.

16   Q.   Did members of the Vice President's family accompany him

17   to the Capitol on January 6?

18   A.   Yes.

19   Q.   Who were they?

20   A.   His wife and his daughter Charlotte.

21            THE COURT:  What's his daughter's name?

22            THE WITNESS:  Charlotte.

23            MR. VALENTINI:  I will bring up what has been marked

24   as Exhibit 400, which is not yet in evidence.

25   BY MR. VALENTINI:

1    Q.   Are you able to see it on the screen?

2    A.   I see Exhibit 401.

3           THE COURT:  Is that what you want, 401?

4           MR. VALENTINI:  No.

5    BY MR. VALENTINI:

6    Q.   Are you able to see Exhibit 400?

7    A.   Yes.

8    Q.   There should be one page to this exhibit.  Is this

9    document an email?

10   A.   Yes, it is.

11   Q.   Do you remember writing this email?

12   A.   Yes, I do.

13   Q.   When did you write this email?

14   A.   I would have sent this email on January 5th, 2021.

15   Q.   And is Exhibit 400 a fair and accurate copy or redacted

16   copy of the email that you just described?

17   A.   Yes, it is.

18          MR. VALENTINI:  The government moves to admit

19   Exhibit 400 into evidence.

20          MS. GOETZL:  No objection.

21          THE COURT:  Okay.  It will be admitted.

22          MR. VALENTINI:  And let me zoom in to the top portion

23   of this email.

24   BY MR. VALENTINI:

25   Q.   Without revealing any specific names, whom did you send

1    this email to?

2    A.   So this email would have been sent to our counterparts

3    that we work with on a daily basis up at the Capitol from the

4    Senate Sergeant at Arms Office, the House Sergeant at Arms

5    Office, and the U.S. Capitol Police.  We typically would send

6    this type of information to their special events unit, and it

7    also would have gone to some Secret Service members who were

8    involved in the visit.

9             THE COURT:  I didn't hear the last part of your

10   answer.

11            THE WITNESS:  I said we would also send it to some

12   Secret Service members who were part of the visit.

13   BY MR. VALENTINI:

14   Q.   Inspector Hawa, I'm often told that I speak fast.  I will

15   pass on the same reminder just to make it easier for the court

16   reporter to take down what you're saying, please.

17   A.   Okay.

18   Q.   Thank you.  What's the subject of the email?

19   A.   The subject is HOS Notification, Visit of Vice President

20   Michael Pence, Mrs. Pence, and Charlotte Pence to the U.S.

21   Capitol, parenthesis, S-214, backslash, House and Senate

22   Floors, parenthesis, on January 6, 2021.

23   Q.   And the first word that you mentioned from the subject

24   line was "HOS."  That's an acronym?

25   A.   It is.

1    Q.    Do you know what it stands for?

2    A.    Yes.  It stands for Head of State.

3    Q.    And what was the purpose of the email that has been

4    marked -- that has been admitted into evidence as Exhibit 400?

5    A.    So we would have sent this notification, again, to our

6    partners -- Capitol Police, members of the House and Senate

7    Sergeant at Arms -- in an effort to coordinate the visit of

8    Vice President Pence and his family to the Capitol on

9    January 6th.

10   Q.    The subject line of this email also references S-214,

11   slash, House and Senate Floors.  Could you please explain those

12   references to the jury.

13   A.    Yes.  So it's just giving a quick overshot of an

14   attachment that would have been with this email that would have

15   given more specific information, but it's letting them know

16   that the Vice President and his family would be going to S-214,

17   which is the Vice President's ceremonial office, as we refer to

18   it in the U.S. Capitol Building, as well as the House and

19   Senate Floors, which are also in the Capitol Building.

20   Q.    Inspector Hawa, you just said that there was an attachment

21   to this email as well?

22   A.    Correct.

23         MR. VALENTINI:  If we can stop publishing this

24   exhibit, I will pull up what has been marked as Exhibit 401,

25   not yet in evidence.

1    BY MR. VALENTINI:

2    Q.   Inspector Hawa, do you see Exhibit 401 on your screen?

3    A.   I do.

4    Q.   Do you know what this document is?

5    A.   Yes.

6    Q.   What is it?

7    A.   It is the Head of State worksheet that would have been

8    attached to the email that was Exhibit 400.

9    Q.   And do you see some areas of this exhibit are blacked out

10   or redacted?

11   A.   Yes, I do.

12   Q.   Those redactions were made in preparation for trial, but

13   they were not in the document as you attached it originally?

14   A.   That's correct.

15        MR. VALENTINI:  The government moves for the

16   admission of Exhibit 401 into evidence.

17        MS. GOETZL:  No objection.

18        THE COURT:  It will be admitted and can be viewed by

19   the jury.

20        MR. VALENTINI:  Let me zoom in to the top portion on

21   this exhibit.

22   BY MR. VALENTINI:

23   Q.   Inspector Hawa, could you explain to the jury who are

24   these individuals and locations listed.

25   A.   Sure.  Well, first we list the visitors, who our

1    protectees are that would be coming to the Capitol, and in this

2    instance that would be Vice President Michael Pence,

3    Mrs. Pence, and their daughter Charlotte Pence.  We also list

4    the liaison supervisor, who in this instance would be myself,

5    and then my VP -- vice presidential protective division

6    counterpart, if you will.  That was Elizabeth Glavey.  She

7    worked with me that day for the arrival and the events

8    throughout.  And then we also list the agents who will be

9    driving the motorcade for the Vice President that day.

10            MR. VALENTINI:  Let me now zoom in on the bottom

11   portion of the exhibit.

12   BY MR. VALENTINI:

13   Q.   This bottom portion of the exhibit reflects what is

14   characterized as an itinerary?

15   A.   That's correct.

16   Q.   Could you please describe for the jury what information is

17   summarized in this itinerary.

18   A.   Yes.  So this itinerary we're basically providing

19   information again to our counterparts who were working at the

20   Capitol, letting them know what time we anticipate the arrival

21   of our protectee, the location of the arrival, and then the SSA

22   is known as the greeters who might greet the protectee, where

23   we are going to go once we arrive, and then it will just list

24   out the itinerary for the duration of the visit.  In this

25   instance we were moving between the Vice President's Office,

1   the House Floor, and the Senate Chambers and with an

2   anticipated departure from the House Carriage.

3   Q.   So when was the Vice President scheduled to arrive at the

4   Capitol on January 6?

5   A.   12:30 p.m.

6   Q.   And where within the Capitol was the Vice President

7   expected to arrive?

8   A.   He was expected to arrive at the Senate Carriage.

9   Q.   Do you know what that -- where the Senate Carriage is

10  located within the Capitol Building?

11  A.   Yes.  It's just -- it's located just outside of the Senate

12  side of the main Capitol Building.

13          MR. VALENTINI:  Let me bring up what has been marked

14  as Exhibit 605, which is already in evidence.

15  BY MR. VALENTINI:

16  Q.   Using your touch screen, Inspector Hawa, would you be able

17  to identify, generally speaking, where the carriage house is

18  located in the Capitol.

19  A.   Yes.  This is -- we're looking at the back side --

20  Q.   Yes.

21  A.   -- from the west side.  Okay.  So this is -- the Senate

22  Carriage would be right here (indicating).

23  Q.   Thank you.

24          MR. VALENTINI:  Let's return to Exhibit 401.

25  BY MR. VALENTINI:

Hawa - Direct (Valentini)                                          1102

1    Q.   Were you at the Capitol on January 6th to receive Vice

2    President Pence when he arrived?

3    A.   Yes.

4    Q.   Did he, in fact, arrive at the U.S. Capitol around noon?

5    A.   It was around 12:30 p.m., yes.

6    Q.   Where did the Vice President go after arriving at the

7    Capitol?

8    A.   So upon arrival we walked via foot.  We walked up the --

9    we utilized the Member Staircase to the second floor.

10             THE COURT:  Member Staircase of Senate or House?

11             THE WITNESS:  Senate.  So we walked up the Member

12   Staircase on the Senate side, which leads to the doors just

13   outside of his office and the back hallway of the Senate

14   Chamber; so he walked into his office and then at some point

15   moved over to the Senate Chamber.

16   BY MR. VALENTINI:

17   Q.   On what floor of the Capitol is the Vice President's

18   Office?

19   A.   Second.

20   Q.   And you said that's on the Senate side of the second floor

21   of the Capitol?

22   A.   Correct.

23   Q.   When the Vice President is visiting the Capitol, what are

24   your responsibilities?

25             THE COURT:  You want this itinerary down or up?

```
 1              MR. VALENTINI:  I'm sorry?

 2              THE COURT:  You want it up or down?  It's no longer

 3    on the screen.

 4              MR. VALENTINI:  Oh, no.  I was just questioning the

 5    witness.  Yeah.  I don't need the exhibit.

 6              THE COURT:  Okay.  Sorry.

 7              MR. VALENTINI:  No.

 8    BY MR. VALENTINI:

 9    Q.   When the Vice President is visiting the Capitol, what are

10    the responsibilities as Secret Service liaison?

11    A.   So our responsibilities, again, are to kind of do the pre-

12    advance work and sending out the Head of State notification, or

13    sometimes it's not necessarily in that format but to send a

14    notification to our counter- --

15              (Court reporter requested clarification.)

16    A.   It's sometimes not in that format.  We'll send a

17    notification to our counterparts, Capitol Police, Senate and/or

18    House Sergeant at Arms Office, and we do the pre-advance work

19    to notify those individuals of the itinerary of the protectee.

20    And then once they arrive, we will work again to lead them to

21    the locations that they are going to once they're on Capitol

22    grounds, securing the, you know, arrival, departure, access

23    control both getting onto complex and then within the complex.

24    BY MR. VALENTINI:

25    Q.   And Inspector Hawa, you may have mentioned this briefly
```

Hawa - Direct (Valentini)                                        1104

1    already, but did there come a time when the Vice President left

2    the ceremonial office to go to a different part of the Capitol

3    Building?

4    A.   Yes.

5    Q.   And where did he go?

6    A.   So soon after he arrived, he went over to the Senate

7    Chamber and met with the Senators who were gathered in the

8    Senate Chamber, and then just before 1:00 p.m. the Vice

9    President along with the Senators moved across the Capitol on

10   the second floor main hallway to the House Chamber.

11   Q.   And how long of a walk is it from the Vice President's

12   Ceremonial Office to the Senate Chamber?

13   A.   Takes a few minutes.  I'd say less than --

14         THE COURT:  How long?  How long?

15         THE WITNESS:  Less than five minutes.

16   BY MR. VALENTINI:

17   Q.   And you said that from the Senate Chamber there came a

18   time when the Vice President went over to the House side of the

19   Capitol?

20   A.   Correct.

21   Q.   And you said that that was about 1:00 p.m.?

22   A.   A little bit before 1:00, yes.

23   Q.   A little bit before 1:00 p.m.  And did the Vice President

24   walk that route alone?

25   A.   No.

1    Q.   Was it more of a formal process?

2    A.   Yes.  It was somewhat of a choreographed ceremonial

3    process walking across with the other Senators, Senate and

4    House Sergeant at Arms members, and others.  Obviously there

5    was Capitol Police, Secret Service, but yes, it's more of a

6    ceremonial procession over, if you will.

7    Q.   And do you have an understanding of why there was a more

8    ceremonial procession that day?

9    A.   I think it's just the way in which they handle the

10   certification of the Electoral College votes.

11            THE COURT:  So he had protection as he was walking, I

12   presume, from Secret Service?

13            THE WITNESS:  Yes, Your Honor.

14            THE COURT:  And he was walking with Senators and

15   Congressmen?

16            THE WITNESS:  Senators.  The Congressmen would have

17   been over on the House side.

18            THE COURT:  Congressmen were already over there?

19            THE WITNESS:  House of Representatives, yes.

20   BY MR. VALENTINI:

21   Q.   Did you walk the route with the Vice President at that

22   time?

23   A.   Yes, I did.

24   Q.   What happened when the Vice President arrived at the House

25   Chamber?

1    A.    So the Vice President and I believe his detail later went

2    into the House Chamber.  A majority of us stayed outside of the

3    House Chamber.  It's just the agreement we have with the

4    Sergeant at Arms Office.  And they entered the House Chamber,

5    and my understanding is the certification of the Electoral

6    College votes began approximately 1 p.m.

7    Q.    And did the Vice President at some point return to the

8    Senate Chamber from the House Chamber?

9    A.    Yes.

10   Q.    And could you provide the jury a general sense of how long

11   after arriving at the House Chamber the Vice President returned

12   to the Senate Chamber.

13   A.    Yes.  I want to say it was approximately 1:15 p.m.  There

14   was an objection to one of the state's votes, and when that

15   happens, the House members and the Senators stop the Electoral

16   College certification process, and they separate into the two

17   chambers, to the House Chamber and to the Senate Chamber.  So

18   at 1:15 there was an objection to, again, Arizona's votes; so

19   the Vice President and the other Senators made their way back

20   down the same hallway we arrived, and they walked back over to

21   the Senate Chamber.

22   Q.    And did you accompany the Vice President as he went from

23   the House Chamber back to the Senate Chamber?

24   A.    Yes.

25   Q.    Did there come a time when you began receiving

1    notifications or updates about a security situation happening

2    on Capitol grounds?

3    A.    Yes.

4    Q.    And what were those updates?

5    A.    So right about that same time we were making our way

6    across from the House Chamber to the Senate Chamber around

7    1:15, I was hearing some radio traffic on the Capitol Police

8    officer who was assisting me that day.  There was two

9    primary -- primarily assigned to our detail to assist us.

10   There was also multiple along the route, but I was hearing some

11   chaos, if you will.  There was obviously an issue where I could

12   hear Capitol Police officers calling for help, assistance,

13   backup, and my counterpoint was explaining to me that there had

14   been a breach of our security perimeter on the West Side of the

15   Capitol.

16   Q.    When you say your counterpart, could you identify which

17   organization that counterpart worked for.

18   A.    Yes.  Capitol Police.

19   Q.    And did there come a time when you also received a call or

20   a request with respect to the Vice President's motorcade?

21   A.    Yes.

22   Q.    Could you tell the jury about the events relating to the

23   Vice President's motorcade at this point.

24   A.    Sure.  So we had the Vice President's motorcade staged on

25   the East Plaza, which is just outside of where the Senate

1   Carriage entrance is or the arrival was, so the motorcade was

2   staged out there, and I started receiving phone calls

3   requesting permission, if you will, for a new location because

4   the Secret Service agents who were with the motorcade felt that

5   there was a heavy presence of unauthorized or unknown

6   individuals on the plaza area and there was concern that they

7   were going to breach the bike rack and security perimeter that

8   had been set up on the plaza.  So they were calling to us

9   asking us, you know, for direction of where to move the

10  motorcade to get it to a safer location.

11  Q.   And did you approve the removal of the motorcade to a

12  different location?

13  A.   Yes.  Well, I coordinate with the Capitol Police and the

14  Senate and House Sergeant at Arms protocol officers who assist

15  us as well during the visit.  It was a coordinated effort.

16          THE COURT:  And the question was:  Did you approve

17  what?

18          MR. VALENTINI:  The moving of the motorcade to a

19  different location from where it was staged.

20  BY MR. VALENTINI:

21  Q.   And back to what was happening inside the Capitol.  When

22  you left -- we left off when the Vice President had returned to

23  the Senate from the House side.  Where did the Vice President

24  go initially after returning from the House Chamber to the

25  Senate side?

Hawa - Direct (Valentini)                                          1109

1    A.    So initially he walked into the Senate Chamber with the

2    other Senators and then at some point made his way into his

3    office.

4    Q.    And how long was he in his ceremonial office at that

5    point?

6    A.    Until -- how long until when?

7    Q.    Did at some point there come a time when he left the

8    ceremonial office?

9    A.    Yes.

10   Q.    And what happened next?

11   A.    So approximately 2:30 p.m. on January 6th, 2021, we had

12   made a decision, again, based on the security breaches and the

13   threat that was being posed to us.  We had realized at that

14   point there had been security breaches of unknown and

15   unauthorized individuals into the Capitol, first on the House

16   side, and then there was also breaches on the Senate side.

17   They were getting very close to us and our protectee, so we

18   made a decision that it was time to move the Vice President to

19   a safer location.

20   Q.    You just said "safer location."  What was the concern with

21   the Vice President being in his ceremonial office at that

22   point?

23   A.    So based on the information and the visual information we

24   were receiving, and we saw that we were basically getting to a

25   point where we would be trapped from the House side and the

1   Senate side, and we didn't want to get into a situation where

2   we were trapped in his ceremonial office by these unknown,

3   unauthorized individuals because we understood these numbers to

4   be, you know, in the thousands at that point.

5   Q.   And if I understand you correctly, part of the concern is

6   that the Senate Office is on the second floor?

7   A.   Correct.

8          THE COURT:  And I didn't hear your question.

9   BY MR. VALENTINI:

10  Q.   Part of the concern is that the Senate Office is on the

11  second floor of the building?

12  A.   That's correct, and we'd gotten to a point, to be clear,

13  where there was -- actually, some of the unknown, unauthorized

14  individuals had made their way to the bottom of the staircase

15  where we had taken the Vice President up initially to his

16  office, so we didn't want to be trapped on the second floor or

17  the first floor and get to a position where we couldn't use the

18  stairways to get him out and to safety.

19  Q.   Thank you.  Inspector Hawa, I'm going to show you the

20  first frame of what has been marked as Exhibit -- a video that

21  has been marked as Exhibit 402.  Inspector Hawa, just by

22  watching -- seeing the first frame or first few frames of this

23  video, are you familiar with this video?

24  A.   Yes, I am.

25  Q.   Do you know where this video was recorded?

1    A.   Seems to me there was a camera in the lobby area just

2    outside of the double doors there that lead into the back side

3    of the Senate Chamber and the Vice President's Office.

4    Q.   Were you personally present for the events recorded in

5    this video?

6    A.   Correct.

7         MR. VALENTINI:  The government moves for the

8    admission of Exhibit 402 into evidence.

9         MS. GOETZL:  No objection.

10        THE COURT:  It will be admitted and may be shown to

11   the jury.

12   BY MR. VALENTINI:

13   Q.   Okay.  Inspector Hawa, in this first frame of the video,

14   do you see a staircase?

15   A.   Yes.

16   Q.   Is that the staircase that you and the Vice President used

17   to go from the carriage house to the ceremonial office?

18   A.   Yes.  We used -- that's the Member Staircase on the Senate

19   side that I mentioned that we used upon arrival on the Senate

20   Carriage side to walk the Vice President up to his ceremonial

21   office.

22   Q.   And these doors that I just circled on the right-hand side

23   of this frame, do you know where they lead to?

24   A.   Yes.

25   Q.   Where do they lead to?

1   A.    So again, it's a hallway, a back hallway that runs along

2   the back side of the Senate Chamber; so if you walk to those

3   doors, to the left would be the Senate Chamber, and then to the

4   right would be the Vice President's Office.

5   Q.    And do you see the time stamp on this video in the top

6   left corner?

7   A.    Yes.

8   Q.    And could you please read it for the jury.

9   A.    Looks like it's Wednesday, January 6, 2021, at

10  2:25:47 p.m.

11  Q.    And do you recall where the Vice President was at

12  approximately this time on January 6?

13  A.    Yes.  He was in his office.

14  Q.    And so that would be behind the doors that are currently

15  circled on the screen?

16  A.    Correct.

17              MR. VALENTINI:  Let me clear the marks from the

18  screen.

19  BY MR. VALENTINI:

20  Q.    Inspector Hawa, do you see yourself in this frame?

21  A.    Yes.

22  Q.    Could you please -- using the touch screen could you

23  please circle yourself.

24  A.    (The witness complied.)

25  Q.    And Inspector Hawa, what were you doing at this point on

1    January 6?

2    A.    So at this point I had run a route to make sure that the

3    area -- the location that we wanted to take the Vice President

4    that we thought to be safer than the location of his office, I

5    had run that route to make sure it was secure, safe, and free

6    of any of these unauthorized individuals who had breached the

7    Capitol, and I was coordinating with one of his shift agents,

8    one of the agents who's assigned to the Vice President's

9    detail, and I was just letting him know that the area was clear

10   and that we needed to go and it was a time to move before,

11   again, we got trapped and lost our ground to get him -- get the

12   Vice President to a safer location.

13   Q.    So by this point you were already aware that rioters had

14   entered the building?

15   A.    Correct.

16   Q.    And were you -- had you heard any noise consistent with

17   rioters being in the building at this point?

18   A.    Absolutely.

19   Q.    Where were you when you heard those noises?

20   A.    So once we had brought the Vice President and the Senators

21   back across to the Senate Chamber, a little bit after, like,

22   1:15 -- approximately 1:15 is right about -- between that point

23   up and until this moment of this video, you could hear

24   throughout the Capitol the glass breaking from the riot, the

25   noise, the loudness, not only, you know, on the officers'

1    radios, but also just throughout the Capitol because it's --

2    you know, noise travels, so it was easy to hear on the Senate

3    side breaches that were happening on the House side.

4         And then I had also -- at the bottom of that staircase, as

5    I mentioned, in the area where we had first arrived, I had come

6    face to face with some of these unauthorized individuals, you

7    know, letting them know they couldn't come through that area,

8    that it was secure, and just holding them back with some of the

9    Capitol Police officers.

10   Q.   So from a secure perspective, how difficult is it to move

11   the Vice President within the Capitol Building when you know

12   there are rioters inside the building?

13   A.   It's challenging.  Not ideal.

14   Q.   Is it one of the more challenging things you have done as

15   an agent at the Secret Service?

16   A.   Probably one of the most challenging movements I've had to

17   make.

18   Q.   Let me play this video for the jury, and I may stop along

19   the way and ask you some questions.

20        (A portion of Exhibit 402 was played.)

21   BY MR. VALENTINI:

22   Q.   Inspector Hawa, I've stopped this exhibit at 2:26:01 p.m.

23   Could you please circle for the jury any individuals that you

24   recognize near the door in this exhibit.

25   A.   Sure.  So this individual, this is the Vice President's --

1    we refer to him as a detail leader, his number one agent in

2    charge.  Right here is Vice President Pence.  This is their

3    daughter Charlotte.  This is Mrs. Pence (indicating

4    throughout).

5              THE COURT:  So again, that's his daughter Charlotte?

6              THE WITNESS:  Yes, and in front of their daughter

7    Charlotte is Mrs. Pence.

8              THE COURT:  So the one you've circled is which one,

9    do you know?

10             THE WITNESS:  So I circled both.  So you have the

11   Vice President, and then his daughter is in front of him, and

12   then Mrs. Pence is in front of their daughter (indicating

13   throughout).

14             THE COURT:  Okay.  Got it.

15   BY MR. VALENTINI:

16   Q.   I'm going to clear some markings from the screen.

17   A.   Okay.

18   Q.   And without getting any -- into any details, in general

19   terms where did you relocate the Vice President at this point?

20   A.   Okay.  So we were still within this Capitol main complex

21   in an underground location, if you will, under the Capitol

22   Building plaza area but still within where we would consider a

23   secure location.

24   Q.   Just to be clear, the secure location was within Capitol

25   grounds?

Hawa - Direct (Valentini)                                      1116

1    A.    Yes, and it was in our secure -- within our secure

2    perimeter.

3    Q.    And how long was the Vice President at that location on

4    January 6th?

5    A.    We were there for approximately five hours.

6    Q.    Did the Vice President leave that secure location at any

7    time prior to the time when he returned to the Capitol

8    Building?

9    A.    No, he did not.

10   Q.    So the Vice President from that secure location went

11   directly back to the Capitol Building?

12   A.    Correct.

13   Q.    And that's after approximately five hours?

14   A.    Correct.

15   Q.    And do you remember at approximately what time the Vice

16   President returned to the Senate side of the building?

17   A.    Yes.  I want to say it was sometime between 7 and 8 p.m.

18   Q.    Did the Vice President ever leave the Capitol grounds from

19   the time when his motorcade arrived at the carriage house

20   earlier in the day and the time it left the Capitol Building

21   after the certification of the Electoral College?

22   A.    He did not leave.

23   Q.    What is your understanding -- understanding of what had

24   happened to the proceedings that day while the President --

25   while the Vice President was being held in the secure location?

1    A.   My understanding, the reason it was passed to me was that

2    the proceedings had to be placed on hold.  They had to cease

3    because not only were we taking the Vice President to a secure

4    location, but the Senators were being moved to a secure

5    location.  The House of Representatives members were also being

6    moved to a secure location.  Leadership from the Capitol was

7    being moved to secure locations, so there was a need to halt

8    the proceedings.

9    Q.   And you said the Vice President was at the secure location

10   for approximately five hours?

11   A.   That is correct.

12   Q.   Would you have made a recommendation as the -- that the

13   Vice President be allowed to return to the Senate building

14   while rioters were still in the building?

15   A.   I would not have made that recommendation.

16   Q.   What had to happen before the Vice President could return

17   to the Senate Chamber?

18   A.   We would have had to render it safe, meaning we would have

19   had to done a security sweep.  And by "sweep," I mean, you

20   know, going through and looking into areas ensuring that there

21   were no unauthorized individuals in the vicinity or areas that

22   we would be returning to with the Vice President, sweeping to

23   make sure there was no explosives after this event, anything

24   dangerous that would render harm to the Vice President or any

25   of our protectees or, quite honestly, anybody who would be part

1    of that event.

2    Q.   Is this a simple operation?

3    A.   I would not say simple.  It takes quite a few individuals.

4    Q.   And I may have asked you this before, but at approximately

5    what time did the Vice President return to the Senate Chamber?

6    A.   Sometime between 7 and 8 p.m.

7    Q.   Was the certification --

8              THE COURT:  Were you with him when he returned?

9              THE WITNESS:  I'm sorry, sir?

10             THE COURT:  Were you with him and part of the group

11   when he returned?

12             THE WITNESS:  Yes, Your Honor.

13   BY MR. VALENTINI:

14   Q.   Was the certification of the 2020 election ultimately

15   completed that day?

16   A.   It was completed on January 7th, 2021.

17   Q.   And how long -- going back to the beginning of your

18   examination, how long have you been with the Secret Service?

19   A.   Twenty-four years.

20   Q.   In your 24 years with the Secret Service, have you ever

21   been in a situation that was more threatening to the person you

22   were protecting than January 6, 2021?

23   A.   No.

24             MR. VALENTINI:  No further questions.

25             THE COURT:  Ms. Goetzl.

1                        CROSS-EXAMINATION

2    BY MS. GOETZL:

3    Q.    Good morning, Inspector.  I'm Celia Goetzl.

4    A.    Good morning.

5    Q.    So on January 6th, 2021, you worked in the Liaison

6    Division?

7    A.    Correct.

8    Q.    And the Liaison Division has two branches; is that

9    correct?

10   A.    No.  What do you mean by that, "two branches"?

11   Q.    There's a Capitol Hill branch specifically to the Liaison

12   Division?

13   A.    There's multiple areas of responsibility that we would

14   cover under the Liaison Division.

15   Q.    Okay.  So does the Liaison Division have an office in

16   Capitol Hill?

17   A.    We do.

18   Q.    Okay.  And you worked in that office?

19   A.    Correct.

20   Q.    Okay.  So you worked permanently at the Capitol at that

21   time?

22   A.    That's correct.

23   Q.    Okay.  And it was you and four others at that time --

24   A.    Four others.

25   Q.    -- who worked in your office at the Capitol?

1    A.    Yes.  There was five of us, correct.

2    Q.    Okay.  And you testified on direct that the liaison office

3    coordinates protectees' access to the Capitol?

4    A.    Correct.

5    Q.    Okay.  And it helps them navigate their way around the

6    Capitol?

7    A.    Correct.

8    Q.    The office itself is not responsible for restricting

9    access to the Capitol?

10   A.    We do that in coordination with, again, Capitol Police,

11   the Sergeant At Arms Offices.

12   Q.    Okay.  But your responsibility wasn't to set the

13   restrictions on the Capitol?

14   A.    We would set the restrictions, again, in coordination.  We

15   would explain what we needed and worked in coordination with

16   the Capitol Police to determine what needed to be barricaded

17   off.

18   Q.    Okay.  And you first started working in the Liaison

19   Division -- when did you first -- first start working in the

20   Liaison Division at the Capitol?

21   A.    I want to say it was in, let's see, '21...I would have

22   gone over there in, I want to say, the fall or winter of 2020.

23   Q.    Okay.  So early 2020 or -- early 2020?

24   A.    Yeah.  I'd been there for about a year, about a year.

25   Q.    Okay.  And that was about -- it was already over halfway

1    through Vice President Pence's term; correct?

2    A.    Probably more than halfway at that point.

3    Q.    And before -- is it fair to say that Secret Service

4    protectees often come Capitol -- come to the Capitol?

5    A.    Yes.

6    Q.    And that's why you -- the Secret Service has an office at

7    the Capitol?

8    A.    That is correct.

9    Q.    Okay.  And so before January 6, you had coordinated Vice

10   President Pence coming to the Capitol ten or more times?

11   A.    Sounds about right.

12   Q.    Once or twice a month he would come?

13   A.    Sounds about right.

14   Q.    Okay.  And when the Vice President came to the Capitol, it

15   was for official business?

16   A.    Correct.

17   Q.    And on January 6th, he was there for official business?

18   A.    That's correct.

19           MS. GOETZL:  Okay.  I want to pull up Government's

20   Exhibit 400, which has been admitted into evidence.

21           THE COURT:  Exhibit which?

22           MS. GOETZL:  400.

23           THE COURT:  Thank you.

24   BY MS. GOETZL:

25   Q.    And you testified on direct that this is the email that

1  you sent to notify everyone that the Vice President was going

2  to be there?

3  A.   Correct.

4          MS. GOETZL:  Okay.  And could we just zoom in to the

5  top portion.

6  BY MS. GOETZL:

7  Q.   Okay.  And you sent the email the day before he was

8  supposed to be there, on January 5th?

9  A.   That's correct.

10 Q.   And it was at 2:50 p.m.?

11 A.   That's correct.

12         MS. GOETZL:  Okay.  I just want to pull up the Head

13 of State form, which is Government Exhibit 401.

14 BY MS. GOETZL:

15 Q.   And you testified on direct that this worksheet was the

16 attachment to that email that we just saw?

17 A.   That's correct.

18 Q.   And it just notifies everyone of who's coming and where

19 they're going?

20 A.   Correct.

21 Q.   Okay.  The purpose of this form is to facilitate the

22 protectees' entrance and access into the Capitol?

23 A.   It accomplishes a few things, actually.  It helps

24 notify -- and again, there had been conversations prior to

25 this, so this was not the first time -- on January 5th, my

1    email was not the first time the Capitol Police or the Sergeant

2    At Arms Offices were aware he was coming.  We send this sheet

3    when we have more specific information to plug in, so as we get

4    closer to the event, we may have more specific times.

5    Sometimes we have personnel changes, so we wait till usually

6    24 hours before, the day before, to send the information so

7    it's most accurate so we don't have to continue to send amended

8    notifications.

9    Q.   But this form basically has the contact information of the

10   people who will be with him and his itinerary?

11   A.   That is correct.

12   Q.   Okay.  So it's basically just to facilitate his visit to

13   the Capitol?

14   A.   Yes, and it also helps the Capitol Police know, you know,

15   how many protectees we have coming so they can offer their

16   assistance and the number of manpower they may assign to the

17   visit.

18   Q.   Okay.  But this form does not say anything about what

19   manpower is going to be used for the visit?

20   A.   Well, it tells you what Secret Service agents will be

21   involved, some of them, and then again, based on the movements

22   and the number of protectees coming, that decision will be made

23   by the entities who we're coordinating with.

24   Q.   Okay.  But again, this form does not say, "We need 25

25   officers"?

Hawa - Cross (Goetzl)                                          1124

 1    A.   Correct, it does not.

 2    Q.   Okay.  So this form just has his itinerary and a list of

 3    contact people?

 4    A.   That's correct.

 5    Q.   Okay.  This form doesn't say what area is restricted at

 6    the Capitol because of the Vice President being there?

 7    A.   It does not.

 8         MS. GOETZL:  Okay.  Court's indulgence.

 9    Thank you.

10    BY MS. GOETZL:

11    Q.   Inspector Hawa, are you familiar with something called a

12    national special security event?

13    A.   I am.

14    Q.   Okay.  And January 6th was not a national special security

15    event; correct?

16    A.   It was not.

17    Q.   Okay.  At a national special security event, you would

18    have a Secret Service inspector inspect the perimeter to see if

19    it's sufficiently restricted?

20    A.   We would not have a Secret Service inspector inspect the

21    perimeter.  That's not correct.

22    Q.   Okay.  Would Secret Service be posted around the national

23    special security event?

24    A.   Yes, they would.

25    Q.   Okay.  And on January 6, Secret Service agents were not

1  posted around the Capitol Building?

2  A.   They were not initially, no.

3  Q.   Okay.  And they were not patrolling the perimeter that had

4  been set up?

5  A.   That is not correct.

6  Q.   So Secret Service agents were patrolling the perimeter?

7  A.   There very well could have been Secret Service agents in

8  the vicinity, yes.

9  Q.   Okay.  You've testified in other January 6 cases?

10  A.   Yes.

11  Q.   And do you -- did you testify on March 21st, 2022, were

12  you asked the following question --

13            THE COURT:  In what case?

14            MS. GOETZL:  In *United States vs. Griffin*, Couy

15  Griffin.

16  BY MS. GOETZL:

17  Q.   You were asked:

18       There were Secret Service agents on January 6th along the

19  National Mall who were patrolling a security perimeter; is that

20  right?

21       No, that's not correct.

22  A.   That's in reference to the Mall.

23  Q.   Understood.  So your testimony today is that there were

24  Secret Service agents patrolling the perimeter of the Capitol?

25  A.   There could have well been, yes.  We have teams.

1  Q.   Did you have personal knowledge of Secret Service agents

2  patrolling the perimeter of the Capitol?

3            MR. VALENTINI:  Your Honor, I have to object.  The

4  defense is not allowing the witness to complete her answer.  I

5  understand this is cross-examination, but the witness should

6  still have an opportunity to complete her answer.

7            THE COURT:  Okay.  I didn't know whether she

8  completed her answer.  What she had said was there could well

9  have been agents patrolling the perimeter.

10       Was there more to that answer?

11            THE WITNESS:  Yes, Your Honor.  So we have teams

12  that, when there are known events with our protectees present,

13  that would be in the vicinity patrolling the area of the event

14  where protectees may be.

15  BY MS. GOETZL:

16  Q.   Do you have personal knowledge of what teams and if any

17  teams were patrolling the area that day?

18  A.   Yes.  I would have received a notification that there were

19  individuals that would be in the vicinity.

20  Q.   Okay.  I'm not asking you if you -- what normally happens

21  in the course of business.  What I'm asking you is:  Do you

22  remember receiving an email that day that there were Secret

23  Service patrolling that area?

24  A.   Specifically at this moment, no, because that was some

25  time ago, but I'm quite certain one was sent notifying us of

1    what would be a typical event for us in the way we operate.

2    Q.    Okay.  And that would be for something that is not a

3    national special security event?

4    A.    That is correct.

5    Q.    Okay.  So you don't remember seeing any particular email

6    about Secret Service patrolling the perimeter?

7              MR. VALENTINI:  Objection.  Your Honor, could we have

8    a brief bench conference, please?

9              THE COURT:  Sure.

10        (At sidebar)

11             MR. VALENTINI:  Your Honor, this is the subject --

12             THE COURT:  I can't hear you.

13             MR. VALENTINI:  This is the subject of a motion in

14   limine and a ruling on that motion in limine.  There was two

15   areas that -- where Your Honor determined that were not within

16   the proper scope of cross-examination which have to do with the

17   ordinary protocols to protect Secret Service protectees.  Where

18   the Vice President was on that day is relevant.  What the

19   ordinary protocols are is --

20             THE COURT:  That's not what she's asking about.

21   She's asking something that's directly relevant to whether you

22   can prove certain charges in this case, on their theory this is

23   relevant to whether you can prove certain charges.  This agent

24   has said she's received a notification.  If there's a

25   notification that agents were patrolling the perimeter, you can

1    produce and redact it.

2        I mean, tell me if I misunderstand why you're trying to do

3    this.

4             MS. GOETZL:  No.  That's correct.  I'm not asking

5    about general protocols at all.  The witness is testifying

6    about general protocols.  I'm asking about January 6.

7             THE COURT:  And she -- in their argument about one or

8    more of your counts, in terms of what is a restricted area,

9    they're trying to make a distinction, as the statute does,

10   between these special -- whatever they're called -- events like

11   Fourth of July and all that and what was intended to be a

12   normal day with protectees of the Secret Service and whether or

13   not the area was restricted, and she -- their argument is that

14   unless the Secret Service restricts an area, it's not

15   restricted.

16       Whether she's right or wrong as a matter of law is another

17   question, but that's their theory, or one of their theories,

18   and so it seems to me that this is relevant and it can be done

19   in a way that doesn't disclose the kind of information that we

20   understand why you don't think can be disclosed, but you can't

21   prevent her from trying to create a record to then make the

22   argument they want to make.

23            MR. VALENTINI:  Understood, Your Honor.  I would just

24   ask, then, that the questioning be closely tethered to what

25   happened on January 6 specifically, and I think you've done it

1    and the defense has done it at several points, but perhaps

2    directed from the Court as well to make sure that the question

3    is not about general protocols so it would be very important

4    given security interests at stake.

5              THE COURT:  She will do that, I'm confident.  And if

6    you want her to lead a little more, she can lead a little more.

7    And if there's a document or documents that either support or

8    don't support their theory, they can be made available and, if

9    necessarily appropriate, presented to the jury in redacted

10   form.  If you're comfortable relying exclusively on direct,

11   cross, and redirect, that's your call.

12             MR. VALENTINI:  I just need the questioning to be

13   very narrowly tailored to January 6 because of the security

14   interests at stake.  That's our concern.

15             THE COURT:  I think that's understood, is it not,

16   Ms. Goetzl?

17             MS. GOETZL:  Yeah, absolutely.

18             THE COURT:  Thank you.

19        (In open court)

20             MS. GOETZL:  I'm just going to ask Adam:  Could you

21   please pull up Government's Exhibit 601, which has already been

22   admitted into evidence?

23   BY MS. GOETZL:

24   Q.   So your testimony is that you likely received an email

25   that Secret Service agents were patrolling the perimeter of the

1    Capitol on January 6th?

2    A.    Yes.  I don't know if "patrolling" is necessarily the

3    right word, but yes, there was likely Secret Service agents on

4    the exterior of the perimeter of the Capitol on January 6.

5    Q.    Okay.  Is it your testimony that there were likely Secret

6    Service agents posted around this red line on January 6th?

7    A.    There were not Secret Service agents posted along the red

8    line.

9    Q.    Okay.  So by patrolling the perimeter, what exactly do you

10   mean?

11   A.    So one of the units that we use in the area, again, would

12   be there to notice if there was anything out of the ordinary or

13   anything of concern on the outside of our site.

14   Q.    Okay.  So they're there to inform you of what's going on

15   at the perimeter?

16   A.    Not at the perimeter.  Anything on the exterior.  We're

17   kind of getting into a little bit of --

18            THE COURT:  Yes.  We understand that there's certain

19   issues with respect to security that it's difficult for you to

20   go into, and we're going to -- that's what we were talking

21   about at the bench, and both sides are going to try to be

22   cognizant of that.

23       So let's talk in general.  You've made a distinction

24   between the fact that at certain kinds of events, agents would

25   be posted, but January 6 was not that kind of event.  What are

1    they called again?  Special...

2              THE WITNESS:  A national special security event?

3    Yeah, it was not a national special security event.

4              THE COURT:  Okay.  And so they were not posted?

5              THE WITNESS:  Yes.  We did not have agents posted

6    along the perimeter at this event.

7              THE COURT:  But then you made a distinction between

8    being posted and patrolling.

9              THE WITNESS:  Correct.

10             THE COURT:  Can you -- without getting into issues

11   that pose security concerns, what does "patrolling" mean?

12             THE WITNESS:  So somewhat of, I guess you could say,

13   surveilling, paying attention to surrounding areas, kind of

14   just being there on the outside to let us know if they see

15   anything out of the ordinary or concerning, but they are not

16   posted at the site.

17   BY MS. GOETZL:

18   Q.   And they weren't focused exclusively on this red line in

19   Government Exhibit 601?

20             THE COURT:  Is that a question?  Were they focused?

21             MS. GOETZL:  That's a question.

22   BY MS. GOETZL:

23   Q.   Is it correct they were not focused exclusively on this

24   red line?

25   A.   I can't speak to how that team was operating.

1    Q.   Okay.

2              THE COURT:  Would -- when people are patrolling in

3    this way, do they have any identifying paraphernalia on their

4    person that would identify them as Secret Service?

5              THE WITNESS:  If they needed to do so for security of

6    themselves or others, yes, they would have identification on

7    them.

8              THE COURT:  Okay.  And they would be in communication

9    with people in a situation like this inside the Capitol, other

10   agents inside the Capitol?

11             THE WITNESS:  Yes, they could be.

12             THE COURT:  Okay.

13   BY MS. GOETZL:

14   Q.   Did you have any personal interaction with agents who

15   you're describing patrolling the outside on January 6th?

16   A.   I did not have personal communications with them, no.

17   Q.   Did you have any personal communications with them before

18   January 6 about January 6?

19   A.   I did not.

20   Q.   Okay.  And I just want to ask you a few questions about

21   this map.  You did not make this map; correct?

22   A.   I did not make that map.

23   Q.   With -- you did not put the red line on it?

24   A.   I did not create this map.

25   Q.   Okay.  And to your knowledge the Secret Service did not

1    make this map?

2    A.    I don't know who made this map.

3    Q.    Okay.  And you had not seen this map on January 5th, which

4    is the day you sent the notice of state worksheet?

5    A.    This map in particular, no.  I had seen a version of this

6    identifying what would be the secure perimeter for the

7    January 6th event.

8    Q.    And that is not this map?

9    A.    I don't believe it was this one exactly, no.

10   Q.    Okay.  So the first time you saw this map is sometime

11   after January 6th?

12   A.    Yes.  I believe the version that we saw was more of a

13   black and white, not like an aerial view map, if that makes

14   sense.

15   Q.    Okay.  So you -- the first time you saw this map was

16   sometime after January 6th?

17   A.    This particular map?

18   Q.    (Nods head.)

19   A.    Yes.

20   Q.    Yeah.

21   A.    I believe so.

22   Q.    Okay.  And your understanding of the reason for this red

23   line and this restricted area was because there was an

24   inaugural stage in construction, there was COVID restrictions,

25   and there was this event that was happening?

1    A.    Correct.

2    Q.    Okay.  It was not specifically restricted because Vice

3    President Pence was going to be there?

4    A.    That is correct.

5              MS. GOETZL:  Court's indulgence.

6    BY MS. GOETZL:

7    Q.    I just want to ask you a few questions about S-214, which

8    you referred to as the ceremonial office.  That was the first

9    place that Vice President Pence was scheduled to go when he

10   arrived?

11   A.    That is correct.

12   Q.    And it was, in fact, the first place that he went when he

13   arrived?

14   A.    That is correct.

15   Q.    And it is a working office?

16   A.    That's my understanding.

17   Q.    And it's the Vice President's permanent office in the

18   Capitol?

19   A.    Yes, that's my understanding.

20   Q.    It's not used by anyone else?

21   A.    I don't believe so.

22   Q.    Okay.  So it's reserved for the Vice President?

23   A.    As far as I understand, yes.

24   Q.    And it was used only by the Vice President the entire time

25   that you personally worked in the Capitol?

1    A.   As far as I know, yes.

2    Q.   Okay.  And the Vice President uses this office for

3    official business?

4    A.   Yes.

5    Q.   And he can do work in this office?

6    A.   That is my understanding.

7    Q.   Okay.  And it's -- you testified on direct it's across a

8    hallway from the Senate Chamber?

9    A.   That is correct.

10   Q.   Okay.  And I think you testified that it takes less than

11   five minutes to walk there from the Senate Chamber, but is

12   it --

13   A.   No, that's not correct.

14   Q.   Oh, okay.  So how long does it take to walk from the

15   Senate Chamber to S-214?

16   A.   It's seconds.  It's literally across the hallway.  I said

17   it takes less than five minutes to walk from the House Chamber

18   to the Senate Chamber.

19   Q.   Oh, I see.  I misunderstood.  And there's a plaque outside

20   the door, as there are with lots of rooms in the Capitol, that

21   says what S-214 is?

22   A.   I don't know that to be true or not true.

23   Q.   Okay.  You don't know that there's a sign that says Vice

24   President's Office?

25   A.   I don't recall there being one, no.

1    Q.   Okay.  And you're aware that the Vice President is the

2    President of the Senate?

3    A.   Yes.

4    Q.   Okay.  And I just want to confirm lastly, on January 6th,

5    Vice President Pence did not leave the Capitol Building.  Is

6    that your testimony?

7    A.   He did not leave the secure perimeter.

8    Q.   So he did leave the Capitol Building?

9    A.   The actual building that we know to be on the first and

10   second floor and therefore the actual structure of the

11   building, yes, he did leave that area.

12   Q.   Okay.  So your testimony is that he did not leave what was

13   in --

14           MS. GOETZL:  Can you please put up Government Exhibit

15   601.

16   BY MS. GOETZL:

17   Q.   Is your testimony that he did not leave the physical

18   infrastructure of the building or that he did not leave the

19   area marked by the red line?

20   A.   He did not leave the area marked by the red line.

21   Q.   Okay.  So he did leave the physical infrastructure of the

22   building?

23   A.   That is correct.

24           MS. GOETZL:  Okay.  Court's indulgence.

25           Thank you.  I have no further questions.

REDIRECT EXAMINATION

BY MR. VALENTINI:

Q.  Hi.

A.  Hello.

Q.  You were asked on cross-examination whether the perimeter
that was marked in red in the exhibit that you saw was --
whether it was or was not specifically restricted because the
Vice President was present.  Do you recall those questions?

A.  Yes.

Q.  But does -- the existence -- was that perimeter in place
in part because the Vice President was going to visit?

A.  Yes.

Q.  It was one of the reasons for that restricted area?

A.  That is correct.

Q.  You were also asked about the office that the Vice
President maintains in the Senate building.  Do you recall
those questions?

A.  Yes.

Q.  And you were asked whether that was a, quote, permanent
office.  Do you remember that?

A.  Yes.

Q.  The Vice President works permanently in the White House,
does he not?

A.  Yes.  My understanding is he does have an office
permanently in the White House and that's where he works.

Hawa - Redirect (Valentini)                                    1138

1    Q.    Okay.  And he was visiting the Senate only temporarily?

2    A.    Yes.

3              MS. GOETZL:  Objection, relevance.

4              THE COURT:  Overruled.  Go ahead.  What was the

5    question?  I can't hear.

6              MS. GOETZL:  Could we go to sidebar, please?

7         (At sidebar)

8              THE COURT:  What was the question?

9              MR. VALENTINI:  Whether on January 6th the Vice

10   President was visiting the Senate only temporarily.

11             MS. GOETZL:  He'd *[sic]* testify as a -- as to a

12   disputed fact that's literally a factual dispute for the jury

13   to decide.  Whether the Vice President is visiting temporarily

14   is the language of the statute and which we're arguing did not

15   occur.

16             MR. VALENTINI:  Your Honor, on cross-examination the

17   defense went up and down whether the President was there

18   temporarily or was only --

19             THE COURT:  Vice President.

20             MR. VALENTINI:  Vice President, of course, was there

21   temporarily or not.  I can --

22             THE COURT:  I'll permit it, and you can have recross.

23             MS. GOETZL:  Just so the record is clear, I just --

24   I'm requesting that that be stricken from the record and that

25   there be no more questioning.

1           THE COURT:  What's the issue?

2           MS. GOETZL:  The issue is the statute requires that

3    the jury find that the Vice President was temporarily visiting

4    the Capitol, and the government counsel would like to have this

5    witness testify as to that factual determination that he was

6    visiting temporarily the Capitol, which is a factual dispute

7    for the jury, so I just want to make the record very clear that

8    we want that to be stricken from the record.

9           MR. VALENTINI:  Your Honor, I believe your rulings --

10   that Your Honor's ruling just now is correct.  The defense has

11   been asking exactly the same question whether the President --

12   the Vice President has a permanent office or not in the Capitol

13   Building.  The question whether the Vice President was there

14   temporarily or not is a fair factual question to ask this

15   witness.

16          THE COURT:  Which statute are we talking?

17          MS. GOETZL:  We're talking about 175- --

18          THE COURT:  Why don't we let the jury go for a few

19   minutes?

20       (In open court)

21          THE COURT:  The witness can go back to the witness

22   room, and the jury can go back to the jury room.

23       (Jury out at 11:26 a.m.)

24          THE COURT:  So the jury has been excused and the

25   witness has been excused, and I'll hear Ms. Goetzl's argument,

Hawa - Redirect (Valentini)                                    1140

1   which as I understand it relates to the fourth and fifth count

2   of the indictment, 18 U.S.C. 1752.

3           MS. GOETZL:  It does, Your Honor, and thank you for

4   allowing me to just create a record.  So 1752 defines, as this

5   Court is well aware, "Restricted Building or Grounds" in a

6   specific provision.

7           THE COURT:  Tell me which part of the statute you're

8   looking at.

9           MS. GOETZL:  1752(c)(1).  And it defines the term

10  "Restricted Building or Grounds" means any posted, cordoned

11  off, or otherwise restricted area, and the relevant subsection

12  here is subsection (B), of a building or grounds where the

13  President or other person protected by the Secret Service is or

14  will be temporarily visiting.  That is a factual issue for the

15  jury to decide.

16          An argument that we want to make to the jury is that Vice

17  President Pence was not temporarily visiting because he had a

18  permanent office there, and the government is welcome to ask

19  questions about how often or not Vice President Pence went to

20  the Capitol, but it is not allowed to ask the witness to answer

21  the ultimate jury dispute, which is whether or not he was

22  temporarily visiting the Capitol on that date, so the question

23  that the government asked the witness was, was Vice President

24  Pence temporarily visiting the Capitol on January 6th, which is

25  a conclusion that we are asking be sent to the jury in this

1    case.

2              THE COURT:  Sir.

3              MR. VALENTINI:  Your Honor, there is -- it is the

4    ultimate -- the question will be sent to the jury, and the jury

5    will be the fact finder, but there is no bar in the rules of

6    evidence.  First of all, there's no bar on asking a question as

7    to a fact just because that fact has to be decided by the jury.

8    A witness who has personal knowledge of a certain fact can

9    offer that testimony.

10             THE COURT:  What's the question again?

11             MR. VALENTINI:  The question they raise is whether --

12             THE COURT:  The question you asked.

13             MR. VALENTINI:  Was the Vice President temporarily

14   visiting --

15             THE COURT:  That's a conclusion.  That's not a fact.

16             MR. VALENTINI:  Whether it was -- there's no

17   conclusion to that.  There is a fact whether he was there

18   temporarily or whether he had a plan to return.  I can go to

19   deeper facts.

20             THE COURT:  But what you asked him -- what you asked

21   her on direct is how often he visits, how often he's there, and

22   she said something to which you responded, So about once a

23   month?  And she said yes.  So those are facts from which you

24   can argue it's temporary, and Ms. Goetzl did not ask --

25             MS. GOETZL:  Your Honor, those were not questions

1    Mr. --

2                THE COURT:  I'm sorry.  Speak into the microphone

3    every time you talk, please.

4                MS. GOETZL:  Your Honor, those were my questions that

5    you're reading from my cross-examination.

6                THE COURT:  Okay.  But the witness has testified,

7    regardless of who asked the question, that the Vice President

8    is at the Senate about once a month, and the other thing that

9    she said on cross was not that he was permanently there but

10   that he had a permanent office that is an office that's not

11   used by anyone else.  And, I mean, I think that the facts

12   are -- and then you asked, Well, doesn't he have an office at

13   the White House?  And she said -- where are my notes on that?

14   And she said yes, and you said, Doesn't he work in the White

15   House?  And she says yes.

16       I think he also has an office in the old Executive Office

17   Building, I'm not sure, but -- so, you know, those are all fact

18   questions.  He normally works at the White House, but he is

19   present in the Senate.  He's at the White House.  She hasn't

20   said this, but I think she would say -- not in these words --

21   that he's at the White House -- he's doing his job as Vice

22   President every day.  He's either at the White House, the old

23   Executive Office Building, traveling around the country,

24   whatever he's doing.  We've already got testimony that he's at

25   the Senate maybe only once a month.  Those are contrasts of

 1    facts.

 2         He's got a permanent office in the Senate.  He's also got

 3    a permanent office in the White House, and I think, though

 4    nobody said this, he has a permanent office in the old

 5    Executive Office Building.  And so I think Ms. Goetzl's right

 6    that you can develop the facts, but you can't use the words of

 7    the statute that are highly contested whether he's at a place

 8    that he's temporarily visiting.  I mean, that's --

 9              MR. VALENTINI:  Your Honor, I think your initial

10    ruling was correct.  I think there is no bar on using words

11    just because they're also used in the statute in asking

12    questions, but I will -- I will rephrase those questions, and I

13    will rely -- I will draw out the underlying facts.

14              THE COURT:  All right.  Ms. Goetzl.

15              MS. GOETZL:  Your Honor, just so the record is clear,

16    we are asking the Court to order that that question be stricken

17    from the record.

18              THE COURT:  Okay.  Before the jury comes in, I'll ask

19    the court reporter to tell me the exact language of the

20    question about temporarily so I can do what Ms. Goetzl

21    requests.

22         (The last question and its answer were repeated by the

23    court reporter.)

24              THE COURT:  So it isn't just the use of the word

25    "temporarily."  It is also the use of the word "visiting,"

 1    which is also directly from the statute.

 2           MS. GOETZL:  That's correct, Your Honor, but there I

 3    think it was just the magnitude of the question literally

 4    asking for the factual -- for an answer as to a disputed fact

 5    so -- the conclusion that the jury has to draw, so it was in

 6    this situation both the words "visiting" and "temporarily."

 7           MR. VALENTINI:  And Your Honor, with respect to --

 8    I'm still waiting to hear what the legal basis is for this

 9    notion that a witness who has personal knowledge of a fact

10    which also happens to be the fact in the statute cannot testify

11    as to that.

12           THE COURT:  Well, let Ms. Goetzl say anything else

13    she wants to say on that.

14           MR. VALENTINI:  What I do know is that Rule 704

15    says -- and has to do mostly with expert witnesses says an

16    opinion is not inadmissible just because it goes to the

17    ultimate issue of fact.  This is a requirement that's been

18    manufactured --

19           THE COURT:  Well, there's a lot of case law under

20    Rule 704.

21           MR. VALENTINI:  Yeah.

22           THE COURT:  That doesn't -- it is not as black and

23    white as you just stated, but this is not an expert witness.

24           MR. VALENTINI:  Understood, but just by frame of

25    reference, the fact that witness testimony embraces an ultimate

1    issue is not a bar.  It's not a per se bar as it's being passed

2    on --

3            THE COURT:  Depends on the circumstances, and I've

4    written opinions on that in my last trial.

5        Ms. Goetzl, whatever else you want to say for the record.

6            MS. GOETZL:  For the record, I'd just reiterate what

7    the Court just said, that she's not an expert witness.  She

8    can't testify as to an opinion and that the government is

9    basically asking her to testify as to a factual dispute that is

10   before the jury -- the ultimate conclusion of a factual dispute

11   that we are asking for the jury to decide.

12           THE COURT:  All right.  I've ruled.  I've given my

13   reasons.  I think it prejudices the defense, and I don't think

14   it's a fact.  I think it's a conclusion and opinion.

15   Temporarily visiting, what does that mean?  It's an opinion.

16   It's a conclusion.  Am I temporarily visiting this courtroom

17   'cause I'd rather be in my chambers or at home or in the

18   Bahamas?  No.  But, you know, how would you characterize

19   something is not a fact, in my opinion.

20       So that's my ruling.  Let's take a ten-minute midmorning

21   and/or bathroom break while the jury is out.

22       (Recess taken at 11:38 a.m.)

23       (At 11:54 a.m. on March 7, 2023; with counsel for the

24   parties and the defendant present; WITH the jury:)

25        LANELLE HAWA, PREVIOUSLY SWORN, RESUMED THE STAND

1            THE COURT:  Everybody may be seated.  The witness is

2    back.  You may be seated.  I just want to tell the jury one

3    thing.

4        So ladies and gentlemen of the jury, there was a question

5    asked just before we took our break.  The question was he was

6    visiting -- something like he was visiting the Senate only

7    temporarily; correct?  The witness answered the question,

8    "Yes."  I'm directing you to disregard the question.  I'm

9    striking the question and the answer.  Disregard the question.

10   Disregard the answer, that specific question and that

11   specific answer, for legal reasons, and I'll leave it at that

12   for now.

13       Mr. Valentini, go ahead.

14                   REDIRECT EXAMINATION RESUMED

15   BY MR. VALENTINI:

16   Q.    Welcome back, Inspector Hawa.

17   A.    Thank you.

18   Q.    So before the break you were asked some questions about

19   the Vice President's Office in the Senate building.  Prior to

20   January 6 -- prior to the Vice President's visit on January 6,

21   did you plan for the Vice President to stay permanently at the

22   Capitol?

23   A.    Meaning for the duration of January 6?

24   Q.    No.  Permanently.

25   A.    No.  There was no intention that he was going to be there

1    permanently.

2    Q.   In fact, you planned for his arrival?

3    A.   Correct.

4    Q.   Yes.  You also planned for his departure?

5    A.   That is correct.

6    Q.   And did the Vice President, in fact, leave the Capitol as

7    soon as the work was done?

8    A.   Yes, he did.

9    Q.   Did you make any plans for the Vice President to come back

10   to the Capitol on January 7th?

11   A.   Not after -- not after the event had concluded.

12          THE COURT:  You testified earlier that the

13   certification actually did not take place till January 7th;

14   right?

15          THE WITNESS:  That's correct.

16          THE COURT:  And about what time did that happen?

17          THE WITNESS:  They concluded at approximately

18   4:30 a.m. on January 7, 2021.

19   BY MR. VALENTINI:

20   Q.   Did you make any plans for the Vice President to return to

21   the Capitol on January 8th?

22   A.   No, not to my knowledge.

23   Q.   How about January 9th?

24   A.   At the time I don't believe we were anticipating that,

25   no.

1  Q.   You were also asked some questions about the secure

2  location where the President -- where the Vice President was

3  taken to as a result of the riot.  Do you remember those

4  questions?

5  A.   Yes.

6           MR. VALENTINI:  Let me pull up what has been

7  introduced into evidence as Exhibit 601.

8  BY MR. VALENTINI:

9  Q.   Was the secure -- you testified before that the secure

10 location is underground?

11          THE COURT:  It's not up yet on the screen.  Give it a

12 minute.

13          MR. VALENTINI:  Permission to publish.

14      Thank you.

15 BY MR. VALENTINI:

16 Q.   You testified before that the secure location is

17 underground?

18 A.   Yes, that's correct.

19 Q.   Is the secure location entirely within the perimeter area

20 marked in red in Exhibit 601?

21 A.   Yes, the area where we were was entirely within the secure

22 perimeter.

23          MR. VALENTINI:  No further questions.

24          THE COURT:  Ms. Goetzl, anything else?

25          MS. GOETZL:  Thank you.

1                        RECROSS-EXAMINATION

2      BY MS. GOETZL:

3      Q.   I just have one question.  You testified on redirect just

4      now that one of the reasons for the perimeter line around the

5      Capitol was that Vice President Pence was there?

6      A.   That's correct.

7      Q.   On other times that Vice President Pence was there and has

8      been at the Capitol, a perimeter like that has not been

9      established; isn't that correct?

10     A.   That is not correct.

11     Q.   So every single time the Vice President visited the

12     Capitol, that red line, that same red line, was established?

13     A.   That is not correct.

14     Q.   Okay.  I'm asking you if that red line was established

15     every time the Vice President went to the Capitol.

16     A.   That -- it was not every time the Vice President went to

17     the Capitol.

18     Q.   Okay.  Thank you.

19               THE COURT:  Anything else?

20               MR. VALENTINI:  No further questions, Your Honor.

21               THE COURT:  Thank you.  You're excused.

22          So I would ask counsel to give me a prognosis.  I know we

23     have an issue we have to decide before the next witness is

24     called.  If that's going to take -- if that's going to be

25     brief, we can ask the jury to wait for us again.  If you think

1    it's going to take a while, they can go to an early lunch and

2    come back earlier than usual, but I'm not -- I don't know

3    enough to know the answer to that.

4        So if the two sides could give me a prognosis.  Can we

5    resolve it in ten minutes or less before the witness is called?

6            MR. SMOCK:  Your Honor, it's always hard to predict.

7    I think it might make sense, to avoid having the jury wait

8    while we discuss it, to have them have lunch so that we can

9    efficiently proceed immediately after that.  I would defer to

10   the Court.

11           THE COURT:  It's a little early, but you might

12   actually avoid the crowds.  So it's 12 o'clock.  I guess I

13   would say -- because we're going to try to resolve this issue

14   and the other thing I promised you I'd talk about, so I'll ask

15   the jury to come back at 12:30.  It's an hour and a half.

16       What time is it?  Oh, I wasn't going to give you a shorter

17   lunch.  I was going to give you a longer lunch.  Come back at

18   1:30.  That gives you time to go out if you want to, or the

19   cafeteria probably won't be as crowded quite yet as it is some

20   other days.  We're going to resolve two legal issues, and we'll

21   try to resume at 1:30 with the next witness, and we are going

22   to end by 4:30 today.

23       Okay.  And the usual instructions about not discussing the

24   case.

25           (Jury out at 12:01 p.m.)

1          MR. SMOCK:  My understanding is that the government

2     next intends to call Neal Matthews, and the Court may recall --

3          THE COURT:  What's his name?

4          MR. SMOCK:  Neal Matthews.

5          THE COURT:  Oh, yes.

6          MR. SMOCK:  The Court, I think, recalls that he

7     testified at the evidentiary hearing on the defense suppression

8     motion.  He was a Gallaudet Police officer at the time and also

9     an acquaintance of Mr. GossJankowski.  Mr. Dreher can correct

10    me if I'm wrong, but my understanding is that the government

11    intends to call him to identify Mr. GossJankowski, to point him

12    out in videos that have already been seen, and then to describe

13    a conversation that he had with Mr. GossJankowski, and I have

14    the 302 from that conversation, his account of that

15    conversation, and that 302 describes that conversation in one

16    and a half lines, which is Matthews stated that GossJankowski

17    had told him that he was at the Capitol on January 6, 2021, and

18    did not regret it.

19         My concern is, as one might guess, with the second part of

20    that statement that he did not regret it.  I asked Mr. Dreher

21    whether he intended to elicit that testimony, and he said that

22    he did.  Number one, and again, the government can be heard

23    about this after I'm done, but my concern is it seems to me

24    that the number one -- that the only real purpose of having

25    Mr. Matthews testify is for that purpose, to say he did not

1    regret it.  We don't need Mr. Matthews to come in here and
2    watch the same videos that we've all seen about the man with
3    the bright blue jacket and identify Mr. GossJankowski as that
4    person.  The defense has never denied that he was the person in
5    those videos, so we don't need Mr. Matthews to do that.
6        To the extent they want to have Mr. Matthews testify that
7    Mr. GossJankowski said he was at the Capitol, fine.  Again, not
8    a disputed issue.  I don't see the purpose of it.  The only
9    purpose I see for Mr. Matthews being called is to get in this
10   statement that he allegedly said that he did not regret going
11   to the Capitol.
12       Now, a couple of things about that.  Number one, it's not
13   relevant under 401 whether or not Mr. GossJankowski regretted
14   going to the Capitol.  It has to -- evidence obviously has to
15   have a tendency to prove a fact that is at issue in this case,
16   and whether or not he regretted it, lack of remorse, anything
17   of that sort is not relevant.
18       Number two, even if the government could articulate some
19   way that it might, in fact, be relevant, which I'm not aware of
20   what it would be, it's certainly overly prejudicial under 403.
21   There's no meaningful benefit from getting that information,
22   and the only purpose of getting that statement in front of the
23   jury is to make them angry and to distract them from the facts
24   that are at issue.
25       So our view would be certainly, if the government can

1    articulate reasons that Mr. Matthews' testimony in general is

2    relevant and is necessary, no objection to it, but we certainly

3    have an objection to his testimony to the extent he gets into a

4    statement by Mr. GossJankowski after the fact about whether he

5    regretted being at the Capitol or not.

6            MR. DREHER:  Your Honor, I would certainly ask that

7    this Court allow Neal Matthews to testify to the conversation

8    that he had with Mr. GossJankowski in a relatively close period

9    of time to the events of January 6.  As, you know, Mr. Smock is

10   aware, not only is -- each and every element must be proved

11   beyond a reasonable doubt, but also there has not been a

12   specific stipulation regarding the intent of Mr. GossJankowski

13   while he was performing the acts that we see him perform on not

14   only the surveillance videos, but also the open-source videos

15   and soon the body-worn cameras that will be displayed as well.

16       This contemporaneous statement regarding -- I should say

17   this very specific contemporaneous statement regarding whether

18   or not Mr. GossJankowski had any sort of regrets as to his

19   actions on January 6th I do believe are relevant to prove

20   intent.  The jury is going to have to decide whether or not the

21   actions that they observed in these videos were intentional or

22   otherwise not accidental, and certainly someone who does

23   perform accidental acts would, in theory at least, have some

24   sort of regrets as to the actions he committed, but here it's

25   directly relevant to issues at this trial.  So certainly in

1    terms of Mr. GossJankowski's statements contemporaneous or at

2    least very close in time to the actions of January 6 would be

3    relevant for this jury in its determination of

4    Mr. GossJankowski's intent.

5        Now, outside of that, certainly this statement is not

6    hearsay, and this Court is well aware through the suppression

7    hearing testimony that this conversation occurred over Facebook

8    Messenger.  In other words, Mr. Matthews was at least close

9    enough to Mr. GossJankowski to be able to reach out and make

10   contact with him through Facebook and have this video chat with

11   him.

12       So in terms of any other bar regarding the rules of

13   evidence, I don't foresee that to be the case.  I also don't --

14   I also would ask the Court not to put the idea that the

15   defendant's own statements could somehow prejudice him to the

16   point beyond what would be probative for the jury to decide.

17       So with that we would ask that the Court not limit

18   Mr. Matthews' testimony and allow him to testify to the jury

19   and explain what Mr. GossJankowski told him just -- I believe

20   it was 12 days after January 6.

21           THE COURT:  And beyond that statement the other

22   objection that Mr. Smock made was it's a waste of time to have

23   Mr. Matthews identify the defendant and to go over old videos,

24   so what's your response to that second part?

25           MR. DREHER:  Certainly identification becomes a

 1    disputed issue with any plea of not guilty, Your Honor, as the

 2    burden is placed on the government to prove each and every

 3    element beyond a reasonable doubt, but also that it was the

 4    defendant who committed the offense.  Mr. Matthews' testimony

 5    from being a long time acquaintance, placing him at January 6th

 6    and also placing him as the individual in the courtroom is

 7    relevant for the jury's determination as to whether it was

 8    Mr. GossJankowski that committed the crimes.

 9            THE COURT:  Okay.  So he's going to identify -- so

10    how long do you think that part of the testimony is going to

11    take?  I mean, are you going to go over a lot of videos with

12    him again in order to accomplish this?

13            MR. DREHER:  My intent, Your Honor, just so that the

14    Court's aware, is one of the open-source videos in which

15    Mr. GossJankowski is holding the device that the defense has

16    outlined as a stun gun, but then also one of the Capitol

17    surveillance videos from inside the tunnel.

18            THE COURT:  Okay.  So it shouldn't take that long.

19            MR. DREHER:  My hope is not.  However, he does prefer

20    speaking in American Sign Language for his testimony.  I don't

21    foresee that adding time to it, but I just want to make the

22    Court aware.

23            MR. SMOCK:  So a couple things.  One --

24            THE COURT:  He didn't do that during the hearing.

25            MR. DREHER:  He also testified through American Sign

 1    Language at the suppression hearing.

 2         THE COURT:  Oh, yes, he did.  Yes, he did.  Excuse

 3    me.  Yes, he did.

 4         MR. SMOCK:  So Your Honor, with respect to the issues

 5    of him identifying videos, et cetera, I mean, our objection to

 6    that is less significant.  It's more just a time-wasting thing

 7    because we're never going to get in front of this jury and say

 8    he's not the person in the video.  It's sort of absurd.  But in

 9    any event, if that's what the government wants to do, so be it.

10       Our real concern is with this alleged statement by

11    Mr. GossJankowski, and the government has not identified a way

12    in which that testimony about him allegedly not regretting it

13    is relevant.  The statement that they're attributing to

14    Mr. GossJankowski is that he told him that he was at the

15    Capitol and he did not regret it.  The government has said that

16    maybe this is relevant to intent.  We're not disputing that he

17    intended to be at the Capitol, so there is -- it's not -- I

18    don't understand why there's a need to --

19         THE COURT:  That's not enough.  Okay.  Anything -- go

20    ahead.  I don't mean to interrupt.

21         MR. SMOCK:  So our concern is that not only is it not

22    relevant, the government hasn't identified a basis for

23    relevance and also that it's overly prejudicial under 403.  The

24    only basis for it is to anger the jury on an issue that, again,

25    is not relevant to any of the elements that they have to decide

1    here.

2              THE COURT:  Okay.  Anything else, Mr. Dreher?

3              MR. DREHER:  No, Your Honor.  Thank you.

4              THE COURT:  Okay.  I'll overrule the objection.  I'll

5    let him testify.  I think it is relevant to intent.  It's not

6    just the intent to be at the Capitol, it's the intent to do

7    certain acts while at the Capitol, and I don't remember the

8    context in which it was said, but a January 6 participant who

9    says "I don't regret it" it's possible means I don't regret

10   supporting the President, I don't regret going to the rally, I

11   don't regret having these views, I don't regret that I still

12   believe the election was stolen as opposed to I don't regret

13   assaulting someone.

14        And, you know, he can be cross-examined if you want about

15   that statement, or you can ask the jury to draw different

16   inferences from it than the government wants him to draw, but I

17   think it's relevant, and I don't think it's overly prejudicial.

18        So while you're at the podium, Mr. Smock, I want to go to

19   the *Daubert* thing while we're all here, so I want to ask you a

20   couple of quick questions.  You've said this numerous times,

21   but I just want the record to be clear before I give you my

22   ruling.  You are offering him as an expert on -- and you're

23   going to ask me to instruct the jury he is -- if I say he's

24   qualified, he is qualified as an expert on, what are those

25   magic words?  You said it before the other day, and now I

1     forget where I wrote it down.

2          MR. SMOCK:  The effect of electricity on the human

3     body and on conducted electrical weapons.

4          THE COURT:  Okay.  So that leads me to my next

5     question, and that is with respect to his conclusions numbers 6

6     and 7 -- or his opinions numbers 6 and 7, and I have two

7     questions.  One is whether that expertise qualifies him to say

8     certain of those things, particularly in number 7, and the

9     second question is how -- these are brief summaries in Docket

10    112-2 at page 7, his report.  How nuanced is his testimony?

11       We've got a lot of discussion about how anything can be

12    turned into a weapon: a shoe, a ballpoint pen, what have you.

13    Is his testimony that it cannot be used -- how do I want to

14    phrase this?  Whatever that device was, it could have been used

15    to strike somebody across the head, and he is not -- I assume

16    he's not going to say that's not so.

17         MR. SMOCK:  That's correct.

18         THE COURT:  He's going to be saying, if permitted,

19    that the device is not a stun gun, it's not a Taser, it is what

20    he -- what he says it is, and these are its capabilities, and

21    with those capabilities at a distance it could not cause

22    physical injury or physical pain or endanger life.  Is that

23    correct?

24         MR. SMOCK:  Basically, but just to be clear, this is

25    not something that shoots a probe so it would be -- if applied

1    to a person and the electrical charge is initiated, it would

2    not do that.

3              THE COURT:  But his testimony given his expertise

4    would be if it were -- I don't want to put words into your

5    mouth or in his, but in general, if it were applied to a

6    person, the electrical charge could not cast that kind of --

7              MR. SMOCK:  Correct.  He's not going to say if

8    somebody smashed someone over the head with it, it wouldn't --

9    he's focused on the electrical charge emitting from it.

10             THE COURT:  Well, then, let me ask a couple of more

11   questions.  If I were to permit him to say that it could not

12   endanger life, could not cause injury, could not cause injury

13   that involves substantial risk of death, extreme physical pain,

14   how is he qualified to say protracted and obvious

15   disfigurement, protracted loss of impairment of the function of

16   a bodily member, organ, or mental faculty?  Isn't that beyond

17   his expertise?

18             MR. SMOCK:  It's not, Your Honor, and he will be

19   prepared to provide more details about his expertise, but this

20   is his specific area of expertise, the impact of electricity on

21   the human body, and it's something that he's studied throughout

22   his career, and so he, based on his experience studying this,

23   can testify about that based on his expertise.

24             THE COURT:  Do you want to say anything about the

25   questions I've raised or anything else before I tell you where

1   I'm coming from?  Of course, you'll have the opportunity to

2   voir dire him.

3           MR. DREHER:  Yes, Your Honor.  I understand that.

4   One thing about his availability is the government is already

5   prepared to cease and allow him to begin right at nine.  I

6   would suggest -- and I'm not sure if the Court would be willing

7   to reconsider whether or not to have this hearing about this

8   witness's expertise prior to the jury hearing it as somewhat of

9   a -- considering how nuanced the opinion might be, and at least

10  in our responses we did ask for that opportunity to have the

11  Court hear from the witness himself prior to making these

12  determinations, and I think if we were to ask the jury just to

13  come in later on Wednesday, we would be able to take care of

14  that and then have the jury present for when -- when and if

15  Dr. Kroll is ready to testify.

16      That would provide the Court with more information prior

17  to making this ruling and prior to the testimony being placed

18  in front of the jury, but ultimately I would point out that

19  Dr. Kroll, at least on paper, expresses no knowledge or

20  expertise of that -- of a medical doctor, which I believe is --

21          THE COURT:  That's right.

22          MR. SMOCK:  He's prepared to talk to that, Your

23  Honor.  In fact, medical doctors don't have specific expertise

24  in the impact of electricity on the human body.  That's the

25  field of a person with his background and his biomedical

1    specialty, which is bioelectricity.  Medical doctors are not

2    trained in this field, and in fact he does train doctors on

3    this very thing, and he will talk about that.

4            THE COURT:  All right.  Well, let me tell you what

5    I -- do you have any idea about how long your direct would be

6    with him?

7            MR. SMOCK:  My guess is about an hour and a half.

8            THE COURT:  Okay.  And he's going to be here at

9    9 o'clock, available?

10           MR. SMOCK:  He can be here whenever the Court wishes.

11           THE COURT:  Okay.  Well, I think the following.  The

12   government argued -- let me talk about the first four of his

13   opinions.  The government argued back on February 27th, when we

14   had legal argument on this and I declined the idea of having

15   a -- hearing testimony, that it should be excluded, among other

16   reasons, because it's not beyond the jury's ability as

17   laypeople to understand this on their own, we don't need an

18   expert, there's an insufficient foundation to determine what

19   the device is, he's just comparing photographs, no definition

20   of what a stun gun is, these are not scientific terms, and

21   unclear of what he defines as a stun gun and what its

22   capabilities are, and with respect to number 5 that -- I'll

23   come back to that.

24       And what you said in response was, well, we have to prove

25   what -- the government has to prove what it is because they've

1    alleged a particular thing, and they also have to exclude --

2    prove its capabilities to cause injury, and then the government

3    also argued about his methodology.

4         So I think the first -- first of all, I don't have a

5    problem with his methodology, and I don't have a problem with

6    his expertise and his training, and if there was ever any

7    question about whether the jury could understand it without --

8    based on lay testimony alone, that was underscored by Captain

9    Ortega's testimony yesterday.

10        So I think as to his qualifications of -- obviously, the

11   government can voir dire him in the presence of the jury; and

12   the first four conclusions and opinions, and I can give more

13   detailed reasoning, I think they should be admitted so that the

14   jury understands from an expert with his expertise what this is

15   and then going on to what it is capable of doing.  I think that

16   opinion number 5 is the same.

17        It is with respect to opinion numbers 6 and 7 that I've

18   raised the questions I've just raised; and therefore, it may be

19   helpful to have him testify outside the presence of the jury

20   limited to numbers 6 and 7, and maybe we could do that in an

21   hour or so.

22             MR. SMOCK:  Your Honor, we will defer to the Court.

23   I think, though, that I want to be clear that, you know, in

24   terms of a person who would be qualified to provide this

25   information, he's probably among the most in the country.  He's

1   on the board that actually creates the standards for what

2   qualifies as a stun gun.  He's created any number of medical

3   devices using electricity.  He knows the standards.  He knows

4   the standards are there because of the question of whether or

5   not an item can cause physical injury or death.  He's

6   testified this -- on these issues throughout the country in

7   courts --

8        THE COURT:  Let's hear what he'll say.  I mean, has

9   he testified with a reasonable degree of scientific certainty

10  that it cannot cause serious bodily harm, that it doesn't

11  propose a substantial risk of death?  Protracted and obvious

12  disfigurement, that sounds like a stretch.  Protracted loss of

13  impairment of function of a bodily member, organ, or mental

14  facility.  He's not a medical doctor, he's not a psychiatrist,

15  he's not a psychologist, he's not a neurologist.  Those are the

16  things that concern me, you know.

17      And maybe in a hopefully brief evidentiary hearing outside

18  the presence of the jury that will -- either it will satisfy me

19  or we can permit him to testify about the first five, probably

20  6, but Mr. Dreher will explore that, and maybe part of 7 but

21  not all of 7.  That's -- I mean I -- that's what I'm thinking

22  right now, and so if we want to start at 9:00 outside the

23  presence of the jury and at 10:30 with the jury, something like

24  that.

25        MR. SMOCK:  That's fine.  My thinking is we could get

1    this done within less than an hour, so I would ask that the

2    jury be present beginning at 10:00.

3          THE COURT:  We can ask the jury to be in at 10:00.

4    They got food and beverage.  Although I wandered in there

5    yesterday after they had left, and they apparently don't like

6    bagels.  Of course there's this debate, if any of you are up in

7    New York -- and I know Mr. Smock went to school in New York.

8    Some people think you can't get a good bagel in Washington, the

9    only good place to get a bagel is in New York, but there are a

10   couple of places here that I recommend.

11       Anything else?

12          MR. SMOCK:  What are they?

13          THE COURT:  Oh, what's it called?  Call My Mother --

14          MR. SMOCK:  Oh, yeah.

15          THE COURT:  -- which is up by Holy Trinity, and then

16   there's another one someplace else.

17          MR. SMOCK:  On 8th Street, yeah.

18          THE COURT:  And it used to be Georgetown Bagel, but

19   that's not in Georgetown anymore; and then there's Bethesda --

20   whatever it's called in Bethesda near where the old Barnes

21   & Noble used to be.  So if you want to, write those down.

22   Otherwise you can order a transcript.

23          MR. DREHER:  Your Honor, before we break for lunch,

24   as it relates to the prior ruling with Officer Bogner's

25   body-worn camera, I may have misunderstood the Court's ruling.

1    I know we're to block out the bloody hand; however, the times

2    with which the hand is depicted is also contemporaneous to the

3    statements that this Court outlined in terms of you need to get

4    out of the door or the officers telling the rioters certain

5    directions.

6           THE COURT:  That's okay, but I don't know how you do

7    it technologically.

8           MR. DREHER:  What I was going to ask the Court is I

9    can place a black box over the video portion while the audio

10   still plays or even just limit it to covering that officer's

11   hand.  I didn't know if the Court had a preference as it

12   relates to its ruling.  I did approach Mr. Smock about this.

13          THE COURT:  Whatever you think and Mr. Smock is okay

14   with.  So we're going to take out the early statement this is a

15   federal -- these are federal crimes, we're going to take out

16   the bloodied hand but not the bloodied finger, and we're not

17   going to take out the mucous.

18          MR. DREHER:  Correct, Your Honor.  I will reach out

19   again to Mr. Smock.

20          THE COURT:  Off the record.

21      (Recess taken at 12:30 p.m.)

22      (At 1:43 p.m. on March 7, 2023; with counsel for the

23   parties and the defendant present; WITHOUT the jury:)

24          THE COURT:  May we get the jury, or is there

25   something --

```
 1              MR. DREHER:  Your Honor, if I may just place on the
 2    record, prior to Your Honor taking the bench, both sides did
 3    have an opportunity to work with the proceedings interpreters
 4    to ensure all the sight lines and placement of all the parties
 5    involved allowed for effective communication of the courtroom,
 6    and so I ultimately just wanted to be able to place that on the
 7    record and have the defense acknowledge the same.
 8              THE COURT:  Okay.  And you both said earlier that
 9    this witness would be speaking through an American Sign
10    Language interpreter?
11              MR. DREHER:  That's correct, Your Honor.
12              THE COURT:  So why don't we get the jury, and we'll
13    get the witness.
14         (Jury in at 1:44 p.m.)
15              THE COURT:  All right.  Everybody ready?  Everybody
16    there?  Yes, you are.  Good afternoon, everybody.
17         And why don't you -- Mr. Dreher, why don't you call the
18    government's next witness.
19              MR. DREHER:  Neal Matthews.
20           NEAL MATTHEWS, PLAINTIFF'S WITNESS, SWORN
21         COURTROOM DEPUTY:  Thank you.
22              THE COURT:  All right.  The witness has been sworn.
23    Good afternoon to you, Mr. Matthews.
24              THE WITNESS:  Good afternoon, Your Honor.
25              THE COURT:  Go ahead, Mr. Dreher.
```

Matthews - Direct (Dreher)                                    1167

1                           DIRECT EXAMINATION

2    BY MR. DREHER:

3    Q.   Sir, if you would please introduce yourself and spell your

4    name for the record.

5    A.   Certainly.  My name is Neal Matthews.

6    Q.   Are you able to provide a spelling?

7    A.   Sure.  N-E-A-L, M-A-T-T-H-E-W-S.

8    Q.   Thank you.  Now, when you meet somebody out on the street,

9    would you normally spell your name for them when you first meet

10   them?

11   A.   No, no.  I might spell it.  If I spelled it, it would be

12   very quick.  It would look like a sign.

13   Q.   Now, do you have a specific sign that you use to reference

14   your name?

15   A.   Well, I have what we call a name sign I was given as I was

16   growing up, but I don't -- I don't have a -- I haven't used it

17   since I was a child, and since I grew up, my coworkers call me

18   by my last name, Matthews.

19   Q.   I understand.  Are you currently employed?

20   A.   I am.

21   Q.   Where are you employed?

22   A.   I'm a lieutenant at Gallaudet University Police Department

23   now.

24   Q.   How long have you worked for Gallaudet University?

25   A.   Five years currently.

Matthews - Direct (Dreher)                                    1168

1   Q.   And you said you're a lieutenant with the police

2   department there?

3   A.   Yes.  It's called the Campus Public Safety Police.

4   Q.   Now, sir, I do want to take you back to January 6th of

5   2021.  Were you working at Gallaudet University at that period

6   of time?

7   A.   I was.  I was off duty on that day, but I'm still -- I was

8   employed at Gallaudet University.

9   Q.   Now, I do want to just clarify, during that time period,

10  were you ever at the United States Capitol?

11  A.   No.

12  Q.   Where were you when -- on January 6, 2021?

13  A.   I was at the firehouse where I work as a volunteer as a

14  side job.

15  Q.   And so are you a resident of Washington, D.C.?

16  A.   No.  I'm a resident of Maryland.

17  Q.   Now, sir, do you know the defendant, Vitali GossJankowski?

18  A.   Yes, I do.

19  Q.   How do you know the defendant?

20  A.   I know him through his mother.  She used to be an

21  administrator at Kendall School, where I was a student, and so

22  I met him around as he was growing up after middle school, and

23  when we were students at Gallaudet, I knew him better, and I

24  worked with him at the training center, at the athletic

25  training center.  I worked on the football team.  He was a

 1   player at the time and so he was a student, and I'd see him on

 2   campus.  Sometimes I would see him off campus as well.

 3              THE COURT:  Was that the football team at Gallaudet

 4   or the football team at middle school?  I'm not clear.

 5              THE WITNESS:  At the university.  He started -- I've

 6   known him since middle school, but I saw him more and more when

 7   he was enrolled at the university.

 8              THE COURT:  Thank you.

 9   BY MR. DREHER:

10   Q.   So were you previously a student at Gallaudet University

11   as well?

12   A.   Yes.  I grad- -- I'm a graduate of Gallaudet.

13   Q.   When did you graduate?

14   A.   I graduated in 2021.

15   Q.   So were you also working at the public safety while being

16   a student at Gallaudet as well?

17   A.   Yes.  I was an officer for DPS.

18   Q.   Do you know when Mr. GossJankowski began his studies at

19   Gallaudet University?

20   A.   Not exactly, but I was there in 2012, and I think he

21   probably joined shortly thereafter, maybe 20 -- 2013, somewhere

22   around there.

23   Q.   And so when he began, were the two of you close?

24   A.   No, no, no.  We were never close.  We knew mutual friends.

25   The Gallaudet community is very small, you'd see each other

1    around at community events and the like.

2    Q.   Would the two of you ever speak?

3    A.   Sure, casually, conversations seeing each other on campus,

4    that kind of thing.

5    Q.   Now, do you know what his sign name is?

6    A.   Based on my knowledge it's this on the left shoulder above

7    your heart (indicating).  It's a "V" for his first name.

8    Q.   And is that how you would refer to him?

9    A.   Yes.

10   Q.   Now, sir, is the person that you know as Vitali

11   GossJankowski present in the courtroom today?

12   A.   Yes.  He's sitting directly across from me.

13   Q.   Would you be able to point to him and identify an article

14   of clothing he's wearing.

15   A.   Sure.  He -- again, he's directly across from me.  He has

16   a black jacket, a suit and black shirt on, and dark hair.

17   Q.   Now, sir, what I would like to do is have you draw your

18   attention to the screen in front of you, if you could.

19            THE COURT:  Something will come up in a minute.

20            THE WITNESS:  Sure.  I wasn't sure.  I was just

21   trying to get it situated.

22            MR. DREHER:  Now, for the record, Your Honor, I was

23   going to play for the witness Exhibit Number 100.1.

24            THE COURT:  So Exhibit 121 is...

25            MR. DREHER:  Sorry.  100.1.

1            THE COURT:  Oh, 100.1.  Okay.

2            MR. DREHER:  Yes, Your Honor.  I apologize.

3            THE COURT:  That is already in evidence, yes.

4            MR. DREHER:  That is already in evidence.

5            THE COURT:  So the witness can see it and the jury

6    can see it.

7            MR. DREHER:  And I was going to start the exhibit at

8    time stamp 2:40 p.m. and 58 seconds.

9    BY MR. DREHER:

10   Q.   Now, sir, what I'm going to ask you to do is to observe

11   the screen in front of you, and if at any time you see someone

12   that you recognize, would you please raise your hand.

13   A.   Certainly.

14       (A portion of Exhibit 100.1 was played.)

15   BY MR. DREHER:

16   Q.   And, I'm sorry, I did see you raise your hand.  Did you

17   see someone that you recognized?

18   A.   I did.  I'm not sure you can see him right now.  If you

19   would back up maybe five seconds.  He might be in it if you

20   keep it going forward, but it looks like he has a hat.  He's

21   the guy behind the hat on the right-hand corner.

22           MR. DREHER:  What I'll do -- for the record, it's

23   currently stopped at 2:41:05 p.m.  I'll go back to 2:41:50 p.m.

24           THE WITNESS:  Now I see him.  He's in the middle,

25   yeah.  I can see him in the screen too but kind of half of his

1    face looking around.  He's got dark glasses on and a blue

2    jacket.

3              MR. DREHER:  All right.  Just for the record, this is

4    at 2:41:52 p.m.

5    BY MR. DREHER:

6    Q.   Sir, the screen in front of you is actually a touch screen

7    and will allow you to draw on the screen.  If you would please

8    draw a circle around the individual that you recognize.

9    A.   (The witness complied.)

10   Q.   And that individual that you just circled, who is that

11   individual?

12   A.   That's Vitali GossJankowski.

13   Q.   And again, that's the individual who's presently in court?

14   A.   That's correct.

15             MR. DREHER:  Ms. Johnson, would you be kind enough to

16   stop presentment to the jury?

17        And then for the -- excuse me.  For the record, I'm going

18   to show the witness what's been admitted as Exhibit 143.2A.

19             THE COURT:  Okay.  It's been admitted, so it can be

20   shown to the jury and to the witness.

21        (A portion of Exhibit 143.2A was played.)

22             MR. DREHER:  And then also for the record, Your

23   Honor, I'm going to begin at the 2:30 mark of the video, which

24   is not a time stamp, but instead the video time.

25   BY MR. DREHER:

Matthews - Direct (Dreher)                                    1173

1    Q.   And sir, if I could direct your attention, then, again to

2    the screen in front of you, I'm going to ask you to do the same

3    thing.  At any point that you recognize somebody, please raise

4    your right hand.

5    A.   Yes, sir.

6         (A portion of Exhibit 143.2A was played.)

7    BY MR. DREHER:

8    Q.   I'm sorry.  I've seen you raise your hand.  Is there

9    someone that you recognize in the frame?

10   A.   Yes.  On the left-hand side of the frame with the black

11   pair of glasses and the blue jacket on the left.

12   Q.   Now, if you would please, again, circle this individual

13   that you're referring to on the screen in front of you.

14   A.   (The witness complied.)

15   Q.   And then who is that individual?

16   A.   That's Vitali GossJankowski.

17        MR. DREHER:  All right.  Ms. Johnson, if we'd stop

18   presenting to the jury.

19        Thank you.

20   BY MR. DREHER:

21   Q.   Now, sir, did there come a time when you became aware that

22   Vitali GossJankowski was at the United States Capitol on

23   January 6th?

24   A.   I didn't find out through social media -- I found it out

25   from social media, but I got the information looking -- of who

1     the police were looking for, for the picture.

2              INTERPRETER MATHERS:  The interpreter needs to

3     clarify one thing.

4         The interpretation is correct.

5     BY MR. DREHER:

6     Q.   Now, on social media there was a photograph that you saw

7     of -- of somebody was looking for Mr. GossJankowski?

8     A.   Yeah.  So I saw it through social media, and then I saw it

9     in my office where we had a list of people, and his picture was

10    there as well; so I recognized him immediately as someone they

11    were looking for.

12             THE COURT:  I'm sorry.  I didn't understand.  You saw

13    his picture in your office?  How did that come about?

14             THE WITNESS:  Well, it wasn't actually my office, but

15    they sent out an email with all of the people that the FBI --

16    that the authorities were looking for, and Vitali was one of

17    those, and I recognized him in that picture that came out as

18    well as the picture that I saw on social media.

19             THE COURT:  And when you say they sent out an email

20    with a photograph, who sent it out?

21             THE WITNESS:  I'm not entirely sure who it was, but

22    it's a news department or the FBI.  It was pictures that were

23    going out all over the community on regular media of people

24    that the police were looking for in regards to January 6.  It

25    was public information.  That's how I saw it.

Matthews - Direct (Dreher)                                      1175

1    BY MR. DREHER:

2    Q.   Now, sir, after immediately recognizing Mr. GossJankowski,

3    what did you do next?

4    A.   I reached out to him through Facebook.

5    Q.   How is it that you reached out to him on Facebook?

6    A.   Through Facebook Messenger.  We weren't friends at that

7    time, I don't think.  I'm not sure, but that's how I reached

8    out to him.  I wasn't friends with him.  He approved my

9    request, and I let him know that people were looking for him in

10   regards to January 6th and that he should turn himself in, he

11   should come in and give up -- give himself up to the

12   authorities.

13           THE COURT:  Had you and Mr. GossJankowski been

14   Facebook friends before that date?

15           THE WITNESS:  I don't believe so.  We weren't at that

16   time, not what I remember.  I don't think we've ever been

17   Facebook friends.

18   BY MR. DREHER:

19   Q.   So when you said that it was approved, was it the message

20   that was approved or your Facebook friendship was approved?

21   A.   No, I didn't reach out to him as a friend.  I offered a

22   message to him.  He approved that.  You have to approve each

23   other if you're not friends on Facebook in order to communicate

24   with each other via their Messenger app feature.

25   Q.   And then, when you would communicate with him, would it be

 1    only through text?

 2    A.    Yeah, through text using the Facebook Messenger app, and

 3    then we also talked on what's called a video chat part of the

 4    app.

 5    Q.    And that is part of Facebook as well?

 6    A.    It is.

 7    Q.    Now, is the video chat -- forgive me if I'm putting this

 8    incorrectly, but is the video chat a common means of

 9    communication in the deaf community?

10    A.    Yeah, video is.  We certainly use FaceTime more often or

11    video.  There are a number of different providers that we have

12    in order to use the telephone that way.  Video chat is another

13    way to talk directly with a deaf person from another person or

14    signer ourselves.

15    Q.    So was it the fact that it was Facebook Messenger

16    specifically because of the video feature or were -- was it

17    just the only app you were available to use at the time?

18    A.    No, it wasn't the only app that I had.  It's just easier

19    to use a video app because you can use American Sign Language

20    instead of English.  English isn't usually our strongest

21    language, so if we're using a video app, we can communicate

22    more normally, more naturally, and more understandably.  For

23    example, in English you might have to say, "I am going to the

24    store," but in American Sign Language it would be about half

25    the time to say the same thing.  So texting you have -- it

1    takes a lot more time.  It's a lot more tedious.  I'd much

2    rather use a video so I can use my natural language.

3    Q.   Do you remember approximately how often after January 6

4    that you were able to have these video chats with

5    Mr. GossJankowski?

6              THE COURT:  How long after January 6th?

7              MR. DREHER:  Yes, Your Honor.

8              THE COURT:  How many days after, roughly?

9              MR. DREHER:  Yes, Your Honor.

10   A.   I don't remember the exact date, but I remember it was

11   January 14th, and I remember that because it was the day before

12   my birthday and I was at an event.  People were talking about

13   what was going on with him, and it was memorable to me because

14   my birthday was the next day, so I reached out to him and got

15   him connected with the police department.

16   BY MR. DREHER:

17   Q.   Now, in your communication with him on Facebook, were you

18   able to see him communicating with you?

19   A.   Yes.

20   Q.   And during that conversation did he ever speak about what

21   he did on January 6th?

22   A.   At first he denied any involvement.  Then he changed his

23   story and said, yeah, I was involved, and then later he said

24   and I'm -- I'm not ashamed of it, I'm proud of it, it was a

25   good experience going down there, I was curious, but at the

1   same time I was a part of it.

2   Q.   And was this these -- this entire conversation was in one

3   video chat?

4   A.   I think we spoke two or three times.  We would text first,

5   and then we would video back and forth.  We might get

6   disconnected and chat to reconnect and then have another video

7   call or chat.

8   Q.   But were all of these video chats on the same day?

9   A.   Some were around there, the 13th or the 14th.  If you look

10  up the message, you'll actually see the exact date, 'cause it's

11  on the message.

12  Q.   Now, sir, taking you back to the photograph that you said

13  you immediately identified Mr. GossJankowski in, was there any

14  distinctive clothing that you remember him wearing in those

15  photographs?

16  A.   At that time he had a blue jacket on.  You could see a

17  little bit that his hair was kind of curly but primarily that

18  it was black.  If that's the day I called him, he wore the same

19  jacket that you saw in the pictures.

20  Q.   So then not only were the photographs of him at January 6

21  in this blue jacket, but when you were speaking to him on

22  Facebook, he wore the same jacket?

23  A.   That's correct.

24  Q.   And I just want to dive into this a little further just so

25  that the jury is aware.  During this time was this already

1    after your time with the football team?

2    A.   I wasn't directly.  I always volunteer with the athletic

3    training program, but I wasn't directly involved, but I'm a big

4    supporter of all of their events.

5    Q.   So then how common would it be for you to interact or

6    speak with Mr. GossJankowski?

7    A.   We didn't interact very often.  I'd see him around campus

8    sometimes at the front of the university, or he might be

9    walking around, or there might be a deaf event or some social

10   event.  I would see him, we would greet, but it wasn't never

11   anything in depth.  After January 6th, I didn't see him at all

12   sometimes except for the front of the university, but I didn't

13   see him or talk to him directly after January 6.

14   Q.   And then before, when you were growing up, was your

15   relationship with him closer than what it was at the

16   university?

17   A.   I saw him more often when I was -- and I talked to him

18   more often when I was a university student.  We were in

19   different grades in elementary school.  I was from Maryland.

20   He was from Florida at that time.  I know his mother very well.

21   Well, I don't know her that well, but I know her better than I

22   know him.

23              MR. DREHER:  Your Honor, I have no further

24   questions.

25              THE COURT:  Mr. Smock.

1                          CROSS-EXAMINATION

2     BY MR. SMOCK:

3     Q.   Officer Matthews, hello.  We met before.  I'm Ned Smock.

4     I just wanted to talk to you a little bit more about that

5     evening of January 14th, when you describe having a

6     conversation with Mr. GossJankowski.  First of all, that was

7     more than two years ago; right?  That was January 14th of 2020

8     [sic]?

9     A.   Yes.  Yes, it was.

10    Q.   And you said that was the night before your birthday.  Am

11    I right?

12    A.   Correct.

13    Q.   And at that time you were intoxicated?

14    A.   Yes.

15    Q.   So --

16    A.   But I wasn't too drunk.  I wasn't too drunk to function.

17    Q.   Okay.  But during the communications with

18    Mr. GossJankowski, you were drunk?

19    A.   I had a buzz.  I wasn't drunk.

20    Q.   Okay.  You didn't write any notes after that conversation,

21    did you?

22    A.   I didn't do that.  I did call my investigative unit at

23    Gallaudet University.  I called them immediately and asked what

24    I should be doing, what is my role here, and contacted the MPD

25    officer and made sure that everything was going to be

1    accessible when Mr. GossJankowski turned himself in.

2    Q.   So you didn't write any notes or reports or anything about

3    the nature of that communication on the night of January 14th?

4    A.   No official documentation, just the Facebook Messenger.

5    Q.   I want to talk about what you did write that night

6    before -- the night before your birthday.  You mentioned that

7    you got in touch with the MPD after you communicated with

8    Mr. GossJankowski; is that right?

9    A.   After I knew that he was with the MPD officer, yes.

10   Q.   And, in fact, you communicated via text message with an

11   officer from the DC Metropolitan Police Department named

12   Officer Ulrich; is that right?

13             THE COURT:  You said officer who?

14             MR. SMOCK:  Ulrich, U-L-R-I-C-H.

15   A.   Yes.

16   BY MR. SMOCK:

17   Q.   And your communications with Officer Ulrich were

18   essentially in relation to Mr. GossJankowski and

19   Mr. GossJankowski's preparations to speak to MPD law

20   enforcement?

21             MR. DREHER:  Your Honor, I'm going to object to the

22   question.  I believe it calls for hearsay.

23             THE COURT:  Well, at the moment I think he's asking

24   him what he said to Officer Ulrich.  That's how I interpreted

25   the question.

1       MR. SMOCK:  That's correct.  I'm talking about a

2  communication which the witness had with Officer Ulrich which I

3  will show him.

4       THE COURT:  All right.  Why don't you re- -- why

5  don't you ask the question again, and we'll see what the answer

6  is.

7  BY MR. SMOCK:

8  Q.   You exchanged text messages with Officer Ulrich that

9  evening; correct?

10 A.   Yes.

11 Q.   I'm going to show you --

12      MR. SMOCK:  And only for the witness, Ms. Johnson,

13 what we've marked as Defense Exhibit 19 for identification.

14      INTERPRETER MATHERS:  Your Honor, may the interpreter

15 also look at it?

16      THE COURT:  Do we have a copy of it?

17      INTERPRETER MATHERS:  No.  I can look at it on his

18 screen if it's okay with you.

19      THE COURT:  Pardon me?

20      INTERPRETER MATHERS:  May I also look at the text

21 message with the witness?

22      THE COURT:  Oh, now I see it.  Okay.  It should be up

23 in front of the witness.

24 BY MR. SMOCK:

25 Q.   Officer Matthews, do you recognize that to be the text of

Matthews - Cross (Smock)                                    1183

1    your communication between yourself and Officer Ulrich on that

2    evening?

3    A.   Yes, it is.

4              MR. SMOCK:  I'd move to admit Exhibit 19.

5              MR. DREHER:  Your Honor, again, I would object.

6    These statements are hearsay.

7              MR. SMOCK:  Your Honor, it's not being introduced for

8    its truth.  It's being introduced for the state of mind of

9    Officer Matthews at the time.

10             MR. DREHER:  Which I don't believe would be relevant

11   then, Your Honor.

12             THE COURT:  Well, I'm going to admit it, and it's

13   certainly relevant.  If you want me to explain my reasoning, we

14   can do it at the bench.

15             MR. SMOCK:  Ms. Johnson, can we publish this exhibit

16   to the jury?

17             THE COURT:  I said we're going to talk at the bench.

18             MR. SMOCK:  Oh, I'm sorry.  I didn't...

19        (At sidebar)

20             THE COURT:  I'm going to admit it because I think his

21   comments go to his credibility and bias.  Her comments we can

22   tell the jury are not being admitted for the truth of the

23   matter asserted but just to put it in context.

24             MR. DREHER:  Certainly, Your Honor.  At least on the

25   record, in terms of Mr. Smock's offer, it was being offered for

1   his state of mind.  Now, I understand the Court, though, is

2   ruling in terms of the bias that it would show, so under that I

3   understand the Court's ruling.

4            THE COURT:  Were you offering it for state of mind or

5   were you --

6            MR. SMOCK:  I think bias is probably a better way to

7   describe it.  I think it's both.

8            THE COURT:  I mean, I think, you know, you have a

9   right to attack a witness's credibility.  Credibility includes

10  bias.  I think in this case it cuts both ways because he's

11  told -- at the hearing previously he told us he was both a

12  friend or an acquaintance but he had a law enforcement

13  function, and he sort of was ambivalent about his views.

14       Anything further?

15           MR. DREHER:  The only thing I would bring up, Judge,

16  in terms of bias is I don't think at that point it becomes then

17  an exhibit for the jury, just more -- we have listed our other

18  issues as well, but in terms of bias itself, I don't believe

19  that it becomes an exhibit for the jury.

20           THE COURT:  That's a good evidence question.

21           MR. SMOCK:  I don't see any reason why it wouldn't be

22  admissible.  It's not being introduced for its truth.  It's --

23           THE COURT:  Well, I don't know the answer right now.

24  I know I've written about this in the *Sutton* case.  Bias,

25  whether it's -- whether it's admitted or not, I think you can

 1    either brief it or I'll look up my prior opinion.  We don't

 2    have to decide that right now.

 3              MR. DREHER:  Right.  Understood, Your Honor.

 4              THE COURT:  I'll reserve ruling on whether it comes

 5    into evidence or not until tomorrow if you want to think about

 6    it, and I'll think about it too.

 7              MR. DREHER:  Yes, Your Honor.

 8              THE COURT:  But it can be shown to him, and he can

 9    ask him about it.

10       (In open court)

11              THE COURT:  Just so the witness and the jury

12    understands, particularly the witness at this point, we were

13    discussing a question of law.  That's why we were discussing it

14    outside the presence of the witness and outside the presence of

15    the jury.  And in view of what I said to the lawyers, I'll let

16    Mr. Smock proceed with the line of questioning he was about to

17    undertake --

18              MR. SMOCK:  Thank you, Your Honor.

19              THE COURT:  -- for the reasons stated at the bench.

20    BY MR. SMOCK:

21    Q.   So again, this is a text message communication you're

22    having with Officer Ulrich the same evening you communicated

23    via Facebook Live with Mr. GossJankowski; is that right?

24    A.   Yes.

25              MR. SMOCK:  I'm going to ask that this be published

 1    so the jury can see it.

 2              THE COURT:  Okay.  The jury may view it.  It's a text

 3    message which has been labeled Defense Exhibit Number 19.

 4    BY MR. SMOCK:

 5    Q.   Now, in these text message exchanges, the gray bubbles are

 6    you, and the blue bubbles are Officer Ulrich; is that right?

 7    A.   Yes, that's correct.

 8              MR. SMOCK:  So Adam, I'd ask you to blow up the

 9    fourth gray bubble towards the bottom.

10    BY MR. SMOCK:

11    Q.   So this first gray bubble in the blowup is written by you

12    that evening; correct?

13    A.   Yes, that's correct.

14    Q.   And am I right reading that you wrote, "Well, asshole me I

15    don't care, he shouldn't have been there in first place causing

16    trouble.  Nice me; well it depends on case there then they

17    would handle him there."

18         Is that -- am I reading that right?

19    A.   Yes, that's what it says.

20    Q.   My question was just --

21    A.   Do you want me to clarify its meaning or --

22              THE COURT:  Let him finish --

23    BY MR. SMOCK:

24    Q.   I'm simply asking --

25              THE COURT:  Let him finish translating the answer.

Matthews - Cross (Smock)                                        1187

1    A.    So I knew that this would be a case and that it would be a

2    federal case so...and I knew it was going to proceed, and so I

3    knew that that was going to happen, and so that's why I was

4    saying it this way.  That's what this all meant.  I just wanted

5    to give you some context for what I was saying.

6    BY MR. SMOCK:

7    Q.    Thank you.  So the second text message in this screen you

8    wrote, "I hope he get his ass.  I.mail if he's involved into

9    this shit."  Did you write that?

10   A.    That was a typo.

11   Q.    And you were intoxicated that night; right?

12   A.    Yeah.  We were texting.  I was buzzed, yeah.

13            MR. SMOCK:  You can take that down now.

14   BY MR. SMOCK:

15   Q.    Now, we talked about the communication you had with

16   Mr. GossJankowski that evening on the 14th.  You had a second

17   video call with Mr. GossJankowski that same evening; correct?

18        And when you had that second call, Mr. GossJankowski was

19   actually face to face with officers of the Metropolitan Police

20   Department; correct?

21        So you understanding was --

22            COURT REPORTER:  I'm not hearing an answer.

23            THE COURT:  Yes.  Let him answer.

24   A.    Yes.

25            MR. SMOCK:  I apologize to everyone involved.

1    BY MR. SMOCK:

2    Q.   Your understanding, then, was that Mr. GossJankowski had,

3    immediately after speaking to you, communicated with MPD and

4    arranged to meet with them to talk with them; right?

5    A.   I told him that he needed to turn himself in, and the

6    reason I was texting with Officer Ulrich, because I wanted to

7    make sure that everybody understood that he was deaf and that

8    he needed to have access because -- oh, but Officer Ulrich

9    signs and because I didn't want to have a situation, 'cause

10   this happens often with the deaf community where they have

11   language deprivation, and so sometimes without direct

12   communication it's not effective, so I wanted to make sure that

13   he had full access.  That was my biggest priority.

14        So what happened on January 6, quite honestly, I didn't

15   know all the facts.  I didn't know that he was there or wasn't

16   there or anything like that.  It was -- obviously it was a

17   video, and I did see that, but at the time my primary concern

18   was making sure that he had access in the MPD office, and that

19   would require a sign language -- somebody who knew sign

20   language.

21             THE COURT:  So just when you're done, I have a

22   question when you're done.

23             THE WITNESS:  I don't remember exactly where I stood

24   when I was talking to him or where he was standing, where

25   people were located.  I didn't -- that wasn't clear to me.  I

Matthews - Cross (Smock)                                            1189

1   just wanted to make sure he had access.

2               MR. SMOCK:  Understood.  Oh, sorry.

3               THE COURT:  So just so the jury understands, do I

4   understand you to be saying that Officer Ulrich knew American

5   Sign Language?

6               THE WITNESS:  That is correct, yes.  She knows sign

7   language.

8               THE COURT:  And were you communicating with her?  So

9   you told -- you suggested or you told Mr. GossJankowski that

10  you thought he should turn himself in; is that correct?

11              THE WITNESS:  Yes.

12              THE COURT:  And so are you telling us that if he was

13  going to turn himself in and talk to officers, one of the

14  reasons you were in touch with Officer Ulrich was because you

15  knew that she knew American Sign Language and could help with

16  any communication?

17              THE WITNESS:  That was my goal, yes.

18              THE COURT:  Thank you.

19  BY MR. SMOCK:

20  Q.   And that same evening within 30 or 45 minutes

21  Mr. GossJankowski went to meet with Officer Ulrich; correct?

22  A.   I don't think it was Officer Ulrich.  I know he met with

23  the MPD.  He called me and I said -- or I think he showed me

24  this much later that something -- that Officer Ulrich was

25  involved, and I said, okay, you trust her?  'Cause I knew her

1    from working at Gallaudet, and we had a situation occur at the

2    university and MPD was involved, and Officer Ulrich is the one

3    who typically responds to those kind of issues because she

4    knows sign language.

5    Q.    So just so I'm clear, Mr. GossJankowski went and met with

6    law enforcement that same evening; right?

7    A.    Yes.

8              MR. SMOCK:   Thank you.

9                        REDIRECT EXAMINATION

10   BY MR. DREHER:

11   Q.    Mr. Matthews, earlier when we were discussing

12   communication via Facebook, you had mentioned that written

13   English is not your first language?

14   A.    That's correct.

15   Q.    Are you able to explain that to the jury?

16   A.    Explain?  What do you mean?

17   Q.    In other words, what was your first language growing up?

18   A.    My first language is American Sign Language.  I'm a

19   third-generation deaf individual, so my grandfather and my

20   father are deaf as well as me.

21   Q.    So how is it, then, that you learned written English?

22   A.    Well, through school, and I have three brothers and

23   sisters who are hearing, who can hear, so I was always involved

24   at a very early age with my mom's side of the family, who also

25   can hear so...also various events in the community, sports,

1    things like that.

2    Q.   So this --

3    A.   I also worked at -- we also work -- all worked on the farm

4    together on my mother's side of the family so...also I went to

5    a public education system through the third grade until I went

6    to the deaf school.

7    Q.   So when you are writing written English, are you thinking

8    in written English, or are you thinking in American Sign

9    Language?

10   A.   Yeah.  I'm thinking in American Sign Language and put it

11   into English.  If you ask me to write a story, you wouldn't

12   understand half of it.  Maybe much later you might be able to

13   figure out what I'm saying but not immediately.

14   Q.   So is it fair to say that American Sign Language is not a

15   word-for-word translation with written English?

16   A.   That's correct, it is not a word for word.  It's

17   different.

18   Q.   So when on cross-examination you were shown these text

19   messages to Officer Ulrich, when you wrote them, what is it

20   that you were saying?

21   A.   Well, as I said, my point was to make sure that -- in

22   dealing with that situation I wanted to make sure that whoever

23   was there was going to make sure he had access.

24   Q.   Now, you used that term again on cross-examination, this

25   "had access."  Is that a problem with the deaf community?

1    A.    Unfortunately, it is.

2    Q.    How so?

3    A.    Most of the time, for an example, when a deaf person is

4    being arrested, they're handcuffed behind their back, which is

5    normal procedure for law enforcement.  However, then the

6    officer will then talk to the deaf person even though the deaf

7    person may be calm, not agitated or aggressive, and once the

8    officer feels safe, then he may or she may allow the handcuffs

9    to be placed on the front of the body.  But sometimes if a deaf

10   person's hands are handcuffed behind their back and they're

11   trying to talk, trying to communicate, it's not clear.

12        For example, if someone is pulled over, they sign, hey,

13   I'm deaf, or point to their ears, there is -- this isn't always

14   the case because sometimes deaf people can hear a little bit,

15   but with traffic stops of course there's traffic happening so

16   it may be very difficult to capture everything that's being

17   said by the officer.  So when somebody's saying something to

18   me, for example, I'm having to work to translate that into

19   American Sign Language after trying to figure out if I heard

20   each of the words that would have been said.

21             THE COURT:  Let me ask a follow-up question.  Are you

22   saying that if a deaf person is handcuffed behind his back,

23   that that's a problem because it makes them more nervous or

24   anxious, or are you saying that it's a problem because a part

25   of a deaf person's communication is with the use of his or her

Matthews - Redirect (Dreher)                                    1193

 1    hands?

 2                 THE WITNESS:  It's both, Your Honor.  It's both.  So

 3    if my hands are behind my back, I'm unable to speak anymore and

 4    nobody's going to understand me and I can't sign so I just --

 5    I'm completely left without any ability to communicate with

 6    another person, and if somebody puts it in front of me -- my

 7    hands in front of me, I can at least gesture, point to my ears.

 8    I can still move my hands a little bit but still not completely

 9    effectively, maybe write back and forth a little bit if I need

10    to.

11                 THE COURT:  Thank you.

12    BY MR. DREHER:

13    Q.   Now, this question of access, does it also occur outside

14    of the law enforcement context?

15    A.   Yeah, many different situations.  Emergency, medical

16    situations, with the fire department.  I mean anything, really.

17    Even in the airlines, right, as you're sitting there, you may

18    not know what's happening if you're -- if the plane is leaving

19    from another gate, you won't know that until you watch other

20    people that are running to another gate or you see something.

21    Q.   Now, earlier you mentioned that there are individuals, at

22    least when you were speaking about traffic stops, who can hear

23    somewhat but not enough to communicate.  Is there any way of

24    identifying that when you're speaking to others in the deaf

25    community?

Matthews - Redirect (Dreher)                                        1194

1    A.   So we have what we call the elite deaf community, and then

2    we have a group of individuals who are considered like kind of

3    mixed.  They may have grown up in the mainstream program.  They

4    may not have learned American Sign Language until much later.

5    Q.   And are --

6    A.   And the elites typically come from other deaf family

7    members.

8    Q.   And you specifically, are you able to identify somebody

9    who's in the elite deaf community?

10              MR. SMOCK:  Objection, Your Honor.

11              THE COURT:  I'll permit it.

12              THE WITNESS:  Typically I can, because with the elite

13   deaf community members, they went to a school for the deaf so

14   you may know their family and their family's family and their

15   family's family.  Like, I said that I know Mr. GossJankowski's

16   mother -- mothers, excuse me, and that's how I would identify

17   him.

18   BY MR. DREHER:

19   Q.   Now, being an officer with Gallaudet University, is this

20   access issue something that you are familiar with on a daily

21   basis?

22   A.   Yes.  Now, our access with students is better compared to

23   an officer who can hear.  As you can see, I'm deaf.  I can

24   sign, so I can communicate with our students and I can

25   empathize with their struggles and frustrations and I can

1   adapt, and also I recognize certain body language movements.

2   So simple things like a simple nod like this could mean, oh, I

3   understand you, and then we can go from there and have a

4   communication, we can talk about that, so that happens within

5   the deaf community often.

6   Q.   Now, as you mentioned on cross-examination, there was an

7   officer with the Metropolitan Police that you're familiar with

8   who also knows how to sign?

9   A.   Yeah.  She responds to the campus when we have situations

10  quite a bit.

11  Q.   Now, how did you first meet her and become aware of her

12  ability to sign?

13  A.   So we had a situation at the university, and she showed up

14  and started signing so I was like, cool, you know sign

15  language.

16          COURT REPORTER:  I'm sorry.  Slow down, please.

17  A.   Yeah.  And she knew sign language, and I was like, okay,

18  cool, you know sign language.

19  BY MR. DREHER:

20  Q.   Now, do you know if she is also deaf?

21  A.   No, no, she's not deaf.

22  Q.   And so do you interact with her on situations that may not

23  be within campus when dealing with this access to communication

24  issue?

25  A.   Could you repeat the question.

Matthews - Redirect (Dreher)                                    1196

1    Q.   Is she the officer you normally contact on this access

2    issue on perhaps cases that are not on campus?

3    A.   So I wouldn't reach out to her for any reason if it wasn't

4    related to Gallaudet or the deaf community.  I may see her

5    around occasionally, not at Gallaudet.  I do Rover dog sitting

6    occasionally, so I may see her when I'm walking a dog, but

7    that's it.  She doesn't work directly for the deaf and

8    hard-of-hearing unit at MPD.  She works 5D, which is under --

9    which Gallaudet's under.  That's how I know her, from the Fifth

10   District.

11            THE COURT:  So Gallaudet University is in the Fifth

12   District of the Metropolitan Police Department?

13            THE WITNESS:  That's correct, yeah.  So Gallaudet

14   University's map is right there.  In the front of it is the

15   First District, and then we're 5D going backward from Florida

16   up.

17            MR. DREHER:  Your Honor, I have no further questions.

18            THE COURT:  Mr. Smock, anything further?

19            MR. SMOCK:  Nothing further.  Thank you.

20            THE COURT:  All right.  Officer Matthews, thank you

21   very much.

22            THE WITNESS:  Thank you.

23            THE COURT:  I would suggest -- we're going to try to

24   break today at 4:30, so I would suggest that even though it

25   might be a little early, we take a break now.  It's a logical

 1    place before the government calls its next witness.  And then

 2    we'll get as far as we can with that witness before 4:30, and

 3    we'll break.

 4            (Recess taken at 2:34 p.m.)

 5            (At 2:55 p.m. on March 7, 2023; with counsel for the

 6    parties and the defendant present; WITH the jury:)

 7                    THE COURT:  All right.  Everybody here?  Yes.

 8       Okay.  I didn't see Juror Number 6 'cause you were bending

 9    down for a minute.  Okay.  Everybody is here, and if

10    everybody's ready, the government can go ahead and call its

11    next witness.

12                    MR. VALENTINI:  The government calls Daniel Schwager.

13                    DANIEL SCHWAGER, PLAINTIFF'S WITNESS, SWORN

14            THE COURT:  Good afternoon, sir.

15            THE WITNESS:  Hi.  How are you?

16                        DIRECT EXAMINATION

17    BY MR. VALENTINI:

18    Q.   Could you please state and spell your name for the record.

19    A.   Daniel Schwager.  Daniel is D-A-N-I-E-L.  Schwager is

20    S-C-H-W-A-G-E-R.

21    Q.   On January 6, 2021, what was your job?

22    A.   I was the General Counsel to the Secretary of the United

23    States Senate.

24    Q.   And what are the responsibilities of the Secretary of the

25    Senate?

Schwager - Direct (Valentini)                            1198

1    A.   The Secretary of the Senate is like the chief

2    administrative officer of the Senate.  The Secretary has a

3    number of departments under her authority that handle

4    administrative functions, and there are several groups.  The

5    financial office of the Senate is under the Secretary, the

6    historical and curators' offices and also all the clerks who

7    run the chamber and handle the documents and the official

8    business of the Senate.

9    Q.   And does the Secretary of the Senate work for a particular

10   political party?

11   A.   No.  The Secretary is nominated by the Majority Leader but

12   is elected by the entire Senate, and her responsibility is to

13   serve the entire Senate.

14   Q.   Who was --

15            THE COURT:  Who was the Secretary at the time?

16            THE WITNESS:  Julie Adams was the Secretary in 2021

17   on January 6th.

18   BY MR. VALENTINI:

19   Q.   And you say you were the General Counsel to the Secretary

20   of the Senate?

21   A.   That's correct.

22   Q.   And what were your responsibilities as General Counsel to

23   the Secretary of the Senate?

24   A.   I was a one-man legal shop for the Secretary and for all

25   of our departments, so I advised the Secretary on any number

Schwager - Direct (Valentini)                              1199

1    of, excuse me, legal issues, compliance, ethical issues.  I

2    helped the Secretary administer all of the departments.  I

3    helped the heads of the departments, the clerks with any

4    questions they might have about the law or policy, and I

5    interacted with other offices of the Senate regarding the

6    duties of the office of the Secretary as well.  I also reviewed

7    contracts, and I had responsibilities for continuity of

8    Congress.

9    Q.    I gather you're a lawyer by trade?

10   A.    I am.

11   Q.    How long did you serve as the General Counsel to the

12   Secretary of the Senate?

13   A.    Almost six years, I think.

14   Q.    And did you work on Capitol -- well, could you tell the

15   jury when you started working as general counsel.

16   A.    In April of 2016.  Is that right?  Yes, I think so.  It's

17   been a while.  Yes.

18   Q.    And did you work on Capitol Hill before becoming the

19   General Counsel of the Secretary of the Senate?

20   A.    I did.

21   Q.    And what were those jobs?

22   A.    My first job on the Hill was as a counsel in the Senate

23   Ethics Committee, and from there I went to become the chief

24   counsel and staff director of the House Ethics Committee, the

25   Ethics Committee in the House of Representatives.

1    Q.   And so those Ethics Committee jobs that you just

2    described, are those partisan or political jobs?

3    A.   No.  The staff and staff director of the Ethics Committees

4    are explicitly nonpartisan.  They're hired by both sides.

5    Those committees are the only bipartisan committees, which

6    means evenly divided, and so as staff director and chief

7    counsel, I had equal responsibilities to the chairperson and

8    the ranking member or vice chairperson, and as a counsel I

9    served every office of the Senate or House equally.

10   Q.   And so between your ethics jobs and your job as a General

11   Counsel to the Secretary of the Senate, how long in total did

12   you serve in Congress?

13   A.   In Congress I served approximately 11 years total.

14   Q.   Do you still work in Congress?

15   A.   I do not.

16   Q.   And why did you leave?

17   A.   I'm sorry.  Why did I leave?

18   Q.   Yeah.  Why did you leave?

19   A.   Another opportunity came up that I thought was an exciting

20   opportunity.

21   Q.   And so where do you work now?

22   A.   I work at a nonprofit.

23   Q.   And what does -- just very generally speaking, what does

24   the nonprofit do?

25   A.   The nonprofit works in public records requests generally

1    and litigation of public records requests.

2    Q.   Still legal work?

3    A.   Yes.  I'm the chief counsel at this nonprofit.

4    Q.   So back to January 6, 2021.  During your time serving

5    Congress -- let me ask you a couple of questions about how --

6    sort of the structure of Congress and how it works.  Congress

7    has two houses?

8    A.   That's correct.

9    Q.   And that's what?  If you could tell us which ones they

10   are.

11   A.   The Senate.

12   Q.   Yeah.

13   A.   Sorry.  The Senate and the House of Representatives.

14   Q.   Okay.  And on January 6, 2021, who was the Speaker of the

15   House?

16   A.   The Speaker of the House was Nancy Pelosi.

17   Q.   And who presides over the Senate's agenda?

18   A.   The person who manages the Senate's agenda typically is

19   the Majority Leader, which is just a senator from the caucus

20   that holds the majority in the Senate who's chosen by their

21   caucus to administer and manage the administration of the

22   Senate itself.

23   Q.   And formally who is the President of the Senate?

24   A.   The President of the Senate designated in the Constitution

25   is the Vice President of the United States.

Schwager - Direct (Valentini)                                      1202

1            THE COURT:  And who was the Senate Majority Leader on

2    January 6, 2021?

3            THE WITNESS:  On January 6, 2021, it was Mitch

4    McConnell, Senator Mitch McConnell.

5            THE COURT:  So he was the Majority Leader of the

6    Senate, Nancy Pelosi was Speaker of the House?

7            THE WITNESS:  That's correct.

8    BY MR. VALENTINI:

9    Q.   And when the Vice President is busy or not present in the

10   Senate, who presides over the Senate?

11   A.   The next in line is known as the President Pro Tempore,

12   and that is traditionally the most senior member of the

13   majority party in the Senate, and on January 6, 2021, that was

14   Senator Chuck Grassley of Iowa.

15   Q.   And so there -- Congress meets every sort of number of

16   years in sessions; is that right?

17   A.   Yes.  A Congress is defined as two years, and they're --

18   each year is a session, is known as a session of that Congress,

19   so there's a first session and a second session of each

20   Congress.

21   Q.   And when does a Congress start?

22   A.   Each Congress begins on January 3rd of the odd year

23   following a general election from the previous November.

24   Q.   Are there some things that have to happen for each new

25   Congress?

Schwager - Direct (Valentini)                                    1203

1   A.   Yes.  New members of each chamber have to be sworn in, and

2   there are different requirements for the Senate and the House.

3   Rules have to be adopted in the House.  They have to elect the

4   Speaker.  In the Senate they will elect the officers, and they

5   do that in the House as well.  Yeah, there are various

6   administrative acts that occur at the beginning of every

7   Congress.

8              THE COURT:  And did you say that there is a specific

9   date in January that, when all things run smoothly, the House

10  begins its new Congress, its new term, and the Senate begins

11  its new Congress, its new term?

12             THE WITNESS:  Yes, Your Honor.  The terms of a

13  Congress both end and begin on January 3rd.  Now, the Senate,

14  for instance, may agree to first convene on a day after the

15  3rd.  They don't have to convene on the 3rd if it's a Sunday,

16  et cetera, but that is the day that the Congress begins.

17  BY MR. VALENTINI:

18  Q.   Now, every four years we also have presidential elections?

19  A.   Correct.

20  Q.   And in the years -- in the years that a Congressional --

21  new -- a new Congress follows a presidential election, does

22  Congress have any additional responsibilities?

23  A.   Yes.  The Constitution and statutory law require the

24  Congress to count the votes of the Electoral College and then

25  declare who has been elected President and Vice President of

1    the United States.

2    Q.    Okay.  So let's talk a little bit about the 2020

3    presidential election.  Do you recall when the 2020

4    presidential election actually took place?

5    A.    I've worked so many elections, I keep forgetting which

6    November day, whether it was the 3rd or the 6th.  I forget

7    which day it was that year already.

8    Q.    It was in November 2020?

9    A.    It was definitely in November.  It is the first Tuesday

10   after the first Monday of November.

11   Q.    Okay.  And Congress was set to meet on January 6, 2021, to

12   certify the voting from the November 3rd, 2020, election?

13   A.    That's correct.

14   Q.    So tell us about the whole certification process and how

15   it works from the closing of the polls in November until the

16   following January.

17   A.    Sure.  The term "certification" is kind of a common usage

18   term, but there are various steps.  On Election Day, on

19   November 3rd, the residents of every state elect electors who

20   have been chosen in different ways in different states,

21   typically by the various parties, to be electors on a slate of

22   a particular candidate.  In not every state are they committed

23   to vote for that candidate, but that's typically how they're

24   known.

25         The next step, after the state determines which electors

1    were selected in the general election, then the secretary of

2    state or the state's chief election official and the governor

3    have to create and sign and seal a certificate of

4    ascertainment, which is a document that says who has been

5    chosen as the electors for that state.  The next step is those

6    electors who have been chosen by certificate of ascertainment,

7    and that certificate is sent to the archivist of the United

8    States for official recordkeeping.

9              THE COURT:  So each state sends its own certificate

10   to the archivist of the United States?

11             THE WITNESS:  That's correct.

12             THE COURT:  Thank you.

13             THE WITNESS:  And that's the official declaration of

14   who the electors are.

15             THE COURT:  And it lists their names?

16             THE WITNESS:  It lists their names, yes.

17   BY MR. VALENTINI:

18   Q.   And what do those winning slates of electors do?

19   A.   So the next step is on a date specified in law, the

20   electors in every state on the same day have to meet in their

21   state, and there will be state law saying where they have to

22   meet at what time, et cetera, and they vote for President and

23   Vice President, and then the law directs how they create what

24   are called certificates of vote.

25        These are sometimes called the Electoral College ballots.

1    Sometimes they're called -- they are known as certificates of

2    vote officially, and those list how many votes -- or they list

3    the selection of each elector for President and for Vice

4    President.  Two separate certificates, one for President, one

5    for Vice President.  Those certificates are then attached with

6    a copy of the certificate of ascertainment to demonstrate that

7    those were the authentic electors, and they create a number of

8    originals, and there are a number of destinations where those

9    certificates are sent, including the President of the Senate.

10       The archivist of the United States, the chief judge of the

11   district court in their -- in the district in which the elector

12   sat, the governor, and a few other officials receive copies of

13   the certificates of vote from the electors, and they're signed

14   by the chief election official at the state.  They're attested

15   to.

16            THE COURT:  And when you say -- I know this has been

17   said.  I don't want to repeat everything, but I want everybody

18   to be clear.  So among the people you mentioned that it was

19   sent to is the President of the Senate?

20            THE WITNESS:  Correct.

21            THE COURT:  You said earlier that the President of

22   the Senate is the Vice President of the United States; correct?

23            THE WITNESS:  That's right.  They are sent to his

24   office in the Senate, so they are received in the Senate as

25   Senate records.

1    BY MR. VALENTINI:

2    Q.   And at that point who takes custody of these ballots?

3    A.   All Senate records are the custody or are -- are taken

4    into the custody of the Secretary of the Senate.  Secretary of

5    Senate is officially the custodian of Senate records so if

6    the -- they will go to the Office of the President of the

7    Senate, who would then provide them to the office of the

8    Secretary.

9    Q.   And focusing on Congress, what happens in Congress after

10   the certificates are received by the President of the Senate?

11   A.   Well, the next step in the process is that the Secretary

12   of the Senate keeps them for safekeeping, keeps custody of

13   them, and then they are brought to the Joint Session for the

14   counting of the Electoral College certificates, which takes

15   place on January 6th.

16              THE COURT:  And I take it, although I don't think you

17   said this, that under -- is it federal law that each state has

18   to send its documents by a date certain so that everything is

19   in place before January 6; is that right?

20              THE WITNESS:  There are laws regarding when they have

21   to have them in, but those deadlines are related to various

22   consequences of contests of the votes.  We don't -- there are

23   processes, but typically the office of the Secretary and the

24   office of the archivist will work with the states who, if they

25   are -- if they're taking a while for the mails or if the mails

1    are slow, which does happen as well, we will make sure that

2    every state has sent in an official certificate of vote.

3    BY MR. VALENTINI:

4    Q.   And what is the source of law that determines what must

5    happen on January 6?

6    A.   The Constitution is the first source of law, and then

7    there is statutory law, the United States Code, and then there

8    is the Senate and the House also adopt rules.

9    Q.   So first, on the Constitution, which provision of the

10   Constitution governs what must happen on January 6?

11   A.   It's now the 12th Amendment governs certain aspects of it.

12   Q.   And you also mentioned the U.S. Code?

13   A.   That's correct.

14   Q.   And what is the U.S. Code, for those who are not lawyers?

15   A.   The U.S. Code is the compilation of all of the public laws

16   of the United States.

17   Q.   And is the U.S. Code divided into titles?

18   A.   It is.

19   Q.   And is there a particular title where the laws that

20   pertain to January 6 are codified?

21   A.   Yes.  That's Title 3 of the U.S. Code.

22   Q.   Okay.  I'm going -- Mr. Schwager, I'm going to show you

23   what has been marked as Exhibit 500, which is not in evidence.

24   I understand the print is small, so let me zoom in to a portion

25   of the exhibit.

1      And do you recognize what has been marked as Exhibit 500?

2   A.   I do.

3   Q.   What is it?

4   A.   It appears to be a copy of the 12th Amendment to the

5   Constitution of the United States.

6        MR. VALENTINI:  Okay.  So the government would move

7   to admit Exhibit 500 into evidence.

8        THE COURT:  Is there any objection?

9        MS. GOETZL:  No objection.

10       THE COURT:  Okay.  The 12th Amendment will be

11   admitted.  We have a civics lesson this afternoon.

12   BY MR. VALENTINI:

13   Q.   Mr. Schwager, I have zoomed in to a portion of the 12th

14   Amendment here, and I'm going to ask:  Is this -- do you

15   recognize this as a portion of the 12th Amendment?

16   A.   I do.

17   Q.   And could you please read what's highlighted on the screen

18   starting with "The electors" until it says "shall then be

19   counted."

20   A.   "The electors shall meet in their respective states, and

21   vote by ballot for President and Vice President, one of whom,

22   at least, shall not be an inhabitant of the same state with

23   themselves; they shall name in their ballots the person voted

24   for as President, and in distinct ballots the person voted for

25   as Vice President, and they shall make distinct lists of all

1    persons voted for as President, and of all persons voted for as

2    Vice President, and of the number of votes for each, which

3    lists they shall sign and certify, and transmit sealed to the

4    seat of the government of the United States, directed to the

5    President of the Senate; the President of the Senate shall, in

6    the presence of the Senate and House of Representatives, open

7    all the certificates, and the votes shall then be counted."

8    Q.   Thank you.  And Mr. Schwager, you also referenced Title 3

9    of the U.S. Code as a source of law that governs what must

10   happen on January 6?

11   A.   Correct.

12   Q.   Let me show you four documents which have been marked as

13   Exhibit 501A, and I will scroll briefly.  We'll just -- I will

14   also show 501B, 501C, and 501D.

15        Mr. Schwager, do you recognize these documents that I just

16   showed you?

17   A.   I do.

18   Q.   What are they?

19   A.   They appear to be sections of Title 3 of the United States

20   Code, Sections 15, 16, 17, and 18.

21             MR. VALENTINI:  Your Honor, the government would move

22   to admit Exhibits 501A, 501B, 501C, and 501D into evidence.

23             MS. GOETZL:  No objection.

24             THE COURT:  They'll be admitted without objection and

25   can be shown to the jury.

1    MR. VALENTINI:  Let me go first to Exhibit 501A.  Let

2    me highlight the beginning of the text.

3    BY MR. VALENTINI:

4    Q.   Mr. Schwager, could you please read the highlighted text

5    for the jury.

6    A.   "Congress shall be in session on the 6th day of January

7    succeeding every meeting of the electors.  The Senate and House

8    of Representatives shall meet in the Hall of the House of

9    Representatives at the hour of one o'clock in the afternoon on

10   that day, and the President of the Senate shall be their

11   presiding officer.  Two tellers shall be previously appointed

12   on the part of the Senate and two on the part of the House of

13   Representatives."

14   Q.   Thank you.  So although each house is equal to each other,

15   when they are convening together in the Joint Session, it's the

16   President of the Senate who presides over the session?

17   A.   That's correct.

18        MR. VALENTINI:  And we can stop publishing this

19   exhibit.

20   BY MR. VALENTINI:

21   Q.   Let me show you what has been admitted into evidence --

22   no.  Let me show you a document which has not yet been admitted

23   into evidence, Exhibit 502.

24        MR. VALENTINI:  And let me zoom in 'cause the text is

25   small.

1   BY MR. VALENTINI:

2   Q.   Do you recognize the text of what has been marked as

3   Exhibit 502?

4   A.   I do.

5   Q.   And what is it?

6   A.   It's a concurrent resolution, specifically Senate

7   Concurrent Resolution Number 1.

8            MR. VALENTINI:  Let me highlight or zoom in to a

9   different portion of the exhibit as well.

10  BY MR. VALENTINI:

11  Q.   And can you tell by looking at Exhibit 502 when this joint

12  resolution happened?

13  A.   Yes.  There's a date at the top.  On January 3rd, 2021,

14  but this was -- this would be the first Senate concurrent

15  resolution of the 117th Congress, which is the Congress that

16  began on January 3rd, 2021.

17           THE COURT:  Senate concurrent resolution.  Does

18  "concurrent" mean, though, that it's really by both houses?

19           THE WITNESS:  So a concurrent resolution is a type of

20  legislation that is begun in one house and agreed to in both

21  chambers, but it does not require the President's signature.

22           THE COURT:  So this is called Senate concurrent

23  resolution because presumably it started in the Senate but

24  by -- because it's, quote/unquote, concurrent, that means the

25  House also voted for the same thing?

1          THE WITNESS:  That's exactly right, yes.  Either

2   chamber can start a concurrent resolution, and it's just titled

3   whichever chamber begins it.

4          THE COURT:  Okay.  Is there any objection to its

5   admission?

6          MS. GOETZL:  No objection.

7          THE COURT:  It will be admitted without objection.

8   BY MR. VALENTINI:

9   Q.   And could you please read the portion beginning at the

10  beginning of the concurrent resolution until the phrase "shall

11  be their presiding officer."

12  A.   "Resolved by the Senate (the House of Representatives

13  concurring) that the two houses of Congress shall meet in the

14  Hall of the House of Representatives on Wednesday, the 6th day

15  of January 2021, at one o'clock postmeridian pursuant to the

16  requirements of the Constitution and laws relating to the

17  election of President and Vice President of the United States,

18  and the President of the Senate shall be their presiding

19  officer."

20  Q.   Thank you.  And so picking up on a question Judge Friedman

21  asked you just a minute ago, this resolution ori- -- do you

22  know which chamber it originated in?

23  A.   The Senate.

24  Q.   And was it later joined by the House?

25  A.   It was.

Schwager - Direct (Valentini)                          1214

1   Q.   And what does the concurrent resolution in Exhibit 502

2   accomplish?

3   A.   It adopts essentially the procedures committed in law as a

4   resolution or, in essence, a rule of both chambers.  So since

5   both chambers have constitutional rulemaking authority, it adds

6   an extra layer to the authority for the proceeding, and it

7   signals that both chambers intend to follow this procedure.

8            MR. VALENTINI:  Thank you.  And I'm going to switch

9   to Exhibit 501B, which is already in evidence.

10  BY MR. VALENTINI:

11  Q.   And I'm going to -- the beginning this -- you said this is

12  a provision of Title 3 of the U.S. Code?

13  A.   That's correct.

14  Q.   And at the beginning this provision states, "At such joint

15  meeting of the two houses, seats shall be provided as follows,"

16  and then a little bit later it says -- a little bit later --

17  could you please read for the record starting at "Such joint

18  meeting shall not be dissolved"?

19  A.   "Such joint meeting shall not be dissolved until the count

20  of electoral votes shall be completed and the result declared;

21  and no recess shall be taken unless a question shall have

22  arisen in regard to counting any such votes, or otherwise under

23  this subchapter, in which case it shall be competent for either

24  house, acting separately, in the manner herein before provided,

25  to direct a recess of such house not beyond the next calendar

Schwager - Direct (Valentini)                          1215

 1    day, Sunday excepted, at the hour of 10 o'clock in the
 2    forenoon.  But if the counting of the electoral votes and the
 3    declaration of the result shall not have been completed before
 4    the fifth calendar day next after such first meeting of the two
 5    houses, no further or other recess shall be taken by either
 6    house."
 7    Q.   In lay terms, could you please explain to the jury what
 8    this means.
 9    A.   That means once this session has started, we're not
10    allowed to stop until we're finished, and it says if it takes
11    up to four days, I think we can go home and sleep at night, but
12    if we can't get it done in that, we can't even do that.  But
13    it's a single session that begins once we start, and the
14    session does not officially adjourn until we are completed and
15    a winner has been declared.
16    Q.   And are there time limitations on objections and debate as
17    well?
18    A.   On debates, yes.
19    Q.   So can we go back, and I'm going to ask you to read the
20    last portion of this statutory provision that you have not yet
21    read, the one starting "but if."
22    A.   "But if the counting of the electoral votes and the
23    declaration of the result shall not have been completed before
24    the fifth calendar day next after such first meeting of the two
25    houses, no further or other recess shall be taken by either

Schwager - Direct (Valentini)                        1216

1    house."

2    Q.   Thank you.

3         THE COURT:  So it's got to be done by the fifth

4    calendar day?

5         THE WITNESS:  No.  It -- it can go on as long as it

6    needs to, but we can't go home anymore after the fifth

7    calendar --

8         THE COURT:  When you talk about going home, does this

9    provision also say that they're meeting in Joint Session, but

10   if certain things happen then you -- I don't know what the

11   right word is, but you take a break from the Joint Session, and

12   everybody goes back to their own quarters, the House to talk

13   about something somebody's raised in the House and the Senate

14   to talk about something that somebody's raised in the Senate,

15   and then you come back together again?

16        THE WITNESS:  That's correct.

17        THE COURT:  When you get to the fifth day, you can't

18   even do that?

19        THE WITNESS:  Well, we can't go home at night, but we

20   do still debate follow -- proceeding these rules, and that's a

21   different statutory --

22        THE COURT:  Oh, okay.

23        THE WITNESS:  -- provision than that one so it is --

24   one of the exhibits addresses those rules.

25   BY MR. VALENTINI:

1   Q.   So in practice if, say, a member of the House objects,

2   what happens during the Joint Session?  What happens then?

3   A.   If a member of the House alone objects, the objection is

4   read and nothing happens.  We then continue on counting the

5   votes.  If there's an objection raised by both a member of the

6   House and a Senator, at least one of each, then both houses

7   retire to their chambers.

8        The House is already in its chamber, but the Senate will

9   retire to its chamber, and the objection will be debated in

10  both chambers, and this is one of the -- one of the other

11  exhibits has procedures and limits for that debate, and it

12  limits how long each Member or Senator may speak on the debate,

13  and it's -- all the objections for that state are debated

14  within that debate.  The maximum's, I believe, two hours per

15  objection or two hours per side.  It's in one of the exhibits.

16  And then they return to the Joint Session and announce their

17  votes on the objection.

18  Q.   Going back to January 6, 2021, in particular, were you

19  aware that there was a possibility that there may be -- there

20  could be objections during the Joint Session?

21  A.   There was a lot of speculation in the press.  Various

22  members and Senators had suggested that that would happen.  I

23  had an appointment on January 7th that I canceled and postponed

24  to a later date.  Yes, that was definitely a possibility.

25  Q.   So I was going to ask you:  What did you do in order to

1    prepare for those potential objections?

2    A.   I personally studied up on the law and briefed the

3    Secretary to make sure the Secretary was aware of their -- of

4    her responsibilities.  We worked with the Parliamentarian of

5    the Senate.  We made sure the staff was aware that this could

6    be happening.  It's not entirely unusual for the staff of the

7    Senate to have to work through the night once or twice or more

8    every year, so we just made ourselves ready.  As I said, I

9    postponed an appointment I had the next day.

10   Q.   Did you say that this was not the first time that you

11   attended a Joint Session of Congress to certify the results of

12   an Electoral College?

13   A.   This was the second time I had worked this session,

14   correct.

15   Q.   So going back to these ballots, once they arrive, are

16   there specific locations or containers that are used to hold

17   these ballots?

18   A.   The Senate has ceremonial ballot boxes that we do use to

19   store and transport the ballots that fit in those boxes, yes.

20   Q.   You said "the ballots that fit in those boxes."  Is that

21   because some ballots don't fit in the boxes?

22   A.   Yes.

23   Q.   They're too large?

24   A.   Yes.

25   Q.   So now, when the Senate was called into order on

Schwager - Direct (Valentini)                                        1219

1    January 6, where were you?

2    A.   When it was called into order, I believe I was in the

3    hallway right outside the Senate Chamber, what's called the

4    Ohio Clock Corridor.

5    Q.   Now, between the Senate Chamber and the House Chamber,

6    which one is bigger?

7    A.   The House Chamber.

8    Q.   And the Joint Session is large.  How many people --

9    A.   Correct.

10   Q.   -- attend the Joint Session?

11   A.   Well, there are 541 members and delegates in the house.

12   There are 100 Senators.  The President of the Senate is added,

13   and various officers, various staff have to be there to help

14   facilitate, so a lot of people.

15   Q.   So it would be physically difficult for the Joint Session

16   to meet in the Senate Chamber?

17   A.   Yes.  That's why we meet in the House Chamber.  We would

18   not all fit in the Senate Chamber.

19   Q.   So on January 6, 2021, did there come a time when the

20   Senators moved from the Senate Chamber to the House Chamber?

21   A.   Yes.

22   Q.   And is that a pretty formal ceremonial process?

23   A.   It is.  It's a procession, we call it, and it happens at

24   each Joint Session.  The Senate first has to convene in the

25   Senate Chamber and then agree to proceed to the House Chamber.

1    The procession is led by the Secretary of the Senate, and the

2    Sergeant at Arms or Deputy Sergeant at Arms perhaps, depending

3    on the situation, and then the leaders of the Senate and then

4    all the Senators and then various staff are in line with them,

5    et cetera.

6    Q.   And are the ballots -- or the ballots that you just

7    referenced, are those part of the ceremonial procession?

8    A.   They are.  They follow the Secretary of the Senate, and

9    they are carried by Senate staff at the head of the procession.

10   Q.   And so at some point Vice President Pence and the Senators

11   arrive in the House Chamber?

12   A.   That's correct.

13   Q.   And what -- and they started counting these votes?

14   A.   Yes, eventually.

15   Q.   And what happened at that point?

16   A.   After the count proceeded, we got to the first state that

17   had an objection.  The objection was raised.  It was joined by

18   both a Member of the House and a Senator, at least one, and so

19   at that point the chambers re- -- the two bodies retired to

20   their chambers to begin debate.

21   Q.   And so the Senators went back to the Senate Chamber?

22   A.   Correct.

23   Q.   And the Vice President went with the Senators because he's

24   the President of the Senate; right?

25   A.   Correct.

1    Q.   And did you go with Vice President Pence and the Senators

2    back to the Senate Chamber yourself?

3    A.   I did go with the group back to the Senate Chamber, yes.

4    Q.   And sort of physically speaking, how did you get from the

5    House Chamber to the Senate Chamber?

6    A.   The House and Senate Chambers are at opposite ends of a

7    long hallway in the Capitol Building, so you can walk directly

8    out the door of one straight down a hallway into the door of

9    the other.  That's how the Senators proceeded.  I might have

10   gone around a different entrance taking care of some business.

11   Q.   And for the Senators who went directly from the House

12   Chamber to the Senate Chamber, how long a walk is it?

13   A.   Oh, maybe a minute.

14   Q.   Does the walk go through the Rotunda --

15   A.   Yes.

16   Q.   -- of the Capitol?

17   A.   Yes.  At that floor the center of that long hallway is

18   known as the Rotunda, and it's beneath the Dome of the Capitol.

19   Q.   I'm going to show you a couple of exhibits, and then I'm

20   going to ask you to -- about a video.

21        MR. VALENTINI:  I have brought up what has been

22   marked as Exhibit 506, and I'm going to scroll through it.

23        Let me pull up Exhibit 507.

24   BY MR. VALENTINI:

25   Q.   Do you recognize what these exhibits are?

Schwager - Direct (Valentini)                                    1222

1    A.    I do.

2    Q.    And what are they?

3    A.    These are pages of the Congressional Record.

4    Q.    And what is the Congressional Record?

5    A.    The Congressional Record is the daily compilation of the

6    events that occur in each chamber of Congress.

7    Q.    Let me show you a different exhibit that has been marked

8    as Exhibit 503.

9              THE COURT:  What is it, five, oh...

10             MR. VALENTINI:  503, and I've stopped at this first

11   frame.

12   BY MR. VALENTINI:

13   Q.    Before coming to court did you see the video that is

14   marked here as Exhibit 503?

15   A.    I believe I did.

16   Q.    And is it a compilation of video from C-SPAN from the two

17   chambers and excerpts from the Congressional Record?

18   A.    That is what it appears to be, yes.

19   Q.    And is it a fair and accurate representation of what it

20   depicts of what happened?

21   A.    To the extent it records things that I witnessed and I'm

22   aware of, yes, it is a fair and accurate representation.

23             MR. VALENTINI:  The government moves to admit

24   Exhibit 503 into evidence.

25             MS. GOETZL:  No objection, Your Honor.

1          THE COURT:  It will be admitted without objection.

2          MR. VALENTINI:  The government also moves to admit

3    Exhibit 506 and 507 into evidence.

4          THE COURT:  In their entirety?

5          MR. VALENTINI:  Yes.

6          MS. GOETZL:  No objection.

7          THE COURT:  Okay.  506 and 507.  506 you've showed

8    him.  I'm not sure you've shown him 507, but I take it one is

9    the Congressional Record from the Senate side and one is the

10   Congressional Record from the House side; is that right?

11         MR. VALENTINI:  That is correct, Your Honor.

12         THE COURT:  Okay.  They will be --

13         MR. VALENTINI:  They're excerpts.

14         THE COURT:  What?

15         MR. VALENTINI:  They're excerpts from that day.

16         THE COURT:  Yeah.  Ms. Goetzl did not have any

17   objection, so they'll be admitted.

18         MR. VALENTINI:  I'm going to start playing this

19   exhibit at the beginning, and I'm going to play the first

20   couple of minutes.

21     (A portion of Exhibit 503 was played.)

22         THE COURT:  Can you turn the volume up a little.

23         MR. VALENTINI:  Unfortunately, I don't think I can

24   make the volume any higher from here.

25         THE COURT:  All right.  That may be the best we can

Schwager - Direct (Valentini)                                    1224

1    do.

2         (A portion of Exhibit 503 was played.)

3    BY MR. VALENTINI:

4    Q.   Mr. Schwager, we just saw several individuals walking,

5    carrying some boxes.  Is this the procession you were talking

6    about earlier in your testimony?

7    A.   It is.

8    Q.   And just to be clear, what is the significance of the

9    boxes that are being used?

10   A.   So these are the Senate staffers.  In this picture it's a

11   little harder to see in the frame that you froze it, but they

12   are carrying three wooden boxes, mahogany wooden boxes, that

13   carry most of the ballots.  You can see some right in the

14   middle, and then at the -- behind the boxes are the staff

15   carrying the certificates that did not fit inside those boxes.

16   Q.   And could you -- using the touch screen that is in front

17   of you, could you please circle them for the jury.

18   A.   Sure.

19   Q.   You can use your finger.

20   A.   There's a box in there.  There's a box right there.  These

21   are the oversized ballots, yes.  And this is the Secretary of

22   the Senate here leading the procession (indicating throughout).

23        MR. VALENTINI:  Let's continue playing the exhibit

24   for a few more seconds.

25   BY MR. VALENTINI:

1    Q.   I have now stopped the time counter in this video at

2    minute counter 2:22, and a group of individuals appear to be

3    walking into the Senate Cham- -- into the House Chamber at this

4    point.  Do you know who they are?

5    A.   Yes.  These are -- this is the beginning of the line of

6    Senators led by the Senate Majority Leader Senator McConnell,

7    and following are Senators Blunt and Klobuchar, who were the

8    two Senate tellers, and then it looks like Senator Leahy and

9    then other Senators behind him at the door.

10   Q.   Mr. Schwager, you just said "Senate tellers."  Could you

11   tell us who the Senate tellers are.

12   A.   Yeah.  I've read a little extra of one of the provisions

13   earlier on that the Senate and the House each appoint two of

14   their members to actually read and review the certificates that

15   are handed to them by the Vice President and announce the votes

16   from that state's certificate, and the four of them rotate

17   reading certificates.

18           THE COURT:  Four, meaning two from the House and two

19   from the Senate?

20           THE WITNESS:  Correct.

21   BY MR. VALENTINI:

22   Q.   Mr. Schwager, I have circled a gentleman who appears at

23   the rostrum at time mark 2 minutes and 39 seconds into this

24   exhibit.  Do you know who that gentleman is?

25   A.   That's Vice President Pence, the President of the Senate.

Schwager - Direct (Valentini)                                    1226

1    Q.   And could you tell the jury who is standing next to him?

2    A.   Nancy Pelosi, the Speaker of the House of Representatives

3    at the time.

4    Q.   I'm going to continue playing this exhibit, and I'm going

5    to ask you to tell us if you can see yourself in this exhibit.

6         (A portion of Exhibit 503 was played.)

7    A.   Yes.  I can there.

8    BY MR. VALENTINI:

9    Q.   Could you please circle yourself for the jury.

10   A.   Sure (indicating).

11   Q.   Thank you.

12        MR. VALENTINI:  I'm now continue -- I'm going to

13   continue playing this exhibit for another minute or so.

14        (A portion of Exhibit 503 was played.)

15   BY MR. VALENTINI:

16   Q.   And I don't know if you could hear the sound in this

17   video.  In the video Vice President Pence announced that the

18   Senate was going to withdraw from the -- or retire from the

19   House Chamber.  Is that the objection process that you outlined

20   before?

21   A.   That's correct.  That's in response to there having been

22   objections from a member of each chamber to -- I believe it was

23   the votes of the state of Arizona.

24   Q.   And when the Senate retired to the Senate Chamber at

25   approximately -- is it 1:14 in the afternoon?  What happened to

1    those ballot boxes that we saw stream in to the House Chamber

2    before?

3    A.   The Senate staff took them back, and we brought them with

4    us and all of the materials we had back to the Senate Chamber.

5    Q.   And why didn't you just leave them in the House?

6    A.   The Secretary of the Senate remains the custodian of those

7    and remains responsible for their security, and so we are

8    always going to keep those ballots with the Senate.

9         MR. VALENTINI:  I'm going to continue playing this

10   exhibit.

11        (A portion of Exhibit 503 was played.)

12        MR. VALENTINI:  Skip back one second.

13   BY MR. VALENTINI:

14   Q.   Mr. Schwager, what is the time on -- I've stopped the

15   exhibit at time mark 4 minutes and 58 seconds into the exhibit,

16   but what was the time, the time that is captured at that point

17   in the exhibit?

18   A.   It's 1:29 or 1:30.

19   Q.   And what had just happened at that -- what -- could you

20   explain for the jury what just happened in the exhibit.

21   A.   Sure.  The President of the Senate, the Vice President

22   presiding over the Senate, what we say gavelled in the

23   objection -- the objection debate, announced the rules of the

24   debate that are set forth in law, and is -- would be about to

25   call on the first speaker for the debate.

1    Q.   You said before that there's a time limit of two hours per

2    objection?

3    A.   Correct.

4    Q.   And debate started, it seems, at 1:29 or 1:30 p.m.?

5    A.   Correct.

6    Q.   And so what was the end time, the latest possible end time

7    for debate on this objection?

8    A.   Well, it's two hours of total debate.  If there was an

9    interruption, then they would need to continue it after the

10   interruption, so it should have been over at 3:30.  It should

11   not have been stopped.  It should have been completed at 3:30.

12   Q.   Were you yourself present in the Senate Chamber during the

13   time period starting at 1:30 to debate the objection that had

14   been raised?

15   A.   At some point I did enter the chamber during the debate.

16   I don't recall if I was there from the very moment it started,

17   but I was there for the majority of it, yes.

18   Q.   And did something -- did there come a time when something

19   out of the ordinary happened?

20   A.   Yes.

21   Q.   And could you describe that for the jury, please.

22   A.   Yes.  There came a point when another Senate staffer

23   informed me that protesters had breached the building, meaning

24   the Capitol Building, which was very alarming to me and I knew

25   was a dangerous situation because it's a very secure building

Schwager - Direct (Valentini)                                    1229

1     and has incredibly heightened security on any Joint Session

2     that occurs, so I immediately -- I immediately went down.  I

3     was standing in the back of the chamber.  There are some staff

4     benches, and that's where I heard, and I immediately went down

5     to be closer to the dais so I could advise the Secretary, who

6     was sitting on the dais, and help her and help the clerks with

7     anything that needed to happen.

8          I had a sense of what was about to happen.  I could see

9     Capitol Police officers and doorkeepers coming in and starting

10    to lock all the chamber doors and the gallery doors, and I

11    could tell we were in, you know, a very tense situation.  We

12    were following procedures that we had drilled on in drills that

13    are called active shooter drills, and also as I was making my

14    way down, I saw that a security detail was removing the Vice

15    President from the chamber, and the President Pro Tempore,

16    Senator Grassley, was being brought up to the dais, and I

17    understood kind of what that meant and what would happen next.

18    Q.   And what did happen next?

19    A.   Senator Grassley gavelled us out into what's called a

20    recess subject to the call of the chair, which is the procedure

21    we set up for emergency situations, and then Senator Grassley

22    was removed from the chamber by a security detail, and then a

23    Capitol Police officer who performs this task in the drill

24    who's one of the officers assigned to the chamber regularly and

25    who I'm familiar with, he took the dais and made an

1    announcement to the Senators that -- I forget exactly his

2    wording, but in essence there -- we have a situation or there's

3    a threat or there are -- I forget exactly what he said, but

4    then he asked everybody to remain calm, stay in their seats,

5    and follow the directions of the Capitol Police, and there

6    would be further instructions.

7    Q.   And did there come a time when there was an actual

8    lockdown of the Senate Chamber?

9    A.   That's when I said we saw Capitol Police officers and

10   doorkeepers coming in and locking the doors.  That is a

11   lockdown.  That is exactly what was happening, yes.

12   Q.   And you said that a Capitol Police officer said that

13   further instructions will be forthcoming?

14   A.   Yes.

15   Q.   Did more instructions arrive at some point?

16   A.   Yeah.  Eventually we were evacuated from the chamber at

17   the direction of the Capitol Police.

18   Q.   And while you were -- while the doors to the Senate

19   Chamber were locked, could you hear any noise or commotion

20   coming from outside of the Senate Chamber itself?

21   A.   Well, before the doors were locked, the lobby doors to the

22   Senate, you could see in the image that's frozen right now at

23   4:58 in the exhibit, the one on the right is where I was

24   standing, which you would see in a few seconds on this exhibit,

25   but when that was opened for officers to come in and for the

1    Vice President and the President Pro Tempore to come out, the

2    Secretary and I were also gathering some of our staff who were

3    standing in the lobby into the chamber 'cause we knew that it

4    was about to be locked down and we wanted our staff with us,

5    and I could hear a big commotion out -- down the hallway from

6    the lobby, outside of the lobby to the right.

7    Q.    And when -- when you eventually were evacuated from the

8    Senate Chamber, did additional Capitol Police officers come to

9    the chamber to facilitate that to put the process in place?

10   A.    I wouldn't know if it was additional.  There were a lot of

11   Capitol Police officers around by then.  There were Capitol

12   Police officers along the route in which we were evacuating

13   guiding us and also making sure we were showing our

14   identification to make sure we were all -- we all belonged

15   there.  Yes, there were a lot of Capitol Police officers.

16   Q.    And without disclosing specifically where you were

17   evacuated to, could you tell the jury what you brought with you

18   when you were evacuated.

19   A.    I was part of the group of staff who -- before we

20   evacuated, I had moved to the table where the ballot boxes were

21   just at that point to make sure no -- you know, we were all

22   kind of milling about.  I didn't want anybody opening the boxes

23   and flipping through the ballots, including Senators, so -- but

24   once we were evacuated, a group of staff grabbed the ballot

25   boxes and some of the other materials and paperwork and

1    paraphernalia that we use for it, and I carried some of those

2    items, and I assisted others carry a ballot box, and yeah,

3    there were a group of Secretary staff and other Senate staff

4    who were making sure we brought that with us.

5    Q.   And so were those ballot boxes in the custody of the

6    Secretary of the Senate throughout the time of the evacuation?

7    A.   They were.

8              THE COURT:  Through you and other members of her

9    staff?

10             THE WITNESS:  Through staff of the Secretary and --

11   yes, through staff of the Secretary and the Capitol Police

12   under the direction of the staff of the Secretary.

13             MR. VALENTINI:  Let me play another minute or so of

14   this exhibit.

15        (A portion of Exhibit 503 was played.)

16             MR. VALENTINI:  I'm sorry.

17        (A portion of Exhibit 503 was played.)

18   BY MR. VALENTINI:

19   Q.   Mr. Schwager, I know that you were not yourself in the

20   House at that time, but are you able to identify who is the

21   lady in the center of the rostrum?

22   A.   Speaker Pelosi.

23   Q.   And what time do you see on the clock?

24   A.   I see 1:32 is --

25             THE COURT:  I can't hear.

1          (A portion of Exhibit 503 was played.)

2    A.   I'm sorry.  That time that I gave was -- was wrong.  I

3    think it was a counter.

4    BY MR. VALENTINI:

5    Q.   Yes.

6          (A portion of Exhibit 503 was played.)

7          MR. VALENTINI:  I have stopped this exhibit at time

8    mark 6 minutes and 46 seconds into the exhibit, and I have

9    circled a door at this point in the frame.

10   BY MR. VALENTINI:

11   Q.   Mr. Schwager, understanding that this is the House

12   Chamber, not the Senate Chamber, are you able to identify where

13   that door leads?

14   A.   Yes.  I worked in the House of Representatives for about

15   two and a half years, and I've been in the chamber many times.

16   That leads to what's known as the Speaker's Lobby.  That's the

17   lobby outside the House Chamber.

18   Q.   And in this exhibit did you see members exiting the House

19   Chamber through that door?

20   A.   I see people exiting through that door.  I can't tell who

21   they are.

22          MR. VALENTINI:  Okay.  I have stopped the exhibit now

23   at time mark 6 minutes and 55 seconds into the exhibit.

24   BY MR. VALENTINI:

25   Q.   And let me just ask you about the excerpts from the

1    Congressional Record that is projected here.  It says that the

2    House stands in recess subject to the call of the chair.  Do

3    you know what that means?

4    A.   Yes.  A recess subject to the call of the chair is

5    essentially a time-out, a temporary time-out when either

6    chamber is not ready to adjourn but they need to figure out

7    what to do next or for some reason they just need to pause

8    without formally ending but, you know, without also formally

9    making all the staff stand in place and all of that.  They

10   might recess subject to the call of the chair, which means

11   everybody stand by and we'll come back soon, essentially.

12            MR. VALENTINI:  Let me resume playing.

13        (A portion of Exhibit 503 was played.)

14            MR. VALENTINI:  I have stopped this exhibit now at

15   time mark 7 minutes and 39 seconds into this exhibit.

16   BY MR. VALENTINI:

17   Q.   And the excerpt from the Congressional Record that is

18   projected here again refers to the House being in recess

19   subject to the call of the chair, and could you see from the

20   excerpt from the Congressional Record what time that was?

21   A.   2:29 p.m.

22   Q.   And so is this sort of the same process as -- the same

23   event as before, another time-out, as you've characterized it

24   before?

25   A.    Yes.  It seems they had reconvened from the first recess

1    subject to the call, and now they're going into a second or

2    another subject -- recess subject to the call.

3    Q.   And so at this point, 2:29 p.m. on January 6, 2021, both

4    the House and the Senate were in recess?

5    A.   Subject to the call of the chair, yes.

6    Q.   That is, by 2:29 the proceedings had been stopped or

7    halted in both chambers?

8    A.   Yes, I believe so.

9         (A portion of Exhibit 503 was played.)

10   BY MR. VALENTINI:

11   Q.   At some point after you were evacuated from the Senate

12   Chamber, did there come a time you returned to the Senate

13   Chamber?

14   A.   Yes.

15   Q.   And was there a time when the Senators were able to return

16   to the Senate Chamber?

17   A.   Yes, there was.

18   Q.   And what was the purpose of returning to the Senate

19   Chamber?

20   A.   To finish the debate on the objection and then reconvene

21   or return to the joint portion of the Joint Session and finish

22   the counting of the Electoral College vote.

23   Q.   And do you recall approximately at what time the Senators

24   were able to return to the Senate Chamber to continue the

25   debate on the objection?

1   A.   I think it was around 8 p.m. or 7 or -- sometime around 7

2   or 8 p.m.

3   Q.   Were you able to go in to the Senate Chamber before the

4   Senators arrived?

5   A.   Yes, I was.  I was the -- with the second group, small

6   group of staff who returned with some Capitol Police officers

7   to the chamber, and I went back to report back to the Secretary

8   whether the chamber was in suitable condition for reconvening

9   there or if there were any issues that we needed to address

10  before we could reconvene inside the chamber.

11  Q.   And so what conditions was -- were the chambers and the

12  areas around the chambers in when you returned?

13  A.   The hallways around the chamber were in very bad

14  condition.  There was powder all over the place.  There were

15  broken furniture, broken glass, pockmarked walls.  It was

16  really bad.  Inside the chamber, fortunately, it was not quite

17  as bad.  There was a bit of a mess here and there, some papers

18  in disarray on the dais, but I did a quick survey of, like, the

19  desks and the chairs 'cause the curator is one of our

20  departments, and I didn't see any significant damage inside the

21  chamber itself.

22  Q.   And based on that survey that you did, did you determine

23  that the Senators could come back and meet in the Senate

24  Chamber?

25  A.   My recommendation was that there was nothing significantly

1    stopping that from happening, yes, that that could happen.

2    Q.   And did the Senate, in fact, return to the Senate Chamber?

3    A.   It did.

4         MR. VALENTINI:  Let's continue playing the video.

5         (A portion of Exhibit 503 was played.)

6         MR. VALENTINI:  And I've stopped the exhibit at time

7    mark 8:07.

8    BY MR. VALENTINI:

9    Q.   Could you please read the excerpts of the Congressional

10   Record that is displayed in the exhibit at this point?

11   A.   "Thereupon, the Senate, at 2:13 p.m., recessed subject to

12   the call of the chair and reassembled at 8:06 p.m. when called

13   to order by the Vice President of the United States."

14   Q.   So earlier in the exhibit we saw that the Senate went into

15   recess subject to the call of the chair, if that's the right

16   term, at 2:13 p.m.?

17   A.   Correct.

18   Q.   And it didn't reconvene until 8:06 p.m.?

19   A.   Correct.

20   Q.   And that's as a result of the events at the Capitol and on

21   the Capitol grounds on January 6th?

22   A.   Correct.

23        (A portion of Exhibit 503 was played.)

24        MR. VALENTINI:  I've now stopped the exhibit at time

25   mark 8 minutes and 20 seconds into the exhibit.

1    BY MR. VALENTINI:

2    Q.   Could you please read the excerpt from the Congressional

3    Record that is displayed on the exhibit at this point.

4    A.   "The recess having expired, the House was called to order

5    by the Speaker at 9 o'clock and two minutes p.m."

6    Q.   So at what time did the proceedings resume on debate on

7    the Arizona objection in the House?

8    A.   I believe that's what this is referring to, so at 9:02.

9    Q.   Did the Joint Session of Congress come back later on

10   January 6th?

11   A.   Yes.

12   Q.   And did the Joint Session of Congress come to an end on

13   January 6, 2021?

14   A.   No.

15   Q.   When did the Joint Session of Congress come to an end?

16   A.   On January 7th.

17        (A portion of Exhibit 503 was played.)

18   BY MR. VALENTINI:

19   Q.   Mr. Schwager, could you please read the excerpts from the

20   Congressional Record that is displayed on Exhibit 503 at this

21   time, which is time mark 8 minutes and 52 seconds into the

22   exhibit.

23   A.   "The Vice President.  The state of the vote for President

24   of the United States, as delivered to the President of the

25   Senate, is as follows:  The whole number of electors appointed

1    to vote for President of the United States is 538.  Within that

2    whole number, a majority is 270.  The votes for President of

3    the United States are as follows."

4         (A portion of Exhibit 503 was played.)

5    BY MR. VALENTINI:

6    Q.   You said earlier that the Joint Session of Congress ended

7    on January 7th, 2021?

8    A.   Correct.

9    Q.   Do you recall what time on January 7th the Joint Session

10   of Congress came to an end?

11   A.   3:44.

12             THE COURT:  A.m.?

13             THE WITNESS:  A.m., yes.  Thank you.

14        (A portion of Exhibit 503 was played.)

15             MR. VALENTINI:  We can take that down.

16   BY MR. VALENTINI:

17   Q.   Mr. Schwager, at what time did you go home on January 6,

18   2021?

19   A.   I think it was probably a little bit after 4 o'clock in

20   the morning.

21             THE COURT:  On January 6th or January 7th?

22             THE WITNESS:  January 7th.

23             MR. VALENTINI:  Sorry.  No further questions.

24             MS. GOETZL:  No questions, Your Honor.

25             THE COURT:  No questions?  Well, I think you are

1    excused, sir.

2              THE WITNESS:  Thank you.

3              THE COURT:  Thank you for the civics lesson.

4              THE WITNESS:  Thank you.

5              THE COURT:  So it doesn't make sense to call another

6    witness at this point.  It does not, I said.  I had said

7    earlier, maybe even yesterday, that I needed to end by 4:30

8    today.  It's now ten after four, so it's before 4:30.

9         So let me tell you what our plan is for tomorrow.  We have

10   to take a particular witness out of turn who is -- because of

11   scheduling and travel arrangements and things like that.  We

12   also have to have some discussion, the lawyers and I, before

13   you hear from that witness.  So the lawyers and I are going to

14   meet at 9 o'clock in the morning, and if you get here by -- if

15   everybody's here by 10:15, I'm hoping we can get started.  So

16   don't aim for 9:30.  Don't even pretend, even.  I mean, you're

17   all welcome earlier, but you can't start till everyone's here.

18   I hope we can start by 10:15.  So you can come in a little bit

19   later tomorrow, and tomorrow is a full day, so let's see how

20   much we can accomplish.

21        So thank you for your attention today, and keep in mind my

22   admonitions about keeping yourself limited to just what's

23   happening here in the courtroom.  Thank you.  Have a nice

24   evening, everyone.

25        (Jury out at 4:12 p.m.)

1       THE COURT:  Anything else?

2       MR. SMOCK:  No, Your Honor.

3       MR. DREHER:  Nothing from the government.

4       THE COURT:  All right.  I'll see you all tomorrow

5   morning at 9 a.m. with the witness.

6       (Recessed at 4:13 p.m.)

7

8                          * * * * * * * *

9

10      I certify that the foregoing is a correct transcript from

11  the record of proceedings in the above-entitled matter.

12

13

14      /s/Lisa G. Grimminger                April 19, 2023
        Lisa G. Grimminger, RDR, CRR, CRC    Date
15

16

17

18

19

20

21

22

23

24

25

```
 1                          I-N-D-E-X

 2

 3                     Direct   Cross   Redirect   Recross

 4

 5   WITNESSES:

 6   FOR THE PLAINTIFF:

 7   Lanelle Hawa            1092    1119    1137      1149

 8   Neal Matthews           1167    1180    1190      ----

 9   Daniel Schwager         1197    ----    ----      ----

10
                                                      Ruled
11   EXHIBITS:                            Offered      On

12   19. Text Messages between Matthews and Ulrich 1183    1185

13   400. Email - USSS Head of State Notification
          Vice President Pence, Mrs. Pence and
14        daughter [REDACTED]                  1096       1096

15   401. Secret Service Head of State
          Notification Worksheet               1099       1099
16
17   402. Vice President Relocation Video      1111       1111

18   500. U.S. Constitution--12th Amendment    1209       1209

19   501A. Title 3, United States Code, Section 15 1210    1210

20   501B. Title 3, United States Code, Section 16 1210    1210

21   501C. Title 3, United States Code, Section 17 1210    1210

22   501D. Title 3, United States Code, Section 18 1210    1210

23   502. Senate Concurrent Resolution 1       1213       1213

24   503. Video Montage--including Congressional
          Record and video footage from House
25        and Senate                           1222       1223
```

1243

```
 1
        EXHIBITS: (cont'd.)                    Offered      Ruled
 2                                                           On

        506. Congressional Record - Senate
 3           (Vol. 167, No. 4, S13, S14, S18)     1223        1223

 4      507. Congressional Record - House
             (Vol. 167, No. 4, H75, H76, H84, H85)  1223     1223
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```