```
 1                BEFORE THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,      )    Case Number 1:21CR123
                                     )
 4              Plaintiff,           )
                                     )
 5    vs.                            )
                                     )    Washington, D.C.
 6    VITALI GOSSJANKOWSKI,          )    March 8, 2023
                                     )    9:07 a.m.
 7              Defendant.           )

 8

 9                              VOLUME VII
                        TRANSCRIPT OF JURY TRIAL
10              BEFORE THE HONORABLE PAUL L. FRIEDMAN
                 UNITED STATES SENIOR DISTRICT JUDGE
11

12

13

14

15

16

17

18

19

20    COURT REPORTER:              Ms. Lisa Grimminger, RDR, CRR, CRC
                                   100 Centennial Mall North
21                                 Room 587
                                   Lincoln, NE 68508
22                                 (402) 437-1908

23

24
      Proceedings recorded by stenotype shorthand.
25    Transcript produced by computer-aided transcription.
```

```
 1                          A-P-P-E-A-R-A-N-C-E-S

 2     FOR THE PLAINTIFF:            MR. FRANCESCO VALENTINI
                                     DOJ-CRM
 3                                   950 Pennsylvania Avenue NW
                                     Washington, D.C. 20530
 4
                                     MR. ADAM MICHAEL DREHER
 5                                   DOJ-USAO
                                     601 D Street NW
 6                                   Washington, D.C. 20001

 7                                   MS. KAREN E. ROCHLIN
                                     DOJ-USAO
 8                                   99 Northeast 4th Street
                                     Miami, FL 33132
 9
       FOR THE DEFENDANT:            MR. EDWARD SMOCK
10                                   MS. CELIA GOETZL
                                     FEDERAL PUBLIC DEFENDER FOR D.C.
11                                   625 Indiana Avenue NW
                                     Suite 550
12                                   Washington, D.C. 20004

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (At 9:07 a.m. on March 8, 2023; with counsel for the

2    parties and the defendant present; WITHOUT the jury:)

3        COURTROOM DEPUTY:  This is Case Number 21-123, United

4    States versus Vitali GossJankowski.  For the United States I

5    have Francesco Valentini, Adam Dreher, and Karen Rochlin.  For

6    defendant I have Edward Smock and Celia Goetzl.  Our American

7    Sign Language interpreters are Jeremy Brunson and Carla

8    Mathers, and our court reporter today is Lisa Grimminger.

9        All parties are present.

10        THE COURT:  Good morning, everybody.  So we agreed

11    yesterday at the government's request that I would hear from

12    Dr. Kroll outside the presence of the jury this morning,

13    particularly with respect to the last two opinions.  I don't

14    think we have to go through everything he's going to tell the

15    jury, but those are the areas I'm concerned about.  I'll leave

16    it to counsel's discretion if you feel the need to explore

17    anything else outside the presence of the jury, but I think

18    that's where I am.

19        And that doesn't mean that, as is often done with an

20    expert in front of a jury, that the government -- too many

21    double negatives in the sentence I'm about to say.  The

22    government may still voir dire the witness in the presence of

23    the jury with respect to his qualifications if they think

24    that's appropriate later.

25        So Mr. Smock, is the most logical thing for you to put the

Dr. Kroll - Direct (Smock)                                      1247

1   witness on the stand and to focus on the things that I've

2   raised concerns about and see where we are?  And then there's

3   cross and redirect.  We can excuse Dr. Kroll and have a brief

4   argument, and then I can make a ruling.

5           MR. SMOCK:  Certainly.  And Dr. Kroll is here, and I

6   guess what I would just ask -- I won't be offended.  If at some

7   point while I'm providing his background the Court gets bored

8   and wants me to move on, I will of course move on.

9           THE COURT:  I've read his report.  I've read all the

10  briefs on this.  I've skimmed his CV.  I haven't looked at --

11  read through the title of every single article.

12          MR. SMOCK:  Well, it's 109 pages.  I'm surprised that

13  you didn't take the time.  So shall I call Dr. Kroll?

14          THE COURT:  Yeah.  Let's go ahead.

15          MR. SMOCK:  Defense calls Dr. Mark Kroll.

16          DR. MARK KROLL, DEFENDANT'S WITNESS, SWORN

17          THE COURT:  Good morning.

18          THE WITNESS:  Good morning, Your Honor.

19          THE COURT:  Have a seat.  Take off your mask.  Pour

20  yourself some water.  If you want to, speak into the

21  microphone.

22                       DIRECT EXAMINATION

23  BY MR. SMOCK:

24  Q.   Good morning, Dr. Kroll.

25  A.   Good morning, sir.

Dr. Kroll - Direct (Smock)                                    1248

1    Q.    Can you tell us what you do for a living.

2    A.    I'm a biomedical scientist.

3    Q.    And what does that mean?  What does it mean to be a

4    biomedical scientist?

5    A.    It's mostly pretty boring stuff.  Biomedical science and

6    the study of a human body as a physics problem; so as a

7    scientist I do research, write papers, write books, and give

8    lectures.

9    Q.    And do you have a particular specialty within the

10   biomedical field?

11   A.    I do.  My specialty is in bioelectricity with a special

12   focus on the effects of --

13             THE COURT:  Could you speak a little more into the

14   microphone.  I'm having trouble hearing.

15   A.    My specialty is bioelectricity with a focus on effects of

16   the electrical shocks on a human body.

17   BY MR. SMOCK:

18   Q.    And can you tell us about your educational background.

19   A.    My undergraduate degree is in mathematics.  I have a

20   master's and PhD in electrical engineering and an MBA.

21   Q.    And can you tell the Court a little bit about your career.

22   A.    In 1970, I started working in pacemaker research working

23   for Medtronic when I was a student, which is now the Microsoft

24   of medicine.  I then finished up in school, worked at Cherne

25   Medical, which was doing electrocardiographic improvements and

Dr. Kroll - Direct (Smock)                                        1249

1   improved EKG with 22 leads.  I went from there to Angeion,

2   which is developing a small implantable defibrillator.  At the

3   same time I have co-founded SurVivaLink, which makes a

4   single-button defibrillator that you see in a lot of airports.

5        And then I went to St. Jude Medical, now called Abbott

6   Labs, which is the number two pacemaker company in the world,

7   and I ran engineering worldwide for them for a while, and then

8   I was a chief technology officer.  In 2005, I retired to spend

9   more time doing teaching and research.

10  Q.   And are you affiliated with any educational institutions?

11  A.   Yes.  I'm an adjunct full professor biomedical engineering

12  at the University of Minnesota and a adjunct full professor,

13  biomedical professor, at Cal Poly.  I should stress that's more

14  of an emeritus role in which I do some research with the head

15  of the department and occasionally give a Zoom lecture there.

16  Q.   Do you do research on the effects of electrical shocks on

17  the human body?

18  A.   I do.

19  Q.   Can you tell us a little bit about that research.

20  A.   The primary area of that research was in defibrillation.

21  How do you improve defibrillation shocks?  We give

22  defibrillation shocks to reverse a lethal condition called

23  ventricular defibrillation.  So if you've ever seen anyone say

24  "clear" and they put the patches on someone that's in a cardiac

25  arrest, they give that shock.  Those devices primarily use my

1    theories for optimizing that shock at this point; so that was

2    my primary area of research, which was therapeutic shocks.

3    Also done research in traumatic shocks looking at what can be

4    lethal and what can be injurious from a certain type of shock.

5    Q.   And have you also done research on conducted electrical

6    weapons?

7    A.   I have.

8    Q.   And can you just clarify for the Court what a conducted

9    electrical weapon is.

10             THE COURT:  Conductive?

11             MR. SMOCK:  Conducted electrical weapon.

12             THE COURT:  Conducted electrical weapons.

13   A.   The easiest way to describe them is to use the trademark

14   term Taser by which most people would refer to them even though

15   that's only one of seven brands sold worldwide, and it is

16   primarily used by launching two probes to connect with the

17   human body where it becomes a muscle stimulator, and the hope

18   is that the muscles of the violent offender are locked up and

19   the person falls over, drops the knife.

20        And the benefit of this is that it has reduced fatal

21   police officer shootings by two-thirds, so that's the primary

22   electrical weapon that we all think about, and it's the primary

23   one that I've worked on.  That weapon can also be used as a

24   stand-alone stun gun by removing the probes so it does not

25   launch any probes and wires.

1    BY MR. SMOCK:

2    Q.    So in other words, a Taser can be used to shoot probes but

3    also to apply to a person's body; right?

4    A.    Yes, sir.

5    Q.    Have you written peer-reviewed publications specifically

6    about conducted electrical weapons?

7    A.    I have.

8    Q.    Can you just give us a general overview of some of those.

9    A.    I have some of them cited in my ex report, if it's okay

10   to look.

11          MR. SMOCK:  I would ask that he be allowed to just

12   look at his report to refresh his recollection.

13          THE COURT:  Sure.

14   A.    I have a few examples in here.  Here's a paper in the

15   *International Journal of Legal Medicine*, 2018:  Adrenergic and

16   metabolic effects of electrical weapons review on meta-analysis

17   of human data.  Here's a paper from *Forensic Science Medicine*

18   *and Pathology*, also from 2018:  The Cardiac and Skeletal Muscle

19   Effects of Electrical Weapons.  Here's a paper from 2017:

20   Fatal and Nonfatal Burn Injuries With the Electrical Weapons

21   and Explosive Fumes.

22          One of the most horrible things that happens, if someone

23   has gasoline on their clothing either from a suicide attempt or

24   from an accident and an electrical weapon that ignites that

25   gasoline, and obviously bad things happen then.  But I've done

Dr. Kroll - Direct (Smock)                                    1252

 1    maybe 50 papers and abstracts and book chapters on electrical

 2    weapons.

 3    BY MR. SMOCK:

 4    Q.    And have you done presentations at conferences and things

 5    of that nature related to conducted electrical weapons?

 6    A.    I have.  I've lectured in numerous countries on electrical

 7    weapons.

 8    Q.    And are you on any committees that are related to

 9    electrical weapons and the interaction of electricity in the

10    human body?

11    A.    Yes.

12    Q.    Can you tell about a couple of those.

13    A.    The most relevant is the ANSI standard for stun guns and

14    electrical weapons.

15           THE COURT:  What's it called again?

16           THE WITNESS:  ANSI, American National Standards

17    Institute.  They're the primary standards organization in the

18    United States of America.  They have thousands of standards

19    covering everything from bicycle helmets to safety glasses, and

20    they have -- of course have a standard on stun guns and

21    electrical weapons, so I sit on that committee.

22           The most prestigious committee I sit on is TC64 MT4, which

23    is a meaningless number except it is the premier committee for

24    the International Electrical Technical Commission, and we set

25    the safety standards for electrical shocks, and this is adopted

Dr. Kroll - Direct (Smock)                                    1253

1    by about 100 countries worldwide.  This allows us to determine

2    whether a certain type of shock would be injurious or fatal.

3    BY MR. SMOCK:

4    Q.   And do you serve as an advisor to any companies that

5    produce conducted electrical weapons?

6    A.   I do.  The first is not obvious.  It's Amorok,

7    A-M-O-R-O-K, and they make the very sophisticated virtual

8    security guards which include cameras and electric fences to

9    protect sensitive expensive buildings such as Federal Express

10   warehouses, and the electrical weapon definition includes

11   electric fences.

12        The most interesting one is that of Axon.  Axon makes the

13   body cameras you typically see in the upper right-hand corner

14   of police videos, and they also make the Taser brand of

15   electrical weapons; so I sit on their corporate board and their

16   scientific and medical advisory board.

17   Q.   What role do you play for Axon?

18   A.   I give them advice on improving the safety and

19   effectiveness of their electrical weapons.

20   Q.   Now, have you received any awards in the field of

21   biomedical engineers?

22   A.   I have.

23   Q.   And can you tell us about maybe one of them.

24   A.   The one I'm most proud of is the top international award

25   which I received in 2010, the career achievement award I

Dr. Kroll - Direct (Smock)                                    1254

1    received in Buenos Aires, Argentina, and that is the two top

2    awards.  One is for an academic and one is for career, and I

3    received the career achievement award.  That would be the one

4    I'm most proud of.

5    Q.   And now I want to shift to sort of another line of

6    questioning.  Dr. Kroll, you are not a medical doctor.  Am I

7    right?

8    A.   That's correct.

9    Q.   Can you -- you're a PhD doctor, and I'd just ask you to

10   sort of explain to the Court and help the Court understand the

11   difference between a doctor like yourself, who specializes in

12   biomedical sciences, and an MD, a doctor who's a medical

13   doctor.

14   A.   There are three primary differences.  The first is the

15   most obvious.  We are not trained or licensed to treat and

16   touch patients such as a health care professional is, whether

17   that's a medical doctor, nurse, chiropractor, dentist, EMT.

18   Second, we do research that we hope will help thousands, if not

19   millions, of patients, whereas a physician typically works on

20   one patient at a time.  The third difference is we give advice

21   to physicians so they can give advice to patients.

22   Q.   And have you researched the training that's received by

23   medical doctors as to what the effect of electricity on the

24   human body is?

25   A.   I have.

1    Q.   Can you tell us about that.

2    A.   American medical schools all teach the same examination,

3    and they are required to learn three sentences about electrical

4    injury and risk.  The first is alternating current can cause

5    fibrillation; next, lightning strikes can cause asystole or

6    flatline; and third, electrical shocks can cause burns.

7    Q.   Is that pretty much the extent of it?

8    A.   That's the extent of it.

9    Q.   So what are the different roles for an MD versus someone

10   like you, a PhD biomedical scientist, regarding electrical

11   injury?

12   A.   We don't treat electrical injury.  I publish on how to

13   treat and how to diagnose it.  If someone came in with a big

14   electrical burn in a hospital, they would be treated by an

15   emergency physician, but they don't -- they're not able to

16   diagnose exact cause or if it really was an electrical burn,

17   for example, and one of the biggest problems is in the majority

18   of cases electrocution, which is a fatal injury, does not leave

19   a mark, and that's where our scientific analysis comes in as

20   well.

21   Q.   So that's where you can provide assistance to a medical

22   doctor; is that right?

23   A.   That's -- yes, through our publications and lectures and

24   our International Standard 60479, which tells how to analyze

25   electrical shocks or injurious potential.

Dr. Kroll - Direct (Smock)                                    1256

1    Q.   So in your role as a biomedical scientist, have you taught
2    or lectured to medical doctors?
3    A.   Yes.
4    Q.   Can you tell a little bit -- give us a little detail about
5    that.
6    A.   I have lectured in 38 countries and most of the teaching
7    hospitals in the United States.
8    Q.   And have you been recognized in the field of medicine for
9    your biomedical contributions?
10   A.   I have.  I received the high honor of fellow from the
11   American College of Cardiology for my teaching of
12   cardiologists, and I received the high honor of fellow from the
13   Heart Rhythm Society, which deals with a subspecialty of
14   cardiology called electricity physiology.  These are the people
15   that do ablations and put in pacemakers and defibrillators, and
16   they gave me the fellow honor for my scientific contributions
17   to their profession.
18   Q.   And have you been invited to provide chapters for
19   textbooks that are used by forensic physicians?
20   A.   Yes.  Many of the top textbooks that the forensic
21   pathologists use have a chapter by me or me and an associate on
22   electrical injuries or on electrical weapons.
23   Q.   I want to talk to you now specifically about your
24   expertise determining whether a device can cause serious bodily
25   injury or death.  Have you published peer-reviewed papers on

Dr. Kroll - Direct (Smock)                                          1257

1    electric shocks and electrical injury?

2    A.   Yes.

3    Q.   And are you on -- well, let me ask you:  You mentioned the

4    International Electrotechnical Commission that you sit on.

5    What does that commission do?

6         Actually, let me rephrase.  Does that commission play any

7    role in determining whether a particular amount of electrical

8    charge in a device has the potential to cause injury or death?

9    A.   Yes.

10   Q.   Can you explain how that comes up in your work with the

11   committee.

12   A.   Our standard, which has hundreds of pages, is recognized

13   in about 100 countries around the world.  Any country that you

14   could generally name recognizes our standard, and it explains

15   exactly how you analyze the risk of a shock or the effects of a

16   shock after it happened starting with the voltage, the pathway,

17   the resistance, the frequency, and the duration.  Then our

18   standard tells you whether this could be injurious or fatal or

19   painful.

20   Q.   Is there a general understanding in the field of

21   bioelectricity about how much electrical charge can cause

22   injury or death?

23   A.   Yes.

24   Q.   And about how much electrical charge applied to a person

25   by an electrical device like a stun gun or some other

1    electrical device would likely cause death?

2    A.   The conservative standard is 9,000 microcoulombs, and

3    that's based on the most likely scenario for a short shock that

4    would cause death.  And I say "short shock" as opposed to the

5    continuous part that comes out of a wall outlet, and that sad

6    scenario used to happen a hundred years before electric fences

7    were regulated where a 12-year-old child would walk barefoot in

8    the rain and come up in contact with an electric fence in their

9    chest and be electrocuted.  And so our standard has a safety

10   level 3,000 microcoulombs for safety and 9,000 for high risk of

11   cardiac arrest.

12   Q.   And we'll get into this later today, but just so the Court

13   has an understanding, you said 3,000 to 9,000 microcoulombs.

14   Am I right?

15   A.   Yes.

16   Q.   And what was the electrical charge produced by the

17   electric device that Mr. GossJankowski had?

18   A.   It was about six-tenths, about two-thirds of a

19   microcoulomb.

20            THE COURT:  Two-thirds of what?

21            THE WITNESS:  Two-thirds of a microcoulomb.

22   BY MR. SMOCK:

23   Q.   So 0.64 or something like that?

24   A.   Correct.

25   Q.   Now, how can an electrical charge cause an injury?

1    A.    It ironically takes -- or I should say counterintuitively,

2    it takes more charge to cause an injury than it does to cause

3    death.

4    Q.    Can you explain why that is.

5    A.    Electrical injury -- nonfatal electrical injury is a burn,

6    and a burn requires heating.  So you think about taking a hair

7    dryer, which is 1500 watts, and you have to apply that for

8    many, many seconds on bare skin to even get discomfort from the

9    heat.  If you held it on there for a long, long time, you'd

10   eventually burn the skin.  So it takes a tremendous amount of

11   electrical current, electrical power to be more precise, to

12   cause a burn, and it takes a lot less to electrocute.

13   Q.    And you said that that number is in the thousands of

14   microcoulombs, though?

15   A.    Well, it takes about 9,000 microcoulombs is what it would

16   take to kill you if it landed near your heart or it was -- the

17   current passed by your heart, and so it's much more than that,

18   much stronger shock than that, to cause burns.

19   Q.    Did you help to produce a book about electrical weapon

20   wounds called the *Atlas of Conducted Electrical Weapon Wounds*

21   *and Forensic Analysis*?

22   A.    I did.

23   Q.    And did one of the chapters in that --

24         THE COURT:  What was it called?

25         MR. SMOCK:  The *Atlas of Conducted Electrical Weapon*

1    *Wounds and Forensic Analysis.*

2            THE COURT:  Okay.  Is that on page -- beginning on

3    page 42 of the forensic analysis of conducted electrical

4    weapons?

5         That's the one.  Okay.

6            MR. SMOCK:  That's likely one of the many

7    publications that I am not sure where it is on the --

8            THE COURT:  Page 42 in the CV.

9    BY MR. SMOCK:

10   Q.   Okay.  Now, did one of the chapters in that book address

11   wounds that are caused by application of a Taser conducted

12   electrical weapon?

13   A.   Yes.

14   Q.   Now, again, we can get into this later, but how about --

15   how many microcoulombs does an actual Taser device deliver?

16   A.   Well, the specific weapon used there was the X26, which is

17   the most powerful one that you can even buy on the used market

18   today, and that was about 120 microcoulombs per pulse.

19   Q.   And again, how much charge did the Vipertek and Police 916

20   deliver?

21   A.   About two-thirds of a microcoulomb.

22   Q.   So would it be fair to say that a Taser is more than 150

23   times more powerful than the device that you've identified that

24   Mr. GossJankowski possessed?

25   A.   Yes.

1   Q.   Now, did the book that we've referred to include

2   photographs of the skin of people who had a Taser applied

3   directly to their skin?

4   A.   Yes.

5   Q.   And that's -- that's -- I think we talked about this

6   before.  When it is used not to shoot probes but in -- what is

7   it called, drive mode?  Is that what it's called?

8   A.   Drive stun mode.  So the real electrical weapons the

9   police officers use has an appendage on the front that shoots

10  the probes.  That can be removed, and the weapon can be used as

11  a stun gun by directly applying it to the skin.

12          THE COURT:  So when we see situations on television

13  news or whatever police Tasering somebody, and first, am I

14  correct the theory is that if used properly, it will disable

15  the person but not kill them or seriously injury them?

16          THE WITNESS:  That's the theory, yes, and it usually

17  works that way.  Not always.

18          THE COURT:  Usually works that way.  So that's a

19  Taser.  You've just described a Taser, and you've described a

20  Taser where they can remove one piece of it?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  And what do we see most police officers

23  doing and using when they try to disable someone on the street

24  rather than shoot him or do something else?

25          THE WITNESS:  It's with the probes, because the drive

1    stun has proven not to be very effective, the direct contact,

2    because 80 percent of the people that resist arrest have an

3    elevated pain threshold either through a psychotic break or

4    recreational drugs or alcohol; so the new model that came out

5    this year does not even have the stun capability.  It's just

6    not proven to be very effective.

7                THE COURT:  Doesn't have the stun capability?

8                THE WITNESS:  Correct, yes, sir.  Only the probes.

9                THE COURT:  And the probe does what?

10               THE WITNESS:  Well, the probes land hopefully about a

11   foot apart, so on the muscle stimulation pulses are delivered.

12   They go down into the muscle layer, so they lock up the muscle

13   especially in the back, because that's where the nerves that

14   control your legs and arms come from, and they will lock up the

15   muscles.  The person freezes.

16               THE COURT:  So this is totally irrelevant, but when

17   we see that somebody dies as a result of that, is it usually

18   because it's used improperly or too close, or is it that they

19   happened upon a particularly vulnerable individual?

20               THE WITNESS:  Both yes and no.  Both.  The biggest

21   problem is fatal falls, 'cause if you get a good muscle lockup

22   and you're standing on an elevated surface or you're running

23   and you fall, you can have a significant head injury, and I

24   published on that 'cause I like to publish on the bad stuff,

25   and there have been over 20 deaths from that.  There have been

Dr. Kroll - Direct (Smock)                                    1263

1    ten deaths from the burns.  As far as the electrocution goes,

2    we don't believe that's happened.  That's an area of debate,

3    maybe a couple of cases, but I don't think that's occurred yet

4    in the 6 million field uses.

5                    THE COURT:  Thank you.

6    BY MR. SMOCK:

7    Q.    So Dr. Kroll, am I right that the point of a Taser

8    electrical weapon is to lock up the muscles briefly?

9    A.    That's the primary usage, yes, sir.

10   Q.    And the purpose is not to cause an injury.  Am I right?

11   A.    That's correct.  The probe does go into the skin, and it

12   leaves a temporary wound from the penetration of the skin.

13   That is technically not classified as an injury any more than a

14   flu shot.  This functions almost like a shock.  A thin wire

15   goes in, and it comes out.

16   Q.    And I'll get to that in a moment.  I moved away from what

17   I was about to show you, but the one thing I wanted to make

18   clear is given the charge that was emitted by this Vipertek and

19   Police 916 device, did it have the capacity to even lock up a

20   person's muscles?

21   A.    No.

22   Q.    So let me get back to that -- the book that we were

23   describing.  I think we already established that that book had

24   photographs of the skin of people who had had a Taser applied

25   to it.  Am I right?

1    A.   Yes.

2           MR. SMOCK:  I'm going to ask to show Dr. Kroll

3    Defense Exhibit 20, which is not in evidence.

4    BY MR. SMOCK:

5    Q.   Is that the image from the book that I discussed?

6    A.   Yes.

7           MR. SMOCK:  I'd move to admit Defense Exhibit 20.

8           THE COURT:  For the purpose of this hearing?

9           MR. SMOCK:  Yes, Your Honor.

10          MR. DREHER:  I just want to clarify, Your Honor.

11   There was two images.

12          MR. SMOCK:  That's true.  Are you able to scroll to

13   the other one?

14          MR. DREHER:  Not that it changes the mind of Your

15   Honor, there's no -- for the record, there's no objection for

16   this hearing.

17          MR. SMOCK:  So Adam, if you can scroll to the first

18   image.

19   BY MR. SMOCK:

20   Q.   Dr. Kroll, can you tell the Court what this image depicts.

21   A.   Yeah.  This shows the effects of the X26 in drive stun

22   mode and applied to a volunteer for five continuous seconds and

23   pushed in hard.

24   Q.   And can you describe the effects that you can see there.

25   A.   There is a blanching effect which is partially caused by

Dr. Kroll - Direct (Smock)                                    1265

1    the pressure pushing blood away from the skin and also the

2    start of a sunburn, essentially a sunburn as it's informally

3    referred to.

4              MR. SMOCK:  And can we move, Adam, now to the second

5    image.

6    BY MR. SMOCK:

7    Q.  Can you describe --

8              MR. SMOCK:  And can you move it up a little bit.

9    BY MR. SMOCK:

10   Q.  Can you describe what this image depicts.

11   A.  This is the healing of the -- forgive the informality, but

12   what we refer to as the sunburn.  So this is the healing of the

13   sunburn after 48 hours maximal effect, and you see the square

14   sheet of the electrodes in the skin.

15   Q.  And again, we've established that this is the effects of a

16   Taser, which is more than 150 times as powerful as the device

17   that we're speaking of in this case?

18   A.  I agree.

19             MR. SMOCK:  You can take that down.

20   BY MR. SMOCK:

21   Q.  Now, Dr. Kroll, I'm sort of wrapping up with this portion.

22   Have you ever been qualified as an expert in the field of

23   electrical weapons and the effects of electricity on the human

24   body?

25   A.  I have.

Dr. Kroll - Cross (Dreher)                                    1266

1    Q.    About how many times?

2    A.    At least two dozen.

3    Q.    And in those cases did you offer opinions about whether a

4    particular charge could cause injury or death?

5    A.    Yes.

6    Q.    Who typically retains you as an expert when you testify?

7    A.    My most common client now is the United States Department

8    of Justice, both civil defense and the criminal division.

9    After that it would be Chicago PD, LAPD, LA Sheriff's

10   Department.  I had a case with the New York Police Department.

11              MR. SMOCK:  Your Honor, those are all the questions I

12   had.  We believe that forms the basis for offering Dr. Kroll as

13   an expert in the effects of electricity on the body and

14   conducted electrical weapons.

15              THE COURT:  Okay.  Mr. Dreher.

16                        CROSS-EXAMINATION

17   BY MR. DREHER:

18   Q.    Good morning, sir.

19   A.    Good morning, sir.

20   Q.    You just testified that your most common client is the

21   Department of Justice?

22   A.    I'm thinking of clients that have hired me more than a few

23   times, and I think I've done probably six -- probably six cases

24   for the U.S. Department of Justice.

25   Q.    Now, this doesn't include testimony, though, does it?

Dr. Kroll - Cross (Dreher)                                    1267

1    A.   How many of those went to testimony?  One did for the

2    criminal division in Las Vegas, and I believe the other ones

3    went to deposition.  You know what?  Two-thirds of the time it

4    doesn't go to deposition, at least in civil defense, so I can

5    certainly remember one criminal testifying in federal court in

6    Las Vegas.

7    Q.   Are you aware that that was a sentencing phase that you

8    testified at that point?

9    A.   That was a sentencing phase, but causation was a critical

10   issue there.

11   Q.   Are you aware of what the finding was after that

12   sentencing?

13   A.   No.

14   Q.   No?

15   A.   It was kind of quiet after COVID, but I'd love to hear.

16   Q.   Now, sir, I want to get back to sort of your training and

17   expertise in this, and I did have an opportunity to review your

18   CV, and I will say I'm glad to see a fellow Spartan anywhere I

19   can go, but one question I do have is:  Are there parts of the

20   body that are not affected by electricity?

21   A.   Well, the body is controlled by electricity and hormones,

22   so I couldn't say there's anywhere in the body that's not

23   affected by electricity unless you want to restrict that

24   portion to electric stimulation that's applied externally or to

25   electrical shocks.

Dr. Kroll - Cross (Dreher)                                    1268

1    Q.   Now, is that more of the water content within the human

2    body, or is that the actual electricity being transmitted from

3    the brain to different organs?

4    A.   Regarding what?  I would like clarification of your

5    question.

6    Q.   What is the focus of your studies?  Is it more how

7    electricity affects different areas of the body, or is it more

8    the electrical output of the body on itself?

9    A.   That's a very good distinction because it kind of runs two

10   ways.  The body produces electricity, and we can sense that

11   externally most commonly through an EKG, and that was my work

12   with training medical.  That's very little of my work now.

13   That's probably less than 10 percent in the last ten years.  My

14   primary focus now is injecting electricity into the body either

15   through wires or through electrodes attached to the skin.

16   Q.   So is it fair to say, then, that more recently you've

17   moved away from sort of the body's production of its own

18   electricity?

19   A.   That's correct.

20   Q.   Now, is the focus of your research now more on the effects

21   of electricity being implanted into the body on specific parts

22   of the body?

23   A.   Well, to just think about what I'm doing this year, it is

24   a new type of pacemaker, and I'm on the scientific advisory

25   board for a startup for reducing blood pressure, so that would

Dr. Kroll - Cross (Dreher)                                    1269

1    be stimulating the heart.  I'm actively involved in the use of

2    electricity to treat cancer, solid tumors, and we're in the

3    middle of clinical trials in Singapore and New Zealand.

4         I'm actively working in the area of electrocution risk,

5    the electric car manufacturers, and I've been working with

6    Mercedes and Volkswagen and Ford, Europe, to determine the

7    safety of high voltages of direct current so mechanics or EMTs

8    don't get shocked, so that would be external hand to hand or

9    hand to foot, and we're working on the safety standard for

10   portable charging stations so some child that walks up to a

11   portable electric car charging station and puts their tongue

12   into the nozzle doesn't get killed.

13        I'm very active on the work on electric weapons, improving

14   them, so right now it is both external and internally applied

15   electrical stimulation and shocks.

16   Q.   And I do want to speak first of the internal electrical

17   shocks.  Is the heart the most common injury in electrical

18   shocks?

19   A.   No.  Well, fatal or nonfatal?

20   Q.   So for fatal shocks resulting from electricity internally

21   within the body, is the heart of greatest concern?

22   A.   When you said "internally," referring to shocks applied

23   internally or shocks applied externally with the internal

24   effect?

25   Q.   So on direct examination you were provided with an exhibit

 1    showing what I would consider an external injury from
 2    electrical shocks.  Would you agree with that assessment?
 3    A.    Yes, and whether or not a sunburn would be considered
 4    injury depends upon the threshold that you're using, but yes, I
 5    basically agree.
 6    Q.    Now, an internal injury, would that also look the same if
 7    a person were cut open?
 8    A.    Internal injuries -- and I'm not trying to dodge your
 9    question.  This is a fascinating area that we're going to be
10    arguing about in our main meaning today I see, but internal
11    injuries from electrical shocks are extremely rare.  We see it
12    with lightning, but from man-made electricity it generally
13    doesn't occur.  With power line shocks we can sometimes get
14    nerve injury.  I think if you want me to help you with the
15    question, I'd be happy to do so in the interest of time as far
16    as the heart goes.
17    Q.    Internal injuries within the body caused by electricity,
18    is that something you're able to see?
19    A.    Rarely.  With lightning we can see it.  With power line
20    shocks we can see very, very subtle effects on the heart.
21    We're talking 20,000-volt shocks.  There's a new study out of
22    Korea by Park.  Did you want this much detail?
23    Q.    Well, I guess my question is:  You can only see those if
24    the patient has died; correct?
25    A.    No.  That's incorrect.

Dr. Kroll - Cross (Dreher)                                    1271

1    Q.   How is it that you would be able to study an injury on a
2    living patient internally?
3    A.   For high-voltage shocks, standard procedure is to give
4    them an echocardiogram to make sure that their heart is pumping
5    normally, and even with 20,000-volt shocks -- the Park study is
6    the best one out of Korea.  They see that the pumping is
7    basically normal in terms of ejection fraction.  It's pumping
8    the same amount of blood out, but they can see very subtle
9    changes in the speed of the contraction.
10   Q.   Would you also see scarring or any other damage to the
11   tissue?
12   A.   You could.  I think what you meant to say, would it be
13   possible to see scarring if it existed?  I'm assuming that's
14   what you meant; right?
15   Q.   With the EKG, correct.
16   A.   EKG, rarely.  EKG shows heavy scarring after a heart
17   attack.  We see a Q wave, but a echocardiogram would give you
18   much more subtle detection capability if you had massive
19   scarring.  If we're looking for real scarring, and we don't see
20   this in electrical shocks, you would go with either a
21   gadolinium-enhanced magnetic resonance imaging or technetium-99
22   single-photon emission computed tomography for scarring, and
23   that's very good for picking up the scarring after a heart
24   attack.  We don't see a scarring from a shock in the heart.
25   Q.   Now, when you say "heart attack," do you mean cardiac

Dr. Kroll - Cross (Dreher)                                        1272

1   arrest?

2   A.    No.   They are different.   Would you like me to explain the

3   difference?

4   Q.    No.   What I'm trying to understand, then, is a heart

5   attack certainly deals with the plumbing, if I remember your

6   prior testimony.

7   A.    Yes.

8   Q.    So why is it that you would notice scarring on a problem

9   with the plumbing when it seems that your focus is electricity?

10  A.    I was referring to your broader question, can we pick up

11  scarring in the heart by external testing in live patients.

12  Q.    So in other words, in using an MRI, you would be able to

13  see scarring internally?

14  A.    Yes.

15  Q.    Now, have any of your studies produced any sort of MRI

16  imaging after someone has been touched with one of these

17  weapons?

18  A.    No, and that -- such a study would be unethical because we

19  know that's impossible.

20          THE COURT:   Say that again.

21          THE WITNESS:   Such a study would be unethical because

22  we know such an injury would not be possible and because you

23  couldn't -- I couldn't get it through my ethics committee at

24  the University of Minnesota.   You couldn't get it through

25  George Washington University because you have to show some

1    linkage, either a mechanistic argument or animal studies,

2    before you could get to that.

3    BY MR. DREHER:

4    Q.   So, sir, earlier on direct you testified there were

5    studies of patients laying down and having conducted energy

6    weapons placed on their skin for five-second periods; right?

7    A.   Correct.

8    Q.   So ethically that is possible?

9    A.   That's correct.

10   Q.   So why is it unethical to do the same for internal

11   injuries?

12   A.   Well, it's not unethical because of risk of injury to the

13   patient.  It would be considered a risk of -- it would be

14   considered unethical because there's nothing to be gained from

15   the use of those expensive studies.  Even 20,000-volt power

16   line shocks are not going to cause scarring in the heart, so we

17   know that the little stun gun is not going to cause scarring of

18   the heart.  The current doesn't get down that deep for

19   starters.

20   Q.   Okay.  So let me just back up for a second, then.  You

21   have not performed any studies using MRIs to determine whether

22   or not there is scarring internally because you already know

23   that there won't be scarring; correct?

24   A.   Well, that applies to me and it applies to researchers

25   around the world that are interested in electrical weapons, so

Dr. Kroll - Cross (Dreher)                                    1274

 1    you're correct that such a study has never been done and never

 2    will be.

 3               THE COURT:  For the reason he states, because you

 4    already know the answer?

 5               THE WITNESS:  Well, we know how much electrical shock

 6    it takes to cause even the most minor cardiac injuries.  No.

 7    It doesn't take much electricity to kill you, defibrillate.

 8    That's why we have the GFI protectors in our bathrooms.  But

 9    for actually causing mechanical damage to the heart, scarring,

10    you would almost have to fry the whole body before that

11    happened.

12    BY MR. DREHER:

13    Q.   Now, outside of the heart, are the lungs also affected by

14    electricity?

15    A.   I'm not aware of any data that suggests that the lungs

16    would be affected.  They are very resistive, about 2,000 ohm

17    centimeters.  They do not conduct electricity so they're very

18    unlikely to be affected by it.

19    Q.   And are you familiar of any of the other major organs that

20    would be affected by electricity?

21    A.   Well, the first one, your big concern is a fatality,

22    fibrillation, electrocution.  That's the heart.  It's not a

23    structural thing.  It doesn't cause scarring.  It messes up the

24    electrical system.  It's like your computer getting locked up

25    and you have to do a control-alt-delete.  So if you put that

Dr. Kroll - Cross (Dreher)                                    1275

1    aside and we look for what can be affected by electrical

2    shocks, with very strong electrical shocks you can have burns

3    and you can have nerve damage.  The nerves are all based on

4    electricity, and they're somewhat sensitive to strong

5    electrical shocks.

6    Q.   So, sir, I'm going to ask my question again.  Are any

7    other major organs beside the heart and the lungs affected by

8    electricity?

9    A.   Did you want to restrict that to electrical stimulation,

10   natural physiologic electrical control, or just traumatic

11   external shocks?

12   Q.   I would like to limit it to your knowledge of whether

13   electricity affects any other major organ in the human body.

14   A.   Then I will answer all three parts.  Number one,

15   electrical control, yes.  The brain controls all the organs'

16   electrical control through both the sympathetic and the vagal

17   nervous system.

18        Number two, with electrical stimulation we can affect

19   those organs primarily with wires put in them, so we have

20   stimulators for the stomach, the intestines, the heart, even

21   for breathing.

22        And the third, for external shocks, before those organs

23   would be damaged by strong external shocks, the body is just

24   about fried, and I hate to be so informal and macabre, but it

25   takes an enormous amount of electrical shock to cause internal

Dr. Kroll - Cross (Dreher)                                    1276

 1    damage because the shock tends to be carried by the external

 2    muscles, the skeletal muscles.  They tend to travel outside of

 3    the thorax and abdomen.

 4         THE COURT:  In your report on page 7, in your seventh

 5    summary of opinions -- I understand these are summaries.  You

 6    talk about that it's your opinion that this particular device

 7    could not cause pain -- could not cause injury to or protracted

 8    loss or impairment of the function of a bodily member, organ,

 9    or mental faculty.  So when you use the word "organ," it

10    suggests to me that you're talking about other things beside

11    the heart.

12         THE WITNESS:  Well, I would include the heart there.

13         THE COURT:  What else would you include?

14         THE WITNESS:  Well, counsel brought up lungs, which

15    frankly is a creative suggestion.  I haven't heard that one.

16         THE COURT:  I think, I mean, again, this is just --

17    the last part of the seventh summary of opinion is that it

18    cannot cause injury without substantial risk of death, extreme

19    physical pain, protracted and obvious disfigurement, or

20    protected loss of impairment of the function of a bodily

21    member, organ, or mental faculty.  So what's the basis for your

22    opinion or opinions that it cannot cause protracted loss or

23    impairment of the function of a bodily member, one; two, an

24    organ; or three, a mental faculty?

25         THE WITNESS:  We have an international standard, IEC

1    60479, that lists all of the bad things that can happen from

2    electricity and how much it takes, and this little noisemaker

3    doesn't come close to delivering an electric current that can

4    cause any of these problems, so it's not just a speculative

5    opinion, Your Honor.  This is based on international accepted

6    standards.

7    BY MR. DREHER:

8    Q.   So in other words, sir, you're relying on the standard and

9    not necessarily any of the research or training that you bring

10   to the table?

11   A.   No.  I rely -- I can rely on the standard, as a hundred

12   countries do around the world and specialists do, but I can

13   also rely on my 50 -- 53 years of research in bioelectricity or

14   53-year career, which a majority was focused on bioelectricity.

15   Q.   Now, in the research that you do take part in, a lot of

16   times in the studies, at least that I've seen, there's always

17   contributors as well; right?

18   A.   That's correct.

19   Q.   Now, what is the relationship like just in a general sense

20   when you're complete -- when you're conducting a study

21   involving another contributor?

22   A.   Hopefully it's cordial.

23   Q.   Now, ultimately is, I guess, two heads better than one?

24   Is that an old saying that you're familiar with?

25   A.   I'm familiar with that saying.

1   Q.   So is it safe, then, to think that you at least have

2   reviewed all the studies with your name on it?

3   A.   I have, yes.

4   Q.   And then if there are more than one other contributor, is

5   there a way to determine what parts you bring to the table as

6   opposed to someone else?

7   A.   Well, the rules used to be a little looser.  Now the rules

8   are very strict in the last few years.  Some of the more

9   prestigious journals require you to state exactly what each

10  party brought to the paper.

11  Q.   Now, a lot of the studies that are outlined within your CV

12  are before that time; correct?

13  A.   Yes.  That's just been within the last few years.

14  Q.   And a lot of the contributors that you worked with, at

15  least in the studies outlined within your CV, included medical

16  doctors; right?

17  A.   Oh, sure.  I like to involve my physician colleagues.

18  Q.   Not only -- I think it was Dr. Jeffrey Ho is someone who

19  seems to be recurring in a lot of the studies that you've

20  conducted; correct?

21  A.   No.

22  Q.   No?  Have you conducted any studies with Dr. Jeffrey Ho?

23               THE COURT:  What's the last name?

24               MR. DREHER:  The spelling is H-O, I believe.

25               THE COURT:  On page 5 there's a reference to J., I

1    think a J.D. Ho, in one of the books and -- or two of the

2    books, actually.  Is that the person you're referring to,

3    Mr. Dreher?

4              MR. DREHER:  I'm attempting to.

5    BY MR. DREHER:

6    Q.   Is his first name Jeffrey?

7    A.   Yes.  I know Jeffrey Ho very well.  I just haven't -- I

8    can't recall studies that I've done with him face to face.  In

9    2008, it was a study done of the human resistance from the X26

10   electrical weapon, and he's a co-author on that.  I wrote the

11   original protocol.  Don Dawes first authored the paper that

12   comes to mind, but generally we're -- frankly, we're friendly

13   competitors so we don't publish together.  We kind of mostly

14   publish competitively except in the two books that we did

15   together.

16   Q.   Well, certainly, as an attorney, I understand friendly

17   competition, but can you explain what that means to you.

18   A.   We -- we go back and forth as to who was the most

19   published expert on electrical weapons.  I think with my most

20   recent paper I think I'm one up on him, like 45 versus 43 or

21   something like that.

22   Q.   So it's not necessarily that the two of you disagree as to

23   the effects of conducted electrical weapons?

24   A.   I'm sure you could find some nuanced area because we dig

25   into this incredible detail, but if you have a specific area of

Dr. Kroll - Cross (Dreher)                                    1280

1    potential disagreement, I'd be happy to comment on it.

2    Q.   Now, ultimately his background is through medicine;

3    correct?

4    A.   Well, it's medicine, and he's a licensed police officer,

5    and he has been involved in studying electrical weapons for

6    almost 20 years.  It would be -- so that's his background and

7    experience.

8    Q.   But at least the background in biology is from his

9    experience as a medical doctor; correct?

10   A.   I'm not sure when he took his biology class.

11            THE COURT:  Are you almost done?

12            MR. DREHER:  Yes, Your Honor.

13   BY MR. DREHER:

14   Q.   Now, I do want to get back to what you were saying about

15   the traveling of electricity throughout the human body.  How is

16   it that electricity travels through the body?

17   A.   It's a pretty hard answer in a five-minute question.  I

18   like to analogize it to baseball.  So if you had somebody

19   running from first to second base, they could run in a straight

20   line, especially if they've stopped on first and then at the

21   next batter they run straight, but typically they are -- if

22   they think they can hit a double, they have a curved run, and

23   that's why the sandy area there is curved out.  So the flow of

24   electricity in the human body looks like it kind of curves out.

25   That's as nonqualitative -- or it's nonquantitative to describe

1    it.

2         So if you have two electrodes that are very close, say

3    within a couple of inches, it's tend -- it tends to be confined

4    to the skin, the epidermis and the subdermis and fatty layer.

5    If the electrodes are a foot apart, the electrical current will

6    tend to dive in and flow through the skeletal muscles and then

7    come back.  Is that enough detail?

8    Q.   Yes.  Ultimately, then, the amount of time it takes the

9    electricity to reach two different points is an important part

10   of measuring the effects of electricity on the human body;

11   correct?

12   A.   No.

13   Q.   So when you're talking about different points in their

14   lengths, what is it that you meant?

15   A.   I meant that there is enough distance for the current to

16   spread out.  The current flows pretty much at the speed of

17   light so the amount of time is not relevant, but the distance

18   gives us the opportunity for the current to dive in further

19   into the body.  You think about the old bromide of electrical

20   current taking the shortest path.  That's somewhat relevant

21   here in that if we have two electrodes on the skin, it's going

22   to pretty much go through the skin unless they're separated by

23   a long distance.

24   Q.   So if I get what you're saying correctly, electricity

25   itself travels at the same speed no matter the device that's

Dr. Kroll - Cross (Dreher)                                    1282

1    used; right?

2    A.    That's basically correct.  It's about approximately the

3    speed of light.  It depends on the water content, et cetera,

4    but close to the speed of light.

5    Q.    So why is it, then, that the amount of time it takes to

6    reach the human body an important factor in determining the

7    injury to the body?

8    A.    I don't -- I'm not sure the right way to say this but --

9    Q.    If you could describe for the Court the difference between

10   the unit of measurement of coulombs versus the unit of

11   measurement of amperes.

12   A.    Okay.  So I think what you meant -- okay.  Amperes is

13   charge.  I'm sorry.  Coulombs, is that what you meant to say?

14   Q.    Coulombs.  I apologize.

15   A.    Coulombs is the amount of electrons.  It's like saying how

16   many marbles or how many peas are in this tablespoon of this

17   scoop.  If you look at the flow rate, which is how many

18   coulombs per second, that's an ampere of current.  It's the

19   rate.  So the difference would be, say, a bathtub holds so many

20   cups of water.  That would be equivalent to a coulomb of

21   charge.  If you ask what is the flow rate, cups per second or

22   gallons per second, coming out of the faucet into the sink or

23   into the tub, that would be the analogy to current in amperes.

24   Q.    So then in the research that you've conducted, is the

25   measurement of coulombs more or less used than ampere?

Dr. Kroll - Cross (Dreher)                                    1283

1   A.   Both.  It depends on the type of shock.  If you have a

2   shock that lasts longer than one second of a continuous

3   sinusoidal power that comes out of all that's in this room, the

4   ampere of current is what determines the danger.  If you have a

5   short shock like short pulses that come out of a stun gun or in

6   electric fences, then it would be the charge in that pulse,

7   because the average current is very, very low 'cause you have a

8   pulse and then nothing, then a pulse and nothing, so there's

9   the coulombs of charge and then the pulse.

10  Q.   And the length of time, then, of the pulse is not of

11  concern to you?

12  A.   The length -- assuming that we're dealing with the short

13  shocks that are on the order of microseconds, in other words,

14  far, far less than a second, then the length of time doesn't

15  really matter.  If we're dealing with shocks that last one or

16  two seconds, then once you're past that, the duration doesn't

17  matter.  Electrocution, for example, occurs in one or two

18  seconds or not at all.  Most electric burns occur in the first

19  second or two from lightning or a power line.  Is that helpful?

20  Q.   No.  What I'm asking specifically is when is it you would

21  use coulombs versus amperes?

22  A.   If the individual pulses are less than a thousandth of a

23  second, we would use coulombs.  If the shock is longer than a

24  second, then we use amperes, and then you can get into more

25  complicated situations where we might use both.  For example,

1    the --

2    Q.   So are you familiar with any studies that compare the

3    damage caused by a coulomb versus -- one coulomb of electricity

4    versus one ampere of electricity?

5    A.   I'm -- I can -- if it's an exact study, or that's hard to

6    say, but we have standards that would answer that question.

7    Q.   Is that the ANSI standards that are proprietary?

8    A.   The ANSI standard, the IEC standard.  I would rely more on

9    the IEC standard because it's stood the test of time of decades

10   of acceptance in about a hundred countries.

11           MR. SMOCK:  Your Honor, I'm going to object given --

12           THE COURT:  Time is running here, and we're just

13   trying to decide whether he's qualified to testify or not about

14   what he's qualified to testify.  I don't understand any of this

15   stuff, and I'm not sure the jury will either, by the way, but

16   that's between you guys.

17           MR. DREHER:  Your Honor, just for clarity of the

18   record --

19           THE COURT:  I will restate my last comment.  I

20   understand a lot of this stuff.  To be honest, this last stuff

21   seems to be awfully in the weeds for the lay juror to

22   understand.

23           MR. DREHER:  If I may just ask one more question,

24   Your Honor.

25           THE COURT:  You can ask more than one.  I'm just

Dr. Kroll - Cross (Dreher)                                    1285

1    saying we really need to get to the point of -- I have to make

2    a decision here about whether to let him testify and whether I

3    should limit his testimony in any way.

4              MR. DREHER:  In that case, Your Honor, I'll take two

5    questions.

6    BY MR. DREHER:

7    Q.   Sir, is the standard -- is the comparison between a

8    coulomb of electricity and ampere of electricity something that

9    you can tell us?

10   A.   Yes.

11   Q.   What is the difference, or what is the conversion?

12   A.   It depends on the wave form.  If it's something like a

13   direct current coming off of a battery of an electric vehicle,

14   it's simple multiplication.  You take the coulombs -- or simple

15   division, I should say.  If you deliver 10 coulombs in five

16   seconds, you divide them.  It's two amperes of current.  That's

17   the simplest.  It gets more complicated with rapid pulses, but

18   that's the simplest calculation.

19   Q.   And is it -- are the standards that you rely upon

20   generally related to the amount of amperes on a human body to

21   determine its danger?

22   A.   Book 1 does.  60479-1 uses amperes of current.  60479-2

23   includes coulombs of charge for short shocks, so we cover all

24   the bases.

25   Q.   And you did not provide an ampere measurement on the

 1    device that you identified for this case; correct?

 2    A.    I think I did in the paper.

 3    Q.    The paper?

 4    A.    Yes.  There was an accompanying paper that's under review

 5    right now.  It hasn't been accepted yet.  I'll know in the next

 6    month.  Accepted for publication.

 7          THE COURT:  Has that paper been made available to the

 8    lawyers in this case?

 9          MR. SMOCK:  We have it, Your Honor.

10          MR. DREHER:  Oh.  Yeah, you gave it to us.

11    Your Honor, I have been provided with that.  I just wasn't

12    sure what he was looking at up there.  I have no further

13    questions and would continue the objection as it relates to

14    opinions 6 and 7 for this witness.

15          THE COURT:  Let me ask you a couple of questions.

16    First of all, does it matter if something is being emitted from

17    an electrical device towards a person -- and maybe it differs

18    from device to device, I assume it does -- no matter how close

19    you are to that person?

20          THE WITNESS:  Well, if you're far away, it's not

21    going to, so the answer is generally not.  You have to have a

22    connection either through wires or direct contact, so your

23    personal distance shouldn't matter.

24          THE COURT:  Well, I mean, if I'm standing at the back

25    of the courtroom with a Taser and I direct it at you, is it

1   going to have any effect?

2           THE WITNESS:  No, sir.

3           THE COURT:  So there is -- I mean, you have to be

4   somewhat close to you to make it matter.

5           THE WITNESS:  Well, with the probes, you can launch

6   the probes 25 feet.  For the Vipertek in this case, there's no

7   probes, so you'd actually have to have direct contact.

8           THE COURT:  So with respect to the Vipertek or the

9   Police 916, the two items that you think this was, are there

10  any studies at all about those particular devices and what

11  they -- what kinds of injuries they can or cannot cause?

12          THE WITNESS:  The only real study is -- well, let me

13  back up.  Each time somebody makes a new electrical stimulator,

14  whether it's a muscle stimulator for your six-pack or someone

15  wants to sell someone a stun gun, you don't need to go and test

16  a hundred volunteers because we have standards that the FDA

17  uses and that ANSI uses; so you measure the output with meters

18  and oscilloscope, and you say it puts out this much, and then

19  we know from these standards if that's safe or not.  So no, we

20  don't do individual studies on these things.

21          THE COURT:  Okay.  Because in one place he asked you

22  a question.  Are you relying on the standards for certain

23  conclusions that you've reached was one of Mr. Dreher's

24  questions, and you said yes, plus my 54 years of research in my

25  career.  So with respect to these two items, are you saying

 1    that there was -- once you identified them as a Vipertek

 2    VTS-979 or a Police 916, there was no need to, for example,

 3    test them on an individual or on an animal because the accepted

 4    standards lead you to conclude that they can't cause harm?

 5             THE WITNESS:  That's correct.  There would be no

 6    need.  For fun I've handed some of these things out at parties

 7    and let people try them, and based on my representations that

 8    they could be felt but not painful, people have done this, and

 9    that's not a large statistical sample, and I'm not relying on

10    that for my testimony today.

11             THE COURT:  Do these items cause some sort of shock?

12    Could they?

13             THE WITNESS:  Here's the technical -- the tricky part

14    on the technical definition.  The dictionary definition of a

15    shock versus an electric current is it can cause pain or

16    injury.  Based on the standards these should be sensed, so

17    there's a sensation, but it's not -- not painful, and that is

18    my experience from the limited testing with people

19             THE COURT:  And it's, based on the standards, not

20    painful.

21             THE WITNESS:  Yes, sir.  So technic- -- if you buy

22    the six-pack muscle stimulators on Amazon for 50 bucks, I find

23    those uncomfortable, but people use them, and this Vipertek

24    puts out a lot less current than those muscle stimulators do.

25             THE COURT:  So even prolonged contact or prolonged

1    shocks would not cause serious injury or danger to life?

2         THE WITNESS:  No, sir.  There's just not enough power

3    there to burn skin even.

4         THE COURT:  Okay, all right.  Mr. Smock, anything

5    further?

6         MR. SMOCK:  No.  Thank you, Your Honor.

7         THE COURT:  One last question.  You reference that

8    these things cannot cause injury, including loss or impairment

9    of the function of a bodily member, organ, or mental faculty,

10   and talk about mental faculty for a minute.  What's the basis

11   for that conclusion?

12        THE WITNESS:  Based on our standard these things

13   would not cause any kind of cognitive damage.  There is -- this

14   is an active area of research for powerful shocks.  What the

15   mental effects are is in that area of active, frankly,

16   controversy right now, an open issue.

17        If somebody has a power line shock and they touch a power

18   line and the current goes from their arm down through the chest

19   down to the feet and it's so brief it won't stop the heart but

20   they have nerve damage, many of these people report PTSD,

21   anxiety, depression, and the question is, is that a

22   psychological problem, or did some of the current get up into

23   their brain?  That's an area of active research.  Not really an

24   issue here because of these probes being so close and because

25   of the frankly miniscule amount of electrical output.

1    THE COURT:  Okay.  Anybody have any further

2    questions?

3    MR. SMOCK:  No, Your Honor.

4    THE COURT:  If not, we'll ask Dr. Kroll to go to the

5    witness room for a little bit.  I'll hear briefly from counsel,

6    and then we'll hear you testify all over again in front of the

7    jury.

8    So I guess we can be brief.  What are the arguments for

9    excluding him or some of his opinions or limiting some of his

10   opinions?

11   MR. DREHER:  Your Honor, as it relates to the -- at

12   least the summary of opinion number 6 in that this device is

13   not able to be used in a manner that would endanger life, I

14   think the testimony of Dr. Kroll thus far has only outlined the

15   electrical output of the device itself and not other uses that

16   it could be -- that could have not only caused injury, but also

17   in a manner in which it could be dangerous, so I believe 6

18   should still be limited in that he's -- nothing within his

19   testimony has outlined how it was used but more just the

20   functionality of the electrical output of the device itself.

21   As it relates to number 7 and getting to at least the

22   mental faculties portion, what he did testify about was that

23   there are electrical signals that are from the brain to the

24   body to control it, and while certainly it seemed that his

25   testimony was relating to the physical aspects, there were some

1    mental aspects that would -- at least would outline that

2    there's more to mental faculty than meets the eye.

3        I do believe that's perhaps too broad for the opinion

4    itself, but ultimately I do think that the hearing itself was

5    important in that it did sort of shore out specifically what

6    this witness was going to testify to in terms of the electrical

7    output, and I would just ask that the Court limit his opinions

8    to specifically the electrical output of this device in front

9    of the jury.

10       Thank you.

11           MR. SMOCK:  Your Honor, I think it's just absolutely

12   clear that he's eminently qualified to all of his opinions.  I

13   think he was absolutely clear about it.  Nothing on cross put

14   any of that into doubt.  The government can certainly go into

15   the detail that they did with him on cross.  That's totally

16   appropriate.  We'll see how interested the jury is in some of

17   those details, but it's absolutely clear we know the standards

18   and he's perfectly qualified to offer these opinions.

19       Certainly, the government can cross him about whether, if

20   you strike someone with it, it can cause injury.  He hasn't

21   opined that that's not possible, so there's absolutely no basis

22   to keep out this testimony given his qualifications, which are

23   unparalleled.

24           THE COURT:  Well, okay.  So I don't know what you

25   mean by limit to electrical output, Mr. Dreher.  You know, I

 1    think it's a given, although the summary doesn't say this, but

 2    we've had so many conversations about how you can use any

 3    device.  I can use this pitcher which is not an inherently

 4    dangerous weapon, and you could use the Vipertek or the Police

 5    916, if that's what they are, or a stun gun, if that's what it

 6    is, to hit somebody with, and I think -- I can't imagine that

 7    if you asked him this question he wouldn't say of course you

 8    could use that to hit somebody with.  That's not what I'm an

 9    expert on, and that's not what I'm talking about.

10        So is there something more nuanced that you mean by

11    limiting his opinions to electrical output?

12            MR. DREHER:  It's not often I do this, Your Honor,

13    but I'm going to rely on an argument from Ms. Goetzl as it

14    related to at least the statutory definition of what

15    temporarily visiting might mean.  If he's going to use the

16    specific words that the jury must find, I believe it would be

17    appropriate to limit his testimony in a manner to where he's

18    not able to opine specifically this is not a deadly or

19    dangerous weapon.

20        So I'm not sure if that answers the Court's question, but

21    that's really what I think this boils down to is it's going to

22    confuse the jury and possibly confuse the jury into thinking

23    that they must only consider the electrical device output

24    during the testimony of Dr. Kroll as opposed to the entire

25    situation itself.

         1          MR. SMOCK:  I mean, it's fairly obvious that that's a

         2    ground for cross.  It's not a basis to keep out his testimony.

         3          THE COURT:  Well, firstly, I'm just looking at the

         4    summaries.  The summaries don't contain the words "deadly or

         5    dangerous weapon"; right?

         6          MR. SMOCK:  That's correct.

         7          THE COURT:  They say cannot endanger life, cannot be

         8    used in a manner to endanger life.  Of course, if he's asked,

         9    "You mean you couldn't use this to beat somebody over the

        10    head," he's going to say, yeah, you could.  I assume he's going

        11    to say, yeah, you could do that, that's not an area of my

        12    expertise, that's not what I was asked to talk about.

        13          MR. SMOCK:  Correct.

        14          THE COURT:  And the next, number 7, says inflict

        15    serious bodily harm.  It gets closer to the language of the

        16    indictment -- I'm not sure if it's the language of the

        17    statute -- and cannot cause injury that involves substantial

        18    risk of death -- that gets closer -- extreme physical pain and

        19    then the rest of it.  But, you know, we can go back and forth,

        20    I suppose, and debate this.

        21          Let me -- I'm going to take about a ten-minute break, and

        22    I'll come back and tell you exactly what I think, but I do sort

        23    of have an outline of an oral opinion about why I'm -- why I

        24    think he's qualified and why I'm going to admit his testimony

        25    and why I disagree with the Ninth Circuit in *Wallace*, but is it

```
 1    necessary that I say all of that before he testifies, or is it

 2    sufficient that I just -- for the government's purposes if I

 3    say that later and just say I think he's qualified to testify

 4    about, you know, clearly 1 through 4, and I'll tell you what I

 5    think about 5 and then tell you what I think about 6 and 7; or

 6    do you need a whole -- does everybody want my whole oral

 7    opinion at this point?

 8              MR. DREHER:  Your Honor, I don't think that's

 9    necessary as it's potential that this might be an issue for the

10    jury instructions --

11              THE COURT:  Yes.

12              MR. DREHER:  -- as opposed to what this witness could

13    opine.  It's just more the verbiage that is used.  At least the

14    summary of the opinions seems to track specific case law in

15    terms of deadly or dangerous weapon.  That is at least

16    troublesome so if --

17         Let me just have a moment.

18         So I certainly don't think we need the full opinion as the

19    Court referenced, but in terms of making it more teed up, I

20    guess, when it comes to the charging conference and jury

21    instructions, absolutely.

22              THE COURT:  Absolutely.  Now, I will give the -- what

23    used to be called the expert witness instruction in the red

24    book.  It's now called the specialized opinion testimony

25    instruction.  At some point at the beginning of his testimony
```

1    or after I qualify him as an expert, I'll give that

2    instruction.  Of course I'll give it again at the end.

3         So can we take, you know, 10 or 15 minutes?  I'll come

4    back and say something, and then we'll get the jury in and get

5    started.

6         (Recess taken at 10:24 a.m.)

7         (At 10:52 a.m. on March 8, 2023; with counsel for the

8    parties and the defendant present; WITHOUT the jury:)

9         THE COURT:  All right.  Anything anybody else wants

10   to say?

11        All right.  So going back to some time ago when we first

12   started discussing Dr. Kroll, the government argued that his

13   testimony should be excluded.  First, that the first four

14   opinions are not beyond jurors' common understanding and we

15   don't need an expert, and further that it was unclear what he

16   defines as a stun gun; and there was also an objection to the

17   fact that he only reviewed photographs of devices and tested

18   only five different devices and various other things.

19        And then there was the argument made based on the *Wallace*

20   case that he's getting into questions of law rather than fact

21   in terms of what is a deadly or dangerous weapon and more

22   precisely whether a stun gun was a deadly or dangerous weapon,

23   because the Ninth Circuit found that as a matter of law -- and

24   that was the first time that the government had argued that any

25   part of this was a matter of law rather than a matter of fact.

1    Up until then I thought there had been agreement that whether

2    something could cause injury or was deadly or dangerous is a

3    fact question for the jury.

4         There were more specific arguments with respect to the

5    sixth and seventh conclusions and the argument they didn't test

6    these devices, and then in addition today and I think also

7    originally too, the government argued that in effect he's

8    parroting the language of the statute, is he giving legal

9    conclusions.  And Mr. Smock responded that, you know, based on

10   his expertise that he could do all of these things, to opine as

11   to all of these things.

12        I originally denied the request for a *Daubert* hearing, but

13   I had some concerns I raised yesterday as well about the sixth

14   and seventh of his seven opinions as summarized on page 7 of

15   Docket 112-2, and so this morning at the request of the

16   government we did have a *Daubert* hearing outside the presence

17   of the jury, and we -- both sides examined Dr. Kroll, and I

18   asked him some questions as well.

19        So I am going to deny the government's motion asking that

20   Dr. Kroll be excluded, his testimony and his opinions be

21   excluded in their entirety, and for the reasons that follow I

22   am going to permit him to testify on everything in his summary;

23   and therefore, I'm denying Docket 112.  I've thought about this

24   a lot.  I've considered the parties' submissions and the

25   briefs, the oral arguments which we've now had a couple of

1    times, and this morning's testimony as well.  Without -- so

2    this will be my final opinion on the subject.

3        Under Rule 702, of course, he can testify if he's

4    qualified as an expert by reason of knowledge, skill,

5    experience, training, or education, and unlike fact -- other

6    witnesses, he can give fact opinions.  Rule 702 has been

7    interpreted to favor admissibility according to cases in this

8    circuit and the advisory committee notes, which said that a

9    review of the case law after *Daubert* shows that the rejection

10   of expert testimony is the exception rather than the rule.

11       On the other hand, the judge is the gatekeeper, because in

12   *Daubert* and in *Kumho*, K-U-M-H-O, the Supreme Court said we

13   really do have to protect the jury from opinions that don't

14   have a basis in careful methodology and are reliable and we

15   have to exclude unreliable things to shield the jury from

16   unreliable or irrelevant testimony because jurors do tend to --

17   may tend to give extra weight to the testimony of an expert.

18   There's an instruction which said that they shouldn't, and I

19   will give that instruction.

20       But in order to be admissible, the expert testimony must

21   be both relevant and reliable under D.C. Circuit precedent, and

22   to be qualified an expert doesn't have to be a leading

23   authority in the field or even a member of a recognized

24   professional community, and I think that comes after *Kumho*, but

25   this expert is.

1        Dr. Kroll is and recognized in his field.  He's qualified,

2   he's an expert, he's a scientist specializing in

3   bioelectricity, the interaction of electricity in the human

4   body.  He has a master's degree, a PhD in electrical

5   engineering.  His field of research, as we heard at great

6   length already this morning, is the effect of electrical shocks

7   on the human body.  He has published and lectured extensively

8   on this topic.  He's written a couple hundred abstract papers

9   and books' chapters, which are set forth in the CV which was --

10  certain pages of which were discussed this morning.  And based

11  on his education, training and experience, I find that he's

12  qualified.

13       I also find that this testimony is relevant.  What this

14  thing was that Mr. GossJankowski had on January 6th in his hand

15  or was handed and possessed and may have used is relevant

16  because -- I've always thought it was relevant, but as I said

17  the other day, Captain Ortega's testimony makes it clear to me

18  that laypeople cannot make these -- would be aided by an expert

19  in determining what the item was, what the item was not, and

20  what the item was capable of; and there was some testimony this

21  morning about what doctors do, medical doctors versus what

22  someone like Dr. Kroll does; and it's clear that his background

23  and experience are directly relevant to the issues before the

24  jury in three counts in this case and particularly the count

25  charging use of a deadly or dangerous weapon.  He's not being

1    proffered as an expert on weapons generally, and as I've said,

2    the question of whether it's a deadly or dangerous weapon is a

3    question of fact for the jury.  It's not a question of law.

4        The one case that the one court that held that a stun gun

5    may be found to be a deadly, dangerous weapon as a matter of

6    law is not a D.C. Circuit case.  It's a Ninth Circuit case,

7    *United States vs. Wallace*, 800 F.2d 1509, from 1986.  And "A,"

8    I think, despite my great regard for my friend Judge Schroeder

9    and her colleagues on that panel, I think they were wrong.  And

10   beyond that it was said in a particular context.

11       Namely, first, the trial judge said that it was a question

12   of law, but it was a question of law within the particular

13   factual context of that case, and it seems to me that -- and

14   there was evidence introduced at trial about the kind of injury

15   that stun guns cause, so obviously the jury -- the jury heard

16   evidence.  I'm not clear why the judge took it away from the

17   jury and said it was a matter of law if the judge did, but in

18   that case it was in the context, I think, of an airplane and

19   that the fact was that even if not used, it was likely to cause

20   fear in that context of all the people surrounding him.

21       So it's factually distinguishable but, more importantly, I

22   think it's just wrong.  And while *United States vs. Arrington*

23   in this circuit is not directly on point -- that's 309 F.3d,

24   page 40 -- in an opinion by Former Judge Merrick Garland joined

25   by Judge Stengel and Judge Williams, the Court made a

1    distinction between weapons that are inherently dangerous and

2    those that are not and -- but still discussed what the jury

3    must be told and what the jury must find, and the jury must

4    find it's a deadly weapon but also must find that the object

5    was capable of causing serious bodily injury or death to

6    another person and that the defendant must use it in that

7    manner, is what they said in *Arrington,* for things that are not

8    inherently dangerous so...and of course you need both the act

9    and the intent or mens rea.

10       So I do not find -- I do not find *Wallace* persuasive, and

11   I do think that the rule here -- and all of my colleagues, I

12   think, in the circuit, to the extent it's even in dicta or have

13   discussed it, suggests that it's a question of fact for the

14   jury whether something is a deadly or dangerous weapon.  And

15   I've mentioned this before, again not binding, but the common

16   law now codified solved the dangerous weapon statute in the DC

17   Code.  All of the DC Court of Appeals cases and all of the jury

18   instructions say it's a fact for the jury.

19       I think that this is a fact for the jury, and there are a

20   number of cases that my colleagues have tried, and they've so

21   instructed the jury that they have to find that as a matter of

22   fact.  So, "A," I think the jury would be aided by an expert

23   with respect to what the weapon was and what it wasn't, what

24   it -- what the weapon that Dr. Kroll says that it was could and

25   could not do, and that gets us through the first five of his

1    opinions.

2        I think his methodology -- I don't have a problem with his

3    methodology.  Based on his experience he compared various

4    electrical devices, including Tasers and stun guns of various

5    kinds, and reached a conclusion it wasn't either of those and

6    it was one of these other two things instead.  He was asked

7    this morning whether he did any tests on these items, and he

8    said he didn't but that there are established standards of the

9    recognized standards organization on whose board or advisory

10   group or something he is serving or has served and that

11   applying those standards he reaches the conclusions that he did

12   about what the device that he says it was can and cannot do,

13   and I think he had sufficient facts to give his opinions on the

14   first five of his opinions in the summary.

15       And to the extent that the government wants to attack his

16   methodology or attack his conclusions, that's why we have

17   cross-examination.  And the jury does not have to believe him,

18   and they don't have to accept any of his opinions, or they can

19   accept some and reject others, and that's what I'm going to

20   tell them in instructions.  That's why we have

21   cross-examination.  And again, with respect to his testimony

22   about what it emits or doesn't emit, how he determined what

23   this likely was, all of that's grounds for cross-examination

24   and not a basis to exclude.

25       So with respect to 6 and 7, I think there are essentially

1    two arguments.  One is that he has an insufficient basis to

2    reach each and every one of the conclusions in numbers 6 and 7

3    in page 7 of Docket 112-2; and two, that he shouldn't be

4    allowed to parrot the language of the statute for the same

5    reasons I wouldn't let that happen with respect to the

6    temporarily visiting language of the other statute from a lay

7    witness yesterday.

8         I think that he explained clearly why he has the opinion

9    to a reasonable scientific certainty that the device could not

10   be used in the manner likely to endanger life, and I think he

11   explained similarly why he concludes that it cannot cause

12   injury that involves a substantial risk of death, extreme

13   physical pain, and disfigurement, or protracted loss of

14   impairment of the function of a bodily member, organ, or mental

15   faculty.  He was asked about those last items in particular at

16   great length by Mr. Dreher and by me, and I think he explained

17   why he reaches these conclusions.

18        There are certain things that you can't test for.  There's

19   certain things that you don't test for because all of the

20   medical and bioelectrical literature tells you it's not going

21   to happen.  I can't remember specifically, but one thing he

22   said, it would be unethical to do an MRI or other things

23   because it's impossible.  You wouldn't find anything.

24        With respect to my concern about how he can talk about

25   mental faculty, he talked about there are very few things in

1    his research and in the literature that suggests that there

2    could ever be an effect on cognitive ability and mental

3    faculty, such as touching a power pole or being struck by

4    lightning, which are unique events not relevant in this case.

5        He did focus -- when he was talking about what organs can

6    be damaged, he focused most on the heart because there's so

7    much that can be said about that -- EKGs, electrocardiograms,

8    various other things -- and that any damage to other organs

9    would not be visible, and that was explored, and what he meant

10   by other organs was explored.  And again, I think that this is

11   an area for cross-examination, and it goes to weight, not to

12   exclusion.

13       And what about parroting the language?  Parroting the

14   language of the statute is kind of a variant of discussing --

15   or at least is touched on by the cases which discuss the

16   prohibition on an expert giving a legal opinion or reaching

17   legal conclusions or taking matters away from the jury.  The

18   primary case in this jurisdiction is *Burkhart vs. Washington*

19   *Metropolitan Transit Authority*, 112 F.3d 1207, and the reason

20   you can't give legal conclusions as an expert is that it may

21   influence the trier of fact, the jury, and, more importantly,

22   infringes on the responsibilities of the judge to give

23   instructions on the law.

24       On the other hand, the Court said in *Burkhart* that an

25   expert may offer his opinion as to facts that, if found, would

1   support a conclusion that the legal standard at issue was

2   satisfied, but he may not testify as to whether the legal

3   standard was satisfied.  So here he's using language about

4   causing injury, endangering life, substantial risk of death,

5   extreme physical pain, and those are not the precise words of

6   the statute.  They may come close, but as the Court again said

7   in *Burkhart*, the line between impermissible legal conclusions

8   and admissible testimony that might assist the trier of fact in

9   understanding the evidence or in determining a fact at issue is

10  not always bright.

11       And so the question is, is he talking in the vernacular

12  here and/or in the context of his own expertise and research as

13  opposed to saying this is my conclusion, it was a deadly and

14  dangerous weapon?  And I think it's the former.  He doesn't

15  directly track the language of the statute in this case.

16  Deadly or dangerous weapon is in the statute, it's in

17  Counts III or IV, but the words "deadly" and "dangerous" are

18  also common sense words used in the vernacular.  But again,

19  they're not directly used in his summary of opinions, at least.

20       So I don't think his opinions in 6 or 7 are not -- I don't

21  think his opinions in 6 and 7 are opinions on whether a

22  particular legal standard has been satisfied, and it's not an

23  impermissible -- they're not impermissible legal conclusions.

24  I think that what he says will assist the jury in finding facts

25  based on my instructions on the law.

1    I think in some of Dr. Kroll's testimony that the device

2    is not capable of emitting a charge.  If the device is what he

3    says it was and not a stun gun, the device is not capable of

4    emitting a charge or -- strong enough to have been used in a

5    manner likely to endanger the life or inflict serious bodily

6    harm; and therefore, it's directly relevant to the ultimate

7    question about whether it was a deadly or dangerous device

8    capable of causing such harm.

9    That's a jury question, and we have testimony from

10   officers, we have video, and we will have examination of

11   Dr. Kroll, and the jury will consider it all with proper

12   instructions and make its own decision about whether they

13   accept some or all of Dr. Kroll's testimony or not in view of

14   what they've seen and will see and have heard and will hear.

15   Erica, anything else?

16        LAW CLERK:  (Indicating with thumbs up.)

17        THE COURT:  Okay.  So that's where I am.  I don't

18   know if anybody needs to say anything for the record or whether

19   we should finally get the jury in.

20        MR. SMOCK:  We're ready for the jury, Your Honor.

21   The one request I would make is part of the reason we're

22   calling Dr. Kroll at this point is that he is trying to get

23   back this evening.  He has a flight at 3:20.  I don't know

24   whether he's going to make it, but to the extent we can go

25   forward through 1:30 without a break, that would be much

```
 1   appreciated.

 2              THE COURT:  Okay.

 3              MR. SMOCK:  To the extent that's possible.  I'm just

 4   making the request.

 5              THE COURT:  I'll let the court reporter know, let me

 6   know when she needs a break, and anybody else too.  I mean, we

 7   can always take short bathroom breaks if we don't take a longer

 8   break before 1:30.

 9       Is there anything else anybody wants to say before we get

10   the jury in?

11              MR. SMOCK:  No, Your Honor.

12              MR. DREHER:  Nothing at this time, Your Honor.

13              THE COURT:  Thank you, Mr. Dreher.  Okay.

14              MR. SMOCK:  Shall I have Dr. Kroll come and sit on

15   the witness stand?

16              THE COURT:  Yeah, sure.

17       (Jury in at 11:21 a.m.)

18        DR. MARK KROLL, PREVIOUSLY SWORN, RESUMED THE STAND

19              THE COURT:  First, ladies and gentlemen, once again,

20   I apologize for our delay this morning.  It was unavoidable.

21       Secondly, as I think I told you yesterday, we are normally

22   hearing first from the witnesses the government is going to

23   call, and normally we would hear from witnesses from the

24   defendant's side only after the government was done calling its

25   witnesses, but the next witness you're going to hear from is --
```

1    because of his travel schedule -- he's from out of town, as
2    you'll hear -- and other commitments, he has -- the government
3    has been kind enough to try to accommodate him by letting
4    Mr. Smock take this witness out of turn; so we're going to turn
5    to Dr. Kroll, who you'll hear from.  He is a witness called by
6    the defense side.
7         Okay.  Mr. Smock.
8                        DIRECT EXAMINATION
9    BY MR. SMOCK:
10   Q.   Good morning, Dr. Kroll.
11   A.   Good morning, sir.
12   Q.   Can you tell the jury what you do for a living.
13   A.   I'm a biomedical scientist.
14         THE COURT:  First let him identify himself for the
15   record.  Have you sworn him yet?  I don't know.  Do we need to
16   swear him in again in front of the jury?
17        Yes, let's do that.
18         DR. MARK KROLL, DEFENDANT'S WITNESS, SWORN
19         COURTROOM DEPUTY:  Could you please state and spell
20   your name for the record.
21         THE WITNESS:  Mark William Kroll.
22   BY MR. SMOCK:
23   Q.   Dr. Kroll, can you tell the jury what you do for a living.
24   A.   I'm a biomedical scientist.
25   Q.   And do you have a primary specialty in the biomedical

1    sciences?

2    A.    My primary specialty is bioelectricity with a focus on the

3    effects of electrical shocks on a human body.

4    Q.    And so bioelectricity, could you explain that a little bit

5    more.

6    A.    Bioelectricity is a scientific specialty, it's not a

7    medical specialty, and we study the effects of external

8    electricity on the human body and also the travel of

9    electricity internally control- -- for example, controlling

10   nerves and developing the EKG from the inside of the body.

11   Q.    Can you tell the jury about your educational background.

12   A.    My formal education is a bachelor's degree in mathematics

13   and a master's and PhD in electrical engineering as well as an

14   MBA.

15   Q.    And can you talk about your career, please.

16   A.    I started working in pacemaker research in 1970.  I

17   started at the University of Minnesota, and when I finished

18   college and graduate school, I worked for a company that --

19   called Cherne Medical that was making an advanced

20   electrocardiogram for early detection of heart disease.

21        Then I went to Angeion, which was developing a very small

22   implantable defibrillator to restart your heart if you had a

23   cardiac arrest.  From there I was recruited to St. Jude

24   Medical.  Now it's called Abbott Labs.  It's the number two

25   pacemaker company in the world.  I retired there in 2005 to

Dr. Kroll - Direct (Smock)                                    1309

1    spend more time on teaching.

2    Q.   And are you currently affiliated with any educational

3    institutions?

4    A.   Yes.  I'm adjunct full professor, biomedical engineering,

5    at the University of Minnesota and adjunct full professor of

6    biomedical engineering at California Polytechnic Institute, but

7    that is a fairly low duty cycle involvement, some Zoom lectures

8    and involvement in a location research project.

9    Q.   And you've said that you are a PhD doctor and a biomedical

10   scientist.  Can you help the jury understand the difference

11   between a doctor specializing in biomedical sciences like

12   yourself and a medical doctor, an MD.

13   A.   There are three differences.  The first is the obvious

14   one.  We do not touch patients or treat patients directly.  We

15   don't touch patients like a medical doctor, a nurse, a

16   chiropractor, a dentist would.  Second difference is we do

17   research on things that hopefully help thousands or millions of

18   patients, whereas a physician or healer deals with one patient

19   at a time.  And the third part, which I think is probably the

20   most important, is we give science to physicians so they can

21   practice scientific medicine, and the idea is that we give

22   advice to the physicians so they can give advice to the

23   patients.

24   Q.   Have you researched the types of training received by

25   medical doctors on the effects of electricity on human body --

1    on the human body?

2    A.   I have.  The American medical schools all study to the

3    same national examination, and they are required to learn three

4    sentences about electrical injury and electrical dangers.  The

5    first one is that alternating current, which is what you get

6    out of a wall socket, for example, can cause a cardiac arrest

7    via ventricular fibrillation.  The second thing is that

8    lightning can cause asystole or flatline, and the third is that

9    electrical shocks can cause burns.

10   Q.   So not much; is that right?

11   A.   They have to learn a lot, a lot of things, yeah, so they

12   don't have a lot of time to learn a lot about electricity.

13            THE COURT:  They learn enough to deal with people who

14   come into the emergency room who've put their hand in a socket

15   or been struck by lightning.

16            THE WITNESS:  Yes, sir.

17   BY MR. SMOCK:

18   Q.   So what are the different roles of an MD as opposed to a

19   biomedical scientist like yourself when it comes to the effect

20   of electricity on the human body?

21   A.   Well, there are 140 specialties recognized in the United

22   States in medicine, everything from radiology to oncology to

23   pediatrics.  There is no specialty for bioelectricity and

24   electrical shocks, which kind of makes sense, because if a

25   physician held out their shingle saying their specialty is

1    electric shock, they wouldn't be that busy because electrical

2    injury is not that common.

3         And so we research these areas and provide teaching, and

4    the physicians then can go to the National Library of Medicine,

5    they can go to our papers, go to our books, go to our lectures

6    and see how to handle an electrical injury, and they can easily

7    determine whether an electrical injury actually occurred,

8    because in the majority of electrocutions, there's no burns,

9    there's no markings, so it ends up being kind of mysterious to

10   a nonspecialist.

11   Q.   So am I right in assuming that you have taught medical

12   doctors about bioelectricity?

13   A.   Yes.  That's my primary audience.  I have lectured in 38

14   countries, including most of the major teaching hospitals and

15   medical colleges in the United States, and taught through over

16   a hundred papers in the National Library of Medicine and four

17   books.

18   Q.   And have you -- you mentioned books.  Have you been asked

19   to provide chapters for textbooks that are used by physicians?

20   A.   Yes.  I've written several textbook chapters for

21   cardiology texts and at least a half a dozen for forensic

22   pathology texts, and forensic pathology is that subspecialty of

23   medicine that deals with the analysis of death; so I've written

24   chapters on effects of electrical shocks and electrocution.

25   Q.   And do you sit on any boards or committees related to the

Dr. Kroll - Direct (Smock)                                          1312

1   field of bioelectricity?

2   A.   Yes.  I sit on the International Electrotechnical

3   Commission committee that writes the standard for analyzing the

4   dangers of electric shocks.  That's a five-book standard that

5   deals with amount of voltage, the amount of currents, the

6   pathway where the shock gets you, and then it tells people

7   whether or not that would be a danger of causing burns, nerve

8   injury, pain, or death, and that standard is accepted by about

9   100 countries worldwide, including the United States of

10  America.  That's probably the most relevant one.

11  Q.   And are you also --

12           THE COURT:  What's the name of that board again?  I'm

13  sorry.

14           THE WITNESS:  It's the International Electrotechnical

15  Commission.  If you Google it as IEC, it'll pop up.  A lot less

16  typing, Your Honor.

17           THE COURT:  Thank you.

18  BY MR. SMOCK:

19  Q.   Are you also on a board or committee called ANSI for

20  short?

21  A.   Yes.  ANSI is the American National Standards Institute.

22  They make standards for most of the things you touch in the

23  United States -- bicycle helmets, safety goggles, motorcycle

24  helmets, things like that -- and of course they have a standard

25  on stun guns and electrical weapons, and I sit on that

Dr. Kroll - Direct (Smock)                                    1313

1    committee that writes and updates those standards.

2    Q.    And I'll get to that a little bit later.  Have you

3    presented lectures in the field of electrical devices and the

4    effects of electrical shocks on the human body?

5    A.    Yes.

6    Q.    Can you give any estimate about how many?

7    A.    Would be hundreds.  Before COVID I was lecturing at least

8    once a week, so 50 times a year, so I don't know if it would be

9    a thousand, but it would be in the high -- definitely in the

10   hundreds.

11   Q.    So Dr. Kroll, can you tell the jury what a conducted

12   electrical weapon is.

13   A.    Yes.  It's a weapon --

14             MR. DREHER:  Your Honor, before we get into the, I

15   guess, meat of the testimony, I'd like an opportunity to voir

16   dire the witness.

17             THE COURT:  Absolutely.  I mean, you haven't offered

18   him as an expert yet.

19             MR. SMOCK:  Not yet.  So I have no objection.  No,

20   I'm not -- I still have more questions to ask prior to doing

21   that.

22             THE COURT:  We don't want him to give his opinions

23   until he's qualified.

24             MR. SMOCK:  I don't intend to have him do that, Your

25   Honor.

1              THE COURT:  We'll let him proceed a little further,

2     then.

3              MR. DREHER:  I apologize, Your Honor.  Maybe I

4     misunderstood the question.

5              THE COURT:  Maybe I did too.

6              MR. SMOCK:  Okay.  I'll ask it again, and if there's

7     a problem, I'm happy to rephrase.

8     BY MR. SMOCK:

9     Q.   What is a conducted electrical weapon?

10    A.   Most people think of it as a Taser, which is a trademark

11    for the best-selling brand of conducted electrical weapon, but

12    it's a little broader than that.  It's a weapon that uses

13    electricity to stop somebody.  Could even include electric

14    fence, for example.  But the most common weapon that we think

15    about in this -- with that definition is what the police use in

16    the United States that shoots out two probes with wires, and

17    wires land on the person, and they put muscle stimulation

18    pulses through so the muscles lock up and they fall over to

19    reduce shootings.

20    Q.   And have you written specifically about conducted

21    electrical weapons?

22    A.   Yes.  I've published about 40-some papers on them and

23    coedited two books on them.

24    Q.   And have you made presentations about conducted electrical

25    weapons?

Dr. Kroll - Direct (Smock)                                          1315

1    A.   Yes, all over the world.

2    Q.   Now, do you serve as an advisor to any companies that

3    produce electrical weapons?

4    A.   I do.  The first one you might not think about, which is

5    Amorok.  They make the very advanced virtual security systems

6    for Federal Express, for example, and high-value buildings with

7    automatic cameras and electric fences, which is technically an

8    electrical weapon.  I'm their scientific advisor.  The one that

9    might come to mind most quickly is Axon, and they make the

10   Taser brand electrical weapon.

11   Q.   And what is your role with Axon?

12   A.   I give them advice on what studies to do, safe -- how to

13   improve their safety and how to improve their effectiveness,

14   and I sit on their corporate board as well, but it's all to

15   give that type of advice.

16   Q.   Have you, Dr. Kroll, ever been qualified as an expert in

17   court in the field of electrical weapons and the effect of

18   electricity on the human body?

19   A.   Yes.

20   Q.   Can you estimate how many times that's occurred?

21   A.   At least two dozen.

22        THE COURT:  At least two dozen, did you say?

23        THE WITNESS:  Yes, Your Honor.

24   BY MR. SMOCK:

25   Q.   And who typically retains you as an expert in court cases?

Dr. Kroll - Direct (Smock)                                    1316

1    A.    It would be various law enforcement agencies.  Sometimes

2    it's the prosecution, like the United States Department of

3    Justice or the government of Australia, and many times it's the

4    defense of the law enforcement agency.  That would cover

5    90 percent of it.

6    Q.    So is it fair to say that you've been retained by the

7    Department of Justice to testify or to provide opinions about

8    the effects of electricity on the human body?

9    A.    Yes, about a half a dozen times.

10   Q.    Dr. Kroll, what hourly rate do you charge lawyers for your

11   work?

12   A.    For the law enforcement type of work, I charge $480 an

13   hour.

14   Q.    And do you know generally how much money you expect to

15   bill for your work on this case for the federal public

16   defender's office?

17   A.    It would be in the thousands of dollars.  I don't know.

18   I'm not sure.

19          THE COURT:  Do you have a different billing rate for

20   your initial research and writing a report versus testifying in

21   court?

22          THE WITNESS:  Yes, sir.  I think in this case I do,

23   so it would be 480 an hour for the research, and it's slightly

24   higher for testifying in court.  I don't recall what it is.

25   Maybe it's 600.  I'm just not sure right now.

```
 1              THE COURT:  Do you know approximately how many hours
 2      you've spent so far on this case, roughly?
 3              THE WITNESS:  Twenty hours maybe, counting today.
 4      BY MR. SMOCK:
 5      Q.   Sounds about right.
 6           Dr. Kroll, is that amount that you have talked about
 7      consistent with the amount that you have been paid in other
 8      cases in which you've testified?
 9      A.   Yes, but a lot of other work I charge more.
10              MR. SMOCK:  Your Honor, we would at this point move
11      to offer Dr. Kroll as an expert in the field of electricity,
12      the effect of electricity on the human body, and conducted
13      electrical weapons.
14              THE COURT:  Now, Mr. Dreher.
15           So say again what you're offering him as an expert in.
16              MR. SMOCK:  The effect of electricity on the human
17      body, or bioelectricity, and conducted electric weapons.
18              THE COURT:  Okay.
19                          VOIR DIRE EXAMINATION
20      BY MR. DREHER:
21      Q.   Good morning, sir.
22      A.   Good morning.
23      Q.   I don't know if you answered this specific question, but
24      have you actually been paid by the federal public defender's
25      office?
```

1    A.    I've received some checks, yes.

2    Q.    Oh, okay.

3    A.    I'm not sure if it was in this case or another one.

4    Q.    So there have been times when you've testified before for

5    the defense?

6    A.    Well, I was retained and paid in another case, and that

7    did not go to testimony.

8              THE COURT:  In another case representing a defendant

9    in a criminal case; is that what you're talking about?

10             THE WITNESS:  Yes, sir, and I think I've probably

11   gotten one check in this case.  I just don't remember.

12   BY MR. DREHER:

13   Q.    That's all right.  Mainly what I was hoping to ask is:

14   You testified earlier about your educational background and

15   that you had graduated, I believe, with your master's in 1990?

16   A.    I don't believe I gave the date.  And do you need to know

17   the date?

18   Q.    When was it that you graduated from school?

19   A.    My last degree?

20   Q.    When is the last time you attended an educational

21   institution in a learning sense?

22   A.    Probably '91.

23   Q.    And earlier you testified that you have provided at least

24   education to others; correct?

25   A.    That's correct.

Dr. Kroll - Voir Dire (Dreher)                          1319

1   Q.   Do you still attend trainings or take part in seminars

2   related to this topic?

3   A.   All the time.

4   Q.   What is the extent of the trainings that you've had since

5   you've graduated from school?

6   A.   Well, part of the -- science is a little different from

7   other disciplines such as law where you maybe go to law school

8   and then take a CLE class every year or something like that.

9   It's our job to come up with new things, so we can't go and be

10  trained out of a book, and so once we get the PhD, that's the

11  start of a scientist's career and education.  That just proves

12  we can do one study.

13       And then, as we advance through our research and

14  publications and sharing knowledge, then we get our serious

15  credentials, which are the fellow credentials.  Those are sort

16  of the bookmarks, and I have four of those.  We get those

17  typically in our forties or fifties once we've been established

18  as a scientist.  So it's not like we just sit in a class and we

19  learn things and then we're set loose on the world.  It's an

20  ongoing process.

21  Q.   Does this ongoing process include receiving education from

22  others?

23  A.   It's an exchange.  We go to the conferences.  For example,

24  in July we have the biomedical conference in Sydney, Australia,

25  and then I have a paper to present.  I'll sit in my colleagues'

Dr. Kroll - Voir Dire (Dreher)                                    1320

1    papers.

2                THE COURT:  So you're going to go to a conference

3    like that, and you're going to present a paper.

4                THE WITNESS:  That's --

5                THE COURT:  You're going to sit around and listen

6    to -- sit around.  You're going to listen to other people

7    present papers as well?

8                THE WITNESS:  Yes, and then we debate them, and I'll

9    offer questions and suggestions.  That's the way it works.  We

10   are in charge of coming up with the new stuff, so we can't go

11   to textbooks for our learning, I think, is the point I'm trying

12   to make.  We write the books.

13   BY MR. DREHER:

14   Q.   Okay.  So it's safe to say, then, that you are following

15   your own book; correct?

16   A.   The job of a scientist is to write the books, and we use

17   new studies that our colleagues have come up with and research

18   that we do, and we put that together in our books and our

19   publications, and then those are indexed by the National

20   Library of Medicine, and then anyone can go to a library.

21   Actually, they can go on the internet and get the outline of

22   the paper and then go to the library to get the full paper; so

23   that's how we promulgate new science.  It's our job to come up

24   with new stuff.

25   Q.   So as it relates specifically, then, to this case and the

Dr. Kroll - Voir Dire (Dreher)                                    1321

1    research and textbooks that you relied upon in this case, were

2    there sources outside of books that either you have written or

3    studies that you have conducted?

4    A.    I'm trying to think of the specific opinions that I relied

5    on or specific sources, forgive me, that I'm relying on, and

6    that would include books that I wrote, books that other people

7    have written, scientific papers, and maybe most importantly

8    scientific standards that we help write as well for electrical

9    safety and the performance of stun guns.

10   Q.    So I guess that kind of gets to what I'm asking, sir.  Is

11   there something that you're relying upon that you have not

12   contributed to write in your testimony today?

13              THE COURT:  Of course there is.

14        You didn't write all the standards; right?

15              THE WITNESS:  I didn't write all the standards,

16   right.  For example, IEC -- the IEC standard, which is the

17   fundamental one we use internationally for determining the risk

18   of electrical injury, I've only been on that committee for

19   eight years, and so I've been -- I've been helping to write the

20   updates, but it's been around for almost 100 years, and it's

21   gradually evolved.  Every ten years they come up with a new

22   standards book.  So the answer is really yes and no.

23              MR. DREHER:  Okay.  Your Honor, I have no further

24   questions, and I have no objection.

25              THE COURT:  Okay, all right.  So ladies and

1    gentlemen, Dr. Kroll -- I will recognize Dr. Kroll as an expert

2    on the effect of electricity on the human body and conducted

3    electrical devices.

4        Right?

5            MR. SMOCK:  Yes.

6            THE COURT:  And I will tell you, ladies and

7    gentlemen -- and I'll give you this instruction again later as

8    well -- that ordinarily in a trial a witness may not testify as

9    to his or her opinions or conclusions, but we have an exception

10   for expert witnesses.  Expert witnesses are allowed to give

11   their opinions and their conclusions and the reasons for those

12   opinions or conclusions because they have become some -- become

13   an expert in some art, science, profession, or calling, and

14   I've just said I'm recognizing Dr. Kroll as an expert.

15       The jury is not bound by the testimony of an expert or by

16   his opinions or conclusions.  If you find that any opinion or

17   conclusion that an expert gives is not based on sufficient

18   education or practical experience or research experience or

19   that the reasons that support his opinion or conclusion are not

20   sound or that the opinion or conclusion is outweighed by other

21   evidence, you may disregard either completely or partially some

22   or all of the expert's opinions or conclusions.

23       You must consider the expert's testimony along with all

24   the other evidence in the case and give it as much weight as

25   you think it fairly deserves.

1        Okay.  So with that you may proceed.

2              MR. SMOCK:  Thank you, Your Honor.

3                    DIRECT EXAMINATION RESUMED

4     BY MR. SMOCK:

5     Q.    So Dr. Kroll, I'd like to start by talking about types of

6     conducted electrical weapons and standards used to evaluate

7     them.  So the first thing I want to ask you about that is:

8     What is a Taser?  You started to talk about that earlier.

9     A.    The Taser brand electrical weapon is what we call a

10    handheld electrical weapon to distinguish it from --

11              THE COURT:  You've got to talk a little bit slower

12    for the court reporter.

13    A.    -- to distinguish it from the electric fence, which is

14    obviously fixed.  And the specific Taser brand, which is the

15    best-selling electrical weapon, launches two probes, and then

16    those should adhere to the subject, lock up their muscles by

17    being a muscle stimulator so they fall down to prevent a

18    shooting.  That model of device can also have the probes

19    removed.  It has a little bit of a nose cone on the front, if

20    you will, if you think about a rocket analogy.  That can be

21    removed, and it can be applied directly to cause pain to give

22    compliance with an officer's commands without using things like

23    pepper spray and other intimidation-type tools or something

24    like that.

25              So the Taser brand electrical weapon can function as a

1    stun gun; and therefore, the outputs are also covered by the

2    stun gun standard.  So it operates either in probe mode or in a

3    drive -- what they call a drive stun mode because you're

4    supposed to push it into the skin.

5    BY MR. SMOCK:

6    Q.   Dr. Kroll, I'm going to show you what's been marked as

7    Defendant's Exhibit 12 for identification and ask you what

8    you -- what that is.

9    A.   That's a picture of the X26 Taser brand electrical weapon,

10   and it shows a blurry picture of the probes coming out with the

11   wires, so there's two wires to make the connection.

12              THE COURT:  What is it again?  It's a --

13              THE WITNESS:  This is the Taser brand electrical

14   weapon.  It's the X26 model.

15              THE COURT:  Okay.

16              THE WITNESS:  And it has just launched two probes, so

17   we see the wires in the air.  We've not seen the probes, which

18   would be way off screen to the left, and this is what police

19   officers use to reduce shootings.

20              MR. SMOCK:  Your Honor, I'd move to admit Defendant's

21   Exhibit 12.

22              THE COURT:  Any objection?

23              MR. DREHER:  Just to relevance, Your Honor.

24              THE COURT:  Overruled.  It will be admitted.

25   BY MR. SMOCK:

Dr. Kroll - Direct (Smock)                                    1325

1    Q.   So Dr. Kroll, now that the jury can see this, can you just

2    explain again what we're seeing here.

3    A.   The Taser brand model X26 is what we're seeing here, and

4    it has just launched two probes from its -- the nose cone, if

5    you will, so we've seen the wires.  We don't see the probes,

6    which would be way off to our left, and the blue part in the

7    center there, that can be removed.  You see two big circular

8    buttons.  That can be squeezed in and removed so this can be

9    used as a stand-alone stun gun.

10   Q.   And when used as a stand-alone stun gun, could you again

11   explain what a law enforcement officer or someone using it

12   would do.

13   A.   When it's just used as a stun gun, it's used to cause pain

14   compliance.  It's very uncomfortable.  Most people cannot

15   tolerate it, and so when an officer wants to have compliance to

16   get somebody, say, to cooperate with handcuffing, they would

17   apply this, pull the trigger.  It delivers a painful shock to

18   the body to get compliance without having to go to more

19   dangerous things like pepper spray and batons and things like

20   that.

21   Q.   And other than -- well, what is the main purpose of the

22   shock created by a Taser conducted electrical weapon for law

23   enforcement?

24   A.   The main reason or the main effect is with the probes.  So

25   if someone was standing with a knife before these Taser weapons

Dr. Kroll - Direct (Smock)                                    1326

1    and they were to advance on a police officer, the police

2    officer would shoot them with a firearm, and often the person

3    would die.  These probes go in.  They lock up the muscles

4    because its function is a muscle stimulator.  The person falls

5    down, drops the knife, and then they can be handcuffed and

6    taken in for...

7              THE COURT:  So the probe has -- its impact is on the

8    muscles?

9              THE WITNESS:  Yes, sir, it's on the muscles.

10             THE COURT:  Okay.

11   BY MR. SMOCK:

12   Q.   And how long does that impact last on the muscles?

13   A.   It's a shock.  When it's over, it's over.  The standard

14   minimum run is five seconds.

15             THE COURT:  What does that mean, five seconds?  What

16   happens within that five seconds?

17             THE WITNESS:  The thing automatically shuts off after

18   five seconds.  That's supposed to be enough time for the person

19   to drop the knife, fall down, and be taken under control.

20             THE COURT:  Okay.  So the impact on the body is

21   longer than five seconds, but the thing coming out of the stun

22   gun is a five-second...

23             THE WITNESS:  Yes, sir.  It's five seconds of pulses

24   at 19 pulses per second, so it delivers a total of 85 pulses.

25   BY MR. SMOCK:

1    Q.   And Dr. Kroll, does a Taser conducted electrical weapon

2    typically cause serious bodily injury if it's applied to a

3    person?

4    A.   Typically not.  If a person ducks and a probe goes into

5    the eye, that's a very serious injury, of course.  If the

6    person is at an elevated surface and they fall and hit their

7    head on concrete and their muscles are locked up, they cannot

8    break their fall, and there have been deaths due to that.  And

9    tragically, there have been cases of people that had gasoline

10   on them and the spark ignited the gasoline and they burned up.

11   So those are the three main issues that are taught in police

12   training to avoid.

13   Q.   And how do you measure the electrical output of a Taser?

14   A.   The primary electrical output method is with

15   microcoulombs, and I apologize for the long word, but it goes

16   back to a French scientist from 200 years ago that measured the

17   electrical charge, and that is how I measure the output of each

18   pulse.

19   Q.   And how much electrical output does a Taser conducted

20   electrical weapon deliver?

21   A.   This model delivered about 120 microcoulombs.  The newer

22   ones are a little less, on the order of 70 -- or 70 to a

23   hundred.

24        MR. SMOCK:  Adam, you can take this exhibit down.

25   BY MR. SMOCK:

Dr. Kroll - Direct (Smock)                                    1328

1    Q.   Now, we've referred to stun guns and Tasers.  Can you just

2    sort of quickly explain the difference between the two to the

3    extent you believe there is one.

4    A.   That's really tough because these terms get interchanged a

5    lot, but there is an ANSI standard that covers both stun guns

6    and conducted electrical weapons, and so they measure the

7    output whether you're using the probes or direct contact.  So

8    for the purposes of measuring output, it really doesn't matter,

9    but most people think of a stun gun as something involving a

10   direct contact, and most people think of Taser as something

11   involving probes that go out to make a contact at a distance,

12   say, up to 25 feet.

13            THE COURT:  So say that again.  A stun gun is what?

14            THE WITNESS:  These -- the stun gun is typ- --

15   typically when people talk about a stun gun, it could include

16   the Taser weapon, but more precisely it would refer to direct

17   contact.  So the Taser weapon, after you remove the probe

18   section, now it becomes very technically a stun gun because

19   it's directly applied to cause pain.

20            THE COURT:  Got it.

21   BY MR. SMOCK:

22   Q.   Now, Dr. Kroll, you mentioned standards governing stun

23   guns and Tasers, and can you tell the jury a little bit more

24   about what those standards are and who creates them.

25   A.   The American National Standards Institute, like I

1   mentioned, has standards on motorcycle helmets and bicycle

2   helmets.  They have a standard on stun guns and electrical

3   weapons, and they give the minimum output that it has to have

4   for some effectiveness and a maximum for safety.

5   Q.   So a device might be tested and it turns out that it's too

6   powerful to qualify as a stun gun; is that right?

7   A.   That's correct.

8   Q.   And is it also the case that a device could be tested and

9   then it's not powerful enough to qualify as a stun gun?

10  A.   That's correct.

11  Q.   And why might a device not be powerful enough?  What's the

12  significance of a device coming below the minimum standard?

13  A.   Minimal effect if -- well, for one thing, police officers

14  have to deal with many subjects that have an altered pain

15  threshold.  Rational, sober people generally don't resist

16  arrest.  80 percent of the people that resist arrest have an

17  altered pain threshold from either a psychotic break,

18  recreational drugs, or high level of alcohol, and so there's a

19  minimum standard of 40 microcoulombs -- the minimum

20  requirement, I should say, of 40 microcoulombs for a stun gun.

21  Q.   And does every electrical device that looks like a stun

22  gun or is advertised as a stun gun meet the standards in the

23  field under ANSI to qualify as a stun gun?

24  A.   No.  Very few actually meet the standard.

25  Q.   And based on your research in the field, are there

1   electrical devices advertised for sale as stun guns that are

2   not actually qualified as stun guns under those standards?

3   A.   Yes.

4   Q.   Are there many, very few?

5   A.   The majority of the weapons sold on Amazon, for example,

6   as stun guns would not -- do not qualify as a stun gun.

7            THE COURT:  So if somebody buys one of those on

8   Amazon, are they going to discover at some point that it

9   doesn't do what they think it's going to do?

10           THE WITNESS:  Tragically, yes, and we would hope that

11  it would be from, you know, using it on themselves or a friend

12  to discover this instead of in an actual life-or-death

13  situation.

14           THE COURT:  Instead of what?

15           THE WITNESS:  An actual life-or-death situation or a

16  situation with an accoster.

17           THE COURT:  I assume that law enforcement knows the

18  difference between devices when they buy things.  I mean, we

19  haven't ever had any experience or any research that shows

20  that, you know, some police department or something buys a

21  whole bunch of things that they think is going to be usable for

22  the purposes you've described and discovered no, or is it

23  normally just the random purchaser on Amazon or something?

24           THE WITNESS:  No.  The police departments don't buy

25  the stun guns on Amazon.  They pay a thousand dollars for the

1    real thing, not $20 for an Amazon stun gun.

2    BY MR. SMOCK:

3    Q.   And Dr. Kroll, just so we're clear about your answer, when

4    you said tragically sometimes people don't figure it out, are

5    you saying that there's a concern that if these people applied

6    these minimal -- these items that fall below standards that

7    they would cause harm to themselves?

8    A.   They would not stop an accoster.

9    Q.   So your point is they would not know that, in fact, if

10   they used it on someone, it would have no real effect?

11   A.   That's correct but -- I mean, but to be fair, it makes a

12   lot of noise, and that might scare some people away.

13   Q.   Got it.  I want to talk now specifically about this case.

14   Are you aware that the electrical device that Mr. GossJankowski

15   possessed on January 6 was not recovered?

16   A.   Yes.

17   Q.   Have you tried to identify the type of device he possessed

18   that day?

19   A.   Yes.

20   Q.   How did you do that?

21   A.   I looked at the pictures from the evidence videos, and

22   then I scanned through hundreds of Google images on stun guns

23   as well as the Amazon pages on stun guns to find out which

24   weapons looked similar.

25   Q.   And did you ultimately reach a conclusion about the type

1    of device that Mr. GossJankowski possessed that day?

2    A.   I did.

3    Q.   What type of device was it?

4    A.   It was either the Vipertek or the Police 916.  They

5    have -- they're made with the same housing, almost an identical

6    housing.

7    Q.   I'm going to show you what has been marked as Defense

8    Exhibit 1, and when it comes up on your screen, I'll ask if you

9    can say what you recognize that to be.

10   A.   That is a photo of a Vipertek and the Police 916.

11            THE COURT:  There are two different kinds of items on

12   the screen at the moment?

13            THE WITNESS:  Yes, sir.

14            MR. SMOCK:  I'd move to admit Defense Exhibit 1.

15            MR. DREHER:  No objection.

16            THE COURT:  It will be admitted.

17   BY MR. SMOCK:

18   Q.   So can you direct the jury to which of these is which.

19   A.   The top one is the Vipertek, and the bottom one is the

20   Police 916.  In this view they are identical, so they're

21   basically the same case or housing.

22   Q.   So I want to walk through how you came to this conclusion

23   by making these comparisons, and by -- in doing so I want to

24   first show you what's been marked as Defendant's Exhibit 2 for

25   identification and ask you, once you see it, what you recognize

Dr. Kroll - Direct (Smock)                                    1333

1    that to be.

2    A.   That is either -- well --

3             THE COURT:  Don't tell us what it is.  Do you

4    recognize this photograph as something you've seen before?

5             THE WITNESS:  Yes.

6    BY MR. SMOCK:

7    Q.   And is that Mr. GossJankowski holding the electrical

8    device?

9    A.   Yes.

10            MR. SMOCK:  I'd move to admit defense Exhibit 2.

11            MR. DREHER:  No objection.

12            THE COURT:  It will be admitted.

13            MR. SMOCK:  I'm now also going to ask that Adam put

14   up Exhibit 3 for identification.

15   BY MR. SMOCK:

16   Q.   And when you see that item, I'd ask that you tell us what

17   you see.

18   A.   I see the electrical device being held in his hand.

19            MR. SMOCK:  I'd move to admit defense Exhibit 3.

20            MR. DREHER:  No objection.

21            THE COURT:  It will be admitted.

22            MR. SMOCK:  Now, Adam, if you could put these two

23   photographs next to each other, Exhibit 2 and Exhibit 3.

24   BY MR. SMOCK:

25   Q.   What characteristics --

Dr. Kroll - Direct (Smock)                                    1334

1           THE COURT:  One second.  They're there.  They're both

2    up now.

3           MR. SMOCK:  Thank you, Your Honor.

4    BY MR. SMOCK:

5    Q.   What characteristics of this device were relevant to you

6    as you looked at this photograph?

7    A.   Most of the cheap devices sold as stun guns have a square

8    front, and this has a chiseled front, which is more visible on

9    the left-hand picture, and that makes it somewhat distinctive.

10   Also the black housing.

11   Q.   And do you see the white item on the top of this device,

12   the white circular item?

13   A.   Yes, and that's the integral flashlight.

14          THE COURT:  What is it?

15          THE WITNESS:  That's a flashlight.

16   BY MR. SMOCK:

17   Q.   What about the metal items at the top of this device?

18   A.   The two sharp ones pointing at each other in the middle

19   are the arcing electrodes.  That's used to make the loud noise.

20   And then the two short flat electrodes on either extreme, those

21   would be contact electrodes.

22          THE COURT:  They are what?

23          THE WITNESS:  Contact electrodes.

24          MR. SMOCK:  I'm going to ask, Adam, that you put up

25   Defendant's Exhibit 4 for identification.

Dr. Kroll - Direct (Smock)                                  1335

1   BY MR. SMOCK:

2   Q.   Dr. Kroll, what do you recognize that to be?

3   A.   These are the ten best-selling devices sold as stun guns

4   on Amazon based on the number of reviews that I tested for a

5   scientific paper that my colleagues and I have.

6            THE COURT:  You're saying these are stun guns?

7            THE WITNESS:  These are ones that are advertised as

8   stun guns on Amazon.

9   BY MR. SMOCK:

10  Q.   And just to be clear, do these meet the standards to

11  officially qualify as stun guns?

12  A.   No.

13           MR. SMOCK:  I'd move to admit Defendant's Exhibit 4.

14           MR. DREHER:  No objection.

15           THE COURT:  It will be admitted.

16           MR. SMOCK:  And Adam, if you could zoom in on the two

17  devices there.

18       Thank you.

19  BY MR. SMOCK:

20  Q.   What was relevant to you in your comparison here in

21  determining that it was one of these two devices?

22  A.   What I call the chiseled front end.  Distinctive on the

23  sides we have the three waves and the general grip of the

24  weapon, the narrow grip as opposed to its rectangular casing.

25  Those are fairly distinctive.

1    Q.   Do you see the flashlight as well?

2    A.   Yes.

3              MR. SMOCK:  I'm going to ask, Adam, that you put up

4    Defendant's Exhibit 5 for identification.

5    BY MR. SMOCK:

6    Q.   Dr. Kroll, what do you recognize this to be?

7    A.   That appears to be the electrical device that

8    Mr. GossJankowski was holding, and I see the --

9              MR. SMOCK:  Let me move to admit it so the jury can

10   see it.  I would move to admit Defendant's Exhibit 5.

11             MR. DREHER:  No objection.

12             THE COURT:  It will be admitted.

13   BY MR. SMOCK:

14   Q.   Sorry to interrupt you, Dr. Kroll.  I'll let you carry on.

15   A.   Okay.  It looks like either the Vipertek or the Police

16   916, and what's very clear is the flashlight.  We see the poles

17   for the mounting screws and the two arcing electrodes.

18   Q.   And just to be clear, in this photograph is there

19   electricity arcing?

20   A.   No.  There's a black spot between the two arcing

21   electrodes.

22   Q.   I'm going to show you now what has been marked as

23   Exhibit 6 for identification.  What do you recognize this to

24   be?

25   A.   This is the assembly screw holes which again are

Dr. Kroll - Direct (Smock)                                           1337

1    distinctive, their placement.

2              MR. SMOCK:  I'd move to admit Defendant's Exhibit 6.

3              MR. DREHER:  No objection.

4              THE COURT:  It will be admitted.

5    BY MR. SMOCK:

6    Q.   So you were just explaining that you're seeing the same

7    assembly screw holes here; is that correct?

8    A.   Yes.

9              MR. SMOCK:  Now I'm going to ask that, Adam, you put

10   up Exhibit 7 for identification.

11   BY MR. SMOCK:

12   Q.   What do you recognize this to be?

13   A.   That's a picture of Mr. GossJankowski holding a black

14   electrical device.

15             MR. SMOCK:  I'd move to admit Defendant's Exhibit 7.

16             MR. DREHER:  No objection.

17             THE COURT:  It will be admitted.

18             MR. SMOCK:  I would now ask, Adam, that you put up

19   Defendant's Exhibit 8 for identification.

20        And I would move to admit this photograph into evidence.

21             THE COURT:  Well, has he identified it yet?

22   BY MR. SMOCK:

23   Q.   Can you identify this photograph.  What is it that this

24   is?

25   A.   It's the same picture of Mr. GossJankowski, just showing

1   on the right the comparison to the Vipertek unit that is turned

2   on.

3            MR. SMOCK:  I'd move to admit Defendant's Exhibit 8.

4            MR. DREHER:  No objection.

5   BY MR. SMOCK:

6   Q.   So what is the relevance of this photograph in your

7   determination related to this issue?

8   A.   It shows the device is turned on.

9   Q.   And that -- do both of the devices have a red LED?

10  A.   Yes.

11  Q.   And does the Police 916 device also have that same red LED

12  on the side when it's turned on?

13  A.   Yes.

14           MR. SMOCK:  I'd move -- I'd ask, Adam, that you put

15  up Defendant's Exhibit 9 for identification.

16  BY MR. SMOCK:

17  Q.   Do you recognize this to be the same electrical device

18  held by Mr. GossJankowski?

19  A.   Yes.

20           MR. SMOCK:  I'd move to admit Exhibit 9.

21           MR. DREHER:  No objection.

22           THE COURT:  All right.  Number 9 will be admitted.

23           MR. SMOCK:  Adam, can you put up Defendant's

24  Exhibit 11 for identification.

25  BY MR. SMOCK:

Dr. Kroll - Direct (Smock)                                    1339

1    Q.    What do you recognize this to be?

2    A.    On the left of the picture, Mr. GossJankowski holding the

3    device, and then on the right I have the Vipertek for

4    comparison.

5              MR. SMOCK:  I'd move to admit Defendant's Exhibit 11.

6              MR. DREHER:  No objection.

7              THE COURT:  It will be admitted.

8    BY MR. SMOCK:

9    Q.   Dr. Kroll, what was relevant to you in your evaluation of

10   these photographs?

11   A.    It just further shows the distinctive feature between the

12   Vipertek and the Police 916 model compared to the photograph of

13   Mr. GossJankowski holding something in his hand.

14             THE COURT:  And what are the distinctive features

15   that...

16             THE WITNESS:  Specifically, I'm pointing out the grip

17   shoulder.  There is a notch there from where the fingers would

18   be before we start the chiseled front end, but there's -- yeah,

19   that's a specific thing that we're seeing in the surveillance

20   video.

21             MR. SMOCK:  Thank you.  Can you take that down, Adam.

22   BY MR. SMOCK:

23   Q.   So Dr. Kroll, are those the main comparisons that led you

24   to conclude that the device that was possessed by

25   Dr. GossJankowski -- or by Mr. GossJankowski was either the

Dr. Kroll - Direct (Smock)                                    1340

1    Vipertek or the Police 916 branded devices?

2    A.   Yes.

3    Q.   And did you determine whether those devices were available

4    for sale to the public on the internet?

5    A.   Yes.

6    Q.   Where did you see them for sale?

7    A.   I saw them all over Google, and I specifically ordered

8    several on Amazon.

9    Q.   And on Amazon where did the Vipertek device rank among the

10   search results when you searched stun gun?

11   A.   It was either the most popular or second most popular.  I

12   think it had almost 14,000 reviews.

13   Q.   And do you recall how much it costs to buy?

14   A.   It's about $20.

15           THE COURT:  Approximately what?

16           THE WITNESS:  $20.

17   BY MR. SMOCK:

18   Q.   And just for comparison's sake, we were looking at a Taser

19   earlier.  How much does a Taser cost?

20   A.   That particular model costs a thousand dollars.  The new

21   ones are $1,500.

22   Q.   And do you recall how much the Police 916 device

23   advertised on Amazon costs?

24   A.   It's also about $20.

25   Q.   So I think you said this, but just to be clear, did you

Dr. Kroll - Direct (Smock)                                    1341

1    purchase units of these two devices in order to test their

2    power?

3    A.   Yes.

4            THE COURT:  Purchase which two devices?

5            THE WITNESS:  I purchased several of the Vipertek and

6    also some of the Police 916.

7    BY MR. SMOCK:

8    Q.   So the first thing that I want to do with respect to that

9    is just go over what you determined about how these devices

10   worked.

11           MR. SMOCK:  And in doing so I'm going to ask Adam

12   that you put up Exhibit 4 that's already in evidence and blow

13   up the two devices that we are talking about here.

14   BY MR. SMOCK:

15   Q.   For each of these devices --

16           THE COURT:  What are these two devices again?

17           THE WITNESS:  It's a Vipertek on the left, and on the

18   right is the Police 916.

19   BY MR. SMOCK:

20   Q.   Now, when you -- how do you turn one of these things on?

21   A.   I'm sorry.  How do I determine what?

22   Q.   How do you turn one of these -- either of these devices

23   on?

24   A.   There's a slide switch right on the top right in the

25   middle.

Dr. Kroll - Direct (Smock)                                    1342

1    Q.    And you actually are able to use your screen to indicate

2    where that is.

3    A.    Yeah.  Right there (indicating).  Push the slide switch

4    forward, turns it on.

5    Q.    And does that slide switch have any other function, for

6    example, with respect to the flashlight?

7    A.    Yes.  When it's moved halfways up, the flashlight turns

8    on.  When it's moved all the way up, then the weapon is

9    prepared to make the loud sound.

10   Q.    And when you turn -- flick the switch, does the red light

11   on the other side of the device turn on?

12   A.    Yes, when you flip it all the way.

13   Q.    And when you push that switch all the way forward, does

14   the device create an electrical arc?

15   A.    No.  You have to also depress this button here with your

16   thumb (indicating).

17   Q.    And we also have seen in these images those two

18   electric -- or these two metal items going across the

19   flashlight.  Can you again explain what those are and what

20   their purpose is.

21   A.    Those are arcing electrodes, and they're very close to

22   make a very strong arc with fairly low voltage to make a loud

23   noise.

24   Q.    And does that loud noise have anything to do with the

25   actual power of a device if it were applied to a person?

Dr. Kroll - Direct (Smock)                                    1343

1   A.    No.

2   Q.    And can you explain whether an actual stun gun that you're

3   familiar with actually has these two metal items going across?

4   A.    No.  The real stun guns used by police do not have these

5   arcing electrodes to make noise.

6   Q.    And so just so we're clear, in your view what is the

7   purpose of those two metal items?

8   A.    It is to make a loud noise and to make a bright arc with

9   reduced electrical output because they're so close.  It doesn't

10  have to take much electricity to make the arc to jump between

11  them.

12  Q.    Now, what are the two metal items at the top of the

13  device?

14  A.    Those would be contact electrodes.

15  Q.    And what is the purpose of those?

16  A.    The purpose of those is to deliver a charge to the skin.

17          THE COURT:  Deliver the charge what?

18          THE WITNESS:  To the skin or clothing.

19  BY MR. SMOCK:

20  Q.    And does the strength of that charge depend obvious- --

21  depend on the charge emitted by the device itself?

22  A.    Yes.

23  Q.    And is there -- what is the significance of the distance

24  between those two items?

25  A.    To get muscle lockup you need to have electrodes about a

Dr. Kroll - Direct (Smock)                                      1344

1    foot apart so that the current can go deeper into the body and

2    affect the muscles.  When the electrodes are that close, it

3    pretty much travels through the skin so there's no effect on

4    the muscles.

5              THE COURT:  How close do you have to be to somebody

6    to have an effect?

7              THE WITNESS:  You would have to be close enough to

8    touch them.

9              MR. SMOCK:  So Your Honor, just let me ask a question

10   to be clear about that.

11   BY MR. SMOCK:

12   Q.   This device, to have any effect whatsoever, needs to be

13   applied to a person; correct?

14   A.   That's correct.

15             THE COURT:  And when you say "this device," the one

16   on the left is the Vipertek and the one on the right is the

17   Police 916; is that right?

18             THE WITNESS:  Yes.  Yes, Your Honor.

19             THE COURT:  And is your answer the same with respect

20   to both?

21             THE WITNESS:  Yes, Your Honor.  The Police model is

22   actually a little weaker.  Especially with a marginal contact

23   it's really weak, but the principle is the same.

24   BY MR. SMOCK:

25   Q.   And I'll get into the results of your testing in one

Dr. Kroll - Direct (Smock)                                    1345

1    moment.

2          Dr. Kroll, did you have an opportunity to watch videos

3    that had been submitted into evidence of Mr. GossJankowski

4    creating an electrical arc with the device?

5    A.    Yes.

6    Q.    And did you, yourself, with the devices that you tested,

7    press the button to create an electrical arc?

8    A.    Yes.

9    Q.    And did the sound created and the nature of the electrical

10   arc appear to be the same?

11   A.    Yes.

12          MR. SMOCK:  Now you can take that down, Adam.

13   BY MR. SMOCK:

14   Q.    Dr. Kroll, did I ask you to test these two devices?

15   A.    Yes.

16   Q.    What was the purpose of testing the two devices?

17   A.    I wanted to find out if they put out enough electrical

18   charge to be considered a stun gun.

19   Q.    And how does an expert like yourself in this field measure

20   the power of an electrical device like this?

21   A.    Well, we connect them to a resistor to simulate the load

22   that you'd have if you were to have it up against the skin, and

23   then we measure the output by an oscilloscope so we can see the

24   tracing, and it's the area under the curve of that tracing that

25   gives us the charge.

1   Q.   Now, what unit did you use to measure the output of these

2   devices?

3   A.   I used both.  I used the Vipertek and the Police 916.

4   Q.   I'm sorry.  What unit of measurement?  I'm probably not

5   using the right terminology.

6   A.   No.  My mistake.  Forgive me.  The primary one was the

7   microcoulombs of charge.

8            THE COURT:  Could you spell that to everybody.

9            THE WITNESS:  Well, micro, M-I-C-R-O, and coulomb is

10  C-O-U-L-O-M-B, all one word.

11  BY MR. SMOCK:

12  Q.   And is that a standard way in the field of determining the

13  power or the electrical output of something that is claiming to

14  be a conducted electrical weapon?

15  A.   Yes.

16  Q.   Now, when you performed tests on these two devices, what

17  were the outputs in microcoulombs of these two devices?

18  A.   They were around two-thirds of a microcoulomb.  I don't

19  have my ex report with me to get it exactly, but I think about

20  .64 or .66, something like that.  Less than 1 microcoulomb.

21  Q.   So would it help to look at your report to recall the

22  exact number?

23  A.   Yes, please.

24            MR. SMOCK:  Your Honor, is it all right if I

25  approach?

Dr. Kroll - Direct (Smock)                                    1347

1          THE COURT:  Sure.

2          THE WITNESS:  Thank you.

3    BY MR. SMOCK:

4    Q.   I've handed you your report.

5    A.   It looks like I had it right.  I think it was .66 for the

6    Vipertek and .64 for the Police 916.

7    Q.   So Dr. Kroll, are those numbers high?

8    A.   No.

9    Q.   Can you explain.

10   A.   Well, they are about a hundredth of what a police stun gun

11   would put out, actually less, but about a hundredth of what a

12   police stun gun would put out, and they're not enough to

13   satisfy the ANSI standard for a stun gun.

14   Q.   So I want to talk about that in a little more detail.  You

15   mentioned the ANSI standards.  Are those standards for

16   determining whether something qualifies as a stun gun that we

17   talked about earlier?

18   A.   Yes.

19          THE COURT:  What is the standard called again?

20          THE WITNESS:  It's the ANSI.

21          THE COURT:  Oh.  For the organization that you talked

22   about.

23          THE WITNESS:  Oh.  American National Standards

24   Institute.

25          THE COURT:  Okay.

1   BY MR. SMOCK:

2   Q.   And under those standards what is the minimum charge

3   required for a device to qualify as a stun gun?

4   A.   The ANSI standard minimum is 40 microcoulombs.

5   Q.   Forty?

6   A.   Yes.

7   Q.   And can you remind us the charge emitted by these two

8   devices?

9   A.   About .65.

10  Q.   So if my math is correct, is that about 1 or 2 percent of

11  the minimum qualification for something to qualify as a stun

12  gun?

13  A.   Yes.

14  Q.   Now, what is the maximum charge for a stun gun?

15  A.   The maximum is 125 microcoulombs.

16  Q.   So again, the devices that you tested were far below that,

17  it's fair to say?

18  A.   Yes.

19  Q.   Did you reach a conclusion based on those tests about

20  whether the device that Mr. GossJankowski possessed was, in

21  fact, a stun gun?

22  A.   I did.

23  Q.   And what was your conclusion?

24  A.   These would not qualify as a stun gun.

25  Q.   Would these items be capable of causing muscles to lock?

1    A.    No.

2    Q.    Now I want to talk for a moment about how outputs from

3    these devices would compare to other electrical devices.  We've

4    talked about Tasers, but what is an electronic nerve

5    stimulator?

6              THE COURT:  An electronic what?

7              MR. SMOCK:  Nerve stimulator.

8    A.    The electronic nerve stimulator is an FDA-approved device

9    that you can put around a bad joint or painful joint, and it

10   delivers a buzz that you feel to block the pain.  And there are

11   stronger ones that are called electronic muscle stimulators,

12   and you can put them on your tummy to try to get your six-pack

13   back.  You can put them on your arm to stimulate the muscles to

14   get an easy workout.

15             THE COURT:  There's an objection.

16             MR. DREHER:  Yes, Your Honor.  I'm going to object to

17   this line of questioning as to relevance, and also I'm not sure

18   it complies with Rule 703.

19             THE COURT:  All right.  Let's come to the bench and

20   talk.

21        (At sidebar)

22             MR. DREHER:  Your Honor, Mr. Smock can correct me if

23   I'm wrong, but I believe he's going to ask the witness to

24   testify to the amount of charge this device that he's tested

25   would have as compared to these muscle stimulators, and

1    certainly we've already had the comparison as it relates to

2    police-type Taser devices, but getting into the muscle

3    stimulators I don't believe would be relevant as there is some

4    prejudice involved with the idea that these medical devices

5    would -- I believe he's going to testify that the electrical

6    output of this device is less than these medical devices.

7         Now, under 703 the prejudice analysis flips.  In other

8    words, if this is a basis of one of his opinions, the probative

9    value must be substantially outweighing the prejudicial effect,

10   and here I don't believe that Mr. Smock will be able to

11   overcome that switched prejudicial value.

12            MR. SMOCK:  Your Honor --

13            THE COURT:  Why is it relevant?

14            MR. SMOCK:  The main issue that the jury will be

15   asked to decide on this issue is whether this device can cause

16   injury, and the fact that this device is far less powerful than

17   a medical device that by definition does not cause injury is

18   extremely relevant and, in fact, is central to their

19   determination.  This was in the report.  There's no real debate

20   about it, and the fact that this device was significantly less

21   powerful than medical devices is relevant and important for the

22   jury to understand, and I will do it in five minutes.

23            THE COURT:  So I want to look at 703.  Wait a minute.

24            MR. SMOCK:  The other question is --

25            THE COURT:  This is substantially prejudice.

 1          MR. SMOCK:  The question is who it's prejudicing and

 2    how it's prejudicing.  I mean, it's directly relevant.  It goes

 3    to the question of injury and ability to injure, and it's a way

 4    for the jury to understand this issue that they wouldn't

 5    otherwise be able to see.

 6          MR. DREHER:  And so the answer to Mr. Smock's

 7    question who it's prejudicing would be the jury.  It's not

 8    necessarily inflammatory, but it certainly would confuse the

 9    issue in terms of what the comparisons being made are.  So

10    given the wording of the rule on it, I don't believe it

11    substantially outweighs the prejudicial effect, at least the

12    probative value that Mr. Smock is intending to offer it for.

13          THE COURT:  Okay.

14          MR. SMOCK:  I --

15          THE COURT:  Anything else anybody wants to say?

16          MR. SMOCK:  I just see no -- there's been no

17    explanation as to what the confusion would be.  If there's

18    confusion, they can talk about it on cross, but it's a

19    straightforward issue.

20          THE COURT:  Well, and the primary point is to compare

21    the Vipertek and Police whatever it's called to a stun gun,

22    Taser.  That's the primary problem.

23          MR. SMOCK:  Respectfully, no, it's not, but that's

24    part of it.  The question is whether it's capable of causing

25    injury.  I'm trying to give the jury an understanding about

1    things that would not, medical devices that are stronger that

2    obviously don't cause injury, so it's simply limiting us --

3              THE COURT:  Okay.  I understand your point.  You got

4    a long way to go with this witness?

5              MR. SMOCK:  Not really.

6              THE COURT:  Oh, okay.  All right.  Why don't you all

7    sit down, and let me talk to Erica for a minute.

8         Wait, wait.

9              MS. ROCHLIN:  If I may, could I ask the Court for a

10   short break before 1:30, depending on how long this goes?  I'm

11   not entirely sure...

12             THE COURT:  I would like to do that too, and my

13   question really is whether you want to do it now or you want to

14   let Mr. --

15             MS. ROCHLIN:  I defer to the Court as the best time,

16   but 1:30 is starting to feel further and further away for me.

17             THE COURT:  Mr. Smock, continue.

18             MR. SMOCK:  I think I have probably 15 or 20 minutes

19   more is my best guess.

20             MS. ROCHLIN:  I'll do my best to hang in.

21             THE COURT:  I mean, I'm happy to take a break if you

22   want to, but if we think we can finish his direct in 15 or so

23   minutes...

24             MS. ROCHLIN:  I'll hang in there for 15 minutes.

25             THE COURT:  All right.  Let's go.  Let's go sit down.

1          (In open court)

2              THE COURT:  I've considered the objection, and we've

3     discussed it at some length at the bench, and I will overrule

4     the objection and let Mr. Smock continue.

5              MR. SMOCK:  Thank you, Your Honor.

6          I will ask, Adam, that you put up Defendant's Exhibit 14

7     for identification.

8     BY MR. SMOCK:

9     Q.   These are odd images, but can you explain what they are.

10    A.   These are FDA-approved electronic muscle stimulators.

11             MR. SMOCK:  I would move to admit Defendant's

12    Exhibit 14.

13             THE COURT:  And I assume that the objection to the

14    exhibit is the same objection we just discussed at the bench to

15    the testimony that it relates to; correct?

16             MR. DREHER:  That's correct, Your Honor.  There's no

17    further objection.

18             THE COURT:  Okay.  So I understand the objection.

19    Having considered that I think I will -- the same objection.

20    The objection to the exhibit is overruled for the same

21    objection [sic] to this nature of his testimony was overruled.

22    For the same reasons.

23             MR. DREHER:  Thank you.

24             THE COURT:  Exhibit 14.

25    BY MR. SMOCK:

1    Q.    Will you explain what we're seeing.

2    A.    We know a lot about electric stimulation of the muscles

3    from the widespread acceptance of electronic muscle

4    stimulators.  These are FDA approved.  They have to meet

5    certain standards for minimum output and maximum output, and so

6    it helps us judge the safety of other electrical stimulators of

7    the body.

8    Q.    Just to be clear, why would someone do this?

9    A.    They -- well, it's -- maybe it's because they're too lazy

10   to go to the gym or they don't have time to go to the gym and

11   they want to tone -- get themselves toned up.

12   Q.    And you also mentioned that these devices can be used to

13   block pain; is that right?

14   A.    Yes.  The ones that block pain typically put out about

15   half of the charge of the ones that stimulate the muscles

16   'cause it's uncomfortable to stimulate the muscles.

17   Q.    So devices like this are designed not to cause injury;

18   correct?

19   A.    That's correct.

20   Q.    And definitely not serious bodily injury or death.  Am I

21   right?

22   A.    That's correct.

23   Q.    Now, are electronic nerve stimulators like this regulated

24   by standards in the field to assure that they are effective and

25   would not cause injury?

1    A.   Yes.

2         THE COURT:  Are the standards the same ones you've

3    been talking about, or are they by some government agency?

4         THE WITNESS:  It's a quasi -- quasi-government

5    agency.  It's not the ANSI stun gun standard, but there's a

6    standard that's a joint ANSI and AAMI standard that the FDA

7    relies on, and AAMI is the American Association for the

8    Advancement of Medical Instrumentation, if I have that correct.

9         THE COURT:  And you just said the FDA relies on that.

10   You're talking about the government agency the Food and Drug

11   Administration?

12        THE WITNESS:  Yes, Your Honor.  So if you look at the

13   actual FDA applications for these things, they say we tested

14   them according to this nerve stimulator standard and it meets

15   all of the requirements of that nerve stimulator standard and

16   no further testing is required.

17        MR. SMOCK:  Now, Adam, you can take that image down.

18   BY MR. SMOCK:

19   Q.   What are -- what is the minimum charge under the standards

20   you've just described for a device to qualify as a nerve

21   stimulator like we've seen on the screen a moment ago?

22   A.   Seven microcoulombs.

23   Q.   Seven?

24   A.   Correct, seven.

25   Q.   Can you remind me the number of microcoulombs emitted by

Dr. Kroll - Direct (Smock)                                    1356

1   the two devices, that Police 916 and the Vipertek?

2   A.    .66 and .64.

3   Q.    So does that mean that they were less than 10 percent as

4   strong as the minimum strength of a medical device like we've

5   just been looking at?

6   A.    Yes.

7   Q.    And what is the maximum charge for a medical electrical

8   nerve stimulator?

9   A.    The FDA allows 75 microcoulombs.  Very specifically, I

10  should say the accepted standard allows 75 microcoulombs, and

11  that's a standard that the FDA relies on.

12  Q.    So that maximum is less than -- so these units had less

13  than 1 percent of that maximum.  Is my math right?

14  A.    That's correct.

15  Q.    Now, Dr. Kroll, are there general understandings in the

16  field of bioelectricity about how much electrical charge could

17  cause injury or death?

18  A.    Yes.

19  Q.    And is that information that you and your colleagues use

20  in determining safety standards for electrical devices in your

21  work with the International Electrotechnical Commission?

22  A.    Yes.

23  Q.    Can you tell the jury how an electrical charge might cause

24  death.

25  A.    Over a hundred years ago, children on farms were being

1    electrocuted by electric fences, and so Underwriters Laboratory

2    initiated some studies and came up with a standard back in the

3    '30s initially to limit the amount of charge so that a little

4    child wouldn't be electrocuted.  And there's a difficult

5    balance because electric fences have to stop a big cow, but

6    imagine the worst-case scenario, a 12-year-old child whose

7    chest is about the height of the electric fence walking

8    barefoot on wet ground being contacted in the chest.

9           Tragically, there used to be a lot of deaths from this, so

10   they put in a limit of 4 millicoulombs, which is 4,000

11   microcoulombs, as a safety limit.  The new -- the international

12   limit is 3 microcoulombs.  It's even less.

13   Q.   Did you mean millicoulombs?

14   A.   Millicoulombs.  Forgive me.  Millicoulombs, which is 3,000

15   microcoulombs, with 9,000 being given as high risk of death.

16   Q.   And if a charge of that very high level is applied to a

17   person, how would it cause death?

18   A.   It would have sent enough current through the heart to

19   confuse the heart's electrical system.  And so the heart's

20   electrical system, which is normally controlled by pulses that

21   spread through evenly, starts to have waves that go around in a

22   circle, and this causes ventricular fibrillation, so waves are

23   just going around wildly around the heart.  It's not pumping.

24   Now it's a cardiac arrest, and the person would die.

25   Q.   And is there an understanding in the field about how much

1    electrical charge applied to a person by an electrical device

2    like a stun gun would likely cause death?

3    A.   It would be almost impossible for a stun gun to do it

4    because the probes are so close together.  I mentioned the

5    tragic cases of electric fence shocks from a hundred years ago.

6    That was somebody that took a shock in the chest right over the

7    heart, so the current went into the heart and then went down

8    through their abdomen through their legs to their feet on the

9    wet ground.

10          If you took a stun gun, that would have to be enormous to

11   deliver that kind of charge and deliver it right over the

12   heart.  It would tend to follow the skin and it wouldn't go

13   into the heart, so it would be some enormous number of above

14   9,000 microcoulombs that we know to be dangerous.

15   Q.   So above 9,000 microcoulombs?

16   A.   Yes, sir.

17               THE COURT:  To do what?

18               THE WITNESS:  To cause death.

19               THE COURT:  You're talking about causing death now?

20               THE WITNESS:  Yes, sir.

21   BY MR. SMOCK:

22   Q.   And again, how many microcoulombs did the two devices

23   we're talking about emit?

24   A.   About two-thirds of a microcoulomb, less than one.

25   Q.   Now, how can an electrical charge cause injury?

Dr. Kroll - Direct (Smock)                                        1359

1    A.   Surprisingly, it takes more electrical output to cause an

2    injury, which is a burn, than it does to cause death, which is

3    counterintuitive, 'cause you think about that injury is not

4    fatal, but it actually takes more electrical output to cause

5    death which is burns, like I said, versus a fatal shock because

6    the heart is sensitive to electricity if you have the

7    electricity going through there, so it takes a lot more power

8    because you have to heat the skin up to cause a burn.

9    Q.   And do most people who have been fatally shocked have

10   burns or other injuries on their bodies?

11   A.   No.  The majority of people, it's about 60 percent of the

12   people, that have been electrocuted have no signs on their

13   body.  They're near an electrical source and they fall over

14   dead from the electrocution 'cause it interferes with the

15   heart's normal rhythm.

16            THE COURT:  So most people would not have visible

17   signs on the outside of the body anywhere?

18            THE WITNESS:  Yes, that's true, Your Honor.  The

19   voltage might be a little strong, but I'm thinking of the study

20   by Wright in the '80s, which was the biggest study of this, and

21   it was around 60 percent.  So it's a majority but it's not --

22            THE COURT:  A majority that did not?

23            THE WITNESS:  Correct, did not have a mark.  And

24   that's balanced out by the people that contacted power lines or

25   lightning, 'cause they always have burns.

1    BY MR. SMOCK:

2    Q.   Now, we've talked about the fact that a Taser, a police

3    Taser, is about more than 150 times as powerful as these two

4    devices.  Can you tell the jury if a Taser causes an injury to

5    a person if it's applied to them?

6    A.    It depends upon if you use a very low level of energy,

7    because if you use the dry stun and applied it directly to the

8    skin, full power, held it on for five seconds, you get a real

9    light kind of a sunburn where the electrodes were.  Whether you

10   consider that an injury or not is open to interpretation, but

11   that's kind of like a sunburn, and it's all gone in three days.

12   Q.   And based on your knowledge in this field, were one of the

13   two devices that we're talking about here applied to a person's

14   skin, would it even create that sunburn effect?

15   A.    No.

16   Q.   Now, Dr. Kroll, based on these findings and the testing

17   that you've done, did you reach a conclusion about whether

18   either of these devices could be used in a manner that would

19   likely endanger life?

20   A.    I did.

21   Q.   And what was your conclusion?

22   A.    They could not be used in a manner that was likely to

23   endanger life.

24   Q.   And based on these findings did you reach a conclusion

25   about whether these devices could be used in a manner that

1    could cause serious bodily injury?

2    A.   I did.

3    Q.   And what was your conclusion about that?

4    A.   They could not be used in a manner to cause serious bodily

5    injury.

6    Q.   Did you reach a conclusion about whether these devices

7    could cause extreme physical pain?

8    A.   I did.

9    Q.   And what was your conclusion?

10   A.   They could not cause extreme physical pain.

11   Q.   Did you reach a conclusion about whether these devices

12   could cause protracted and obvious disfigurement?

13   A.   I did.

14   Q.   And what was your conclusion?

15   A.   They could not cause protracted and obvious disfigurement.

16   Q.   And did you reach a conclusion about whether it could

17   cause impairment or protracted loss of the function of a bodily

18   member, organ, or mental faculty?

19   A.   I did.

20   Q.   And what was your conclusion?

21   A.   It could not do that.

22   Q.   Now, just the last area that I want to talk to you about

23   very briefly is earlier in this trial we saw a video of this

24   device being activated, and it produced a bright electrical arc

25   and a loud noise.  Did you -- when you tested these devices,

1    did you test their sound level?

2    A.   I did.

3              THE COURT:  Their what level?

4              MR. SMOCK:  Sound level.

5              THE COURT:  Okay.

6    BY MR. SMOCK:

7    Q.   What sound level did they produce?

8    A.   They were very high.  The Police 916 came in at

9    109 decibels, and the Vipertek came in at about 107.

10   Q.   And is there anything about the design of these devices

11   that promotes such a loud noise?

12   A.   Yes.

13   Q.   What is it?

14   A.   Having the electrodes very close together makes a very

15   loud noise because you get a very intense electrical arc there.

16   Q.   And does anything about that intense electrical arc or the

17   sound that it emits that tells you about how strong it would be

18   if it were applied to a person?

19   A.   No.  It generally goes in the opposite direction.  If

20   you're putting your output into making a loud sound, it's not

21   going to be as good for doing stimulation or stunning.

22   Q.   So why do these devices make so much noise and produce

23   this bright arc if they aren't powerful?

24   A.   The analogy that I like to use is why do people buy

25   fishing lures?  They buy a shiny -- and I've been guilty of

1    this -- buy a shiny, fancy fishing lure because it's attractive

2    to me.  It may or may not be attractive to a fish.  And so

3    someone can pick one of these up at a department store and arc

4    it, and they can be very impressed, so they think it must be

5    very powerful because it makes a lot of noise and has this

6    bright arc.

7    Q.    And is it, in fact, powerful?

8    A.    No.

9              MR. SMOCK:  Thank you.  No further questions.

10             THE COURT:  So let's come to the bench for a minute.

11        (At sidebar)

12             THE COURT:  So my question is a prognosis on how long

13   your cross will take.

14             MR. DREHER:  I'm going to go until 1:30, it sounds

15   like.

16             THE COURT:  No, no, no.  We're either going to take a

17   lunch break now or we're going to go until you finish.  We're

18   going to take a ten-minute break now and finish the cross, or

19   we're going to take a lunch break now, but that's why I want to

20   know how long it will take.

21             MR. DREHER:  Well, it was my understanding the expert

22   needs to leave, so I guess my preference is ten minutes and

23   then we go into the cross.

24             THE COURT:  Wait a minute.  Who needs to leave?

25             MR. DREHER:  The doctor.

1       THE COURT:  I know, but he should not be restricted.

2  If you're going to tell me you're going to need two hours,

3  he'll change his plane reservation.  If you can tell me you

4  need 30 or 45 minutes, we can take a ten-minute break and have

5  a very -- have a light lunch.

6       MR. DREHER:  Given his answers this morning, I could

7  foresee this being about an hour, hour and 15 minutes, Judge.

8       MR. SMOCK:  And Your Honor, I think our preference

9  would be keep going after a short break.  The jury came in at

10  11:00 having gotten in at 10:00.  We'd like to make progress

11  and hopefully get him on his way if it's possible.

12       THE COURT:  I'll ask the jury what they want to do.

13  He can change his plane reservation.

14     (In open court)

15       THE COURT:  So ladies and gentlemen of the jury,

16  would you like to take a ten-minute break and then go for

17  another hour or so, or would you like to take a lunch break and

18  do this after lunch?  Because if we go for another hour or so,

19  we probably can finish with this witness, but that gets us till

20  2 o'clock rather than our usual lunch, which is at 1:00, 1:15,

21  something like that.  But we started late for the jury so...

22       COURTROOM DEPUTY:  The cafeteria closes at 2:00.

23       THE COURT:  The cafeteria closes at 2:00, that is

24  correct, so we can't take a break for lunch -- we have to take

25  a break for lunch by 1:30, 20 to 2:00, so we could take a

1   ten-minute break and go to 1:30, 20 to 2:00, but we're probably

2   still going to have to come back after lunch because otherwise

3   you won't get lunch, or we can break now and come back at 1:30.

4        Nobody's saying --

5             A JUROR:  Can we get a lunch now?

6             THE COURT:  Go to lunch now?

7             A JUROR:  Yeah.

8             THE COURT:  Let's make it 45 minutes instead of an

9   hour.  Let's come back at 1:30.

10        (Recess taken and jury out at 12:47 p.m.)

11        (At 1:38 p.m. on March 8, 2023; with counsel for the

12   parties and the defendant present; WITH the jury:)

13        DR. MARK KROLL, PREVIOUSLY SWORN, RESUMED THE STAND

14             THE COURT:  Dr. Kroll, you can be seated.

15        Everybody on the jury got everything they need?

16        All right.  Good afternoon.

17        And Mr. Dreher, you may proceed.

18             MR. DREHER:  Thank you, Your Honor.

19                      CROSS-EXAMINATION

20   BY MR. DREHER:

21   Q.   Good afternoon, sir.

22   A.   Good afternoon, sir.

23   Q.   Sir, before lunch you testified about the electricity

24   stimulators that people place on their muscles; correct?

25   A.   Yes.

1    Q.   And there's a specific term that you used to describe

2    those.  What was that term?

3    A.   I used a few.  One was electronic nerve stimulators, and

4    the other one was electronic muscle stimulators.

5    Q.   So is there a preferred label of those devices in your

6    field?

7    A.   It depends.  The international standard puts them all

8    together, electronic nerve stimulators and muscle stimulators

9    in one standard, and in the U.S. we call them transcutaneous

10   neurostimulators or just muscle stimulators.  I can't say

11   there's more of a dramatically strong feeling one way or the

12   another.

13   Q.   Do you understand generally how they're used?

14   A.   Yes.

15   Q.   And they're generally always used by somebody who knows

16   that they're on their body; correct?

17   A.   Yes.

18   Q.   And, in fact, the person who is using those often controls

19   when is it -- when it is activated as well; correct?

20   A.   Correct.

21   Q.   And an individual wouldn't place these electrodes on

22   perhaps sensitive areas of the body, such as the eye?

23   A.   I don't know why they would put it on the eye, but it's --

24   Q.   In fact, there's very specific locations on the body with

25   which these devices would be placed; right?

 1     A.    No.  I'm not sure if it's left open.  People can put them

 2     wherever they want.  They want to tone up muscles or block pain

 3     generally.

 4     Q.    So if you want to, I'll just refer you back to the exhibit

 5     that was presented on direct.  There were specific locations

 6     where those devices were placed; right?

 7     A.    Yes.

 8     Q.    And those generally related to muscle groups that at least

 9     appeared in the picture to be the target?

10     A.    I agree.  There are some that cover the whole body

11     literally from hands to feet as well, which I did not show a

12     picture of that.

13     Q.    Now, also those devices are marketed differently than the

14     stun guns that you purchased from Amazon; correct?

15     A.    Of course.

16     Q.    And the marketing on those is that those devices

17     themselves perform some sort of benefit; correct?

18     A.    I imagine.  I mean, that's usually what people do in

19     marketing.

20     Q.    And as it relates, then, to the best-selling stun guns on

21     Amazon that you purchased, they're marketed differently than

22     these medical devices are?

23     A.    Can you be more specific?  I don't hold myself out as a

24     marketing expert.  Could you be more specific?

25     Q.    You said you're not a marketing expert?

1    A.    Correct.

2    Q.    So when you searched on Amazon for the best-selling stun

3    guns and you obtained ten different devices, that was

4    independent of any marketing that you were attempting to do?

5    A.    I'm sorry.  I'm confused by that question.  "Marketing" to

6    me means that I'm trying to sell something.  I was trying to

7    buy something.  I'm confused by the question.

8    Q.    All right, okay.  I think I get it.  So in other words,

9    you're not attempting to sell anything when you test these

10   devices?

11   A.    That's correct.

12   Q.    All right.  Sir, you're a member of the board of directors

13   on Axon; correct?

14   A.    That's correct.

15   Q.    You receive payment for your services as a member of the

16   board of directors; correct?

17   A.    Of course.

18   Q.    You also serve on the science committee of Axon?

19   A.    Scientific and medical advisory board, yes.

20   Q.    And you receive compensation for serving on that

21   committee; correct?

22   A.    I'm sorry.  It's the science and medicine committee as

23   well, and the answer is yes, I do.

24   Q.    Now, you also serve as the chair of the litigation

25   committee of Axon; correct?

Dr. Kroll - Cross (Dreher)                                    1369

1   A.    No.

2   Q.    Do you serve on the member -- as a member of that

3   committee?

4   A.    I don't think that committee exists anymore.

5   Q.    So are there two committees that you serve on with Axon?

6   A.    Yes.

7   Q.    What is the name of the second committee that you serve

8   on?

9   A.    Enterprise risk.

10  Q.    Enterprise risk?

11  A.    Yes.

12  Q.    Does that generally handle litigation matters that are

13  involved with Axon?

14  A.    I don't know.  They don't get sued anymore now that the

15  science is out on these weapons, so I suppose that's a

16  theoretical possibility, but it doesn't come up anymore.

17  Q.    Now, in fact, Axon used to be called Taser International;

18  right?

19  A.    That's correct.

20  Q.    And as Taser International, the company was sued quite

21  often?

22  A.    They were sued a lot when their weapons first came out 15,

23  20 years ago before the science was settled, before the

24  standards, yes, that's correct.  That doesn't happen anymore.

25  Q.    Now, earlier when I had an opportunity to question you

1    about sort of the science that is used, you said about eight

2    years ago is when you came on to the scene?

3    A.    For what particular issue?

4    Q.    As it relates to conducted energy weapons and its test on

5    the --

6              THE COURT:   What do you mean, "Came on to the scene"?

7    BY MR. DREHER:

8    Q.    The ANSI standards that you referenced.  In other words,

9    you helped start to establish those ANSI standards about eight

10   years ago.  Did I misunderstand you?

11   A.    I'm trying to remember when I got involved on that

12   committee.  Well, I may have been referring to the IEC

13   committee, which I got involved in in the fall of 2017.  No.

14   Fall of 2014, so that would be about eight years ago.  That,

15   you know, was about a year or two later that ANSI set up a

16   committee, so maybe it was seven years ago that I got on the

17   ANSI committee for stun guns and about eight or nine years ago

18   I got on the committee for the IEC.

19   Q.    So let me ask this:  Were -- was Ta- -- Taser

20   International and Axon, the company's current name, have

21   lawsuits decreased since the creation of those ANSI standards

22   that you helped create?

23   A.    No, I don't think so.  I think the lawsuits pretty much

24   went away about ten years ago, but who can say?  I mean, I

25   suppose it helps explain things when you've got standards, but

1    originally, unless you give credit to the Department of

2    Justice, there were all these lawsuits because when these

3    people would die by the police, they would say, oh, maybe he

4    was electrocuted.

5    Q.   Let me stop you right there, sir.

6              MR. SMOCK:  Let the witness answer.

7              THE COURT:  It wasn't responsive to a question.

8         So go ahead, Mr. Dreher.

9              MR. DREHER:  Yes, Your Honor.  Thank you.

10   BY MR. DREHER:

11   Q.   This second committee that's now called -- is it risk

12   assessment that you serve on?

13   A.   Enterprise risk or something like that.

14   Q.   You also receive compensation for serving on that

15   committee too, as well?

16   A.   I'm not sure if it's separately broken out or not, but

17   they pay me to be on the board like all directors.

18   Q.   And then Axon also pays you an additional amount for your

19   research; correct?

20   A.   Sometimes.  Sometimes it involves them, sometimes it

21   doesn't.

22   Q.   In other words, you serve on the board of directors as

23   well as these two committees and then provide consulting

24   services to the company as well?

25   A.   That's correct.

Dr. Kroll - Cross (Dreher)                              1372

1    Q.   And you also receive additional compensation for that

2    consulting service too?

3    A.   I think that's what we just agreed to.

4    Q.   Now, in total for the year 2021, was your income from Axon

5    about $350,000?

6    A.   That sounds about right.

7    Q.   Now, Axon also pays expenses associated with travels and

8    your research; correct?

9    A.   I hope so.

10   Q.   And if I'm correct, in 2021, that was about a hundred

11   thousand dollars?

12   A.   That sounds crazy.  I don't travel that much.  That was

13   with COVID too, so that doesn't make sense.

14   Q.   Now, sir, you also receive compensation in the form of

15   shares of stock of the company?

16   A.   No.  That's included in that 350 number.

17   Q.   Okay.  But you currently own part of Axon?

18   A.   Well, I don't know what you call "part," but I have some

19   shares in the company, yes.

20   Q.   Some shares?

21   A.   Yes.

22   Q.   Sir, is the amount of shares that you own in Axon about

23   16,000 shares?

24   A.   No.

25   Q.   No?  Now, sir, I'd like to draw your attention to the

Dr. Kroll - Cross (Dreher)                                    1373

 1    screen in front of you and also note for the record that this

 2    is being not only shown to the witness, but also to opposing

 3    counsel.

 4         All right.  Sir, do you own 13,165 shares of Axon?

 5    A.   What year was this?

 6    Q.   Does that help?

 7    A.   Where am I supposed to see the year?

 8         THE COURT:  There's probably a date somewhere.

 9         MR. DREHER:  I'm sorry, Judge?

10    A.   I don't know what year this is.  Last I checked, it's less

11    than 10,000 shares, if that helps.

12    BY MR. DREHER:

13    Q.   So if I direct your attention to this portion...

14    A.   Okay.  So this is about two years ago.  Yeah, I think it's

15    under 10,000 shares.

16    Q.   Now, just for -- I guess for the jury, each of these

17    shares is approximately worth $220?

18    A.   I think that's what it's about today, yes.

19    Q.   So your ownership of Axon is about $3 million, isn't it?

20    A.   No.

21    Q.   It's not?

22    A.   Correct.  It's under -- I don't know.  It's a million and

23    a half, a million seven.  It's still a lot of money, but it's

24    not 3 million.

25    Q.   And that amount of money is affected, then, by the

1   marketing of Axon as well, isn't it?

2   A.   I'm not involved in their marketing.

3   Q.   That's not what I asked, sir.  The amount of the share

4   cost is affected by the marketing that the company makes;

5   correct?

6   A.   I assume, like any company, of course the better their

7   sales are, profits, the better their stock is.

8   Q.   This is a publicly traded company that would be affected

9   by its sales; correct?

10   A.   Of course.

11   Q.   Okay.  Now, earlier you testified that what you did was

12   obtain the ten most -- or excuse me, the ten highest-selling

13   devices available on Amazon; correct?

14   A.   Yes.

15   Q.   And according to the studies that you did, you concluded

16   that these were far inferior to the devices that your company

17   sells; correct?

18   A.   No, I didn't.  They're inferior.  It's a different market.

19   One is for consumers, one is for police officers.  One is

20   professional, and one is whatever people think they get out of

21   it.  I don't -- I don't think I'd use that conclusion.

22   Q.   So you don't believe that the market of stun guns is in

23   the same category of the devices that you tested versus what

24   police use?

25   A.   No.  It's a different world.  The present Taser-branded

1    weapons sell for $1,500.  They require training by law

2    enforcement trainers versus a $20 noisemaker.  I'm not sure

3    what you'd compare it to, but it's not the same market.

4    Q.   And that's your opinion as a member of the board of

5    directors of Axon; correct?

6    A.   It's my opinion regardless of if I was on the board or

7    not.  I think that's a pretty obvious fact.

8    Q.   How did you start at Axon?  They approached you, didn't

9    they?

10   A.   Well, kind of, but not really.  I'd love to tell the

11   story.  It's a great story if you have the time.

12   Q.   When they approached you, in fact, they offered you a spot

13   on the board of directors; correct?

14   A.   They did not approach me directly, but can I tell the

15   story if it's important?

16   Q.   Yes.

17   A.   So about 25 years ago my 19-year-old son had an idea for a

18   disposable cell phone.

19              THE COURT:  You need to talk more into the microphone

20   rather than face the jury, unless you can do both.

21              THE WITNESS:  Okay.

22   A.   About 25 years ago my son had an idea for a disposable

23   cell phone, so we got some patents on that.  And then at

24   Christmas my 11-year-old son said, "Why don't we add a Taser to

25   that?"  I didn't know what a Taser was.  This was like 2000.

1   So we got some patents on that and then had a patent broker try

2   to sell those patents.

3        They approached the Taser company, and they said, well,

4   this was really a dumb idea.  We don't want to -- they said

5   weapons for police, these are serious weapons to replace the

6   gun.  We're not going to put them on a cell phone, but we'd

7   like to meet Professor Kroll.  And actually I wasn't a

8   professor at that time, so it would be Dr. Kroll.

9        So I flew to Scottsdale, met with them, and they said,

10  well, we'd like to have you get involved in the company because

11  you've done all this scientific research on shocks on the

12  heart, and we want to make sure we don't affect the heart.  So

13  they invited me to join the board.  The story is kind of

14  complicated, but it involves my two sons, so I love telling

15  this story.

16  BY MR. DREHER:

17  Q.  Now, just to be clear, you didn't start in the mail room

18  of Axon.  You didn't work your way up through the company or

19  anything?

20  A.  I've never been an employee of Axon.  I'm an outside

21  advisor as the director and a consultant.

22  Q.  So what you do you don't consider as employment?

23  A.  I'm not an employee.

24  Q.  Although you're compensated by Axon for numerous roles

25  that you fill for the company?

1    A.   They pay for my time, but as a board member for a holding

2    company, I think I'm representing the public, and they pay me

3    for my consulting, they pay me for my advice, just like I'm

4    being paid here today.

5    Q.   Now, Axon's not the only company that pays you for your

6    consulting work; correct?

7    A.   That's correct.

8    Q.   In fact, there's another company.  Is it Haemonetics?

9    A.   It's Haemonetics, H-A-E-M-O-N-E-T-I-C-S, and they do not

10   pay me for consulting.  They pay me to sit on their public

11   board.

12   Q.   So Haemonetics is a medical device company, though;

13   correct?

14   A.   That's correct.

15   Q.   And as a member of their board of directors, you're also

16   compensated?

17   A.   Of course.

18   Q.   And was your income approximately the same amount in the

19   year 2021 from Haemonetics as it was from Axon?

20   A.   Well, it's about 250K.

21   Q.   Now, the premise of that company is electricity and the

22   effects on the human body as well; correct?

23   A.   Which company are you referring to?

24   Q.   Haemonetics.

25   A.   It's Haemontics, and it's blood transfusion equipment.  If

1    you've ever given blood or received blood or taken a

2    plasma-derived drug, that probably went through one of our

3    machines.

4    Q.   So in that role you have no -- it's not related to your

5    expertise in electricity at all?

6    A.   My involvement -- I think my strategic involvement there

7    comes from a career in medical devices.

8    Q.   Sir, does your involvement relate to electricity at all

9    for that company?

10   A.   It comes up once in a while, but it's mostly about how to

11   make safe and effective medical devices.

12   Q.   Does that company create any of the products that you

13   displayed to this jury?

14   A.   No.

15   Q.   No?  Now, I do want to get into specifically what you

16   called the tests that you did for this case, and ultimately you

17   were able to testify on direct examination that you could hear

18   this device in the videos from January 6; correct?

19   A.   I did hear it in one video, yes.

20   Q.   Okay.  And then your testing also involved a soundproof

21   room and measuring the decibels of some sort; correct?

22   A.   Soundproof might not be perfectly accurate, but a

23   semi-anechoic room and measuring the decibels, that's correct.

24   Q.   And it was over a hundred decibels?

25   A.   That's correct.

Dr. Kroll - Cross (Dreher)                                  1379

1    Q.   Now, are you able to tell us -- that's pretty loud, isn't

2    it?

3    A.   Yes.

4    Q.   And I believe your testimony on direct examination would

5    be that seeing this device as well as hearing it would be

6    intimidating?

7    A.   It would be to people that don't understand how they work.

8    To a trained law enforcement officer, probably not so much,

9    because they know that they're essentially toys, but to the

10   average citizen that could be intimidating.  Electricity can be

11   scary.

12   Q.   Okay.

13            THE COURT:  Which device are you talking about now?

14            THE WITNESS:  I think we're talking about the

15   Vipertek or the Police 916 which we heard in the surveillance

16   video, Your Honor.

17   BY MR. DREHER:

18   Q.   And so just to clarify, sir, the device that you tested,

19   both of those devices registered above 100 decibels; correct?

20   A.   That's correct.

21   Q.   And also you were able to observe video from January 6

22   outlining the activation of the device held by

23   Mr. GossJankowski; correct?

24   A.   Well, there's two levels to activation.  There's a slide

25   switch which turns it on, and then you have to push the thumb

1    switch to make it arc; so that's what I was referring to.  When

2    the slide switch is slid, then the red light comes on.  That's

3    the way you're able to see.

4    Q.   And were you ever presented with any videos outlining the

5    electrical arc or at least allowed you to observe the

6    electrical arc of this device in pursuing your opinions?

7    A.   I'm not sure it was critical to my opinion, but yes.

8    There is a video where we see the arc and we hear the sound.

9    Q.   And you were presented with that video.  You did see that

10   video?

11   A.   That's correct.

12   Q.   Okay.  And did that arc occur independent of the

13   flashlight activation?

14   A.   Yes.

15   Q.   So in other words, the devices that you tested, that

16   toggle switch controlling both the flashlight and the arc are

17   two different levels on that switch; correct?

18   A.   That -- I believe that -- that's correct.  I recall -- no.

19   There's an off, and then there's a middle setting which is the

20   flashlight, and the extreme setting which is the -- enabling

21   the arcing before you push with the thumb switch.

22   Q.   So in other words, when the switch is fully pressed, in

23   other words, ready for electricity to emanate from the end, the

24   flashlight is not operational when you depress the button?

25   A.   I believe I'm recalling that different.  Different models

1    of these sparkler flashlights have different operations, and

2    I've tested ten different models, so it's possible that I

3    confused it.  But if I recall correctly, on the Vipertek when

4    you do the arcing, the flashlight's off.

5    Q.   Now, speaking specifically to the Vipertek, you keep

6    referring to it as the Vipertek, but is there a model number

7    that's associated with that?

8    A.   Yes, VTS-979.

9    Q.   And when you purchased this device from Amazon -- you said

10   979?

11   A.   Correct.

12   Q.   Did it come in a box?

13   A.   Yes.

14   Q.   Are you sure it wasn't used in some manner?

15   A.   I actually bought four of them.  They didn't appear to be

16   used, and I think Amazon would be unlikely to sell used stuff.

17   That's no.

18   Q.   Sir, have you made purchases on Amazon before?

19   A.   Almost every day.

20   Q.   Okay.  Did you notice the seller on Amazon and where these

21   devices came from?

22   A.   I may have at the time.  I don't recall now.

23   Q.   So in other words, you can't testify today to determine

24   who the seller was that you purchased these devices from?

25   A.   I think the seller was Amazon.

1    Q.   Okay.  Are you sure all four devices came from Amazon?

2    A.   I'm pretty sure.  I mean, it's possible -- I know they use

3    third-party sales and things like that, but if my recollection

4    serves me correctly, they came right from the Amazon warehouse.

5    Q.   And you said they all came in a box?

6             THE COURT:  Did they come in four separate boxes?

7    Did you order them at the same time, different times?

8             THE WITNESS:  Four separate boxes.

9    BY MR. DREHER:

10   Q.   Now, in each box were there any sort of manuals or

11   instructions associated with the devices?

12   A.   Yes.

13   Q.   In fact, it came with an instruction manual?

14   A.   I don't recall exactly how thick it was, if I'd call it a

15   manual, but these things typically come with a page or two of

16   instructions.

17            MR. DREHER:  Your Honor, for the record, I've put up

18   on the screen what I will later mark as Exhibit 1000.

19            THE COURT:  Okay.

20   BY MR. DREHER:

21   Q.   And sir, if I can draw your attention to the screen in

22   front of you, does this look familiar to you?

23   A.   It does.

24   Q.   This is, in fact, the operating manual that comes with the

25   Vipertek 979, isn't it?

1    A.    I'll take your word for it.

2    Q.    Well, sir, I'm asking you:  This is the operator's manual

3    that came with the VTS-979; correct?

4    A.    It probably is.

5    Q.    And these came in each of the boxes of the devices you

6    purchased from Amazon; right?

7    A.    Correct.

8              MR. DREHER:  Your Honor, the government would move

9    for the admission of proposed Exhibit 1000.

10              MR. SMOCK:  No objection.

11              THE COURT:  It will be admitted without objection.

12    The jury may see it.

13    BY MR. DREHER:

14    Q.    So sir, underneath the word "warning," it reads, "Do not

15    discharge the stun gun into the air for more than one second at

16    a time, as this will damage the unit and void the warranty."

17              Did I read that correctly?

18    A.    Yes, you did.

19    Q.    Now, in testing these four devices, did you follow all

20    these directions before testing it?

21    A.    Well, I didn't discharge them into the air.  They were

22    discharged -- the answer is -- well, I'll have to look at them

23    one by one.  A lot of these instructions are -- some of the

24    instructions for these weapons are quite silly.  They're not

25    factual -- factually based.  You want me to specifically talk

 1    about the one about do not discharge into the air for more than

 2    one second?

 3    Q.   I guess my question is more so, sir, did you test these

 4    immediately out of the box?

 5    A.   No.

 6    Q.   What procedure did you use to test these devices?

 7    A.   Charged them up overnight.

 8    Q.   And how did you charge them?

 9    A.   Plugged them in.

10    Q.   Plugged them into what?

11    A.   The Vipertek uses -- I'm trying to remember.  One of these

12    uses 110 volts directly, and I think that is the Vipertek, so I

13    plugged them into a household electrical current.

14    Q.   So then after leaving them there overnight, then you hook

15    them up to your testing equipment; correct?

16    A.   Hook them up to a resistive load as required by the

17    FDA-accepted standards for the proper resist of load.

18    Q.   And I will get to that, but ultimately was there anything

19    from charging it to this testing machine that you did to this

20    Vipertek?

21        And I can pull up your report if that'll make it easier

22    for you.

23    A.   I just want to make sure I'm using the 500 on the load.

24        No.  They were connected to the load per the ANSI and AAMI

25    specs, and I measured the output.

1   Q.   Now, did you connect the interior prongs or the exterior

2   prongs?

3   A.   Probably the interior as they are -- they're easier, but

4   they're all the same so it wouldn't matter.

5   Q.   Now, sir, you said "probably," but you're not sure which

6   ones?

7   A.   Well, it wouldn't matter so it wasn't an area of great

8   focus for me.  The arcing electrodes inside are longer.

9   They're easier to clip to, so that's reasonably what I would

10  have clipped.

11  Q.   But earlier you testified that that's not the portion that

12  would touch a body?

13  A.   Well, it's all the same.  It's the same metal connection.

14  It wouldn't matter.  They're all the same voltage on them.

15  Q.   The same voltage?

16  A.   The one on the left and the one on the right, they would

17  have the same voltage.

18  Q.   You didn't provide us with the amount of voltage.

19  A.   Is that a question?

20  Q.   Isn't it true you did not provide us with the amount of

21  voltage that your tests revealed?

22  A.   I did in the paper.  And by the way, it doesn't really

23  matter that much.  The point of my saying that they have the

24  same voltage means it's all the same piece of metal and they're

25  connected, so it wouldn't matter where you connected them.  If

Dr. Kroll - Cross (Dreher)                                           1386

 1    you want to get into the voltage of these devices, then we can

 2    go on to my paper that's under review.

 3    Q.   In other words, then, although you said the voltage

 4    wouldn't be affected, would the number of microcoulombs be

 5    affected?

 6    A.   No.

 7    Q.   No?  And you did this by testing all the prongs on the

 8    device?

 9    A.   I didn't need to.  It's -- that's a metallic connection.

10    It's like it's -- I don't know how to make this any simpler,

11    but if it's one piece of metal here and a piece of metal here

12    and I have voltage on them, if I clip on here or clip on there,

13    it doesn't really matter.

14    Q.   And you're able to tell us that these pieces of metal were

15    connected?

16    A.   Yes.

17    Q.   In other words, the interior prong and the exterior prong

18    on the same side is connected in some way?

19    A.   Yes.

20    Q.   Okay.  Did you open up the Vipertek to determine that?

21    A.   I did not need to open it up to determine that.

22    Q.   Was it from the exterior you can tell that somehow?

23    A.   I know from my learning and experience that that is the

24    way it would be designed, so I didn't have to open it up.

25    Q.   I thought you didn't get into the design of these devices,

Dr. Kroll - Cross (Dreher)                                    1387

1    sir.

2    A.    Is there a question?

3    Q.    Do you get involved in the design of devices manufactured

4    by companies other than Axon?

5    A.    I'm aware of the designs.  I know how that circuitry

6    works.

7    Q.    And after placing this device on your testing machine, for

8    lack of a better word, what result is produced to you?  In

9    other words, is it a display screen that outlines what the

10   microcoulombs were, or is there some other method for

11   determining, maybe a meter somehow?

12   A.    I think I explained it earlier -- maybe it's before the

13   jury came in -- that I use an oscilloscope to show the exact

14   wave form, and then we calculate the area under the curve, and

15   that gives us the charge.

16   Q.    And that requires you then to do some math?

17   A.    Pretty trivial mathematics, yes, pretty trivial

18   calculations.

19   Q.    Now, was this part of the test specifically for this case,

20   or was this part of the test for when you were testing all ten

21   of these devices off of Amazon?

22   A.    I'm not sure I see a difference.  This has come up in two

23   of these cases, and so I thought this was somewhat interesting

24   to explain what the outputs of these were, and I was curious

25   can anyone measure the amount of real outputs to any of these

1    being sold as stun guns so they qualify as stun guns, so I have

2    a lot of motivations for doing that testing.

3    Q.   So is it your testimony it's not important whether the

4    testing was specific to this case or specific to the studies

5    that you publish?

6    A.   I would hope not, because I think if you do a lot of

7    scientific studies, you get the same answer whether you're

8    doing it for scientific curiosity or for --

9    Q.   Well, I'm concerned, sir, in terms of the findings that

10   you present to this jury.  Is it relatable to

11   Mr. GossJankowski's case, or is it something that you are

12   publishing separately from Mr. GossJankowski's case?

13   A.   I think that's a false choice.  They're both true.

14   Q.   Did you have four independent devices when you were

15   testing and presenting your conclusions to this jury separate

16   from the studies that you were doing outside of

17   Mr. GossJankowski's case?

18   A.   I'm totally confused by the question.  Can you run it to

19   me again.

20   Q.   When you made purchases of four of these Vipertek 979

21   devices on Amazon, was it for Mr. GossJankowski's case, or was

22   it some other material that you were hoping to produce?

23   A.   First of all, it's not to be nitpicking, but it's not the

24   Vipertek 916.  That's the Police 916, and the Vipertek is the

25   VTS-979, just to keep the record straight, and the original

1   inspiration was another January 6 case from -- another

2   so-called stun gun case from January 6th, and I wanted to know

3   what these outputs were and also realized that not only could

4   that be helpful to this courtroom, but it would be helpful in

5   general.  As a scientist, I'm trained to publish my results, so

6   I wrote up a paper and submitted it.  Does that answer your

7   question?

8   Q.    Not quite.  So the four devices that you purchased, were

9   they also used in some other study?

10  A.    No.

11  Q.    So the four devices, the Vipertek 979 devices, were only

12  used in your results for this case?

13  A.    No.  I meant -- when you said another study, I'm referring

14  to the study that we -- that we talked about earlier this

15  morning, which is a paper under review.  I wasn't thinking of

16  the measurements that I made for this case as an official

17  study.

18        THE COURT:  You did -- I'm confused by terms, the

19  term "study," the term "material," the term "paper."  I think

20  either this morning outside of the presence of the jury or

21  earlier today you talked about a research paper you wrote.

22        THE WITNESS:  Yes.

23        THE COURT:  And was that research paper based in

24  whole or in part on the work you did in this case?

25        THE WITNESS:  Yes.

```
 1            THE COURT:  And which came first, the chicken or the
 2   egg?  I mean, were you engaged by the defense to do a report
 3   first before you wrote the paper?
 4            THE WITNESS:  Well, it's actually a third option,
 5   Your Honor.  There's another case, another January 6th case
 6   that involved a reputed stun gun that came before either one of
 7   those.
 8            THE COURT:  And did you provide a report in that
 9   case?
10            THE WITNESS:  Yes, Your Honor.
11            THE COURT:  And was that before the defense team in
12   this case asked you to do work for them?
13            THE WITNESS:  Well --
14            THE COURT:  If you remember.
15            THE WITNESS:  The other case was -- I was retained
16   before on that case.  I was retained before this case, and
17   whether I did that work before I was retained on this case,
18   that, I don't recall.  There may have been some overlap.
19            THE COURT:  But you were retained by
20   Mr. GossJankowski's defense team; right?
21            THE WITNESS:  Yes, sir.
22            THE COURT:  And were you asked to look at and see if
23   you could offer opinions on certain specific questions?
24            THE WITNESS:  Yes, sir.
25            THE COURT:  And did you write this research paper
```

1    after you worked on this -- worked on the report in this case

2    or after you began to do your work for the report on this case?

3              THE WITNESS:  Yes, sir.  This paper that is under

4    review right now was not submitted until January.  These cases

5    were the inspiration for that paper.

6              THE COURT:  Cases were the inspiration for the paper.

7              THE WITNESS:  Yes, sir.

8              THE COURT:  And the date of the report you provided

9    to the defense team in this case is December 12th, 2022; right?

10             THE WITNESS:  Yes.

11             THE COURT:  And the paper that you wrote has been

12   provided to counsel for both sides in this case?

13             THE WITNESS:  Yes, sir.

14             THE COURT:  Go ahead.

15             MR. DREHER:  Your Honor, may we approach the bench?

16             THE COURT:  Yeah.

17        (At sidebar)

18             MR. DREHER:  Because of what's he talking about, Your

19   Honor, I would request *Jencks* of this -- of the report from

20   this prior case in terms of at least another -- it sounds like

21   there was another opinion associated with a January 6 case.

22             THE COURT:  Was this something done for your office,

23   do you know?

24             MR. SMOCK:  No.

25             THE COURT:  Well, I mean, one way to -- I don't know

1  how we get -- how we find it.  We could ask him the name of the

2  case and find it on the system.  I don't know if that would

3  generate the report or not, but it would generate the name of

4  the case and the lawyers on the case.

5          MR. DREHER:  And certainly, if it was a January 6

6  case, I think we would be able to figure out what was produced

7  in that, Your Honor.  It's just a matter of I didn't know if

8  that would be something we should do in front of the jury.

9          THE COURT:  Yeah.

10          MR. SMOCK:  Your Honor, I may have the report.  I

11  think he may have given it to me months and months ago.  I'm

12  happy to give it to the government.  I might find it on my

13  computer or somewhere similar.  Also, by the way, it was a case

14  prosecuted by --

15          THE COURT:  I understand that, but there are a lot of

16  these cases.  Is there a problem with asking the name of the

17  case in the presence of the jury?  And then you can look on

18  your computer and see if you can find it.

19          MR. SMOCK:  I can look on my computer without him --

20  I mean, I have to get onto the network.

21          THE COURT:  We have to confirm that it's the same

22  case, or we can ask the jury to step out for five minutes and

23  get some information from him.

24          MR. SMOCK:  Sure.

25          THE COURT:  Because I think that the prosecution

```
1    should know as much as they can about what he did on that case
2    and what case it was, so let's do that.
3         (In open court)
4         THE COURT:  So we're going to ask the jury to step
5    out for maybe five minutes while we ask Dr. Kroll a couple of
6    questions.
7         (Jury out at 2:17 p.m.)
8         THE COURT:  All right.  Everybody can be seated.  So
9    the jury has left the courtroom.
10        So do you know the name of the defendant or the name of
11   the case in which you did -- the other January 6 case in which
12   you did work?
13        THE WITNESS:  Yes, Your Honor.  I can remember two
14   other ones now.
15        THE COURT:  Okay.
16        THE WITNESS:  So the other one involving the Vipertek
17   was USA v. Rodriguez.
18        THE COURT:  Rodriguez.
19        THE WITNESS:  And the other one involving the Mace
20   sparkler flashlight was USA v. Byerly, and I was retained on
21   that in late 2021.
22        THE COURT:  Do you remember the names of the lawyers
23   or the law firm or the entity that retained you in those cases?
24        THE WITNESS:  It was all the Federal Public
25   Defender's Office.
```

1       MR. SMOCK:  Yes, but from a different district.

2       THE COURT:  They were tried here, though.

3       THE WITNESS:  Those two pleaded.

4       THE COURT:  They pleaded.  Okay.  So it sounds like

5   the cases were here, Ms. Goetzl and Mr. Smock.

6       And correct me if I'm wrong.  It sounds like the cases

7   were here, but in a lot of these cases, we've had both

8   prosecutors and defense lawyers from other offices around the

9   country because of the number of cases we've had.  So Byerly,

10  how is that spelled, if you remember?

11      THE WITNESS:  I think B-E-Y- -- oh, boy.

12      THE COURT:  B-E-Y-E-R?

13      THE WITNESS:  E-Y sounds right.

14      THE COURT:  Something like that, and Rodriguez.  Any

15  other questions while the jury's out to try to jog his memory

16  on this?

17      MR. DREHER:  Yes.

18      Do you recall the first name of Mr. Rodriguez or

19  Ms. Rodriguez?

20      THE WITNESS:  No.  I mean, if I could turn my phone

21  on, I could search it, if it's real important.

22      THE COURT:  Sure.  If you can give us more

23  information about either one or both of those cases, it's worth

24  the time to do that.

25      MR. DREHER:  And then my only other question, Your

1    Honor, would be:  Although I understand the cases pled out, you

2    provided reports to the defense on those?

3              THE WITNESS:  Yes.

4              MR. DREHER:  Okay.

5              THE COURT:  So why don't you check your phone?

6       So it seems like the reports -- there were reports

7    prepared, but before you had an opportunity to testify, there

8    were pleas.

9              THE WITNESS:  Correct.

10             THE COURT:  Okay.

11             MR. SMOCK:  And Your Honor, just so the record is

12   clear -- and Dr. Kroll can correct me if I'm wrong -- I don't

13   believe that either of those cases involved either of these

14   devices, so I don't believe that what we're talking about is

15   *Jencks*.  To the extent I can find anything, I'll provide it,

16   but I don't believe that it's *Jencks*.

17             THE COURT:  Well, that may be right.  It may be that

18   it may not be.  They may not be relevant, or they may have

19   limited probative value, but I think that the government would

20   like to see what exists before they finish with the witness.

21             THE WITNESS:  Okay.  Byerly is L-E-Y *[sic]*.

22             THE COURT:  First name, if you --

23             THE WITNESS:  And I don't -- and it's searching my

24   phone here to try to find more.  It's not finding it because I

25   don't recall the first name, and it's searching slowly, Your

```
 1    Honor.  All I have is the last name on what I can pull up on

 2    the phone here.

 3           Oh, here we go.  Oh, that's it.

 4           And then Rodriguez, Daniel Rodriguez.  Rebecca Levy is the

 5    attorney with the federal defender's office.

 6                 MR. DREHER:  Did you say Daniel or Danielle?

 7                 THE WITNESS:  Daniel.

 8                 MR. DREHER:  Daniel.

 9                 THE WITNESS:  Daniel Rodriguez.  B-Y-E-R-L-E-Y.

10                 THE COURT:  B-Y-E-R-L-E-Y.

11                 THE WITNESS:  Yes, Your Honor.

12           I take it back.  That's why my search didn't come up.  I

13    had it misspelled in a few emails.  It's actually B-Y-E-R-L-Y,

14    Alan Byerly.

15                 THE COURT:  Alan?

16                 THE WITNESS:  Yes, sir, A-L-A-N.

17                 THE COURT:  Progress is being made here.  Alan

18    Byerly.

19                 THE WITNESS:  Defense attorney is Hunter Labovitz out

20    of the Philadelphia defender's office.

21                 THE COURT:  So I guess my question would be for

22    counsel on both sides.  Can somebody on the prosecution team

23    and somebody on the defense team be searching for relevant

24    documents while Mr. Dreher pursues his cross on other topics?

25    Because that would save time if we can do that.  Otherwise, you
```

1    know, we can take a few minutes and look for it.

2              MR. DREHER:  Just to clarify, you said that the

3    *Rodriguez* case involved an actual electric device.  Was that on

4    Officer Fanone?

5              THE WITNESS:  Yes.

6              MR. DREHER:  Okay.

7              THE WITNESS:  And I thought that was also a Vipertek,

8    but now I'm -- since you asked me with that puzzled look, now

9    I'm wanting to go back to that.

10             MR. DREHER:  Your Honor, I think given the condition

11   of Officer Fanone after receiving -- at least by the publicly

12   available information after receiving multiple injuries from a

13   device that may or may not be the same device, I would ask for

14   some time before the jury's brought in before I get into other

15   topics of my cross.

16             THE COURT:  Okay, all right.  So I guess we

17   unfortunately have to take another break.  You're probably

18   going to leave later than you wanted to.  Which airport are you

19   leaving from?

20             THE WITNESS:  Well, I just had my flight changed.

21             THE COURT:  Don't tell them what time because they

22   may go slower.

23             THE WITNESS:  No.  It's Dulles.

24             THE COURT:  Okay.  You changed your flight.  So let's

25   take a little bit of time, and counsel will let us know when

```
 1    they're ready to proceed, and Ms. Johnson will tell the jury we
 2    may be a little longer than what we originally thought.
 3              (Recess taken at 2:26 p.m.)
 4              (At 3:09 p.m. on March 8, 2023; with counsel for the
 5    parties and the defendant present; WITHOUT the jury:)
 6              THE COURT:  So has the problem been solved?
 7              MR. DREHER:  Not entirely, Your Honor.  In fact, we
 8    did have an opportunity to confer with the defense prior to the
 9    Court taking the bench, and really the government -- the team,
10    we've conferred and tried to think of what remedy could be
11    applicable in this scenario.
12              THE COURT:  Remedy?  The question -- first question,
13    I mean, is it not possible to get the reports from the prior
14    cases?
15              MR. DREHER:  Your Honor, if I may just request that
16    this conversation occur outside of the presence of the witness.
17              THE COURT:  Oh, I'm sorry.  Yes.  I think that's a
18    good idea.
19         Go back to the witness room.
20         Thank you, Ms. Rochlin, for being so vigilant.
21              MS. ROCHLIN:  Happy to help when I can, Your Honor.
22              MR. DREHER:  So just as a little factual background,
23    and I think this will answer the Court's questions.  We were
24    able to obtain a copy of the report outlined at least in the
25    Rodriguez case, which I think is most concerning.  And just for
```

1    a little background for the Court, that case involved an

2    electroshock device that was applied to the back of the neck of

3    Michael Fanone and the injuries that he sustained after being

4    pulled out of the tunnel at approximately the same time as

5    Officer Moore, the victim in our case.

6        Now, in his expert report for that, he is not -- Dr. Kroll

7    is not able to specifically identify what the device is;

8    however, he does place that device in the Michael Fanone case

9    in the same category as sparkler flashlight, using the same

10   terminology of all bark, no bite, that the injuries on Officer

11   Fanone's neck could not have come from the device identified,

12   and that Officer Fanone was never weakened by the device and

13   never immobilized by the device and that the device did not

14   cause Officer Fanone to ever lose consciousness.

15       Now, certainly the publicity with which the case involving

16   Officer Fanone has received I think provides more public

17   knowledge of the injuries actually sustained by Officer Fanone

18   than the victim in our case that would directly refute a lot of

19   the conclusions made by Dr. Kroll in that case, especially

20   since he would place that device in the same category as the

21   device he places this -- or excuse me, the same category of the

22   device in this case.

23       So the government sees this really as a game changer in

24   terms of having the ability to actually show injuries sustained

25   from a device similar to what Dr. Kroll has concluded, and

1    unfortunately occurring in the middle of the cross-examination

2    is the difficulty, so in terms of discussing the remedy, the

3    government did consider possibly requesting just the entirety

4    of Dr. Kroll's testimony be excluded but instead of that would

5    like to ask the Court to provide the government with just a

6    little bit more time before the cross continues.

7         However, I do want to point out that because procedurally

8    we've already called Dr. Kroll out of order, the government is

9    still prepared to call witnesses and return to its case in that

10   intervening time, but certainly we would ask for the

11   opportunity to complete cross-examination of Dr. Kroll once the

12   science can be digested, I guess, is the best way.

13        THE COURT:  Which is not going to happen today.

14        MR. DREHER:  I've read through the report, Your

15   Honor; however, there's a lot of comparisons and T's to be

16   crossed and I's to be dotted for an effective

17   cross-examination, I believe.

18        THE COURT:  Before I'd ask...

19        MR. DREHER:  And then certainly at the conclusion,

20   then, of our case, Your Honor, we would ask at least leave it

21   open for when that decision must be made for the opportunity to

22   put on a rebuttal witness that will likely contradict what

23   Dr. Kroll's opinion is not only in our case, but also in the

24   *Rodriguez* case.

25        THE COURT:  What about the *Byerly* case?  Has anybody

 1    been able to find that report?

 2            MR. DREHER:  The report in the *Byerly* case also

 3    references -- I believe the company that produces that weapon

 4    was called Mace, although it's not a spray mace.  It's just a

 5    company of -- for lack of a better word, the stun gun is titled

 6    Mace.  Now, Dr. Kroll also places that within the same category

 7    of sparkler flashlight and not as powerful as the muscle toners

 8    and whatnot.

 9            THE COURT:  So you've got the report in *Byerly* as

10    well?

11            MR. DREHER:  Yes, Your Honor.

12            THE COURT:  Okay.  So I understand why you're

13    emphasizing the *Rodriguez* case, but in terms of the remedy

14    proposed, if I were to agree with that, that would also give

15    you the opportunity to inquire of him about *Byerly*, and any

16    rebuttal witness you had could perhaps deal with both witness

17    or witnesses.

18            MR. DREHER:  Yes, Your Honor, that's correct.

19            THE COURT:  *Byerly* may not be as relevant or may not

20    be as charged or whatever the word you used was.

21            MR. DREHER:  The greatest pun I could think of, Your

22    Honor.

23            THE COURT:  So Mr. Smock, what do you suggest?

24            MR. SMOCK:  Your Honor, I mean, our preference would

25    be to move forward with Dr. Kroll.  They've been provided those

1    reports and --

2            THE COURT:  They may have to go get an expert before

3    this case is over.

4            MR. SMOCK:  Well, in fairness, Your Honor, they've

5    been aware of this issue for more than a year now and have

6    never gotten --

7            THE COURT:  The issue, yes, but not his prior either

8    inconsistent testimony or consistent but based on different

9    devices or consistent based on less information, and at the

10   very least it goes to his credibility and his -- the extent to

11   which the jury ought to believe him, and he's just -- anyway.

12           MR. SMOCK:  What his reports show is that there is a

13   category of devices that market themselves as stun guns but

14   that are far less powerful, and that's consistent with what

15   these other reports say, and you know, that's really the extent

16   of it.  So it's not clear to me why we would need to continue

17   this matter to permit further research.

18           THE COURT:  And in the case of a lay witness, even in

19   the case of a lay witness, most judges today, in order to keep

20   the trial moving along, will require the government to turn

21   *Jencks* material over before the end of the direct examination.

22   The Jencks Act says the end of direct examination, which means

23   if everybody followed that religiously, there would be a delay

24   after every direct examination in every single case.  That's

25   not the practice, but an expert -- and usually, you know, you

1    can read over a FBI 302 interview or whatever in a reasonable

2    period of time and develop your cross-examination for a lay

3    witness.

4         An expert's different, and for whatever reason the

5    government chose not to get an expert in this case to counter

6    Dr. Kroll.  I think they're at least entitled to the

7    opportunity to review his statements prepared for prior

8    January 6 cases on the same subject.  They may want to talk to

9    the prosecutors in those cases.  I don't know whether talking

10   to any of the witnesses would be helpful or not, and they may

11   want to consult with some sort of an expert even if they don't

12   want to call that expert, so I get that.

13        Now, there are a couple of ways to do it.  One is at some

14   point in the trial to resume Dr. Kroll by Zoom, which would not

15   be ideal, if his travel is a problem, and another is to have

16   him come back depending on what his schedule is, but I don't

17   think we can finish him today.

18        MR. SMOCK:  Very well.  I mean, I've made my record.

19   I think I would -- we can inquire of Dr. Kroll of his

20   availability, but I don't know that we need to decide that

21   immediately right now.

22        THE COURT:  It's not still possible for him to make

23   his plane, I take it, his three-something plane?

24        MR. SMOCK:  Well, I think he told the Court that he

25   moved it back over lunch or at some point.

1        THE COURT:  What was his earlier flight?

2        MR. SMOCK:  3:20, I think.

3        THE COURT:  3:20.  Well, it's too late for that.  So

4   is there anything else anybody wants to say about that?

5   Because I want to raise one other thing that does have to do

6   with scheduling and could possibly affect this.  Anybody else?

7   So I've decided to grant the government's request to give them

8   a reasonable period of time to review this and to prepare for

9   further cross-examination.

10       Okay.  So at the moment we are meeting tomorrow, which is

11  Thursday, until -- beginning around 10:15 until around 4:45.

12  On Friday we can begin earlier, but I have to end by about

13  four.  On Monday we're sitting.  We have a full trial day, I

14  think.  No, no.  We don't have a full trial day.  I've already

15  said we don't have a full trial day in my earlier order.  No.

16  Wait a minute, wait a minute.  Yes, right.  We don't have a

17  full trial day.

18       Tuesday we cannot sit because we do not have American Sign

19  Language interpreters available.  Wednesday we have one

20  American Sign Language interpreter, not two.  Efforts are

21  continuing to be made, but at the moment we only have one.

22  Thursday we have none.  That's 'cause this trial was supposed

23  to have been over by now.  Not by now but sooner.  So no one

24  for Thursday.  Friday, March 17th, the full team is confirmed.

25       Now, we can jerry-rig a solution once deliberations begin

```
1    because the American Sign Language interpreters don't have to
2    be here sitting around while we're sitting around and either
3    come in, if needed, from their place of work or do something
4    over Zoom.  We will have questions from the jury, and that's
5    where we stand at the moment.
6         Teresa Salazar, who coordinates interpreters, is trying to
7    figure it out and see if she can find -- in her latest, more
8    cryptic email -- there have been many of them since -- she's
9    looking into our problem, and there might be a glimmer of hope.
10   Our only other alternative is at very great expense to bring
11   people in from another jurisdiction.  So at the moment we're
12   good for Monday, March 13th.  We've already agreed we're not
13   sitting on Tuesday, March 14th.  For Wednesday, March 15th, we
14   got one interpreter.  I don't know if it's even feasible -- the
15   interpreters can tell us -- is we proceed with one interpreter
16   and take long breaks.
17             INTERPRETER MATHERS:  (Shakes head.)
18             THE COURT:  The answer is no.  I've been told the
19   answer is no just now.
20        So if we can get one more interpreter, we can -- we'll be
21   okay on Wednesday, March 15th.  At the moment we're not okay on
22   Thursday, March 16.  So I don't know what anybody's prognosis
23   is for when we're going to finish this trial, and now we have
24   this other problem in terms of figuring out Dr. Kroll's
25   schedule.  And of course the government will have a better
```

1    sense of how many witnesses they're going to call after we hear

2    from Officer -- what's his name, with the body-worn camera?

3              MR. DREHER:  So Sergeant Bogner is the individual

4    we've been referencing, but Officer Spooner would be the next

5    witness.

6              THE COURT:  Okay.  Officer Spooner, Sergeant Bogner,

7    and clearly Officer Moore.  Moore, who was the alleged victim

8    of the count that involves the use of this device.

9              MR. DREHER:  And that's not the limit of who we

10   intend to call, Your Honor.

11             THE COURT:  I understand that.

12             MR. DREHER:  Yeah.

13             THE COURT:  I also think that sometimes, as trials go

14   on, you are able to streamline your case if you think you've

15   made your points and you're getting to be cumulative, but these

16   are our problems going forward.  So shall we -- what shall we

17   do?  Tell Dr. Kroll to go home, and defense counsel can figure

18   out what his availability is and see if we can connect it with

19   the ASL interpreters' availability?  And the other thing to

20   consider, though not today probably, is whether either or

21   both -- either or both sides would agree to proceed with him

22   virtually later in the trial.

23             MR. SMOCK:  Your Honor, we can inquire of Dr. Kroll

24   as to his schedule.  I mean, I think one question is the length

25   of the delay that the government is seeking.  I mean, it could

1    be that if he's missed his flight, the next flight, that

2    perhaps he could just testify tomorrow.  I don't know how much

3    time they're asking for.

4              THE COURT:  Well, I mean, that's -- I don't know if

5    that's possible.  Is Ms. Goetzl going to ask him about his

6    availability including for tomorrow?

7              MR. SMOCK:  Yes.

8              THE COURT:  All right.  I mean, if the government

9    thinks that's feasible, we could adjourn for today now and let

10   them go work on this problem, but that may not be feasible.

11             MR. DREHER:  And, you know, unfortunately Dr. Kroll's

12   not the only schedule that is being worked.  There is an

13   officer, Officer Spooner, who will not be available tomorrow

14   that we were hoping to get through today.

15             THE COURT:  How long do you expect his testimony?

16             MR. DREHER:  His is one of the short body-worn

17   cameras of an officer in the tunnel.

18             THE COURT:  As soon as we get this logistical thing

19   resolved, then we can call Officer Spooner and get the jury

20   back in the room, but the question is whether -- once we have

21   Ms. Goetzl's answer quickly about his availability.  But one of

22   Mr. Smock's suggestions is maybe the government could be ready

23   to proceed with Dr. Kroll tomorrow if Dr. Kroll were available

24   tomorrow, and the defense will go buy him a nice dinner or

25   something, although he can probably afford to buy them a

1    dinner.

2          MR. SMOCK:  So Your Honor, my understanding is that

3    Dr. Kroll could spend the night tonight in light of the fact of

4    the hour it is anyway and would be able to testify tomorrow.

5          THE COURT:  It would be nice to finish with him.

6          MR. DREHER:  Your Honor, I'm not sure if Dr. Kroll's

7    already made plans to fly out tomorrow, but certainly I would

8    ask for a later flight than what he --

9          THE COURT:  Pardon me?

10         MR. DREHER:  A later flight if -- and I don't

11   necessarily think first thing in the morning in terms of --

12         THE COURT:  I'm not suggesting first thing in the

13   morning.

14         MR. DREHER:  Okay.  I believe tomorrow would provide

15   sufficient time, then.

16         THE COURT:  Okay.  But it won't be first thing in the

17   morning probably, and I do have to leave here by 4 o'clock.

18         MR. DREHER:  Your Honor, I'm not sure if this would

19   be an option either, but perhaps if he were to leave and come

20   back Monday, that would provide more time, certainly, but --

21         THE COURT:  I know it would provide you more time.

22   Look, I just think we have to make some decisions here to move

23   this trial along.  We got a lot of problems.  I would suggest

24   that we tell him to stay over tonight and we do it tomorrow,

25   and, you know, if you want to send part of your team back now

1    to start working on this -- who's the lawyer for Spooner?

2          MR. DREHER:  I am, Your Honor.

3          THE COURT:  Well...

4          MR. DREHER:  As certainly, I'm sure, this Court

5    knows better than I, there are hours after the court closes as

6    well.

7          THE COURT:  I do.  I remember that both from private

8    practice and from my last contentious trial in which I wrote 28

9    opinions, some of them during the trial.  At least you guys are

10   trying to cooperate with each other and only argue about the

11   important stuff, and I appreciate that.  So I suggest that we

12   ask Dr. Kroll to stay over.  We will not do him first thing in

13   the morning, but we will get to him late in the morning.  I

14   don't know, take a late lunch, take an early lunch, get him out

15   of here tomorrow.  I think we can tell him he can leave the

16   courthouse by no later than 4:30 tomorrow.

17         MR. DREHER:  Yes, Your Honor.  In that case, in the

18   morning I would just ask the Court's permission that I

19   personally not be present during --

20         THE COURT:  Absolutely.

21         MR. DREHER:  Then that should work.

22         THE COURT:  Thank you very much, Mr. Dreher.  Why

23   don't we get the jury.  Why don't one of you go tell Dr. Kroll

24   what our plan is.  That's the best we can do for him, and we'll

25   get the jury in, and we'll hear from Officer Spooner, and

1    Ms. Salazar is going to continue to work on trying to get us

2    American Sign Language interpreters for next week.  But I had

3    my definitive answer we cannot do it with only one American

4    Sign Language interpreter.  I can't read lips, but I can read

5    gestures and facial expressions.

6         (Jury in at 3:30 p.m.)

7              THE COURT:  We have decided that rather than waste

8    any more of your time while we work on our logistical issues

9    with respect to Dr. Kroll that we will have him come back

10   tomorrow and we will stop here rather than have you sit in the

11   jury room for no good reason, and instead we'll revert to the

12   government's side, and they will call their next witness.

13        And I suggest, Mr. Smock, that you remove from the witness

14   stand Dr. Kroll's water glass, pen, and expert report, because

15   I do not believe the next witness knows anything about the

16   expert report.

17        So we're going to go back now to a government's witness,

18   and we are hoping to finish with him today, and tomorrow we'll

19   begin no earlier than 10:15.

20             MR. DREHER:  Bronson Spooner.

21             BRONSON SPOONER, PLAINTIFF'S WITNESS, SWORN

22             THE COURT:  Good afternoon, sir.  If you don't mind

23   taking off your mask and speaking into the microphone so

24   everybody can hear you.

25        Thank you.

DIRECT EXAMINATION

BY MR. DREHER:

Q.   Good afternoon, sir.  If you would, please introduce

yourself and spell your name for the Court.

A.   Yes.  I'm Officer Bronson Spooner from the Metropolitan

Police Department, and it's spelled B-R-O-N-S-O-N,

S-P-O-O-N-E-R.

Q.   Now, sir, how long have you been employed by the

Metropolitan Police?

A.   Seven years.

Q.   In what capacity do you serve MPD?

A.   Police officer.

Q.   Now, prior to joining the MPD seven years ago, did you

have any prior law enforcement experience?

A.   No.

Q.   Is there any sort of training that you have to go through

in order to become an officer with the Metropolitan Police?

A.   Yes.  It's a training at the academy.

Q.   How long is the training at the academy?

A.   About nine months or so.

Q.   And throughout your time with MPD, have you always served

as a police officer?

A.   Yes.

Q.   Now, were you working as a police officer on January 6th,

2021?

1   A.    Yes, yes.

2   Q.    Was there any specific division or unit that you were

3   assigned to on that day?

4   A.    On that day I was assigned to a civil disturbance unit,

5   CDU 42.

6   Q.    Can you describe to the jury what a civil disturbance unit

7   is.

8   A.    It's just a unit that helps safeguard anything in case of

9   any riots or any civil disorder.

10  Q.    Now, was this your sole assignment on that day?

11  A.    Yes.

12  Q.    At that time in January of 2021, did you also serve other

13  units as well?

14  A.    Other units?

15  Q.    In other words, was the CDU unit your only function with

16  the MPD at that time?

17  A.    Yes.  We were deployed on that day for that purpose.

18  Q.    Now, can you explain to the jury where you were deployed

19  to.

20  A.    On the beginning of the day, we were just basically on

21  Pennsylvania Avenue.  We were just hanging out.  We weren't

22  really doing much.  Things were pretty -- earlier in the day

23  things were pretty calm.  It was just a lot of people

24  everywhere.

25  Q.    Now, could you tell us what time your day started on

1    January 6th.

2    A.   What I can recall, it was in the morning.  I think by the

3    time we got downtown and everything, it was still early, like

4    maybe 10:00, 9:00 or 10:00.

5    Q.   And are you -- generally at that time would you patrol the

6    area of Pennsylvania Avenue on a day-to-day basis?

7    A.   No.  I'm out of the Fourth District.  We're actually not

8    downtown usually.

9    Q.   So was January 6, 2021, a special assignment for you?

10   A.   Yes, it was.

11   Q.   Now, were members of CDU 42, I think you said, are they

12   all from the Fourth District as well?

13   A.   Yes, sir.

14   Q.   And approximately how many officers did CDU 42 entail?

15   A.   Typically, 28.

16              THE COURT:  Twenty-eight officers, what?  I'm not

17   sure I --

18              THE WITNESS:  Twenty-eight officers, yes.

19              THE COURT:  What was the question?

20              MR. DREHER:  How many officers are in CDU 42, Your

21   Honor.

22   BY MR. DREHER:

23   Q.   And so were all 28 officers at that same location that

24   morning?

25   A.   We were in the same general vicinity.  They kind of had us

1   spread out in different squads.

2   Q.   Now, are you able to describe for us on that morning what

3   your duties were?

4   A.   At that time we were just there to give police presence,

5   assist.  There was a lot of people walking around asking where

6   the bathrooms were, directions, so we were just out, you know,

7   with the crowd.

8   Q.   Now, at that time did you have -- were you fully

9   uniformed?

10  A.   Yes.

11  Q.   What were you wearing at that time?

12  A.   What I'm wearing right now.

13  Q.   Okay.  Did there come a time on January 6th when you

14  changed?

15  A.   Yes.

16  Q.   What did you change into?

17  A.   Well, when we got called to the Capitol, we had to change

18  into what's called hard gear.  It's basically protective gear

19  that protects certain parts of your body like your arms, your

20  shins, your thighs.

21  Q.   Now, this hard gear, was it with you on Pennsylvania

22  Avenue as well?

23  A.   It was -- we all had them in our duffle bags in the vans.

24  Q.   And do you remember about what time you were called to the

25  Capitol?

1    A.   I can't remember exactly.  Somewhere around 1:00 or 2:00.

2    Q.   Is that in the afternoon?

3    A.   In the afternoon, yes.

4    Q.   And so the trip from where you were to the duffle bag,

5    then to the Capitol, are you able to tell us approximately how

6    long that took?

7    A.   Everything happened so fast.  As soon as everything -- it

8    was a lot of yelling on the air so -- on our radios, so they

9    had us rush to the Capitol as soon as possible.  So from the

10   time we got the call to the time we got to the Capitol, maybe

11   10, 15 minutes.

12   Q.   Now, you described that there was a rush over the air.

13   Are you equipped with a radio?

14   A.   Yes, sir.

15   Q.   And is that a personal radio, or is that a vehicle radio

16   that you use?

17   A.   It's our personal radio.

18   Q.   Personal?

19        Now, also on your body there's other equipment that you're

20   equipped with; correct?

21   A.   Yes, sir.

22   Q.   On that day did you also have a weapon of any kind?

23   A.   Yes.  I had -- we had our regular duty weapon, firearm,

24   pepper spray, ASP baton.

25   Q.   Now, do you also have the equipment that records what --

1    A.    Body cameras, yes.

2    Q.    The body cameras?

3    A.    Body cameras.

4    Q.    And where is that positioned on your body?

5    A.    Directly on my chest.

6    Q.    Oh.  Are you --

7    A.    I'm wearing it right now.

8    Q.    You're wearing it right now?

9          THE COURT:  That's a body-worn camera you just

10   pointed to?

11         THE WITNESS:  Yes, sir.

12   BY MR. DREHER:

13   Q.    Okay.  Now, is a body-worn camera something that's part of

14   the uniform?

15   A.    Yes, sir.  We are supposed to wear it at all times.

16         THE COURT:  Didn't used to be years ago, but now it

17   is.

18         THE WITNESS:  Yeah, it is now.  It wasn't, what,

19   maybe four -- no, five years ago.

20   BY MR. DREHER:

21   Q.    Now let me ask:  When you put on this hard gear, does it

22   go over top of the camera?

23   A.    No.  We're supposed to wear this on the outermost garment

24   so -- we also wear a jumpsuit sometimes.  It's supposed to be

25   fire retardant.  I don't think anyone had enough time to put

Spooner - Direct (Dreher)                                    1417

1    that part on, so the hard gear goes over your body, and the

2    camera stays right where it is.

3    Q.   So then there was nothing that obstructed the view of your

4    body-worn camera on January 6?

5    A.   No, sir.

6    Q.   No?

7    A.   No, sir.

8    Q.   Are you able to tell us what path you took to get to the

9    Capitol?

10   A.   Driving wise or when we first got on foot?

11   Q.   When you got the call to go to the Capitol, what was the

12   path that you took?

13   A.   Well, I wasn't the driver of the van.  We just got

14   directed to the van.  They drove.  I'm not exactly sure.  I

15   would have to see the actual setup.

16            THE COURT:  Just to clarify, you were originally in a

17   vehicle?

18            THE WITNESS:  We were out on foot.  When we got the

19   call, we had to rush back to our vans to get our equipment, so

20   we ran to the vans.  As the driver was driving to the Capitol,

21   we were getting stuff together and situated.  When we got to

22   the Capitol, we got out of the vans from just putting on our

23   gear as fast as possible and then proceeded to walk up the path

24   to the Capitol.

25   BY MR. DREHER:

Spooner - Direct (Dreher)                                        1418

1    Q.   Now, sir, on the screen in front of you, I've just placed

2    what's previously been admitted as Government's Exhibit 605.

3            MR. DREHER:  And Ms. Johnson -- there it is.

4    BY MR. DREHER:

5    Q.   Now, sir, on this diagram can you show us the path that

6    you took to get to the Capitol --

7    A.   Okay.

8    Q.   -- using the touch screen in front of you.

9    A.   Okay.  Yes.  We started walking up around this path right

10   here (indicating).

11   Q.   And then the location that you first went when you arrived

12   at the Capitol, where was that?

13   A.   It was a little further down.  It's not even on here.  It

14   was like, I guess, where -- this driveway right here, around

15   this area.

16   Q.   Now, was there a location that you were told to set up or

17   to go to?

18   A.   We were just told to get to the Capitol as fast as

19   possible.  That's where the vans pulled in.  As we pulled in,

20   we saw a string of other vans, so we just pulled in there, got

21   out of the vans, and put our gear on as fast as possible.

22   Q.   Now, what did you see when you first arrived at the United

23   States Capitol?

24   A.   Well, at first we saw a few people scattered around this

25   area but a lot more, a lot more in these areas right here

1    (indicating throughout).  So as we came up the path, the crowd

2    got a lot thicker.

3    Q.   Were you able to determine where this crowd was coming

4    from?

5    A.   No, not exactly.  It was chaotic.

6    Q.   All right.  So I'm going to clear the screen real quick,

7    and I'm going to ask you:  Could you give us an idea of the

8    number of people that you observed at that time?

9    A.   Thousands.

10   Q.   Were there more people than there were officers?

11   A.   Absolutely.

12   Q.   Now, when you arrived at the Capitol, did your duties

13   change?

14   A.   Well, we were told to get to the front as fast as

15   possible.  It was a lot of noise going over the air, a lot of

16   yelling, screaming, you know, they're -- they're breaching, so

17   we tried to fight our way through the crowd, get there as fast

18   as possible, and at some point I got assaulted before I got to

19   the front.

20   Q.   Now, when you say "the front," where do you mean?  If you

21   can show us.

22   A.   In this area, before we got to this whole area right here

23   (indicating), I remember getting assaulted and then having

24   to -- I was blinded, and I had to be dragged somewhere else.  I

25   couldn't see where I was going 'cause I had -- I was sprayed in

1    the face.

2    Q.   And that was before you even got to the front?

3    A.   Right.

4    Q.   Now, what is the treatment following a spray to the face?

5    A.   Water in your face, in your eyes.

6    Q.   Now, did this prevent you from going to the Capitol?

7    A.   Well, I got, I think -- I'm not a hundred percent sure.

8    Somewhere in this area is where I think I got assaulted and --

9    but someone led me somewhere in this area.  Right around here

10   was where I started -- there was bottles of water, and I was

11   pouring water in my eyes to get it out.  It took a little while

12   for me to be able to see again, but as soon as that happened, I

13   had went right back into the crowd to try to hold things back

14   until they eventually had us all retreat back into the Capitol

15   (indicating throughout).

16   Q.   So you went back to the crowd after being assaulted?

17   A.   Yes.

18   Q.   Are you able to, I guess, tell us how long you were at

19   this front before you retreated back to the Capitol?

20   A.   We were there for, like, another 10, 15 minutes or so

21   before there was projectiles being thrown, gas, a lot of spray.

22   Q.   Now, I do want to just specify for the jury, were these

23   projectiles being thrown by officers?

24   A.   There were some being thrown by officers as well as the

25   crowd.

1    Q.   Okay.  And then the crowd was also throwing projectiles at

2    the officers?

3    A.   Yes.  Yes, they were.

4    Q.   Now, was it your decision to move the officers back to the

5    interior of the Capitol?

6    A.   No, it wasn't.  It was a commander.  I don't know his

7    name.

8    Q.   And was commander his rank or his position?

9    A.   His rank.

10   Q.   Now, in the seven years that you've worked for MPD, is it

11   common to see a commander at the scene?

12   A.   Depending on the situation.  I guess in this situation,

13   yes.

14   Q.   And was it this commander that was giving orders?

15   A.   At the time, yes.  Like I said, it was very chaotic.

16   There were a lot of people everywhere.  There were a lot of

17   sergeants, officers trying to scramble to get things situated

18   as things were being thrown at us.  At some point it became too

19   much for us to handle, so the commander ordered everyone into

20   the Capitol.

21   Q.   Now, on the touch screen in front of you, are you able to

22   show us the path you took to get inside the Capitol?

23   A.   Yes.  First, this little opening right here is some --

24   it's the stairs that led up to this area, and in this area the

25   crowd started coming up, and we held here for a little while,

1    but then there were more people up top that were throwing

2    things down and hanging off this entire area, and at that

3    moment when it got too much for us to handle, we retreated into

4    this opening right here (indicating throughout).

5    Q.   Now, are you familiar with whether that opening has a

6    specific name?

7    A.   He -- he just said kind of another -- that was the first

8    and only day I've ever really been to the Capitol.

9    Q.   Right.

10   A.   I'd never been there before.  He just said everyone go

11   into the tunnel and close the doors.

12   Q.   And that was the commander?

13   A.   Yes.

14   Q.   Now, at this point is it -- how had your duties changed?

15   A.   We were just in defense.  We just wanted to keep anyone

16   from entering the Capitol.

17   Q.   Now, while you were making your way into the tunnel, are

18   you able to tell us how many rioters you observed?

19   A.   When we first got to the tunnel and we closed the door, we

20   couldn't see anything because the doors were closed, and the

21   commander basically said if anyone comes into this -- through

22   this door --

23   Q.   Now, I do want to stop you right there.

24   A.   Okay.

25   Q.   Before getting into the tunnel --

1    A.    No.  Well, I didn't really see at that point 'cause we

2    were going in.  I was still kind of half blinded.  I didn't see

3    the actual crowd, like, the majority of the crowd until those

4    doors were opened.

5    Q.    So you make your way into the tunnel.  Can you describe

6    for us how that entranceway is set up.

7    A.    It's like a regular tunnel with double doors as far as I

8    think I can remember.  We went through those doors, and we

9    closed them.

10   Q.    And just so we're clear, that was the only time you've

11   ever been into the --

12   A.    That was the only time I've ever been there.

13   Q.    Now, what did you do once you arrived inside the Capitol?

14   A.    Well, once we got into the Capitol and closed the doors,

15   and we had shields.  We had like, you know, riot shields, and

16   basically the commander was like, if anyone breaches that door,

17   we're going to pretty much go old school CDU.

18   Q.    Old school CDU?

19   A.    Yes.

20   Q.    Okay.

21               THE COURT:  Old school what?

22               THE WITNESS:  Well --

23               THE COURT:  Give us the phrase again, and he can tell

24   us what it means.

25               THE WITNESS:  Well, old school CDU.  I never got the

1    clear definition of what that is.  I can only assume.

2    Basically stop it by any means.

3    BY MR. DREHER:

4    Q.   And that was when you were already inside the Capitol?

5    A.   Inside the Capitol in front of those doors.  Well, behind

6    the doors, I should say.

7    Q.   Now, while you were there, did you ever observe those

8    doors get breached?

9    A.   Yes.

10   Q.   And who breached the doors?

11   A.   The protesters, rioters.

12   Q.   Now, do you remember any of these rioters sticking out in

13   your head or any particular rioter?

14   A.   No, no one in particular.  I just saw glass breaking.

15   Q.   Now, earlier you also testified that you had some sort of

16   shield?

17   A.   Yes.

18   Q.   Where did that shield come from?

19   A.   We -- in our CDU vans we also have a certain set of

20   shields, so they came from our vans, basically.

21   Q.   And what were you using this shield for?

22   A.   The shield was basically to keep anyone back from

23   proceeding.

24   Q.   Now, once you had hold of this shield, did you maintain

25   possession of it throughout the rest of the day?

1    A.   I tried to, but it was taken from me.

2    Q.   Now, earlier we also talked about that you had a body

3    camera on --

4    A.   Yes, sir.

5    Q.   -- during that day.  Have you had an opportunity to review

6    body-worn camera footage from your time in the tunnel prior to

7    testifying today?

8    A.   Just one time, yeah.

9    Q.   Okay.

10            THE COURT:  So for the body-worn camera, the way it

11   works -- tell me if I've got this right -- is you, the officer

12   wearing the camera, have to turn it on; right?

13            THE WITNESS:  Yes, sir.

14            THE COURT:  And you make the decision when to do

15   that?

16            THE WITNESS:  We're supposed to turn it on the minute

17   you have any interaction with someone in the public.

18            THE COURT:  You're supposed to turn them on

19   whenever --

20            THE WITNESS:  Public.

21            THE COURT:  So if you stopped me for jaywalking,

22   would you turn that on?

23            THE WITNESS:  Absolutely.

24            THE COURT:  I'll be careful.  And if you stop

25   somebody for driving through a red light or a stop sign?

 1              THE WITNESS:  Any interaction with a citizen, you

 2      turn it on.

 3              THE COURT:  Okay.

 4      BY MR. DREHER:

 5      Q.   And so was your body-worn camera turned on prior to

 6      entering the tunnel?

 7      A.   It was.

 8      Q.   And to your knowledge, do you know if your camera was

 9      activated throughout your entire time at the Capitol?

10      A.   I'm pretty sure it wasn't, because the way these things

11      work, if anything's pressed against it for any amount of time,

12      it'll turn -- it will go off, and I was stuck between officers

13      and rioters, so many times my camera was being pressed.  I even

14      lost it at one point when I got assaulted.  My camera fell off,

15      and I had to go find it.

16      Q.   But it wasn't you that turned it off?

17      A.   No, absolutely not.

18              MR. DREHER:  Okay.  Ms. Johnson, would we be able to

19      pull this down just for a moment?

20      BY MR. DREHER:

21      Q.   Now, sir, on your screen I'm showing you what's been

22      previously marked and has not been admitted yet as Government's

23      Exhibit 122, and for just a few moments I'm going to play it,

24      and if I can direct your attention to the screen in front of

25      you.

1           (A portion of Exhibit 122 was played.)

2    BY MR. DREHER:

3    Q.   Now, sir, I've played about ten seconds of this clip for

4    you.  Are you able to tell us what this is?

5    A.   It looks like a camera behind the shield.

6    Q.   Do you recognize who is behind the camera?

7    A.   I know my body cam number, so this is my body cam.

8    Q.   In other words, you can identify that this is yours based

9    on the number?

10   A.   Yes.

11   Q.   And does this fairly and accurately depict the events that

12   you experienced while inside the tunnel?

13   A.   Yes.

14           MR. DREHER:  Your Honor, the government would move

15   for the admission of Government's 122 into evidence.

16           MR. SMOCK:  No objection.

17           THE COURT:  It will be admitted.

18           MR. DREHER:  And permission to present to the jury.

19           THE COURT:  Yes.

20   BY MR. DREHER:

21   Q.   Officer Spooner, I'm going to ask you to follow along with

22   us, and I just want to let you know at one point at about 14:45

23   and 45 seconds, I'm going to pause the video and then ask you

24   some questions about it.  Okay?

25   A.   Okay.

1          (A portion of Exhibit 122 was played.)

2     BY MR. DREHER:

3     Q.   All right.  Sir, I'm going to pause it right there.  And

4     the time stamp at the top, for the record, reads 14:45:47; is

5     that accurate, sir?

6     A.   Yes, sir.

7     Q.   Now, in standard time that's 2:45 p.m.?

8     A.   Yes, sir.

9     Q.   Now, up until this point we see you -- or at least we see

10    what appears to be something that the camera is looking

11    through.  Can you tell us what that is.

12    A.   The shield.

13    Q.   And this is the shield that you described earlier as what

14    you were using to protect yourself?

15    A.   Yes, sir.

16    Q.   Now, we also could see a lot of rioters through this

17    shield.  What was your position compared to other officers

18    while in the tunnel?

19    A.   There were a couple beside me and some behind me.  Well, a

20    lot behind me.

21    Q.   Let me ask you this, sir:  Were there any officers in

22    front of you?

23    A.   Not that I can tell.

24    Q.   Aside from this shield was there anything between you and

25    the rioters?

Spooner - Direct (Dreher)                                           1429

1    A.    No.

2    Q.    Now, obviously we only saw a short clip of your time in

3    the tunnel thus far, but how long had you been in the tunnel by

4    that time, if you know?

5    A.    At that time maybe about 15 minutes or so.

6    Q.    And certainly your time in the tunnel wasn't the first

7    time that you had been battling rioters?

8    A.    No, no, sir.

9    Q.    So in terms of the time that you had spent at the Capitol

10   at this point, how much time had elapsed up until this point?

11   A.    About an hour or so.

12   Q.    And now, earlier you told us about at least some portion

13   that you had to recover from an assault, but did this portion

14   of the clip that we viewed outline the majority of what you

15   were doing while at the Capitol?

16   A.    This part is where I was in the longest, yes.  We were in

17   that tunnel rotating for a while.

18   Q.    Can you tell us what it was like in the tunnel.

19   A.    It was -- it was very scary.

20          THE COURT:  Very what?  I didn't hear what you said.

21          THE WITNESS:  Scary.

22   BY MR. DREHER:

23   Q.    And certainly -- was there any physical tolls that were

24   happening at the time?

25   A.    Physical tolls?  Yeah.  I was -- I was in pain.  My eyes

1  were burning.  My skin was burning from all the chemical agents

2  that were deployed.  I actually got hit in the head.  I got

3  trapped in the crowd, couldn't breathe for a little while.  I

4  had to crawl through glass, so yeah.

5  Q.   Okay.  Now, although we haven't seen it yet, after this

6  clip can you tell the jury how long you stayed in the tunnel.

7  A.   I think a total of about two hours.

8  Q.   And during that two hours were you still wrestling with

9  the rioters?

10  A.   It was -- we had -- we pretty much did it in rotations.

11  You'd stay up front trying to hold people back, and as people

12  would get fatigued, they would try to get fresh officers on the

13  front, bring the old ones to the back to kind of decon, which

14  is basically pouring water all over yourself to try to

15  counteract the chemical agents.

16  Q.   Now, aside from the chemical agents, do you remember any

17  other weapons being used against you?

18  A.   There were poles, a lot of things being thrown, a lot of

19  heavy objects.  I saw some -- you know, some metal poles, some

20  wood.  I think I saw one of our helmets being tossed back

21  through.

22  Q.   Now, this may sound silly, but how are you able to

23  identify that it was one of your helmets?

24  A.   Well, one of our helmets or Capitol helmets.  It was

25  definitely a law enforcement helmet.

1    Q.   And so there was some sort of writing on the helmet?

2    A.   Yes.

3         MR. DREHER:  Your Honor, for the record, I'm going to

4    continue playing the exhibit.

5         (A portion of Exhibit 122 was played.)

6         MR. DREHER:  And then, for the record, I've stopped

7    it now at 14:46:04.

8    BY MR. DREHER:

9    Q.   And Officer Spooner, were you able to follow along with us

10   in observing that exhibit?

11   A.   Yes, sir.

12   Q.   Can you tell us at this moment what happened to your

13   shield.

14   A.   It was taken from me.

15   Q.   So now at this point is there anything between you and the

16   rioters?

17   A.   No, sir.

18   Q.   What was going through your mind at this point?

19   A.   I didn't know what was going to happen.

20   Q.   How so?

21   A.   Well, I am pretty much right in front of these thousands

22   of people, and they're determined to get past or through by any

23   means, and I didn't have any protection really at that point.

24   Q.   Now, Officer Spooner, earlier you testified that you had

25   been on the police force for quite some time at this point?

1    A.    Yes, sir.

2    Q.    Has there ever been an experience as a police officer that

3    compares to this in the tunnel?

4    A.    No, sir.

5    Q.    Now, before we play it, at some point you lose your

6    footing in the tunnel.  Do you remember that happening?

7    A.    I do.

8    Q.    Can you tell us what happened.

9    A.    Well, I can't remember if it was before or after this, but

10   at some point I lost -- my helmet got ripped off as well, so I

11   was pretty much exposed.  I had no helmet, no shield.  I

12   remember I got -- I remember getting hit in my head and then

13   kind of falling backwards into the officers behind me as the

14   rioters were coming in, so I was kind of trapped in between the

15   two forces, and I had a gas mask on at the time, so it was kind

16   of pressed against my face so I couldn't breathe, and basically

17   I'm struggling, and I got as low as I could get, and I'm

18   crawling through the glass on the floor until I found -- you

19   know, I was able to look up and see an opening, and I reached

20   up.

21        You know, I'm yelling.  I reached up, and I remember

22   grabbing an officer's vest and, like, yanking it, pulling it

23   down so they could see that I'm down there, and someone noticed

24   me, and they helped pull me out.

25   Q.    Now, you mentioned glass on the floor.  Is it safe to

1   assume that was broken glass?

2   A.   It was broken glass from the doors that were broken out as

3   they were coming in.

4          MR. DREHER:  Your Honor, I'm going to play the

5   remaining portion of the exhibit.

6          (A portion of Exhibit 122 was played.)

7          MR. DREHER:  And then, Ms. Johnson, if we could stop

8   publishing to the jury.

9   BY MR. DREHER:

10  Q.   Now, Officer Spooner, at the conclusion of that clip, did

11  your day at the Capitol end at that time?

12  A.   No.

13  Q.   How long were you at the United States Capitol?

14  A.   It was until into the wee hours of the morning totally.

15  Q.   Now, throughout your time in the tunnel -- or excuse me.

16  Let me back up.  Were you in the tunnel until the wee hours of

17  the morning, or was there other areas of the Capitol you went

18  to?

19  A.   No.  We were in the tunnel for maybe two hours or so, a

20  little bit more.  We had -- after I was deconning, we had to go

21  back into a different part.  I'm not sure where.  I don't know

22  my way around the Capitol.  I just remember going through

23  another door, and there were other people trying to help hold

24  people back from other sides.

25          We did that for a little while until we heard that the

1    other jurisdictions were coming in to help, and after that

2    everyone that was in the tunnel or other parts of the Capitol

3    just met in the Rotunda area, kind of gathered ourselves, and

4    we had to wait for the fire department to show up to pretty

5    much hose all of our equipment down because it was covered in

6    chemical agents.  So by the time we finally -- everything was

7    said and done, it was into the hours of the morning.

8    Q.    And throughout your entire time at the Capitol, was there

9    anytime that compares to the time you spent in the tunnel?

10   A.    No.  The tunnel was -- the tunnel was probably the worst.

11   Q.    Why is that?

12   A.    Well, because it was so much chaos in that little confined

13   area with all the sprays and gas that were going through there,

14   and there was really no way to escape it.  It's pretty bad.

15   Q.    And so your duties while you were in the tunnel was to

16   prevent individuals from entering the Capitol; correct?

17   A.    Yes.

18   Q.    Now, were those duties hindered after you lost your helmet

19   and your shield?

20   A.    Yes.  I didn't have any protection.  I mean, I was able to

21   grab another shield from somewhere else, but my helmet was

22   gone.

23   Q.    So you went back into the fight?

24   A.    Yes.

25            MR. DREHER:  If I may just have a moment, Your Honor.

 1                THE COURT:  Yes.

 2    BY MR. DREHER:

 3    Q.    I'm sorry.  I do want to talk a little bit about after

 4    January 6.  Did you suffer any injuries from your time at the

 5    Capitol?

 6    A.    I had a concussion, a mild concussion.

 7    Q.    Has that been treated?

 8    A.    Yes.  You know, we saw our physicians at the clinic, and I

 9    have my own physician, but yeah.

10    Q.    And I know I asked before the Capitol.  I'm going to ask

11    the same since your time at the Capitol.  Has there been any

12    incident that has compared to what you faced at the Capitol?

13    A.    No.

14                MR. DREHER:  Your Honor, I have no further questions.

15                MR. SMOCK:  Your Honor, we have no questions for

16    Officer Spooner.

17                THE COURT:  Thank you, Officer Spooner.  Thanks very

18    much.  You're excused.

19                THE WITNESS:  All right.  Thank you.

20                THE COURT:  I'm glad we were able to accommodate your

21    schedule.

22                THE WITNESS:  Thank you, sir.

23                THE COURT:  Is there anything we can fruitfully do in

24    the next 45 minutes or not?

25                MR. DREHER:  Oh, 45 minutes?

```
 1              THE COURT:  Is there anything we can do in the next
 2    45 minutes today or not?
 3              MR. DREHER:  Yes, Your Honor, I believe so.  For some
 4    reason I thought it was 4:30 today but...
 5              THE COURT:  I don't think I said that.
 6              MR. DREHER:  No.  That's me.
 7              THE COURT:  I'm trying to keep track of my schedule
 8    and everybody's schedule.
 9              A JUROR:  I think you said tomorrow.
10              THE COURT:  Tomorrow.  Tomorrow, yes.  Tomorrow and
11    tomorrow and tomorrow.
12         So is this your witness, Mr. Dreher?
13              MR. DREHER:  Yes, Your Honor.
14              THE COURT:  Does that affect our ability to do what
15    you need to do tomorrow?
16              MR. DREHER:  No, Your Honor.
17         Sergeant William Bogner.
18              WILLIAM BOGNER, PLAINTIFF'S WITNESS, SWORN
19              THE COURT:  Sir, good afternoon.  If you could take
20    off your mask and speak into the microphone.
21              THE WITNESS:  Sure.
22              THE COURT:  Thank you.
23                           DIRECT EXAMINATION
24    BY MR. DREHER:
25    Q.   Good afternoon, sir.  If you could please introduce
```

1   yourself and spell your name for the record.

2   A.   My name's Sergeant William Bogner, W-I-L-L-I-A-M,

3   B-O-G-N-E-R.

4   Q.   Now, sir, you introduced yourself as a sergeant.  Are you

5   currently employed?

6   A.   I am.  I'm employed with the Metropolitan Police

7   Department.

8   Q.   How long have you served with the Metropolitan Police?

9   A.   Just short of 15 years.

10  Q.   Now, do you have any specific roles or divisions that

11  you're assigned to?

12  A.   I'm assigned to the Metropolitan Police Academy.  I work

13  in the operations branch there.

14  Q.   And where is the academy located?

15  A.   4665 Blue Plains Drive Southwest.

16  Q.   Now, on January 6, 2021, were you also assigned to the

17  academy?

18  A.   I was assigned there but detailed to SOD's domestic

19  security office.

20          THE COURT:  Tell us what SOD is.

21          THE WITNESS:  What's that?

22          THE COURT:  Tell the jury.

23          THE WITNESS:  Oh.  The special operations division

24  domestic security office.

25  BY MR. DREHER:

1    Q.   And was it just for that day you were assigned there?

2    A.   For a period of time.  It had been a while.  I don't

3    remember exactly how long, and that's periodic throughout the

4    years I've done that.

5    Q.   Okay.  So that assignment wasn't directly related to what

6    occurred on January 6?

7    A.   No.

8    Q.   When did you become aware that something was happening out

9    of the ordinary on January 6?

10   A.   We were at the office, and we started to hear the radio

11   traffic.  Inspector Glover was talking on the radio.  They were

12   requesting additional units, and that's when we became aware.

13   Q.   So your duties prior to hearing that call, what were they?

14   A.   So that day I was working with Lieutenant Andy Horos, who

15   was in charge of the domestic security office, and he was

16   responsible for placing our civil disturbance units throughout

17   the city.

18   Q.   Now, were you assigned to a civil disturbance unit?

19   A.   No.

20   Q.   Was that lieutenant assigned to a specific unit?

21   A.   No.  He would be the kind of manager that oversees where

22   all of the units for the whole city would go.

23   Q.   Now, in your role with that lieutenant, did you become

24   aware of where all the units were?

25   A.   Yes.  I wouldn't be able to tell you now, but throughout

1    the day he would place them, and, you know, we would have

2    conversations about it.

3    Q.   Do you know if they were all in the same portion of the

4    city?

5    A.   No.  They were spread out.  We had many units activated

6    that day, and they were spread out throughout the city.

7    Q.   Can you tell us about when -- what time that call came?

8    A.   I don't remember the exact time.

9    Q.   At some time did your duties change on January 6th?

10   A.   Yes.

11   Q.   When did that occur?

12   A.   When we were on -- once we were on scene at the Capitol,

13   it became apparent that things were different than we expected,

14   and I had to take on other roles.

15   Q.   Are you aware about what time you arrived at the Capitol?

16   A.   I don't remember, but we did activate our body cameras as

17   a time stamp.

18   Q.   And so your body-worn camera is something that you have on

19   you at all times?

20   A.   Typically, yes.

21   Q.   And so how did you activate it?

22   A.   There's a button in the center, and we press that twice.

23   Q.   Are you aware if your body-worn camera remained activated

24   throughout your time at the Capitol?

25   A.   I never deactivated it, but it did fall off for a period

Bogner - Direct (Dreher)                                          1440

 1    of time and I wasn't in control of it.

 2              THE COURT:  So when it fell off, were you able to

 3    retrieve it?

 4              THE WITNESS:  Actually, then-Lieutenant Smalls found

 5    it at some point and handed it back to me, 'cause there's a

 6    sticker on the back with my name on it.

 7              THE COURT:  So just so we understand the technology

 8    better, the jury and I, if the body-worn camera falls off, does

 9    it stop recording?

10              THE WITNESS:  It does not.

11              THE COURT:  Okay.  So when you received it, was it

12    still -- when you received it back, was it still recording, or

13    did you have to reactivate it?

14              THE WITNESS:  No.  I believe it was still activated.

15    BY MR. DREHER:

16    Q.   So how was it held onto your uniform?

17    A.   There's a clip.  I actually have it on me if you want to

18    see the clip, but it clips onto our uniform.

19              THE COURT:  And the policy of the Metropolitan Police

20    Department for the last several years, correct me if I'm wrong,

21    has been that you always wear your body-worn camera?

22              THE WITNESS:  Yes.  When we're expected to be in the

23    public realm, yes.  There's administrative assignments where we

24    wouldn't necessarily wear it.

25              THE COURT:  When you're in the office, you're not

1    filming your fellow officers?

2              THE WITNESS:  Yes.

3    BY MR. DREHER:

4    Q.   And so what did you see when you first arrived at the

5    Capitol?

6    A.   So when we first arrived, we kind of still weren't sure

7    the extent of what was happening.  It wasn't until we walked up

8    on our approach that you started to see the mass of people.

9    Q.   Do you remember what side of the Capitol you walked up?

10   A.   I do.  We parked on the southwest side of the Capitol and

11   then walked up, and there was, like, a little tree wooded area

12   on the southwest side of the terrace, I guess I'll call it, and

13   we cut through those trees.

14   Q.   Now, sir, if I could direct your attention to the screen

15   in front of you, I've just placed what's already been admitted

16   as Government's Exhibit 605.  Now, this is the Capitol from the

17   west.  Are you able to, using the touch screen in front of you,

18   describe for us how you approached the Capitol.

19   A.   If I touch it, does it --

20   Q.   It'll draw.  It'll draw whatever you touch.

21   A.   Okay.  So we parked on what would be off the map down in

22   this corner, and we walked up, and when we walked up, there's

23   trees in this area, and we walked through those trees and then

24   cut up onto the terrace.

25   Q.   Now, by the time that you walked up to the Capitol, can

Bogner - Direct (Dreher)                                      1442

1    you tell us what you were wearing.

2    A.   Full police uniform like I'm dressed today.  I can't

3    remember if it was long or short sleeves, but it was full

4    police uniform.

5    Q.   And so did you have any hard gear on or --

6    A.   Yes.  In addition I had my outer vest, I'm sorry, and then

7    I had some specialized equipment, some different OC sprays that

8    we wouldn't normally carry unless it was a -- with -- when I'm

9    with DSO, we carry additional stuff, and that would be our

10   MK-9s and possibly MK-46s.

11   Q.   And those are some sort of civil --

12   A.   They're just larger OC spray.

13   Q.   And by "OC," what is OC spray?

14   A.   OC spray is commonly referred to as pepper spray.

15   Q.   And what is OC spray used for?

16   A.   It's a defensive weapon.  When you spray someone in the

17   face, their eyes water.  They tear up.  Their nose runs.  They

18   have a pain reaction.

19   Q.   And so you had two weapons capable of expelling this?

20   A.   I had at least three.

21   Q.   At least three?

22   A.   (Witness nods head.)

23            THE COURT:  What were the three weapons you had that

24   were capable --

25            THE WITNESS:  Different size OC sprays.  So I have

1    leg pockets that had larger ones in it, and then I have a small

2    one on my belt, and at some points during the day, I had picked

3    up other ones.

4    BY MR. DREHER:

5    Q.   Now describe for us what you saw when you arrived at the

6    Capitol in terms of people.

7    A.   So there was a large mass of people on the west side of

8    the Capitol Building.  We saw -- I mean, if I can draw here,

9    there were bike racks kind of along this area and --

10   Q.   If I can just stop you real quick, I'm going to clear the

11   previous drawing.  If you could, where are -- where were the

12   bike racks?

13   A.   The bike racks were kind of along this area (indicating).

14   Q.   Okay.

15   A.   And there were a line of officers behind those bike racks,

16   and in some places there were actual physical altercations

17   going on with the officers and the people on the other side of

18   the bike racks.

19   Q.   Now, did you join that line of officers down there?

20   A.   I did not.  So our role that day was kind of to provide

21   some high-level oversight, and one of the things -- and bring

22   specialized equipment.  One of the things that we did or I did

23   immediately was we had -- we had an LRAD with us, which is a

24   public address system.  It's a small black box, and it has

25   directional sound.  It projects sound in a given direction, and

1    I was the person who moved that LRAD around once it was giving

2    the unlawful assembly warnings that day.

3    Q.   And so this device produced a loud sound?

4    A.   Yes.  It's a person's voice projected out giving warnings

5    to disperse and the fact that it's an unlawful assembly.

6              MR. DREHER:  And I'm going to clear the previous

7    drawings.

8    BY MR. DREHER:

9    Q.   Can you show us on 605 here where you deployed that

10   device.

11   A.   So I think I initially picked it up in this area, and then

12   you can see me kind of move around in this area (indicating),

13   but the device projects in whatever way it's aimed, so it was

14   aimed in all the different directions projecting that sound, so

15   I moved it around as we were moving.

16   Q.   Now, earlier you testified you were providing some

17   high-level oversight.  Was it your decision to activate this

18   device?

19   A.   I believe someone said get the LRAD, another sergeant, I

20   believe, that day.  He's more experienced and kind of has those

21   moments, so he's kind of the wise guy, and he says activate it,

22   so we did.

23   Q.   Now, did your duties change after you activate this

24   device?

25   A.   I wouldn't say that that's a catalyst for a change.  They

1    kind of morphed the situation as the day progressed.  I

2    wouldn't say the LRAD itself was a catalyst for change.

3    Q.   Now, did there come a time when you left this area of the

4    Capitol?

5    A.   Yes.

6    Q.   When did that occur?

7    A.   At one point, I believe it was Commander Haines and

8    Sergeant Frank Edwards were having a discussion about moving

9    the line back and having all the officers fall back.  There

10   were individuals filling -- I'm going to draw again, if that's

11   okay.

12   Q.   Yeah.  Let me just clear the screen.

13   A.   Yeah.

14   Q.   And that will allow you to --

15   A.   So at the time we were down in this area, and there were

16   people climbing up inside.  This was scaffolding, and they were

17   climbing up inside and coming out on top of the bleachers on

18   both sides, and so they were starting to come around behind us,

19   so the decision was made to fall back to the inaugural stage,

20   which is in this area, and there are stairwells here, and

21   that's the stairwell predominantly that we used to get up to

22   the inaugural stage (indicating throughout).

23   Q.   Now, sir, as part of your normal duties with the

24   Metropolitan Police, are you assigned to the area of the

25   Capitol?

1    A.    No.

2    Q.    How familiar are you with the layout of the building and

3    how it's set up?

4    A.    Not at all that day, other than a tour when I first came.

5    I think it was a visit before I even moved here, so it would

6    have been prior to 2008.  I did a tour, like just kind of a

7    quick tour of the Capitol.  That was the only other time I had

8    been in the building at that point.

9    Q.    Now, after moving up, then, to the inaugural stage, what

10   happened there?

11   A.    There was some interaction.  Initially we were just trying

12   to get our bearings and figure out what was next because it was

13   kind of a big deal to move back like that, and there were some

14   individuals.  I know at one point there were some Capitol

15   Police officers over here trying to hold back the line of crowd

16   coming off of the scaffolding, and I joined them, and I was

17   thinking of deploying OC spray at that point, but it just

18   wasn't the right moment for that given the wind direction and

19   other things, so eventually we ended up moving all of our

20   equipment back into what we now call the tunnel, which is in

21   this area right here (indicating).

22   Q.    Now, at this point in the day, do you know about what time

23   that was?

24   A.    I have very, very little concept of the time from that

25   day.

 1   Q.   And that sort of brings me to my next question.  When did

 2   your day begin?

 3   A.   I don't remember the time, but it was early morning.

 4   Q.   And can you tell us when your day ended that day.

 5   A.   Well after dark.

 6           THE COURT:  Well after what?

 7           THE WITNESS:  What's that?

 8           THE COURT:  I didn't hear your answer.

 9           THE WITNESS:  Well after dark.  It was well into the

10   night.  It was a very long day.

11   BY MR. DREHER:

12   Q.   And so was it still daytime when you entered this tunnel?

13   A.   Yes, it was still light.

14           MR. DREHER:  Ms. Johnson, if we could pull this down

15   just for a moment.

16   BY MR. DREHER:

17   Q.   Now, sir, on the screen in front of you, I've placed a

18   video that has previously been admitted as Government's

19   Exhibit 141.1, and I'm going to start it at 4 minutes and 3

20   seconds -- the video time, not a time stamp -- and I'm going to

21   ask that if at any point you recognize anyone in this video to

22   please raise your hand.

23   A.   Okay.

24           (A portion of Exhibit 141.1 was played.)

25   A.   I do recognize someone.  This gentleman in the green hat

Bogner - Direct (Dreher)                                              1448

1    is a previous defendant in a case.

2    BY MR. DREHER:

3    Q.   Well, sir, I'm going to ask you to focus on the officers.

4    A.   Okay.

5         (A portion of Exhibit 141.1 was played.)

6    A.   I do.

7    BY MR. DREHER:

8    Q.   I'm sorry.  I did see you raise your hand.  Is there

9    someone you recognize?

10   A.   Yes.  I see myself in the middle of the screen.

11   Q.   Using the touch screen, can you circle yourself.

12   A.   Yeah (indicating).

13   Q.   Okay.  So it looks like you were right next to the rioters

14   during this moment?

15   A.   I was.

16   Q.   Now, can you describe for us what you're wearing.

17   A.   I'm wearing a Kevlar helmet with a protective face shield.

18   Q.   Was there any other protective equipment that you had with

19   you?

20   A.   I have a COVID mask down underneath my chin.  At that

21   point I had pulled it down so I could try to project my voice

22   further, and then I had the uniform I described earlier.  I

23   have a vest and full police uniform.

24   Q.   All right.  I'm going to play the video just for a few

25   more seconds to see if we might be able to get a better grab

Bogner - Direct (Dreher)                                    1449

1    here.

2    A.   Okay.

3         (A portion of Exhibit 141.1 was played.)

4    BY MR. DREHER:

5    Q.   All right.  Sir, it looks like perhaps -- is that your

6    name tape?

7    A.   That's my name tape, my body camera, and then a Taser that

8    was on the front of my vest.

9    Q.   And so earlier we talked about that body-worn camera.  Was

10   that activated during this period of time?

11   A.   Yes.

12        THE COURT:  Because you were coming in contact with

13   members of the public?

14        THE WITNESS:  We had activated it when we got out of

15   the vehicle that day.

16        THE COURT:  When you got out of the vehicle?

17        THE WITNESS:  Yes.

18        THE COURT:  So it had been activated for some time?

19        THE WITNESS:  For some time, yes.

20   BY MR. DREHER:

21   Q.   The number on the front of your helmet, is that

22   significant in any way?

23   A.   That's my badge number.  It matches the badge on my shirt.

24   Q.   So to your knowledge is every helmet marked in such a

25   manner?

Bogner - Direct (Dreher)                                        1450

1    A.   So when you look at -- in this picture, you see my helmet

2    has the markings, and you see the helmet to my left in that

3    video.  That would be a Capitol Police helmet.  They don't have

4    it.  So MPD helmets, yes.  Capitol, not necessarily.  I don't

5    know what their policies are.

6    Q.   Just for clarity, can you circle the non-marked helmet for

7    us.

8    A.   (The witness complied.)

9    Q.   And so you are able to identify that helmet as a Capitol

10   Police officer helmet?

11   A.   Yes.

12   Q.   And then, sir, you also described that you had a Taser on

13   your front as well?

14   A.   Yes.

15   Q.   What is that?

16   A.   A Taser is an electronic device that projects darts and

17   can strike an individual and introduce an electrical charge

18   that can incapacitate or cause pain.

19   Q.   And so did you have any other weapons on you on that day?

20   A.   On that day I would have had -- at this moment I would

21   have had my firearm, a Taser, several canisters of OC spray, an

22   ASP baton.  It's a collapsible baton that's held open by

23   friction when you open it.  I think that's it at this point.

24   Q.   Now, sir, are you able to tell us based on just a review

25   of this portion of this video about how long you had been in

1    the tunnel at this point?

2    A.   I'm not able to, no.  I would say that this is fairly

3    early on just because of our position, but I don't know the

4    time based on the video.

5    Q.   Do you believe reviewing your body-worn camera would help

6    in that?

7    A.   My body-worn camera would have a time stamp, yes.

8          MR. DREHER:  Ms. Johnson, if we would be able to take

9    this down just for a moment.

10   BY MR. DREHER:

11   Q.   Sir, I'm going to show you what's not yet been admitted as

12   Government's Exhibit 123.1, and I'm just going to play for you

13   the first 10 or 15 seconds or so.

14         (A portion of Exhibit 123.1 was played.)

15   BY MR. DREHER:

16   Q.   Now, sir, after reviewing that portion are you able to

17   identify what this is?

18   A.   This should be my body camera video.  And then, if you

19   don't mind if I draw, this number here would match the serial

20   number on the back of my camera (indicating).

21   Q.   So in other words, based on the number of the screen but

22   also its contents, you're able to tell us that it's your

23   body-worn camera?

24   A.   Yes.

25   Q.   Can you tell us where it's from or what time it's from.

1   A.   So this is from -- I drew over it, but it looks like

2   14:40.  I don't know if we can erase those lines.

3        Yes, 14:40, so 2:40 p.m. that day.

4   Q.   Now, does this footage fairly and accurately depict what

5   occurred on January 6th of that day?

6   A.   It does.  This is probably shortly after we entered the

7   tunnel.  The officer to the left is the Capitol Police.

8   Q.   Sir, before you get into sort of the content of the

9   exhibit, does this fairly and accurately depict what occurred

10  to you on that day?

11  A.   Yes.

12          MR. DREHER:  Your Honor, the government would move

13  for the admission of Government Exhibit 123.1.

14          MR. SMOCK:  No objection.

15          THE COURT:  It will be admitted.

16          MR. DREHER:  And permission to present to the jury.

17          THE COURT:  Yes.

18  BY MR. DREHER:

19  Q.   Sir, I'm going to start this back at the beginning, and

20  what I'm going to do is I'm going to play portions of this and

21  ask you to follow along with us.  Likely in the next two

22  minutes I will be pausing it and then asking you further

23  questions.  Okay?

24  A.   Okay.

25          (A portion of Exhibit 123.1 was played.)

1   BY MR. DREHER:

2   Q.   All right.  Sir, I'm going to pause it here at the video's

3   time stamp of 14:41:16 p.m.  Could you describe for us who just

4   walked through those double doors.

5   A.   So there were a number of police officers from a couple of

6   different agencies that walked through the doors.  Commander

7   Kyle was seen there.  Now-Commander Bagshaw, then lieutenant,

8   was seen there.  You see me speaking to Christina and Tina, who

9   were two members of my team that day, and we were assessing

10  what we had available to us in that moment, and just a number

11  of police officers.

12  Q.   And these doors, can you tell us where they're located.

13  A.   So these are -- if you were on that inaugural stage, it's

14  that archway that I circled as to where we were taking the

15  equipment.

16  Q.   Now, in that portion of the video clip that I just played

17  you, did you notice any signs on the doors?

18  A.   There was a sign on that outer door.  It was black or

19  brown with white letters.

20  Q.   And then ultimately while you're inside -- or excuse me.

21  Let me back up.  Is this the first time on January 6th that you

22  entered this tunnel?

23  A.   It's around the same time.  I don't remember if I walked

24  in and back out briefly, but yes, this is, like, the first

25  period of time that we were in that -- that we occupied that

Bogner - Direct (Dreher)                                          1454

1    tunnel.

2    Q.   And is there ever a time when there's no longer just

3    officers inside this tunnel?

4    A.   Yes.

5    Q.   Okay.  I'm going to play another portion of this video

6    clip.  If you could follow along with us.

7         (A portion of Exhibit 123.1 was played.)

8    BY MR. DREHER:

9    Q.   I'm going to pause it right here, Sergeant Bogner.  Can

10   you describe for us where you're standing.

11   A.   So if you see this arch of light that's kind of behind the

12   individuals outside the door, that's the archway I circled on

13   the video.  We're looking out towards what would be the

14   inaugural stage.  If you could see through those individuals,

15   the inaugural stage would be right there.  So this is what we

16   call the tunnel, and this is the outer doors and the inner

17   doors of that foyer there (indicating throughout).

18   Q.   And on these outer doors those are the doors further away

19   from where this camera is located?

20   A.   Yes, with the two signs on them.

21   Q.   Okay.  And those doors, can you tell us what they were

22   made of?

23   A.   So I don't know the composition of the metal, but there

24   was -- they were metal framed with glass.

25   Q.   And can you tell us for the record what the time stamp is

1    at the top of the video.

2    A.   It says 14:42 and 4 seconds.

3    Q.   Okay.  I'm going to play just a quick clip now of this

4    video.

5         (A portion of Exhibit 123.1 was played.)

6    BY MR. DREHER:

7    Q.   And then I'm going to stop it here at 14:42:26, Sergeant

8    Bogner.  And certainly the jury was able to see what happened

9    at the outer door, but prior to that whose voice was that that

10   we heard when we hear someone say, "He's got a weapon"?

11   A.   That was my voice.

12   Q.   Was there something specifically that you saw at that

13   time?

14   A.   That individual, you see him -- he pulls something, and he

15   feels it like this, and I believe that to be a pocketknife with

16   a glass breaker at this point.  That's what I felt like.  So

17   some pocketknives, larger pocketknives have a glass breaker on

18   the bottom of them, and you see him feel for it and then strike

19   the glass, and the glass breaks.  I don't know that to be the

20   case, but logically that's what I've -- what I believe it is.

21   Q.   Now, when you came in to the tunnel, did you lock the

22   door?

23   A.   There was a Capitol Police officer you see move through

24   the video a couple of times.  He has a hat on, it's round, and

25   then a black mask.  He's tall and slender.  He's the one that

Bogner - Direct (Dreher)                                          1456

1    actually locked the doors.

2    Q.   And so was it significant to have the glass of the doors

3    broken?

4    A.   Yes.  I mean, at that moment I was thinking, oh, these

5    doors -- that's got to be some sort of security glass.  These

6    doors are going to last a while.  We can take a breath.  And

7    then I see them break, and you see -- I reach through, and you

8    can sort of see a little black device that I'm pushing through.

9    That's an MK-9.

10        That's like an intermediate-size OC spray, and I was

11   actually -- what you can't see here -- you see the doors

12   open -- is my body is turned, so the camera kind of turns to

13   where the body is, but I'm reaching out like this to spray

14   individuals as they're breaking out the glass to try to slow

15   them down while the officers are getting ready to hold them

16   back.

17   Q.   What is -- what is it that you're thinking when you see

18   this glass break?

19   A.   It's kind of like a little bit of a panic moment because

20   you see the doors are closed and locked, and in my head I'm

21   thinking this is the U.S. Capitol.  That has to be some kind of

22   security glass; right?  So I'm thinking we have a bit of a

23   reprieve, and we didn't, so that was a shock to me.

24   Q.   And then, as you described, you had your body turned and

25   you had some sort of device.  What were you using that device

1    for?

2    A.    It emits OC spray that we discussed earlier, and I was

3    using it to spray the rioters as they were breaking out the

4    glass.  So as their face was exposed through the holes in the

5    glass, I was targeting their faces through the holes in the

6    glass.

7    Q.    And so you were still trying to prevent people from

8    entering the Capitol?

9    A.    Absolutely.  You can actually see a similar device sitting

10   here on the metal detector also.  This is an MK-9 here, so it's

11   similar.  Not exactly the same one, but a similar device

12   (indicating).

13            MR. DREHER:  Okay.  And for the record, I'm going to

14   continue playing the exhibit.

15        (A portion of Exhibit 123.1 was played.)

16   BY MR. DREHER:

17   Q.    And I'm just going to pause it here for a moment, Sergeant

18   Bogner, at 14:43:09.  Whose voice is it that we hear saying,

19   "Grab the shields"?

20   A.    That's my voice throughout most of that video.

21   Q.    Why were you telling other officers to grab the shields?

22   A.    So in this moment I'm the supervisor that's at the front

23   of this, the group of officers, and these shields, though

24   they're Capitol Police shields, there are a majority of MPD

25   officers holding those shields, and I want the shields up front

1   because of what we were experiencing outside.  By them breaking

2   out the glass, their intentions seemed to be to force their way

3   into the Capitol one way or the other.  So the shields were the

4   best defense we had at the moment, and I wanted to get those up

5   front because these inner doors did not lock.

6   Q.   You said the inner doors did not lock?

7   A.   The inner doors did not lock, which is why you see them

8   just pulling them open.

9   Q.   Okay.  And then at one point we then hear, "Hold the

10  line."  What does that mean?

11  A.   So as you -- you may or may not have noticed a certain

12  number of the officers started to push forward like they were

13  going for the open door, and I did not want them to get sucked

14  out of that open door, so I want them to stay in a line as we

15  practice and train so that no one is exposed and out in front

16  of the line, if that makes sense.

17  Q.   So in other words, you weren't saying "hold the line" for

18  rioters entering.  Instead you were telling the officers to

19  stay where they were and not push out?

20  A.   To stay in a formation, a line formation, and not push

21  out, because as they push out, they become exposed, so we want

22  them to stay in a line formation with those shields.

23  Q.   Now, at the time that this was occurring, had you already

24  identified that you were the only supervisor at the front?

25  A.   I was not the only supervisor.  There was an individual

1    you saw earlier.  He didn't have stripes on the sleeve, but

2    he's also a sergeant.  There's a lieutenant, there's a

3    commander, but in that moment I'm at the front, so I have to

4    make the decision and give the directive.

5              MR. DREHER:  Your Honor, I'm going to continue

6    playing the exhibit.

7         (A portion of Exhibit 123.1 was played.)

8    BY MR. DREHER:

9    Q.   All right.  For the record, I've stopped this at 14:47

10   exact p.m., and there's a couple questions I had about the

11   portion we just observed, Sergeant.  Was that you saying,

12   "Hands off the door"?

13   A.   Yes, it was.

14   Q.   And who were you telling that to?

15   A.   It was -- you can kind of see him in some of the footage,

16   but before the glass is broken, you can see him standing up.

17   He had a red stocking hat on.  He was kind of the largest guy

18   standing there in the front, had some tattoos on his arms.

19   He's holding that door and pressing his -- he's a large man

20   pressing his body weight into the officers, and I knew that the

21   officer in front of me was kind of having a hard time because

22   of how hard she was being pressed into me, and I wanted him to

23   release that door because he was using it for kind of leverage

24   to press in and it was making the officers not able to do their

25   job and potentially harming them so...

1   Q.   So it wasn't just the other officers that you were giving

2   commands to.  You were also giving commands to rioters?

3   A.   Yes.

4   Q.   And then, when you stated, "We cannot let you in," what

5   did you mean?

6   A.   There was -- some individual was saying something, and

7   that was my response to him.  I didn't catch what they said,

8   but that was my response.

9   Q.   Now, can you explain to us what you meant by a secondary

10   shield line?

11   A.   So in this moment I'm obviously concerned that we're not

12   going to be able to hold this line, so what I would like the

13   officers behind us to do is to establish a secondary line

14   should this one fail so that they will not get past that line,

15   because given more time, while these officers are at the front

16   line here, the other officers have -- there's a lot of officers

17   at this tunnel.  They can form a secondary line that's more

18   well prepared and kind of get their thoughts about them should

19   we have to pull back, so it was just a secondary fallback

20   position that I was trying to plan.

21   Q.   And was there any specific reason why you didn't believe

22   this first line would hold?

23   A.   This line is hasty.  It's brought together in a hasty

24   manner.  The officers don't know each other that are

25   necessarily standing next to each other.  A more well-planned

 1    line has a better chance of holding.  It's contingency

 2    planning.

 3            MR. DREHER:  I'm going to continue playing the

 4    exhibit.

 5        (A portion of Exhibit 123.1 was played.)

 6            MR. DREHER:  Now, for the record, I've stopped it at

 7    14:48 and 28 seconds.

 8    BY MR. DREHER:

 9    Q.   And in the portion that we just observed, there's a lot of

10    differences in the uniforms of the officers around us.

11    A.   Uh-huh.

12    Q.   Can you explain why that is.

13    A.   So not only are there different agencies, there are

14    different CDU platoons, and different CDU platoons have

15    different levels of equipment.  So this officer in front of

16    us -- you see his name, Spooner -- there.  He would have been

17    part of what we would call a 2 platoon.  And kind of the short

18    answer of what is a 2 platoon, every -- we have seven police

19    districts, and each district has five platoons, and if you use

20    one, the first district, as an example, they have platoon 11,

21    12, 13, 14, 15.  The 12, those would be what we call a 2

22    platoon because it ends in a two, and those platoons that end

23    in two have specialized equipment, and you see the pads that

24    are part of that there.

25    Q.   And so also we see some officers in neon jackets.

1   A.   Yes.  So we have two different types of neon jackets.

2   Some of which you see here are mountain bike jackets

3   specifically.  They're very similarly colored, but there's the

4   regular patrol jacket which has neon on it, and then, like, you

5   see the sleeve at -- kind of top towards the left.  That looks

6   like a mountain bike sleeve to me from a mountain bike jacket.

7   Q.   And so are there also mountain bike units of the

8   Metropolitan Police?

9   A.   There are.  Those would be the CDU platoons that mostly

10  ride a mountain bike.  They ride in fours, so in that same line

11  are both.  CDU platoon 14 would be the mountain bike platoon.

12  Q.   And then earlier you identified a specific helmet that

13  wasn't labeled that's from a different agency; correct?

14  A.   That particular one I circled was from Capitol Police,

15  yes.

16  Q.   Now, earlier you read this officer's name tape as Spooner.

17  Do you know who Officer Spooner is?

18  A.   I have never met him before.

19       MR. DREHER:  I'm going to continue playing the

20  exhibit.

21       (A portion of Exhibit 123.1 was played.)

22  BY MR. DREHER:

23  Q.   Now, Sergeant Spooner *[sic]*, I'm going to stop it here at

24  14:50, and I'm going to ask about the formation of officers at

25  this point.  We see some shields above our heads, some in

1    front.  Could you describe that for us.

2    A.   So we have kind of a makeshift line, like a hasty line,

3    and the initial front officers, most of them had shields in

4    front, and you see the officers behind.  They're bringing up

5    the shields over the top so when things are thrown in, it hits

6    the shields and not the officers.

7    Q.   And then at one part during this video, we hear you yell,

8    "It's just a fire extinguisher."  Why were you yelling that?

9    A.   So in a moment like that where everyone's already at an

10   elevated level, a lot of the officers are scared.  They see

11   this smoke coming at them or this -- whatever it is.  I didn't

12   know for sure if it was only a fire extinguisher, but I was

13   trying to give them the confidence to stand their ground and

14   not panic.  I believed it to be a fire extinguisher, so I said

15   that so they wouldn't panic and try to back up.

16   Q.   Is that why it was followed by, "Hold the line"?

17   A.   Yes.

18   Q.   Now, at this point in -- while you were in the tunnel,

19   were the officers acting as anything more than a wall?

20   A.   There were a number -- if you watch, you'll see the

21   officers.  They do give some strikes.  They do some of that.

22   When you have a shield, it's difficult to do much more than

23   hold that shield, especially when people are pulling on it, and

24   you'll hear me talk.  In this clip you heard me.  There was a

25   Capitol Police officer that helped get Officer Spooner through.

1    She was directly in front of me.  She had control of one of the

2    shields, and all of these shields that I can see are -- I

3    believe them to be Capitol Police shields.

4        One, they have the seal, but also their size and type is

5    different, slightly different than what we have so they can --

6    we can identify that, but she didn't want to let go of the

7    shield that was over the head, and she wanted to take it with

8    her, and I kept telling her we won't let it go, meaning we

9    won't lose your shield, but eventually we did lose most of

10   these shields.

11   Q.   Now, you personally, were you giving audible commands to

12   the rioters to leave the Capitol?

13   A.   I mean, periodically, yes, but intermittent.  As I was

14   able to, I suppose.

15   Q.   Were you able to hear other officers giving similar

16   commands to the rioters?

17   A.   Lots of commands to back up, you know, to do different --

18   different things.  Everybody was saying a different thing, but

19   they were saying it to someone.

20   Q.   Now, are you aware of any other means of communication

21   that were being used to explain to people they shouldn't be in

22   this tunnel?

23   A.   The officers were establishing a line.  You hear numerous

24   instructions being given by different officers.  They were

25   using force to kind of adhere to those instructions so, I mean,

1   yes, there were -- but if you're asking if we had a PA system

2   or anything of that nature at this moment, no.

3   Q.   So that L- -- was it LRAD?

4   A.   The LRAD is in the tunnel off to the side so right behind

5   where these officers are at.  So to the right of the screen,

6   there is like a T-intersection, and we had stored some of our

7   stuff around the corner in that T-intersection, and that's

8   where the LRAD was located.

9   Q.   But it wasn't activated during this time?

10  A.   No.  You would hear it if it was.

11          MR. DREHER:  I'm going to continue playing a portion

12  of the exhibit.

13          (A portion of Exhibit 123.1 was played.)

14  BY MR. DREHER:

15  Q.   Now, for the record, I'm going to stop it here at 14:52:10

16  and just ask, Sergeant Bogner, who are you telling to back up?

17  A.   The rioters.  At the moment we're trying to -- if you see

18  in the video there's another sergeant that I was conversing

19  with, Sergeant Peek from the Fourth District, he's in kind of

20  some of that harder gear of their 2 platoon that you can --

21  that I had described earlier and had -- was bleeding from the

22  finger.  He and I were trying to get them -- there was a bit of

23  a lull, I guess, and we were trying to push out, so every time

24  we saw a space, we tried to take it.

25  Q.   So I -- let me just stop you for a second.  And this

Bogner - Direct (Dreher)                                           1466

1    occurred at 14:52 or so?

2    A.    Just before, yes, as we were -- as we were conversing a

3    little bit about his finger where he said he thought he broke

4    it but --

5    Q.    There was a lull in the rioters, you said?

6    A.    Well, when you hear me say we're going to push them back,

7    you hear me say something to that effect, and what we did each

8    time there was any space -- and I'm assuming there was space.

9    I can't see it here, but I know that that was our tactic that

10   we used.  We tried to take that space and continue to advance

11   anywhere we could.

12            THE COURT:  And when you were saying "back up," you

13   were speaking to the rioters?

14            THE WITNESS:  Yes, I was.

15            MR. DREHER:  Your Honor, should we approach the

16   bench?

17            THE COURT:  I didn't --

18        (At sidebar)

19            MR. DREHER:  I just noticed the time.

20            THE COURT:  I was about to ask you how much more you

21   had with him.

22            MR. DREHER:  I think this would be a logical stopping

23   point because I think it will be more time just in terms of

24   playing the rest of the video.

25            THE COURT:  All right.  You think you're going to

1    have any cross for him?

2              MR. SMOCK:  I doubt it.

3              THE COURT:  So how much more time do you need?

4              MR. DREHER:  Perhaps 20 more minutes.

5              THE COURT:  Well, I won't do that.

6              MR. DREHER:  Okay.

7              THE COURT:  So what are we going to do?  Because you

8    need to be away tomorrow to work on the Kroll business.

9              MR. DREHER:  Well, I certainly can appear to finish

10   this, Your Honor.  Then --

11             THE COURT:  Okay.  It's going to be a close day, but

12   4:45 at the latest.  I can't start before 10:15 tomorrow.

13        (In open court)

14             THE COURT:  All right.  Officer -- Sergeant Bogner,

15   we're going to let you go till tomorrow.

16             THE WITNESS:  Okay.

17             THE COURT:  Ladies and gentlemen of the jury, we're

18   going to try to get started at 10:15 tomorrow.

19             A JUROR:  10:15?

20             THE COURT:  Excuse me a second.  Yeah.  Yes.  We will

21   try -- we can't start before then, I'm afraid, so tomorrow we

22   will try to start at 10:15, which means you should be here by

23   10:15, and we will get started.  We will finish with Officer

24   Bogner first, I believe, and then I'm not sure whether the next

25   witness will be Dr. Kroll again or somebody else, but at some

```
1    point tomorrow Dr. Kroll will probably return to the stand.

2    Okay?  Everybody okay?  Remember my instructions.

3              A JUROR:  Got it.

4              THE COURT:  Got it?

5              A JUROR:  Got it.

6              THE COURT:  Thank you.

7         (Recessed at 5:07 p.m.)

8

9                          * * * * * * * *

10

11        I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.

13

14

15        /s/Lisa G. Grimminger          April 19, 2023
          Lisa G. Grimminger, RDR, CRR, CRC   Date
16

17

18

19

20

21

22

23

24

25
```

```
 1                        I-N-D-E-X

 2

 3                                    Direct      Cross

 4

 5    WITNESSES:

 6    FOR THE DEFENDANT:

 7    Dr. Mark Kroll                 1247,1307   1266,1365

 8    FOR THE PLAINTIFF:

 9    Bronson Spooner                   1411       ----

10    Michael Bogner                    1436       ----

11

12                                                        Ruled
      EXHIBITS:                          Offered         On
13
      1. Image of Vipertek VTS-979 and Police 916   1332      1332
14
      2. Photo of Mr. GossJankowski with device     1333      1333
15
      3. Photo of device                            1333      1333
16
      4. Photos of chiseled front characteristic    1335      1335
17
      5. Photo of Mr. GossJankowski with device     1336      1336
18
      6. Photos of assembly screw holes             1337      1337
19
      7. Photo of Mr. GossJankowski with device     1337      1337
20
      8. Photo of red LED characteristic       1337,1338      1338
21
      9. Photo of Mr. GossJankowski with device     1338      1338
22
      11. Photos of shoulder grip characteristic    1339      1339
23
      12. Photo of Taser                            1324      1324
24
      14. Electronic muscle stimulators             1353      1353
25
      20. Photos of X26 stun gun effects            1264      ----
```

1470

```
1     EXHIBITS: (cont'd.)                        Offered    Ruled
                                                            On
2
      122. MPD Officer Bronson Spooner
3          [Body-Worn Camera #X6039BA66]
           from 2:43 p.m. to 2:48 p.m.           1427       1427
4
      123.1. MPD Officer William Bogner
5          [Body-Worn Camera #X6030478K]
           from 2:40 p.m. to 2:54 p.m.           1452       1452
6
      1000. Vipertek VTS-979 operating manual    1383       1383
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```