BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        )       Case Number 1:21CR123
                                 )
            Plaintiff,           )
                                 )
vs.                              )
                                 )       Washington, D.C.
VITALI GOSSJANKOWSKI,            )       March 9, 2023
                                 )        10:26 a.m.
            Defendant.           )



                        VOLUME VIII
               TRANSCRIPT OF JURY TRIAL
         BEFORE THE HONORABLE PAUL L. FRIEDMAN
          UNITED STATES SENIOR DISTRICT JUDGE


COURT REPORTER:              Ms. Lisa Grimminger, RDR, CRR, CRC
                             100 Centennial Mall North
                             Room 587
                             Lincoln, NE 68508
                             (402) 437-1908


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
 1                         A-P-P-E-A-R-A-N-C-E-S

 2     FOR THE PLAINTIFF:           MR. FRANCESCO VALENTINI
                                    DOJ-CRM
 3                                  950 Pennsylvania Avenue NW
                                    Washington, D.C. 20530
 4
                                    MR. ADAM MICHAEL DREHER
 5                                  DOJ-USAO
                                    601 D Street NW
 6                                  Washington, D.C. 20001

 7                                  MS. KAREN E. ROCHLIN
                                    DOJ-USAO
 8                                  99 Northeast 4th Street
                                    Miami, FL 33132
 9
       FOR THE DEFENDANT:           MR. EDWARD SMOCK
10                                  MS. CELIA GOETZL
                                    FEDERAL PUBLIC DEFENDER FOR D.C.
11                                  625 Indiana Avenue NW
                                    Suite 550
12                                  Washington, D.C. 20004

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1          (At 10:26 a.m. on March 9, 2023; with counsel for the

 2     parties and the defendant present; WITH the jury:)

 3          WILLIAM BOGNER, PREVIOUSLY SWORN, RESUMED THE STAND

 4              THE COURT:  Good morning, everybody.  Sergeant Bogner

 5     is under oath from yesterday.

 6          And Mr. Dreher, you may continue.

 7              MR. DREHER:  Yes, Your Honor.  Thank you.

 8                      DIRECT EXAMINATION RESUMED

 9     BY MR. DREHER:

10     Q.   Good morning, sir.

11     A.   Good morning.

12     Q.   Now, where we left off yesterday we were at about 14:52

13     into the exhibit, and that's 2:52 p.m.  Do you remember that?

14     A.   I do.

15              MR. DREHER:  And Ms. Johnson, will we be able to

16     return to publishing this to the jury?

17     BY MR. DREHER:

18     Q.   Now, sir, if you could please -- for the remaining two

19     minutes of this video, I would ask that you follow along with

20     us with the jury but this time not necessarily focused so much

21     on the visual but instead focus on the audio.

22          (A portion of Exhibit 123.1 was played.)

23              MR. DREHER:  And then if we could stop presenting for

24     the jury for a moment.

25          Thank you, Ms. Johnson.

1    BY MR. DREHER:

2    Q.   Now, Sergeant Bogner, when the screen goes blank, were you

3    able to hear sort of a cackling sound?

4    A.   A cackling sound?

5    Q.   Or what sound did you hear in the exhibit?

6    A.   It sounded like a clicking sound.

7    Q.   A clicking sound?

8    A.   Yeah.

9    Q.   Are you able to tell us what that sound came from?

10   A.   It sounds like a stun gun to me.

11   Q.   And do you remember hearing that on January 6th as well?

12   A.   Yes.

13   Q.   Now I want to ask:  During this moment while you're in the

14   tunnel -- we just had an opportunity to observe about

15   14 minutes of your time there -- where was your focus

16   throughout this time?

17   A.   It went back and forth between the rioters and the

18   officers, trying to make sure that the officers were okay

19   because it is a compressed area, and then also trying to do

20   what I can to -- from the position that I'm in with the rioters

21   as well.

22   Q.   And while you were in the tunnel, did you observe any

23   weapons being used against your officers?

24   A.   Yes.  I mean, there were different -- various different

25   things used as weapons against us throughout the time there.

1   Q.   Now, did hearing this clicking sound have any significance

2   to you while you were in the tunnel?

3   A.   It's concerning.  It's a similar noise to a police Taser,

4   and I didn't see any of that being used, but it is a concerning

5   noise, yes.

6   Q.   And why was it concerning to you?

7   A.   'Cause it can cause an officer harm.

8   Q.   Now, after hearing this clicking sound, was there anything

9   that you're able to do to identify where it was coming from?

10  A.   There's -- I mean, there's little you can do besides try

11  to listen and see if you can see where it's coming from.  At

12  this point you're kind of pinned in and can't move so you can't

13  go looking for anything.

14  Q.   So while pinned in is it safe to say all you could do was

15  hear it?

16  A.   Yes.

17  Q.   Now certainly -- this clip ends at around 2:54.  Did your

18  day on January 6th end at that time?

19  A.   No.

20  Q.   Can you describe for the jury what you did after this

21  period of time.

22  A.   So we were here for a while longer until additional

23  resources were brought, and then eventually I believe both

24  Lieutenant Horos and some members of the Virginia State Police

25  deployed everything from sting balls to flash bang grenades in

1    order to push people back, and then eventually we were able to

2    go back onto the inaugural stage where everyone kind of stayed

3    to catch their breath for a little while, and then I ended up

4    going back to restock on munitions and bring more up just in

5    case we needed them, and there was a push-off of the front lawn

6    of the Capitol to get the rest of the people off Capitol

7    grounds.

8    Q.   So just so that we can clarify for the jury, when you said

9    go back, did you mean back into the Capitol or some other

10   location?

11   A.   No.  Back to our office in Southwest in order to get

12   additional munitions from storage.

13   Q.   Now, this may sound like a silly question, but is there a

14   reason why you had to go obtain more munitions?

15   A.   Because we pretty much exhaust- -- at that point we had

16   pretty much exhausted everything that we had brought with us to

17   the Capitol that day.

18   Q.   Now, Sergeant Bogner, I'm going to take you back to the

19   start of this examination and talk a little bit more about your

20   time at the academy.  Are you familiar with how the

21   Metropolitan Police approaches civil disturbances?

22   A.   I am.

23   Q.   How so?

24   A.   I have worked with DSO to instruct our CDU units for

25   years, since 2017 at least.

1   Q.   And then, again, how long have you been a police officer

2   yourself?

3   A.   Since 2008.

4   Q.   Now, have you taken part in other civil disturbances?

5   A.   Many.

6   Q.   How do you --

7            THE COURT:  Let me ask you a question.  The words

8   that are being used here, "civil disturbances," there are a lot

9   of things that go on: parades, peaceful demonstrations, things

10  like that.  In terms of what you train in and instruct people

11  on, how broad or how narrow is what you're train- -- what

12  you're training people in?

13           THE WITNESS:  We cover both peaceful demonstrations,

14  First Amendment assemblies, all the way up to and including

15  riotous acts.

16           THE COURT:  All the way up to...

17           THE WITNESS:  All the way up to and including riotous

18  situations.

19           THE COURT:  So I just want you to be precise about

20  what you're talking about when you're answering those

21  questions.

22           THE WITNESS:  Yes.

23  BY MR. DREHER:

24  Q.   So, sir, when you have taken part in other demonstrations,

25  did you observe the same tactics as what was used by the MPD on

1    January 6th?

2    A.    Yes.  Elements of what were used this day are what we

3    train.  In some cases on January 6th, the situation was so

4    rapidly evolving that it was hard to form our typical organized

5    structure, so officers did have to improvise at times; however,

6    yes, these do represent what we teach.

7    Q.    Now, in these other demonstrations that you've taken part

8    in, has a line of MPD ever been broken?

9    A.    There are times where we have certainly had to readjust

10   our lines and move.  I can't say, like, if -- if you're asking

11   if we've ever been, like, kind of overrun, I don't believe so.

12   I can't recall a time, but we have had to readjust.

13   Q.    And so how would your experience at the Capitol on

14   January 6 compare to those other events that you've taken part

15   in?

16   A.    I would say the intensity and duration of what happened on

17   January 6th was much longer, and at times I have been in other

18   riotous situations where the intensity was there, but it just

19   didn't last for that protracted period of time.

20   Q.    And so for the duration of the entirety of your time at

21   the Capitol, how does that compare to the time that you were in

22   the tunnel?

23   A.    I don't understand.

24   Q.    In other words, was there a portion of your day on

25   January 6th that was significant in some way as compared to the

1    entirety of your time at the Capitol?

2    A.   I would say the time in the tunnel was probably the most

3    impactful on me, as an individual.  It's very difficult to be

4    in that tight crowd, have so many people that you are

5    responsible for, and not be able to do very much to take care

6    of that, so that was probably the most intense portion of the

7    day was the time in the tunnel.

8    Q.   So how has it impacted you?

9    A.   I think about it a lot.  I mean, there's a lot of days

10   where you think about it.  I went through a period of kind of

11   second-guessing some of my early actions, things that I could

12   have done better, things that I could have done differently.  I

13   would say that's the most of it, yeah, but I do think about it

14   often.

15              MR. DREHER:  If I may have just one moment, Your

16   Honor.

17              THE COURT:  Yes, sir.

18              MR. DREHER:  Your Honor, I have no further questions.

19              THE COURT:  Thank you.

20              MR. SMOCK:  Your Honor, we don't have any

21   cross-examination for Sergeant Bogner.

22              THE COURT:  No cross-examination.  Well, I think --

23   Sergeant Bogner, I think you're excused.  Thank you very much,

24   sir.

25              THE WITNESS:  Thank you, sir.

1          THE COURT:  Sorry we couldn't finish yesterday.

2          THE WITNESS:  That's okay.

3          THE COURT:  Are you ready with your next witness?

4          MR. VALENTINI:  The government calls Edgar Tippett.

5          COURTROOM DEPUTY:  Good morning, sir.  Can you please

6    raise your right hand.

7          EDGAR C. TIPPETT, PLAINTIFF'S WITNESS, SWORN

8          COURTROOM DEPUTY:  Thank you, sir.

9          THE WITNESS:  Uh-huh.

10                      DIRECT EXAMINATION

11   BY MR. VALENTINI:

12   Q.   Good morning.

13   A.   Good morning.

14   Q.   Could you please state and spell your name for the record.

15   A.   My name is Edgar Charles Tippett, E-D-G-A-R,

16   C-H-A-R-L-E-S, T-I-P-P-E-T-T.

17   Q.   Are you currently employed, Mr. Tippett?

18   A.   Yes, I am.  Safeway stores, an LLC of Albertsons.

19   Q.   And how long have you been employed at Safeway?

20   A.   Be 44 years July 1st.

21   Q.   Congratulations.

22   A.   Yeah.  Thank you.

23   Q.   And for those who may not know, what is Safeway?

24   A.   Safeway is a food and drugstore.  It operates throughout

25   the country.

Tippett - Direct (Valentini)                                    1481

1    Q.    What is your position with Safeway?

2    A.    I am a district manager.  I've been in this position since

3    1999.

4    Q.    Does Safeway have any stores in the District of Columbia?

5    A.    Yes, we do.  We have 12 stores in the District of

6    Columbia.

7    Q.    And in your position do you oversee any stores?

8    A.    Yes.  I oversee 5 of those 12 at this time.

9    Q.    And do you oversee stores in other districts outside of

10   the District of Columbia?

11   A.    Yes.  I have Montgomery County, Frederick, Carroll County,

12   and one in Howard.

13   Q.    And as of January 6, 2021, how many stores did Safeway

14   have within the District of Columbia?

15   A.    Twelve.

16   Q.    And could you describe your responsibility as a district

17   manager for Safeway, please.

18   A.    As district manager we operate the retail side.  We're in

19   charge of food safety, sanitation, store conditions, profit,

20   loss, sales, anything from A to Z, personnel, placement.

21   Anything A to Z at the store level, store side of it.

22   Q.    And I'm going to ask you to think back about January 6,

23   2021.

24   A.    Yes, sir.

25   Q.    Do you remember that day?

Tippett - Direct (Valentini)                                    1482

1    A.    Yes, I do.

2    Q.    Were you working that day?

3    A.    Yes, I was.

4    Q.    And did you --

5              THE COURT:  Where were you working?  I mean physical

6    location.

7              THE WITNESS:  Oh.  I was downtown that day, yeah.

8    Anytime there's issues I usually go to that area.

9    BY MR. VALENTINI:

10   Q.    And did you at some point receive an email that changed

11   Safeway's operations that day?

12   A.    Yes, we did, or I did, yes.

13   Q.    Just one second.  Let me show you what has been marked as

14   Exhibit 801.

15             THE COURT:  What's the exhibit number?

16             MR. VALENTINI:  801.

17   BY MR. VALENTINI:

18   Q.    Mr. Tippett, do you recognize this email?

19   A.    Yes, I do.

20   Q.    Were you one of the recipients on this email?

21   A.    Yes, I was.

22   Q.    And on what day did you receive this email?

23   A.    On January 6th, 1-6-21.

24   Q.    Now, a number of names have been blacked out from this

25   email.

Tippett - Direct (Valentini)                                    1483

1    A.    Yes, sir.

2    Q.    But you recall that you were one of the recipients on this

3    email?

4    A.    Yes, absolutely, yes.

5    Q.    Other than the redactions is this email a fair and

6    accurate representation or a copy of the email that you

7    received on January 6, 2021?

8    A.    It is an exact copy of that email.

9              MR. VALENTINI:  The government moves to admit

10   Government's Exhibit 801 into evidence.

11             MS. GOETZL:  No objection.

12             THE COURT:  It will be admitted.  Thank you.

13             MR. VALENTINI:  Let me zoom in on the top portion of

14   the email.

15   BY MR. VALENTINI:

16   Q.    Once again, what was the date and time of this email?

17   A.    The email came out at approximately 3:43 p.m.  It was on

18   1-6-2021, Wednesday.

19   Q.    And was this email sent by a Safeway employee, if you

20   recall?

21   A.    Yes, sir, sent by the division president.

22             THE COURT:  Sent by who?

23             THE WITNESS:  Our division president.

24   BY MR. VALENTINI:

25   Q.    And could you describe generally the role of the division

Tippett - Direct (Valentini)                               1484

1  president as you --

2  A.   Well, he oversees the entire operation.  It's 277 stores

3  including Acme at this time.  We have our -- Acme is part of

4  our Mid-Atlantic division.  He is in charge of obviously the

5  entire operation, sales, profits, which is -- and keeping our

6  employees safe and managing our stores.

7  Q.   Is it safe to say that the division president is your

8  boss?

9  A.   Oh, yes, yeah.  He's two layers up but he's my boss, yes.

10  I was with him yesterday.

11  Q.   And what level employees received this email?

12  A.   I'm sorry?

13  Q.   What level employees received this email?  Who was --

14  A.   The store managers and the district managers that oversaw

15  the stores along with our retail operations managers, marketing

16  team managers, and security staff.

17           MR. VALENTINI:  Let me zoom in briefly on the subject

18  line on the -- of the email.

19  BY MR. VALENTINI:

20  Q.   Could you please read the subject line of this email.

21  A.   Washington, D.C., curfew tonight, 1-6-21, 6 p.m. to

22  6 a.m., Capitol locked down.

23  Q.   And is it your understanding that, in fact, on the

24  afternoon of January 6, 2021, the mayor of D.C. imposed a

25  citywide curfew?

Tippett - Direct (Valentini)                                    1485

1    A.    Yes, we were aware of that.

2    Q.    And do you know why the mayor of D.C. imposed a curfew?

3    A.    Due to the insurrection at the Capitol, they wanted to

4    clear the city.

5    Q.    And stepping back a second, around the same time as you

6    received this email, did you also participate in a conference

7    call with your colleagues?

8    A.    Yes.  Prior to the email coming out, we, as a group and

9    the leaders on this email versus probably the people that are

10   redacted out -- sorry.  We had an email to discuss what steps

11   we needed to take -- take place to keep our employees safe and

12   to lock down our stores properly and keep the stores safe.

13   Q.    And as a result of that conference call, what was decided?

14   A.    We decided to actually close our stores at 4 o'clock and

15   have everybody completely out of the stores by 4:30.  As we

16   have a lot of employees that take public transportation, it

17   takes them a little bit longer to get out of the city, and

18   public transportation was closing also, so we had to get people

19   out in a quick manner.

20         We had steps to take to secure the stores.  We brought

21   everything that was outside inside -- carts, at the time

22   probably firewood, logs, et cetera, that's outside -- and then

23   we placed pallets across the front doors, and then we exited

24   the stores and locked them by 4:30.  Everybody had to check off

25   to me that there was no one in the stores at 4:30.

Tippett - Direct (Valentini)                                    1486

1    Q.   And were all of those decisions made because of the

2    citywide curfew that had been ordered?

3    A.   Yes.  We don't ever close otherwise.  Yeah.

4              THE COURT:  Well, you sometimes close.  You're not

5    open 24 hours.

6              THE WITNESS:  Well, that's correct, yes.  Yes.

7    Sorry.  We don't close early, yes.

8    BY MR. VALENTINI:

9    Q.   I'm going to ask you some questions about --

10             THE COURT:  Many of us are aware that you don't close

11   early.

12             THE WITNESS:  Thank you.

13   BY MR. VALENTINI:

14   Q.   Let me zoom in on the body of the email, Mr. Tippett.

15   A.   Uh-huh.

16   Q.   And could you please read for the jury the body of the

17   email that is now in evidence.

18   A.   Yes.

19        There is in place a 6 p.m. to 6 a.m. citywide curfew

20   throughout Washington, D.C., tonight, Wednesday, 1-6-21.  All

21   D.C. stores will close at 4 p.m. with plans to reopen at 6 to

22   7 a.m.  Night crews will not be in place.

23        Please review and utilize the execution points detailed

24   below to ensure:

25        Number one, our people are safe.

Tippett - Direct (Valentini)                                    1487

1           Number two, our people are safe.

2           Number three, our stores are secured.

3           Number four, all cash and cash-like items are secured --

4     CCO stands for self-checkout -- cash and change towers in the

5     safe.

6           Number five, the exterior of our stores are cleaned up as

7     detailed below.

8           We wanted to send a cheat sheet outlining the steps to

9     consider and taken as the decision to close early is made.  If

10    you are not able to execute all of these items because of time

11    constraints, it's okay.  Do what you can and stay safe.  The

12    safety of our people will always come first.

13    Q.   So, Mr. Tippett, this directive ordered all stores to be

14    closed by 4 p.m. and all employees to be out of the locations

15    by 4:30 p.m.?

16    A.   Yes, sir.

17    Q.   And what time were the stores in the district supposed to

18    close while --

19    A.   At that time --

20    Q.   Sorry.  Let me finish the question for the record.

21    A.   Yes.

22    Q.   At what time were the stores in the district supposed to

23    close on January 6, 2021?

24    A.   Okay.  We had -- at that time we had three of the district

25    stores that were 24 hours.  That was the "L" Street location,

Tippett - Direct (Valentini)                                1488

1   Georgetown, and Capitol Hill.  The other stores there was

2   probably two at ten, I believe, which was -- that was Minnesota

3   and Benning, Hechinger Mall.  All other stores were between 11

4   or 12 p.m.

5   Q.   So no store was scheduled to close at 4 p.m.?

6   A.   No, sir.

7   Q.   No store was scheduled to close for a number of hours

8   after 4 p.m.?

9   A.   No, sir.

10  Q.   As a district manager, are you familiar with the sales

11  revenue of the stores in the district?

12  A.   Very familiar, yes.

13  Q.   And in particular have you reviewed sales data for

14  January 2021?

15  A.   Yes.

16  Q.   So let me just start with the obvious.  In the ordinary

17  course Safeway stores do record sales between 4 p.m. and the

18  time of closing?

19  A.   Yes.

20  Q.   And on January 6, however, did any Safeway store record

21  any sales between 4 p.m. and the time when they were supposed

22  to close?

23  A.   There were zero sales after 4 p.m. until the next morning

24  when they -- when they opened.

25  Q.   Just to be clear, the Safeway stores closed at 4 p.m.

1    because of the events of January 6th at the Capitol?

2    A.    That is absolutely correct.

3    Q.    Does Safeway -- well, could you -- before we get to that,

4    could you tell the jury a little bit about what's, in general

5    terms, the volume of sales during -- throughout the day for the

6    Safeway stores?

7    A.    Sure.  We generally do about 50 percent of our sales

8    between the time we open and roughly 3 o'clock, and then from

9    three to closing we do the additional 50 percent of our sales

10   so it's -- the day's broken up into really kind of two shifts,

11   so that's how our sales generally flow on a daily basis.  Same

12   everywhere.

13   Q.    Mr. Tippett, does Safeway also make projections about how

14   much revenue it expects to record on a daily basis?

15   A.    Absolutely.  We have -- we do planning about six months --

16   roughly six months out our planning starts, and then we plan

17   for our sales in the stores which helps us, obviously, staff

18   and produce product.  We do it by period, which is a month; we

19   do it by week, and we do it by day, and then we can break it

20   down by hours.

21   Q.    And why do you do this?

22   A.    Well, we do that to -- although some people may not think

23   so on occasion, we do it to make sure we have the same -- right

24   amount of people in our store to handle the customer flow, and

25   it's also because it's controllable.  That's one of our biggest

1    controllables, and our basic expense obviously is payroll in a

2    grocery store.  It's one of the biggest controllables that we

3    monitor, and we want to be able to make sure we have the right

4    people at the right time in our stores.

5    Q.   And just for the benefit of the jury, you said that's one

6    of the "controllables"?

7    A.   Yes.

8    Q.   And what do you mean by a controllable?

9    A.   Something that we feel that we can control, period, is the

10   flow of traffic and how many people should be there to handle

11   that flow.

12   Q.   And does Safeway also track its actual sales on a daily

13   basis after they're made?

14   A.   Oh, yes, up to the minute, yes.  I can find out exactly

15   what every one of my stores is doing right now.

16   Q.   And does Safeway compare actual sales to projected sales

17   to see how well it's doing?

18   A.   We compare to actual versus projected and versus last

19   year, yes.

20   Q.   And does Safeway conduct its comparison on a monthly

21   basis, on a daily basis, on a quarterly basis?

22   A.   Hourly, daily, weekly, monthly, yes.

23   Q.   And does Safeway keep records of these actual sales and

24   projected sales in the ordinary course of its business?

25   A.   Yes, yeah.  I receive two emails a day from the previous

Tippett - Direct (Valentini)                                1491

1    day breaking all my sales down by store.

2              MR. VALENTINI:  Let me -- let me pull up Exhibit 802,

3    which is not yet in evidence.

4    BY MR. VALENTINI:

5    Q.   Mr. Tippett, do you recognize this document which has been

6    marked as Exhibit 802?

7    A.   Yes, I do.

8    Q.   Would you tell us what it is just generally.

9    A.   Generally, it is a comparison from our -- it's our actual

10   IDs versus or projected IDs and then the actual versus

11   projected up or down percentage.  Red is bad, black is good.

12   That's the easiest way to understand it.

13   Q.   And we're going to get to the details --

14   A.   Yes.

15   Q.   -- of this document, but before we get there, is this a

16   document that Safeway keeps in its -- maintains in its ordinary

17   course of business?

18   A.   Yes.  Daily, yes.  I can go back several years.

19   Q.   And to be clear, this is a three-page document?

20   A.   Yes.  That's the 5th, 6th, and 7th that you have there.

21             MR. VALENTINI:  Your Honor, the government moves to

22   admit Exhibit 802 into evidence.

23             MS. GOETZL:  No objection, Your Honor.

24             THE COURT:  Thank you, Ms. Goetzl.

25   BY MR. VALENTINI:

Tippett - Direct (Valentini)                                    1492

1    Q.   Mr. Tippett, I would like to start by focusing on page 2

2    of this exhibit, which I'm going to zoom out just for clarity.

3    A.   Okay.  Thanks.

4    Q.   Mr. Tippett, could you explain to us what you are seeing

5    generally now that the exhibit is before the jury.

6    A.   Okay.  Generally what we're seeing is a catastrophe in our

7    terms, because our sales are way off our projection.

8    Q.   Let's take this a little bit sort of step by step.  Let's

9    start with the columns that we don't see, the ones that have

10   been blacked out.

11   A.   Those -- okay.  Sorry.

12   Q.   No.  That's fine.  I'm going to ask you about these

13   columns one at a time.

14   A.   Okay.

15   Q.   There's the first column that says actual total and then

16   has a dollar sign?

17   A.   Yeah.  That's the dollars.  That's been redacted.

18   Q.   Taking a step back, we're now on page two of Exhibit 802?

19   A.   Yes.

20   Q.   And there is some -- on the top left corner of the table,

21   it says Wednesday, 1-6-21?

22   A.   Yes.

23   Q.   What does that mean to you?

24   A.   That's the day -- the date of the -- the day that it's --

25   the projection and the sales from that day.

Tippett - Direct (Valentini)                                    1493

1   Q.   And we have already covered the column that is labeled

2   actual total dollars.  Let's move on to the column -- the

3   other -- the next blacked-out columns that says projected total

4   dollars.  Could you explain to the jury what that is.

5   A.   So the projected is the dollar or the sales projection up

6   or down percentagewise that we expect that store to do that

7   particular day.  As you can see, there were a lot of stores

8   that projected to be negative that day, which is -- which was

9   not where we were running at the time -- excuse me, due to

10  COVID.  COVID obviously was a boost to the grocery stores'

11  business.  At this time in space, I guess, we were running

12  roughly between 25 to 30 percent positive sales, so we were not

13  only beating our projected IDs, we were, you know, kind of

14  destroying our projected IDs.

15  Q.   It sounds like good news, and I will get to the columns --

16  A.   Yes.

17  Q.   -- that have percentages, but I wanted to stay for a

18  second on the columns that are blacked out.

19  A.   Uh-huh.

20  Q.   So we've talked about the first two starting from the

21  left.  We talked about the column labeled projected total

22  dollars.  Then there's a third column that is blacked out, and

23  if you could just tell the jury what -- it says dollars versus

24  projected.  If you could tell the jury very briefly just what

25  that one column captures.

Tippett - Direct (Valentini)                                1494

1    A.    The blacked-out one?

2    Q.    Yes.

3    A.    Yeah.  Just the actual number of the sales that the store

4    did that day versus what it should have done so the --

5    obviously, if we go back to the first column, the actual sales

6    was the actual sales that that store did that day.  The

7    projected would be the dollars that that store was expected to

8    do that day.  Third column would be the difference plus or

9    minus what we did versus the projection in dollars.

10   Q.    And so this table has about, I believe, 12 lines?

11   A.    Yes.

12   Q.    And could you explain to the jury what each line in the

13   table corresponds to.

14   A.    I'm confused.

15   Q.    Row, each row in the table.

16   A.    Oh, each row?  What that particular -- like, if you go to

17   the one here with Piney Branch, that's that store's total that

18   they did that day, whether they did the actual sales, the

19   projected, and then the difference.

20   Q.    And so there is 12 rows for 12 stores, one row per store?

21   A.    One row for each store, correct.

22   Q.    So now, moving on to the columns that have percentage

23   figures, the first one says Actual ID and then a percent sign.

24   Could you explain to the jury what that column captures.

25   A.    So that is the actual IDs versus last year's sales.  So

1    for instance, take Piney Branch 1276.  They did 13.81 percent

2    below what they did last year, and I guess the critical thing

3    to remember again is with COVID we were running roughly

4    20 percent up, 20 to 30.

5    Q.   On a regular day?

6    A.   On a -- every day, yes.

7    Q.   And when you say compared to last year, do you mean

8    compared to January 6, 2020?

9    A.   Yes, correct.

10   Q.   Same day, previous calendar year?

11   A.   Same day, previous year.

12   Q.   And so could you -- and then if we move on to the right,

13   there's a column that is labeled Projected ID, and then there's

14   a percent sign?

15   A.   Uh-huh.

16   Q.   And I'm going to ask you a predictable question.  If you

17   could explain to the jury what that column captures.

18   A.   That column is what the -- what the projection was set at

19   for that store to do.  Like, Piney Branch should have been

20   14.45 percent up that day.

21   Q.   Okay.  And so let's take one of these stores as an

22   example, and let's take Piney Branch, which is the first row.

23   A.   Uh-huh.

24   Q.   For Piney Branch we see a figure of negative 13.81 percent

25   under the Actual ID percent column.  Could you explain to the

Tippett - Direct (Valentini)                                1496

1   jury what that means.

2   A.    Yeah.   The store actually did 13.81 percent less in

3   business than it did the previous year that day.

4   Q.    Okay.   So January 6, 2021, recorded -- the Piney Branch

5   store recorded sales that were 13.81 percent less than on

6   January 6, 2020?

7   A.    Correct.

8   Q.    Moving on to the right and to the projected ID percent, we

9   see a number that is in the black that says 14.45 percent for

10  the Piney Branch store.   What does that mean?

11  A.    That means we projected that store to be 14.45 percent

12  above the year.

13  Q.    So before January 6, 2021, you had projected that on

14  January 6, 2021, your Piney Branch store would record sales

15  that were 14.45 percent above what they recorded on January 6,

16  2020?

17  A.    Correct.

18  Q.    But, in fact, that store recorded sales that were

19  13.81 percent less than in 2020?

20  A.    Correct.

21  Q.    And moving on to the last column on the right, what does

22  that column capture?

23  A.    That column is the difference between the actual and the

24  projected ID, which we have a flip of a negative 28.26, and at

25  the time, outside of this time zone, we were running

Tippett - Direct (Valentini)                                    1497

1    significantly above our projected.

2                THE COURT:  So in other words, this thing -- this

3    chart shows two things, as I understand it.  One is, for

4    whatever reasons that you all understood, you were projecting

5    an increase in sales from the prior year?

6                THE WITNESS:  For Piney Branch, yes.

7                THE COURT:  For Piney Branch?

8                THE WITNESS:  Yes.

9                THE COURT:  Now, that doesn't necessarily mean that

10   was what was going to happen, but that's what your data, your

11   marketing, et cetera --

12               THE WITNESS:  Yes.

13               THE COURT:  -- suggested was likely to happen?

14               THE WITNESS:  Yes.  My job in financial is all based

15   on that, yes, that number.

16               THE COURT:  And comparing that you're down

17   28.26 percent?

18               THE WITNESS:  Correct.

19               THE COURT:  But then the other two columns -- the

20   first two columns are let's look at what happened last year on

21   the same day?

22               THE WITNESS:  Correct, yes.

23               THE COURT:  And if you look at actuals from the prior

24   year --

25               THE WITNESS:  Yes.

Tippett - Direct (Valentini)                              1498

1          THE COURT:  -- this shows you're down 13.81?

2          THE WITNESS:  Yes.  Each store went significantly

3    down, yes.

4          THE COURT:  In some cases, as you go down the column,

5    again, for whatever reasons, marketing financial reasons for a

6    particular branch, you actually projected less on this date

7    from the prior year?

8          THE WITNESS:  Correct.  And that -- do you want me to

9    explain?

10         THE COURT:  Yeah.  I'm just curious.  I don't want

11   you to go into all --

12         THE WITNESS:  Yeah.  It will be real quick.  So SNAP

13   benefits affect a lot of these stores greatly.  2737 there,

14   Alabama Avenue, 1177 Waterfront, 2892 Corcoran Street, not as

15   much SNAP benefits.  Hechinger Mall, Georgetown, not so much.

16   But we do get a lot of southeast district of -- southeast D.C.

17   coming to Georgetown and shop, so Petworth is affected by the

18   SNAP.  Benefits ended.  The days slide from year to year

19   because you're a day behind usually, so last year the SNAP

20   benefits dropped, this year SNAP may not have dropped, so

21   either the money wasn't in the system yet...

22        So those kind of things, that's why you see some of the

23   negatives in the projected, because the SNAP benefits wouldn't

24   have dropped on the 6th yet in most of these stores, and then

25   the next day or the days after, as SNAP dropped, we would

1    expect those stores to go positive.

2              THE COURT:  And what is SNAP?

3              THE WITNESS:  SNAP is food stamps.

4              THE COURT:  Food stamps?

5              THE WITNESS:  Yes.

6    BY MR. VALENTINI:

7    Q.   And Mr. Tippett, if I could direct your attention to the

8    second-to-last row on this table, the Capitol Hill store.

9    A.   Yes.

10   Q.   And it looks like there's an error message there for those

11   percentages.

12   A.   Yeah.  They hadn't turned a year yet.  They were less than

13   a year old, so we couldn't compare them to last year.  They

14   still had a target.  It just didn't go against last year.

15   Q.   Taking a step back and looking at the results for

16   January 6, 2021, did any of the Safeway stores in the district

17   meet the projections for January 6 --

18   A.   No.

19   Q.   -- 2021?

20   A.   No.  They weren't close.

21   Q.   They were not close, meaning they significantly

22   underperformed the sales projection?

23   A.   Yeah.  I wouldn't have a 45th year if I ran those numbers.

24   Yes.

25   Q.   So each of those stores made less than had been projected?

1    A.   Yes, that's correct.

2    Q.   And I think you just answered that question, but was this

3    usual or unusual based on your experience at Safeway?

4    A.   It was extremely unusual at the time.  As most people

5    know, the grocery stores unfortunately were the beneficiary of,

6    you know, a terrible time with COVID.  I mean, we were the only

7    ones open, you know, and for -- you know, to deliver.

8    Restaurants were closed at some points and bars and everything

9    else, so the grocery store did significantly perform,

10   overperform, and when we wrote the plan, COVID wasn't -- you

11   know, we didn't know what the effects of COVID were at the

12   times, 'cause the plan might have been written a little more

13   aggressively, you know.

14        Fortunately for -- you know, I guess monetarily more of

15   our people were -- we were given bonuses for, you know, what we

16   did at that time, rank and file all the way through division

17   presidents, for how we operated at the time so we were -- you

18   know.  But we didn't -- we didn't really put that into our

19   projected IDs 'cause nobody knew what was going to happen.

20   Q.   And taking another step back, does Safeway sell all sorts

21   of goods in the District of Columbia?

22   A.   Yes, we do.

23   Q.   Okay.  Are these goods -- in part, are they all

24   manufactured within the District of Columbia?

25   A.   No, no.  We get deliveries out of Lancaster, Pennsylvania,

1   and Jessup, Maryland, comes -- our frozen comes from there.

2   Q.   And how do these deliveries that you just referenced come

3   in to the Safeway stores in the District of Columbia?

4   A.   They come by truck, and nonperishable generally comes to

5   us between 3 p.m. and 10 a.m.  That's the window for

6   nonperishable, and then perishable ships from 2 a.m. to roughly

7   10 a.m. in the morning.

8           THE COURT:  You say "ships."  Do you mean --

9           THE WITNESS:  Ships in.  Truck, yeah.

10          THE COURT:  -- the trucks?

11          THE WITNESS:  No ships, yeah.

12          THE COURT:  Oh, excuse me.  You said they're shipped.

13          THE WITNESS:  Shipped to us, yes.

14          THE COURT:  So do you mean that's the time when the

15  trucks arrive?

16          THE WITNESS:  Correct, yes, yes.

17  BY MR. VALENTINI:

18  Q.   And on January 6, 2021, after 4 p.m. were Safeway stores

19  able to receive the shipments that they were otherwise

20  scheduled to receive?

21  A.   No.  We were not able to bring any trucks into the city

22  after we stopped trucking at 3 p.m., so anything that didn't

23  get there before 3:00 we kept in Lancaster or Jessup.

24  Q.   And did that affect Safeway's operations on January 6,

25  2021?

Tippett - Direct (Valentini)                                    1502

1    A.   Yes, greatly, because we have night crews in every store

2    seven days a week that replenish from the day's business.  So

3    not only did we not get the trucks, obviously we didn't have

4    the people there to run the store over the night and get things

5    back in shape as we normally do.  Also, you know, what you have

6    to remember too is with our planning process we -- you know, we

7    make a lot of things on site: cut fruit, we cut meat, you know,

8    deli sandwiches, platters, salads, et cetera, bakery.  Our

9    baked goods, you know, a lot of the baked goods are -- you

10   know, we make from scratch.

11        This is not a commercial, it's just -- but we do all this,

12   and we do this -- you know, a computer system tells us, you

13   know, this day, you know, make 12 -- you know, make 12 loaves

14   of French bread and you're going to sell three or four

15   before -- you know, before 3 o'clock and you're going to sell

16   the rest after 3 o'clock 'cause French bread, you know, sales

17   pick up after 3:00 a little bit more.

18        So all of that we -- all that product we lost so there was

19   no -- you know, we had no outlet for that product so, you know,

20   we made a lot of product that we had -- you know, we have a lot

21   of one-day product that we make daily that, you know, ended up,

22   you know, unfortunately in dumpsters.

23             MR. VALENTINI:  Thank you very much, Mr. Tippett.  I

24   have no further questions.

25             THE WITNESS:  Sure.

| | |
|---|---|
| 1 | THE COURT:  Ms. Goetzl. |
| 2 | MS. GOETZL:  Thank you. |
| 3 | CROSS-EXAMINATION |
| 4 | BY MS. GOETZL: |
| 5 | Q.   Good morning, Mr. Tippett.  I'm Celia Goetzl. |
| 6 | A.   Good morning. |
| 7 | Q.   I just want to start out by asking you a little bit about |
| 8 | your involvement in this case.  You're not a party to this |
| 9 | case? |
| 10 | A.   A party how?  I don't know what that means. |
| 11 | Q.   Are you -- do you have -- are you one of the parties in |
| 12 | this case?  Are you associated with the United States -- |
| 13 | A.   Oh, no. |
| 14 | Q.   -- or my client, Mr. GossJankowski? |
| 15 | A.   No, ma'am, no. |
| 16 | Q.   And you're employed full time by Safeway? |
| 17 | A.   Yes, I am. |
| 18 | Q.   Okay.  And Safeway pays your salary? |
| 19 | A.   Correct. |
| 20 | Q.   Okay.  And you're being paid by Safeway while you're here |
| 21 | in court today? |
| 22 | A.   Yes. |
| 23 | Q.   Okay.  So you're testifying as part of your job with |
| 24 | Safeway? |
| 25 | A.   Correct. |

1    Q.   Okay.  And you've also testified in other January 6th

2    cases?

3    A.   Correct.

4    Q.   Okay.  And that is at least three cases?

5    A.   At least, yeah.

6    Q.   Okay.  Have you testified in more than three cases?

7    A.   It might be.  I did one last week so this is probably my

8    fifth, I guess.

9    Q.   Okay.

10   A.   Do you want to know why?

11   Q.   Do I want to know why?

12   A.   Why I was chosen.

13   Q.   Yes.

14   A.   Okay.  So originally Donovan Ford, the retail op, retail

15   operation manager, who was my boss at the time, he was chosen

16   to do this.

17   Q.   What do you mean by "chosen"?

18   A.   Well, he was -- I guess somebody asked us, you know, could

19   we -- you know, could we look at this for us, you know.  I

20   don't know those -- I don't know those ins and outs.  But he

21   left the company.  He's in California, okay, so then they asked

22   me would I testify.

23   Q.   Did the government contact you about testifying?

24   A.   Contact me?  They contacted our lawyers, I guess.  I don't

25   know.  I just get -- I go through Amy Burke, who is our legal

 1   counsel, and then she -- then I guess I get emails to testify.

 2   Q.   Okay.

 3   A.   And subpoenas.

 4   Q.   So is it your understanding that the government contacted

 5   Amy Burke to ask do you have anyone who can testify?

 6   A.   I don't know.  See, I don't know the ins and outs of that.

 7   Q.   Okay.  And is it your understanding that you will be

 8   testifying in more January 6 cases?

 9   A.   As they come up, if I get subpoenaed, I guess I have to;

10   right?  I don't know the --

11        THE COURT:  If you get a subpoena, you have to be

12   here.

13        THE WITNESS:  Yes.

14   BY MS. GOETZL:

15   Q.   Okay.  Fair enough.  And you talked a lot about -- and I'm

16   just going to turn to talking about your testimony today.

17   A.   Sure.

18   Q.   You talked a lot about -- or we looked at one day of daily

19   numbers in this chart?

20   A.   Yes.

21   Q.   Is it fair to say that the numbers of what we see on that

22   chart -- you receive that chart every day?

23   A.   Yes.

24   Q.   And the numbers fluctuate on a day-to-day basis?

25   A.   Yeah, they -- yeah.  They fluctuate but never that

1    greatly.  We're usually pretty close on projection unless -- in

2    this case we had COVID, which was, you know, a hundred-year

3    issue so, you know, it's -- we don't normally miss by that

4    much, and we don't usually not do business after four.

5    Q.    Understood.  But your numbers fluctuate from day to day?

6    A.    Yes.  Slightly, yeah, yeah, yes.

7    Q.    Okay.  And there are a variety of circumstances that

8    affect your numbers?

9    A.    Yes.

10   Q.    And the weather can be a factor that affects your numbers?

11   A.    The weather can be a factor, but we don't close, so we

12   still do business.

13   Q.    Okay.  Is it your testimony that you never close because

14   of weather?

15   A.    Well, I've been a DM since 1999, and my stores have run

16   their normal hours through snow, wind.  The only time we'll

17   close is if there's -- we're forced to 'cause we have -- what

18   we have is we have key carriers in our stores that live close

19   by, and they keep our stores running because we're an

20   essential -- we consider ourselves an essential operation.

21   Q.    Okay.  So even if you don't close --

22   A.    Uh-huh.

23   Q.    -- weather affects your numbers?

24   A.    Yes.

25   Q.    Okay.  And inflation can affect your numbers?

1    A.    Inflation can help.

2    Q.    Competitors opening, that can affect your numbers?

3    A.    Can hurt you or help, yeah.

4    Q.    And you testified on direct that food stamps affect your

5    numbers?

6    A.    Yes.

7    Q.    And you have 12 stores -- or Safeway has 12 stores in DC?

8    A.    I'm very familiar with all of them, yes.

9    Q.    Okay.  And so the one store on Capitol Hill --

10   A.    Yes.

11   Q.    -- that last year -- or two years ago now, in January of

12   2021, that had only been open for a few months; right?

13   A.    Less than a year, yes.

14   Q.    Okay.  So you didn't have any data for that store for your

15   daily comparison?

16   A.    No, but they have -- we always set a target.  It's a new

17   store so the target was set.  They did have a target set, but

18   they didn't go up against last year, so they don't show on that

19   form.

20   Q.    Understood.  So you receive a lot of other forms on a

21   daily basis, not just that daily sheet?

22   A.    We get two, two different emails.

23          MS. GOETZL:  Okay.  And that chart that we saw, let's

24   just go ahead and pull it up if you can, Adam, Government

25   Exhibit 802, which has been admitted into evidence.

1          And could we show that to the jury as well.

2     BY MS. GOETZL:

3     Q.   Okay.  So this --

4          MS. GOETZL:  Sorry.  If you could just zoom out

5     again.

6     BY MS. GOETZL:

7     Q.   First, so I just want to note -- do you know how many

8     pages are shown here?

9          MS. GOETZL:  Can we just scroll down some?

10    A.   There's three.

11    BY MS. GOETZL:

12    Q.   There's three pages.  Okay.  And what are --

13    A.   5th, 6th, and 7th.

14    Q.   The 5th, 6th, and the 7th?

15    A.   Yes.

16    Q.   And there's no data for the Capitol Hill store because --

17    or at least on this chart because there was no data from the

18    previous year to compare?

19    A.   Correct.

20    Q.   Okay.  And you said you receive two emails.  This comes

21    with one of the emails?

22    A.   Yes.

23    Q.   And you --

24    A.   Well, this is a snapshot, because my district would be on

25    one page, and at the time Phil White was running the other

Tippett - Cross (Goetzl)                                        1509

1    district, so they took just the city stores and crunched them

2    down.

3    Q.   So this was created for --

4    A.   No.  It's the actual email.  It's just a snapshot of just

5    the district stores.

6    Q.   Understood.  So when you get this email, how many days

7    does it have in it?

8    A.   We go -- it goes a week, starts -- our week starts Sunday

9    through Saturday so you get -- you have Sunday, Monday,

10   Tuesday, through the week.

11   Q.   Okay.  And just out of curiosity, what does "nonfuel"

12   mean?

13   A.   "Nonfuel" means you have -- we have fuel stations, so fuel

14   we don't -- because fuel is so -- it's just volatile with the

15   price.  That can really affect things.

16   Q.   Okay.  So you get -- this email you get seven days, so I

17   guess on Sunday you would only get one day --

18   A.   Yes.

19   Q.   -- or do you get the previous week?

20   A.   No, no.  I just get Sunday.

21   Q.   Okay.  And then on Monday you would get Sunday and Monday?

22   A.   Yes, correct.

23   Q.   Okay.  And you said you receive another email.  So do you

24   receive other revenue metrics?

25   A.   Monthly by the period, yes.  This is the daily one.  This

1    is the daily, and the other daily just has -- doesn't have a

2    breakdown of the stores.  It just has a district.

3    Q.   Okay.  So you receive a monthly chart that looks similar

4    to this?

5    A.   Sure.

6    Q.   With the monthly data?

7    A.   Yes.

8    Q.   And do you also receive a chart that has period data?

9    Well, that is the monthly --

10   A.   That is the month- --

11   Q.   -- data.

12   A.   Yes, yes.

13   Q.   What about this quarterly data?

14   A.   Yes, yeah.

15   Q.   Okay.  And you look at those numbers as well?

16   A.   Oh, absolutely, yeah, yeah.  I have to.

17              MS. GOETZL:  Okay.  Let's -- I just want to go over

18   the -- if you could zoom in now, Adam.

19        Thank you.

20   BY MS. GOETZL:

21   Q.   The columns that government counsel spoke with you about.

22   A.   Uh-huh.

23   Q.   So I just want to talk about the projected ID number.

24   A.   Okay.

25   Q.   That is an aspirational goal, isn't it?

1   A.   Well, it's based on a lot of facts.  I mean, we go back,

2   you know.  You have -- you check -- you do a six-week previous

3   and you throw out all the holidays so you get an actual number,

4   and then you go back to last year to see what the store's

5   running, and then you do a three-month trend also.  All that

6   goes into making that projected ID.  And we go in to the DMs,

7   go into a room with the retail ops, and that's -- we look at

8   these store by store, and we come to an agreement on what the

9   projected ID is.

10  Q.   And is it fair to say that the projected ID is a goal?  It

11  is a little bit of a push from what you think you can do?

12  A.   I would say that there -- we do set achievable goals,

13  because our bonuses for our store directors and our operations

14  managers in our stores are all set on this projected ID.  So

15  while it may be a -- you know, it may be like, okay, last

16  period you did 12 percent, but if you the last year did

17  12 percent also, you would actually be -- they'd lower your

18  projected ID because year over year it's hard to maintain a

19  12 percent growth.  So those go up and down so they are --

20  they're not pie in the sky or not, you know, unachievable.

21       In my years I've probably bonused more times than I

22  haven't or, you know, well more times than I haven't, and it's

23  because we can hit these.  You have to hit your projected ID,

24  and you have to hit your even and odd number, which is profits.

25  Q.   Okay.  And you said just now these are achievable goals?

1    A.    Yes.

2    Q.    This is a goal?

3    A.    Yes, yeah.  It's the only way.  There's no other way to --

4    you have to have a goal.

5    Q.    Okay.  So this is a goal, a target that you would like to

6    hit, and if you hit this goal, you -- it affects your bonus?

7    A.    It affects your compensation.  Not just mine, but also our

8    store directors, our produce managers, meat managers, every

9    manager position in our stores and our -- my -- I have a group

10   of people that work with me, my operations people that are, you

11   know, in charge of all the departments so it's -- there's --

12   you know, the bonuses, while lucrative, are, you know,

13   absolutely that.  They're a bonus, you know.  They're -- that's

14   how they're made to be.

15         So you do obviously want to set -- you know, you never

16   start a game out to try to lose.  You want to hit that number;

17   right?  I mean, that's what it's about so -- but you also don't

18   want to -- you know, you don't play a little league team

19   against a pro team because it's not achievable, so we do try to

20   set them as achievable numbers, so we give our people that

21   emphasis to go get it.

22   Q.    Understood.  So when a store does not meet its projected

23   ID, that does not mean that the store is operating at a loss?

24   A.    No.  Just sales.  If you -- it doesn't mean it's operating

25   at a loss.

Tippett - Cross (Goetzl)                                          1513

1    Q.    Okay.  Thank you.

2    A.    But if you do 50,000 -- if you're supposed to do 50,000,

3    there's a projected number of profits that will come from that

4    50,000, and if you only do 30,000 the day you were supposed to

5    do 50, that projected total of dollars also is less; so you've

6    not only lost sales, you've lost profits.

7    Q.    Okay.  Is it -- can you say that every time you do not

8    meet projected ID, you are operating at a loss?

9    A.    You can -- just when you have sales, sales -- sales did

10   not hit the projected ID.  There's a case --

11   Q.    I'm talking about the store operating at a loss.  Has it

12   lost money?

13   A.    That -- compared to what it should have made that day,

14   yes.  It probably would have lost --

15   Q.    I'm not talking about revenue.

16   A.    Okay.

17   Q.    Is it operating at a loss?

18   A.    I -- I don't -- I -- no.  Is it lost -- what are you

19   losing?  You've lost sales, yes.

20   Q.    You lost potential sales that could have happened, but

21   that doesn't mean that it didn't still make money that day.

22   A.    It made less than it was supposed to.

23   Q.    Okay.  But that does not mean that it did not make a

24   profit that day.

25   A.    My role --

1    Q.   The store did not --

2            THE COURT:  Don't argue with him.  Ask him a

3    question.

4    BY MS. GOETZL:

5    Q.   Does it mean -- when the projected ID -- sorry.  When you

6    do not meet your projected ID, does that mean that the store

7    did not make money that day?

8    A.   No.  It could still make money, yeah.

9    Q.   Okay.  Thank you.  And when a store has an actual ID that

10   is lower or in the red, that does not mean that the store did

11   not make money that day.

12   A.   It can still be profitable, yeah.

13   Q.   Okay.  Thank you.

14   A.   You're welcome.

15   Q.   And stores operate below your projected numbers sometimes;

16   right?

17   A.   During this time, no.

18   Q.   Okay.

19   A.   Not at all.  Now, historically, outside of what was

20   happening at this time, could have been, but at this time we

21   hit -- any number you could throw out there, we could hit it.

22   Q.   Okay.  So let's take a look at January 5th, 'cause you

23   testified a lot that, you know, you were just way up your

24   projections during COVID.

25   A.   Uh-huh.

Tippett - Cross (Goetzl)                                          1515

1    Q.   January 5th, you did not close early; correct?

2    A.   That's correct.

3    Q.   And I'm looking at your projecteds here in the second

4    column, and a significant number of them are in the red.  Would

5    you agree most of them are in the red?

6    A.   Three, 4, 5, 6, 7 out of 12, yeah.  Seven out of 11,

7    actually, yeah.

8    Q.   So I'm counting eight, actually.  So you projected on

9    January 5th that eight of your stores were projecting --

10   A.   No.  Oh, eight.  The projections.  Sorry.  Yes, yes, we

11   did, yes.

12   Q.   Okay.  And in fact, one, two, three, four, five, six --

13   I'm looking at seven on January 5th actually did less than they

14   did the year before.

15   A.   Correct.

16   Q.   Okay.

17   A.   Do you want me to explain?

18   Q.   No.  Thank you.

19   A.   Okay.

20        MS. GOETZL:  Court's indulgence.

21   BY MS. GOETZL:

22   Q.   Okay.  So is it fair to say that sometimes stores operate

23   below the projected?

24   A.   On occasion, yes.

25   Q.   Okay.  And they also sometimes, we can see from this

1  chart, operate below what they operated on that date the year

2  before.

3  A.   Is that yes or -- you want a yes or no?

4  Q.   I'm asking you:  Is it true that sometimes stores operate

5  below how they did the year before?

6  A.   Obviously, yes.  On this day, yes.

7  Q.   Okay.  Thank you.  And isn't it the nature of business

8  that sometimes you have good days and sometimes you have bad

9  days?

10 A.   Yes, yeah.

11 Q.   And sometimes you have a day where you operate below

12 revenue that you had hoped for, but the next day you operate

13 above the revenue that you'd hoped for?

14 A.   Yes, but you never usually have a day where everybody

15 operates that way, which is what we had.

16 Q.   So sometimes when you're underperforming one day, you can

17 make -- you make up by overperforming on another day?

18 A.   Yeah.  We have a -- well, roughly we consider about

19 40 percent of our customers are walk-in.  We call them walk-in

20 customers who maybe not -- didn't plan to come that day.

21      MS. GOETZL:  Your Honor, I'd ask to instruct the

22 witness to answer the question.

23      THE COURT:  Answer the question she put on the table

24 as best you can.  What was the last question?

25      THE WITNESS:  Yeah.  I'm sorry.

1    BY MS. GOETZL:

2    Q.   Sometimes when you underperform on one day, you make up

3    for it by overperforming on another day?

4    A.   It's possible, yeah.

5    Q.   Okay.  That's generally how supermarkets work?

6    A.   We're pretty steady.

7    Q.   They don't underperform one day and then overperform

8    another day?  They generally perform the same every day?

9    A.   Our -- well, our sales are pretty steady.  I mean,

10   compared to last year you're pretty steady.  Your numbers are

11   fairly steady.

12   Q.   Okay.  But you agree with me that sometimes supermarkets

13   underperform one day and overperform another day?

14   A.   Yeah, sure.

15   Q.   And they make up the difference that way?

16   A.   Okay.  Yeah.

17   Q.   You agree with me?

18   A.   They may not make up the whole difference.  I don't know

19   if you can make that as a general statement.  Sometimes you

20   lose sales and don't make them up.  Sometimes you do more and

21   don't lose it.

22   Q.   Okay.  Let's consider just for a second a snowstorm.

23   A.   Sure.

24   Q.   Okay?  Revenue generally increases before -- when people

25   know that snow is coming.

1    A.    Correct.

2    Q.    Okay.  And then when the weather actually hits, revenue

3    slows?

4    A.    Correct.

5    Q.    And then by the third day you end up back to where you

6    were before?

7    A.    Correct.

8    Q.    Okay.

9    A.    Well, actually well above.

10   Q.    Okay.  And in terms of shipments of goods, it operates the

11   same way; right?  So if you have to stop shipments because of a

12   snowstorm, they then come in the next day; and by the third or

13   fourth day, you're back to where you were before?

14   A.    Yeah.  You can plan -- we plan for snowstorms, though.

15   Q.    Okay.

16              THE COURT:  What happens to the perishable goods in

17   the trucks if they're delayed, day or night?

18              THE WITNESS:  Well, in those cases, if they're

19   delayed, which, you know, on occasion they will be, you know,

20   up to 24 hours since we come out of Lancaster, Pennsylvania,

21   they'll keep it in the warehouse, not in the trucks.  'Cause if

22   they sit in the trucks, the product gets frozen sometimes

23   depending on how cold it is.  Even though a truck has the

24   refrigerated unit, they can still get too cold.  It's like

25   something sitting in your garage.  Occasionally if you put a

1    soda out there, it'll freeze up.  So a truck's like a big soda

2    can.  Things can freeze and die in the truck, yes.

3    BY MS. GOETZL:

4    Q.   And then ultimately in a few days you completely recover

5    from that?

6    A.   Yes.  Probably not a few days.  We try to recover quicker

7    than that, yes.

8    Q.   Okay.  And on January 6th, within a few days, the same as

9    if there would have been a snowstorm, you completely recovered?

10   A.   Conditions wise?

11   Q.   In terms of the trucks that were loaded --

12   A.   Yeah.

13   Q.   -- and ready to come, in three or four days, you had

14   recovered?

15   A.   Yeah.

16   Q.   You were back to normal.

17   A.   It put us between one to two days behind per store

18   depending on the --

19   Q.   By two days --

20          THE COURT:  Don't interrupt him.  You asked him a

21   question.

22   A.   It depends, you know.  It's probably going to put the

23   stores one to two days behind depending on how -- what trucks

24   they had too and also the size of the store depending on how

25   many people they have available.  So, you know, the bigger

1    stores can recover quicker.  They have more help.

2    BY MS. GOETZL:

3    Q.   Okay.  So by one to two days, all the stores were

4    completely recovered?

5    A.   Yeah, roughly.  I'd say yeah.

6    Q.   Okay.  Thank you.

7    A.   You're welcome.

8    Q.   So I want to just turn now to the second page of this

9    Exhibit 802, which is January 6th, and you testified to this on

10   direct.

11          MS. GOETZL:  Can you just zoom in, Adam, please, to

12   the chart.

13   BY MS. GOETZL:

14   Q.   Eight of the 11 stores were projected on January 6th to

15   have less than the year before, to generate less than they had

16   the year before?

17   A.   Yeah, correct, yeah.

18          MS. GOETZL:  Okay.  And now can we go to January 7th,

19   please.

20   BY MS. GOETZL:

21   Q.   Okay.  And this is the chart for January 7th.

22   A.   Uh-huh.

23   Q.   And it shows that 8 of the 11 stores -- that's this first

24   column -- generated more revenue than they had the year before?

25   A.   Got back to what was normal sales, yes.

Tippett - Cross (Goetzl)                                    1521

1    Q.   Well, I'm just asking:  Did 8 of the 11 stores make more

2    money --

3    A.   Yes.

4    Q.   -- on January 7, 2021, than they did on January 7th, 2020?

5    A.   Yes.

6    Q.   Okay.  And all of the 11 stores, if we look at the last

7    column, operated better than projected?

8    A.   Yes.

9    Q.   Okay.  And your chart, or at least these three pages that

10   Safeway has provided to us, they don't show how the stores

11   performed on January 8th?

12   A.   No.

13   Q.   Don't -- doesn't show how the stores performed on

14   January 9th?

15   A.   No.

16   Q.   Doesn't show how the stores performed that week as a

17   whole?

18   A.   Just the 5th, 6th, and 7th.

19   Q.   Okay.  Doesn't show the period data that you get?

20   A.   Correct.

21   Q.   And it does not show the quarterly data?

22   A.   Yeah.

23   Q.   Okay.  And you make a sales plan on a quarterly basis; is

24   that correct?  You make a quarterly sales plan?

25   A.   We do a daily, weekly, quarterly, yeah.  Period,

Tippett - Cross (Goetzl)                                    1522

1    quarterly.  It all rolls up.

2    Q.   Okay.  And you review your sales plan on a quarterly basis

3    to compare it?

4    A.   We look -- when we build the plan, we build it for the

5    quarter because we're a publicly traded company, so you have to

6    put a quarter number out there because, you know, the stock

7    market.  And then what we do is then we break it down to the

8    stores.  So you set the number here, and then it flows and then

9    you -- it goes down to the stores to break it down, 'cause the

10   store can't look at a number and say you have to be 5 percent

11   up for the quarter.  You have to break it down by day to

12   really, you know, attack it by day, because you can't wait till

13   the end of the quarter and see if you're good or not.

14   Q.   Is it fair to say that you look at the quarterly numbers

15   and compare them quarter to quarter and your projected

16   quarterly numbers versus your actual quarterly numbers?

17   A.    We look at our numbers daily, weekly, period, quarterly.

18            MS. GOETZL:  Okay.  Court's indulgence.

19   BY MS. GOETZL:

20   Q.   Okay.  The last thing I want to talk about is just the

21   shipments --

22   A.    Uh-huh.

23   Q.   -- that you talked about that go from Pennsylvania to D.C.

24   A.    Yes.

25   Q.   As you sit here today, is it your understanding that all

Tippett - Cross (Goetzl)                                          1523

1   shipments that were scheduled to be received that week, in

2   fact, arrived?

3   A.   No.  They canceled some of the shipments and then had us

4   rewrite orders.

5   Q.   So they did not --

6   A.   We --

7   Q.   -- arrive that -- all the shipments that you ordered?

8          MR. VALENTINI:  Objection, Your Honor.  The witness

9   was answering the question.  I would kindly --

10          THE COURT:  Yes.  Don't interrupt him.

11          MR. VALENTINI:  -- ask that he be permitted to finish

12   the question -- the answer.

13   A.   So some of the -- some of the orders we canceled, so they

14   did not receive every order they should have received, that's

15   correct, because we move some orders further down because what

16   happens is once you back up everything like that, everybody

17   gets affected.  The entire district -- or the entire division

18   gets affected.

19          So you have to decide where can I -- if the store's

20   supposed to get an order Tuesday, not Wednesday, you know, do

21   they need -- now they need an order because, you know, they

22   weren't -- they were not operational that night.  So things got

23   moved around a little bit for these 12 stores to get orders

24   either into the stores or if some orders were canceled and

25   rewritten and came the next day.

1    BY MS. GOETZL:

2    Q.   Okay.  So you canceled some orders, but every order that

3    you made that wasn't canceled arrived in D.C.?

4    A.   Yeah, if they ordered it.  If they had to rewrite it, they

5    ordered -- they got it, like, a day later or so, you know.

6    Q.   Okay.  So all --

7    A.   But we didn't -- some stores did not get every order they

8    normally get.  We either get every other day, five days a week,

9    seven -- or six days or seven days a week depending on the

10   volume of the store.

11   Q.   Okay.  And as you sit here today, can you tell us exactly

12   how many orders were canceled?

13   A.   I'd tell you the -- I know Georgetown was because I know

14   they had an order that was due that day because they're seven

15   days a week.  Petworth is also seven days a week.  Piney Branch

16   is six days a week.  They don't get one on Friday for Saturday,

17   so they would have been canceled.  So stores that got the

18   larger amount of orders, we let them go because the drop in

19   sales allowed us to have product in the stores, and the smaller

20   stores were more affected because they get every other day so

21   there wasn't as much product in the stores to make up for it so

22   they -- they actually were put ahead of the larger stores, the

23   larger volume stores.

24   Q.   Okay.  So as you sit here today, you cannot give me an

25   exact number of how many orders were canceled?

1    A.    No.

2    Q.    Okay.  And there were orders that were received on

3    January 6th?

4    A.    No.  No, no, no, no.  Not in the city.

5          MR. VALENTINI:  Objection.  Could the question be

6    defined as to the time that we're referring to on January 6?

7    BY MS. GOETZL:

8    Q.    I'm talking about -- I'm just asking:  Can you confirm

9    that there were orders that were received at grocery store --

10   Safeway grocery stores on January 6th?

11   A.    The perishable orders were received that morning for

12   the day.  Grocery that night was not delivered.  Anything

13   after --

14         THE COURT:  So in other words, the orders that you

15   normally receive in the morning were received?

16         THE WITNESS:  Yes.

17         THE COURT:  The orders you normally receive after

18   4 p.m. were not?

19         THE WITNESS:  Correct, yes.

20         MS. GOETZL:  Okay.

21         THE COURT:  I think that's what you said on direct.

22         THE WITNESS:  Thank you.

23   BY MS. GOETZL:

24   Q.    No further questions.  Thank you, Mr. Tippett.

25   A.    Sure.  Thanks.

1                        REDIRECT EXAMINATION

2       BY MR. VALENTINI:

3       Q.   I have only a few more questions.

4       A.   Sure.

5       Q.   I'm going to show you what has been admitted into evidence

6       as Exhibit 802.  Let's start with the second page for

7       January 6, 2021.  Do I recall it correctly, Mr. Tippett, that

8       on direct examination you described the results -- the sales

9       results for this day as a catastrophe?

10      A.   Correct.

11      Q.   That's because they were significantly -- they came in

12      significantly lower than projected?

13      A.   Not only projected, but significantly below last year,

14      yes.  We expect to grow over the quarter, yes.

15      Q.   Or at least not underperform?

16      A.   Correct, yes.

17      Q.   And if we can go -- let's take a few of these.  For

18      instance, the Georgetown store.  By how much percentwise did

19      the Georgetown store underperform on January 6, 2021, compared

20      to January 6, 2020?

21      A.   46.98 percent down from the same day last year.

22      Q.   About half the sales of the previous years?

23      A.   Yes, almost half, yeah.

24      Q.   How about the City Vista store?

25      A.   City Vista, 52 percent below the year before.

Tippett - Redirect (Valentini)                            1527

1          MR. VALENTINI:  Okay.  Let me move up to the first

2     page in the exhibit, which is January 5th, 2021.

3          THE WITNESS:  Uh-huh.

4          MR. VALENTINI:  Let me zoom in on that.

5     BY MR. VALENTINI:

6     Q.    Mr. Tippett, how long have you been employed at Safeway?

7     A.    Forty-four years.

8     Q.    In your 44 years of experience, do the sales results for

9     January 5th look like a catastrophe?

10    A.    No, although I will say January 5th -- am I allowed to say

11    this?  It's -- January 5th was affected a little bit because

12    there was -- in the city there -- there were a lot of things on

13    the news about people arriving downtown and into the city so

14    people tend to -- a lot of times in the city people tend to

15    stay home more, so the 5th was a little bit less.  It was lower

16    than our normal run rate at the time so, you know, it was

17    affected a little bit.  The 5th was affected a little bit.

18         The 7th was affected just a touch, although it came back a

19    little bit, but they -- you know, it was not just a one -- it

20    didn't affect us just from 4 o'clock on.  It affected us the

21    day before a little bit and the day of, mostly.

22    Q.    But January 5th did not -- was not a catastrophe in terms

23    of sales?

24    A.    No, no, no.  We knew it was going to be a little slower

25    then because of what was happening.

1    Q.   Let's look, then, at January 7th, 2021.

2    A.   Uh-huh.

3    Q.   How did the Safeway stores perform on that day?

4    A.   Extremely well, yeah.  I mean much, much better, and, you

5    know, I guess when you look at this, the furthest store away

6    from downtown, Piney Branch, was the best at 43 percent.

7    Q.   Definitely not a catastrophe?

8    A.   No, sir, no.

9    Q.   January 6, however, was a catastrophe for Safeway?

10   A.   Yeah.  It was a disaster, yeah.

11   Q.   And you said you've worked at Safeway 44 or 45 years?

12   A.   Forty-four.  January 1st, 44 years.

13   Q.   In your 44 years of experience, do you have any doubt that

14   that catastrophe was because the stores had to close as a

15   result of the events at the Capitol on January 6?

16   A.   It was, absolutely, because we had to close due to the

17   events.

18             MR. VALENTINI:  I have no further questions.

19             THE COURT:  Thank you.  All right.

20             MS. GOETZL:  No further questions.

21             THE COURT:  Mr. Tippett, thank you.  You may be

22   excused.

23             THE WITNESS:  Thank you, sir.

24             THE COURT:  And I think we'll let the jury go back to

25   the jury room for 15 minutes.  I want to talk to the lawyers

1   about where we're going next this morning.

2        (Jury out at 11:39 a.m.)

3             THE COURT:  Everybody can be seated, but I do want to

4   ask --

5        Well, just in time.  So Mr. Dreher, I was about to ask

6   whether you would be ready -- we've taken a 15-minute break --

7   whether you'd be ready with Dr. Kroll, at, you know, 5 till 12.

8             MR. DREHER:  Yes, Your Honor.

9             THE COURT:  Well, that answers my question about

10  where we go next.

11       Sit down.

12       I just want to mention one or two other things.  One, some

13  of the jurors have started to get antsy about -- and asking

14  questions about when is this trial going to end?  I think

15  during voir dire we suggested the testimony would likely go

16  through this week but then deliberations might go into next

17  week.  We didn't tell them testimony would go into next week,

18  and so at some point it would be nice to give them a prognosis,

19  although I'm nervous about doing that because sometimes we're

20  wrong.  I think once we get done with Dr. Kroll, the government

21  might be able to tell us a little bit about how long they

22  expect the other witnesses to go.

23       We're working on getting American Sign Language

24  interpreters for the 15th, 16th, and 17th.  Some of it's

25  already accomplished, and some of it isn't.  I would like to

1    put on the table for defense counsel's consideration --

2    depending on where we are in the trial, we might be ready for a

3    Rule 29 motion on Tuesday when we don't have any American Sign

4    Language interpreters.  We might not.  Regardless of that, we

5    could fruitfully discuss jury instructions on Tuesday,

6    March 14th.

7         So the question that counsel for Mr. GossJankowski have to

8    consider after talking to their client, and I don't need an

9    answer right now obviously, is whether they would consider

10   waiving his presence either for Rule 29 legal arguments, 'cause

11   they're just legal arguments, but they're important legal

12   arguments or -- and/or whether they'd consider his waiving his

13   presence for a discussion of jury instructions, which also will

14   involve a lot of legal questions but also just a lot of process

15   and procedure and, you know, tweaking a word here or there.  I

16   mean, sometimes it's just we're basically in agreement but

17   we're arguing about the way you ought to phrase X, Y or Z, and

18   other times it's -- we have very different views about how to

19   instruct on the elements of a certain crime.

20        So for Mr. Smock and Ms. Goetzl to consider and to talk to

21   their client about whether they'd be able -- whether he and

22   they would be willing to waive his presence either for Rule 29

23   arguments, although we may not be ready for that yet, or for

24   jury instruction discussion on Tuesday when we will not have

25   American Sign Language interpreters.

1      So those are what I wanted to put on the table.  Is there

2   anything else anybody wants to say before we take about a

3   10-minute break or 12-minute before we get Dr. Kroll back?

4            MR. SMOCK:  No.

5            THE COURT:  Okay.  Thank you.

6       (Recess taken at 11:43 a.m.)

7       (At 11:59 a.m. on March 9, 2023; with counsel for the

8   parties and the defendant present; WITH the jury:)

9        DR. MARK KROLL, PREVIOUSLY SWORN, RESUMED THE STAND

10           THE COURT:  Ladies and gentlemen of the jury, you see

11   that Dr. Kroll is back with us, and Mr. Dreher will continue

12   his cross-examination of Dr. Kroll.  As you recall, we've taken

13   Dr. Kroll out of turn because he's really a witness for the

14   defense.  Mr. Smock started with the questioning, and

15   Mr. Dreher began his cross-examination and will continue it

16   now.

17      And you're still under oath from yesterday, Dr. Kroll.

18           THE WITNESS:  Thank you, Your Honor.

19           THE COURT:  Thank you.

20                  CROSS-EXAMINATION RESUMED

21   BY MR. DREHER:

22   Q.   Good afternoon, sir.

23   A.   Good afternoon.

24   Q.   Now, when we left off, we were discussing the timing of

25   the testing that you did involving this case.  Do you remember

1    that?

2    A.   I remember the question, yes.

3    Q.   All right.  Now, basically, when it came to devices that

4    were at the Capitol on January 6th, you performed some testing

5    with other devices as well; right?

6    A.   Yes.

7    Q.   Now, the testing involving these other devices, did they

8    occur at the same time as the testing for the device in this

9    case?

10   A.   Partly yes and partly not.

11   Q.   Can you explain that to the jury.

12   A.   The first kind of Amazon toy that I tested was a little

13   flashlight, actually a nice flashlight that made a loud arcing

14   sound on the front.  It was a round flashlight, pretty much

15   looked like a normal flashlight, and I tested that earlier last

16   year, tested the output of it.  And then later last year I

17   tested the Vipertek and the Police 916 that was involved in

18   this case and made some measurements on that so I could write

19   my ex report in early December of last year.

20        Then I realized that this was kind of an interesting

21   issue, so I ordered a number of these devices, ten different

22   models and three of each model, so I ordered about 30 of them

23   total and performed a large number of tests in December of last

24   year and January of this year so I could submit a paper.

25   Q.   And so the first expert report that you have completed,

 1   it's dated March 24th of 2022.  Does that sound about the time

 2   that you performed that first test on that flashlight device?

 3   A.   Yes, sir.

 4   Q.   Now, you concluded that that device itself was also -- a

 5   sparkler flashlight is what you called it; correct?

 6   A.   That sounds right.

 7            THE COURT:  So just so the jury is clear, that report

 8   of March 24, 2022, I take it, was for a different case, not

 9   this case?

10            THE WITNESS:  Yes, Your Honor.

11            THE COURT:  Okay.

12   BY MR. DREHER:

13   Q.   Now, was that testing that you performed on that device

14   used in your conclusions in this case?

15   A.   No.

16   Q.   But it was used when you did your own study?

17   A.   That device was used, but I redid the testing for this

18   paper.

19   Q.   Now, when you provided the testing on that first device,

20   you, in fact, had a known device that you were testing;

21   correct?

22   A.   I actually had four of them: two of the large ones and two

23   of the small flashlights.

24   Q.   And it was the smaller ones that you were testing for that

25   case; correct?

1    A.   I believe I tested all -- two large ones and the two small

2    ones.

3    Q.   Now, in performing those tests you provided the raw

4    charge?

5    A.   I don't have that report in front of me.  If you have it

6    handy, I'd be happy to comment on it.

7    Q.   Okay.  If I could draw your attention, then, to the screen

8    in front of you, sir.

9         Now, sir, what's appeared on that screen, does that look

10   familiar?

11   A.   Yes.

12   Q.   And do you believe after reviewing this that this would

13   refresh your recollection as to the answer to my question?

14   A.   I'm not sure if it refreshes recollection because I don't

15   really have that much of a recollection, but this looks

16   reasonable, and those numbers look reasonable.

17            THE COURT:  But this is an excerpt from that report

18   in that earlier case that's now up on the screen?

19            THE WITNESS:  I believe so.

20   BY MR. DREHER:

21   Q.   So in that test you provided the raw charge?

22   A.   Yes.

23   Q.   The energy?

24   A.   Yes.

25   Q.   The peak voltage?

```
 1    A.    Yes.

 2    Q.    The average voltage?

 3    A.    Correct.

 4    Q.    The average power?

 5    A.    Correct.

 6    Q.    The pulse duration?

 7    A.    Correct.

 8    Q.    The normalized charge?

 9    A.    Correct.

10    Q.    The period?

11    A.    Correct.

12    Q.    And the pulse rate of that device?

13    A.    Yes.

14    Q.    Now, am I correct in that that's nine different aspects of

15    this device that you tested for the first time?

16    A.    Yes.

17    Q.    Now fast-forward, then, to your testing in this case.  You

18    provided one --

19    A.    May I correct something on here?

20    Q.    Sir --

21              THE COURT:  What's up on the screen?

22              THE WITNESS:  Yeah, on the screen.

23    BY MR. DREHER:

24    Q.    Sir, the question I have is:  In this case you provided

25    just the raw charge; correct?
```

Kroll - Cross (Dreher)                                          1536

1    A.   Let me take a look.

2    Q.   Would it help if I direct --

3              THE COURT:  He's got it in front of him.

4    BY MR. DREHER:

5    Q.   You got it in front of you?

6              THE COURT:  The report in this case he has in front

7    of him.

8              THE WITNESS:  Yes.

9              THE COURT:  The report on the old case is still up on

10   the screen, not for the jury to see at this point.

11             THE WITNESS:  Well, not just the raw charge.  It's

12   the charge and the sound output.

13             THE COURT:  The charge and what?

14             THE WITNESS:  The sound output, the decibels.

15   BY MR. DREHER:

16   Q.   Now, you also included the decibels in this March test as

17   well, so that would be ten different aspects that you provided

18   in the March case?

19   A.   If you tell me that it had the decibels in that March

20   case, I'll take your word for it.

21             MR. DREHER:  Let me scroll a bit.

22   BY MR. DREHER:

23   Q.   Now, as part of your conclusions in this case, you said it

24   was all --

25             THE COURT:  Conclusions in which case?

1           MR. DREHER:  In the March -- I apologize, Your Honor.

2    BY MR. DREHER:

3    Q.   In the March test you concluded that this was all bark and

4    no bite; correct?

5    A.   That sounds like my terminology.  I'm not seeing it in

6    what you're showing in front of me right now.

7    Q.   Okay.

8    A.   Do you have a copy that I can look at?  Because I can't

9    read this fast when you're scrolling it.

10          MR. DREHER:  If I may approach, Your Honor.

11          THE COURT:  Yes, sir.

12          MR. DREHER:  I'm approaching the witness with a copy

13   of the report from March.

14          THE WITNESS:  Thank you.

15          THE COURT:  Thank you.

16   BY MR. DREHER:

17   Q.   And then, sir, I'll give you an opportunity to review

18   that, and if you would please look up at me after you've had

19   that opportunity.

20   A.   I'm ready.

21   Q.   Now, sir, if I can draw your attention, then, to page 14

22   of that.  And I'm going to read number 4, and tell me if I read

23   this correctly.

24        "The Mace compact stun gun is best described as a sparkler

25   flashlight since its effects are primarily auditory and visual

 1    and there is no stunning.  To use a canine analogy, they are

 2    all bark and no bite."

 3        Did I read that correctly?

 4    A.   Yes.

 5    Q.   Now, for the jury in this case, that's how you described

 6    the device in this case as well; correct?

 7    A.   Yes.

 8    Q.   Now, going back, then, to the March case, you provided

 9    nine different electrical findings with that device; correct?

10    A.   No.  My findings are on page 12, and they only refer to

11    the charge.

12    Q.   Now, the information that you provided in that report

13    outlines these nine different categories of testing on this

14    device; correct?

15    A.   I'm not sure that's totally fair.  I just mentioned on

16    page 10 that I tested a whole number of things, gave every

17    electrical parameter you could imagine; but as you see from

18    page 12 under my findings, I did not need them.  They were

19    based -- basically the charge.  On page 13 I did mention one

20    thing on -- no, it's -- all I mention is the charge.  So yes, I

21    measured those.  I reported them just to be complete, but they

22    did not go into my findings 'cause they were not necessary.

23    Findings just are based on charge.

24    Q.   Now, ultimately as well, the testing that you did on these

25    were on two different levels of resistance; correct?

Kroll - Cross (Dreher)                                          1539

1    A.    Yes.  I used both the 500 ohms for the FDA testing and the

2    600 ohms for the stun gun standard.

3    Q.    Now, in the 500 ohms, that's the resistance of the

4    electric circuit; correct?

5    A.    Yes.

6    Q.    And you registered a raw charge of .632 on one unit and

7    .670 microcoulombs on the other unit; correct?

8    A.    Yes, sir, that's correct.

9    Q.    Now, that's about the same as the device in this case,

10   isn't it?

11   A.    Yes, but let me make sure we use that -- the -- I should

12   explain that the difference between the 500-ohm and 600-ohm

13   load is not huge.  That's why the ANSI standard and the FDA

14   standard have slightly different numbers.  They're both pretty

15   similar.  So I used the 500-ohm load for the nerve stimulator

16   testing.

17         I used both in this case as well, so the answer is yes for

18   the 500-ohm load for the FDA-accepted standards, yes.  They're

19   very close.

20   Q.    And so this is the raw charge that you measured?

21   A.    That's correct.

22   Q.    Now, on the device in March, you also provided the

23   normalized charge?

24   A.    That's correct.

25   Q.    Can you explain to the jury what that is.

1   A.   For nerve stimulation under the ANSI standard, you want to

2   give some benefit for shorter pulses.  If you have a really

3   long pulse, the nerves say, okay, I got it already, and so you

4   discount long pulses and you give a little bit of a bonus for

5   short pulses and the -- some people do that.  That's in the

6   ANSI standard.  The FDA does not have that in their standards

7   for the normalization.

8   Q.   And so at the 500 ohms resistance, this device that you

9   tested in March provided .907 microcoulombs, and then the

10  second device was .962 microcoulombs; correct?

11  A.   Basically, right.  .97, but that's close enough.

12  Q.   So ultimately this normalized charge is higher than the

13  raw charge?

14  A.   It's a little higher, yes.

15  Q.   And you did not provide the normalized charge in the

16  device you tested for this case; correct?

17  A.   No, but I can tell you what it is.  It's going to be still

18  under a microcoulomb.  It doesn't make --

19  Q.   Now, ultimately, sir, you tested that device in March

20  under 600 ohms of resistance; correct?

21  A.   Correct.

22  Q.   And the raw charge with the higher -- with 100 ohms more

23  resistance actually registered .787 microcoulombs on the first

24  device and .799 microcoulombs on the second device; correct?

25  A.   That's correct.

Kroll - Cross (Dreher)                                              1541

1    Q.   So at a higher resistance you measured a higher total

2    charge, raw charge?

3    A.   For that flashlight.  It had the opposite effect here, as

4    you know.

5    Q.   Now, ultimately you also provided the normalized charge at

6    600 ohms; correct?

7    A.   Yes.

8    Q.   And again, even with the higher resistance, it became a

9    higher normalized charge at 1.125 microcoulombs and 1.144

10   microcoulombs; correct?

11   A.   Correct.

12   Q.   Now, sir, you used this information when preparing the

13   study that you mentioned earlier about all of these devices;

14   correct?

15   A.   No.  I went back and restudied them.  Back last December

16   or this -- this January, I -- we measured them from scratch.

17   Q.   You remeasured this device before providing your study?

18            THE COURT:  When you're referring to "study," I think

19   we've had two words that have been used in this discussion the

20   other day and today, and I want to be sure if they're the same

21   thing or different things.  There was a discussion by Dr. Kroll

22   of a paper that he wrote, I believe, in January, but he can

23   tell us.  A paper that he wrote a month or so after preparing

24   the expert report in this case, and both counsel have been

25   provided with that paper.

1      Is that -- Mr. Dreher, just for clarification, when you

2   talk about the study, is that what you're talking about?

3          MR. DREHER:  Yes, Your Honor.  I apologize.  The

4   paper.

5          THE COURT:  Okay.  I want to be clear.  I want the

6   jury to be clear.  So they're synonymous in this discussion.

7   BY MR. DREHER:

8   Q.   And so, Dr. Kroll, in preparing this paper that you intend

9   to publish, you reexamined that device from March?

10  A.   That's correct.  I went through everything again de novo

11  with a stable setup for all of them, and I even used a slight

12  variation on how I did my measurements based on what I learned

13  last year to make sure I got more measurements, and they were

14  very consistent 'cause they were all measured within the same

15  day, fully charged.  Were on the same circuit with a slightly

16  improved methodology.

17  Q.   Now, in that paper you don't provide those nine different

18  measurements; correct?

19  A.   I don't provide all of them.  Most of them are, frankly,

20  not relevant.

21  Q.   In fact, you just chart the raw charge associated with

22  these ten different items found on Amazon?

23  A.   No.  That's incorrect.

24  Q.   So the x-axis of the chart is the raw charge of each of

25  these ten devices; correct?

1    A.    Well, which chart are you referring to?

2    Q.    In your paper.

3    A.    Which graph are you referring to?  Are you referring to

4    Figure 4 or 5?

5    Q.    So sir, if I can direct your attention to the screen in

6    front of you.  Does this graph look familiar?

7    A.    Okay.  That's Figure 5.  Yes.

8    Q.    And you chart the raw charge over the load resistance on

9    this graph; correct?

10   A.    That's correct.

11   Q.    Now, the device that you tested in March was the Mace

12   compact device, wasn't it?

13   A.    That's correct.

14   Q.    And then we heard that in March you concluded that the raw

15   charge was .623, somewhere in there; correct?

16   A.    That's correct.

17   Q.    Now, on this chart it's the short orange dotted line,

18   isn't it?

19   A.    Correct.

20   Q.    And that's much lower than what you found in March.

21   A.    Yes.  When I did my report for the case last year, I used

22   a very conservative measurement.  When I redid this for my

23   scientific paper, I was much more careful, and it ended up

24   being a lower charge, about .3 something.  So on my report that

25   I did for the federal court case of last year, I was quite

1    conservative, so I said there was more charge, so that actually

2    was in the government's favor in that case.

3    Q.   Sir, did you tell this jury that you were more careful

4    when preparing your own report than you were when you prepared

5    a report regarding a federal case?

6    A.   I was more conservative on the federal case, and after I

7    redid these measurements, I came up with a more accurate number

8    which was actually less, so the report was in the government's

9    favor, the initial report was.

10   Q.   Sir, is there a reason why you believe it's in the

11   government's favor for you to have such a variance of what the

12   output of a device is?

13   A.   Of course not.

14   Q.   So getting back to my original question, what's charted on

15   here in your paper is a much different raw charge as you found

16   back in March; correct?

17   A.   It is a lower raw charge, absolutely.  It was measured

18   more accurately with improved equipment and an improved

19   methodology.

20   Q.   Now, sir, that report back from March wasn't the only

21   January 6 case you provided a report for, though; correct?

22   A.   That's correct.

23   Q.   In fact, you were also asked to provide a report in

24   generally the same time period as the report in this case.  Our

25   case, it was December 12th, 2022; right?

1          THE COURT:  The date of the report?

2          THE WITNESS:  Correct.

3          THE COURT:  The date of the report in this case is

4    December 12, 2022?

5          THE WITNESS:  Yes, sir.

6    BY MR. DREHER:

7    Q.   And sir, if I can direct your attention to the screen in

8    front of you, can you tell us the date of the report in another

9    case.

10   A.   This was the 5th of December, 2022.

11        And again, could I trouble you for a copy of this if we're

12   going to discuss it?

13          MR. DREHER:  Your Honor, if I may approach the

14   witness?

15          THE COURT:  Yes, sir.

16          MR. DREHER:  Your Honor, I'm handing the witness a

17   copy of the report I'm referencing on the screen.

18          THE WITNESS:  Thank you.

19   BY MR. DREHER:

20   Q.   And sir, if you wouldn't mind reviewing it and then

21   looking up at me when you're ready to proceed.

22   A.   I'm ready.

23   Q.   Now, sir, in this report you also provided some

24   conclusions; right?

25   A.   Yes.

1    Q.   Now, if I can direct your attention, then, to page 7 of

2    this report, you conclude that that device "is best described

3    as a sparkler flashlight since its effects are primarily

4    auditory and visual and there is no stunning.  To use a canine

5    analogy, they are all bark and no bite."

6         Did I read that correctly?

7    A.   Yes.

8    Q.   And in fact, that's a similar conclusion to what you have

9    in our case, isn't it?

10   A.   That's correct.

11   Q.   But one difference in the case from December 5th, this

12   other case, was that there were injuries, a photograph of

13   injuries sustained by an officer who a device was used against;

14   correct?

15   A.   Well, you've worded that question very carefully.  The

16   officer had injuries and the device used against him but -- and

17   I'd love to show these pictures to the jury -- those injuries

18   do not match the electrodes on the device used.  They're not

19   even close, so I think it would be misleading to suggest that

20   the scratches on the back of this officer's neck had anything

21   to do with that device.

22   Q.   So you were presented with photographs of injuries

23   sustained by an officer, and you concluded it was not caused by

24   the sparkler flashlight ; correct?

25   A.   That's correct.  Not even close.  Can we show the picture

1    to the jury?

2          THE COURT:  No.

3    BY MR. DREHER:

4    Q.   Now, again, in the December 5th case, you scoped Amazon

5    for the types of devices that could have been identified in

6    that case; right?

7    A.   It went beyond that.  I looked at hundreds of Google

8    images of stun guns.  And frankly, I was conservative when I

9    said it was even a sparkler flashlight, because when you look

10   at the picture in Figure 3, we don't see --

11   Q.   Now, sir, I'm going to direct your attention to a specific

12   page in your report, and it is page 9, and it shows a screen

13   grab from Amazon; right?

14   A.   Yes.

15   Q.   Now, it shows several different models of Vipertek

16   sparkler flashlights, as you call them; correct?

17   A.   No.  Well, it does show three, but the other one is a

18   Fightsense, called a mini stun gun.  So yes, there's three

19   Viperteks on there and then a Fightsense.

20   Q.   So in your paper you refer to the Vipertek 979 as the

21   Vipertek device; correct?

22   A.   That's correct.

23   Q.   But Vipertek makes many different types of devices, don't

24   they?

25   A.   No.

1   Q.   No?  There's at least four.

2   A.   That's branding.  For example, the flashlight there, the

3   VTS-195, that's just the Mace flashlight labeled as a Vipertek,

4   so it's obviously not going to be manufactured by them.  It's

5   whoever manufactured the Mace device, and then they put their

6   label on it.  So there's no need to test that because --

7           THE COURT:  Vipertek puts its label on the Mace

8   flashlight?  Is that what you're saying?

9           THE WITNESS:  Yes, sir.  Commonly that happens.

10  People manufacture something, they change -- the manufacturer

11  makes these Amazon toys, and then, if you pay, they'll put your

12  name on it, so that was -- there was no need to test that

13  separately from the Mace.  It's most commonly sold as the Mace

14  brand, so that's how I referred to it as, the Mace brand.

15  BY MR. DREHER:

16  Q.   Certainly you don't consider this Vipertek company as a

17  competitor to Axon?

18  A.   Of course not.  You don't see any police carrying these.

19  Q.   And certainly you're not testifying that the injuries that

20  the officer sustained in that December 5th report didn't

21  happen.

22  A.   I have no idea how he got those scratches on his neck.

23  They clearly don't match what's shown as electrodes in Figure

24  3.  And if we could show that to the jury, it would be

25  extremely obvious.

Kroll - Cross (Dreher)                                          1549

1   Q.   Well, let me ask you this:  Did you -- as part of that

2   case, were you provided with information of the severity of the

3   injuries the officer received?

4   A.   I read his testimony.

5   Q.   And so you understand that he also had several -- let me

6   ask you this:  Based on what you reviewed in that case, did he

7   lose his mental faculties?

8   A.   I believe he testified that he passed out at some point

9   during his struggle, which clearly has nothing to do with one

10  of these Amazon toys.

11  Q.   Were you aware of a cardiac arrest?

12  A.   I don't believe he suffered a cardiac arrest.  I think

13  that there was some confusion about that, but I'm not sure that

14  happened.  It really didn't go to the -- my report, but if you

15  want to refresh me on that, I'd be happy to discuss it.  Are

16  you alleging that he had a cardiac arrest?

17  Q.   You're not a medical doctor; correct?

18  A.   That's correct.

19  Q.   And you're telling the jury that he did not have a cardiac

20  arrest?

21  A.   Can you refresh me with what the evidence is that he had a

22  cardiac arrest?

23  Q.   What I'm asking is:  Are you aware, as part of your report

24  in that case, whether the officer had a cardiac arrest?

25  A.   Let me go back and review this.

Kroll - Cross (Dreher)                                              1550

1          I did not give an opinion as to whether or not he ever had

2     a cardiac arrest in his life.  Obviously it would not be

3     involved in the use of one of these sparkler flashlights,

4     'cause they can't cause a cardiac arrest.

5               THE COURT:  Well, were you asked in that case -- were

6     you provided in that case with information about the extent of

7     his injuries when you reached a conclusion that the device in

8     that case could not have caused certain injuries?

9               THE WITNESS:  Yes, Your Honor, and very specifically,

10    he claimed that he lost consciousness at some point during the

11    riot, and so my opinion number 9, page 7, I said the device did

12    not cause him to ever lose consciousness, as it couldn't.

13    BY MR. DREHER:

14    Q.    Now, you were provided with the name of that officer?

15    A.    Yes.

16    Q.    And that officer was with the Metropolitan Police, Officer

17    Mike Fanone?

18    A.    Yes.

19    Q.    And in your review of that case, you concluded that

20    Officer Fanone was never weakened by the device, the sparkler

21    flashlight?

22               THE COURT:  Was never what?  I didn't hear you.

23               MR. DREHER:  Weakened.  He was never weakened by that

24    sparkler flashlight.

25    A.    That's correct.  They do not weaken people.

Kroll - Cross (Dreher)                                            1551

1   BY MR. DREHER:

2   Q.   You also opined that Officer Fanone was never immobilized

3   by what you call a sparkler flashlight?

4   A.   That's correct.  That's opinion number 8.  They do not

5   immobilize people.  That's why police don't use these.

6   Q.   And, in fact, you concluded that the loud arcing sound

7   from the device most likely caused Officer Fanone to imagine

8   far greater pain than was actually present.  Did I read that

9   correctly?

10  A.   You did.  And I published on this, the psychological

11  effects of electrical sounding arcs.

12  Q.   So your opinion in that case was that the pain Officer

13  Fanone felt was not as great from the device?

14  A.   I'm sorry?

15  Q.   Your opinion suggests that Officer Fanone was mistaken

16  about the level of pain he experienced caused by this sparkler

17  flashlight; correct?

18  A.   Pain is a very personal and very subjective thing, and if

19  he imagined that or he felt that this was a touch to his body

20  and it caused pain, that's a very personal thing.  We can't get

21  into his brain to determine that.  What we do know from

22  research -- and I published two papers on this -- is that the

23  sound of an electrical arcing can make someone think they got a

24  shock -- I published that in *American Journal of Emergency*

25  *Medicine* -- even when they didn't.

1      So I just wanted to point out here that people can think

2   they got a shock when they hear the sound, but we also know

3   that these devices are incapable of causing pain.  They cause a

4   sensation, but it's not what most people would describe as

5   pain.

6   Q.   And you came to this conclusion even seeing the

7   photographs of the back of Officer Fanone's neck?

8   A.   Oh, that helped.  That helped a lot because I could see

9   that those scratches didn't come close to matching the

10  electrode patterns of the device.  There was one really long --

11  can we show it to the jury?  That would save a lot of time.

12  Q.   Let me stop.  Are you aware of any studies that measures

13  the amount of microcoulombs it takes for an individual to

14  experience pain?

15  A.   Yes.

16  Q.   And, in fact, you're aware that there has been human

17  studies to test the number of microcoulombs before somebody

18  experiences intolerable pain?

19  A.   Numerous studies.

20  Q.   Isn't it true that at a rate of .5 microcoulombs, most

21  individuals experience pain?

22  A.   That's -- for most people it would be a sensation.  A

23  better rule of thumb is the 1, 10, and 100.  At about 1

24  microcoulomb, you have sensation; at about 10, it's pain; at

25  about 100, it's intolerable pain.  And we know that from lots

1    of studies.

2    Q.   Sir, that's milliamperes, isn't it?

3    A.   That's also roughly true for milliamperes.  At one --

4    Q.   What I'm asking you, sir, is:  Are you aware of a study

5    that talks about --

6              MR. SMOCK:  Can the witness finish answering the

7    question?

8              THE COURT:  What?  I can't hear you.

9              MR. SMOCK:  I'm asking that the witness be permitted

10   to finish answering the question before the next question is

11   asked.

12             THE COURT:  What was the last question?

13             MR. DREHER:  The last question was whether or not the

14   studies he's referring to relate to milliamperes, Your Honor.

15   He answered the question and then --

16             THE COURT:  Okay.  So why don't you continue your

17   answer to that question if there's more.

18             THE WITNESS:  Thank you.  For milliamperes the

19   numbers are not completely out of that ballpark, but we have --

20   at about 1 milliampere, we have sensation.  It's less for

21   females, and it depends upon fingertip sensation.  It's even

22   less on the tongue.  At about 5, it's extremely painful.  At

23   about 100, you can have death.  So the numbers are different

24   for milliamperes.

25   BY MR. DREHER:

1    Q.   Sir, I'm going to direct your attention to the screen in

2    front of you, and I'm going to ask if you're familiar with the

3    Department of Justice's Study of Deaths Following Electro

4    Muscular Disruption.

5    A.   I'm very familiar with this.  I testified at this

6    conference.

7    Q.   In fact, do you consider this a reliable source when

8    coming to any sort of conclusion related to stun guns or

9    Tasers?

10   A.   It was a report from a panel that met over quite a long

11   time and had several people speak.  It does not reflect new

12   data, and there are a few errors in it.  It's generally pretty

13   well done.

14           THE COURT:  And this is dated, according to what I

15   see on the screen, May of 2011; is that right?

16           THE WITNESS:  Yes.

17   BY MR. DREHER:

18   Q.   Now, in fact, you provided a briefing to this panel,

19   didn't you?

20   A.   I was invited to speak, yes.

21   Q.   So getting you back to my question, this is a reliable

22   source in your field; correct?

23   A.   It's pretty reliable.  I mean, it's well known that it has

24   a mistake on the pain for microcoulombs, but I'd be happy to

25   discuss it if you want to get to that page.

1    Q.    There's a mistake for the level of pain for microcoulombs

2    in this report?

3    A.    Yes.

4    Q.    Now, this was published in May of 2011, and nobody's fixed

5    this mistake since then?

6    A.    That's your Department of Justice.  I don't think it's my

7    responsibility to fix it.

8    Q.    Now, within this report it does provide just what I asked,

9    and that's -- it reads, "To give a sense of what the effect of

10   100 micro-coulombs of delivered charge would have on a person,

11   Mr. Reilly conducted laboratory experiments with human

12   subjects, who were subjected to brief high-voltage pulses on

13   their forearms.  Subjects reported pain on average at 0.5

14   micro-coulombs, and intolerable pain at 1.0 micro-coulombs."

15         Did I read that correctly?

16   A.    Yes, and I think it's an error.  I know Pat Reilly very

17   well.  I've been to his home --

18   Q.    Sir --

19   A.    -- and the answer is you read it correctly.

20   Q.    Sir --

21   A.    Yes, you read it correctly, but it's an error.

22              THE COURT:  That's enough.  That's the answer.

23   BY MR. DREHER:

24   Q.    So then the device that you tested in March registered

25   somewhere between pain and intolerable pain, according to

1    Mr. Reilly; correct?

2    A.   I'm not sure if that's a typo there, because I'm familiar

3    with Reilly's papers and the generally accepted numbers, and

4    that includes some of the papers that he published as well as

5    many others.  It's 1 for sensation, 10 for pain, and 100 for

6    intolerable pain.  In fact, that's reflected in the

7    International Electrotechnical standards for --

8    Q.   Those standards that you wrote?

9    A.   No, I did not write those.  Those standards have been

10   around for a hundred years.  I'm on the committee that

11   maintains those 'cause every ten years we update them, and they

12   have 1 microcoulomb for sensation, 10 for pain, 100 for

13   intolerable pain.

14   Q.   Now, sir, I do want to take you back to this report that

15   you provided back in March, and you provided some citations for

16   each of the not only conclusions, but underlying factual basis;

17   right?

18   A.   Yes.

19   Q.   Now, correct me if I'm wrong, but there's over 131

20   citations that you provide?

21   A.   The copy that you gave me does not have the citations, so

22   I'll take your word for it.

23              THE COURT:  What report were you asking him about?

24              MR. DREHER:  This is the one from March of 2022, Your

25   Honor, the first one.

1    BY MR. DREHER:

2    Q.   Now, in December, in our case you also provided some

3    citations as well; correct?

4    A.   Yes.

5    Q.   Now, in that report there's 115 citations?

6    A.   Yes.

7    Q.   Now, in our report, of those 115 citations, 113 come from

8    your research; right?

9    A.   Well, those are not necessarily citations outside of my

10   introduction on the front to establish my experience in this

11   area.  So the first thing I did was say I have published 110

12   papers and presentations of book chapters in this area, so of

13   course they have my name in them.

14   Q.   I guess what I'm asking, Dr. Kroll, is:  You didn't use

15   anyone else's findings in support of your conclusions; right?

16   A.   That's incorrect.

17   Q.   Excuse me.  Two of the 115 citations are someone else?

18   A.   Well, I used the ANSI standard, which was very important,

19   and the FDA.  AAMI standard, that's 112.  I did cite to them.

20   So we have the AAMI and ANSI standard, which is important,

21   because that shows the minimum of 7 microcoulombs for a nerve

22   stimulator, which disproves AAMI that that's intolerable pain,

23   of course.  So I also had the IEC at 113 and ANSI at 114.

24   Those are the three critical standards that I relied on to show

25   these are not stun guns.  I only needed those three standards.

1    Q.    Now, again, sir, I do want to talk a little bit about your

2    testing in this case.  And earlier you testified that you

3    purchased seven of the Vipertek 979 devices and three of the

4    Police devices; correct?

5    A.    No.

6    Q.    How many did you order?

7    A.    It was seven total, so four Vipertek and three of the

8    Police.

9    Q.    And you ordered these off Amazon?

10   A.    Yes.

11         MR. DREHER:  Your Honor, I'm going to ask that my

12   case agent hand me this Amazon box.

13   BY MR. DREHER:

14   Q.    Now, sir, did the devices come in something like a box

15   like this?

16   A.    Looks -- that looks like the Amazon logo to me.

17   Q.    And then, when you opened the Amazon box, you received

18   something that looks like this?

19   A.    Correct.

20         THE COURT:  Are you going to mark either of those?

21         MR. DREHER:  Your Honor, I'm going to mark this

22   interior Police box as government's proposed Exhibit 1001.

23   BY MR. DREHER:

24   Q.    And certainly it comes with some sort of packaging;

25   correct?

Kroll - Cross (Dreher)                                          1559

```
 1    A.    I don't recall exactly.  It looks like you're showing us

 2    the packaging.

 3    Q.    Did it come with a charging cord?

 4    A.    Yes.

 5    Q.    In fact, you had to use this to charge it before you

 6    tested it; right?

 7    A.    That or another cord.

 8    Q.    And then it came with the device itself?

 9    A.    I hope so.

10    Q.    And then, again, those instruction sheets that we talked

11    about yesterday?

12    A.    That looks right.

13    Q.    Now, in your testing of this device, you testified

14    yesterday that you, in fact, charged it up before testing it?

15    A.    That's correct.

16    Q.    Now, this is the Police device?

17    A.    That's what you said.

18    Q.    The Police device here?

19          THE COURT:  Well, do you want to show -- let me ask

20    you a question.  Is the -- he's shown you a box that says

21    "Police" on it.  Is that the -- did the box that had -- there

22    are two devices you're talking about here.  One is the

23    Vipertek, and one is the Police device, correct, in our case?

24    Is that right, Dr. Kroll?

25          THE WITNESS:  Yes, Your Honor.
```

```
 1              THE COURT:  And the one that was the Police device,
 2    is that -- did that come in a box like the one he showed you
 3    that said "Police" on it, if you remember?
 4              THE WITNESS:  I -- that sounds right.
 5              MR. DREHER:  Your Honor, the government would move
 6    for the admission of proposed Exhibit 1001, the box and its
 7    contents.
 8              THE COURT:  The box and its contents?
 9              MR. DREHER:  Yes, Your Honor.
10              MR. SMOCK:  No objection.
11              THE COURT:  It will be admitted without objection.
12              MR. DREHER:  And permission to publish to the jury.
13              THE COURT:  Yes.
14    BY MR. DREHER:
15    Q.   So then this is the device that came from Amazon when you
16    ordered the Police device or a similar device?
17    A.   May I see it?
18    Q.   Can you see it from where you're sitting?
19              THE COURT:  Why don't you show it to him.  Go to
20    the -- take -- walk to the witness box.
21    A.   Oh, can you -- can we see the model number on it?  I'm not
22    sure.  They have several models that they humorously label as
23    Police.  What's the number on that?  We got to assume.  We
24    don't know.  I tested three of the so-called Police devices.
25    That looked pretty similar.
```

1    BY MR. DREHER:

2    Q.   Now, Dr. Kroll, just to clarify, you tested three, but two

3    were not functioning; right?

4    A.   No.  I tested three different Police models.  Okay.  For

5    the 916, is that the -- will you just assert that that's a 916

6    to save us a lot of time?

7             MR. DREHER:  May I approach with the box?

8             THE COURT:  Yes.

9    A.   Because there's three different models.

10        Okay.  Yes, sir, that's it.  I tested three of those.

11   BY MR. DREHER:

12   Q.   And yesterday you testified that there's a selector switch

13   on the one side; correct?

14   A.   Yeah.  Yes, that's reasonable, right.

15   Q.   And when it's to the middle, the flashlight turns on?

16   A.   Correct.

17   Q.   And then when it's all the way up, the red light shows up

18   on the side?

19   A.   Correct.

20   Q.   And then the flashlight is off?

21   A.   Correct.

22   Q.   Now, yesterday you also testified that there's no way to

23   activate the flashlight while the switch is all the way up;

24   correct?

25   A.   It varies with different models.  Most of them you cannot

1    do the arcing and flashlight at the same time.

2    Q.    Sir, I'm not asking you about other models.  I'm asking

3    you about this model.

4    A.    Well, I can't recall exactly.  If I said that yesterday, I

5    said that yesterday, but most of them you cannot use the

6    flashlight while they're arcing, but we can find out in two

7    seconds if that's true or not.

8    Q.    What I'm asking you, with the switch pushed all the way

9    towards the prongs, is there a way to turn on the flashlight?

10   A.    I don't recall.

11   Q.    Okay.  And then you also referenced yesterday this button

12   here that causes it to arc?

13   A.    That's correct.

14   Q.    And when you tested this device, you tested the interior

15   prongs but not the exterior prongs?

16   A.    They're all the same metal.  That's all the same voltage.

17   Q.    The same voltage?

18   A.    Right.

19   Q.    Okay.

20   A.    They're the same voltage so they will deliver the same

21   current, same charge.

22   Q.    And then you also tested its sound?

23   A.    That's correct.

24            MR. DREHER:  Now, Your Honor, for the record, at this

25   time I'm going to activate this device.

1          THE COURT:  All right.

2    BY MR. DREHER:

3    Q.   And sir, could you listen for us.  I'm going to ask a

4    question about it.  Okay?

5          Did that sound like the device that you tested for this

6    case?

7    A.   Yes.  They pretty much sound the same.

8    Q.   And that was over 100 decibels?

9    A.   Yes.

10   Q.   And so it remains active as long as this switch and this

11   red light is going on; correct?

12   A.   What do you mean by "active"?

13   Q.   In other words, the number of times I depress this button,

14   it will continue to activate?

15   A.   You mean make the arc?  Is that what you're trying to say?

16          THE COURT:  Are you talking about making the arc or

17   making the sound, if there's a difference, Mr. Dreher.

18          MR. DREHER:  Making the arc.

19   A.   It's -- yeah.  You have to have the switch up, and then

20   you depress the thumb button switch, yes.

21   BY MR. DREHER:

22   Q.   And that can be activated multiple times, can't it?

23   A.   Of course.

24          MR. DREHER:  Your Honor, at this time I'm going to

25   activate the device multiple times.

1    BY MR. DREHER:

2    Q.   And sir, so it's true that this device will activate as

3    many times as I press that button until the battery dies;

4    correct?

5    A.   Or the circuitry dies.  These things are very poor

6    quality.  Like I say, two of the three didn't even function.

7    So you can arc them for a while, but as I think the

8    instructions for a lot of these say, don't arc them for more

9    than a couple seconds, because the circuitry tends to fail.  So

10   the answer is not necessarily.

11          THE COURT:  Let me ask a question just because of

12   what we just observed here.  When you press that button and it

13   emits the light, when he, quote/unquote, activated it, does

14   that always mean that you also get the sound at the same time

15   you get the light?

16          THE WITNESS:  The sound comes from the arcing.  It's

17   the electrical arcs.  There's no speaker in there, Your Honor.

18   The whole sound comes from the arcing.

19          THE COURT:  Okay.  I just wanted to understand, and I

20   hope the jury would understand as well.

21          THE WITNESS:  I'd be happy to apply it to my own leg,

22   if you'd like, so people can see the effects.

23   BY MR. DREHER:

24   Q.   Now, ultimately this was one of the devices that you

25   tested for our case; is that correct?

1   A.   That's correct.

2   Q.   And you mentioned that of the three devices of this type,

3   two of them did not function?

4   A.   That's correct.

5   Q.   Now, the device in my hand, would you be able to tell us

6   whether this was functioning?

7   A.   I heard the arcing, but if you can let me put it on my

8   leg, I can tell you how much the output is, see how strong the

9   sensation is.

10  Q.   Now, you also tested the Vipertek device; correct?

11  A.   That's correct.

12       MR. DREHER:  Your Honor, I'd ask that this be marked,

13  both the box and its contents, as government's proposed

14  Exhibit 1002.

15  BY MR. DREHER:

16  Q.   And so, sir, does this look like the box that you received

17  when you ordered the Vipertek device?

18  A.   Yes.

19       MR. DREHER:  Your Honor, I would move for the

20  admission of 1002.

21       MR. SMOCK:  No objection.

22       THE COURT:  No objection.  It will be admitted.

23  BY MR. DREHER:

24  Q.   And so it's somewhat similar, the box, to 1001.  You open

25  it up, and you can see that the contents has the device.  Is

1    this the device?

2    A.    It looks similar from here.

3    Q.    It also comes with a charging cord?

4    A.    Yes.

5    Q.    The instructions?  We talked about these yesterday.

6    A.    Yes.

7    Q.    And again, this device is similarly packaged; correct?

8    A.    Yes.

9              MR. DREHER:  I'm going to approach the witness, Your

10   Honor.

11   BY MR. DREHER:

12   Q.    Sir, I'm going to ask that you look at this device.  Is

13   this the 979 device?

14   A.    It looks about right.

15   Q.    And so, as you outlined in your report, this is very

16   similar to the Police device; correct?

17   A.    Almost identical except for the charging station, the

18   charging plug.

19   Q.    And, in fact, it has two sets of prongs on the top.

20   A.    Is that a question?

21   Q.    It has two different prongs at the top; correct?

22   A.    That's the way it looks, yes, that's correct.

23   Q.    It also has that same selector switch on the side?

24   A.    Yes.

25   Q.    And when this switch is in the middle, the flashlight

1    activates; right?

2    A.   That's correct.

3    Q.   And then when the switch is all the way towards the

4    prongs, a red activation light is active?

5    A.   That's correct.

6    Q.   Now, when you were testing this device, were you able to

7    have the flashlight activate -- or excuse me.  Were you able to

8    get the flashlight to turn on while that selector switch and

9    red light was on?

10   A.   I don't recall.  Most of them do not allow you to do

11   arcing and the flashlight at the same time.

12   Q.   Sir, my question is:  With this device were you able to

13   turn on the flashlight with the selector switch all the way to

14   the prongs?

15   A.   I don't recall.  I think the answer is no 'cause that's

16   the way it is for most of them.  They're so limited in power,

17   you can't have the arc and the flashlight at the same time, but

18   I can't recall exactly what one -- I tested over 30 units.  I

19   can't recall exactly which ones allowed arcing and flashing at

20   the same time.

21   Q.   And again, to activate the arcing, you press this one

22   button?

23   A.   That's correct.

24        MR. DREHER:  And Your Honor, at this time I'm going

25   to activate it.

1    BY MR. DREHER:

2    Q.    Now, sir, were you able to see the arcing?

3    A.    Yes.

4    Q.    And that was after one press of the button.

5    A.    I only saw one press, one arc, yes.

6    Q.    But this device will actually activate as many times as

7    the button is depressed; correct?

8    A.    No, not necessarily.  They generally -- they break down

9    after -- sometimes after one arc, sometimes after 50.  They're

10   not very reliable.  That's -- again, that's why police don't

11   use them.

12   Q.    After 50?

13   A.    Yeah.

14         MR. DREHER:  Your Honor, at this time I'm going to

15   activate the device multiple times.

16   BY MR. DREHER:

17   Q.    Now, sir, each time I depressed the button, it activated;

18   right?

19   A.    Yes.

20         MR. DREHER:  And then, just for the jury, I'm going

21   to show them I'm turning this off.

22   BY MR. DREHER:

23   Q.    Now, sir, is it your testimony that that can happen 50

24   times in a row?

25   A.    Depends on the unit.  They warn not to activate them for

1   more than a few seconds in the air because the electronics is

2   not very reliable.  Some of these fail right away, and some of

3   them can go longer.

4   Q.   Now, sir, are you able to tell us, aside from the auditory

5   noise that this makes, perhaps there's smell or other sensation

6   you might have after activating this?

7   A.   I'd like to try it on my leg in front of the jury.  That

8   way it would save a lot of time.

9        THE COURT:  He's asking the questions, Dr. Kroll.

10  BY MR. DREHER:

11  Q.   Is there another way to experience the arc that we see

12  from this, in other words, smell or -- I don't want to say

13  taste, but is there another way to perceive what's happening

14  when this is activated?

15  A.   In a closed room you could smell ozone from the arcing

16  like you can get from an electric clothes dryer sometimes.

17  Q.   So you can also smell it?

18  A.   In a closed room after a long time.

19  Q.   Now, sir, I know you're giddy to get this on your thigh,

20  but I also want to ask:  Are you aware of human anatomy at all

21  in your studies?

22  A.   I don't call myself out as an expert on human anatomy.  I

23  understand enough of the relevant anatomy to tell you where

24  electric current flows in the body, different areas of skin

25  through the nerves and the muscles, if that's helpful.

1    Q.   Right.  It's the nerves that detect pain; right?

2    A.   That's correct.

3    Q.   And there are some areas of the body that have nerves

4    closer to the skin than your thigh; right?

5    A.   Well, fingertips have a lot of nerves right there, so you

6    have a fine sense of touch, of course.

7    Q.   Your face?

8    A.   Not so much.  The tongue is the most sensitive part to

9    electric.

10   Q.   The back of your neck?

11   A.   Is that a question?

12   Q.   Does the back of your neck have nerve endings closer than

13   your thigh?

14   A.   I don't know.  The most sensitive spot is the tongue.

15   That's why if you put a 9-volt battery on your tongue, you can

16   feel it.

17   Q.   Do you know if the groin area has more nerve endings than

18   your thigh?

19   A.   You mean nerves per square centimeter or total number of

20   nerves?  What do you mean specifically?

21   Q.   Would you experience the same level of pain with these

22   devices placed on your thigh as you would in your eye?

23   A.   I don't know if that's been tried.  I'd be happy to try it

24   on my neck and thigh if that matters.

25   Q.   You don't know if that's been tried?

1   A.   We -- the studies that looked at pain sensation from

2   electric currents have focused on the fingertips and the

3   tongue.  They're the most sensitive.  And so I'm not sure if we

4   have other comparisons between other parts of the body.  I'm

5   not sure if that's been studied and published.

6   Q.   Now, sir, I'd like to draw your attention back to the

7   report that you authored on December 5th of 2022.  This is the

8   report involving Officer Mike Fanone.

9        And if I heard you correctly, you said there hasn't been a

10  lot of studies regarding whether or not these devices cause

11  more pain in the face or eye area; is that correct?

12  A.   That's not exactly what I said.  What I said is that

13  studies in general of electric shock pain, which go back to the

14  '40s, have not focused on the face and neck.  They mostly

15  focused on the fingertips, because we know they're the most

16  sensitive, and the tongue, because that's very sensitive to

17  electric shock.

18  Q.   Now, I do want to just shift gears quickly back to this

19  report that you issued in March of 2022.

20            THE COURT:  So that's not the case involving Officer

21  Fanone.  That's the other case.

22            MR. DREHER:  Correct, Your Honor.

23  BY MR. DREHER:

24  Q.   And on page 14 you opined, "Since these units put out

25  almost no power or charge, they could be used safely right

1    around the eye."

2         Did I read that correctly?

3    A.    Which one is that?

4    Q.    Five.

5    A.    Five.  Thank you.  Yes.

6    Q.    So what we just saw, 1001 and 1002, in your opinion, can

7    be safely used around an eye?

8    A.    Based on the FDA standards for nerve stimulations, the

9    answer is yes.

10   Q.    Now, let me just clarify.  You're not talking about this

11   object coming directly into the eye; right?

12   A.    That would be pretty hard to do because the eye is set

13   back inside the orbital bones.  Can you be more specific?

14   Q.    In other words, you're not talking about it just being

15   punched into somebody's eye?

16   A.    I said around the eye, because we know that through

17   electrical stimulation around the --

18   Q.    That's what I'm asking, sir.  Are you talking about the

19   electricity or this device being punched into somebody's eye?

20   A.    I'm talking about the electricity.

21   Q.    And certainly you're not talking about perhaps the

22   scenario that that individual --

23   A.    Excuse me.  I wasn't done with my question -- my answer.

24   Q.    Oh, I apologize.  Go right ahead.

25   A.    Anything sharp poked in the eye is, of course, dangerous;

1     so it would be the electricity.

2             THE COURT:  Well, I think the distinction -- I think

3     that's the distinction Mr. Dreher's trying to make.  Anything

4     sharp, if punched directly into the eye -- a ballpoint pen, for

5     example -- could cause injury.

6             THE WITNESS:  Yes, Your Honor.

7             THE COURT:  But you're not talking about the use of

8     this item or anything else to do that kind of a hitting,

9     striking, punching into the eye.  You're talking about

10    electricity and electrical stimulation; is that right?

11            THE WITNESS:  Right, and that's based on the FDA

12    limits.

13    BY MR. DREHER:

14    Q.   And so you're not talking about the scenario that the

15    target of this device is facing; correct?

16    A.   I'm not sure I understand the question.

17    Q.   The environment with which the target of this device is

18    experiencing at the time.

19    A.   The target is the ears because they make noise to scare

20    people, so I'm thinking of target as a whole person, so I'm not

21    sure I understand your question.

22    Q.   Now, in all your research do -- the person these devices

23    are being activated against, are they in a clinical setting?

24    A.   There is no research on these devices nor shall there ever

25    be, because they put out not even a seventh of what the FDA

1    requires as a minimum for a nerve stimulator, so no reputable

2    teaching hospital would ever do a study.  It would be simply

3    silly.  They can measure the output.  They see it's not even

4    close to what you need for a minimum for a nerve stimulator,

5    and they would stop.

6    Q.   And so this level, this 7 level, was that confirmed in a

7    clinical setting?

8    A.   The FDA has a minimum level of 7 microcoulombs for a nerve

9    stimulator, and that's based on numerous studies which I can't

10   recite right now, numerous human studies that show that's a

11   bare minimum to -- for -- to affect your nerves.  I can't

12   recite exactly what those studies are right now, but I'm

13   certain based on numerous ones.

14   Q.   Now, those studies were in a clinical setting, correct,

15   sir?

16   A.   That would be the presumption because you are testing

17   human volunteers.  When you say clinical study, I assume you're

18   referring to -- well, "clinical" in testing just means it's on

19   humans.  So the answer is yes, those would be considered

20   clinical studies, whatever AAMI and ANSI cited or anyone else,

21   standards for the FDA.

22   Q.   Now, sir, you're a co-editor to a book titled *Atlas of*

23   *Conducted Electrical Weapon Wounds and Forensic Analysis*;

24   correct?

25   A.   That's correct.

1    Q.    And that's published by Springer?

2    A.    That's correct.

3    Q.    And certainly you would agree that this is a reliable

4    source in your field; correct?

5    A.    I think it's reliable.  Those things always have some

6    obsolescence in them, which is why we do new editions, but it

7    was certainly very reliable at the time we wrote it.

8    Q.    Certainly no errors on the microcoulomb measurements in

9    this source?

10   A.    I hope not, because I wrote the chapter on the physics of

11   electrical injury for that book, so I would hope you wouldn't

12   find any mistakes in there, but it happens sometimes.

13            MR. DREHER:  Now, Your Honor, I'm going to approach

14   opposing counsel before I approach the witness.

15        And then, Your Honor, now I'm going to approach the

16   witness with this book open at the preface page Roman numeral

17   viii and ix.

18            THE WITNESS:  Thank you.

19   BY MR. DREHER:

20   Q.    Now, sir, if you would please review those two pages and

21   then look up at me when you're ready to proceed.

22   A.    Ready.

23   Q.    Ready?  Now, sir, are you able to tell me if there was a

24   clinical setting when testing these types of devices on humans?

25   A.    Any testing of humans is considered a clinical study as

1    opposed to an animal study or an epidemiological study.

2    Q.   So in other words, the target of this device is hooked up

3    to medical equipment to monitor its reaction; right?

4    A.   That would depend on the study.

5    Q.   The photographs within your book outline that the target

6    of the device is laying down; right?

7    A.   I think the -- you showed me pictures of people being

8    tested, and they did have EKGs on them so that's -- if that's

9    helpful.

10   Q.   Now, in these studies that you're familiar with, at any

11   time has somebody been exerted physically for about an hour and

12   a half before these devices being placed on their body?

13   A.   Now, we were earlier talking about the clinical studies

14   that led to the FDA minimum of 7 microcoulombs.  Are we done

15   with that completely, so we're just focusing on the study cited

16   in our book?

17   Q.   My question is asking whether or not individuals, as part

18   of the studies that you're talking about, happened in a

19   clinical setting.

20   A.   You're not helping clarify your question.  Are you talking

21   about the studies for nerve stimulators in general or muscle

22   stimulators or specifically the Taser-brand muscle stimulators?

23   Q.   What was used to determine the 7 level of safe stun gun

24   use?

25   A.   Without the ANSI standard -- ANSI -- AAMI standard in

Kroll - Cross (Dreher)                                    1577

1   front of me, I don't have the citations handy, but muscle

2   stimulation -- at least the first animal study of muscle

3   stimulation was published in 1901, so we have 122 years on

4   that.

5           THE COURT:  Do you know about how much longer you're

6   going to be?

7           MR. DREHER:  I don't, Your Honor.

8           THE COURT:  The only reason I'm concerned, of course,

9   is that we do know the cafeteria closes at 2 o'clock, and so

10  you tell us.  If you know it's going to be 10 or 15 minutes,

11  that's one thing; but if it's not, you need to give us a

12  prognosis, a good breaking time.

13          MR. DREHER:  Your Honor, I am generally opposed to

14  ever arguing against lunch.

15          THE COURT:  Well, I am in favor of arguing against

16  lunch if you told us you'd only be ten more minutes.

17          MR. DREHER:  I believe it would be longer than ten

18  minutes.

19          THE COURT:  All right.  So it's five after 1:00.

20      Mr. Smock, do you have anything you want to discuss at the

21  bench, or shall I just set a time for our return?

22          MR. SMOCK:  Your Honor, without appearing to minimize

23  the importance of lunch...

24          THE COURT:  Come to a microphone that I can hear you

25  from.

1        MR. SMOCK:  I wonder whether lunch could be maybe

2   45 minutes or so --

3        THE COURT:  Fine.

4        MR. SMOCK:  -- if it needs to be.

5        THE COURT:  We did that the other day, and we're

6   trying to finish with Dr. Kroll so he can leave town.  It is

7   1:05.  Forty-five minutes would be ten to 2:00, so let's come

8   back at ten to 2:00.  And we're going to finish with Dr. Kroll

9   before the end of the day, but we may have time for another

10  witness.  We will conclude today no later than 4:45, and we

11  will conclude tomorrow around 4:30.  Maybe it could be a few

12  minutes beyond that.  That's today and tomorrow.  I'll talk to

13  you about next week later today.

14       (Jury out at 1:07 p.m.)

15       THE COURT:  So I guess everybody has to do what they

16  have to do, but let's try to be as efficient as we can.  We'd

17  like today for Dr. Kroll to be able to make his plane, and I

18  think the jury is happy when we finish with a witness and move

19  on to another one.  So I'll see you ten to 2:00.

20       (Recess taken at 1:08 p.m.)

21       (At 1:56 p.m. on March 9, 2023; with counsel for the

22  parties and the defendant present; WITH the jury:)

23       DR. MARK KROLL, PREVIOUSLY SWORN, RESUMED THE STAND

24       THE COURT:  Good afternoon, all.  It looks like

25  they're ready.

1        Go ahead, Mr. Dreher.

2                   CROSS-EXAMINATION RESUMED

3    BY MR. DREHER:

4    Q.   Now, sir, when we left off, we were talking about the

5    settings with which human studies have happened -- have

6    occurred with conducted energy weapons.  Do you remember that?

7    A.   Thank you for narrowing it down.  So yes, I do recall

8    that.

9    Q.   Now, isn't it true that in your tests for this case, you

10   did not test this device on somebody who had been physically

11   exerting themselves for hours?

12   A.   There was no human testing for my paper or this case.

13   That was just testing to the standards, which is -- which is

14   why we have standards, by the way, so you don't have to do

15   human testing every time someone comes up with a new muscle

16   stimulator.

17   Q.   So you didn't test with somebody who was in the middle of

18   a crowd and couldn't move on their own?

19   A.   There's no human testing here.  That's why we have

20   standards.  It's based on hundreds of tests that have come

21   before us.  We know how much electricity it takes to get

22   different effects, so we test to those standards.

23   Q.   So you didn't test on anyone whose helmet was being

24   pulled?

25   A.   Like I said, I didn't test this on any human being.

1    That's why standards are used.

2    Q.   And you also didn't test this on an individual whose vest

3    was being pulled against their neck?

4    A.   Same answer.

5    Q.   And you didn't test this on an individual who had been

6    receiving punches and kicks?

7    A.   Same.

8    Q.   And you didn't test this device in a setting that would

9    mirror what effects was occurring on January 6th of 2021;

10   correct?

11   A.   The human body is the human body.  The studies have been

12   done on humans, and that's why we can use standards to go back

13   and get good answers about predicting the effects.

14   Q.   Now, certainly this courtroom does not provide the same

15   scenario as on January 6; correct?

16   A.   As far as what I was asked to opine on, absolutely.

17   That's why I volunteered to take a shock with that thing.

18   Technically, it wouldn't be a shock 'cause it's not painful,

19   but the human body's the human body.

20   Q.   Now, just to clarify, earlier you said you would take one

21   on the thigh?

22   A.   Yes, or the lower leg so I wouldn't have to pull my pants

23   up that far.

24   Q.   Now, ultimately in this report that you provided in March

25   of 2022, you rendered an opinion that a device with a similar

1    output as this Vipertek, Exhibit 1002, would be safe for use

2    around an eye?

3    A.   The device that was -- we were never able to identify that

4    device.  I conservatively said it was a sparkler flashlight,

5    but we don't see obvious electrodes.  It could have been a TV

6    remote control for all we know.

7    Q.   Now I'm referring to the March report.  This is the one

8    with the Mace compact.  Do you recall that test that you

9    performed?

10   A.   I apologize.  You're right.  That's the Mace compact

11   device.  I confused it with the December 2022 report.  Forgive

12   me.

13   Q.   And that Mace compact stun gun was a similar output as

14   this Vipertek device as well; correct?

15   A.   Similar.

16   Q.   And you opined that that Mace stun gun would be safe for

17   use around someone's eye.

18   A.   First of all, it's legally not a stun gun, but if we're

19   talking about the Mace sparkler flashlight, the electrical

20   output would be safe, and we know that because when people do

21   surgery around the eye, they use electrocauterization, which

22   puts out a lot more power, to heal up the surgery scratches.

23   So the answer is yes, the electrical output would be safe to

24   use around the eye.

25   Q.   So then this device you would safely use around your eye?

1    A.    I thought we straightened that out before about the

2    difference between electrical output and the sharp electrodes.

3    Q.    Sir, what I'm asking is:  Would you be willing in this

4    courtroom to activate this device in your eye multiple times

5    based on its electrical output?

6    A.    That's impossible because the electrodes don't get close

7    enough and -- so I would use that output.  That output can be

8    used, yes, for nerve stimulation, 'cause we've done studies to

9    look at rapid eye movement.  We put sensors around the eyes,

10   and you can do stimulation around the eyes.  It would involve

11   much higher outputs.  I'm not comfortable putting any sharp

12   metal near my eyes.

13   Q.    So just for the jury, you're not comfortable putting this

14   device around your eye?

15   A.    Well, let's try it.  Let's see how close I feel

16   comfortable.  Why don't you hand it to me.

17              MR. DREHER:  May I approach, Your Honor?

18              THE COURT:  If there's no objection, yes.

19   BY MR. DREHER:

20   Q.    Now, sir, do you want me to turn this on, or are you going

21   to?

22   A.    Oh, I'm happy to operate it.

23              THE COURT:  And which device is this, Dr. Kroll?

24              THE WITNESS:  This is the Vipertek.  I'm not going to

25   give myself a shock but, I mean, you know, you could do this.

1     You can get a charge up there.  I'd rather not get a scratch.

2     I'd rather do it to my leg.  I don't want to get a scratch on

3     my face.

4     BY MR. DREHER:

5     Q.   So you're not comfortable doing it near your eye?

6     A.   No.

7              MR. DREHER:  Okay.  If I may approach, Your Honor?

8              THE COURT:  Yes.

9     BY MR. DREHER:

10    Q.   And now, certainly, as we've already mentioned, the

11    environment of this courtroom is not the same as on

12    January 6th; correct?

13    A.   In regards to what?

14    Q.   Well, in preparing your report for this case, were you

15    provided with video footage of anything other than

16    Mr. GossJankowski holding a device such as this?

17    A.   Yes.  I saw a lot of video footage.

18    Q.   Did you see any video footage of Mr. GossJankowski holding

19    a device like this and arcing it towards officers?

20    A.   I saw him arcing it.  I wasn't clear that he was arcing it

21    towards anybody.  He was holding it up in the air and arcing

22    it.

23    Q.   In other words, of the video that you observed, was he

24    inside of a tunnel while activating this?

25    A.   I believe so.

1   Q.   And did you see video of Mr. GossJankowski approaching an

2   officer outside of this tunnel with this device or a similar

3   device?

4   A.   Yes.

5   Q.   And you observed the video of Mr. GossJankowski pulling an

6   officer's helmet to get this device closer to him?

7            MR. SMOCK:  Objection.

8            THE COURT:  Objection is sustained.  There are a lot

9   of facts and assumptions built into the way you phrased the

10  question.

11           MR. DREHER:  I apologize, Your Honor.

12  BY MR. DREHER:

13  Q.   In preparation for your testimony today, did you observe

14  video taken from outside of the Capitol Tunnel?

15  A.   Yes.

16  Q.   Now, sir, although -- although in this case specifically

17  we've spoken a lot about electrical devices, there are other

18  areas with which you've opined on police tactics; correct?

19  A.   No.

20  Q.   Well, sir, in your report that you provided for this case,

21  one of those citations that we mentioned earlier -- this is

22  citation 107 -- was an article with you as its lead researcher

23  titled Prolonging the Prone Position published in *The American*

24  *Journal of Forensic Medical Pathology* in March of 2020.

25  A.   That was a reply to a letter to the editor.  It's not an

1    article.

2    Q.   That's not an article?

3    A.   Correct.

4    Q.   So you relied upon a reply to a letter to the editor as

5    support for your conclusions on this case?

6    A.   No.

7    Q.   Why was it cited?

8    A.   As I explained earlier, I just listed the number of papers

9    that I had regarding use of force and electrical weapons.

10   Q.   Now, that particular reply didn't involve any electrical

11   weapons, did it?

12   A.   Correct.

13   Q.   In fact, it just related to the weight that could be

14   placed upon a subject in the prone position; correct?

15   A.   That's correct.

16   Q.   And we're talking about an officer's weight on a subject

17   in the prone position; correct?

18   A.   Not necessarily.  Could be anybody's weight.

19   Q.   Well, ultimately you concluded that putting your weight on

20   someone being held in the prone position could not injure that

21   person; right?

22   A.   Where did I conclude that?  Can I see it?

23   Q.   So I apologize.  My colleague just informed me it's the

24   Applied Force During Prone Restraint:  Is Officer Weight a

25   Factor? is the title of the article in *The American Journal of*

1   *Forensic Pathology*.  Does that change your answer before in

2   terms of whether or not this was a paper that you researched?

3   A.    This is a paper that I wrote based on a study that I did

4   with some colleagues.

5   Q.    And in that study that you did, you were measuring the

6   weight that could be placed on a prone subject's back and

7   measured whether or not injury could occur; right?

8   A.    No.

9   Q.    What was the purpose of that study?

10  A.    Nobody had ever measured how much weight an officer could

11  apply with their knees, and so we did it.

12  Q.    And when did this study occur?

13  A.    2018.

14  Q.    And this was in Minnesota?

15  A.    Yes.

16  Q.    And what was your conclusions from that study?

17  A.    Depending upon how much the officer weighed, whether male

18  or female, whether they applied one knee or two knees or which

19  type of single-knee application they used, you had different

20  weights.

21  Q.    Now, you concluded there's no correlation between the

22  weight of the officer on the back of a subject and injury;

23  correct?

24  A.    We did not measure injury.  These weights were measured on

25  a dummy on thin electronic scales.

1   Q.   Were you attempting to measure whether or not this dummy

2   would suffer from asphyxia?

3   A.   Like I said before, we are not measuring injury.  It was

4   just a dummy.  We measured the weight because people had

5   debated how much weight you could place with the knee and no

6   one had ever measured it, so it was a gap in the scientific

7   literature, and my colleagues and I decided to fill it with

8   this very simple test.

9   Q.   Now, this very simple test that you performed, were you

10  able to correlate weight of an officer and whether or not this

11  dummy would suffer from asphyxia?

12  A.   Same answer.

13  Q.   So I understand you said no injury, but what I'm

14  referencing now is asphyxia.  There was no correlation between

15  the weight of the officer and whether or not there was

16  asphyxia?

17  A.   Like I say, it was a dummy.  We couldn't ask him.  We were

18  just measuring the weight.

19  Q.   Now, this involved particular police tactics; correct?

20  A.   Well, to the extent that officers use knee force in a

21  prone position to handcuff people, I guess it imply -- it

22  involves tactics.  We were not commenting on tactics.  That's

23  not something that I consider myself an expert in.

24  Q.   Now, certainly there were no electrodes or electricity at

25  all in this study; correct?

1    A.   Outside of the electronic scales, no.

2    Q.   Okay.  And ultimately your team concluded that there was

3    not support for the hypothesis of restraint asphyxia.  Does

4    that sound about right?

5    A.   Yes, based on numerous other studies that measured how

6    much weight it took to get to asphyxia.  We just determined the

7    pounds of weight.

8    Q.   Now, if you could please remind the jury, who is the

9    number one customer for the Taser-brand stun guns from Axon?

10   A.   Law enforcement, sheriffs, police departments, military

11   police all over the world.

12   Q.   So the number of units sold by Axon goes mainly to police

13   agencies; correct?

14   A.   Not to be too technical, it's highway patrol, sheriffs,

15   military police, so I don't know.  So I imagine police total is

16   maybe half, specifically.

17   Q.   Half of Axon's profits come from police agencies, don't

18   they?

19   A.   I'm not sure.  They don't break down their profits by

20   customer.

21   Q.   This is a company that you have $2 million in stock;

22   right?

23   A.   Not that much.  It's close to that, probably.

24   Q.   And was paid $350,000 in 2021?

25   A.   Yes.

1    Q.   And you serve on the board of their directors?

2    A.   That's correct.

3    Q.   And their committee of science?

4    A.   Just the same answer as yesterday, yes.

5    Q.   And their committee on, what was it, risk, risk

6    mitigation?

7    A.   Same answer as yesterday.

8             MR. DREHER:  Okay.  If I may have just a moment, Your

9    Honor.

10            THE COURT:  Yes.

11            MR. DREHER:  Your Honor, I have no further questions.

12            THE COURT:  All right.  Mr. Smock.

13                         REDIRECT EXAMINATION

14   BY MR. SMOCK:

15   Q.   Hello again, Dr. Kroll.

16   A.   Good afternoon.

17   Q.   Mr. Dreher just brought up Axon again, and I just want to

18   ask you about that.  Does Axon tell you what to do?

19   A.   No.  They don't know I'm here.

20   Q.   And in your work do you publish only positive information

21   about Axon products?

22   A.   No.  No one has published more negative things, its bad

23   side effects, about their weapons than I have.

24   Q.   And did Axon or anyone at that company suggest that you

25   get involved in this case?

1   A.   No.  In fact, they'd rather I didn't.

2   Q.   Why is that?

3   A.   Because the federal government's a big customer of theirs

4   and they don't like me going against them.  Their employees are

5   forbidden to do expert testimony against customers.

6   Q.   Now, in its cross-examination Mr. Dreher spent much of his

7   time going over reports you wrote in different cases, so I want

8   to just clarify a few things about those reports now here.  You

9   in -- there were two reports other than Mr. GossJankowski's

10  case that you were involved in relating to incidents from

11  January 6th.  Am I right?

12  A.   That's correct.

13  Q.   And those cases all involved electronic devices that

14  marketed themselves as stun guns.  Am I right?

15  A.   Yes, in two cases.  The middle case, we're not sure really

16  what it was.  I assume, conservatively, that it was.

17  Q.   Okay.  And based on your research and evaluations in those

18  cases, you've said that you reached a conclusion that these

19  items were what you referred to as sparkler flashlights and

20  that they were all bark and no bite; is that correct?

21  A.   That's correct.

22  Q.   Does the fact that -- why did you reach the same

23  conclusion in all three cases?

24  A.   Well, certainly in two of those three cases, I knew what

25  the units were, and I was able to measure them.  In that middle

1    case there was an allegation that the thing was a stun gun.   I

2    looked at it and assumed conservatively that it was since I

3    know what the output of these Amazon sparklers is, but the more

4    I look at that picture, I'm starting to think maybe it was a TV

5    controller.  We just don't know what it was.

6    Q.    So I'll talk to you a little bit more about that in a

7    minute.  I want to talk first briefly about what Mr. Dreher has

8    referred to as the March report.  And again, to be clear,

9    that's a report you wrote about a different case; right?

10   A.    Correct.

11   Q.    But because questions were asked about it, I just want to

12   clarify a few things.  Did you examine the device that was

13   possessed by the defendant in that case?

14   A.    I examined that model, yes.

15   Q.    And you performed tests on it?

16   A.    Yes.

17   Q.    And so --

18              THE COURT:  So you examined that model?

19              MR. SMOCK:  So I'll clarify.

20              THE COURT:  Okay.  I'm not sure that was the intent

21   of the question, but maybe I'm wrong.

22              MR. SMOCK:  And I can clarify the question.

23              THE COURT:  Yeah.

24   BY MR. SMOCK:

25   Q.    You determined the type of device that was?

1    A.    Yes.

2    Q.    And did you perform testing on models of that device?

3    A.    Yes, two of them.

4    Q.    Thank you.  Now, what did you determine about the power of

5    that device?

6    A.    That its raw charge was about two-thirds of a

7    microcoulomb.

8    Q.    Okay.  Now, are you aware whether the prosecution in that

9    case hired a person to use what they referred to as their

10   expert?

11           MR. DREHER:  Objection, Your Honor.  I'm not sure

12   that's relevant or inside the scope of cross-examination.

13           THE COURT:  Sustained.

14           MR. SMOCK:  Your Honor, can we approach for a moment?

15           THE COURT:  Yes.

16        (At sidebar)

17           THE COURT:  What's the relevance?

18           MR. SMOCK:  Yes.  The government has suggested that

19   he incorrectly determined that this device and the device in

20   the other case was low powered.  In both of the other cases

21   that they've gone over, the government had experts who agreed

22   with Dr. Kroll that the device was a low-power device, you

23   know, and so the point is they're suggesting through bringing

24   up these other reports that he was wrong in his determination

25   about whether these devices are powerful and can incapacitate a

1    person.

2       Their own experts in both of those cases agreed with

3    Dr. Kroll, and unless I can tell the jury that and get him to

4    talk about his knowledge of that, which he knows because he

5    worked on those cases, they're left with the impression that

6    somehow Dr. Kroll was wrong.

7             MR. DREHER:  Your Honor, I would argue Mr. Smock is

8    cutting the hair very thin here, specifically because on

9    cross-examination the weapon from March was actually compared

10   to this weapon as the --

11            THE COURT:  Which weapon?

12            MR. DREHER:  The weapon in our case as the same power

13   output.  There was never any implication that the weapon in the

14   March case was somehow underpowered or anything along those

15   lines.  Now, even if the experts in those prior cases made the

16   same conclusion as to the level of power, those experts still

17   concluded that those were deadly or dangerous weapons, so it's

18   not necessarily the power that --

19            THE COURT:  Well, you've persuaded me.  We're going

20   to have a mini trial about what happened in another case.  Now,

21   if you want to call the experts from the other case, call them.

22            MR. SMOCK:  They've brought all these things up and

23   so --

24            THE COURT:  They did.

25            MR. SMOCK:  -- I need to ask this person about my --

 1          THE COURT:  You cannot ask about what a witness --

 2    another witness's report said that's later modified.  I thought

 3    there was a plea in the case, but you said --

 4          MR. DREHER:  It's my understanding both of the prior

 5    cases pled, Your Honor.

 6          THE COURT:  Did you just say the expert testified or

 7    that there were other conclusions in his report?

 8          MR. DREHER:  The other conclusions were that these

 9    were still deadly or dangerous weapons, the competing experts.

10          THE COURT:  There was another thing I suppose we

11    could do is he can ask him about things in the March report,

12    and then you can come back and say, yes, but they also

13    concluded it was deadly.  I mean, if you want to do that, I

14    mean, I suppose we can do that.  I just don't want to get into

15    a fight among experts, two of whom are not here to say what

16    they really meant.

17          MR. SMOCK:  Okay.  So if I can ask a question about

18    that, I may ask him some follow-up.

19          MS. ROCHLIN:  It's also hearsay.  It's getting

20    collateral.

21          THE COURT:  It is hearsay, actually.  I think I agree

22    with that.  I mean, basically what was -- I think basically

23    what was happening before is Mr. Dreher was asking Kroll about

24    his own conclusions and his own reports and his own writing,

25    and now you want to ask about -- you're either going to have to

1    show him the reports from the other experts -- and why isn't

2    that hearsay?

3              MR. SMOCK:  Well, I mean, he's an expert, and he can

4    rely on hearsay.

5              MS. ROCHLIN:  But he's not --

6              THE COURT:  But he's not relying on it.  You're

7    trying to impeach him with hearsay.

8         Okay.  I agree with the government.  Objection is

9    sustained.  We're not going to have a trial within a trial.

10   We're not going to have a fight among experts who are not here.

11   We're not going to introduce or even show him reports from --

12   that are not his own reports.  The purpose of the cross was to

13   try to impeach him with his own words and his own conclusions.

14        And the other question is I thought we already -- I

15   thought I've already ruled that I wouldn't let an expert say it

16   was a deadly or dangerous weapon, so if these other reports you

17   want to rely on -- the parts you want to rely on are not only

18   experts who are not here and witnesses who can't be

19   cross-examined, hearsay evidence, also the part you want to

20   rely on is the part that I've already excluded in this case at

21   your request.

22             MR. SMOCK:  There -- I accept the Court's ruling.

23             THE COURT:  Well, that's sustained.

24        Don't say you accept it.  Don't say you accept the ruling.

25   Don't say you accept the ruling, because you may want to

1    argue -- make that argument to the Court of Appeals.  You're

2    not going to argue further.

3             MR. SMOCK:  Correct.  I object to the Court's ruling.

4        (In open court)

5             THE COURT:  All right.  I said I sustained the

6    objection, and I do continue to sustain the objection.

7        So move on, Mr. Smock, please.

8    BY MR. SMOCK:

9    Q.   Dr. Kroll, you were asked with respect to that report

10   about differences in measurements that you took of that device,

11   which I think was a Mace device, between the report and the

12   subsequent article that you wrote, and I think it was a

13   difference of .3 or .7 or something like that.  Am I right?

14   A.   Yes.

15   Q.   Is that difference significant in determining whether this

16   device could cause injury or death?

17   A.   No.

18   Q.   Mr. Dreher also talked about the fact that in the report

19   from March, you included a number of different measurements

20   with respect to the device that you did not include in the

21   report related to my client, Mr. GossJankowski.  Is it

22   necessary to know each of the measurements that you included in

23   the other report to determine whether this device is capable of

24   causing death or serious bodily injury?

25   A.   No.

1    Q.    Why not?

2    A.    Because the standards are basically written around

3    microcoulombs, and even in that early report from last March,

4    my findings all cited to microcoulombs.  I just put in a lot of

5    other measurements, frankly, a lot of work that I didn't feel

6    like duplicating because they weren't relevant.  They weren't

7    necessary.

8    Q.    Did you also, in the article that you subsequently wrote,

9    provide additional data with respect to the Vipertek and the

10   Police 916?

11   A.    I did.

12   Q.    Did the additional data and measurements that you provided

13   in that article change your opinion about whether or not these

14   devices are capable of causing death or serious bodily injury?

15   A.    No.

16   Q.    Now, the government also devoted a great deal of time to a

17   report that you wrote in December of last year, again about a

18   different case, this one involving Officer Fanone.  Can you

19   tell the jury what questions you were asked to address in your

20   work on that separate case.

21   A.    Certainly.  I was asked to opine whether or not that

22   device used in that incident was a stun --

23            THE COURT:  Do me a favor.  Talk a little slower into

24   the microphone.

25            THE WITNESS:  Thank you, Your Honor.

Kroll - Redirect (Smock)                                           1598

1    A.    Was the weapon a Taser or what the device was.  Was it a

2    Taser, was it a stun gun?  Could it have caused any of the

3    scratches on the back of Officer Fanone's neck?  Could it have

4    weakened him?  Could it have immobilized him?  Could it have

5    caused him to lose consciousness?

6    BY MR. SMOCK:

7    Q.    So Dr. Kroll, just as an initial matter, in this report or

8    as you sit here on the stand, you're not suggesting that

9    Officer Fanone didn't go through a horrible experience on that

10   day, are you?

11   A.    No.  It sounds like he did.

12   Q.    And so was the focus of this report strictly on whether an

13   electrical device caused particular problems for him?

14   A.    That's correct.

15   Q.    So I want to talk about what you relied on in reaching

16   conclusions.  Did you watch video of what happened in that

17   case?

18   A.    Yes.

19   Q.    Did you see photographs of the device?

20   A.    Well, all we see is the top end of it which is -- well,

21   we're not even sure it was a stun gun, for that matter.

22   Q.    So I'll get to that.  Did you review interviews of

23   Mr. Fanone?

24   A.    Yes.

25   Q.    And photographs taken of Officer Fanone after the

1    incident?

2    A.    Yes.

3    Q.    Did you review medical records from treatment of Officer

4    Fanone?

5    A.    Yes.

6    Q.    All right.  Is there anything else that I've missed that

7    you relied on?

8    A.    Again, a huge internet image search trying to find a stun

9    gun that had the end markings of that thing held in the hand,

10   without luck.

11   Q.    Okay.  So the government again talked to you about this

12   question of pain.  Now, in your research have you observed and

13   talked to people who have had a low-powered sparkler device

14   applied to them?

15   A.    Yes.

16   Q.    And what did you learn?

17   A.    They can feel it, but they don't find it painful.  After

18   some long period of time, they find it annoying, but I

19   videotaped them.  They calmly describe it as I can feel it, I

20   can feel it.  One guy described it as -- at the end of a long

21   application, he described it as kind of a tattooing sensation.

22   Q.    And based on your research what causes people to

23   experience pain when they have an electronic device applied to

24   them depending on whether it's low power or high power?

25   A.    The body has two different types of pain receptors.  We

1    have the one for sharp pain, the myelinated.  That means it's

2    an insulated nerve sheath.  A-delta neurons, they pick up sharp

3    pain.  And then we have the unmyelinated C fibers, which pick

4    up more of a dull pain like a tummy ache or an ache, and these

5    can be electrically stimulated.

6    Q.   Now, did you take the position in the case from December

7    of 2022, the report you wrote in December 2022, that Officer

8    Fanone was somehow lying when he said he experienced any pain?

9    A.   No, of course not.

10   Q.   Now I want to talk for a minute about what was referred to

11   as an NIJ report, and you recall that Mr. Dreher asked you

12   about a sentence in that report in which --

13              THE COURT:  This is what was referred to as the

14   Department of Justice report?

15              MR. SMOCK:  Well, I think it would make sense for me

16   to ask first for Dr. Kroll to sort of give a little bit of a

17   clearer explanation of what that document is.

18   A.   The Taser-brand electrical weapons became very popular in

19   2003 and 2004, and the Department of Justice convened a panel

20   to look at all of the existing studies that were done of these

21   and invited experts to come and speak.  I was honored to come

22   and speak and give a presentation, and then they compiled these

23   into a report.  The big issue was could people be electrocuted

24   by that device, because obviously they're used in dangerous

25   situations, and when people fight with police, sometimes they

1    die.  So the question is was it the drugs, was it their bad

2    heart, was it the prolonged struggle, could they have been

3    electrocuted, and then they issued their report.

4    BY MR. SMOCK:

5    Q.   Now, is that report somehow viewed as an authoritative

6    treatise in the field of bioelectricity about how many

7    microcoulombs cause pain in a human being?

8    A.   No.

9    Q.   Now, I noticed when Mr. Dreher asked you about it that

10   before he even got to it, you referred to the existence of an

11   error.  Can you tell a little bit about how you know about that

12   error, which I think Mr. Dreher referred to it as indicating

13   that 1.0 microcoulombs could cause extreme pain or something of

14   that nature.

15   A.   Yes.  My friend and colleague, Pat Reilly, wrote one of

16   the textbooks on bioelectricity called *Applied Bioelectricity,*

17   and he's a very respected colleague and an expert.  And in the

18   '60s, when we were getting ready to put people up into space,

19   in the Gemini and Apollo program, one of the big concerns was

20   static shock, because it's obviously very dry in the space

21   capsules, so NASA paid him through Jet Propulsion Laboratories

22   to do a number of studies of static shocks and what the

23   sensation would be, because you wouldn't want some astronaut to

24   grab a control and get a static shock and be distracted.

25        So he did a number of very interesting studies of the

1    sensation from static shock on the fingertips.  As the report

2    was written by the NIJ, it -- they said that half a

3    microcoulomb is acceptable and 1 microcoulomb is extremely

4    painful.  We know that's a typo, because that's only two to

5    one.  That's sort of like saying if you drank one glass of

6    water, you'd be happy, but two glasses of water, you'd explode.

7    That difference of two to one is not consistent with what we

8    know about the effect of electricity on the nerves.

9    Q.   And just so we can remind ourselves, how many

10   microcoulombs does a Taser, actual police Taser, emit?

11   A.   The most famous one, the X26, puts out about 120.

12   Q.   And so is the difference between 0.5 microcoulombs and 1

13   microcoulomb significant in determining pain in a person?

14   A.   No.

15   Q.   Another way to look at this is -- do you recall telling us

16   about the minimum number of microcoulombs for something to

17   qualify as a stun gun?  Do you remember what the ANSI standard

18   is for that?

19   A.   It's 40 microcoulombs is the minimum to qualify as a stun

20   gun.

21   Q.   Would it make any sense that the minimum necessary charge

22   for a stun gun would be 40 microcoulombs if a person actually

23   did experience extraordinary pain at 1 microcoulomb?

24   A.   No.

25   Q.   What about the ANSI standard minimum number of

1  microcoulombs for something to qualify as a medical muscle

2  stimulator?

3  A.    That's 7 microcoulombs.

4  Q.    Again, would it make sense if it is actually true that 1

5  microcoulomb causes extreme pain that the standard would say

6  that you have to be at least 7 microcoulombs to qualify as a

7  medical muscle stimulator?

8  A.    No, and that also goes for the TENS nerve blockers.

9  They're putting -- they have to put out at least 7

10  microcoulombs at a high frequency to block pain.  So if they

11  were causing extreme pain, obviously they wouldn't be used.

12  Q.    Now, when -- you've said that there are circumstances,

13  certainly, with strong conducted electrical weapons that a

14  person will experience pain; correct?

15  A.    Yes.

16  Q.    And is that pain associated with an actual injury to their

17  body?

18  A.    No.  That's -- and that's the design goal.  As opposed to

19  hitting with fists or clubs like old police units used to have

20  to use, the whole idea is to cause short-term pain, no

21  lingering pain, and no injury to get compliance with lawful

22  officer commands.

23  Q.    Now, Mr. Dreher spent a fair amount of time speaking about

24  markings on the neck of Officer Fanone.  Again, this is a

25  totally different case, but I'm going to ask you about it

1    because you were asked about it on cross-examination.  You were

2    asked -- tell me what you were asked to determine about those

3    markings.

4    A.    After the riots Officer Fanone had a picture of his

5    neck -- I'm not sure how much later they were -- and they

6    showed some scratches, and I was asked to opine if those could

7    have been caused by the device shown in the suspect's hand, and

8    the difference is dramatic.

9          Earlier on yesterday we talked about some of the markings

10   from our textbook on Taser electrical weapons, and the markings

11   matched the electrodes, which makes sense.  They've got the

12   little square electrodes, and you've got little square sunburns

13   afterwards, and there was no connection at all between the

14   electrode locations on that device and the markings on Officer

15   Fanone's neck.

16   Q.    And again, were you -- did you take the position that

17   somehow Officer Fanone did not, in fact, get markings on his

18   neck after -- based on what happened to him on January 6th?

19   A.    No.  Obviously he had markings.  They just didn't come

20   from that, whatever that thing was in the person's hand.

21   Q.    Did you reach a conclusion about whether the device in

22   that case could have immobilized or weakened Officer Fanone?

23   A.    I did reach such a conclusion.

24   Q.    And what was your basis for that?

25   A.    Multiple things.  If we assume, conservatively -- if

1    there's any way we can show a picture to the jury.

2    Q.   I'm sorry?

3    A.   Any way we could show a picture of that to the jury?

4    Q.   Yes.  Hold on one moment.

5    A.   If it's helpful, I have it in my report.

6    Q.   I'm going to show you what has been marked as Defense

7    Exhibit 21 for identification.  So this actually comes from

8    your report.  Am I right?

9    A.   Yes.

10   Q.   And can you describe what you see.

11   A.   We see the little black box being held in someone's hand

12   in Figure 3.  In Figure 4 we see the markings on Officer

13   Fanone's neck.

14            MR. SMOCK:  I'd move to admit Defense Exhibit 21.

15            MR. DREHER:  Your Honor, I'm going to object.  I

16   believe more foundation would be required as to this witness's

17   knowledge to the photographs themselves.

18            THE COURT:  All right.  More foundation.

19   BY MR. SMOCK:

20   Q.   Okay.  The photograph on the left, where did you -- first

21   of all, both of these photographs appear in your own report.

22   Am I right?

23   A.   That's correct.

24   Q.   Where did you obtain the photograph on the left?  Where

25   did you get it from?

1    A.   That's a screenshot from a video.

2    Q.   And --

3              THE COURT:  Of the video of events on January 6th?

4              THE WITNESS:  Yes, Your Honor.

5    BY MR. SMOCK:

6    Q.   And who provided that video to you?

7    A.   The public defender's office of the United States

8    Department of Justice.

9    Q.   So in other words, you'd assume that the Department of

10   Justice provided that video to the federal public defender

11   who --

12        (Phone rings.)

13             THE COURT:  Sorry.

14   BY MR. SMOCK:

15   Q.   -- who was involved in that case; is that right?

16   A.   Yes.

17   Q.   Okay.  And what is your understanding that that photograph

18   depicts?

19   A.   That was the device that was alleged to be a stun gun that

20   was alleged to injure Officer Fanone.

21   Q.   And the photograph on the right, where did you obtain that

22   photograph?

23   A.   That was the same source, federal defender's office.

24   Q.   And what's your understanding about what that depicts?

25   A.   Some scratches on Officer Fanone's neck.

Kroll - Redirect (Smock)                                            1607

```
 1              MR. SMOCK:  I'd move to admit Defense Exhibit 21.
 2              MR. DREHER:  Your Honor, may I have an opportunity to
 3    voir dire on this particular exhibit?
 4              THE COURT:  Sure.
 5                          VOIR DIRE EXAMINATION
 6    BY MR. DREHER:
 7    Q.   Now, sir, independently from what you were told, do you
 8    have any independent knowledge of where these photographs come
 9    from?
10    A.   No.
11              MR. DREHER:  Your Honor, I would still object as to
12    foundation in terms of --
13              THE COURT:  You want to come to the bench?
14              MR. DREHER:  Yes, Your Honor.
15         (At sidebar)
16              THE COURT:  All right.  In the report for the case we
17    are now in trial in, Dr. Kroll's report, there have been
18    photographs taken from videos on January 6th as well as videos
19    shown him on January 6 involving Officer Moore and
20    Mr. GossJankowski.  There are also photographs of devices.
21    Now, I don't understand why you are objecting to his
22    explanation of excerpts from a video that was provided to him
23    of Officer Fanone's neck by the Department of Justice or U.S.
24    Attorney's Office in this March report.
25              MR. DREHER:  So I think the distinction is that Your
```

 1    Honor is referencing specifically the facts of this case as

 2    opposed to a different case.  This witness has testified he

 3    also reviewed video and he also reviewed other things and had a

 4    basis of comparison to explain that those photographs that were

 5    in his report came from this case.

 6              THE COURT:  Well, maybe he decided the same thing

 7    now.  I don't know.  But I don't understand why there's a

 8    challenge to photographs that were provided to him by the

 9    government.  I mean, you don't really believe it's not Officer

10    Fanone and not Officer Fanone's neck.

11              MR. VALENTINI:  Your Honor, if I may.  But I believe

12    the concern is all we know as to the basis of the origin of

13    these photographs this particular witness is testifying to, and

14    he doesn't know himself because he got it from lawyers that he

15    was serving.

16              THE COURT:  Your lawyers.

17              MR. VALENTINI:  I'm sorry?

18              THE COURT:  He got it from lawyers in your office.

19              MR. VALENTINI:  That is possible that's who he was

20    representing.  If we had an opportunity to verify, that would

21    be helpful.

22              THE COURT:  Why are you assuming that he's not

23    telling the truth about this?

24              MR. VALENTINI:  Your Honor, I'm just explaining the

25    basis of the objection.

```
1              THE COURT:  I understand.  Now, is the device itself
2     a device that he found online, or is it the actual device that
3     the defendant in the Fanone case had?
4              MR. SMOCK:  This is the -- that's a picture from
5     January 6th, the device that the defendant had.
6              THE COURT:  Okay.
7              MS. ROCHLIN:  He didn't have the actual device, and
8     there is dispute --
9              MR. SMOCK:  No.  My answer is the correct answer to
10    your question, which is the device in the photograph was the
11    device on January 6, and it was correct --
12             MS. ROCHLIN:  No.
13             MR. SMOCK:  -- that's not the device.
14             MS. ROCHLIN:  No.  Well, excuse me.  The
15    photograph -- I'm sorry.  The photograph is a picture of the
16    device.  The identity of the device is a matter of dispute.
17             THE COURT:  What's a matter of dispute?
18             MS. ROCHLIN:  Between the experts the nature --
19             THE COURT:  Whether that's --
20             MS. ROCHLIN:  Right.  The brand and the nature of the
21    device.
22             THE COURT:  Wait, wait.  Wait a minute.  My first
23    question is:  Is it a picture of the device that the defendant
24    in the Fanone case had in his hand?  Because in our case with
25    Mr. GossJankowski, we don't have the device.  We don't have the
```

1  device so everything is about what it looks like in the

2  pictures and his comparison.  If it's *Rodriguez* --

3            MS. ROCHLIN:  Yes.

4            THE COURT:  In Fanone, the *Rodriguez* case, if this is

5  the device that the government says was the actual device

6  seized from Rodriguez, given to Rodriguez, however they got it,

7  if that was the testi- -- or there was no testimony, but if

8  that is the basis for the statement of facts on the plea

9  agreement, then I don't understand the objection.

10            MS. ROCHLIN:  All we have is a photo of the device

11  captured on video.  The device itself is not --

12            THE COURT:  Did Kroll examine the device?

13            MS. ROCHLIN:  No, no, he did not examine the

14  recovered device from January 6th.  He may have examined a

15  device that he purchased himself.  The device itself was not

16  recovered.

17            MR. SMOCK:  And in that case the expert retained by

18  the government reached the same conclusion.

19            THE COURT:  But we're not going to get into that.

20  I'll permit it.

21       (In open court)

22            THE COURT:  Objection is overruled.  Mr. Smock can

23  continue.

24            MR. SMOCK:  I'd ask to publish the exhibit for the

25  jury.

```
 1                 THE COURT:  Let's give it a number.
 2                 MR. SMOCK:  Exhibit 21.
 3                 THE COURT:  Will you give us a revised exhibit list
 4     when you revise it.
 5                 MR. SMOCK:  Yes.  I'm getting a really horrible look
 6     from Ms. Johnson here.  We'll talk afterwards.  I apologize.
 7                      REDIRECT EXAMINATION RESUMED
 8     BY MR. SMOCK:
 9     Q.   Now that we have this photograph up, why don't you explain
10     to us how you reached the conclusion that these markings --
11                 THE COURT:  First, tell us -- tell the jury what you
12     believe or know are depicted in this excerpt from your report
13     in the Rodriguez case involving Fanone, Officer Fanone.  What
14     is Figure 3, and what is Figure 4?  Where did you come by them?
15                 THE WITNESS:  I think Figure 3 is the alleged stun
16     gun used in the incident taken from surveillance video.  Figure
17     4 is markings on Officer Fanone's neck from a picture taken
18     sometime later.
19     BY MR. SMOCK:
20     Q.   And can you explain how you reached a conclusion that
21     those markings on the photograph on the right could not have
22     been caused by the device on the left.
23     A.   There are three reasons.  Number one, assuming that the
24     device on the left actually was one of these sparklers as
25     Amazon -- so-called stun guns, they don't put out enough power
```

1    to cause burns.  Reason number two is that the burns caused by

2    high-powered weapons such as real police Taser weapons have

3    markings that match the electrodes.  So we see -- over here we

4    see the two electrodes, and they are flat and sort of

5    approaching each other like little thin beams, if you will, so

6    the type of wounds that we would expect would look like this

7    (indicating), and we don't see that.

8        This -- whatever this is here, and I added the red circles

9    just to highlight things.  Whatever this wound is down here we

10   can easily eliminate because it's not paired.  It's a solo

11   wound, so that clearly wasn't caused by electrical current.

12   Remember, electricity takes two contacts, two ends of a

13   battery, two plugs into the wall.  Up here in the higher-up

14   circle, you see that the two alleged wounds don't really match,

15   and again, they're not rectangular shaped, so we can eliminate

16   that one.  And this one on the lower left looks like long

17   scratches.  They look nothing like the electrodes in this case,

18   so we can eliminate that.

19       The third thing is stun guns can cause wounds from

20   scratching 'cause they have sharp electrodes, which is why I

21   didn't want to put the Vipertek up to my eye.  If we look at

22   this weapon here or whatever it is -- it could be a TV

23   controller, for all I know.

24           THE COURT:  Did you ever actually touch that weapon

25   or that device, excuse me, in -- at any point in your

1    preparation of the report in the *Rodriguez* case?

2              THE WITNESS:  No, sir.  It was never located.

3              THE COURT:  To your knowledge.

4              THE WITNESS:  That's what was represented to me, that

5    it was lost.

6              THE COURT:  Well, so this -- so in -- you said it was

7    never located.  So you are testifying that this is not the

8    actual device that was used by Mr. -- allegedly used by

9    Mr. Rodriguez on the day in question?

10             THE WITNESS:  What I'm -- this is the -- it was

11   represented to me that this device held in Mr. Rodriguez's hand

12   was the device used on the day in question.

13             THE COURT:  Okay.

14   BY MR. SMOCK:

15   Q.   Now --

16   A.   Just let me finish.  And so there's no sharp ends.  These

17   are flat ends and couldn't have made the scratches.  And one

18   more thing, forgive me, but as described in detail in our book

19   that Mr. Dreher was kind enough to share, the wounds from

20   electrical weapons, more powerful ones, from the real Taser

21   used by police, those will heal up in three to four days, so

22   you don't see scar tissue.  Thank you.

23             MR. SMOCK:  Thanks.  You can take that down, Adam.

24   BY MR. SMOCK:

25   Q.   Now, the government also asked you about Officer Fanone

 1   losing consciousness on that day.

 2           THE COURT:  Officer Fanone what?

 3           MR. SMOCK:  Losing consciousness on that day.

 4   BY MR. SMOCK:

 5   Q.   Do you recall that?

 6   A.   Yes.

 7   Q.   And you're not here to say to this jury that Officer

 8   Fanone lied when he said he lost consciousness, are you?

 9   A.   Of course not.

10   Q.   Were you asked to offer an opinion about whether an

11   electrical weapon could have been the cause of his losing

12   consciousness?

13   A.   Yes.

14   Q.   And did you reach a conclusion about that?

15   A.   I did.

16   Q.   What was that conclusion?

17   A.   Electrical weapons don't cause loss of consciousness.

18   Q.   And have electrical weapons as strong as Tasers been

19   tested and applied to law enforcement officers during

20   trainings?

21   A.   Yes, about 2 million times.  Most officers are required to

22   take a hit with the probes separated so it affects their whole

23   trunk so they get an appreciation of the impact of the device.

24   It makes them respect it so they're more likely to use it in

25   some cases but also respect how powerful the weapon is so

1    they're less likely to misuse it.

2    Q.   Did you say 2 million?

3    A.   Over 2 million training applications that are documented.

4    Q.   And are you aware of a single case in which a law

5    enforcement officer lost consciousness due to the application

6    of a Taser?

7              THE COURT:  Due to the application of what?

8              MR. SMOCK:  Of a Taser.

9    A.   I'm not aware.  There were one or two officers that may

10   have fainted beforehand because people are afraid of

11   electricity, but no one lost consciousness due to the

12   application itself.

13             MR. SMOCK:  Court's indulgence for one moment.

14        I have nothing further, Your Honor.

15             THE COURT:  Mr. Dreher, do you have anything?

16             MR. DREHER:  No, Your Honor.  Thank you.

17             THE COURT:  Okay.  Well, Dr. Kroll, I think you're

18   finally excused.

19             THE WITNESS:  Thank you, Your Honor.

20             THE COURT:  Thank you very much.  And if whoever

21   could retrieve what -- oh, he's returning the documents to

22   wherever he got them from.

23        So we will take a midafternoon break at some point, but if

24   the government is ready, they could call their next witness.

25             MR. DREHER:  Sergeant Jason Mastony.

1    THE COURT:  Is he on your original witness list?

2    MR. DREHER:  Yes, Your Honor.

3    THE COURT:  Okay.

4    COURTROOM DEPUTY:  Good afternoon, sir.

5    THE COURT:  I see he wasn't a sergeant when you

6    prepared your witness list.

7    MR. DREHER:  Oh.  I apologize, Your Honor.

8    JASON MASTONY, PLAINTIFF'S WITNESS, SWORN

9    COURTROOM DEPUTY:  Thank you, sir.

10   THE COURT:  Make yourself comfortable, if you can,

11   and take your mask off, please, and speak into the microphone.

12                        DIRECT EXAMINATION

13   BY MR. DREHER:

14   Q.   Good afternoon, sir.  If you would please introduce

15   yourself and spell your name for the Court.

16   A.   Good afternoon.  I'm Detective Sergeant Jason Mastony.

17   It's J-A-S-O-N, M-A-S-T-O-N-Y.

18   Q.   Now, sir, you introduced yourself as a detective sergeant.

19   Are you currently employed?

20   A.   Yes.  I am employed by the Metropolitan Police Department,

21   Sixth District Detective's Office.

22   Q.   How long have you been an officer with the Metropolitan

23   Police?

24   A.   Twelve years.

25   Q.   And how long have you been a detective sergeant?

1    A.   Two or three months.

2    Q.   Now, sir, were you working for the Metropolitan Police on

3    January 6th of 2021?

4    A.   I was.

5    Q.   And what role were you assigned on that particular day?

6    A.   That day I was assigned to our Civil Disturbance Platoon

7    42, rapid response.  I was a sergeant in that platoon

8    responsible for a squad of seven officers.

9    Q.   And what time of day did your day start?

10   A.   We conducted our roll call at 7:30 in the morning.

11   Q.   Where did that roll call occur?

12   A.   The Fourth District police station.  That's 6001 Georgia

13   Avenue Northwest.

14   Q.   When is it that you made your way downtown?

15   A.   Right after roll call we responded down to essentially

16   Fifth and Constitution between -- I apologize, Tenth and

17   Constitution, between 10th and 14th Street, where we staged for

18   the day.

19   Q.   Now, when you say "staged for the day," what do you mean?

20   A.   So our original assignment on January 6th, 2021, was as a

21   high visibility unit.  My platoon, CDU 42, was equipped with

22   civil disturbance gear, pads, helmets, gas masks, that sort of

23   thing.  On this day we did not don any of that stuff.  On our

24   initial assignment we just went down in a uniform similar to

25   what I'm wearing right now, like high visibility vests and

1    jackets, and our assignment that day was essentially just to

2    line Constitution Avenue between 10th and 14th Street in

3    anticipation of just a large crowd that would need assistance

4    in moving.

5    Q.   Now, during this time where was your hard gear located?

6    A.   We all had it in our -- we had essentially rental vans

7    assigned to us, and so the hard gear was in -- packed in our

8    bags inside the vans.

9    Q.   Now, you also told us you were wearing at that time

10   something similar to what you're wearing now.  Does that

11   include the body-worn camera on your front?

12   A.   Yes.  Every MPD officer assigned with me that day had a

13   body-worn camera on their external vests worn in the same

14   manner as the one you see on my vest right now.

15   Q.   And on that day you were wearing one; correct?

16   A.   I was.

17   Q.   Was that body-worn camera functioning on that day?

18   A.   It was.

19   Q.   Now, once you arrived on Constitution Avenue, can you tell

20   the jury how long you were there for.

21   A.   We were there between -- so we got there, I'd estimate,

22   around 8:30 in the morning, and we were there until 12:30 in

23   the afternoon.  I apologize.  I think it was at 1:30.

24   Q.   What happened at that time?

25   A.   So before 1:30 the crowd started essentially becoming less

1    of a First Amendment assembly, a lawful parade, people with

2    slogans and things like that voicing their concern, and became

3    more agitated and hostile.  We started getting calls for

4    assistance from the United States Capitol.  Our overall CDU

5    commander, Inspector Robert Glover, responded down there, began

6    assigning platoons to come in to assist on the U.S. Capitol

7    grounds.  My platoon was eventually called.  We were a hard

8    gear platoon.  There was only one other hard gear platoon on

9    MPD working at that time of day, so we were called.  We got

10   dressed in the street, put on all our protective equipment, and

11   responded down to the U.S. Capitol.

12   Q.   Now, was this you and all seven of your squad mates as

13   well?

14   A.   So this was my entire platoon, which that was -- the

15   entirety of it was 30 MPD members altogether: one lieutenant,

16   four sergeants, and at the time 25 officers in the platoon.

17   Q.   All right.  Sir, if I can direct your attention to the

18   screen in front of you, I'm going to show you what's -- oh,

19   excuse me, what's previously been admitted as Government's

20   Exhibit 605.

21            MR. DREHER:  And if we could publish this -- oh, I'm

22   sorry.  Already taken care of.

23            THE COURT:  She's ahead of you this time, Mr. Dreher.

24   BY MR. DREHER:

25   Q.   Now, sir, can you tell us what we're looking at here.

Mastony - Direct (Dreher)                                    1620

1    A.    So this is the United States Capitol.  This appears to be

2    a rendering of the West Front.  The west is facing towards the

3    bottom of the screen.  And then this model of the Capitol has

4    the temporary stands and scaffolding that was assembled on

5    January 6th in anticipation of the inauguration.

6    Q.    Now, sir, the screen in front of you is actually a touch

7    screen, and so I would ask if you could touch and draw the path

8    that you took to get to the U.S. Capitol that day.

9    A.    So we came in on the northwest side, so slightly off

10   screen up here, and then I'd never been to the U.S. Capitol

11   before, so I did not know where they were calling for

12   assistance, and we found a Capitol Police officer who told us

13   where our police line was, and he took us in through the crowd

14   essentially, yeah, right through here (indicating throughout).

15   Q.    Sir, you just told us you had never been to the Capitol

16   prior to this day?

17   A.    I had been once for a few minutes as a tourist.  I walked

18   up and said, "That's the Capitol," and I walked back.

19   Q.    I understand.  And when you arrived there, you had to walk

20   through a crowd?

21   A.    Yes.

22   Q.    Could you tell the jury how many people were already in

23   the lawn by the time you arrived?

24   A.    I couldn't give an exact number, but it was in the

25   thousands.

1    Q.   You believe there were more rioters than there were

2    officers at that point?

3    A.   There were clearly more rioters than there were officers

4    at that point.

5    Q.   Now, as you approached the Capitol, did you already have

6    your hard gear on?

7    A.   Yeah.  We got dressed in the street at 10th and

8    Constitution.

9    Q.   And could you tell us specifically what this hard gear

10   entails.

11   A.   So essentially all the civil -- all members of the MPD is

12   given a basic kit of civil disturbance gear that -- it's a

13   ballistic helmet and an extended riot baton, which is the long

14   metal pole, a set of gloves with padding on them, and a gas

15   mask, and that's what almost all the members of the police

16   department carry.

17        CDU 42 is a rapid response platoon -- there's seven of

18   them on MPD -- and in addition to that equipment, we're given

19   padding which is essentially football, lacrosse, hockey,

20   similar to that -- they just strap on to our external vests --

21   and then our duty belt, and they protect essentially the entire

22   front side of our arms and our legs from our groin area down to

23   our feet.

24   Q.   Now, does any of this equipment interfere with or get in

25   front of the body-worn camera?

1    A.    It can at times, but in general, as it's equipped, it

2    shouldn't get in the way of the camera where it's positioned.

3              MR. DREHER:  I'm going to clear the screen.

4    BY MR. DREHER:

5    Q.    Sir, and if you don't mind, could you explain to the jury

6    using the diagram where the police line was.

7    A.    So if I'm correct in what these two -- these two seating

8    areas on the side are, this police line extended from here, and

9    then it went around this area and then came around here and

10   hooked in about there.  So like I said, we came in from this

11   direction on the north side of the line, and the police line

12   essentially is from -- this is -- this is all scaffolding that

13   goes up multiple stories into the air, and so our police line

14   was at one end of that, down the length of the West Front, and

15   then hooked into an area next to this similar tower or

16   scaffolding that had seating on top (indicating throughout).

17   Q.    And when you arrived there, at that time were you engaging

18   with rioters?

19   A.    So initially it was just people milling about the Capitol

20   grounds with no real clear purpose.  I began bringing my

21   platoon in.  I was the first, in the lead.  I walked them into

22   that crowd and eventually got more resistance as we walked

23   through the crowd here until I was physically having to move

24   people out of the way to get to the line.  Once I got to the

25   line, I came in and I turned around, and I found that of the 30

1    officers I had mentioned earlier, there was only four of us.

2    The rest of the officers had been cut off in the crowd and did

3    not make it to the line with us.

4    Q.   Now, how long were you at the line at that point?

5    A.   So that was when I first arrived and then -- we held --

6    eventually the rest of the platoon would make their way into

7    the line with us, and we held that line for approximately half

8    an hour before it collapsed.

9         THE COURT:  About what time was that, do you

10   remember?

11        THE WITNESS:  It was approximately 2:30.  It's on my

12   camera.  Around 2:27 there's gas deployed.  The line thins out.

13   We hold it for a few more minutes, and around that time at

14   around 2:30, the line breaks entirely.

15   BY MR. DREHER:

16   Q.   Now, sir, as a police officer, have you ever taken part in

17   civil disturbances in the past?

18   A.   I have.

19   Q.   And these were prior to January 6th?

20   A.   Yes.

21   Q.   Can you describe for us, I guess, some normal tactics that

22   would be used by the civil disturbance unit.

23   A.   In general, at the most basic level, you're forming a line

24   to deny access to an area by a group of people that want to

25   enter that area.  So the most basic CDU formation is just the

1    line, nothing complicated, just officers shoulder to shoulder

2    forming a line.  And then someone in your command structure has

3    a plan, we're going to keep these people away from this.

4    Either it's other people or it's property they desire to

5    destroy or whatever it is.  You form that line, and you are

6    then a physical boundary between that crowd and what is behind

7    you.

8    Q.   Now, is every member of this line fully uniformed and

9    looking the same as you were at that point?

10   A.   So on January 6th, every officer on the line to what I saw

11   was uniformed.  They weren't just MPD officers.  They were U.S.

12   Capitol Police officers.  The line at the time had to have been

13   assembled out of multiple things, so you had my platoon that

14   was wearing the armor I described.  You had another platoon

15   like us that was wearing similar armor, but they had a coverall

16   that -- it takes longer to get on so we weren't wearing it --

17   over their entire uniform.

18        Then you had U.S. Capitol Police there in armor, you had

19   U.S. Capitol Police there without armor, and you had MPD

20   officers that were either in a mountain bike platoon wearing

21   mountain bike gear, essentially this with an external vest, and

22   then you had MPD officers who were just -- either just assigned

23   to another area in general wearing a bright yellow visibility

24   jacket, but we were all uniformed.  There weren't plainclothes

25   officers on the line at the time.

Mastony - Direct (Dreher)                                    1625

1    Q.   And so each member of the line had a badge?

2    A.   Yes.

3    Q.   Now, in your prior experience before January 6th, had you

4    ever been part of a situation to where a line has broken?

5    A.   No.  To my knowledge, in my 12 years and then the

6    knowledge of the people who trained me going back 25 years, a

7    line has never broken like it did on January 6th.  We've

8    withdrawn lines to move them someplace else, but have a line

9    overrun like that had not occurred.

10   Q.   So on January 6th, after this line had broken, what

11   happened next?

12   A.   So we were essentially --

13              THE COURT:  Let me ask you:  When you're talking

14   about the time when the line is broken, could you show us on

15   the diagram approximately where you and the others in the line

16   were located before it was broken or just about the time it was

17   broken?

18              THE WITNESS:  Yes, Your Honor.  So this is the line

19   as I described it.  This is my position on the line.  I was one

20   of the few or only officials on that side of the line, so

21   essentially my responsibility as I knew it to be was to hold

22   the right side.  The line broke with pressure here at my

23   position.  I got grabbed by another rioter and taken over here,

24   and then the rioters flowed in this area until we were

25   encircled again, just smaller.  The entire line along here

1    collapsed just from my side down the length of the line until

2    we were encircled approximately here, so from this space we

3    were then in that space (indicating throughout).

4        At that time I did not know the geography of the Capitol.

5    I just thought we were trapped in a smaller space.  I came to

6    know that there was a route up onto the inaugural platform

7    through a construction stairwell that we ended up extracting

8    all the people on the lower level up to that upper level.

9    BY MR. DREHER:

10   Q.   And so you personally made your way up to the upper level?

11   A.   Yes.

12   Q.   Once you reached the inaugural stage, was there another

13   line that was formed outside?

14   A.   So no.  My initial plan when I was here on the upper level

15   was to hold that same stairwell that I had just come up.  I was

16   under the misconception that that was the only way up from the

17   lower level to the upper level, but at the time there was

18   rioters along this level.  They had taken this, they had taken

19   that.  So essentially I was trying to hold this one small

20   little piece while I was completely surrounded; so there was no

21   line established on the inaugural platform (indicating

22   throughout).

23       We ended up withdrawing in two places.  Some people went

24   up here and established a police line there, and then the rest

25   of us went into the United States Capitol through what I'll be

1    referring to as the tunnel (indicating).  It was just an access

2    hallway between the inaugural stage and the internal part of

3    the United States Capitol.

4    Q.   Now, sir, while you were on the inaugural stage, did you

5    have an opportunity to look out to the mall, the National Mall?

6    A.   Yes.

7    Q.   What is it that you saw when you looked down?

8    A.   A crowd of thousands of people that had completely

9    consumed the West Front of the Capitol.

10   Q.   Would you be able to estimate the number of people that

11   you saw?

12   A.   I would say it was on the order of 10,000 people.

13   Q.   Now, you told us that you went inside the Capitol at that

14   point?

15   A.   Yes.

16   Q.   What, if anything, did you do when you got inside the

17   Capitol?

18   A.   So upon entering that hallway, there's two sets of doors:

19   an extreme outer door that opens to open air, and then there's

20   a small space and then another door that opens to the inside of

21   the Capitol.  Right there is a metal detector and then a

22   utility corridor running down northwest -- north to south in

23   the Capitol.  Behind that is a corridor that leads to a

24   stairwell that goes up and down the Capitol.

25        So upon entering that it was quickly determined that we

1    needed to form a line again at that entrance point, 'cause

2    failure to hold that position, the door to entering the

3    Capitol, there would be no way to contain the situation after

4    that.  It was just -- colloquially, it's a choke point, a small

5    corridor where a few number of officers could hold out against

6    a large group of people trying to come in.  So we essentially

7    just established a new police line by that metal detector

8    before those corridors started, so we attempted as best we

9    could to hold that doorway.

10   Q.   Now, did you personally become a member of this line?

11   A.   Yes.

12   Q.   And during this period of time, was your body-worn camera

13   activated?

14   A.   It was.

15            MR. DREHER:  Ms. Johnson, if we would be able to

16   cease presentment at this point.

17   BY MR. DREHER:

18   Q.   And now, sir, I'm going to show you about ten seconds of

19   what's been marked as Government's Exhibit 121.1, and if you

20   could just review this for about ten seconds, I'm going to have

21   some questions for you.

22        (A portion of Exhibit 121.1 was played.)

23   BY MR. DREHER:

24   Q.   All right.  Sir, I played about 13 seconds of it.  Do you

25   recognize this footage?

1    A.    Yes.

2    Q.    What is it?

3    A.    So that's footage of my body-worn camera.  You see the

4    plastic shield in front of me at one point I pick up.

5    Q.    Sir, before we get into the content of the video, what is

6    it about this video that allows you to know what it is?

7    A.    So in the top right corner of the video is a time stamp.

8    This is placed on all videos that are recorded through an Axon

9    body camera, so they appear with a time stamp with a serial

10   number of the camera and a date, and essentially that's just

11   right up here on the right-hand side.  Once I take this camera

12   off and I put it on a docking station, this video downloads,

13   and it has that time stamp on it.  Can't be removed.  It's just

14   there.

15   Q.    Now, sir, have you had a chance to review this footage

16   prior to testifying today?

17   A.    I have.

18   Q.    And does this footage fairly and accurately depict your

19   experience on January 6th?

20   A.    It does.

21         MR. DREHER:  Your Honor, the government would move

22   for the admission of 121.1.

23         MR. SMOCK:  No objection.

24         THE COURT:  Any objection?

25         MR. SMOCK:  No objection.

1          THE COURT:  Thank you.  It will be admitted.

2   BY MR. DREHER:

3   Q.   Now, sir, I'm going to start this back from the beginning

4   and ask you to review this footage with us.  I am going to

5   pause it once in the middle and ask further questions.  Okay?

6   A.   Okay.

7          (A portion of Exhibit 121.1 was played.)

8   BY MR. DREHER:

9   Q.   Now, sir, during your --

10         MR. DREHER:  Or for the record, I've paused the video

11  at 14:45:18 p.m., and that's the time -- that's the time of

12  day, not the time of the video.

13  BY MR. DREHER:

14  Q.   Now, sir, during this time we see something between you,

15  your camera, and the rioters.  Can you explain what that is.

16  A.   Yes.  So that's a U.S. Capitol-issued riot shield.

17  Essentially, it's just a hard plastic shield with handles on it

18  that you have had training in, and essentially it's just a

19  barricade.  You hold it in your arm with your arm extended,

20  looped through, and you get on the line with several officers,

21  and you just form an additional barrier on that.  So that's

22  what that is.

23      I had it at the time when they had forced the doors just

24  prior to this and came in, and that's essentially crushed up

25  against my chest in this image.  The pressure from the outside

1    had folded my arms up so I couldn't push forward anymore, so

2    the shield is just pressed up against to where my camera is

3    recording.

4    Q.   Now, was there anything between you and the rioters aside

5    from this shield?

6    A.   At points the rioters will have shields, but in this

7    instance I think it's just the crowd that's pushed in on me.

8    Q.   Do you know how the rioters obtained Capitol Police

9    shields?

10   A.   To my knowledge, they took them from either staged

11   locations that were meant for law enforcement after they were

12   overrun or physically took them from officers.

13   Q.   Did you ever have one of these shields taken from you on

14   that day?

15   A.   I did.

16   Q.   How many?

17   A.   It occurred several times during the course of the

18   back-and-forth.  I was in the tunnel for approximately an hour,

19   an hour and a half, and I had several shields during that time.

20   I never exited with a shield, so at points during it the shield

21   would get torn out of my hand, and, you know, I'd let it go

22   'cause there was no further need to it in that environment.

23   Q.   Now, are there any particular rioters that stick out to

24   you in your mind during this particular time in the tunnel?

25   A.   Not to my clear recollection.  Really, at this time you're

1    kind of in sensory overload.  You have too many people crushing

2    in on you, so yeah.  At this point in the tunnel, I don't have

3    any strong recollection of anybody in my personal memory.

4    Q.   All right.  Sir, I'm going to draw a circle on this

5    exhibit, and I've drawn a circle around what appears to be a

6    face.  Is it fair to say you don't have any specific

7    recollection about that individual?

8    A.   I personally don't, no.

9            MR. DREHER:  Okay.  I'm going to finish playing the

10   exhibit at this time.

11           (A portion of Exhibit 121.1 was played.)

12           MR. DREHER:  Then, Ms. Johnson, if we could take it

13   down.

14   BY MR. DREHER:

15   Q.   Now, sir, if I can direct your attention back to that

16   screen in front of you, I'm going to play what's been marked as

17   121.2 for about ten seconds again.

18           (A portion of Exhibit 121.2 was played.)

19   BY MR. DREHER:

20   Q.   Now, sir, it looks like I played about 12 seconds.  Are

21   you able to tell us what you've just seen?

22   A.   So this is a point in the, you know, five minute -- or by

23   the time stamp, ten minutes after what we just viewed.  We are

24   slightly more advanced into the hallway.

25   Q.   Let me back up just a little bit further.  Is this video

1    something that you reviewed prior to testifying today?

2    A.   It is.

3    Q.   And does it fairly and accurately depict the events that

4    you experienced on January 6?

5    A.   It does.

6            MR. DREHER:  Your Honor, the government moves for the

7    admission of Government's 121.2.

8            MR. SMOCK:  No objection.

9            THE COURT:  It will be admitted without objection.

10   BY MR. DREHER:

11   Q.   All right.  Sir, again, I'm going to start from the

12   beginning and play this for a portion and then pause it with

13   some questions for you during the pause.

14       (A portion of Exhibit 121.2 was played.)

15           MR. DREHER:  All right.  For the record, I've paused

16   the video at 14:55:27 p.m.  Again, that's the time as opposed

17   to the time stamp on the video.

18   BY MR. DREHER:

19   Q.   And, sir, when we start this video, it doesn't appear that

20   you have a shield at that point; is that correct?

21   A.   Yes.  I do not.

22   Q.   Now, at -- now in the video we do see a shield.  Is this a

23   different or the same shield as you had before?

24   A.   Could be the same, could be different.  I lost the shield

25   I had prior to this.  It got torn away by the crowd.  I then

1    pick up this shield that's on the ground and hold it kind of

2    sideways across the four or five officers that are the front of

3    the line at this point.

4    Q.   Would you consider yourself one of the four officers in

5    the front?

6    A.   Yes.

7    Q.   Now, we also noticed that in this video there's some space

8    between the front and the rioters.  Can you tell us why that

9    is.

10   A.   So at this point there's just a kind of disengagement.

11   The crowd is not actively assaulting the line, and at this

12   point I'm perfectly okay with that.  I'm taking every moment of

13   breath I can.  I do not want to -- you know, I'm -- at this

14   point I have no desire to take the personal initiative to try

15   to get these individuals out of the tunnel.  I'm just trying to

16   hold what I have.

17   Q.   Sir, the time says 14:55, but although we've only seen

18   limited portions of this, how long had you been exerting

19   yourself at this point?

20   A.   So I made it into the line on the lower level, the one

21   that got overrun.  I came into that line at approximately 2:30.

22   So that line got overrun.  I'd been holding that for, you know,

23   a half hour.  Then we just came back in the building, and then

24   this new line, the one in the hallway, has been under active

25   assault for the ten minutes prior to this; so 55 minutes, give

1    or take.

2    Q.    And you were at the front of this active assault?

3    A.    Yeah, at this point I was.

4    Q.    Now, sir, could you tell us what was going through your

5    head at this time.

6    A.    I knew that we were in a bad spot.  You know, we were in a

7    building that was being essentially besieged, and failure to

8    hold the position we were in would have resulted in the crowd

9    outside then being inside the U.S. Capitol with no hope of us

10   having an organized resistance to it.  Behind us it's just open

11   corridors and moving, and we were kind of the only assembled

12   force in between the crowd on the West Front and getting

13   inside.

14        But, you know, other than that, physically, I was

15   exhausted.  I'd been exposed to every sort of chemical irritant

16   at that point.  I wasn't wearing protective covering, they

17   weren't issued, so my uniform is saturated with chemical

18   irritant, so my body's on fire.  I'd been exposed previously to

19   tear gas and OC spray, so I'm wearing a gas mask at this point,

20   but that has -- you know, still has all the lingering effects

21   of being, you know, sprayed with a chemical irritant several

22   minutes before that.  So face is on fire, everything hurts

23   essentially, but, you know, that's -- that's about it.  I

24   was -- we were not in a good position at this point.

25   Q.    I understand.  Did you observe any weapons in the crowd?

1    A.    Yeah.   There were at varying points knives, Tasers, blunt

2    objects, table legs, flags that had, you know, metal poles on

3    them they used to strike us, and then also some of our riot

4    batons had gotten their hands -- had gotten into the hands of

5    the rioters at that point, so those were getting put on us.

6    They additionally had their own personal self-defense sprays

7    that they were using on us, and they had taken some of the

8    sprays from us, some of our chemical munitions or chemical

9    irritant dispensers, and were using them back on us.

10   Q.    Now, sir, I'm just going to play a short portion of the

11   exhibit and ask that you follow along with us again.

12         (A portion of Exhibit 121.2 was played.)

13            MR. DREHER:  For the record, I've stopped it at

14   14:55:32 p.m.

15   BY MR. DREHER:

16   Q.    And sir, in this portion of the video, it looked like

17   there were poles on the ground.  Were you able to observe that?

18   A.    Yes.

19   Q.    Were these the same types of poles that you were talking

20   about when you saw weapons in the crowd?

21   A.    Yeah.   So among the things that we were being hit with was

22   just flags attached to poles, whether they were wooden poles,

23   metal poles.  In this case it looks like an aluminum -- like an

24   aluminum pole tied to a flag.  So yeah, that gets picked up off

25   the ground.

Mastony - Direct (Dreher)                                    1637

1    Q.   And would somebody who has this pole affect your duties

2    for that day in any way?

3    A.   If they were striking me with it, they would.

4            MR. DREHER:  I'm going to continue playing the

5    exhibit.

6        (A portion of Exhibit 121.2 was played.)

7    BY MR. DREHER:

8    Q.   Now, sir, just for the record, I've paused the video at

9    14:55:46 p.m., and I'm going to direct your attention to this

10   individual that I've just circled.  At this moment on

11   January 6th, this shield that's depicted in your body-worn

12   camera, did you maintain possession of that shield throughout

13   the rest of the day?

14   A.   I did not.  I would lose this shield at some point as

15   well.

16   Q.   And once you lose this shield, is there anything between

17   you and the rioters at that point?

18   A.   No.

19           MR. DREHER:  For the record, I'm going to finish

20   playing the exhibit.

21       (A portion of Exhibit 121.2 was played.)

22           MR. DREHER:  And then, Ms. Johnson, if we could take

23   the exhibit down.

24       Thank you.

25   BY MR. DREHER:

1    Q.   Now, sir, during that portion of the video, we see a lot

2    of flashing lights.  Can you tell us what those were.

3    A.   Yeah.  At points in the hallway -- we refer to it on the

4    street as getting light checked.  Protesters will use a bright

5    flashlight and essentially either put it on a strobe function

6    or shine it in our eyes.  Mostly in less confrontational

7    protests that's just kind of a method to irritate the police

8    or, you know, just try to annoy you, but yeah, it does cause

9    you an inability to see at points.

10        And one of our common response to it is just light check

11   them back, shine a light back in their eyes.  Not really

12   feasible in this case.  I don't have access to my arms after

13   the crowd pushes in, and then when I do have access to them,

14   I'm holding a shield so...but that's what that is.  Someone is

15   strobing a high-powered flashlight into the eyes of the police.

16   Q.   Now, although you told us you weren't able to do it, do

17   you know if any of the officers were doing that?

18            THE COURT:  Were doing what?

19            MR. DREHER:  Flashing the light.

20   A.   So that light coming in was not an officer.  Officers may

21   have used that tactic, as it was something we were employing

22   during 2020 to address getting light checked, but yeah.  On

23   that particular sequence of the line, I doubt it, just because

24   we were under too much pressure to really engage in that.  It's

25   something that kind of more occurs when you have two

1    established groups of lines that aren't fighting each other.

2    It's just something that goes on.

3    BY MR. DREHER:

4    Q.   And earlier you described the pressure.  What did you mean

5    by that?

6    A.   So this is a concentrated hallway, you know.  I have three

7    officers maybe to my left at that point, and there's maybe a

8    few dozen officers behind me.  All those officers behind me are

9    trying to push out of the Capitol to try to take back that

10   hallway, so you have all that pressure from behind.  You have

11   everybody who's entering from the crowd outside the Capitol

12   coming into that one hallway, and they're trying to exert all

13   their pressure in on us to break through us.

14        So for large portions of my time in the hallway, it was

15   just essentially a big shoving match where you're in the

16   middle.  I'm not doing anything very active.  I'm not striking

17   people or defending myself.  I'm just in the middle of two

18   unmovable forces -- the crowd trying to push in, trying to push

19   through us, the police behind me trying to push forward, trying

20   to push the crowd out -- and so you're just kind of jammed

21   there in the middle.

22   Q.   Now, can you tell us how long you were jammed there for?

23   A.   Normally it would go on for a few minutes.  My video will

24   have just, you know, segments where it's just a creaking

25   plastic shield and then something moves.  The crowd, you know,

1    pulls back a little bit, but yes.  So for minutes at a time,

2    you'll just be kind of crushed in this position where you're

3    not really able to defend yourself.

4        You're wearing a gas mask that has a small intake on it,

5    so that will get pressed up against something, and you're not

6    able to move.  You don't have access to your hands to move it,

7    and so that will just seal, and you have no air.  So I would go

8    with that for a few seconds and hope that something would move,

9    and it always did, but yeah, that's not a pleasant experience,

10   but yeah.  It was not the entire hour and a half that I was in

11   the hallway that it was like that, but good segments of it

12   during concerted pushes by the crowd was me just pinned up

13   against either the side of the wall, the door, or other

14   officers, unable to move.

15   Q.   What's going through your mind as you're experiencing

16   this?

17   A.   Well, it's a bad situation.  The only thing I'm really

18   hanging on at that point is I'm still with officers.  As long

19   as I have other people, other police officers essentially on my

20   side with me, I'll be okay.  If I pass out or I fall down, I'll

21   have police officers there.  I'm not -- the nightmare scenario

22   here is me being by myself with that crowd, so I was very

23   concerned.  This wasn't a good situation, but I was okay with

24   it.  I was able to keep my head together because I had officers

25   with me.

1    MR. DREHER:  Your Honor, I have no further questions.

2    THE COURT:  Okay.  I said we were going to take a

3    midafternoon break.  Do you want to do that now, Mr. Smock,

4    or...

5    MR. SMOCK:  Yes.  And I can tell the Court we don't

6    have any cross-examination.

7    THE COURT:  You don't have any questions for this

8    officer?

9    MR. SMOCK:  No.

10   THE COURT:  Oh.  Well, thank you for telling us that.

11   Thank you, Sergeant.  You're excused.

12   THE WITNESS:  Thank you, Your Honor.

13   THE COURT:  Why don't we take about ten minutes, and

14   then we'll have the next witness, and we are going to try to

15   end today between 4:30 and 4:45, and I'll tell you the schedule

16   after that.

17   (Jury out and recess taken at 3:32 p.m.)

18   (At 3:51 p.m. on March 9, 2023; with counsel for the

19   parties and the defendant present; WITHOUT the jury:)

20   THE COURT:  So we just had an example of the

21   reverse -- what I call the reverse *Jencks* Act, which is how you

22   got those reports and got to use them.  It's Rule 26.2.  Does

23   anybody know why Rule 26.2 was enacted?  *United States vs.*

24   *Nobles*, Supreme Court of the United States, where the

25   government won.  After the Supreme Court spoke, the rules

1   writers changed the rules.

2        (Jury in at 3:51 p.m.)

3            THE COURT:  If everyone is ready, the government can

4   call its next witness.

5            MR. DREHER:  Officer Sarah Beaver.

6            COURTROOM DEPUTY:  Good afternoon, ma'am.

7            THE WITNESS:  Good afternoon.  How are you?

8            COURTROOM DEPUTY:  Okay.

9            SARAH E. BEAVER, PLAINTIFF'S WITNESS, SWORN

10           COURTROOM DEPUTY:  Thank you, ma'am.

11           THE COURT:  Good afternoon.  Yes, please take your

12   mask off.  Speak into the microphone.

13           THE WITNESS:  Good afternoon, Your Honor.  How are

14   you?

15           THE COURT:  How are you?

16                        DIRECT EXAMINATION

17   BY MR. DREHER:

18   Q.   So, ma'am, if you would please introduce yourself, and

19   then spell your name for the record.

20   A.   Yes.  Hi.  I'm Sarah Elisabeth Beaver, a law officer with

21   the Metropolitan Police Department.  It's Sarah, S-A-R-A-H,

22   Elisabeth, E-L-I-S-A-B-E-T-H, and Beaver, B-E-A-V-E-R.

23   Q.   How long have you been an officer with Metropolitan

24   Police?

25   A.   It'll be ten years in June.

1   Q.   And do you have a specific function that you serve

2   while as an officer?

3   A.   I'm a field training officer.  I have been for about seven

4   years, getting paid for it about five.

5          THE COURT:  Would you say that again.  What training?

6          THE WITNESS:  A field training officer.

7          THE COURT:  Oh.

8   BY MR. DREHER:

9   Q.   Is there a specific district that you work in?

10  A.   I work in the First District.

11  Q.   Where is the First District?

12  A.   We're actually in the First District now.

13  Q.   So it's this area, downtown area?

14  A.   Correct.

15  Q.   And how long have you been in the downtown area?

16  A.   For the same amount of time, my entire career.

17  Q.   So were you working in that area on January 6, 2021?

18  A.   Yes, I was.

19  Q.   And what time of day did your day start on January 6,

20  2021?

21  A.   Our day started about 0700, so 7:30 in the morning.

22  Q.   Where did you report when you first arrived to work that

23  day?

24  A.   The First District Station, 101 "M" Street Southwest.

25  Q.   What was the street again?

1    A.    101 "M" Street Southwest, down by Lansburgh.

2    Q.    Now, is that where you spent the entirety of January 6th?

3    A.    No, sir.  We were -- our assignment for the day was to

4    actually sit at the rear of this courthouse in the 300 block of

5    "C" Street Northwest until we were called upon, if that

6    happened.

7    Q.    Now, when you say "we," who do you mean?

8    A.    I'm part of a civil disturbance unit that's deployed

9    through the Special Operations Division, and these units are

10   deployed for First Amendment assemblies, sometimes traffic

11   posts.  Anything where there's a massive amount of people that

12   are going to be there, they just want police presence there.

13   So on that day I was Civil Disturbance Unit 12, and it

14   consisted of 28 officers, four sergeants, and one lieutenant.

15   Q.    You said the unit number was 12?

16   A.    Yes.

17   Q.    And so when you were posted initially, where were you at?

18   A.    We were at the rear of the courthouse here, 300 "C"

19   Street.

20   Q.    Now, at that time were you fully uniformed?

21   A.    They had told us that there was a potential to have

22   issues, but they weren't expecting them, but they didn't know.

23   So you saw the sergeant come in here in our typical uniform.

24   I'm a rapid response team, so we actually had more equipment on

25   that day.

1    Over top of the uniform minus the vest that the sergeant
2    was wearing, you would have pads, basically like football pads;
3    you would have shin pads; kneepads; thigh pads; leg pads; arm
4    pads; shoulder pads.  We have ballistic helmets as well.  Over
5    top of the pads that were on top of the uniform, you would have
6    black pants and like a black jacket.  They're flame-retardant
7    so people throwing Molotov cocktails on you, they can't set you
8    on fire.  Then, of course, you wear the vest over the top of
9    all of that.  Very heavy uniform.  The helmet weighs about 6 to
10   7 pounds.
11   Q.   Now, over top of this were you still equipped with a
12   body-worn camera?
13   A.   Yes, sir.
14   Q.   And where would that have been located on your body?
15   A.   In the middle of your chest.  It's attached to the vest.
16   Q.   And are you aware if your body-worn camera was functioning
17   on January 6?
18   A.   It was.
19   Q.   Now, did there come a time when you moved from your post
20   behind the courthouse?
21   A.   There was a time.  It was about 1:18.  The sergeants came
22   up.  We had our cruisers lined up because, as you can imagine
23   when you're traveling with that many people in a caravan,
24   there's a bunch of cars, so at one point he just runs up to the
25   car, and he slams his hand down (indicating).

1          THE COURT:  Ma'am, I think you should slow down and

2    speak more into the microphone even if you're not directly --

3          THE WITNESS:  Yes, sir.

4          THE COURT:  -- looking directly at the jury.

5          THE WITNESS:  I apologize.

6    A.   All right.  So there's a caravan of cars.  We probably had

7    four vans and probably five take-homes and maybe the sergeant's

8    car.  So we were lined up in the 300 block of "C" Street, and

9    like I said, about 1:18 p.m. the sergeant comes around, slams

10   his hand down on the car.  "Get ready, we're going to be

11   activated, let's go, get dressed."

12   BY MR. DREHER:

13   Q.   And when he said, "Get dressed," what did you take that to

14   mean?

15   A.   Get the rest of your pads on if you were relaxing and, you

16   know, chilling in the car, because at that time we weren't

17   expecting any issues.  So I was reading a book.  My partner was

18   watching Netflix on TV.

19   Q.   And where did you go after that?

20   A.   At that point we made our way -- I guess from here we

21   would have made a right onto Third Street and turned left onto

22   Independence, the Pennsylvania Avenue side, around the back of

23   the Capitol on the south side, and that's where we parked.

24   Q.   And so at that -- that trip, you were in a vehicle of some

25   sort?

1    A.    Correct.  We were in police cruisers.

2    Q.    Did you ever dismount from the cruiser?

3    A.    We did.  At about 1:20 p.m. we arrived on the scene.  As

4    soon as we got out of the car, I activated -- you know,

5    double-tapped the body camera, which activates it, and we ran

6    down the south side of the Capitol steps onto the Lower Terrace

7    right above the stairs.

8    Q.    Now, you told us earlier that you normally work in the

9    downtown area.  Are you familiar with the United States

10   Capitol?

11   A.    Yes, sir.

12   Q.    I'm going to ask that you look at the screen in front of

13   you, and I'm going to show you what's previously been admitted

14   as Government's Exhibit 605.

15        Now, ma'am, can you describe for us what we see on the

16   screen.

17   A.    That's the United States Capitol grounds.

18   Q.    Now, you explained that you had parked at a location.  Can

19   you show us, using the touch screen in front of you, where that

20   was.

21   A.    Sure.  We would have entered from here, like right here

22   (indicating).

23   Q.    And so how, then -- when you said you went around the

24   terrace, what path did you take?

25   A.    We -- there was a walkway here.  I don't know if you can

1    see it.  It kind of comes up under here, and then we came down

2    through here (indicating).

3              THE COURT:  So that would have been on the House side

4    of the Capitol?  Do you know?

5              THE WITNESS:  I believe so, yes, because the Senate

6    office buildings are on that side.  Yes, it would have been the

7    House side.

8    BY MR. DREHER:

9    Q.   And so your ultimate destination, then, was the west side

10   of the Capitol down -- on that area?

11   A.   Correct.  That's where they told us to -- they said just

12   keep going down the stairwell.  There's a stairwell here that

13   you can't really see that's underneath all of this, so we ended

14   up here.  The steps were here, but we made a line right here

15   (indicating throughout).  There were already police officers

16   there when we got there.

17             MR. DREHER:  I'm just going to clear the screen for a

18   moment.

19   BY MR. DREHER:

20   Q.   And you said at some point during your trip to the west

21   side, you arrived at this spot at some point?

22   A.   Yes.

23   Q.   While you were there, did you have an opportunity to look

24   out and see the National Mall?

25   A.   Yes.

1    Q.    What was it that you saw?

2    A.    There were a lot of people assembling our direction.  The

3    crowd got massively bigger as the time went on, but there were

4    a lot of people there.  They hadn't gathered on the side of the

5    building yet, but they were gathering in the front, and they

6    were walking that direction.

7    Q.    Could you tell us about how many rioters there were?

8    A.    Yeah.  I really don't know, but I would say it looked to

9    be, like, 20 to 50,000.  I mean, there was a bunch of people

10   there.

11   Q.    Were there more rioters than there were officers at that

12   point?

13   A.    Yes, yes, absolutely.

14         MR. DREHER:  All right.  I'm going to clear the

15   screen again.

16   BY MR. DREHER:

17   Q.    And at some point, then, you arrived down in this area?

18   A.    Yes.

19   Q.    What did you see when you got down there?

20   A.    When we -- when we came onto the platform there, there

21   were cans of OC, there were water bottles, there was orange

22   stuff everywhere, which is the OC.  There were officers laid

23   out from the United States Capitol Police.  There were our bike

24   officers wearing the yellow jackets.  They were spread out as a

25   line trying to keep people from coming this direction.  Capitol

1    Police had their own line down there too.

2         It was a massive amount of people.  They all had all kinds

3    of signs that said degrading things towards the police, towards

4    the Democratic Party.  They had a lot of Trump memorabilia,

5    flags, things of that nature.  They had already ascended and

6    climbed onto the scaffolding they had there for the

7    inauguration 14 days later.  There were officers laid out.

8    They were crying, trying to get the -- I guess the things that

9    were thrown at us off their face.

10   Q.   Now, ma'am, what did you do when you arrived to that

11   scene?

12   A.   The only thing we could do.  We went and made a line in

13   front of the -- you know, we tried to reinforce the line.  It

14   was already sparse with officers 'cause there were some that

15   were lying in the back that were injured.

16   Q.   Would you be able to indicate on the diagram in front of

17   you where this line was.

18   A.   The line was right here, I believe, because they were

19   standing on the steps, which is this area right here

20   (indicating throughout).

21   Q.   Now, were you a direct member of this line?

22   A.   Yes.

23   Q.   In other words, you were facing rioters at this point?

24   A.   Correct.

25   Q.   How long were you on this line?

1    A.    I believe the line held for between an hour and an hour

2    and 20 minutes, I believe, and then the line was broken.

3    Q.    Could you tell us how the line was broken.

4    A.    Well, the whole time we were standing out there -- let me

5    preface it with this.  People were throwing things at us.  They

6    were pulling the metal fencing up.  They were trying to get it

7    separated because it was attached by, like -- there was, like,

8    an insert that fits into the next one so that they're all stuck

9    together, but the people were trying to pull them up.  They

10   were actually hitting officers under the chin in the face with

11   the things when they pulled them up.  They were throwing them

12   back into the crowd.  One guy launched a flagpole.

13         We had a very large sign that probably weighed a couple of

14   hundred pounds that was passed through us.  The lieutenants

15   said, hey, get this sign and bring it over here on this side,

16   you know, don't push it back on the crowd.  Just take it from

17   them.  One of the officers I was with, he got pulled into the

18   crowd, so three of us had to go grab him, pull him back so that

19   he didn't end up down the stairs with the crowd.

20         Equipment was being ripped off police officers.  My

21   sergeant's radio was handed to me.  This guy goes, "Hey, is

22   this yours?"  I said, "Sure, give it to me."  I put it on my

23   vest and kept it for later.  There were a lot of things going

24   on there.

25   Q.    And what was going through your mind during this time?

1    A.   Well, I mean, at first it was like disbelief.  I mean, I

2    can't believe these people are even, you know, doing these

3    types of things, especially not on this -- you know, Capitol

4    grounds.

5         But I think overall it was a feeling of impending doom.

6    I've actually never had that as a police officer, and I've been

7    in some scary situations, but this was completely different

8    because this was a massive amount of people, and they were

9    saying all types of things directed towards the police.  We had

10   a guy on a megaphone walking back and forth.  He was saying,

11   you know, line -- you're not going to hold the fucking line.

12   Q.   Let me stop you right there just for a moment.  How long

13   were you on this line?

14   A.   For about an hour and 20 minutes.

15   Q.   And earlier you described that this line had broken

16   somehow?

17   A.   Yes, it did.  I can't tell you exactly how it broke

18   because I had my back turned, but I could tell you I was

19   helping another officer that had his -- his eyes were doused

20   with OC, so I was helping him try to be able to see 'cause

21   there was water back there.  Somebody had water, so I put it on

22   his eyes.  I turned around.  I was like, "Carvel, don't turn

23   around, man.  They broke the line."  I turned around, and they

24   were feet from our face.

25   Q.   Ma'am, I'm sorry.  I know this is difficult.  Are you able

1    to slow down?

2    A.    Yes.  I'm sorry.

3    Q.    Okay.

4    A.    Trying to get it all out.

5    Q.    I understand.  So you're helping another officer with OC

6    in his eyes?

7    A.    Yes, 'cause they were spraying stuff.  They sprayed stuff

8    all over us, but my visor was down, thankfully, and I didn't

9    get it at that time.

10   Q.    Now, when you say "they," do you mean the rioters?

11   A.    Yes, sir.

12   Q.    Okay.  Now, with your back turned, at some point then you

13   turned back to the rioters?

14   A.    Correct, because I had him in front of me, so I turned

15   around, and then I saw them.  I told him, "Don't turn around."

16   He turns around.  They're, like, 3 feet from me or closer than

17   you are.  They're, like, right here, and it was like, okay,

18   what are we going to do with this, you know.

19   Q.    What was the answer to that question?

20   A.    The answer to that question came when the commander at the

21   time, Robert Glover, stated retreat.  I've never in my life

22   heard a police commander say that, because we're supposed to

23   run towards the danger and not away from it.

24   Q.    Now, using the diagram in front of you -- and I'm going to

25   clear the screen just for a moment -- can you describe the

1    route that you took from that order.

2    A.   Yes, and I think the staircase -- I'm not really sure

3    where the staircase is.  I think it's here maybe, but we

4    ended -- but anyway, it came out -- 'cause I think -- I believe

5    that's -- I believe that's the tunnel right there.  But yes, we

6    ran up the staircase that you probably can't see in this

7    picture, ended up right about here, but ultimately ended up

8    right there (indicating throughout).

9    Q.   Okay.  Now, once you got up to this second level, were you

10   able to look out to the National Mall?

11   A.   When I ran up the stairs into the second level, it was

12   nothing but CS gas, and I could barely see anything, and I took

13   it all in because I didn't have my gas mask on, so I was

14   completely unable to see or really breathe at that time, so I

15   figured the only place that there was clean air in the

16   entire -- in the entire area was inside, so I turned around and

17   ran up the stairs as fast as I could so I could get some clean

18   air.

19   Q.   Now, were you the only one to enter the tunnel at that

20   point?

21   A.   I believe I was of the first ones in the tunnel, but no.

22   There were people who came in after me, but I did not see them

23   until after I had -- there was a bathroom in a little corridor.

24   Capitol officers like to come in here, so I put my head under

25   the faucet to get my eyes cleared out.  So when I came out,

1    then all the other officers were in the hallway at that point.

2    Q.   And so this bathroom that you went to, was it sort of a

3    standard faucet that you were using?

4    A.   Yes.

5    Q.   How was it that you were able to clear your eyes out?

6    A.   I put my head under the faucet --

7    Q.   Okay.

8    A.   -- and ran -- you know, ran the water in and -- you know,

9    going like this trying to get them out, yeah, just lid -- you

10   know (indicating), best you could do.

11   Q.   Were you alone in this bathroom?

12   A.   Yes.

13   Q.   What was going through your mind at that time?

14   A.   You know, like I said, this has never happened to us in

15   modern times here at the Metropolitan Police Department.  So

16   yeah, there was a certain amount of fear there, but at the same

17   time it hadn't gotten as bad as it was going to get, and we

18   really couldn't predict what was going to happen next.

19        So when I came out of the hallway, I saw the other

20   officers.  I walked down towards the front of the tunnel to

21   see, you know, what was going on.  I just knew that we had all

22   retreated into the building, so I wasn't sure, you know, if

23   there was a way to shut the door or what was going on.  I

24   didn't -- you know, I've never heard a commander say retreat,

25   so I had no idea what was coming.

1          MR. DREHER:  Okay.  Ms. Johnson, if we are able to

2     take this down for a moment.

3     BY MR. DREHER:

4     Q.   Now, ma'am, I would like to direct your attention to the

5     screen in front of you.  I'm going to play about ten seconds of

6     a video that's been marked Government's Exhibit 122.

7          THE COURT:  I don't think it's 122, is it?

8          MR. DREHER:  I apologize, Your Honor.  I got my

9     numbers mixed up.  I apologize.  Your Honor, it's Government's

10    Exhibit 120.

11    BY MR. DREHER:

12    Q.   And ma'am, I'm going to play about ten seconds of this for

13    you, and if you could --

14         (A portion of Exhibit 120 was played.)

15         MR. DREHER:  So I'm going to stop it there.

16    BY MR. DREHER:

17    Q.   Ma'am, can you tell us what this video is.

18    A.   Yeah.  This is the interior of the Lower West Terrace

19    Tunnel.

20    Q.   Well, more specifically, can you tell us where this video

21    comes from.

22    A.   Well, the United States Capitol.

23    Q.   And where is it being recorded from?

24    A.   The United States Capitol in the hallway.

25    Q.   Is this from a camera that's on your person?

1    A.    Yes, sir.

2    Q.    Now, have you had a chance to review this video prior to

3    testifying today?

4    A.    Yes.

5    Q.    And does this video clip fairly and accurately depict some

6    of the events that you experienced on January 6th?

7    A.    Yes.

8              THE COURT:  So this was from your body-worn camera;

9    is that what you're saying?

10             THE WITNESS:  Yes, sir.  This is my body camera.

11             THE COURT:  Okay.

12             MR. DREHER:  I would move for the admission of

13   Government's 120.

14             MR. SMOCK:  No objection.

15             THE COURT:  It will be admitted without objection.

16   BY MR. DREHER:

17   Q.    So ma'am, I'm just going to start this at the beginning

18   and play portions of it, and I'm going to pause it and at that

19   point ask you questions.  If you could follow along with us.

20   A.    Sure.

21             (A portion of Exhibit 120 was played.)

22             MR. DREHER:  All right.  For the record, I've paused

23   the video at 14:42:45 p.m.

24   BY MR. DREHER:

25   Q.    And during this clip we see an individual with a different

1   hat than the other officers are wearing.  Can you tell us who

2   that individual was.

3   A.   I'm sorry.  You're addressing the man with the gray coat?

4   Q.   Yes.

5   A.   He was a commander.  I'm not -- I don't remember what his

6   name is at this time.

7   Q.   Now, is the commander a supervisory role, to your

8   understanding?

9   A.   Yes.

10  Q.   How high of a supervisor is that?

11  A.   Let's see.  The structure is officer, sergeant,

12  lieutenant, captain, and then commander.  Well, inspector and

13  then commander, so he's up there.

14  Q.   Okay.  And was he providing orders in this tunnel?

15  A.   He was.

16  Q.   So how had your duties changed from when you started your

17  day until now?

18  A.   How did my viewpoint change?

19  Q.   How did your duties change?

20  A.   Oh, my duties.  Well, you know, we were on standby mode at

21  the beginning of the day, and then we went from standby mode to

22  full deployment and then inevitably to whatever force was

23  necessary to use, and that's what we were ordered to do.

24  Q.   And what were you trying to stop?

25  A.   We were trying to stop these individuals from entering

1    into Congress's Chambers and getting their hands on members of

2    Congress and their staffers, which they were threatening to do

3    outside while we were standing outside, just because somebody

4    lost an election that they wanted to win an election.

5             MR. DREHER:  Well, I'm going to continue playing the

6    exhibit at this point.

7             (A portion of Exhibit 120 was played.)

8             MR. DREHER:  Now, for the record, I've paused the

9    clip at 14:43:26 p.m.

10   BY MR. DREHER:

11   Q.   And ma'am, can you describe -- are you facing towards the

12   interior of the Capitol or towards the exterior of the Capitol?

13   A.   I'm facing the exterior of the Capitol.

14   Q.   And so these rioters that we see in the screen, they're

15   trying to come in?

16   A.   Yes, sir.

17   Q.   Now, after you get on to this metal detector and you see

18   this, what's going through your mind right now?

19   A.   I mean, at first it's unbelievable.  With all those police

20   officers standing there, there's no reason why they would think

21   that they were visiting the Capitol or that it was okay for

22   them to pass through there, and the fact that they were

23   actively pushing and fighting the police, to me, was absolutely

24   ridiculous.

25   Q.   Now, is there anything about this period of time that

1  sticks out to your mind during January 6th, any events that

2  stick out in your mind?

3  A.   When I was standing on the metal detector, I know for a

4  fact I got spit on.  I don't know who did it, but I do know

5  that happened.  Also I used my OC spray because I was one of

6  the only people who could reach above the officers to actually

7  try to blind the individuals to get them pushed back down the

8  stairs.

9          THE COURT:  Could you say that again.  You were one

10  of the only people trying to do what?

11          THE WITNESS:  I was one of the only people that could

12  reach over the other officers with the OC spray.  The other

13  ones would have hit the officers in the back of the head,

14  because I was up above the crowd to be able to spray them.

15  BY MR. DREHER:

16  Q.   And then you also said at some point you got spit on?

17  A.   Yes, sir.  That's the one time I did remember that I got

18  spit on was when I was standing up there.

19          MR. DREHER:  I'm going to continue playing the

20  exhibit.

21      (A portion of Exhibit 120 was played.)

22          MR. DREHER:  For the record, I've paused it at

23  14:45:16 p.m.

24  BY MR. DREHER:

25  Q.   And ma'am, for the next portion I'm going to slow the

1   exhibit down a bit, but I'm going to ask that you focus your

2   attention on this area here.  Are you able to do that for me?

3   A.   Yes.

4          MR. DREHER:  And then, for the record, I'm going to

5   continue playing the exhibit.

6      (A portion of Exhibit 120 was played.)

7   BY MR. DREHER:

8   Q.   Now, earlier you told us that one of the moments you

9   remember from January 6 was being spit on?

10  A.   Yes, sir.

11  Q.   Where were you hit?

12  A.   It was up here on the chest, right here (indicating).

13  Q.   Okay.

14  A.   Above the body cam.

15         MR. DREHER:  Now I'm going to return to normal speed

16  and finish playing the exhibit.

17     (A portion of Exhibit 120 was played.)

18         MR. DREHER:  Ms. Johnson, if we're able to take that

19  down.

20  BY MR. DREHER:

21  Q.   Now, certainly we only got to see a short portion of your

22  day on January 6, but can you tell us what happened after this

23  video clip.

24  A.   So some of the things that I remember -- let's see.  The

25  first one was being spit on.

1          THE COURT:  Could you talk a little more into the

2     microphone.

3          THE WITNESS:  I'm sorry.

4     A.    The first one was being spit on.  The second one was I had

5     somehow managed to get -- once I got down off the conveyor

6     belt, I was actually -- officers were trying to leave the front

7     of the line, and I ended up getting pushed to the front of the

8     line, and while I was up there, the rioters -- there were so

9     many people up there that them pushing on my chest, I was

10    losing my breath and unable to breathe.

11          They were pushing my baton back into my chest, and it was

12    getting to the point where I could no longer take in full

13    breaths, so I thought if I passed out that I was probably

14    either going to get trampled or at the very least be

15    unconscious for a long period of time at people's feet because

16    we couldn't pull people out of the tunnel.

17          So at one point the one rioter had grabbed my baton, and

18    he threw it up over his head out into the thing, and he

19    continued to push on my chest, so at that point there was a guy

20    standing beside him, and I was telling him, "I can't breathe, I

21    can't breathe, you know, please, please don't hurt me, I can't

22    breathe" and...

23    BY MR. DREHER:

24    Q.    Ma'am, ma'am, I do want to just stop you for a moment and

25    just clarify.  Are these individuals that you can discern in

1    the crowd, or are these just random people in the crowd?

2    A.   No.  I mean, I can discern who these people are.  They're

3    not in the courtroom now, but I could discern who they were.

4    Q.   Okay.  Let me focus a little more.  How long did you spend

5    in the tunnel?

6    A.   We were in the tunnel probably till at least 5 o'clock.

7    It was a long period of time.

8    Q.   And when you say 5 o'clock, you mean 5 p.m.?

9    A.   Yes, absolutely.  We were fighting nonstop for hours,

10   taking turns getting in and out.

11   Q.   And so just for clarity, that would have been about two

12   hours after the clip that we just saw?

13   A.   Correct.

14   Q.   Now, did your day end at 5 o'clock?

15   A.   No, the day did not end at 5 o'clock.  What happened was a

16   lot of other agencies came on the scene.  At some point the

17   Maryland State Police were in the tunnel, the Virginia State

18   Police were in the tunnel.  They were also helping us clear the

19   scene.  Eventually the scene was rendered safe enough for us to

20   leave and then pull back a little bit.

21        At 6 o'clock the mayor of the District of Columbia issued

22   a curfew for the entire city.  So eventually we left around

23   about -- I think it was after 8:00.  It had fallen dark

24   already.  It was completely dark.  We couldn't figure out how

25   to get off the Capitol.  We didn't know where we were going at

1    that point because it was dark, but after we stepped out off

2    all the stuff, we moved back to First Street.  I believe that's

3    First Street that's in front of the Supreme Court, and that's

4    where we sat until a little after midnight.

5               THE COURT:  About what time was that, would you say?

6               THE WITNESS:  We were up there until about, I would

7    say, 12:30 a.m. on the 7th, somewhere around that time.

8    BY MR. DREHER:

9    Q.   And so you started at 7:30 in the morning on the 6th and

10   didn't end until 12:30 on the 7th?

11   A.   We weren't dismissed at 12:30, but that's when we left

12   Capitol grounds to go back to the station.

13   Q.   I understand.

14              MR. DREHER:  I have no further questions, Your Honor.

15              MR. SMOCK:  We have no cross-examination, Your Honor.

16              THE COURT:  Okay, all right.  Thank you, Officer

17   Beaver, very much.

18              THE WITNESS:  Thank you.

19              THE COURT:  You're excused.

20        All right.  So if the government's next witness will be

21   ready by 9:30 a.m.  I don't think the lawyers and I have

22   anything to discuss.

23        Is everybody on the jury available at 9:30 a.m. tomorrow?

24        Okay.  Let me tell you what our schedule is going to be so

25   far as I know it right now.  Tomorrow we will start at

1    9:30 a.m. with the next witness.  Monday I think we can also

2    start at 9:30 a.m., at least at the moment.  Oh, tomorrow we'll

3    start at 9:30 a.m.  I need to end by 4:30 p.m.  Monday we'll

4    start at 9:30 a.m.  I need to end by about 3 p.m.  Tuesday we

5    will not be sitting at all.

6         So the question is:  Where will we be in the trial by the

7    end of Monday?  Maybe we can give you a good prognosis

8    prediction before we leave tomorrow about when I'll instruct

9    the jury and you will hear closing arguments.  I don't think it

10   will be Monday, and I know that it can't be Tuesday for reasons

11   of scheduling that cannot be helped.  So that's what I have to

12   tell you.

13        And, you know, we appreciate your patience and your

14   ability to try to accommodate a situation that's lasted a

15   little longer than we all thought it would.  I mean, I knew --

16   pretty much knew we would be into the early part of next week,

17   at least with jury deliberations.  The selection of the jury

18   took a little longer for reasons that maybe you appreciate, and

19   we'll do the best we can.

20        So we'll start tomorrow at 9:30 and hopefully make a lot

21   of progress.  So thank you.  Good night.  Have a nice evening.

22   Remember my instructions and admonitions.

23        (Jury out at 4:27 p.m.)

24             THE COURT:  So sit down for a second.  So looking at

25   the witness list, I see Officer Brown and Agent Mulvihill, who

1   we've heard from at the earlier hearing, and maybe you have a

2   sense of how long each of them is going to take.  I assume it

3   won't take as long as the last time we were in.  Then we have

4   two other FBI agents.  One is a computer analysis response

5   person, and the other one, I'm not sure who he is, and then we

6   have a person named Kyle Sexton.  I don't know who he is.  So

7   if you have some sense of what tomorrow and Monday will look

8   like...

9           MR. VALENTINI:  Thank you, Your Honor.

10          THE COURT:  Turn it -- is it on?

11          MR. VALENTINI:  Thank you, Your Honor.  We expect

12   that we have four witnesses left.  One is Mr. Sexton.  One is

13   Officer Moore.  We have our case agent and a CART analyst from

14   the FBI, and they're not particularly long witnesses.  Our

15   optimistic prognosis is that we could be completed with the

16   examination of those witnesses tomorrow.  There will be other

17   things to do, of course.  Then it will be turned over to the

18   defense.  There may be motions in between, and of course there

19   is some charging work to do, but that is our prognosis as far

20   as our case is concerned.

21          THE COURT:  So if that were to happen -- and does

22   that suggest we may not hear from Officer Brown and Agent

23   Mulvihill?

24          MR. VALENTINI:  Only one of them.

25          THE COURT:  Only one of them.  Okay.  So if we were

1    to finish tomorrow with all of that, we could hear a Rule 29

2    motion if there were time.

3              MR. VALENTINI:  Yeah.

4              THE COURT:  And then at the moment the defense has

5    said their case will consist of reading a stipulation.  There

6    was some suggestion at some point in the last day or two there

7    might be some sort of other rebuttal witness, and then of

8    course they have to decide with their client whether or not he

9    wants to testify, because every defendant has a right to

10   testify.  Every defendant also has a right to remain silent,

11   and all of us know from our experience that sometimes that

12   decision is not finally made until after all the other evidence

13   has been heard.

14       So Mr. Smock, do you have anything to add to this

15   discussion?

16             MR. SMOCK:  Your Honor, I think from our perspective

17   our case subsequent to Dr. Kroll is really just going to be

18   reading that stipulation in, so we'd be ready to argue Rule 29.

19   We would also be ready to at least start the charging

20   conference tomorrow.  From our perspective it would be great to

21   be doing closings on Monday, particularly given the fact that

22   we won't be able to proceed on Tuesday.

23             THE COURT:  I don't know if that's feasible, but it

24   could be so -- and the other thing I do have to confess is I

25   haven't taken a close look at the instructions yet, and I think

1    some of them may be controversial.  But why don't we see how

2    the day goes tomorrow?  It's also possible that we could -- if

3    your prognosis is right, it could be possible we could finish

4    our charging conference Monday morning and still have closing

5    arguments.

6        Juror Number 40888 says she's supposed to be out of town

7    for a family event Thursday and Friday of next week.  I did not

8    mention it before due to the initial timeline had us finishing

9    earlier.  So I guess my suggestion is that we tell Ms. Johnson

10   to tell her if she could wait till the end of the day tomorrow

11   or even Monday morning, we could give her a much better sense

12   of how things stand.

13       Now, at the moment we do not have any American Sign

14   Language interpreters at all for Tuesday.  If I understand what

15   I've heard is that once the jury begins deliberations that we

16   might be able to do it with one or maybe just one on Zoom even,

17   if necessary, because presumably all we'll be getting is a

18   question from the jury.  We'll have a brief discussion, and

19   then we'll answer the jury, and if we needed to take a short

20   break for the interpreter to retool between the discussion and

21   the answer, we can do that, and then the verdict actually

22   shouldn't take very long.

23       So our problem becomes if we -- if your prognosis is too

24   optimistic, if we don't get to the jury on Monday, our problem

25   remains Tuesday, where we don't have anybody, and Ms. Salazar

```
 1    has worked very hard to find somebody, but I don't think we
 2    have anybody for Tuesday.
 3              INTERPRETER MATHERS:  Correct.  Can you hear me?
 4              THE COURT:  Why don't you talk into the mike.
 5              INTERPRETER MATHERS:  You're correct.  We don't have
 6    anyone for Tuesday.  My understanding is that we have at least
 7    one.  If they are in deliberations, that's fine for Wednesday
 8    and Thursday.  We're still working on getting two for both
 9    days, and we have two for Friday.
10              THE COURT:  Thank you.  So our problem is if we don't
11    get as far as everybody wants to on Monday, then we can't do
12    closings until Wednesday.  Well, let me put -- we're not here
13    on Tuesday.
14              MR. SMOCK:  Right.
15              THE COURT:  Let me put it this way.  If we don't -- I
16    mean, it's possible, I suppose, that even if we finished
17    everything but the charging conference tomorrow, we could do
18    that early Monday morning and still get to closings in the
19    afternoon, and they could start deliberating.
20              MR. VALENTINI:  Yes.
21              THE COURT:  And if we didn't get to the Rule 29, same
22    thing, but then of course the question for the defense is how
23    extensive do they want the Rule 29 to be.  They've raised a lot
24    of issues pretrial, and they need to make their record, but I
25    don't know.  So I think that you should be ready for the
```

 1    Rule 29 tomorrow, but it may or may not happen.

 2        Yes.  What don't you want to say?  You don't have to.

 3            MR. SMOCK:  I get to be the one who says this?  I

 4    think, yes, we're -- we'll be ready to argue Rule 29, and if it

 5    were possible to at least start the charging conference

 6    tomorrow, I think it would make sense.

 7            THE COURT:  Okay.  Well, I mean, let's see where we

 8    are.

 9            MR. VALENTINI:  Yeah.  With respect to the charging

10    conference, if I could ask for a --

11        Two points.  The first one is with respect to the charging

12    conference.  I believe there's a request for memoranda of law

13    on one point with respect to the special verdict.

14            THE COURT:  Yes.

15            MR. VALENTINI:  And it's -- I confess it's not

16    entirely clear to me what the requested briefing is about.  I

17    believe the defense -- I know it's about a 231 count.  I

18    believe the defense had offered a special verdict in their

19    proposed verdict, but I think this issue is a separate special

20    verdict.

21            THE COURT:  As I understand the issue -- tell me if

22    I'm wrong -- the question is whether or not the jury has to

23    unanimously agree --

24            MR. VALENTINI:  Okay.

25            THE COURT:  -- that the assault was as to a

1    particular officer.

2                MR. SMOCK:  The 231.

3                THE COURT:  I don't know that there's any law on

4    that, and I want law on that.

5                MR. VALENTINI:  Okay.

6                MR. SMOCK:  And Your Honor, it was with respect to

7    the 231 count.

8                THE COURT:  Right.

9                MR. SMOCK:  And I will have a brief filed within

10   20 minutes or so.

11               THE COURT:  All right.  I mean, in conspiracy cases

12   there's law that you have to prove -- the jury has to agree

13   unanimously on one specific overt act.  I don't know if there's

14   any law under 231 or anything analogous that would support the

15   view that they have to find an assault on a particular officer,

16   particularly since there is the -- there is the other verbs in

17   that statute, and it may be that the government's -- the

18   government is only going to suggest one particular officer, I

19   don't know that for sure, in it's closing.

20        So if you'll file a brief, we'll look at the brief

21   tonight, and the government can file a quick response or cases

22   or whatever depending upon what it says.  There's that issue.

23        I also had the question about Facebook stuff, but I also

24   think that -- let me say this.  What I was concerned about is

25   this.  Conversation between Mr. GossJankowski and somebody

1    else, the whole thing comes in.  I've already ruled on that

2    with respect to one Facebook thing.  I haven't yet ruled, but

3    I'm going to rule with respect to the Defense Exhibit 19 that

4    the whole thing comes in for two reasons.  It's the text

5    message between Matthews and somebody.

6              MS. ROCHLIN:  Officer Ulrich, Your Honor.

7              THE COURT:  Officer Ulrich.  I'm going to rule it

8    comes in for the same reason.  Well, not the same reason,

9    because it's not a statement by a party-opponent, but if it's

10   being offered on the basis of bias, I think you will find that

11   if that's the basis, bias, credibility, I think you will find

12   that it can come in under *United States vs. Abel*, 469 U.S. page

13   45, and the D.C. -- not the D.C. Circuit.  Judge Lamberth's

14   opinion in *United States vs. Slough*, S-L-O-U-G-H, 22 F.Supp.3d

15   29, so I think I would admit that.

16        The question with respect to 305, Exhibit -- the

17   Government Exhibit 305, I believe, is I'm not at all concerned

18   about Facebook interactions between Mr. GossJankowski and

19   others, but the government wants to admit things in which he

20   wasn't directly involved, and I asked if there was any law on

21   that since I'm not a big Facebook person.

22             MR. VALENTINI:  Yes, Your Honor.  I am ready to

23   address the point.  I believe you're, yeah, referring to

24   Exhibit 305.

25             THE COURT:  Well, I don't have time right now.

```
 1              MR. VALENTINI:  Okay.

 2              THE COURT:  So I think that if there are cases and

 3     you're going to address it, why don't you give them the cases

 4     you're going to rely on, and we'll talk about it tomorrow.

 5              MR. VALENTINI:  Your Honor, we don't have cases on

 6     point with respect to Facebook groups and that particular means

 7     of communications.

 8              THE COURT:  But you have something?

 9              MR. VALENTINI:  We have some argument with respect to

10     conditional relevance and why it applies here.

11              THE COURT:  We'll find a time to do that.  It won't

12     take long.

13              MR. VALENTINI:  No, it won't.

14              THE COURT:  So what else?  I mean, your theory is --

15     your prognosis is that it is possible that we will be done with

16     the case tomorrow and ready to discuss instructions?

17              MR. VALENTINI:  Yes, Your Honor.

18              THE COURT:  Okay.  And you're going to file a brief

19     tonight.  Erica's going to look at that.  Could you also email

20     her?  Are the instructions numbered --

21              MR. VALENTINI:  Yes.

22              THE COURT:  -- the way you submitted them?

23              MR. VALENTINI:  Yes, yes.

24              THE COURT:  Could you also make sure you're in

25     agreement?  She can figure it out probably, but send her an
```

1  email which are the instructions about which there's dispute or

2  substantive dispute as opposed to nitpicking words.  And I

3  don't know what she was planning to do later, but she and her

4  co-clerk can try to take a look at some of that stuff tonight

5  so that the three of us can discuss them tomorrow in case we do

6  get to instructions tomorrow.

7       I'm sure she can look through and find it herself, but it

8  would be helpful if you two, in the next ten minutes, just say

9  these are the ones that might engender some debate.  Send her

10  an email, and if the government has a response to the brief on

11  unanimity, they can -- if you want to write a brief, you can

12  write a brief and file it.  If you want to just say we don't

13  think these cases stand for that and here's some cases that say

14  the contrary, you can just email her and Mr. Smock and

15  Ms. Goetzl a bunch -- some cases.  If that's a quicker way to

16  do it, file something later.  None of us know yet what he's

17  going to say in his brief in 20 minutes.

18       It's actually now 25 minutes 'cause we've been talking.

19            MR. SMOCK:  I've been writing as we've been going.

20            THE COURT:  But we won't hold you to that.

21            MR. VALENTINI:  Thank you, Your Honor.

22            THE COURT:  All right.  I've got to go.

23       (Adjourned at 4:42 p.m.)

24

25

1    I certify that the foregoing is a correct transcript from

2    the record of proceedings in the above-entitled matter.

3

4

5        */s/Lisa G. Grimminger*              April 19, 2023
         Lisa G. Grimminger, RDR, CRR, CRC   Date

6

7                        I-N-D-E-X

8

9                              Direct   Cross   Redirect

10

11   WITNESSES:

12   FOR THE PLAINTIFF:

13   William Bogner              1473    ----    ----

14   Edgar C. Tippett            1480    1503    1526

15   Jason Mastony               1616    ----    ----

16   Sarah E. Beaver             1642    ----    ----

17   FOR THE DEFENDANT:

18   Dr. Mark Kroll              ----    1531    1589

19

20

                                                    Ruled
21   EXHIBITS:                        Offered        On

22   21. Photo of Taser and markings   1605,1607  1605,1610

23   120. MPD Officer Sarah Beaver
         [Body-Worn Camera #X6039BCAU]
24       from 2:41 p.m. to 2:47 p.m.      1657        1657

25

```
 1    EXHIBITS: (cont'd.)                     Offered      Ruled
                                                            On
 2
      121.1 MPD Officer Jason Mastony
 3         [Body-Worn Camera #X6039BFSE]
           from 2:44:30 p.m. to 2:45:30 p.m.    1629        1630
 4
      121.2 MPD Officer Jason Mastony
 5         [Body-Worn Camera #X6039BFSE]
           from 2:55 p.m. to 2:57 p.m.          1633        1633
 6
      801. Safeway Email re: D.C. Store Closures 1483       1483
 7
      802. Safeway D.C. Stores Sales            1491        1491
 8
      1001. Police 916 packaging and contents   1560        1560
 9
      1002. Vipertek packaging and contents     1565        1565
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```