<pre>
 1                BEFORE THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,     )    Case Number 1:21CR123
                                   )
 4             Plaintiff,          )
                                   )
 5   vs.                           )
                                   )    Washington, D.C.
 6   VITALI GOSSJANKOWSKI,         )    March 10, 2023
                                   )    9:37 a.m.
 7             Defendant.          )

 8

 9                            VOLUME IX
                       TRANSCRIPT OF JURY TRIAL
10            BEFORE THE HONORABLE PAUL L. FRIEDMAN
               UNITED STATES SENIOR DISTRICT JUDGE
11

12

13

14

15

16

17

18

19

20   COURT REPORTER:              Ms. Lisa Grimminger, RDR, CRR, CRC
                                  100 Centennial Mall North
21                                Room 587
                                  Lincoln, NE 68508
22                                (402) 437-1908

23

24

     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
</pre>

```
 1                         A-P-P-E-A-R-A-N-C-E-S

 2    FOR THE PLAINTIFF:          MR. FRANCESCO VALENTINI
                                  DOJ-CRM
 3                                950 Pennsylvania Avenue NW
                                  Washington, D.C. 20530
 4
                                  MR. ADAM MICHAEL DREHER
 5                                DOJ-USAO
                                  601 D Street NW
 6                                Washington, D.C. 20001

 7                                MS. KAREN E. ROCHLIN
                                  DOJ-USAO
 8                                99 Northeast 4th Street
                                  Miami, FL 33132
 9
      FOR THE DEFENDANT:          MR. EDWARD SMOCK
10                                MS. CELIA GOETZL
                                  FEDERAL PUBLIC DEFENDER FOR D.C.
11                                625 Indiana Avenue NW
                                  Suite 550
12                                Washington, D.C. 20004

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           (At 9:37 a.m. on March 10, 2023; with counsel for the

2    parties and the defendant present; WITHOUT the jury:)

3                THE COURT:  Good morning, everyone.  Call the case.

4                COURTROOM DEPUTY:  This is Criminal Action 21-123,

5    United States of America versus Vitali GossJankowski.

6           For the United States I have Francesco Valentini, Adam

7    Dreher, and Karen Rochlin.  For the defendant I have Edward

8    Smock and Celia Goetzl.  Our ASL interpreters this morning are

9    Sarah Blattberg and Carla Mathers.  Our court reporter is Lisa

10   Grimminger.

11          All parties are present.

12               THE COURT:  Good morning, everybody.  I understand

13   that you wanted to discuss some things before we get the jury

14   in.

15               MR. SMOCK:  Thank you, Your Honor.  I think there

16   were three things that I thought might make sense just to

17   at least bring to the Court's attention before we go

18   forward.

19          Sorry.  This angle is very odd.  I keep looking at you

20   through the Plexiglas.

21          First of all, just one thing with respect to Officer

22   Moore, who I believe will be testifying today, and you'll

23   recall that Officer Moore is the alleged victim in the -- for

24   the assault charge.  Two things I just wanted to raise about

25   that so that we don't need to have bench conferences and

1    interrupt his testimony.

2        The first thing is Officer Moore has said repeatedly that

3    he does not recall the events that form the basis for the

4    assault.  And, in fact, I think it's undebatable that he

5    couldn't, because I don't think he even would have been able to

6    see what was happening.  So my concern is that I don't think

7    that, as happened, for example, with Officer Ortega to some

8    extent, that he should be permitted to sort of narrate what he

9    thinks is happening in the video.

10        Certainly, I have no objection to playing the video and

11   him talking about things that he recalls, but to the extent the

12   government would wish to have him, you know, play the alleged

13   assault in slow motion as they've done before and have him sort

14   of narrate what he's seeing would be inappropriate, because he

15   has no specific recollection of it or knowledge of what

16   happened.  So I wanted to make that sort of objection on the

17   record so that I don't want to seem insensitive by interrupting

18   his testimony.

19        The second thing about his testimony is that I was

20   provided sort of a victim statement he made in court in a

21   sentencing recently, which was entirely appropriate and

22   understandable, but one part of it was he talked about the

23   ongoing impacts of the events of January 6th, including

24   nightmares and really, again, understandable reactions to what

25   happened, but my concern is that if he's permitted to go into

1    detail about ongoing impact, nightmares, thinking about it

2    constantly, and things of that nature, number one, it's not

3    relevant to the charges in this case, and number two, it's

4    overly prejudicial.

5         So again, I have no objection to what I imagine will be of

6    the government's proposed testimony from Officer Moore, but

7    those are the two areas that we would be objecting to and

8    prefer not to object while he's on the stand talking about

9    nightmares, for example.  That's the first thing, and I'm happy

10   to talk about it now, or I can tell you the other two.

11            THE COURT:  Why don't you give me the other two and

12   then...

13            MR. SMOCK:  One is a housekeeping matter which

14   doesn't really involve a dispute between the government and the

15   defense, but I just wanted to let you know that Kyle Sexton is

16   one of the people who the government plans to call.  He was

17   Mr. GossJankowski's roommate.  My understanding is that he was

18   interviewed by the FBI and I think maybe one of the

19   prosecutors.  There's a 302 and a video of that interview that

20   had not yet been turned over, and my understanding is that the

21   government is turning it over now.

22        The government has indicated that they would wait to call

23   him until I have a chance to look at it, but just so you know,

24   that may be something that would impact how we -- the order of

25   witnesses and potentially a break.

1    THE COURT:  So you're getting what you're entitled

2    to, but because you're just getting it this morning, it may

3    impact when they can call him so that you're prepared.

4    MR. SMOCK:  Correct.  And I don't know how long the

5    video is.  That's the only thing that gives me a little bit of

6    pause.

7    Then the last thing is just to the extent the

8    government -- I mean, my assumption is the government is

9    planning to call a witness to introduce Facebook records, so I

10   think prior to that we definitely need to finalize that

11   issue.

12   THE COURT:  Yeah.  Okay.  As long as you're on your

13   feet, so that's Exhibit 305.  I think, as long as you're on

14   your feet, I read the briefs that you both -- you filed a brief

15   last night, and the government filed an email in response.

16   What the government is proposing, I believe, is precisely

17   what Judge Cooper did in *United States vs. Richard Barnett*,

18   Criminal 21-038, in which he -- I think this is what the

19   government's proposing -- that he did give a unanimity

20   instruction, a specific unanimity instruction saying something

21   to the effect that -- if I can find it here -- that as to

22   Count I, in order to find -- return a guilty verdict, you must

23   all agree that the defendant committed an act or attempted to

24   commit an act with the intended purpose of obstruction,

25   impeding, or interfering with Metropolitan Police Officer

1    Terrence Craig.  And what -- as I understand it, what happened

2    was the indictment itself did not mention Officer Craig in the

3    231 count.  It did say a MPD Police officer, but during the

4    course of the testimony, it became clear that that was the

5    person everybody was talking about, and so he gave that

6    instruction.

7         And I don't know whether the government thinks that

8    there's only one person in that 231(a), but it may be that some

9    sort of a unanimity instruction with respect to Count I can be

10   agreed upon.  The government seems to be willing to do that for

11   a variety of reasons, but the government has also cited a lot

12   of case law about how unanimity verdict forms and special

13   interrogatories are disfavored in criminal cases, so maybe the

14   parties can work that out.  You might want to look at what

15   happened in *Barnett*, if it wasn't cited by either of you, and

16   then talk to each other.

17              MR. SMOCK:  Happy to do that, Your Honor.

18              THE COURT:  And while I'm on that subject, before the

19   government gets up, I would suggest the following to the

20   government.  I said that in the interest of time that an email

21   response to the filing would be kind, and at 10:19 last night

22   Mr. Valentini sent an email, and I do this a lot in certain

23   cases.  I suggest that you, if you want to just keep it in that

24   form, just file something called a notice with an attachment on

25   the docket so that your argument is on the record, not for my

1    use so much, but so that the Court of Appeals understands, if

2    it gets to the Court of Appeals, that this matter was fully

3    considered by both sides before I resolved things.

4              MR. VALENTINI:  I will do that, Your Honor.

5              THE COURT:  All right.  So we're going to hear what

6    the government has to say about the items that Mr. Smock has

7    raised this morning.

8         Mr. Dreher.

9              MR. DREHER:  Yes, Your Honor.  Starting first with

10   the testimony of Officer Moore, I agree with Mr. Smock in that

11   Officer Moore's specific memory of specific acts during that

12   time on January 6th, he -- I do not believe his testimony will

13   be specifically related to him remembering the acts that are

14   captured on the video.  However, the video already admitted

15   into evidence, I did intend to still play for Officer Moore to

16   explain not only the geography of the Capitol but also just

17   outline all of what he went through as he was being pulled out

18   of the tunnel.

19        In terms of the slow motion, there is a portion in which

20   there is an interaction with Mr. GossJankowski and Officer

21   Moore, but also that interaction does explain or at least

22   provide some insight for the jury as to why Officer Moore would

23   not have seen what happened.  It displays Officer Moore's head

24   down.  He's being pulled and pushed by other rioters at the

25   time and describes at least the environment he's in for the

1    jury to determine if his lack of memory is at least explained

2    through the evidence that has already been admitted.

3         Now, there are also exhibits that do depict what occurred

4    at that time that have not yet been admitted, and I believe

5    Officer Moore would be able to provide the foundation in line

6    with other exhibits that have been admitted with Captain Ortega

7    of the location, the timing, and whatnot for those admissions

8    even though specifically Officer Moore's knowledge of the

9    events depicted are limited because of what Officer Moore was

10   going through at the time.

11        Now, as it relates, I guess, to the lasting effects --

12             THE COURT:  The what?

13             MR. DREHER:  -- the lasting effects of January 6th on

14   Officer Moore, I do believe it's relevant regardless of Officer

15   Moore's testimony about the specific acts committed by the

16   defendant.  The defendant was still a part of what Officer

17   Moore went through.  At least that's what's been alleged in the

18   indictment.

19             THE COURT:  You're not planning to offer the victim

20   impact statement?

21             MR. DREHER:  So just -- correct, Your Honor.  I'm not

22   going to offer the transcript of what his prior testimony was

23   at a sentencing, but certainly what he went through and is

24   still going through because of what happened to him at the

25   Capitol, I believe, is relevant and --

1    THE COURT:  My view is that there have been other

2    officers who've testified, and there was brief questioning

3    about the lasting impact on them, and it seems to me there's no

4    reason why Officer Moore shouldn't be permitted to do that as

5    well.  As to the other points where you and Mr. Smock disagree,

6    his testimony will be that he doesn't remember specifically

7    exactly what happened, certainly not who was responsible for

8    it, but he can testify about, yes, that's me standing there as

9    these events were going on even though I don't remember them

10   and other things with respect to the environment just like

11   other officers have.

12       So I think that in principle I agree with the government's

13   approach, and having said that, I don't think it solves -- I

14   don't think in the time we've discussed it completely solves

15   Mr. Smock's hope that he won't have to stand up and object

16   because, I mean, there are certain things that I might find

17   objectionable, but I'm certainly not going to narrow your

18   testimony before I begin to hear it to the extent that

19   Mr. Smock wants me to.

20       So I'm afraid that there may be the need to stand up and

21   object, and since we've had this discussion, it may be -- some

22   of the objections may be simple one-word or two-word

23   objections, and I'll just say overruled if it's consistent with

24   what I'm saying now, or I will say sustained, or I'll say let's

25   come to the bench and talk about it.  But, you know, I can't

1  decide all of this stuff about relevance and even prejudice in

2  advance, I'm afraid.

3      MR. SMOCK:  Your Honor, just the one remaining thing

4  I'd say about it is -- I think this is probably clear, but the

5  line that I think would be crossed, for example, is showing the

6  video in slow motion and saying things like do you see a man

7  with a blue jacket, do you see him reaching his arm, et cetera.

8  Those are things that he only knows from the video, so that's

9  the only thing I want to make clear.

10      THE COURT:  I think I agree with that because that

11  gets close to the victim identifying his assailant when in fact

12  we all know that he can't, and I think it's sufficient to show,

13  not ask those kinds of questions, and once again, the jury will

14  be the judge of what it sees on the video.  But placing him

15  where he was and what -- talking about what he was experiencing

16  in general and explaining why he doesn't remember specifically

17  without saying in effect but do you see the guy standing right

18  there in the blue jacket when he didn't see him on the day in

19  question or he didn't see him at those moments, so I think

20  Mr. Smock's objection, to that extent, I will sustain it.

21      MR. DREHER:  Yes, Your Honor.  I completely

22  understand.

23      THE COURT:  Okay.  So we have count section things

24  you all will work out.  The Facebook Exhibit 305 maybe we don't

25  need to discuss right this minute because I'd just as soon get

```
 1    the jury in and start with your next witness unless you think
 2    we need to discuss 305 at this minute.
 3            MR. SMOCK:  I mean, I don't know the order of their
 4    witnesses.  I guess the only question is how long their next
 5    witness will be, who their next witness is.
 6            THE COURT:  That's why I say can we begin with the
 7    witness?
 8            MR. DREHER:  I believe so, Your Honor.
 9            THE COURT:  Well, then, unless there's anything else,
10    let's get the jury in, and you can bring the witness into the
11    courtroom, and we'll get started at ten till ten instead of at
12    9:30.
13        (Jury in at 9:53 a.m.)
14            THE COURT:  Good morning, everybody.  Please get
15    comfortable.  And do you have everything you need?  Or
16    Ms. Johnson will give you everything you need.
17        The government can call its next witness.
18            MR. DREHER:  Kerry Schultz.
19            COURTROOM DEPUTY:  Good morning, ma'am.  Step into
20    the box and raise your right hand.
21             KERRY SCHULTZ, PLAINTIFF'S WITNESS, SWORN
22            COURTROOM DEPUTY:  Thank you, ma'am.
23            THE COURT:  Yes.  Please take off your mask.  Speak
24    into the microphone.  Good morning.
25            THE WITNESS:  Good morning.
```

Schultz - Direct (Dreher)                                              1689

                            DIRECT EXAMINATION

1  BY MR. DREHER:

2  Q.   Good morning, ma'am.  If you would please introduce

3  yourself and spell your name for the record.

4  A.   Yes.  My name is Kerry Schultz, and that's spelled

5  K-E-R-R-Y, S-C-H-U-L-T-Z.

6           THE COURT:  Could you get a little closer to the

7  microphone, please, and pull your chair in or pull the

8  microphone.

9       Thanks.

10           THE WITNESS:  Uh-huh.

11  BY MR. DREHER:

12  Q.   Are you currently employed?

13  A.   Yes, sir.

14  Q.   What do you do for a living?

15  A.   I am a digital forensic examiner for the FBI.

16  Q.   How long have you been a digital forensic examiner?

17  A.   I have been doing this job for about 11 years.

18  Q.   And that's with the FBI?

19  A.   Yes.

20  Q.   And on January 6th of 2021, were you also working in that

21  capacity for the Federal Bureau of Investigation?

22  A.   Yes, I was.

23  Q.   Where in the country were you at that point?

24  A.   I was assigned to the Washington Field Office working in

1   Manassas, Virginia.

2   Q.   So when you say "Washington Field Office," do you mean the

3   state or in the city?

4   A.   Washington, D.C.

5   Q.   And so what does a digital forensic, excuse me, analyst

6   do?

7   A.   We examine digital evidence such as cell phones,

8   computers, loose media, just to name a few.

9   Q.   And could you explain to the jury how you go about doing

10  such a -- such tasks.

11  A.   We have -- can I be specific more towards like computers

12  or mobile devices?  It's -- the process is a little bit

13  different.

14  Q.   Let's take specifically the mobile devices.  How is it

15  that you examine a mobile device?

16  A.   Okay.  Normally when I would receive a mobile device, I

17  would do a physical inventory of it, you know, notate any

18  damage.  We would try to investigate, like, the model number

19  and figure out what tools we need to use to extract the device.

20  We -- generally there's -- there's a lot of ways of doing it,

21  but, generally speaking, you would connect the phone to a

22  computer with a cable and use digital forensic software in

23  order to pull the data from the device into a readable format

24  for review by the case team.

25  Q.   Now, in order to do this, did you have to go through any

1    trainings?

2    A.   Yes, sir.  I've had quite a bit of training internally to

3    the FBI as well as vendor training provided by specific

4    software vendors that we use for this process.

5               THE COURT:  Provided by whom?

6               THE WITNESS:  In this case it would be Cellebrite.

7    I've had vendor training from Cellebrite, and I've also had

8    internal FBI training on how to use the Cellebrite program.

9    BY MR. DREHER:

10   Q.   And so just to clarify, did you complete this training

11   prior to January of 2021?

12   A.   Yes.

13   Q.   Now, around that time did there -- did there come a point

14   when you received two iPhones associated with this case?

15   A.   I received one iPhone, yes.

16   Q.   And how did you receive it?

17   A.   It was through our evidence control room.  I went to our

18   evidence control room and requested to check out the item, and

19   I was able to sign it out of our evidence control.

20   Q.   What did you do after signing it out?

21   A.   I proceeded to do the examination as I mentioned before,

22   doing a physical inventory, taking pictures, attaching it to

23   our software to determine what tools I needed to use in order

24   to extract the device.  In this particular case the iPhone that

25   I was attempting to examine was locked with a passcode and I

1    was not able to --

2              THE COURT:  I'm sorry, ma'am.  I'm having trouble

3    hearing you.  This particular iPhone was what?

4              THE WITNESS:  Locked with a passcode.  There was a

5    PIN number, so I was not able to extract it with the tools

6    available to me at the time, so I had to request additional

7    assistance from an examiner who used advanced tools in order to

8    determine the password and extract the data from the device.

9    BY MR. DREHER:

10   Q.   Now, ultimately you were able to extract the data from

11   that device?

12   A.   Yes, the data was extracted from the device.

13   Q.   Was there another phone that you were able to extract

14   information from?

15   A.   There was another phone who -- that was extracted by

16   another person, and I received a report from that extraction,

17   and that is a report that I copied to make available for the

18   case team to review.

19   Q.   Now, just to clarify for the jury, when you say "report,"

20   what do you mean by that?

21   A.   Once we get an extraction from a digital device, we use

22   our forensic tools in order to categorize -- we call it

23   parsing.  It goes through all the data on there and puts it in

24   categories such as messages, photos, videos.  It puts them in

25   groupings so that the case team can easily review the

1    information.

2         So the report is the product that we would provide to the

3    case team in order to open and review all the categorized data

4    so they can see what was on the phone and make their -- we call

5    them tags.  They would highlight individual items in order to

6    make -- mark them as pertinent to the investigation.

7    Q.   So in other words, this report is all the information from

8    the device?

9    A.   The report is everything that the tool was able to extract

10   from the device, yes.

11   Q.   Now, in preparation to your testimony today, were you able

12   to review the information obtained from these two devices?

13   A.   I reviewed it inasmuch as to make sure that the report

14   was functioning as expected and providing it to the case team.

15   I did not review every single piece of information on the

16   phone.

17   Q.   And can you tell us how large some of these phones can

18   get.

19   A.   Oh, I mean, it kind of varies.  Some of the phones might

20   be, like, 64 gigabytes.  Some of them could be 128 or 256.  It

21   all depends on the model of the device.

22   Q.   So for us not familiar with this, is there a way to

23   explain just how much data that could be?

24   A.   It's hard to say 'cause the size that the phone is doesn't

25   necessarily tell you how much data is actually on the device.

Schultz - Direct (Dreher)                                    1694

1    It tells you how much it can store.  Ultimately it's really

2    what is stored on the device is how much it is, so it could be

3    up to that amount, but it might not be that much, so it just

4    depends on the device and how it's used.

5    Q.   So, ma'am, if I could direct your attention to the screen

6    in front of you.  I'm going to show you what's been marked as

7    Government's 205.

8         And ma'am, are you able to explain what I'm showing you on

9    the screen?  What is it?

10   A.   This -- because of my familiarity of the data that was on

11   this phone, this particular photo appears to be a thumbnail

12   from a video that was on the device.

13   Q.   And this is from a phone that you were able to view the

14   report?

15   A.   Yes, this image was included in the report.

16   Q.   And so this image would also have been on that phone?

17   A.   Yes, that's correct.

18            MR. DREHER:  Your Honor, the government moves for the

19   admission of 205.

20            MR. SMOCK:  Your Honor, can I just ask one quick voir

21   dire question?  I didn't understand --

22            COURTROOM DEPUTY:  Mr. Smock, please use the

23   microphone.

24            THE COURT:  He wants to ask a voir dire question.

25       Go ahead.

1            VOIR DIRE EXAMINATION

2   BY MR. SMOCK:

3   Q.    Hello, Ms. Schultz.  Just a quick question.

4   A.    Okay.

5   Q.    Did you say that this thumbnail came from the iPhone 7

6   that you yourself examined?

7   A.    There was an iPhone 11 and an iPhone 7, and I don't recall

8   which one of the two devices that this picture came from.  It

9   was from one of the two iPhones.

10  Q.    Okay.  And did you perform the download and analysis of

11  both of them?

12  A.    The iPhone 7 was downloaded from another examiner, and

13  then I parsed the extraction and created the report for the

14  case team to review.

15  Q.    Okay.

16  A.    The other phone, the iPhone 11, was extracted by somebody

17  else, and the report was generated, and then I provided the

18  report to the case team after verifying it was intact.  And

19  when we copy digital evidence, we use an MD5 hash value, which

20  is like a digital fingerprint.  If any small amount of data

21  changes within the file, it would change the hash value.  So I

22  copied the report, verified that that digital fingerprint

23  matched, so nothing got changed, and then provided that report

24  for the review for the case team.

25  Q.    And so for the iPhone 11 you did not perform the download

1   analysis of that phone?

2   A.   I did not perform the download.  I did, however, copy the

3   report and provide it to the case team for review.

4   Q.   Okay.  So in sort of layperson's terms, you made a copy of

5   it and gave it to somebody else?

6   A.   Yes, that is correct.

7          MR. SMOCK:  Your Honor, our objection is to

8   foundation as to not being aware which of the phones this came

9   from.

10          THE COURT:  Can we establish which of the phones this

11  is from.

12          MR. DREHER:  Yes, Your Honor.

13                  DIRECT EXAMINATION RESUMED

14  BY MR. DREHER:

15  Q.   Now, ma'am, when devices such as this are stored in the

16  evidence locker, is there any way to know where each phone came

17  from?

18  A.   Are you talking about the physical phone itself?

19  Q.   Just any sort of digital evidence.  How is -- how is its

20  location kept -- how is the information of the location kept

21  within the FBI records?

22  A.   Right.  We have a system called Sentinel where evidence is

23  entered into this electronic system, and that has -- when we

24  enter an evidence item into the system, the location of where

25  it was found is stored in with the record for that evidence

Schultz - Direct (Dreher)                                    1697

1    item.  So I would look at the chain of custody and also the

2    record in our Sentinel system to see where it was collected

3    from.

4    Q.   And so would each piece of evidence be serialized in some

5    way?

6    A.   They do get assigned 1B numbers, which is like a unique ID

7    for an evidence item for a particular case; so the way I would

8    be able to tell what device is what is by looking in the system

9    to see what 1B number was assigned to that evidence item.

10   Q.   Okay.  So I would imagine there's probably more than one

11   1B number associated with any given case, but are those numbers

12   somehow tracked by the FBI?

13   A.   Yes.  There's -- each 1B number is unique to a particular

14   case.  So in this case I believe there -- well, I don't want to

15   talk about -- there was, like, multiple items for this case,

16   but each one of the 1B numbers was unique for this case.

17   Q.   Okay.  So would the number 1B9 be significant to you in

18   any way?

19   A.   Yes.

20   Q.   Can you explain what that is.

21   A.   Yes.  1B9 is the number that was assigned to the iPhone 7,

22   the red iPhone 7.

23              THE COURT:  This is the number assigned to the

24   iPhone 7?

25              THE WITNESS:  Yes.

Schultz - Direct (Dreher)                                          1698

1    BY MR. DREHER:

2    Q.   And then each of the either -- whatever digital evidence

3    you removed from the iPhone 7, would that include this same 1B9

4    number with it?

5    A.   I'm sorry.  Can you repeat the question?

6    Q.   So certainly 1B9 is the entirety of the information;

7    correct?

8    A.   Correct.

9    Q.   When you take out one piece of that information, does it

10   still keep that 1B9 moniker?

11   A.   We also -- when we're examining a device, we would give it

12   also a Q number, which is a questioned item number.  In this

13   case, the 1B9, there would be questioned item number QWF9.  So

14   sometimes the reports will refer to the Q number versus the 1B

15   number.  This is designed to give individual numbers to

16   information.  So say you have a computer with four hard drives.

17   You can give each hard drive its own number.  So I'm not sure

18   if that's what you're referring to, but there may be a

19   questioned item number also associated with this device.

20            THE COURT:  The item that's -- that you haven't seen

21   yet that's on the screen, how would you determine -- or how

22   did -- can you determine whether it came from the iPhone 7 or

23   the iPhone 11?

24            THE WITNESS:  There is a report that was generated

25   where this photograph came from.  Inside the report there's a

1    path to where this photo is exactly on the device, and that

2    would also tell me which device it came from.

3    BY MR. DREHER:

4    Q.   And do you believe reviewing that report would allow you

5    to identify where this particular photograph came from?

6    A.   Yes, sir.

7              MR. DREHER:  If I may just have a moment, Your Honor.

8              THE COURT:  Sure.  And if you need to send it to

9    Ms. Johnson, she can print it, if that would be helpful.

10             MR. DREHER:  Oh, yes, Your Honor.

11             THE COURT:  I think.

12   BY MR. DREHER:

13   Q.   Ma'am, if I can direct your attention to the screen in

14   front of you.

15   A.   Okay.

16   Q.   So are you able to tell us whether or not the iPhone was,

17   in fact, serialized in some way?

18   A.   This report --

19   Q.   Without referring to the report, are you able to tell us

20   whether or not the iPhone was serialized in some way?

21   A.   I'm not sure what you're asking.

22             THE COURT:  The question is -- I believe he's showing

23   you the report or a page of the report.  Does viewing that

24   report now refresh your recollection and help you in any way?

25   Without reading directly from it, does it help you in any way

1    after you've reviewed that page?  And if you need to see other

2    pages, he'll show you those to determine whether the exhibit he

3    put up on the screen earlier comes from the iPhone 7 or the

4    iPhone 11.  That's the question, I think.

5            THE WITNESS:  This report shows me which item is the

6    iPhone 7, but it doesn't show me where that specific photo came

7    from.  There was a PDF report generated.  In part of that

8    generation process, there was a files folder that gave you all

9    the files, like all the videos and pictures that were on that

10   report.  The PDF report itself, that has thumbnails of all the

11   pictures that were included and videos.  That report has a path

12   to the location of where the specific photo came from.

13   BY MR. DREHER:

14   Q.   Ma'am, I'm going to direct your attention once more and

15   give you an opportunity to review the screen once more, and if

16   you could review this and look up at me after you've had a

17   chance to do so.

18           THE COURT:  This is again Exhibit --

19           MR. DREHER:  This is not an exhibit, Your Honor.

20           THE COURT:  Oh, okay.

21   A.   Okay.  Yes.

22   BY MR. DREHER:

23   Q.   And then after reviewing those -- and if I can draw your

24   attention, then, back to government's proposed Exhibit 205.

25   Are you able to tell us where this image came from?

Schultz - Direct (Dreher)                                    1701

1  A.   This image appears to have come from the iPhone 11, which

2  was 1B8.

3            MR. DREHER:  Okay.  Let me just have one moment, Your

4  Honor.

5            THE COURT:  Yes.

6            THE WITNESS:  I'm sorry.

7            THE COURT:  Wait one second.  Do you need to -- she

8  wants to say something else.  Do you need to clarify something

9  or --

10  BY MR. DREHER:

11  Q.   If I may just ask you a question.  You said an iPhone 8

12  [sic].  Earlier you referred to an iPhone 7 and an iPhone 11.

13  A.   Yes.  I'm sorry.  I misspoke just now.  I need to clarify

14  my answer.

15  Q.   Okay.

16  A.   Okay.  So there was an extraction of 1B8, which is an

17  iPhone 11, and there was an extraction of an iPhone 7, which

18  was 1B9.  This was from 1B9, not 1B8.

19  Q.   So that would be the iPhone 7?

20  A.   Yes, sir.  My apologies.

21            MR. DREHER:  Your Honor, I would move once more for

22  the admission of Government's 205.

23            THE COURT:  Is there any further objection,

24  Mr. Smock?

25            MR. SMOCK:  No, Your Honor.

Schultz - Direct (Dreher)                                          1702

1              MR. DREHER:  And I would ask that it be presented to

2     the jury.

3              THE COURT:  It will be admitted.

4     BY MR. DREHER:

5     Q.   Now, earlier you told us that this was a thumbnail.  How

6     do devices like these store thumbnails?

7     A.   It depends on the application.  Specific to this

8     photograph, it was a thumbnail for a -- it was stored in the

9     camera roll for this phone, so this is a thumbnail from

10    something that was in the camera roll on that phone.

11    Occasionally there are thumbnails for things that are inside of

12    an app that's on the phone.  This particular one was from the

13    camera roll.

14    Q.   So then, it being from the camera roll, are you able to

15    determine whether or not this photograph came from somebody

16    taking it from the phone or whether it came from some other

17    device and sent to this phone?

18    A.   It could have been either taken from this phone or saved

19    to the photo camera roll if it was sent to that phone.  Either

20    way it would end up in that same location.

21             MR. DREHER:  Ms. Johnson, are we able to take this

22    down for a moment?

23    BY MR. DREHER:

24    Q.   Now, ma'am, if I could direct your attention to the screen

25    in front of you.  This is what's been marked as government's

Schultz - Direct (Dreher)                                          1703

1    proposed Exhibit 206.  Have you seen this image before?

2    A.    I have.

3    Q.    And can you tell us where it is from.

4    A.    This was a thumbnail from a video.

5    Q.    From the same device?

6    A.    I would have to look at that same information from this

7    just to make sure.

8              THE COURT:  You said it was video?

9              THE WITNESS:  This is a thumbnail image from a short

10   video, yes.

11             THE COURT:  And was the video on the phone?

12             THE WITNESS:  I'd have to refer to the report.  Some

13   of them there were thumbnails for a video and the video was not

14   on the phone because the video was in the cloud.  Apple

15   devices, there's an iCloud storage where you can have the photo

16   up in the cloud, and on the device all you see is a thumbnail

17   until you actively click the thumbnail to, like, have the

18   picture or the video downloaded from the cloud to the device.

19   So in this case there were some where it was on the device and

20   some that were -- it was in the cloud, and this particular one

21   I would need to look at the report in order to determine if it

22   was in the cloud or on the device.

23   BY MR. DREHER:

24   Q.    Now, did you obtain this photograph from the extraction of

25   the devices in this case?

1    A.   Yes.

2             MR. DREHER:  Your Honor, I would move for the

3    admission of 206.

4             MR. SMOCK:  No objection.

5             THE COURT:  206 will be admitted.

6             MR. DREHER:  And if we could present this.

7         Thank you, Ms. Johnson.

8    BY MR. DREHER:

9    Q.   Now, ma'am, you said that this was a thumbnail.  How is it

10   in your line of work that you're able to determine it was a

11   thumbnail?

12   A.   There are several ways for me to be able to tell that it's

13   a thumbnail.  One way, at the top of your screen here, the file

14   name is 5005_5.JPG.  That's a naming convention that Apple

15   devices use for thumbnails.  It usually -- like, if you look at

16   the path of where this is stored, it will also give you the

17   name of the original picture or video that it came from.  Other

18   thumbnails are stored in other locations.  Some of them may

19   have a .THM file extension, and that also would indicate to me

20   that it's a thumbnail.  This particular one is a .JPEG with the

21   5005 file name.  That tells me that it came from somewhere

22   else.

23            MR. DREHER:  If we can put this down, Ms. Johnson.

24   BY MR. DREHER:

25   Q.   I'm going to show you what's government's proposed 207.

1         Now, ma'am, can you tell us where this photograph comes

2    from.

3    A.   This also was a photograph that was extracted from the

4    device, just as the other photo was.  This is also named

5    5005.JPG.  There's an underscore eight 'cause there was

6    multiple 5005s, so each one gets its own name.  So this is also

7    a thumbnail from either a picture or video that was on the

8    device.

9              MR. DREHER:  I'd move for the admission of 207.

10             MR. SMOCK:  No objection.

11             THE COURT:  It will be admitted without objection.

12             MR. DREHER:  Thank you, Ms. Johnson.  If we are able

13   to bring it down.

14   BY MR. DREHER:

15   Q.   Now, ma'am, if I could direct your attention to the screen

16   in front of you, I'm going to show you what's been marked as

17   government's proposed Exhibit 208, and I'm going to show just a

18   short portion of this.  I'm going to ask if you recognize it.

19        (A portion of Exhibit 208 was played.)

20   BY MR. DREHER:

21   Q.   So ma'am, I've shown you about nine seconds of this

22   proposed exhibit.  Are you able to tell us what this is?

23   A.   Yes.  This is a video that was extracted from the device.

24             THE COURT:  Which device, the iPhone 7?

25             THE WITNESS:  I would need to look at the PDF report

1   that shows that path that you showed me before to make

2   100 percent sure that this was from the iPhone 7.

3   BY MR. DREHER:

4   Q.   Okay.  So ma'am, if I could direct your attention to the

5   screen in front of you, and I'm just going to scroll.

6        Now, does reviewing this document refresh your

7   recollection as to where this file may have come from?

8   A.   Yes, sir.

9   Q.   Are you able to tell us where that -- or what I've shown

10  you as Proposed Exhibit 208 has come from?

11  A.   Yes.  This video was from the iPhone 11.

12  Q.   And again, that's associated with this case?

13  A.   Yes.

14            MR. DREHER:  I would move for the admission of

15  government's proposed Exhibit 208.

16            MR. SMOCK:  Your Honor, our objection is to the lack

17  of foundation given that this witness didn't perform --

18            THE COURT:  I can't hear you.  Make your objection.

19  You want to ask her some questions?

20            MR. SMOCK:  This was the phone that you did not

21  perform the extraction from?

22            THE WITNESS:  That is correct.

23            MR. SMOCK:  It's just -- it's a foundational

24  objection, Your Honor.

25            THE COURT:  Somebody else made the extractions?

 1                THE WITNESS:  Yes, sir.

 2                THE COURT:  Somebody in your office?

 3                THE WITNESS:  Somebody in the Washington Field Office

 4     did, yes.

 5                THE COURT:  Someone with the same background and

 6     experience as you as a --

 7                THE WITNESS:  It's my understanding that he's had

 8     vendor training for this particular tool, yes.

 9                THE COURT:  Any further questions?

10     BY MR. DREHER:

11     Q.    Now, earlier you mentioned the hashtag signature.  Was

12     this device also something you were able to review this hashtag

13     signature on?

14     A.    Right.  So when I received this report from another

15     source, I was able to open up the report, and inside there is

16     an area where it can tell you -- you could verify the hash

17     value.  The hash value, again, is that digital fingerprint to

18     make sure nothing changed.  Inside the report itself it said

19     that the hash value was verified; so that's how I could tell

20     that this report was verified to have come from this iPhone 11.

21     And also once I copied it to our forensic network in order for

22     the case team to review, it also got a new hash value of the

23     full package, and then that verified as well to make sure there

24     were no changes.

25                MR. DREHER:  I would move for the admission of 208.

Schultz - Direct (Dreher)                                      1708

 1              THE COURT:  I'm going to admit it over objection,

 2   208.

 3              MR. DREHER:  And I'm going to play the exhibit.

 4        (A portion of Exhibit 208 was played.)

 5              MR. DREHER:  Now, Ms. Johnson, would you be able to

 6   stop publishing.

 7   BY MR. DREHER:

 8   Q.   Now, ma'am, I'm going to show you what's been marked as

 9   government's proposed Exhibit 209 for a few seconds here.

10        (A portion of Exhibit 209 was played.)

11   BY MR. DREHER:

12   Q.   Are you able to identify that?

13   A.   Yes, sir.

14   Q.   What was that?

15   A.   This is a video that also came from the iPhone -- I'm

16   sorry.  It says in there 1B11, but that is from the -- I'm

17   sorry.  The number says 1B11 on the exhibit right here, but

18   that should be 1B8.

19              THE COURT:  It should be what?

20              THE WITNESS:  1B8.

21   BY MR. DREHER:

22   Q.   So it comes from the iPhone 11?

23   A.   Right.  If I were to view the PDF report that contains

24   that video, I can 100 percent tell you which device it came

25   from even though it says B11.

Schultz - Direct (Dreher)                                          1709

1              THE COURT:  I'm confused.  We have two iPhones here,

2    right, an iPhone 7 and an iPhone 11?

3              THE WITNESS:  Correct.

4              THE COURT:  And I believe you testified that an

5    identifier 1B9 means it's the iPhone 7.

6              THE WITNESS:  Yes.  1B8 is iPhone -- I apologize.

7              THE COURT:  I believe you testified earlier when we

8    were talking about Exhibit 205, the photograph he showed you --

9    and either counsel can correct me if I'm wrong or we can go

10   back to the transcript.  I believe you testified that if it

11   said 1B9, that meant it was from the iPhone 7.

12             THE WITNESS:  That's correct.

13             THE COURT:  And then I think you also told us this --

14   I'm less certain -- that there was some other number, 1B

15   something else, that meant it came from the iPhone 11.  Is that

16   what you're talking about now?

17             THE WITNESS:  Yes, sir.  1B8 came from the iPhone 11.

18   BY MR. DREHER:

19   Q.   And so if I could direct your attention, then, to the

20   screen in front of you, and then I'm just going to scroll for a

21   bit.

22        With what you reviewed, are you able to tell us which

23   iPhone the government's proposed Exhibit 209 comes from?

24   A.   Yes.  That was from the iPhone 11.

25             MR. DREHER:  The government moves for the admission

1    of proposed Exhibit 209.

2              MR. SMOCK:  Same objection.

3              THE COURT:  It will be admitted over objection.

4              MR. DREHER:  And I'm going to play the exhibit.

5         (A portion of Exhibit 209 was played.)

6              MR. DREHER:  Thank you.

7    BY MR. DREHER:

8    Q.   Now, ma'am, after obtaining this data, what do you do with

9    it?

10   A.   In what context?

11   Q.   Is it something that goes back to the evidence locker, or

12   is it something that you maintain possession of?

13   A.   Once we generate -- we parse the extraction and generate a

14   report, we create a master copy that goes into evidence

15   control, and we also have a forensic network, which is where it

16   was stored for the case team to review, and there would be a

17   copy maintained up on the forensic network until they were

18   complete, like, completely done with the review, and then we

19   would remove it from the network.

20   Q.   And so were all the procedures that have been set up

21   followed in this case?

22   A.   Yes, sir.

23             MR. DREHER:  Your Honor, I have no further questions.

24                       CROSS-EXAMINATION

25   BY MR. SMOCK:

Schultz - Cross (Smock)                                          1711

1    Q.   Good morning again, Ms. Schultz.

2    A.   Good morning.

3    Q.   I want to go over with you a handful of additional

4    photographs that would have been recovered from the iPhone 11.

5            MR. SMOCK:  First, Adam, I'm going to ask that you

6    put up Defense Exhibit 15 for identification.

7    BY MR. SMOCK:

8    Q.   Do you recognize that photograph from your review of the

9    Cellebrite report?

10   A.   I would need to refer to the Cellebrite report to make

11   sure that this photo is a specific one that's in the report.

12   Q.   Understood.

13           MR. SMOCK:  Your Honor, could I approach for a

14   moment?

15           THE COURT:  What?

16           MR. SMOCK:  Can I approach?

17           THE COURT:  Sure.

18           MR. SMOCK:  Oh, I'm sorry.  Not approach you.

19   Approach the witness.

20           THE COURT:  Oh, I'm sorry.

21           MR. SMOCK:  No offense.

22           THE COURT:  Yes.  No.  So, okay, you're going to show

23   her something that may refresh her recollection?

24           MR. SMOCK:  Yes.

25           THE COURT:  Thank you.

1    BY MR. SMOCK:

2    Q.   So I'm showing you the iPhone 11 report and referring you

3    to page 10 and asking you to look at the third image.

4    A.   Okay.

5    Q.   Does that appear to be the same image?

6    A.   Yes, it does.

7    Q.   Thank you.

8             MR. SMOCK:  Your Honor, I'd move to admit Defense

9    Exhibit 15.

10            MR. DREHER:  No objection.

11            THE COURT:  It will be admitted.

12   BY MR. SMOCK:

13   Q.   And based on your review of the report, your understanding

14   is that that would have been a photograph -- well, actually,

15   why don't you tell me.  How could that have ended up on the

16   phone?

17   A.   How could it have ended up on the phone?  There are

18   multiple ways.  Just now when I was looking at the report, I

19   was looking at the photo itself.  I did not take note of the

20   full path of where it was coming from.  I mean, the photograph

21   could be on the phone either because it was looked at on the

22   internet or it was taken with the camera on the phone.  There's

23   multiple ways that this photo could have ended up on the

24   device.

25            THE COURT:  So let me go to something you said

Schultz - Cross (Smock)                                        1713

1   before.  Let me see if this is true.  Could be on the phone

2   because the person who possessed the phone at the time was

3   taking a video or photographs; right?

4            THE WITNESS:  Correct.

5            THE COURT:  And did you say earlier that something

6   could also be on a phone -- like, if somebody sends me

7   something, sends me a photograph or a video, that's also on my

8   phone.

9            THE WITNESS:  Yes, that's correct.

10           THE COURT:  Okay.  So that's another way it could

11  have been on this phone.

12           THE WITNESS:  Correct.

13  BY MR. SMOCK:

14  Q.   And Ms. --

15           THE COURT:  Can you determine which way something

16  gets on somebody's phone with your experience?

17           THE WITNESS:  Depending on where it's stored would

18  give me more information as to whether or not I could tell you

19  for sure where it came from.  Occasionally if it's on the

20  camera roll, that doesn't necessarily mean they took the photo.

21  It means they saved it to their camera roll; so in that case it

22  would depend on whether they took the photo or they saved it to

23  their camera roll.

24  BY MR. SMOCK:

25  Q.   And would the fact that thumbnail is a word in the file

Schultz - Cross (Smock)                                          1714

1   path tell you anything similar to what you said about an

2   earlier image that was shown?

3   A.    Right.  If thumbnail is in the path, then that usually

4   means that this is a small version of the original photo.  This

5   is just a small thumbnail for viewing on the device.  It

6   doesn't necessarily mean that you've got a copy of the whole

7   entire picture or video.

8   Q.    So similar to what you said about the previous video

9   showing the electrical device; correct?

10  A.    Correct.

11  Q.    I'm now going to show you --

12           MR. SMOCK:  If I could just have on the witness's

13  screen Defense Exhibit 16 for identification.

14  BY MR. SMOCK:

15  Q.    And I'm not going to require you to recall this.  What

16  I'll do is just show you, if I could again, the Cellebrite

17  report from that iPhone 11.

18  A.    Okay.

19  Q.    And I'm directing your attention to the second image

20  there.

21  A.    Okay.

22  Q.    Does that appear to be the same image?

23  A.    Yes, sir.

24           MR. SMOCK:  I'd move to admit Defense Exhibit 16.

25           MR. DREHER:  No objection.

Schultz - Cross (Smock)                                          1715

 1              THE COURT:  It will be admitted.
 2   BY MR. SMOCK:
 3   Q.   Again, same situation.  The file path includes the word
 4   thumbnails?
 5   A.   Yes.  The file path for this particular photo shows that
 6   it's in the camera roll and this is a thumbnail.
 7   Q.   So this would have been a photograph taken by the user of
 8   the phone?
 9   A.   Either taken by the user or saved to their camera roll.
10   Q.   Got it.  Thank you.
11              MR. SMOCK:  If I could just have the witness's
12   screen.  Thanks, Ms. Johnson.
13   BY MR. SMOCK:
14   Q.   I'm going to show you what's been marked as Defense
15   Exhibit 17 for identification.
16        Do you recognize that image?
17   A.   Yes, I have seen this image.
18   Q.   I can show you the report, but do you otherwise
19   acknowledge that it comes from that iPhone 11?
20   A.   Yes, this image came from the iPhone 11.
21              MR. SMOCK:  I'd move to admit Defense 17.
22              MR. DREHER:  No objection.
23              THE COURT:  It is admitted and shown to the jury.
24   BY MR. SMOCK:
25   Q.   Is that the same situation, that this photograph would

Schultz - Cross (Smock)                                              1716

1   have either been taken by the phone's user or -- what did you

2   say, downloaded?

3   A.   It could have been either saved to the camera roll or

4   taken by the photo -- or taken by the camera on the phone, or,

5   I mean, in some cases it's something that they viewed on the

6   internet.

7   Q.   Okay.  Based on your review of this report, do you have

8   any basis to believe that this was taken off of the internet as

9   opposed to have been a photograph taken by the user?

10  A.   May I refer to the report again, please.

11       Okay.

12  Q.   Did that help you answer the question?

13  A.   Yes, sir.  This is in the camera roll on the device, so it

14  was either taken by the camera or saved to the camera roll.

15  Q.   Got it.  Thanks.

16       MR. SMOCK:  Can I just have the witness's screen.

17  Last one.

18            THE WITNESS:  Okay.

19            MR. SMOCK:  Defense Exhibit 18 for identification.

20  BY MR. SMOCK:

21  Q.   Do you recognize this photograph from your review of the

22  contents of the phone?

23  A.   I don't recall seeing this; however, I did not review

24  every single photo.

25  Q.   Got it.

Schultz - Cross (Smock)                                          1717

```
 1                  MR. SMOCK:  I'd move to admit it unless the
 2      government wants me to find the specific image in the report.
 3                  MR. DREHER:  There's no objection.
 4                  MR. SMOCK:  So I'd move to admit Exhibit 18.
 5                  THE COURT:  It will be admitted without objection.
 6                  MR. SMOCK:  Just one moment.  I'm just trying to see
 7      where that photograph is in this report.  It's testing my
 8      eyesight here.  These are tiny.
 9      BY MR. SMOCK:
10      Q.   Any reason to believe that this photograph was in some way
11      different than the others in terms of its likelihood of being
12      taken by the user?
13      A.   I can't answer that question.
14                  THE COURT:  Does -- never mind.
15                  MR. SMOCK:  Here it is.  Can I approach?
16      BY MR. SMOCK:
17      Q.   Almost done.  It's image number 20, I think.
18      A.   20.  Okay.
19      Q.   Does that clarify for you?
20      A.   Yes.  The path where this photo was recovered is slightly
21      different than the rest.  This particular one indicates that
22      this photo is in the cloud and not on this device itself.  The
23      thumbnail is available on the device so, if the user clicks it,
24      it can then download it from the cloud onto the device, but it
25      appears in this case that had not been downloaded to the
```

Schultz - Cross (Smock)                                    1718

1    device.

2    Q.   And so that's an image that could have been -- or video,

3    you're saying, that could have been taken by the user of the

4    phone but was on the cloud?

5    A.   Right.  May I look at the report again?

6         THE COURT:  Sure.

7    A.   Okay.  This one appears to be a thumbnail from a photo.

8    BY MR. SMOCK:

9    Q.   Okay.  Again, that could have been taken by the user of

10   the phone?

11   A.   Could have been, but from this information I can't tell

12   you that for sure.

13   Q.   Okay.  And can't tell for sure whether it was downloaded

14   from somewhere else either?

15   A.   Agreed, yes.

16        MR. SMOCK:  Okay.  Thank you.  I have no further

17   questions.

18        MR. DREHER:  I have nothing further, Your Honor.

19        THE COURT:  Thank you very much, Ms. Schultz.

20   Appreciate it.

21        THE WITNESS:  Thank you.

22        THE COURT:  The government may call its next witness.

23        MR. DREHER:  Officer Morris Moore.

24        MR. SMOCK:  Your Honor, I hate to --

25        THE COURT:  What?

1          MR. SMOCK:  Could we have a two-minute bathroom

2     break?

3          THE COURT:  We can have more than that.  Before we

4     start the next witness, why don't we take, say, ten minutes.

5     Then we'll come back with this witness.

6          (Jury out and recess taken at 10:45 a.m.)

7          (At 11:03 a.m. on March 10, 2023; with counsel for the

8     parties and the defendant present; WITHOUT the jury:)

9          THE COURT:  Are we ready for the jury, everybody?

10          MR. DREHER:  Not just yet, Your Honor.  There was

11     just something I'd like to place on the record.  I have just

12     moments ago received an updated -- not necessarily an updated

13     but a 302 that was provided by the FBI as a portion of our

14     interview for trial prep associated with whom I intend to call

15     next, Mr. Kyle Sexton.  Just so that the Court's aware,

16     Mr. Sexton is deaf, so there was a request to allow the Court's

17     interpreters to review that as well.  And so I don't know if

18     we're necessarily ready for the jury, 'cause I would also like

19     to give not only the defense an opportunity to review this, but

20     also the --

21          THE COURT:  So we're not calling Officer Moore next?

22          MR. DREHER:  Correct, Your Honor.

23          THE COURT:  Okay, all right.  Mr. Smock or

24     Ms. Goetzl, what would you like to say on this question?  He

25     wants to call Sexton next, and he wants to show you a new 302,

```
 1    and the witness himself is deaf.

 2              MR. SMOCK:  So...

 3              THE COURT:  Mr. GossJankowski's roommate?

 4              MR. SMOCK:  Yes.  So my point with respect to

 5    Mr. Sexton -- and I don't think that the government disagrees

 6    with this -- is that there is a 302 from a trial prep interview

 7    with him and it sounds like a video of that interview that have

 8    not yet been provided to me, so we need to see those things

 9    before he gets on the stand.  My impression had been that they

10    were going to call Officer Moore next, which would at least

11    give us some testimony before --

12              THE COURT:  That was my impression too.

13              MR. SMOCK:  Yeah.

14              THE COURT:  Anybody you can call instead of

15    Mr. Sexton first?  I know Officer Moore may take a while, but

16    either him or somebody else.  I mean, you all were telling me

17    you might be finished with all the witnesses today, but I'm not

18    so sure.

19              MR. DREHER:  Right.  Certainly, we could call Officer

20    Moore, and he's available and ready to come out, Your Honor, so

21    that would be possible.  I would just note that the interview

22    that was had was recorded because Mr. Sexton was communicating

23    through an interpreter during that interview so it is a video

24    file that I have not been able to upload through the connection

25    that I get here.
```

```
 1              THE COURT:  Well, my question is:  Why wouldn't it
 2    make more sense -- you guys can consult but why -- would it
 3    make more sense to call Officer Moore next?  And you could sort
 4    through all of this during the lunch hour.  You can upload it,
 5    defense can look at it, you know, the interpreters can look at
 6    it.  But whatever you propose.
 7              MR. DREHER:  We'll then call Officer Moore.
 8              THE COURT:  All right.  Well, let's go ahead with
 9    Officer Moore, and if you tell me at some point that we have to
10    stop with Officer Moore and move to Mr. Sexton after lunch
11    first, we can talk about that, but maybe we can finish with
12    Officer Moore.  I don't know how long he's going to take, so
13    let's get -- let's get the jury in, and let's get Officer Moore
14    in.
15         (Jury in at 11:07 a.m.)
16              THE COURT:  If everyone is ready, the government may
17    call its next witness.
18              MR. DREHER:  Officer Morris Moore.
19              COURTROOM DEPUTY:  Sir, could you please step into
20    the box and raise your right hand.
21              THE WITNESS:  Sure.
22         MORRIS R. MOORE JR., PLAINTIFF'S WITNESS, SWORN
23              COURTROOM DEPUTY:  Thank you, sir.
24              THE COURT:  You may be seated, sir.  If you'll take
25    off your mask and testify so everybody can hear you, and move a
```

1    little closer to the microphone.

2        Thank you very much.

3                      DIRECT EXAMINATION

4    BY MR. DREHER:

5    Q.   Good morning, sir.  If you would please introduce yourself

6    and spell your name for the record.

7    A.   My name is Morris Rudolph Moore Jr.

8    Q.   And are you currently employed?

9    A.   No.  Retired Capitol Police.

10   Q.   How long had you served on the Capitol Police?

11   A.   Thirty-five years, five months, three days.

12   Q.   And when did you retire?

13   A.   December 30th, 2022.

14   Q.   And so were you working with the Capitol Police on

15   January 6th of 2021?

16   A.   Absolutely.

17   Q.   And where were you stationed at?

18   A.   I was stationed at the truck station on the House side of

19   the House office buildings, Delaware Avenue.

20   Q.   Now, can you describe to the jury, what exactly is the

21   truck station?

22   A.   The truck station is where we screen trucks that comes

23   from a facility off Capitol Hill, and those trucks come to that

24   location, Delaware Avenue, where we will run a check on the

25   individual, the products that they have, and also we have a K-9

Morris - Direct (Dreher)                                              1723

```
 1    Unit, and also we have officers there to assist and to explain
 2    to the drivers where they need to go to deliver their products
 3    at the House office buildings and at the Capitol.
 4    Q.   And so can you explain to the jury, when you say "the
 5    Capitol," do you mean the entire complex, or is there a
 6    specific building?
 7    A.   Well, the Capitol.  Actually, they have a section where
 8    buildings were -- they have a delivery point, so we actually
 9    direct them to the delivery point where they need to direct
10    their -- deliver their products.
11    Q.   And so January 6, were you stationed at that delivery
12    point?
13    A.   Yes, I was.
14    Q.   Now, when you say "trucks," what sort of trucks do you
15    mean?
16    A.   You're looking at box trucks, you're looking at vans,
17    you're looking at 18-wheelers that come through the location.
18              THE COURT:  Are you generally referring to goods or
19    things to --
20              THE WITNESS:  They're goods.  They're products that
21    the architect of the Capitol order, some of the members of
22    Congress and Senators order for their offices, things like
23    that, flowers, publications, GPO that come to that location to
24    deliver their letters, information.
25    BY MR. DREHER:
```

1  Q.   And just for the jury, then, GPO means what?

2  A.   Government Printing Office.

3  Q.   So a lot of paper?

4  A.   Absolutely.  A lot of publications going to different

5  members of Congress and Senators.

6  Q.   So these are big trucks, I'm guessing.

7  A.   Absolutely, yes, they are.

8  Q.   And when you're stationed at the delivery point, is there

9  any safety equipment or a specific uniform that you wear?

10 A.   Well, it all depends on the time of the season.  At that

11 particular time back in January, it was cold.  So we wear cold

12 weather gear, but also we are required to wear a visibility

13 vest which has a reflector where trucks see us.  They'll know

14 that they possibly need to stop.  And we have K-9 Units there

15 as well to screen the vehicles, to walk around the trucks or

16 vehicles to sniff for different types of things like possibly

17 bombs.

18 Q.   Now, I do want to get back to this visibility vest.  Can

19 you describe that for us.

20 A.   A visibility vest is a vest -- it's almost like a vest

21 where I will put it on over the top of my overcoat.  It has a

22 zipper up front.  It has adjustables on the side with Velcro.

23 Q.   What color is it?

24 A.   It's kind of like a lime color with "Capitol Police" on

25 the back of it.

Morris - Direct (Dreher)                                    1725

```
1    Q.   And so you would wear this over top of your standard
2    uniform?
3    A.   Yes.
4    Q.   Now, does the Capitol Police have body-worn cameras?
5    A.   No.
6    Q.   And so what time did you arrive to your station on
7    January 6?
8    A.   4:45 in the morning.
9    Q.   Is that a normal shift start for you?
10   A.   Yeah, it's a normal shift.  My shift starts at 4:45 in the
11   morning, and I get off at 1 o'clock every day, so I've been
12   working, like, that assignment for the last four or five years.
13   Q.   Okay.  And so then did you spend the entirety of your day
14   on January 6th at that location?
15   A.   No.
16   Q.   What time, if at any point, did you leave?
17   A.   I left when things started -- I would say started going
18   bad at the Capitol.  Actually, there were two police officers
19   there.  Officer Schaefer and myself was there.  He got called
20   to respond over to either the DMC or a -- the RNC buildings.
21   That's where we were getting reports that possible pipe bombs
22   were over at that location, so he got pulled.  He responded
23   over.  They left me at Delaware Avenue by myself, and then
24   there were cries on the radio about we need help over at the
25   Capitol, we're being bombarded.
```

Morris - Direct (Dreher)                                    1726

1         So I called my detail office, which is the House Division,

2    to talk to a supervisor, which I didn't get a supervisor at all

3    because I guess they were over there as well assisting other

4    police officers at that time.  So I just so happened to see a

5    lieutenant walking from the Fairchild Building come into my

6    location.

7    Q.   Now, sir, I do just need you to stop just for a moment.

8    A.   Sure.

9    Q.   So you were alone at your station --

10   A.   Absolutely.

11   Q.   -- at some point.  Where did this lieutenant come from?

12   A.   Fairchild Building.

13   Q.   And so in relation to your station, can you describe for

14   us where that would be.

15   A.   Okay.  It was actually to my right, because here's

16   Delaware Avenue.  Here's Washington Avenue.  Fairchild

17   Building.  Fairchild Building's where we, I guess, rent out

18   space from Mr. Fairchild to use certain offices for Capitol

19   Police.

20   Q.   And so at least --

21             THE COURT:  Is that building near House office

22   buildings?

23             THE WITNESS:  It is.

24   BY MR. DREHER:

25   Q.   And so when this lieutenant got to your location, what

Morris - Direct (Dreher)                                    1727

1    happened next?

2    A.   I reached out to him, and I explained to him that there's

3    no use of having my assignment to stay open because of the fact

4    that everything was suspended.  All the trucks were suspended

5    as far as going through that point -- that point to get

6    screened because of the fact that -- what was going on at the

7    Capitol.  So instead of me stand there, I didn't actually plead

8    with him, but I had asked him that it's no use in me staying

9    here at this point.  I need to go over to the Capitol.

10   Q.   Now, how was it that you became aware of what was

11   happening at the Capitol Building?

12   A.   Well, through the radio communication, because there was a

13   lot of radio traffic going on over at the Capitol, and

14   basically we were stretched -- stretched very thin.  So it's no

15   need for me to just sit there and listen to some of my police

16   comrades, coworkers, you know, get overtaken, so I felt that I

17   need to -- I need to be over there.

18   Q.   Now, at some point did you make your way to the Capitol

19   Building?

20   A.   Yes.  Actually, when I talked to the lieutenant, he had

21   told me, "Shut it down and get over there," so I shut it down,

22   and I went over there.

23   Q.   Can you tell us about what time you went to the Capitol

24   Building.

25   A.   I don't know exactly what time, but at maybe possibly 11,

Morris - Direct (Dreher)                                          1728

1    possibly.

2    Q.   Sir, direct your attention to the screen in front of you,

3    and I just want you to know that that's a touch screen that's

4    in front of you.

5    A.   Okay.

6    Q.   But I'm going to ask that you review what's already been

7    admitted as Government's Exhibit 605, and if you could just

8    touch your finger and draw for us the path that you took to get

9    to the Capitol.

10   A.   Okay.  To your right here is, like, Independence Avenue.

11   Coming from Independence Avenue from the House Division, which

12   you have the regular Longworth and Cannon Building.  Okay?  I

13   came from between the Rayburn Building to the Longworth,

14   walking up the path on over to the Capitol itself (indicating

15   throughout).

16   Q.   And so I think you already said this.  You were walking at

17   this point?

18   A.   Absolutely.  This is walking distance.

19   Q.   Now, as you're walking over, were you able to change your

20   uniform at all?

21   A.   No, not at all.  For myself, I wasn't on a CDU unit at

22   all, so I basically didn't have time to change or anything

23   because I didn't have the equipment.  I didn't have a helmet.

24   I didn't have the -- I would say the -- I had a ballistic vest

25   on, but as far as other equipment like arm pads, kneepads,

1    things like that, I did not have that.

2    Q.   Okay.  Now, at any point in your trip over to the Capitol,

3    did you locate any protective equipment?

4    A.   No.

5    Q.   All right.  So from this location where did you go next?

6    A.   From that location I walked direct, walking down.  This is

7    the Upper West Terrace of the House side (indicating).  You

8    have two sides of the Capitol: House side, Senate side.  I'm on

9    the House side right now, and I'm walking up, and as soon as I

10   got up to the top, I looked out into the west side of the

11   Capitol, and I saw so many people coming up to the Capitol.

12   Q.   Now, where you indicated on the exhibit, is that an

13   elevated position?

14   A.   It's an elevated position.

15   Q.   So did this allow you to see the National Mall?

16   A.   Absolutely.

17   Q.   So you said there was a lot of people.  Could you tell us

18   about how many.

19   A.   I would say in the thousands.  I'm looking at maybe tens

20   of thousand, possibly.

21           THE COURT:  How many?  What did you say?

22           THE WITNESS:  I would say about maybe 10,000 people.

23   BY MR. DREHER:

24   Q.   Now, at that point were you able to see whether or not

25   these individuals were on the Capitol grounds?

1    A.    Yes, they were.

2    Q.    And how long did you remain on this Upper West Terrace?

3    A.    I would say for a split second, because as I'm walking,

4    I'm looking at the west side of the Capitol; so as I'm walking,

5    I'm looking and I'm, like, okay.  And as I walked basically on

6    the stage they were building for the inauguration, I walked

7    down this location down here, and probably right there at the

8    bottom was where there was bicycle racks where we had set up.

9    And you had Metropolitan, you had Capitol Police in their riot

10   gear down there, you know, battling.  Basically it was a

11   battle.

12   Q.    Now let me ask you this:  From the Upper West Terrace

13   going down these stairs into this battle, what was going

14   through your mind at that time?

15   A.    Well, you know, as a police officer, you know, there's a

16   little fear, but also when you're a small police officer,

17   you've been doing this for years, you take on that

18   responsibility that you're not running away from the fight.

19   You're going to the fight.  So that was just not in me to run

20   away.  It was to assist and to help out and to -- you know, the

21   challenge, I mean.  You know, you hear that, your coworkers

22   crying out on the radio we need assistance here, we need

23   assistance there.  It was like the movie 300.  It's, like,

24   maybe a thousand of us and about 10,000 of them, so how can we

25   defeat them?

1    Q.   Now, sir, I might already know the answer to this

2    question, but did you punch out at 1 o'clock when your shift

3    ended?

4    A.   No.

5    Q.   Do you know about how long you were on the west yard?

6    A.   I was possibly on the West Front for maybe about four or

7    five hours, but at the end of the day, I believe I punched out

8    around 10:00, maybe 11:00 o'clock at night.

9    Q.   After starting at 4:45 in the morning?

10   A.   Yes.

11   Q.   All right.  I want to take us back down to this first line

12   when you first go from the Upper West Terrace down to what you

13   described as the movie 300.  At any point were you able to

14   obtain any padding or extra protection other than the uniform

15   you were wearing?

16   A.   Okay.  What happened was I would say right around this

17   point (indicating), as we started to get pushed back, I saw a

18   helmet laying on the ground, so I grabbed the helmet, and I put

19   it on to protect myself.

20   Q.   Do you know where the helmet came from?

21   A.   At the end I found out that it was a helmet from

22   Metropolitan.

23   Q.   How did you find that out?

24   A.   By looking at the numbers and actually the letters on the

25   helmet itself.

Morris - Direct (Dreher)                                         1732

1    Q.   And so can you describe for us what you're wearing at this

2    point.  Earlier you said you had a high-visibility vest.  Were

3    you still wearing that?

4    A.   Yes, I was still wearing the high-visibility vest and also

5    my winter coat.

6    Q.   And your winter coat.  And then now you have the helmet

7    that is an MPD helmet on?

8    A.   Yes.

9    Q.   Now, you told us down here --

10        MR. DREHER:  And I'll clear the screen real quick.

11   BY MR. DREHER:

12   Q.   While you're down in this area here (indicating), do you

13   know about how long you were in that area?

14   A.   I would say close to maybe an hour or so, because on this

15   line here, like I said, it was a fence there, and there was a

16   lot of tear gas, a lot of spray that was going on, and

17   underneath the stage we had water (indicating).  It's like a

18   contaminated area where we were -- like, some of the officers

19   that were, like, getting sprayed, had spray in their eyes, they

20   were pulling them back underneath the stage, putting water in

21   their eyes to get them back -- get them back in the fight.

22        That's how that situation was.  That's how it was possibly

23   the whole day.  We were there getting sprayed with mace,

24   getting projectiles thrown at us.  Some of us didn't have

25   helmets, protective gear to protect ourselves, but, you know,

1    we had a sworn duty to do.

2    Q.   Now let me ask you this, sir.  The mace and the sprays --

3    did you have a gas mask?

4    A.   No, I didn't have a gas mask at all.

5    Q.   Now, where did you go after this area?  If you can show us

6    on the screen.

7    A.   Okay.  After that area we moved out possibly to a next

8    level where the stage was being built.  So we move up to that

9    stage, and as the crowd continued to move up, we moved up as

10   well because -- with the limited amount of police officers we

11   had, including Metropolitan, because of the fact that you have

12   to look at actually the Capitol's surrounded, so we had

13   officers on the other side of the Capitol as well, that's the

14   east side and the north side of the Capitol so, you know, we

15   did our best with what we had and --

16   Q.   Now let me ask this:  At any point were you on the

17   inaugural stage?

18   A.   Yes.

19   Q.   And during your time on that stage, were you able to again

20   look out over the National Mall?

21   A.   Briefly, but also I have to look at what's in front of me

22   as well, you know.  Briefly, yes, looked over into it.  Also

23   you really didn't have time to, you know, kind of like take a

24   peek of what's further down the road, only what's in front of

25   you.  So I couldn't concentrate on, you know, the future, only

1    the present, because of the fact that if you focus on the

2    future, the present will slap you right in the face.

3         So that's what's -- what was going on there, and as I --

4    we moved up, we fought there.  Like I said, we got projectiles

5    thrown at us, tear gas thrown at us.  The crowd had overtaken

6    the fence there.  They tore the fence down, and they were

7    moving up, upward, upward, and --

8    Q.   Now, sir, were you staying ahead of the crowd?

9    A.   Yes.  We were trying to stay ahead of the crowd.

10   Q.   So was there a particular location that you were trying to

11   get at that point?

12   A.   Well, being that, you know, we had leadership out there,

13   it's not like the leadership -- like a bullhorn, like, saying,

14   you know, retreat, or we need to go this way, this way.  It was

15   almost like self-preservation, like survival, you know, in a

16   war itself, because we did not know how things would go, I

17   mean.

18   Q.   So let me ask just about your time here.  I know you said

19   you couldn't look out to the future because the present would

20   slap you.  Given that present mentality, can you tell us about

21   how many rioters you were focusing on at this point.

22   A.   I was focusing basically on what's around, what's around

23   me, basically what's in front of me, coming, and what's near,

24   coming, and I pulled out my expandable baton, and I was seeing

25   rioters with poles and sticks longer than my baton, so it was a

1   challenge.  I mean, it was tempting...I know that, you know,

2   we're taught to -- as police officers, if your life is dearly

3   in jeopardy, there's only one other thing that we could do.

4   Q.   Now, at that moment did you feel that your own life was in

5   jeopardy?

6   A.   To a certain extent, but also I did not see any rioters

7   pull out any possible deadly weapons as far as guns.  So in a

8   way we're trained to -- if something like that does happen, we

9   have the right as police officers to meet force with force, but

10  I would not shoot a bystander just rushing at me.  Only if my

11  life is or any of my coworkers' lives or anybody else's life

12  was in danger.

13  Q.   Now, sir, if I can direct you again to Exhibit 605.  Can

14  you tell us where the tunnel is.

15  A.   The tunnel?

16  Q.   Yeah.  If I say "the tunnel," does that mean anything to

17  you in the Capitol?

18  A.   Well, the tunnel -- basically you have the Lower West

19  Terrace Door.  The Lower West Terrace door is where -- I guess

20  the swearing-in ceremony at the Capitol, it would be actually

21  possibly right here, and that door is where the President of

22  the United States comes out onto the platform to get sworn in

23  as President of the United States.  I have worked over at the

24  Capitol for over 12 years so -- on that section there, but this

25  is the tunnel itself.  This is basically the Lower West Terrace

1   (indicating throughout).

2   Q.   Now, when you worked in a section, you said, for 12 years,

3   did you ever use this door?

4   A.   Absolutely.  Actually, coming from down at Peace Circle,

5   that's where most of us police officers parked our vehicles,

6   and we walked up the West Front to get through that door, and

7   that door was just a secure door.

8   Q.   Now, were members of the public able to use that door?

9   A.   No.  Maybe a Congressman, Senators, but we would have

10  radio communications that one of them are coming to that door.

11  Q.   Now, on January 6th, did you enter that door?

12  A.   I entered that door after we were overpowered here and

13  after we were, like, overpowered here.  Excuse me.  And then we

14  had to retreat up through that entrance there (indicating

15  throughout).

16  Q.   Now let me -- let me ask you this:  When you first came to

17  the Capitol, was there any specific duty that you had, or what

18  were you trying to do when you first got to the Capitol?

19  A.   I was trying to assist and to protect not only the

20  Capitol, but also what was going on in the Capitol, and

21  basically what's going on in the Capitol is where you have

22  members of Congress in session.

23  Q.   Now, when you moved from each of these lines, did your

24  duties ever change?

25  A.   No, never changed.  I mean, me, being a Capitol Police

1    officer being there, working there for over 30 years, you know,

2    with my experience and everything, I actually knew what to do

3    because I have worked numerous demonstrations at the Capitol,

4    but this demonstration here was over the -- over the top,

5    actually over the top.  Because some of the demonstrations that

6    we dealt with, we knew or we were instructed on who we needed

7    to arrest, which people we're going to arrest, so this is

8    what -- this demonstration was not a script.  Some situations

9    at the Capitol there was basically a script for -- with the

10   committee rooms sort of people.

11   Q.   Sir, if I could just stop you for a moment, I want to

12   speak a little bit more about when you arrived into the -- you

13   said the Lower West Terrace Door?

14   A.   Yes.

15   Q.   Can you tell us, at least from your experience, how this

16   door is set up.

17   A.   The door is set up where you have your -- you have, like,

18   two doors, secure doors.  They're glass doors.  The door's set

19   up where it's almost like this (indicating).  That's the

20   entrance to the door itself, okay, and you had two secure

21   doors, glass doors, but also you had a metal detector, and you

22   had an x-ray machine here as well.

23        MR. DREHER:  Ms. Johnson, can we pull this down for

24   just a moment.

25   BY MR. DREHER:

Morris - Direct (Dreher)                                    1738

1   Q.   And then, sir, I'm going to display for you what's

2   previously been admitted as Government's Exhibit 120.

3        (A portion of Exhibit 120 was played.)

4   BY MR. DREHER:

5   Q.   Now, just based on that short clip, are you able to tell

6   us where this is from?

7   A.   This is the Lower West Terrace Door.  Actually, this is

8   the metal detector there (indicating), and there's an x-ray

9   machine in front of the metal detector.

10        MR. DREHER:  All right.  I'm going to rewind it just

11   a few seconds here, and I might clear this.

12   BY MR. DREHER:

13   Q.   I'm going to direct your attention over here.  Do you

14   recognize who that is?

15   A.   Yes.  I recognize that this is myself right here

16   (indicating).

17   Q.   And so the vest that you described earlier, is that that

18   high-visibility vest that you're wearing?

19   A.   Absolutely.

20   Q.   And then on top of your head there, you got the MPD

21   helmet?

22   A.   Absolutely.

23   Q.   Now, it looks like there's something on your waist there.

24   Can you tell us what that was.

25   A.   This right here (indicating)?

Morris - Direct (Dreher)                                          1739

1    Q.   Yes.

2    A.   That's my radio.

3    Q.   Now, was there any other equipment that you had around

4    your belt?

5    A.   What we have -- well, what I have around my waist is my

6    weapon to my right, which is my .40 Glock.  In the back of that

7    is my baton.  To my left would be my mace.  To the back of it

8    would be my handcuffs.  And in the back would be -- it was like

9    a first aid where if someone was to possibly be bleeding out,

10   we would take a -- I forget the name of it, but we would assist

11   that person.

12             THE COURT:  Do you carry a Taser?

13             THE WITNESS:  We didn't carry a Taser.

14             THE COURT:  You do not?

15             THE WITNESS:  No.

16             THE COURT:  But you do have mace with you?

17             THE WITNESS:  Yes.

18   BY MR. DREHER:

19   Q.   Now, sir, while you were there in the tunnel, did you see

20   anyone else with your type of high-visibility vest and then an

21   MPD helmet?

22   A.   No.

23   Q.   Now, can you tell us about how long you were in the

24   tunnel.

25   A.   Well, actually, at that particular door, which is the

1    Lower West Terrace Door, it may have been for maybe an hour,

2    maybe a little more.  I really couldn't keep up with the time

3    because of the fact that the rioters were rushing the door and

4    we were pushing back and forth.  It's like a tug-of-war in that

5    sense.  Tug-of-war is where you had so many officers and you

6    have people rushing up the steps to get to and to push us out,

7    so we were like pushing back and forth, back and forth,

8    back and forth.

9         So it was a while, but also we -- you know, we had

10   officers going down with mace in their eyes.  Because they

11   were, like, up front with shields, mace was being sprayed in

12   their eyes.  They were coming back and they were getting

13   assisted, first aid, but also we had other officers coming and

14   filling in.

15   Q.   Now, at any time during these pushes, were you also taking

16   part in pushing the rioters?

17   A.   Yes.

18   Q.   Now, I'm assuming it's safe to say you weren't checking

19   your watch during this period of time.

20   A.   No, no, I wasn't.

21   Q.   So during your time inside this entranceway, can you tell

22   us what was going through your mind.

23   A.   Well, I was just thinking about, you know, protecting not

24   only the House, but protecting yourself, protecting your

25   officers, stopping people from illegally coming into the

1    Capitol.  The Capitol was closed, so these individuals, to me,

2    they had no right trespassing, forcing their way into the

3    Capitol, so we had every right to stop these individuals.  If

4    someone tells you to stop, someone tells you to stop.  You need

5    to stop.

6    Q.   Now, sir, during your time in this entranceway, what was

7    it like having other officers nearby?

8    A.   It was great, the support of Metropolitan.  I don't know

9    who -- the other federal law enforcement that was there, but it

10   was -- it was warming to have more and more support.  And also,

11   if you do look at that entrance, you have a tunnel to your

12   right and a tunnel to your left, which we have more officers

13   coming and giving support and more officers going down, getting

14   sprayed, you know, some officers falling to their knees and

15   basically was almost like defenseless.  I mean, their eyes

16   watered, their eyes are red, you know, because they got sprayed

17   by mace.

18        At one time someone had sprayed a fire extinguisher so it

19   was at one time purely just white and you basically couldn't

20   see your hand in front of your eyes, but we just -- just had to

21   hold the line.

22   Q.   Now, did there ever come a time when you no longer had the

23   support of your other officers around you?

24   A.   No.  I think there was continuous support.  Continued

25   support, I mean.

1    Q.   Did there come a time when you left this entranceway?

2    A.   I would say about -- maybe what happened was by being in

3    that tunnel and them pushing and some officers possibly being

4    injured with spray, you're moving up front, and I kept on

5    moving up front and up front and up front, and I pulled out my

6    baton and exchanges and --

7                 THE COURT:  When you say "moving up front," you mean

8    moving closer to people coming into the Capitol?

9                 THE WITNESS:  Absolutely and --

10   BY MR. DREHER:

11   Q.   And you had your baton at that point?

12   A.   Yes.  I pulled my baton out because of the fact that it

13   was almost like a rugby match.  A rugby match is when you're

14   getting the ball and you're pushing, you're pushing forward and

15   pushing forward.  We were just like sardines.  You couldn't

16   really move, but I remember pulling out my baton.  By the time

17   I got up front and were swinging my baton and it was so tight

18   when you swinging, next thing you know someone's grabbing on to

19   your baton.

20          So I don't know who, but somebody grabbed my baton.  I was

21   without a baton, but I stayed there and kept on pushing

22   forward.  After I kept on pushing forward, I kept on moving

23   forward and forward, closer and closer to the crowd.  Then I

24   got pulled into the crowd.

25   Q.   Now, sir, I'm going to direct your attention to the screen

 1   in front of you, and I'm going to show you what's previously

 2   been admitted as Government's 100.3.

 3              THE COURT:  I believe, before you do that, if I'm not

 4   mistaken, 123 is not in evidence, but 123.1 is in evidence.

 5              MR. DREHER:  One, zero, three.

 6              THE COURT:  I'm sorry.  I misunderstood you.  Sorry.

 7   103.

 8              MR. DREHER:  I'm talking 100.3, Your Honor.

 9              THE COURT:  Okay.  I misunderstood you.  100.3.

10              MR. DREHER:  Yes.

11              THE COURT:  Which is in evidence.

12   BY MR. DREHER:

13   Q.   Now, sir, looking at the screen in front of you, can you

14   orient us and tell us where this is.

15   A.   This is the Lower West Terrace entrance of the Capitol on

16   the west side of the Capitol.

17   Q.   And you were describing for us that you took part in a

18   push to push rioters out of it?

19   A.   Absolutely.

20   Q.   Now, sir, I'm going to play a portion of this exhibit and

21   ask you to follow along with us.

22        (A portion of Exhibit 100.3 was played.)

23              MR. DREHER:  And just for the record, I've stopped

24   this portion of the exhibit at 3:18:32 p.m., and that's a time

25   stamp and not the video stamp.

Morris - Direct (Dreher)                                    1744

1   BY MR. DREHER:

2   Q.   And sir, I would like to direct your attention here to

3   this individual wearing an MPD helmet and the Capitol Police

4   vest.  Do you know who that individual is?

5   A.   That's myself.

6   Q.   And so this was part of that push that you were describing

7   before?

8   A.   Yes.

9        MR. DREHER:  All right.  I'm going to clear the

10  screen and play further portions of this exhibit.

11       (A portion of Exhibit 100.3 was played.)

12       MR. DREHER:  Now, for the record, I've stopped it at

13  3:18:56 p.m.

14  BY MR. DREHER:

15  Q.   And we can see a big plastic something in front of you as

16  you're pushing.  Can you tell us what that is.

17  A.   That's a plastic riot shield.

18  Q.   And then in your hand you had sort of an object.  What was

19  that?

20  A.   My baton.

21  Q.   And that's --

22  A.   My right hand.

23  Q.   That's what you were telling us about earlier?

24  A.   Absolutely.

25       MR. DREHER:  I'm going to continue playing the

1    exhibit.

2         (A portion of Exhibit 100.3 was played.)

3              MR. DREHER:  Now, for the record, I've stopped the

4    exhibit at 3:19:51 p.m.

5    BY MR. DREHER:

6    Q.   Now, Officer Moore, can you tell us where you went.

7    A.   Actually, there were steps that goes down, so it was

8    almost like going down a drain, getting pushed down and getting

9    sucked down into the crowd.

10   Q.   And so on the outside of this, then, that's the inaugural

11   stage that you said before?

12   A.   Yes.

13              MR. DREHER:  Ms. Johnson, are we able to pull this

14   down just for a moment?

15   BY MR. DREHER:

16   Q.   And sir, if I could direct your attention to what's on the

17   screen.  I'm showing you what's previously been admitted as

18   government's 144.2.

19              MR. DREHER:  And if we could publish this to the

20   jury.

21   BY MR. DREHER:

22   Q.   Now, sir, with the screen in front of you, can you orient

23   us and tell us what we're looking at here.

24   A.   Well, this right here is the Lower West Terrace entrance

25   (indicating).  As I explained previously, that's where the

1   President of the United States comes out to get sworn in on the

2   stage.

3   Q.   Okay.  Now, for the record -- well, here.  Let me ask you

4   this.  Can you tell based on this, what's on your screen now,

5   what direction the camera is facing, what cardinal direction.

6   A.   I believe that the camera possibly is facing straight

7   ahead.

8         MR. DREHER:  Okay.  So I'm going to turn the camera

9   around.

10  BY MR. DREHER:

11  Q.   And sir, can you tell us what's on the screen now.  What

12  are we looking at now?

13  A.   We're looking at a lot of riot -- rioters.

14  Q.   And would this be on the inaugural stage?

15  A.   Yes, inaugural stage.  And also where you see these

16  individuals right here is where that would be possibly a camera

17  shining on the event itself if the President was being

18  inaugurated or sworn in (indicating).

19  Q.   And so when you say "the event," you mean the

20  inauguration?

21  A.   Yes.

22         MR. DREHER:  Okay.  Now I'm going to clear the

23  screen, and I'm going to move the camera again.

24  BY MR. DREHER:

25  Q.   And sir, with the image that's on your screen now, can you

1    tell us what this structure here is.

2    A.    That's the Upper West Terrace.  Actually, I believe that's

3    where possibly participants would be sitting if the President

4    was being sworn in.  That's the House side of the building

5    itself, 'cause the building splits into halves, the House side

6    on the right and the Senate side on the left.

7    Q.    And of course, on the screen we see a lot of rioters?

8    A.    Absolutely.

9    Q.    Sir, I'm going to turn the camera again.  And can you tell

10   us what this area up here is.

11   A.    Upper West Terrace Door, Upper West Terrace.

12   Q.    And that Upper West Terrace you described early on in the

13   examination is at a higher elevation?

14   A.    Yes.

15   Q.    And of course, we see rioters there at that point too?

16   A.    Yes, but by the time I got over there, I don't remember if

17   there were rioters up on that level yet.

18   Q.    Can you tell us what this is here.

19   A.    Lady Freedom on the Capitol.

20   Q.    Now I'm going to focus our image back on the entranceway

21   that you described before and jump about four minutes into this

22   exhibit and then play the exhibit.

23         (A portion of Exhibit 144.2 was played.)

24              MR. DREHER:  Now, for the record, I've stopped the

25   exhibit at 4 minutes and 50 seconds.

1    BY MR. DREHER:

2    Q.   And I'm going to ask you, sir, can you tell us who this

3    individual is.

4    A.   It looked like an MPD police officer.

5         MR. DREHER:   Okay.   Now I'm going to continue playing

6    the exhibit.

7         (A portion of Exhibit 144.2 was played.)

8         MR. DREHER:   And then, for the record, I've stopped

9    it at 5 minutes and 2 seconds video time.

10   BY MR. DREHER:

11   Q.   And sir, I'm going to ask you to look here.   Are you able

12   to tell us who that individual is?

13   A.   Possibly myself.   I see a helmet, and also I see possibly

14   a visibility vest the color of the United States Capitol Police

15   where...

16        MR. DREHER:   All right.   I'm going to zoom in on this

17   individual, and I'm going to have to slow this down.

18   BY MR. DREHER:

19   Q.   And now, sir, what I'm going to do is I'm going to play

20   this video and try to track this person for a few moments and

21   then ask you some more questions.   Okay?

22        (A portion of Exhibit 144.2 was played.)

23   BY MR. DREHER:

24   Q.   Now, sir, viewing that portion, we can see the lettering

25   of the helmet.   Do you know the position of the letters on the

1    helmet, or do you remember where the letters were on the

2    helmet?

3    A.   They were on the back.

4           THE COURT:  On the helmet he was wearing?

5           MR. DREHER:  The helmet he was wearing, Your Honor.

6    A.   The helmet?  The letters were on the back of the helmet

7    actually, on the back --

8    BY MR. DREHER:

9    Q.   And so --

10   A.   -- back of the neck.

11   Q.   And so during this period of time, where were you facing?

12   A.   At the time it looked like my head was down.  It looked

13   like my vest was, like, halfway off of me, per se, so...

14   Q.   And when you say that vest, you mean that high-visibility

15   vest?

16   A.   High-visibility vest was off, yeah.  Not off but, like,

17   ripped a little bit, it seemed like.

18          MR. DREHER:  Now I'm going to continue playing the

19   exhibit.

20        (A portion of Exhibit 144.2 was played.)

21          MR. DREHER:  And now, for the record, I've stopped it

22   at 5 minutes and 25 seconds.

23   BY MR. DREHER:

24   Q.   And I want to ask, sir, as you're coming down from the

25   Lower West Terrace into this situation, what was going through

1   your head at that time?

2   A.    Trying to survive.  I mean, I was like, oh, shit, you

3   know, I'm being sucked down into people that were angry not

4   only of me, but because of what the -- with the government, me

5   trying to defend the Capitol, but I was like -- I was -- I had

6   to survive.

7   Q.    Were you able to control your movements at this point?

8   A.    It didn't seem like I -- I could really control myself, in

9   a way.  I'm just moving.  But also there were two individuals

10  there.  One was in the front, one was in the back, and one was

11  saying, hey, look here, you know, don't go over to the left

12  because it's crazy over there, they're doing some crazy stuff

13  over there.  So I was led to the Senate side, north side of the

14  building outside on the West Front.

15  Q.    Now, at this point you come down from the Lower West --

16  or, excuse me, the Lower West Terrace entrance into this crowd.

17  Do you remember particular individuals or -- aside from these

18  two individuals, do you remember anybody specifically?

19  A.    No.  Actually, I was just focused on -- I knew the

20  footsteps of the Capitol.  I knew the West Terrace of the

21  Capitol, I knew the north side of the Capitol, the south side

22  of the Capitol, so I knew where I needed to go, and I was kind

23  of moving with the crowd in like a sardine-type state just

24  trying to get to possibly safety.

25              MR. DREHER:  And I'm going to continue playing the

1   exhibit.

2         (A portion of Exhibit 144.2 was played.)

3            MR. DREHER:  For the record, I've stopped it at 5:58

4   in the exhibit.

5   BY MR. DREHER:

6   Q.   And at this point is this when you identify the two

7   individuals?

8   A.   You know, I don't remember, but I do remember that one of

9   the individual's between 6 feet and 6'3".  Another individual's

10  possibly between 5'10" and maybe 6 feet tall.  One had on all

11  black, and one had on tan.  I believe they both had, like,

12  ballistic vests.  When I mean ballistic vests, I mean

13  bulletproof vests.

14            THE COURT:  What kind of vests?

15            THE WITNESS:  Ballistic.

16  BY MR. DREHER:

17  Q.   And so, as you mentioned earlier, you were led out of this

18  situation?

19  A.   Yes.

20            MR. DREHER:  I'm going to continue playing the

21  exhibit.

22         (A portion of Exhibit 144.2 was played.)

23            MR. DREHER:  And for the record, I've stopped it at 6

24  minutes and 29 seconds of the clip.

25  BY MR. DREHER:

Morris - Direct (Dreher)                                            1752

1    Q.   And now, sir, can you orient the jury for us.  Are you

2    depicted in the image that we see now?

3    A.   Yes.

4    Q.   Can you circle yourself for us.

5    A.   (The witness complied.)

6    Q.   And so throughout this exhibit we've heard a lot of noise

7    and a lot of commotion.  Can you describe what it was like on

8    January 6 entering this environment.

9    A.   I would say a lot of angry people.  I mean people angry,

10   people saying all different types of things, what they wanted

11   to do, how they wanted to get in the Capitol and things like

12   that, you know, so it was a very angry crowd.

13   Q.   And now I'm going to zoom out, excuse me, on this and ask:

14   Do you see any other police officers in your vicinity?

15   A.   I don't see any other officer in the crowd except for when

16   you first started the video, I saw an officer being pulled down

17   and pulled down to the -- if you're facing the screen, he's

18   being pulled down to the right side.

19   Q.   So during -- taking you back, then, to January 6th, during

20   this part did you come across any officers while you were on

21   the inaugural stage?

22   A.   At that point?

23   Q.   Correct.

24   A.   No.

25   Q.   When was it again that you met up with fellow officers?

1    A.   I would say after the two individuals led me down the

2    steps onto the north side of the Capitol, where I met officers

3    over there on Constitution Avenue.

4              MR. DREHER:  I'm going to continue playing the

5    exhibit.

6         (A portion of Exhibit 144.2 was played.)

7    BY MR. DREHER:

8    Q.   And then, for the record, I've stopped at 6 minutes and

9    55 seconds.

10             MR. DREHER:  And Ms. Johnson, would we be able to

11   take this down?

12   BY MR. DREHER:

13   Q.   And then, sir, if I could direct your attention to the

14   screen in front of you, I'm going to again show you what's

15   previously been admitted as Government's 605.  And if you

16   could, please, sir, show us with the touch screen the route

17   that you took to leave this inaugural stage.

18   A.   Okay.  Right here was the Lower West Terrace Door

19   entrance.  I'm being pulled down onto that platform and then

20   being led to the right -- left side facing out that area

21   (indicating throughout).

22   Q.   And while you're being led through this crowd, at any

23   point did you see any officers?

24   A.   No.

25   Q.   Where did you end up going after this?

1    A.    Actually going towards the north side climbing over a

2    barrier, concrete barrier, then going to the north side, which

3    is Constitution Avenue.

4    Q.    Was it at that point you saw fellow officers?

5    A.    Yes.

6    Q.    Could you tell us how you were feeling when you got back

7    in the company of fellow officers.

8    A.    I was relieved, but also I maneuvered around to -- I

9    believe it may have been the Senate side of the Capitol, walked

10   in, and then I started assisting in the other areas.  I

11   assisted --

12   Q.    Well, one sec, sir.  So after you got led out, after the

13   scene that we just saw and you were then reunited with other

14   officers, you went back into the Capitol?

15   A.    Absolutely.

16   Q.    Why is that?

17   A.    I had a duty to do.  I just didn't quit.  So if I have a

18   duty to do, I need to do it.  I'm not going to run.  I'm not

19   going to hide.  I went back and I assisted, and I got into

20   other skirmishes; so I had a committed duty.

21             MR. DREHER:  Ms. Johnson, if we could take this down

22   just for a moment.

23   BY MR. DREHER:

24   Q.    Now, sir, if I can, let me clear the screen for you.

25   Direct your attention to the screen in front of you.

1          MR. DREHER:  This is yet to be admitted, but it's

2     been marked as Government's Exhibit 145.

3     BY MR. DREHER:

4     Q.   Now I'm going to play a few seconds for you and then ask

5     you some questions about it.

6     A.   Sure.

7          (A portion of Exhibit 145 was played.)

8     BY MR. DREHER:

9     Q.   Now, sir, I've played about ten seconds for you.  Are you

10    able to identify where this is taken?

11    A.   Lower West Terrace Door entrance.

12    Q.   And based on what's in -- what you observed, can you tell

13    us about when this was taken, what day.

14    A.   January 6.

15         MR. DREHER:  I would move for the admission of

16    Government's Proposed Exhibit 145.

17         MR. SMOCK:  No objection.

18         THE COURT:  It will be admitted without objection.

19    BY MR. DREHER:

20    Q.   And sir, I'm going to start it back from the beginning and

21    play it for the jury.  If you would please follow along with

22    us.

23         (A portion of Exhibit 145 was played.)

24         MR. DREHER:  Now, Ms. Johnson, if we could take this

25    down.

1    BY MR. DREHER:

2    Q.   And then, sir, if I could direct your attention to the

3    screen once more, I'm going to play again a few seconds for you

4    of what's been marked as Government Proposed Exhibit 146.

5         (A portion of Exhibit 146 was played.)

6              COURTROOM DEPUTY:  146 was admitted?

7              THE COURT:  146 is not admitted.

8              COURTROOM DEPUTY:  Oh, it was not?  I have it down

9    as...

10             THE COURT:  I don't believe so.  I don't think 146

11   was previously admitted.  147 was but not 146.

12   BY MR. DREHER:

13   Q.   Now, sir, I've played about nine seconds for you.  Based

14   on what you observed, are you able to tell us where this video

15   was taken?

16   A.   At the Capitol.

17   Q.   And can you tell us when this video was taken.

18   A.   January 6.

19             MR. DREHER:  I would move for the admission --

20             THE COURT:  Where was -- where was it taken, did you

21   say?

22             THE WITNESS:  That was taken on the -- I would say a

23   few feet down from the Lower West Terrace entrance of the

24   Capitol.

25             THE COURT:  Any objection to its admission?

1              MR. SMOCK:  No, Your Honor.

2              THE COURT:  It will be admitted without objection.

3              MR. DREHER:  I'm just going to start at the

4   beginning.

5          (A portion of Exhibit 146 was played.)

6              MR. DREHER:  And for the record, I'm going to stop it

7   at 19 seconds into the video.

8   BY MR. DREHER:

9   Q.   Sir, are you able to identify anybody in this?

10  A.   Myself.

11  Q.   Can you draw for us where you are.

12  A.   Right there (indicating).

13  Q.   Okay.  And then just going back to the beginning, are you

14  able to see yourself in this frame?

15  A.   No.

16  Q.   Now, your memory of January 6th, at this time when you're

17  on the inaugural stage, do you know your exact location or

18  remember exactly where you were at all times?

19  A.   Pretty much, like I say, I had previous experience over at

20  the Capitol.  I worked inside.  I worked outside multiple

21  entrances of the Capitol so, yeah, I do know.

22         (A portion of Exhibit 146 was played.)

23             MR. DREHER:  All right.  Ms. Johnson, if we could

24  take that down just for a moment.

25  BY MR. DREHER:

1    Q.   Now, sir, I'm going to go back to what was previously

2    admitted as Government's 144.2 and again fast-forward to about

3    4 minutes and 40 seconds, and if you could just for us review

4    this portion, and then I'm going to have some questions for

5    you.  Okay?

6    A.   Sure.

7         (A portion of Exhibit 144.2 was played.)

8    BY MR. DREHER:

9    Q.   So I'm going to pause it at 5 minutes and 31 seconds into

10   the video and ask you, sir, can you describe for us the path

11   that you took from the entranceway to where you are now.

12   A.   That was the north side of the building, the pathway from

13   the Lower West Terrace Door on around the pathway down the

14   steps to the north side of the building on the west side of the

15   Capitol.

16        MR. DREHER:  And I'm going to continue playing the

17   exhibit.

18        (A portion of Exhibit 144.2 was played.)

19        MR. DREHER:  And now I'm going to stop the exhibit at

20   6 minutes and 27 seconds.

21   Ms. Johnson, are you able to take this down?

22   Thank you.

23   BY MR. DREHER:

24   Q.   Now, sir, during this pathway were you being pulled by

25   rioters?

1    A.   Being shoved, and it felt like I was being led.

2    Q.   Did you ever feel anyone punch you?

3    A.   Like I -- it was packed.  I don't know if I experienced

4    anybody punching me or anything like that.

5    Q.   Were you able to feel if anybody pulled you?

6    A.   No.  I just felt like, you know, people were being nudged,

7    that I'm being nudged in a different way.

8    Q.   And so were you just going with the flow?

9    A.   Going with the flow, actually, to the -- you know, to the

10   right side, basically my escape plan.  In a way, my dealing

11   with a large crowd like that, I'm the only one.  I mean, I

12   couldn't fight everybody so...

13   Q.   So in your mind at this time did you have that same

14   tactic?  You weren't going to be able to fight your way out of

15   this?

16   A.   I mean, I possibly could, but, like I say, being

17   overpowered and moving in the direction that the crowd possibly

18   wanted me to move in, I moved in -- into that direction.

19             MR. DREHER:  Now I'm going to take this down.

20   BY MR. DREHER:

21   Q.   And sir, go back to when we talked about you going back

22   into the Capitol.  Did you remain inside the Capitol until what

23   you described earlier, almost 11 o'clock?

24   A.   I remained back into -- I went back into the Capitol.  I

25   went to different areas.  The Rotunda, that's where -- the east

1   side of the building which had the big doors, those doors

2   couldn't be closed because somehow they were damaged.  We went

3   from one section to another section.  By that time the whole

4   building was kind of bombarded with people.  Then I went back

5   down to the west side of the building, which was the Upper West

6   Terrace Door, and I --

7                THE COURT:  You went back into the Capitol.  Did you

8   go back in through that tunnel we saw you in earlier?

9                THE WITNESS:  No.

10               THE COURT:  Is the Rotunda on the same floor as the

11  tunnel, or is it --

12               THE WITNESS:  That tunnel is at the lowest part of

13  the Capitol.

14               THE COURT:  And so when you went back into the

15  Capitol and went to the Rotunda, you went in through another

16  door?

17               THE WITNESS:  Yes.

18               THE COURT:  And is that on a level higher than the --

19               THE WITNESS:  Level higher.

20               THE COURT:  Thank you.

21  BY MR. DREHER:

22  Q.   And so, sir, throughout your time while you were at the

23  Capitol, did you ever have that padding that we discussed at

24  the beginning of your examination, the additional pads?

25  A.   No.  I kept everything.  The helmet, that's all I had, the

1    helmet and the jacket itself, the visibility vest to be

2    recognized as a police officer, because that's what we are

3    recognized as when we're dealing with large crowds.

4              MR. DREHER:  If I may have just one moment, Your

5    Honor.

6         Your Honor, I have no further questions.

7              THE COURT:  Why don't we come to the bench for a

8    minute.

9         (At sidebar)

10             THE COURT:  So how long do you anticipate cross might

11   be?

12             MR. SMOCK:  Five minutes.

13             THE COURT:  Oh, okay.  So then we can finish Officer

14   Moore before we take a lunch break.  Then how much time should

15   we break for lunch?  'Cause I know you have to review the

16   Sexton material.

17             MR. DREHER:  And just so that the Court's aware, you

18   know, this is no disparaging on the Court, but I'm going to

19   leave the building to go back to mine for the internet

20   connection in order to upload it quicker.  I think that would

21   be faster.

22             THE COURT:  No disrespect.

23             MR. DREHER:  I appreciate it, Your Honor.  So if we

24   could get an extra ten minutes for me to travel.

25             THE COURT:  Sure.  So an hour and a quarter or more?

```
 1                MR. SMOCK:  I think that's enough.

 2                THE COURT:  I'm reading her eyes.

 3                MR. SMOCK:  That's acceptable for me as well, Your

 4    Honor.

 5                THE COURT:  Okay, all right.  So we'll finish with

 6    Officer Moore, and then we'll go to lunch.

 7           (In open court)

 8                THE COURT:  Okay.  Mr. Smock, whenever Mr. Dreher is

 9    done at the podium, you can cross-examine.

10                          CROSS-EXAMINATION

11    BY MR. SMOCK:

12    Q.   Good afternoon, Officer Moore.  I'm Ned Smock.  I'm from

13    the public defender's office.  I just have a few things I want

14    to go over with you.

15    A.   Sure.

16    Q.   First of all, much of what -- you went over a number of

17    videos from the Lower West Terrace, and it's fair to say that

18    you were in a great deal of distress at that point when you got

19    pulled into the crowd.  Am I right?

20    A.   Yes.

21    Q.   And obviously that's not disparaging you.  It was a

22    nightmare situation.  And it looked as if your head was down

23    for a fair amount of that time, probably to protect yourself.

24    Am I right?

25    A.   True.
```

1    Q.   So what that means is that the video that you were shown

2    today of what happened on the Lower West Terrace is things that

3    you know occurred now from the video but you yourself weren't

4    seeing in real time; is that fair?

5    A.   True.

6    Q.   So one of the videos that the government showed you was

7    Exhibit 146.

8            MR. SMOCK:  And, Adam, I'm going to ask you to put

9    that up, if you could, and you can just stop at the first

10   frame.

11   BY MR. SMOCK:

12   Q.   Do you remember seeing that in your direct examination?

13   A.   Yes.

14   Q.   And now this is the video that the government showed you,

15   and what I'd like to do is show Exhibit 147, which starts

16   before that.

17           MR. SMOCK:  And, Adam, if you could start -- go to

18   minute marker 30 and just stop there for a moment.

19       Actually, you can keep playing for a moment, and I'll tell

20   you when to stop.

21       (A portion of Exhibit 147 was played.)

22           MR. SMOCK:  Okay.  Can you stop for a second.

23   BY MR. SMOCK:

24   Q.   Does this appear to be sort of the same scene as the

25   exhibit that was played before?

1    A.    Yes.

2          MR. SMOCK:  Adam, can you play this video through

3    until about 1:50.

4          (A portion of Exhibit 147 was played.)

5          MR. SMOCK:  Adam, can you stop for a moment.

6    BY MR. SMOCK:

7    Q.    I don't know if you can answer this question.  If you

8    can't, you can say.  Does that look like the beginning of the

9    video that you saw?  Does this look like about the beginning of

10   the video you saw earlier in 146?

11   A.    Somewhat, yes.

12         MR. SMOCK:  You can keep playing that.

13         (A portion of Exhibit 147 was played.)

14   BY MR. SMOCK:

15   Q.    I have nothing further.  Thank you, Officer.

16         THE COURT:  Before you take that down, did you see

17   yourself in that video at all?

18         THE WITNESS:  Just briefly.

19         THE COURT:  Okay.

20         MR. SMOCK:  Thank you.

21         THE COURT:  Mr. Dreher.

22         MR. SMOCK:  Well, actually, can I just have a moment,

23   one second to --

24         THE COURT:  All right.  Take your time.

25         MR. SMOCK:  I have nothing further, Your Honor.

1           THE COURT:  Mr. Dreher.

2           MR. DREHER:  Nothing further, Your Honor.  Thank you.

3           THE COURT:  Okay.  Officer Moore, thank you very

4    much.  We appreciate it.

5       So it's 12:30 or so.  Why don't we come back at -- take a

6    little longer this time 'cause there's some technical things

7    going on.  I think we only may have two more witnesses.

8           MR. DREHER:  (Nods head.)

9           THE COURT:  I think we may only have two more

10   witnesses in the government's case, and then the government

11   will be done.  So I never want to promise you anything because

12   sometimes I'm totally wrong, but it sounds like we'll finish

13   with the government's case after lunch, and then we'll see

14   where we are.

15      So Officer Moore, thank you very much.

16          THE WITNESS:  Thank you.

17      (Jury out at 12:34 p.m.)

18          THE COURT:  One other thing on the record.  I haven't

19   discussed this with Ms. Johnson yet.  We don't have any -- I

20   said I haven't discussed this with Ms. Johnson yet, but we

21   don't have any American Sign Language interpreters on Tuesday,

22   and I've already asked -- told the jury they don't have to come

23   on Tuesday.  If we get the case to the jury on Monday and they

24   start deliberating, even if it's only for a little while, what

25   if we ask the jury if they would be available Tuesday

1    afternoon, and then they could come in?

2        I said Tuesday afternoon 'cause Ms. Johnson and I are not

3    available Tuesday.  They could come in, say, around noon and

4    resume their deliberations with the understanding that if they

5    had a question, Ms. Johnson would be authorized to tell them

6    that I would answer their question on Wednesday rather than

7    Tuesday and they should keep deliberating on Tuesday afternoon

8    until they're ready to go home, whether it's 4:30 or 5:00, but

9    no question could be answered.

10       And the only person in this scenario -- so I want

11   everybody to think about it.  Since we don't have any

12   interpreters, we would never come into the courtroom, and the

13   only person who would communicate with them, with the jury,

14   would be Ms. Johnson, only to make sure they were all there

15   first thing at whatever time we tell them and let them go when

16   they're ready to go and tell them we can't answer any questions

17   until the next day.

18            COURTROOM DEPUTY:  There are some jurors that have

19   made other arrangements to do other things.

20            THE COURT:  Have they already done that?

21            COURTROOM DEPUTY:  To my knowledge, yes, especially

22   one juror who -- as I indicated to you last week, who was

23   moving her office.

24            THE COURT:  I know.  Maybe she could do that Tuesday

25   morning.  So if you think this is a feasible idea, we better

```
 1    talk to them sooner rather than later because, as Ms. Johnson
 2    just said, some of them have already begun to change their
 3    plans.  And if you -- you know, we can tell them now.  They may
 4    have already gone to lunch.  We can tell them after lunch.
 5             MR. SMOCK:  The defense has no objection.  I think it
 6    would make sense.
 7             THE COURT:  Assuming we can get started.  You know,
 8    the sooner we're done with instructions and closing arguments
 9    on Monday afternoon...
10             MR. VALENTINI:  Could the government have the
11    opportunity to discuss it within the prosecution team over
12    lunch, and we'll let you know?
13             THE COURT:  Sure.  Because they may have left for the
14    cafeteria anyway, so I can't tell them until they get back
15    anyway.
16             MR. VALENTINI:  Thank you, Your Honor.
17             THE COURT:  If you don't like the idea, then they
18    might start Monday afternoon and then take all of Tuesday off,
19    or we could tell them to go home and not let the alternates go
20    until Wednesday morning if we had the entire day Tuesday off.
21    We will lose a juror who has travel plans on Thursday, and
22    Ms. Johnson can tell us if she knows anything else about
23    anybody else.
24        I mean, my only point, so we might be able to use up part
25    of Tuesday if they haven't already made other plans.  Otherwise
```

```
1    they can't begin deliberations until Wednesday.  And one juror

2    says she has travel plans on Thursday, and I don't know if

3    there's anybody else.  And my suggestion would be if we don't

4    begin till Wednesday, we probably should let the juror with

5    Thursday travel plans go before they start, because as I

6    understand the law, if you excuse a juror once deliberations

7    have started and you bring back an alternate, then the

8    remaining 11 have to review all the evidence they've already

9    discussed and all the discussions they've already had with the

10   alternate.

11        So if we already know somebody's got plane tickets and

12   travel plans and we don't start till Wednesday, we should let

13   him or her go and put the alternate in place before they start

14   deliberations.  If we start Monday afternoon and use Tuesday

15   afternoon, assuming they can do that now 'cause I've already

16   told them no, those are the things for you all to think about.

17             MR. VALENTINI:  Thank you, Your Honor.  One last

18   thing is I think before the jury returns or shortly at some

19   point this afternoon, we'll need to resolve the objections

20   regarding the Facebook exhibits.

21             THE COURT:  305?

22             MR. VALENTINI:  Correct.

23             THE COURT:  When do you want to do that?  You want to

24   do that now, or do you want to do that when we come back?

25             MR. VALENTINI:  We're prepared to do that now if the
```

1   defense is.

2           THE COURT:  Let me find the exhibit.  And I already

3   told you yesterday I would admit Defense Exhibit 19 and my

4   reasons for doing so, and I previously admitted Government

5   Exhibit 304, and so the question is Government Exhibit 305.

6           MR. VALENTINI:  Yes, Your Honor, and this will be

7   Facebook postings from a Facebook group.  These will not be

8   admitted for the truth of the matter asserted in those

9   postings.  Obviously we're not trying to prove any of the

10  veracity of the statements in those postings.  The reason to

11  admit those postings --

12          THE COURT:  Slow down a little.  First let them find

13  the exhibit.

14          MR. SMOCK:  No.  I'm going to ask that

15  Mr. GossJankowski be permitted to go to the bathroom.  We'll

16  waive his appearance or his presence for that brief moment.

17          THE COURT:  Okay.  We're discussing Exhibit 305, and

18  Mr. Valentini has said not for the truth of the matter

19  asserted.

20          MR. VALENTINI:  But for the defendant's knowledge of

21  what was going to happen on January 6 and his intent as he went

22  to the Capitol on January 6.  These Facebook postings are from

23  a Facebook group.  Your Honor last time mentioned or asked us

24  to -- if we could find any case law.

25          THE COURT:  This was a Facebook group he was a member

1    of?

2              MR. VALENTINI:  Yes.  Correct, Your Honor.  Your

3    Honor asked us to -- you know, if there was any case law of

4    specific Facebook groups, and unfortunately we have not found

5    any, but we know the principle that governs the admission of

6    this type of evidence is a familiar one, which is conditional

7    relevance.  These postings --

8              THE COURT:  Say that again.

9              MR. VALENTINI:  Is conditional relevance.

10             THE COURT:  Conditional --

11             MR. VALENTINI:  Relevance under 104.

12             THE COURT:  -- relevance.

13             MR. VALENTINI:  Yes.  Sorry.  And the reason for that

14   is that if the defendant -- if there's a sufficient showing, a

15   sufficient prima facie showing that the defendant likely read

16   this, likely saw and read -- reviewed these postings, they're

17   relevant because they go to his intent.  If there's not a

18   sufficient showing or a sufficient basis to draw that

19   inference, then they don't meet the relevance.

20        So the relevance is conditional on whether there's a

21   sufficient basis to believe that the defendant saw these

22   postings, and a number of factual considerations merited in

23   favor of finding that there is such a sufficient basis to draw

24   that inference.  This Facebook group contained, as of

25   January 15th, I believe approximately -- I think I've counted

 1    21 participants, and that would be on page 305-33.  There was a
 2    total over time -- a different time so I think a total -- they
 3    reached a maximum of 37 participants in this Facebook group.
 4         As I understand it, you know, the defense has a different
 5    view.  They can correct me.  So this is not like a Facebook
 6    group that has hundreds of participants.  Some of them do, and
 7    there's perhaps the inference that any particular participant
 8    actually reviewed any particular posting is weaker, but here
 9    this is not that kind of large Facebook group.  It's relatively
10    narrow in size, and what we have is a number of instances in
11    which the defendant participated, actively posted to the group.
12         And so we have, for instance, one posting on page 13 of
13    the exhibit.
14              THE COURT:  I'm sorry.  Oh, I see how they're
15    numbered.  Yes.  Page...
16              MR. VALENTINI:  13, the top posting that's on
17    January 4th.
18              THE COURT:  Just again, so I'm clear, where it says
19    author Vitali GossJankowski, it has a date and the time, and
20    then the body is from him; is that correct?
21              MR. VALENTINI:  Yes, yes.
22              THE COURT:  Where it says, "We need to set up an
23    arrangement to meet to make a big gathering before we start
24    marching," and it says a few other things.
25              MR. VALENTINI:  Yeah, and so on.  "And I know the

1    excessive use of phones in heavily crowded areas are going to

2    slow us to communicate."

3        Next I'm just going to go very briefly through some of

4    Mr. GossJankowski's postings.  On page 23 of the exhibit, this

5    is on the evening on January 6, page 23 at 22:35:21 Uniform

6    Time, it says, "I was at the Capitol and it was" -- and then it

7    appears to be a typo.  It says very --

8                THE COURT:  It may be but it says --

9                MR. VALENTINI:  He means to say violent.

10               THE COURT:  "Lolent" probably meant violent.

11               MR. VALENTINI:  Yes.  I was being charitable.  Then

12   on page 24, the defendant posts again in the evening on

13   January 6th, "They are Antifa."  On page 25, I believe there

14   are two postings by the defendant, one on January 6 at 17:53 --

15   again, this is Uniform Time -- "hey."  Later on that day --

16   well, actually immediately, a second later it says, "Thomas,

17   hey."  There's more postings on page 28.  That posting was also

18   on January 6, albeit earlier.  Actually, earlier in the day,

19   "No backpack" on page 28.  Page 31 there's --

20               THE COURT:  Wait a minute.  I'm still on page 26.

21               MR. VALENTINI:  Oh, sorry.

22               THE COURT:  What did you say after -- I mean page 28.

23   What did you say after page 28?

24               MR. VALENTINI:  On page 28 there is a posting by

25   Mr. GossJankowski at approximately 1:30 in the morning Uniform

1    Time that says "no backpack," and that's the first full posting

2    on page 28.  Then on page 31 on January 7th, the defendant

3    posts that's why he is in Texas, to protect himself.  On the

4    same day he has another posting.  He says "okay."

5         And then on page 32 there is a number of postings, and

6    these are a little bit later on.  They are on January 11th on

7    page 32, and there's a number of postings by the defendant

8    and -- well, actually, let me strike the ones on page 32.

9    Those don't appear to be from this -- I apologize for that.  So

10   yeah, let me strike the postings from page 32.  That was my

11   mistake.

12             THE COURT:  Wait.  What?

13             MR. VALENTINI:  Let me not rely on any postings by

14   Mr. GossJankowski on -- that are reflected on page 32 of this

15   exhibit.  Those are from a different -- I was confused by the

16   pagination, and I apologize for that.

17             THE COURT:  So are we eliminating page 32 from the

18   exhibit?

19             MR. VALENTINI:  Not the entirety of page 32.  Just

20   the top portion until the thread which is numbered 3461.

21             THE COURT:  So the top portion even though there's

22   some things --

23             MR. VALENTINI:  Yes.

24             THE COURT:  -- you want to eliminate?

25             MR. VALENTINI:  Yes.  Those are not from this

 1    particular Facebook group.

 2         And so the inference that we ask the Court to draw is that

 3    because of Mr. GossJankowski's participation in this Facebook

 4    group and because of the relatively small size of this Facebook

 5    group, there is a basis to conclude that he, in fact, read

 6    these postings as they were being posted.

 7         Again, they're not being introduced for the truth of the

 8    matter asserted, just for the fact that he was aware of things

 9    about January 6.

10         Thank you, Your Honor.

11         MR. SMOCK:  Your Honor, this is a significant issue

12    for us, and I want to make sure everything is clear about what

13    the government has proposed.

14         First of all, it's absolutely clear that what they're

15    focused on most is these sort of advertisement pages including

16    calling it a million militia march thing, we're coming to fight

17    for Trump, et cetera.  These are -- there are references to,

18    you know, patriots, pictures of guns, pictures of a building

19    exploding.  That's why this is something that they want to

20    admit.  And so the crucial question is whether it's something

21    that they can establish that Mr. GossJankowski looked at, and

22    there are a handful of things I want to focus on with respect

23    to that.

24         First of all, this concept of Facebook groups.  Now, I'm,

25    you know, not an avid Facebook user, so I've had to understand

```
 1    it a little bit better by speaking to other people.  But just,
 2    for example, from speaking to a law student in my office, she
 3    said she's a member of dozens of Facebook groups and she
 4    doesn't necessarily look at everything that's on a Facebook
 5    posting -- group's postings.  It just depends on what she wants
 6    to do.
 7         So the question is:  Is there information in here that
 8    it's clear Mr. GossJankowski saw and took part in?  And to be
 9    clear, there are a handful of points here where there are
10    postings by Mr. GossJankowski, and we don't object to a handful
11    of those things.  That's appropriate.  That's something that he
12    posted or there is -- there's evidence that he viewed it or
13    something of the sort.  But what we have here is the government
14    basically picking and choosing from within a long string of
15    posts by different people on this group pieces that they think
16    are harmful to Mr. GossJankowski in an effort to prove intent,
17    which is a crucial issue in this case, without being able to
18    link it up to him.
19         And this, again, is another issue I want to make sure the
20    Court understands.  This exhibit was produced to us in probably
21    sort of a different format than Your Honor is seeing it right
22    now.  What we have here is not -- you know, I think the way
23    it's paginated -- I don't even have the copy that the
24    government is relying on.  I'm not blaming them for this, but
25    I'm hearing references to page numbers 1 through 30 something.
```

1    I want to make sure the Court understands that this is not a

2    sequential sort of account of every posting on this group.

3    What it really is, is I think probably about 10 to 12 segments

4    of a much larger set of communications on this group that the

5    government has picked out.

6        So if the Court looks at the top of the page, which is

7    actually the pages of the business records from which these

8    materials are drawn, you'll see that it's actually several

9    hundred pages of communications.

10             THE COURT:  The first page is 1127 -- 11-277, and

11   then there are some pages that are 11-664.

12             MR. SMOCK:  11-724.  I'm seeing 9,642.  So this idea

13   that we're talking about Mr. GossJankowski contributing on one

14   given date somehow proving up his knowledge of a posting that

15   was hundreds of pages later in this record is not reasonable,

16   to say the least.  So what we have is basically a group, you

17   know, many different segments of a much larger set of

18   communications with most of them.

19       So the way that I have been looking at this is the way

20   that it was produced.  There are, you know, two pages that show

21   the number of the participants.  There's one page from

22   December 22nd that shows a photograph that has absolutely no

23   linkage to Mr. GossJankowski at all.  There's one segment that

24   is titled December 27th photo.  The main point seems to be

25   showing a photograph saying, "Calling all patriots."  Nothing

1    in that segment has any linkage to Mr. GossJankowski viewing it

2    or saying anything about it.  There's one called December 28th

3    photo, again showing a photo, no linkage to Mr. GossJankowski

4    commenting on it or showing any basis to believe he saw it.

5           There's one called --

6           THE COURT:  This is 28?  I'm looking at

7    Exhibit 305-28, and there's no photo on that page.

8           MR. SMOCK:  So thank you.

9           THE COURT:  I mean, you're looking at something

10   different than from what Mr. Valentini and I are looking at.

11          MR. SMOCK:  No, I'm -- that gets to this point that

12   I'm looking at a version of this that was produced, and I can

13   link them up.

14          THE COURT:  Okay.

15          MR. SMOCK:  So if I'm now going through it

16   sequentially, going from 305-002, and that was produced to us.

17          THE COURT:  So 305-002, yes, is the Uncle Sam

18   picture.

19          MR. SMOCK:  Correct.  So that is a segment, and you

20   can tell that by looking at the pagination.  It's page 1288.

21   After that you have --

22          THE COURT:  Page 11-288.

23          MR. SMOCK:  Correct.  Then you have page 11-289 and

24   11-290.  That's what comes from the Facebook records, and

25   that's what would be sort of like the chronology of

1    communications.  Nothing in this set of three pages has any

2    link to Mr. GossJankowski or evidence that he viewed these

3    items.  Does that make sense?

4         THE COURT:  Yeah, I see.  And then we go to 11-409.

5         MR. SMOCK:  Correct.

6         THE COURT:  454, 483, 11-644.

7         MR. SMOCK:  Correct.

8         THE COURT:  632, 664, 653.  Then we go 11-721.  Then

9    we jump back; right?

10        MR. SMOCK:  So for not a single one of these images

11   other than one that I can think of where -- let me see if I can

12   find it.  There's one where Mr. GossJankowski says something

13   about a backpack, which does seem to be a reference to -- this

14   is at 305-27 and 305-28.  That's the only example I can find of

15   a legitimate potential usage of one of these images or

16   exchanges, because it seems to be a posting that shows a list

17   of items that can be brought, and then Mr. GossJankowski

18   writes, "No backpack?"  That's the extent of it.

19        Again, we don't have objections to postings where

20   Mr. GossJankowski says something, but beyond that -- certainly

21   these images are inadmissible because they're not relevant and

22   they're overly prejudicial, but beyond that this really is not

23   evidence that should be put before the jury.

24        THE COURT:  So I have a question for the government.

25   You said you were relying on 104 of the Federal Rules of

1    Evidence, I believe.

2              MR. VALENTINI:  I hope I don't have the number wrong.

3    Conditional relevance?

4              THE COURT:  Doesn't look...do you have a book on

5    conditional relevance?  401.

6              MR. VALENTINI:  Yes, 401 -- no.  104(b).  104(b),

7    relevance that depends on a fact.  The simple point, I think --

8              THE COURT:  Wait.  What's the rule number?

9              MR. VALENTINI:  104, Your Honor.

10             THE COURT:  104?  Give me some language from 104 that

11   has anything to do with this.

12             MR. VALENTINI:  It just frames the -- it was -- I was

13   just trying to frame the question.  It says, "When the

14   relevance of evidence depends on whether a fact exists," in

15   this case whether Mr. GossJankowski saw the posting.

16             THE COURT:  So 104(b).  "When the relevance of

17   evidence depends on whether a fact exists, proof must be

18   introduced sufficient to support a finding that the fact does

19   exist.  The court may admit the proposed evidence on the

20   condition that the proof be introduced later."

21        So what proof are you going to introduce later?

22             MR. VALENTINI:  No, no.  I was relying on the first

23   sentence, the fact -- I was just trying to offer a framing of

24   the legal question of the admissibility question presented

25   here, which is these postings are relevant if we can offer

1    sufficient proof that Mr. GossJankowski likely saw these

2    postings.  And we rely on the size of the Facebook groups and

3    his direct participation in this group and the fact that --

4    well, we could also add another fact that could be -- what may

5    be coming into evidence with Mr. Sexton's testimony later today

6    as to one of the members of the group, but these are the

7    fact -- all we were trying to -- all we're trying to do, Your

8    Honor, is offer a legal framework for the Court to analyze this

9    question.

10        The question here is not one of prejudice as we

11   understand -- as we look at it.  It's not about 403.  It is

12   about whether the postings are relevant are not, and they are

13   relevant if there is a sufficient inference to be drawn that

14   Mr. GossJankowski read the postings.  And because of the nature

15   of the Facebook groups at issue and because of

16   Mr. GossJankowski's active participation in this group, we

17   think that preliminary -- that a prerequisite for relevance is

18   met.

19             THE COURT:  I'm going to exclude it except for the

20   parts that he was a participant in, so you can redo that

21   exhibit.

22             MR. VALENTINI:  Thank you, Your Honor.

23             THE COURT:  Okay.  We've told them 1:45, so we'll see

24   where we are.  Oh, Mr. Dreher left, meaning no offense to me.

25        I said Mr. Dreher left, meaning no offense to me, as he

1   put it.

2            MR. VALENTINI:  Thank you, Your Honor.

3        (Recess taken at 1:00 p.m.)

4        (At 2:08 p.m. on March 10, 2023; with counsel for the

5   parties and the defendant present; WITHOUT the jury:)

6            THE COURT:  All right.  So where are we?

7            MR. DREHER:  Your Honor, over the lunch break -- and

8   I use that term loosely -- the sides were able to confer not

9   only about this Court's ruling as to the Facebook posts, but

10  also about the videos associated with Kyle Sexton, and so it's

11  my understanding, I think, that we had at least conferred and

12  agreed on the redaction to the Facebook exhibit and would be

13  ready to proceed at this time, but I'll allow opposing counsel

14  to speak for themselves.

15           MR. SMOCK:  We're ready, Your Honor.

16           THE COURT:  And it was also the discovery material

17  that related to Mr. Sexton and the video Mr. Smock needed to

18  review.

19       So you can come up and speak to that, I guess, Mr. Smock.

20           MR. SMOCK:  I've had an opportunity to review it,

21  yeah.

22           THE COURT:  And what about the Exhibit 305?

23           MR. SMOCK:  We have resolved the issue.

24           MR. DREHER:  And then, Your Honor, just for, I

25  suppose, at this point a little bit of good news, I suspect

1    that we only intend to call one more witness now prior to

2    closing, and that would be James Mulvihill, the special agent,

3    the case agent.  So I believe his testimony will go and then

4    we'll be able to -- I don't know if the Court wants the jury to

5    take another break in the afternoon before moving on at that

6    point or how you would like us to signal the end.

7              THE COURT:  Well, I think you should rest when you're

8    done, and Mr. Smock and Ms. Goetzl will introduce the

9    stipulation.  Before they finally rest, I would like to address

10   Mr. GossJankowski personally to remind him of his right to

11   remain silent and his right to testify if he chooses to.  I am

12   sure there have been many discussions about that, but I

13   always -- I always think it appropriate just before the defense

14   rests for the judge to have that conversation with the

15   defendant as well.

16             MR. DREHER:  I understand, and that's kind of what I

17   was getting at in the scheduling.  If you would like us to rest

18   and then allow the jury an opportunity to leave or if you

19   would --

20             THE COURT:  Yeah.  I think you should rest, and then

21   we will let the jury leave, and then I'll have the discussion.

22   Mr. Smock and Ms. Goetzl can tell us if there's anything other

23   than the stipulation, and then I'll talk to Mr. GossJankowski,

24   and then we'll get the jury back, and maybe we'll tell them the

25   case is over except for instructions.

1    MR. DREHER:  Yes, Your Honor.

2    THE COURT:  I would like to -- before we get the

3    jury, I want to say one more thing about my ruling on 305.  I

4    had an opportunity over lunchtime to review Professor

5    Saltzburg's treatise, Federal Rules of Evidence Manual, 12th

6    Edition, Stephen Saltzburg, Michael Martin, Daniel Capra in the

7    most recent edition, and under Rule 104(b) they did some

8    examples of conditional relevance and when it is -- when it

9    comes up and when it is appropriate and when it's not, and they

10   go on to say it has to be connected up to facts and other

11   evidence and that the judge also can determine under 104, just

12   as the judge could under 401, whether the even conditional

13   probative value and likely probative value, if it can be

14   connected up, of the proffered evidence is substantially

15   outweighed by the risk of prejudice.

16   So 403 comes in as well, and I'm not saying the government

17   didn't acknowledge that.  Even a question of conditional

18   relevance, let's say, specifically allocated or subject to the

19   jury, the Court's initial determination is if a reasonable

20   juror could find the existence of the predicate facts.  So I

21   would have gone on to a prejudice analysis, and I think some of

22   it was prejudicial.

23   He also cites in a footnote a case that I have read over

24   lunch, the United States vs. V-A-Y-N-E-R, 769 F.3d 125, which

25   is a Second Circuit case from 2014, and it says, for example,

1    evidence that a defendant posted information on his Facebook

2    page was only relevant if the page was, in fact, his.  I think

3    that may be a little overstatement of the case itself, but this

4    is what Saltzburg says.  The trial judge must exclude the

5    evidence if the proponent fails to establish that the defendant

6    owned the page, citing *Vayner*.  Evidence of social media was

7    erroneously admitted when the government failed to provide a

8    basis on which a reasonable juror could conclude that the page

9    in question was not just an internet page but, in fact, the

10   defendant's profile or Facebook page.

11       If you look -- that's what the Saltzburg treatise says.

12   If you look at the actual decision, it turns out he's really

13   talking about analogy, because it's not a 104 case.  It's a 901

14   authentication case, but I still think it makes the point that

15   if -- and supports the point that there are issues that may

16   come up with relation to hearsay.  There may be issues that he

17   created the page or not or was responsible for it or was

18   involved with others in that page.  Sometimes, well, this is

19   not relevant.

20       So if you read the case closely, I guess my main point is

21   it's not directly relevant because it's a Rule 901 case, not a

22   Rule 104 case, but it does not in any way change my view and,

23   in fact, by analogy supports my view, for what it's worth.

24            MR. VALENTINI:  Thank you for the explanation, Your

25   Honor.

1          THE COURT:  Okay.  So we're ready for the jury and

2    then the next witness, I take it?

3          MR. DREHER:  Yes, Your Honor.

4          THE COURT:  So let's get the jury.

5        (Jury in at 2:16 p.m.)

6          THE COURT:  All right.  If everyone is ready, the

7    government may call its next witness.

8          MR. DREHER:  The government calls Special Agent James

9    Mulvihill.

10          JAMES MULVIHILL, PLAINTIFF'S WITNESS, SWORN

11          COURTROOM DEPUTY:  Thank you, sir.

12                      DIRECT EXAMINATION

13    BY MR. DREHER:

14    Q.   Good afternoon, sir.  If you would please introduce

15    yourself and spell your name for the record.

16    A.   I'm James Mulvihill, J-A-M-E-S, Mulvihill,

17    M-U-L-V-I-H-I-L-L.

18    Q.   Now, sir, are you currently employed?

19    A.   I am.

20    Q.   In what capacity?

21    A.   Special Agent with the FBI.

22    Q.   How long have you been a special agent with the FBI?

23    A.   I've been in the FBI for 23 years.  I've been an agent for

24    almost 14.

25    Q.   Now, within the FBI do you have a specific area that you

Mulvihill - Direct (Dreher)                                    1786

1  work in, in other words, by geography or assignment?

2  A.   So right now I'm a supervisory special agent at the OCDETF

3  Fusion Center.  I work in the national organized crime section.

4  Q.   Where is that center located?

5  A.   That's located in Merrifield, Virginia.

6  Q.   And back in January of 2021, where were you working?

7  A.   I was working at the Washington Field Office for the squad

8  CR6, which is known as the Safe Streets Task Force.

9  Q.   Now, prior to January of 2021, how long had you worked in

10  the Washington, D.C., area?

11  A.   I've worked in Washington, D.C., my whole career,

12  approximately 23 years.

13  Q.   And on January 6th of 2021, did your role with the Safe

14  Streets Task Force change?

15  A.   It did.

16  Q.   How so?

17  A.   Normally in Safe Streets Task Force, I would work violent

18  gangs and narcotics cases, but we actually deployed to the

19  Capitol that day.

20  Q.   And so you were present at the Capitol on January 6th?

21  A.   I was.

22  Q.   Now, if we can put that aside just for a moment, after

23  January 6, did you take any part in the FBI's investigation of

24  what occurred at the Capitol?

25  A.   I did.

1   Q.   How so?

2   A.   Excuse me.  Well, as everyone knows, the FBI was taking

3   in, I guess, leads from the public and from any law enforcement

4   agency or anything and --

5            THE COURT:  Could you get the microphone a little

6   closer.

7            THE WITNESS:  Yeah.  Sorry.

8   A.   The FBI was taking leads or had produced a bunch of BOLOs,

9   which is be on the lookouts, and produced that to the public

10  and provided them on our website.  So on January 13th, my

11  partner, Scott Brown, and I were, I guess, the next in the

12  queue for the next lead that had come in, and we responded to a

13  lead from the Metropolitan Police Department.

14  BY MR. DREHER:

15  Q.   Where did this lead take you?

16  A.   Took us to the vicinity of 9th and Florida area, northeast

17  Washington, D.C.

18  Q.   Now, what was your understanding of why you were going

19  there?

20  A.   My understanding was that someone had called in and wanted

21  to talk to police or report them -- turn themselves in or

22  report themselves for being on a BOLO.

23  Q.   Did you end up meeting anyone at that location?

24  A.   I did.

25  Q.   Is the person that you met present in the courtroom?

 1    A.    Yes.

 2    Q.    Could you please point to him and identify an article of

 3    clothing he's wearing.

 4    A.    The gentleman over here, Vitali GossJankowski.  He's

 5    wearing a woven shirt or a button-up shirt.

 6    Q.    When you met him on that day, did he provide any sort of

 7    identification of who he was?

 8    A.    He did.

 9    Q.    Did that identification also tell you who he was?

10    A.    Yes.

11    Q.    Now, how long was your conversation on that day?

12    A.    Somewhere around, max, 15, 20 minutes.

13    Q.    Was that the only time that you spoke with him?

14    A.    No.

15    Q.    Now I do want to talk about the next couple of days.  When

16    you became next up in the queue and received this case, what

17    does that mean?

18    A.    That means the whole -- the whole Washington Field Office,

19    all the FBI agents in the office had basically been taking on

20    roles and had not stopped what we were currently working but

21    were ingesting these January 6th leads as they came in.

22    Q.    So in other words, once you got a lead, would you keep it

23    until the end?

24    A.    Not necessarily.

25    Q.    Now, with this specific case have you been with it the

1    entire time?

2    A.   Yes.

3    Q.   And so were you tasked with investigating

4    Mr. GossJankowski's involvement on January 6?

5    A.   Yes.  My partner, Scott Brown, and I were.

6    Q.   So in those next couple of days after you first spoke with

7    Mr. GossJankowski, what did you do as part of your

8    investigation?

9    A.   We -- I reached out to -- so after we initially met

10   Mr. GossJankowski and understood that he was a deaf person, I

11   reached out to my EEO squad at headquarters, which is the equal

12   employment opportunity squad, and talked to our -- talked to

13   our translators on how to handle this case properly.

14   Q.   And so at the first meeting with him, did you have someone

15   translating for you?

16   A.   Yes.

17   Q.   And then after you spoke with someone from EEO, any

18   further conversations, then, you also had someone translating

19   for you?

20   A.   Yes.

21   Q.   So about how much time passed before you were able to

22   speak with Mr. GossJankowski again?

23   A.   So we first spoke --

24            THE COURT:  Wait.  Again, in between when and when?

25            MR. DREHER:  Oh, I apologize.  I'll back up, Your

1    Honor.  I appreciate that.

2    BY MR. DREHER:

3    Q.   Was there ever a time when you spoke to Mr. GossJankowski

4    again?

5    A.   Yes.

6    Q.   And how much time elapsed between those two periods?

7    A.   Approximately four days.  The next time I spoke to him was

8    on January 17th.

9    Q.   Now, is speaking to people involved part of FBI's

10   procedure in investigating these cases?

11   A.   Yes.

12   Q.   What other sorts of investigative work did you do with

13   this case?

14   A.   Well, my partner was able to obtain a number of warrants.

15   Q.   And what is your understanding of what a warrant is?

16   A.   My understanding of a warrant?  It's issued by the court

17   as not permission but...

18   Q.   Does this allow you to search for things?

19   A.   Yes.

20   Q.   Okay.

21           THE COURT:  So there are at least two kinds of

22   warrants that I'm familiar with.  The jury may not be.  One is

23   a warrant that a judge or a magistrate judge authorizes to

24   search for things.  Is that your experience as well?

25           THE WITNESS:  Yes, sir.

1          THE COURT:  And it's based on an affidavit from a law

2    enforcement officer which the judge says is sufficient to let

3    you search.  Is that your understanding?

4          THE WITNESS:  That's correct, Your Honor.

5          THE COURT:  And then the other kind of warrant is --

6    again, it's issued by a judge or a magistrate on the request of

7    law enforcement to -- a warrant to arrest somebody; right?

8          THE WITNESS:  That's my understanding.

9          THE COURT:  Okay.  It's probably everybody's

10   understanding, but I thought the record should be clear.

11         THE WITNESS:  I just didn't know the exact

12   definition.

13   BY MR. DREHER:

14   Q.   No.  I understand.  I apologize.  So sir, you're tasked

15   with investigating Mr. GossJankowski's involvement on

16   January 6th.  What steps did you take after speaking with him?

17   A.   So after speaking with Mr. GossJankowski on the 13th or --

18   Q.   Yes.

19   A.   So we were able to obtain his contact information from

20   that initial meeting, and then we set up another meeting with

21   Mr. GossJankowski, my co-case agent, Scott Brown, did, on

22   January 17th.

23   Q.   And so was your conversation on the 17th more in depth

24   than the first conversation that you had?

25   A.   Yes.

1    Q.    Now let me ask you:  Was there any -- when you first met

2    Mr. GossJankowski, do you recall what sort of clothing he was

3    wearing?

4    A.    I do.

5    Q.    What was he wearing?

6    A.    I don't know all his clothing, but I do know he was

7    wearing a bright blue jacket.

8    Q.    And then when you met him again, was there any clothing

9    that stuck out to your mind when you met him that time?

10   A.    He was wearing the same jacket.

11   Q.    Now, why was this significant in your investigation?

12   A.    Significant because in all the videos we were able to

13   obtain of Mr. GossJankowski, he was wearing this particular

14   jacket.

15   Q.    Now, throughout the course of your investigation, did you

16   ever have an opportunity to search through Mr. GossJankowski's

17   home?

18   A.    Yes.

19          MR. DREHER:  Your Honor, I'm going to approach the

20   witness with a physical exhibit that's labeled Government's

21   Proposed Exhibit 700.

22   BY MR. DREHER:

23   Q.    Now, sir, if you would please just open that up briefly

24   and look inside of that accordion folder.  What's inside there

25   is what's been marked as Proposed Exhibit 700.  Do you

1   recognize what's inside there?

2   A.   I do.

3   Q.   And where do you recognize that from?

4   A.   I recognize this from an item that was seized -- two items

5   that were seized: one at Mr. GossJankowski's house, one off of

6   Mr. GossJankowski's person.

7   Q.   Now, are you familiar with the processes or -- processes

8   for keeping items that are seized from somebody's home?

9   A.   I am.

10  Q.   And are you aware of whether or not these items also

11  followed those processes?

12  A.   Yes, they did.

13          MR. DREHER:  Your Honor, at this time the government

14  moves for the admission of Exhibit 700.

15          THE COURT:  Any objection?

16          MR. SMOCK:  No objection.

17          THE COURT:  It will be admitted without objection.

18  BY MR. DREHER:

19  Q.   So sir, if you will take that blue jacket item out of

20  there.

21  A.   (The witness complied.)

22  Q.   And can you explain what it's stored in.

23  A.   It's stored in a plastic bag.

24  Q.   If you would please open it up and show it to the jury.

25  A.   (The witness complied.)

1    Q.   Now, sir, are you able to tell us that this is the jacket
2    Mr. GossJankowski was wearing both opportunities you had to
3    speak with him?
4    A.   Yes.
5    Q.   Yes?  Okay.  Now, earlier you told us that there were two
6    items in that envelope, and I would like to direct your
7    attention to what's been marked as Government's Proposed
8    Exhibit 701.
9         And is that also an item that was seized from
10   Mr. GossJankowski?
11   A.   Yes.
12   Q.   And did that item follow the same procedures and processes
13   for when seizing items with the FBI?
14   A.   It did.
15             MR. DREHER:  Your Honor, I would move for the
16   admission of 701.
17             MR. SMOCK:  No objection.
18             THE COURT:  It will be admitted without objection.
19   BY MR. DREHER:
20   Q.   Would you be able to take that item out and show it to the
21   jury, please.
22   A.   Yes.
23   Q.   Now, sir, for the record, what is that item?
24   A.   A pair of black Nike sunglasses.
25   Q.   Now, why are those sunglasses significant to your

1    investigation?

2    A.   Because it's believed those are the sunglasses

3    Mr. GossJankowski was wearing while at the Capitol on

4    January 6th.

5    Q.   Now, sir, I'd like to direct your attention to the screen

6    in front of you.

7         And I've just put up a photograph.  Can you tell us what

8    this -- where this photograph comes from.

9    A.   Comes from the search warrant we conducted at

10   Mr. GossJankowski's house on January 18th.

11   Q.   And does it fairly and accurately depict the events as you

12   remember them from that day?

13   A.   Yes.

14        MR. DREHER:  I would move for the admission of

15   Government's 700A.

16        MR. SMOCK:  No objection.

17        THE COURT:  It will be admitted.

18        MR. DREHER:  If we can publish that to the jury.

19   BY MR. DREHER:

20   Q.   Now, sir, are you able to tell us where this photograph

21   was taken?

22   A.   In Mr. GossJankowski's house, 837 Florida Avenue

23   Northwest -- or I'm sorry, Northeast, Washington, D.C.

24   Q.   And is this a photograph of Government's 700, the blue

25   jacket?

1    A.   Yes.

2    Q.   Now, is taking photographs of the items that are seized

3    the procedure that you must follow?

4    A.   Yes.

5         MR. DREHER:  Ms. Johnson, if we'd be able to take

6    this down for a moment.

7    BY MR. DREHER:

8    Q.   Now, sir, I'm going to put a photograph up on the screen

9    as well.  Have you seen this photograph before?

10   A.   Yes.

11   Q.   Can you tell us where it comes from.

12   A.   Yeah.  It's an ID from the Library of Congress as a reader

13   for Vitali GossJankowski.

14   Q.   I just mean where the photograph was.

15   A.   It was in Mr. GossJankowski's house.

16        MR. DREHER:  Your Honor, I would move for the

17   admission of Government's Proposed Exhibit 702.

18        MR. SMOCK:  No objection.

19        THE COURT:  It will be admitted.

20        MR. DREHER:  If we could publish this.

21   BY MR. DREHER:

22   Q.   Now, sir, can you explain to the jury why it would be

23   important to photograph an ID during a search as well.

24   A.   Yes.  Just to show that items of the individual lives at

25   that residence or he keeps stuff that would identify himself at

1     that residence.

2              MR. DREHER:  Ms. Johnson, if we could take this down.

3     BY MR. DREHER:

4     Q.   Now, sir, following this search did your investigation

5     end?

6     A.   No.

7     Q.   What other steps did you take?

8     A.   Mr. GossJankowski was arrested that day.

9     Q.   And after -- following that arrest did your investigation

10    end?

11    A.   No.

12    Q.   What further steps did your team take?

13    A.   My team continued and finished the search warrant that

14    day, and Mr. GossJankowski was brought back to the Washington

15    Field Office, where he was interviewed.

16    Q.   Now, throughout the course of the investigation, were

17    there ever any searches that were completed following this?

18    A.   Yes.

19    Q.   Where did those searches occur?

20    A.   My partner, again, Scott Brown, was able to obtain a

21    warrant for a Facebook search.

22    Q.   Now, what is your understanding of Facebook?

23    A.   It's a social media site where friends, family,

24    acquaintances can be in contact with each other.

25    Q.   Now, by "social media" you mean on computers?

1    A.    Correct.

2    Q.    Okay.  So was it the information that you were able to

3    obtain from this?

4    A.    Yes.

5    Q.    How does this information get to you?

6    A.    It's -- it was -- it didn't -- it was emailed to Scott

7    Brown via the warrant.

8    Q.    You had an opportunity to review this information prior to

9    testifying today?

10   A.    Yes.

11   Q.    Now, sir, I put on the screen what's been marked as

12   Government's Proposed Exhibit 300.  Do you recognize this

13   document?

14   A.    Yes.

15   Q.    Can you tell me what this document is.

16   A.    Yeah.  It's a certificate of authenticity of domestic

17   records of regulatory conducted activity.

18   Q.    And can you tell us where this document comes from?

19   A.    From -- from Facebook.

20   Q.    And so is this something that the FBI would normally

21   receive when obtaining data from Facebook?

22   A.    Yes.

23          MR. DREHER:  I would move for the admission of

24   Government's Proposed 300.

25          MR. SMOCK:  No objection.

1           THE COURT:  It will be admitted.

2      BY MR. DREHER:

3      Q.   Now, sir, if I can direct your attention to the bottom of

4      the page here, can you tell me what date you -- what date this

5      document was signed?

6      A.   Yes.  February 4th, 2021.

7      Q.   Now, is this all that the FBI obtained from Facebook?

8      A.   No.

9      Q.   What else did the FBI receive?

10     A.   Received the requested information from Facebook, Vitali

11     GossJankowski's Facebook account records from a certain date

12     from --

13     Q.   Well, let me ask you this:  When it comes to you, what

14     format does it come to you in?

15     A.   An email, like...

16     Q.   So is it a document of some sort?  Is it -- I'm guessing

17     it's not a video of what it is.

18     A.   No, it's not a video.

19     Q.   Okay.  So when it's emailed to you, does it all come in

20     one file?

21     A.   I'm not a hundred percent sure how this one came.

22     Q.   Okay.  But you had an opportunity to review portions of

23     the Facebook page; correct?

24     A.   Yes.  Not all, not 1200 pages of it or 12,000 pages of it

25     but --

1    Q.   12,000 pages?

2    A.   12,000, yes.

3         MR. DREHER:  Okay.  Ms. Johnson, are we able to take

4    this down?

5    BY MR. DREHER:

6    Q.   Now, sir, if I could direct your attention to the screen

7    in front of you, can you tell me what this is.

8    A.   Yes.

9    Q.   Where did this document come from?

10   A.   From Facebook.

11   Q.   And this came alongside the certificate of authenticity?

12   A.   Yes.

13        MR. DREHER:  I would move for the admission of

14   Government's Proposed 301.

15        MR. SMOCK:  No objection.

16        THE COURT:  It will be admitted.

17   BY MR. DREHER:

18   Q.   Now, sir, it looks like at the top it says page 1.  Is

19   this the first page of those 12,000 pages you told us about?

20   A.   Yes.

21   Q.   And what is your understanding of the purpose of this

22   page?

23   A.   It tells us the subscriber information for the account.

24   Q.   And so I want to direct your attention to the middle

25   portion of the page just right around here (indicating).

1     And can you tell us who's identified as the owner of the

2     account of the information that you received?

3     A.    Yeah.  Vitali GossJankowski.

4           MR. DREHER:  I'm going to clear the screen.  I'll

5     scroll down.

6     BY MR. DREHER:

7     Q.    Now I would like to direct your attention here to the

8     language that's listed by user portion.  Can you read for us

9     the languages that are listed by the user of this account.

10    A.    Yes.  Russian language, English language, American Sign

11    Language, Hebrew, British Sign Language, German language,

12    Icelandic Sign Language, alien languages.

13    Q.    Okay.  And then also there's a section here in this part

14    of the subscriber information that lists some phone numbers.

15    Do you see that?

16    A.    Yes.

17          MR. DREHER:  Ms. Johnson, would we be able to take

18    this down?

19    BY MR. DREHER:

20    Q.    Now, sir, I've just put up what's been marked as

21    Government's Proposed Exhibit 303, and can you identify us --

22    identify for us what this is.

23    A.    It's a Facebook business record.

24    Q.    And this is from what you received from Facebook?

25    A.    Yes.

1    Q.   Alongside that certificate of authenticity?

2    A.   Yes.

3              MR. DREHER:  I would move for the admission of

4    Government's 303.

5              MR. SMOCK:  No objection.

6              THE COURT:  It will be admitted.

7    BY MR. DREHER:

8    Q.   Now, this exhibit starts -- at least it looks like the

9    author of a message is Fernando Aguilar with a specific

10   Facebook number with a response by Vitali GossJankowski with

11   another specific Facebook number.  And if you would, please,

12   sir, can you tell us what the 2021-01-05, 23:15:40 UTC is?

13   A.   That's the date the message was sent and the time.

14   Q.   Now, that time is in -- is that Eastern Standard Time?

15   A.   No.

16   Q.   What's your understanding of what UTC is?

17   A.   It's the -- I forget the exact acronym, but it's the

18   universal time.  It's called the primary.

19   Q.   You said the primary?

20   A.   Yes.

21   Q.   So I guess is there a mathematical equation we can do to

22   convert this into Eastern Time?

23   A.   Yes.  I believe it's five hours behind at this time.

24              THE COURT:  Which is behind which?

25              THE WITNESS:  Pardon?

1          THE COURT:  Which is behind which?  You said five

2     hours.

3          THE WITNESS:  The real time, Eastern Standard Time,

4     is five hours behind what's listed here.

5          THE COURT:  And so instead of 23:15:40 UTC, this

6     message in our time would be 18:15:40 Eastern Standard Time?

7          THE WITNESS:  Yes.

8     BY MR. DREHER:

9     Q.   Okay.  Thank you.  Now --

10    A.   Thank you for doing the math.

11    Q.   -- if you would, please, can you read for us what that

12    Facebook account that Mr. GossJankowski was replying to wrote

13    at 18:15:40 Eastern Standard Time.

14    A.   He writes, "It's not right but tell me you don't

15    understand why they would think to do that."

16    Q.   And then it looks like Mr. GossJankowski responds at

17    18:30:24 Eastern Standard Time.  What does he write?

18    A.   He writes, "Tyrannical censorship is obvious."

19    Q.   Now, of course, there is a response again, and that other

20    Facebook account at 18:31:44 Eastern Standard Time says what?

21    A.   "I do think it's wrong to do that.  I don't always agree

22    with you, but I'm always going to speak up for your right to

23    speak and to express whatever you may think.  My question is:

24    Do you see a why?"

25    Q.   And then Mr. GossJankowski responds at 18:50:54 Eastern

1    Standard Time by saying what?

2    A.    "Tomorrow is the Congress to certify electoral vote

3    certification.  Mayor Bower inadvertently intended to prevent

4    us from entering D.C."

5    Q.    Now, again, looking at the date, this was January 5th,

6    2021?

7    A.    Yes.

8    Q.    And the electoral vote was to be certified the following

9    day at the United States Capitol; correct?

10   A.    Correct.

11   Q.    Now I want to draw your attention -- we'll skip the

12   next -- the next interaction, but I want to draw your attention

13   to this message by Mr. GossJankowski on January 5th, but late

14   in the evening on January 5th.  What does he say there?

15   A.    "Preventive tactical to control the participants in the

16   D.C. are" *[sic]*.

17   Q.    And following that message what does he tell this Facebook

18   friend?

19   A.    "I will find out tomorrow in the early morning."

20   Q.    Now, certainly with the conversion of UTC to Eastern

21   Standard Time and this being in the late evening of

22   January 5th, when he says "tomorrow," would that be

23   January 6th?

24   A.    To my understanding, yes.

25   Q.    Now I'm going to jump ahead in time a little bit and take

1    you to what reads as January 6, 22:06:48 UTC, when this other

2    Facebook account asks what?

3    A.   I'm sorry.  What was the time again?

4    Q.   At 22:06:48.

5    A.   Okay.

6    Q.   What does this other Facebook account ask?

7    A.   "You safe?"

8    Q.   And, again, in Eastern Standard Time this would have

9    occurred -- this time I'll put you on the spot.  When would

10   that have occurred?

11   A.   18:06 -- I'm sorry, 17:06:48 Eastern Standard Time.

12   Q.   So it would be five in the evening?

13   A.   Correct.

14   Q.   And what does Vitali GossJankowski reply?

15   A.   Yes.

16   Q.   He does reply.  What does he reply?

17   A.   "Yes, I'm home."

18   Q.   Can you tell us how long after that first message he

19   replies?

20   A.   Approximately 28 minutes.  I'm sorry.  What is that, six?

21   Make me do the math.  18 minutes.  Is that right?  Yeah.

22   Q.   Well, five seconds after that message he says something

23   else.  What does he tell this other Facebook user?

24   A.   "I have a Taser LOL."

25   Q.   And then again, 30 seconds after Mr. GossJankowski says...

1    A.   "They snatched two riot guys out of their line, then they

2    ripped off their protective headgear then strike many fists at

3    him."

4    Q.   Then again, 9 seconds later he says...

5    A.   "One of them was ghostly scared."

6    Q.   Now, this other Facebook account -- I'll skip two

7    messages, but at 22:35:40 UTC on January 6th, what does that

8    other Facebook user say?

9    A.   "Damn, it got crazy real quick."

10   Q.   And does Mr. GossJankowski reply?

11   A.   Yes.

12   Q.   And what does he say?

13   A.   "Yes."

14   Q.   Now, about 30 seconds later Mr. GossJankowski writes again

15   to this Facebook user, and I'm going to scroll the page down

16   and ask that you read what Mr. GossJankowski wrote on

17   January 6th at 5:43 p.m. Eastern Standard Time.

18   A.   "They stole the ballistic shields, protective gears,

19   batons, and even the pepper mace guns."

20   Q.   Now this other Facebook user asks a question.  Can you

21   read what that question is.

22   A.   "How did it go down?"

23   Q.   Does Mr. GossJankowski reply?

24   A.   Yes.

25   Q.   What does he say?

1    A.    "The riot guys formed five rows to push us out of the

2    building.  Pepper mace is their powerful tool."

3              MR. DREHER:  Ms. Johnson, can we take this down.

4         Actually -- I apologize, Ms. Johnson.  Can you put it back

5    up.

6    BY MR. DREHER:

7    Q.    But Mr. GossJankowski continues, doesn't he?

8    A.    Yes.

9    Q.    What does he say next?

10   A.    "Every time they reloaded canisters of pepper mace, the

11   rioters violently pushed riot cops back into the building."

12   Q.    And then again, only 40 seconds later?

13   A.    "Rioters took more than five ballistic shields then

14   smashed them to riot cops head."

15   Q.    Now this other Facebook user asks another question.  What

16   is that question?

17   A.    "Really?"

18   Q.    And then Mr. GossJankowski responds 13 minutes later and

19   says...

20   A.    "Yes, they told me LOL."

21              MR. DREHER:  Now, Ms. Johnson, can we take it down.

22   BY MR. DREHER:

23   Q.    Now, sir, this wasn't the only record from Facebook that

24   you were able to obtain; correct?

25   A.    Correct.

 1    Q.   And, sir, if I could direct your attention to the screen,

 2    I've put up what's been marked as Government's Proposed

 3    Exhibit 304.  Can you tell us what this document is.

 4    A.   Facebook business record.

 5    Q.   Is this from the same record that you received alongside

 6    that certificate of authenticity?

 7    A.   Yes.

 8              MR. DREHER:  I would move for the admission of

 9    Government's 304.

10              MR. SMOCK:  No objection.

11              THE COURT:  It will be admitted.

12    BY MR. DREHER:

13    Q.   Sir, this conversation begins on January 8th at 23:12 UTC

14    with Mr. GossJankowski at the top; correct?

15    A.   Correct.

16    Q.   Now, what does he say in the following message to this --

17    to another Facebook user?

18    A.   The next one down from the first one?

19    Q.   Correct.

20    A.   "OMG?  Trump did not incite."

21    Q.   And then this other Facebook user responds almost

22    immediately, and what does that user say?

23    A.   "He did," exclamation point.

24    Q.   And then this user continues...

25    A.   "And is continuing to do so."

1    Q.   Now, what was Mr. GossJankowski's response just a minute

2    and a half later?

3    A.   "Maxine Winters did."

4    Q.   And he continues on almost immediately?

5    A.   Yeah.  He said, "No, he did not."

6    Q.   And what's his, again, immediate response again?

7    A.   "Stop blaming on him."

8    Q.   Now, if we skip a couple messages, this other Facebook

9    user, on January 21st at 17:37:17 UTC, says something else to

10   Mr. GossJankowski.  Can you tell us what that user said.

11   A.   Who's *[sic]* fault is that?

12   Q.   And what is Mr. GossJankowski's reply on this exhibit?

13   A.   "That Congresswoman did" with a redaction.

14   Q.   Now, sir, what is -- he continues on, obviously.  What

15   does Mr. GossJankowski continue to say?

16   A.   You need -- "You need to woke up, both of us.  I was

17   there.  The rioters are mostly BLM and Antifa and disguised

18   Trump supporters."

19   Q.   Now Mr. GossJankowski continues, doesn't he?

20   A.   Yes.

21   Q.   What does he say, then, on January 12th at 20:10 UTC?

22   A.   "Just go eat more crude oil based foods.  So sad that you

23   think you guys are so perfect than us."

24   Q.   Now this other Facebook user responds as well.  What does

25   that other user say just 10 seconds later?

1    A.    "No one is perfect."

2    Q.    And does Mr. GossJankowski respond to that?

3    A.    Yes.

4    Q.    What does Mr. GossJankowski say?

5    A.    "You guys are way worse than I ever expect."

6    Q.    And then this other Facebook user, not 30 seconds later,

7    says what?

8    A.    "Why do you think so?"

9    Q.    And Mr. GossJankowski responds with...

10   A.    "Trust me I was never inside the Capitol using."

11   Q.    Now, skipping the next message, this other Facebook user

12   asks a question of Mr. GossJankowski.  What does that user ask?

13   A.    "What's the pic from then," question mark.

14   Q.    And does Mr. GossJankowski respond?

15   A.    Yes.

16   Q.    And what does he respond with?

17   A.    "It must be the background of the external doorway."

18   Q.    Okay.  Now, skipping the other Facebook user's next

19   response, Mr. GossJankowski gives -- says something on

20   January 14th, 22:02 UTC.  And what does Mr. GossJankowski

21   say?

22   A.    "And I never assaulted a cop.  I tried to intervene but I

23   couldn't because of being so crowded."

24   Q.    Now, Special Agent Mulvihill, can you remind us again when

25   you first spoke to Mr. GossJankowski.

1    A.    Yes.  January 14th.

2    Q.    On January 14th?

3    A.    Uh-huh.

4          MR. DREHER:  Ms. Johnson, are we able to take this

5    down?

6    BY MR. DREHER:

7    Q.    Now, sir, if I could direct your attention to the screen

8    in front of you again.  I'm going to show you what's been

9    marked as Government's Exhibit 305.  Are you able to identify

10   what this document is?

11   A.    It's a Facebook business record.

12   Q.    Now, does this come alongside that certificate of

13   authenticity you discussed before?

14   A.    It did.

15         MR. DREHER:  Your Honor, I would move for the

16   admission of Government's 305.

17         MR. SMOCK:  No objection.

18         THE COURT:  And it's been redacted consistent with

19   our earlier discussion?

20         MR. DREHER:  Yes, Your Honor.

21         THE COURT:  It will be admitted in that form.

22   BY MR. DREHER:

23   Q.    Now, sir, looking at the first page of this document, we

24   see the word "thread" followed by a number.  What is your

25   understanding of what this is?

1    A.    It's a thread.  It's a number that's assigned to this

2    particular thread of Facebook posts.

3    Q.    Now, does all this information also list the participants

4    of this particular thread?

5    A.    Yes.

6    Q.    And how many -- or I should say are there any of the

7    participants who might be relevant to the case that we're

8    hearing listed within this list?

9    A.    Yes.

10   Q.    Who is listed within the participants?

11   A.    Vitali GossJankowski.

12   Q.    Now, on the screen in front of you, would you able to

13   circle his name for us.

14   A.    Yes.  Sorry.

15   Q.    Thank you.  I'm going to go to page 2 of this document and

16   ask you what -- is there a way to tell what this thread is

17   called?

18   A.    Yes.

19   Q.    And how can we do that based on these documents?

20   A.    About halfway or three-quarters of the way down the page,

21   it says Author Thomas Drake, and I guess the first post -- from

22   my understanding the first post would be Thomas Drake named

23   this group Deaf MAGA-General.

24   Q.    Okay.  Now, in your review of these records, do you see

25   Mr. GossJankowski interact with this group or thread?

1    A.    Yes.

2    Q.    And again, just like with the messages, there's a sent

3    time, and here it's January 4th, 20:05:24 UTC, and so that

4    would be 15:05 Eastern Standard Time; correct?

5    A.    Correct.

6    Q.    I always take the easy ones.

7    A.    Yeah.

8    Q.    Now, what does Mr. GossJankowski write to this group on

9    January 4th?

10   A.    "We need to set up arrangement to meet to make a big

11   gathering before we start marching.  I know the excessive usage

12   of phones in heavily crowded areas are going to slow us to

13   communicate."

14   Q.    Now, sir, I'm going to take you to the next page of this

15   document.  And we see that there's at least another Facebook

16   user that sends a photo.  Now, are we able to tell from this

17   document when this photo is sent?

18   A.    Yes.

19   Q.    When was this photo sent to this group?

20   A.    January 6, 2021.

21   Q.    At a particular time?

22   A.    1:28 UTC, 1:28:55 UTC.

23   Q.    So this would be the evening before January 6; correct?

24   A.    Yeah.  So if you do the math, it would be January 5th,

25   late in the evening.

1    Q.    And then we go on, and this is the photo that's sent;

2    correct?

3    A.    Yes.

4    Q.    And now, almost immediately after this photo is posted,

5    what does Mr. GossJankowski reply to the group with?

6    A.    No backpacks -- "no backpack," question mark.

7    Q.    Now, within this same group Mr. GossJankowski continues to

8    communicate on January 6, doesn't he?

9    A.    Yes.

10   Q.    And what does he tell the group at 22:35:22 UTC?

11   A.    I was at Capitol and it was very lolent, L-O-L-E-N-T.

12   It's a typo.

13   Q.    Then, again on January 6th, another Facebook user at 23:20

14   UTC says what to this group?

15   A.    Says, "These people who climbed the wall to Capitol Hill

16   could be rioters (Antifa-BLM) who broke in Capitol Hill and

17   they are out at evening.  It's the same patterns."

18   Q.    And does Mr. GossJankowski respond to this?

19   A.    Yes.

20   Q.    And what does he respond about 30 seconds later?

21   A.    "They are Antifa."

22        MR. DREHER:  Ms. Johnson, would we be able to take

23   this down.

24        Let me just have one moment.

25        Your Honor, I have no further questions.

1                       CROSS-EXAMINATION

2    BY MR. SMOCK:

3    Q.    Hello, Special Agent Mulvihill.

4    A.    Hello.

5    Q.    So I want to start by talking about something that you

6    just went over with Mr. Dreher.  You put up Exhibit 304.

7              MR. SMOCK:  And I'm going to ask Adam to put that

8    exhibit up.  And Adam, can you move to the next page and blow

9    up the third post from the bottom.

10   BY MR. SMOCK:

11   Q.    So this last post at 22:02 UTC, can you read that again.

12   A.    "And I never assaulted a cop.  I tried to intervene but I

13   couldn't because of being so crowded."

14   Q.    Now, you testified in response to Mr. Dreher's question

15   that at the time he wrote that, you had not spoken to him; is

16   that right?

17   A.    I spoke to him that day.

18   Q.    Okay.  So I'm just trying to understand what the point of

19   that questioning was, I guess.  So 22:02 is -- and you've

20   mastered the math better than I have -- 5:00 o'clock?

21             THE COURT:  The 14th at five hours earlier than it

22   suggests here; is that right?

23   BY MR. SMOCK:

24   Q.    So that's 5:00 -- he would have written that at 5:02 p.m.;

25   is that right?

1    A.    That's correct.

2    Q.    Okay.  So do you recall when on January 14th you spoke to

3    Mr. GossJankowski?

4    A.    It was sometime around then.  I don't know the exact time

5    without looking.

6    Q.    Well, maybe you can clarify for us.  What is the relevance

7    of the timing of that from your perspective?

8               THE COURT:  That's for you to argue about.

9               MR. SMOCK:  Okay.

10              THE COURT:  When you say you spoke to him on

11   January 14th, I take it that was not in person?

12              THE WITNESS:  It was in person.

13              THE COURT:  'Cause earlier on direct you said that

14   you first -- I thought you said you first responded to

15   Mr. GossJankowski's address on January 13th, but maybe I have

16   that wrong.

17              MR. SMOCK:  I think it was the 14th.

18              THE WITNESS:  Yeah.  I may have been mistaken.  It

19   was the 14th.

20   BY MR. SMOCK:

21   Q.    I mean, I guess what I'm asking is:  Were you -- or is the

22   answer to your question intended to imply somehow that because

23   Mr. GossJankowski wrote that, you hadn't told him that he was a

24   suspect and so it must somehow mean that he --

25              MR. DREHER:  Your Honor, I'm going to object.

1          THE COURT:  Objection is sustained.

2          MR. DREHER:  Thank you.

3   BY MR. SMOCK:

4   Q.   Okay.  Well, let me just --

5          THE COURT:  I mean, we've established the time that

6   this Facebook exchange took place, assuming everybody can do

7   the math, and I don't know whether or not we've established the

8   time of the first interchange with Mr. GossJankowski outside

9   his residence, I believe.

10  BY MR. SMOCK:

11  Q.   Okay.  So Agent Mulvihill, you talked about the fact that

12  Mr. GossJankowski contacted law enforcement on the 14th

13  independently.  He did so affirmatively, reached out to law

14  enforcement; correct?

15  A.   Yes.

16  Q.   And you became aware that he did that because prior to

17  that he had seen what's referred to as a be-on-lookout form; is

18  that right?

19  A.   That's my understanding.

20  Q.   So that's a document that's created by law enforcement,

21  essentially sort of like a wanted poster.  Is that a fair

22  representation of what it would be?

23  A.   No.

24  Q.   How would you describe it?

25  A.   A be on the lookout.

1    Q.   That's a concrete answer.  Maybe I'll show it to you.

2              MR. SMOCK:  And I'm going to give a new exhibit

3    number, Ms. Johnson, just because this came up unexpectedly.

4    BY MR. SMOCK:

5    Q.   I'm going to show you what I'd like to mark as Defense

6    Exhibit 22 for identification.  Do you recognize that to be the

7    be-on-the-lookout form that Mr. GossJankowski responded to?

8    A.   Yes.

9              MR. SMOCK:  I'd move to admit Exhibit 22.

10             THE COURT:  Well, it's already been up on the screen

11   so I --

12             MR. SMOCK:  Oh, I'm sorry.  Well, here it is.

13             THE COURT:  Is there any objection?

14             MR. DREHER:  There's no objection, Your Honor.

15             THE COURT:  All right.  It's admitted.  That's good.

16   BY MR. SMOCK:

17   Q.   So the image -- the second image from the right on the

18   bottom row is Mr. GossJankowski; correct?

19   A.   Yes.

20   Q.   And written across the top there's an allegation, "Assault

21   on federal officers and violence at the U.S. Capitol"; correct?

22   A.   An allegation?

23   Q.   Well, it's -- that's apparently the offense that is being

24   looked into seeking information about; correct?

25   A.   I think that's exactly what it says, seeking information.

Mulvihill - Cross (Smock)                                    1819

1    Q.    Got it.

2          MR. SMOCK:  You can take that down now.

3    BY MR. SMOCK:

4    Q.    So when Mr. GossJankowski reached out to law enforcement

5    earlier in the day on the 14th, he was doing so in response to

6    a be-on-the-lookout form; correct?

7    A.    That's my understanding.

8    Q.    Okay.  So getting into sort of the chronology of events,

9    then, you're aware that Mr. GossJankowski, upon learning of

10   this, actually called 911.  Am I right?

11   A.    That's correct.

12   Q.    And he said that he wanted to turn himself in; correct?

13         MR. DREHER:  Objection, Your Honor.  That's hearsay.

14         THE COURT:  I'll permit it.

15   BY MR. SMOCK:

16   Q.    He said he wanted to turn himself in?

17   A.    I don't know his exact words, but something to that

18   effect.

19   Q.    Okay.  So as a result of that, you and other officers

20   actually went to meet him on the street; correct?

21   A.    Correct.

22   Q.    And you had a conversation with him that day, and you took

23   a photograph of him; correct?

24   A.    Correct.

25   Q.    And he willingly spoke to you; correct?

1   A.   Correct.

2   Q.   And a person doesn't have to speak to the police, do they?

3   A.   No.

4   Q.   But he did so?

5   A.   He did.

6   Q.   And then after that you had exchanged numbers essentially,

7   or was it your co-agent, Mr. Brown?

8   A.   Yeah.  Detective Scott Brown, my co-case agent.

9   Q.   So he had Mr. GossJankowski's contact information,

10  Mr. GossJankowski had Mr. Brown's information, and they texted

11  with one another; is that right?

12  A.   I don't know if that -- that night but eventually, yes.

13  Q.   In the days following; correct?

14  A.   Correct.

15  Q.   And, in fact, you then reached out or Mr. -- is it Agent

16  Brown or Detective Brown?

17  A.   He's a deputized Metropolitan Police Department, so he's a

18  federal agent deputized.  It's called a task force officer, and

19  he was assigned to my squad at that time.

20  Q.   I just want to get the right title when I talk about him.

21  Task Force Officer Brown, he asked Mr. GossJankowski if you

22  folks could interview him a second time; is that right?

23  A.   Correct.

24  Q.   And, in fact, you did go to interview him on January 17th;

25  correct?

 1   A.    Yes.

 2   Q.    And you sat down at his kitchen table for an interview;

 3   right?

 4   A.    Yes.

 5   Q.    And he talked to you for more than an hour that day;

 6   right?

 7   A.    Yes.

 8   Q.    And he denied assaulting an officer; correct?

 9         MR. DREHER:  Your Honor, I'm going to object to

10   hearsay.

11         THE COURT:  I'll permit it.

12   BY MR. SMOCK:

13   Q.    Is that right?

14   A.    Can you repeat the question.

15   Q.    He denied assaulting an officer on January 6th?

16         THE COURT:  On January 17th.

17         MR. SMOCK:  Right.

18   BY MR. SMOCK:

19   Q.    He denied --

20         THE COURT:  The date of the interview you're talking

21   about is January 17th.

22   BY MR. SMOCK:

23   Q.    He denied that on January 6th he assaulted Officer Moore;

24   is that right?

25         THE COURT:  Wait.  You're building assumption into

1      that question.  Come to the bench.

2            (At sidebar)

3            THE COURT:  Look, there's an objection to all of this

4      based on hearsay.  There is -- we know he was interviewed.

5      There's testimony he was interviewed.  I take it that the 302s

6      or the interviews, nobody's going to offer them even though

7      they're on the government's exhibit list, so the fact that he's

8      not going to testify, "A," doesn't that just make this hearsay?

9      And that's my first question.

10           MR. SMOCK:  I'll withdraw the question.

11           THE COURT:  My real problem with your question -- my

12     real problem.  My second problem with the question is I don't

13     think anywhere in those interview notes either he or the

14     officer mentioned a particular officer by name in terms of

15     discussion of assaulting an officer.

16           MR. SMOCK:  Well, I mean, I could get into the

17     details of that.  That's a complicated --

18           THE COURT:  Is it in the 302 that Officer Michael

19     Moore's name was mentioned?

20           MR. SMOCK:  Well, the issue is that at the time -- I

21     mean, this is more complicated than we needed to get into, but

22     they believed that Officer Fanone was --

23           THE COURT:  I understand that, but he's asked -- they

24     interview him.  The questions and the answers are summarized in

25     the 302 interview.  The question is calling for hearsay.  Did

1    he deny he assaulted someone?  There is nothing in there that

2    mentions Officer Moore, but since it's hearsay anyway, I mean,

3    you're going to withdraw the question, but that's what got me

4    to my feet is when you built an assumption into the question I

5    don't think is fair, particularly when there's no way to test

6    it other than admitting more hearsay.

7              MR. SMOCK:  Okay.

8              MR. VALENTINI:  Just to make a brief record, we think

9    there is a major hearsay problem here.  And if the defendant

10   wants to take the stand, he can do that, of course, but he

11   can't just smother this testimony to this case agent and then

12   avoid taking the stand on cross-examination.  That's exactly

13   what's going on, so I think there's a major hearsay problem.

14             THE COURT:  I think so too.

15             MR. SMOCK:  They also had two recorded interviews on

16   the exhibit list which they chose not to do, but anyway.

17             THE COURT:  They don't have to offer everything

18   that's on their exhibit list.

19             MR. VALENTINI:  I want to make a very clear record.

20   If the defendant -- if the defense wants to call the defendant

21   as a witness, they can do that.  We are not -- we are under no

22   obligation to put on any particular statement that the

23   defendant made, whether it's on an exhibit list or not.  I just

24   wanted to make --

25             THE COURT:  I agree with you.

1          MR. VALENTINI:  Thank you.

2          THE COURT:  I think that what is relevant, and I

3    don't think the government disagreed, is the fact that you're

4    bringing up that he voluntarily talked to them and he was

5    cooperative, but the substance of it is hearsay.

6          MR. VALENTINI:  Correct.  Thank you, Your Honor.

7       (In open court)

8          THE COURT:  Ladies and gentlemen of the jury, I'm

9    going to strike the last question and the last answer, if there

10   was one, and you should disregard it.

11   BY MR. SMOCK:

12   Q.   So, Special Agent Mulvihill, we're talking now about an

13   interview that you had with Mr. GossJankowski on January 17th.

14   That was the interview that occurred in Mr. GossJankowski's

15   house; right?

16   A.   Yes.

17   Q.   And you spoke for more than an hour; right?

18   A.   Yes.

19   Q.   And it was recorded; right?

20   A.   Yes.

21   Q.   And you're also aware that Mr. GossJankowski sat with

22   yourself and other law enforcement officers for -- a few days

23   after that, correct, on January 18th?  Actually the next day.

24   Sorry.  January 18th?

25   A.   Yes.

1    Q.   And that was a conversation where he again voluntarily

2    spoke to you about the events of January 6; correct?

3    A.   Yes.

4    Q.   And that was also recorded; correct?

5    A.   Yes.

6            MR. SMOCK:  Can I have one moment?

7        I don't have any further questions.  Thank you.

8            THE COURT:  Anything else, Mr. Dreher?

9            MR. DREHER:  No, Your Honor.  Thank you.

10           THE COURT:  Okay.  Let's take a short recess so

11   everybody can get organized for the next witness to the extent

12   we need to get organized and collect all the stuff on the

13   witness stand.  No more than ten minutes this time.  Okay?

14           MR. DREHER:  Yes, Your Honor.

15       (Jury out and recess taken at 3:18 p.m.)

16       (At 3:36 p.m. on March 10, 2023; with counsel for the

17   parties and the defendant present; WITHOUT the jury:)

18           THE COURT:  Are we ready for the jury, everyone?

19           MR. DREHER:  Your Honor, just so the Court's aware, I

20   would just rest.  I didn't know if we would then take another

21   break at that point.

22           THE COURT:  I thought you had one more witness.

23           MR. DREHER:  I believe we're just going to rest at

24   this point.

25           THE COURT:  Oh, without that witness?

1    MR. DREHER:  Correct.

2    THE COURT:  Oh.  Well, let's sit down, then.  That's

3    why I said let's get set up for the next witness.  So what we

4    should probably -- if it weren't for all the to-ing and

5    fro-ing, we should have -- the government said they were going

6    to rest.  We should go through all the exhibits to make sure

7    we're all on the same page.  Then we'd have the stipulation,

8    and Mr. Smock can tell us whether there are any other

9    witnesses, and then I would address Mr. GossJankowski.

10   We could do all that now before we bring the jury back

11   unless you're uncomfortable doing it that way.

12    MR. DREHER:  I can't imagine this is what would be

13   needed, but certainly, as an officer of the court, there's no

14   fake out or anything.  We would rest as soon as the jury

15   returns.

16    THE COURT:  Everyone else comfortable with me not

17   reading all the exhibits that are in because we think we're all

18   on the same page, or do you want me to do that?  I'm happy to

19   do that.  It will take five minutes.

20    MR. VALENTINI:  I will defer to Your Honor.  I don't

21   think it's needed.  I think we're operating in good faith, and

22   I think Ms. Johnson has been keeping track.

23    THE COURT:  Any discrepancy between your list, my

24   list, and Ms. Johnson's list, we can figure that out at the end

25   of the day today or Monday morning.

```
 1              MR. VALENTINI:  We are comfortable with that, Your
 2    Honor.
 3              THE COURT:  Mr. Smock, what's your view of how we
 4    should proceed?
 5              MR. SMOCK:  I'm all for doing something that doesn't
 6    involve the jury coming back and forth.  I think the only thing
 7    that we wanted -- Ms. Goetzl was reminding me of is we want to
 8    make sure that we're making our Rule 29 motion and doing it at
 9    the appropriate time.  Obviously under normal circumstances
10    we'd do it immediately after the government rests, but as long
11    as it could be understood that we have the motion, you know,
12    we'd like to make it and preserve it and then make the argument
13    after the jury leaves.  That's fine.
14              THE COURT:  Well, let me put it this way.  I have had
15    the experience in other cases where the parties have agreed
16    that even though you've put on your case, even in a case when
17    there are more witnesses, that you preserve your right to have
18    it argued based upon the government's evidence.
19        Secondly, I think it's even less of a problem here because
20    we've already heard from more than one of your witnesses, so if
21    you're happy.  And are you okay with that?
22              MR. SMOCK:  Yes.
23              THE COURT:  Is there going to be anything other than
24    the stipulation?
25              MR. SMOCK:  No.
```

```
 1                    THE COURT:  In that case can I address
 2     Mr. GossJankowski now?
 3                    MR. SMOCK:  You may.
 4                    THE COURT:  Would you like to come up, have him come
 5     up with your interpreter?
 6                    MR. SMOCK:  I think I would defer to the
 7     interpreters.
 8                    THE COURT:  Is it easier to just stay where he is?
 9                    MR. SMOCK:  I think so, unless they see otherwise.
10                    INTERPRETER MATHERS:  He said he would prefer to
11     stay.
12                    THE COURT:  Okay.  And so whoever's going to speak
13     can speak.
14          Mr. GossJankowski, do you understand that you have a right
15     to testify in this trial if you want to?
16                    THE DEFENDANT:  Yes, I do, Your Honor.  I understand
17     that.
18                    THE COURT:  Do you also understand that you have a
19     right to remain silent and not to testify if that is your
20     choice?
21                    THE DEFENDANT:  I do understand that, Your Honor.
22                    THE COURT:  I also want to tell you that this is an
23     important decision for anybody charged as a defendant in a
24     criminal case.  You understand that?
25                    THE DEFENDANT:  Yes, I do.
```

```
1              THE COURT:  It is also a personal decision.  Your
2    lawyers can give you their best advice, but ultimately the
3    decision is up to you.  Do you understand that?
4              THE DEFENDANT:  Yes, I understand it's my own
5    decision.
6              THE COURT:  And do you think you've had enough time
7    and opportunity to discuss with your lawyers what they think is
8    best and have a conversation with them about that?
9              THE DEFENDANT:  Yes, I believe I did.
10             THE COURT:  Would I be correct in assuming you've had
11   more than one conversation about that?
12             THE DEFENDANT:  You would be correct.  I've had
13   several conversations with them, and I don't believe that I
14   would like to take the stand.
15             THE COURT:  Okay.  So you do not want to take the
16   stand?
17             THE DEFENDANT:  Yes.  That's what we discussed, and I
18   made the decision that I did not want to take the stand.
19             THE COURT:  Okay.  Thank you.
20         Is everybody satisfied with that colloquy?
21             MR. DREHER:  Just one moment, Your Honor.
22         Your Honor, I'm satisfied.
23             MR. SMOCK:  Yes, Your Honor.
24             THE COURT:  Okay.  I think before we get them in, I
25   have one -- let's talk about logistics.  My suggestion would be
```

1    we either have the Rule 29 argument this afternoon, depending

2    upon how long it's anticipated it will take, or first thing

3    Monday morning.  Regardless, I suggest we come in at

4    9:00 o'clock Monday morning and talk about jury instructions

5    and we ask the jury to come in at noon for closing arguments

6    and jury instructions.  Does that make sense?

7                MR. VALENTINI:  Yes, Your Honor.  That seems very

8    reasonable.

9                MR. SMOCK:  Yes, Your Honor.

10               THE COURT:  So the only remaining question for the

11   jury -- and the government was going to think about this -- is

12   assuming that we get through jury instructions and closing

13   arguments Monday and they retire to deliberate, do we have them

14   come back on Tuesday afternoon without any ASL reporters

15   available with the understanding if they have any notes they

16   will be deferred, or should we wait until Wednesday?

17         And I want to make one other comment before you tell me

18   your view, and if that is -- if we wait until Wednesday, we

19   will likely lose Juror Number 4 and substitute Alternate 1.

20               MS. ROCHLIN:  Your Honor, if I may.

21               THE COURT:  Yes.

22               MS. ROCHLIN:  A little bit of breaking news.  I would

23   like if the Court would indulge me to make a practical

24   suggestion --

25               THE COURT:  Yes.

 1          MS. ROCHLIN:  -- if the Court hasn't explored it, but

 2     what's been proposed to me is that there may be much greater

 3     interpreter availability even on Tuesday if there were

 4     agreement to let interpreters work by means of VTC, for

 5     example, so that you could have an interpreter in California

 6     cover the lesser amount of interpretation needed to cover a

 7     question, for example.

 8          THE COURT:  Well, that's true.

 9          MS. ROCHLIN:  So I don't know if the government could

10     look into its resources to see if there is an --

11          THE COURT:  Well, we can't do it now.

12          MS. ROCHLIN:  Very well, Your Honor.  I just wanted

13     to float the proposal.

14          THE COURT:  There's an interpreter in California who

15     is prepared to fly in, and we told her at the break at lunch

16     not to fly in, but it may be that that same person is available

17     to be available on Zoom.

18          MS. ROCHLIN:  And we could confer with defense

19     counsel and get their reaction to that, but it seems better

20     than not having --

21          THE COURT:  My question is what I tell the jury.

22          MS. ROCHLIN:  Yes, Your Honor.

23          THE COURT:  Yes.  The other question we do have to

24     find out from them is they may not be available because we've

25     already told them Tuesday is off, so there may not actually be

```
 1    an alternative, and in which case we'll excuse Juror Number 4
 2    and substitute Alternate 1, I think, if we can't start till
 3    Wednesday.  So as long as everybody understands that.
 4         I think Alternate Number 1, Tonya, is the last row, second
 5    last seat; correct?
 6              COURTROOM DEPUTY:  Correct.
 7              THE COURT:  Not the person in the last, last seat.
 8    He's Alternate Number 2.
 9              MR. SMOCK:  I guess I may have missed something.  For
10    Tuesday I was trying to figure out what we're saying.  Are we
11    saying that if the jury is available and there's a VTC
12    interpreter available, we could have them here all day Tuesday?
13              THE COURT:  Starting at noon.  Ms. Johnson -- we need
14    Ms. Johnson, and she's not available before noon.
15              MR. SMOCK:  Okay.  But we would have an interpreter
16    available; is that --
17              THE COURT:  We don't know that yet.
18              MR. SMOCK:  Okay, okay.
19              THE COURT:  We will have to find out later today.  I
20    mean, we'll have to find out later today.
21              MR. SMOCK:  Right.
22              THE COURT:  What shall I tell the jury is the bottom
23    line.  Tuesday, if they're available, should they come in at
24    noon on Tuesday or wait till Wednesday?  If they're not
25    available, at this point there's nothing we can do about it.
```

1    What's the bottom line?

2           MR. SMOCK:  We're okay with them coming in on

3    Tuesday.  I think the only -- I had one question just about

4    Monday.  I think obviously when they come depends on how

5    quickly the Court can get the jury instructions done.

6           THE COURT:  I have to tell you this.  I have to leave

7    here by 3:30 on Monday.  Have to, have to, have to.

8           MR. SMOCK:  Okay.

9           THE COURT:  And I've told you that for weeks.

10          MR. SMOCK:  No.  I understand.  I think -- so that

11   puts us in a situation where we would need to be sure we would

12   have the jury instructions done by noon to be able to instruct

13   and get the closings done, including breaks.

14          THE COURT:  Maybe a little later than noon.  I would

15   get them here by noon, and maybe, you know, we don't take lunch

16   or something if we have to skip lunch.

17          MR. SMOCK:  I guess I'm --

18          THE COURT:  Otherwise we'll do closings on Wednesday,

19   because we will not have the requisite number of American Sign

20   Language interpreters on Tuesday regardless.

21          COURTROOM DEPUTY:  Would you like me to inquire of

22   the jury?

23          THE COURT:  No.  Well, do you want to know the answer

24   about that before we bring the jury in, whether we've got 14

25   people available Tuesday afternoon if we need them or if

1    they've made firm, firm decisions before then?  Ms. Johnson can

2    ask them that, or I could ask them that after we do everything

3    else we're going to do.

4        By the way, we're running out of time for Rule 29.

5            MR. VALENTINI:  That question, if Ms. Johnson may ask

6    it, I think would be very helpful in order to make a decision.

7            THE COURT:  Go ask them.

8            MR. VALENTINI:  Thank you.

9            THE COURT:  All right.  Ms. Johnson is going to ask

10   them if they are going to be available noon or one o'clock at

11   the latest Tuesday.

12           MR. SMOCK:  Your Honor, this is probably going to

13   annoy you, but just thinking out loud, I think to some extent

14   the Monday situation depends on how the Court feels how quickly

15   it would be able to get the jury instructions resolved, because

16   the concern I have is if we're pushing to get the jury

17   instructions --

18           THE COURT:  I think a lot of the questions you've

19   already raised I've already decided or other judges have

20   decided in prior cases.

21           MR. SMOCK:  That's fine.

22           THE COURT:  I mean, I think I'm going to reject a lot

23   of your suggestions because I think other judges and I already

24   dealt with them in opinions, and I know they're opinions

25   sometimes on motions to dismiss rather than looking at the four

```
 1    corners of the indictment, but in terms of our view of the law,
 2    which is what we apply in discussing instructions -- you know,
 3    I'm not saying all of your suggestions, not by any means, but,
 4    I mean, we may not be able to have them retyped and available
 5    to hand copies to the jury by the time I read them; so they may
 6    not have the instructions the moment they start deliberating,
 7    but they will have them.  I don't normally send the indictment
 8    back, but I do send the instructions back.
 9              MR. VALENTINI:  We will not request the indictment
10    back either.
11              THE COURT:  And I think since COVID -- the other
12    reason it's a little bit logistically different, since COVID
13    we've been sending 12 copies of the instructions back.  In the
14    old days we'd send three or four, and they can share.  That's
15    why Ms. Johnson gives them everything they've got, you know,
16    individual files, not just loose papers and pens and pencils
17    and stuff like that.
18              COURTROOM DEPUTY:  There are some jurors that will
19    not be able to make it on Tuesday.  There are some jurors that
20    will not be able to make it on Tuesday because of work, work
21    obligations and other appointments so...
22              THE COURT:  All right.  There are some jurors who
23    will not be able to make it on Tuesday afternoon because of
24    work obligations.  That suggests to me that what we would do on
25    Monday is we would have instructions and closing arguments.
```

1    We're going to have all 14 of them come back on Wednesday

2    because we will not -- in my view, even if we -- let's say we

3    finish by 3:30 or 4:00.  I don't think we should have them

4    start deliberating for an hour and then skip a day and then

5    have somebody get sick and have to call an alternate back.

6        I would rather -- if we have to skip all of Tuesday, I

7    would rather start with all 14 of them on Wednesday and then

8    tell Juror Number 4 she's going to be excused and substitute

9    Alternate Number 1, and if somebody else has obligations or

10   gets sick or something, then we have to substitute two

11   alternates.

12       MR. VALENTINI:  So I do apologize.  Is it the Court's

13   intent to let Juror Number 4 know immediately upon her arrival

14   on Wednesday that she would be excused?

15       THE COURT:  Well, I was thinking we might want to let

16   her know before then, because she's very nervous about it.

17       MR. DREHER:  I understand, Your Honor.

18       THE COURT:  I mean, I don't know whether we should

19   tell her this afternoon that she's going to be excused or

20   whether we should do it Monday when we come in, but I don't

21   think we should wait till Wednesday and let her wonder all day

22   Tuesday if she's going to be able to take her trip.

23       MR. DREHER:  Certainly.  I would suggest to the Court

24   that she sit through closing arguments before she's informed

25   just so that the integrity of the jury as a whole is in effect.

1           THE COURT:  I think I agree with that, yes.

2           MR. DREHER:  But in terms of missing Tuesday and then

3    having her come in Wednesday is what I was curious about, Your

4    Honor.  I think it would make sense to let her know Monday when

5    we leave that she would be excused, and then Wednesday the

6    jurors would be able to start immediately upon them arriving.

7           THE COURT:  Is there anything more that the defense

8    wants to say before we're confident we've got all the moving

9    pieces in some kind of position?

10          MR. SMOCK:  I have nothing more to add.

11          THE COURT:  It's not ideal.

12      (Jury in at 3:54 p.m.)

13          THE COURT:  So you may find this hard to believe

14   since we've kept you waiting, but I think by keeping you

15   waiting we've actually saved you time.  You'll see.

16      Mr. Dreher.

17          MR. DREHER:  Your Honor, at this time the United

18   States rests.

19          THE COURT:  Okay.  The government rests its case.  I

20   think we are in agreement on the exhibits that I've admitted in

21   evidence.  It rests its case without prejudice to our reviewing

22   our list of exhibits and making sure we're all on the same

23   page, because we want all the right exhibits to go back to the

24   jury in the end.

25      Mr. Smock, Ms. Goetzl.

1    MS. GOETZL:  Thank you, Your Honor.  We just have a

2    stipulation that we'd like to read into the record.

3    THE COURT:  Ladies and gentlemen, a stipulation -- I

4    may have said this before, and I'll say it again in more formal

5    language as part of the final instructions.  A stipulation is

6    an agreement between the parties.  In this case I believe it is

7    about what a particular witness would say if she had been

8    called to the witness stand, and instead of taking the time to

9    call her to the witness stand, the government -- this is a

10   defense witness, but the government and the defense have agreed

11   on the important things that she would say, and Ms. Goetzl's

12   going to tell you now what that witness would have said if she

13   were called here.

14   MS. GOETZL:  The parties agree that Mr. GossJankowski

15   is unable to read lips, understand spoken English, or speak

16   English himself.

17   THE COURT:  Thank you.  So that's an agreement as to

18   what would have been said by a witness.

19   All right.  Mr. Smock or Ms. Goetzl.

20   MR. SMOCK:  The defense also rests, Your Honor.

21   THE COURT:  Ladies and gentlemen, you've heard all

22   the evidence in the case.  What's left is jury instructions,

23   what is the law that you have to apply, and closing arguments.

24   Very important, just like the opening statements, the arguments

25   of counsel are not evidence, but it's their opportunity to

1    summarize for you what they think the evidence has shown and to

2    argue to you what they think the verdicts should be.

3        The lawyers and I are going to work a little more tonight,

4    and we are going to meet at 9 a.m. on Monday to finalize the

5    jury instructions, so we would like you to come in at noon on

6    Monday, and you will hear the closing arguments and the final

7    jury instructions.  And we previously agreed, although we

8    double-checked with you to see if we could revisit that

9    question, I had told you we would not be sitting on Tuesday.

10   It later appeared that we might be able to sit part of Tuesday

11   afternoon, but that is not going to work for all 14 of you

12   because, relying on what I had said, some of you had already

13   made other personal or business arrangements, so we respect

14   that.

15       It does mean that jury deliberations will probably begin

16   on Wednesday, not Monday afternoon, but we'll see how Monday

17   afternoon goes.  And I know that one juror has a particular

18   issue, and we will be able to deal with that on Monday and -- I

19   think we'll be able to deal with that on Monday.  I'd rather

20   wait until everybody is here and everyone has heard the entire

21   trial.

22       So anybody have any questions?  If not, you're excused for

23   the weekend.  We'll see you Monday around noon.  Again, more

24   important than ever, you've heard and seen all the evidence.

25   Please don't talk to anybody or let anybody talk to you.  Don't

```
 1    watch anything, listen to anything, go on social media, and let
 2    Ms. Johnson know if there are any issues.
 3         Anything I forgot?
 4         Okay, okay.  Thank you very much, and have a nice weekend.
 5         (Jury out at 4:00 p.m.)
 6         THE COURT:  Do you have a prognosis as to how long
 7    your Rule 29 argument is going to be, Mr. Smock or Ms. Goetzl,
 8    whosoever making it?
 9         MS. GOETZL:  Definitely less than half an hour.
10         THE COURT:  Less than half an hour?
11         MS. GOETZL:  Yes.
12         THE COURT:  I was hoping --
13         MS. GOETZL:  I can try to make it --
14         THE COURT:  Okay.  Do your best.  I mean, that's all
15    we can ask.  Because I do think it would be useful to get the
16    Rule 29 done so we can spend all Monday morning on
17    instructions.
18         And I'll tell the reporter that now, if nobody orders a
19    transcript of this, I may want at least a rough version of it
20    at some point at your convenience.
21         MS. GOETZL:  Okay.  Thank you.  Mr. GossJankowski
22    hereby moves under Rule 29 --
23         THE COURT:  Move the microphone a little closer.
24         MS. GOETZL:  -- moves under Rule 29 for judgment on
25    acquittal on every count of the indictment because the evidence
```

1    is insufficient to sustain a conviction on each of those

2    counts, and I'm just going to walk through each of the counts.

3         For Count I, which is obstructing, impeding, and

4    interfering with the officers during a civil proceeding or

5    attempt to do that, our argument is that the statute requires

6    Mr. GossJankowski's conduct to have interfered with commerce or

7    a federally protected function, and there is no evidence of

8    that here that his conduct affected commerce, obstructed

9    commerce actually, or obstructed a federally protected

10   function, which in this case the government's only evidence of

11   that is through the -- they presented evidence that the Secret

12   Service was affected.

13        Mr. GossJankowski did not have any interaction with Secret

14   Service officers, and his conduct did not affect Secret

15   Service.  Even if the Court rejects my argument that -- our

16   argument that his conduct does not have to have interfered with

17   commerce or affected a federally protected function and just

18   the civil disorder more generally must affect commerce or

19   interfere with a federally protected function, the same thing.

20   There is no -- that basically the -- civil disorder's

21   connection to commerce is too attenuated, and the civil

22   disorder's connection to impacting or delaying a federally

23   protected function is similarly too attenuated.

24        There is no evidence that it impacted commerce.

25   Mr. Tippett's testimony, some of which was consistent and some

1     of which was inconsistent, basically showed that commerce was

2     not affected.  Business bounced back the next day so -- and our

3     argument also related to our motion to dismiss was that to the

4     extent that there is only a de minimis connection required

5     under the statute, Congress does not have the authority to

6     punish that conduct under *Morrison* and *Lopez*.

7              THE COURT:  Under what?

8              MS. GOETZL:  Under *Morrison* and *Lopez* there must be a

9     substantial impact on commerce.

10         For Count II we reiterate our argument that the Joint

11    Session of Congress is not an official proceeding within the

12    meaning of the statute.  The evidence was very clear when

13    Mr. Schwager and Officer Hawa testified that it's a procession,

14    it's a ceremonial proceeding, it's a ceremony.  It's not a

15    proceeding -- it's not a proceeding, quote, before the

16    Congress.  It is a ceremony in the Congress.  It is not the

17    Congress deciding anything, and so that's our argument with

18    respect to that.

19         There's no evidence here that Mr. GossJankowski interfered

20    with any type of documentary evidence, which is our argument

21    that's currently on appeal in *United States vs. Miller* and

22    *United States vs. Fischer*.  More than that --

23              THE COURT:  *Miller* is Judge Nichols' case that's on

24    appeal; correct?

25              MS. GOETZL:  Correct.

1      THE COURT:  What's *Fischer?*

2      MS. GOETZL:  I believe that's another Judge Nichols

3  case that's either --

4      THE COURT:  At the moment he's in a minority of one,

5  but if there are two other Article III judges in this building

6  that agree with him, then we'll be in a different ball game.

7      MS. GOETZL:  Yes, and there's no knowing when that

8  decision will be issued.  I understand it's already been

9  argued, but we make that argument to preserve the record out

10  there.

11      THE COURT:  For the record, but again, if there's a

12  decision from the circuit after there's a verdict in this case,

13  you've preserved that point to a -- they'll already have

14  decided it one way or the other.

15      MS. GOETZL:  Yes.

16      Further, with respect to the 1512 count, which is

17  Count II, there's just no evidence at all that

18  Mr. GossJankowski intended to obstruct the Electoral College

19  vote count.  There's no evidence of any preplanning.  There's

20  no evidence that he didn't even -- there's not even any

21  evidence that he didn't accept the results of the election as

22  there are in other cases.  He was not wearing -- he clearly did

23  not show up that day intending to, you know, obstruct the

24  electoral count.  He's not wearing any military gear, tactical

25  gear, anything like that.  He's wearing a bright blue jacket.

1    He was very easy to identify.  He's identified by every single

2    witness who came in here, and he turned himself in, and, you

3    know, there's really no issue about that.

4        There's also no evidence that he knew that his actions

5    were likely to affect the proceeding.  For all he knew, the

6    proceeding was continuing.  He was just on this western part of

7    the Capitol.  He was nowhere near where the votes were counted

8    or ultimately decided.  He did not go into the Capitol, and so

9    there's just no evidence of his intent to or knowledge of

10   disrupting specifically the Electoral College vote count.

11       Furthermore, there's just no evidence that he acted

12   corruptly.  That's really the distinguishing feature between

13   Count II and, like, perhaps Count I or Count VI.  I mean,

14   there's just no evidence that he acted with a corrupt intent,

15   and Judge Jackson recently decided that it's not an objective

16   test of whether he should have known that what he was doing was

17   wrong or unlawful.  It's a subjective test of what is inside

18   his head, and there just is insufficient evidence of what is --

19   what was inside his head, and there's also plainly insufficient

20   evidence of aiding and abetting because --

21            THE COURT:  Insufficient evidence of what?

22            MS. GOETZL:  Of aiding and abetting, to the extent

23   he's been charged with aiding and abetting others who intended

24   to obstruct the electoral count certification of the election

25   results.  There's just no evidence that he had any joint motive

1    with them, that he -- that -- you know, and he arrived at the

2    Capitol grounds after people had already broken into the

3    Capitol Building and proceedings had already stopped.  He had

4    no advance notice that people were going into the Senate or

5    House Chambers or breaching the building, and none of his

6    actions, while some of them might have been offensive, rise to

7    the level of aiding and abetting people who intended to stop

8    Congress from certifying the electoral vote.

9         For Count III --

10        THE COURT:  Before you move on, I have a question for

11   you.  You mentioned something, an opinion by Judge Jackson.  Do

12   you have the cite to that?

13        MS. GOETZL:  Sorry.  It's not an opinion.  It was

14   actually a bench trial, and it was in *United States vs. Joshua*

15   *Matthew Black*.  The case number is 21-127.  The decision was --

16   her decision was orally read into the record on January 13th,

17   2023, and so that objective versus subjective test comes from

18   that transcript at page 34, and there she found the defendant

19   not guilty of 1512 for the same reason we think the government

20   has just not presented any evidence of intent in this case.  We

21   think this case is actually much stronger than that case.  In

22   that case Mr. Black was in the Senate building.  He was clearly

23   politically motivated.  There's a bunch of things that he said

24   on Facebook posts and social media, things that he said

25   afterwards.  It's just not comparable at all to this case.

1    For Count III, which is the assault charge, our argument

2    is that there's just literally no evidence to meet any elements

3    of that offense.  First, there's no evidence that

4    Mr. GossJankowski acted forcibly, so there's just no force at

5    all, evidence of any force.  There's no evidence of intent to

6    assault or intent to interfere with Officer Moore.  There's no

7    evidence -- and also for the forcibly, I mean, that also goes

8    for the purported physical contact prong of the offense.  So

9    Mr. GossJankowski, to be clear, has been charged with three

10   separate types of assault.

11   First, involving -- felony assault involving physical

12   contact; second, felony assault with the intent to commit

13   another felony; and then third is the felony assault with a

14   deadly or dangerous weapon.  First, there is just no evidence

15   of any forcible contact with Officer Moore, none whatsoever.

16   With respect to the intent to commit another felony, the

17   government has put it in their jury instructions as assault

18   with intent to commit interfering with a law enforcement

19   officer during a civil disorder.

20   Okay.  So that's also one of the reasons why -- this is

21   just an aside -- we believe the government needs to identify

22   the law enforcement officer, because it would literally make no

23   sense to have a charge that he intended to assault Officer

24   Moore with the intent to impede Officer Moore, I mean, or did

25   he --

1    THE COURT:  So this was the other felony cited in the

2    jury instructions is count -- Count I?

3    MS. GOETZL:  Yes.  And so then it becomes, well, did

4    he attempt to assault -- or sorry, assault Officer Moore with

5    the intent to impede Officer Beaver when Officer Beaver was in

6    a totally different location at a totally different time?  So

7    as an initial matter I just think that the government's assault

8    charge with the intent to commit another felony prong is just

9    completely unsupported by the record.  And there is no evidence

10   that establishes that he assaulted Officer Moore, but even if

11   he did assault Officer Moore, that it was with the intent to

12   impede another officer or Officer Moore.  And to the extent

13   that it's to impede Officer Moore, then it is literally the

14   same charge, so it should merge in that sense.

15   THE COURT:  You said the third -- so we got forcible

16   contact with Morris, number one.  The other felony is

17   number two.

18   MS. GOETZL:  And then the third one is the deadly or

19   dangerous weapon, and the Court knows our argument very well on

20   that.  The evidence is insufficient to establish that the

21   device was inherently dangerous, insufficient to establish the

22   device was capable of causing serious bodily injury or death,

23   and definitely insufficient to establish that Mr. GossJankowski

24   intended to use it in any manner that was capable of causing

25   serious bodily injury or death.  The government really has just

 1    no evidence at all of -- of the device being capable of causing

 2    serious injury or death or Mr. GossJankowski intending to use

 3    it in that manner.

 4         For Counts IV and --

 5              THE COURT:  Wait.

 6              MS. GOETZL:  Sorry.

 7              THE COURT:  Is it also a part of your argument that

 8    the government must prove beyond a reasonable doubt that it was

 9    a stun gun and they haven't done that?

10              MS. GOETZL:  That is also part of our argument.

11    Thank you for bringing that to my attention.  Our argument is

12    also that the government must prove that the device he was

13    using was a stun gun because that is what is charged in the

14    indictment and that the government did not prove that the

15    device was a stun gun.  In fact, it presented no evidence at

16    all of what the device was at all.

17         For Counts IV and V, which are the 1752 charges, our

18    argument is that there was insufficient evidence that the --

19    first our argument is that the government has to prove that the

20    Vice President was temporarily visiting the Capitol and not

21    that his wife or his daughter were temporarily visiting the

22    Capitol, and that is because his wife and his daughter --

23              THE COURT:  Is there something in their instructions

24    that suggests to the jury that if they find that the Vice

25    President's wife and daughter was in the Capitol, that's

1     enough?

2          MS. GOETZL:  Yes, because the instructions just say

3     Secret Service protectee.  The statute just says Secret Service

4     protectee, so we will be asking for a limiting instruction that

5     the Secret Service protectee, you know, restricted building or

6     grounds is defined as posted, cordoned off, otherwise

7     restricted area of a building or grounds where the President or

8     other person protected by the Secret Service is or will be

9     temporarily visiting.

10         And so because of the government's case in chief and the

11    evidence it presented about Charlotte Bond Pence and

12    Mrs. Pence, we will be asking the Court for a limited

13    instruction to instruct the jury that it cannot find that

14    Mrs. Pence or Charlotte Bond Pence were the other persons

15    protected by the Secret Service for the purposes of that count,

16    but aside from the -- so our argument to the Court on that

17    count is that President *[sic]* Pence was not temporarily

18    visiting the Capitol.

19         I mean, in our -- our position is that it's just a

20    misapplication of that statute.  That statute was not intended

21    to protect the Capitol from trespassing.  There is a Capitol

22    trespassing statute that was not charged in this case, and so

23    we also will request the lesser included charge on -- lesser

24    included offense for 1752(a)(1) and (a)(2), which are Counts IV

25    and V.

1      THE COURT:  Give me a second.  So you request a

2  lesser included offense instruction for Counts IV and V?

3      MS. GOETZL:  Because both of those counts charge

4  Mr. GossJankowski with carrying a deadly or dangerous weapon

5  so --

6      THE COURT:  So a lesser included offense would be

7  doing the acts required but without a deadly or dangerous

8  weapon.

9      MS. GOETZL:  That's correct.

10     THE COURT:  So the last phrase is in relation to the

11  offense that he used or carried a deadly or dangerous weapon,

12  that is, a stun gun.  The lesser included offense would be

13  basically the preceding language of Counts IV and V.

14     MS. GOETZL:  Correct.  So it would be the language

15  from subsection (a)(1) for Count IV and (a)(2) for Count V and

16  so -- but another reason why he's not guilty of Counts IV and V

17  as they are charged is because there is no evidence --

18     THE COURT:  And your proposed verdict form has a

19  couple of places where it says if you find him guilty, fine,

20  but if not, move on and consider.

21     MS. GOETZL:  Yes.  And I don't remember if our

22  proposed verdict form specifically asks for the lesser included

23  on those charges but I --

24     THE COURT:  One of the things you could both do over

25  the weekend is take another look at your verdict forms.  One of

1    the things I will say about verdict forms -- I don't mean to

2    interrupt your argument -- is, just so the government knows

3    what I've been doing probably for the last ten years or so, is

4    saying "not guilty" first and "guilty" second, not before.

5            MS. GOETZL:  Thank you, Your Honor.  We appreciate

6    that.  We did request that in our verdict form.

7            THE COURT:  I know.

8            MS. GOETZL:  So for Count V -- I guess, sorry, to go

9    back to the 1752 counts, which are Counts IV and V, the

10   evidence is insufficient to show that Mr. GossJankowski carried

11   a stun gun and that the thing he carried was a deadly or

12   dangerous weapon, so we'd move for judgment of acquittal on

13   those counts on that basis as well.

14       And for Count V it's similar to the argument we made for

15   Counts I and II.  For Count V there also has to be evidence

16   that he intended to impede or disrupt government functions, and

17   there's just no evidence at all of what Mr. GossJankowski

18   intended to do in this case.

19       And that argument is also the same for Count VI, which is

20   disorderly conduct in the Capitol Building requires intent to

21   impede, disrupt, or disturb the orderly conduct of a session of

22   Congress or either House of Congress, and again, there's just

23   no evidence of what he intended to do.

24       And with that I would just confer with Mr. Smock to make

25   sure I haven't missed anything and then --

1           THE COURT:  You did it in less than a half hour, I

2      think.  So you may confer, see if there's anything else.

3           MS. GOETZL:  Okay.  We are done.  Thank you.

4           THE COURT:  Listening to you reminded me that the

5      defense, now that all the evidence is in, needs to draft a

6      defense theory of the case instruction.

7           MS. GOETZL:  We do, Your Honor.  We can submit that

8      to you this weekend.

9           THE COURT:  Yeah, and to opposing counsel.

10          MS. GOETZL:  Yes.

11          THE COURT:  So it's ready for us to have a debate on

12     that as well Monday morning.

13          MS. GOETZL:  Yes.  Thank you.

14          THE COURT:  Mr. Valentini.

15          MR. VALENTINI:  Thank you, Your Honor.  I'm mindful

16     that I believe we have a hard stop at 4:30 today.

17          THE COURT:  It's not a hard stop.  I hoped for a

18     stop.  I'm supposed to be someplace.  If I'm a little late,

19     I'll be a little late.

20          MR. VALENTINI:  Well, we'll try to be brief

21     nonetheless, and we'll respond to defense counsel's arguments

22     in turn.

23          With respect to Count I, that's a 231 count.  The first

24     argument is that the conduct itself must interfere with

25     commerce, except that is a legal argument that every judge on

1    this court has rejected.  That is contrary to the language of

2    the statute.  The relevant phrase "which may in any way or

3    degree obstruct, delay, or adversely affect commerce or the

4    movement of any article or commodity in commerce" modifies not

5    the conduct but the civil disorder.  That is a commonly

6    accepted interpretation.  It is consistent with every

7    applicable canon of statutory interpretation.

8            THE COURT:  And her argument that it must be

9    substantial seems to be undermined by the language "in any way

10   and degree."  A degree could be less than substantial.

11           MR. VALENTINI:  That was going to be my second point.

12           THE COURT:  It can't be zero.

13           MR. VALENTINI:  No.  I mean, there has to be an

14   effect.  That's why we called Mr. Tippett, who was -- I think

15   his testimony aptly and cheerfully supported the finding that

16   there was an effect on commerce.  Because of the events of

17   January 6, the civil disorder caused the curfew, which in turn

18   resulted in the closing of the Safeway stores.  The events of

19   January 6, the civil disorder, also impacted a federally

20   protected function, specifically the certification of the

21   Electoral College vote.  So on that ground -- alternative

22   ground to the federal nexus element is satisfied.

23       With respect to Count II, I'm not going to rehash all of

24   the legal arguments that have been presented before trial in

25   this case and other cases and that all judges on this court

1    except for one have accepted, so I'm not going to get into

2    whether the certification or the Electoral College was an

3    official proceeding.  I think Your Honor so ruled in *Puma*, and

4    other judges have reached the same conclusion.

5        Defense counsel also made the argument that there's no

6    evidence that Mr. GossJankowski intended to obstruct the vote,

7    but in fact the evidence shows that Mr. GossJankowski -- we

8    just saw it today, actually -- was clearly aware that the role

9    of Congress on January 6 was going to be the certification of

10   the Electoral College.

11       I would direct Your Honor's attention to Exhibit 303.

12   There were also in Exhibit 305 other statements by the

13   defendant to the effect of preparatory work the night before

14   January 6, and so we think that in terms of his awareness,

15   knowledge, and intent with respect to -- specifically to the

16   certification of the Electoral College, there's ample evidence

17   in the record.  The jury will have ample evidence to find the

18   defendant guilty, but certainly under the permissive Rule 29

19   standard, it's not even close, in our view.

20       There was also a point that was made about whether the

21   corruptly element was satisfied.  Again, many courts, including

22   Your Honor in *Puma,* I believe, passed on the correct -- on the

23   meaning of "corruptly."  In the context of the statute, it

24   requires only a cognizance of wrongdoing, and here what speaks

25   louder than anything else is Mr. GossJankowski's conduct.  We

1    have seen video after video of what Mr. GossJankowski did in

2    that tunnel.

3          I'll expand on that in closing argument, I'm sure, but I

4    think that for now I can just refer the Court back to what he

5    did in the tunnel, what he did on the inaugural stage, the fact

6    that he beckoned the crowd forward, you know.  There was some

7    reference today that he did not aid and abet, did not try to

8    coordinate with others, but we saw him time and again come out

9    of that tunnel, look out on that inaugural stage, and try to

10   beckon more and more people forward.  Why?  Because they needed

11   the numbers to continue stopping the certification of the

12   Electoral College.

13         On to Count III.  So with respect to forcibly, there's --

14   I think defense counsel stated that they don't see any element

15   of force in the conduct of the defendant vis-a-vis Officer

16   Moore, except Exhibit 144.2 makes clear that there was force.

17   It makes clear that Mr. GossJankowski advanced towards Officer

18   Moore, he grabbed that helmet with his right hand, and then he

19   bore down with his left hand with a stun gun in hand.  That is

20   forcible conduct.  It is surely more than sufficient to satisfy

21   the Rule 29 standard to get the case to the jury.

22         There was also some reference in my colleague's argument

23   about the intent to commit another felony, and I think there

24   was some suggestion that maybe the two felonies should merge

25   somehow.  No.  Mr. GossJankowski --

1              THE COURT:  She was talking about attempt.  I think

2     she was talking about how attempt should merge.  Is that what

3     you're talking about?

4              MR. VALENTINI:  I thought the suggestion -- you know,

5     I'll be corrected, I'm sure, if I'm getting this wrong.  I

6     think the suggestion was that, one, that we could not charge

7     Mr. GossJankowski with committing an assault, and I'm using

8     that in sort of an informal sense.  He could not be charged

9     with assaulting Officer Moore with the intent to commit another

10    felony where the other felony is a civil disorder, but of

11    course that's exactly what happened in this case.  The assault

12    was part and parcel of a plan to further the civil disorder,

13    which is a separate offense with separate elements which is

14    charged in Count I.

15         So both as a legal matter and as a factual matter, there

16    is ample evidence here for the jury to conclude that the

17    defendant violated 111 with the intent to commit another

18    felony, specifically the 231, also the 1512(c)(2), but the 231

19    is the one that I think was referred to in argument.  Now we

20    get to the element I was --

21             THE COURT:  It was referred to in argument because

22    she said that's what you included in the jury instructions.

23             MR. VALENTINI:  No.  I understand.  I appreciate

24    that.  Now, with respect to the deadly and dangerous weapon

25    issue, we have had a lot of evidence come in in this case.  We

1    have heard from Captain Ortega what he understood that device

2    to be, what he would have done if he had seen that device on

3    Capitol -- in the Capitol Building, and how he -- and why he

4    would have confiscated it had he not been in the midst of a

5    riot, because it posed a risk of harm to the officers.  But

6    even beyond that, Mr. GossJankowski himself in his Facebook

7    postings -- we saw it today -- referred to the device he had as

8    a Taser.

9         And let's not forget we heard from Dr. Kroll in this

10   courtroom.  Dr. Kroll's testimony at the end of the day favors

11   the government.  It supports our position.  Dr. Kroll is the

12   gentleman who was unwilling to zap that device in his eyeball.

13   And why is that?  I don't think -- I think the jury will bring

14   its common sense into the jury room, and I think that the same

15   common sense all the more satisfies the Rule 29 standard in

16   this case.  Now, whether it was proved it's a stun gun, there's

17   no legal definition of a stun gun, and I think what --

18             THE COURT:  A what?

19             MR. VALENTINI:  There's no legal definition of a stun

20   gun.  It's an allegation in the indictment which informs the

21   defense of what it is that we are alleging was used as a

22   dan- -- a lethal and dangerous weapon, and Dr. Kroll has got a

23   view about what counts as a stun gun, what doesn't, what counts

24   as an Amazon toy and other things like that, and he's free to

25   tell the jury we have a different view.  And in any event, that

1   is not a Rule 29 matter.

2           THE COURT:  Well, I think that the jury on that issue

3   has Dr. Kroll's opinion.

4           MR. VALENTINI:  I'm sorry?

5           THE COURT:  The jury on that issue has Dr. Kroll's

6   opinion.  They can accept or reject it --

7           MR. VALENTINI:  Yeah.

8           THE COURT:  -- or any portions of it, and they have

9   lay testimony from experienced law enforcement officers and as

10  well as, you know, the Facebook posts you mentioned which,

11  yeah, for what it's worth, and their job is to consider all

12  that and decide whether they think you've proven it beyond a

13  reasonable doubt.  And, you know, I must say that I thought

14  Kroll's report, conclusions, and testimony were pretty strong

15  before cross.

16      And frankly, what you all saw in the stuff from the other

17  two cases and his testimony about them I think might -- might,

18  I say might -- undermine his credibility with the jury, and

19  that's what I think that it might do so -- and it's hard for me

20  to say that no reasonable jury could conclude that it's a stun

21  gun beyond a reasonable doubt.

22          MR. VALENTINI:  Yes, Your Honor, and I'll add this.

23  A lot of expert reports may look, as you mentioned, stronger

24  until cross.  It's just the nature of the adversary process.

25      So I think this leaves us with Count IV and V.  I think

1   there was some reference to a potential limiting instruction as

2   to which protectees the jury can find, and that's a matter for

3   Monday.  I don't think -- I don't think that has anything to do

4   with a Rule 29 motion.  There was also some reference to the

5   temporarily requirement under 1752.

6           THE COURT:  Temporarily visiting.

7           MR. VALENTINI:  Right, temporarily visiting.  To the

8   extent the defense is arguing that there is not enough evidence

9   for the jury to conclude that the Vice President was

10  temporarily visiting Congress that day, that's just plainly

11  wrong.  To the extent they're arguing something as a matter of

12  law, I believe this Court rejected the argument before trial,

13  so I'm not sure either way it's something that --

14          THE COURT:  I think I did reject it before trial on

15  this case and maybe in *Puma* also, and Judge Moss went into some

16  length about it in one of his opinions.

17          MR. VALENTINI:  I think there have been a number of

18  opinions on this issue.  It's one of those issues where it's

19  not a one to everyone else, it's a zero to everyone else kind

20  of tally right now.

21          THE COURT:  And I think you also had testimony which

22  the jury can accept or reject from the General Counsel to the

23  Secretary of the Senate about how often that particular Vice

24  President, Vice President Pence, used the office at the Senate.

25          MR. VALENTINI:  As well as Inspector Hawa's testimony

1    with respect to the plans for that day.

2              THE COURT:  Correct.

3              MR. VALENTINI:  They spilled into the following day,

4    but there was still a plan to leave at some point.  So there's

5    plenty of evidence in the record, Your Honor.

6         There was a question raised about a potential lesser

7    included instruction under 1752 that would allow the jury to

8    convict on the misdemeanor version of 1752, the one without

9    that deadly and dangerous weapon enhancement.  I think that's a

10   matter for Monday as well, but to the extent that they are

11   advancing the argument there is insufficient evidence for the

12   jury to conclude that Mr. GossJankowski was carrying a deadly

13   or dangerous weapon as he entered or -- and remained in the --

14   in a restricted area or building or that he violated 1752

15   (a)(2) without carrying a dangerous or -- deadly or dangerous

16   weapon, those arguments fail for the same reasons that we just

17   argued with respect to the 111 charge in Count III.

18        If Your Honor has any specific questions about any other

19   issue that has been raised that I've not addressed, I'm happy

20   to answer it, but I was just trying to get as close to 4:30 as

21   I could.

22             THE COURT:  Go ahead.  Anything else you wanted to

23   say?

24             MR. VALENTINI:  No.  No, thank you.

25             THE COURT:  Ms. GossJankowski -- Ms. GossJankowski.

1    Ms. Goetzl.

2         MS. GOETZL:  Yes.  Thank you.  I just want to address

3    two points that government counsel made.  The first is that he

4    argued that in Count 231, which is Count I, the certification

5    of the electoral vote was the federally protected function.

6    That just cannot be.  There's a statutory definition of

7    federally protected function, and it has to involve a

8    department or agency.  Congress is not a department or agency,

9    so to the extent that they're going to rely on that argument,

10   that's just wrong as a matter of law, and they can't use the

11   certification of the electoral vote to show a federally

12   protected function.

13        Second, government counsel, I believe there was some

14   confusion about our argument with respect to assault with

15   intent to commit another felony.  So government counsel just

16   made reference -- when government counsel submitted to us their

17   proposed jury instructions, their jury instructions for that

18   charge read that they were charging him with assault with

19   intent to commit Count I, which is -- which we're calling civil

20   disorder, but it isn't actually civil disorder.  It's

21   obstructing or interfering with a law enforcement officer who

22   is engaged in a civil disorder, so the civil disorder itself is

23   not the count.

24        So it's obstructing or interfering with a law enforcement

25   officer.  So the government essentially has -- essentially, I

1    believe, thinks that it's going to show or could show that

2    Mr. GossJankowski intended or assaulted Officer Moore with the

3    intent to impede Officer Moore, which really makes no sense.

4    It's the same -- he has to intend -- it's basically the same

5    thing, because the only difference there is for the civil --

6    for the interfering of law enforcement officers, the only

7    different elements are the commerce element and the lack of the

8    word "forcibly."

9        So I mean -- and this might be something I have to take

10   another look at over the weekend, but it seems to me that the

11   government has to identify which law enforcement officer it's

12   saying that Mr. GossJankowski impeded in Count I so that we can

13   make sense of the assault with intent to commit that felony of

14   interfering with a specific law enforcement officer in Count I.

15           THE COURT:  As I understand the statute, the last

16   phrase, where the acts in violation of this section involve

17   physical contact with the victim and the intent to commit

18   another felony, I understand they could prove either/or.  With

19   respect to the first part of it, the acts in violation of this

20   section involve physical contact with the victim, I believe,

21   unless the government has a different view, that that phrase

22   refers back to the victim identified in Count III, which is

23   Officer Moore.

24       The question is the intent to commit another felony.  If

25   that other felony that they say the evidence shows has been

```
 1    demonstrated, proved, and have a jury instruction that focuses
 2    on a particular other felony, they want the jury to be told
 3    what that last few words in Count III means is back to
 4    231(a)(3).  Your argument is that they need to identify in
 5    Count I who the victim is, and it might or might not be Officer
 6    Moore.
 7              MS. GOETZL:  Correct.  And if it's not Officer Moore,
 8    then it would not make sense.  Then there would be no --
 9    there's just no evidence of -- if it is Officer Moore, it seems
10    problematic because it's essentially the same -- the same
11    conduct being charged in both prongs of the test; right?  So
12    assaulting Officer Moore with the intent to impede Officer
13    Moore.  It seems redundant.
14              THE COURT:  You all -- you both can look at it.
15              MS. GOETZL:  To the extent it's a different officer,
16    it makes no sense, because it would be assaulting Officer Moore
17    with the intent to impede Officer Mastony, who was up in the
18    tunnel, or Officer Beaver, who we heard from, or Officer
19    Spooner, who --
20              THE COURT:  Well, Count III says he used a deadly
21    weapon to forcibly assault, resist, blah, blah, blah, blah,
22    blah, blah, an officer employed by the United States.  That is
23    Officer Moore.
24              MS. GOETZL:  Correct.
25              THE COURT:  Any of those verbs.
```

1    MS. GOETZL:  Yes.

2    THE COURT:  The Capitol police officer while Officer

3  Moore was engaged in the -- in the performance of his official

4  duties and with the acts in violation of the section about

5  physical contact with the victim clearly means Officer Moore.

6    MS. GOETZL:  Correct.

7    THE COURT:  The question is that last phrase --

8    MS. GOETZL:  Correct.

9    THE COURT:  -- which may or may not ever come into

10  play, because the jury only has to find one or the other.  But

11  then we get to what we tell the jury in our instructions about

12  the last phrase.

13    MS. GOETZL:  And whether we ask for either

14  interrogatories or a special verdict form.

15    THE COURT:  Yeah.

16    MS. GOETZL:  And with respect to that I also just

17  want to indicate that for the first time I just heard

18  government counsel say, oh, well, it could have been the 1512,

19  the intent to -- the assault with intent to commit the 1512,

20  which is Count II.  To the extent that the government is going

21  to make that argument, we are definitely requesting a special

22  verdict form where the jury has to find that the other felony

23  was either Count I or Count II, because that's not an argument

24  that we were expecting when we submitted the joint instructions

25  and verdict form to the Court.

1    THE COURT:  Mr. Valentini, anything you want to

2    clarify or explain or respond to?

3    MR. VALENTINI:  Just briefly.  As to the federally

4    protected function for the 231, I don't think -- I don't think

5    we'll ever get to that, but just as a legal point, the Vice

6    President's participation in the certification of the Electoral

7    College satisfies that.  I mean, you know, they said there has

8    to be a member of the Executive Branch.  The Vice President is

9    a member of the Executive Branch, and this argument has been

10   teed up in a number of cases.  I'm trying to remember if I've

11   seen it decided yet, but it's one of the many arguments on

12   these statutes that has been debated.  But, anyway, we have

13   testimony here with respect to commerce.

14      Now, with respect to the intent to commit a different

15   felony, there is no merging.  This is *Blockburger* 101.  There's

16   different elements, right, so these are different felonies.

17   Right?  The only argument, as I understand it, is that they

18   think that to the extent that the 231 comes into play as the

19   last element of the aggravated version of the 111(a), then we

20   have to identify a specific officer, but that seems to assume

21   that 111(a) means with the intent to commit another felony

22   except 231, in which case you have to specify the officer.

23      I don't understand --

24      THE COURT:  We could go round and round on this, but

25   her last point is if you are -- if she heard you right and you

1    are proposing the other felony referenced in Count III could be

2    either Count I or Count II, and I'm not sure you were, but

3    that's what she heard you say.

4            MR. VALENTINI:  Oh, I understand.  Okay.  So with

5    respect to the special verdict as to different felonies, we can

6    talk about whether it's means or elements and whether it has --

7            THE COURT:  My question is, as I understand it,

8    intent to commit another felony.  The argument you first made

9    and I believe your proposed jury instruction says, ladies and

10   gentlemen of the jury, that other felony is 231.

11           MR. VALENTINI:  Yes.

12           THE COURT:  If you're now saying, ladies and

13   gentlemen of the jury, you can find either 231 or Count II,

14   "A," it changes your jury instruction, and "B," it complicates

15   the issues that we've just been discussing.  Maybe not for

16   Rule 29, but in terms of fair notice before you make your

17   closing argument and what the jury instructions say, which then

18   leads into the defense argument.  It's even worse than we

19   thought.  We really do need a special verdict form now or

20   interrogatories.

21           MR. VALENTINI:  I understand how the points line up

22   completely.  It's nothing to do with Rule 29.  We will continue

23   to consider among ourselves with respect to which felony we're

24   talking about.

25        The other point I wanted to make is certainly there's

1    nothing in the indictment that limits which felony we can

2    argue, so that's also an important point.

3                THE COURT:  You do agree that if the jury instruction

4    says "X," it would be unfair in closing argument to say it can

5    be either "X" or "Y."

6                MR. VALENTINI:  No.  Of course, of course.  I

7    understand that, yes.

8                THE COURT:  And they need to know in advance, and it

9    may lead them to a stronger special verdict form argument.

10               MR. VALENTINI:  Understood, Your Honor.

11               THE COURT:  Okay.

12               MR. VALENTINI:  Thank you.

13               THE COURT:  Anything else?

14               MR. VALENTINI:  Not from the government, unless you

15   have any other questions, Your Honor.

16               THE COURT:  Probably not surprising to some, I'm

17   going to invoke Rule 29(B) and reserve decision on all counts,

18   proceed with the trial -- or rather submit the case to the jury

19   and decide the motion after the jury returns its verdict.

20         I do that for two reasons.  One, I may not have to decide

21   part of the motion because the jury might acquit on some

22   counts; and two, in fairness to the government, if I reserve

23   ruling and there's an appeal and the Court of Appeals -- from

24   the defense and the government raises -- and if -- if after the

25   jury returns a verdict I then grant the motion of the

1    government in part and the Court of Appeals thinks I was wrong,

2    they can remand and order me to reinstate it.  If I grant it

3    before the jury verdict, because of double jeopardy it's lost

4    forever.

5          And so Rule 29 provides that option, and in this case I

6    could rule on some of them now and deny some portions of the

7    motion based in part on some of my earlier decisions and

8    decisions of my colleagues, but I think in fairness to both

9    sides, I'll reserve ruling and decide it later.

10         So 9:00 o'clock Monday you'll provide defense theory of --

11   defendant's theory of the case.  If there are any other

12   developments, you've narrowed your points of differences.  If

13   you have other things that are either problems or less of a

14   problem than they have appeared thus far, if you email Erica,

15   she and I will be in touch over the weekend.

16         So everybody have a good weekend.  You know, it's a shame

17   about Tuesday in some ways, but without an ASL interpreter it

18   would have been complicated anyway, and I think we will lose

19   Juror Number 4, but we started a day late, and I think jury

20   selection took a day longer than we thought it was going to

21   take, but it is what it is at this point, and we'll get it

22   done.

23         Thank you very much, everybody.  Have a good weekend.

24              COURTROOM DEPUTY:  Court is adjourned.

25         (Adjourned at 4:48 p.m.)

```
 1        I certify that the foregoing is a correct transcript from

 2    the record of proceedings in the above-entitled matter.

 3

 4

 5        /s/Lisa G. Grimminger              April 19, 2023
          Lisa G. Grimminger, RDR, CRR, CRC  Date
 6
                           I-N-D-E-X
 7
                                        Direct   Cross
 8
      WITNESSES:
 9    FOR THE PLAINTIFF:

10    Kerry Schultz                   1689     1710

11    Morris R. Moore Jr.             1722     1762

12    James Mulvihill                 1785     1815

13

14

                                                         Ruled
15    MOTIONS:                            Made            On

16    Defendant's Rule 29 motion          1840           1867

17
                                                         Ruled
18    EXHIBITS:                        Offered            On

19    15. Photo of rally at Ellipse from
          Mr. GossJankowski's phone      1712           1712
20
      16. Photo of rally at Ellipse from
21        Mr. GossJankowski's phone      1714           1715

22    17. Photo of President Trump at rally at
          Ellipse from Mr. GossJankowski's phone  1715   1715
23
      18. Photo of Rudolph Giuliani and John
24        Eastman at rally at Ellipse from
          Mr. GossJankowski's phone      1717           1717
25
      22. Be on the lookout flyer       1818           1818
```

```
 1        EXHIBITS: (cont'd.)                        Offered      Ruled
                                                                  On
 2
          145. Howell video [WT unified message
 3             141025931159740.mp4]                   1755         1755

 4        146. Howell video [WT unified message
               1529501220581387.mp4]                  1756         1757
 5
          205. 5005.JPG
 6             [Cellebrite report, images, line 22] 1694,1701      1702

 7        206. 5005.JPG
               [Cellebrite report, images, line 27]   1704         1704
 8
          207. 5005.JPG
 9             [Cellebrite report, images, line 30]   1705         1705

10        208. Video:  9A2D2952-95BE-4573-A714-
               B71C6650B9DD.medium.mp4              1706,1707      1708
11
          209. Video:  IMG_2664.mov,
12             Cellebrite report, videos, line 2      1710         1710

13        300. Facebook business record certification 1798         1799

14        301. Facebook subscriber records [REDACTED] 1800         1800

15        303. Facebook thread between
               F.A. and the defendant                 1802         1802
16
          304. Facebook thread between
17             H.R. and the defendant                 1808         1808

18        305. Facebook thread re: Deaf MAGA          1811         1811

19        700. Blue jacket                            1793         1793

20        700A. Photograph of blue jacket             1795         1795

21        701. Nike sunglasses                        1794         1794

22        702. Photo of Vitali GossJankowski ID       1796         1796

23

24

25
```