```
1                    BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2


3     UNITED STATES OF AMERICA,         .
                                        .   Case Number 21-cr-123
4               Plaintiff,              .
                                        .
5           vs.                         .
                                        .   Washington, D.C.
6     VITALI GOSSJANKOWSKI,             .   March 15, 2023
                                        .   9:22 a.m.
7               Defendant.              .
      - - - - - - - - - - - - - - - - -

8


9                      TRANSCRIPT OF JURY TRIAL, VOLUME X
                    BEFORE THE HONORABLE PAUL L. FRIEDMAN
10                       UNITED STATES DISTRICT JUDGE

11    APPEARANCES:

12    For the United States:        FRANCESCO VALENTINI, ESQ.
                                    United States Department of Justice
13                                  950 Pennsylvania Avenue Northwest
                                    Washington, D.C. 20530
14
                                    ADAM DREHER, AUSA
15                                  United States Attorney's Office
                                    601 D Street Northwest
16                                  Washington, D.C. 20579

17                                  KAREN ROCHLIN, AUSA
                                    United States Attorney's Office
18                                  99 Northeast Fourth Street
                                    Miami, Florida 33132
19
      For the Defendant:           EDWARD SMOCK, AFPD
20                                  CELIA GOETZL, AFPD
                                    Federal Public Defender's Office
21                                  625 Indiana Avenue Northwest
                                    Suite 550
22                                  Washington, D.C. 20004

23    Official Court Reporter:      SARA A. WICK, RPR, CRR
                                    333 Constitution Avenue Northwest
24                                  Room 4704-B
                                    Washington, D.C. 20001
25                                  202-354-3284
```

1

# C O N T E N T S

2

3    Jury Instructions.....................................    28

4    Closing Statement by Government.......................    60

5    Closing Statement by Defense..........................    89

6    Rebuttal Closing Statement by Government..............   113

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1
2      (Call to order of the court.)
3      (Jury not present.)
4          COURTROOM DEPUTY:  This is 21-cr-123, United States
5   versus Vitali GossJankowski.
6      For the United States, we have Francesco Valentini, Adam
7   Dreher, and Karen Rochlin.  For the defendant, I have Edward
8   Smock and Celia Goetzl.  Our ASL interpreters this morning are
9   Sarah Blattberg and Shannon Shakely.  And our court reporter
10  today is Sara Wick.
11     All parties are present.
12         THE COURT:  Okay.  It's the Ides of March.  I don't
13  know what that means.
14     So just to reprise for the record where I think we are, we
15  had a lot of argument the other day, particularly about the
16  substantive instructions for each of the counts.  And after
17  considering all the arguments and additional memoranda of law
18  and e-mails that were sent about that, my clerks and I made
19  revisions, and I made decisions about who I agreed with on which
20  points.
21     We e-mailed those to counsel yesterday, I forget what time
22  it was, maybe 12:00 or 1:00, and then I met with counsel here in
23  the courtroom yesterday afternoon at 3:00.  Mr. GossJankowski,
24  through counsel, had waived his own presence and the presence of
25  American Sign Language interpreters, because we were just really

1      talking about law and instructions.

2          And some additional objections and suggestions were made,

3      and I made some additional changes on the substantive

4      instructions as a result of our conversations yesterday.  Those

5      were all sent out to counsel again.  I think a full set of

6      instructions was sent out again to counsel.

7          And we discussed one other issue -- a few issues but one

8      other related to instructions, what do we do with the physical

9      evidence, the device.  I guess there were two of them that were

10     admitted in evidence and the boxes in which -- the kinds of

11     boxes in which they would have been sent by Amazon and

12     instructions.

13         As I understand it, and you all please confirm for the

14     record, that there were no additional objections or suggestions

15     to any instructions at all, except -- all the ones we sent out,

16     again, no one was saying I made a mistake on how I recorded our

17     agreements in my decisions, no e-mails, no concerns other than

18     the objections already preserved with respect to any

19     instructions except with respect to, I believe, 2.500 and 2.501

20     with respect to those physical exhibits, I think it's

21     Exhibit 1000, 1001, or maybe it's 1001 and 1002.  And those are

22     the only things really still to be resolved.

23         Mr. Dreher and I would like Ms. Goetzl to confirm that what

24     I've said so far is accurate.

25             MR. DREHER:  That is an accurate recitation, Your

1    Honor.

2              MR. SMOCK:  Your Honor, that is accurate.

3              THE COURT:  Thanks, Mr. Smock.  All right.

4         So then with respect to those two remaining instructions,

5    one is, using the Red Book numbers, even though they've been

6    revised, 2.500, redacted documents and video clips, counsel had

7    agreed to a substitute for what we had sent out yesterday, but

8    2.501 is disputed.

9              MR. DREHER:  That's my understanding, Your Honor.

10             THE COURT:  Is that right?

11             MR. SMOCK:  That's correct.

12             THE COURT:  So I looked at the concerns about 2.501

13   exhibits during deliberations.  And we're talking about Exhibits

14   1001 and 1002.  And the government had proposed an alternative

15   to what I had sent out, 2.501.  Mr. Smock and Ms. Goetzl, as I

16   read their e-mail, have raised two different objections.  One is

17   having a marshal in the jury room or court security officer

18   while any exhibits are reviewed by the jury, because that's an

19   extraneous person in the jury room and all that.

20        I think the instruction I gave you earlier this morning

21   from a drug trial I had may solve that problem, which is the

22   jury is specifically instructed under that old instruction that

23   the marshal will come in -- I mean, if it's a gun or drugs, what

24   we have typically done in this courthouse is the marshal comes

25   in with the gun or drugs.

1        And we'll get to the question about examining the item,

2   because that's a second issue in this case.  And the jury can

3   examine it in the presence of the marshal, but the marshal stays

4   in the room for security reasons.  But they're specifically told

5   they shouldn't discuss it while the marshal is there.

6        And then the marshal leaves with the items, and then they

7   can talk.  And if they want to see it again, they can see it

8   again.

9        And as I understand it, in gun cases, for example, that

10  means they can hold the weapon, and if they want to pull the

11  trigger or something, they can do that.  I believe in drug

12  cases, they are not permitted to open the sealed packaging and

13  determine for themselves what it is.

14       Maybe we can reach a meeting of the minds on that

15  particular question, but the defense objection here, as I

16  understand it, is if they have the devices in the room, that

17  they will be able to effectively do their own experiments.  They

18  can test them.  They can touch their faces with them if they

19  wanted to.  They can hear the sounds.  They can see the flashing

20  lights.

21       And the problem -- and I haven't had time to read any of

22  the cases, but the problem is that what has happened so far is,

23  through direct and cross-examination of Dr. Kroll, to the extent

24  that any, quote unquote, experiments have been done, they've

25  been done in the courtroom with counsel present and in response

1    to questions, including the, quote unquote, experiment which

2    Dr. Kroll declined to do.

3        So as I said, I haven't had time to look at any of the

4    cases, but I think there's some substance to the points that the

5    defense is raising.

6        MR. SMOCK:  Your Honor, I think you've explained our

7    position fairly well.  I think we retain an objection to having

8    a marshal go back into the jury room with these devices for the

9    reasons we've described last May.

10       Even saying that it's for security purposes gives the

11   implication that this item is dangerous, and that's exactly the

12   argument that we are saying is not accurate.  So it gives this

13   imprimatur from the Court itself that this item needs to be

14   protected by an armed U.S. Marshal.

15       THE COURT:  Well, actually, it's a court security

16   officer, and he or she is not armed.

17       MR. SMOCK:  Essentially, law enforcement.  It's being

18   treated differently than any other piece of evidence, and

19   they're being told we need to take special precaution with

20   respect to these two pieces of evidence as opposed to anything

21   else.  Certainly, if it were a firearm and there was no dispute

22   about whether it was dangerous, there wouldn't be this issue.

23       There is the issue in this instance when -- if the Court is

24   taking action to sort of point it out as something that a

25   special precaution needs to be taken with respect to it.

1         The other, the Court is right.  The concern is the jury --
2    we will have no idea what the jury does with this item.  This
3    will be a different question from how heavy is it, how light is
4    it, things of that nature.  This is sort of a scientific
5    question about whether it's capable of causing serious bodily
6    injury or death.
7         We don't know --
8              THE COURT:  But it's a fact question they have to
9    decide.
10             MR. SMOCK:  That's true.
11             THE COURT:  And it's been admitted in evidence.
12             MR. SMOCK:  That is true.  I mean, what I will say
13   about that is that the devices were not on the government's
14   exhibit list.  They got brought out sort of as a surprise on
15   cross.  I probably should have at that point said they should be
16   a demonstrative, but I didn't want in front of the jury to turn
17   it into a big deal.
18        But I think the point of it is, our concern is the jury
19   will be doing things, creating evidence that wasn't created in
20   the courtroom.  We don't know whether one of them will test it
21   on themselves and give their views to the rest of the jury about
22   what happens.
23        It becomes sort of a -- a creation of key evidence on a
24   crucial fact in this case that is not happening in the
25   courtroom, and that is our concern.

1        MR. DREHER:  Your Honor, I think to address the

2   defense's concerns, there could be an explanation to cure both.

3   Ultimately, if the marshal is going to be delivering these

4   devices to the jurors, the jurors could also be instructed that

5   while the marshal is present he or she will not allow any sort

6   of testing on each other or on themselves and at least make it

7   clear to the jurors that during their examination of these

8   devices they're not to place the devices on themselves in

9   any way.

10       I do think it's important for the jurors to be able to see

11   its activation, as there has been at least argument regarding

12   the flashlight versus the actual electricity coming out at

13   different parts of video clips that are going to also be

14   provided to the jury during their deliberations and the controls

15   of these devices requiring only one or the other based on the

16   other different activation light that's on it as well.

17       So I could foresee a situation to where the jurors

18   themselves would want to be able to see the toggle switch, see

19   the selection between the two different modes that these devices

20   have in terms of whether or not that becomes important for their

21   decision.

22       I think ultimately, these being admitted into evidence and

23   being presented to the jury in the deliberation room is much

24   like any other piece of evidence.  We certainly don't know if

25   the jurors are going to want to review every single piece of

1     evidence or every video clip in its entirety or whether or not

2     the photographs that have been admitted are going to be any

3     concern to the jurors during their deliberation either.

4          What we end up doing by not providing some sort of access

5     to the jurors on this is not give the guidance that is required

6     for, while they may determine this not to be a deadly or

7     dangerous weapon, there's still a lot of daylight between that

8     and whether or not it can cause harm to a juror, especially in a

9     scenario to where -- a scenario where we certainly don't want

10    them to harm each other or themselves, to add stress to the

11    already possible stressful decision that they must make.

12         So I certainly would ask the Court -- I do -- the

13    government's position would be I think the additional

14    instruction as outlined in the gas tank case does alleviate any

15    concerns that the defense would have.  But then also, if for

16    some reason the defense still has concerns about elevating these

17    devices somehow in terms of the security purpose, I would

18    suggest the Court remove "for security purposes" out of the

19    instruction and just, I guess, frame it more as a, we only have

20    one of these exhibits and they need to be maintained by the

21    Court.

22             MR. SMOCK:  So our objection remains the same, Your

23    Honor.  Our view is that the items should not be sent back for

24    the reasons we've described.  There is just a danger here in

25    language suggesting to the jury a danger.  There's concern about

having a courtroom blue coat essentially bring it back.

THE COURT:  A courtroom what?

MR. SMOCK:  I'm using a colloquial term.  I use the term "blue coat."  I can't remember the term you used.

THE COURT:  Court security officer.

MR. SMOCK:  I don't mean to offend anyone that's here. Our concern remains the same.

Certainly, if the Court is going to allow it back, we agree that there should be some sort of instruction saying that they're not to experiment using the device.

Another thing that I --

THE COURT:  What would typically happen, I suppose, is that if a device --

(Government counsel conferring.)

THE COURT:  -- say a gun or -- because I've never had this case.  It probably happens in Superior Court.  If a knife were an issue, I doubt that the jurors would be allowed to pass the knife around the table.  But if a gun is an issue and the marshals have made sure it was clear and didn't have any ammunition in it, they would be allowed to pass it around the table.

In this case, I assume if they wanted to see it, at least some of them would want to hold it and maybe press one of the buttons and see what -- how it worked.  And I guess that's the objection that the defense has.

1        MR. SMOCK:  So obviously, one of government counsel

2    can activate the device during closing argument.  It wouldn't

3    surprise me if they're going to do that.  They've seen it in

4    court.  It just doesn't seem useful for the jury to do that in

5    the jury room.

6        MR. DREHER:  Your Honor, if I could go back to the

7    Court's example, I think it is illustrative in that the

8    difference between a gun and a knife relates to another

9    component that's required to make the device dangerous.

10       With a knife, it's, for lack of a better word, inherently

11   dangerous in that there's no other components that are needed to

12   have that device cause damage.  With a gun, we can remove the

13   ammunition and ensure that it's safe before we put it back into

14   the jury room.

15       However, with this, because the source of electricity is

16   not something that we can separate from the device, I think it

17   relates more to the knife scenario than it would the gun

18   scenario in that the device itself is, you know, part and parcel

19   with the batteries that power the electricity that cause the

20   damage of the device.

21       And so certainly, I think with the added deference to that

22   and the standard procedure that all courts follow in terms of

23   any sort of possible thing that could harm another person, I

24   think it becomes less likely that having a marshal presenting

25   these devices to the jury in any way encourages the jurors to

1    somehow take some semblance that it's the Court --

2              THE COURT:  These two exhibits, 1001 and 1002, were

3    exhibits that you or your -- these are not the specific

4    exhibits -- specific items that Dr. Kroll examined; is that

5    right?

6              MR. DREHER:  That's correct, Your Honor.

7              THE COURT:  What they are is your team viewing -- tell

8    me again how you present it to the jury.  Are these both items

9    that look similar to the device that Mr. GossJankowski held in

10   his hand, or are they similar to the device that Dr. Kroll said

11   he tested?

12             MR. DREHER:  So as it was presented -- the expert

13   itself did not test the device in this case.

14             THE COURT:  No, the expert himself -- nobody has the

15   device that Mr. GossJankowski actually had in his hand.

16             MR. DREHER:  Correct.

17             THE COURT:  So the expert looked at all these videos

18   and pictures, and he ordered -- he determined what he thought

19   looked closest to it, he ordered a bunch of those, and he tested

20   them.

21      What exactly are 1001 and 1002?

22             MR. DREHER:  So 1001 and 1002 are the box and contents

23   of what would have arrived when Dr. Kroll was testing the

24   devices that he tested.

25             THE COURT:  So you're just reminding me of what the

1    jury heard.  I just don't remember.  So one of them is a

2    Vipertech whatever it is, and the other is the POLICE 916?

3              MR. DREHER:  That's correct, Your Honor.

4              THE COURT:  Okay.  And Dr. Kroll was shown these

5    things, and he said -- he was asked about, is this the kind of

6    box it would have arrived in, and you said you got instructions

7    with them.  And then he looked at them, and he said, yes, these

8    look like the devices I received.

9         So the jury is basically told -- the evidence that both

10   sides would agree to, when you argue it however you're going to

11   argue it, is:  A, neither of these is what Mr. GossJankowski had

12   because that was never recovered from anybody or any place, B,

13   neither of these is the exact item that Dr. Kroll tested, but

14   Dr. Kroll confirmed that they were the Vipertech and the

15   POLICE 916 and looked like the things he tested, and these

16   looked like the boxes they arrived in.

17        Right?

18             MR. SMOCK:  That's accurate.

19             THE COURT:  So the jury knows that.  So there should

20   be no problem with the jury receiving the boxes and the

21   instructions.  But then that creates a question in their minds

22   of why don't we get what's inside.

23        I had one other thought, but it's probably not a good one.

24   No, never mind.

25             MR. DREHER:  Ultimately, that's why I think the best

approach is the standard approach the Court takes when faced

with these types of scenarios, and that is, a marshal will

deliver the item to the jurors if they ask for it and then stand

by until they are done examining the exhibit, but then be

available if and when the jurors ever ask for the item again.

Because it's so standardized, I don't believe it adds to

any sort of -- or implies any sort of way in which they should

determine the issues.  It just provides the safety that should

be required.

MR. SMOCK:  Again, that goes to the very point.

Number 1, the jurors aren't aware of standard procedures.  This

is, for many of them, the only time they've sat on a jury.  To

have a court security officer bring in two particular pieces of

evidence as opposed to anything else raises the implication that

it's dangerous.

Again, in cases involving guns or knives, I can't imagine a

defense attorney making an argument that it's not dangerous.

This is a unique case where that is the issue.

THE COURT:  Well, I think -- give me a minute.

(Pause.)

THE COURT:  All right.  So here's what I think.  This

argument about the court security officer being -- this happens

all the time.  Not only that, and maybe you're unaware of this,

but once the jury begins deliberation, there's a court security

officer sitting at the jury room at all times.  They will see

him or her, and the purpose of that person is to make sure that
no unauthorized person goes into the jury room and to make sure
that the door to the jury room is not closed until all 12 people
are there.  That's his or her job.  That happens in every trial
in this courthouse.  The courtroom deputy doesn't do that; the
court security officer does that.

So I would suggest that I take the government's proposal
and say, "I'll be sending you into the jury room with the
exhibits in evidence except for the two devices admitted as
Government's Exhibit 1.  But you may examine any" -- well, I
will say, "You may examine any or all of the exhibits in
evidence as you consider your verdict.  Please keep in mind that
exhibits that were only marked for identification but were not
admitted into evidence will not be given to you to examine.  If
you wish to examine the devices admitted in evidence as
Government's Exhibits 1001 and 1002, please notify the courtroom
deputy by written note."

And I will put in -- even though we know this is not quite
accurate, "Either she or the court security officer," we know it
will be the court security officer, but we'll tone it down a
bit, "will bring them to you."

COURTROOM DEPUTY:  Judge, I have a question.

THE COURT:  You don't want me to say that?

COURTROOM DEPUTY:  We're not bringing them a whole
list of exhibits that have been admitted.  Are you going to make

1    it clear that --

2              THE COURT:  I don't understand your question.

3              COURTROOM DEPUTY:  So you just indicated that Exhibits

4    1001, 1002 will be sent to you if needed or whatever, but I

5    don't know if they know, if they're going to be aware of what

6    these exhibits are, or are you just going to identify them as --

7              THE COURT:  Oh, I see.

8              MR. VALENTINI:  Just on that particular point, as

9    counsel is conferring, I think the reference to "devices" makes

10   it very clear, I hope, to the jury, who has been listening

11   carefully, that we're talking about this pretty conspicuous

12   device.

13     I appreciate the point they don't have an exhibit list, but

14   the reference to "device," "devices" would alert them.

15             THE COURT:  So we say, "The boxes and devices" -- "If

16   you wish to examine the devices that were admitted into evidence

17   and marked as Government Exhibit 1001, 1002, please notify the

18   courtroom deputy by written note, and either she or the court

19   security officer will bring them to you.  Ms. Johnson or the

20   court security officer will remain in the jury room while each

21   of you has the opportunity to examine that evidence.  You should

22   not discuss the evidence or otherwise discuss the case among

23   yourselves while he or she is present in the jury room.  You may

24   ask to examine the evidence as often as you find it necessary."

25             MR. SMOCK:  Your Honor, one thing that I'm recognizing

about these devices is -- and I think this may address some of

the concern.  The government indicated that they have no problem

with language saying that the jury shouldn't test the item on

themselves, et cetera, et cetera.

Each of these items has a way to deactivate it.  If you

simply pull this item out, it will still be able to turn the

flashlight on.  You can still see how the switch works.  You can

do everything you want to do, but it doesn't activate.

THE COURT:  What do you mean by "activate"?

MR. SMOCK:  Arc.  In other words, the electricity

doesn't go.  It doesn't --

THE COURT:  So the light doesn't come out, or the

sound doesn't come out, or neither?

MR. SMOCK:  Neither.  It becomes unable to perform

this, quote unquote, stunning function.  If we did it this way

and simply gave it to them without this pin in, it would assure

they can see how heavy it is, they can see the way the switch

works like the government wanted, they can see the button that

activates it.  But it eliminates the concern.

Number 1, I doubt that we would then need to have the

marshals back there or the court security back there with it,

because it's essentially just a flashlight at that point.  And

they can see everything about it.  We know at that point they're

not going to perform experiments.

So I think that seems to be -- if the Court is inclined to

1    send these back, that would seem to be an appropriate way of

2    handling it.

3          MR. DREHER:  Your Honor, in response, the two

4    different models do have two different ways in which these pins

5    interact and the contacts of each match.  However, the Vipertech

6    device itself has a more permanent type of pin.  Mr. Smock was

7    able to yank it out just earlier in order to render it somewhat

8    inert.  But I think that goes against what the evidence would

9    suggest.  There's been video clips to where we also hear this

10   device.  We see this device and the arc itself.

11       And I think limiting that in some way would then require us

12   to specifically tell the jury that this has been, in other

13   words, rendered safe, which goes mainly against exactly what the

14   defense is asking for here.  So I'm not sure I understand the

15   logic of the argument.

16       I certainly approve of the safety measures, but I think

17   having the either court security officer or the deputy courtroom

18   clerk instruction as the Court provided would be the best route

19   to go through, because then not only is the jury still able to

20   observe and examine these devices as they appear presumably on

21   the videos from January 6, it provides them with a greater

22   understanding of the evidence.

23         MR. SMOCK:  And our position, Your Honor, would be,

24   assuming we go the route that I'm proposing at this point, the

25   instruction would simply read, "These devices have been rendered

unable to arc because performing experiments with this device or with these devices would be inappropriate.  You are to rely upon the evidence that" --

THE COURT:  What would be inappropriate?

MR. SMOCK:  "Performing testing or experimenting with these devices would be inappropriate.  You are to rely on the evidence from the trial alone."

THE COURT:  What was the discussion earlier about not performing testing on your body?  What was the language that somebody suggested?  I think you said, Mr. Dreher, we could tell them they couldn't test the device on their body or touch themselves with it or something like that.

It gets a little complicated, but --

MR. DREHER:  Yes, Your Honor.  And really, I think perhaps -- perhaps I didn't put it the best way possible, but I was attempting to illustrate just how difficult some of these instructions will end up being if we start thinking about every eventuality as opposed to the most simple language that a reasonable jury can understand.

THE COURT:  Well, I'm going to overrule the defense objection.  I'm going to let the jury request these items if they want to.  It seems to me they were admitted in evidence. They were never published to the jury, and I guess either side could have asked that they be published to the jury and passed around the jury box, in which case we would have seen how they

1    looked at them and what they did and whether they played with

2    the switches or not.  That didn't happen.

3         But they are in evidence, and I can't remember, but I don't

4    think there was an objection to them coming into evidence.  And

5    the jury is entitled to see everything that's in evidence.

6         If you can think of other kinds of cases where there's

7    objects that they view -- I keep coming up with Superior Court

8    examples.  What if it was a shoplifting case and every witness

9    said it was a navy blue dress that was stolen and we all look at

10   it and we say this is pale blue, that's not what I think of navy

11   blue.

12        Can't the jury examine the dress, pass it around, look at

13   it?

14        What if a witness said it was a -- the reason I recognized

15   the person is that they were carrying a Louis Vuitton

16   pocketbook, and I know those because I'm in the fashion industry

17   and everything.  And they get it in the jury room and say look

18   at the label, this is not what she said.  So that goes to her

19   credibility.

20        There are probably better examples.  It's a long time since

21   I prosecuted misdemeanor cases in Superior Court, but those are

22   the ones that come to mind.

23        It's in evidence.  These are in evidence without any

24   objection from the defense, and you can all check the record, or

25   it's in evidence because I overruled the objection.  I don't

1     know.  They have a right to see every exhibit and to examine it.

2         And so I have marked up this instruction.  It'll take a

3     while if we want to get it retyped so everybody can see it, but

4     we can do that just so you have it, or I can just read it from

5     the marked-up version.  But we're delaying the jury

6     instructions, which means we're delaying closing arguments.

7         MR. DREHER:  We would have no objection to the Court

8     reading the marked-up version, assuming that a printed version

9     would still be supplied to the jurors.

10        THE COURT:  And to you later, okay.

11    What I would propose to say is -- the government's first

12    paragraph remains pretty much the same.  I changed two words.

13    The second paragraph of the government's proposed edits to

14    instruction 2501 would say, "If you wish to examine the devices

15    admitted into evidence and marked as Government's Exhibits 1001

16    and 1002, please notify the courtroom deputy by written note,

17    and either she or the court security officer will bring them to

18    you."  Maybe I will say "a court security officer."  "A court

19    security officer will bring them to you."  "Ms. Johnson or the

20    court security officer will remain in the jury room while you

21    have the opportunity," because each of them may not want to, "to

22    examine that evidence.  You should not discuss any evidence or

23    otherwise discuss this case among yourselves while he or she is

24    present in the jury room.  You may ask to examine the evidence

25    as often as you find it necessary."

1      So you can say whatever else you want to.  Your objections

2 are noted.

3           MR. SMOCK:  Your Honor, noting our objection for all

4 the reasons that have been raised here today and in the filing

5 or e-mail from last night, which we will file on the docket,

6 just for the record, given the Court's ruling, we would ask that

7 an added sentence be included, which would read, "You are

8 advised not to perform experiments or testing with these

9 devices, as you should consider only evidence and argument

10 received in open court."

11           MR. DREHER:  So I think that language is vague in

12 terms of what an experiment would be, whether listening to it

13 could be an experiment or how it would be interpreted.

14      So I would ask that if the Court were inclined to add that,

15 which I don't think it would be necessary, but if the Court

16 believed it would be necessary, that it would be specific to

17 either touching oneself or another juror with the device.

18           THE COURT:  I could give that instruction as

19 Mr. Dreher just suggested it, if he can remember what he said in

20 a minute, but the defense may feel, A, that it doesn't

21 sufficiently convey what they would like conveyed, and B, it may

22 connote dangerousness.

23           MR. SMOCK:  That's right.

24           THE COURT:  So his instruction, defense instruction is

25 much broader but, I think, undercuts the notion that a jury is

entitled to examine any item of evidence that's been admitted.

And the more limited instruction, while it solves part of the problem, which is we don't want them, you know, doing their own experiments, I think doing experiments is different from examining the device.

And I think that if I'm not going to give Mr. Smock's broader instruction, the defense, as I understand it, would object to the government's narrow instruction because it connotes dangerousness, which is a very important fact issue for the jury to find.

Okay.  Is there anything else that anybody wants to say about this or any other matter?

MR. SMOCK:  No, Your Honor.

MR. DREHER:  No, Your Honor.

THE COURT:  Let me ask this question.  It's now 5 after 10:00.  We've given the court reporter a copy of the instructions, and while I won't be verbatim, I will be close to verbatim, and obviously, this one will be quite different, but it's the only one that we've changed this morning.

We can get the jury in right now, and I could do my instructions, which will take 45 minutes or so, and then we can take a break, and you can get organized for closing.

I do think that in fairness, that after the government's closing, we should take another break before the defense closing, but that the government should do its rebuttal right

1    after the defense closing, and we should get all that done

2    before we go to lunch, because I don't think it's fair to one

3    side or the other to break up the closings.  It could be a later

4    lunch, but that's okay, I guess.

5        Should we get them all in, including number 4, and then

6    excuse her, or should we just get her in here first and tell her

7    what our decision is?  Let's do that.

8            MR. SMOCK:  I defer to the Court.

9            THE COURT:  You still don't think we should just let

10   her sit here and listen?  She knows she's being excused, and you

11   want to single her out in advance rather than just let her sit

12   in her normal seat and then excuse her?

13           MR. SMOCK:  I would prefer that.

14           THE COURT:  Prefer which?

15           MR. SMOCK:  That she be excused so she can watch from

16   the audience.

17           THE COURT:  You don't think that will offend any of

18   her fellow jurors, that the lawyers have asked that she step

19   aside now?

20           MR. SMOCK:  I don't believe so, so long as the

21   Court --

22           THE COURT:  Okay.  Let's get her in here.

23           COURTROOM DEPUTY:  Just that juror?

24           THE COURT:  Yeah.

25       (Juror number 4 entered courtroom.)

```
 1              THE COURT:  So I assume nothing has changed since the

 2   other day?

 3              JUROR:  Nothing's changed.

 4              THE COURT:  So what we have agreed would probably make

 5   sense would be for you to sit in the gallery rather than your

 6   normal seat.

 7              JUROR:  Okay.  And I actually have to go.

 8              THE COURT:  You have to go?

 9              JUROR:  Yes.

10              THE COURT:  You can't stay?

11              JUROR:  No.  Is it happening soon?

12              THE COURT:  I have to do instructions first, which

13   will take 45 minutes.  We will be done probably by 1:00.

14              JUROR:  Yeah, I'm --

15              THE COURT:  You have to go?

16              JUROR:  Yes, I have to go.

17              THE COURT:  Then why don't we get the entire jury in.

18   You can take your seat in the jury box.  They already know

19   you've got these travel plans.  So I will excuse you in the

20   presence of your fellow jurors.  You will leave.  If you want,

21   you can bring your belongings when you come in now.

22              JUROR:  I'm leaving now?

23              THE COURT:  You're going to go back to the jury room,

24   get your belongings, come in, sit in your normal seat.  I will

25   excuse you, and you can go out that way.  So you can say
```

1    good-bye now, and we will get the whole jury in.

2          Thank you for everything.  We do appreciate it.

3          (Juror number 4 exited courtroom.)

4          THE COURT:  Well, I'm glad we talked to her

5    separately.  I really like jurors.  A lot of them don't want to

6    serve initially, but once they're there, they really try to be

7    conscientious and do the right thing and do the best they can.

8    They get committed to the process.

9          And you're all clear with Ms. Johnson on exhibits?  We know

10   what's in and what's going back to the jury?

11         MR. DREHER:  Yes, Your Honor.  We did provide a thumb

12   drive to defense this morning.

13         THE COURT:  And the defense is all set and clear with

14   defense as well, Mr. Smock?

15         MR. SMOCK:  I believe so, yes.

16         THE COURT:  Thank you.

17         (Jury entered courtroom.)

18         THE COURT:  Okay.  Everyone may be seated.  I'm going

19   to give you instructions on the law, and then we're going to

20   have closing arguments.

21         As you all know, the trial has gone longer than we

22   anticipated, and I'm sorry about that.  We appreciate

23   everybody's time and attention, but I'm afraid that even before

24   we begin this morning, we're going to have to excuse our friend

25   in seat 4, juror number 0888, from this jury.

1    Thank you for all your time and attention.  I'm sorry we

2    didn't move a little more quickly, because you've been as

3    devoted as anyone to this whole process.  So thank you, and

4    travel safely.

5         JUROR:  Thank you.

6         THE COURT:  So I'm going to talk to you about the law,

7    and then we will take a short break, and we will have closing

8    arguments.

9    So you've now heard the evidence in this case, and it's now

10   my duty and responsibility as the Judge in the case to give you

11   instructions as to the law that applies and to the evidence that

12   has been presented.  It's your sworn duty to base your verdict

13   upon the law that I give you in these instructions and upon the

14   evidence that has been admitted in the case.

15   You will have a copy of these instructions with you in the

16   jury room.  So take whatever notes you want to as I talk, but

17   you will also have these in written form.  They're all typed

18   out, maybe not quite verbatim, and I may divert somewhat from

19   the typed version, but not in any substantive way.

20   So you'll have this typed version I have before me now.

21   And you may -- if you want to refer to these instructions, you

22   may refer to any particular portion of the instructions, but I

23   remind you that you must consider the instructions as a whole,

24   and you may not follow -- you are not authorized to just follow

25   some and ignore the others.

1       If you have any questions about the instructions, you

2   should feel free to send me a note during your deliberations.

3   And we will collect all of these and your notepads and

4   everything else when we're done.

5       As I told you before, my job has been to conduct the trial

6   in an orderly, fair, and efficient manner, to rule on questions

7   of law, and to instruct you on the law in this case.  It is your

8   duty to accept the law as I instruct you.  You should consider

9   all the instructions as a whole.  You may not ignore or refuse

10  to follow any of them.

11      Your job, the function of the jury, is to determine what

12  the facts are in this case.  You are the sole judges of the

13  facts.  While it's my responsibility to decide what to admit in

14  evidence in the case during the trial, you alone are to decide

15  the weight, if any, to give to that evidence.  You alone decide

16  the credibility or the believability of the witnesses.

17      As human beings, we all have personal likes and dislikes.

18  We have opinions.  We have prejudices.  We have biases.

19  Generally, we are aware of these things.  But you also should

20  consider the possibility that you have implicit biases, that is,

21  biases of which you may not even be consciously aware.

22      Personal prejudice, preferences, or biases have no place in

23  a courtroom where our goal is to arrive at a just and fair and

24  impartial verdict.  All people deserve fair treatment in our

25  system of justice, regardless of any personal characteristics

such as race, national origin or ethnic origin, religion, age,

disability, sex, gender, identity or expression, sexual

orientation, education, or income level.

You should determine the facts solely from a fair

consideration of the evidence.  You should decide the case

without prejudice, without fear, without sympathy, favoritism,

or consideration of public opinion.

You may not take anything I may have said or done as

indicating how I think you should decide the case.  If you

believe that I have expressed or indicated any such opinions in

my words or actions, you should ignore it.  The verdict in this

case is your sole and exclusive responsibility.

And if I've referred or if any of the lawyers have referred

to evidence in a certain way and that reference to the evidence

is different from your own memory and recollection of the

evidence, it is your memory that should control during your

deliberations.

And I've told you this before and I will tell you again

later, that if your memory differs from somebody else's notes,

if they may have taken more extensive notes, it is still your

memory that controls.

You may only consider during your deliberations the

evidence that was properly admitted in this trial.  The evidence

in this case consists of the sworn testimony of the witnesses on

the witness stand, the exhibits that were admitted into

1    evidence, and the facts and testimony stipulated to by the

2    parties.

3         Now, what do I mean by a stipulation?  During the trial,

4    the parties agreed, that is, stipulated, to certain facts, and

5    you will recall there was one stipulation that was read by the

6    defense, and that was instead of calling a particular witness.

7    So the parties have agreed on the facts that were read to you by

8    the defense.  Any stipulation of fact is undisputed evidence.

9         So when you consider the evidence, you are permitted to

10   draw from the facts that you find have been proven such

11   reasonable inferences you feel are justified in light of your

12   experience.  And you should give any evidence such weight as in

13   your judgment it is fairly entitled to receive.

14        The statements and arguments of the lawyers are not

15   evidence.  I've told you that before.  They're only intended to

16   assist you in understanding the evidence.  That applies to their

17   opening statements and the closing arguments that you will hear

18   in a little while.  Similarly, the questions of the lawyers and

19   any facts embedded in those questions or assumed facts embedded

20   in those questions are not evidence.  The questions of the

21   lawyers are not evidence.  Only what the witness says in

22   response, along with the exhibits that were admitted, are the

23   evidence in the case.

24        A criminal indictment is not evidence.  It is merely the

25   formal way of accusing a person of a crime.  You must not

1    consider the indictment as evidence of any kind.  You may not

2    consider it as evidence of Mr. GossJankowski's guilt or draw any

3    inference of guilt from the fact that there is an indictment.

4        Every defendant in a criminal case is presumed to be

5    innocent.  This presumption of innocence remains with the

6    defendant throughout the trial unless and until the government

7    has proven he's guilty beyond a reasonable doubt.  This burden

8    never shifts throughout the trial.

9        The law does not require Vitali GossJankowski to prove his

10   innocence or to produce any evidence at all.  If you find that

11   the government has proven beyond a reasonable doubt every

12   element of a particular offense with which Mr. GossJankowski is

13   charged, it is your duty to find him guilty of that offense.

14       On the other hand, if you find the government has failed to

15   prove any element of a particular offense beyond a reasonable

16   doubt, you must find Mr. GossJankowski not guilty of that

17   offense.

18       The government has the burden of proving Vitali

19   GossJankowski guilty beyond a reasonable doubt.  What does that

20   mean?  In civil cases -- some of you may have been on trials in

21   civil cases or watched television, you know, an automobile

22   accident, a contract dispute, a landlord/tenant dispute, and

23   even more complicated civil cases -- it is only necessary to

24   prove that a fact is more likely true than not or, in some

25   cases, that its truth is highly probable.

1     In criminal cases such as this one, the government's proof
2     must be more powerful than that.  It must be proof beyond a
3     reasonable doubt.  Reasonable doubt, as the name implies, is a
4     doubt based on reason, a doubt for which you have a reason based
5     on the evidence or the lack of evidence in the case.  If after
6     careful, honest, and impartial consideration of all the evidence
7     you cannot say that you are firmly convinced of the defendant's
8     guilt on a particular count of the indictment, then you have a
9     reasonable doubt.

10     Reasonable doubt is the kind of doubt that would cause a
11     reasonable person, after careful and thoughtful reflection, to
12     hesitate to act in the graver or more important matters in one's
13     life.  However, it is not an imaginary doubt, nor a doubt based
14     on guesswork or speculation.  It is a doubt based on reason.

15     The government is not required to prove guilt beyond all
16     doubt or to a mathematical or scientific certainty.  Its burden
17     is to prove guilt beyond a reasonable doubt.

18     There are two types of evidence in any case from which you
19     may determine what the facts are.  There's something called
20     direct evidence and circumstantial evidence.  When a witness
21     such as an eyewitness asserts actual knowledge of a fact, that
22     witness's testimony is direct evidence.  On the other hand,
23     evidence of facts and circumstances from which a reasonable
24     inference may be drawn is called circumstantial evidence.

25     Let me give you an example.  If you look out a window and

saw that snow was falling -- let's hope that doesn't happen
again this year.  Assume you look out a window and see that snow
is falling and you later testify in court that you saw the snow
is falling, that testimony would be direct evidence that snow
was falling at the time you saw it happen.

But suppose you looked out a window and saw no snow on the
ground and then you went to sleep and you woke up the next
morning and there was snow on the ground.  You didn't see it
snow, but there was snow on the ground, and you could testify
there was snow on the ground.  So your testimony about what you
had seen would be circumstantial evidence that it had snowed
while you were asleep.  Under oath, you could only say there was
snow on the ground; I didn't see it snow.  But a jury might
infer that it must have snowed last night.

Okay.  The law says that both direct and circumstantial
evidence are acceptable as a way to prove a fact.  The law does
not favor one kind of evidence over the other.  It is for you to
decide how much evidence, how much weight -- I'm sorry.  It is
for you to decide how much weight to give to any particular
evidence in the case, whether it is direct or circumstantial.
You are permitted to give equal weight to both.

Circumstantial evidence does not require a greater degree
of certainty than direct evidence.  In reaching a verdict in
this case, you should consider all the evidence presented, both
direct and circumstantial.

One of the questions you were asked when we were picking the jury was whether the nature of the charges in this case would affect your ability to reach a fair and impartial verdict. And you all answered that question in ways that satisfied the lawyers that you would be fair and impartial jurors, and you were under oath when you gave your answers.

We asked you that question because you must not allow the nature of the charges in this case to affect your verdict. You must consider only the evidence that has been presented in the case in reaching a fair and impartial verdict.

Sometimes, the lawyers objected when the other side asked a question or made an argument or offered evidence that the objecting lawyer did not believe was proper.

You should not hold any objections made by the lawyers against the lawyer who made the objection or against the party that lawyer's representing. It's a lawyer's responsibility to object to evidence that they believe is not properly admissible under the Rules of Evidence.

If during the course of a trial I sustained an objection to a lawyer's question, you should ignore the question. And I told you that at the time. And you must not speculate as to what answer would have been given.

If after a witness answered a question I ruled that the answer should be stricken, you should ignore both the question and the answer, and they should play no part in your

deliberations.

Similarly, exhibits as to which I have sustained an objection or that I ordered stricken are not evidence, and you must not consider them in your deliberations.

Let me talk about credibility of witnesses.  In determining whether the government has proved the charges against the defendant beyond a reasonable doubt, you must consider the testimony of all the witnesses who have testified here in this court, in this trial.  You are the sole judges of what we call the credibility or the believability of the witnesses.  You alone determine whether to believe any witness and the extent to which that witness should be believed.

Judging a witness's credibility or believability means evaluating whether in your view the witness has testified truthfully and also whether the witness accurately observed, recalled, and described the matters about which he or she has testified.  You can consider anything that in your view and your judgment affects the credibility of any witness.

For example, you may consider the demeanor and the behavior of the witness on the witness stand, the witness's manner of testifying, whether the witness impressed you as a truthful person, whether the witness impressed you as having an accurate memory, whether the witness has any reason for not telling the truth, whether the witness had a meaningful opportunity to observe the matters about which he or she has testified, whether

1   the witness had any -- has any interest in the outcome of this

2   case or stands to gain anything by testifying or has friendship

3   or hostility towards other people concerned in the case.

4       In evaluating the accuracy of a witness's memory, you may

5   consider the circumstances surrounding the event, including the

6   time elapsed between the event and any later recollections of

7   the event and the circumstances under which the witness was

8   asked to recall details of the event.

9       You may consider whether there are any consistencies or

10  inconsistencies in a witness's testimony or between that

11  witness's testimony and any previous statements made by the

12  witness.  You may consider the consequences -- I'm sorry.  You

13  may consider any consistencies or inconsistencies between that

14  witness's testimony and any other evidence in the case that you

15  credit.  You may consider whether any inconsistencies are the

16  result of lapses in memory or mistake or misunderstanding or

17  intentional falsehood or differences in perception.

18      You may consider the reasonableness or unreasonableness,

19  the probability or improbability of the testimony of a witness

20  in determining whether to accept it as true and accurate.  You

21  may consider whether the witness has been contradicted or

22  supported by other evidence that you credit.

23      If you believe that any witness has shown himself or

24  herself to be biased or prejudiced for or against either side in

25  the trial or motivated by self-interest, you may consider and

determine whether such bias or prejudice has colored the testimony of the witness so as to affect the desire and capability of that witness to tell the truth.

You should give the testimony of each witness such weight as in your judgment it is fairly entitled to receive.

The testimony of a police officer or law enforcement officer should be evaluated by you just as any other evidence in the case.  In evaluating the officer's credibility, you should use the same guidelines that you apply to the testimony of any witness.  In no event should you give either greater weight or lesser weight to the testimony of any witness merely because he or she is a police officer.

As I've told you before, every defendant in a criminal case has an absolute right not to testify.  Vitali GossJankowski has chosen, with the advice of his counsel, to exercise this right. You must not hold this decision against him, and it would be improper for you to speculate as to the reason or reasons for his decision.  You must not assume the defendant is guilty just because he chose not to testify.

In this case you heard the testimony of Dr. Mark Kroll, who expressed opinions concerning the device allegedly used by Mr. GossJankowski on January 6, 2021.

If scientific, technical, or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness who possesses knowledge,

skill, experience, training, or education may testify, and that witness may state an opinion or conclusion concerning such matters.

As with any witness, you may accept the witness's testimony in whole or in part, but you're not -- you are not bound to accept the witness's testimony or the witness's opinion.  If you find that the opinion is not based on sufficient education or experience or that the reasons supporting the opinion are not sound or that the opinion is outweighed by other evidence in the case, you may completely or partially disregard the opinion.

You should consider this evidence with all the other evidence in the case and give it as much weight as you think it fairly deserves.

Someone's intent or knowledge ordinarily cannot be proved directly, because there's no way of knowing what a person is actually thinking.  But you may infer someone's intent or knowledge from the surrounding circumstances.  You may consider any statement made or done by the defendant and all other facts and circumstances received in evidence which may indicate his or her intent or knowledge.  You may infer but are not required to infer that a person intends the natural and probable consequences of acts he or she intentionally did or intentionally did not do.

It is entirely up to you, however, to decide what facts to find from the evidence received during the trial.  You should

consider all of the circumstances and evidence that you think
are relevant in determining whether the government has proved
beyond a reasonable doubt that the defendant acted with the
necessary state of mind.

I'm going to talk to you about the specific counts of the
indictment in a couple minutes.  Each count of the indictment
charges a separate and distinct offense.  You should consider
each charge and the evidence which applies to it separately, and
you should return separate verdicts as to each count.  The fact
that you may find the defendant guilty or not guilty of one
count of the indictment should not influence your verdict with
respect to any other count of the indictment.

A verdict must represent the considered judgment of each
juror.  In order to return a verdict, each juror must agree with
the verdict.  In other words, the verdict on each count must be
unanimous.  On each count, it must be unanimous.

All right.  Now, as I told you way in the beginning, in
this case, Mr. GossJankowski is charged in six separate -- there
are six separate charges for you to consider.  And I'm going to
tell you now the elements that are required for each separate
count and in some cases give you definitions as well.  Again,
you will have a copy of this in front of you.

Count 1 of the indictment charges the defendant with
committing an act to obstruct, impede, or interfere with law
enforcement officers lawfully carrying out their official duties

incident to a civil disorder, which is a violation of federal
law.   Count 1 also charges the defendant with attempting to
commit an act to obstruct, impede, or interfere with law
enforcement officers lawfully carrying out their official duties
incident to a civil disorder.

So I will first explain the elements of the substantive
offense, along with certain definitions.  Then I will explain
how to determine whether the defendant attempted that
substantive offense.

So in order to find the defendant guilty of the primary
offense here, the substantive offense, you must find that the
government proved each of the following elements beyond a
reasonable doubt:  First, that the defendant knowingly committed
an act with the intended purpose of obstructing, impeding, or
interfering with one or more law enforcement officers; second,
that at the time of the defendant's act, the law enforcement
officer or officers were engaged in the lawful performance of
their official duties incident to and during a civil disorder;
third, that the civil disorder in any way or degree obstructed,
delayed, or adversely affected either commerce or the movement
of any article or commodity in commerce or the conduct or
performance of any federally protected function.

In order to find the defendant guilty of this offense, you
must unanimously agree on at least one specific officer who was
the intended victim of the defendant's acts of obstruction,

1    impediment, or interference.

2         Now for some definitions.  A person knowingly acts -- a

3    person acts knowingly if he realizes that what he is doing --

4    let me start again.

5         A person acts knowingly if he realizes what he is doing and

6    is aware of the nature of his conduct and does not act through

7    ignorance, mistake, or accident.  In deciding whether the

8    defendant acted knowingly, you may consider all of the evidence,

9    including what the defendant did or said.

10        The term "civil disorder" means any public disturbance

11   involving acts of violence by assemblages of three or more

12   persons which causes an immediate danger of or results in damage

13   or injury to the property or person of any other individual.

14        "Commerce" means commerce, A, between any state or the

15   District of Columbia and anyplace outside of that state or the

16   District of Columbia; or between points within any state and the

17   District of Columbia but through anyplace outside; or C, wholly

18   within the District of Columbia.

19        The term "federally protected function" means any function,

20   operation, or action carried out under the laws of the United

21   States by any department, agency, or instrumentality of the

22   United States or by an officer or employee thereof.

23        The term "department" includes executive departments.  The

24   Department of Homeland Security, which includes the United

25   States Secret Service, is an executive department.

1    The term "agency" includes any department, independent

2    establishment, commission, administration, authority, board, or

3    bureau of the United States.

4    The term "law enforcement officer" means any officer or

5    employee of the United States or the District of Columbia while

6    engaged in the enforcement or prosecution of any criminal laws

7    of the United States or the District of Columbia.

8    Now, in Count 1, the defendant is also charged with attempt

9    to commit the crime of obstructing officers during a civil

10   disorder.  An attempt to obstruct officers during a civil

11   disorder is a federal crime, even if the defendant did not

12   actually complete the crime of obstructing officers during a

13   civil disorder.

14   In order to find a defendant guilty of attempt to commit

15   the crime of obstructing officers during a civil disorder, you

16   must find that the government proved beyond a reasonable doubt

17   each of the following elements:  First, that the defendant

18   intended to commit the crime of obstructing officers during a

19   civil disorder.  As I have defined that offense already -- I've

20   already defined the offense of committing the crime of

21   obstructing officers during a civil disorder.

22   For an attempt, you must find first that the defendant

23   intended to commit that crime; second, that the defendant -- for

24   attempt, that the defendant took a substantial step toward

25   committing obstructing officers during a civil disorder which

strongly corroborates or confirms that the defendant intended to commit that crime.

With respect to the first element of attempt, you may not find the defendant guilty of attempting to obstruct officers during a civil disorder merely because he thought about it.  You must find the evidence proved beyond a reasonable doubt that the defendant's mental state passed beyond the stage of thinking about the crime to actually intending to commit it.

With respect to the second step, the substantial step element, you may not find the defendant guilty of attempting to obstruct officers during a civil disorder merely because he made some plans to or some preparation for committing that crime.  Instead, you must find that the defendant took some firm, clear, undeniable action to accomplish his intent to commit -- that's where the typo is -- to commit obstruction during a civil disorder.  However, the substantial step element does not require the government to prove that the defendant did everything except the last act to complete the crime.

All right.  So these are important instructions.  I know they may be somewhat complicated, but I'm going through step by step, and I hope you are following me.  You will have copies of these instructions in the jury room.  If everybody is with me so far, I will move to Count 2.

Count 2 of the indictment charges the defendant with corruptly obstructing an official proceeding, which is a

violation of the law.  Count 2 also charges the defendant with
attempting to obstruct or impede an official proceeding and with
aiding and abetting others to commit that offense.

So first, I will explain the elements of the substance of
the offense, along with certain definitions.  Then I will
explain how to determine whether the defendant attempted that
offense and whether he may have aided and abetted the offense.

So first, in order to find the defendant guilty of
obstruction of an official proceeding, you must find that the
government proved each of the following elements beyond a
reasonable doubt:  First, that the defendant attempted to or did
obstruct or impede an official proceeding; second, that the
defendant acted with the intent to obstruct or impede the
official proceeding; third, that the defendant acted knowingly,
with awareness that the natural and probable effect of his
conduct would be to obstruct or impede the official proceeding;
and fourth, that the defendant acted corruptly.

The term "official proceeding" includes a proceeding before
the Congress.  The official proceeding need not be pending or
about to be instituted at the time of the offense.  If the
official proceeding was not pending or about to be instituted,
the government must prove beyond a reasonable doubt that the
official proceeding was reasonably foreseeable to the defendant.

As for the term "knowingly," it has the same meaning that I
gave you previously when describing the earlier count.

1    To act corruptly, the defendant must use unlawful means or

2    have an improper purpose, or both.

3    The defendant must also act with consciousness of

4    wrongdoing.  Consciousness of wrongdoing means with an

5    understanding or awareness that what the person is doing is

6    wrong.

7    Now I'm moving on to attempt.  In Count 2, the defendant is

8    also charged with attempt to commit the crime of obstruction of

9    an official proceeding.  An attempt to commit obstruction of an

10   official proceeding is a crime even if the defendant did not

11   complete the crime of obstruction of an official proceeding.

12   In order to find a defendant guilty of attempt to commit

13   obstruction of an official proceeding, you must find that the

14   government proved beyond a reasonable doubt that -- each of the

15   following two elements:  First -- this is for attempt -- that

16   the defendant intended to commit the crime of obstruction of an

17   official proceeding as I have just defined that offense; and

18   second, that he took a substantial step toward committing

19   obstruction of an official proceeding which strongly

20   corroborates or confirms that the defendant intended to commit

21   that crime.

22   Then there is aiding and abetting.  In this case, the

23   government also alleges that the defendant aided and abetted

24   other people in committing obstruction of an official proceeding

25   as charged in Count 2.

1        So I'm going to tell you about aiding and abetting and

2   underscore that this instruction on aiding and abetting only

3   applies to this count.  It's the only count of which there's a

4   charge of aiding and abetting.

5        In order to find the defendant guilty of obstruction of an

6   official proceeding because he aided and abetted others in

7   committing the offense, you must find the government proved

8   beyond a reasonable doubt the following five things:  First,

9   that others committed obstruction of an official proceeding by

10  committing each of the elements of the offense charged as I've

11  explained above; two, that the defendant knew that an

12  obstruction of an official proceeding was going to be committed

13  or was being committed by others; three, that the defendant

14  performed an act or acts in furtherance of the offense; fourth,

15  that the defendant knowingly performed an act or acts for the

16  purpose of aiding, assisting, soliciting, facilitating, or

17  encouraging others in committing the offense of obstruction of

18  an official proceeding; fifth, that the defendant did that act

19  or acts with the intent that others commit the offense of

20  obstruction of an official proceeding.

21       Some affirmative conduct by the defendant in planning or

22  carrying out the crime is necessary.  Mere physical presence by

23  Mr. GossJankowski at the place and time the crime is committed

24  is not by itself sufficient to establish guilt of aiding and

25  abetting.

Evidence that Mr. GossJankowski merely associated with persons involved in a criminal venture or was merely present or was merely a knowing spectator during the commission of the offense is not enough for you to find Mr. GossJankowski guilty as an aider or abettor.

I'm going to go on to Count 3.  Count 3 of the indictment charges Mr. GossJankowski with forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with an officer of the United States, specifically Morris Moore, who was engaged in the performance of his official duties, which is a violation of federal law.

This count also charges that the defendant, in the commission of such acts, used a deadly or dangerous weapon, made physical contact with Morris Moore, and acted with the intent to commit another felony.

First, you should consider whether the defendant is guilty of forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with an officer of the United States who is engaged in the performance of his official duties while using a deadly or dangerous weapon.

Whether or not you find the defendant guilty or not guilty of that, you must go on to consider whether the defendant is guilty or not guilty of forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with an officer of the United States who is engaged in the performance of his

official duties without using a deadly or dangerous weapon,
while making physical contact with the person, or acting with
the intent to commit another felony.

I will discuss each of these offenses in turn.  First, the
elements of assaulting, resisting, or impeding officers using a
deadly or dangerous weapon.

In order to find that the defendant is guilty of forcibly
assaulting, resisting, opposing, impeding, intimidating, or
interfering with an officer of the United States who is engaged
in the performance of his official duties while using a deadly
or dangerous weapon, you must find the following elements beyond
a reasonable doubt:  First, that the defendant forcibly
assaulted, resisted, opposed, impeded, intimidated, or
interfered with United States Capitol Police Officer Morris
Moore; second, that the defendant did such acts voluntarily and
intentionally; third, that the person that the defendant
assaulted, resisted, opposed, impeded, intimidated, or
interfered with, Morris Moore, was an officer or employee of the
United States or any agency in any branch of the United States
government; fourth, that Morris Moore was engaged in or on
account of the performance of his official duties when the
defendant acted; and fifth, that in doing such acts, the
defendant used a deadly or dangerous weapon.

Now, the second different -- the second different thing you
must consider is the following:  In order to find the defendant

guilty of forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with an officer of the United States who is engaged in the performance of his official duties while making physical contact with the victim or acted with the intent to commit another felony, you must find the following elements beyond a reasonable doubt.

And you will notice as I just characterized this offense, there is no mention here of a deadly or dangerous weapon. That's the first thing you consider. Now you're considering these counts which do not involve that -- this charge which does not involve that.

So here are the elements you must find beyond a reasonable doubt: First, that the defendant forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with Morris Moore; second, that the defendant did such acts voluntarily and intentionally; third, that the person the defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with, Morris Moore, was an officer or employee of the United States or any agency in any branch of the United States government; that Morris Moore was engaged in or on account of the performance of his official duties when the defendant acted; fifth, that the defendant made physical contact with Morris Moore or that the defendant acted with the intent to commit the crime with which he is charged in the preceding count, Count 2.

In order to find the defendant guilty of this offense, you

must decide unanimously whether the defendant's forcible conduct resulted in physical contact with Officer Moore or whether the defendant acted with the intent to commit Count 2 while engaged in forcible conduct.

The government does not have to prove both, but you must unanimously find beyond a reasonable doubt that the government proved one or the other in order to find the defendant guilty.

Okay.  So let me underscore this last point.  For this charge, there are five separate elements, which I've just listed for you.  But what I'm talking about here at the end is just the fifth of those five elements.

So one of the things the government must prove beyond a reasonable doubt is that the defendant made physical contact with Morris Moore or that the defendant acted with the intent to commit the offense charged in Count 2, that is, the obstruction of an official proceeding count.

So in order to find the defendant guilty, you must decide unanimously, one, whether the defendant's forcible conduct resulted in physical contact with Officer Moore or, two, whether the defendant acted with the intent to commit Count 2, that is, obstruction of an official proceeding while engaged in forcible conduct.

The government does not have to prove both, but you must unanimously find beyond a reasonable doubt that the government proved one or the other or both in order to find the defendant

guilty of this offense.

Definitions.  A person acts forcibly if he uses force, attempts to use force, or threatens to use force against the officer.  A threat to use force at some unspecified time in the future is not sufficient to establish that a defendant acted forcibly.

The term "assault" means any intentional attempt or threat to inflict injury upon someone else when coupled with a present apparent ability to do so.  Finding that one used force or attempted or threatened to use it is not the same as a finding that he attempted or threatened to inflict injury.

In order to find the defendant committed an assault, you must find beyond a reasonable doubt that the defendant acted forcibly and that he intended to inflict or intended to threaten injury.

The terms "resist," "oppose," "impede," "intimidate," and "interfere with" carry their everyday, common, ordinary meanings.  But all of these acts, assault, resist, oppose, impede, intimidate, and interfere with, are modified by the word "forcibly."  Thus, before you can find the defendant guilty, you must find beyond a reasonable doubt that he acted forcibly.

An object may be considered a deadly or dangerous weapon for one of two reasons.  An object is deadly or dangerous where it is inherently dangerous, meaning that the design of the

object is such that in its ordinary use it is likely to cause serious bodily injury or death.

For example, a loaded gun is inherently dangerous.  An object also may be deadly or dangerous if the device is capable of causing serious bodily injury or death to another person and the defendant used it in that manner.

In determining whether the object is a deadly or dangerous weapon, you may consider both the physical capabilities of the object used and the manner in which the object is used.

All right.  Count 4 -- moving on, Count 4, Count 4 of the indictment charges the defendant with entering or remaining in a restricted building or grounds while using or carrying a dangerous or deadly weapon, which is a violation of federal law. I will instruct you on the lesser included offense also of entering or remaining in a restricted building or grounds.

You should consider first whether the defendant is guilty of entering or remaining in a restricted building or grounds while using or carrying a deadly or dangerous weapon.  If you find that the defendant is guilty of this offense, you do not go on to the lesser included offense of -- that I will also describe.  But if you find him not guilty of the primary offense, you should go on to consider whether he's guilty of entering or remaining in a restricted building or grounds.

The order in which you should consider these charges will be set forth in a verdict form, which I will give you for your

1    guidance later.

2         I will now discuss each of these crimes in turn.

3         In order to find the defendant guilty of entering or

4    remaining in a restricted building or grounds with a deadly or

5    dangerous weapon, you must find that the government proved each

6    of the following elements beyond a reasonable doubt:  First,

7    that the defendant entered or remained in a restricted building

8    or grounds; second, that the defendant did so without lawful

9    authority; third, that the defendant did so knowingly; fourth,

10   that the defendant knowingly used or carried a deadly or

11   dangerous weapon during and in relation to this offense.

12        Now the lesser included offense.  In order to find the

13   defendant guilty of entering or remaining in a restricted

14   building or grounds, you must find first that the defendant

15   entered or remained in a restricted building or grounds; second,

16   that the defendant did so without lawful authority; third, that

17   the defendant did so knowingly.

18        Definitions.  The term "restricted building or grounds"

19   means any posted, cordoned off, or otherwise restricted area of

20   a building or grounds where a person protected by the Secret

21   Service, here the vice president, Vice President Pence, is

22   temporarily visiting or will be temporarily visiting.

23        The term "knowingly" has the same meaning that I gave you

24   before.  The term "deadly or dangerous weapon" has the same

25   meaning that I gave you before.  To find that the defendant used

or carried a deadly or dangerous weapon, you must find beyond a reasonable doubt that the object was capable of causing serious bodily injury or death to another person and that the defendant carried the object with the intent to use it in a manner capable of causing serious bodily injury or death to another person. The defendant need not have actually used the object in that manner under Count 4.

Count 5 -- Count 5 of the indictment charges the defendant with disorderly or disruptive conduct in a restricted building or grounds while using or carrying a dangerous or deadly weapon, which is a violation of federal law.

I will also instruct you on the lesser included offense of disorderly and disruptive conduct in a restricted building or grounds.

You should first consider whether the defendant is guilty of disorderly and disruptive conduct in a restricted building or grounds while using or carrying a deadly or dangerous weapon. If you do -- if you find the defendant guilty of this offense, do not go on to the lesser included offense. If you find the defendant not guilty, you should go on to consider whether he is guilty of a -- disorderly and disruptive conduct in a restricted building or grounds.

The order in which you should consider these charges will be reflected in the verdict form that I will be giving you.

I will now discuss each of these in turn.  In order to find

the defendant guilty of disorderly or disruptive conduct in a
restricted building or grounds with a deadly or dangerous
weapon, you must find that the government proved each of the
following elements beyond a reasonable doubt:  First, that the
defendant engaged in disorderly or disruptive conduct in or in
proximity to any restricted building or grounds; second, that
the defendant did so knowingly and with the intent to impede or
disrupt the orderly conduct of government business or official
functions; third, that the conduct occurred when or so that his
conduct impeded or disrupted the orderly conduct of government
business or official functions; fourth, that the defendant
knowingly used or carried a deadly or dangerous weapon during
and in relation to the offense.

Okay.  Now the lesser included offense.  In order to find a
defendant guilty of disorderly or disruptive conduct in a
restricted building or grounds, you must find the following:
First, that the defendant engaged in disorderly or disruptive
conduct in or in proximity to any restricted building or
grounds; second, that the defendant did so knowingly and with
the intent to impede or disrupt the orderly conduct of
government business or official functions; third, that the
defendant's conduct occurred when or so that his conduct in fact
impeded or disrupted the orderly conduct of government business
or official functions.

Disorderly conduct occurs when a person is unreasonably

loud and disruptive under the circumstances or interferes with another person.  It may include loud, threatening, or abusive language or acting in a manner so as to cause another individual to be in reasonable fear that some harm to their person or property is likely.  It is behavior that tends to disturb the public peace, offend public morals, or undermine public safety.

Disruptive conduct is a disturbance that interrupts the normal business or orderly conduct of an event, public activity, or gathering.

The term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area of the building or grounds where a person protected by the Secret Service, here Vice President Pence, is temporarily visiting or will be temporarily visiting.

The term "knowingly" has the same meaning that I gave you previously.  The term "deadly or dangerous weapon" has the same meaning that I gave you previously.

To find that the defendant used or carried a deadly or dangerous weapon, you must find beyond a reasonable doubt that the object was capable of causing serious bodily injury or death to another person and the defendant carried the object with the intent to use it in a manner capable of causing serious bodily injury or death to another person.

The defendant need not have -- I will go back.  The defendant need not have actually used the object in that manner.

Finally, Count 6.  Count 6 of the indictment charges the defendant with disorderly conduct in a Capitol building or grounds, which is a violation of federal law.

In order to find the defendant guilty of this offense, you must find that the government proved each of the following elements beyond a reasonable doubt:  First, that the defendant engaged in disorderly or disruptive conduct in any of the United States Capitol buildings or grounds; second, that the defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either house of Congress; third, that the defendant acted willfully and knowingly.

The term "United States Capitol building or grounds" includes the United States Capitol located at First Street Southeast in Washington, D.C., and its grounds, which includes all squares, reservations, streets, roadways, walks, and other areas as defined on a map entitled "map showing areas comprising United States Capitol grounds" dated June 25, 1946, approved by the Architect of the Capitol and recorded in the Office of the Surveyor of the District of Columbia in Book 127, page 8.

The term "disorderly or disruptive conduct" has the same meaning I described to you in the instruction on Count 6 defining disorderly conduct and defining disruptive conduct.

The term "knowingly" has the same meaning that I gave you previously.

1        Finally, as to all of these counts, mere presence -- mere

2    presence at the scene of a crime or mere knowledge that a crime

3    is being committed is not sufficient to establish that the

4    defendant committed the crimes with which he is charged.

5    Mr. GossJankowski must be a participant and not merely a knowing

6    spectator.  Mr. GossJankowski's presence may be considered by

7    you, the jury, along with other evidence in the case.

8        Counsel, why don't you come to the bench.

9        (Bench conference.)

10        THE COURT:  What I want to ask is whether I made any

11    mistakes, misstated anything, missed anything.

12        MR. DREHER:  No, Your Honor.

13        MR. SMOCK:  I don't believe so, Your Honor.

14        THE COURT:  Everybody's prior objections are

15    preserved, obviously.  So 15 minutes, and then we will start

16    with the government's closings.  And I said we will try to do

17    all of this before lunch, and I would like to, but we will

18    revisit that question depending upon what time it is.

19        (End of bench conference.)

20        THE COURT:  Okay.  Those are my instructions on the

21    law.

22        So we are going to take about a 15-minute break so

23    everybody can relax, you included, interpreters and the court

24    reporter, and so -- and so the government can get all its ducks

25    in order for its closing argument, which will begin in 15

1   minutes.

2          (Recess taken from 11:08 a.m. to 11:31 a.m.)

3          (Jury not present.)

4              THE COURT:  Are we ready for the jury?

5              MR. VALENTINI:  Yes, Your Honor.

6          (Jury entered courtroom.)

7              THE COURT:  Okay.  Everybody here?  Everybody ready?

8   You look ready.

9      Okay.  Government, Mr. Valentini, you may begin whenever

10  you're ready.

11             MR. VALENTINI:  Thank you, Your Honor.

12     Ladies and gentlemen of the jury, good morning.  Thank you

13  for your patience over the last two and a half weeks.  We all

14  really appreciate it.

15     January 6 was a dark day for our democracy, for the

16  peaceful transfer of power between administrations.  January 6

17  was also a dark day for the men and women in uniform who were

18  rushed to the Capitol to protect the building that day and the

19  people in it.

20     You have heard in this trial from many of those heroes.

21  You have heard from Captain Ortega.  You have heard from Officer

22  Beaver.  You have heard from Officer Spooner.  And of course,

23  you have heard from United States Capitol Police Officer Morris

24  Moore, the officer whom the defendant in this case, Vitali

25  GossJankowski, assaulted with a stun gun outside the Lower West

Terrace tunnel.

January 6 was also a dark day for those charged with protecting the Vice President of the United States as he was temporarily visiting the Capitol that day.  You have heard from United States Secret Service Inspector Lanelle Hawa.  She told you how January 6 was unlike any situation she has experienced in her decades of service for the Secret Service.

And January 6 was also a dark day for our city.  A curfew was imposed, effective 6:00 p.m. that day.  Even the most mundane of economic activities ground to a halt.  Safeway, a supermarket chain that prides itself in being open no matter what, no matter how, closed at 4:00 p.m. that day.

In Mr. Tippett's words, January 6 was a catastrophe.  But January 6 was not a catastrophe of the natural kind.  There was no earthquake.  There was no snow blizzard.  There was no flood. January 6 was a catastrophe that was brought out by the work of an angry mob that descended upon the Capitol because they did not like the outcome of a presidential election.  January 6 was the work of an angry mob that descended upon the Capitol because it wanted to stop the certification of the Electoral College that day.

The defendant in this case, Vitali GossJankowski, joined that mob knowing perfectly well what Congress was required to do that day, the certification of the Electoral College.  And he joined that mob with a specific corrupt intent, to stop the

1    proceeding in its tracks.

2         Most everything the defendant did in this case that

3    afternoon, prior to getting into the tunnel, in the tunnel, and

4    right outside the tunnel, was in service of that objective, to

5    stop the certification of the Electoral College.  That is why,

6    after entering the restricted perimeter, Mr. GossJankowski did

7    not stop.  He continued to breach inner perimeter after inner

8    perimeter until he got to the Capitol building itself.

9         That is why, when the opportunity arose after the police

10   line failed and collapsed on the west front, Mr. GossJankowski

11   was among the first at 2:42 p.m. to reach the Lower West Terrace

12   tunnel, the nerve center of the Capitol, as Captain Ortega

13   explained to you.

14        That is why Mr. GossJankowski repeatedly incited the crowd

15   who was standing out on the inaugural stage.  He beckoned them

16   forward.  He did that because he understood a riot's strength

17   lies in its numbers.  You cannot stop the certification of the

18   Electoral College without taking over Congress, and you cannot

19   take over Congress and overtake the police line without numbers.

20        And that is why Mr. GossJankowski helped other rioters

21   deprive the police officers of the one tool of protection, those

22   plastic shields that they had, first by passing them back as the

23   frontline rioters were stripping them from the officers and then

24   moving forward and grabbing a sergeant's mask and shield itself.

25        That is, of course, why Mr. GossJankowski assaulted Capitol

Police Officer Morris Moore on the front steps outside the Lower West Terrace tunnel, grabbing Officer Moore by his helmet with his right hand, pulling him towards himself, and then bearing down on the officer with his left hand with a stun gun in hand.

Ladies and gentlemen, you have watched a lot of videos over the last two weeks.  You have heard a lot of testimony.  I will not rehash every bit of testimony that you have heard, and I will not replay every video that's in evidence.  You can rewatch as much of that video as you need to make your decision once you are in the deliberation room.

But I will limit myself and highlight the most critical facts, and I will try to explain how those facts establish beyond a reasonable doubt every single element you need to find to find Mr. GossJankowski guilty of every crime charged in the indictment.

By the time January 6 came around, the defendant already knew full well what was going to happen in Congress that day.  It's Exhibit 303.  It's taken from the defendant's Facebook records.  It's a Facebook text that the defendant wrote.  He explained to a Facebook friend, "Tomorrow, it's the Congress to certify the electoral vote."

He also understood taking over Congress on that day will require tactical thinking.  And in fact, even before he wrote this message on January 5, the day before January 6, the defendant had started making arrangements with like-minded

individuals, on Facebook again, on how "to set up an arrangement to meet to make a big gathering before we start marching."

Marching.  Marching where?  You, the jury, can draw that inference based upon what you saw Mr. GossJankowski do on January 6.

Let's turn to January 6 itself.  You watched a lot of videos.  We started off with Exhibit 130.  Mr. GossJankowski on the early afternoon of January 6 was outside the West Front in the proximity of the scaffolding that was put in place in preparation for the inauguration.  You will remember, Captain Ortega told you that by this point, by the time he reached this location, the defendant had already trespassed the restricted area that had been set up to protect the Capitol, to protect Congress, on January 6.  Everything he does after this point on January 6 is within the restricted area.

But Mr. GossJankowski does not stop at the scaffolding.  He makes his way up the west staircase from the Lower West Terrace tunnel towards the Capitol building itself.  He walks up past the scaffolding.  He then makes an important turn.  He turns onto a platform, if you will recall, that was set up right in front of the stadium seating.

And from that platform, you will see, he takes a stand -- or a seat in the stadium seating that had been set up in preparation for the inauguration.

Now, why is this important?  It is important because from this position, from this location, Mr. GossJankowski has a direct line of sight down to the inaugural stage where you can see the police in crisis and down on the Lower West Terrace where the battle rages on between the police officers as they are retreating and the rioters.

By now, by this point, this image, his position, forecloses any claim that he didn't know what was going on, that he didn't know a riot was going on on January 6, 2021.

But of course, that is not where the defendant stops on January 6, 2021.  Instead, as the police is retreating into the Lower West Terrace tunnel, the defendant seizes on the opportunity to get closer and closer to that building where Congress is required and is scheduled and is supposed to be certifying the outcome of the 2020 presidential election.

And so the defendant converges on the Lower West Terrace tunnel, the Lower West Terrace door that you heard so much about over the last two weeks.  Now, you will remember that Captain Ortega explained to you the strategic and the historic importance of the Lower West Terrace door.  Historically, that is the passageway through which every president-elect has walked in recent memory to reach the inaugural stage and become the President of the United States.  That is what was supposed to happen two weeks later on January 20th.

And that Lower West Terrace door also carries, as Captain

Ortega explained to you, critical strategic importance.  Why?
Well, this map of the Capitol shows it to you, too.  From there,
the Rotunda, the heart of the Capitol, is only a few minutes'
walk away and a couple of flights up.  From there, the rioters
can reach the Senate chamber, the House chamber.  You remember
Captain Ortega's testimony.

But to Vitali GossJankowski, reaching the Lower West
Terrace door was only the beginning.  To take over the Congress
to stop the certification for good, the mob must get inside.

So what does he do?  Well, for one thing, he watches, and
he makes his way to the front of that line.  He takes a sip of a
water bottle discarded on the side.  And from there, he has a
front row seat to what is going on right in front of him.  And
you can see what is going on right in front of him from the
body-worn camera of the officers inside, specifically from the
body-worn camera of Sergeant Bogner.  Mr. GossJankowski has a
front-row view to the destruction of the double glass doors in
the Lower West Terrace tunnel.

Now, you may have noticed just a second ago as I was
replaying Exhibit 100.1 at 2:42 p.m., that the defendant seemed
at some point to inch backwards, to retreat momentarily to the
threshold of the archway.  You might think that he's ready to go
home now, having watched the destruction of the Lower West
Terrace glass door.  He is retreating for a moment.

But Sergeant Bogner explained that that was not what the

defendant was doing or explained why that is not what the

defendant was doing.  What the defendant was doing was seeking

repair from the OC spray that Sergeant Bogner, who was appalled

at the fact that the rioters had just destroyed those glass

doors, was spraying into the West Terrace tunnel.

And that's also why moments later, by 2:45, the defendant

is back to the front of the line.

(Video played.)

MR. VALENTINI:  Again, he walks through shattered

glass, shattered glass from a door where only minutes earlier,

two large black signs with white lettering said "members

entrance only."

(Video played.)

MR. VALENTINI:  And from there, again, the defendant

has a front-row seat to the destruction of the other rioters who

was using a flag pole against the police line on the inside of

those double doors.

Now, you will remember, Captain Ortega told you -- Captain

Ortega knows this building inside and out.  He's worked there a

long time.  He told you how far is Mr. GossJankowski from the

attack at that point, and he said within arm's reach.

That's not the only thing that Vitali GossJankowski

accomplishes as he stands at the front of that line at 2:45,

only three minutes after first arriving at the Lower West

Terrace tunnel.  The other thing he does is start confronting

1    the police officers.

2         (Video playing.)

3         MR. VALENTINI:  He wags his finger, and then he spits

4    at them twice.  You will remember that Officer Beaver testifies

5    that she remembers being spat on on that day in that tunnel.

6         Now, you've also heard from the police officers that this

7    battle, the rage in the Lower West Terrace tunnel, went in

8    waves.  There were times when the rioters were advancing, there

9    were times where the police officers were receding, and back and

10   forth.  And that was in part, as you recall from the testimony,

11   because there were so many chemicals in the tunnel and because

12   of the intensity of the battle within that tunnel.

13        And so at 2:46 p.m., the defendant is taking one of those

14   breaks, is cycling back out to the front of the archway.  But

15   what he does when he does that is proof positive of his intent

16   that day.  He moves back.  He sees the crowd out on the

17   inaugural stage.  And he beckons them forward.  Again, that is

18   critical proof of his intent.  He wanted the numbers in that

19   tunnel because he wanted to take over that entryway so they

20   could take over Congress and stop the certification of the

21   Electoral College once and for all.

22        You can see he does this at 2:46:14.  He does it at

23   2:46:37.  He also signals to the crowd strength or we need

24   strong people to take over this line.  He's inciting the crowd.

25        As time goes on and as the rioters are not making -- not

1  able to breach this door that is defended by the Capitol Police

2  officers and the MPD officers, the defendant becomes

3  increasingly aggressive, increasingly physical in his

4  confrontation.  That's why at 2:46:21, you see him for the first

5  time touch and reach for one of those shields, the

6  quintessential tool of protection for the Capitol Police and the

7  MPD officers whom the rioters are stripping from the police

8  officers and throwing back into the crowd so they cannot use

9  them anymore.

10      The defendant does this at 2:46:21 and does it again at

11  2:53:40 and 2:53:54.

12      2:53 p.m. is an important time in the defendant's day at

13  the Capitol.  In fact, it is a pivotal turning point.  That is

14  when he receives from another rioter a device.

15      (Video played.)

16          MR. VALENTINI:  The defendant's reaction when he first

17  receives this device tells you everything you need to know about

18  the defendant's state of mind and what he plans to do and what

19  he wants to accomplish that day.  He's jubilant.  He shows it

20  off to other rioters.  He plays with it.  He activates it.

21      As you know, many individuals, both -- many individuals at

22  the Capitol that day had cell phones with them and were

23  recording the events of the day.

24      This exhibit, 141.1, is a different view of the defendant's

25  reaction as he's receiving the device, the stun gun.

1        (Video played.)

2             MR. VALENTINI:  There's no regret.  There's no

3    concern.  There's no alarm.  He just received a stun gun.  What

4    does he do?  He's smirking.  He's happy about it.  It's exactly

5    what he needs to do what he wants and what he needs to do at the

6    Capitol.

7        (Video played.)

8             MR. VALENTINI:  And here's the other thing that is

9    critical about that moment, about his receipt of that stun gun.

10   The defendant is emboldened by it.  You can see immediately,

11   after receiving the stun gun, the defendant moves forward.  He's

12   triggering it, he's bouncing up and down, and he's shining it at

13   police officers, in the direction of police officers.

14       That, ladies and gentlemen, is a direct threat to those

15   police officers.

16       (Video playing.)

17            MR. VALENTINI:  Not only that, the defendant is

18   emboldened.  He does again what he does so often that afternoon.

19   He spits at the police officers twice.

20       Now, I said that the defendant was proud, was jubilant

21   about receiving the stun gun.  Let's see what he does minutes

22   after receiving the stun gun outside of the Lower West Terrace

23   tunnel.

24       (Video played.)

25            MR. VALENTINI:  He shows it off to some seemingly

strangers.  He triggers it.  He activates it.  He boasts about

it.  And that is exactly what Vitali GossJankowski did later on

that afternoon on Facebook when he texted a friend, "I have a

Taser, LOL."  You can judge whether that Taser was an LOL matter

to the officers on the other side of those doors.

He also has a picture of that Taser -- of that stun gun,

excuse me, in his Facebook, a picture decorated with emojis.

Back to the Lower West Terrace tunnel, now that he has a

stun gun, now that he's armed with a stun gun, as I said, the

defendant is emboldened.  He moves forward, and he becomes more

and more physical in his confrontation with the police.

So that's when the defendant reaches for Sergeant Mastony's

shield on the other side of the glass doors.

(Video playing.)

MR. VALENTINI:  And that is the view from

Sergeant Mastony's body-worn camera on January 6.  As you have

seen, the defendant is not successful in grabbing and stripping

the shield away from Sergeant Mastony.  But that's not the

point.  What matters is the defendant making it in to Congress

and interrupting the certification of the certification

proceeding violently or by any other means.

The violence in the Lower West Terrace tunnel escalates

only minutes later at approximately 3:11 in the afternoon.  That

is when the crowd, the rioters, the mob engages in this sort of

concerted push, this medieval heave-ho, if you will.

1          (Video played.)

2          MR. VALENTINI:  And again, at 3:11:55 p.m., the

3    defendant is right there, ready to join in the action.

4          (Video played.)

5          MR. VALENTINI:  What the defendant does next is one of

6    the most important parts of this case.  As you will recall,

7    later, after the heave-ho, the crowd, the police line starts

8    pushing forward and cleaves at least momentarily the Lower West

9    Terrace tunnel from the mob that was assembled there.

10         As a part of this push, two officers are separated from the

11   police line.  One officer goes off to the side, where he gets

12   assaulted.  The other officer is United States Capitol Police

13   Officer Morris Moore.  You have heard from Officer Moore in this

14   trial.  You have seen the video of Morris Moore's assault in

15   this trial.  It's Exhibit 144.2.  It's a 360-degree video,

16   three-dimensional, and the assault starts at about time mark

17   4:50 until time mark 5:40 in that video.

18         I urge you to watch that video as many times as you need in

19   the deliberation room until you're satisfied of what you see and

20   you're satisfied that you know what happened.  Take your time.

21   Slow it down if you need to.  Zoom in if you need to.  There is

22   nothing nefarious about doing that.  That is your job, finding

23   out what you see in that video, finding out what happened

24   outside the Lower West Terrace tunnel on January 6, 2021.

25         The video shows that Vitali GossJankowski, first as Officer

1   Moore is approaching, furiously fidgets and operates and

2   activates the stun gun that he received only minutes earlier.

3   The video then shows Vitali GossJankowski reaches forward with

4   his right arm, extends.  He grabs the helmet of Officer Moore,

5   the helmet with the lettering "MPD," the helmet that Officer

6   Morris Moore had retrieved, abandoned from the ground, because

7   he had the quick judgment of thinking that that helmet would

8   serve a better purpose on his head than on a rioter's head.  The

9   defendant grabs the helmet.  He pulls the officer towards him.

10  And then he comes bearing down with his left arm that holds the

11  stun gun.

12       This is what Exhibit 144.2 shows.  So let me play that

13  video for you.

14       (Video played.)

15            MR. VALENTINI:  Look for the reflective jacket, the

16  reflective vest that Officer Morris Moore was wearing, because

17  that day, he didn't think he would be fighting off a riot.  He

18  thought he would be working at the loading dock, where he was

19  supposed to be on duty that day.

20       (Video played.)

21            MR. VALENTINI:  You see the defendant follow him,

22  furiously tinkering with the stun gun.  You see the defendant

23  stretching as far as he can until he grabs ahold of the MPD

24  helmet that Capitol Police Officer Morris Moore is wearing.  You

25  see the defendant pulling the helmet, pulling Officer Moore by

1    the head close to him, and you will see the defendant come

2    bearing down with his left arm that carries the stun gun on the

3    officer's head.

4        These are the critical facts in this case.  For these

5    facts, the defendant has been charged with six counts, six

6    different offenses.  Judge Friedman is instructing you as to

7    elements of each one of the six offenses.  The evidence is

8    overwhelming as to each element of each of those offenses.  The

9    defendant's guilty on all counts.

10       And in the remainder of my time with you today, I will walk

11   through each one of those counts and map how the evidence that

12   you have seen, that you have heard over the course of this trial

13   establishes each and every one of those elements.

14       Count 1 charges the defendant with civil disorder.  First

15   element, you have to find that the defendant knowingly committed

16   an act or attempted to commit an act with the intended purpose

17   of obstructing, impeding, or interfering with one or more law

18   enforcement officers.

19       As the Judge instructed you, you must agree on at least one

20   officer victim, but you can also agree on more than one.  And

21   one officer victim is obvious.  It's Officer Moore, who you just

22   saw being assaulted by the defendant that day.  By assaulting

23   Officer Moore, the defendant knowingly committed an act with the

24   intended purpose of obstructing, impeding, or interfering with

25   one or more law enforcement officers.

1    But you can also find that the defendant committed an act

2    with the intended purpose of obstructing other officers.  You

3    can find that act established when the defendant reached for

4    Sergeant Mastony's shield inside that tunnel.  You can find that

5    act established when the defendant wags his finger and then

6    spits in the direction of Officer Beaver inside that tunnel.

7    You can find all of those.

8    Second element, the law enforcement officer or officers

9    were engaged in the law performance of their official duties

10   incident to and during a civil disorder.

11   There is no question that each and every one of the

12   officers that you have heard from in this case was engaged in

13   the lawful performance of their official duties that day.  That

14   is true of Officer Moore.  That is true of Officer Beaver.  That

15   is true of Sergeant Mastony.  It's true of Sergeant Bogner.  And

16   it's true of Officer Spooner.

17   How about the fact that the official duties must be

18   incident to and during a civil disorder?  Well, the Judge told

19   you what a civil disorder is.  It means any public disturbance

20   involving acts of violence by assemblages of three or more

21   persons which causes an immediate danger of or results in damage

22   or injury to the property of person of any other individual.

23   There is no question that the riot on January 6 at the

24   Capitol was a civil disorder.

25   Third, you must find that the civil disorder in any way or

degree obstructed, delayed, or adversely affected either

commerce or the movement of any article or commodity in commerce

or the conduct or performance of any federally protected

function.

Here, you have two options, both of which are established.

First, you can focus on Mr. Tippett's testimony about the impact

that the civil disorder, the January 6 and the curfew that

resulted from events at the Capitol, had on Congress.  He

testified that Safeway had to close at 4:00 p.m. that day.  Not

11:00.  Not 24/7.  It had to close at 4:00 p.m. that day.  There

were no sales at Safeway after 4:00 p.m. that day.  There also

were no shipments received by Safeway after 4:00 p.m. that day.

That easily establishes this commerce requirement.

Or in addition, you could find that the evidence

establishes a link to a federally protected function.  If you

remember how the Judge told you the federally protected function

is defined, it includes essentially any function of any federal

department.  That includes the Secret Service function of

protecting the vice president.

And you heard from United States Secret Service Inspector

Lanelle Hawa that the vice president was moved, was evacuated to

a secure location.  That adversely affected the Secret Service's

protective function.  For that reason, too, the third element is

established beyond a reasonable doubt.

Count 2 charges the defendant with obstruction of an

official proceeding and aiding and abetting the obstruction of an official proceeding.  You have to find that the defendant attempted to or did obstruct or impede an official proceeding.

What is the official proceeding here?  That is straightforward.  It is the General Session of Congress that Dan Schwager, former general counsel to the Secretary of the Senate, talked to you about.  I hope you remember that civic lesson.  We learned a lot about that proceeding.  Well, that is an official proceeding.

Did the defendant's actions intend to or obstruct that official proceeding?  Well, that was the whole point.  That is why the defendant and the angry mob was attempting to take over Congress.

The other three elements are all intertwined and all deal with intent.  The second element asks you to find that the defendant acted with the intent to obstruct or impede the official proceeding.  The third element requires you to find that the defendant acted knowingly, meaning with the awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding.  Let me take these two in reverse.

As to the defendant's knowledge, the defendant knew exactly what was going to happen on January 6 at the Capitol.  We know it from Exhibit 303, his Facebook text on January 5 when he tells his friend, Oh, here's what's happening tomorrow, it's the

certification of the Electoral College.

And when the defendant chooses to lay siege to the Capitol at the exact time and at the exact place where he knows Congress is supposed to be certifying the outcome of the Electoral College, that means he's acting knowingly and he's acting with intent to obstruct or impede the official proceeding.

As I said before, everything -- most everything that the defendant did on that afternoon is proof of his intent to stop the certification of the Electoral College.

So let's move on to the fourth element, the defendant acted corruptly.  That means by using unlawful means or acting with an unlawful purpose, or both, and with consciousness of wrongdoing.

Here, if you will excuse the phrase, it's an embarrassment of riches.  Did the defendant unlawfully -- uses unlawful means?  How about invading Congress?  How about grabbing for Sergeant Mastony's shield?  How about spitting at officers?  How about walking through the shattered glass doors on the Lower West Terrace?  How about attacking Capitol Police Officer Morris Moore with a stun gun?  That shows he was acting with unlawful purpose.

And for consciousness of wrongdoing, you are jurors.  You can use your common sense.  It is common sense that anyone who committed this act committed it with consciousness of wrongdoing.

Let's move on to Count 3.  It charges the defendant with

1    assaulting, resisting, or impeding officers with a dangerous

2    weapon.  There are actually two versions of Count 3, as you may

3    recall from the Judge's instructions.  We are going to start

4    with the dangerous weapon version.

5         First, you must find that the defendant forcibly assaulted,

6    resisted, opposed, impeded, intimidated, or interfered with the

7    U.S. Capitol Police Officer Morris Moore.  Again, any of those

8    verbs will do so long as it's carried out forcibly.  That was

9    the Judge's instruction.

10        Well, by grabbing Officer Moore by the helmet, pulling him

11   close to him, and bearing down on him with the stun gun, the

12   defendant did each of these things.  He forcibly assaulted

13   Officer Moore.  He forcibly resisted Officer Moore.  He forcibly

14   opposed Officer Moore.  He forcibly impeded Officer Moore.  He

15   forcibly intimidated Officer Moore.  And he forcibly interfered

16   with Officer Moore.

17        The second element, the defendant did such acts voluntarily

18   and intentionally, again, you can look at the video.  You can

19   look at the conduct and infer the defendant's intent, the

20   defendant's knowledge, the defendant's voluntariness from his

21   actions.  It's Exhibit 144.2.

22        The third element, Morris Moore was an officer of the

23   United States who was then engaged in the performance of his

24   official duties.  That was Officer Moore's testimony.  He showed

25   up for work, showed up for work at his duty station that day at

1    the loading docks, and then, in response to calls for

2    enforcement in the Capitol building, he walked over to the

3    Capitol building still wearing his reflective jacket.

4         The fourth element says in doing such acts the defendant

5    used a deadly or dangerous weapon, that is, an object that is

6    either inherently dangerous or capable of causing serious bodily

7    injury or death to another person, and the defendant used it in

8    that manner.

9         If the defense opening statement is any indication, this is

10   where they will focus most of their attention.  But the evidence

11   establishes overwhelmingly that the stun gun that the defendant

12   used on Officer Moore was a deadly or dangerous weapon.

13        First, Captain Ortega, he saw this device in the video, and

14   he said that stun guns are prohibited in the Capitol building

15   precisely because they can cause harm, they can harm members of

16   Congress and they can harm police officers.

17        Second, during the cross-examination of defendant's

18   so-called expert, Mr. Kroll, a manual of one of the devices that

19   that person identified as the potential device was introduced

20   into evidence.  It's Exhibit 1000.  There was not a lot of time

21   spent on this particular document during the cross-examination,

22   but I urge you, when you're back in the deliberation room and

23   you get the exhibits, to look at this Exhibit 1000, to review

24   it, and to see what it says.

25        And this is what it says about the effect of the stun gun.

1    The -- the manual of one of the stun guns that the defense

2    expert identified as likely the device used in this case, it

3    says, "A shock from a stun gun lasting one second or less," one

4    second or less, "will cause pain and minor muscle contractions."

5    That alone, muscle contractions, that means loss of control over

6    one's muscles.

7        Second, "stunning the assailant," or in this case the

8    police officer, "for one or two seconds will cause muscle spasms

9    and a dazed mental state."  A dazed mental state is a loss of a

10   mental faculty.

11       Third, "stunning the assailant for three to five seconds

12   will cause loss of balance and muscle control."  All of these

13   effects amount to serious bodily injury.

14       And the third piece of evidence that you should consider

15   comes from the defendant's expert himself, Dr. Kroll.  Recall,

16   he admitted fair and square that the metal prongs on this

17   device, these metal prongs can cause injury with or without an

18   electric charge.  He admitted that.

19       And while he had a lot to say about dismissing this device

20   as an Amazon toy and all the names he used to dismiss it, when

21   asked by co-counsel Mr. Dreher whether he was willing to apply

22   it to his own eye, he declined.  And I can't blame him

23   (demonstrating) because this is not something that should go

24   into anybody's eye.  This should not go into Officer Morris

25   Moore's head or eye area (demonstrating).

1          Now, as you will recall, the Judge also said that there is

2     a second version of Count 3 that you have to decide.  That

3     version -- the first three elements of that second version of

4     Count 3 are the same three elements that we just discussed for

5     the first version of Count 3.  I hope you're following.

6          As for the fourth element, there's two options.  You must

7     find that either the defendant's acts involved physical contact

8     with Officer Moore or the defendant's acts involved the intent

9     to commit another felony, specifically the obstruction of an

10    official proceeding that we were talking about just a minute ago

11    in Count 2.

12         So let's start with the first possibility.  You only have

13    to find one of these two.  You have to be unanimous as to either

14    the first or the second, but you only need to find one of these

15    two.

16         Did the defendant make contact with Officer Moore?  His

17    hand is on the helmet.  That alone establishes the first of

18    these two prongs.

19         As to the second possibility, the defendant's acts involve

20    intent to commit another felony, again, you can and should infer

21    the defendant's intent based on his actions.  We've already

22    talked about the defendant's intent with respect to obstruction

23    of the proceeding.  All this prong requires, all this element

24    requires is to find that when the defendant assaulted this

25    particular victim, that was part and parcel of his intent to

stop the certification of the Electoral College.  It's an easy inference to draw.

Let's move on to Count 4, entering or remaining in a restricted area with a deadly or dangerous weapon.  As for the first element, you have to find that the defendant entered or remained in a restricted building or grounds.

Recall Captain Ortega's testimony.  Everything within that red perimeter is a part of the restricted building or ground. The defendant did not merely cross the outer perimeter.  He breached inner perimeter after inner perimeter.  He even went into the Lower West Terrace tunnel.  He even crossed through the glass doors.  Do you remember, he walked through the shattered glass?

Second, the defendant did so without lawful authority to do so.  Well, I'm not sure whether the defense is going to contest this, but the defendant was not authorized to be there.

Third, the defendant did so knowingly.  Again, this is why it's important that the defendant had -- well, first, you can use your common sense.  When you're being tear-gassed, when chemical irritants are being deployed against you in the midst of a riot, you can infer the defendant knew that he was not supposed to be there.

But in addition to that, you saw the video where the defendant is standing atop the structure, and he has this direct line of sight down on the inaugural stage, down on the Lower

1    West Terrace tunnel.  He knows he's exactly in the midst of a

2    riot.  He knows exactly he's not supposed to be there.

3        Finally, you have to find that the defendant knowingly used

4    or carried a deadly or dangerous weapon during or in relation to

5    the offense.

6        Well, he had the stun gun within the restricted area.  So

7    he was remaining unlawfully, knowingly in that restricted area

8    while carrying and while using at one point a deadly or

9    dangerous weapon.

10       Count 6, disorderly conduct in a restricted area with a

11   deadly or dangerous weapon, first, you have to find that the

12   defendant engaged in disorderly or disruptive conduct in any

13   restricted building or ground.  Most everything the defendant

14   did was -- everything we outlined the defendant did in an effort

15   to stop the certification of the Electoral College amounted to

16   disorderly or disruptive conduct.

17       Invading that tunnel was disorderly or disruptive conduct.

18   Walking through shattered glass was disorderly or disruptive

19   conduct.  Inciting the mob outside to come into the tunnel was

20   disruptive or disorderly conduct, so was reaching for

21   Sergeant Mastony's shield, so was passing the shields back, so

22   was spitting at the police officers.

23       Second, you have to find that the defendant did so

24   knowingly and with the intent to impede or disrupt the orderly

25   conduct of government business or official functions.  This is

the same proof as the intent to obstruct the official
proceeding.  You can also find that the defendant intended to
impede or disrupt the orderly operation of the Capitol Police on
Capitol grounds.

Third, the defendant's conduct occurred when and so that --
or so that his conduct in fact impeded or disrupted the orderly
conduct of government business or official functions.

Well, you remember the testimony of Inspector Hawa.  She
was not going to recommend the vice president be back in the
Senate chamber in the Capitol building so long as there were
rioters on the premises.

Finally, the defendant knowingly used or carried a deadly
or dangerous weapon during and in relation to the offense.
Well, this is the same proof as before.  While he was doing all
of these things or at least when he was doing all of these
things after he received the stun gun, the defendant was
carrying a deadly or dangerous weapon during and in relation to
his disorderly conduct.

Finally, Count 6, this is very similar, disorderly conduct
in a Capitol building or grounds.  First, you have to find that
the defendant engaged in disorderly or disruptive conduct in any
of the United States Capitol building or grounds.  That is what
we just discussed with respect to Count 6.

You also have to find that the defendant did so with the
intent to impede, disrupt, or disturb the orderly conduct of a

1    session of Congress or either house of Congress.

2         Again, most everything the defendant did in the afternoon

3    of January 6, 2021, was in service of his objective of stopping

4    the certification of the Electoral College.  That is a session

5    of Congress.  Mr. Schwager explained that in detail.

6         Finally, you have to find that the defendant acted

7    willfully and knowingly.  And here again, I call on your common

8    sense.  Just look at what the defendant did and infer the

9    natural intent, draw the natural inference about what he

10   intended to do, why he was doing what he was doing.

11        Ladies and gentlemen, thank you for taking this case

12   seriously.  Take your time to review the evidence.  Again,

13   there's a lot of video.  Some of it is critically important.

14   When you do, you will reach the only conclusion that the

15   evidence in this case supports, that the defendant committed

16   every single one of the offenses charged in the indictment.

17        Thank you.

18        THE COURT:  So why don't we come to the bench for a

19   minute or two.

20        (Bench conference.)

21        THE COURT:  First, there were no objections made by

22   the defense during the closing arguments, and I would like to

23   suggest that if there are any objections they want to make and

24   deal with while the jury is still here, they can make them now.

25   If they want to make any objections for the record, they can do

1    it without the jury in the room.

2         But before I release them, is there anything you want to

3    raise?

4              MR. SMOCK:  No.

5              THE COURT:  My next question is this:  It is 12:30.  I

6    originally said I would like to finish closing arguments before

7    it goes to lunch.  I also said that I didn't want to have a

8    lunch break divide the defense closing and the government

9    rebuttal, and the cafeteria closes at 2:00.  We have sometimes

10   broken at 1:15 and 1:30 in this case.

11        So let me ask Mr. Smock and Ms. Goetzl what they anticipate

12   doing, what they suggest.

13             MR. SMOCK:  We'd be breaking now --

14             THE COURT:  We would take about ten minutes, start

15   with your closing, and have rebuttal.

16             MR. SMOCK:  I'm going to be 40 to 45 minutes, I think.

17             THE COURT:  So we should probably take an earlier

18   lunch.  Prognoses are always difficult.  And the defense should

19   have the time it needs, and the government should have what time

20   it needs for its rebuttal.  So I think that makes sense.

21        Shall we tell them --

22             MR. VALENTINI:  May I recommend a 45-minute lunch?

23             THE COURT:  I think that's fair.  The defense is

24   already ready.  You can eat in 45 minutes.

25        (End of bench conference.)

```
 1              THE COURT:  So as not to constrict anybody's time at
 2     this important part of the trial and to make sure the cafeteria
 3     doesn't close before we break for lunch, we're going to break
 4     now, which is early, and we're going to try to make it 45
 5     minutes.  So if you would come back at 1:15, then we will hear
 6     from the defense and government's rebuttal, and then I have a
 7     few brief instructions to give you, and then you can start
 8     deliberating.
 9          (Jury exited courtroom.)
10              THE COURT:  Is there anything anybody wants to raise
11     before we take our 45-minute lunch break?
12              MR. DREHER:  No, Your Honor.
13              MR. SMOCK:  No, thank you.
14              THE COURT:  1:15.  Thank you.
15          (Recess taken from 12:32 p.m. to 1:24 p.m.)
16          (Call to order of the court.)
17          (Jury not present.)
18              THE COURT:  All right.  Are we ready for the jury,
19     everyone?
20              MR. DREHER:  Yes.
21              THE COURT:  Mr. Smock, do you have the lavaliere mic
22     on?
23              MR. SMOCK:  I do.  Can you hear me?
24              THE COURT:  Is it high enough up?
25              MR. SMOCK:  I can move it higher.
```

1          THE COURT:  Okay.  Let's get the jury in.

2       (Jury entered courtroom.)

3          THE COURT:  Everybody here?  Everybody ready?

4    Okay.  If everybody's ready, Mr. Smock, you may proceed.

5          MR. SMOCK:  Thank you, Your Honor.

6       Ladies and gentlemen, the government just has it wrong

7    about this assault charge involving Officer Moore.  We readily

8    acknowledge that Mr. GossJankowski did things on January 6 that

9    he shouldn't have done and that you may find him guilty of some

10   charges in this case on that basis.  But I want to be absolutely

11   clear about this as I start:  Mr. GossJankowski did not assault

12   Officer Moore on January 6.  He was trying to help him.  He

13   wasn't trying to harm him.  And Mr. GossJankowski shouldn't have

14   done many of the things he did in that tunnel, but that

15   shouldn't make him guilty of all five of the additional charges

16   the government has piled on in this case.

17      Mr. GossJankowski went to the Capitol after watching the

18   speech by President Trump in which President Trump told his

19   followers to go to the Capitol, and that's what

20   Mr. GossJankowski did.  He didn't go there with the specific

21   corrupt intent to interfere with the electoral vote count.

22      The government has overcharged Mr. GossJankowski with six

23   separate counts.  And the focus of my argument for you today is

24   going to be on that assault charge and on Mr. GossJankowski's

25   intent on the day in question, January 6.

1    We started this process more than two weeks ago with a jury

2    selection process that took longer than normal.  It took about

3    three days, and you recall that you were asked many questions

4    about January 6 and your feelings about January 6.  You were

5    brought in individually to talk to the Judge about that.  And

6    there was a reason for that.  The reason for that is, we all

7    agree -- and you heard Mr. Valentini say this as well, and we

8    agree to this as well -- January 6 was a dark day in our

9    nation's history.

10   All of us have very strong feelings about that day.  And

11   you were asked questions about that so that the Court could be

12   assured that each of you would rely solely on the evidence in

13   this case in making your determination and that you wouldn't

14   bring in passion and prejudice and things you feel about

15   followers of Donald Trump, about what happened on January 6,

16   that you would focus solely on the evidence.

17   Now, what I also want to talk about is the fact that we

18   always hear -- we hear all the time people say that January 6

19   was an assault on our democracy.  And many of us feel that

20   strongly, that it was an assault of democracy and the rule of

21   law.  And what I want to ask us to think about is whether the

22   response to an assault on democracy and the rule of law would

23   be -- should be to just throw those ideas out the window.

24   I submit to you that the response to an assault like that

25   should be to strengthen our resolve to hold those principles and

use those principles in this court as we decide this case.
These principles of the presumption of innocence, the burden of
proof, proof beyond a reasonable doubt are the bedrock
principles of our criminal justice system, and they're more
important now than they've ever been.  And that's what we're
asking you to keep in mind as you deliberate in this case.

The presumption of innocence means that Mr. GossJankowski
came into this courtroom an innocent man, and he remains an
innocent man unless and until the government proves his guilt to
you.

The burden of proof is just as important.  The burden of
proof means that the government and the government alone is
responsible for proving guilt in this case.  What that means is,
if you come away from hearing the evidence in this case and
you're asking yourself questions like, why didn't the government
show us videos of Mr. GossJankowski being interviewed, why
didn't they show us all the videos that truly showed his intent
in that alleged assault, why haven't they presented us evidence
of Mr. GossJankowski's intent that day, you can't turn to us for
those answers.  Those answers have to come from this table.
That burden never shifts.

Now, what about the burden of -- the proof beyond a
reasonable doubt.  Judge Friedman has told you that proof beyond
a reasonable doubt is the highest legal standard in our system.
What it means is you have to be firmly convinced of

Mr. GossJankowski's guilt on any count before you can return a guilty verdict.  Proof beyond a reasonable doubt means you could come away from looking at the evidence in this case and feel as if, oh, I think that Mr. GossJankowski probably committed an assault on Officer Moore.  And after I explain the evidence to you, I don't think you'll even get to that point.

But you could even get to a point where you feel as if it's highly likely that Mr. GossJankowski intended to assault Officer Moore, that he had the requisite intent to commit obstruction in violation of Count 2, and your answer has to be not guilty if you still have a reasonable doubt as to those charges and as to those facts.  It's the highest standard in our legal system.

So I want to talk about the charges.  There are six charges, and Mr. Valentini went over them in some detail with you.  I don't have time to go over every element of every charge with you.  I trust and I think everyone here trusts that you're going to go over the evidence in this case, you're going to look at every element, and you're going to follow that burden, that presumption of innocence, and the requirement of proof beyond a reasonable doubt and determine whether the government has established every element of every offense beyond a reasonable doubt.

I'm going to be focusing on the specific issues that we believe are most important in your deliberations, and I'm going to start by talking about the assault charge, Count 3.

1          Now, to establish that count, in our view, the most

2    important thing that the government has to prove and what they

3    haven't proved in their presentation of evidence to you is that

4    Mr. GossJankowski intentionally, voluntarily, and forcibly

5    assaulted Officer Moore.  That, they cannot prove, and they have

6    not proven that in this case.

7          A person acts forcibly if he uses force, attempts to use

8    force, or threatens to use force against the officer.

9    Mr. GossJankowski was not trying to use force on this officer.

10   He was trying to help him.  And you'll see that from the video.

11         Let's talk about what happened in those moments on the

12   inaugural stage.  What we saw from the video is that it's a

13   crowded scene, it's hectic, there's people pushing back and

14   forth.  And you see that there's an officer -- Officer Moore

15   gets grabbed and pulled down into the crowd by members of this

16   mob.  You see that they start assaulting Officer Moore.  And you

17   see from the video that Mr. GossJankowski, who is below on the

18   stage, sees this, and his reaction to seeing it is immediate.

19   He immediately starts wagging his finger and yelling "no" to

20   members of the crowd.  He's not yelling that at the police.

21   He's turning around and repeatedly yelling "no" to members of

22   the crowd.

23         It's a visceral reaction that he has, and it's the reaction

24   that all of us would hope a person would have seeing a police

25   officer being attacked.  That's what we see from

Mr. GossJankowski when he sees what's happening to Officer Moore.

And keep in mind here that Mr. GossJankowski is deaf.  He can't hear what's happening.  So when you watch the video, you can hear there are a number of people in that crowd who are saying, "Don't hurt the cop, save him; don't hurt the cop."  Mr. GossJankowski cannot hear that, and that's an important fact to keep in mind, because he doesn't know that there are people with like minds as him who want to help this guy.  Mr. GossJankowski feels as if he may be the only person who wants to help this officer.

So what you see from the video is Mr. GossJankowski approaches towards the officer.  You see he pulls out that electrical device that had been handed to him, because he thinks he may have to use it to get these attackers off of Officer Moore.  You saw from the video that just moments before Mr. GossJankowski gets to Officer Moore, somebody takes an upper cut.  A guy in a gray hoodie takes an upper cut right at Officer Moore's face.  He's under attack, and Mr. GossJankowski is trying to help him.

So Mr. GossJankowski moves forward, and in a split second, he leans forward and reaches forward and tries to pull Officer Moore up, who is crouched down.  And then he backs off.  And you see from the video that he then holds up his hands as if to say, Stand back from the officer, don't hurt him.

1          That's what happens here.  Mr. GossJankowski was trying to

2     help Officer Moore.  He wasn't trying to harm him.

3          And you saw from Mr. GossJankowski himself an explanation

4     to his friend about what happened.  He said, "I never assaulted

5     a cop.  I tried to intervene, but I couldn't because of being so

6     crowded."

7          Ladies and gentlemen, that's precisely what the video

8     shows.  The video Exhibit 147 makes Mr. GossJankowski --

9               THE COURT:  Is it 146 or 147?

10              MR. SMOCK:  147.

11         Makes Mr. GossJankowski's intent entirely clear, and let's

12    watch it.

13         (Video playing.)

14              MR. SMOCK:  You will see Mr. GossJankowski in the

15    bottom right in the blue jacket.  He sees Officer Moore being

16    pulled down.  He might also see Officer Fanone as well.  And he

17    reacts.  You can hear him yelling "no."  He moves forward.  He

18    takes out the device, because he knows he may need to use it to

19    fight off attackers.  And he reaches forward, and it's over.

20    That's the alleged assault.  He puts up his hands.

21         Ladies and gentlemen, that video shows the entire incident,

22    and it shows it from Mr. GossJankowski's perspective.  In fact,

23    I will show you in a minute a video that's closer up.  But that

24    video requires a not guilty verdict.  It shows what

25    Mr. GossJankowski's intent was.  He was trying to help.  He

1    wasn't trying to hurt.

2         Now, Exhibit 146 is a shorter snippet of that video that I

3    just showed you, the time frame that I just showed you, and it's

4    taken from closer up, and so it gives you a better sense of how

5    hectic this scene was.  It gives you a better sense of the fact

6    that Mr. GossJankowski reached over two or three people in that

7    instant and couldn't see where he was reaching.  This isn't a

8    man who is trying to assault an officer.

9         (Video played.)

10        MR. SMOCK:  There's his hand reaching up.  This isn't

11   the behavior of a man trying to assault a police officer.  It's

12   not.  And it certainly is not beyond a reasonable doubt.

13        On Monday, I ran into an employee of another judge in this

14   building in the hallway, and he said to me, What's the matter

15   with your client?  I said, Why do you say that?  He said, Well,

16   I came up to him, and I asked him how he was doing, and he just

17   kept walking.

18        MR. VALENTINI:  Objection, Your Honor.  Can we have a

19   sidebar?

20        MR. SMOCK:  I mean, I will move on if it's somehow

21   objectionable to explain --

22        THE COURT:  I think you should move on.

23        MR. SMOCK:  Okay.

24        The point I'm trying to make is that Mr. GossJankowski

25   experiences life differently than all of us.  He perceives

1    things differently because he's deaf.  And we can't lose sight

2    of that when we're considering what was going through his mind

3    and what he could perceive in that hectic scene of a crowd

4    pushing back and forth.  People are yelling.  He can't hear it.

5    He has no understanding there are other people who might be

6    trying to help this police officer.  You have to take that into

7    account as well in assessing his intent.

8         It's important enough what happened in Exhibit 147 that I

9    think it makes sense to watch it again and watch it silently,

10   because Mr. GossJankowski couldn't hear anything that day.  This

11   is zoomed-in a little bit on 147.

12        (Video playing.)

13        MR. SMOCK:  He's gesturing to members of the crowd who

14   are pushing forward towards that officer "no."

15        Now, what was interesting to me about Mr. Valentini's

16   closing argument is he told you you can judge a person's intent

17   based on their actions.  We agree.

18        So the question becomes, why is it that the government

19   didn't play Exhibit 147 for you?  It was on their exhibit list,

20   but they didn't play it for you.  You saw them, through Captain

21   Ortega, through Officer Moore himself, through no fault of his

22   own, he doesn't decide how this evidence is presented, Officer

23   Moore, but they played this video, Number 144.2, repeatedly, and

24   they didn't play 147, which is what happened just moments

25   beforehand and clearly shows his intent.

1    They didn't play that video for you because it's completely

2    contradictory to their theory of this case.  It shows that what

3    they're telling you about Mr. GossJankowski's intent is not

4    true.

5        In order to believe the government's account of what

6    Mr. GossJankowski's intent was that day, you have to believe

7    that one moment he's saying "no" and trying to get members of

8    the crowd to stop attacking this officer and the next moment

9    he's turning around and trying to attack the officer himself

10   with a weapon.  It doesn't make sense.

11       The only other way you could figure it out is to believe

12   that "no, no, no" being waved at a crowd is "I'm about to go

13   attack this officer."  It doesn't make sense, and it certainly

14   doesn't make sense beyond a reasonable doubt.

15       Now, during trial, the government raised the fact that

16   Mr. GossJankowski had wagged his finger and spit at police

17   officers in the tunnel, and that's true, and that was absolutely

18   wrong.  There's no justifying that.

19       But there's a big difference between confronting officers

20   in a tunnel, a line of officers who have shields up, and

21   attacking a defenseless police officer who is in a crowd of

22   people.

23       Everyone has a line, and for Mr. GossJankowski, that

24   line -- seeing people attacking a police officer who is

25   defenseless in a crowd was way over that line, and that's why he

1   reacted in the way that he did.

2       Even people who are much more active than Mr. GossJankowski

3   in the tunnel had this same line.  You remember this guy, and

4   listen to what he's saying during the same time when he also

5   sees Officer Moore under attack.

6       (Video played.)

7           MR. SMOCK:  He's saying, "Don't hurt the cop."  He

8   might look familiar to you because that's the first guy who was

9   in the tunnel.  That's the guy who was face to face with

10  officers pushing up against them for long periods of time in the

11  tunnel.

12      Everybody has a line, and for Mr. GossJankowski and for

13  that man, assaulting a defenseless police officer was way over

14  the line, and that's why he gestured to the crowd, that's why he

15  said "no," and that's why he tried to come to the defense of

16  Officer Moore.

17      So we know what happened, but what we saw from the

18  government is repeatedly playing this Exhibit 144.2.  During

19  their presentation of evidence -- this is the 360-degree video,

20  and there's a handful of things I want to make clear about that.

21      First of all, that video was taken from a totally different

22  perspective of where Mr. GossJankowski was.  Mr. GossJankowski

23  is looking this way.  The videos that I've just shown you are

24  directly behind him.  That video is taken from a man who is

25  standing on a railing up high looking in a direction this way.

1      What that video depicts, particularly when it's played

2   slowed down frame by frame, it totally distorts what happened.

3   It doesn't show you what Mr. GossJankowski could see.  He

4   couldn't see what you're seeing in that video.  And it gives you

5   the impression that Mr. GossJankowski, over a period of several

6   seconds, is aiming in a way that he definitely wasn't.  There's

7   no way to believe that Mr. GossJankowski could see what that

8   video shows.

9      And when you look at 146 and 147, you see that absolutely

10   clearly.  It happened in a second.  And he was trying to help

11   Officer Moore.  He was trying to pull him up.  He wasn't trying

12   to attack him.

13      Now, Mr. Valentini wasn't explicit about this today, but

14   during trial, the government seemed to suggest that

15   Mr. GossJankowski had actually activated this device when he

16   approached Mr. Moore, Officer Moore, and I want to be clear

17   about that.

18      You saw the device.  The device can be turned on with a

19   switch on the side.  But to actually activate it, to make it

20   arc, you have to press a button.  And that's what you saw --

21   Mr. Valentini did it today in his closing argument.  That's what

22   makes the noise.  That's what makes it spark.  So you can turn

23   it on, but you have to press a button to activate it.

24      And Mr. GossJankowski definitely did not activate that

25   device when he was near Officer Moore, and that's a crucial

1    fact.

2         The government hasn't made clear their basis for even

3    saying it, and I don't know if they're even maintaining that

4    now, but I want to be absolutely clear about this, because it's

5    important to your determination of this count.

6         The government, during their presentation of evidence, put

7    up this Exhibit 144.2A8, and they suggested to you that this

8    round white circle that you see on the left was an indication

9    that this thing was actually activated.

10        But what you know from seeing photographs of this device is

11   that it has a shiny white flashlight in the middle.  Even when

12   the flashlight's not on, that white circle that you're seeing on

13   the left is what you're seeing.  You're not seeing this device

14   activate.  You saw the device activated on video; you saw it in

15   court repeatedly.  This thing was not being activated.

16        And you know that also from looking at Exhibit 146.  I'm

17   going to show that to you, but I want to just remind you that

18   when you heard this thing being activated, it's extremely loud.

19   Dr. Kroll said it was more than 100 decibels.  So if it was

20   activated, on Exhibit 146, which was taken from very close by,

21   you would hear it activated.

22        So let's listen.

23        (Video played.)

24            MR. SMOCK:  You don't hear anything, because he didn't

25   activate the device.  And I'm not going to play more video, but

1    to the extent you still have any questions about this, you can

2    look at Exhibit 144.2.  That's the 360-degree video.

3        And if you look at minute marker 4:50, you see a person who

4    actually attacks Officer Fanone, and he does activate an

5    electrical device on Officer Fanone, and you hear it loud and

6    clear.  But if you carry on in that video and see

7    Mr. GossJankowski approach Officer Moore, there's no sound.  He

8    didn't activate this device.

9        So that gets us to the device itself.  And I'm not going to

10   spend a huge amount of time on it, because I think the crucial

11   fact is, Mr. GossJankowski didn't assault Officer Moore.

12       So the fact that he didn't intentionally, voluntarily, or

13   forcibly assault Officer Moore makes him not guilty of Count 3,

14   full stop.  You don't need to get to this question of whether

15   this device was a deadly or dangerous weapon.

16       I'm going to talk about it in case someone disagrees with

17   me on the jury, because you would have -- to find him guilty of

18   Count 3, the main aspect of Count 3, you would have to make a

19   finding that this was a deadly or dangerous weapon.

20       And I will also show you that for Count 4 and 5, whether it

21   was a deadly or dangerous weapon is important as well.  So let

22   me just talk about that device for a minute.

23       Oh, and actually, by the way, let me also mention that

24   Mr. Valentini talked about other iterations of this Count 3, if

25   the government can prove that Officer Moore was contacted or

1    that there was an intent to commit another crime.

2         You don't need to get into the weeds about that, because

3    the question remains for those aspects of the charge whether

4    they can prove that he intentionally, voluntarily, and forcibly

5    assaulted Mr. Moore.  He did not.  He's not guilty.  There's no

6    question about that.

7         Now, this question of whether this device was a deadly or

8    dangerous weapon, Judge Friedman gives you a definition -- gave

9    you a definition, and you will have this back in the jury room,

10   but I want to talk about it.

11        There are two ways that the government could prove this was

12   a deadly or dangerous weapon, and they failed to do either.

13        We brought in Dr. Kroll to talk about this device.  And you

14   know, there's no doubt that this device makes a lot of noise and

15   makes a lot of light.  And there's no doubt that it's

16   intimidating.  We're not disputing any of that.  That's the

17   purpose of the design of this $20 Amazon device, is to

18   intimidate.

19        You know from a Ph.D. specialist in bioelectricity that

20   this device doesn't have the capacity to do any of these things,

21   though.  What the government has shown you is false advertising

22   from a manufacturer of a $20 Amazon device suggesting that it's

23   more powerful than it is.  That's not evidence upon which you

24   can fairly rely in a criminal case.

25        You heard from Dr. Kroll about this device.  He told you

1    that he tested this device, and what he found out was, it's far

2    less powerful than even a medical muscle stimulator.  And it's

3    intuitive; right?  A medical muscle stimulator by its very

4    design cannot cause serious bodily injury.

5         And what he told you is, this device is loud, this device

6    creates a lot of noise.  But this device is 9 percent of the

7    minimum charge of a muscle stimulator.  In other words, it

8    wouldn't be powerful enough to be considered one.

9         He talked to you about Tasers and stun guns, and he told

10   you that the point of a stun gun, an actual stun gun, is to

11   immobilize a person momentarily so that police don't have to use

12   a deadly or dangerous weapon.  That's the point of it.

13        And this device was -- had 2 percent of the minimum charge

14   for a stun gun.  So you know from Dr. Kroll that this item, if

15   it's used for the purpose that it was made, would not cause

16   serious bodily injury or death.  It's not inherently dangerous.

17        So they've failed on that point.

18        So then you get to the moment during Dr. Kroll's testimony

19   that had us all on the edge of our seat.  Right?  When we asked

20   Dr. Kroll to shock himself in the eye with this thing.

21        It's entertaining, it's exciting, this question of whether

22   or not he will do it, but it has absolutely nothing to do with

23   the legal standard in this case.

24        The second question is whether the object is capable of

25   causing serious bodily injury or death to another person and the

1     defendant used it in that manner.

2         So here's how the legal standard relates to this challenge

3     to our expert on the stand.  There's no evidence that

4     Mr. GossJankowski tried to tase this guy in the eye.  He's not

5     doing that.  He didn't use it in that manner.

6         So the question of whether or not this device can cause

7     serious bodily injury if it's put in someone's eye is

8     irrelevant.  The question is whether it can cause serious bodily

9     injury if it's used in that manner.

10        Now, I want to talk about Dr. Kroll for a moment.  There

11    was a long cross-examination of Dr. Kroll in which the

12    government seemed to suggest that he was somehow biased because

13    he earns money from the Axon Corporation, which is the company

14    that makes Tasers.

15        I'm struggling understanding how his relationship with Axon

16    makes him biased.  What American corporation wants someone to be

17    associated with them on the stand in a case on behalf of someone

18    involved with January 6?  How does that help Axon?  Where was an

19    audience of potential Taser buyers who somehow would be impacted

20    by his testimony?  There's really nothing that they've said that

21    would suggest that he was somehow, you know, biased or couldn't

22    be trusted.

23        And the other thing to keep in mind is, Dr. Kroll told you

24    he's been hired by this Department of Justice several times in

25    the past as an expert.  Yet somehow, when Dr. Kroll testifies on

1    behalf of a defendant, he's unreliable.  It doesn't make sense.

2         And the other thing to think about is, we talked about the

3    burden of proof; right?  The burden of proof is on this table

4    alone.  Where is their expert giving you data, giving you facts,

5    giving you information that you can rely upon to make a

6    determination about this crucial legal issue about whether this

7    item can cause serious bodily injury or death?  It can't, and

8    that's why they didn't present an expert with a Ph.D. or

9    anything to establish that for you.

10        What they're relying on is false advertising in a user

11   manual for a $20 Amazon product.  That's not proof beyond a

12   reasonable doubt in a criminal trial with these consequences.

13   You can't rely on that to make a determination that this is an

14   item that can cause serious bodily injury or death.

15        So I talked about Counts 4 and 5, and I will just quickly

16   explain to you that the reason that that device is relevant is,

17   you have to return verdicts of not guilty on Counts 4 and 5

18   based on a determination that the government has not proven to

19   you beyond a reasonable doubt that this device was a deadly or

20   dangerous weapon.

21        There are lesser included charges you can consider, but you

22   can't convict of the more serious charges, because they haven't

23   established that it's a deadly or dangerous weapon.

24        So now I want to shift to the obstruction charge, Count 2,

25   and I want to talk to you about the elements that the government

has to prove on that charge.

What from our point of view is most important about this obstruction charge is, it's different than some of the charges in that it's not just about what Mr. GossJankowski did; it's focused largely on his intent and his knowledge and the nature of his conduct.  So to establish guilt on this charge, the government has to prove that he intended -- that Mr. GossJankowski intended to obstruct or impede the official proceeding.  They have to show you that he acted knowingly, that he was aware that the effect of his conduct that day would be to obstruct or impede the official proceeding.  And to be clear, the government has to establish that that official proceeding is the electoral vote count.

And so what I want to talk to you about in the little time that I have left with you today is, where is the evidence of Mr. GossJankowski's specific corrupt intent on that issue?  What do we know about Mr. GossJankowski's day on January 6?

Well, we know that he woke up and he went to this speech by then-President Trump.  We know that he heard a speech by Rudy Giuliani, that he saw a speech by this John Eastman character, who is a lawyer associated with President Trump, and he heard a speech in which President Trump told him to go to the Capitol along with the other followers, and he did that.

Mr. GossJankowski was going to go wherever President Trump told him to go that day.  If President Trump had told him to go

to the Washington Monument, he would have gone to the Washington

Monument.  If he had told him to march to the Lincoln Memorial,

he would have done that.  He didn't do this with some sort of

corrupt intent, to go to the Capitol to interfere with the

electoral vote process.

    And when you think about it, if he did have that intent,

they would be able to present evidence to you about that.  And I

want to go over that.  What would be the evidence that they

would be able to present if he actually did have that corrupt

intent?

    We all know that after the election people had all sorts of

theories about how things went wrong.  They had theories about

voting machines.  They had theories about --

        MR. VALENTINI:  Objection, Your Honor.  None of this

is in evidence.

        THE COURT:  Come to the bench.

    (Bench conference.)

        THE COURT:  What's your objection?

        MR. VALENTINI:  Oh, he started mouthing off about

voting machines and conspiracy theories and things that are not

in evidence.  I mean, he could have put it in evidence, but none

of that is in the record.

        THE COURT:  This is all the stuff that they've seen on

television and January 6 hearings and reading in the newspapers,

which you're telling them not to do and to limit themselves to

1    just the evidence in the case.  So that's out.

2              MR. SMOCK:  Okay.

3              MR. VALENTINI:  Your Honor, this is the second time.

4    Before that, he was telling a story about a conversation with a

5    colleague in the elevator.  All of this is way out of bounds.

6              THE COURT:  Those two things are out of bounds.

7         (End of bench conference.)

8              THE COURT:  I will sustain that objection.  Move on to

9    other things, please.

10             MR. SMOCK:  So if Mr. GossJankowski was focused on the

11   electoral vote count, if it was something that he was planning

12   to obstruct, if it was something that he had an intent to

13   obstruct, you would see comments by him on social media.

14        And what the government can point to was a single Facebook

15   post where he says something about the existence of the

16   electoral vote count.  That's a far cry from evidence that he

17   has an intent to obstruct the electoral vote coat.

18        The next thing that I would point to is, they didn't put

19   forward any evidence from other people, from witnesses, friends

20   of Mr. GossJankowski, acquaintances, suggesting that he was

21   saying anything in advance of January 6 about an intent to

22   obstruct the electoral vote process.  There was none of that.

23   We have no evidence that Mr. GossJankowski engaged in planning

24   or preparations.

25        You heard from Special Agent Mulvihill that there was a

search performed of Mr. GossJankowski's home.  He didn't hear
from them that there was all sorts of pamphlets and other
information, any evidence suggesting an intent on his part to
obstruct the electoral vote process.  What you saw from them is
that they got the jacket that he was wearing that day and some
sort of ID.

You also know from watching the videos that people went to
the Capitol that day wearing military fatigues.  They went
wearing ballistic bulletproof vests, Kevlar helmets, gas masks.
Those are people who have clear intent to get into the Capitol
and to obstruct the electoral vote count.  Mr. GossJankowski was
wearing street clothes.

So the next thing we can do is compare his conduct to other
people who went to the Capitol that day.  You saw evidence that
people were climbing walls.  You saw videos from people trying
to break through doors.  You saw people seeking out other
entrances.

And you heard that Mr. GossJankowski was on a stairway from
which he could have easily accessed a breached door on the
Senate Wing.  You heard he would have had the ability to circle
the Capitol.  And you learned about the number of entrances that
were open.  Mr. GossJankowski didn't seek out those other
entrances.  He didn't go into the building.  He didn't do
anything of the sort that might suggest that he had a specific
intent to interrupt the electoral vote count.

1    You also know that he was interviewed by law enforcement

2    three separate times, and you heard from Agent Mulvihill that

3    two of those were recorded.  Rest assured that if he had said

4    anything in those interviews that might have suggested that he

5    had requisite corrupt intent to interfere with the electoral

6    vote process, you would have seen that evidence.  And they

7    didn't play those interviews.

8    The last thing is, you didn't see any evidence after the

9    fact of Mr. GossJankowski somehow celebrating the electoral vote

10   count being slowed down or being delayed.

11   So there's really a significant lack of evidence on this

12   point.  And when they don't have that evidence, a not guilty

13   verdict is required.

14   The last thing to think about is this knowingly

15   requirement.  And there, the government is required to show that

16   he acted knowingly, knowing that the natural and probable effect

17   of his conduct would be to obstruct or impede the official

18   proceeding.

19   And here, the timing is relevant.  We know that

20   Mr. GossJankowski showed up at the West Terrace tunnel at 2:42.

21   That's 13 minutes after the House has stood in recess.  So

22   nothing about his conduct is in relationship to what's happening

23   inside the Capitol.  There's no evidence of an intent or a

24   knowledge based on his conduct there.

25   The government's last theory about this obstruction charge

is aiding and abetting.  And without getting into the details of that, I just want to emphasize that in order to convince you that he aided and abetted in the obstruction, they still have to prove that Mr. GossJankowski knew that people are obstructing the electoral vote and intended to further that crime.  And that gets back to what I've just been telling you about an absence of evidence of his intent on that front.

So I have to sit down now, and that's, obviously, difficult for a defense attorney.  What happens now is that because the government and the government alone has the burden in this case, they have the ability to give what's referred to as a rebuttal argument.  So what they can do is get up and try to fix things or explain things or address things that I've said.

But what I want to emphasize is the evidence remains the same.  The government can't hide Exhibit 147, which shows Mr. GossJankowski's true intent, when they talk about that assault charge.  The government can't come up with new evidence that might show Mr. GossJankowski's intent.

So while it might seem like the government has the last word in this case, the truth is that you do.  And what we're asking you to do is abide by the oath that you took, consider only the evidence that you've heard in this case, and we're asking you to apportion guilt associated only with what Mr. GossJankowski did, not what they failed to prove.

Mr. GossJankowski did not assault Officer Moore.  He's not

1    guilty of that charge, and the evidence shows that.

2    Mr. GossJankowski didn't have the requisite intent to obstruct

3    the electoral vote count.

4         So what we're asking you to think about is, specifically

5    with respect to that assault charge is how does it make sense

6    that the same person who is desperately yelling "no" and trying

7    to wave off people from attacking this officer at the same time

8    is the same person who moments later himself tries to attack

9    this officer with a weapon.  It doesn't make sense, and it

10   definitely doesn't make sense beyond a reasonable doubt.

11        We're asking you to find him not guilty.  Thank you.

12             MR. VALENTINI:  Ladies and gentlemen, Mr. Smock and I

13   agree about one thing:  The evidence remains the same.

14        What we have just heard is the defense trying to gaslight

15   you, trying to convince you that you're crazy, that what you

16   have seen during the trial in Exhibit 144.2 and all of the

17   exhibits, including Exhibit 147, is just not what it looks like,

18   that it's something else.

19        But the thing is, ask yourself, if Mr. GossJankowski was

20   trying to help United States Capitol Police Officer Moore, why

21   did he grab him by the helmet with his right hand?  Why did he

22   pull him towards him?  Why did he come bearing down on the

23   officer with a stun gun?  It does not make sense.

24        This is not about the angle of Exhibit 144.2 as opposed to

25   147.  This is about what the defendant did with his hands to

1    Capitol Police Officer Morris.

2         But there's something else that doesn't make sense about

3    what you just heard.  You heard a lot about Exhibit 147 and the

4    wagging of the finger.  The problem is, they don't have a theory

5    as to who is the defendant wagging the finger to.  Because we

6    know he had done it before, and we saw it in our presentation

7    today.

8         (Video playing.)

9         MR. VALENTINI:  This is what the defendant means when

10   he wags his finger at law enforcement, precisely the direction

11   he's wagging his finger at the beginning of the clip you were

12   shown in Exhibit 147.

13        So let's look at Exhibit 147.

14        By the way, they have this theory that somehow -- I think

15   the defense acknowledged that it was on the government's exhibit

16   list, but we were somehow concealing 147 from the jury.  They

17   played it first.  This is true.  We also had several witnesses

18   afterwards.

19        As you watch Mr. GossJankowski wag that finger as he did in

20   the tunnel only minutes earlier, consider in which direction

21   he's wagging that finger and what is communicated to that law

22   enforcement officer who is being pulled down by the crowd in

23   that direction.

24        (Video played.)

25        MR. VALENTINI:  I think you also heard some suggestion

1    that Mr. GossJankowski was not leaping forward as the officer

2    was coming closer.  Just watch it.

3        (Video played.)

4        MR. VALENTINI:  And when you hear the crowd

5    saying "don't hurt the cops," whom are they talking to?

6    Mr. GossJankowski, the one who is leaping forward to assault the

7    cop.

8        You also heard some suggestion that it is impossible that

9    Mr. GossJankowski had activated that device as he was bearing it

10   down on Officer Moore.  Why?  They say, Well, because you

11   couldn't hear it; you would have heard it.

12       Here's the thing.  Here's the part they didn't tell you.

13   Read the instruction manual of the device.  It's Exhibit 1000.

14   "While holding a stun gun against assailant, you will not see or

15   hear the spark.  This stun gun cannot be damaged by continued

16   firing into the body of an assailant."  And then it says, "Do

17   not discharge the stun gun into the air for more than one second

18   at a time."

19       In other words, this stun gun is designed so that if it is

20   discharged into the air, it does make the noise and has the arc.

21   If it's discharged into the body, the electricity goes into the

22   body of the victim.  That's why you didn't hear it.  It is at a

23   minimum no proof that somehow the device was not activated.

24       You also heard an attempt from the defense to rehabilitate

25   Dr. Kroll.  The thing about Dr. Kroll -- I will grant him, he's

1    one shrewd businessperson.  Most companies, if they want to

2    advertise their products, they have to go out and buy ad space.

3    Mr. Kroll, Dr. Kroll, has a different way of doing it.  He gets

4    hired to work as an expert, advertises the Taser products, and

5    then he gets paid $480 an hour, I believe is the figure, to

6    provide expert reports.

7        The problem is that there is a catch with that model.  When

8    you testify as an expert, you also get cross-examined, and

9    that's where it all came apart.  That's where my co-counsel,

10   Mr. Dreher, called Mr. Kroll's bluff.

11       Mr. Kroll spent considerable time trying to dismiss the

12   stun gun as an Amazon toy, a cheap $20 device.  I think you

13   heard some of those characterizations today.

14       But through all that arrogance, Dr. Kroll was unwilling to

15   discharge that device into his eye.  And he came up with a

16   story.  It's because it's sharp.  Well, first of all, the fact

17   that it's sharp and that can cause damage alone makes it a

18   dangerous weapon under the definition that you were given.

19       But even aside from the sharp prong, the metal prongs that

20   can alone cause damage and alone make the weapon a dangerous

21   weapon, the fact is, if you activate that device into your eye,

22   you just use your common sense to infer what happens.

23       Another couple of problems with Dr. Kroll's testimony.  I

24   don't know if you recall.  He seems to have a pretty high

25   threshold for pain.  I think you heard him on cross-examination

take the position that even a prone position restraint has no

link to asphyxia.  You can make of that what you will.

You also heard him make statements about the injury

sustained by other officers, including Officer Fanone.  You've

heard a little bit about Officer Fanone in this trial.  And you

heard him suggest that well, pain is very subjective, maybe -- I

understood, you may understand that suggestion to be something

like well, maybe the pain was all in Officer Fanone's head.

You also heard some suggestion that because we did not --

because the government did not call their own expert, somehow

there's a problem with our proof.

The thing is, you as jurors can bring your common sense

into the jury room.  You have seen this device.  If you want to

examine it, you can ask to examine it.  It is for you to decide

whether this is a deadly or dangerous weapon.

I also want to spend a couple of minutes, a few minutes

talking about this obstruction of an official proceeding charge.

What I heard the defense say is essentially first, it was all

former President Trump's fault.  Well, up to a point.  The thing

is, the defendant chose to descend on the Capitol.  The

defendant chose to breach the restricted area and perimeter

after perimeter and go all the way to the Lower West Terrace.

It was the defendant's choice for sure to receive the stun gun.

And it was the defendant's choice to assault Officer Morris.

None of what he may have heard or you may have perceived at

this rally earlier in the day makes him any less guilty of the charges in this case.

I also heard a suggestion that the defendant did not go into the building, and so he cannot be, or he should be held -- not be held responsible for what he did.

Well, there's two problems with that statement. The first, he in fact crossed those glass doors. He walked through the shattered glass, the doors into the Capitol building. So that's problem 1.

Problem 2 is, if he did not enter the building, it surely was not for lack of trying. You have seen those videos.

I also understood the defense to argue that because the defendant got to the Lower West Terrace tunnel 13 minutes after the proceeding was originally suspended, he somehow could not be intending to obstruct the official proceeding. The problem is, the goal was to not have that proceeding resume ever again. That was the goal. It was not just to stop it or halt it for a few minutes. It was to make sure that Congress would not go back and actually certify the electoral vote count.

And we've also heard some suggestion that he did not intend -- he could not have intended to obstruct the Electoral College count, that that's not why he went to the building, that you should have seen more on social media.

Here's the thing that you did see in Exhibit 303 in the Facebook text. That is proof positive that the defendant knew

1   at least as of January 5, the day before January 6, that

2   Congress would be certifying the results of the Electoral

3   College vote.

4       And here's the thing.  If you know that Congress is

5   required and will be certifying the result of the Electoral

6   College vote and you choose exactly the place and exactly the

7   time and only that place and only that time to lay siege to the

8   Capitol, well, then chances are that you are trying to obstruct

9   the certification of the Electoral College.

10      Ladies and gentlemen, you've been at this for a long time.

11  We are all grateful for your patience.  You have all the

12  evidence.  You have the responsibility to decide this case.  Go

13  back to the jury room, review the evidence, take all the time

14  you need.  Once you have done that, you will find that the

15  defendant is guilty of every count in the indictment.

16      Thank you.

17          THE COURT:  All right.  Does anybody want to come to

18  the bench for any reason?

19          MR. SMOCK:  (Shook head.)

20          MR. VALENTINI:  (Shook head.)

21          THE COURT:  Okay.  Ladies and gentlemen, you've heard

22  all the evidence and seen all the evidence and heard the closing

23  arguments of counsel, and you've heard my instructions on the

24  law.  It's time for you to start deliberating.

25      When you return to the jury room, you should first select a

foreperson to preside over your deliberations and to be your
spokesperson here in the courtroom.  There are no specific rules
about how you should select a foreperson.  It's up to you.  Just
as you go about your tasks, be mindful of your mission to reach
a fair and just verdict based on the evidence.

So consider selecting a foreperson who you think will be
able to help facilitate your discussions, who can help you
organize the evidence, who will encourage civility and mutual
respect among all of you, who will invite each juror to speak up
regarding his or her views about the evidence, and who will
promote a full and fair consideration of the evidence.

That's what the foreperson should do, but each juror is
equal and has an equal say in the discussions and in the
deliberations and ultimate decision.

I will be sending into the jury room with you exhibits that
have been admitted into evidence, except for the two devices
admitted in evidence as Government Exhibits 1001 and 1002.

Now, you may examine any or all of the exhibits as you
consider your verdict.  Please keep in mind that exhibits that
were only marked for identification but were not admitted in
evidence will not be given to you to examine or consider in
reaching your verdict.

If you wish to examine the devices admitted in evidence and
marked as Government Exhibits 1001 and 1002, please send a note
to Ms. Johnson, write it out, and either she or a court security

1    officer will bring those exhibits to you.

2         The court security officer or Ms. Johnson will remain in

3    the jury room while you have the opportunity to examine those

4    particular exhibits, but you should not discuss any evidence or

5    otherwise discuss the case at all among yourselves while he or

6    she is present in the jury room with you.  And you may ask to

7    examine the evidence as often as you find it necessary.

8         You also will be given instructions on how you can observe

9    the videos that have been shown, any or all of them.  I think

10   they're on a thumb drive.  I think there's a television set in

11   there that accommodates that.  I'm not a technology person, but

12   Ms. Johnson or someone will explain all of that.

13        During the course of the trial -- there were a number of

14   exhibits admitted in evidence, but there were times when only

15   parts of those exhibits -- of an exhibit was admitted, only the

16   part that I considered relevant to your determinations and

17   deliberations.

18        Where this has occurred, I've required that the parts that

19   are not relevant of a particular exhibit to be blacked out or

20   blurred or deleted.  So as you examine the exhibits and if you

21   see or hear an exhibit where there appear to be omissions, don't

22   worry about it.  That was done for a reason.  You should

23   consider only the parts that were admitted.  You should not

24   guess as to what has been taken out.

25        As I said before we started this trial and even during jury

selection, the question of possible punishment of the defendant

in the event that there's a conviction is not a concern of

yours.  It should not enter into or influence your deliberations

in any way.

The duty of imposing a sentence on any convicted person in

this court in the event of a conviction is on the Judge and only

on the Judge.  So it's up to me at the end of the day.  Your

verdict should be based solely on the evidence in this case, and

you should not consider the matter of punishment at all.

Again and again and again, I would like to remind you,

don't watch anything, listen to anything, read anything.  In

some cases, although not necessarily in this one, there may be

reports in the newspaper, on the radio, Internet, or television.

If there's any media coverage, don't watch it, don't listen to

it.  Walk away.  You must not read, listen to, or watch such

reports, because as I've said over and over, you have to decide

this case based solely on the evidence presented in this

courtroom.

And now you've heard it all and seen it all.  If anything

inadvertently comes to your attention, do not discuss it with

your fellow jurors or anyone else.  Just let Ms. Johnson know.

As you go back to deliberate, again, remember, don't

communicate with anybody else about this case.  Don't talk to

family or friends or acquaintances.  Don't let them talk to you.

Stay away from social media, e-mails, text, blogging, Googling,

other social media.  Independent research is absolutely
forbidden.

Now, I said you would be provided with a copy of the
instructions, and you will.  You will also be given a verdict
form for your use when you have concluded your deliberations.
The form is not evidence in the case, and nothing in the form
should be taken to suggest or convey any opinion by me as to
what the verdict should be.  Nothing in the form replaces the
instructions I have given you on the law, and nothing replaces
or modifies the instructions about the elements of the
individual charges which the government must prove beyond a
reasonable doubt.

The form is meant only to assist you in recording your
verdict.  And the form, as you will see, has the -- we've
revised it a couple of times.  I don't have a copy with me.  But
the form goes through the counts in the order that the
indictment lists them in.  You can discuss the evidence and
discuss the counts and discuss the charges and discuss the
evidence in any order you want to.  You don't have to take them
in the order that they are on this form.  You decide what the
most logical way is for you to proceed when you get into
deliberations.  Neither the lawyers nor I have any role to play
after you leave us to go deliberate.

Now, if it becomes necessary during your deliberations to
communicate with me, if you have a question, for example, or

1    anything else, you may send a note by either the court security

2    officer who will be sitting outside the room or through

3    Ms. Johnson.  And it should be signed by your foreperson or by

4    any one or more members of the jury.

5         None of you should try to communicate with me except by a

6    signed note.  And I will not communicate with you on any matter

7    concerning the merits of this case except either responding to

8    your note in writing or possibly asking you all to come back to

9    the courtroom and answering your question orally here on the

10   record with the lawyers present as well.

11        Bear in mind, if you write us a note, you are never, never,

12   never under any circumstances to reveal to anyone, not to

13   Ms. Johnson, not to the court security officer, how you're

14   voting until you're all done and you've reached your unanimous

15   verdict or verdicts.  This means you should never say in writing

16   or orally that you're divided 7 to 5, 4 to 8, whatever, or in

17   any other fashion, whether the vote is for conviction or for

18   acquittal or in any other issue in the case.

19        The attitude and conduct of jurors at the beginning of your

20   deliberations are matters of considerable importance.  It may

21   not be useful for a juror, for example, as soon as you walk into

22   the jury room to voice a strong expression of opinion or to

23   announce a determination that you stand for a certain verdict.

24   If you do that at the outset, sometimes a sense of pride causes

25   a juror to hesitate to back away from a position.

1    Many jurors find it useful to avoid an initial vote upon

2    retiring to the jury room.  Calmly reviewing and discussing with

3    each other and listening to each other the case at the beginning

4    of the deliberations is often a more useful way to proceed and

5    throughout the deliberations, discussing, listening, having

6    interactions civilly.

7    Remember, you're not partisans.  You're not advocates for

8    any side or person or party in this matter.  You are the judges

9    of the facts.

10   Now, the last thing I have to do before you begin your

11   deliberations is to make sure there are only 12 of you.  The law

12   requires that in a criminal case only 12 people can deliberate.

13   When we started, the selection of alternates was an

14   entirely random process.  It's nothing personal.  We selected

15   two -- I just noticed another typo in our instructions which

16   will have to be changed.

17   We selected two seats to be the alternate seats, and we

18   told you who the alternates were.  They are seats 13 and 14 in

19   the back row.  We have already excused our friend in seat

20   number 4, for reasons which I think she explained to some of

21   you, because the trial went on a little longer than usual.

22   So since the rest of you who have remained healthy and

23   attentive and are ready to start deliberating, I can now excuse

24   one more juror, unless any of you has anything you need to tell

25   me before I do so and before we start deliberating.

1        I don't see anybody raising their hand.

2        And so I think we're going to say good-bye to our friend

3    over here in seat number 14 in the back with our gratitude.

4        And if you would write down and give to Ms. Johnson your

5    phone number or the best way to reach you, we will call you.  We

6    will call you in the unlikely event that something happens to

7    one of our other jurors while they're deliberating and we have

8    to ask you to come back.  That's very unlikely.  However -- and

9    Ms. Johnson will call you after the verdict and after the case

10    is over, because I'm sure after all the time and attention and

11    patience you've given us, you're interested.

12        So since, however, the slight possibility exists that we

13    might have to call you back, please do not discuss the case with

14    anyone or do any independent research or anything else or read

15    anything until Ms. Johnson tells you -- calls and tells you the

16    case is over, including the Internet and all of that.

17        So I think that's all I have to say.  Now, normally, I

18    would say you should report back to the jury office, but no,

19    you've been here longer than you thought you were going to be

20    here.  So you've already given your badge to Ms. Johnson, and we

21    thank you for your time, your attention, your patience, and you

22    can get your belongings from the jury room, and then you're free

23    to go with our gratitude.

24        And the rest of you are the jury, and I'm going to let you

25    go back in a minute.

1       Let me just ask counsel if there's anything we need to talk

2   about at the bench before the jury goes back.

3           MR. VALENTINI:  No, Your Honor.

4           MR. SMOCK:  No, Your Honor.

5           THE COURT:  Okay.

6       And so you go back.  You'll get started.  You'll tell

7   Ms. Johnson or our friendly court security officer who has been

8   here almost as long as I have, that -- what time do you want to

9   leave today?  What time you want to start tomorrow?

10      We cannot start until everybody is here in the room and

11  ready to start talking.  You'll have breakfast in the morning,

12  and once you start deliberating tomorrow, you will have lunch

13  also.  And we will wait to hear from you.  If you have any

14  questions, write them out.

15      Thank you.  We'll see you when you're ready to talk to us.

16      (Jury exited courtroom.)

17          THE COURT:  All right.  If everybody would have a

18  seat.  Ashley, we have to make changes in 2.511 before we send

19  the instructions back, but we can do that in a few minutes.

20      So now that the jury is out, is there anything that anybody

21  wants to say for the record, preserve any objections, anything

22  at all before we talk about our logistics for the rest of today

23  and tomorrow?

24          MR. DREHER:  Nothing from the government.

25          MR. SMOCK:  No, Your Honor.  Thanks.

1           THE COURT:  Here's what I'm concerned about.  I don't

2      want to waste too much time.  So if we should get a question

3      from the jury -- I mean, it could happen today, but I'm not

4      sure -- I want to make sure that you're at a place where you can

5      be communicated with and you can get here quickly.

6          And I think, Ms. Goetzl and Mr. Smock, that also relates to

7      your client, because we can't do anything without

8      Mr. GossJankowski here, because you're going to want to consult

9      with him about any question we get from the jury.

10         As I understand it -- and our interpreters can help us with

11     this one.  I don't know who is working while the jury is in

12     deliberations and whether they're going to be here physically or

13     whether they're not going to be here physically.  Are you going

14     to be here sitting around waiting?

15          INTERPRETER:  Not probably in the courtroom, Your

16     Honor, but in the building, yes.

17          THE COURT:  Good.  Thank you.

18         So you've already agreed on the exhibits going back, and we

19     know how here handling Exhibits 1001 and 1002.  Just let

20     Ms. Johnson know the quickest way to reach you and how we should

21     do that.

22         Mr. Smock and Ms. Goetzl are responsible for notifying

23     Mr. GossJankowski and getting him here.

24         I don't know that I have anything else to say.  Does

25     anybody else have anything else to say?  All right.

1          (Recess taken from 2:40 p.m. to 4:34 p.m.)

2          (Jury not present.)

3          THE COURT:  So the jury has sent us three notes, and

4     they've also then asked if they could go home, and I told

5     Ms. Johnson they could go home, because I thought it would be

6     more productive if we try to resolve this stuff.

7          So the first note came at 3:53 p.m., the second at

8     3:56 p.m., and the third at 4:18 p.m.  And they all deal, it

9     seems to me, with perhaps our being a little careless in certain

10    respects, because they have obviously looked at the verdict form

11    and then looked at some of the instructions, and maybe we made

12    some mistakes on the verdict form.  I don't think we made any

13    mistakes in the instructions.

14         And that has to do with some of their questions at least,

15    and some of the other ones on quick reading seem to me to do

16    with the disjunctive/conjunctive problem, which we all know as

17    lawyers that the statutes use the conjunctive, but the jury,

18    when there's a list of acts, usually needs to only find one of

19    them.

20         I believe and hope that we made that clear in the

21    instructions themselves.  We don't have a general instruction

22    that says injunctive/disjunctive and here's the story on that,

23    but in describing each count, I hope we've been careful.

24         So I'm hoping that you're actually going to be able to

25    reach a meeting of the minds, the defense and the prosecution,

1    on a number of these questions, and we may have to revise the

2    verdict form.  I don't know what else we will have to do.

3        All right.  Ms. Rochlin, you seem to be taking the lead

4    here.

5            MS. ROCHLIN:  I think it's probably time I did

6    something substantive.

7            THE COURT:  I assume you've been doing things behind

8    the scenes all along.

9        Make sure your microphone is on.

10           MS. ROCHLIN:  Your Honor, the United States agrees

11    with the Court about the conjunctive/disjunctive issue, and we

12    do think the jury should be instructed that they should pick the

13    option for "or."

14        That is certainly consistent with circuit precedent, not

15    just in this circuit but every other circuit where I've ever

16    researched the issue.  And I know there is D.C. Circuit

17    precedent on this issue.  I think the -- an example of a case

18    would be *United States v. Brown* that I'm recalling from memory,

19    but I can certainly supply a case with a citation to the Court

20    if necessary.  This seems like pretty basic hornbook law.

21        And I have asked the defense for their position.  They may

22    be processing the notes and their position at this time, but I

23    would hope, like the Court, we could reach a meeting of the

24    minds on that issue.

25           THE COURT:  I haven't looked, but I assume there's

1   nothing in the standard jury instructions, a general instruction

2   that says when a statute says "and" it normally means "or."  I

3   don't remember any such instruction, but I agree with you

4   there's case law that says it.

5        MS. ROCHLIN:  And I know for a fact that there are

6   pattern jury instructions from other jurisdictions, if not this

7   one.

8        So again, if it would assist the Court, I am happy either

9   this evening or overnight to find those and e-mail them to your

10   clerk or submit them in whatever form the Court prefers.

11        THE COURT:  Assuming there is a meeting of the minds

12   on this issue, and we will hear from Mr. Smock shortly, one way

13   to deal with it would be to find and modify, if necessary, one

14   or more of those pattern jury instructions and run them by the

15   defense and see if we can -- both sides can agree on appropriate

16   language to respond to certain parts of their questions.

17        MS. ROCHLIN:  Yes, Your Honor.

18        As for the remainder of the questions about whether there

19   needs to be a match between the verdict form and the

20   instructions and questions about whether the verdict form should

21   refer to grounds with respect to Count 6, I don't know if the

22   Court wants or needs to take up those questions now, but I'm

23   happy to address them.

24        THE COURT:  Well, it says, "For Count 6, the verdict

25   form asks how do we find the defendant on the charge of

1      disorderly conduct in a Capitol building?" and asks whether it

2      should instead say, "How do you find on the charge of disorderly

3      conduct in a Capitol building or grounds?"

4          And I think they must have looked -- they don't have a copy

5      of the indictment.  They must have looked at our instructions.

6          MS. ROCHLIN:  Right.  And so the government's position

7      would be they should follow the Court's instructions.

8          THE COURT:  Right.  I'm perfectly -- remember, the

9      verdict form -- we could send them a modified verdict form.

10         MS. ROCHLIN:  We could do that, Your Honor, or we

11     could explain that as the Court previously instructed they are

12     to draw no conclusions or inferences from the verdict form

13     itself and it's just a kind of shorthand.

14         THE COURT:  Okay.

15         MS. ROCHLIN:  And I defer to the Court on that.  I

16     hate to make more work for the Court and its staff.

17         THE COURT:  It's not that hard to do.  But I think

18     you've suggested two ways to deal with it:  One is say the

19     instruction controls, the verdict form is a shorthand; the

20     alternative would be say that and give them a revised verdict

21     form.

22         And we'll see what Mr. Smock has to say.  All right.  So I

23     guess, Mr. Smock, do you want to speak to -- so far, the

24     government's made two points.  One is the general and/or

25     conjunctive/disjunctive, and the other deals specifically with

1   the first note, the 3:53 p.m. note.

2           MR. SMOCK:  So with respect to the 3:53 p.m. note, I

3   mean, I think it probably makes sense to follow the guidance

4   provided by the government of referring them to the instructions

5   and saying that those control and that the verdict form is

6   essentially shorthand, you can't cover everything in a verdict

7   form.

8           THE COURT:  So you're not in favor of a revised form,

9   at least right now?

10          MR. SMOCK:  I mean, I don't know that I have a strong

11  opposition to it.  Obviously, we would want to review it.  But I

12  don't know that I have a strong feeling.

13      Based on the fact that we've received three multi-question

14  notes about things like this in the last, you know, 20 minutes,

15  I imagine we may get more if we don't -- I mean, it could be

16  that it would make sense to revise the verdict form just to make

17  sure we're crossing all Ts and dotting all Is to avoid any

18  further questions.  But it's also true that this evening the

19  defense can look at the verdict form more carefully, and if we

20  have a view about a way to revise it, we would propose it to the

21  Court.

22          THE COURT:  So if now we're going to agree on -- we're

23  going to discuss the principles that govern how to respond to

24  these questions, and we may reserve on exactly what process and

25  procedure.

1          What about the and/or question?

2          MR. SMOCK:  I think to be abundantly safe, before

3    providing a final answer about that, I would like to look at the

4    case law provided by the government before giving a final answer

5    about that, if that's all right.

6          THE COURT:  Okay.  So let me suggest, to move the ball

7    forward, that as soon as feasibly possible, the government will

8    send some case law to you, and so we don't make this a two-step

9    process, she will also send you one or more pattern jury

10   instructions, or she may modify them slightly, but send them to

11   you, and so that by e-mail later you will be back and forth with

12   each other, but you will be prepared to tell me in the morning

13   whether you agree as to how we should answer the

14   disjunctive/conjunctive thing and whether you've agreed on a --

15   on a possible instruction.

16       I mean, if we agree -- if the government's right on the

17   law, the jury does need an answer to our questions, and it may

18   be better to have as our model a pattern jury instruction that

19   some circuits have adopted rather than me just winging it.

20         MR. SMOCK:  Makes total sense.  I agree.

21       The only other thing, as I'm sort of going through the

22   series of questions on the 4:18 note, one reason it might make

23   sense to revise the verdict form is that the second-to-last

24   comment is a pretty clear reference to a typo.

25         THE COURT:  Let's go one at a time.  We've talked

about the 3:53 note.  When we get to the 3:56 p.m. note, and
this is the same -- it says, "Count 1 of the verdict form asks
how you find the defendant on the charge of civil disorder.
Shouldn't the verdict form say 'how do you find the defendant on
the charge of obstructing officers during a civil disorder in
Count 1?'" which is a quote from my instructions, I guess.

"More broadly, should" -- this is the broader question.
"Should the counts on the verdict form match the counts on the
jury instructions?"

Then they have what I think is a somewhat -- then we get to
the first and/or question in the 3:56 note, which is, "For
example, Count 2 says 'proceeding or aiding and abetting' on the
verdict form.  But the jury instruction says 'and.'"

So there, I think -- I think that they conflated in their
minds two things which we know are separate.  One is that the
verdict form is a shorthand for the indictment, and we could
either say that or we could revise the verdict form to say
you're right, here's a revised thing.  We might even give
ourselves a little mea culpa by saying we did it as a shorthand,
but you're right.

But the second question is -- has to be treated by us
lawyers as a separate question.  It's really not the same.  One
is simply how we've expressed ourselves in two different
documents; the other is a legal question.

So -- I don't know what you and Ms. Rochlin want to say

about my last little speech, but that's what I'm thinking as I look at the 3:56 p.m. note.

MR. SMOCK:  I agree with you about that.  I do think a fair number of the foreperson's questions do relate to this question of whether the verdict form is shorthand, but that third question is, whether they realize it or not, somewhat more substantive, and I think it would make sense to just look at it this evening before giving an answer.

THE COURT:  Before we move on, even though they're all sort of related, why don't I hear what the government has to say about the 3:56 p.m., and then we'll move on to the 4:18 p.m. note.

MS. ROCHLIN:  Your Honor, again, as to the first question about the difference between the verdict form and what I'm interpreting is the instructions, I think the same answer would apply.

As for the paragraph and the question that begins "more broadly" where it addresses again the conjunctive versus disjunctive issue, a colleague of mine from the Eighth Circuit has already e-mailed me the standard jury instruction from the Eighth Circuit.  I'm going to try and do better and find something closer to home, but I will forward those examples to Mr. Smock.

THE COURT:  So you're going to try to find, one, some D.C. Circuit or decisions of my colleagues on conjunctive/

1    disjunctive.  Assuming there's nothing in our Red Book, and I

2    don't think there is, you're going to find some good pattern

3    instructions.  You've already got one.

4            MS. ROCHLIN:  I've got one already.  I will work on

5    getting others.  But I think, even though I like to feel as if

6    I'm working quickly, it makes sense to allow the government and

7    opposing counsel this evening to look at the instructions that

8    are collected and perhaps to come to some agreement or at least

9    present our best options to the Court.

10           THE COURT:  Okay.  So should we look at the 4:18 note?

11           MS. ROCHLIN:  That makes sense to me, Your Honor.

12           THE COURT:  I'm sorry?

13           MS. ROCHLIN:  I agree with moving on to the 4:18 note.

14           THE COURT:  So the last note, just so I'm -- again,

15   they want -- they ask why aren't we saying entering and

16   remaining instead of just remaining in Count 4.  They then ask

17   the and/or question again.  Then it says, "For Count 5, the

18   verdict form asks 'disorderly and disruptive,' but the

19   instruction uses 'or.'  Please clarify if it's 'and' or 'or.'

20       "The verdict form says 'if you find the government

21   guilty.'"

22           MS. ROCHLIN:  I have to believe that's a typo that

23   escaped us all, Your Honor.

24           THE COURT:  Yeah, and none of us caught it the number

25   of times we've all looked at it.

1          MS. ROCHLIN:  Sometimes the eye sees what it expects.

2          THE COURT:  That was Count 5.

3      And then the last thing, "Count 5 of the verdict form says

4  'lesser included offense of disorderly and disruptive,' if 'and'

5  should be 'or' like the jury instruction."

6      So we've got one typo, and then the other two, and

7  everything else really relates to two questions, the verdict

8  form's inconsistency, in their view, with the jury instructions

9  and the and/or question.

10          MS. ROCHLIN:  Yes, Your Honor.

11          THE COURT:  So I'm inclined to agree with what

12  Mr. Smock said a couple of minutes ago, that given the number of

13  things that they have asked about relating to the alleged

14  inconsistency between the verdict form and the instructions,

15  that we should answer their questions, but I think we should go

16  beyond just saying the instructions control.  I think a revised

17  verdict form would be helpful.

18      But if the government has an objection to that, we can

19  discuss that in the morning.

20          MS. ROCHLIN:  I don't have a strong objection, Your

21  Honor.  I had a concern about slowing down the process, but in

22  light of the fact that the jury is already, I assume, on its way

23  home, I think we have time this evening to do what needs to be

24  done.

25      So no, there is no objection to a revised form.

1          THE COURT:  If you stay where you are and Mr. Smock

2    comes back to the podium, I have a suggestion.

3          My suggestion is that we undertake a division of labor,

4    that Mr. Smock prepare a revised verdict form consistent with

5    what we've just discussed this afternoon, that he and Ms. Goetzl

6    proofread it very carefully, and that they send it to the

7    government.  And the government can decide whether they agree

8    with the change, and they too can proofread it very carefully.

9          And while they're doing that, Ms. Rochlin will find some

10   D.C. Circuit or D.C. District Court case law on

11   conjunctive/disjunctive, provide that to Mr. Smock and

12   Ms. Goetzl, and also some pattern jury instructions from other

13   jurisdictions.

14         And if we meet at 9:00 in the morning -- what time is the

15   jury coming back?

16         COURTROOM DEPUTY:  9:30.

17         THE COURT:  The jury is coming back at 9:30.  If we

18   meet at 9:00 in the morning to finally resolve these things, we

19   could then get them in and answer their questions first thing in

20   the morning and give them a revised verdict form and retrieve

21   the old one.

22         MR. SMOCK:  Makes sense.

23         MS. ROCHLIN:  Agreed, Your Honor.

24         THE COURT:  Okay.  Anybody else have anything to say?

25         MR. SMOCK:  I don't think I've ever gotten so many

1    questions in a short period of time.  I think there's at least a

2    dozen.

3           THE COURT:  Well, what I think is interesting about it

4    is that maybe we can conclude that they've decided to try to

5    understand what we've all said about the law before they see how

6    it applies to the evidence.  Because I gave them instructions.

7    Both Mr. Valentini and Mr. Smock spent a fair amount of their

8    time talking about the elements.

9        And it's not a bad thing that they're taking us all

10   seriously on what's involved in this case.  They find the facts,

11   but I'm happy that they're trying to apply the law.

12          MS. ROCHLIN:  Speaks well to the pool in the District

13   of Columbia, Your Honor.

14          THE COURT:  Yeah, I think so.  I think people try very

15   hard.  I think we have one lawyer on the jury.  We've got a

16   number of professionals.  But we've got a lot of people who this

17   is a little bit more new and different to.  We'll see.

18       All right.  So we have a plan as to how we're going to

19   proceed, and we will all meet here at 9:00 tomorrow morning.

20   Hopefully, the questions on the table will have been resolved or

21   mostly resolved and agreed to in the meantime, and we will

22   answer the questions and move on.

23       Anything else anybody needs to say?  Okay.  See everybody

24   in the morning.

25          (Proceedings adjourned at 4:56 p.m.)

1        CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, Sara A. Wick, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8   /s/ Sara A. Wick_____        June 15, 2023_____

9   SIGNATURE OF COURT REPORTER            DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25