UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>**VITALI GOSSJANKOWSKI,**<br>　　　　　　　　　*Defendant.* | No. 21-cr-123 (PLF) |

**MOTION FOR JUDGMENT OF ACQUITTAL OR FOR A NEW TRIAL**

Defendant Vitali GossJankowski, through counsel, hereby moves for a judgment of acquittal or for a new trial, and states as follows.

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendant Vitali GossJankowski was charged under a superseding indictment with six counts: (1) 18 U.S.C. § 231(a)(3) (Civil Disorder); (2) 18 U.S.C. §§ 1512(c)(2); 2 (Obstruction of an Official Proceeding); (3) 18 U.S.C. §§ 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon); (4) 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon); (5) 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon); and (6) 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building).

GossJankowski was tried by a jury from March 3–16, 2023. The government presented twelve witnesses in its case-in-chief: Capitol Police Captain Ronald Ortega, Secret Service Inspector Lanelle Hawa, friend Neal Matthews, Secretary of the Senate counsel Daniel Schwager, MPD Sergeant William Bogner, MPD Officer Bronson Spooner, Safeway employee Edgar Tippett,

MPD Detective Jason Mastony, MPD Officer Sarah Beaver, FBI Analyst Kerry Schultz, MPD Officer Morris Rudolph Moore, and FBI Special Agent James Mulvihill. The defense called one expert witness, Dr. Mark Kroll.

The government's case was built around footage of GossJankowsi and others from security cameras, MPD body-worn cameras, and citizen videos. This footage established that between 12:45 p.m. and 2:10 p.m., a throng of protesters marched toward the Capitol on January 6, which was originally surrounded by different layers of fencing, including "snow fencing" and interlocking bike racks. Tr. 784. The fences were marked with signs stating, "Area Closed By Order of the United States Capitol Police Board." Gov. Ex. 604. The crowd pushed through each of these layers and surrounded the Capitol, eventually making their way to the Capitol doors. Around 2:13 p.m., rioters first breached the Capitol building. Tr. 835:10. Shortly thereafter, both houses of Congress suspended their individual sessions, which had been convened to consider objections to Arizona's electoral college votes. *Id.*

There was an inaugural stage in front of the Capitol that rioters took over sometime after 2:36 p.m. Tr. 871. Before that happened, GossJankowski was captured on video in the stadium seating surrounding the inaugural stage looking out at the scene. Sometime between 2:36 p.m. and 2:42 p.m., GossJankowski made his way toward a tunnel entrance to the Capitol on the lower west side. Tr. 872; Gov. Ex. 100.1. He walks up to the tunnel at 2:41 p.m. In the tunnel, a crowd of rioters gathered next to closed glass doors that led to an entrance to the Capitol. *Id.* The closed doors led to another set of doors, behind which a group of Capitol Police officers and MPD officers with riot shields guarded the entrance. Gov. Ex. 101.

In videos, GossJankowski can be seen moving around in the tunnel, at times going to the front of the rioters and at times moving out. *Id.*; Gov. Ex. 100.1. He is often seen looking around,

looking at his phone, and biting his nails. *Id*. At 2:42 p.m., a member of the crowd breaks the glass in the doors. Gov. Ex. 101. Police officers immediately begin spraying chemicals at the crowd through the hole in the glass, *id*., and GossJankowski retreats out of the tunnel, Gov. Ex. 100.1. He then looks at what is going on and slowly makes his way back to the front of the tunnel group. *Id*.

After the glass on the doors was broken, police with riot shields began pushing against the crowd. Gov. Ex. 101. GossJankowski can be seen at the side while police engage with the middle of the group of protestors. *Id*. At 2:45 p.m., GossJankowski appears to wag his finger at officers and spit in their direction. *Id*. He then retreats to the tunnel entrance as officers strike the crowd with batons. *Id*.; Gov. Ex. 100.1. He leaves the tunnel, gestures with crowd members, and peeks up at what is happening inside. *Id*.

At 2:48 p.m., he walks away for two minutes, then comes back near the tunnel entrance and looks around for two minutes, then walks away for two minutes. Gov. Ex. 100.1. At 2:53 p.m. he walks back into the tunnel and passes police riot shields backwards over his head as the crowd passes them back from the front of the police line. *Id*. At this time, an unknown crowd-member in the tunnel handed GossJankowski a "Vipertek" device that makes electric arcs. *Id*. GossJankowski appears excited. At 2:54 p.m., he raises his hand and flashes an arc toward the police line. He then makes his way toward the front and spits at the police line. *Id*. At 2:56 p.m., GossJankowski retreats to the tunnel entrance. He climbs up on the side and waives at others outside the tunnel to enter. He then bites his fingers and looks at the Vipertek device. At 2:59 p.m., he leaves the tunnel.

At 3:10 p.m., GossJankowski goes back to the tunnel entrance and tries to peek inside. Gov. Ex. 101.2. He makes his way inside again at 3:11 p.m. and joins the crowd when they begin a "heave ho" movement against the police line. Tr. 983; Gov. Ex. 101.2. He then leaves the tunnel again at 3:12 p.m. *Id*.

3

At 3:18 p.m., the police largely succeed in pushing the crowd out of the tunnel. Gov. Ex. 101.3. However, an officer is pulled by the crowd away from the police line. *Id.*; Tr. 993. While some rioters attack the officer, others shout "Don't hurt the cop" and try to protect him. Gov. Ex. 144.2. Seeing this unfold, GossJankowski turns to the crowd behind him and vigorously wags his finger and mouths, "No." Def. Ex. 147. He then moves and reaches into the melee where MPD Officer Morris Moore has been pulled.

The central dispute in the trial was over GossJankowski's intent during this incident. The government used still photographs from Gov. Ex. 144.2 emphasizing the hand holding the Vipertek to argue that GossJankowski was attempting to pull Officer Moore toward him and assault him with the Vipertek. Gov. Ex. 144.2A. But in the video, GossJankowski appears to simply be reaching forward with both hands while trying to maneuver through the crowd immediately after appearing to instruct the crowd not to hurt Officer Moore, and then tried to pull him away from the attackers. Gov. Ex. 144.2. Importantly, GossJankowski told detectives that he did not know how to turn the device off, so he was uncomfortable putting it in his jacket pocket and had to hold it out the whole time. Def. Ex. 31 (not admitted). Although this would explain why he had the device in his hand as he moved both hands forward, GossJankowski did not testify, so the jury did not hear this key information for interpreting the video.

In addition to the videos, the government relied on Facebook messages showing that GossJankowski discussed gathering and marching on January 6 because, "Tomorrow, it's the Congress to certify the electoral vote." Gov. Ex. 303.

The defense moved for a judgment of acquittal under Rule 29, which the Court reserved. The jury convicted GossJankowski of all six counts but did not find that he used or possessed a deadly weapon.

After trial, the Court held *ex parte* discussions concerning GossJankowski's concerns with his prior counsel. Although the Court had conducted a colloquy where GossJankowski affirmed that he did not wish to testify, Tr. 1828, he later informed the Court that he wished to testify but his counsel was not prepared. As a result of these discussions, undersigned counsel was appointed to assist GossJankowsi with post-trial motions.

## LEGAL STANDARDS

Rule 29(a) of the Federal Rules of Criminal Procedure provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In reviewing a Rule 29 motion, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). As the D.C. Circuit has explained, "if, upon the whole of the evidence, a reasonable mind must be in balance as between guilt and innocence, a verdict of guilt cannot be sustained." *Curley*, 160 F.2d at 233. When conducting this inquiry, the Court must "accord[] the government the benefit of all legitimate inferences." *United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983). However, "[c]onjecture and surmise regarding what a defendant may have intended or known is insufficient to support a conviction." *United States v. Coppin,* 1 F. App'x 283, 291 (6th Cir. 2001). And where there are possible "innocent explanations" for the government's evidence, it must be viewed as "equivocal and thus insufficient to sustain [a] conviction[]" *United States v. Davis*, 863 F.3d 894, 904, 906 (D.C. Cir. 2017); *see also United States v. Teffera*, 985 F.2d 1082, 1086, 1088 (D.C. Cir. 1993) (stating that "the government's web of

inference is too weak to meet the legal standard of sufficiency" because alternative explanations of its evidence "are at least equally consistent with" the "plausible hypotheses" of the defense).

Rule 33 of the Federal Rules of Criminal Procedure grants the Court authority to order a new trial "if the interest of justice so requires." Compared to Rule 29, "the Court has greater discretion [under Rule 33] to make its own judgment about whether the verdict is just in light of the evidence adduced at trial." *United States v. Wilkerson*, 656 F. Supp. 2d 22, 28 (D.D.C. 2009). As the Supreme Court explained:

> When a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different…. The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*Tibbs v. Florida*, 457 U.S. 31, 38, n.11 (1982). "A reversal on this ground, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Instead, the [reviewing] court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Id.* at 42.

## ARGUMENT

### I. There Was Insufficient Evidence to Prove Defendant's Guilt Beyond a Reasonable Doubt

At the close of evidence, the defense moved for a judgment of acquittal on all counts. Gossjankowski reiterates those arguments by attachment here. Ex. 1. In addition, he submits the following additional points.

**A. The Video Evidence Did Not Prove Assault of Officer Moore**

The video evidence of the interaction with Officer Moore, captured in Gov. Ex. 144.2 and Def. Ex. 147, was insufficient to support the conclusion beyond a reasonable doubt that GossJankowski intended to or did commit a forcible assault or otherwise interfered with Officer Moore. The government's interpretation of this incident was supported by GossJankowski's prior conduct toward the police, which involved spitting and passing of riot shields. Gov. Ex. 100.1; Gov. Ex. 101. However, after that conduct, GossJankowski left the area of the tunnel and became an observer. Then, when the crowd pulled Officer Moore away from the police line and assaulted him, GossJankowski joined a chorus of others shouting not to hurt him, and specifically wagged his finger and mothed "No" immediately before trying to intervene. Def. Ex. 147.

To be sure, the government's screenshots from the incident, divorced from the moving video, created an impression of GossJankowsi pulling Officer Moore toward him and then reaching forward to "tase" him. Gov. Ex. 144.2A. However, that is simply an editing illusion. Viewed in real time, it is clear that GossJankowski's movement of the arm holding the Vipertek device was part of several movements where he was just trying to maneuver through the crowd while holding the device away from himself so that he did not "tase" himself or others. He did not know how to turn the device off, and he did not feel comfortable putting it in his pocket lest it "tase" him. And he did not make "tase" Officer Moore, as the video shows. Nor does the video show GossJankowski acting with any level of force, as the statute requires.

In sum, the interaction with Officer Moore immediately divided the crowd—all of whom were unlawful trespassers, according to the government—into those who nevertheless wanted to protect Officer Moore and those who wanted to harm him. And the only conclusive evidence regarding which camp of rioters GossJankowski fell in—Def. Ex. 147—shows him clearly and urging

the crowd not to mistreat the officer. On this record, no reasonable jury could find that GossJankowski used force to assault or otherwise interfere with Officer Moore.

### B. There Was Insufficient Evidence of Intent Under § 1512(c)

1. There was no evidence that GossJankowski specifically intended to interrupt the certification proceeding

Based on government concessions in other cases, there does not appear to be a dispute that at least some people who went to the Capitol grounds on January 6 and took part in the civil disorder lacked the specific intent to obstruct or impede the certification proceeding. Undoubtedly, many were swept up in the moment and just wanted to be a part of a likeminded crowd on what felt like a momentous day. Others undoubtedly were motivated by a desire to make their voices heard as an act of political protest. *See, e.g.*, Gov. Ex. 133 (showing protestor shouting, "Do you hear us now?!" as rioters breach barricades). In other cases, there has been testimony and evidence that defendants believed the certification had already concluded by the time the crowd reached the Capitol, even if they *would* have tried to stop it. *See, e.g.*, Ex. 2 (oral ruling in *United States v. Black*, 21-cr-127 (ABJ) (finding that "the defendant seemed to have thought it was already over" when he went to the Capitol), Ex. 4 at 326, 335–36 (oral ruling in *United States v. Griffin*, 21-cr-92 (TNM)) (finding that "[e]n route to the Capitol, they heard that Vice President Pence had already certified the election," and "the defendant thought the electoral certification had already occurred prior to his entering the restricted area"). Accordingly, to prove that a defendant had the specific intent to disrupt the certification proceeding, more is required that simply showing that a defendant was part of the riot and delayed the resumption of the certification as a factual matter.

Here, the government did not introduce any of the kind of certification-related discussions, plans, and congressional references used to establish a violation of § 1512(c) in Proud Boys, Oath

Keepers, and other cases. There was no evidence that GossJankowski targeted or complained about Speaker Pelosi, Vice-President Pence, or others; no discussions of him wanting to scare Congress out of certifying the election, as has been present in other cases; no evidence of him bemoaning the resumption of the certification or its outcome, as has been present in other cases; no evidence of him discussing war, rebellion, or overthrowing the government, as has been present in other cases. Rather, the only evidence introduced by the government for GossJankowski's intent was a Facebook group message he sent discussing gathering with others before they "start marching," Gov. Ex. 305, and a message he sent explaining the reason for gathering in D.C. by stating, "Tomorrow, it's the Congress to certify the electoral vote," Gov. Ex. 303. But simply referencing the certification as the reason for marching does not begin to prove the Gossjankowski harbored an intent to disrupt it. Marches and rallies are forms of political expression, and the President had scheduled a large rally and speech for that very reason on January 6. GossJankowski's two messages evinced no desire to try to halt the certification process itself, much less to do so through violence or force. His Facebook messages were simply the barest starting point of information and planning that anyone who showed up that day would have had in his or her mind.

By comparison, the evidence of GossJankowski's intent to obstruct an already-halted proceeding is far less than in the case of *United States v. Black*, 21-cr-127 (ABJ), which resulted in an acquittal by Judge Amy Berman Jackson. Ex. 2. In that case:

- The defendant was among the "very first" people to push past the snow fence and bike rack barriers, breaking through them by "12:54," or six minutes before the certification proceeding started. *Id*. at 4–5.
- The defendant was "one of the first, if not the first person to climb over the fence that had been erected to protect the inaugural stage, and he starts strolling across the stage." *Id*. at 5.
- The defendant shouted at police, "'We will not stand down.'" *Id*. at 16.

- The defendant criticized those "just standing" on the Capitol steps and said "the goal [of going into the Capitol] was to show the politicians that the people run this country." *Id*. at 19.

- After several run ins with police, the defendant took the first opportunity to enter the Capitol building. *Id*. at 5.

- The "defendant ma[d]e[] it down to the Senate lobby on the second floor, exactly where we just seen the Vice President make his escape." *Id*. at 10.

- "At 2:48 p.m. the defendant enter[ed] the Senate chamber…entirely unauthorized." *Id*.

- The defendant "touche[d] the keypads of the computers that are not his to touch and are plainly part of the Senate's official business." *Id*. at 11.

- "He join[ed] others looking at papers on Senator Cruz's desk," *id*., and took a photo of a document relating to certification objections.

- The defendant was asked twice to leave the Senate by police officer, but refused. *Id*.

- The defendant described the need to "abolish[]" and "overthrow[]" the government when it "gets crooked," and stated "'that's what we were doing.'" *Id*. at 20–21.

- The defendant described his mindset as, "want[ing] [the politicians] to know that we, the people, can do it if we decide….we had the numbers and the power at the moment to show them that you don't run the country." *Id*. at 22.

Despite this clear intention to push past barriers and police and revolutionary motivation, Judge Jackson found that the government had failed to prove a violation of § 1512(c). Fundamental to the Court's reasoning was the fact that despite the defendant's participation in certification-focused "Stop the Steal" rallies, "we don't know how much of it the defendant heard or internalized." Ex. 2 at 30. This conclusion applies powerfully here, since Defendant GossJankowski literally *could not hear* the vast majority of the messages swirling about in the crowds, and gave no indication during or after January 6 that he had internalized any messages to interrupt the proceeding.

Simply put, given the wide variety of intents and understandings by riot goers that day, the government has failed to meet its burden of proving that GossJankowski's conduct was specifically aimed at ensuring that a particular proceeding—the electoral certification—remained halted. There

were many other possible motivations that were consistent with planning to be "marching" on the day "Congress [was] to certify the electoral vote," Gov. Ex. 303, including the revolutionary "stick it to the politicians" mindset in *Black*, the "we already lost" anger in *Griffin* (and *Black*), or just an unthinking mob mindset that many protestors described feeling and later regretting. As between these (or other) alternatives, the government offered nothing but "[c]onjecture and surmise regarding what [the] defendant may have intended or known," which "is insufficient to support a conviction." *Coppin*, 1 F. App'x at 291.

   2.   <u>There was no evidence that GossJankowski acted "corruptly"</u>

   Under either the Court's instructions or the formulation endorsed by the concurrence in *United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023), there was insufficient evidence that GossJankowski acted "corruptly" on January 6. First, nothing in the trial showed that GossJankowski acted with "consciousness of wrongdoing." As stated in the instructions, "'[c]onsciousness of wrongdoing' means with an understanding or awareness that what the person is doing is wrong." ECF 166 at 26. It does not mean objectively wrong, or even subjective knowledge that one's conduct is unlawful. It means that the defendant appreciated the wrongfulness of his conduct regardless of its legality, and corruptly chose to proceed.

   The sum total of the government's argument for consciousness of wrongdoing was:

   And for consciousness of wrongdoing, you are jurors. You can use your common sense. It is common sense that anyone who committed this act committed it with consciousness of wrongdoing.

3/15/23 AM Tr. 78. With all due respect, it simply is not "common sense" that someone who genuinely believed that our fundamental democratic norms had been subverted by a pandemic-enabled fraud would find it "wrong" to engage in civil disobedience involving entering restricted places, pushing up against police, and trying to interrupt a sham certification of a fraudulent result.

Resistance to the government is literally how the country was founded, and it has been the driver of most of country's progress from a White, male, aristocratic, slave-holding, and segregated republic to a full, inclusive democracy. Some of the most *uncorrupt* luminaries in our history resisted and even skirmished with police at times. Even spitting at, taunting, and pushing police does not evidence consciousness of wrongdoing, as the many heartfelt protests against police brutality in the summer of 2020 showed. While these acts may be unlawful, many noble and uncorrupt leaders have taught that resistance to unjust laws is one's duty. Accordingly, the government needed more evidence of consciousness of wrongdoing than simply "common sense." It needed something akin to what "corrupt" usually implies in obstruction statutes—a subjectively dishonest or cynical attempt to thwart justice.

Here, there was simply no evidence that GossJankowski had a consciousness that he was acting wrongly in a corrupt manner. As Def. Ex. 147 indicates, GossJankowsk evidenced a sense of personal morality that distinguished between spitting at police—a disgusting but nonviolent act—and harming them physically. If his intent really were to get in the building to interrupt what he perceived as a corrupt proceeding, he and the crowd had to get past the police. But there were lines that were too far for him in that collective endeavor, and there is no evidence that he ever believed he was doing anything wrong or personally corrupt in participating in a mass act of civil disobedience against what he perceived to be a grave injustice. Accordingly, § 1512(c) simply does not apply to GossJankowski's *mens rea*, even under the Court's instructions, and it was never intended to. *See* Ex. 2 at 33 (oral ruling in *United States v. Black*, 21-cr-127 (ABJ) (finding as basis for § 1512(c) acquittal that "defendant's political and religious views are deeply intertwined, and they're certainly a spiritual aspect to all of it"); *id.* at 34 (nothing, with regard to "corruptly" element, "the unique stew in his mind [of] considerable misunderstanding about the Constitution, considerable

misinformation about the outcome of the election, some pretty ugly assumptions about some of the political figures involved, and a deep faith that infused all of his political beliefs that all of that is percolating together and is being further agitated and heated up by rhetoric available on social media," which undermined the conclusion that defendant "had...an understanding or awareness that what he was doing was wrong").

Moreover, the Court's instructions did not fully capture the meaning of "corruptly" in the obstruction context. As the concurrence explained at length in *Fischer*, the term "corruptly" is a unique term that "originated as the mental state for common-law corruption crimes like extortion and bribery." 64 F.4th at 352 (Walker J., concurring). While hundreds of statutes use terms such as "knowingly," "willfully," or "maliciously" to delineate the usual spectrum of *mens rea*, the term "corruptly" appears relatively few times in the U.S. Code and usually in the specific context of "federal statutes covering bribery and obstruction of justice." *Id.*[1] As explained in the concurrence, "[i]n both its common-law and codified forms, 'corruptly' has almost always required proof that a defendant acted with an intent to procure an unlawful benefit." *Id.* Accordingly, the instructions ought to have required as an element that the jury find that GossJankowski acted "'an intent to procure an unlawful benefit either for himself or for some other person.'" *Id.* (quoting *Marinello v. United States*, --- U.S. ----, 138 S. Ct. 1101, 1114, 200 L.Ed.2d 356 (2018) (Thomas, J., dissenting) (cleaned up); *see also United States v. Aguilar*, 515 U.S. 593, 616–17 (1995) (Scalia, J., concurring and dissenting in part) ("An act is done corruptly if it's done voluntarily and intentionally to bring

---

[1] An amicus brief submitted by the National Constitutional Law Union in the pending D.C. Circuit case of *United States v. Robertson*, Case No. 22-3062, summarized this stark linguistic divide: "A search of the United States Code through a legal research tool...revealed that the United States Congress...conditioned [criminal liability] (A) on the word "corruptly" -- 26 times; (B) on the word "unlawfully" -- 203 times; (C) on the word "willfully" -- 729 times; (D) on the word "knowingly" -- 1,177 times." Ex. 3 at 9.

about either an unlawful result or a lawful result by some unlawful method, with a hope or expectation of either financial gain or other benefit to oneself or a benefit of another person.").

Here, there was no evidence that GossJankowski sought to obtain an unlawful benefit for himself. He was not on trial on January 6, and he had nothing to gain by temporarily interrupting the certification proceeding. There are individuals who stood to personally gain from such an act—such as President Trump—and he likely acted with corrupt intent on January 6. But GossJankowski's conduct, besides simply being caught up in the crowd, had genuine political motivations and was directed *against* what he viewed as an unlawful result. Accordingly, the Court should enter a judgment of acquittal on Count 2.

## C. There Was Insufficient Evidence that GossJankowski Knew the Capitol Was a "Restricted Area"

Section 1752(a)(1) punishes anyone who "*knowingly* enters or remains in any restricted building or grounds without lawful authority to do so." (emphasis added). As used in the statute and applied here, the phrase "restricted building or grounds" "means any posted, cordoned off, or otherwise restricted area…of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting…." § 1752(c)(1). Here, the government failed to prove that GossJankowski knew that the Capitol grounds were a "restricted building or grounds" as defined by the statute for two main reasons.

1. <u>The government failed to prove that GossJankowski knew the areas he went were cordoned off</u>

There is no dispute that GossJankowski entered a tunnel on the lower west terrace of the Capitol and went up to a door that was cordoned off and defended by MPD and Capitol Police officers. In meeting this police line, GossJankowski presumably obtained the knowledge that the area behind the door was "otherwise restricted." § 1752(a)(1). But he never *crossed* that door, or

any other open doors that had been breached. Tr. 1067 ("I did not see him go up and try to enter that door, sir."); Tr. 1069 (agreeing that "Mr. GossJankowski never went into any of those breached entrances"). Accordingly, to prove that he knowingly entered a "restricted building or grounds" in violation of § 18 U.S.C. § 1752(a)(1), the government was required to prove that GossJankowski knew that the areas he actually went through were cordoned off or restricted.

However, the government's evidence did not place GossJankowski on or near the Capitol grounds until around 2:36 p.m. Tr. 872; Gov. Ex. 100.1. And Capt. Ortega testified that long before that time, rioters had progressively "pushed aside" the bike racks and "knocked down" the snow fencing, Tr. 1058, which was "the way a person would have known" the area was restricted, Tr. 1060; *see also id*. (agreeing that "by 1:28 in the afternoon or so, the walkway in front of the Capitol essentially was filled with people."); Tr. 1061 (agreeing that defendant was not seen until "2:36 p.m." and that "an hour prior to that this area in front of the Capitol was filled with people"). Since any posted barriers were already knocked down, and GossJankowski stopped right at the point in the tunnel where officers created a physical barrier, the government failed in its burden to prove that GossJankowski actually knew that the Capitol grounds—and not just its interior—were a restricted area.

In its redirect of Capt. Ortega, the government tried to fix this problem; however, its efforts merely underscored its lack of proof. First, the government had Capt. Ortega confirm that doors in the lower west terrace tunnel had a sign saying, "Members Entrance Only." Tr. 1070. But a sign saying only "Members" can come through an entrance does not provide notice that the area behind the entrance is restricted as defined in § 1752; it is more akin to a handicapped parking spot that provides privileged access to certain individuals. Next, the government had Capt. Ortega recite again that the area around the Capitol was restricted" with "multiple perimeters utilizing bike rack,

utilizing snow fencing, utilizing signs, and utilizing police officers." Tr. 1071. But in the very next breath, as if missing the defense's point, the government elicited that "those signs [were] up until the rioters knocked them down," and "the fencing [was] up until the rioters knocked it down." *Id*. Since those "rioters" preceded GossJankowski by over an hour, this testimony merely underscored the lack of proof that GossJankowski saw any restricted signs or barriers prior to joining a crowd freely standing on the Capitol grounds.

Importantly, the law in the District of Columbia has long been that the Capitol grounds are a *public forum* where the public is entitled to gather and express its views. *See Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 584 (D.D.C.), *aff'd*, 409 U.S. 972 (1972) ("The Capitol Grounds… have traditionally been open to the public; indeed, thousands of people visit them each year….Nor is the primary purpose for which the Capitol was designed—legislating—incompatible with the existence of all parades, assemblages, or processions which may take place on the grounds."); *Hodge v. Talkin*, 799 F.3d 1145, 1161 (D.C. Cir. 2015) (describing "the Capitol grounds [as] a public forum by requirement of the First Amendment"). Thus, without affirmative proof that GossJankowski encountered signs or barriers cordoning off the specific areas he went that day, he should be entitled to a presumption that he believed he could be in those places. Certainly, testimony that there *used to be* barriers that were taken down by rioters an hour *before* GossJankowski arrived is not sufficient to prove beyond a reasonable doubt that GossJankowski obtained this knowledge prior to videos showing him curiously poking his head into the lower west terrace tunnel and then meeting, for the first time for him, a police line cordoning off the Capitol entrance.

2. <u>There was no evidence that GossJankowski knew that a Secret Service protectee was at the Capitol</u>

There is another reason the government's evidence failed to meet its burden: the "signs" announcing the restrictions only provided notice that the Capitol Police Board had ordered the perimeter. Thus, anyone who encountered them would only have known that the Capitol Police forbade anyone from entering. But more is required under § 1752(a)(1). The statute criminalizes "knowingly enter[ing] or remain[ing] in any restricted building or grounds." *Id*. Thus, separate and apart from the requirement that the area entered actually has the official status of a "restricted building or grounds," Congress has required that the defendant *know* that status. And under the statute's language and structure, this means that a defendant must know that the area is one of three things: (1) that it is one of certain specific areas (*e.g.*, the White House); (2) that it is an area a Secret Service protectee is "temporarily visiting"; or (3) that it is an area designated as part of a national security event. *Id. See also United States v. Bingert*, No. 1:21-CR-91-1-RCL, 2023 WL 3613237, at *1 (D.D.C. May 24, 2023) ("[T]he government must prove not only that defendants knew they were in a 'posted, cordoned off, or otherwise restricted area,' but also that they knew that it was such an area 'of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visting.'") (citing § 1752(c)(1)(B)).

This knowledge requirement mirrors the Supreme Court's analysis of the knowledge requirement in an analogous criminal statute in *McFadden v. United States*, 576 U.S. 186 (2015). In *McFadden*, the Court addressed the *mens rea* of 21 U.S.C. § 841(a)(1), which makes it unlawful to "knowingly… distribute…a controlled substance." Interpreting this language, the Court held:

> Under the most natural reading of this provision, the word "knowingly" applies not just to the statute's verbs but also to the object of those verbs – "***a*** controlled substance."….When used as an indefinite article, "a" means "[s]ome unde-termined or unspecified particular."… The ordinary meaning of § 841(a)(1) thus

requires a defendant to know only that the substance he is dealing with is some unspecified substance listed on the federal drug schedules.

*Id*. at 191–92 (emphasis added).

The Court discussed two ways that such knowledge may be proven. First, a defendant could know he possessed a substance listed on the drug schedules, even if he did not know which substance it was. The Court gave the example of a low-level member of a drug organization who handles a "white powder" that he knows is on the drug schedules but does not know what the substance is. *McFadden*, 576 U.S. at 192. Such a defendant "would be guilty of knowingly distributing 'a controlled substance.'" *Id*. Second, a defendant could know "the identity of the substance he possessed." *Id*. The Court gave the example of "a defendant who knows he is distributing heroin but does not know that heroin is listed on the schedules." *Id*. "Because ignorance of the law is typically no defense to criminal prosecution, this defendant would also be guilty of knowingly distributing "'a controlled substance.'" *Id*. (citation omitted).

The government in *McFadden* wanted to go further, arguing that the statute applied if the defendant "'knew he was dealing with an illegal or regulated substance' under *some law*." 576 U.S. at 195 (emphasis added). However, the Supreme Court rejected this argument, stating:

> Section 841(a)(1) . . . requires that a defendant knew he was dealing a "a controlled substance." That term includes only those drugs listed on the federal drug schedules…. It is not broad enough to include all substances regulated by any law.

*Id*.

The interpretive principles are highly relevant here. Like the phrase "a controlled substance," the phrase "any" "restricted building or grounds" describes an "unspecified particular." *McFadden*, 576 U.S. at 191. Thus, the ordinary meaning of § 1752(a)(1) requires a defendant to know either (1) that the area he is entering is some unspecified area listed in § 1752(c),

even if he did not know which type of qualifying area it was, or (2) to know the characteristics of the area that qualify it as a restricted area under § 1762(c).

Knowledge of the first type could be imparted by official signs telling entrants they are entering a "restricted building or grounds" under § 1752(a)(1), as often appear at the homes of former presidents. Even if a visitor did not know why the area was restricted, the sign would afford the type of knowledge required by the statue. Knowledge of the second type would exist if a defendant climbed a fence at the White House or sneaked past barriers at a presidential rally, even if she did not know doing so was prohibited. Since ignorance of the law is no excuse, and the characteristics of the area that make such areas restricted were known by the defendant, the knowledge requirement of § 1752(a)(1) would be met.

Conversely, the knowledge requirement would not be met if a defendant neither had notice that an area had been officially designated as a "restricted building or grounds" under § 1752(c) nor knew of the characteristics that made it a "restricted building or grounds." It would not matter if the area were visibly cordoned off and restricted, and the defendant knew that, but did not know the connection to the § 1752(c) requirement. Just as the knowledge requirement in 841(a)(1) "is not broad enough to include all substances regulated by *any law*," *McFadden* 576 U.S. at 195 (emphasis added), the requirement in § 1752(a) is not met by mere knowledge that an area has been restricted by *some authority*, such as municipal, state, or non-Secret Service federal agencies.

Indeed, to hold otherwise would have grave due process concerns, since it would imbue all restricted area notices with the full weight of federal criminal liability based on unknown facts about who was "temporarily visiting." One could imagine teenagers sneaking past their public school's "no students allowed" sign on the teacher's lounge hoping to steal some candy; if unbeknownst to them, Vice-President Pence happened to be visiting and giving a pep talk to the teachers, that would

19

not transform a minor act of deviancy into a federal crime. Or more relevantly, one could imagine civil rights activists deciding to trespass and stage a sit-in on the lawn of a mayor who signed a controversial "anti-woke" bill. In calculating whether to engage in such civil disobedience, the activists would understand that in walking past municipal "restricted area" signs, they would be subjecting themselves to local prosecution. But it would not be reasonable to impose federal liability under § 1752(a) on the protestors for violating signs having nothing to do with § 1752(a) if it turned out that the Vice-President had just flown in to show support for the mayor, unbeknownst to them.

Similarly, January 6 involved animated protestors marching to the Capitol and encountering signs warning that the area was restricted by the Capitol Police Board. The logical inference from this warning would have been that peacefully crossing the barrier to protest would subject someone to the relatively minor punishments of 40 U.S.C. § 5109. These penalties specifically govern the Capitol building and strike a reasonably fair balance between the need for order at the Capitol and the healthy democratic impulse to "parade, demonstrate, or picket" at the Capitol.[2] It makes sense that if such protestors did not specifically know that the Vice-President or other Secret Service protectees were visiting that day, they cannot be charged under § 1752(a), since they did not know they were entering "restricted building or grounds" as defined by that statute with the more severe penalties. Rather, they would have known they were entering Capitol grounds and knowingly subjecting themselves to liability under the laws governing the Capitol.

---

[2] *See Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 584 (D.D.C.), *aff'd*, 409 U.S. 972 (1972) ("The Capitol Grounds (excluding such places as the Senate and House floors, committee rooms, etc.) have traditionally been open to the public; indeed, thousands of people visit them each year. . . . Nor is the primary purpose for which the Capitol was designed – legislating – incompatible with the existence of all parades, assemblages, or processions which may take place on the grounds.").

Requiring the government to prove that a defendant had one of these two types of knowledge discussed in *McFadden*—knowledge that an area was specifically restricted by the Secret Service under § 1752(a) or knowledge of the facts that make an area restricted under § 1752(a)—will pose little to no problem in most cases. Practically speaking, visits by the President or Vice-President typically are accompanied by fanfare and press, and there is little risk that someone would inadvertently go there without knowledge of their presence. *See United States v. Bursey*, 416 F.3d 301, 304 (4th Cir. 2005) (defendant conceded he knew President was visiting for a rally featuring 7000 tickets). Indeed, Moreover, in most "fence-jumper" cases, the defendant goes past the perimeter precisely *because* it is a "restricted building or grounds" where the President or Vice-President are located. *See United States v. Jabr*, 4 F.4th 97, 99 (D.C. Cir. 2021) (defendant explained to law enforcement her "ill-conceived . . . plan to attain an audience with the President"). And when the "restricted building or grounds" is the White House, the government can easily argue that the defendant knew he was entering an area listed in the statute because he could see the White House right in front of him. *See United States v. Caputo*, 201 F.Supp.3d 65, 72 (D.D.C. 2016) ("like every other reasonable person who visits the White House perimeter, Caputo was well-aware that unauthorized entry onto the grounds was illegal.").

This knowledge requirement will likewise pose little burden in most January 6 cases. Vice-President Pence played a central role in the events that day. In President Trump's rally, he publicly called on Pence by name to intervene in the certification. Around 1:00 p.m., Pence issued a widely-discussed statement on Twitter that he would not take any action to thwart the certification. There has been evidence in many cases, including *Griffin*, *Black*, and the Oath Keepers cases, that the defendants specifically discussed Vice-President Pence's role in the certification and felt betrayed by him. And there were well-known chants among rioters to "Hang Mike Pence."

However, there was no such evidence introduced in this case. And significantly, GossJankowski would have been unable to hear any Pence-related chants or discussions in the crowd about Pence's Twitter statement. Thus, on the trial record, the Court should enter a judgment of acquittal on Count 4 for failure to prove that GossJankowski *knew* the facts that made the Capitol grounds a "restricted building or grounds" under § 1752(a)(1)—i.e., the fact that Pence was "temporarily visiting," § 1752(c).

## II. The Court Should Grant a New Trial

### A. GossJankowski Was Unable to Intelligently Waive his Right to Testify Due to Counsel's Unpreparedness

A defendant in a criminal case has the constitutional right to testify on his own behalf. *Rock v. Arkansas*, 483 U.S. 44, 52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) ("Even more fundamental to a personal defense than the right of self-representation ... is an accused's right to present his own version of events in his own words. A defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness."). "Only the defendant may waive this right, not his counsel, and it must be knowing and voluntary." *United States v. Mullins*, 315 F.3d 449, 452 (5th Cir. 2002) (citing *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir.1997)).

Here, this trial largely centered on the interpretation of six seconds of video. In the video, GossJankowski appears to be holding out a "taser" while moving toward a law enforcement officer. Accordingly, it was crucial for the jury to hear the most important interpretive fact about this incident: GossJankowski did not know how to turn the device off and was afraid to put it in his pocket, meaning he had to have it held out like that while he attempted to move within the crowd. Knowing this fact dramatically alters one's view of the video, as would hearing from GossJankowski

himself about what he was trying to do. And this was something GossJankowski told officers the first time he spoke with them, corroborating its credibility.

GossJankowski wanted to testify about these key facts. However, when he expressed this desire to his prior attorneys, he was told unequivocally that they were not ready to put him on the stand, and that preparing him to testify would take weeks that they did not have. Although the Court conducted an inquiry into whether GossJankowski wished to testify, his counsel's failure to prepare him to testify and instruction to him that they were not prepared to call him left him without the ability to make an knowing and voluntary waiver of this crucial right.

A claim by defendant that his counsel unfairly denied him the right to testify is analyzed under the ineffective assistance of counsel standard of *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This standard has been applied to claims that attorneys "fail[ed] to adequately prepare [a defendant] to testify, resulting in a less-than-fully-informed waiver of that right," *United States v. Gray-Burriss*, 251 F. Supp. 3d 13, 23 (D.D.C. 2017), *aff'd*, 920 F.3d 61 (D.C. Cir. 2019), and to claims that "attorneys were so ill-prepared…they never found the time to even begin to prepare [defendant] to testify," *United States v. Ailemen*, 710 F. Supp. 2d 960, 969 (N.D. Cal. 2008), *aff'd*, 473 F. App'x 754 (9th Cir. 2012). To obtain relief under *Strickland*, a defendant must show (1) that counsel's performance was deficient, *i.e.*, that that representation fell below an objective standard of reasonableness; and (2) that the deficient performance prejudiced the defense, i,e, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome." *Id*.

Both prongs of *Strickland* are met here. It is axiomatic that preparation is essential for effective representation at trial. Where defense counsel fails to prepare a defendant to testify, there

is a "failure to ensure the defendant's waiver of this right was voluntary and knowing," that is "not reasonable" and falls "'outside the wide range of professionally competent assistance.'" *United States v. Lore*, 26 F. Supp. 2d 729, 739 (D.N.J. 1998) (quoting *Strickland*, 466 U.S. at 690). While there are circumstances where a defendants' prior convictions or other incriminating evidence may make it reasonable for an attorney to prioritize other tasks rather than preparing a defendant to testify, that was not the case here. GossJankowski did not have any admissible convictions to worry about, and the most important charges in the case—§ 1512(c) and § 111(a)(1)—turned almost entirely on his intent, which only he could testify about. Thus, there is no reasonable defense strategy that would not involve *at least* being prepared to call the defendant should he wish to testify.

The failure to prepare Gossjankoski to testify also prejudiced the defense. Regarding the assault charge, the government was able to effectively argue that Gossjankoski was attempting to "tase" Officer Moore when he reached forward with his arm while holding out the Vipertek device. The key to disproving this narrative was explaining that Gossjankowski always held the device out because he could not figure out how to turn it off and was afraid of "tasing" himself if he put it in his pocket. If Gosskanjowski was able to provide this information to the jury—which was corroborated by the fact that he was always holding the device in available videos and told this to police at the earliest possible moment—there is a "reasonable probability" that at least one juror would have seen the video evidence his way. This is especially true given the affirmative video evidence from Def. Ex. 147 showing that Gossjankowski wagged his finger and said "No" when rioters pulled Officer Moore into the crowd and assaulted him.

While there were undoubtedly problems with calling Gossjankowski to the stand that might have made it a reasonable strategy not to call him, it was objectively unreasonable in this case not to prioritize *preparing* him for that possibility. And as a result, Gossjankowski was deprived of the

24

ability to make a knowing and voluntary waiver of his right to testify, and the jury was deprived of key information that prejudiced his defense. This justifies a new trial so that Gossjankowski can exercise this right. Indeed, the Court has the power to order a new trial under Rule 33 even without a formal finding of ineffective assistance, and it should exercise that power in these circumstances.

## B. The § 1512(c) Instruction Misstated the *Mens Rea* Standard

As explained above, the many courts in this District that have defined "corruptly" have largely overlooked the fact that "corruptly" is a unique term that "originated as the mental state for common-law corruption crimes like extortion and bribery." 64 F.4th at 352 (Walker J., concurring). Regardless of whether the concurrence is controlling authority, its conclusion is correct and explains the odd infrequency with which the U.S. Code references "corruptly" versus other mental states and the fact that it appears almost exclusively in the obstruction context. *See* Note 1, *supra*. Its definition should thus be incorporated into instructions for § 1512(c).

"[T]he omission of an element is an error that is subject to [constitutional] harmless-error analysis…" *Neder v. United States*, 527 U.S. 1, 15 (1999). Under this standard, a new trial is warranted unless the record demonstrates "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967). As explained in Part I.B.2, *supra*, there was insufficient evidence that GossJankowski acted with "an intent to procure an unlawful benefit." 64 F.4th at 352 (Walker J., concurring). He had nothing to gain from the certification, financial or otherwise. Had the jury been told of this element, it is highly likey they would have acquitted for lack of corrupt intent. Because the instruction given by the Court failed to include a necessary element of acting "corruptly" as long understood, justice would be served by ordering a new trial so that Mr. GossJankowski will not stand convicted based on a verdict reflecting less than all the elements of § 1512(c).

### C.  The § 1752 Instructions Insufficiently Described the *Mens Rea* Standard

Likewise, the instructions for § 1752(a)(1) failed to inform the jury that GossJankowski's knowledge had to extend to the fact that Vice-President Pence was visiting the Capitol. *See* Part I.C.2, *supra*. Rather, it created the impression that the jury need only find that Vice-Presdient Pence was, in fact, temporarily visiting the Capitol. This misstatement supports ordering a new trial. Without question, the record here does not demonstrate "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24. Indeed, including this element would have been outcome-dispositive on this record. The government did not introduce any evidence suggesting that GossJankowski had personal knowledge of the Vice-President's visit or otherwise was aware of his role on January 6, so a jury properly instructed would have been highly likely to acquit based on this absence of proof. Accordingly, justice at a minimum supports a new trial so that the jury can be properly informed of the knowledge element of § 1752(a).

### D.  GossJankowski Was Prejudiced by the Audio Evidence

The video evidence in this case contained audio of rioters shouting, cursing, and expressing antipathy toward police. It is not a pleasant experience to listen to, and it has a subtle but undeniable effect of prejudicing the listener against anyone associated with January 6. In most cases, this audio is necessary to provide context for decisions the defendant made or information the defendant heard. However, for GossJankowski, it obscures rather than illuminates the truth, because it creates a subconscious false perception that GossJankowski was aware of what was being shouted all around them. To more accurately present the experience GossJankowski had that day, and to avoid unfair prejudice, the videos of GossJankowski should be played without audio. Although this form of subtle prejudice is not something that would merit a new trial standing alone, especially without objecting

in the first instance, it cumulatively supports the conclusion that GossJankowski's first trial was too flawed to let stand, and that a new trial is required in the interests of justice.

## E.  The Paucity of the Evidence Justifies a Retrial

To the extent that the Court disagrees that no reasonable juror could have found for the government beyond a reasonable doubt, the Court should use its discretionary authority under Rule 33 to order a new trial "despite the abstract sufficiency of the evidence to sustain the verdict." *Tibbs*, 457 U.S. at 38. There was no clear evidence of any forcible assault against Officer Moore in this case; there was just a fast-moving video showing GossJankowski moving toward the officer (1) at a time when others were trying to help him, and (2) after GossJankowski and others had shouted words of support and not to hurt him. Gov. Ex. 144.2; Def. Ex. 147. This strongly supports a conclusion of innocence on this charge. At a minimum, this evidence preponderates sufficiently heavily against the verdict to indicate that a serious miscarriage of justice may have occurred. Similarly, the evidence that GossJankowski intended to stop the already-halted certification was extremely sparse and far less than the evidence in cases such as *Black*, where an acquittal was ordered by the judge. Accordingly, it would be prudent and just for the Court to act as a "thirteenth juror," grant a new trial, and submit the issues for determination by another jury. *Id*.

## CONCLUSION

For the foregoing reasons, Defendant Vitali GossJankowski respectfully requests that the Court enter a judgment of acquittal on all counts or, alternatively, orders a new trial in this matter.

.

September 13, 2023                          Respectfully submitted,

                                           /s/ Matthew J. Peed
                                           Matthew J. Peed (D.C. Bar No. 503328)
                                           CLINTON & PEED
                                           1775 I St. NW, Suite 1150
                                           Washington, D.C. 20006
                                           (202) 919-9491 (tel)
                                           (202) 587-5610 (fax)

                                           *Counsel for Defendant Vitali Gossjankowski*