```
 1                  BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,          .
                                        .  Case Number 21-cr-92
 4             Plaintiff,               .
                                        .
 5        vs.                           .
                                        .  Washington, D.C.
 6   COUY GRIFFIN,                      .  March 22, 2022
                                        .  9:33 a.m.
 7             Defendant.               .
     - - - - - - - - - - - - - - - - -

 8

 9                    TRANSCRIPT OF BENCH TRIAL
               BEFORE THE HONORABLE TREVOR N. MCFADDEN
10                  UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the United States:     JANANI IYENGAR, AUSA
                                KIMBERLY PASCHALL, AUSA
14                              United States Attorney's Office
                                555 Fourth Street Northwest
15                              Washington, D.C. 20530

16   For the Defendant:         NICHOLAS D. SMITH, ESQ.
                                David B. Smith, PLLC
17                              7 East 20th Street
                                New York, New York 10003
18

19

20   Official Court Reporter:   SARA A. WICK, RPR, CRR
                                United States District Court
21                                 for the District of Columbia
                                333 Constitution Avenue Northwest
22                              Room 4704-B
                                Washington, D.C. 20001
23                              202-354-3284

24
     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C O N T E N T S

CLOSINGS

Closing Statement by the Government ...................... 274

Closing Statement by the Defense ........................ 288

Rebuttal Closing Statement by the Government ............ 314

Oral Judgment ........................................... 324

                        P R O C E E D I N G S

1       (Call to order of the court.)

2               COURTROOM DEPUTY:  This is Criminal Case 21-92, United

3   States of America versus Couy Griffin.

4       Counsel, please come forward to identify yourselves for the

5   record, starting with the government.

6               MS. IYENGAR:  Good morning, Your Honor.  Janani

7   Iyengar for the United States, and I am here with my colleague

8   Kimberly Paschall.

9               THE COURT:  Good morning, Ms. Iyengar.  Good morning,

10  Ms. Paschall.

11              MR. SMITH:  Good morning, Judge.  Nick Smith for

12  defendant Couy Griffin.

13              THE COURT:  Good morning, Mr. Smith.  Good morning,

14  Mr. Griffin.

15              THE DEFENDANT:  Good morning, Your Honor.

16              THE COURT:  Mr. Smith, are you seeking to recall

17  Inspector Hawa?

18              MR. SMITH:  Judge, can the parties approach the bench

19  to discuss this?

20      (Bench conference.)

21              MR. SMITH:  The issue is there might be one nit in the

22  testimony of Inspector Hawa that we would like to clean up.

23      She testified that the vice president had reached the

24  secure location within a few minutes.  In the discovery the

1    government produced last night, there's an exact time stamp of

2    2:00 p.m. -- 2:28 p.m.  And it might not be necessary to use the

3    CCV footage that was produced if the witness can just -- would

4    recall that the vice president entered the secure location at

5    that time.

6              THE COURT:  Sorry.  What's the overall time, then?

7    How long are you saying?  She said three minutes.  How long do

8    you think it took?

9              MR. SMITH:  She actually testified a few minutes, and

10   I asked her whether that meant three, and she didn't respond.

11   So a few -- I know this might seem hairsplitting.  But a few

12   doesn't necessarily mean three minutes.  It could be ten

13   minutes.

14             THE COURT:  So how long do you think it actually took?

15             MR. SMITH:  We know how long it took because there's a

16   time -- in the CCV footage, it shows the vice president entering

17   the secure location at 2:28 p.m.  So it might not be necessary

18   to use the footage, so long as the witness clarifies that the

19   vice president did enter the secure location at 2:28 p.m., not a

20   few minutes after leaving the Senate chamber.

21             THE COURT:  Ms. Iyengar, are you willing to stipulate

22   to this?

23             MS. IYENGAR:  Yes, we are, Your Honor.

24             THE COURT:  I suggest we don't recall the witness, you

25   say this on the record, and we establish it that way.

1          MR. SMITH:  No objection.

2       (End of bench conference.)

3          THE COURT:  Mr. Smith, do you have a clarification to

4    make?

5          MR. SMITH:  Yes, Your Honor.

6       In Inspector Hawa's testimony yesterday, when asked how

7    long it took the vice president to reach the secure location,

8    the witness responded "a few minutes."

9       And we are now, I think, with the government's stipulation,

10   the parties are agreed that the vice president entered the

11   secure location at 2:28 p.m. on January 6.

12         THE COURT:  Okay.  Do you agree, Ms. Iyengar?

13         MS. IYENGAR:  Yes, Your Honor, we do.

14         THE COURT:  Okay.  I will take that as stipulated.

15   Thank you, Mr. Smith.

16      Mr. Smith, does the defense wish to present any evidence?

17         MR. SMITH:  No, Your Honor.  And the defendant will

18   not be testifying.

19         THE COURT:  Mr. Griffin, if you could come forward,

20   please, sir.

21      All right.  Mr. Griffin, have you had an opportunity to

22   talk with your attorney regarding whether or not you wish to

23   testify in this case?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  And have you made a decision about that?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  And what is your decision, sir?

3          THE DEFENDANT:  My decision is not to testify.

4          THE COURT:  All right.  And you understand you have an

5     absolute right to testify or not to testify?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Mr. Smith, is there anything else you

8     believe I should be inquiring of your client?

9          MR. SMITH:  No, Your Honor.

10          THE COURT:  Ms. Iyengar?

11          MS. IYENGAR:  No, Your Honor.

12          THE COURT:  Thank you, sir.  You may have a seat.

13          THE DEFENDANT:  Thank you.

14          THE COURT:  All right.  I think we can move to closing

15     arguments.  Do the parties agree?

16          MS. PASCHALL:  Do we perhaps need to take up the MJOA

17     first?

18          THE COURT:  Mr. Smith, I guess my instinct -- this is

19     a bench trial -- is just to deal with your arguments -- as a

20     standard that's more favorable to you, I'm just inclined to deny

21     your MJOA and go straight to closings.  I'm happy to hear you if

22     you would like, but that's -- I don't have a whole lot of

23     experience with misdemeanor bench trials, but I don't know why

24     we would do this twice.

25          MR. SMITH:  Judge, there's one minor point of law

that's a distinction because the standard of appeal -- the
standard of review on appeal may change, depending on whether
the issues are analyzed through certain frameworks.  I believe
that for points of law a de novo standard may apply for Rule
29 -- through the Rule 29 vehicle that might not apply after a
trial -- after a judgment.

So our plan was to just fold that argument into the closing
argument.

THE COURT:  That's fine.  And as far as I'm concerned,
I think you could appeal any conviction on either ground that
you'd be entitled to, but I don't know that it makes sense for
us to go through this twice.

MR. SMITH:  Judge, I think we're on the same page.

THE COURT:  Okay.  So I'm inclined to give each party
half an hour, and the government can allocate that between your
opening and rebuttal however you wish.

I should also say, so you all know what I -- I think it
would be particularly helpful to hear your thoughts on whether
the defendant knowingly entered a restricted area.  I will tell
you, I'm inclined to think the government has shown that he did
enter a restricted area.  I think the harder question is whether
he knew he had.  And then secondly, the disorderly conduct
allegations, I think you've got some arguments to make there,
Ms. Iyengar.

So I would encourage you all to focus on those two areas in

1    particular, but you can do as you wish.

2         Ms. Iyengar.

3         MS. IYENGAR:  Yes, Your Honor.  Thank you.

4    I did just put together a short PowerPoint that just

5    contains some of the exhibits I wanted to show the Court.  I

6    provided a copy to Mr. Smith over e-mail this morning.  I did

7    bring a hard copy as well.

8         MR. SMITH:  That's fine.

9         MS. IYENGAR:  Okay.  All right.  So now that the Court

10   has had an opportunity to review the evidence in this case, the

11   government submits that we have proven each element of each

12   offense in the Third Amended Information beyond a reasonable

13   doubt.  I understand that the Court has specific concerns about

14   the elements that you just discussed, but I did just want to go

15   through each of the elements to show how we established each of

16   them beyond a reasonable doubt.

17        So I will start with the element which really applies to

18   both offenses, that the defendant entered or remained in a

19   restricted building or grounds without lawful authority to do

20   so.

21        The Court heard testimony from Inspector Erickson, and I

22   think actually if I could have the monitor.  I'm not sure if I

23   can do it from my end.  Great.  Thank you so much.

24        So the Court heard testimony from Inspector Erickson.  He

25   testified regarding what the restricted perimeter was, that it

1    had been established.  On January 6, there was fencing put up,

2    which included metal bike racks, as well as snow fencing, and

3    signs that clearly stated that the area was closed to any sort

4    of visitor entering.

5         He also testified that -- and Government's Exhibit 33,

6    which is shown here, that's the Olmstead wall that the Court

7    referenced, that the defendant was climbing over that wall, and

8    that wall demarcated the line that was the restricted area.

9         He further testified that the area that the defendant was

10   climbing over in Government's Exhibit 37 where he was using this

11   bike rack as a ladder to climb over the wall leading into the

12   Lower West Terrace, as well as this plywood ramp here, which is

13   also in Government's Exhibit 37, to access the area underneath

14   the inaugural stage, those areas were also restricted to public

15   access.

16        I think it's clear that the defendant knowingly entered

17   this area, because just as a preliminary matter, again, the

18   video footage here shows that the defendant was climbing over a

19   wall to make his initial entry into the restricted area.  Any

20   reasonable person, as Inspector Erickson testified, would know

21   that they don't have lawful authority to climb over a wall to

22   enter an area in a government space.

23        Additionally --

24             THE COURT:  But the tricky part is, I think I could go

25   down there today, and like if my hat fell over the Olmstead

wall, I think I could jump over the Olmstead wall and get my
hat, couldn't I?

MS. IYENGAR:  I think that's a possibility, and if
that's all he did and then he just jumped right back over the
wall, I don't think we would even be necessarily having this
conversation right now.  But that's not all he did.  He
continued further up the west front of the Capitol building,
uses a metal bike rack as a ladder to enter -- to climb over a
second wall, which I think, again, any reasonable person would
know they don't have lawful authority to do, and then climbs
over a plywood ramp in order to get further up the Lower West
Terrace.

But this is not a case where we just have to make a
reasonable inference that the defendant knew that he was
entering a restricted area.  And I would just point the Court to
the January 7th video that the government entered as
Government's Exhibit 64.  He says in that video, "We get down to
the Capitol.  They have all of this stuff set up for the
inauguration of Joe Biden on the back side of the Capitol.  They
have roped it off.  Well, of course, you are going to have these
patriots.  D.C. police says you can't step over this."

He was made aware that that area was restricted, and he
says it again at the Otero County Commissioners meeting.

THE COURT:  Sorry.  Can you say the exhibit number?
That was 64?

         MS. IYENGAR:  Sure.  It was 64.

         THE COURT:  And when did he say that?

         MS. IYENGAR:  That was at 3:45.

         THE COURT:  I'm sorry.  When is Exhibit 64?

         MS. IYENGAR:  Oh, that was January 7.

         THE COURT:  Okay.  That was down in Roanoke?

         MS. IYENGAR:  That was in Roanoke, yes.

         THE COURT:  Okay.  Thank you.

         MS. IYENGAR:  And then in Government's Exhibit 78 --
and I just put up an excerpt of the transcript of Government's
Exhibit 78, which was the video of the defendant speaking on
January 14 at the Otero County Commissioners meeting.  He
says, "When they got down to the inaugural side, there was some
fencing up.  They were saying that this -- that you couldn't go
any further because this was being reserved for Joe Biden and
his inauguration.  Well, you tell a million Trump supporters
that, they are going to go down there.  Pretty soon, that crowd
just pushed through."

     So again, he's acknowledging he was told that this area was
restricted.  And in spite of being told that, he entered that
area.

     That conduct, in conjunction with just what a reasonable
person would understand is lawful conduct or unlawful conduct,
shows that the defendant was entering an area knowing that that
area was restricted to the public, and he entered it anyway.

1          The defense was making an argument, I think through

2     cross-examination of Inspector Hawa, that there were not Secret

3     Service agents posted at the perimeter to individually tell each

4     person who was entering the perimeter you can't enter here

5     because the vice president is here.

6          That's not what the law requires the government to prove.

7     It allows for an area that is cordoned off, posted that this

8     area is restricted in any way.  And case law has shown that that

9     includes having a law enforcement officer there, having signs

10    that say that the area is restricted, informing people that this

11    area is restricted through overhead announcements, things of

12    that nature.

13         And in this case, again, we don't have to rely on

14    inferences.  We have the defendant's own statements that he knew

15    this area was restricted, and he entered anyway.

16         Okay.  So I guess just going back to -- let me just make

17    sure I'm in the right -- okay.

18         So the government also had to prove that the area was

19    restricted under 1752(c), that there was a U.S. Secret Service

20    protectee in the area who was or would be temporarily visiting.

21         The Court heard testimony from Inspector Hawa that the area

22    was restricted, in part due to the vice president's visit.  The

23    visit was for the purpose of certifying the Electoral College

24    vote, and therefore, it was temporary.

25         I think there was an attempt by the defense on her

1    cross-examination and the cross-examination of Inspector

2    Erickson to say that the visit was not temporary.  This is an

3    argument that has been rejected by other judges in this

4    courthouse on other January 6 cases, including in *United*

5    *States v. Andries*, which is 21-cr-93, which is a Judge Contreras

6    decision, where he found that the vice president was, in fact,

7    temporarily visiting the Capitol since he went there for a

8    particular purpose, he remained there for a limited period of

9    time, and it's possible for a person to make a visit to a place

10   for a business reason.

11        Again --

12             THE COURT:  This is the Judge Nichols point?  Is that

13   what you're addressing?

14             MS. IYENGAR:  Yes; that's correct, yes.

15        In *United States v. McHugh*, again, Judge Bates similarly

16   found that the vice president was temporarily visiting for

17   purposes of 18 U.S.C. 1752, and the citation for that is 2022

18   WL 296304.

19        This point is clear.  There's absolutely nothing in the

20   record to suggest that the vice president was doing anything

21   other than temporarily visiting.  So the government has

22   satisfied its burden to prove that there was a Secret Service

23   protectee temporarily visiting on January 6 at the time that the

24   defendant made his entry into the restricted area.

25             THE COURT:  So you're not relying on the "will be"; is

1    that correct?

2          MS. IYENGAR:  We are not relying on the "will be,"

3    because the reality is he was temporarily visiting.  He was

4    still in the restricted area, and that was the testimony of the

5    Secret Service agent.  He remained in the restricted area

6    throughout the time that the defendant was within the restricted

7    area.

8          THE COURT:  Do you think the defendant needs to know

9    that the vice president is there?

10         MS. IYENGAR:  No, Your Honor.  Our position is that he

11   does not need to know that, and I think the case law on this

12   issue bears that out.  In *Rehaif*, which I hope I'm pronouncing

13   that correctly, it talks about this exact issue.  So 1752(c),

14   which places responsibility on the government to prove that a

15   Secret Service protectee was either in the area, that there was

16   an event of national significance going on, or that the entry

17   was made at the White House, those are all requirements that

18   just create essentially a jurisdictional hook for the federal

19   government to be able to regulate this kind of behavior and

20   ensure the safety and security of federal employees like the

21   people who are protected by the Secret Service.

22        That does not have anything to do with the actual conduct

23   that the defendant was engaging in.  And the statute does not

24   place a mens rea requirement on knowing that a Secret Service

25   protectee was there.  The only mens rea requirement is that the

1    defendant knew he was entering into a restricted area.

2         Okay.  So I guess moving on to -- I think I'm a little bit

3    out of order here.  But I do just want to go back to if the

4    defendant is trying to make any claim here, and I think there

5    was an attempt to make a claim that he did not know this area

6    was restricted, that he was entering the area where he believed

7    a peaceful protest was going on, didn't realize that he didn't

8    have the lawful authority to be there, all of that is undercut

9    by the video footage in this case.

10        And I want to just draw the Court's attention to some

11   excerpts from the transcripts of the video footage and then show

12   a couple of clips to the Court as well.

13        So this is an excerpt from 37, Government's Exhibit 37, and

14   this is Exhibit 37-A.  And as the Court can see, as the

15   defendant is walking up the lawn within the restricted area,

16   he's saying to people around him, "I'll tell you what.  They

17   better be glad we're not armed out here."  And then he says

18   again, "We could all be armed, you know."

19        And then in Exhibit 40, and this is an excerpt from Exhibit

20   40-A, the defendant says, "I'm not saying I couldn't climb up

21   there.  I just don't know if I want to put forth the energy to

22   climb up there."  Then the defendant says, "We'll wait till they

23   get this door broken down."  He's clearly making statements

24   indicating that --

25             THE COURT:  Didn't Mr. Struck say he didn't know who

1    said that?

2            MS. IYENGAR:  He said he could not recognize the

3    voice, but I think it's fair, once the Court has an opportunity

4    to review the video footage, compare it to all the other video

5    footage that was taken that day, you can hear that it is clearly

6    the defendant's voice, and I think that's a fair inference for

7    the Court to make.

8            THE COURT:  Okay.  Why don't you move to the

9    disorderly conduct piece.

10           MS. IYENGAR:  Sure.  Okay.

11       So with respect to the disorderly conduct piece of it,

12   after the defendant entered the restricted area, there were

13   multiple points where he was being loud and disruptive, which is

14   what the government is required to prove regarding the

15   defendant's conduct, that we're required to prove that the

16   defendant engaged in conduct that was unreasonably loud and

17   disruptive under the circumstances.

18       So what we have with the defendant's conduct again is him

19   climbing over metal bike racks to get to the wall leading into

20   the Lower West Terrace, climbing over a plywood ramp to get into

21   the inauguration platform area, which in and of itself is

22   disruptive.

23       At one point you can see in Exhibit 44, and I can play a

24   portion of that exhibit, you can see that the defendant is

25   shouting over the crowd discussing the election being stolen.

1    And let me just play that for the Court.

2           (Video played.)

3           MS. IYENGAR:  And I'm just going to pause it at 00:54.

4    So you have that speech that he gives to the camera where

5    he's shouting into the camera.  There also comes a time when the

6    defendant was engaging with the crowd in a way that was loud and

7    disruptive.

8           Now, I just want to be clear, we are not prosecuting the

9    defendant for praying with the crowd.  But the issue was the way

10   in which he was doing it and the place that he was doing it.

11   He's shouting over a bullhorn into the crowd and actively

12   engaging with them.

13          And we also heard the testimony from Inspector Hawa that

14   the mere presence of people in that restricted area created a

15   security issue for the vice president.  That's the reason that

16   the vice president had to evacuate from the ceremonial office in

17   the first place and remained evacuated until everybody could be

18   cleared both from the inside of the Capitol, as well as from the

19   outside of the Capitol.

20          So this -- all of this conduct in the aggregate is

21   disruptive conduct -- it's disorderly conduct, I'm sorry, within

22   the meaning of the statute.  So we have met our burden on that

23   element.

24          THE COURT:  What about the fact that he thought that

25   the certification was over?  Maybe you disagree with that.  But

1       as I read it, it says, "With intent to impede or disrupt the

2       orderly conduct of government business or official functions."

3           Don't we have evidence that he thought the certification

4       had already occurred?  And if so, doesn't that kind of create a

5       problem for you in showing the rest of this subsection?

6               MS. IYENGAR:  Well, Your Honor, I mean, he's standing

7       outside the Capitol building, first of all, in the middle of

8       what would be a working day.  So even if he didn't believe that

9       he was interrupting the actual Electoral College certification,

10      there's certainly governmental business that is taking place

11      within the United States Capitol, and it's reasonable to infer

12      that he was interfering with whatever business was taking place

13      within the Capitol building at that time.

14          We do disagree that that was his belief at the time.  While

15      he makes claims that he believed that the vice president had

16      already certified the election, there's no reason to believe

17      that he thought that the vice president had already -- that

18      there was no governmental business going on at that point.

19          And again, it's reasonable at that time of day on a working

20      day to believe that some other business is taking place inside

21      the Capitol that is being disrupted.

22              THE COURT:  Aren't you putting the burden a little bit

23      on the wrong side there?  Don't you have to show that he did

24      believe he was impeding government business?

25              MS. IYENGAR:  Well, like I said, Your Honor, I think

1    it's reasonable for the Court to infer, based on the time of day

2    that he was there, the location that he was there, everything

3    that he could see that was going on around him and the conduct

4    that he was engaging in, that this was interfering with some

5    sort of government business that was going on at the Capitol

6    building.  Whether it was specifically to the Electoral College

7    count or something else, he certainly was interfering with

8    whatever business was taking place there.

9            THE COURT:  Did I mishear you?  Did you say you

10   disagree with the suggestion that he thought, obviously

11   incorrectly, that the certification had already occurred?

12           MS. IYENGAR:  No.  I think what I meant to say is we

13   disagree with the suggestion that he believed that the vice

14   president was no longer at the Capitol building or had left

15   already or something of that nature.

16           THE COURT:  I see.

17           MS. IYENGAR:  So yes.  So I believe we have proven the

18   elements of showing that he was engaging in disorderly conduct,

19   showing that he was doing so with the intent to impede or

20   disrupt the orderly conduct of government business inside the

21   Capitol building.

22       And again, Your Honor, I think just to go back to the video

23   footage that we saw during the trial, the speech that I just

24   showed in Exhibit 44 had nothing to do with praying or anything

25   of that nature.  It's talking about the election being stolen.

He talks about in Exhibit 64, which is the January 7 video, the Otero County Commission meeting as well, about entering the restricted area because he was upset about Vice President Pence having -- in his view, having certified the election.

And in Exhibit 57, which I can show to the Court, and I will just preview it for the Court, he says that we need to send a signal that we're not going to put up with this. So his intention of being at the Capitol grounds was, in fact, to impede whatever governmental business was taking place at that time.

(Video played.)

MS. IYENGAR: And I will just pause that at 00:22.

Furthermore, the government submits that it has proved that the defendant's conduct occurred when or so that his conduct in fact impeded or disrupted the orderly conduct of governmental business. Again, Inspector Hawa testified because of the people that were both outside the building, inside the building, the vice president had to be evacuated, that was the reason that the Electoral -- or part of the reason that the Electoral College certification had to be suspended.

So his conduct in the aggregate with all the other individuals that were outside created a security risk for the vice president that suspended an official proceeding.

THE COURT: So is your position that all these thousands of people were engaging in disorderly conduct?

1          MS. IYENGAR:  Certainly the people that -- well, I

2    think the people that were within the restricted perimeter.

3          THE COURT:  Which were all of these people; right?

4          MS. IYENGAR:  I'm sorry?  Yes, which are all of these

5    people who were, again -- I think a person who is just walking

6    through, that might be a different conversation.  But somebody

7    who was being loud, encouraging people to be armed, climbing

8    over barricades, that type of conduct is disorderly conduct, and

9    it is disruptive.  And those individuals -- I think Inspector

10   Hawa's testimony was that the presence of these individuals

11   itself created a security risk.

12        But in terms of the actual statute, people who are engaging

13   in actual disorderly conduct like what the defendant was doing

14   satisfies the elements of the statute here.

15         THE COURT:  Yeah, it just strikes me that that doesn't

16   leave much room between Subsection (1) and Subsection (2).

17   Presumably, the whole reason for that initial trespassing

18   section is because having people in that area creates a security

19   risk.

20         MS. IYENGAR:  Correct; yes.

21         THE COURT:  I thought Congress was trying to

22   differentiate between people who -- kind of mere trespassers

23   versus people who engage in disorderly conduct, do something

24   beyond -- it's something beyond their mere presence as being

25   problematic.

1          MS. IYENGAR:  Yes, Your Honor.  And I think, again, if

2     this was a case where the defendant was just walking through the

3     area, wasn't necessarily talking to anybody or doing anything

4     that was particularly disruptive, we would be having a very

5     different conversation about (a)(2).  That would really be

6     something that's squarely within the confines of (a)(1), and

7     that's the reason for that statute existing.

8          But that's not the scenario that we're in with this

9     defendant.  He did engage in disruptive conduct.  He was being

10    extremely loud, climbing over barriers, engaging with the crowd,

11    and that's what situates him differently from someone whose mere

12    presence was creating a security risk.

13         THE COURT:  Okay.  I will give you a few minutes at

14    the end.  Anything else you wanted to say before we hear from

15    Mr. Smith?

16         MS. IYENGAR:  I think I will reserve the rest of my

17    time for rebuttal, then.  Thank you.

18         THE COURT:  Thank you.

19       Mr. Smith?

20         MR. SMITH:  So, Judge, we're going to move quickly to

21    the two points that you wanted us to address, but we think the

22    Court may have learned some new things about the government's

23    Secret Service restricted area claims yesterday, and we want to

24    touch on those briefly.

25         Whatever the Court thinks about the cause of these

protestors or the embarrassment, I think the evidence -- we
believe the evidence at trial showed that this case is built on
a series of false assumptions and premises.

Officer Erickson testified that the restrictions at the
Capitol on January 6 rested on Capitol Police authority, not the
Secret Service's, and were about the Biden inauguration, not
Secret Service protection.

Inspector Hawa testified -- her testimony showed that the
Secret Service is the entity that as a matter of fact sets
restricted areas and that as a matter of fact the United States
Capitol Police did restricting here without positive input from
the Secret Service at all.

Inspector Hawa testified that if a Secret Service agent
assigned to a restricted area does not know what its size and
scope is, it's probably not as a matter of fact a restricted
area.

Well, then Inspector Hawa misidentified the restricted area
several times.

Where do these facts fit in here?  Officer Erickson and
Inspector Hawa both testified that the vice president has a
permanent office at the Capitol, that Vice President Pence was
there in his capacity as President of the Senate, that the vice
president is, quote, often at the Capitol in his office,
according to Officer Erickson's testimony.  The testimony of
both witnesses, Officer Erickson and Inspector Hawa, was that

1    the vice president breaks ties at the Senate and presides at

2    other proceedings there.

3        The President of the Senate does not, quote, temporarily

4    visit the Senate.  He works --

5            THE COURT:  So I think I get your point, Mr. Smith.

6    Let's think about somebody who scales the wall at Camp David.

7    Wouldn't this be the same situation, where the walls have been

8    set up by the Marine Corps, not the Secret Service.  The

9    president is frequently at Camp David, but it's not specifically

10   mentioned in the statute.

11       Do you think that that person would not be committing a

12   1752 violation?

13           MR. SMITH:  Judge, there's a very specific statutory

14   reason that would never arise, because there's a special statute

15   for the securing of Camp David.  And we didn't have an

16   opportunity to brief it in our last briefing, but we would be

17   happy to brief the Court on that issue.  But there isn't a 17 --

18   I mean, Inspector Hawa cannot be recalled.  But there aren't

19   1752 areas at Camp David because there's a Marine Corps statute

20   for the restriction of the area.  So if one were to enter Camp

21   David, it's not the official residence in 1752(c)(1)(A), but it

22   is restricted under a Marine -- under a different statutory

23   code.

24           THE COURT:  I imagine -- in fact, many other

25   defendants have been prosecuted for kind of Capitol grounds

violations here.  Again, why couldn't the government prosecute for both?

MR. SMITH:  Judge, there's actually never been another prosecution of someone entering the Capitol grounds and being prosecuted for 1752 before January 6.  This is the first time it's ever been done.

THE COURT:  I believe that.  My point is, there are plenty of specific statutes to the Capitol, as I'm sure you're right there are specific statutes to Camp David.

MR. SMITH:  We think that argument cuts in our favor. If there are specific statutes, as I think Officer Erickson pointed out, that pertain to Capitol Police authority, those would be the statutes that naturally Congress intended to apply to the scenario that occurs here.

Officer Erickson also testified that whether one has lawful authority to enter the Capitol Police's restricted area depends on their purpose.  That was very clear in his testimony.  If one were to want to encounter or engage with a member of Congress, the legal authority one needs is different than if one were to want to encounter the vice president.

The government offered no evidence at all that Mr. Griffin had one purpose or the other.  They're merely alleging he was there and protesting the election.  They don't -- the government didn't offer any evidence at all as to the legal burden that its own witness testified matters.  What is the purpose?  What is

the business, in Officer Erickson's words, of the person who is
visiting?  That will change the analysis of whether one has
lawful authority.  The government presented no evidence on that
standard set up by its witness.

Judge, the reason Inspector Hawa could not recognize the
restricted area, the reason Officer Erickson said this is a U.S.
Capitol Police authority area, it's about the inauguration.  The
reason the Court saw a bona fide Secret Service area elsewhere
on the Mall with different restrictions around it is because the
Secret Service understands something the prosecution does not:
The vice president works at the Capitol; he does not temporarily
visit it.

The government cited a couple of published decisions on the
temporarily visiting issue.  There are two of them.  Neither had
the benefit of testimony.  Judge Bates and Judge Contreras did
not sit in court and listen to a Capitol police officer say this
area was set by the Capitol Police pursuant to Capitol Police
authority.  Those judges did not hear a Secret Service agent
testify that as a matter of fact Secret Service sets restricted
areas, not other law enforcement agencies, and that they did not
hear testimony that the vice president has a permanent office
there and is, quote, often there, in the words of Officer
Erickson.

That testimony is important because this is a mixed
question of fact and law.

1    I think we heard Ms. Iyengar say that there is no issue or

2    the defense points to no fact in the record going to the

3    temporarily visiting issue.  That is simply not true.  Both

4    officers, as we just discussed, testified as to the permanent

5    office of the vice president there, that he often travels there

6    for various purposes.

7    So, Judge, moving on to the next issue, as the Court points

8    out, Mr. Griffin had to knowingly enter a, quote, posted,

9    cordoned off, or otherwise restricted area.  Under the canons of

10   noscitur a sociis and ejusdem generis, quote, otherwise

11   restricted means a physical demarcation of the area.

12   So this is not just here knowingly.  This is also basic

13   satisfaction of the elements of the statute before one reaches

14   mens rea.

15   The evidence showed that Griffin did not cross any post or

16   cordon or receive indication from any law enforcement officer

17   that the area was restricted.

18   The Court pointed -- the government pointed to generic

19   montage footage from two hours before Mr. Griffin was in the

20   area.  The Court might recall one point near the Peace Circle a

21   piece of evidence that showed barriers at 12:50 p.m.  It's

22   undisputed that Mr. Griffin did not reach the restricted area

23   zone until 2:30.

24   One of the most crucial pieces of evidence in this case

25   came from the government's own witness.  Officer Erickson

1    testified, when asked about the stone wall, that it's not the

2    wall itself that can be a restricted area boundary under U.S.

3    Capitol Police restriction authority, because the wall is always

4    there.  If the wall is going to be a restricted area for this

5    purpose, it has to be posted, cordoned, or signed "Do Not

6    Enter."  It is undisputed there was no sign on the wall.

7         As the Court pointed out, we could go to the Capitol today,

8    and for First Amendment reasons, as I'm going to discuss later,

9    jump on the Capitol lawn as much as we like.  And it's not just

10   not illegal; it's your constitutional right.

11        So Officer Erickson then testified that there were green

12   snow fencings -- snow fencing.  Well, what did he say about

13   this?  First, he said it's for the inauguration.  Second, he

14   said -- agreed that the green snow fencing in the area where

15   Mr. Griffin entered was on the ground and did not have any sign

16   on it.  He testified that a person like Griffin would have no

17   reason to know of the restricted area without a sign or law

18   enforcement telling them.

19        Matt Struck, the government's witness, testified no officer

20   informed them all day that this was a restricted area.

21            THE COURT:  What do I do with the fact that we have

22   statements from your client saying that he had been told?

23            MR. SMITH:  So let's say the government had just

24   offered this argument about Mr. Griffin's statement and there

25   was no rebutting evidence.  You just have two statements from

Mr. Griffin the day after -- one day after January 6 and seven days after.  If that were it alone, that would be a respectable argument, but it wouldn't be beyond a reasonable doubt.

What we have in the testimony, in the record is Struck testifying that Griffin did not encounter law enforcement all day and that Mr. Struck believes Griffin was referencing social media posts that he had read after January 6 about law enforcement encountering protestors.

It is undisputed in the record Mr. Griffin did not encounter any law enforcement.  So how could Griffin have known that he was not allowed to enter the area from law enforcement if he did not encounter them?

Mr. Griffin -- I think Mr. Struck also testified that sometimes Couy mouths off unfortunately.  That's what Mr. Griffin was doing.  He did not hear from law enforcement he could not enter, and that testimony from Struck alone prohibits a finding of guilt beyond a reasonable doubt.

And those two statements on January 7 and January 14, the defendant is also referencing other people, Your Honor.  He's not saying, "I heard from law enforcement."  He said, "When some patriots are told by law enforcement."  Just that distinction alone is reasonable doubt.  This is Mr. Griffin speaking after the event, one time seven days after, after all of the media in the world is drowned with references to police interacting with protestors.

1    We want to emphasize, Judge, that when Officer Erickson was

2    referring repeated times to sections of snow fencing around the

3    west front, he was referencing the -- he was referencing

4    sections that were either not the area where Mr. Griffin

5    specifically entered or sections as they existed hours before

6    Mr. Griffin arrived there.  Officer Erickson didn't offer any

7    testimony about green snow fencing with respect to the area

8    Mr. Griffin entered except the green snow fencing that was

9    already down and did not have a sign on it.

10             THE COURT:  What about the fact that they were -- your

11    client was there the day before when they had been up and the

12    signs were displayed?

13             MR. SMITH:  So if Your Honor is referring to the

14    exhibit where Mr. Griffin is standing in front of an SUV, I did

15    not even see the snow fencing, and the defendant is facing the

16    video camera.

17    Also, he was about like maybe 2,000 feet away from the snow

18    fence.  I didn't see any signs posted on the snow fences in the

19    deep background of that video, and there's no evidence that the

20    defendant saw them either.

21    So I think there's a critical question that we reach at

22    this point, which is can the Court presume knowledge of entering

23    a restricted area beyond a reasonable doubt based on crossing a

24    stone wall with no "Do Not Enter" sign and no fencing in place

25    at that area?  It can't presume that knowledge because the west

1    front is a public forum.  That's the *Jeannette Rankin Brigade*

2    case.  That's the *Lederman* case in the D.C. Circuit.  That's

3    binding authority here.

4        So for the Court to presume knowledge, infer, as the

5    government says, infer knowledge that he's entering a restricted

6    area because he entered the lawn of the Capitol would be basing

7    an inference on constitutional error.  He has the right to be

8    there.

9            THE COURT:  But, I mean, don't you have a problem that

10   he went up to the stage?

11       I think, you know, if we were just talking about the stone

12   wall, I'm sure you'd be right.  But he went over three walls.

13   He went up this little -- through this door that the government

14   says he said had to be busted down.  He went up to the stage

15   that -- nobody thinks that random tourists could just kind of

16   waltz up there; right?

17           MR. SMITH:  If nobody thinks that, they don't know

18   their D.C. Circuit law.  The D.C. Circuit held that a protestor

19   who was on the east Capitol -- east front Capitol steps is in a

20   public forum, Your Honor.  So if there's no --

21           THE COURT:  That's not the stage.  I'm talking about

22   the --

23           MR. SMITH:  This is the west front.  Even if there's

24   some sort of distinction between -- well, let's go to the west

25   front.  We can go to the *Jeannette Rankin Brigade* which is

binding because it was summarily affirmed by the Supreme Court.
The case involved 5,000 protestors who wanted to march toward
the west front steps of the Capitol.  No Secret Service statute
was applied, but the chief of police said that they would be
guilty of parading on the Capitol grounds if they were to
approach the steps.  This court and then the Supreme Court held
that no, this is a public forum, this is a public forum, and
that overrode restrictions that -- the parading on the grounds
restrictions.

          But here, the issue is different because if there's no sign
or law enforcement officer telling you you can't be on the west
front of the Capitol steps, what you're left in that vacuum with
is a public forum.  It is the case law in this district that the
steps are a forum.

          THE COURT:  They can be restricted; right?

          MR. SMITH:  They can be restricted, but then we're
back to the question of signs.

          THE COURT:  Well --

          MR. SMITH:  We're back to the question of notice.
Officer Erickson testified that -- I asked him, "How would
someone be notified if there's no sign saying do not come in?"
And he said, "From law enforcement."  But no law enforcement
spoke -- there's no evidence that law enforcement spoke with
Mr. Griffin in the record.

          With all these January 6 cases, we're coming to them with

1    the assumption that someone should not be on the Capitol

2    grounds.  That's -- it's a remarkable assumption, because

3    there's case law going back decades saying that's not true.  Not

4    only are you not prohibited; you have a right.

5         So to say that Mr. Griffin's guilty knowledge should be --

6    we can infer that based on his exercise of the right that this

7    court has recognized?  That is so remarkable.

8         I mean, it would be one thing if he was being prosecuted

9    for assaulting someone, for planning to enter the building, for

10   threatening members of Congress inside.  He's being prosecuted

11   for standing on the steps that this court has held are a public

12   forum.

13        And the only reason we think this is remarkable is because

14   of all this -- because of this particular set of facts.  But

15   it's not just about these facts.  This is the law.

16             THE COURT:  But he's not on the steps.  He's on a

17   stage.

18             MR. SMITH:  The stage was set up right on the -- that

19   is the public forum.  If you're saying that entering the --

20   well, Officer Erickson testified that there was no restricted

21   area distinction between the stone wall area and the inaugural

22   platform.  He didn't say that one is entering a restricted area

23   at that point.

24        And the knowledge question goes to the point at which the

25   defendant made a decision whether or not to enter a boundary

1    line.  You have to knowingly enter.  The mens rea element

2    applies to the action of entry, not the action of a decision to

3    step in a certain place once the defendant has already made a

4    decision to go into the defined area.

5         So knowingly applies to the decision that Mr. Griffin made

6    when he's deciding whether to go over the stone wall.  Is that a

7    guilty mind?  Well, with no sign there saying get out, stay out,

8    with no fencing up, the guilty mind assumes that an exercise of

9    his right is criminal.  That can't be the law.

10        And it's not just the law for January 6.  There have been

11   thousands of protestors who would fill up the whole National

12   Mall who would have mens rea if this were the case.

13        And it's also important to emphasize that a ruling in this

14   case would not apply to every other single 1752 case as the

15   government fears.  That's simply not true.  One of the

16   government's exhibits that it showed was protestors running

17   through a barrier that had a "Do Not Enter" sign prominently

18   disclosed on it.  That's a completely different case.  And not

19   all of these cases are the same.  The government shows that

20   exhibit as though -- not really explaining where it is or what

21   time it is, as though that is going to apply to Mr. Griffin.  He

22   had a completely different mind.

23        So, Judge --

24             THE COURT:  But isn't it kind of similar, though?  I

25   mean, if you're saying that his guilty knowledge needs to be

1    judged at the moment he went over the Olmstead wall, what about

2    that protestor who maybe also went over the Olmstead wall and

3    first is faced with a clear sign when he's in the building?

4    Aren't you suggesting that he also would be not guilty?

5             MR. SMITH:  So which protestors?  What's the

6    hypothetical?

7             THE COURT:  The one that you're describing, someone

8    who is bursting through a "Do Not Enter" sign but clearly has

9    been within the restricted area for some time.

10            MR. SMITH:  Then we get to time, place, and manner,

11   Your Honor, because then we have a restriction that is putting

12   the defendant on notice.  Then the question becomes is that a

13   time, place, and manner restriction consistent with First

14   Amendment law.

15        But we're not reaching that point.  We're saying, do we

16   assume a guilty mind without any notice on the point of entry

17   based on the mere fact of crossing a stone wall that surrounds a

18   public forum?  So you -- the Court would be -- the government is

19   asking the Court to entangle itself inferring knowledge based on

20   his exercise of something that is a constitutional right without

21   a time, place, and manner restriction.

22        And that's -- so, Judge, we want to -- on knowledge, we

23   think there's one thing that -- setting aside Struck and saying

24   his testimony, uncontested testimony, government witness, that

25   Mr. Griffin didn't encounter any law enforcement so his

statements later were about other people or God knows what, there's one fact that completely prohibits a finding of guilt beyond a reasonable doubt on knowledge. The government's knowledge case rests on the absurdity that Griffin knew a restricted area its own Secret Service agent did not. The Secret Service agent could not identify the restricted area. And yet, Mr. Griffin's knowledge of it beyond a reasonable doubt is supposed to be found.

I've never heard of such a case where the government's own agent doesn't know what defines the crime, and yet, the defendant does? That fact alone is not just not guilt beyond a reasonable doubt. It -- he didn't know. The defendant didn't know. The Secret Service agent didn't know.

On the point about the vice president's presence in the restricted area, Judge, there's a sworn statement in the record that says the Capitol Visitor Center is not the same as the building, and I understand the Court held that the Capitol Police are not the same as the government, so there was no party admission.

But the government adopted the statement by filing it in court. The Capitol Visitor Center, particularly the loading dock under the building, is not the Capitol building. The undisputed evidence is that Pence left the building at 2:28. Griffin entered the restricted area, as the government calls it, at no point before 2:31. Griffin was not in the building or

1     grounds with the vice president.

2         But even if the vice president was in the building, there's

3     simply no way to find beyond a reasonable doubt that Griffin

4     knew that fact.  And, Judge, the Court does need to find that

5     fact, and we have a bone to pick with the government's case

6     citations.

7         The presumption of scienter says that the knowingly element

8     modifies every element of the crime.  That also includes

9     definitions of what the guilty acts are.  That's the *Staples*

10    case.

11        Ms. Iyengar said that the *Rehaif* case supports the

12    government.  It does not.  The *Rehaif* case reversed a conviction

13    because the Court failed -- did what the government is asking

14    the Court to do here, which is not to apply the knowingly

15    element to every element of every actus reus in the crime.

16        *Staples* is unequivocally clear that that requirement, the

17    presumption of scienter, applies to the definitions in the

18    statute of the offense itself, of the actus reus.

19        Here, the actus reus is entering a restricted building and

20    grounds.  That means one thing in the statute and nothing else.

21    It means a place where a protectee is or temporarily will be.

22    It doesn't mean something else.

23        THE COURT:  So you're saying that somebody has to know

24    that a protectee is there to be --

25        MR. SMITH:  They have to know that, because the

1    presumption of scienter says that the mens rea element modifies

2    every element of the statute, every element, every actus reus.

3    The actus reus is entering a restricted building and grounds,

4    and restricted building and grounds has one meaning alone in the

5    statute, which is a place where a Secret Service protectee is or

6    temporarily will be visiting under Section 1752(c)(1)(B).

7                THE COURT:  So --

8                MR. SMITH:  Judge, there is no argument under *Rehaif*.

9                THE COURT:  That just feels preposterous in

10   practicality.  President Biden goes home to Delaware, and the

11   Secret Service have to tell people sorry, you can't come in

12   here, the president is in here?

13       What kind of security issues is that going to raise if the

14   Secret Service is required to tell people who is in the

15   restricted area in order for the restricted area to have any

16   teeth?

17               MR. SMITH:  Well, Judge, we would point to the *Bursey*

18   case where the Fourth Circuit found that knowledge was only

19   proven because the government informed the defendant many times

20   that he knew a Secret Service protectee was in the area.  That

21   was --

22               THE COURT:  That was also a former version of the

23   statute that I think had a willfulness --

24               MR. SMITH:  Willfully.

25               THE COURT:  --which is no longer there.

1      MR. SMITH:  That -- fair point, Your Honor.  But then

2  the analytical framework the Fourth Circuit uses to analyze

3  whether knowledge was found beyond a reasonable doubt was based

4  on facts going to his -- the defendant's knowledge that a Secret

5  Service protectee was in the area.

6      But I pose another hypothetical to the Court.  Suppose

7  there's a restricted cordon around a building where a vice

8  president is visiting and a student has a dissertation due in

9  two days.  He's got to run inside the building.  He doesn't know

10  the president's in there.  He runs inside; he runs back out.

11  Well, you might say that's a bad decision.  Is that the kind of

12  person that Congress intended 1752 to reach, someone who has no

13  knowledge that the president is even in a place?

14      The point of the statute is to keep -- the whole crime is

15  to keep people from getting too close to the president.  The

16  guilty mind has to go to what the purpose of the crime is.

17      A student running into a building to get his dissertation

18  and running back out who doesn't know the president is in there

19  is not the guilty mind that Congress is talking about.  It's

20  talking about a person who wants to accost someone.

21      And it doesn't -- the statute doesn't require the

22  government to prove that, but that's the type of guilty mind

23  we're thinking of, not someone who has no idea this has anything

24  to do with the president, the vice president, any of the Secret

25  Service protectees.

The sweep of that would reach way too far.  We provided
some examples in our opposition to the government's trial brief,
but there are so many examples that would not really make any
sense for not applying the presumption of scienter.

And don't forget, Judge.  This is a presumption.  The
government has to rebut this.  They've cited one case, and the
presumption was applied there.

I think the Court already pointed out that what the
knowledge -- what the evidence was regarding Mr. Griffin's
knowledge.  The government has not offered a single text
message, nothing from Struck's testimony, not one statement of
Mr. Griffin's, even though he was filmed virtually the whole
day, indicating his knowledge that the vice president was in the
building.

The government provided some evidence, I think a
January 5th video in front of the SUV, where Mr. Griffin says,
"Pence has a big decision to make tomorrow."  Okay.  That was
one day before.  The evidence the next day shows that
Mr. Griffin believed -- I think there's at least four pieces of
evidence that showed that Mr. Griffin believed that the thing
had been certified about three-quarters of the way on his walk
towards the Capitol.

It's the government's burden.  They've proven beyond a
reasonable doubt that even though Mr. Griffin believed that
Pence had certified the election, that the whole thing was still

1    in process and that he was still there?  They haven't proven

2    that.

3          The evidence also showed that Mr. Griffin believed that the

4    setup at the Capitol was for Biden's inauguration, not for Vice

5    President Pence.  That shows a state of mind different than

6    knowledge that Vice President Pence was there.

7          I think even the statement the government relies on,

8    Mr. Griffin saying that if you tell some patriots -- if the

9    police tell some patriots that you can't go to Biden's

10   inauguration, you know, look and see what happens, whatever, I

11   don't -- we don't know why the government thinks that evidence

12   supports its case.  It shows that Mr. Griffin does not have

13   knowledge of the vice president's presence, or it certainly

14   suggests that he doesn't think that any of this restriction has

15   to do with the vice president.

16         So, Judge, on Count 2, disorderly conduct, the government's

17   case is simply unsupported by evidence at all, and this is

18   really a proper venue for a Rule 29 motion, but it's -- we're

19   not going to formally file it because the Court can consider it

20   under the trial standard.

21         Griffin led a prayer at the Capitol.  At first, the

22   government was totally unclear about what exactly were the

23   actions that constituted disorderly conduct.  We will go through

24   them right now.

25         First, the government said walking up ramps.  Well, as the

1    Court pointed out, that collapses any distinction between

2    entering the restricted area and disorderly conduct.

3        Then the government pointed to some speech before

4    Mr. Griffin's prayer and said that this is disorderly conduct,

5    but it said we're not prosecuting him for his speech, it's just

6    that this speech is disorderly or this type of speech.

7        I'm not really exactly sure what the argument is, Judge,

8    but in order to prosecute speech here, you need to show -- to

9    satisfy the *Brandenburg* standard and *Hess v. Indiana*.

10       The government doesn't come close to showing that his

11   statements, which were not directed towards the crowd, satisfy

12   the *Brandenburg* test, which is whether speech was directed to

13   inciting imminent lawless action and likely to produce it.

14       Well, you didn't even hear an argument from the government

15   on *Brandenburg*, but that's because his speech, which was just

16   made to a couple of people standing around him, was not directed

17   toward inciting imminent lawless action.

18       In fact, a couple of seconds later, he addresses the crowd

19   in a prayer where witness Matt Struck said that he saw people

20   calm down and more contemplative after Mr. Griffin spoke.  That

21   is not just not disorderly conduct; that's the antithesis of

22   disorderly conduct.

23       Struck also testified that Griffin did not harm or threaten

24   anyone that day.  He testified that his actions did not put

25   anyone in reasonable fear for their property or their person.

The government comes up with the disorderly conduct definition that it says any loud speech is disorderly conduct. It doesn't say where that comes from, but that's because that would be unconstitutional if there were such a law.

Under D.C. law, disorderly conduct is intentionally or recklessly acting to put another person in reasonable fear for their person or property or inciting violence. That's D.C. Code Section 22-1321. And why would it be appropriate to apply the D.C. Code here? Because Congress did not preempt the field in Section 1752. We are in the District of Columbia. There's no reason that Congress -- there's no reason to read 1752 in such a way that we believe Congress intended to override the local ordinances and laws of the place where 1752 is being applied.

THE COURT: So you think 1752 would be defined differently, depending on if they were like over in Maryland?

MR. SMITH: I'm referring to just the general principle of preemption, Your Honor.

THE COURT: Yeah, I understand that.

MR. SMITH: If there's a set of criminal laws that are applying in a jurisdiction and they're overlapping with a federal law, we don't assume that -- the normal statutory interpretation is we're not assuming that Congress intended to wipe out the understanding of the local laws unless it says so.

So if 1752 is applied in a jurisdiction where disorderly conduct, for example, falls short of the constitutional

1    standard, like the government is proposing -- well, we would

2    analyze it constitutionally, but if it falls within a

3    jurisdiction of a place where disorderly conduct is defined a

4    certain way, why would Congress intend it to be applied

5    differently?  And if they did, they didn't say it.

6              THE COURT:  Well, maybe so the Secret Service would

7    not have to be applying different standards depending on which

8    side of the Potomac they're on.

9              MR. SMITH:  The Secret Service doesn't apply the

10   disorderly conduct standard.

11             THE COURT:  No, they apply this.  They've got to --

12             MR. SMITH:  They don't apply a standard, Judge.  They

13   just protect the president.

14             THE COURT:  Well, they make arrests.

15             MR. SMITH:  I actually don't -- well, so, Your Honor,

16   I think if someone's in a restricted area and they're refusing

17   to leave, that's a restricted area.  I mean, I don't know if

18   they would decline to arrest -- you can't be disorderly and

19   disruptive if you're not in the restricted area.

20        But either way, Judge, I think that as a general matter

21   Congress doesn't preempt local criminal laws unless it says so.

22             THE COURT:  All right.  You've got five minutes, sir.

23             MR. SMITH:  Okay.  Judge, we just want to emphasize

24   that the government's standard of loud noise is not coming from

25   someplace.  Loud noise is not disorderly conduct, because,

1    number 1, it doesn't have a mens rea requirement.  You need to

2    have some kind of intent.

3         The government said that it was Mr. Griffin's intent to

4    disrupt Congress because he led a prayer, because he said "you

5    might get more of this," "there might be more of this where

6    that's coming from."

7         Judge, you can't find guilt beyond a reasonable doubt about

8    that because Mr. Struck testified that Mr. Griffin's statements

9    showed that he was there to support free and fair elections.

10   The Court watched the government's own statements about that

11   right after -- as he was leaving the Capitol.  It saw a

12   statement from Mr. Griffin saying his purpose in being there was

13   to ensure a better life for his children.  Those aren't the

14   stereotypical disorderly conduct types of actions.

15        But whatever the standard is, I think Struck's testimony

16   that Mr. Griffin -- he saw no action on Mr. Griffin's part that

17   would put anyone in fear of the property or person, I think,

18   prohibits a finding of guilt beyond a reasonable doubt.

19        Judge, and very quickly, the government referenced

20   Inspector Hawa's testimony that the mere presence of people

21   created a risk, people.  But the burden is to show that the

22   defendant's conduct, not people.  She testified that Mister --

23   that Vice President Pence had entered the secure location before

24   Mr. Griffin had even crossed the stone wall.  So Mr. Griffin's

25   entering the area did not prompt Vice President Pence to leave.

1    But then, Judge, his one person -- the government has not

2    offered any evidence showing one person's presence standing out

3    there enhanced the security risk for Vice President Biden.  It

4    would be one thing if Mr. Griffin was inspiring other people to

5    enter.  Then he would be responsible for other people's actions.

6    But the government hasn't offered any proof of that.

7            THE COURT:  What about the idea that he kind of

8    inspired this chanting right outside the Capitol while people

9    are trying to conduct business?

10           MR. SMITH:  But Struck's testimony was, and the Court

11   saw, that the prayer calmed people down.  It's visible.  That's

12   not bunk.  You can watch the video again, Judge, Your Honor, and

13   you will see that people -- there's a section of the crowd

14   that's calm and listening to Mr. Griffin.  People around are a

15   sea of noise.  That's the opposite of incitement.

16           THE COURT:  I thought I saw -- I mean, some people

17   kneeled, but a lot of other people start, you know, chanting

18   "pray for Trump"; right?

19           MR. SMITH:  We would say chanting can't constitute

20   disorderly conduct because that would violate the Constitution.

21           THE COURT:  You don't think if people came in here and

22   started chanting during court that would be disorderly conduct?

23           MR. SMITH:  The Supreme Court had an interesting

24   decision a few years ago -- or excuse me, the D.C. Circuit did

25   called *Bronstein* where the Court drew a distinction between

1    people protesting in courts and at the Capitol.  That's also in

2    the *Jeannette Rankin* case.  And there's a fundamental

3    distinction, which is that a court is not a public forum.

4              THE COURT:  Thank goodness for that.

5              MR. SMITH:  So maybe when people run into Supreme

6    Court confirmation hearings and scream, you would say well,

7    maybe the government would regard that as disorderly conduct,

8    but it's not.  People who do that are not even arrested, much

9    less charged with 1752 violations.  So the government's

10   statements about disorderly conduct are not very credible.

11        The Capitol steps are a public forum under *Jeannette Rankin*

12   *Brigade* and *Lederman,* and giving speeches at a public forum

13   cannot constitute disorderly conduct without incitement.  Under

14   *Brandenburg*, there's no incitement.

15        And then, Judge, I think I just want to emphasize that

16   there is not only the intent to commit disorderly conduct, but

17   the defendant's actions have to in fact disrupt the orderly

18   conduct of business.

19        So there's a factual element here, too.  The Court saw no

20   evidence that Mr. Griffin's actions themselves disrupted

21   government business.  As the Court pointed out, not only did

22   Mr. Griffin believe that the business had concluded; the session

23   had recessed about over an hour before Mr. Griffin got there and

24   wasn't gavelled back in until 8:30 in the evening.

25        So this isn't just about Mr. Griffin's intent.  This is

about the facts.  It was a fact that they were in recess from an hour before Mr. Griffin arrived there until several hours after he left.  It has shown no evidence, much less beyond a reasonable doubt, that his actions specifically disrupted government business.

Judge, the final thing we want to say is that someone said that wisdom is the ability to hold two contradictory ideas in mind at the same time and not lose your capacity to function.

So in this case it can both be true that January 6 was embarrassing and shameful and that the government has not proven a 1752 offense specifically for Griffin's prayer and conduct on the Capitol steps.

So we would ask the Court to enter a judgment of not guilty on both counts.

THE COURT:  Thank you, Mr. Smith.

Ms. Iyengar, brief rebuttal?

MS. IYENGAR:  Yes, Your Honor.  There were just a few points that I wanted to respond to.

Mr. Smith, I think, spent a significant amount of time talking about where the snow fencing was, if there were any signs up to put the defendant on notice that this area was restricted.  But that's just not where we are in this case. Again, like I said in my initial closing, if this was a case where the defendant had just hopped over the wall and then hopped right back over, we probably wouldn't even be having this

 1    conversation right now.

 2          But that's not the case.  The defendant went all the way up

 3    the west lawn, onto the Lower West Terrace, onto the

 4    inauguration platform, where the Court rightfully pointed out a

 5    reasonable person would not think they have lawful authority to

 6    be in that area.

 7          THE COURT:  So can you address, though, his point

 8    about you need to have a guilty mind when you enter the

 9    restricted area?  I mean, that feels like the harder -- isn't he

10    right about that, that you've got to know what you're doing is

11    wrong when you -- the Olmstead wall, why isn't the Olmstead

12    wall, that moment being the one that matters?

13          MS. IYENGAR:  Again, this is not a case where we're

14    asking the Court to make an inference about the defendant's

15    knowledge.  He told us what his knowledge was when he entered

16    the restricted area.  He told us in two separate statements, one

17    that was made in his official capacity as an elected official at

18    a county commissioners meeting.  He knew he was not supposed to

19    be in that area, and he entered it anyway.  He could not have

20    been any more clear.

21          Mr. Smith's argument about Mr. Struck's testimony regarding

22    Mr. Struck's belief of the defendant's knowledge should be given

23    very little weight.  The defendant made these statements on

24    multiple occasions following January 6 that he was well aware

25    this area was restricted and he entered it anyway.  That's clear

1    as day.  There's nothing in the record to contradict that, and

2    that evidence in and of itself shows that the defendant had

3    knowledge that this area was restricted.

4              THE COURT:  How would you evaluate Mr. Struck's

5    credibility?

6              MS. IYENGAR:  Well, I think the questions regarding

7    his knowledge of what the defendant thought, I don't think we're

8    really in the realm of his credibility necessarily.  Obviously,

9    it's difficult for one person to know what another person

10   thought or knew at the time.

11             THE COURT:  Sure.  But he said they never saw police;

12   right?

13             MS. IYENGAR:  Right.  And obviously, that was his

14   perception of what was going on.  But again, we have -- this is

15   not one off-the-cuff statement that the defendant made while

16   this was all going on or following the events.  These were

17   multiple statements that he made in what appear to be planned

18   speeches, again not off-the-cuff remarks, and again a speech he

19   was making in his official capacity as an elected official

20   admitting that he knew he was entering a restricted area.

21        So Mr. Struck's perception of what was going on, I don't

22   think there's any reason for the Court to necessarily, you know,

23   discredit his testimony on that.  That was his perception.

24        But the defendant's knowledge, what was going on in his

25   mind, that's a completely separate issue, and I think his own

1    words speak to what his knowledge was at that time.

2           And I would also just point out to the Court that the

3    statute talks about entering and remaining in a restricted area.

4    And there is substantial evidence in the record regarding both

5    the defendant and Mr. Struck remaining in the restricted area

6    here.  You can see from the time stamps in the videos that

7    several hours passed after the defendant crossed over the

8    Olmstead wall, walked up the lawn, walked up to the inauguration

9    platform, remained on the inauguration platform, and then came

10   back down onto the lower area on the Capitol grounds.  So not

11   only did he enter a restricted area, but he also remained in it

12   for a substantial period of time.

13          I also think with regard to the knowing issue, you know,

14   this is not -- the defendant's conduct is not taking place in a

15   vacuum here.  It's not like he's one person hopping over a wall

16   by himself with no one else around him.  He can see what's going

17   on around him, and the Court can see from the video footage the

18   conduct that people were engaging in around him.  People were

19   scaling walls.  You can see in one of the videos that somebody

20   is trying to break a window.

21          You can also see in Exhibit 43-1 the defendant walking up

22   the staircase leading up to the inauguration platform.  You can

23   see as he's walking up the staircase he covers his face with a

24   jacket, and he says, "I love the smell of napalm in the air,"

25   which I think we can reasonably infer is the defendant reacting

1    to the fact that there are chemical agents being released by law

2    enforcement to try to disperse the crowd.

3        So he clearly knew he wasn't supposed to be in this place,

4    and he decided that he was going to be there anyway.

5            THE COURT:  Can you address Mr. Smith's argument that

6    this was a Capitol Police restricted area, not a Secret Service

7    restricted area?

8            MS. IYENGAR:  Well, I think this was an issue that we

9    litigated previously.

10           THE COURT:  As he points out, though, I think there

11   were -- he got a couple factual points here out of the police

12   inspectors that we didn't have before.

13           MS. IYENGAR:  Sure.  But again, I mean, what -- the

14   testimony that we have from Inspector Hawa is that Secret

15   Service does this in tandem with Capitol Police, which I think

16   was the information we had even before this trial began.  They

17   work in tandem to ensure the safety and security of Secret

18   Service protectees who visit the Capitol building, which seems

19   logical because that is the police force that is in charge of

20   the Capitol building and the grounds.

21       The fact that U.S. Capitol Police was in charge of setting

22   up the perimeter, knew what the perimeter was, and perhaps

23   Inspector Hawa didn't know exactly that the barriers were placed

24   on one side of the street versus another side of the street,

25   that doesn't take away from the fact that, you know, again this

1    was an area that was restricted in part due to the vice

2    president's visit.

3         Exhibit 6, which was the e-mail from Inspector Hawa to U.S.

4    Capitol Police saying that Vice President Pence was going to be

5    visiting the next day, part of the reason for sending that

6    e-mail was to ensure that the correct safety protocols were in

7    place for his visit.

8         So regardless of who was physically setting up the barriers

9    or who was determining what the restricted perimeter was, this

10   is still a restricted area within the definition that's set out

11   in 18 U.S.C. 1752.

12        So I also just wanted to address, I guess, the issue

13   regarding the mens rea requirement that Mr. Smith raised.  The

14   *Staples* case that he keeps referring back to, that reads a mens

15   rea requirement into the statute in the *Staples* case where there

16   was no mens rea requirement.

17        That's not the situation that we have here.  1752 sets out

18   a mens rea requirement that the defendant knowingly entered a

19   restricted area.  It could not be clearer.  They don't -- they

20   purposefully did not require knowledge of a protectee being

21   present, knowledge of an event of national significance taking

22   place, knowledge that the person was entering an area that was a

23   part of the White House grounds.  They could have -- Congress

24   could have done that.  They chose not to do that here.  They

25   only required that the mens rea apply to the knowledge that the

1    person was entering a restricted area.  So there's no reason to

2    read a new mens rea requirement into the statute at this point.

3          The point that Mr. Smith raised about *Bursey*, that the

4    Court in that case discussed the defendant in that case having

5    knowledge of the president's presence, that was an issue that

6    was raised by the defendant.  He said the government never

7    proved that I knew that the president was there or going to be

8    there.  The testimony that happened to come out during trial was

9    that the defendant in fact had made statements indicating that

10   he knew that the president was going to be there.

11         And the Court was essentially just responding to what the

12   defendant's argument was saying there is sufficient testimony in

13   the record to say that the defendant absolutely had knowledge

14   that a protectee was going to be in that area.

15         The Court did not say that there is this mens rea

16   requirement that an individual know that a protectee is going to

17   be in that area in order to be convicted under the statute.  And

18   as the Court noted, that was an older version of the statute.

19         I think I also just wanted to address the disorderly

20   conduct arguments that Mr. Smith had made.  The definition that

21   I just stated to the Court, that we put in our trial brief, that

22   definition came directly from the Red Book, that disorderly

23   conduct is conduct that is unreasonably loud or disruptive.

24         Disorderly conduct does not require someone to incite

25   people to violence or anything else.  It's just as simple as

that.  It's conduct that is unreasonably loud or disruptive.

The record is clear here from watching the video footage of the defendant's conduct, he absolutely was engaging in conduct that qualifies as loud and disruptive.  He's engaging with the crowd in a way that is loud and disruptive.  And as the Court pointed out, after he says the prayer that he says to the crowd, people start erupting in these chants.  He makes a speech to the camera talking about election fraud in a way that is extremely loud.  He climbs over barriers.

All of that conduct taken in the aggregate is disorderly conduct under the statute, and we have met our burden on that element.

I think the only other two points that I wanted to address, Mr. Smith had started out with this issue of no evidence being in the record that the defendant didn't have a lawful purpose for visiting the Capitol that day.

Well, the nice thing about this case is we have video footage of what the defendant and Mr. Struck were doing on the Capitol grounds on January 6.  At no point in time are either of them making any sort of effort to visit a particular congressperson or be there for any sort of a lawful purpose.

The defendant again also makes several statements following January 6.  On January 7 at the Otero County Commissioner meeting, talking about what his purpose was for going up to the Capitol, and it had nothing to do with any sort of lawful

1    purpose of visiting a particular congressperson or anything of

2    that nature.  It was to go -- it was because he was -- the

3    defendant was upset about the election having been certified.

4        And I think just the last point I wanted to bring up,

5    Mr. Smith had discussed an affidavit, I believe, from a sergeant

6    at the United States Capitol Police.  And I just wanted to be

7    clear, that was never entered into evidence.  So we would just

8    ask that the Court not consider that.

9            THE COURT:  Can you respond to Mr. Smith's point that

10   Congress had already been gavelled out of session before the

11   defendant entered the restricted area and didn't resume until

12   after?

13           MS. IYENGAR:  So I think that goes to -- my

14   understanding was that went to sort of the disorderly conduct

15   piece of it.

16           THE COURT:  Yes.

17           MS. IYENGAR:  So again, as I was saying, I think it

18   goes sort of both to the issue of whether he was intending to

19   disrupt and whether he actually disrupted.

20       Taking that second piece first, the testimony we heard from

21   Inspector Hawa was that not only did the people who came before

22   the evacuations took place cause the evacuation to occur of the

23   vice president, but he stayed evacuated in the loading dock area

24   because people were continuing to breach the security perimeter.

25   And that included the defendant.  So his mere presence in the

1    security perimeter was creating a security issue.  But again,

2    his conduct was also loud and disruptive under the meaning of

3    the statute.  So that element has been satisfied.

4        With respect to his intent to disrupt, again, I think, you

5    know, this is going on in the middle of the day.  You can see

6    that when the defendant crosses the Olmstead wall it's about

7    2:31 p.m.  This was on a working day at the Capitol building

8    where I think the Court can infer there was government business

9    going on.

10           THE COURT:  But actually not right then.  That's kind

11   of the weird thing, is because it had already been --

12           MS. IYENGAR:  Sure, but I think in terms of the intent

13   piece of it, whether it was going on right at that moment or

14   not, that doesn't, I think, really play into what the

15   defendant's intent was.

16           THE COURT:  I see.  You're just focusing on --

17           MS. IYENGAR:  Correct.  So I think in terms of whether

18   he actually did disrupt, his presence there was just causing a

19   further disruption of government business by causing the vice

20   president to remain in the relocation area and not return to the

21   Senate chamber.

22       In terms of his intent, though, I think again it's fair to

23   infer there's government business going on at the Capitol.  His

24   presence there in conjunction with everything else that was

25   going on, that was certainly -- would certainly have disrupted

1    whatever government business was taking place that day.

2              THE COURT:  Okay.  Thank you.

3              MS. IYENGAR:  Thank you.

4              THE COURT:  Ms. Iyengar, very well argued and handled

5    by both parties.

6         Why don't we come back at 11:45.

7         (Recess taken from 10:58 a.m. to 11:51 a.m.)

8         (Call to order of the court.)

9              THE COURT:  All right.  I want to thank the attorneys

10   again for their work and careful handling of this case.  I've

11   considered the evidence, the arguments of counsel, and am now

12   prepared to render judgment in this case.

13        I'm going to lay out a few facts as I find them in seriatim

14   rather than by witness.  I do want to make a few general

15   credibility findings about the witnesses now, though.

16        All three witnesses struck me as generally credible and

17   attempting to tell the truth.  I did think Mr. Struck didn't

18   always have a very clear memory of January 6, 2021, on all

19   points.  There were several times when he didn't remember things

20   or remembered things incorrectly.  I'm not sure if this is

21   because he was focused on taking videos or what, but where some

22   of his testimony may disagree with my findings, it's because I

23   believed other evidence over his testimony.  I think there may

24   have also been some points where he was trying to minimize the

25   conduct or culpability of the defendant and, by extension,

1    himself.

2        I did find both law enforcement officers to be very

3    credible.  I note their long law enforcement history and senior

4    roles in their respective departments.  They both came across as

5    very conscientious, experienced, and trustworthy.

6        Inspector Hawa was cross-examined on a couple points where

7    her testimony conflicts either with the facts as I'm about to

8    find them or with the law.  I thought those answers were the

9    result of some gotcha questions and that she couldn't reasonably

10   be expected to know the answers or that she had an innocent

11   misrecollection of those events.

12       To the extent her testimony contradicts the facts as I find

13   them, I simply find other evidence more believable as to those

14   points.  I certainly don't think she made any intentional

15   misstatement about a few stray points from over a year ago that

16   were rather tertiary to her duties on January 6.

17       I find that Mr. Griffin and Mr. Struck traveled together

18   from New Mexico to attend President Trump's Stop the Steal

19   Rally.  They did not come to create unrest or to break any laws.

20   Mr. Griffin came in conjunction with his organization, Cowboys

21   for Trump.

22       They arrived in D.C. by January 5, and Mr. Griffin made a

23   speech on January 5 in front of the west front of the Capitol.

24   I'm looking to United States Exhibit 63 for this.  At that time

25   the various barriers on the west front of the lawn were clearly

visible, including snow fencing with signs saying that the area was closed. I think it is likely that Mr. Griffin saw those barriers.

On January 6, Mr. Griffin and Mr. Struck attended the Stop the Steal Rally on the Mall. Mr. Griffin was dressed in professional attire and was unarmed, quite unlike many other people present who came prepared to cause trouble and were wearing military-type gear and carrying masks and other paraphernalia.

After the rally, they began walking towards the Capitol, along with many other people. En route to the Capitol, they heard that Vice President Pence had already certified the election. That was incorrect, but I think it is relevant to Mr. Griffin's later conduct and his knowledge.

They approached the Capitol via the west front, passing the Grant statue and the Peace Monument on First Street. I find that the restricted area for 1752 purposes is identified in United States Exhibit 2. The Olmstead wall along the First Street served as part of this restricted area. This is about a 5-foot stone wall that separates the sidewalk from the west front lawn.

At around 2:31 p.m., the defendant entered the restricted area by climbing over the Olmstead wall. As far as I can tell, there were not signs indicating it was restricted at that point, and there were numerous other people climbing the wall and

1    thousands of people inside the wall.

2         The defendant walked towards the Capitol, climbing at least

3    two other small walls, and walking over the snow fencing which

4    had either been trampled or removed by numerous protestors who

5    had preceded him into the area.

6         He then walked up a narrow staircase into the inauguration

7    stage which had been erected on the west front of the Capitol.

8    The staircase had a door.  The door had been closed.  And he or

9    someone near him said, "We'll wait until they get this door

10   broken down."  That's from United States Exhibit 40.

11        There was OC spray or pepper spray in the area from

12   officers trying to clear the protestors.  Mr. Griffin was

13   clearly aware of the OC spray, as shown in United States Exhibit

14   43.

15        He then took a bullhorn and shouted down to the crowd of

16   protestors on the terrace and lawn below him.  He attempted to

17   lead them in a prayer, which lasted for less than a minute.  A

18   number of people seemed to respond to him, some kneeling as he

19   instructed them, others beginning to chant "pray for Trump."

20   This is all shown in United States Exhibit 54.

21        The defendant remained in the restricted area for some

22   time.  U.S. Exhibit 62 shows him being on the terrace or

23   inauguration stage as late as 4:48 p.m.

24        In subsequent days, Mr. Griffin made several comments about

25   January 6.  On January 7, he made a video while he was down in

1    Roanoke, Virginia, in which he admitted that the area was roped

2    off for the inauguration and that police indicated people

3    couldn't enter the area.

4        On January 14, 2021, he spoke at a special meeting of the

5    Otero County Commissioners where he talked about fencing being

6    up because the site was "being reserved for Joe Biden and his

7    inauguration.  Well, you tell a million Trump supporters that

8    that are going down there, pretty soon that crowd pushed

9    through."

10       I also find that the vice president was in the restricted

11   area during the entire time in question on January 6.  He was

12   moved shortly before Mr. Griffin entered the restricted area

13   from his ceremonial office to a loading dock underneath the

14   Capitol Visitor Center.  I find this was all well within the

15   restricted area for purposes of 1752.

16       I will start with Count 1.  Count 1 of the information

17   charges Mr. Griffin with violating 18 U.S.C. 1752(a)(1).  That

18   provision makes it unlawful to knowingly enter or remain in a

19   restricted building or grounds without lawful authority to do

20   so.  I find the defendant guilty of Count 1.  I also deny the

21   Rule 29 motion on this count.

22       The statute defines restricted building or grounds in a

23   number of ways.  As relevant here, the term means "any posted,

24   cordoned off, or otherwise restricted area of a building or

25   grounds where the president or other person protected by the

Secret Service is or will temporarily be visiting."

The defendant has raised a few different legal arguments concerning how 1752(a)(1) works.  The first argument is that only the Secret Service may designate a restricted area.

As I noted in a memorandum opinion denying his motion to dismiss, I think that's an overly narrow reading of the statute. To quote my previous opinion, the text of the statute "focuses on perpetrators who knowingly enter a restricted area around a protectee, not on how it is restricted or who does the restricting."  That's from 549 F.Supp.3d 49, page 54.  And I do incorporate by reference my analysis of the statute here.

Moreover, in ruling on the defendant's motion to dismiss, I was limited to considering the allegations in the information. Now that I've heard the evidence, it's clear for the defendant on the legal issue that this evidence wouldn't help him. Inspector Hawa testified that the Secret Service consulted with the United States Capitol Police in setting up the restricted area at issue here.  That means this case doesn't squarely present the question of whether the Capitol Police, acting independently of the Secret Service, can designate a restricted area.

To the extent that there was conflict between the testimony of Inspector Erickson, who said the Capitol Police established the area to protect the inauguration setup, and Inspector Hawa, who said that the restricted area was set through coordination

1    between the Secret Service and the Capitol Police, I credit

2    Inspector Hawa's testimony on this point.

3        I think it accords both with 1752 and common sense for the

4    Secret Service to work with local law enforcement, or in this

5    case with the Capitol Police, and take advantage of walls,

6    signage, and other barriers the local law enforcement already

7    have in place.  It especially makes sense here, given the close

8    working relationship between the Capitol Police and the Secret

9    Service.

10       I also want to make clear, I think the restricted area was

11   the Olmstead wall and not subsequent snow fencing.  I think the

12   snow fencing were established as additional, subsequent

13   barriers, but the Olmstead wall was clearly the restricted area

14   for purposes of this -- for 1752 and for this case.  And to the

15   extent there was stray testimony to the contrary, I disregard

16   and disbelieve that testimony.

17       The defense's second argument is that Mr. Griffin cannot be

18   convicted under 1752(a) unless the government shows he knew a

19   Secret Service protectee was or would be temporarily visiting in

20   the restricted building or grounds at issue.

21       I disagree.  The definition of the elements of a criminal

22   offense is entrusted to the legislature, particularly in the

23   case of federal crimes, which are solely creatures of statute.

24   That's according to *Liparota v. United States*, 471 U.S. 419,

25   page 424, from 1985.  So determining the mental state required

for commission of a federal crime requires "construction of the statute and inference of the intent of Congress."  From *Staples v. United States*, 511 U.S. 600, page 605, from 1994.

Here, the text of 1752, which is the best evidence of Congress's intent regarding the mens rea, forecloses the defendant's argument.  I find that Congress specifically included a mens rea requirement in those portions of the statute laying out the elements of the offense, while excluding that mens rea requirement in the definitional provision.  A defendant must act knowingly in committing the offense conduct identified in Subsections (a)(1) through (a)(5).  Each of those subsections begins with the word "knowingly."  By contrast, that limitation appears nowhere in the definitional provision of (c)(1).

The textual distinction -- that textual distinction makes the defendant's primary authorities on this point, *Staples* and *Rehaif*, distinct in a fundamental way.  *Staples* concerned a statutory provision that was "silent regarding the mens rea required for a violation," from page 605.  So there is no textual basis for declining to apply a mens rea requirement to some provisions of the statute and not others.

And *Rehaif* involved a statute in which the scienter required was included in a punishment provision, not in the provisions making conduct unlawful.  So, of course, the Court found "no basis to interpret knowingly" as applying to the second offense element, but not the first.  That's from page

2196 of 139 S.Ct. 2191, from 2019.

It's worth noting that *Rehaif* expressly declined to address a statutory provision like 1752 where "questions may reasonably arise about how far into the statute the modifier knowingly extends."  Also from page 2196.

In sum, the text of the statute makes clear that Congress did not intend for the scienter requirement to apply to 1752's definitional provisions.

And I should also say, it doesn't make a lot of sense to me that the government would have to prove somebody knew that a specific dignitary was there.  I can't imagine that a provision that is looking to protect Secret Service protectees would require the Secret Service to somehow be telling people and proving that people knew which protectee was in the restricted area at what time.

The defendant's third argument seems to be that the relevant restricted area here does not include the loading dock below the Capitol.  In support of that argument, he points to certain statutory definitions in 40 U.S.C. 5101 and 5102.

Those definitions don't limit the restricted area on January 6.  Subsection (c)(1)(B) contemplates that a restricted area will often be ad hoc and context-specific, set as necessary to secure a Secret Service protectee.  The definition, referring to "any building or grounds," affords law enforcement flexibility in establishing a restricted area, reflecting the

common sense notion that protectees may need to be secured in a variety of circumstances.

Only Subsection (c)(1)(A) textually refers to areas with prefixed boundaries, which talks about the White House or its grounds or the vice president's official residence or its grounds.

The defendant's reliance on *United States v. Jabr* to support his argument is thus misplaced, because that case involved (c)(1)(A). *Jabr* looked to other statutory definitions of the phrase "White House grounds" because that phrase appears in other statutory provisions and in Subsection (c)(1)(A).

In contrast, the phrase "Capitol building" or "Capitol grounds" is not in Subsection (c)(1)(B). So it isn't obvious what textual hook there is for incorporating other statutory definitions of the Capitol building or grounds as a limitation on the restricted area here.

That's all to say that the defendant is incorrect in attempting to artificially limit the scope of the relevant restricted area. It is immaterial whether the vice president was at ground level or in an underground garage. Either would be a building or grounds where the vice president was temporarily visiting.

Finally, I disagree with Mr. Griffin's argument that the vice president was not temporarily visiting the Capitol because he has a ceremonial office and constitutional duties at the

1    Capitol.  Mr. Griffin actually elicited very little testimony
2    about how often the vice president does visit the Capitol.  But
3    regardless, I think the U.S. Capitol fits comfortably within the
4    definition of 1752(c)(1)(B).

5        I would just point to and incorporate by reference the
6    thoughtful analysis of Judge Bates in *United States v. McHugh*,
7    2022 WL 296304, out of this district on February 1st of 2022,
8    for that issue.

9        I think there's ample evidence that Mr. Griffin knowingly
10   entered or remained within the restricted area.

11       First, he saw the west front on January 5 complete with
12   multiple rings of snow fencing with signage.  When he crossed
13   the west front lawn on January 6, he would have seen this
14   fencing trampled under foot.

15       Two, he crossed over three different walls, including the
16   Olmstead wall.  Each of these were tall enough that he needed
17   help from others or to rely upon a jerry-rigged ladder or ramp
18   to get over them.  All of this would give -- would suggest to a
19   normal person that perhaps you should not be entering the area.

20       Third, he then climbed an emergency exit staircase onto a
21   wooden inauguration stage that had a closed door.  Either he or
22   someone close to him said that the door had to be busted open.

23       Fourth, he smelled OC spray in the area of the terrace
24   where police had been trying to clear people from the area.

25       Fifth, he also made two statements in the days afterwards

1    admitting that the area had been cordoned off and that police

2    were telling people to stay away.  I think the defense has a

3    fair argument that these statements don't show he specifically

4    was told by the police to stay away, but I do think these

5    statements corroborate the government's argument that he knew he

6    was in an area he was not allowed to be in.

7         While no one of these factors would alone be conclusive of

8    a violation, together they show proof beyond a reasonable doubt.

9    It's certainly not clear to me that Mr. Griffin knew he was

10   entering a restricted area when he initially climbed over the

11   Olmstead wall, even though he was, but by the time he was on the

12   stage, he certainly knew he shouldn't be there.  And yet, he

13   remained.  I find this properly makes out a violation of

14   1752(a)(1).

15        Now for Count 2.  That count charges Mr. Griffin with

16   violating 1752(a)(2), which makes it unlawful to knowingly

17   engage in disorderly or disruptive conduct in or in proximity to

18   any restricted building or grounds; with an intent to impede or

19   disrupt the orderly conduct of government business or official

20   functions; where the defendant's conduct in fact impedes or

21   disrupts the orderly conduct of government business or official

22   functions.

23        I find that the government has failed to carry its burden

24   as to these elements.  However, I would deny the Rule 29 motion.

25        First, the defendant thought the electoral certification

had already occurred prior to his entering the restricted area.

I think this is a serious obstacle to the government showing

that the defendant acted knowingly and with intent to impede or

disrupt the orderly conduct of government business. Perhaps he

could have thought, as the government suggests, that other

congressional business would be taking place. But the burden is

on the government to show that, and there's no such evidence.

More, as it happens, both chambers were in recess before he

entered the restricted area and during the entire time he was

there. I think this further complicates the government's

argument that he impeded or disrupted the orderly conduct of

government business.

In any event, and more fundamentally, nothing showed the

defendant engaged in any disorderly conduct above and beyond

entering a restricted area. That alone cannot show a violation

of 1752(a)(2). The government's video evidence established that

Mr. Griffin progressed to the west terrace, led a prayer, then

departed some time later. I particularly note that he

repeatedly called on people to kneel. Arguably, he was trying

to calm people down, not rile them up.

According to the government's trial brief, its compilation

exhibits establish how and when the disruption occurred. But

the defendant is never seen engaging in the kind of property

destruction or physical violence featured so prominently in the

government's montage. As I said at the beginning of the trial,

the compilation seems to cut in the defendant's favor, not
against him.  There was plenty of disorderly conduct shown in
those films, people fighting with police, throwing things,
damaging property, or attempting to do so.  Mr. Griffin did none
of this.

Finally, the government offered little evidence going to
the defendant's intention to disrupt Congress, meaning it
offered little evidence bearing on 1752(a)(2)'s core mens rea
requirement.

It's true that Mr. Griffin spoke generally about preventing
the election from being stolen by China and referenced being
well armed, but those abstract statements leave more than a
reasonable doubt as to whether he intended for his conduct to
disrupt the certification of the election.

I think there are some close questions about whether his
mere presence impeded or disrupted government business, given
that you'd have to aggregate his conduct with the conduct of
others and that both chambers were in recess the entire time he
was there.

But I don't need to definitively reach those questions
because I don't think he engaged in disorderly or disruptive
conduct, and I certainly don't think he had the mens rea
necessary for that violation.

For all these reasons, I find the defendant guilty of Count
1 and not guilty of Count 2.

1    Mr. Smith, do you wish to go to sentencing today?

2    MR. SMITH:  Your Honor, I would actually like to -- I

3    think we would like to submit something for sentencing first, if

4    that's okay with the Court.

5    THE COURT:  Sure.  That's what we normally do.  I just

6    wasn't sure if your client wanted to come back to D.C.

7    Ms. Chaclan, do you have a proposed sentencing date?

8    MR. SMITH:  Judge, do you think we might be able to do

9    a Zoom sentencing, or is that not --

10   THE COURT:  No.

11   MR. SMITH:  No?  Okay.

12   THE COURT:  June 17th at 2:00 p.m., does that work for

13   the government?

14   MS. IYENGAR:  Yes, Your Honor, that's good for us.

15   THE COURT:  Mr. Smith?

16   MR. SMITH:  Yes, Your Honor.

17   THE COURT:  Okay.  I will set sentencing for June 17

18   at 2:00 p.m.  That will be here in Courtroom 2.  I will ask for

19   the parties to file any memoranda in aid of sentencing by

20   June 10.

21   I will have a presentence report prepared.  Mr. Griffin,

22   you will be interviewed for that report.  You may -- you will

23   have an opportunity to see the report before it's given to me.

24   And you will have an opportunity to speak to me at sentencing if

25   you wish.  Your attorney may also be present during the

1    Probation Office interview if you wish.

2         Ms. Iyengar, anything further for the government?

3    Ms. Paschall?

4              MS. PASCHALL:  Thank you, Your Honor.

5         We just wanted to inquire whether the Court was going to

6    order, consistent with the Chief Judge's order about release of

7    exhibits in these cases to the press and the public, whether you

8    wanted the government to follow the procedure outlined in the

9    Chief Judge's order and upload the government's exhibits to the

10   Dropbox that is accessible to the public.

11             THE COURT:  Do you have a position on that?

12             MS. PASCHALL:  I don't think we do.  We have done so

13   in the Reffitt case, if that's helpful.

14             THE COURT:  Okay.  Mr. Smith, do you have a position

15   on that?

16             MR. SMITH:  We have no objection.

17             THE COURT:  Okay.  I will direct the government, then,

18   to follow that order.

19        Mr. Smith, anything further for the defense?

20             MR. SMITH:  No, Your Honor.  Thank you.

21             THE COURT:  All right.  Thanks, folks.  I will see you

22   in June.

23        (Proceedings adjourned at 12:16 p.m.)

24

25

```
 1                  CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3           I, Sara A. Wick, certify that the foregoing is a

 4      correct transcript from the record of proceedings in the

 5      above-entitled matter.

 6

 7

 8      /s/ Sara A. Wick                    March 30, 2022

 9      SIGNATURE OF COURT REPORTER         DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```