**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-123-PLF** |
| | : | |
| **VITALI GOSSJANKOWSKI** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' OPPOSITION TO MOTION FOR**
**A JUDGMENT OF ACQUITTAL OR A NEW TRIAL**

After a two-week trial, a jury found defendant Vitali GossJankowski guilty of three felonies

and three misdemeanors.  This Court should not disturb the jury's considered verdict.  None of the

claims asserted by the defendant in his post-trial motions (ECF No. 191) has merit.

**BACKGROUND**

I.      **FACTUAL BACKGROUND**

A.      **The January 6 Attack on the United States Capitol and the Battle for the
        Lower West Terrace Tunnel**

At 1:00 p.m., on January 6, 2021, a Joint Session of Congress convened in the Capitol

Building.  Ex. 503.  The Joint Session assembled to debate and certify, as required by law, the vote

of the Electoral College of the 2020 Presidential Election.  *Id.*  In preparation for that event, the

United States Capitol Police had set up a restricted perimeter on the Capitol's grounds.  Ex. 601;

Tr. 780-784.  Restrictions included security barriers and posts manned by Capitol Police officers.

Tr. 783-784.  On the Capitol's west side, those barriers included a mix of bike racks and snow

fencing, as well as signs bearing the warning: "AREA CLOSED – By Order of the United States

Capitol Police Board."  Tr. 783-784; Ex. 603-604.  Below is a map denoting the area that was

restricted to the public on January 6:



*Exhibit 601*

Ex. 601.  In addition to the outer perimeter, the Capitol Police had also set up, on the west side, a middle perimeter and an inner perimeter.  Tr. 784.  The middle perimeter consisted primarily of snow fencing, with additional "AREA CLOSED" signs.  *Id.*  The inner perimeter consisted of more bike racks and more signage.  *Id.*

In the early afternoon of January 6, a large crowd had begun to gather against the barricades at the Peace Circle, near the restricted perimeter's northwest corner.  Ex. 102 (at 0:01 to 0:20).  At 12:54 pm, several members forcibly breached the bike rack barrier at the Peace Circle, marking the first breach of the outer perimeter.  *Id.* (at 0:20 to 0:35).  Within minutes, the rioters were flooding the Lower West Plaza.  *Id.* (at 0:35 to 1:12).

For the next hour and forty-five minutes, a growing number of police officers were faced with an even faster growing number of rioters at the Lower West Plaza, all within the restricted area.  *See* Ex. 103 (Lower West Plaza timelapse: 12:58 p.m. to 2:45 p.m.); Trial Tr. 848-854. During this time, the police repeatedly attempted to establish a defensive line to prevent the rioters

from reaching the Capitol's inaugural stage—a stadium-like platform that was being constructed for the January 20 Inauguration and that would have given the rioters access to the Capitol Building (Ex. 605).  *Id.*; *see also* Trial Tr. 773-774, 804-810; Ex. 103.

Meanwhile, at 1 p.m., the Joint Session of Congress convened as scheduled.  Ex. 503. Shortly thereafter, the House and Senate retired to their respective chambers to consider objections to the Electoral College's certification.  *Id.*  At approximately 2:00 p.m., however, a group of rioters forced their way under the inaugural stage's scaffolding, up the West Front's stairs, and onto the Upper West Terrace.  Ex. 102 (at 1:42 to 2:00).  After smashing multiple windows, at approximately 2:12 p.m., several rioters entered the Capitol Building through the Senate Wing Door.  *Id.* (at 3:25 to 3:45).  As a result of the breach, both the Senate and the House went into recess, and members of Congress, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  The certification proceeding was suspended.  Ex. 503.

As Congress was suspending its proceedings, at 2:28 p.m., several large gaps were forming in the police line on the Lower West Plaza.  Ex. 103.  With rioters already inside the Capitol Building and the police line at the Lower West Plaza collapsing, a general retreat was called.  Tr. 877-878, 888-889, 1420-1422, 1653.  As the officers retreated, the mob seized control of the West Plaza and occupied the inaugural stage.  ]



*Exhibit 103 (screenshots)*

From the Lower West Plaza, police officers retreated into the Capitol Building through the inaugural stage and the Lower West Terrace tunnel, which connected the Capitol Building to the inaugural stage. *E.g.*, Ex. 100.1 (12:40 p.m. to 12:41 p.m.); Tr. 1420-1422, 1653. This entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a narrow, slightly sloped tunnel. Ex. 100.1. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. It is also the point of entrance onto the inaugural stage for the President-Elect on Inauguration Day. Tr. 791-792; Ex. 605. In the Capitol Building's direction, the tunnel led to two sets of metal swinging doors inset with glass. A "Members Entrance Only" sign hung on the outer set of doors. Tr. 929; Ex. 137 (at 0:03). Past the door, and after a security screening area, the tunnel led to the basement of the Capitol Building.

On January 6, the rioters followed the retreating officers to the doors inside the Lower West Terrace tunnel, arriving shortly after 2:41 p.m. *See* Ex. 100.1 (12:41 p.m. to 12:42 p.m.), 100.2 (12:42 p.m. to 12:47 p.m.), 136 (0:55 to 2:14), 137. By then, the outer doors were closed and locked, and police officers were arrayed inside the doorway and guarding the entrance. Ex. 138 (at 0:14 to 1:10). At approximately 2:42 p.m., the mob shattered the outer doors' glass. *Id.* The police responded by spraying Oleoresin Capsicum ("OC") spray at the rioters. *Id.* The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, and other items. *See, e.g.*, Ex. 100.1, 100.2, 100.3, 101.1, 101.2, 121.1, 122, 123.1, 138. Officers created a line in the doorway to block the rioters and engaged them with batons and OC spray. *Id.* A violent battle raged in the tunnel for the next two hours. *Id.*

As a result of the riot, Congress' certification proceedings were suspended until the building was cleared of rioters and secured.  Ex. 503.  They did not resume until approximately 8:00 p.m. that evening.  *Id.*  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.  *Id.*

### B.   Vitali GossJankowski's Conduct on January 6

The defendant, Vitali GossJankowski, joined the mob that attacked the Capitol on January 6, facing off with the officers who were guarding the Lower West Terrace tunnel, assaulting a Capitol Police officer with a stun gun, and obstructing Congress' certification proceeding.

Even before January 6, GossJankowski was fully aware that, on that day, Congress was set to certify the Electoral College vote.  In the evening of January 5, for example, in discussing the local authorities' security plans, GossJankowski told a Facebook friend: "Tomorrow, it's the Congress to certify the electoral certification."  Ex. 303, at 2.  In the same exchange, he predicted, with respect to potential disturbances: "I will find out tomorrow in the early morning."  *Id.*  In a separate message to a Facebook group identified as "Deaf MAGA – General," the defendant similarly stated, "We need to set up an arrangement to meet to make a big gathering before we start marching.  I know the excessive usage of phones in heavily crowded areas are going to slow us to communicate."  Ex. 305, at 3 (Jan. 4, 2021 message).

On January 6, by early afternoon, GossJankowski had entered the restricted area on the Capitol's west front.  *See*, *e.g.*, Ex. 130 (at 0:20 to 0:25).  He approached the inaugural stage's scaffolding (*id.*) and climbed up the Capitol's northwest steps (Ex. 131 (at 0:30)).  From there, he made his way to the stadium seating surrounding the inaugural stage, where he arrived a few minutes before the rioters flooded the stage at 2:42 p.m.  *Compare* Ex. 132 (at 0:01), *with* Tr. 871.  From that vantage point, GossJankowski had an unobstructed view of—and in fact looked out

on—the mayhem that was unfolding on the Lower West Plaza as the officers were retreating.  *See* Ex. 133 (at 0:03 to 0:12, 1:02 to 1:05); Ex. 132 (at 0:01); Tr. 876.

 

*Exhibit 132 (at 0:00)*                   *Exhibit 133 (at 1:02)*

Sometime between 2:36 p.m. and 2:42 p.m., as the officers were retreating into the Lower West Terrace tunnel, GossJankowski went down the stadium's stairs, walked across the stage, and approached the tunnel.  Ex. 134, 135.1; Tr. 877-885.  He arrived at the mouth of the tunnel within a minute of the first rioters.  Tr. 893-895; Ex. 100.1 (2:41 p.m. to 2:42 p.m.).  He then entered the tunnel and looked on as another rioter shattered the outer door's glass pane.  Ex. 138 (at 0:40 to 0:59), 100.1 (2:42 p.m. to 2:43 p.m.), 101.1 (2:42 p.m. to 2:43 p.m.); Tr. 930-939.   When the officers used OC spray to repel the rioters, GossJankowski briefly retreated.  Ex. 138 (at 0:57 to 0:59).  He then returned to the tunnel, advanced past the outer doors, and stood within arm's reach of another rioter who repeatedly struck at the police officers with a flagpole.  Ex. 136 (1:50 to 2:00), 139 (0:25 to 0:45); Tr. 885-891, 941-945.

   

*Exhibit 100.1 (at 2:41:55 p.m.)*      *Exhibit 138 (at 0:57)*      *Exhibit 139 (at 0:29)*

A few minutes later, GossJankowski, who was near the front of the line, theatrically wagged his index finger at the officers in disapproval and then spat, twice, in their direction.  Ex. 101.1 (at 2:45:00 p.m. to 2:45:25 p.m.); Tr. 944-945.  He then moved towards the center of the tunnel and reached to grab the protective shield of one of the officers.  Ex. 101.1 (at 2:45:50 p.m. to 2:46:02 p.m.).  He then retreated into the tunnel and, as he faced the mob on the inaugural stage, pumped his arms in triumph and beckoned more rioters forward.  Ex. 100.1 (at 2:46:02 p.m. to 2:46:41 p.m.).

  

*Exhibit 101.1 (at 2:45:15 p.m., zoomed)*      *Exhibit 101.1 (at 2:45:18 p.m., zoomed)*      *Exhibit 101.1 (at 2:45:20 p.m., zoomed)*
*[defendant wagging his finger]*      *[defendant spitting at officers #1]*      *[defendant spitting at officers #2]*



*Exhibit 100.1 (at 2:45:59 p.m., zoomed)*
*[defendant grabbing a police officer's protective shield]*

For the next several minutes, GossJankowski moved in and out of the tunnel area, repeatedly assisting other rioters as they disposed of protective shields that the rioters were forcibly stealing from the police in the tunnel. Ex. 100.1 (at 2:46:41 p.m. to 2:53:55 p.m.), 141.1 (at 2:25 to 2:30 and 2:40 to 2:45); Tr. 945-955. At 2:53:57 p.m., inside the tunnel, he took possession of a Vipertek-style stun gun from another rioter. Ex. 100.1 (at 2:53:57 p.m.), 141.1 (at 2:45 to 4:47); Tr. 957-959. Visibly excited, GossJankowski tested the device's electric arc and gestured toward other rioters. Ex. 100.1 (at 2:53:57 p.m. to 2:54:10 p.m.), 141.1 (at 2:47 to 3:00). A few moments later, he stepped toward the front of the police line, raised the device above his head, and flashed it in the officers' direction. Ex. 100.1 (at 2:54:10 p.m. to 2:54:16 p.m.), 141.1 (at 3:00 to 3:05); Tr. 960. He then got even closer to the officers' line and spat in their direction—twice. Ex. 100.1 (at 2:54:16 p.m. to 2:54:35 p.m.). GossJankowski then moved back to the tunnel's entrance, beckoned more rioters forward, and climbed atop a side ledge inside the tunnel. Ex. 100.1 (at 2:56:26 p.m. to 2:59:27 p.m.) After watching the scene and tinkering with the stun gun, he exited the tunnel at approximately 2:59 p.m. *Id.*



*Exhibit 100.1 (at 2:53:57 p.m., zoomed)*
*[defendant accepting the stun gun]*



*Exhibit 100.1 (at 2:54:15 p.m.)*
*[defendant flashing the stun gun at the officers]*



*Exhibit 100.1 (at 2:54:31 p.m., zoomed)*
*[defendant spitting at officers #3]*



*Exhibit 100.1 (at 2:54:49 p.m., zoomed)*
*[defendant spitting at officers #4]*

Approximately 10 minutes later, at 3:10 p.m., GossJankowski again returned to the mouth of the tunnel. Ex. 100.2. A minute later, he reentered the tunnel and joined other rioters in a coordinated "heave ho" push to overcome the police line. *Id.* (at 3:12:00 p.m. to 3:12:40 p.m.); Tr. 982-984. He then left the tunnel again. As he made his way back to the inaugural stage, he showed off the stun gun to another rioter who was recording the events, activating the device's electric arc. Ex. 143.2A (at 3:30 to 4:02); Tr. 984-987.



*Exhibit 100.2 (at 3:12:00 p.m.)*
*[defendant joins the "heave ho" in the tunnel]*



*Exhibit 143.2A (at 4:02)*
*[defendant shows off the stun gun]*

By about 3:19 p.m., the police officers had pushed the rioters back to the mouth of the tunnel. Ex. 100.3 (at 3:18:00 p.m. to 3:19:25 p.m.). During the push, however, the rioters pulled at least two police officers into the crowd. Ex. 100.3 (at 3:18:00 p.m. to 3:19:33 p.m.); Tr. 988-993. One of these officers was Capitol Police Officer Morris Moore, who was wearing a yellow "visibility" vest and an "MPDC" helmet he had picked up earlier in the day. Tr. 990-993, 1728-1745. As Officer Moore was being "sucked down" into the "angry" crowd, he "[t]r[ied] to survive," letting the crowd move him and by keeping his "head … down." Tr. 1748-1750, 1762.





*Exhibit 100.3 (at 3:18:57 p.m., zoomed)*
*[Capitol Police Officer Morris Moore, wearing an MPDC helmet and a USCP visibility vest]*

*Exhibit 144.2 (at 5:11)*
*[Capitol Police Officer Morris Moore, wearing an MPDC helmet and being moved through the mob, with his head down]*

As Officer Moore and another officer were being pulled into crowd, some of the rioters were attacking the officers, while others were saying, "Don't hurt the cops" and "Stop it." Ex. 144.2 (at 4:30 to 5:22), 147 (at 0:40 to 0:55). The defendant, at the time, stood a few yards from the tunnel's entrance. As he saw the scene unfold, he vigorously wagged his index finger—precisely as he had done earlier in the tunnel before spitting at the officers—first in the direction

of the officers and then, intermittently, of the crowd.  Ex. 147 (at 0:40 to 0:55).  He also appeared

to mouth the word "no."  Ex. 147 (at 0:40 to 0:55).



*Ex. 147 (at 0:45 to 0:52)*

The defendant then made his way through the crowd towards Officer Moore.  Ex. 144.2 (at

5:21 to 5:27), 147 (at 0:55 to 1:15).  With Officer Moore a few feet away, the defendant tinkered

with the stun gun, activating a flash.  Ex. 144.2 (at 5:27 to 5:32).



*Ex. 144.2 (at 5:31) [defendant (red) holding up his stun gun (yellow arrow) as he approached Off. Moore (blue)]*   *Ex. 144.2 (at 5:32) [defendant (red) holding up his stun gun (yellow arrow) as he approached Off. Moore (blue)]*

GossJankowski then stretched his right arm towards Officer Moore, grabbed the officer's helmet, and brought down the stun gun toward the officer's helmet and/or neck area using his left hand. Ex. 144.2 (at 5:32 to 5:34). Other rioters were able to escort Officer Moore out of the crowd. Ex. 144.2 (at 5:34 to 6:20); Tr. 1758-1759.

 

*Ex. 144.2 (at 5:32) [defendant's right hand (red arrow) reaching to grab Off. Moore's helmet (blue)]*       *Ex. 144.2 (at 5:32) [defendant's right hand (red arrow) grabbing Off. Moore's helmet (blue)]*



*Ex. 144.2 (at 5:32) [defendant bringing down the stun gun (yellow arrow) toward Officer Moore's helmet/neck area with his left hand (red arrow) while grabbing the officer's helmet with his right hand (red arrow)]*

Later that evening, the defendant told another individual in a series of Facebook texts: "I have a taser lol. … They snatched two riot guys out of their line then they ripped off their protective headgear then strike many fists at him. … One of them was ghostly scared." Ex. 303, at 3.  He later added, "Riot guys formed five rows to push us out of the building.  Pepper mace is their powerful tool. … Every time they reloaded canisters of pepper mace, the rioters violently pushed riot cops back into the building." Ex. 303, at 3-4.

### C.     Procedural History

In February 2021, the grand jury charged GossJankowski based on his actions on January 6, 2021.  ECF No. 10.  After a superseding indictment, the defendant faced six counts: (1) civil disorder, in violation of 18 U.S.C. § 231(a)(3) (Count 1); (2) obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count 2); (3) assaulting, resisting, or impeding a federal officer using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b); (4) entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); (5) disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); and (6) disorderly conduct in a Capitol building or grounds, in violation of 40 U.S.C. § 5104(e)(2)(D).

GossJankowski proceeded to trial in March 2023, and the trial lasted approximately two weeks.  At the end of the defense's case, the Court conducted a colloquy regarding the defendant's right to testify.  Speaking through American Sign Language (ASL) interpreters, GossJankowski confirmed that he understood that he had the right to testify or not testify, that the decision was "important" and "personal," and that defense counsel "can give … their best advice, but ultimately the decision is up to" the defendant.  Tr. 1828-1829.  The defendant also confirmed that he had

"had enough time and opportunity to discuss with [his] lawyers," through "several conversations," the decision whether to testify. Tr. 1829. The defendant then informed the Court that he did not want to testify. *Id.* ("That's what we discussed, and I made the decision that I did not want to take the stand.").

The jury returned guilty verdicts on Counts 1, 2, and 6, and guilty verdicts on the following included charges in Counts 3, 4, and 5: on Count 3, assaulting, resisting, or impeding a federal officer while making physical contact with the victim and with the intent to commit another felony; on Count 4, entering and remaining in a restricted building or grounds; and on Count 5, disorderly and disruptive conduct in a restricted building or grounds. The jury found the defendant not guilty of the statutory "deadly or dangerous weapon" enhancements. (ECF No. 163).

## ARGUMENT

## I.   THE DEFENDANT'S ACQUITTAL MOTION LACKS MERIT

### A.   Legal Standards

Rule 29 permits the defendant the move for judgment of acquittal at the close of the government's case in chief or at the close of all evidence on the ground that the evidence presented is "insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The Court must consider the evidence "in the light most favorable to the government" to determine if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Shi*, 991 F.3d 198, 205 (D.C. Cir. 2021) (citations omitted). Stated otherwise, "a judgment of acquittal is warranted 'only when there is no evidence upon which a reasonable mind might find guilt beyond a reasonable doubt.'" *United States v. Khanu*, 675 F. Supp. 2d 55, 60 (D.D.C. 2009) (quoting *United States v. Byfield*, 928 F.2d 1163, 1165 (D.C. Cir. 1991)). When considering a Rule 29 motion after a verdict, the Court "must view the evidence in the light most favorable to the verdict, and must presume that the jury has properly carried out its functions of evaluating the

credibility of witnesses, finding the facts, and drawing justifiable inferences." *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983). Credibility determinations are for the jury, not for the judge when deciding a motion under Rule 29. *United States v. Williamson*, 81 F. Supp. 3d 85, 89 (D.D.C. 2015); *see also Glasser v. United States*, 315 U.S. 60, 80 (1942) (courts should not "weigh the evidence or determine the credibility of witnesses").

A defendant's Rule 29 burden at the post-verdict stage is "very high," in part because evidence to support a conviction does "not need to be overwhelming." *United States v. Pasha*, 797 F.3d 1122, 1135 n.9 (D.C. Cir. 2015). The Court owes "tremendous deference to a jury verdict." *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990).

### B. Sufficient Evidence Supported the Jury's Guilty Verdict on Count 3 (18 U.S.C. § 111)

GossJankowski contends (at 7-9) that the evidence at trial was insufficient to support the jury's finding, in Count 3, that the defendant "intended to or did commit a forcible assault or otherwise interfered with Officer Moore." That claim lacks merit.

Section 111(a)(1) makes it a crime to "forcibly assault[], resist[], oppose[], impede[], intimidate[], or interfere[] with" a federal officer, which includes Capitol Police officers. Section 111(a) then imposes an enhanced penalty when "such acts"—that is, the acts of "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with" the officer victim—"involve physical contact with the victim of that assault or the intent to commit another felony." By its plain terms, then, Section 111(a) enumerates six grounds for liability— "assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing]"—and the jury can base a guilty verdict on any one of those grounds, regardless of whether it finds that the defendant's conduct satisfies the first of those verbs (i.e., "assault[]"). *See* ECF No. 166 at 31 (jury instruction); *United States v. Cua*, No. 21-cr-107, 2023 WL 2162719, at *1, 4 (D.D.C. Feb.

22, 2023).[1]  The word "forcibly" modifies all six verbs, *United States v. Arrington*, 309 F.3d 40, 44 (D. C. Cir. 2002), but the amount of force used need only be minimal.  *See, e.g.*, *United States v. Sommerstedt*, 752 F.2d 1494, 1496 (9th Cir. 1985) ("a defendant may be convicted of violating section 111 if he or she uses any force whatsoever against a federal officer"); *United States v. Fernandez*, 837 F.2d 1031, 1035 (11th Cir. 1988) (same); *United States v. Gass*, No. 96-4209, 1996 U.S. App. LEXIS 20575, at *3 (4th Cir. Aug. 16, 1996) (unpublished) ("No particular level of force is required to prove the offense—only a willful attempt to inflict injury or a threat to inflict injury coupled with a present ability to do so.").

The evidence introduced at trial supported the jury's finding that the defendant forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with Officer Moore on the inaugural stage, and that he did so intentionally.  At the outset, as explained above, between 2:45 p.m. and 3:19 p.m., the defendant taunted the officers protecting the Capitol Building by wagging his finger at them in disapproval; spat at them at least four times; reached to grab an officer's protective shield; repeatedly assisted other rioters in passing back shields stolen from the officers; flashed the stun gun at the officers in the tunnel; beckoned more rioters to join the battle in the tunnel; participated in a medieval "heave ho" effort to overpower the officers; and bragged about his newly acquired stun gun to other rioters on the inaugural stage.  *See supra* pp. 6-9.  This conduct, which happened within minutes before Officer Moore's assault, provides a revealing lens in assessing GossJankowski's attack on Officer Moore minutes later.

The acts that GossJankowski specifically directed at Officer Moore—which were proven at trial via video and photographic evidence (Ex. 144.2, 144.2A, and 147)—conclusively support

---

[1] The defendant does not contend otherwise; in fact, he appears to concede that his conviction on Count 3 could be based on any one of the enumerated verbs.  ECF No. 191 at 7, 9 (describing *actus reus* requirement as "assault[ing] or otherwise interfer[ing]").

the jury's findings as to the conduct and intent elements of Section 111(a). GossJankowski advanced through the crowd until he was within feet of Officer Moore. He raised the stun gun that he was holding in his left hand, flashing it as if to test it. He stretched his right arm forward to grab Officer Moore's helmet with his (free) right hand. Then he brought down the stun gun, which he was holding in his left hand, on Officer Moore's helmet and/or neck area. That sequence— which is reproduced above and below—supported the jury's conclusion that the defendant intended to, and did, forcibly assault Officer Moore. A fortiori, it supported the inference that the defendant forcibly resisted, opposed, impeded, *or* interfered with the same officer—which is all Section 111(a)(1) required.



*Ex. 144.2A [defendant raises and flashes the stun gun (yellow) once in proximity of Officer Moore (blue)]*



*Ex. 144.2A [defendant reaches to grab Officer Moore's helmet (blue) with his right hand (red)]*



*Ex. 144.2 (at 5:32) [defendant's right hand (red arrow) reaches to grab Off. Moore's helmet (blue)]*



*Ex. 144.2 (at 5:32) [defendant's right hand (red arrow) grabs Off. Moore's helmet (blue)]*



*Ex. 144.2 (at 5:32) [defendant brings down the stun gun (yellow arrow) toward Officer Moore's helmet/neck area with his left hand (red arrow) while grabbing the officer's helmet with his right hand (red arrow)]*

The defendant's contentions (at 6-8)—which mostly just rehash the assertions he unsuccessfully pressed at trial (*see* ECF No. 186 at 97-98)—are insubstantial. He concedes (at 7) that his "prior conduct toward the police" (his spitting at the officers, etc.) supports an inference of intent. He theorizes, however, that, upon leaving the tunnel, he suddenly became "an observer" who "joined a chorus of others shouting not to hurt him" and "wagged his finger." Defendant's claim fails for a simple reason: that's not how sufficiency of the evidence works. On a Rule 29 motion, this Court reviews the evidence "in the light most favorable to the government," not the other way around. *Shi*, 991 F.3d at 205. And nothing required the jury to credit the defendant's implausible and self-serving story that he surreptitiously morphed from cop basher to police savior. It was entirely reasonable for the jury to conclude that GossJankowski never changed hats to mere "observer" and that, when he wagged his finger on the inaugural stage and mouthed "no," he

conveyed exactly the same message as when he wagged his finger at the officers minutes earlier in the tunnel: that he disapproved of what they were doing at the Capitol.

GossJankowski's response to the video of the attack itself is also implausible. He concedes (at 7) that "the government's screenshots" created an "impression" that he "pull[ed] Officer Moore toward him and then reach[ed] forward to 'tase' him." Yet he dismisses that "impression" as an "editing illusion" and contends that, "viewed in real time," the video shows an attempt to navigate through the crowd without "'tas[ing]' himself or others." This makes sense, he says, because he "did not know how to turn the device off, and he did not feel comfortable putting it in his pocket."

The problems with the defendant's theory are legion. Start with the facts. The video in Exhibits 144.2 and 147 and the images in Exhibit 144.2A speak for themselves. The trier of fact— the jury—viewed that evidence carefully and repeatedly during trial. It also had access to the same evidence during deliberations. After considering the evidence, the jury unanimously concluded not only that the defendant violated Section 111(a)(1), but also that the assault involved physical contact with the victim. The defendant's attack on Officer Moore is no editing illusion. It is a tragic fact that the defendant improperly attempts to retry via a Rule 29 motion.

And there is more. The defendant's theory turns on the assertions (at 7) that, at the time, he did not know how to turn the stun gun off and did not feel comfortable putting it in his pocket. Sufficiency under Rule 29, however, is measured against the evidence in the record, not the evidence that the defense now wishes were in the record. And, at trial, there was no evidence— and the defendant cites none—to support the contentions at the base of the defendant's sufficiency claim, much less evidence that the jury was *required* to credit.

**C.    Sufficient Evidence Supported the Jury's Guilty Verdict on Count 2 (18 U.S.C. § 1512(c)(2))**

GossJankowski next contends (at 8-14) that there was insufficient evidence that he acted with the intent to obstruct the certification proceeding or that he did so "corruptly."   Neither assertion has merit.   The jury could have rationally found—as it did—that the defendant violated 18 U.S.C. § 1512(c)(2).

### 1.    Intent to Obstruct the Proceeding

There was sufficient evidence for a rational jury to find that the defendant intended to obstruct the certification proceeding.   Even before January 6, GossJankowski knew that, on that day, Congress was set to convene at the Capitol to certify the Electoral College vote.   As noted, in the evening of January 5, he specifically wrote to a Facebook friend, "Tomorrow, it's the Congress to certify the electoral certification."   Ex. 303.[2]   Armed with that knowledge, on January 6, the defendant went to the precise site where that certification proceeding was set to take place (the Capitol) at precisely the time when that certification proceeding was set to take place (the early afternoon of January 6).   Once there, he penetrated restricted perimeter after restricted perimeter. He took a seat in the Capitol's inaugural stadium's seating.   He joined a violent mob that was trying to break into the Lower West Terrace tunnel.   He repeatedly spat at the officers who were trying to protect the Capitol.   He wagged his finger at those officers.   He helped other rioters deprive those officers of their protective shields.   He joined other rioters in a "heave ho" push to overpower the police line.   And he attacked Officer Moore with a stun gun.   He did all of this at

---

[2] The defendant also expected—and made plans for—mass events in connection with the events of January 6.   *See* Ex. 305 ("We need to set up an arrangement to meet to make a big gathering before we start marching.   I know the excessive usage of phones in heavily crowded areas are going to slow us to communicate.").

the very time, and within a few dozen yards, of the chambers where the certification proceeding was supposed to take place.

GossJankowski's uncontroverted knowledge that the certification proceeding was set to take place at the Capitol on January 6—combined with his obstructive acts at that site on that day—gave the jury ample basis to conclude that the defendant intended the natural and probable consequences of his acts that day, ECF No. 166 at 19: obstructing the certification proceeding.[3]

The defendant's responses are unavailing.  He points (at 8-9) to January 6 cases involving the "Proud Boys, Oath Keepers, and other cases" to suggest that the record here did not contain comparable "certification-related discussions, plans, and congressional references."  But it is black-letter law, and this Court correctly instructed the jury, that a finding of intent, like any fact, neither requires nor prefers direct evidence over circumstantial evidence, let alone direct evidence of the narrow type apparently favored by the defendant.  *See* ECF No. 166 at 11.  Circumstantial evidence alone can—and here does—support the jury's intent finding.  *Id.*  In this case, moreover, there *was* direct evidence that the defendant was aware of the certification proceeding: the defendant himself showcased that knowledge in his January 5 Facebook message (Ex. 303).  Finally, and more fundamentally, the fact that some cases have been successfully prosecuted on the basis of a certain type and amount of evidence cannot logically create a *floor* on the type or amount of evidence required in future cases.

GossJankowski also relies on *United States v. Black*, 21-cr-127-ABJ, a bench trial involving a January 6 defendant in which Judge Berman Jackson, serving as factfinder, acquitted, on the facts presented, the defendant of a Section 1512(c)(2) charge, finding that the evidence did

---

[3] *Accord* ECF No. 186 at 79 (government's argument in closing that "when the defendant chooses to lay siege to the Capitol at the exact time and at the exact place where he knows Congress is supposed to be certifying the outcome of the Electoral College, that means he's acting knowingly and he's acting with intent to obstruct or impede the official proceeding"), 119 (same).

not establish Black's intent beyond a reasonable doubt.  GossJankowski's reliance on *Black* fails as a matter of both law and fact.  Start with the law.  *Black* involved a judgment of acquittal by the trier of fact.  This case, in contrast, involves only a sufficiency challenge *after* the trier of fact found the defendant guilty.  The fact that, in *Black*, one trier of fact acquitted a defendant on a given set of facts would say nothing, even on identical facts, of the sufficiency question: whether a rational jury *could have* found the defendant guilty on those facts.  Second, the facts.  As GossJankowski acknowledges (at 8), in *Black*, Judge Berman Jackson found that, when Black went to the Capitol, he "seemed to have thought [the certification proceeding] was already over."  That finding was obviously significant in *Black*: a defendant cannot intend to obstruct a proceeding that he genuinely thinks is already over.  Here, in contrast, there was uncontroverted evidence that the defendant *knew*—and texted—that the certification proceeding was set to take place in Congress on January 6.  And there was no hint of any misapprehension that the proceeding was already concluded, much less evidence of any such misunderstanding that the jury was required to credit.[4]

Finally, the defendant asserts (at 10-11) that there were "many other possible motivations that were consistent with planning to be 'marching' on the day 'Congress [was] to certify the electoral vote.'"  But that logic is exactly what courts are instructed *not* to do on sufficiency review.  As the Supreme Court has "emphasized repeatedly," to prevail on sufficiency review, "the prosecution need not [have] affirmatively 'rule[d] out every hypothesis except that of guilt.'"  *Wright v. West*, 505 U.S. 277, 296 (1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)).

---

[4] In light of GossJankowski's January 5 Facebook text (Ex. 303), it is immaterial whether he also understood the references to the certification proceeding made by certain speakers during the "Stop the Steal" rally.  The defendant's discussion of that rally (at 10) is beside the point.

2.      "Corruptly"

There was likewise more than sufficient evidence for a rational jury to find that the defendant acted corruptly vis-à-vis the certification proceeding.  The D.C. Circuit's recent decision in *United States v. Robertson*, No. 22-3062, __ F.4th __, 2023 WL 6932346 (D.C. Cir. Oct. 20, 2023)—which was issued after the defendant filed his motion—disposes of the defendant's contrary assertions.

In *Robertson*, as here, a January 6 rioter brought a sufficiency challenge to his conviction under 18 U.S.C. § 1512(c)(2).  Slip Op. 2.  In *Robertson*, as here, the defendant had engaged in independently felonious conduct on January 6—there, violations of 18 U.S.C. § 1752(b)(1)(A), and here, violations of 18 U.S.C. §§ 111(a) and 231(a)(3).  *See* Slip Op. 12, 24.  And in *Robertson*, as here, the defendant challenged the sufficiency of the evidence that the defendant acted "corruptly."  *Id.* at 2.  The *Robertson* court rejected the defendant's claim, holding that "'corruptly' in obstruction statutes can be proved in a variety of ways," *id.* at 20, and that one such way is "to demonstrate that [the defendant] 'obstructed or impeded by engaging in other independently unlawful conduct.'"  *Id.* at 20-21.  *Robertson* thus "h[e]ld that the jury could have found … that Robertson acted 'corruptly' based on evidence that he used felonious 'unlawful means' to obstruct, impede, or influence the Electoral College vote certification."  *Id.* at 12.

So, too, here.   The evidence presented at trial overwhelmingly established that GossJankowski used "felonious 'unlawful means'" to obstruct the certification proceeding.  He assaulted Officer Moore while making physical contact and with the intent to commit another felony, in violation of 18 U.S.C. § 111(a), and he committed civil disorder, in violation of 18 U.S.C. § 231(a)(3)—both felonies of which the defendant was convicted at trial and the latter of which the defendant does not even challenge in his Rule 29 motion.  And the defendant's actual acts on January 6, which are described in detail above, illustrate that, if anything, his convictions

under Section 111(a) and 231(a)(3) *underrepresent* the seriousness of his conduct that day.  The trial evidence thus easily exceeds the low bar set in *Robertson* for evidence of corrupt intent.

The defendant's motion, which predated *Robertson*, makes two arguments, but neither survives *Robertson*.  His claim that the evidence did not sufficiently establish "consciousness of wrongdoing" fails as a matter of both law and fact.  First, the law.  *Robertson* made clear that, while "showing 'consciousness of wrongdoing' may itself *suffice* to prove corrupt intent," consciousness of wrongdoing is not necessary where, as in *Robertson* and as in this case, there is sufficient "evidence that [the defendant] used felonious 'unlawful means.'"  Slip Op. 23 n.5 (emphasis added).[5]  That alone disposes of the defendant's argument.

Nor are defendant's quibbles with the evidence of "consciousness of wrongdoing" founded in fact.  The defendant waxes eloquent (at 12) that "[r]esistance to the government" *can* be non-corrupt—and thus not trigger consciousness of wrongdoing—and that "[s]ome of the most *uncorrupt* luminaries in our history resisted and even skirmished with police at times."  That may (or may not) be true in some cases involving conduct that one might rationally consider "civil disobedience."  ECF No. 191 at 11.  But that is not the case here.  The defendant did not engage in conduct that any rational person might consider civil disobedience.  He engaged in vile, cowardly violence whose wrongfulness is (and always was) self-evident.  Among other things, he helped other rioters dispose of shields intended to protect the outnumbered police officers and then ambushed a police officer who was "tr[ying] to survive" after being "sucked down" into an angry

---

[5] To be sure, here, as in *Robertson*, the district court's "instruction required the jury to find that [the defendant] acted with 'consciousness of wrongdoing,' in addition to finding that he acted with an unlawful purpose or through independently unlawful means."  Slip Op. 23 n.5.  But that is as inconsequential here as it was in *Robertson* because sufficiency is measured against the statute's elements, not the instructions given at trial.  *Musacchio v. United States*, 577 U.S. 237, 243 (2016).

crowd and tried to zap him with a stun gun.  It defies reality to suggest (at 12) that the defendant could have somehow "believed he was [not] doing anything wrong or personally corrupt."

The defendant next contends that, contrary to this Court's jury instructions, "corruptly" always requires "'proof that a defendant acted with an intent to procure an unlawful benefit.'" (ECF No. 191 at 13 (quoting *United States v. Fischer*, 64 F.4th 329, 352 (D.C. Cir. 2023) (Walker, J., concurring in part and concurring in the judgment)).  He is again doubly wrong.  As a legal matter, *Roberston* rejected as "wholly unconvincing" Robertson's identical "attempt to limit 'corruptly'" to the same unlawful-benefit meaning.  Slip Op. 26; *see also id.* at 25-32 (analyzing issue in detail).  *Robertson* therefore forecloses the defendant's narrow reading of "corruptly." And, in any event, as applied here, the defendant's argument would fail on the facts.  As noted, the defendant coordinated his January 6 activities with a "MAGA Deaf – General" Facebook group.  Ex. 305.  And, after January 6, he lambasted a Facebook friend for suggesting that the former President "incited" the riot.  Ex. 305.  Even under the defendant's flawed reading of "corruptly," thus, the evidence supported a finding that the defendant intended to "'procure a benefit (the presidency) for another person (Donald Trump).'"  *Robertson* Slip Op. 32.

### D.  Sufficient Evidence Supported the Jury's Guilty Verdict on Counts 4 and 5 (18 U.S.C. §§ 1752(a)(1) and (2))

GossJankowski contends (at 14-22) that the evidence did not support the jury's guilty verdicts on Counts 4 and 5—which charged violations of 18 U.S.C. § 1752(a)(1) and (2), respectively—on the theory that there was insufficient evidence that, on January 6, he knew he was entering or remaining in a "restricted area" at the Capitol.  He bases that claim on two arguments, but neither has merit.

Sections 1752(a)(1) and (2) make it a crime to, respectively, (1) "knowingly enter[] or remain[] in any restricted building or grounds" and (2) "knowingly … engage[] in disorderly or

disruptive conduct in, or within such proximity to, any restricted building or grounds[.]"  18 U.S.C.

§§ 1752(a)(1) and (2).  In turn, the term "restricted area" means, as relevant here, "any posted,

cordoned off, or otherwise restricted area … of a building or grounds where the President or other

person protected by the Secret Service is or will be temporarily visiting."   18 U.S.C.

§ 1752(c)(1)(B).  As explained below, the trial evidence supported the jury's finding that the

defendant possessed the knowledge required by the statute.

1.      GossJankowski first contends (at 14-16) that the evidence did not support the jury's

finding that he knew that the areas he entered on Capitol grounds were "cordoned off" or

"otherwise restricted."  In fact, the trial evidence amply supported the jury's finding.

*First*, at trial, Capitol Police Captain Ortega testified that, on January 6, a restricted area

was put in place on Capitol grounds, corresponding to the diagram in Exhibit 601.  Tr. 780-784.

He further testified that, on the Capitol's west side (where the defendant entered), the outer

perimeter was marked with a mix of bike racks and snow fencing, as well as signs bearing an

"AREA CLOSED" warning in large print.  Tr. 783-784; Ex. 603-604.  In addition, the Capitol

Police had also set up, on the west side, a middle perimeter and an inner perimeter (Tr. 784),

consisting, respectively, of snow fencing and bike racks, as well as additional "AREA CLOSED"

signs.  *Id.*  Captain Ortega further testified that, even after bike racks and snow fencing were

knocked down by the successive waves of rioters in "[some] areas" (Tr. 1058), the fencing and

signs were "still scattered on the ground" (Tr. 1071).  The upshot is clear: no matter when or where

exactly the defendant entered the restricted area, he would have seen the ubiquitous fencing and

signage on the ground—not to mention the other unmistakable evidence that a riot was afoot.  At

a minimum, it was not irrational for a jury to draw that conclusion.

*Second*, uncontroverted evidence placed GossJankowski on the inaugural stadium seating between 2:36 p.m. and 2:41 p.m.  And the video evidence established that, from that stadium seating, GossJankowski had a direct line of sight—and, indeed, looked down on—the mayhem unfolding between the rioters and the police on the Lower West Plaza.  *See* Ex. 130-133; Tr. 871-876; *supra* p. 6.  The fact that the defendant saw, firsthand, the police's heroic efforts to hold the line against the rioters alone demonstrated that he knew that he was not allowed to be there.  At a minimum, it was not unreasonable for the jury to draw that conclusion.

*Third*, and most striking, GossJankowski repeatedly entered the Lower West Terrace tunnel, where he and other rioters faced off with the officers.  *See supra* pp. 6-9.  Among other things, GossJankowski stood inside the tunnel as other rioters shattered the outer doors' glass to gain entrance to the Capitol Building, Ex. 138 (at 0:40 to 0:59)—in plain view of a sign stating, "Members Entrance Only" (*see* Ex. 137; Tr. 929).  Minutes later, the defendant walked past that outer door—and past the shattered glass—as he approached the *inner* doors, where he wagged his index finger at the officers and then spat, twice, in their direction.  *See* Ex. 101.1 (at 2:45:00 p.m. to 2:45:25 p.m.); Tr. 944-945.  A rational jury could easily conclude that the defendant knew, at a bare minimum, that he was not allowed past those outer doors.

The defendant's responses make little sense.  To begin with, he has no response at all to the fact that, from the inaugural stadium seating, he watched the mayhem unfolding between the officers and the rioters in the Lower West Plaza below.  That alone proves his knowledge and disposes of his sufficiency challenge to his convictions under Section 1752.

If the Court finds it necessary to consider the defendant's other arguments, it should reject those as well.  GossJankowski hypothesizes that, by the time he entered the restricted area, the Capitol Police's barriers had been "pushed aside" or "knocked down."  But the defendant

mischaracterizes the relevant testimony—and doubly so.  For one thing, contrary to the defendant's suggestion that "*any* posted barriers were already knocked down" (at 16 (emphasis added)), Captain Ortega's testimony was that "*[t]here were areas where* those bike racks had been pushed aside and the snow fencing was knocked down" (Tr. 1058 (emphasis added)), not that *all* such barriers were gone.  For another, the defendant leaves out the key point: Captain Ortega testified that even where fences or signs were knocked down, they "*were they still scattered on the ground*." Tr. 1071 (emphasis added).  The jury, therefore, could conclude that, when GossJankowski marched through those scattered barriers amid a riot, he knew he was not allowed to be there.

Finally, the defendant tries to downplay the "Members Entrance Only" sign on the tunnel's outer doors—the sign the defendant disobeyed on his way to spitting at the officers, Ex. 101.1 (at 2:45:00 p.m. to 2:45:25 p.m.); Tr. 944-945—as "more akin to a handicapped parking spot" (at 15). But the jury was not required to adopt the defendant's self-serving characterization of the sign—a characterization that strains credulity in any event.  The jury could conclude that the sign meant what it said: that no one other than "Members" was allowed to enter those doors, let alone rioters.[6] And, in any event, the defendant himself admitted that he entered the Capitol Building, not just the grounds, in a Facebook text he wrote later that evening: "Riot guys formed five rows to *push us out of the building*.  Pepper mace is their powerful tool." Ex. 303, at 3-4 (emphasis added).

2.      The defendant also contends that he should be acquitted of Counts 4 and 5 because there was insufficient evidence that he knew that a Secret Service protectee was at the Capitol. That contention fails as a matter of law (as the Court's jury instructions correctly reflect) and fact.

---

[6] Because the evidence conclusively established that the defendant knew that the area was restricted, any purported presumption based on the Capitol grounds' First Amendment status (ECF No. 191 at 16) is beside the point.

The defendant's reading of the statute—which would extend Section 1752's "knowingly" requirement to the protectee's presence within the restricted area—is incorrect as a matter of statutory interpretation.  When a statute such as Section 1752(a) contains an express "knowingly" requirement, the Court must determine "how far down the sentence the word 'knowingly' is intended to travel[.]"  *Liparota v. United States*, 471 U.S. 419, 424 n.7 (1985) (quotation marks omitted).  As noted, Sections 1752(a)(1) and (2) make it a crime, respectively, to (1) "knowingly enter[] or remain[] in any restricted building or grounds" and (2) "knowingly … engage[] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds[.]"  Thus, the defendant's argument implicates the question "how far into the statute the modifier [knowingly] extends."  *Rehaif v. United States*, 139 S. Ct. 2191, 21196 (2019).

The Ninth Circuit recently gave a comprehensive summary of how to answer this question in *United States v. Collazo*, 984 F.3d 1308 (9th Cir. 2021) (en banc):

> In determining whether Congress intended a mens rea requirement in a criminal statute to apply to noncontiguous words or phrases, the Supreme Court uses ordinary tools of statutory interpretation.  The Court starts "as always, with the language of the statute," and considers the natural reading of the language using "ordinary English grammar." … This rule is not rigid: the word "knowingly" does not necessarily apply to every word in "a long statutory phrase, such that questions may reasonably arise about how far into the statute the modifier extends."  … The Court also considers the "surrounding text and structure."  …  In addition to considering the text and structure of the statute, the Court recognizes the presumption, traceable to the common law, that "Congress intends to require a defendant to possess a culpable mental state regarding each of the statutory elements that criminalize otherwise innocent conduct." … By contrast, absent statutory language suggesting otherwise, the scienter presumption does not apply to elements that do not separate innocent from wrongful conduct.

*Id.* at 1322-1325 (internal citations and formatting omitted).

In Section 1752(a), every relevant consideration points against stretching the word "knowingly" to reach the protectee component of the definition of "restricted building or grounds."  *First*, Congress placed that definition in a separate subsection that does not define the offense.  *See*

*Collazo*, 984 F.3d at 1326 ("[I]t is natural to read the intent requirement of 'knowingly or intentionally' as modifying only the elements contained in the statutory phrase defining the § 841(a)(1) offense, i.e., 'distribute' and 'a controlled substance.'"). *Second*, the fact that several of the subsections in Section 1752(a) contain multiple *mens rea* requirements—including, as relevant to Count 5, the "intent to impede or disrupt the orderly conduct of Government business or official functions," § 1752(a)(2)—shows that "Congress knew how to require proof of *mens rea* with respect to the predicate facts for [the statute], and chose not to do so[.]" *Collazo*, 984 F.3d at 1326. *Third*, applying "knowingly" to the definitional subsection "would not separate wrongful from otherwise *innocent* conduct." *United States v. Morgan*, 45 F.4th 192, 208 (D.C. Cir. 2022). Entering or remaining in an area knowing it is restricted and knowing that one does not have authority to be there "is not an 'entirely innocent' act." *Collazo*, 984 F.3d at 1327 (quoting *Rehaif*, 139 S. Ct. at 2197);[7] *see also*, *e.g.*, *United States v. Crowder*, 656 F.3d 870, 875 (9th Cir. 2011) (holding that the word "knowingly" in the Sex Offender Registration and Notification Act (SORNA)—which imposes criminal penalties on any person who "knowingly fails to register or update a registration as required by [SORNA]"—does not apply to the phrase "as required by [SORNA]" because a defendant would know failing to register was "not an innocent act").

Applying "knowingly" to the definitional phrase would also undermine congressional intent. The clear goal of the statute is to help ensure the safety of Secret Service protectees. A requirement that a defendant know or be on notice of a particular protectee's location in order to violate the statute is antithetical to that goal. *See United States v. Couy Griffin*, 21-cr-92, ECF No. 106, at 332 (discussed *infra*). Additionally, such a reading would make certain prosecutions nearly

---

[7] The same is true for the other subsections of Section 1752(a) for which the defendant's theory would impose this requirement. Knowingly engaging in disorderly or disruptive conduct "with intent to impede or disrupt the orderly conduct of government business or official functions" in violation of Section 1752(a)(2) is not innocent conduct.

impossible.  For example, the definition of "restricted buildings or grounds" includes "any posted, cordoned off, or otherwise restricted area … (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance[.]" 18 U.S.C. § 1752(c)(1)(C).  Under the defendant's view, in all prosecutions relying on that prong, the statute's "knowingly" requirement would require the government to prove beyond a reasonable doubt that the defendant knew that the area was restricted "in conjunction with an event designated as a special event of national significance"—an almost impossible bar.  *See, e.g.*, *United States v. Cox*, 577 F.3d 833, 837 (7th Cir. 2009) (holding that "knowingly" does not apply to a minor's age because "[i]t seems implausible that Congress would want it to be harder to prove a violation of § 2423(a) than of § 2421, when the purpose of the former provision is to provide heightened protection for minors against sexual exploitation").

Consistent with the foregoing, in the many other cases arising out of January 6 that have charged offenses under Section 1752(a), no court, including the Court in this case, has instructed a jury that the government is required to prove that a defendant knew that the area was "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting."  *See e.g.*, ECF No.166 at 31 (adopting the government's proposed instructions on violations of Sections 1752(a)); *United States v. Rhine*, 21-cr-687-RC, ECF No. 105 at 15 (same); *United States v. Wren et al.*, No. 21-cr-599-RBW, ECF No. 121 at 39 (same); *United States v. Carpenter*, 21-cr-305-JEB, ECF No. 97 at 12 (same); *United States v. Vargas Santos*, No. 21-cr-47-RDM, ECF No. 73 at 129 (same).[8]  In another January 6 prosecution, Judge McFadden explained why:

---

[8] The defendant cites a sentence from a verdict in a bench trial in *United States v. Bingert*, No. 21-cr-91-RCL, but the issue was immaterial in that case because the court found the defendants guilty on all Section 1752 charges regardless.  *See* ECF No. 166, at 11-13.  And, in other cases, the same judge applied the law consistent with the unanimous view of the judges in this district in other

> The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute. That's according to *Liparota v. United States*, 471 U.S. 419, page 424, from 1985. So determining the mental state required for commission of a federal crime requires "construction of the statute and inference of the intent of Congress." From *Staples v. United States*, 511 U.S. 600, page 605, from 1994.
>
> Here, the text of 1752, which is the best evidence of Congress's intent regarding the mens rea, forecloses the defendant's argument. I find that Congress specifically included a mens rea requirement in those portions of the statute laying out the elements of the offense, while excluding that mens rea requirement in the definitional provision. A defendant must act knowingly in committing the offense conduct identified in Subsections (a)(1) through (a)(5). Each of those subsections begins with the word "knowingly." By contrast, that limitation appears nowhere in the definitional provision of (c)(1). …
>
> In sum, the text of the statute makes clear that Congress did not intend for the scienter requirement to apply to 1752's definitional provisions.
>
> And I should also say, it doesn't make a lot of sense to me that the government would have to prove somebody knew that a specific dignitary was there. I can't imagine that a provision that is looking to protect Secret Service protectees would require the Secret Service to somehow be telling people and proving that people knew which protectee was in the restricted area at what time.

*United States v. Couy Griffin*, 21-cr-92-TNM, ECF No. 106 at 330-32.

The defendant's contrary contentions are insubstantial. *McFadden v. United States*, 576 U.S. 186 (2015), on which the defendant principally relies (at 17-18), is inapposite. In *McFadden*, the Court held that the Controlled Substances Act's knowledge requirement, as applied to analogs of controlled substances, requires proof that the defendant knew *either* (a) that the substance was controlled under federal law; *or* (b) the facts that made the substance so regulated under the Analogue Act. 576 U.S. at 194-195. That holding, if anything, *undermines* the defendant's position here: *McFadden rejected* the defendant's submission in that case—analogous to the

---

cases. *See United States v. Kelly*, 21-cr-708-RCL, ECF No. 101; *United States v. Worrell*, 21-cr-292-RCL, ECF No. 245.

defendant's claim here—that the CSA *always* requires proof of the defendant's knowledge of the definitional characteristics that made the substance an "analogue" under the Act. *Id.* at 196. And while *McFadden* separately rejected the view that the CSA's *mens rea* is satisfied by mere proof of the defendant's knowledge that a substance is "'illegal'" or "'regulated'" "under some law" (as opposed to the federal schedules), *id.* at 195, that ruling has no logical counterpart here: whereas distributing a substance that Congress excluded from federal drug regulation may plausibly be presumed to be an "entirely innocent act," *Rehaif*, 139 S. Ct. at 2197 (alterations omitted), the same is not true of trespassing in a restricted area, regardless of the presence of a protectee.

The defendant also complains (at 19-20) that the consensus view of Section 1752(a)'s *mens rea* requirement "imbue[s] all restricted area notices with the full weight of federal criminal liability based on unknown facts about who was 'temporarily visiting.'" But that is an unremarkable feature shared by countless federal statutes. Consider assault of a federal officer under 18 U.S.C. § 111, to cite an example familiar to the defendant. Section 111 does not require proof of the defendant's knowledge that the victim is a federal officer, *United States v. Feola*, 420 U.S. 671, 684 (1975), and so it, too, brings the "full weight of federal criminal liability based on unknown facts" about a federal nexus. Yet no one would plausibly maintain that this unremarkable feature gives rise to any "due process concerns."[9] The same is true here.

## II.   THE DEFENDANT'S MOTION FOR A NEW TRIAL LACKS MERIT

### A.   Legal Standards

Rule 33 permits the Court to vacate the judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "In order to grant a new trial, the evidence must

---

[9] The defendant tries (at 20) to sanitize the January 6 attack as "animated protestors marching to the Capitol" who just ignored some warning signs. That characterization is as legally unavailing (for the reasons in the text) as it is factually inaccurate. The defendant's own attack on Officer Moore that day illustrates the point.

preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.  This power should be exercised with caution, and is invoked only in those exceptional cases in which the evidence weighs heavily against the verdict." *United States v. Edmonds*, 765 F. Supp. 1112, 1118 (D.D.C. 1991) (internal citations and quotation marks omitted).

The defendant bears this heavy burden under Rule 33, and to meet it he "must show that (1) there was a substantial error and (2) the error affected the defendant's substantial rights." *Williamson*, 81 F. Supp. 3d at 89.

### B.        The Defendant Validly Waived His Right to Testify at Trial

The defendant contends (at 22-25) that his decision not to testify at trial was the result of his former attorneys' "unpreparedness" and that their assertedly deficient assistance prejudiced him.  That claim, which directly contradicts the defendant's own words during the Court's colloquy on the issue during trial, fails for multiple reasons.  *First*, it is procedurally flawed: the defendant has offered no evidence—only his new counsel's assertions—in support of his current, implausible allegations.  *Second*, the defendant is judicially estopped from pressing his claim now: having successfully asserted his right not to testify, he cannot change that position now, just because his strategic interests have changed.  *Third*, even assuming that prior counsel did not prioritize preparing the defendant to testify, that strategy would have been reasonable because taking the stand was a non-starter: on cross-examination, the defendant would have faced a barrage of damning questions.  *Fourth*, for similar reasons, the defendant cannot show prejudice.

#### 1.        Background

Before and during trial, the defendant was represented by three experienced attorneys from the Federal Public Defender's Office from the District of Columbia.[10]  In preparation for trial, the

---

[10] Two of these attorneys, Ned Smock and Celia Goetzl, represented the defendant at trial.  A third attorney, Ubong Akpan, represented the defendant before trial.

defendant's attorneys made and briefed several pretrial motions (which included motions to suppress) and responded to the government's pretrial motions (which included a *Daubert* motion). They vigorously represented the defendant at all pretrial hearings, including an evidentiary hearing on the motion to suppress. And they retained at least two experts in anticipation of trial and made disclosures in connection with those experts. Similarly, at trial, the defendant's attorneys secured the assistance of a stand-by American Sign Language interpreter. They conducted extensive jury voir dire. They vigorously cross-examined the government's witnesses. They called (and prepared) an expert witness who testified about the physical properties of the defendant's stun gun. They made several legal motions and legal objections. And they presented well-crafted opening and closing statements.

At the end of the defense case, the Court engaged the defendant, through ASL interpreters, in a thorough colloquy regarding his decision whether to testify:

> THE COURT: … Mr. GossJankowski, do you understand that you have a right to testify in this trial if you want to?
>
> THE DEFENDANT: Yes, I do, Your Honor. I understand that.
>
> THE COURT: Do you also understand that you have a right to remain silent and not to testify if that is your choice?
>
> THE DEFENDANT: I do understand that, Your Honor.
>
> THE COURT: I also want to tell you that this is an important decision for anybody charged as a defendant in a criminal case. You understand that?
>
> THE DEFENDANT: Yes, I do.
>
> THE COURT: It is also a personal decision. Your lawyers can give you their best advice, but ultimately the decision is up to you. Do you understand that?
>
> THE DEFENDANT: Yes, I understand it's my own decision.
>
> THE COURT: And do you think you've had enough time and opportunity to discuss with your lawyers what they think is best and have a conversation with them about that?

THE DEFENDANT: Yes, I believe I did.

THE COURT: Would I be correct in assuming you've had more than one conversation about that?

THE DEFENDANT: You would be correct.  I've had several conversations with them, and I don't believe that I would like to take the stand.

THE COURT: Okay.  So you do not want to take the stand?

THE DEFENDANT: Yes.  That's what we discussed, and I made the decision that I did not want to take the stand.

THE COURT: Okay.  Thank you.  Is everybody satisfied with that colloquy?

MR. DREHER: Just one moment, Your Honor.  Your Honor, I'm satisfied.

MR. SMOCK: Yes, Your Honor.

Tr. 1829-1830 (formatting altered).[11]

After the jury found the defendant guilty, the defendant informed the Court that he wished to move for a new trial based in part on concerns with his prior attorneys.  After holding *ex parte* discussions with the defendant, the Court allowed prior counsel to withdraw and appointed new counsel.  In his Rule 33 motion, the defendant's new counsel asserts (at 5, 22-25)—with no citation or support in the record and without submitting any witness affidavits or sworn declarations—that GossJankowski had in fact "wished to testify but his counsel was not prepared."  New counsel says that, when the defendant "expressed this desire to his prior attorneys, he was told unequivocally that they were not ready to put him on the stand, and that preparing him to testify would take weeks that they did not have."  (*Id.* at 23).

---

[11] This Court should credit GossJankowski's responses during the colloquy.  *See Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977) ("Solemn declarations in open court carry a strong presumption of verity"); *United States v. Farley*, 72 F.3d 158, 164-65 (D.C. Cir. 1995) (quoting *Blackledge*); *United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994) (strong presumption that statements made during guilty plea colloquy are true).

2.    Legal Standards

As the defendant acknowledges (at 23), his request for a new trial based on his lawyers' asserted "unpreparedness" is assessed under *Strickland v. Washington*, 466 U.S. 668 (1984).  *See, e.g.*, *United States v. Gray-Burriss*, 251 F. Supp. 3d 13, 23 (D.D.C. 2017), *aff'd*, 920 F.3d 61 (D.C. Cir. 2019).  To prevail under *Strickland*, the defendant must show (1) "that counsel's performance was deficient"—*i.e.*, that the lawyer's performance "fell below an objective standard of reasonableness"; *and* (2) "that the deficient performance prejudiced the defense."  *Id.* at 687; *see also United States v. Gray-Burriss*, 920 F.3d 61 (D.C. Cir. 2019).[12]

Under the first prong, this Court's evaluation of counsel's performance is "'highly deferential,'" *Strickland*, 466 U.S. at 689, and the defendant must overcome the "strong presumption" that the challenged action "'might be considered sound trial strategy."  *Strickland*, 466 U.S. at 689; *see also United States v. Toms*, 396 F.3d 427, 432 (D.C. Cir. 2005) (same).  That is because "defense attorneys are to be afforded 'wide latitude in making tactical decisions.'" *Gray-Burriss*, 251 F. Supp. 3d at 23 (quoting *Strickland*, 466 U.S. at 689); *Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (per curiam) (counsel's performance need only "meet a minimal standard of competence").  Accordingly, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Strickland*, 466 U.S. at 690. And even strategic choices made after less-than-full investigation are reasonable, so long as "reasonable professional judgments support the limitations on investigation."  *Id.* at 691.  In all cases, "courts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions."  *Harrington v. Richter*, 562 U.S. 86, 109 (2011).

---

[12] "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim."  *Strickland*, 466 U.S. at 700.

Under *Strickland*'s second prong, as noted, the defendant must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. at 694.  A "reasonable probability" means one "sufficient to undermine confidence in the outcome."  *Id.*  The likelihood of a contrary outcome must have been "substantial, not just conceivable."  *Harrington*, 562 U.S. at 112.

### 3.   The Defendant's Claim Improperly Relies on Attorney *Ipse Dixit*, and the Defendant Should Be Judicially Precluded from Pressing It in Any Event

At the threshold, the defendant's claim should be rejected for at least two procedural reasons.  First, the defendant has failed to provide *any* support for the factual assertions that underpin his claim: that (1) he "wanted to testify"; and (2) "when he expressed this desire to his prior attorneys, he was told unequivocally that they were not ready to put him on the stand, and that preparing him to testify would take weeks that they did not have."  (ECF No. 191 at 23).  The defendant did not submit any affidavit or declaration made under penalty of perjury tending to show that those communications happened, as required to prove facts under the Federal Rules of Criminal Procedure.  *See* Fed. R. Crim. P. 47(d) ("Affidavit Supporting a Motion.  The moving party must serve any supporting affidavit with the motion."); *id.* 1944 committee note ("The last sentence providing that a motion may be supported by affidavit is … intended … to authorize the use of affidavits when affidavits are appropriate to establish a fact."); 28 U.S.C. § 1746 (allowing declarations made under penalty of perjury in lieu of affidavits).  Nor has the defendant pointed to any support for those statements anywhere in the record.[13] Instead, he asks this Court to order a new trial based on nothing more than his new attorney's second-hand representations about alleged

---

[13] The district court held *ex parte* communications with the defendant, but the defendant does not rely on those discussions in his motion.  Nor has the defendant otherwise disclosed the content of those communications to the government.

conversations that would have happened months ago.  Rule 47(d) and this Court's ordinary practice foreclose that outcome.

Adhering to Rule 47's usual reliability requirements is particularly important given the nature of the defendant's allegations, the case's history, and its current posture.  Throughout this prosecution, the defendant received effective—indeed, vigorous—representation from multiple experienced and respected defense attorneys.  That alone makes the uncited assertions in the motion implausible.  What's more, those assertions contradict, on their face, what the defendant told the Court during trial: (i) that he understood that he had a right to testify and that the decision whether to testify was both "important" and "[his] own"; and (ii) that he had enough time and opportunity to discuss the matter with this lawyers, over multiple conversations.  Tr. 1829-1830. Defense counsel, who was familiar with any prior discussions with the defendant, declared himself satisfied with the colloquy.  Tr. 1830.  The defendant's post-trial version, in contrast, contradicts the statements he and his former counsel made during the colloquy.  And the defendant's current version is particularly suspect if one considers his incentives to misdirect at this juncture: after he was found guilty of multiple serious offenses by the jury and as he would ordinarily face sentencing and a likely prison sentence.  The defendant's motion should accordingly be denied for lacking a valid factual predicate.

Second, and related, the defendant should be deemed judicially estopped from asserting his "unpreparedness" claim at this stage.  Judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal citations and alterations omitted).  Accordingly, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his

interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Id.* at 749.

The defendant's claim falls squarely within the strike zone of judicial estoppel.  At trial, the defendant declared himself satisfied with his counsel's advice regarding his right to testify, invoked his right to remain silent, and, of course, "succeed[ed] in maintaining that position"—*i.e.*, he did not testify and was not subject to cross-examination.  *New Hampshire*, 532 U.S. at 750. Now, he assumes a diametrically opposite position: he claims that he was *not* satisfied with his attorneys' work and that he *did not* want to remain silent.  Yet he does not identify any new facts that caused him to change his position.  And no wonder: the only thing that has changed are his interests.  Whereas, at trial, GossJankowski believed that remaining silent afforded him the best chance of avoiding punishment, he now stares down the prospect of a prison sentence.  That is precisely the type of opportunistic litigation strategy that judicial estoppel is meant to foreclose.

>   4.   The Defendant's Assertions, on Their Face, Would Reflect a Reasonable
>        Strategic Decision by Former Defense Counsel, Not Deficient Performance

On the merits, even if one accepts the motion's assertions at face value, the Court should deny GossJankowski's *Strickland* claim at step one, without a hearing: on their face, his new assertions show, at most, a reasonable strategic decision by former counsel.  As the defendant acknowledges (at 24), it may be reasonable, in some cases, "for an attorney to prioritize other tasks rather than preparing a defendant to testify."  *Id.*  Assuming (against all the evidence) that is what happened in this case, such a decision would have been entirely reasonable.

On one side of the question, GossJankowski's new counsel says that, on the stand, GossJankowski would have offered (i) a denial of his intent to assault Officer Moore; and (ii) a claim that he "did not know how to turn the device off and was afraid to put it in his pocket."  *Id.* at 22.  But those self-serving statements would have run headlong into the video evidence

presented at trial, which documented both the defendant's glee upon acquiring the stun gun and the deliberate nature of his attack on Officer Moore.

On the other side of the question, on the stand, the defendant would have faced withering cross-examination about his intent that day. A few examples are illustrative. On cross-examination, the defendant would have been confronted with his intent after he saw—but was not deterred by—the battle on the Lower West Plaza. He would have been confronted with his intent as he decided to fuel the riot despite seeing that other rioters had shattered the tunnel's glass door and despite being exposed to OC spray. He would have been confronted with his intent vis-à-vis the officers in the tunnel as he wagged his finger at them, spat at them at least four times, and flashed the stun gun in their direction—all within minutes before rushing to attack Officer Moore. He would have been confronted with his intent as he joined the "heave ho" assault on the officers' line. He would have been confronted with the fact that, when he was interviewed by investigators, he falsely claimed that he found the stun gun on the ground, whereas, in fact, he received it from another rioter. And he would have been confronted with the fact that, when he was asked by investigators why he rushed towards the officer on the inaugural stage, his first (and implausible) response was, "I was trying to film. I wanted to film it." Against this backdrop, even if one assumes, contrary to common sense, that former defense counsel did not prioritize preparing him to take the stand, such a strategic decision would have been eminently reasonable.[14]

5.    The Motion's Assertions, on Their Face, Fail to Show Any Prejudice

Finally, there is no plausible chance, let alone a reasonable probability, that testimony from the defendant would have made an acquittal on one or more counts substantially more likely. For

---

[14] The defendant's cross-examination would be even more blistering if he is retried, in light of the defendant's subsequent intimidatory, racist, and anti-Semitic messages regarding the January 6 investigation. (*See* ECF No. 194).

all the reasons discussed above, and contrary to the defendant's hindsight, taking the stand would have harmed, not benefitted, the defendant's chances at trial.  And, in any event, the defendant's actions on January 6, which were proved to the jury through incontrovertible video evidence, provided overwhelming evidence of GossJankowski's guilty.  This Court should therefore decline to order a new trial merely because the defendant' former counsel allegedly did not prepare him for potential cross-examination as thoroughly as the defendant now says he would have liked.

* * *

For all these reasons, the defendant's claim fails as a matter of law, and this Court should deny his motion without any further proceedings.  In the alternative, the government respectfully requests that it be permitted to examine, at an evidentiary hearing, the defendant and all relevant witnesses about any discussions relevant to the defendant's decision not to testify.

C.     **The Court Did Not Abuse Its Discretion in Instructing the Jury on the "Corruptly" Requirement of Section 1512(c)(2), As the D.C. Circuit Recently Confirmed in *Robertson***

Reprising one of his sufficiency claims, GossJankowski also contends (at 25) that the Court's jury instructions misstated the "corruptly" element of 18 U.S.C. § 1512(c)(2).  That claim fails for the same reasons that foreclose the defendant's sufficiency challenge to the same count: as explained above (*supra* pp. 23-25), the D.C. Circuit's recent decision in *Robertson* expressly rejected the defendant's reading of "corruptly."  Slip Op. 25-32.  *Robertson*, instead, endorsed each and every "way[]" of proving the "corruptly" element permitted under this Court's instruction to the jury.  *Compare* ECF No. 166 at 26 ("To act 'corruptly,' the defendant must use unlawful means or have an improper purpose, or both.  The defendant must also act with 'consciousness of wrongdoing.'"), *with Robertson* Slip Op. 19-20 ("'[C]hoosing the illegal or dubious course' to obstruct a congressional proceeding can suffice to establish that a defendant acted corruptly.  Alternatively, a defendant's purpose may prove to be 'corrupt' where, as in the hypothetical of the

lawyer who convinces his client not to testify against him, the defendant 'attempts to secure some advantage for himself that was not in accordance with his legal rights.'" (alterations and internal citation omitted)).  If anything, by also requiring proof of "consciousness of wrongdoing," the Court's instruction required *more* than necessary under the statute as construed in *Robertson*.  *See id.* at 23 n.5 ("Because § 1512(c)(2) does not contain a 'knowingly corrupt' requirement, it is not apparent that 'consciousness of wrongdoing' must be proved in this context.").[15]

### D. The Court Did Not Abuse Its Discretion in Instructing the Jury on the *Mens Rea* of Section 1752

GossJankowski next contends (at 26) that the district court's jury instructions misstated the *mens rea* of Section 1752(a)(1) and (2) by not requiring proof that the defendant knew that a Secret Service protectee (*i.e.*, Vice-President Pence) was present within the restricted area.  That claim, however, merely repackages the defendant's meritless sufficiency challenge (*supra* pp. 28-33), which impugns the evidence for failing to establish the same fact.  As explained above, the defendant's sufficiency claim fails as a matter of law.  *Id.*  For the same reasons, so, too, does the instructional-error version of the same theory.

### E. The Defendant Was Not Unduly Prejudiced by the Audio Evidence

The defendant concedes (at 26) that any "subtle prejudice" from playing the audio of video exhibits at trial "is *not* something that would merit a new trial standing alone."  (Emphasis added). Yet, reprising his unsuccessful motion *in limine* (ECF No. 107), the defendant still asks the Court to factor that alleged "subtle" prejudice in favor of a new trial because the audio content was "not a pleasant experience to listen to" and playing the audio at trial created a "subconscious false perception" that the defendant "was aware of what was being shouted all around" him.

---

[15] Indeed, the Court's definition of "corruptly" in this case was materially identical to the definition used by the district court in *Robertson*.

The defendant's claim is a as meritless now as it was before trial.  On one side, as the Court explained at the pretrial conference (ECF No. 170 at 72-74), the actions of other rioters and the resulting chaos were probative of elements that the government was required to prove objectively—*i.e.*, not as perceived by the defendant—to prevail at trial.  *See, e.g.*, 18 U.S.C. § 232(1) (defining "civil disorder" for purposes of 18 U.S.C. § 231(a)(3)).[16]  On the other side of the scale, the parties went to great lengths to minimize any perceived prejudice.  The parties stipulated that the defendant "is unable to read lips, understand spoken English, or speak English himself."  Tr. 1838.  And both the Court and the government made clear that they would consider a reasonable jury instruction on the point if the defendant requested one.  (ECF No. 170 at 72-73).  There is no basis to let the defendant's speculation about "subtle prejudice" and "subconscious … perception[s]" factor into the Rule 33 inquiry.

## F.     The Evidence Was More Than Adequate Under Rule 33

As a last resort, GossJankowski invokes (at 27) this Court's limited authority under Rule 33 to order a new trial "'despite the abstract sufficiency of the evidence to sustain the verdict.'"  *Tibbs v. Florida*, 457 U.S. 31, 38 n.11 (1982).  Contrary to the defendant's implication, however, this power "should be exercised with caution," *Edmonds*, 765 F. Supp. at 1118, and, indeed, may be invoked only if "'the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred.'"  *Tibbs*, 457 U.S. at 38 n.11.

No such thing occurred here.  The near totality of the defendant's conduct on January 6 is beyond dispute—conclusively memorialized in unassailable video recordings.  There is therefore no dispute that, on January 6, the defendant repeatedly went into the Lower West Terrace tunnel;

---

[16] To the extent the defense argues that it proposed a stipulation regarding the civil disorder element, the Court has already rejected that contention.  *See* ECF No. 170 at 73; *Old Chief v. United States*, 519 U.S. 172, 186-189 (1997).

that he wagged his finger and then repeatedly spat at the officers protecting the Capitol; that he helped other rioters deprive the officers of their protective shields; that he beckoned more and more rioters into the tunnel; or that he joined a terrifying "heave ho" push to break the officers' defensive line.  Similarly, with respect to Officer Moore, the most the defendant can muster is a plea that the photographs of his assault are an "editing illusion"—*i.e.*, that the Court and the jury literally should not trust their eyes—in the hope that a rushed look at the video recording of a chaotic scene will obscure his actual conduct.  Finally, with respect to intent, the defendant is essentially asking the Court to re-litigate the jury's eminently reasonable finding that, on January 6, GossJankowski intended the natural and probable consequences of his actions—*i.e.*, that when he intentionally joined a violent riot, forcibly assaulted a police officer, and variously impeded the officers in the tunnel despite knowing that, on that day, the certification proceeding was set to occur at that very place, he in fact intended to obstruct that certification proceeding.  Nothing in Rule 33 permits such a usurpation of the jury's factfinding prerogative.

## CONCLUSION

For the foregoing reasons, the defendant's motion should be denied.

Respectfully Submitted,

MATTHE]W M. GRAVES
United States Attorney
D.C. Bar No. 481052

/s/ *Adam M. Dreher*
ADAM M. DREHER
Assistant United States Attorney
Mich. Bar No. P79246
601 D Street NW
Washington, D.C. 20530
(202) 252-1706
adam.dreher@usdoj.gov

/s/ *Karen E. Rochlin*
KAREN E. ROCHLIN

Assistant United States Attorney
DC Bar No. 394447
9 Northeast 4th Street
Miami, Florida 33132
karen.rochlin@usdoj.gov

/s/ *Francesco Valentini*
FRANCESCO VALENTINI
Senior Counsel, Capitol Siege Section
DC Bar No. 986769
601 D Street NW
Washington, D.C. 20530
francesco.valentini@usdoj.gov