## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**VITALI GOSSJANKOWSKI,**<br>                                    ***Defendant.*** | **No. 21-cr-123 (PLF)** |

## REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL OR, ALTERNATIVELY, FOR A NEW TRIAL

### INTRODUCTION

Contrary to the government's theme, the instant motion does not seek to relitigate issues properly decided by the jury. However, Rules 29 and 33 afford necessary safeguards in our system precisely because, sometimes, the jury gets it wrong—even if getting it wrong is as subtle as misapplying the high burden of reasonable doubt. And in the charged climate of January 6 prosecutions occurring *across the street* from where the crimes occurred, this safeguard is especially vital. Here, the government's evidence did not establish beyond a reasonable doubt the *mens rea* necessary for the crimes charged, even affording the government the benefit of all reasonable inferences. And the video evidence practically disproved any assaultive conduct by GossJankowski, especially if he could have testified regarding the reasons for his movements. No reasonable juror could have convicted GossJankowski on these facts. And even if such a verdict were possible, the jury was denied the opportunity to hear key evidence from GossJankowski as a result of his counsel's inability to prepare him to testify. Under these circumstances, the Court should enter a judgment of acquittal or order a new trial for the sake of GossJankowski and the public.

1

## ARGUMENT

## I. THE EVIDENCE DID NOT SUPPORT THE CHARGED OFFENSES BEYOND A REASONABLE DOUBT

### A. The Government Did Not Prove a Willful Attempt to Inflict Injury on Officer Moore as Required for Count One

The government and defense agree that the prosecution was required to prove the defendant made "a willful attempt to inflict injury or a threat to inflict injury coupled with a present ability to do so." *United States v. Gass*, No. 96-4209, 1996 U.S. App. LEXIS 20575, at *3 (4th Cir. Aug. 16, 1996) (unpublished) (cited at Opp. 16). However, that is simply not what the trial evidence demonstrated, much less beyond a reasonable doubt.

In its Opposition, the government repeats its narrative of what happened, using static screenshots from a moving video:

> He raised the stun gun that he was holding in his left hand, flashing it as if to test it. He stretched his right arm forward to grab Officer Moore's helmet with his (free) right hand. Then he brought down the stun gun, which he was holding in his left hand, on Officer Moore's helmet and/or neck area. That sequence—which is reproduced above and below—supported the jury's conclusion that the defendant intended to, and did, forcibly assault Officer Moore.

Op. 17. While the government's guilt-assuming narration is a *possible* interpretation of the video, it is not a plausible one, much less a reasonable one, in light of events occurring immediately before and after this sequence.

As shown in Ex. 147 (at 0:40 to 0:55), just before he waded into the fray, GossJankowski expressed disapproval of the crowd's attack on Officer Moore. He then used swimming movements to move through the crowd and into the vicinity where at least some people were attempting to pull

Officer Moore away from those who were assaulting him.[1] Ex. 144.2. He then pulled on Officer Moore—as others helping him at that moment were doing—and never "tased" him. *Id.* And after Officer Moore made it away from the vicinity of those attempting to inflict injury on him, GossJankowski did not follow him, encourage the crowd to harm him, or take any other actions consistent with any intent to injure him. *Id.*

The government calls this video evidence of GossJankowski disapproving of the assault on Officer Moore "theorizing" and an "implausible and self-serving story." Opp. 18. But far from an implausible theory, video evidence supporting this conclusion is plain as day. As the government concedes, when the crowd began attacking Officer Moore, GossJankowski became visibly upset and began instructing the crowd "No" while wagging his finger disapprovingly. Ex. 147 (at 0:40 to 0:55); Opp. 18. The government attempts to get around this evidence by claiming that "[i]t was entirely reasonable for the jury to conclude that…when he wagged his finger on the inaugural stage and mouthed 'no,' he conveyed exactly the same message as when he wagged his finger at the officers minutes earlier in the tunnel: that he disapproved of what they were doing at the Capitol." Opp. 18–19. The problem with this argument is that there were no police in the vicinity of GossJankowski when he wagged his finger and said, "no"—only crowd members. GossJankowski thus necessarily addressed the *crowd* when he wagged his finger and said "no." It follows from the government's argument that while it was indeed "exactly the same message" of disapproval "of what they were doing," Opp. 19, the first message directed disapproval at the police, while the second message directed disapproval at the crowd. Thus, the government's argument disproves its

---

[1] When viewed in real time, the government's large screenshot from Ex. 144.2 (at 5:32), purporting to show GossJankowski "bring[ing] down the stun gun…toward Officer Moore's helmet/neck area," Opp. 18, is simply part of the swimming movement he employed to get through the crowd.

case: if the same body language and word "no" is interpreted to mean disapproval, no reasonable jury could have concluded beyond a reasonable doubt that GossJankowski agreed with the mistreatment of Officer Moore rather than aligning himself with the helpful crowd members that the government *concedes* were disapprovingly shouting "'Don't hurt the cops' and 'Stop it.'" Opp. 10 (citing Ex. 144.2 (at 4:30 to 5:22), 147 (at 0:40 to 0:55)).

This is especially true since those very crowd members shouting disapproval at the abuse of Officer Moore had already pushed past police lines and caused police to retreat—conduct that the government believes to be so dispositive of intent. The plain fact, established conclusively by the video evidence, is that a divide erupted in the crowd between those who felt justified in pushing past police lines to express their views on January 6—but wanted to do so without harming police—and those few who took things to the next level by assaulting police officers like Officer Moore. Ex. 147 (at 0:40 to 0:55). That some rioters recognized that injuring the police was crossing a line—even though the same rioters had pushed past police lines—is thus not an "implausible and self-serving story" of rioters "surreptitiously morph[ing] from cop basher to police savior," Opp. 18; it is simply a documented reaction of certain crowd members when other rioters went too far in their minds. And at that *precise* moment when this divide erupted, GossJankowski joined those expressing disapproval. Ex. 147. While one could speculate that GossJankowski simply suddenly decided to express disapproval at the police at that precise moment—despite no officers being in the vicinity to see him—the only reasonable inference is that GossJankowski began expressing disapproval at that moment for precisely the same reasons as those around him did: to encourage the crowd to "'Stop it'" and not "'hurt the cops.'" Opp. 10.

That this is the only reasonable conclusion means that the government's interpretation of the video showing GossJankowski moving toward Officer Moore is implausible, and certainly not

grounds for convicting him beyond a reasonable doubt. *At best*, the video evidence of GossJankowski's movements is inconclusive: attempting to swim through the crowd and help Officer Moore would involve the *same* physical body movements as attempting to get to him to assault him. And there was no testimony that Officer Moore was "tased." Thus, a dispassionate jury applying the burden of proof to the evidence of GossJankowski's movements—which occurred immediately after he expressed disapproval of hurting the police—would be forced to conclude that the government failed to prove "a willful attempt to inflict injury" on the officer by GossJankowski as required by § 111(a). *Gass*, 1996 U.S. App. LEXIS 20575 at *3. The fact that the jury here concluded otherwise, as the government argues (Opp. 19), simply shows the role and importance of Rule 29 in cases like this.

The government asserts that there is a "legion" of problems with a non-assaultive interpretation of Ex. 147, *id*., but does not actually offer any. It simply asserts that the video speaks for itself; that the jury disagreed; and that there is no evidence in the record that GossJankowski held the Vipertek device up and away from his own body because he didn't know how to turn it off. *Id*. Certainly, the video evidence does speak for itself: it shows GossJankowski expressing **disapproval** of the assault immediately before going toward the officer and attempting to intervene. And while the jury disagreed, that is always the case when the Court is asked post-trial to enforce the burden of proof as a matter of due process; certainly, there are understandable reasons here why a jury of humans deliberating across the street from the Capitol may have impetuously applied a lower standard of proof to someone they had just seen spit at the police—a disgusting, if non-forcible act. And while the record does not contain the *additional* helpful information for why GossJankowski held the device away from his body—a reason for granting a new trial—it is not incumbent on a defendant to prove his innocent intent. The lack of GossJankowski's testimony on

this point may have deprived the jury of the clarity it needed to easily dispense with the government's guilt-assuming gloss on his movements, but its absence did not somehow render a chaotic and ambiguous video proof beyond a reasonable doubt of "a willful attempt to inflict injury" on the officer. *Gass*, 1996 U.S. App. LEXIS 20575 at *3.

While the government does its best to use screenshots to support a guilt-assuming narrative—and was successful with the jury at doing so—the video does indeed speak for itself. No reasonable juror could see GossJankowski's disapproving reaction to the assault on Officer Moore—a reaction joined by at least some other rioters—and conclude that the video of him using swimming movements through the crowd and pulling Officer Moore away from his assaulters proved beyond a reasonable doubt that he made "a willful attempt to inflict injury" on him. *Gass*, 1996 U.S. App. LEXIS 20575 at *3.

### B. There Was Insufficient Evidence that Interrupting the Certification Was the Purpose of GossJankowski's Presence or Conduct as Required for Count Two (§ 1512(c)(2))

The government contends that there was sufficient evidence to prove beyond a reasonable doubt that GossJankowski intended to obstruct or impede an official proceeding because:

- He knew Congress was convening at the Capitol on January 6 to certify the Electoral College vote;
- He went to the location of the certification at the time of the proceeding;
- He penetrated into the restricted perimeter;
- At the time that the certification proceeding was supposed to take place, he joined the mob trying to break into the Lower West Terrace tunnel and acted disorderly towards police.

Opp. 20–21. However, these facts apply to virtually everyone at the Capitol that day, including many known to have believed that the certification process was *over* and that there was nothing to obstruct or impede. Thus, it cannot be the case that simply knowing the significance of January 6 and going to the Capitol to protest—even to protest violently inside—establishes an intent to

6

obstruct the certification beyond a reasonable doubt. *United States v. Ogando,* 547 F.3d 102, 109 (2d Cir. 2008) (if "the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt," there is "insufficient proof on which to convict") (quotation marks and citation omitted). More is required to show that a particular defendant had that specific intent, especially because the Capitol is presumptively a place where people go to express their viewpoints and be heard by legislators. *See* Gov. Ex. 133 (showing protestor shouting, "Do you hear us now?!" as rioters breach barricades).[2]

The government does not point to any additional evidence evincing GossJankowski's specific intent: no statements of stopping President Biden "by any means necessary"; no pre-6[th] discussions of bringing weapons or gear; no epithets directed at Speaker Pelosi or other legislators. It simply asserts that this level of circumstantial evidence is enough, ignoring the fact that it is both compatible with a mindset that believed the certification was over and the evidence that rioters who entered the halls of Congress *that day* had that belief. Opp. 21. According to the government, more is not required because "the prosecution need not affirmatively rule out every hypothesis except that of guilt." *Wright v. West*, 505 U.S. 277, 296 (1992). But that truism does not change the fact that it is the government's burden to prove intent beyond a reasonable doubt, and that the burden never shifts to the defendant. And if the facts *within the context of the case* are merely consistent with guilty intent, without more, proof has not been established. *Ogando,* 547 F.3d at 109.

---

[2] Indeed, the instructions of President Trump to the crowd in his January 6 speech—which was observed by the defendant—were couched in terms of encouraging legislators *within* the framework of the certification. *See Former President Donald Trump's January 6 speech*, CNN Politics, available at   https://www.cnn.com/2021/02/08/politics/trump-january-6-speech-transcript/index.html (instructing crowd to "walk down to the Capitol" and "show strength," in order to "cheer on our brave senators and congressmen and women," and "try and give our Republicans, the weak ones,…the kind of pride and boldness that they need to take back our country"). Others were thus undoubtedly motivated by a desire to make their voices heard as an act of political protest.

That is why judicial acquittals like *United States v. Black*, 21-cr-127-ABJ and *United States v. Griffin*, 21-cr-92 (TNM), have ongoing relevance despite the different posture of this case as a Rule 29 motion. They show that January 6 was not like a bank robbery, where there is typically a hard dividing line between guilty and innocent intent under the relevant statutes. In such a case, a putative defendant-conspirator proven by circumstantial evidence to be at the scene as a lookout would not escape conviction just because the government did not "affirmatively rule out" that he *might* have been there to open a bank account. By contrast, January 6 occurred at the seat of government where tens of thousands of citizens had gathered with a wide assortment of intentions in a location considered to be a public forum where the public is ordinarily entitled to gather and express its views, and where many rallies were already scheduled.[3] As *Black* shows, the crowd on January 6 included defendants who broke into the building and even entered the Senate chambers with goals as felonious as "overthrow[ing]" the government, Mot. Ex. 2 at 19—but who were nevertheless innocent of § 1512(c)(2) because their "goal [in going into the Capitol] was to show the politicians that the people run this country," *id.*, not to interrupt the certification.

In *this* context of thousands of actors with innumerable forms of *mens rea* in a presumptive public forum that descended into chaos, where some of the *most* culpable and violent actors had no intent to stop the certification, the government cannot claim that merely attempting to get into the Capitol that day with knowledge of the certification proves a violation of § 1512(c)(2) beyond a reasonable doubt. While the government need not exclude every innocent hypothesis, even the

---

[3] *See Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 584 (D.D.C.), *aff'd*, 409 U.S. 972 (1972) ("The Capitol Grounds… have traditionally been open to the public; indeed, thousands of people visit them each year….Nor is the primary purpose for which the Capitol was designed—legislating—incompatible with the existence of all parades, assemblages, or processions which may take place on the grounds."); *Hodge v. Talkin*, 799 F.3d 1145, 1161 (D.C. Cir. 2015) (describing "the Capitol grounds [as] a public forum by requirement of the First Amendment").

evidence at *this* trial showed that there were protestors who mainly wanted to be heard by their legislators. Ex. 133. And without affirmative evidence that GossJankowski's rowdy behavior was specifically directed at stopping the certification, as opposed to wanting to be heard or even to "overthrow[]" the government, Mot. Ex. 2 at 19, the government cannot claim to have proven the intent element of § 1512(c)(2) in this specific context beyond a reasonable doubt.

### C. There Was Insufficient Evidence of Knowledge for Counts 4 and 5

1. <u>The government failed to prove GossJankowski had actual knowledge that he entered a cordoned off or otherwise restricted area</u>

To prove that GossJankowski knew he was in a cordoned off area, the government first cites testimony by Captain Ortega that signs, bike racks, and snow fencing were "'scattered on the ground'" Opp. 26 (citing Tr. 1071) after being "knocked down by the successive waves of rioters," *id*. But tens of thousands of people were walking over the scene, obscuring any clear view of what was on the ground. Thus, one cannot infer beyond a reasonable doubt that GossJankowski would necessarily have seen any signs or barriers being trampled underfoot by the crowd.[4]

Next, the government argues that GossJankowski had a direct line of sight on the interactions between rioters and the police on the Lower West Plaza between 2:36 p.m. and 2:41 p.m. Opp. 27 (citing Ex. 130-133; Tr. 871-876). According to the government, it was reasonable to infer based on this line of sight "that the defendant saw, firsthand, the police's heroic efforts to hold the line against the rioters...." *Id*. That may be, but holding back a crowd is different from cordoning

---

[4] The government also argues that "'*[t]here were areas* where those bike racks had been pushed aside and the snow fencing was knocked down' (Tr. 1058 (emphasis added))," and "not...all such barriers were gone." Opp. 28. But this argument only works if the government tracked the defendant's path to show that he walked through those areas where bike racks and fencing remained. With all of the video footage of January 6, and the defendant's bright blue coat, demonstrating the defendant's path was surely possible for the government.

off and restricting an area. In crowd-control situations, like a protest or a concert, police may issue directives to crowds to mitigate or manage time-specific or area-specific risks that fluidly change during the course of an event. That does not mean that the police directives had the legal effect of "restricting" an area, much less indefinitely. And crucially here, the police retreated away from the inaugural stage and up to or into the Capitol building before GossJankowski entered the area. Thus, from his perspective, he was entering an area no longer visibly restricted by the police, even temporarily. And he would have logically perceived the police presence at the door of the Capitol as defining the area cordoned off at that time. Thus, the government's second argument still fails to prove the requisite knowledge.

Third, the government argues that after entering the Lower West Terrace Tunnel, GossJankowski "walked past that outer door—and past the shattered glass—as he approached the inner doors," Opp. 27, and that "[a] rational jury could easily conclude that the defendant knew, at a bare minimum, that he was not allowed past those outer doors," *id*. But this argument fails for the same reason as its first two: there were no visible signs restricting the area behind this outer door, which is in a tunnel that is part of a public building that in ordinary times permits visitors; and at the time that GossJankowski was there, the police were not cordoning it off. *See* Ex. 101.1 (at 2:45:00 p.m. Indeed, when police began pushing forward—establishing a new crowd-control line—GossJankowski left the tunnel and went to the stage area.

Finally, the government relies on a permanent "Members Entrance Only" sign on the tunnel door unrelated to any of the January 6 Capitol grounds restrictions. As argued in the motion, this sign only addressed who was permitted to use an entrance into the building; it did not cordon off the building behind the sign or indicate that it was restricted to the public (it ordinarily wasn't). There is a difference, factually and legally, between entering a building one is not permitted to enter,

10

and using a special entrance one into a building one is not privileged to use.[5] And since GossJankowski never went past this entrance into the building at all, the fact that the entrance was for "Members" only does not advance the government's case that he knew he had entered a restricted area.

2. Due process and principles of statutory construction require knowledge that an area is restricted by the federal government for the reasons listed in § 1752

The government's foray into principles of statutory construction misunderstands the very authority it cites. By its terms, § 1752(a) punishes "knowingly enter[ing] or remain[ing] in any restricted building or grounds…" What is it that one must "know[]" to be culpable? That an area one is entering or has entered is a "restricted building or grounds" *as that term is defined*. This is precisely analogous to drug statutes that require knowledge that a substance one distributes is a "'controlled substance'" as that term is defined. *United States v. Collazo*, 984 F.3d 1308, 1326 (9th Cir. 2021) (quoting 18 U.S.C. § 841(a)) (cited at Opp. 30). And that is precisely why the principles of interpretation discussed in *McFadden v. United States*, 576 U.S. 186 (2015)—a controlled substance case—apply fully here.

In *Collazo*, the chief case cited by the government, the Ninth Circuit faced the question of whether imposing specific type-quantity penalties under § 841(b)(1) requires proof that the defendant had knowledge of the type or quantity of a controlled substance. Beginning with the text, the Court noted that "Section 841(a)(1) makes it unlawful for 'any person knowingly or

---

[5] Indeed, the government's reliance on this sign underscores the due process concerns in its interpretation of § 1752. Under its theory, a congressional page who snuck in the "Members Entrance Only" door to get to her office more quickly would be guilty of violating § 1752 if the Vice-President happened to be visiting his Senate Office, even if there were no signs notifying the public or her of that visit or that the Secret Service had deemed her ordinary working area to be "restricted grounds" that day under § 1752.

intentionally' to distribute 'a controlled substance,' which is an 'unspecified substance listed on the federal drug schedules.'" *Collazo*, 984 F.3d at 1326 (quoting *McFadden*, 576 U.S. at 192). Just as in *McFadden*, the *Collazo* court held that knowledge of the details of drugs (type or quantity) is not required for a conviction so long as one knows that the substance was controlled: "a defendant charged with a controlled substance offense need not know the exact nature of the substance with which he was dealing, but can be convicted under § 841…if he believes he has some controlled substance in his possession." *Id*. at 1327 (quotations marks and citation omitted).

The government somehow concludes that the principles that led the *Collazo* court to the same conclusion as *McFadden*—the chief case cited by GossJankowski—require a different outcome here. Its mistake appears to stem from its belief that GossJankowski is arguing that the term "knowingly" must "travel" down the statute into the definitions, all the way to the "protectee's presence within the restricted area." Opp. 28. That is not the case: the term "knowingly" does not need to travel at all—it immediately bumps into the term "restricted building or grounds" with the same rapidity in § 1752(a) as it does to the term "controlled substance" in § 841. GossJankowski's argument is not that a defendant needs to know that a protectee is present within the restricted area; it is that a defendant must know an area is restricted as defined by § 1752(a), just as a defendant must know that a substance is controlled as defined by § 841(a).

As discussed in the Motion, the Supreme Court discussed *two* ways that such knowledge may be proven. First, a defendant could know he possessed a substance listed on the drug schedules, even if he did *not know* which substance it was. *McFadden*, 576 U.S. at 192. This is directly analogous to a defendant on January 6 knowing that an area was restricted by the federal government under § 1752(a), without knowing that a protectee was present. Secondly, a defendant could know "the identity of the substance he possessed." *Id*. This is directly analogous to a defendant on January 6

knowing that Vice-President Pence would be temporarily visiting the Capitol, but not knowing that there was a federal law controlling access to such areas. "Because ignorance of the law is typically no defense to criminal prosecution, this defendant would also be guilty of knowingly [entering a restricted building or grounds.]" *Id.* (citation omitted).

Importantly, under the first method of proof, it is not sufficient that a defendant "'knew he was dealing with an illegal or regulated substance' under some law." *Id.* at 195. As the Supreme Court explained, § 841(a)(1) "requires that a defendant knew he was dealing 'a controlled substance.' That term includes only those drugs listed on the federal drug schedules…. It is not broad enough to include all substances regulated by any law." *Id.* This, too, is directly analogous to the definitional section of § 1752. Under § 1752(a), a defendant is required to know he was entering "a restricted building or grounds." And like § 841(a), "[t]hat term includes only those [areas] listed on the federal [definition in § 1752(c)(1)]….It is not broad enough to include all [areas restricted] by any law." *McFadden*, 576 U.S. at 195. Thus, the defendant must know that he is entering an area restricted as defined by § 1752, not "by any law."

As *McFadden* shows, it is not relevant to the analysis whether applying "knowingly" to the definitional subsection would or "'would not separate wrongful from otherwise innocent conduct,'" as the government suggests. Opp. 30 (citing *United States v. Morgan*, 45 F.4th 192, 208 (D.C. Cir. 2022)); *see also id.* (arguing that "[e]ntering or remaining in an area knowing it is restricted and knowing that one does not have authority to be there 'is not an entirely innocent act.'") (quoting *Collazo*, 984 F.3d at 1327). Selling a substance one knows is prohibited by state law is likewise "not an entirely innocent act"; yet it is insufficient for liability under § 841(a). The role of the innocent/culpable distinction is only relevant because there is a presumption that "Congress intends to require a defendant to possess a culpable mental state regarding each of the statutory

elements that criminalize otherwise innocent conduct." *Rehaif v. United States*, --- U.S. ---, 139 S. Ct. 2191, 2195, 204 L.Ed.2d 594 (2019) (holding that the term "knowingly" in § 924(a)(2)— which imposes penalties on a person who "knowingly violates" certain subsections—"modifies the verb 'violates' and its direct object," including a separate, cross-referenced statutory provision, 18 U.S.C. § 922(g)). But where the knowledge requirement is clear, as it is in § 841(a) and § 1752(a), there is no need to resort to the presumption. (*Collazo* discussed this presumption because it dealt with the *penalty* provisions of § 841(b)(1), which do not have a *mens rea* requirement.)

In addition to misreading *Collazo* and *McFadden*, the government argues that "applying 'knowingly' to the definitional phrase would also undermine congressional intent," Opp. 30, or make prosecutions "nearly impossible," Opp. 30–31.[6] According to the government, "[a] requirement that a defendant know or be on notice of a particular protectee's location in order to violate the statute is antithetical to that goal [of ensuring the safety of Secret Service protectees]." *Id.* at 30. But that is a strawman. GossJankowski is not arguing that a defendant must know "a particular protectee's location." As written, the statute requires that a defendant know she is entering a "posted, cordoned off, or otherwise restricted area" of a building or grounds meeting certain requirements. Such knowledge would be imparted signs posting that entry into an area is prohibited by § 1752(a), without requiring any detail regarding the reasons for the designation. Likewise, it is not true that the government would need to prove that a defendant knew an area was "designated as a special event of national significance" in cases where that was the reason for the

---

[6] Again, the argument is not that the term applies "to the definitional phrase," Opp. 30, but to its *object* ("restricted building or grounds"), which in turn *has* a federal definition (just as "a controlled substance" has a definition). A defendant must simply know that his conduct meets that prohibited definition, even if he doesn't know why; or he must know that he is engaging in *conduct* that meets that definition, even if he does not know that such conduct is prohibited. *McFadden*, 576 U.S. at 192.

restriction. Opp. 31. Again, a simple "POSTED" notice citing § 1752(a) would suffice to impart the requisite knowledge that entering a designated area would subject someone to liability under § 1752(a).

The government also cites *United States v. Couy Griffin*, 21-cr-92-TNM, ECF No. 106 at 330-32, and recites at length that court's rationale. Opp. 32. However, like the government, the court in *Couy Griffin* displays two fundamental misunderstandings in the quoted passage. First, it wrongly concludes that the statutory text "forecloses" this argument because Congress "included a *mens rea* requirement in those portions of the statute laying out the elements of the offense, while excluding that *mens rea* requirement in the definitional provision." *Couy Griffin*, 21-cr-92-TNM, ECF No. 106 at 330-32. This is similar to the government's argument that the knowledge requirement must "travel" down to the definitions. Opp. 29. But Congress did not "exclude" the knowledge requirement from the definition, it defined *the very term* to which the knowledge requirement *applies*. There was neither a need to include the term "knowing" in such a definition, nor a grammatical way to do so. Just as Congress defined "a controlled substance" without awkwardly squeezing in *mens rea* terms, Congress defined "a restricted building or grounds," and then required that a defendant have knowledge that he or she was entering it. The *Couy Griffin* court's analysis, on the contrary, would imply that a defendant need not know he was distributing a controlled substance as defined by federal law in order to be liable under § 841(a).

Second, the court in *Couy Griffin* repeats the government's mistake of interpreting the defendant as saying "'that a provision that is looking to protect Secret Service protectees… require[s] the Secret Service to somehow be telling people and proving that people knew which protectee was in the restricted area at what time.'" Opp. 32. Again, no such requirement is imposed under the analogous *McFadden* analysis. To prosecute someone for entering a restricted area under

§ 1752(a), the government need do nothing more than put up "POSTED" signs identifying the area as restricted under § 1752(a)—a statute that covers numerous grounds for restriction—without specifying "which protectee was in the restricted area," or even that a restricted protectee was the reason for the restriction at all. It is only because in this case, the government is attempting to rely on restriction notices set up by other agencies and under other statutes completely divorced from any connection to the grounds for restriction under § 1752(a), that the government, to convict under that statute, must use the *alternative* means of proving knowledge that a protectee was visiting the area. That is analogous to the government proving that a defendant knew he was dealing in heroin even if he did not know that heroin was prohibited.

Finally, the government dismisses the grave due process concerns that would accompany the prosecution as a federal felony any act of entering a cordoned-off area—even a teacher's lounge or a "members only" country club—based on the unknown fact that a protectee happened to be visiting the area. To justify this cavalier expansion of federal felony liability, the government cites § 111(a) as an example of a statute that "does not require proof of the defendant's knowledge that the victim is a federal officer…and so…brings the 'full weight of federal criminal liability based on unknown facts' about a federal nexus." Opp. 33. But § 111(a) has no knowledge requirement *at all*; it prohibits forcible assaults and resistance that by their nature require violent intentional conduct, and thus there are no due process concerns with prosecuting such acts as a federal crime when the officer is a federal officer, regardless of the defendant's knowledge of that fact. But entering a restricted area is not a crime in any sense unless one knows that the area is restricted; and the validity and importance a putative restriction is highly dependent upon the authority and rationale for the restriction. As the examples in the Motion show, there are many instances in which minor juvenile shenanigans or high-minded civic protests would involve entering locally restricted

areas so designated for reasons far less important or dangerous than areas designated to protect federal interests and protectees. Thus, there is a vast difference between prosecuting intentional assaults under a statute that neither has nor requires a knowledge element, and prosecuting knowingly entering a restricted area when the restriction has nothing to do with federal interests.

Because none of the "posted" messages defining the restricted area of the Capitol mentioned § 1752 or its bases for designating the area as "restricted building or grounds," and because there was no evidence that GossJankoski knew of the underlying facts that made the Capitol grounds qualify as "restricted building or grounds," the evidence was insufficient to support a conviction for Counts 4 and 5.

## II.  GOSSJANKOWSKI WAS DEPRIVED OF A MEANINGFUL RIGHT TO TESTIFY

Some cases do not require, and would not be helped, by a defendant's testimony. However, in a case such as this one, which turned almost entirely on the defendant's intent, it would be objectively unreasonable not to at least prepare a defendant for the possibility of testifying. Despite the otherwise exemplary defense provided by GossJankowski's prior counsel, they failed in this one regard. And as a result, Gossjankowski was deprived of the ability to make a knowing and voluntary waiver of his right to testify, and the jury was deprived of key information that prejudiced his defense. This justifies a new trial so that Gossjankowski can exercise this right.

The government makes four arguments to the contrary. None are persuasive. First, the government argues at length that the Court should dismiss this argument out of hand because GossJankowski did not include any affidavits attesting to the veracity of his claims. But as the government acknowledges, GossJankowski has already discussed his problems with prior counsel *ex parte* with the Court. Opp. 36. And although current counsel does not have access to transcripts of this discussion, it is his understanding that they include representations made under oath

addressing the substance of the claims made in his motion, obviating any formal need for an affidavit. In any event, current counsel now submits an affidavit attesting to prior counsel's acknowledgement of the claims in his motion. Ex. 1. And contrary to the government's assertion, GossJankowski is not "ask[ing] this Court to order a new trial based on nothing more than his new attorney's second-hand representations." Opp. 38. He simply asks for a hearing to establish the grounds for his claims, as would ordinarily be held under 28 U.S.C. § 2255 if his claim were made post-appeal. *See* § 2255 ("Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall…grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.").

Second, the government argues that GossJankowski is "judicially estopped" from asserting ineffective assistance of counsel. Opp. 34. This argument is borderline frivolous. The doctrine of judicial estoppel concerns legal positions: it prohibits a party from "'assum[ing] a certain *position* in a legal proceeding, …succeed[ing] in maintaining that *position*, … [and then] simply because his interests have changed, assume a contrary *position*….'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee,* 156 U.S. 680, 689 (1895)). *See also Pegram v. Herdrich,* 530 U.S. 211, 227, n. 8 (2000) (judicial estoppel "generally prevents a party from prevailing in one phase of a case on an *argument* and then relying on a contradictory *argument* to prevail in another phase."); 18 Moore's Federal Practice § 134.30, p. 134–62 (3d ed. 2000) ("The doctrine of judicial estoppel prevents a party from asserting a *claim* in a legal proceeding that is inconsistent with a *claim* taken by that party in a previous proceeding"); 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4477, p. 782 (1981) ("absent any good explanation, a party should not be allowed to gain an advantage by litigation on one *theory*, and then seek an inconsistent advantage by pursuing an incompatible *theory*"). The decision of a criminal defendant regarding whether to testify is not a

legal position, argument, claim, or theory. It is simply a decision—one that is meticulously guarded as one of the most fundamental rights of due process.

The government nevertheless tries to shoehorn this claim into the estoppel doctrine by describing the defendant's declaration that he was "satisfied with his counsel's advice regarding his right to testify" as a "position," and asserting that he now "assumes a diametrically opposite position: he claims that he was not satisfied with his attorneys' work and that he did not want to remain silent." Opp. 40. But such answers in a colloquy are not litigation positions standing opposed to an opponents' contrary positions and submitted to a court for decision. Nothing was gained, from a litigation perspective, from these answers. They were just tools the Court used to help ensure that any waiver of the important right to testify is knowing and voluntary. While GossJankowski's answers in his colloquy may be considered by the Court when assessing the credibility of his claims now, there is no doctrinal bar to raising an ineffective assistance of counsel claim based on the failure of one's attorneys to prepare a defendant to testify. And indeed, one can easily imagine reasons why a defendant who is told by his attorneys that they are unprepared to call him to the stand might express to the court that he does not wish to testify.

Third, the government argues that it would have been a permissible, reasonable strategy for defense counsel not to prepare a defendant to testify under these circumstances. Opp. 40. That claim boggles the mind. The most serious charges turned on the defendants' intent, something for which he alone could provide direct evidence. And the sequence of events that would have benefited most from his testify—his movement toward Officer Moore while holding out the Vipertek device—is something he could uniquely explain as reflecting his unfamiliarity with the device and desire to intervene. The government claims these "self-serving statements would have run headlong into the video evidence presented at trial," Opp. 40–41, but it vastly overestimates its

case. Exhibit 147 undeniably shows (1) rioters reacting negatively to the assault on Officer Moore and shouting "Stop it" and "Don't hurt the cop"; and (2) GossJankowski joining this chorus by wagging his finger and mouthing "No" to the crowd. This would have corroborated his denial of any intent to injury Officer Moore. Likewise, the defense could have shown numerous other examples of GossJankowski holding out the Vipertek away from his body in a manner reflecting his unfamiliarity and desire not to shock himself, corroborating his explanation for why he held it out as he moved toward Officer Moore. And the fact that Officer Moore did not tesify to being "tased" by the defendant would have further corroborated his explanation.

Likewise, the government greatly overestimates the strength of its hypothetical "withering cross-examination." Opp. 41. It asserts that it would have confronted GossJankowski with various examples of his anti-police conduct in the tunnel, including spitting at police and joining in a "heave-ho" movement against them, "all within minutes before rushing to attack Officer Moore." *Id.* But there is an easy rejoinder: while that offensive conduct occurred "minutes" before Officer Moore was pulled into the crowd, something more germane occurred *seconds* before: the disapproving reaction of the crowd—and GossJanknowski—to the attack. Those who shouted "Don't hurt the cop!" had also crossed police lines and generally acted criminally, just like GossJankowski, but drew the line at assault. And that is the side of the line GossJankowski appeared to support in that precise moment. Moreover, the jury already had this allegedly "withering" evidence; it was not special impeachment information they would only receive if he testified. Thus, the choice was between leaving it unconfronted as a silent witness against him, or having him explain and apologize in human terms for getting carried away on January 6. Had he chosen the latter, he could have credibly insisted that despite his earlier misdeeds, something changed when he saw Officer Moore in danger—a reaction corroborated by Exhibit 147. Given this choice, it would have

been unreasonable to not at least prepare the defendant to see if his testimony was better than the silent indictment of his worst actions that day.

The government also insists it would have conducted a "blistering" confrontation of GossJankowski with his inaccurate prior statements. But impeachment by factual discrepancies of the kind cited by the government seldom land with much force; and here, the evidence does not suggest that GossJankowski was dissembling in his answers to police. While he was clearly handed the Vipertek by another rioter, despite repeatedly telling the police he had found it, that very insistence in the face of video evidence shows that GossJankowski simply remembered something different in the chaos of the day. This discrepancy is not something that would protect a co-conspirator or degrade his own culpability, since whether someone handed the device to him or he found it on the ground has no impact on whether he planned to have the device or was given it by a co-conspirator. GossJankowski could have simply said he forgot where he got it without any real credibility harm.

Finally, the government asserts that "there is no plausible chance, let alone a reasonable probability, that testimony from the defendant would have made an acquittal on one or more counts substantially more likely." Opp. 41. Again, the government's confidence greatly exceeds the evidence. Far from "incontrovertible video evidence [that] provided overwhelming evidence of… guilt," Opp. 42, the video mainly showed GossJankowski milling around and observing the scene, with a few moments of offensive conduct; and in the key moment when Officer Moore was pulled into the crowd, it showed him mouthing, "no" at the crowd and wagging his finger. Given this disapproving message moments before he moved toward Officer Moore, it would have been highly credible for him to testify that at that moment he felt the crowd had gone too far and he did not want

to see any officers injured. That testimony would have matched his actions in that key video sequence and echoed the cries of other rioters of "Stop it" and "Don't hurt the cop!"

## CONCLUSION

For the foregoing reasons, Defendant Vitali GossJankowski respectfully requests that the Court enter a judgment of acquittal or, alternatively, order a new trial in this matter.

.

November 14, 2023                              Respectfully submitted,

                                               /s/ Matthew J. Peed
                                               Matthew J. Peed (D.C. Bar No. 503328)
                                               CLINTON & PEED
                                               1775 I St. NW, Suite 1150
                                               Washington, D.C. 20006
                                               (202) 919-9491 (tel)
                                               (202) 587-5610 (fax)

                                               *Counsel for Defendant Vitali Gossjankowski*