UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>VITALI GOSSJANKOWSKI,<br>       *Defendant*. | No. 21-cr-123 (PLF) |

**REPLY TO THE GOVERNMENT'S SUPPLEMENTAL
MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION
FOR A JUDGMENT OF ACQUITTAL OR NEW TRIAL**

  The government's Supplemental Memorandum addressing *United States v. Groseclose*, No. 1:21-cr-311-CRC, ECF No. 99 (Jan. 5, 2024), appears to concede the correctness of most of Judge Cooper's reasoning, which culminated in the conclusion that no "background principle or purpose [] overrides [18 U.S.C. § 1752]'s plain text applying the knowledge requirement to 'restricted building or grounds'—a statutorily defined term that requires more than an area being restricted in a colloquial sense of the word." 2024 WL 68248, at *8. In so conceding, the government appears to draw its last line in the sand around the concept of "jurisdictional elements." Gov't Supp. Mem. 3. Specifically, the government argues that the second half of the definition of "restricted buildings or grounds"—relating to the reasons for the restriction—is merely "jurisdictional," while the first half—relating to the visible nature of the restriction—is not.

  As explained below, the government's arguments, and its reliance on cases discussing "jurisdictional-only" elements, do not hold up. Judge Cooper was being generous to the government in analogizing § 1752 to the assault statute at issue in *United States v. Feola*, 420 U.S. 671 (1975), an intentional crime that has no textual scienter element. And the government's

1

approach both reverses the way statutory texts and presumptions are supposed to be read and ignores key parts of § 1752's legislative structure and purpose, which were designed to balance protection of the President with fair notice and First Amendment freedoms. For these and other reasons, the Court should follow *Groseclose* in concluding that "'Knowingly' Applies to 'Restricted Building or Grounds' in its Entirety." *Groseclose*, 2024 WL 68248, at *2.

## ARGUMENT

Judge Cooper rightly decided that the factors that make areas restricted under § 1752(c) are an integral part of the definition of "restricted building or grounds," not a "jurisdictional-only" element. Arguing otherwise, the government begins with *Rehaif v. United States*, 139 S. Ct. 2191 (2019), stating that it "illustrates the proper inquiry." Gov't Supp. Mem. 3. But *Rehaif* fully supports Judge Cooper's reasoning: it applied a textual knowledge requirement from 18 U.S.C. § 924 to the "status" element of 18 U.S.C. § 922(g), despite existing caselaw from other contexts suggesting "that Congress does not normally require defendants to know their own status." *Rehaif*, 139 S. Ct. at 2197. This is a strong example and application of the principle that "[t]he term 'knowingly' is normally read 'as applying to *all* the subsequently listed elements of the crime.'" *Id.* at 2192 (quoting *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009)).

In so holding, the *Rehaif* Court observed that the "[n]o one here claims that the word 'knowingly' modifies the statute's jurisdictional element." *Id.* at 2196; § 922(g) ("in or affecting commerce"). Such jurisdictional elements "do not describe the evil Congress seeks to prevent, but instead simply ensure that the Federal Government has the constitutional authority to regulate the defendant's conduct (normally, as [in *Rehaif*], through its Commerce Clause power)." *Rehaif*, 139 S. Ct. at 2196. As the Court explained, "[b]ecause jurisdictional elements normally have

2

nothing to do with the wrongfulness of the defendant's conduct, such elements are not subject to the presumption in favor of scienter." *Id*. From this, the government argues that "the 'knowingly' requirement extends to the additional federal-protectee requirement in Section 1752(c)(1)(B) if, and only if, that requirement is not 'jurisdictional' in the *Rehaif* sense." Gov. Supp. Mem. 4.

At the outset, the government has it backwards. Instead of saying that the term "knowingly" applies to the federal-protectee requirement of § 1752(c)(1)(B) "if and only if, that requirement is not 'jurisdictional,'" *id*., it should have stated that it applies unless, and *only* unless, it is a "jurisdictional-*only*" requirement. In other words, the "normal[] read[ing]" of statutes is to apply the term "knowingly" to each element, *Rehaif*, 139 S. Ct. at 2192, and that normal practice is only suspended when an element has no substantive role other than to "simply ensure that the Federal Government has the constitutional authority to regulate the defendant's conduct," *id*. at 2196. *See also id.* at 2195 (quoting ALI, Model Penal Code § 2.02(4), p. 22 (1985) (when a statute "prescribes the kind of culpability that is sufficient for the commission of an offense, without distinguishing among the material elements thereof, such provision shall apply to all the material elements of the offense, unless a contrary purpose plainly appears").

Here, the text, legislative history, and purpose of § 1752 strongly militate against any conclusion that the presence of Secret Service protectees is a mere "jurisdictional-only" element with no substantive role. First, § 1752's text plainly requires a defendant to "knowingly" enter the statutorily-defined place, "restricted buildings or grounds." § 1752(a)(1). That place is then given a specific, integrated statutory definition, making that whole definition subject to the "knowingly" requirement. *Groseclose*, 2024 WL 68248, at *3 ("When §§ 1752(a)(1) and (a)(2) criminalize conduct within a 'restricted building or grounds,' they are only prohibiting actions occurring

3

within an area that satisfies the entirety of § 1752(c)'s definition for that element."). The second half of this definition—which the government deems to be merely "jurisdictional"—contains three clauses, each of which begin with the word, "of." § 1752(c)(1)(A)–(C). That preposition textually links each of the three kinds of places Congress was seeking to protect (i.e., the White House, temporary visiting places for protectees, and special events of national significance) to the end of the first half of the definition ("area"), making the first half incomplete without the second. Thus, it is not just that the word "knowingly" is in the "direct vicinity" of the protectee language, as *Groseclose* found sufficient, 2024 WL 68248, at *4, but that the protectee requirement is linguistically integrated into the very definition of the "restricted area" that the government *concedes* is covered by the "knowingly" requirement.

The purpose and legislative history of § 1752 further support this conclusion. As originally passed as part of the Omnibus Crime Control Act of 1970, Pub. L. No. 91-644, 84 Stat. 1880, 1891–92 (1971), § 1752 focused exclusively on the protecting the President, and made it unlawful for any person "willfully and knowingly to enter or remain in…any posted, cordoned off, or otherwise restricted area of a building or grounds where the President is or will be temporarily visiting…." It was no accident that this language included a "willfully and knowingly" requirement in close proximity to the location of the President: its avowed purpose was to protect presidents from the increasing threat of intentional assignation attempts. *See* Sen. Rep. 21-1252 at 3 ("Statement of Justification" describing assassination attempts). Far from a mere "jurisdictional-only" element, creating a security threat by knowingly entering grounds where the President would be visiting was "the evil Congress [was] seek[ing] to prevent," *Rehaif*, 139 S. Ct. at 2196, not just a federal hook to prohibit trespassing in general.

Moreover, Congress was especially concerned with *balancing* this protection of the President with constitutional concerns regarding vagueness, overbreadth, and First Amendment freedoms. As the Senate Report states:

> This committee has continuously kept in mind these limitations created by our dedication to a free society, and feel that this bill represents a successful balance between Presidential protection and individual liberty. This balance was not easily achieved. Certainly, this committee is convinced of the need for a uniform minimum of Federal protection for the President at all times. Yet the legislation, as introduced, contained several serious weaknesses…. Although there were a number of specific problems, most fell into one or two categories: overbreadth or vagueness—either one of which would pose serious problems of constitutionality…. In addition, with some of the original language proposed, there would be no rational way of predicting whether one's activities were actually violating the law or not. Such vagueness could well have a chilling effect on individuals seeking to demonstrate, thereby impinging upon the full, free exercise of first amendment rights.

Sen. Rep. 91-1252, at 8.

This important purpose has been overlooked by several courts that mistakenly believed that requiring a defendant to know the whereabouts of a protectee would undermine the protective purpose of the statute. *See, e.g., United States v. Griffin*, No. 21-cr-92 (TNM), ECF No. 106. On the contrary, the Senate Report is saturated with references to the need to ensure that the locations being regulated are clear and defined so that protestors do not accidentally find that they have violated the statute. To accomplish this, the original statute envisioned that the Secretary of the Treasury would *publish* in the Federal Register the precise locations of temporary areas protected under the statute:

> Whereas before, the question of which buildings and grounds were actually included was subject to some question, there will now be a formal designation which will not only describe exactly which buildings and which grounds, but will also be available to everyone in the Federal Register. Similarly, whereas before these were to be orders, regulations, and "proper authority" governing admission, now there will only be regulations—all of which will also be available to everyone

        in the Federal Register. With clearly defined areas and clearly defined regulations, the question of vagueness here is overcome.

Sen. Rep. 91-1252 at 8–9.

    However, the drafters recognized that there will be "special case[s] of a temporary Presidential visit where flexibility must be maintained and there is insufficient time to publicly designate restricted areas by regulation." *Id*. at 8. Far from wanting such areas to be a secret, the drafters "anticipated that the Secret Service will make every effort, consistent with Presidential security, to make such restricted areas known to the public (i.e., by posting or cordoning off)." *Id*. at 9. Consistent with this intent for the public to know the scope of areas subject to liability under the new statute, the Senate Report explained that in "it is provided that one of the elements of the crime is that the person 'knowingly and willfully' violates the restricted area." *Id*.; *see also id* at 10 ("Subsection (a)(1)(ii) deals with the situation where the President is traveling or speaking. In these situations it is impossible to predict far in advance exactly where the President will be—and yet it is still necessary to have an area of security around the President. Thus, subsection (a)(1)(ii) would outlaw anyone from willfully and knowingly entering into or remaining in any posted, cordoned off or otherwise restricted area where the President is or will be visiting in violation of the published regulations.").

    Summing up the balance it seeks to strike, the Senate Report characterized the new § 1752 as an act that "punishes or threatens to punish *only* willful and knowing violations of the statute and regulations thereunder." *Id*. at 13 (emphasis added). This language and purpose could not have been clearer. Congress, while seeking to create a uniform federal authority to police security zones around areas temporarily visited by the President, balanced that goal with the need for the public

to know what areas were restricted for this purpose, to the point of punishing only the knowing entering of restricted areas where the President is or would be visiting.

Missing the clear thrust of the Report, the government mistakenly argues that "[t]he fact that the Senate Report described what must be 'knowing and willful' as the entry into the restricted area—but made no reference to a protectee's visit—strongly and singularly supports the view that the federal-protectee requirement was not subject to the mens rea requirement." Gov. Supp. Mem. 7. This characterization is simply false. As noted above, the Senate Report did make reference to the President's visit in the context of the knowing and willful requirement, stating: "subsection (a)(1)(ii) would outlaw anyone from willfully and knowingly entering into or remaining in any posted, cordoned off or otherwise restricted area *where the President is or will be visiting* in violation of the published regulations." Sen. Rep. 91-1252 at 10 (emphasis added). Indeed, the sentence preceding the government's quotation, which is referenced by it, refers to "the special case of a temporary Presidential visit." *Id*. at 2.

Moreover, the Senate Report is clear that the "posting or cordoning off" was expected to be the *means* by which the public would *know* that the President (or other protectee) was visiting. *See id*. at 9 ("It is anticipated that the Secret Service will…make such restricted areas [where the President is visiting] known to the public (i.e., *by posting or cordoning off*).") (emphasis added). Thus, in context, it would be impossible to "willfully and knowingly enter[] into…any posted, cordoned off or otherwise restricted area where the President is or will be visiting in violation of the published regulations," *id*. at 10, and without knowing that one was entering an area where the President would be temporarily visiting. With the inclusion of the knowing requirement, there simply could be no situation where a defendant could fail to know that he or she was violating all

7

the elements of § 1752. By contrast, the government's relegation of the President's visit to a mere jurisdictional hook reintroduces forms of uncertainty that the drafters strove hard to avoid. *See* Sen. Rep. 21-1252 at 8 (describing how, with prior drafts, "the question of which buildings and grounds were actually included was subject to some question" and "there would be no rational way of predicting whether one's activities were actually violating the law or not").

With this history in mind, it is clear that Judge Cooper was being too generous to the government when he stated that "[i]f the Court were to focus only on § 1752 as it stood when first enacted…., it would be hard-pressed to see meaningful daylight between *Feola* and the present case." *Groseclose*, 2024 WL 68248, at *7; *see also id* (discussing the lack of an aggravated penalty and stating, "[v]iewed from this perspective, the requirement that a Secret Service protectee be on the premises would appear to be 'jurisdictional only' in much the way *Feola* described."). Of course, there is *some* similarity between the federal jurisdiction over Presidential visits created by § 1752 and the federal jurisdiction over assaults discussed in *Feola*. Any such similarity is superficial, however, and the daylight between their scienter requirements shines as bright as the noonday sun.

The law at issue in *Feola*, 18 U.S.C. § 111, prohibits assaulting or impeding federal officers. In creating federal authority to prosecute intentional assaults, there were no issues regarding vagueness, overbreadth, or the First Amendment to contend with. Nor was there any need to include a textual knowledge requirement, since the very nature of assault is an intentional, malicious act. As a result, the federal officer element in *Feola* can be relatively easily cast as federal jurisdictional hook lacking any connection to the culpability of the defendants for intentional assaults. And since the statute lacks a textual knowledge requirement, the question of whether a

8

defendant must know that the victim was a federal officer does not raise the issue of how far down to apply a textual knowledge requirement, much less whether it applies to both halves of an integrated statutory definition.

By contrast, Congress was expressly concerned in the passage of § 1752 with balancing "the need for a uniform minimum of Federal protection for the President" and the need to maintain a "free society" and prevent a "chilling effect on individuals seeking to demonstrate" or otherwise practice "the full, free exercise of first amendment rights." Sen. Rep. 91-1252 at 8. As a consequence of that "balance," "the scope of the legislation was considerably narrowed," and a strong scienter requirement was included, "to create clearly defined areas and clearly defined regulations." *Id*. at 8–9. In analogizing this case to *Feola*, the government goes backwards, upsetting this balance and creating precisely the scenario Congress intended to avoid, where liability under § 1752 depends on facts unknown to a defendant. Sen. Rep. 21-1252 at 8.

Moreover, the analysis in *Feola*, which the government trumpets, provides further support for applying the scienter requirement to the full, integrated definition of "restricted building or grounds." § 1752(a). First, *Feola* expressly recognized that merely passing a law to establish federal jurisdiction over an area of state law "standing alone, would not indicate a congressional conclusion to dispense with a requirement of specific intent…, for the locus of the forum does not of itself define the reach of the substantive offense." 420 U.S. 682–83. Given that there is no other indicia that Congress sought to restrict the scienter language in § 1752(a) to half of a definition, this observation alone should undermine any supposed insights that can be derived from the government's efforts to stretch § 1752's unique text and context onto *Feola*'s template.

9

Second, the *Feola* Court noted that a non-jurisdictional purpose to § 111 *would* support a scienter requirement: "If § 111 is seen primarily as an anti-obstruction statute, it is likely that Congress intended criminal liability to be imposed only when a person acted with the specific intent to impede enforcement activities." *Id*. at 678–79. This reasoning supports applying a scienter requirement here, since § 1752 was enacted specifically "to protect the physical safety of the President of the United States" from assassinations and disorderly disruptions "by extending additional Federal protection for certain conduct to his specifically designated temporary residences and offices and to posted, cordoned off, or otherwise restricted areas where he is or will be visiting." Sen. Rep. 21-1252 at 3.

This language on its own reflects the statute's requirement of a knowing focus on the President. But perhaps more importantly, it was passed in conjunction with language in the same bill making it unlawful to "obstruct, resist, or interfere with a Secret Service agent who is engaged in protective functions." *Id*. at 10. The Senate Report discussing this section expressly references the fact that § 111 (the statute in *Feola*) already punished the forceable assaulting, resisting, or impeding of a Secret Service officer, *id.*, but without scienter. This new section, the Senate Report points out, would prohibit "*knowing* and *willful* interference with a Secret Service agent performing protective functions." *Id*. (emphasis added). This explanatory note strongly supports the conclusion that the other section of the same bill—§ 1758—was intended and designed as an anti-obstruction statute from the beginning, targeting conduct with a higher level of scienter regarding the President and the Secret Service than the catchall provision of § 111 discussed in the Senate Report and in *Feola*.

Judge Cooper reached a similar conclusion about the 2006 amendment to § 1758, concluding that it "reconceptualized" the statute as a kind of aggravated crime when it doubled the penalties and brought them in line with other Secret Service obstruction statutes. *Groseclose*, 2024 WL 68248, at *8. The government, in turn, raises a number of arguments against this "reconceptualization" view of § 1758, noting that penalties were also increased for § 111 over the years, and that the increased penalty for § 1752 is still in line with various state trespassing statutes. Gov. Supp. Mem. 11–13. But this rearguard defense misses Judge Cooper's point: more important than the absolute severity of § 1752 or the mere increase of penalties in general is the specific decision by Congress in 2006 to *link* § 1752 to the other Secret Service-specific obstruction statute discussed above. As Judge Cooper explained,

> This significant increase was *not mere penalty inflation*. The House Conference Report explained that it was "doubl[ing] the statutory penalties (from 6 months to 1 year) for violations of § 1752, to make the penalty *consistent with* the prescribed penalty under 18 U.S.C. § 3056(d) (interference with Secret Service law enforcement personnel generally)." H.R. Conf. Rep. 109-333, at 110.

*Groseclose*, 2024 WL 68248, at *8. Given that the only issue is determining Congressional intent for this statute, this linking of § 1758 to an obstruction statute is strong evidence of a shared *mens rea*, especially given the already strong textual support for applying the scienter requirement, the preexisting presumption of a scienter requirement, and the support in the legislative history for a scienter requirement. Against all of this evidence, the government's analogy to *Feola*—a statute that has no textual scienter requirement and no countervailing fair notice concerns—is insufficient to support the drastic cleaving of a statutory definition in two.

A few other government arguments bear mentioning. First, the government states that "*Groseclose* is also difficult to reconcile with other post-*Feola* cases in which courts, including the

11

Supreme Court, have not applied *mens rea* requirements to elements that the courts deemed jurisdictional." Gov't Supp. Mem. at 14. But the cases cited by the government raise no such difficulty. Almost all involve statutes federalizing a common law crime (*e.g.*, theft, property damage) that happens to have a federal nexus. This is the same pattern as *Feola*, where the federal element was not the kind of fact that typically needs to be "in the mind of the actor at the time he perpetrates the act made criminal by the federal statute." *Feola*, 420 U.S. at 676 n.9.

By contrast, the legislative history of § 1758 is replete with references to the need to combat the *specific* targeting of the President *and* the need to avoid creating a chilling effect on First Amendment activities, including "boisterous[]…emotion-charged strikes and sit-ins." Sen. Rep. 21-1252 at 5 (quotation omitted). Both sides of these twin goals support the conclusion that § 1758 is aimed at knowing conduct that is aimed at the Secret Service protectees or national security events. And more relevant than a few federalized common-law statutes are the myriad situations in the federal code where knowledge requirements have been applied in unintuitive ways based on the presumptions and textual principles discussed in *Rehaif*, 139 S. Ct. at 2197 (applying knowledge requirement to status), *Flores-Figueroa*, 556 U.S. at 650 (applying knowledge requirement to element that identity information belong to actual "other people"), and cases cited therein.

Second, the government has complained of the difficulty of proving a defendant's knowledge that a Secret Service protectee would be visiting a location. Gov. Supp. Mem. 13, n.1. This is a curious concern, since in almost every case a defendant will either have intentionally entered a restricted space *because* of the presence of the protectee—in which cases scienter should not be difficult to prove circumstantially—or without any knowledge or intent to harm a protectee—in which case a prosecution under § 1758 seems misplaced. In any event, the Supreme

12

Court has instructed that "concerns about practical enforceability are insufficient to outweigh the clarity of the text," *Flores-Figueroa*, 556 U.S. at 656–57, and has applied knowledge requirements to "similarly phrased statutes" even when doing so "created practical enforcement problems," *id.*, including in the enforcement of statues protecting children, *see*, *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 79 (1994).

Finally, a theme throughout the government's briefs, and repeated in its supplement, is the argument that the protectee provision should be cleaved from the textual knowledge requirement because it is "not necessary to separate culpable from innocent conduct." Gov. Supp. Mem. 16. The government states that "courts examine the line between culpable and innocent conduct as part of their analysis when determining whether a statute is 'jurisdictional only,' including for statutes that do include an express mens rea." *Id*. But the law often requires separating aggravated conduct from less culpable conduct, not just culpable conduct from innocent conduct; and the presumption of scienter requirement often plays this role even when the base conduct is not wholly innocent. In *Flores-Figueroa*, for example, the lack of a scienter requirement for using someone's identity information would have "exceedingly odd results." 556 U.S. at 661 (Alito, J., concurring). Without such a requirement,

> if a defendant uses a made-up Social Security number without having any reason to know whether it belongs to a real person, the defendant's liability under § 1028A(a)(1) depends on chance: If it turns out that the number belongs to a real person, two years will be added to the defendant's sentence, but if the defendant is lucky and the number does not belong to another person, the statute is not violated.

*Id*. Without a protectee scienter requirement, Section 1758 would have similar oddities depending on chance. For example, a defendant who staged a sit-in at his local town hall would face federal felony charges if the Vice-President happened to be visiting.

13

While the law permits such oddities as result of jurisdictional hooks, there are strong textual reasons to conclude that § 1758 does not support them. As Judge Cooper explained:

> If what is meant by "jurisdictional only" is that the requirement does not speak to the wrongfulness of the conduct but is instead aimed exclusively at providing a basis for bringing the charge in federal court (much like the interstate-nexus requirement), the requirement here that the grounds in question be the President's or Vice President's residence or that a Secret Service protectee be present do not fit the bill. Leaping the White House fence and invading the Naval Observatory grounds are graver offenses than trespassing any random cordoned-off area. And is particularly wrongful, as Congress has found, to trespass or otherwise cause havoc in an area where the Secret Service is attempting to safeguard a protectee.

*Groseclose*, 2024 WL 68248, at *6. Section 1758 was aimed at such "graver" offenses, and its drafters sought to balance the need to protect the President and the need to be able to "predict[] whether one's activities were actually violating the law or not." Sen. Rep. 91-1252 at 8. They did so by requiring publication of all the locations covered by the statute, and, when such publication was impossible due to time constraints, requiring knowledge by a defendant of the elements of conviction. Judge Cooper got § 1752's elements right, and this Court should adopt its conclusion.

January 16, 2024

Respectfully submitted,

/s/ Matthew J. Peed
Matthew J. Peed (D.C. Bar No. 503328)
CLINTON & PEED
1775 I St. NW, Suite 1150
Washington, D.C. 20006
(202) 919-9491 (tel)

*Counsel for Defendant Vitali Gossjankowski*

14